**SCHEDULED FOR ORAL ARGUMENT SEPTEMBER 16, 2024**

No. 24-1113 (and consolidated cases)

---

# In the United States Court of Appeals for the District of Columbia Circuit

_____

TIKTOK INC. and BYTEDANCE, LTD.,

*Petitioners,*

v.

MERRICK B. GARLAND,

in his official capacity as Attorney General of the United States,

*Respondent.*

_____

On Petitions for Review of Constitutionality of
the Protecting Americans from Foreign Adversary Controlled Applications Act

_____

**BRIEF OF FIRST AMENDMENT LAW PROFESSORS
AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS**

_____

Nicholas Reddick
Jonathan A. Patchen
Alyxandra N. Vernon
Anthony Vecchio
WILLKIE FARR & GALLAGHER LLP
333 Bush St.
San Francisco, CA 94104
(415) 858-7400
jpatchen@willkie.com
nreddick@willkie.com
avernon@willkie.com
avecchio@willkie.com

Meryl Conant Governski
*Counsel of Record*
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1016
mgovernski@willkie.com

*Counsel for* Amici Curiae
*First Amendment Scholars*

## CERTIFICATE AS TO PARTIES, RULINGS, AND
## RELATED CASES PURSUANT TO CIRCUIT RULE 28(A)(1)

**A.**     **Parties and *Amici*.**   Except for the *amici* filing this brief, all parties, intervenors, and *amici* appearing before this Court are listed in Brief for Petitioner and Respondent.

**B.**     **Rulings Under Review.**   An accurate reference to the law at issue appears in the Brief for Petitioners.

**C.**     **Related Cases.**   Counsel for *amici curiae* are not aware of any other case currently pending before this or any other court that is related to this case within the meaning of Circuit Rule 28(a)(1)(C).

> */s/    Meryl    Conant    Governski*
> Meryl        Conant        Governski
>
> *Counsel    for*    Amici    Curiae
> *First Amendment Scholars*

i

## DISCLOSURE STATEMENT PURSUANT TO
## CIRCUIT RULE 26.1

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 29(b), undersigned counsel certifies:

*Amici curiae* are natural persons and as such have no parent corporations or stock.

*/s/ Meryl Conant Governski*
Meryl Conant Governski

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Counsel for the United States and all Petitioners stated that they do not oppose the filing of this *amicus* brief.

Pursuant to D.C. Circuit Rule 29(d), *amici* certify that a separate brief is necessary to provide the unique perspective that, under bedrock principles of First Amendment precedent, the TikTok Law, and particularly the divestiture requirement, is unconstitutional. This perspective is based on the collective experience of *amici curiae* as First Amendment scholars, and thus is not amenable to a joint brief. Further, because *amici* are not aware of any other *amicus* brief addressing these issues, they certify pursuant to D.C. Circuit Rule 29(d) that joinder in a single brief with other *amici* would be impracticable.

*/s/ Meryl Conant Governski*
Meryl Conant Governski

## STATEMENT OF AUTHORSHIP AND
## FINANCIAL CONTRIBUTIONS

No counsel for any party authored this brief in whole or in part and no entity or person aside from *amici* and their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

<u>/s/    Meryl    Conant    Governski</u>
Meryl Conant Governski

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici* are scholars of constitutional law who write and teach about the First Amendment.  *Amici* have an interest in ensuring that this Court rule in accordance with the fundamental freedoms protected by the First Amendment.  The names and associations of *amici* are printed below.[†]

Shubhangi Agarwalla
Resident Fellow, Yale Information Society Project
Yale Law School

Enrique Armijo
Professor of Law
Elon University School of Law

Derek Bambauer
Irving Cypen Professor of Law
University of Florida Levin College of Law

Jane Bambauer
Brechner Eminent Scholar and Professor of Law
University of Florida Levin College of Law

Elettra Bietti
Assistant Professor
Northeastern University School of Law & Khoury College of Computer Sciences

Ashutosh Bhagwat
Boochever and Bird Endowed Chair for the Study and Teaching of Freedom and Equality and Distinguished Professor of Law
University of California, Davis School of Law

---

[†]    Institutions are listed for identification purposes only.  Opinions expressed are those of the individual *amici*, and not necessarily of their affiliated institutions.

Stuart N. Brotman
Alvin and Sally Beaman Professor of Journalism and Media Law, Enterprise, and
Leadership
University of Tennessee, Knoxville

Anupam Chander
Scott K. Ginsburg Professor of Law and Technology
Georgetown University Law Center
Visiting Scholar, Institute for Rebooting Social Media
Harvard University

Erwin Chemerinsky
Dean and Jesse H. Choper Distinguished Professor of Law
The University of California, Berkeley School of Law

James Grimmelmann
Tessler Family Professor of Digital and Information Law
Cornell Law School

Nikolas Guggenberger
Assistant Professor
The University of Houston Law Center

G.S. Hans
Associate Clinical Professor of Law and Associate Director of First Amendment
Clinic
Cornell Law School

Robert A. Heverly
Associate Professor of Law
Albany Law School

Michael Karanicolas
Executive Director, Institute for Technology, Law & Policy
University of California Los Angeles

Kate Klonick
Associate Professor of Law
St. John's University School of Law

Mark Lemley
William H. Neukom Professor of Law
Director of the Stanford Program in Law, Science & Technology
Stanford Law School

David S. Levine
Professor
Elon University School of Law

Yvette Joy Liebesman
Professor of Law
Saint Louis University School of Law

Dylan K. Moses
Fellow, The Berkman Klein Center for Internet & Society
Harvard Law School

Sean O'Brien
Visiting Lecturer in Law
Yale Law School

Christopher Sprigman
Murray and Kathleen Bring Professor of Law
Co-Director, Engelberg Center on Innovation Law and Policy
New York University School of Law

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases Pursuant to Circuit Rule 28(a)(1) ....................................................................................................i

Disclosure Statement Pursuant to Circuit Rule 26.1 ...........................................ii

Statement Regarding Consent to File and Separate Briefing .............................iii

Statement of Authorship and Financial Contributions ......................................iv

Identity and Interest of *Amici Curiae* ................................................................v

Table of Contents....................................................................................................viii

Table of Authorities ................................................................................................x

Introduction .............................................................................................................1

Argument ..................................................................................................................4

I.    The TikTok Law's Divestiture Mandate Is Subject to Strict Scrutiny Because It Discriminates Based on Content and Viewpoint. ......................4

    A.    The Divestiture Requirement Is Subject to Strict Scrutiny. ...............6

    B.    The Divestiture Requirement Is Subject to Strict Scrutiny Because it Is Content-Based in Fact ...............................................8

    C.    There Are No Grounds to Find that Strict Scrutiny Does Not Apply to the TikTok Law..........................................................12

        1.    Even if the TikTok Law Is an Economic Regulation, It Is Subject to Strict Scrutiny. ...............................................12

        2.    Lesser Scrutiny Applied to Foreign Investment in Broadcasting Should Not Be Extended to the Internet...........14

        3.    ByteDance's Domicile Does Not Impact Scrutiny. ...............17

      4.     Coercing a Foreign Third Party to Influence TikTok's Speech Does Not Avoid Strict Scrutiny................................ 18

II.    The TikTok Law Cannot Survive Strict Scrutiny.................................... 20

    A.    The National Security Interests Cited by the Government Do Not Justify the Content-Based Restrictions................................... 20

    B.    National Security Interests Could Be Met Through Less Speech-Restrictive Means......................................................... 23

Conclusion..................................................................................... 25

Certificate of Compliance ............................................................. 26

Certificate of Service..................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
   517 U.S. 484 (1996) ...............................................................................2

*Abrams v. United States*,
   250 U.S. 616 (1919) ........................................................................ 1, 5

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ...............................................................................7

*Alario v. Knudsen*,
   2023 WL 8270811 (D. Mont. Nov. 30, 2023)................................................3

*Arkansas Writers' Project, Inc. v. Ragland*,
   481 U.S. 221 (1987) .............................................................................13

*Ashcroft v. ACLU*,
   542 U.S. 656 (2004) .............................................................................24

*Barr v. Am. Ass'n of Pol. Consultants*,
   591 U.S. 610 (2020) ...............................................................................6

*Boos v. Barry*,
   485 U.S. 312 (1988) ...............................................................................1

*Brandenburg v. Ohio*,
   395 U.S. 444 (1969) ...............................................................................5

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011) ...............................................................................9

*Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Elections Practices*,
   2024 WL 866367 (D. Me. Feb. 29, 2024)................................................17

*DLS, Inc. v. City of Chattanooga*,
   107 F.3d 403 (6th Cir. 1997).............................................................. 9, 10

*FCC v. League of Women Voters of Cal.*,
    468 U.S. 364 (1984) ................................................... 14

*Grosjean v. American Press Co.*,
    297 U.S. 233 (1936) ................................................... 12

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013) ..................................................... 7

*Lamont v. Postmaster General*,
    381 U.S. 301 (1965) ..................................................... 5

*Landmark Commc'ns, Inc. v. Virginia*,
    435 U.S. 829 (1978) ................................................... 21

*Leathers v. Medlock*,
    499 U.S. 439 (1991) ................................................... 13

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) .............................................. 12, 13

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971) ................................................... 21

*Nat'l Broad. Co. v. United States*,
    319 U.S. 190 (1943) ................................................... 14

*National Rifle Association of America v. Vullo*,
    144 S. Ct. 1316 (2024) .......................................... 18, 19

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ..................................................... 15

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
    460 U.S. 37 (1983) ................................................. 9, 10

*Police Dep't of Chi. v. Mosley*,
    408 U.S. 92 (1972) ..................................................... 5

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ..................................................... 5

*Red Lion Broad. Co. v. FCC,*
   395 U.S. 367 (1969) ................................................................. 16

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ............................................................ 8, 20

*Reno v. ACLU,*
   521 U.S. 844 (1997) ...................................................... 2, 15, 16

*Ridley v. Mass. Bay Transp. Auth.,*
   390 F.3d 65 (1st Cir. 2004) ................................................. 9, 11

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
   515 U.S. 819 (1995) ............................................................. 5, 6

*Rumsfeld v. F. for Acad. & Inst. Rts., Inc.,*
   547 U.S. 47 (2006) .................................................................. 7

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) ...................................................... 6, 7, 13

*Turner Broad. Sys., Inc. v. FCC,*
   512 U.S. 622 (1994) .......................................................... 14, 15

*United States v. Eichman,*
   496 U.S. 310 (1990) ................................................................. 8

*United States v. Playboy Ent. Grp., Inc.,*
   529 U.S. 803 (2000) ............................................................... 20

*United States v. Schwimmer,*
   279 U.S. 644 (1929) ................................................................. 1

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ............................................................... 10

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ............................................................... 20

## Constitutions

U.S. CONST., amend. I ................................................................. 1

**Statutes**

TikTok Law ................................................................................ 1

    Sec. 2(c) ............................................................................ 7

    Sec. 2(c)(1) ........................................................................ 7

    Sec. 2(g)(2)(A)(i) ............................................................. 6

    Sec. 2(g)(2)(B) ................................................................. 6

    Sec. 2(g)(3) .................................................................. 7, 9

    Sec. 2(g)(3)(A) ................................................................. 9

    Sec. 2(g)(3)(A)(ii) .......................................................... 13

    Sec. 2(g)(3)(B) ............................................................... 10

**Other Authorities**

*About Project Texas: TikTok's Commitment to National Security*,
    https://usds.tiktok.com/usds-about/ (last visited June 21, 2024) ................... 24

Ashutosh Bhagwat, *Do Platforms Have Editorial Rights?*, 1 J. OF
    FREE SPEECH L. 97 (2021) ................................................................ 8

David Vergun, *Leaders Say TikTok Is Potential Cybersecurity Risk to
    U.S.*, U.S. DEP'T OF DEFENSE (Apr. 6, 2023),
    https://www.defense.gov/News/News-
    Stories/Article/Article/3354874/leaders-say-tiktok-is-potential-
    cybersecurity-risk-to-us/ ........................................................... 20

Elena Kagan, *Private Speech, Public Purpose: The Role of
    Governmental Motive in First Amendment Doctrine*, 63 U. CHI. L.
    REV. 413 (1996) ...................................................................... 11

Elke Scholiers & Rachel Lerman, *TikTok Lifted This Family out of
    Public Housing*, WASH. POST (June 17, 2024, 6:00 AM),
    https://www.washingtonpost.com/technology/2024/06/17/tiktok-
    hair-stylist-homeless-small-business/ ........................................... 2

FEDERAL COMMUNICATIONS COMMISSION, *Broadband Data Collection Consumer Information*, https://www.fcc.gov/BroadbandData/consumers (last visited June 26, 2024) .................................................................................. 15

Free Speech Unmuted, *Free Speech, TikTok (and Bills of Attainder!), with Prof. Alan Rozenshtein* (May 21, 2024), https://www.hoover.org/research/free-speech-tiktok-and-bills-attainder-prof-alan-rozenshtein ............................................... 16

Geoffrey R. Stone, *Free Speech and National Security*, 84 IND. L. J. 939 (2009) ................................................................. 21

Jane Coaston, *What the TikTok Bill Is Really About, According to a Leading Republican*, N.Y. TIMES (Apr. 1, 2024), https://www.nytimes.com/2024/04/01/opinion/mike-gallagher-tiktok-sale-ban.html ........................................................... 10, 12

Ralph Norman, *TikTok Is A National Security Threat* (Mar. 14, 2024), https://norman.house.gov/news/documentsingle.aspx?DocumentID=1853 .................................................................................... 22

Richard A. Epstein, *Property, Speech, and the Politics of Distrust*, 59 U. CHI. L. REV. 41 (1992) ........................................................... 8

Stuart Thompson, *How Russian Media Uses Fox News to Make Its Case*, N.Y. TIMES (Apr. 15, 2022), https://www.nytimes.com/2022/04/15/technology/russia-media-fox-news.html ....................................................................... 18

*TikTok Ban v. First Amendment: Legal Experts Explain*, FAST COMPANY (May 21, 2024), https://www.fastcompany.com/91129061/tiktok-ban-vs-first-amendment-legal-experts-explain ........................................... 12

*TikTok and Douyin Explained*, CITIZEN LAB (Mar. 22, 2021), https://citizenlab.ca/2021/03/tiktok-and-douyin-explained/ ......................... 22

Transcript of Oral Argument, *Moody v. NetChoice* (No. 22-277) ........................................................................... 20

**INTRODUCTION**

The First Amendment of the United States Constitution states that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST., amend. I. In line with this right, Americans have the freedom to interact with a full range of ideas and choose for themselves which are fit for adoption. *See United States v. Schwimmer*, 279 U.S. 644, 654-55 (1929) (Holmes, J., dissenting) ("[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought.").

Protection of the free exchange of ideas, especially political speech, is perhaps most important in the face of national security threats, as people often have a range of opinions about how the government should or should not act. *Abrams v. United States*, 250 U.S. 616, 628 (1919) (Holmes, J., dissenting) ("[A]s against dangers peculiar to war, as against others, the principle of the right to free speech is always the same."); *see also Boos v. Barry*, 485 U.S. 312 (1988). Congress has run roughshod over these bedrock constitutional constraints with the Protecting Americans from Foreign Adversary Controlled Applications Act (the "TikTok Law" or the "Law")[1] by targeting a *single online media platform because of the content of some of the speech it carries* and because of fears that the platform *could* be misused by a foreign power.

---

[1]   We use this short form to describe the Law because it specifically targets for punishment a particular online publisher that was the singular focus of Congressional debate on the topic.

TikTok has quickly become its own marketplace of free ideas in the United States where millions of Americans create, view, and exchange information and opinions about a range of topics, "running the gamut from, say, the music of Wagner to Balkan politics to AIDS prevention to the Chicago Bulls." *Reno v. ACLU*, 521 U.S. 844, 851 (1997) (recognizing the essential role the Internet plays in contemporary speech).[2]  The TikTok Law will shut down this marketplace of ideas, either by banning the platform from being offered or maintained in the United States (the "Ban") or by mandating that TikTok's owner, ByteDance, sell the company to a buyer approved by the President of the United States (the "Divestiture").  That buyer is prohibited from any continuing operational relationship with ByteDance. Both scenarios threaten free speech.

The Ban is, by definition, a tactic to suppress speech, both because it deprives participants in the TikTok marketplace the ability to freely exchange ideas and prohibits companies the right to decide for themselves what speech products to offer the marketplace.  *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (complete bans are "particularly dangerous because they all but foreclose alternative means of disseminating certain information").  For the reasons discussed in TikTok's opening brief, the government cannot lawfully ban an information service used by millions of Americans to share news, political opinions, and

---

[2]  *See* Elke Scholiers & Rachel Lerman, *TikTok Lifted This Family out of Public Housing*, WASH. POST (June 17, 2024, 6:00 AM), https://www.washingtonpost.com/technology/2024/06/17/tiktok-hair-stylist-homeless-small-business/.

entertainment content.  *Cf. Alario v. Knudsen*, 2023 WL 8270811, at *1 (D. Mont. Nov. 30, 2023) (enjoining statute attempting to ban TikTok in Montana).

The Divestiture, which is the focus of this Amicus Brief, is a different means to the same, unconstitutional end.  Imagine a law requiring TikTok to format its algorithm to suppress pro-Chinese content unless TikTok sold itself to an American company.  No one would doubt that such a law would be viewpoint discriminatory and burden protected speech in violation of the First Amendment.  Such a law would put TikTok to an unconstitutional choice: speak in a manner it disagrees with or undergo an onerous sale.  The TikTok Law is no different.  It requires TikTok either to shut down (the Ban) *or* cease speaking/editing/promoting speech and attract a new owner subject to government approval (the Divestiture) due to pro-Chinese sentiment on the application.[3]  This is viewpoint discrimination that is subject to strict scrutiny.  *Infra* Argument § I.

Strict scrutiny is fatal to the TikTok Law.  *Infra* Argument § II.  Certain Members of Congress who voted for the law argued that TikTok poses unique national security threats to the United States (while others made clear the law was intended to quash disfavored viewpoints being expressed on the platform).  The government has failed to adduce any public evidence showing that TikTok poses an actual, non-conjectural, and imminent threat to national security.  Mere invocation

---

[3]  Divestiture also would prohibit any operational relationship between the U.S.-based TikTok and any foreign TikTok platform.  This impacts both TikTok's speech and also the speech of TikTok's U.S. users by preventing them from freely interacting with foreign users.

of the national-security rationale does not change this or justify shutting down an entire marketplace of ideas where an estimated 170 million Americans engage in protected speech, nor does it require TikTok to change the content it chooses to carry, post, or promote, even if those decisions draw users' attention to propaganda lauding the Chinese government or supporting a politically disfavored viewpoint.

And the remedy Congress chose lacks a reasonable fit with the putative interests asserted—concerns about propaganda (or relatedly, surveillance)—that can be addressed through other less speech-restrictive means, including, for example, privacy and platform regulation and/or protections for both the data and the algorithm such as those offered through TikTok's own proposal, "Project Texas." For the reasons discussed herein, *Amici* urge this court to find the TikTok Law unconstitutional.

## ARGUMENT

## I.    THE TIKTOK LAW'S DIVESTITURE MANDATE IS SUBJECT TO STRICT SCRUTINY BECAUSE IT DISCRIMINATES BASED ON CONTENT AND VIEWPOINT.

First Amendment concerns are at their highest where, as here, the government attempts to limit the dissemination of opinions with which it disagrees. This is a bedrock principle of free speech, rooted in centuries-old precedent. For example, in *Abrams v. United States,* Justice Holmes noted, "[Courts] should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate

4

check is required to save the country." 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

This commitment to rigorously question attempts to limit propaganda and political rhetoric became bedrock First Amendment law in *Brandenburg v. Ohio*, 395 U.S. 444 (1969), and, more applicable here, *Lamont v. Postmaster General*, 381 U.S. 301 (1965). In *Lamont,* the Supreme Court considered a law that required recipients of communist propaganda sent from or on behalf of certain foreign countries (including China) to confirm that they wished to receive the mailing. The Court unanimously found that this procedure was an unconstitutional "limitation on the unfettered exercise of the addressee's First Amendment rights." *Lamont*, 381 U.S. at 305.

The First Amendment insists on broad tolerance of all speech, whether or not it be deemed "bad." This is not a naïve or overly hopeful rule. Rather, the First Amendment shields political institutions from the consequences of their instincts to pursue politically expedient speech restrictions by establishing that the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). It is for this reason that content-based laws are presumptively unconstitutional and require the government to prove that the law is narrowly tailored to serve compelling state interests. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992); *see* TikTok Br. at 32. Viewpoint discrimination—or the regulation of speech based on "the specific motivating ideology or the opinion or perspective of the speaker"—is a more egregious form of content discrimination." *Rosenberger v. Rector & Visitors of the*

*Univ. of Va.*, 515 U.S. 819, 829 (1995). Like content-based restrictions, viewpoint-based laws are presumptively unconstitutional and subject to strict scrutiny. *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 618 (2020). The TikTok Law must survive strict scrutiny because it is a content- and viewpoint-based infringement of speech.

### A.     The Divestiture Requirement Is Subject to Strict Scrutiny.

The Law's Divestiture requirement triggers strict scrutiny under the First Amendment because it is, on its face, a content- and viewpoint-based restriction for at least four reasons.

*First*, Divestiture is required only if a "covered company" operates an application that permits user-generated and shared "text, images, videos, real-time communications, or similar content" and exempts from its purview any company (other than ByteDance and TikTok) that operates an application "whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews[.]" Sec. 2(g)(2)(A)(i), (g)(2)(B); *see also* TikTok Br. at 35. This type of content bias offends the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011) (provision that forbids sale based in large part on the content of a purchaser's speech subject to strict scrutiny); *Rosenberger*, 515 U.S. at 819 (finding that a state university's policy of favoring certain kinds of speech— "news, information, opinion, entertainment"—over "religious" speech violated the First Amendment).

*Second*, the Law's Divestiture requirement is facially content-based because it applies only to two companies—TikTok and ByteDance. Sec. 2(c), (g)(3). This necessarily, and unconstitutionally, burdens the speech of only these companies—both of whose primary service is offering a platform for the free exchange of ideas and communications—and the specific speakers who choose to use their platforms. *See Sorrell*, 564 U.S. at 565-66. TikTok and ByteDance have no choice but to agree to divestiture: they *must* comply or forego access to the U.S. market. This violates TikTok's free speech rights. *See Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 59 (2006) ("*FAIR*") (acceding to government condition to receive government benefit causes an injury); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013) (even when Congress supplies funding enabling an entity to carry on operations, the First Amendment prohibits "leverag[ing] funding to regulate speech outside the contours of the program itself").

*Third*, the Divestiture's approval requirement is facially content-based. Under the Law, the federal government must approve the purchaser of TikTok and the President of the United States is vested with the power to hand select the next editor of TikTok. Again, TikTok is entirely singled out. Sec. 2(c)(1), (g)(3) (under text of Law, approval condition applies exclusively to TikTok). It also faces another unconstitutional choice: allow executive approval (and censorship) or lose access to the U.S. market. *See FAIR*, 547 U.S. at 49; *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599 (2013) (government may not condition permits on "extortionate demands"). But approval will permit the federal government to select buyers who will be sympathetic to and permit the publication of the government's

7

viewpoints, all while stripping TikTok, a private company, of the authority to decide content and leadership. This is content control. *See* Ashutosh Bhagwat, *Do Platforms Have Editorial Rights?*, 1 J. OF FREE SPEECH L. 97, 117 (2021). Just as the government cannot take physical control of the printing presses, it cannot take editorial control of virtual free speech marketplaces. *See* Richard A. Epstein, *Property, Speech, and the Politics of Distrust*, 59 U. CHI. L. REV. 41, 64 (1992) ("The government cannot take permanent physical possession of the New York Times printing presses").

*Fourth,* the face of the TikTok Law indicates that it is designed to regulate certain types of content because it offers Divestiture *in lieu* of a Ban. This acknowledges that some form of TikTok would be permissible (i.e., would not need to be banned) if it had the "right" owner and, thus, the "right" type of speech. The Divestiture therefore makes clear that the government is seeking to control the content of TikTok's speech.

## B.   The Divestiture Requirement Is Subject to Strict Scrutiny Because it Is Content-Based in Fact.

Even if the Law could be construed as facially neutral (it cannot be), it still is a content-based restriction because the Law cannot be "'justified without reference to the content of the regulated speech,'" and was "adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citations omitted); *see also United States v. Eichman*, 496 U.S. 310, 315-16 (1990). At least three attributes of seemingly neutral

laws that courts consider to entail impermissible viewpoint exclusion—underinclusiveness, facade of viewpoint neutrality, and a poor fit between means and end—exist with the Divestiture Requirement. *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 49 n.9 (1983); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004); *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 411 (6th Cir. 1997).

*First*, the divestiture requirement is underinclusive because it fails to regulate similar entities the way it regulates TikTok. Underinclusiveness "may give rise to a conclusion that the government has in fact made an impermissible distinction on the basis of the content of the regulated speech" because it "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *See DLS*, 107 F.3d at 411; *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011). The Law is underinclusive because ByteDance and TikTok are subject to the Law's requirements *no matter what*.

The Law offers two different definitions of a "foreign adversary controlled application." Sec. 2(g)(3). The first explicitly references TikTok, stating that any application "operated, directly or indirectly . . ., by . . . ByteDance, Ltd [or] TikTok" is a foreign adversary controlled application within the meaning of the Act. Sec. 2(g)(3)(A). The second encompasses "covered companies" controlled by a "foreign adversary" that are found by the President to "present a significant threat to the national security of the United States following the issuance of . . . a public report to Congress . . . describing the specific national security concern involved and containing a classified annex and a description of what assets would need to be

divested to execute a qualified divestiture." Sec. 2(g)(3)(B). This dichotomy is strong evidence that the government has failed to regulate "other, similar activity" to the same degree it regulates TikTok and evinces content-based motive. *See DLS*, 107 F.3d at 411.

*Second*, official statements and actions indicate that the TikTok Law's enactment is a facade for viewpoint-based discrimination. *See, e.g.*, *Perry Educ. Ass'n*, 460 U.S. at 49 n.9 (scouring the record before finding no indication that "policy was motivated by a desire to suppress" excluded group's views); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (looking to public statements made by administrative members for evidence of discriminatory intent). The Law contained no legislative findings demonstrating that TikTok poses a "national security risk." *See* TikTok Br. at 18-20. Rather, public statements made by lawmakers demonstrate the driving motivation behind the Law was TikTok's allegedly pro-Palestinian and pro-Chinese content. *See* App'x to TikTok's Br. at 572 (Rep. Gallagher calling TikTok's content on the Israel-Hamas conflict "purely one-sided"); *id.* at 596 (Sen. Romney stating that content featuring and discussing Palestinians is "overwhelmingly so among TikTok broadcasts"); *see id.* at 566 (Sen. Warner opining that TikTok "will be promoting that Taiwan ought to be part of China, or that Putin's right"); Jane Coaston, *What the TikTok Bill Is Really About, According to a Leading Republican*, N.Y. TIMES (Apr. 1, 2024), https://www.nytimes.com/2024/04/01/opinion/mike-gallagher-tiktok-sale-ban.html (Representative Mike Gallagher, who authored the TikTok Law, explaining "propaganda threat" TikTok). These comments show that the Law was motivated

by a desire to silence viewpoints the government disagrees with, striking at the heart of the First Amendment.

*Third*, the poor fit between the law's means (forced divestiture) and its purported ends (national security) demonstrates a content-based restriction on speech. Suspicion of hostility to a particular viewpoint arises if a restriction poorly serves the viewpoint-neutral ground; "where, in other words, the fit between means and ends is loose or nonexistent." *Ridley*, 390 F.3d at 87; *see also* Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. CHI. L. REV. 413, 455 (1996) ("[T]he looser the fit between the interest asserted and the contours of the law, the greater the cause for suspicion."). Divestiture is not required to advance the government's interest in national security. As Petitioners state, and *amici* reiterate, there are numerous other options—short of divestiture—that are more closely tailored to the government's interest in national security. For example, Congress could have considered transparency requirements or specific prohibitions related to data security on social media companies, as opposed to just data brokers. TikTok Br. at 57-58. Or it could have approved the draft National Security Agreement that TikTok and the Committee on Foreign Investments in the United States had reached. *Id.* at 15-16. It did none of these things, instead electing to proceed to the drastic step of targeting TikTok and forcing divestiture. The tenuous connection between the means and the ends further shows that the Law is a content-based restriction depriving TikTok and its users of the right to free expression.

**C.     There Are No Grounds to Find that Strict Scrutiny Does Not Apply to the TikTok Law.**

> 1.     Even if the TikTok Law Is an Economic Regulation, It Is Subject to Strict Scrutiny.

Proponents of the TikTok Law have attempted to characterize it as a purely economic regulation. *TikTok Ban v. First Amendment: Legal Experts Explain*, Fast Company (May 21, 2024), https://www.fastcompany.com/91129061/tiktok-ban-vs-first-amendment-legal-experts-explain.  Putting aside that the admitted purpose of the law is about limiting speech not regulating the economy[4]—for nearly a century, the United States Supreme Court has held that an economic regulation adopted with the purpose of restricting or retaliating against a viewpoint is subject to strict scrutiny.

For example, in *Grosjean v. American Press Co.*, the Supreme Court invalidated a state tax on advertising revenues of newspapers.  297 U.S. 233 (1936).  There, a 2 percent tax was levied on newspapers with circulations of more than 20,000.  *Id.* at 240.  It did not matter that the tax was an "economic regulation" because its "plain purpose" was to penalize publishers and curtail the publication of more-circulated newspapers.  *Id.* at 251; *see also Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 579-80 (1983).  Because the tax was meant "to limit the circulation of information" based on viewpoint, it was required to but could not withstand strict scrutiny.  *See Grosjean,* 297 U.S. at 250.

---

[4]  *See supra*, Jane Coaston, *What the TikTok Bill Is Really About, According to a Leading Republican*; App'x to TikTok's Br. at 596.

The Supreme Court adopted a similar holding in *Minneapolis Star*, when it employed strict scrutiny to invalidate a tax on paper and ink used by periodicals because it "single[d] out the press [and] target[ed] a small group of newspapers." 460 U.S. at 591. Likewise, in *Arkansas Writers' Project, Inc. v. Ragland*, the Court struck down a "sales tax scheme that taxe[d] general interest magazines, but exempt[ed] newspapers and religious, professional, trade, and sports journals." 481 U.S. 221, 223 (1987). And in *Sorrell*, the Court held unconstitutional a law that restricted the sale of prescription data to pharmaceutical companies because it was "designed to impose a specific, content-based burden on protected expression" by targeting a particular set of speakers. 564 U.S. at 565; *see also Leathers v. Medlock*, 499 U.S. 439, 447 (1991) ("[D]ifferential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints.").

Accordingly, characterizing the TikTok law as an economic regulation does not permit the Law to elide strict scrutiny. The targeting of speech of a specific platform is subject to strict scrutiny no matter how it is described. Just as in *Grosjean* and its progeny, the TikTok Law impermissibly imposes content- and viewpoint-based restrictions on the speech of a particular platform in an effort to limit the circulation of information. In fact, the regulation in this case is far more egregious, immediately targeting a class of one: TikTok. *See* Sec. 2(g)(3)(A)(ii).

13

2. <u>Lesser Scrutiny Applied to Foreign Investment in Broadcasting Should Not Be Extended to the Internet.</u>

Supreme Court cases have permitted more intrusive regulation of broadcast speakers than of speakers in other media. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637 (1994) (collecting cases). But the rationale of applying a less rigorous standard of First Amendment scrutiny to broadcast regulation does not apply in the context of Internet regulation.

The justification for the distinct approach to broadcast regulation rests upon the "unique physical limitations of the broadcast medium." *See id.* (citing *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)). There are more would-be broadcasters than frequencies available in the same locale. And if two broadcasters attempted to transmit over the same frequency in the same locale, they would interfere with one another's signals, so that neither could be heard. *See Nat'l Broad. Co. v. United States*, 319 U.S. 190, 212 (1943). "The scarcity of broadcast frequencies thus required the establishment of some regulatory mechanism to divide the electromagnetic spectrum and assign specific frequencies to particular broadcasters." *Turner*, 512 U.S. at 637-38. The traditional First Amendment analysis is therefore adjusted to allow some limited restraints and impose certain affirmative obligations.

The Internet is different for two reasons. *First*, Internet communications, like newspapers and books, enjoy the greatest safeguards against intrusive regulation. This is because Internet communications "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard" and social

14

media services (which plainly include TikTok) "offer[] 'relatively unlimited, low-cost capacity for communication of all kinds.'" *Packingham v. North Carolina*, 582 U.S. 98, 104, 107 (2017) (quoting *Reno*, 521 U.S. at 870). The Internet serves classic free speech functions, allowing any person to share their opinions. *Reno*, 521 U.S. at 868-70 ("[A]ny person … can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer."). Indeed, the Internet has come to host a diverse range of content and has provided people a place to freely exchange ideas. Because of this, First Amendment protection over the Internet is at its highest.

*Second*, the justification for broadcast regulation does not apply. Unregulated transmission by broadcast radio and television stations risks creating a cacophony of speech that drowns out speech altogether. *See Turner*, 512 U.S. at 637 ("[I]f two broadcasters were to attempt to transmit over the same frequency in the same locale, they would interfere with one another's signals, so that neither could be heard at all.").

The Internet does not face the same scarcity issues. *See Reno*, 521 U.S. at 870 ("[U]nlike the conditions that prevailed when Congress first authorized regulation of the broadcast spectrum, the Internet can hardly be considered a 'scarce' expressive commodity."). Broadband access has grown rapidly, meaning that scarcity cannot justify government intervention on the Internet. *See* FEDERAL COMMUNICATIONS COMMISSION, *Broadband Data Collection Consumer Information*, https://www.fcc.gov/BroadbandData/consumers (last visited June 26,

2024).   What is more, the Court has expressly rejected the idea that the Internet should be treated like broadcasting for the purposes of the First Amendment.  *Reno*, 521 U.S. at 866-67 (explaining that none of the factors that justify the broadcast medium receiving "the most limited First Amendment protection"—the history of extensive government regulation over it, scarcity, and its "invasive" nature—apply to the Internet).

Commentators have sought in vain to rationalize the TikTok Law with terms such as "attention scarcity."  Free Speech Unmuted, *Free Speech, TikTok (and Bills of Attainder!), with Prof. Alan Rozenshtein* (May 21, 2024), https://www.hoover.org/research/free-speech-tiktok-and-bills-attainder-prof-alan-rozenshtein.  But "attention scarcity" does not justify lesser scrutiny.  Rather, it is materially different from the physical constraints that exist in the broadband context.  Only a limited amount of information can flow through the airwaves or a wire without interference, so regulations allocating that bandwidth among different speakers are needed to increase the diversity of speech available for listeners.  *See Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 389-90 (1969).  In contrast, attention scarcity does not impact anyone else's ability to express or listen to speech.  To the contrary, it impacts only that one person by requiring *them* to choose what to watch, to listen to, and to think about.  This is not an obstacle standing in the way of their exercise of their freedom of speech and freedom of thought.  Listeners' choices *are* the exercise of their First Amendment rights.  Justifying speech regulation on the basis of "attention scarcity" means that the more popular an information service is, the more it is subject to government regulation because those platforms have more

of our attention. But the First Amendment does not protect only unpopular services from government intrusion. The more popular a service is, the more people's speech it carries, and the greater the First Amendment harm of restricting that speech.

There is no justification for a lesser level of scrutiny. The TikTok Law should be held to the standard the Supreme Court has consistently applied to laws imposing content or viewpoint controls on Internet communications for nearly three decades—strict scrutiny.

### 3.     ByteDance's Domicile Does Not Impact Scrutiny.

The government may argue that the Law does not silence TikTok, but rather seeks to prevent ByteDance, a non-U.S. actor, from controlling the algorithm used by TikTok that determines what content to amplify. Even accepting as much, strict scrutiny still applies. Indeed, at least one court has previously applied strict scrutiny when a corporation with foreign government ownership challenged legislation on First Amendment grounds. *See Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Elections Practices*, 2024 WL 866367, at *11 (D. Me. Feb. 29, 2024) (enjoining a Maine law that restricted the rights of campaign spending by "foreign government-influenced entities").

In this case, TikTok's decisions regarding content amplification and moderation are no less an exercise of TikTok's own First Amendment rights *even if* the algorithm that implements those decisions was originally formulated by or with the participation of ByteDance. It is commonplace for U.S. persons or entities to adopt and articulate messages originally formulated abroad, and no one doubts that

the First Amendment protects that speech.[5]  Thus, the domicile of TikTok's parent corporation is inapposite to the question of what level of scrutiny applies to the Divestiture.

U.S.-based subsidiaries of foreign corporations frequently convey messages devised in consultation with their parent corporations.  For example, when Toyota U.S.A. takes a public position on the wisdom of moving towards all-electric vehicles, it articulates a policy judgment coordinated with Toyota's Japanese headquarters.  But that does not make the speech any less that of Toyota U.S.A's.  Similarly, TikTok's decisions regarding content amplification and moderation are no less an exercise of TikTok's own First Amendment rights even if the algorithm that implements those decisions was originally formulated by or with the participation of ByteDance.

### 4.   Coercing a Foreign Third Party to Influence TikTok's Speech Does Not Avoid Strict Scrutiny.

Any argument that Divestiture only impacts ByteDance's free speech rights fails.  As established in *National Rifle Association of America v. Vullo*, coercion of one party can harm another entity's First Amendment rights.  144 S. Ct. 1316, 1322 (2024).   There, Maria Vullo, a New York state official, pressured a foreign-

---

[5]   For example, one commentator has argued that some of Fox News' programming bolsters Russia's preferred narrative about the ongoing war in Ukraine.  *See* Stuart Thompson, *How Russian Media Uses Fox News to Make Its Case*, N.Y. TIMES (Apr. 15, 2022), https://www.nytimes.com/2022/04/15/technology/russia-media-fox-news.html. Even if this claim were correct, the government could not rely on these grounds to ban Fox News consistent with the First Amendment.

controlled insurance underwriter to abandon the NRA as a client in exchange for leniency. *Id.* Vullo also published "guidance" letters suggesting that continued business with the NRA posed "reputational risks." *Id.* at 1324. On these allegations, the Court found a potential First Amendment violation because Vullo's conduct punished and suppressed the NRA's pro-gun speech. *Id.* at 1329-30.

So too here. The government is coercing ByteDance to restrict TikTok's speech, and coercing TikTok to restrict its users' speech. ByteDance has no choice but to assent to Divestiture (if at all possible). Divestiture will result in a government-approved change in control, which will harm TikTok's free speech rights by forcing editorial and leadership change—all done to control the content that appears on the application. *See* App'x to TikTok's Br. at 572 (Rep. Gallagher decrying TikTok's pro-Palestinian content); *id.* at 596 (Sen. Romney doing the same); *see id.* at 566 (Sen. Warner's concerns about pro-Chinese content on TikTok). The government, however, "cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo*, 144 S. Ct. at 1328. The Law, and more specifically the Divestiture requirement, thus harms TikTok's free speech rights and strict scrutiny applies.

The TikTok Law's intrusion on free speech is even worse than the coercion found unlawful in *Vullo* because it does not merely indirectly pressure TikTok to suppress certain disfavored viewpoints (specifically, pro-China ones)—it also will directly alter the content on the platform and its algorithm, by altering TikTok's leadership. As Justice Kagan noted during oral argument in *Moody v. NetChoice*, Elon Musk's purchase of Twitter has had a profound impact on the content Twitter

19

permits and chooses to amplify. Transcript of Oral Argument at 39, *Moody v. NetChoice* (No. 22-277). There can be no doubt that replacing ByteDance's ownership of TikTok will alter the content carried on TikTok. If indirect pressure by the government to alter speech might violate the First Amendment, direct pressure to alter speech would do so even more clearly. Such a content- and viewpoint-based goal in itself triggers strict scrutiny under the First Amendment.[6]

## II. THE TIKTOK LAW CANNOT SURVIVE STRICT SCRUTINY.

A law will survive strict scrutiny only if the government can demonstrate both that the law serves a compelling government interest and it is narrowly tailored to achieve that interest. *Reed*, 576 U.S. at 163. However, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000).

### A. The National Security Interests Cited by the Government Do Not Justify the Content-Based Restrictions.

Lawmakers and commentators have argued that TikTok poses a cybersecurity threat sufficient to justify either forcing its divestiture or banning the service altogether. *See* David Vergun, *Leaders Say TikTok Is Potential Cybersecurity Risk to U.S.*, U.S. DEP'T OF DEFENSE (Apr. 6, 2023), https://www.defense.gov/News/News-Stories/Article/Article/3354874/leaders-say-

---

[6] *Reed*, 576 U.S. at 164 (laws are content-based if they "were adopted by the government 'because of disagreement with the message [the speech] conveys.'") (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

tiktok-is-potential-cybersecurity-risk-to-us/.    The animating concern Congress purportedly seeks to address is a threat of access to sensitive user information and foreign propaganda through content selection and promotion.    Of course, public statements by lawmakers show an ulterior motive.  *See supra* § I.B.

The rush to react to foreign propaganda is a prominent feature in American free speech history.  *See* Geoffrey R. Stone, *Free Speech and National Security*, 84 IND. L. J. 939, 939 (2009) ("In the national security setting, however, the United States has a long and checkered history of allowing fear to trump constitutional values.").  Indeed, the First Amendment rights we enjoy today were shaped by a Supreme Court that grew skeptical of speech restrictions that sprung from moral panics over socialist and Communist propaganda.

*Amici* recognize that China, Russia, and other foreign adversaries may very well be strenuously *attempting* to disrupt American political and social order by creating or amplifying social media content that serves their interests.  But an attempt to sow discord, or a fear of the same, is not a sufficient basis to violate free speech.  The law requires more.    It requires national security threats to be imminent.  *N.Y. Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring) ("[National] 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment."); *id.* at 730 (Stewart, J., concurring) (national security threat could not justify a ban on speech absent "direct, immediate, and irreparable damage to our Nation or its people"); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 845 (1978) (before

21

one can suppress speech, the danger "must not be remote or even probable; it must immediate imperil").

The purported national security interests do not justify the TikTok Law's content-based restrictions for at least three reasons.

*First*, the government has not identified any specific cybersecurity threat unique to TikTok. Users share personal data over TikTok, but that is true of all social media and other information services, and a robust industry of data brokers makes such information readily available for purchase. *See TikTok and Douyin Explained*, CITIZEN LAB (Mar. 22, 2021), https://citizenlab.ca/2021/03/tiktok-and-douyin-explained/ ("In comparison to other popular social media platforms, TikTok collects similar types of data to track user behaviour and serve targeted ads."); *see also* TikTok Pet. ¶ 85 (noting that much of the data collected by TikTok is no different from the data that Google and Meta collect).

*Second*, the government has presented no specific evidence—and the legislative history contains none—showing that TikTok presents an imminent, non-conjectural national security risk. Rather, the true motivation for the law appears to be fear that TikTok will convey pro-China or pro-Palestinian propaganda. *See supra* § I.B; Ralph Norman, *TikTok Is A National Security Threat*, NORMAN.HOUSE.GOV (Mar. 14, 2024), https://norman.house.gov/news/documentsingle.aspx?DocumentID=1853 ("It is absolutely within TikTok's ability (i.e. China's ability) to use that platform to manipulate Americans."). Fear of propaganda is not a sufficient national security concern.

*Third*, the cited cybersecurity threats—intellectual property theft for defense-related technologies—are unlikely to occur over TikTok, Facebook, or any other social media app. Further, if the cybersecurity concern is that TikTok includes specially crafted vulnerabilities such as backdoors that enable covert access, the best protection is independent third-party review of TikTok's source code. *Amici* understand that TikTok and Oracle had a draft agreement in place to enable Oracle to undertake just such a review, and to evaluate whether the app's code matched public statements about how TikTok functioned.

## B.    National Security Interests Could Be Met Through Less Speech-Restrictive Means.

Even if the government's national security interests were compelling, the government bears the burden of showing that those interests could not have been more properly addressed through less speech-restrictive mechanisms. They have not, and they cannot.

For example, the government has never explained why TikTok's own proposal (dubbed "Project Texas") for addressing Congress' purported concerns would not provide a less restrictive means. Under Project Texas, TikTok established a special purpose subsidiary managed by U.S. nationals with significant experience working with the U.S. government on national security and cybersecurity issues, to be overseen by an independent board of directors with experience in national security issues. This board would operate all parts of the business responsible for protected U.S. user data and also oversee the application's content delivery

algorithms in the United States. *See About Project Texas: TikTok's Commitment to National Security*, https://usds.tiktok.com/usds-about/ (last visited June 21, 2024).

To buttress those protections, TikTok committed to working with U.S. technology giant Oracle to manage the data storage of U.S. users within a special secure environment and to manage data flows in accordance with protocols that it would establish. In addition, TikTok proposed to have Oracle and another third-party auditor inspect all the code—from whatever source—used to construct this secure environment for U.S. data to ensure that there is no backdoor access to U.S. data. Oracle would also have custody over the TikTok app to ensure that it can only communicate with the secure system. Additionally, TikTok also committed to making its content moderation systems and processes open to outside review, to ensure that moderation is taking place according to TikTok's published guidelines. This auditing was designed to ensure, among other things, that moderation is not removing content critical of the Chinese government or promoting content favored by the Chinese government and was thus consistent with TikTok's public statements of its practices. Project Texas also gave the government an effective "kill switch," that is, the power to turn off the TikTok service, in certain emergency situations.

To survive strict scrutiny, the government must explain why these voluntary undertakings by TikTok were insufficient to address its national security concerns and why, instead, the particular, far-reaching viewpoint-based suppression of speech that the TikTok Law enacts is *necessary* to achieve the government's national security goals. *See Ashcroft v. ACLU*, 542 U.S. 656 (2004) (law not narrowly

tailored because less restrictive alternatives, like filters, were available). It has not done and cannot do so.

## CONCLUSION

The Law imposes content and viewpoint-based restrictions on speech. The government must therefore prove that the Law can withstand strict scrutiny review. The government has not nor can it. This Court should enter judgment for Petitioners.

Dated:  June 27, 2024

Jonathan A. Patchen
Nicholas Reddick
Alyxandra N. Vernon
Anthony Vecchio
WILLKIE FARR & GALLAGHER LLP
333 Bush St.
San Francisco, CA 94104
(415) 858-7400
jpatchen@willkie.com
nreddick@willkie.com
avernon@willkie.com
avecchio@willkie.com

Respectfully submitted,

*/s/ Meryl Conant Governski*
Meryl Conant Governski
   *Counsel of Record*
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1016
mgovernski@willkie.com

*Counsel for* Amici Curiae
*First Amendment Scholars*

25

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and D.C. Circuit Rule 29(d), the undersigned certifies that this brief complies with the applicable type-volume limitations. This brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1), this brief contains 6185 words.

*/s/    Meryl    Conant    Governski*
Meryl Conant Governski

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of June, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.

Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/    Meryl    Conant    Governski*
Meryl Conant Governski