**ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024**

Case No. 24-1113 (and consolidated cases)

In The

# United States Court of Appeals for the District of Columbia Circuit

————————

TIKTOK INC. and BYTEDANCE LTD.,

*Petitioners*,

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent*.

*(caption continued)*

————————

On Petitions for Review of Constitutionality of the Protecting Americans from Foreign Adversary Controlled Applications Act

————————

**CORRECTED BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS**

Thomas A. Berry
CATO INSTITUTE
1000 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 789-5202
tberry@cato.org
*Counsel for Amicus Curiae*

June 27, 2024

BRIAN FIREBAUGH, et al.,

*Petitioners,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the
United States,

*Respondent.*

_____

BASED POLITICS INC.

*Petitioner,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the
United States,

*Respondent.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel certifies:

<u>Parties and Amicus</u>:

a.    The parties to *TikTok Inc. v. Garland*, No. 24-1113, are petitioners TikTok Inc. and ByteDance Ltd. and respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. The parties to the first consolidated case, *Firebaugh v. Garland*, No. 24-1130, are petitioners Brian Firebaugh, Chloe Joy Sexton, Talia Cadet, Timothy Martin, Kiera Spann, Paul Tran, Christopher Townsend, and Steven King and respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. The parties to the second consolidated case, *BASED Politics Inc. v. Garland*, No. 24-1183, are petitioner BASED Politics Inc. and respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. As of the finalization of this brief, the following amici have filed notices of intent to participate as amici curiae: Electronic Frontier Foundation, Freedom of the Press Foundation, TechFreedom, Media Law Resource Center, Center for Democracy and Technology, First Amendment Coalition, Freedom to Read Foundation, The Cato Institute, Professor Matthew Steilen, Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition, Asian American Federation, Asian Americans Advancing Justice Southern California, Calos Coalition,

Hispanic Heritage Foundation, Muslim Public Affairs Council, Native Realities, OCA-Asian Pacific American Advocates of Greater Seattle, OCA-Asian Pacific American Advocates: San Francisco, Sadhana, Sikh Coalition, and South Asian Legal Defense Fund, Foundation For Individual Rights And Expression, Institute For Justice, Reason Foundation, Knight First Amendment Institute at Columbia University, Free Press, and PEN American Center. Because these petitions were filed directly in this Court, there were no district-court proceedings in these cases.

b.      The Cato Institute is a not-for-profit corporation, exempt from income tax under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3); it has no parent corporation; and no publicly held company has a 10% or greater ownership interest in the Cato Institute.

Rulings Under Review: Petitioners seek direct review of whether the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H (2024), is constitutional. There are therefore no prior rulings under review.

Related Cases: These cases were not previously before this Court or any other court. Counsel for Cato Institute is not aware of any other case currently pending before this or any other court that is related to these cases within the meaning of Circuit Rule 28(a)(1)(C).

ii

/s/Thomas A. Berry
Thomas A. Berry

Dated:  June 27, 2024                    *Counsel for Amicus Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* the Cato Institute is a nonprofit corporation. It has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public. Pursuant to D.C. Circuit Rule 26.1(b), the Cato Institute states that it is a 501(c)(3) nonprofit organization dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty.

/s/Thomas A. Berry
Thomas A. Berry

Dated:  June 27, 2024                    *Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

**Page(s)**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT .....................................iv

TABLE OF AUTHORITIES ..................................................................................vi

STATEMENT OF INTEREST OF *AMICUS CURIAE* ...........................................1

SUMMARY OF ARGUMENT AND INTRODUCTION ......................................1

ARGUMENT ..........................................................................................................6

    I.    "PROPAGANDA" IS PROTECTED BY THE FIRST
        AMENDMENT ..........................................................................................6

    II.    "MISINFORMATION AND DISINFORMATION"
        ARE PROTECTED BY THE FIRST AMENDMENT ..........................14

CONCLUSION .....................................................................................................22

CERTIFICATE OF COMPLIANCE ....................................................................23

CERTIFICATE OF SERVICE .............................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Abrams v. United States*, 250 U.S. 616 (1919) ....................................9

*Brown v. Ent. Merch. Ass'n*, 564 U.S. 786 (2011) .......................... 13, 14

*Citizens United v. FEC*, 558 U.S. 310 (2010) ...........................13

*Cohen v. California*, 403 U.S. 15 (1971) .................................................7

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) .........................13

*Guffey v. Mauskopf*, 45 F.4th 442 (D.C. Cir. 2022) ................................12

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) ................................7, 9

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298 (2012) ..........7

*Lamont v. Postmaster General*, 381 U.S. 301 (1965) .............................5

*Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85 (1977)............10

*N.A.A.C.P. v. Button,* 371 U.S. 415 (1963)............................................20

*N.Y. Times Co. v. Sullivan*, 376 U. S. 254 (1964)....................................5

*N.Y. Times v. United States*, 403 U.S. 713 (1971)..................................19

*News Am. Pub., Inc. v. FCC*, 844 F.2d 800 (D.C. Cir. 1988)....................6

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ...................................12

*Thomas v. Collins*, 323 U.S. 516 (1945)...................................................8

*United States v. Alvarez*, 567 U.S. 709 (2012) .............................. 13, 15, 16, 18, 21

*United States v. Stevens*, 559 U.S. 460 (2010); .....................................13

*W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) .......................5

*Whitney v. California*, 274 U.S. 357 (1927) ..................................... 10, 21

### Statutes

Protecting Americans from Foreign Adversary Controlled Applications Act,
Pub. L. No. 118-50 (2024) ................................................................. 3, 19

## Other Authorities

107 CONG. REC. 17,815 (1961) .............................................................2, 4

107 CONG. REC. 17,818 (1961) ................................................................2

Clay Calvert, et al., *Fake News and the First Amendment: Reconciling a Disconnect between Theory and Doctrine*, 86 U. CIN. L. REV. 99 (2018) ...................................................................................... 8, 18, 21

Daniel Arkin, *Pence Calls TikTok 'Digital Fentanyl'*, NBC NEWS (Mar. 13, 2024) ......................................................................................4

GEORGE ORWELL, NINETEEN EIGHTY-FOUR (1949) (Centennial ed. 2003).............15

H.R. Comm. on Energy & Com., Protecting Americans from Foreign Adversary Controlled Applications Act, H.R. Rep. No. 118-417 (2024) ..... 10, 14

*Historical Background of Propaganda Mail Interception*, *in* CONG. Q. ALMANAC (18TH ED., 1962) ......................................................................6

James Weinstein, *What Lies Ahead?: The Marketplace of Ideas, Alvarez v. United States, and First Amendment Protection of Knowing Falsehoods*, 51 SETON HALL L. REV. 135 (2020) ............................................. 16, 19

Jane Coaston, *What the TikTok Bill is Really About, According to a Leading Republican*, N.Y. TIMES, (Apr. 1, 2024) .................................................4

JEFF KOSSEFF, LIAR IN A CROWDED THEATER: FREEDOM OF SPEECH IN A WORLD OF MISINFORMATION (2023) ........................................... 18, 20

JOHN STUART MILL, ON LIBERTY (Gertrude Himmelfarb ed. 1974) (1859)....... 7, 17

Joseph Thai, *The Right to Receive Foreign Speech*, 71 OKLA. L. REV. 269 (2018) ................................................................................ 12, 13

*Legislation to Protect American Data and National Security from Foreign Adversaries: Hearing on H.R. 7520 and H.R. 7521 Before the H. Committee on Energy and Commerce*, 118th Cong. (2024) (statement of Rep. Cathy McMorris Rodgers, Chairwoman, H. Comm. On Energy and Commerce)......................................................................................11

President John F. Kennedy, Remarks on the 20th Anniversary of the Voice of America (Feb. 26, 1962).......................................................................6

Press Release, Jared Huffman, Rep. Huffman Statement on Vote for the Protecting Americans from Foreign Adversary Controlled Applications Act (Mar. 12, 2024) ..............................................................15

Press Release, Rep. Beth Van Duyne, Rep. Beth Van Duyne Votes to Protect North Texans from Communist China (Mar. 13, 2024) .........................................3

Press Release, Rep. Brett Guthrie, Guthrie Votes to Protect Americans' Data Privacy and National Security (Mar. 13, 2024) ...................................................11

Press Release, Rep. Jack Bergman, Bergman Supports Bipartisan Legislation to Stop Foreign Adversaries from Owning Social Media Companies (Mar. 13, 2024) ...................................................................................11

Press Release, Sean Casten, Casten Statement on HR 7521 (Mar. 13, 2024).........15

Press Release, The Select Comm. on the CCP, Gallagher, Bipartisan Coalition Introduce Legislation to Protect Americans from Foreign Adversary Controlled Applications, Including TikTok (Mar. 5, 2024) .............3, 4

Press Release, Yvette D. Clark, Rep. Clarke Releases Statement on H.R. 7521, the Protecting Americans from Foreign Adversary Controlled Applications Act (Mar. 7, 2024)........................................................................14

Report of the Select Committee on Intelligence, U.S. Senate on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election............21

Richard Pipes, Ash Heap of History: President Reagan's Westminster Address 20 Years Later, Remarks at the Heritage Foundation (June 3, 2002)........................................................................................................9

RICK HASEN, CHEAP SPEECH: HOW DISINFORMATION POISONS OUR POLITICS—AND HOW TO CURE IT (2022) ............................................................19

Roscoe Drummond, *Propaganda War: Moscow and the Mails*, WASH. POST (July 15, 1961) ...........................................................................................................2

SELECTED LITERARY AND POLITICAL PAPERS AND ADDRESSES OF WOODROW WILSON (1926)...............................................................................................................9

Steven G. Gey, *The First Amendment and the Dissemination of Socially Worthless Untruths*, 36 FLA. ST. UNIV. L. REV. 1 (2008)............................ 5, 8, 17

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute, established in 1977, is a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books, studies, and the annual *Cato Supreme Court Review*, and conducts conferences and forums.

This case interests Cato because it concerns the First Amendment rights of a social media company and its users, a critically important issue in the digital age.

## SUMMARY OF ARGUMENT AND INTRODUCTION

One after another, members of Congress rose on the House floor to support the bill. "It is really incredible," one member said, "that we should allow an avowed and powerful enemy to be pouring poisonous propaganda into the minds of our own youth." Another member quoted an article warning of "unsolicited propaganda attacking the United States as 'imperialist,' 'war mongering,' and 'colonialist.'" The article asked rhetorically whether "a free society ha[s] to leave itself totally exposed to an unending brainwashing of foreign Communist propaganda—mostly concealed

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amicus* contributed money intended to fund the brief's preparation or submission.

in its origin, subtle, purposeful—directed primarily at young Americans, at college students."

The impressionability of youth was a running theme of the day. The same member repeatedly emphasized that the propaganda at issue was "addressed to our youth, the teachers, and to colleges and universities, because this is a favorite trick of the Communists to get at the minds of our young people." Urging other members to support the bill, he called it "one of the most serious problems we have, to stop this Communist propaganda coming into our country. It is the technique of the Communists to work on the young minds of the various nations."

These fears will sound familiar to anyone who has followed recent debates over social media such as TikTok. But these members were not talking about TikTok. They were not talking about social media at all, because social media did not exist when they spoke. These congressional remarks were delivered not in 2024, but in 1961.[2] The members were urging support for a bill that would subject so-called "Communist political propaganda" to a regime of censorship, under which mail from abroad was opened and read by government officials. If the officials

---

[2] 107 CONG. REC. 17,815 (1961) (statement of Rep. Walter Judd); *id*. at 17,818 (statement of Rep. Glenn Cunningham) (quoting Roscoe Drummond, *Propaganda War: Moscow and the Mails*, WASH. POST (July 15, 1961)); *id*. at 17,814 (statement of Rep. Glenn Cunningham).

decided that a piece of mail qualified as such "propaganda," the addressee could only receive it by affirmative request.

Means of communication may change, but misguided censorial urges are eternal. The law at issue in this case would have the effect of destroying TikTok as we know it within the United States. *See generally* Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H (2024) (hereinafter "the Act" or "the law"). The law was motivated by the same flawed instinct that was on display in 1961: the belief that disfavored speech must be fought with censorship rather than with counterspeech. Members of Congress justified this TikTok ban with claims that "Communist China is using TikTok as a tool to spread dangerous propaganda."[3] They described the speech available on TikTok as "bold attempts to infiltrate our country, spread propaganda."[4] And some candidly admitted that the content and viewpoint of the speech on TikTok was their primary motivation for the bill, not data privacy concerns. A co-sponsor of the bill admitted that "the

---

[3] Press Release, The Select Comm. on the CCP, Gallagher, Bipartisan Coalition Introduce Legislation to Protect Americans from Foreign Adversary Controlled Applications, Including TikTok (Mar. 5, 2024), https://tinyurl.com/yshcpwew (statement of Rep. Elise Stefanik).

[4] Press Release, Rep. Beth Van Duyne, Rep. Beth Van Duyne Votes to Protect North Texans from Communist China (Mar. 13, 2024), https://tinyurl.com/3f999s7r.

greater concern is the propaganda threat" and the question of "what information America's youth gets."[5]

The rhetoric that members used to justify the two bills was strikingly similar despite being separated by sixty years. Even the metaphors echoed across the decades. In 1961: "We would not allow any other country to be shipping in dangerous drugs or disease bacteria. We would not allow anybody to pour poison into our water supply. But here is our most important possession, the minds and attitudes of our youth, and . . . we allow that enemy to pour this poisonous material day after day into the untrained and uncritical minds of our youth."[6] In 2024: "TikTok is Communist Chinese malware that is poisoning the minds of our next generation;"[7] it is "digital fentanyl"[8] that is "poisoning the minds of our youth every day on a massive scale."[9]

---

[5] Jane Coaston, *What the TikTok Bill is Really About, According to a Leading Republican*, N.Y. TIMES (Apr. 1, 2024), https://tinyurl.com/rfrwhyda.

[6] 107 CONG. REC. 17,815 (1961) (statement of Rep. Walter Judd).

[7] Press Release, The Select Comm. on the CCP, *supra* (statement of Rep. Elise Stefanik).

[8] Daniel Arkin, *Pence Calls TikTok 'Digital Fentanyl'*, NBC NEWS (Mar. 13, 2024), https://tinyurl.com/wkemkcka.

[9] Press Release, The Select Comm. on the CCP, *supra*, (Statement of Rep. Chip Roy).

In the 1960s, the Supreme Court rightly struck down the restriction on "Communist political propaganda," finding it to be "an unconstitutional abridgment of the addressee's First Amendment rights." *Lamont v. Postmaster General*, 381 U.S. 301, 307 (1965). The Court described that law as being "at war with the 'uninhibited, robust, and wide-open' debate and discussion that are contemplated by the First Amendment." *Id.* (quoting *N.Y. Times Co. v. Sullivan*, 376 U. S. 254, 270 (1964)).

This Court should reach the same result. The government does not have any interest (let alone a compelling one) in suppressing speech it views as "propaganda." Quite the opposite. "In a democracy, government cannot be allowed to systematically indoctrinate its citizenry or instill in citizens a particular ideological bias, because to do so would essentially allow the government to undermine popular control by manufacturing its own consent."[10]

As Justice Robert Jackson eloquently put it for the Supreme Court, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Congress is attempting to prescribe the outer bounds of orthodoxy by destroying a

---

[10] Steven G. Gey, *The First Amendment and the Dissemination of Socially Worthless Untruths*, 36 FLA. ST. UNIV. L. REV. 1, 19 (2008).

platform because of the (perceived) viewpoints it carries. Courts can "infer censorial intent from legislative history and . . . invalidate laws so motivated." *News Am. Pub., Inc. v. FCC*, 844 F.2d 800, 809 (D.C. Cir. 1988). The censorial intent behind the Act is clear, and the Court should invalidate it.

## ARGUMENT

## I.    "PROPAGANDA" IS PROTECTED BY THE FIRST AMENDMENT

> We welcome the views of others. We seek a free flow of information across national boundaries and oceans, across iron curtains and stone walls. We are not afraid to entrust the American people with unpleasant facts, foreign ideas, alien philosophies, and competitive values. For a nation that is afraid to let its people judge the truth and falsehood in an open market is a nation that is afraid of its people.[11]

With these remarks, President John F. Kennedy succinctly stated America's free speech ideals.[12] These ideals have a lengthy historical pedigree, tracing back to John Stuart Mill and beyond. As Mill put it,

> the peculiar evil of silencing the expression of an opinion is, that it is robbing the human race; posterity as well as the existing generation; those who dissent from the opinion, still more than those who hold it. If the opinion is right, they are deprived of the opportunity of exchanging error for truth: if wrong, they lose, what is almost as great

---

[11] President John F. Kennedy, Remarks on the 20th Anniversary of the Voice of America (Feb. 26, 1962), available at, https://tinyurl.com/5n87us7j.

[12] Kennedy's own record of putting these ideals into practice is mixed. While he ended a Post Office program monitoring Communist "propaganda" in 1961, he later signed the bill which brought a substantially similar program back into effect, until its invalidation by the Supreme Court. *Historical Background of Propaganda Mail Interception*, *in* CONG. Q. ALMANAC (18TH ED., 1962), at 07–370.

a benefit, the clearer perception and livelier impression of truth, produced by its collision with error.[13]

And the principles articulated by Kennedy and Mill are not just cultural values; they are protected by the First Amendment. The Supreme Court has repeatedly affirmed that "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988). Given this importance, "[t]he First Amendment creates an open marketplace in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 308–09 (2012) (cleaned up).

As the Supreme Court has recognized, preserving this marketplace of ideas requires carefully cabining the government's authority. The First Amendment is thus "designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity." *Cohen v. California*, 403 U.S. 15, 24 (1971).

---

[13] JOHN STUART MILL, ON LIBERTY 76 (Gertrude Himmelfarb ed. 1974) (1859).

Maintaining the marketplace of ideas requires placing restrictions on the government's power over speech. "[I]t cannot be the duty, because it is not the right, of the state to protect the public against false doctrine. The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J. concurring).

"At bottom, the key is who gets to decide what content is appropriate to circulate in the marketplace of ideas."[14] It is dangerous to give the government control over that decision precisely because government power distorts the free marketplace of ideas. "[I]f the government were allowed to enshrine in law and prohibit the disavowal of a set of ideological principles that favored the current status quo, the dominant political faction could preempt any attacks on the legitimacy of its power."[15]

And even when government does not act with an intentionally self-serving purpose, regulators will often be too quick to dismiss an idea that deserves a full

---

[14] Clay Calvert, et al., *Fake News and the First Amendment: Reconciling a Disconnect between Theory and Doctrine*, 86 U. Cin. L. Rev. 99, 137–38 (2018).

[15] Gey, *supra*, at 20.

airing (or to embrace an idea that has unseen flaws). "[W]hen men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Hustler Mag.*, 485 U.S. at 51 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

Of course, not all views have merit and not all ideas have wisdom. Many ideologies deserve their place on the "ash heap of history."[16] But a society cannot truly reject an idea that it has not yet been allowed to hear. "[I]t is by the exposure of folly that it is defeated; not by the seclusion of folly."[17] That is why the Supreme Court has consistently held that the antidote for misguided ideas is counterspeech, not censorship. "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Linmark Assocs., Inc. v. Willingboro Twp.*, 431

---

[16] Richard Pipes, Ash Heap of History: President Reagan's Westminster Address 20 Years Later, Remarks at the Heritage Foundation (June 3, 2002) (transcript available at, https://tinyurl.com/we8ax4h7).

[17] Woodrow Wilson, Address at the Institute of France, Paris (May 10, 1919)*in* 2 SELECTED LITERARY AND POLITICAL PAPERS AND ADDRESSES OF WOODROW WILSON 333 (1926).

U.S. 85, 97 (1977) (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)).

The explicitly stated justifications for the TikTok ban at issue in this case are antithetical to these principles. Congress has not attempted to hide the ball. The purpose of this law is to stop Americans from receiving speech on TikTok, because Congress disagrees with (what it perceives to be) the messages expressed on TikTok.[18]

A House committee report on a bill that served as a precursor to the Act claimed that TikTok could be used to "push misinformation, disinformation, *and propaganda* on the American public." H.R. Comm. on Energy & Com., Protecting Americans from Foreign Adversary Controlled Applications Act, H.R. Rep. No. 118-417, at 2 (2024) (emphasis added). The report also warned (using language that might fairly describe every newspaper in America) that the platform could "shape narratives and elevate favorable opinions." *Id.* at 11.

Myriad statements made by members of Congress have removed any doubt that the law is aimed at TikTok because of the perceived viewpoint (and persuasiveness) of speech on the platform. One member said that TikTok "should

---

[18] While non-content-based concerns over hacking and data-tracking could *hypothetically* justify government action against a platform, the government has not proffered public evidence that meets the burden necessary to support this justification either, as the petitioners have explained in their briefs.

10

not be influencing our children and . . . should not be able to indoctrinate American users."[19] Another called it "a valuable propaganda tool."[20] And a third warned that it could "influence the American people and our way of life."[21] Whether these members were right or wrong about the content or persuasiveness of the speech on TikTok, they admitted that they wished to silence the platform *because of* the viewpoints that they believed the platform carried.

The censorship that Congress hopes to achieve cannot be sustained under the Constitution.

First, the Act cannot be justified on the grounds that the targeted speech may come from noncitizens residing outside the United States, who do not have First Amendment rights. Destroying TikTok in the United States would mean that *no one* can use the platform to broadcast their message. This law would cut off the speech

---

[19] Press Release, Rep. Jack Bergman, Bergman Supports Bipartisan Legislation to Stop Foreign Adversaries from Owning Social Media Companies (Mar. 13, 2024), https://tinyurl.com/4cr6k2vr.

[20] *Legislation to Protect American Data and National Security from Foreign Adversaries: Hearing on H.R. 7520 and H.R. 7521 Before the H. Committee on Energy and Commerce*, 118th Cong. 3 (2024) (statement of Rep. Cathy McMorris Rodgers, Chairwoman, H. Comm. On Energy and Commerce).

[21] Press Release, Rep. Brett Guthrie, Guthrie Votes to Protect Americans' Data Privacy and National Security (Mar. 13, 2024), https://tinyurl.com/msu7242f.

of not just noncitizens but also millions of U.S. citizens with full First Amendment rights.

And this Court just recently held that speculative concerns about the potentially harmful speech of noncitizens cannot justify concrete restrictions on the speech of citizens. Specifically, this Court struck down a restriction on the free speech rights of judiciary employees. The government had argued, among other claims, that "nefarious actors like Russian propaganda agencies could try to attribute [the] employees' private political expression to the Judiciary as a whole, in order to falsely characterize the Judiciary as partisan." *Guffey v. Mauskopf*, 45 F.4th 442, 448 (D.C. Cir. 2022). But this Court rejected that argument, holding that "the speculative prospect of Russian propaganda does not justify censoring the political speech of American citizens." *Id.*

Further, the noncitizen status of some (but not all) speakers on TikTok is irrelevant, because destroying TikTok would infringe Americans' First Amendment right to *receive* speech. And that right applies just as much to speech sent from overseas as it does to speech sent from next door. The Supreme Court "in recent decades has fortified the right to receive information and ideas in a variety of contexts."[22] "Considered together, these decisions likely preclude the government

---

[22] Joseph Thai, *The Right to Receive Foreign Speech*, 71 OKLA. L. REV. 269, 305 (2018) (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011); *Citizens United v.*

from barring the entry of political speech from abroad on the ground that the speaker is foreign or that the speech is valueless or false—not because foreign speakers abroad have a First Amendment right to speak, but because the First Amendment demands an open marketplace of ideas for domestic listeners."[23]

Second, Congress's intended censorship cannot be justified on the grounds that America's youth needs protection from the supposed threat of foreign propaganda. The government does not have "a free-floating power to restrict the ideas to which children may be exposed. 'Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.'" *Brown*, 564 U.S. at 794–95 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975)).

Minors have a First Amendment right to receive speech. And the government cannot restrict that right on the basis of a "parental consent" theory. The government could not make it "criminal to admit persons under 18 to a political rally without their parents' prior written consent." *Brown*, 564 U.S. at 795 n.3. "Such laws do not enforce *parental* authority over children's speech . . . ; they impose *governmental*

---

*FEC*, 558 U.S. 310 (2010); *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786 (2011); *United States v. Stevens*, 559 U.S. 460 (2010); *United States v. Alvarez*, 567 U.S. 709 (2012)).

[23] *Id.*

authority, subject only to a parental veto." *Id.* Parents, of course, can choose what is best for their children and control their social media access. But governmental censorship of a social media platform would take that choice away from children *and* parents.

In sum, the Act has singled out TikTok because lawmakers decided that the solution to arguments they did not like is government censorship. Labeling such arguments "propaganda" does not exempt them from the First Amendment. On the contrary, the Supreme Court's opinion in *Lamont* makes clear that the most disfavored political speech is most in need of vigilant judicial protection from government suppression.

## II. "MISINFORMATION AND DISINFORMATION" ARE PROTECTED BY THE FIRST AMENDMENT

A second clear theme runs through the congressional statements justifying the Act. The House committee report warned of "misinformation" and "disinformation." H.R. Comm. on Energy & Com., *supra*, at 2. One member of Congress claimed that speech on TikTok was part of an "extensive disinformation campaign."[24] Another similarly warned that the platform could be used "to foment

---

[24] Press Release, Yvette D. Clark, Rep. Clarke Releases Statement on H.R. 7521, the Protecting Americans from Foreign Adversary Controlled Applications Act (Mar. 7, 2024), https://tinyurl.com/5y68mjd3.

14

malign disinformation campaigns."[25] And a third likewise invoked the fear of "[f]oreign interference and disinformation campaigns."[26]

This justification for the law fares no better than the "propaganda" justification. Just as the government may not censor viewpoints it disfavors, neither may it serve as an arbiter of truth. "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality opinion) (citing GEORGE ORWELL, NINETEEN EIGHTY-FOUR (1949) (Centennial ed. 2003)).[27] Our constitutional tradition favors open discussion rather than government fiat, and that holds true for questions of fact just as much as questions of politics and philosophy.

Just as censoring a flawed political argument makes it harder to rebut, censoring a false statement makes it harder to disprove. Thus, "suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse." *Alvarez*,

---

[25] Press Release, Jared Huffman, Rep. Huffman Statement on Vote for the Protecting Americans from Foreign Adversary Controlled Applications Act (Mar. 12, 2024), https://tinyurl.com/3psywtxd.

[26] Press Release, Sean Casten, Casten Statement on HR 7521 (Mar. 13, 2024), https://tinyurl.com/r975wn55.

[27] All citations to *Alvarez* are to Justice Kennedy's plurality opinion unless otherwise noted.

567 U.S. at 728. For all these reasons, "[t]he remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straight-out lie, the simple truth." *Id.* at 727. Put another way, "[t]he First Amendment presumes that as the ultimate governors of society, we are rational agents capable of sorting out truth from falsity without government supervision."[28]

In the long run, giving the government truth-deciding power would have a negative effect on citizens' own motivation to make independent judgments. "The benefits to be achieved by having the government correct the dissemination of factual falsehoods would be far outweighed by the signaling effect of having the government settle intellectual disputes through legal sanctions. Allowing the government to act in this way would subtly diminish the importance of recognizing the government's natural tendency to twist reality to its own purposes. Allowing the government to encourage truthfulness by punishing falsehood has the potential for lulling the citizenry into taking what the government says at face value."[29]

---

[28] James Weinstein, *What Lies Ahead?: The Marketplace of Ideas, Alvarez v. United States, and First Amendment Protection of Knowing Falsehoods*, 51 SETON HALL L. REV. 135, 165 (2020).

[29] *Id.*

Relatedly, granting such power to the government would lead to many true statements being accidentally censored as false, for the simple reason that no one (including government officials) will get every call right. "Those who desire to suppress" purportedly false speech "of course deny its truth; but they are not infallible. . . To refuse a hearing to an opinion, because they are sure that it is false, is to assume that *their* certainty is the same thing as an absolute certainty. All silencing of discussion is an assumption of infallibility."[30]

Even more ominously, some wrongful cases of censorship would result from malice rather than from honest mistakes. If the government were granted the power to censor certain speech on the grounds that it is "misinformation," that power would be ripe for abuse. Prosecution of falsehoods would necessarily be selective, and often particular statements would be targeted because the "statement of such facts are bound up with political perspectives that the government seeks to undermine."[31] "Imagine, for instance, that a president and his party, which controls both houses of Congress, believes that 'fake news' about health—which also just happens to criticize the administration's handling of a public health crisis—is causing people to

---

[30] MILL, *supra*, at 19.

[31] Gey, *supra*, at 22.

17

make dangerous health decisions."[32] Because of the danger inherent in this and other examples, "a truly self-governing democracy cannot allow those temporarily vested with power to dictate what is true or false."[33]

The Act at issue in this case exemplifies these concerns. In passing the law, the government singled out TikTok despite offering no evidence that TikTok contains more falsehoods than any other social media site. Given the sheer volume of social media posts, it would be easy for the government to cherry pick particular examples of falsehoods on any social media site and use those falsehoods as a justification to shut down the disfavored site. As Justice Breyer wrote, "the pervasiveness of false statements . . . provides a weapon to a government broadly empowered to prosecute falsity without more. And those who are unpopular may fear that the government will use that weapon selectively, say, by prosecuting a pacifist who supports his cause by (falsely) claiming to have been a war hero, while ignoring members of other political groups who might make similar false claims." *Alvarez*, 567 U.S. at 734 (Breyer, J., concurring in judgment).

Americans on all sides of the political spectrum should be wary of such government power. "Think about a law giving the government the power to remove

---

[32] JEFF KOSSEFF, LIAR IN A CROWDED THEATER: FREEDOM OF SPEECH IN A WORLD OF MISINFORMATION 197 (2023).

[33] Calvert, *supra*, at 135.

'misleading political speech' from social media sites, and now imagine that a Trump appointee (or an appointee of whichever president you think might not play fairly under the rules) has the power to decide what counts as 'misleading speech' and to order such speech immediately removed from social media sites."[34] No matter who is in office, "selectively prosecuting those with whose speech the government disagrees violates the core democratic precept of *equal* participation in the political process."[35]

And looking to the future beyond TikTok, the Act would grant the government a further tool of selective censorship. In the Act, Congress has given the president a weapon to suppress and censor disfavored speech on *other* platforms beyond TikTok, based on an amorphous finding of "a significant threat" to "national security." The Act, *supra*, § 2(g)(3)(B)(ii). With no further guidelines, it is easy to imagine an administration picking and choosing which platforms to consider a threat to national security, potentially on the basis of selectively identified "disinformation." "The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *N.Y. Times v. United States*, 403 U.S. 713, 719 (1971) (Black, J.,

---

[34] RICK HASEN, CHEAP SPEECH: HOW DISINFORMATION POISONS OUR POLITICS—AND HOW TO CURE IT 81 (2022).

[35] Weinstein, *supra*, at 165.

concurring). When it comes to the power to shut down a speech platform, far more statutory guidance is required to ensure that actions taken are not pretextual. "[P]recision must be the touchstone of legislation so affecting basic freedoms." *N.A.A.C.P. v. Button,* 371 U.S. 415, 438 (1963).

Finally, government censorship of alleged falsehoods is incompatible with the First Amendment because the government itself has tools to counteract misinformation that are far less restrictive than censoring speech (or banning entire platforms). "Censorship regimes may block some lies. But it is rare that government regulations can effectively block all or even most false speech, and in doing so they may also prevent a great deal of true speech with little benefit."[36] For that reason, the government must first attempt to further its aims with its less speech-restrictive tools. These tools are the government's *own* speech and the government's ability to provide civic education. Yet in this case, the government made no attempt to solve the alleged problems of misinformation on social media with these less extreme options.

Just as in *Alvarez*, "[t]he Government has not shown, and cannot show, why counterspeech would not suffice to achieve its interest. The facts of this case indicate that the dynamics of free speech, of counterspeech, of refutation, can overcome the

---

[36] Kosseff, *supra*, at 146.

lie." *Alvarez*, 567 U.S. at 726. "[T]he processes of education" may "avert the evil" of "falsehood and fallacies." *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring).

"If the government is to play any part in fighting fake news, its role must be educational, not censorial. This means ramping up digital media literacy efforts in the nation's classrooms."[37] Indeed, Congress is aware of such options, since they were proposed in a high-profile Select Committee Report. *See* Report of the Select Committee on Intelligence, U.S. Senate on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, vol. 2, p. 81 (calling for a "public initiative . . . focused on building media literacy from an early age" to "help build long-term resilience to foreign manipulation of our democracy"). With education, the government can bolster "private efforts to combat fake news, including counterspeech, self-regulation and media-literacy education."[38] These options "are far superior to creating a government agency vested with Orwellian authority to determine what news is true and false and, in turn, to censor the latter."[39]

---

[37] Calvert, *supra*, at 138.

[38] *Id.* at 107.

[39] *Id.*

## CONCLUSION

Congress passed the Act because it doesn't like some of the speech on TikTok (or some of the speech Congress *thinks* is on TikTok) and because Congress wants to suppress and censor that speech. Not only that, Congress gave future presidents a dangerous tool with which to threaten or destroy other disfavored speech platforms. If members of Congress or the government disagree with the facts or opinions found on a social media site like TikTok, they can respond and rebut with more persuasive speech. But under the First Amendment, the government cannot punish (let alone destroy) a speech platform because of the viewpoints it carries. That is what happened here, and this Court should block the Act from taking effect.

Respectfully submitted,

/s/ Thomas A. Berry
Thomas A. Berry
CATO INSTITUTE
1000 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 789-5202
tberry@cato.org
*Counsel for Amicus Curiae*

June 27, 2024

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,920 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

/s/Thomas A. Berry
Thomas A. Berry

Dated:  June 27, 2024                                         *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2024 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by CM/ECF.

/s/Thomas A. Berry
Thomas A. Berry

*Counsel for Amicus Curiae*