# United States Court of Appeals
# for the District of Columbia Circuit

## No. 24-1113

(and Consolidated Cases 24-1130 & 24-1183)

TIKTOK INC. and BYTEDANCE LTD.,

*Petitioners,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

*(For Continuation of Caption See Inside Cover)*

*On Petitions for Review of Constitutionality of the Protecting
Americans from Foreign Adversary Controlled Applications Act*

**BRIEF OF *AMICI CURIAE* CHAIRMAN OF THE SELECT COMMITTEE
ON THE CCP JOHN R. MOOLENAAR, RANKING MEMBER RAJA
KRISHNAMOORTHI, AND FIFTY-FIVE MEMBERS OF CONGRESS IN
SUPPORT OF RESPONDENT**

THOMAS M. JOHNSON, JR.
JEREMY J. BROGGI
JOEL S. NOLETTE
DANIEL T. PARK
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
Phone: (202) 719-7000
Fax: (202) 719-7049
tmjohnson@wiley.law
jbroggi@wiley.law
jnolette@wiley.law
dpark@wiley.law

*Counsel for* Amici Curiae

August 2, 2024

BRIAN FIREBAUGH, *et al.*,

*Petitioners,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

_____

BASED POLITICS INC.,

*Petitioner,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

*Amici Curiae* Chairman of the Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party John R. Moolenaar, Ranking Member Raja Krishnamoorthi, and Fifty-Five Members of Congress provide the following information in accordance with Circuit Rule 28(a)(1):

### A.     Parties and *Amici*

Except for the following, the parties, intervenors, and *amici* appearing in this Court in these consolidated cases are listed in the Brief of Petitioners TikTok Inc. and ByteDance Ltd.  As of the finalization of this brief, *amici* appearing in this Court in these consolidated cases are Electronic Frontier Foundation; Freedom of the Press Foundation; TechFreedom; Media Law Resource Center; Center for Democracy and Technology; First Amendment Coalition; Freedom to Read Foundation; Cato Institute; Matthew Steilen; Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition; Asian American Federation; Asian Americans Advancing Justice Southern California; Calos Coalition; Hispanic Heritage Foundation; Muslim Public Affairs Council; Native Realities; OCA-Asian Pacific American Advocates of Greater Seattle; OCA-Asian Pacific American Advocates: San Francisco; OCA-Greater Philadelphia; South Asian Legal Defense Fund; Sikh Coalition; Sadhana; Knight First Amendment Institute at Columbia University; Free Press; PEN American Center; Milton Mueller; Timothy H. Edgar; Susan A. Aaronson; Hans

Klein; Hungry Panda US, Inc.; Shubhangi Agarwalla; Enrique Armijo; Derek Bambauer; Jane Bambauer; Elettra Bietti; Ashutosh Bhagwat; Stuart N. Brotman; Anupam Chander; Erwin Chemerinsky; James Grimmelmann; Nikolas Guggenberger; G. S. Hans; Robert A. Heverly; Michael Karanicolas; Kate Klonick; Mark Lemley; David S. Levine; Yvette Joy Liebesman; Dylan K. Moses; Sean O'Brien; Christopher J. Sprigman; the Honorable Michael B. Mukasey; the Honorable Jeff Sessions; the Honorable Chris Inglis; the Honorable Christopher A. Ford; the Honorable Michelle Van Cleave; the Honorable William Evanina; Gus P. Coldebella; Margaret M. Peterlin; Vice Admiral (Ret.) Mike LeFever, Norman T. Roule, Dr. Lenora P. Gant; Paula Doyle; Teresa H. Shea; Michael Geffroy; Geof Kahn; Jamil N. Jaffer; Rick "Ozzie" Nelson; Andrew Borene; and Edward Fishman.

### B.    Ruling Under Review

Petitioners seek direct review of the constitutionality of the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, Div. H, 138 Stat. 895, 955–60 (2024).  There are no prior rulings under review.

### C.    Related Cases

These cases were not previously before this Court or any other court.  Counsel for *Amici Curiae* are not aware of any other case currently pending before this or any other court that is related to these cases within the meaning of Circuit Rule 28(a)(1)(C).

August 2, 2024

/s/ Thomas M. Johnson, Jr.
Thomas M. Johnson, Jr.
Jeremy J. Broggi
Joel S. Nolette
Daniel T. Park
**WILEY REIN LLP**
2050 M Street NW
Washington, DC  20036
Phone: (202) 719-7000
Fax: (202) 719-7049
tmjohnson@wiley.law
jbroggi@wiley.law
jnolette@wiley.law
dpark@wiley.law

*Counsel for* Amici Curiae

## CIRCUIT RULE 29(D) CERTIFICATE

*Amici Curiae* Chairman of the Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party John R. Moolenaar, Ranking Member Raja Krishnamoorthi, and Fifty-Five Members of Congress certify that a separate *amicus* brief is necessary. This brief provides the unique perspective of Members of Congress on the constitutionality and importance of the law under review.

August 2, 2024

/s/ Thomas M. Johnson, Jr.
Thomas M. Johnson, Jr.
Jeremy J. Broggi
Joel S. Nolette
Daniel T. Park
**WILEY REIN LLP**
2050 M Street NW
Washington, DC  20036
Phone: (202) 719-7000
Fax: (202) 719-7049
tmjohnson@wiley.law
jbroggi@wiley.law
jnolette@wiley.law
dpark@wiley.law

*Counsel for* Amici Curiae

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CIRCUIT RULE 29(D) CERTIFICATE .................................................. iv

TABLE OF AUTHORITIES ............................................................... vi

GLOSSARY ...................................................................................... xi

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................1

STATUTES AND REGULATIONS ...................................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT ...................................................................................4

I.      The Constitution Vests Congress With Authority To Protect Americans From Foreign National Security Threats. ................................................... 4

II.     Congress Appropriately Exercised Its Constitutional Authority By Enacting The Divestiture Act............................................................. 7

    A.      Congress Identified Specific Threats from Foreign Adversaries, Including China. ................................................................7

    B.      Congress Chose to Respond to Those Threats Through Tailored Means that Regulate More Narrowly than Other Foreign Ownership Statutes............................................................16

III.    Petitioners' Constitutional Objections Are Meritless. ................................... 20

    A.      The Divestiture Act Does Not Regulate Free Speech.........................20

    B.      The Divestiture Act Does Not Apply to TikTok Petitioners with the Requisite "Specificity" or "Punish" Them...................................25

CONCLUSION ...................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  591 U.S. 430 (2020)................................................................3, 20, 25

*Am. Soc'y of Ass'n Execs. v. United States*,
  195 F.3d 47 (D.C. Cir. 1999)................................................23

*Arcara v. Cloud Books, Inc.*,
  478 U.S. 697 (1986)................................................................22

*Bank Markazi v. Peterson*,
  578 U.S. 212 (2016)................................................................6

*Bartlett v. Lockwood*,
  160 U.S. 357 (1896)................................................................5

*Batterton v. Marshall*,
  648 F.2d 694 (D.C. Cir. 1980)................................................7

*Bd. of Trs. of Univ. of Ill. v. United States*,
  289 U.S. 48 (1933)................................................................5

*BellSouth Corp. v. FCC*,
  162 F.3d 678 (D.C. Cir. 1998)................................................26–27

*Benz v. Compania Naviera Hidalgo, S.A.*,
  353 U.S. 138 (1957)................................................................6

*Buttfield v. Stranahan*,
  192 U.S. 470 (1904)................................................................5

*Cohen v. Cowles Media Co.*,
  501 U.S. 663 (1991)................................................................24

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952)................................................................6

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................. 6

*Huawei Techs. USA, Inc. v. United States*,
    440 F. Supp. 3d 607 (E.D. Tex. 2020) .............................. 20

*INS v. Chadha*,
    462 U.S. 919 (1983) ............................................................. 7

*Int'l Franchise Ass'n v. City of Seattle*,
    803 F.3d 389 (9th Cir. 2015) ............................................ 23

*Islamic Am. Relief Agency v. Gonzales*,
    477 F.3d 728 (D.C. Cir. 2007) ............................................ 6

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
    909 F.3d 446 (D.C. Cir. 2018) ................................. 9, 26–27

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) ........................................... 4

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024) ...................................................... 21

*Moving Phones P'ship L.P. v. FCC*,
    998 F.2d 1051 (D.C. Cir. 1993) ........................................ 18

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) ........................................................... 27

*Regan v. Wald*,
    468 U.S. 222 (1984) ............................................................. 6

*SEC v. Jarkesy*,
    144 S. Ct. 2117 (2024) ........................................................ 5

*Selective Serv. Sys. v. Minn. Pub. Int. Res. Grp.*,
    468 U.S. 841 (1984) ..................................................... 26, 28

*Simpson v. Shepard*,
    230 U.S. 352 (1913) ............................................................. 5

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ................................................................22

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ................................................................12

*Univ. of Penn. v. EEOC*,
    493 U.S. 182 (1990) ............................................................23–24

*Wine & Spirits Retailers, Inc. v. Rhode Island*,
    418 F.3d 36 (1st Cir. 2005) ....................................................23

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993) ................................................................22

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..............................................................4, 7

**Statutes, Rules, and Related Materials**

15 C.F.R. § 791.4 .........................................................................7

47 U.S.C. § 310 ...........................................................................17

Data Security Law of 2021 .........................................................13

Counter-Espionage Law of 2023 ...............................................14

H.R. Rep. No. 118-417 (2024) ...............................10, 12–14, 16

H.R. Res. 11, 118th Cong. (2023) .............................................10

H.R. Res. 1051, 118th Cong. (2024) .................10, 12–16, 24

National Intelligence Law of 2017 ...........................................13

Pub. L. No. 100-418, 102 Stat. 1107 (1988) ...........................18

Pub. L. No. 106-65, 113 Stat. 512 (1999) .................................8

Pub. L. No. 110-49, 121 Stat. 246 (2007) ...............................18

Pub. L. No. 110-181, 122 Stat. 3 (2008) ....................................8

Pub. L. No. 112-239, 126 Stat. 1632 (2013) ................................................8

Pub. L. No. 115-232, 132 Stat. 1636 (2018) ..........................................8, 19

Pub. L. No. 116-92, 133 Stat. 1198 (2019) ................................................8

Pub. L. No. 116-124, 134 Stat. 158 (2020) ................................................19

Pub. L. No. 116-283, 134 Stat. 3388 (2021) ................................................8

Pub. L. No. 117-55, 135 Stat. 423 (2021) ................................................19

Pub. L. No. 117-328, 136 Stat. 4459 (2022) ................................................12

Pub. L. No. 118-50, 138 Stat. 895 (2024) .......................................1, 2, 7, 15–18, 22

U.S. Const. art. I, § 8, cl. 3 ................................................4

U.S. Const. art. I, § 9, cl. 3 ................................................25

**Other Authorities**

1 Laurence H. Tribe, *American Constitutional Law* § 5-18 (3d ed. 2000) ................................................6

1 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law—Substance & Procedure* § 4.2(a), Westlaw (updated July 2024) ................................................5

Echo Wang, *China's Kunlun Tech Agrees to U.S. Demand to Sell Grindr Gay Dating App*, Reuters (May 13, 2019) ................................................19

*Full Committee Hearing on TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms Before the House Energy & Com. Comm.*, 118th Cong. (2023) ...........11–12, 24

*Hearing on the CCP Cyber Threat to the American Homeland and National Security Before the Select Comm. on the CCP*, 118th Cong. (2024) ................................................11–12

*Hearing on CCP Transnational Repression: The Party's Effort to Silence and Coerce Critics Overseas Before the Select Comm. on the CCP*, 118th Cong. (2023) ................................................11

*Hearing on the Chinese Communist Party's Threat to America Before the Select Comm. on the CCP*, 118th Cong. (2023) ...........................................10

*Hearing on Commanding Heights: Ensuring U.S. Leadership in the Critical and Emerging Technologies of the 21st Century Before the Select Comm. on the CCP*, 118th Cong. (2023) ...................................10

*Hearing on Risky Business: Growing Peril for American Companies in China Before the Select Comm. on the CCP*, 118th Cong. (2023) ...............11

*Hearing on TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms Before the House Energy & Com. Comm.*, 118th Cong. (2023) ..........................................11

*Hearing on Worldwide Threats Before the Senate Select Comm. on Intel.*, 118th Cong. (2024) ....................................................................11

Katja Drinhausen & Helena Legarda, *"Comprehensive National Security" Unleashed: How Xi's Approach Shapes China's Policies at Home and Abroad*, Mercator Institute for China Studies (Sept. 15, 2022) ..............................................................................................14

Letter of Sens. Schumer and Cotton to Acting Dir. Nat'l Intel. (Oct. 23, 2019) ...........................................................................................10

Michael Ramsey, *The Constitution's Text in Foreign Affairs* (2007) ......................5

Off. of the Dir. of Nat'l Intel., *Annual Threat Assessment of the U.S. Intelligence Community* (Feb. 6, 2023) ...............................................9

Rubio, Warner Call for Investigation into TikTok After Chinese Communist Party's Access to U.S. Data Comes to Light (July 6, 2022) ...............................................................................................15

Sebastian Rotella, *Even on U.S. Campuses, China Cracks Down on Students Who Speak Out*, ProPublica (Nov. 30, 2021)................................14–15

*TikTok: Technology Overview and Issues*, Cong. Rsch. Serv. (updated June 30, 2023) ..................................................................................9

U.S. Dep't of Just., *Justice Manual* § 9-90.730 (updated Nov. 2022) ......................9

# **<u>GLOSSARY</u>**

| | |
|---|---|
| CCP | Chinese Communist Party |
| CFIUS | Committee on Foreign Investment in the United States |
| NDAA | National Defense Authorization Act |
| PRC | People's Republic of China |

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* Chairman of the Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party John R. Moolenaar, Ranking Member Raja Krishnamoorthi, and Fifty-Five Members of Congress (listed in the Appendix) are Members of the United States Senate and the United States House of Representatives who seek to protect all Americans from foreign adversary controlled applications that present a clear national security threat to the United States.

Earlier this year, wide bipartisan majorities in Congress enacted and President Biden signed the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, Div. H, 138 Stat. 895, 955–60 (2024) ("Divestiture Act") (and a near-identical precursor to this law was introduced by the bipartisan leaders of the Select Committee on the CCP, unanimously reported out of the House Energy and Commerce Committee with a 50-0 vote, and passed the House by a vote of 352-65-1). Contrary to the claims of Petitioners in these cases, the Divestiture Act does not regulate speech or require any social-media company to stop operating in the United States. The Divestiture Act is instead focused entirely on the regulation

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *Amici Curiae* or their counsel contributed money intended to fund the brief's preparation or submission.

of foreign adversary control and provides a clear, achievable path for affected companies to resolve the pressing and non-hypothetical national security threats posed by their current ownership structures.  Because the Constitution invests the political branches and especially Congress with responsibility and authority to protect the American people from foreign threats, *Amici Curiae* have a strong interest in supporting the Divestiture Act.

## STATUTES AND REGULATIONS

All applicable statutes are contained in the Brief of Petitioners TikTok Inc. and ByteDance Ltd. ("TikTok Br.").

## INTRODUCTION AND SUMMARY OF ARGUMENT

In the Divestiture Act, Congress determined that foreign adversary controlled applications that present a clear and significant national security threat should not be permitted to access application stores or web hosting services in the United States. To stop foreign adversaries from targeting, surveilling, and conducting covert repression campaigns against the American people through social media and related applications, the Divestiture Act requires companies controlled by the Democratic People's Republic of North Korea, the People's Republic of China, the Russian Federation, and the Islamic Republic of Iran to divest themselves of that control or face restrictions in the United States.  Divestiture Act §§ 2(a), 2(c); *see id.* § 2(g)(4) (citing 10 U.S.C. § 4872(d)(2)).

In enacting the Divestiture Act, Congress exercised the authorities and responsibilities vested in it by Article I of the Constitution of the United States.  Backed by extensive factfinding about the national security threat to the American people posed by certain foreign adversary controlled applications, the Divestiture Act resembles and, indeed, is narrower than numerous other restrictions on foreign ownership that Congress has enacted in other statutory regimes.  Congress did not transcend the limits imposed by the First Amendment and other constitutional restraints, because "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020), and because the Divestiture Act regulates business conduct not speech.

ByteDance and TikTok ("TikTok Petitioners") say they would prefer an executive judgment under subsection 2(g)(3)(B) rather than a congressional judgment under subsection 2(g)(3)(A).  But that overlooks Congress's power to regulate both foreign commerce and its power to regulate domestic interstate commerce.  That Congress elected to ascertain foreign adversary control itself rather than delegate its authority to the executive branch is, if anything, a point in the statute's favor.  And because the Divestiture Act prescribes prospective steps that TikTok Petitioners and other companies may voluntarily take to avoid its prohibitions in the United States,

rather than punishing them for any past conduct, TikTok Petitioners' arguments based on the Bill of Attainder Clause are meritless.

## ARGUMENT

### I. The Constitution Vests Congress With Authority To Protect Americans From Foreign National Security Threats.

The Constitution establishes Congress as the Nation's lawmaker. The first clause of Article I provides that "All legislative Powers" are "vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." As the Constitution makes clear, "[t]he Founders of this Nation entrusted the law making power to the Congress alone." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952).

Congress may legislate pursuant to its constitutional powers with any purpose not constitutionally prohibited. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819) ("Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."). And Congress's lawmaking power includes authority to regulate both foreign and interstate commerce.

With respect to foreign commerce, the Foreign Commerce Clause grants Congress authority to "regulate Commerce with foreign nations." U.S. Const. art. I, § 8, cl. 3. This authority has many applications reflecting Congress's power to protect

4

national security.  "[F]rom the beginning[,] Congress has exercised a plenary power in respect to the exclusion of merchandise brought from foreign countries." *Buttfield v. Stranahan*, 192 U.S. 470, 492 (1904); *see also SEC v. Jarkesy*, 144 S. Ct. 2117, 2132 (2024) (noting how, in *Buttfield*, the Court held that "Congress's power over foreign commerce . . . was so total that no party had a 'vested right' to import anything into the country").  Congress can "establish quarantine regulations, and to protect the country as respects its commerce from contagious and infectious diseases." *See Bartlett v. Lockwood*, 160 U.S. 357, 361 (1896); *accord Simpson v. Shepard*, 230 U.S. 352, 406 (1913).  And Congress may "pass embargo and non-intercourse laws." *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933) (internal quotation marks omitted); *see also* 1 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law—Substance & Procedure* § 4.2(a), Westlaw (updated July 2024) ("The Constitution as originally framed seems . . . to recognize a virtually unlimited power of Congress over commerce with foreign nations.").

The Divestiture Act is also a routine exercise of Congress's interstate commerce power.  To be sure, the law relates to national security and foreign affairs.  But because it regulates domestic activity, it stands at the core of Congress's lawmaking power.  *See* Michael Ramsey, *The Constitution's Text in Foreign Affairs* 6 (2007) ("[A]ltering rights and duties within the domestic legal system, even in pursuit of foreign affairs objectives, . . . is a 'legislative' (lawmaking) function, not an

executive one.").  As "[f]ully eleven of the powers that Article I, § 8 grants Congress deal in some way with foreign affairs," 1 Laurence H. Tribe, *American Constitutional Law* § 5-18 (3d ed. 2000), Congress is on especially strong footing here.

Because "Congress . . . has the facilities necessary to make fairly" the "important policy decision[s]" in the "delicate field of international relations," *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957), judicial review in this area is, as a rule, "extremely deferential."  *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007); *see, e.g.*, *Bank Markazi v. Peterson*, 578 U.S. 212, 234 (2016); *Regan v. Wald*, 468 U.S. 222, 242 (1984); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952).  Per the Framers' design, the "sensitive and weighty interests of national security and foreign affairs" should be addressed by Congress, and courts are "not to substitute . . . [their] own evaluation of evidence for a reasonable evaluation by the Legislative Branch."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010) (collecting authorities).

For these reasons, TikTok Petitioners err in suggesting that Congress is not qualified to make its own judgment about the national security threat posed by the PRC's control of those companies and must instead provide those companies with the process it supplied to other entities, including judicial review of factual findings made by the executive branch.  *See* TikTok Br. 39–43.  But executive processes are

at most a second-best option, adopted to "reintroduce public participation and fairness to affected parties after governmental authority ha[d] been delegated to unrepresentative agencies." *See Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980). Congress represents the people, answers to the people, and is constitutionally empowered to establish and delimit executive discretion in the realm of foreign commerce. *See Youngstown*, 343 U.S. at 585. The "single, finely wrought and exhaustively considered, procedure" set forth in Article I, *INS v. Chadha*, 462 U.S. 919, 951 (1983), is constitutionally adequate.

## II.     Congress Appropriately Exercised Its Constitutional Authority By Enacting The Divestiture Act.

The Divestiture Act is backed by extensive legislative factfinding demonstrating that foreign adversary nations seek to exploit applications including social media to target, surveil, and conduct other covert activities (including transnational repression) against the American people. The Divestiture Act resembles, but is narrower than, similar foreign ownership regulations that have been on the books for decades and upheld by the courts.

### A.     Congress Identified Specific Threats from Foreign Adversaries, Including China.

The Divestiture Act targets specific safety and national security threats posed by foreign adversary nations, including the PRC. *See* Divestiture Act § 2(g)(4) (citing 10 U.S.C. § 4872(d)(2)); *accord* 15 C.F.R. § 791.4(a) (recognizing that these

countries "have engaged in a long-term pattern or serious instances of conduct significantly adverse to the national security of the United States or security and safety of United States persons"). It is the product of extensive legislative factfinding going back decades.

For instance, since 1999, Congress has required the Secretary of Defense to submit to it an annual report on PRC strategy. *See* National Defense Authorization Act for Fiscal Year 2000, Pub. L. No. 106-65, § 1202(a)–(b), 113 Stat. 512, 781–82 (1999). Over the years, the content Congress required the Secretary of Defense to cover in that report has ballooned to include many specifics about the PRC's cyber strategy and malicious actions via digital media. *See, e.g.*, NDAA for Fiscal Year 2008, Pub. L. No. 110-181, § 1263, 122 Stat. 3, 407 (2008); NDAA for Fiscal Year 2013, Pub. L. No. 112-239, § 1271, 126 Stat. 1632, 2022 (2013); John S. McCain NDAA for Fiscal Year 2019, Pub. L. No. 115-232, § 1260, 132 Stat. 1636, 2059 (2018); NDAA for Fiscal Year 2020, Pub. L. No. 116-92, § 1260, 133 Stat. 1198, 1677–78 (2019). And Congress has required the President to report on the PRC's "use of intelligence networks to exploit open research and development" and "[m]alicious cyber activities," NDAA for Fiscal Year 2019 § 1261, as well as efforts to "deter industrial espionage and large-scale cyber theft of intellectual property and personal information" by the PRC, William M. (Mac) Thornberry NDAA for Fiscal Year 2021, Pub. L. No. 116-283, § 1260F, 134 Stat. 3388, 3963–64 (2021).

8

Congress has long understood how internet-based applications can be a vector exploited by foreign adversaries to compromise Americans' devices and to surveil, covertly influence, and repress. *See generally, e.g.*, *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446 (D.C. Cir. 2018) (discussing the ban Congress imposed on Kaspersky Lab's cybersecurity software in the NDAA for Fiscal Year 2018). And it has been advised repeatedly about the threats posed by the PRC's "cyber espionage operations." *See* Off. of the Dir. of Nat'l Intel., *Annual Threat Assessment of the U.S. Intelligence Community* 10 (Feb. 6, 2023), https://tinyurl.com/5n6r6k68. Moreover, Congress understood that foreign adversary controlled applications present espionage and counter-intelligence risks that cannot be remedied through less restrictive means, such as traditional counter-intelligence mechanisms like defensive briefings. *See* U.S. Dep't of Just., *Justice Manual* § 9-90.730 (updated Nov. 2022).

All this legislative factfinding enabled Congress to assess the national security risk posed by foreign adversary controlled applications generally, as well as the connection between the PRC and ByteDance (the owner of the TikTok social-media application) in this instance. In its current form, TikTok began operations in the United States in August 2018. *See TikTok: Technology Overview and Issues*, Cong. Rsch. Serv. (updated June 30, 2023), https://tinyurl.com/mvejaz84. More or less immediately, legislators began investigating the "national security risks" it posed.

9

*See* Letter of Sens. Schumer and Cotton to Acting Dir. Nat'l Intel. (Oct. 23, 2019), https://tinyurl.com/2t7bfwz7.  Subsequently, recognizing the threat posed by the CCP more generally, a wide and bipartisan majority of the House of Representatives (365-65) voted to establish the Select Committee on the CCP, to investigate and make policy recommendations to address that threat.  *See* H.R. Res. 11, 118th Cong. (2023).

The Select Committee on the CCP and the Senate Select Committee on Intelligence have held numerous classified briefings and open hearings on the threat posed by the CCP generally as well as through TikTok specifically.  *See* Amended Public Redacted Brief for Respondent ("Gov't Br.") 2, 11; *see also* H.R. Rep. No. 118-417, at 10–11 (2024); H.R. Res. 1051, 118th Cong. (2024).

For instance, the Select Committee on the CCP heard about the CCP's grand strategy and the threats it poses to America generally.  *See Hearing on the Chinese Communist Party's Threat to America Before the Select Comm. on the CCP*, 118th Cong. (2023), https://tinyurl.com/4p94n5jj.  Numerous national-security-and-technology experts testified about the PRC's technology ambitions.  *See Hearing on Commanding Heights: Ensuring U.S. Leadership in the Critical and Emerging Technologies of the 21st Century Before the Select Comm. on the CCP*, 118th Cong. (2023), https://tinyurl.com/4rfkpruy.  Witnesses testified about the PRC's laws and

practices requiring nominally private enterprises to engage in clandestine cooperation with PRC authorities. *See Hearing on Risky Business: Growing Peril for American Companies in China Before the Select Comm. on the CCP*, 118th Cong. (2023), https://tinyurl.com/49f72hvd. Government cybersecurity officials testified about cyber threats the CCP poses to the United States. *See Hearing on the CCP Cyber Threat to the American Homeland and National Security Before the Select Comm. on the CCP*, 118th Cong. (2024), https://tinyurl.com/448fh89a ("*CCP Cyber Threat Hearing*"). And witnesses testified about the CCP's campaign of transnational repression. *See Hearing on CCP Transnational Repression: The Party's Effort to Silence and Coerce Critics Overseas Before the Select Comm. on the CCP*, 118th Cong. (2023), https://tinyurl.com/3yjsc45f.

Similarly, the Senate Select Committee on Intelligence held numerous open and closed hearings on foreign covert intelligence operations leveraging social-media platforms, including receiving testimony from the Director of the FBI on the national security threat posed by TikTok during its annual Worldwide Threats hearing. *See Hearing on Worldwide Threats Before the Senate Select Comm. on Intel.*, 118th Cong., at 01:08:53–01:11:01 (2024), https://tinyurl.com/4pehm887.

Not only that, but in March 2023, TikTok Inc. CEO Shou Zi Chew testified before Congress for approximately five hours. *See generally Full Committee Hearing on TikTok: How Congress Can Safeguard American Data Privacy and Protect*

*Children from Online Harms Before the House Energy & Com. Comm.*, 118th Cong. (2023), https://tinyurl.com/mpanhcfa ("*TikTok Hearing*").

Acting on the information it has obtained over this time, Congress previously enacted the No TikTok on Government Devices Act, prohibiting government officials from downloading or using TikTok on their government devices. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. R, § 101, 136 Stat. 4459, 5258–59 (2022). The Divestiture Act—spearheaded by the then-Chairman and the Ranking Member of the Select Committee on the CCP and sponsored by the current Chairman—followed this thorough investigative process. *See, e.g.*, H.R. Res. 1051. The findings undergirding the law bear this out.[2]

As the Report on H.R. 7521—what became the Divestiture Act—of the House Committee on Energy and Commerce details, there are "tight interlinkages" between ByteDance, TikTok, and the CCP. H.R. Rep. No. 118-417, at 3; *accord* H.R. Res. 1051. Through TikTok, the PRC not only can "control data collection on millions of users" but also can "control the software on millions of devices" and thus "compromise" them. *See CCP Cyber Threat Hearing*, *supra*, at 00:43:30–00:45:08 (Testimony of FBI Director Wray); *see also* H.R. Res. 1051 (referencing this testimony).

---

[2] Of course, "Congress is not obligated, when enacting its statutes, to make a record . . . to accommodate judicial review." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) (plurality opinion). But there is one here.

Among the ways this is so, the PRC is able to coerce companies headquartered there—like ByteDance—to "surrender all its data to the PRC," no matter "where that data was collected." *See* H.R. Rep. No. 118-417, at 3–4; *see also* H.R. Res. 1051 (reciting the President's determination in 2020 that "TikTok's ownership by ByteDance Ltd. enables the [PRC] . . . and [CCP] . . . to gain access to 'Americans' personal and proprietary information'"). Several recent PRC laws underscore this threat. *See* H.R. Rep. No. 118-417, at 4; H.R. Res. 1051.

For instance, the National Intelligence Law of 2017 requires that "[a]ll organizations and citizens shall support, assist, and cooperate with national intelligence efforts." *See* National Intelligence Law of 2017, ch. I, art. 7, https://tinyurl.com/5n6cbxdc. Among other things, this means that PRC security and intelligence forces can require organizations like ByteDance—along with their subsidiaries anywhere around the globe—to "provide necessary support, assistance, and cooperation," which includes giving those forces access to collect all "relevant files, materials or items." *Id.* ch. II, arts. 14–16. Also, the Data Security Law of 2021 gives PRC authorities jurisdiction over "data handling activities" outside of the Chinese mainland and requires all "relevant organizations and individuals" to "cooperate" when "[p]ublic security organs and state security organs collect[] data as necessary to lawfully preserve national security or investigate crimes." *See* Data Security Law of 2021, ch. I, art. 2; ch. IV, art. 35, https://tinyurl.com/mrxvv8b6. And the

13

PRC's recently revised Counter-Espionage Law mandates that any technological innovations be accessible to PRC authorities for use to further the PRC's state security and intelligence goals. *See* Counter-Espionage Law of 2023, ch. I, art. 8; ch. IV, arts. 44, 49; ch. V, art. 59, https://tinyurl.com/yb5yvtsx.

These laws—paired with Chairman Xi Jinping's dramatic broadening of the country's conception of national security, *see, e.g.*, Katja Drinhausen & Helena Legarda, *"Comprehensive National Security" Unleashed: How Xi's Approach Shapes China's Policies at Home and Abroad*, Mercator Institute for China Studies (Sept. 15, 2022), https://tinyurl.com/yvfmdrdy—mean that ByteDance must comply with virtually any data request from the PRC, including a request for TikTok data. The national security risks that such access could pose in a conflict hardly require enumeration.

And the threat of all this being weaponized for surveillance, covert influence, and transnational repression is not hypothetical. As has been reported, the CCP and others have used TikTok to spy on pro-democracy protestors in Hong Kong and to conduct "surreptitious surveillance" on U.S. citizen journalists. *See* H.R. Rep. No. 118-417, at 5 & n.22, 8 & n.45, 9; H.R. Res. 1051 (reciting then-National Security Advisor Robert O'Brien's statement that "the CCP uses TikTok . . . to collect personal, private, and intimate data on Americans to use 'for malign purposes'"); *see also* Sebastian Rotella, *Even on U.S. Campuses, China Cracks Down on Students*

*Who Speak Out*, ProPublica (Nov. 30, 2021), https://tinyurl.com/4ky4d244 (documenting how the PRC uses social-media applications to surveil, target, and persecute U.S.-based dissidents).

Congress therefore determined that addressing this existing and future threat for designated social-media applications, including TikTok, required excising the foreign adversary control from the applications.  And with respect to TikTok in particular, Congress considered half-measures that have been proposed (so-called "Project Texas") and concluded that they are neither reliable, *see, e.g.*, *Rubio, Warner Call for Investigation into TikTok After Chinese Communist Party's Access to U.S. Data Comes to Light* (July 6, 2022), https://tinyurl.com/423m2z4x (documenting "TikTok's misrepresentation" about its corporate structure that "undermine[d] longstanding claims by TikTok's management that the company's operations were firewalled from the CCP's demands"), nor adequate, *see* H.R. Res. 1051 (finding that "Project Texas" would still expose Americans to "malicious code, backdoor vulnerabilities, surreptitious surveillance, and other problematic activities" deriving from the PRC).[3]

---

[3] Along with the Divestiture Act, Congress also enacted the Protecting Americans' Data from Foreign Adversaries Act, *see* Pub. L. No. 118-50, Div. I, 138 Stat. 895, 960–63 (2024).  This law addresses a related national security problem—data-broker sales of Americans' data to foreign adversaries.

Indeed, through extensive discussions with TikTok's senior corporate management, congressional committees identified myriad deficiencies in the proposed national security agreement offered by TikTok Petitioners, as well as residual risks that could not be resolved through any behavioral remedies stipulated to by the Committee on Foreign Investment in the United States (particularly given documented instances of the company's misrepresentation over its corporate governance, data security, and other practices). *See, e.g.*, H.R. Rep. 118-417 at 4–5; H.R. Res. 1051. Congress thus determined that the Divestiture Act is the least restrictive way to resolve the national security threat because nothing short of addressing TikTok's foreign adversary control can address such risks.

**B.    Congress Chose to Respond to Those Threats Through Tailored Means that Regulate More Narrowly than Other Foreign Ownership Statutes.**

Accordingly, Congress passed the Divestiture Act.  Contrary to Petitioners' contentions, the Divestiture Act neither bans any social-media application nor imposes any regulation on speech.  For apps whose operators choose to keep them "controlled by a foreign adversary" after a specified time, the law (1) prohibits app stores from "distribut[ing], maintain[ing], or updat[ing]" foreign adversary controlled applications "within the land or maritime borders of the United States" by means of an online application store and (2) prohibits internet hosting services from providing such "services to enable the distribution, maintenance, or updating" of

16

foreign adversary controlled applications "within the land or maritime borders of the United States." Divestiture Act § 2(a)(1)–(3), 2(c). But the Divestiture Act gives companies that operate "foreign adversary controlled applications" in the United States a way to continue offering uninterrupted services in the United States without threatening national security—by taking prescribed steps to eliminate foreign adversary control over the application. *See id.* § 2(c)(1); *id.* § 2(g)(3), (6).

The Divestiture Act not only reflects specific intelligence Congress considered about the impact of foreign adversary control on ByteDance and its applications; it is also representative of longstanding congressional concern about the potential national security risks posed by foreign control of American companies. Indeed, the Act is narrower than other, similar foreign ownership regulations, including ones that have been upheld against constitutional challenge.

For instance, in the Communications Act of 1934, Congress generally prohibited foreign-incorporated or -owned companies from holding radio spectrum licenses. *See* 47 U.S.C. § 310(b)(2)–(3). Under § 310, a company qualifies as foreign owned if more than twenty percent of its stock is owned by foreign persons or entities. *See id.* § 310(b)(3). The Divestiture Act follows this model, similarly adopting a foreign incorporation rule as well as a "20 percent stake" threshold in defining what it means for a company to be "controlled by a foreign adversary." Divestiture

Act § 2(g)(1)(A)–(B).  That said, the Divestiture Act is narrower: while the Communications Act applies universally, the Divestiture Act applies only to applications that present a "significant threat to the national security of the United States," have a large user base, and are ultimately controlled by one of four foreign adversary nations.  *See id.* § 2(g)(3)(B)(ii); *id.* § 2(g)(2); *id.* § 2(g)(4) (citing 10 U.S.C. § 4872(d)(2)).

This Court has upheld § 310's foreign ownership ban against constitutional attack.  In *Moving Phones Partnership L.P. v. FCC*, 998 F.2d 1051 (D.C. Cir. 1993), the court recognized that § 310 "reflect[ed] a long-standing determination to safeguard the United States from foreign influence in broadcasting."  *Id.* at 1055 (internal quotation marks omitted).  And in the face of an equal-protection challenge to § 310, the court applied rational-basis scrutiny and found that the statute easily passed given the "national security policy" underlying it.  *See id.* at 1056.

Consider also CFIUS, an interagency body with authority to review, block, and even unwind after-the-fact corporate mergers, acquisitions, or takeovers that "could result in foreign control" over domestic commerce.  Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 5021, 102 Stat. 1107, 1425–26 (1988); Foreign Investment and National Security Act of 2007, Pub. L. No. 110-49, § 3, 121 Stat. 246, 252 (2007).  Recently, this authority has been exercised to require the divestiture of an American app owned by a Chinese company.  *See, e.g.*,

Echo Wang, *China's Kunlun Tech Agrees to U.S. Demand to Sell Grindr Gay Dating App*, Reuters (May 13, 2019), https://tinyurl.com/yhsc6hrs. The Divestiture Act complements the much broader authority granted to CFIUS by regulating with particularity a narrowly defined class of foreign adversary controlled applications.

More recently, Congress has adopted other measures that specifically target the national security threat posed by CCP control of companies involved in supplying communications network infrastructure. For example, in the NDAA for Fiscal Year 2019, Congress prohibited federal agencies from using telecommunications equipment produced by several entities affiliated with the PRC, including Huawei and ZTE. *See* Pub. L. No. 115-232, § 889. Then, in 2019, Congress required the FCC to create a list of "covered communications equipment or services" on which federal funds could not be spent, and the law defined those as communications or services that "pose[] an unacceptable risk to the national security." Secure and Trusted Communications Networks Act, Pub. L. No. 116-124, § 2, 134 Stat. 158, 158–59 (2020). In that law, Congress required the FCC to include as "covered" the equipment produced by the specific entities identified in the NDAA for Fiscal Year 2019. *See id.* § 2(c)(3). And in 2021, Congress passed the Secure Equipment Act, Pub. L. No. 117-55, 135 Stat. 423 (2021), specifying that the FCC could not authorize the use of such "covered" equipment. *See id.* § 2(a)(2).

19

In these laws, too, Congress identified specific companies that posed a threat to American data security due to Chinese corporate ownership.  And the first law in this series, the NDAA for Fiscal Year 2019, has been upheld against constitutional challenge claiming that the law improperly singled out specific companies.  *See Huawei Techs. USA, Inc. v. United States*, 440 F. Supp. 3d 607, 628–54 (E.D. Tex. 2020).  The Divestiture Act is no different.

## III.     Petitioners' Constitutional Objections Are Meritless.

### A.     The Divestiture Act Does Not Regulate Free Speech.

Petitioners' principal argument is that the Divestiture Act violates their First Amendment rights.  TikTok. Br. 28–61; Opening Br. of Creator Pet'rs 23–62; Br. of Pet'r BASED Politics Inc. 14–30.  That is wrong.

First, "it is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev.*, 591 U.S. at 433 (collecting cases); *see also id.* at 433, 439 (holding that "legally distinct foreign affiliates" of American corporations "possess no rights under the U.S. Constitution").  That forecloses any First Amendment claim—as well as any other constitutional claim—by ByteDance, which concedes that it is a foreign incorporated holding company and in its brief asserts no operations within the United States.  *See* TikTok Br. 6–7.

20

The same principle appears to foreclose any argument by Petitioner TikTok as well.  Although "TikTok Inc." is "an American company incorporated and headquartered in California," its "ultimate parent is ByteDance Ltd."  TikTok Br. 6.  And, as Justice Barrett recently explained, "a social-media platform's foreign ownership and control over its content-moderation decisions might affect whether" the First Amendment applies, even for a U.S.-based company.  *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2410 (2024) (concurring).  TikTok says here that its "U.S. application is highly integrated with the global TikTok application" and "runs on billions of lines of code that have been developed over multiple years by a team of thousands of global engineers."  TikTok Br. 21, 23 (cleaned); *see also id.* at 32 ("A post-divestiture, U.S.-only TikTok would lack the recommendation engine that has driven its success").  Those assertions, taken against the backdrop of TikTok's foreign ownership structure, strongly suggest that "the platform's corporate leadership abroad makes the policy decisions about the viewpoints and content the platform will disseminate" and that "Americans" "the corporation employs" are taking "the direction of foreign executives."  *NetChoice*, 144 S. Ct. at 2410 (Barrett, J., concurring).  Thus, even if the Divestiture Act did regulate TikTok's speech, such regulation "might [not] . . . trigger First Amendment scrutiny."  *See id.*

21

Second, and more fundamentally, the Divestiture Act regulates corporate ownership over U.S.-based communications infrastructure, not speech.  The Supreme Court has long held that "restrictions on protected expression are distinct from restrictions on economic activity" and that "the First Amendment does not prevent" the latter.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  Also, it has "reject[ed] the 'view that an apparently limitless variety of conduct can be labeled speech.'"  *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).  Determining that speech is not at issue is easy where the regulated conduct "manifests absolutely no element of protected expression."  *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705 (1986).

That is so here.  The Divestiture Act states that it "does not apply to a foreign adversary controlled application with respect to which a qualified divestiture is executed."  Divestiture Act § 2(c).  A "qualified divestiture" is, in relevant part, "a divestiture or similar transaction" that "the President determines, through an interagency process, would result in the relevant foreign adversary controlled application no longer being controlled by a foreign adversary."  *Id.* § 2(g)(6).  Far from forcing TikTok "to guess what type of divestiture would satisfy the President," TikTok Br. 43; *see also id.* at 33, the Divestiture Act plainly sets forth the criteria by which a company will be deemed "controlled by a foreign adversary," *see* Divestiture Act § 2(g)(1).

22

Under the Divestiture Act, therefore, TikTok can avoid any regulation whatsoever by simply divesting itself of foreign control.  Because that requirement "exhibits nothing that even the most vivid imagination might deem uniquely expressive," *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 53 (1st Cir. 2005); *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) ("A business agreement or business dealings . . . is not conduct with a significant expressive element"), the First Amendment does not apply.

TikTok Petitioners do not deny that a qualified divestiture is conduct not speech.  Instead, they assert that their First Amendment rights are nevertheless burdened because "the practical effect of the [Divestiture] Act is to shut TikTok down." TikTok Br. 31.  But that plainly is not true.  For one, the Divestiture Act does not require that TikTok shut down—only that it shed foreign adversary control.  *Cf. Am. Soc'y of Ass'n Execs. v. United States*, 195 F.3d 47, 50 (D.C. Cir. 1999) (concluding that a law providing "option[s]" whereby an entity "can avoid any alleged burden on its First Amendment rights"—such as by "splitting itself into two organizations"— does not trigger First Amendment scrutiny).  As for the TikTok Petitioners' argument that compliance might take time and be "expensive," TikTok Br. 22, 32, similar (and here, temporary) burdens are imposed by "many laws [that] make the exercise of First Amendment rights more difficult," *see Univ. of Penn. v. EEOC*, 493 U.S. 182, 200 (1990).  But a plaintiff "cannot claim a First Amendment violation simply

because" it "may be subject to . . . government regulation." *Id.*  By the same token, the Creator Petitioners and BASED Politics cannot claim a constitutional injury if TikTok elects to shut down rather than shed its foreign adversary control.

Further, TikTok Petitioners' argument on this point—framed in terms of the purported "infeasibility" of spinning off a U.S.-specific version of TikTok, *see* Tik-Tok Br. 21–24—rests on a myopic reading of the Divestiture Act.  ByteDance could spin off TikTok entirely—both U.S.-based and non-U.S. operations—and avoid the ostensible challenges posed by a "hypothetical U.S.-only TikTok."  *See* TikTok Br. 22.

Though Mr. Chew testified before Congress under 18 U.S.C. § 1001 that "ByteDance is not owned or controlled by the Chinese government," *see TikTok Hearing*, *supra*, at 00:20:39–00:20:50, TikTok Petitioners now suggest that the PRC holds such sway over ByteDance that it would block this sort of transaction, *see* TikTok Br. 24.  But if that is so, the PRC, not the Divestiture Act, is to blame.  And the First Amendment is not triggered by that.  *Cf. Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991) (finding no First Amendment problem when speech restrictions were "self-imposed").

TikTok Petitioners assert that "any divestiture would change TikTok's speech" because a "post-divestiture, U.S.-only TikTok would lack the recommenda-tion engine that has driven its success."  TikTok Br. 32.  But elsewhere, TikTok

Petitioners concede that this "recommendation engine" is in fact under the control of a foreign adversary country.  *See* TikTok Br. 25.  TikTok Petitioners' concession that TikTok's recommendation engine is ultimately controlled by the PRC merely confirms that, to the extent that it involves expressive conduct, such conduct is unprotected.  *See Agency for Int'l Dev.*, 591 U.S. at 433.

TikTok Petitioners are also wrong in claiming the Divestiture Act is content- and speaker-based.  *See* TikTok Br. 25, 33–38.  The statute creates neutral and generally applicable rules for all foreign adversary controlled applications that are determined to pose a national security risk.  To be sure, with respect to the TikTok Petitioners, Congress determined that the application is controlled by a foreign adversary and poses a significant national security threat and did not delegate that function to the executive branch.  But Congress gave TikTok Petitioners the same divestment choice and process that it gave to every other application designated under the statute that is controlled by a foreign adversary and poses a significant national security threat.

### B.    The Divestiture Act Does Not Apply to TikTok Petitioners with the Requisite "Specificity" or "Punish" Them.

TikTok Petitioners assert that the Divestiture Act violates the Bill of Attainder Clause.[4]  *See* U.S. Const. art. I, § 9, cl. 3.  "[A]ssuming that the Bill of Attainder

---

[4]  These Petitioners' remaining claims also fail.  *See* Gov't Br. 75–76, 83–86.

Clause extends to corporations," *Kaspersky Lab*, 909 F.3d at 454; *see id.* (explaining "question remains open"), it is not violated here.

To begin, the Divestiture Act does not "appl[y] with specificity." *See Kaspersky Lab*, 909 F.3d at 454. In this context, "specificity" means "irreversible," "absolute barriers" such as unalterable past conduct or immutable characteristics. *See Selective Serv. Sys. v. Minn. Pub. Int. Res. Grp.*, 468 U.S. 841, 848–51 (1984). That element is not satisfied here because the Divestiture Act provides a path for foreign adversary controlled applications to shed foreign control.

Equally important, the Divestiture Act does not impose punishment. *See Kaspersky Lab*, 909 F.3d at 454. "[T]o distinguish permissible burdens from impermissible punishments," the Supreme Court instructs lower courts "to conduct 'three necessary inquiries'": (1) "'whether the challenged statute falls within the historical meaning of legislative punishment'"; (2) "'whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'"; and (3) "'whether the legislative record evinces a congressional intent to punish.'" *Id.* at 455 (quoting *Selective Serv. Sys.*, 468 U.S. at 852). All three confirm the Divestiture Act's constitutionality.

First, the Divestiture Act is not a legislative punishment. A "statute that leaves open perpetually the possibility of overcoming a legislative restriction does not fall within the historical meaning of forbidden legislative punishment." *BellSouth Corp.*

26

*v. FCC*, 162 F.3d 678, 685 (D.C. Cir. 1998) (cleaned).  As discussed, the Divestiture Act satisfies this test.

Second, the Divestiture Act furthers nonpunitive goals.  The legislative record shows that Congress was well aware of the national security threats posed by foreign adversary controlled applications and enacted "a rather conventional response to a security risk: remove the risk."  *Kaspersky Lab*, 909 F.3d at 457.  The Divestiture Act is not "underinclusive" as to the risks Congress identified because it applies to any foreign adversary controlled application deemed a significant national security threat by the President and because TikTok Petitioners "posed the most urgent potential threat."  *See id.* at 456, 459.

Third, the legislative record evinces non-punitive intent.  Again, Congress amassed a substantial record reflecting its legitimate national security concerns with foreign adversary controlled applications.  *See* Section II.A., *supra*.  And the Divestiture Act's structure shows Congress's intent reached beyond ByteDance and TikTok.  *See, e.g.*, *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 481 (1977) ("[S]pecific aspects of the Act . . . just do not square with the claim that the Act was a punitive measure." (cleaned)).  TikTok Petitioners' attempt, *see* TikTok Br. at 19–21, 67–68, to cherry-pick statements by individual Members of Congress to obfuscate the clearly articulated national security purpose of the Divestiture Act and to attribute punitive intent to those Members fails when the statements are examined in context.

27

And, in any event, this attempt falls far short of the "unmistakable evidence of punitive intent which is required before a Congressional enactment of this kind may be struck down." *See Selective Serv. Sys.*, 468 U.S. at 855 n.15 (cleaned); *see id.* ("isolated statements expressing understandable indignation" not enough).  In introducing and passing the Divestiture Act with overwhelming bipartisan support, the Select Committee on the CCP and Congress acted not to punish ByteDance, but to protect national security.

**CONCLUSION**

The Court should deny the Petitions for Review.


August 2, 2024                                        /s/ Thomas M. Johnson, Jr.
                                                     Thomas M. Johnson, Jr.
                                                     Jeremy J. Broggi
                                                     Joel S. Nolette
                                                     Daniel T. Park
                                                     **WILEY REIN LLP**
                                                     2050 M Street NW
                                                     Washington, DC  20036
                                                     Phone: (202) 719-7000
                                                     Fax: (202) 719-7049
                                                     tmjohnson@wiley.law
                                                     jbroggi@wiley.law
                                                     jnolette@wiley.law
                                                     dpark@wiley.law

                                                     *Counsel for* Amici Curiae

# CERTIFICATE OF COMPLIANCE

I hereby certify, on August 2, 2024, that:

1.  This document complies with the word limit under Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), this document contains 6,282 words.

2.  This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document was prepared in a proportionally spaced typeface using Microsoft Word for Office 365 MSO in a 14-point Times New Roman font.

/s/ Thomas M. Johnson, Jr.
Thomas M. Johnson, Jr.

## CERTIFICATE OF SERVICE

I certify that on August 2, 2024, a true and correct copy of this Brief of *Amici Curiae* was filed and served electronically upon counsel of record registered with the Court's CM/ECF system.

/s/ Thomas M. Johnson, Jr.
Thomas M. Johnson, Jr.

# APPENDIX

## *U.S. House of Representatives*

Select Committee on the CCP Chairman John R. Moolenaar

Select Committee on the CCP Ranking Member Raja Krishnamoorthi

Energy and Commerce Committee Chair Cathy McMorris Rodgers

Energy and Commerce Committee Ranking Member Frank Pallone

Majority Leader Steve Scalise

Speaker Emerita Nancy Pelosi

Representative Jake Auchincloss

Representative Andy Barr

Representative Shontel M. Brown

Representative Larry Bucshon, M.D.

Representative Kat Cammack

Representative André Carson

Representative Earl L. "Buddy" Carter

Representative Kathy Castor

Representative Ben Cline

Representative Dan Crenshaw

Representative John Curtis

Representative Donald G. Davis

Representative Chris Deluzio

Representative Jeff Duncan

Representative Neal P. Dunn, M.D.

Representative Anna G. Eshoo

Representative Carlos Giménez

Representative Josh Gottheimer

Representative H. Morgan Griffith

Representative Brett Guthrie

Representative Diana Harshbarger

Representative Ashley Hinson

Representative John James

Representative Dusty Johnson

Representative Darin LaHood

Representative Robert E. Latta

Representative Blaine Luetkemeyer

Representative Jared Moskowitz

Representative Seth Moulton

Representative Dan Newhouse

Representative Greg Pence

Representative August Pfluger

Representative Brad Sherman

Representative Mikie Sherrill

Representative Elissa Slotkin

Representative Michelle Park Steel

Representative Elise Stefanik

Representative Haley M. Stevens

Representative Thomas Suozzi

Representative Ritchie Torres

Representative Tim Walberg

Representative Randy Weber

Representative Rob Wittman

C

### *U.S. Senate*

Senate Select Committee on Intelligence Vice Chairman Marco Rubio

Senator Marsha Blackburn

Senator John Cornyn

Senator Tom Cotton

Senator Josh Hawley

Senator Pete Ricketts

Senator James E. Risch

Senator Mike Rounds

D