CASE SCHEDULED FOR ORAL ARGUMENT SEPTEMBER 16, 2024

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

|  |  |  |
|---|---|---|
| TIKTOK INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BYTEDANCE LTD., | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | No. 24-1113 (Lead) |
| | ) | |
| MERRICK B. GARLAND, in his official | ) | *caption continued on* |
| capacity as Attorney General of the | ) | *inside cover* |
| United States, | ) | |
| *Respondent.* | ) | |

_____

**TIKTOK PETITIONERS' OPPOSITION TO RESPONDENT'S
MOTION TO FILE MATERIALS *EX PARTE* AND CROSS-
MOTION IN THE ALTERNATIVE FOR APPOINTMENT OF A
SPECIAL MASTER**

|  |  |  |
|---|---|---|
| BRIAN FIREBAUGH, CHLOE JOY SEXTON, TALIA CADET, TIMOTHY MARTIN, KIERA SPANN, PAUL TRAN, CHRISTOPHER TOWNSEND, and STEVEN KING, | ) ) ) ) ) ) ) ) |  |
| *Petitioners*, | ) ) |  |
| v. | ) ) | No. 24-1130 |
| MERRICK B. GARLAND, in his official capacity as Attorney General of the United States, | ) ) ) ) |  |
| *Respondent.* | ) ) |  |
| BASED POLITICS INC., | ) ) |  |
| *Petitioner*, | ) ) |  |
| v. | ) ) | No. 24-1183 |
| MERRICK B. GARLAND, in his official capacity as Attorney General of the United States, | ) ) ) ) |  |
| *Respondent.* | ) ) |  |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

ARGUMENT ......................................................................................... 4

I.     The Government's Request to Submit Materials *Ex Parte* Should Be Denied. ........................................................................ 4

    A.    The Government's *Post Hoc* Rationalizations Are Irrelevant ... 5

    B.    The Government's Reliance on *Ex Parte* Submissions Violates Foundational First Amendment and Due Process Principles ... 9

        1.    The government's request to rely on *ex parte* evidence to defend its sweeping speech restriction violates fundamental norms. .......................................................................... 9

           a)    Courts rarely tolerate reliance on *ex parte* evidence, particularly where First Amendment rights are at stake. . 9

           b)    The government's submissions in this case demonstrate the dangers of *ex parte* submissions. ................................. 12

        2.    Due process requirements reinforce the need to strike the government's *ex parte* submissions. ...................................... 21

        3.    This case does not present the "very limited" circumstances where reliance on *ex parte* arguments and evidence has been tolerated. ................................................................ 26

    C.    The Court Should Deny the Motion for Leave to File *Ex Parte*. ...................................................... 31

II.    In the Alternative, This Court Should Appoint a Special Master to Implement Case-Specific Procedural Protections to Mitigate the Prejudice from the Government's *Ex Parte* Submissions. ............. 32

III.   The Government's Motion Reinforces The Potential Need for a Temporary Injunction. ................................................................. 38

CONCLUSION ................................................................................... 39

CERTIFICATE OF COMPLIANCE ................................................... 42

CERTIFICATE OF SERVICE ............................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abourezk v. Reagan,*
  785 F.2d 1043 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987) ........... 1, 9, 10

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,*
  686 F.3d 965 (9th Cir. 2012) ........................................................ 23, 36

*Al-Hela v. Biden,*
  66 F.4th 217 (D.C. Cir. 2023) (en banc) ................................. 13, 35, 36

*Alario v. Knudsen,*
  2023 WL 8270811 (D. Mont. Nov. 30, 2023) ..................................... 15

*Am.-Arab Anti-Discrimination Comm. v. Reno,*
  70 F.3d 1045 (9th Cir. 1995) ................................................... 13, 23, 25

*Bauchman for Bauchman v. West High School,*
  132 F.3d 542 (10th Cir. 1997) ............................................................ 35

*Brock v. Roadway Express, Inc.,*
  481 U.S. 252 (1987) ............................................................................ 13

*Carroll v. President & Comm'rs of Princess Anne,*
  393 U.S. 175 (1968) ............................................................... 10, 11, 21

*Dep't of Navy v. Egan,*
  484 U.S. 518 (1988) ............................................................................ 24

*Fares v. Smith,*
  901 F.3d 315 (D.C. Cir. 2018) .............................. 22, 26, 29, 30, 31, 36

*First Nat'l Bank of Boston v. Bellotti,*
  435 U.S. 765 (1978) ............................................................................ 22

*Franz v. United States,*
  707 F.2d 582 (D.C. Cir. 1983) ............................................................ 10

*Freedman v. Maryland*,
　380 U.S. 51 (1965) ....................................................................... 11, 28

*Gen. Dynamics Corp. v. United States*,
　563 U.S. 478 (2011) ............................................................................ 27

*Greene v. McElroy*,
　360 U.S. 474 (1959) ............................................................................ 11

*Hill v. Kemp*,
　478 F.3d 1236 (10th Cir. 2007) ......................................................... 18

*Holder v. Humanitarian Law Project*,
　561 U.S. 1 (2010) ................................................................................ 25

*Holy Land Found. v. Ashcroft*,
　333 F.3d 156 (D.C. Cir. 2003) ...................................................... 28, 30

*Horn v. Huddle*,
　647 F. Supp. 2d 55 (D.D.C. 2009) ..................................................... 36

*Jifry v. FAA*,
　370 F.3d 1174 (D.C. Cir. 2004) ......................................................... 27

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
　341 U.S. 123 (1951) ............................................................................ 11

*Kaley v. United States*,
　571 U.S. 320 (2014) ............................................................................ 14

*Kashem v. Barr*,
　941 F.3d 358 (9th Cir. 2019) ............................................................. 32

*Kennedy v. Bremerton Sch. Dist.*,
　597 U.S. 507 (2022) .............................................................................. 6

*Korematsu v. United States*,
　584 F. Supp. 1406 (N.D. Cal. 1984) .................................................. 25

*Marcus v. Search Warrants*,
　367 U.S. 717 (1961) ............................................................................ 11

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ................................................................. 21, 22

*N.L.R.B. v. A-Plus Roofing, Inc.*,
  39 F.3d 1410 (9th Cir. 1994) ................................................... 35

*Nat'l Council of Resistance of Iran v. Dep't of State*,
  251 F.3d 192 (D.C. Cir. 2001) ................................... 28, 30, 33

*In re NSA Telecomms. Recs. Litig.*,
  595 F. Supp. 2d 1077 (N.D. Cal. 2009) ............................... 36

*New York Times Co. v. United States*,
  403 U.S. 713 (1971) ................................................................. 25

*Olivares v. TSA*,
  819 F.3d 454 (D.C. Cir. 2016) ............................................... 27

*In re Oliver*,
  333 U.S. 257 (1948) ................................................................. 11

*Parhat v. Gates*,
  532 F.3d 834 (D.C. Cir. 2008) ............................................... 32

*Press-Enterprise Co. v. Super. Ct. of Cal.*,
  464 U.S. 501 (1984) ................................................................. 11

*Ralls Corp. v. CFIUS*,
  758 F.3d 296 (D.C. Cir. 2014) ................................... 27, 28, 30

*Stanley v. Georgia*,
  394 U.S. 557 (1969) ................................................................. 12

*Ted Cruz for Senate v. FEC*,
  542 F. Supp. 3d 1 (D.D.C. 2021) .......................................... 12

*In re DoD*,
  848 F.2d 232 (D.C. Cir. 1988) ............................................... 34

*United States v. Abuhamra*,
  389 F.3d 309 (2d Cir. 2004) ........................................... 31, 37

*United States v. Charmer Indus., Inc.*,
 722 F.2d 1073 (2d Cir. 1983) ............................................. 35

*United States v. Microsoft Corp.*,
 56 F.3d 1448 (D.C. Cir. 1995) ............................................. 9

*Wash. Post v. DoD*,
 766 F. Supp. 1 (D.D.C. 1991) ............................................. 34

*Zedner v. United States*,
 547 U.S. 489 (2006) ............................................. 8

*Zevallos v. Obama*,
 793 F.3d 106 (D.C. Cir. 2015) ............................................. 27, 28

**Constitutional Provisions**

Amend. I ................. 1, 3, 6, 9, 11, 12, 21, 22, 23, 27, 28, 30, 31, 32, 35, 39

**Statutes**

8 U.S.C. § 1189(a)(3)(B) ............................................. 30

18 U.S.C. app. 3 § 6(e)(2)(C) ............................................. 32

50 U.S.C.
 § 1702(c) ............................................. 30
 § 1803(i) ............................................. 36
 § 4565(e)(3) ............................................. 30

Protecting Americans from Foreign Adversary Controlled
 Applications Act, Pub. L. No. 118-50, div. H (2024) ..................... 2, 3
 Sec. 2(a)(2) ............................................. 29
 Sec. 2(g)(3)(b) ............................................. 30

**Other Authorities**

Cristiano Lima-Strong, *Senators Look to 'Make the Case' to The Public on TikTok*, Wash. Post (Mar. 21, 2024) ............................................. 24

Decl. of Karen Sprenger, *Alario v. Knudsen*, No. CV 23-56-M-DWM (D. Mont. July 5, 2023), ECF No. 16 ............................................. 15

Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ......... 19, 20, 26

Fed. R. App. P. 48(a) .............................................................................. 34

Fed. R. App. P. 48(b) .............................................................................. 35

Fed. R. Civ. P. 53(a)(1) .......................................................................... 34

Fed. R. Evid. 402 ...................................................................................... 6

L. Brandeis, Other People's Money (1933) ............................................. 1

## INTRODUCTION

"Sunlight is said to be the best of disinfectants." L. Brandeis, Other People's Money 62 (1933). But the government wants this case to be litigated in the dark—with the free speech rights of Petitioners and 170 million Americans hanging in the balance.

The government seeks this Court's approval to file more than 15% of its brief and 30% of its evidence in secret. But it does not come close to overcoming the "firmly held main rule that a court may not dispose of a case on the basis of *ex parte*, *in camera* submissions." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987). Particularly when First Amendment rights are at stake, secret evidence—which is never subject to the crucible of adversarial testing— is not a reliable, credible, or constitutionally-permissible basis for the government to meet its heavy burden to justify restricting speech.

Nor is it compatible with the obligation of an independent judiciary to strictly scrutinize an unprecedented law that singles out and shuts down a specific, expressly-targeted speech platform, while denying it the benefit of the more rigorous procedural and substantive protections available to every other company alleged to pose the same threat.

1

The dangers of the government's request to shield its evidence from adversarial scrutiny are proven by its own brief.  Starting from its very first line, the government's brief is premised on demonstrable factual errors regarding key issues, such as whether TikTok collects "precise location" information from its users (it does not); whether TikTok's U.S. recommendation engine is located in China (it is not); and whether TikTok is owned by a Chinese company (it is not).

These errors in the government's public submissions make adversarial testing of the government's secret submissions all the more important.  If Petitioners are unable to review the government's evidence, they will be unable to rebut contentions that are factually incorrect—let alone explain to the Court why the government's arguments and evidence are legally insufficient.

The government's extensive redactions are even more troubling given its recent decision to un-redact a formerly classified paragraph from its brief—which turns out to contain only quotes from the industry publication *Buzzfeed* and Petitioners' own filings in this case.

There should be no need for the Court to decide the government's motion.  As Petitioners have explained, the Protecting Americans from

Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H (2024) ("Act") should be enjoined as unconstitutional for reasons that do not require consideration of the government's national security evidence—which would render the government's *ex parte* submissions irrelevant. TikTok Br. 28-50, 54-57. The Court should accordingly defer ruling on the government's motion until it can be considered in conjunction with the merits briefing.

But if the Court decides it must consider the government's national security argument, the motion should be denied. The government claims that *ex parte* filings are the norm when classified information is involved. But the cases the government cites are very different for multiple reasons, including because none involves a First Amendment violation—let alone one of this magnitude.

In the alternative, Petitioners request that the Court appoint a district court judge as a special master to assess the contents of the classified submissions and the government's asserted need for secrecy, receive briefing from the parties on the appropriate procedures—if any—that could mitigate the severe prejudice Petitioners will suffer from

consideration of the government's *ex parte* submissions, and formulate recommendations to this Court regarding those issues.

If the Court chooses that route, Petitioners reiterate their request for a temporary injunction to allow time for the Court to consider any recommendations from the special master, hear any objections from the parties, and determine what steps are necessary to mitigate the harms from the government's secret submissions. The government cannot be permitted to frustrate meaningful review with an extensive *ex parte* submission, and then run out the clock on the rights of Petitioners and 170 million U.S. TikTok users.

## ARGUMENT

### I.    The Government's Request to Submit Materials *Ex Parte* Should Be Denied.

As described in Petitioners' opening brief, the Act imposes an enormously broad and consequential speech restriction, expressly singling out and shuttering a speech platform used by 170 million Americans. It also deprives Petitioners of their property and constitutional rights—as well as the ability to challenge the government's conduct under the same standards and procedures applicable to everyone else. *See* TikTok Br. 41-43.

The only evidence the government submitted in defense of the Act are three declarations from employees in the Office of the Director for National Intelligence ("Blackburn Declaration"), the Federal Bureau of Investigation ("Vorndran Declaration"), and the Department of Justice ("Newman Declaration").  The government now asks the Court to allow it to file 27 pages of those declarations, as well as more than 14 pages of its brief, *ex parte*.[1]

The government's motion should be denied for multiple, independent reasons.

## A.    The Government's *Post Hoc* Rationalizations Are Irrelevant.

The Court should deny the government's motion for the threshold reason that the *ex parte* evidence it seeks to introduce contains *post hoc*

---

[1] The government also filed a notice stating its intention to file additional *ex parte* materials.  *See* Am. Notice Regarding Hearing Tr., Doc. #2067516, at 1-3 (describing plan to file redacted hearing transcript from U.S. House of Representatives Committee on Energy and Commerce). The notice states that the government "will make best efforts to file, on the public docket, a redacted version" of these materials "in advance of Petitioners' reply brief, which is currently due August 15, 2024."  *Id.*  For the reasons set out in this opposition and cross-motion, any request for *ex parte* consideration of those additional materials should be denied as well.

rationalizations for the Act that are not relevant to this case. *Cf.* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

In the unique circumstances of this case—a challenge to a statute that targets a specific, named speaker for deprivation of First Amendment rights—legislative findings were required to enable the Court to evaluate the law's constitutionality based on the actual reasons for Congress's unusual action. *See* TikTok Br. 48-49, 57-58. The government's declarations are therefore irrelevant.

Even if legislative findings were not required, settled precedent bars the government from invoking "hypothesized," "*post hoc*" explanations to justify interference with First Amendment rights. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022). Nor can the government meet its burden by presenting information that was put before only a select few Members of Congress.

Here, the government scrupulously avoids stating that the information in its declarations was in fact put before Congress *at all*— much less that Congress endorsed the declarations' conclusions. The government makes a carefully-worded representation that its declarations "are based on the same body of intelligence that was relied

6

on in briefing the Congress, and the key judgments in the intelligence community's assessment were conveyed to Congress."   Am. Notice Regarding Hearing Tr., Doc #2067516, at 2.  That representation cites a redacted paragraph of the Blackburn Declaration—preventing Petitioners from assessing the support for this vague assertion.  But the government's phrasing suggests that only Executive Branch *conclusions* were "conveyed to Congress"—and does not state that all (or even most) of the *information* in the declarations was presented to the minority of Members who attended one of the closed-door sessions about the Act.

That conclusion is confirmed by the only government witness (Principal Deputy Assistant Attorney General David Newman) who appears to have even attended a Congressional session.  *See* Gov't App.87.  Although his "high level" description of the "topics" discussed in these sessions is generic and partly redacted, it appears to include notable omissions.  For instance, he does not refer (at least publicly) to any discussion of why the 90-page National Security Agreement Petitioners negotiated with the government was insufficient to resolve the government's national security concerns, or why the Agreement could not be modified to address any such concerns.  *See* Gov't App.88.

7

Further, the assertion that some unspecified classified information was submitted at certain sessions does not establish that *Congress* enacted the Act on the basis of that information, particularly absent a single legislative finding to that effect. Indeed, there is no evidence that all, most, or even a substantial number of Members were even aware of that information when voting on the Act. In fact, the government's declarations suggest that fewer than 25% of House Members attended the House briefing on the Act, and that the full Senate was not even provided such a briefing. *See* Gov't App.3 (Blackburn Declaration); Gov't App.87 (Newman Declaration). "There is no basis either in law or in reality for th[e] … belief" that "Congress as a whole" took this drastic step based on information proffered to only certain Members. *See Zedner v. United States*, 547 U.S. 489, 510 (2006) (Scalia, J., concurring in part and in the judgment).

Thus, to the extent the government seeks to rely on information in its *ex parte* submissions that was not presented to or even available to— let alone relied on by—Congress as a whole, that information is legally irrelevant. This Court should therefore deny the government's motion, regardless of the content of the government's submissions.

8

B.    **The Government's Reliance on *Ex Parte* Submissions Violates Foundational First Amendment and Due Process Principles.**

The *ex parte* nature of the government's submissions is a further and independent reason why its motion should be denied. Adjudicating core rights on the basis of secret arguments and evidence is antithetical to the Constitution and prevents the Court from undertaking the rigorous scrutiny the First Amendment demands.

1.    *The government's request to rely on* ex parte *evidence to defend its sweeping speech restriction violates fundamental norms.*

a)    *Courts rarely tolerate reliance on* ex parte *evidence, particularly where First Amendment rights are at stake.*

"*Ex parte* communications generally are disfavored because they conflict with a fundamental precept of our system of justice: a fair hearing requires a reasonable opportunity to know the claims of the opposing party and to meet them." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995) (quotation marks omitted). Accordingly, "reliance upon *ex parte* evidence to decide the merits of a dispute" is permissible "[o]nly in the most extraordinary circumstances." *Abourezk*, 785 F.2d at 1061. There are powerful reasons for that rule.

9

*First*, *ex parte* proceedings undermine the justice system's truth-seeking function, depriving a court of the "fundamental instrument for judicial judgment: an adversary proceeding in which both parties may participate" and scrutinize their opponents' evidence and arguments. *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968). Scrutiny of "the government's asserted rationale for its action … reduces the likelihood of error—*i.e.*, the risk that the government will act on the basis of what, in reality, is an insufficient justification." *Franz v. United States*, 707 F.2d 582, 608 (D.C. Cir. 1983).

*Second*, a court's reliance on *ex parte* evidence undermines the legitimacy of the judicial proceeding. "The openness of judicial proceedings serves to preserve both the appearance and the reality of fairness in the adjudications of United States courts." *Abourezk*, 785 F.2d at 1060-61. Deciding a case based on submissions that the affected party cannot review and rebut thus undermines not only the court's truth-seeking function, but also public confidence in the proceeding.

*Third*, adjudicating a party's rights based on arguments and evidence that the party cannot see is fundamentally unfair. The "traditional Anglo-American distrust for secret trials" predates not only

the Founding, but even the Norman Conquest. *In re Oliver*, 333 U.S. 257, 268-69 (1948); *see Press-Enterprise Co. v. Super. Ct. of Cal.*, 464 U.S. 501, 505 (1984). This is because "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring). Accordingly, "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496 (1959).

The dangers of *ex parte* submissions are heightened when First Amendment rights are at stake. Given the vital interests protected by the First Amendment, the government may restrict speech only if there is an opportunity for meaningful judicial review. *See Carroll*, 393 U.S. at 181. To be meaningful, that review must be adversarial. As the Supreme Court has emphasized, "only a judicial determination *in an adversary proceeding* ensures the necessary sensitivity to freedom of expression." *Freedman v. Maryland*, 380 U.S. 51, 58 (1965) (emphases added); *accord Marcus v. Search Warrants*, 367 U.S. 717, 731-33 (1961).

The unreliability of *ex parte* evidence, *supra* p.10, is particularly troubling in the First Amendment context, where the government bears the burden of justifying its burden on speech, *see* TikTok Br. 28, and a lack of adversarial testing risks thwarting a court's "independent duty to scrutinize the government's interest as well as the means chosen to realize it," *Ted Cruz for Senate v. FEC*, 542 F. Supp. 3d 1, 19 (D.D.C. 2021) (three-judge panel), *aff'd*, 596 U.S. 289 (2022). And when the public's "fundamental" "right to receive information and ideas" is at stake, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969), it is all the more important that the court reach results that are not only *correct*, but also *perceived as fair*.

> **b)  The government's submissions in this case demonstrate the dangers of ex parte submissions.**

The government's request to submit *ex parte* materials in this case violates the foundational principles described above. The government seeks to permanently suppress a vast quantity of speech. It is wholly impermissible—and, as far as Petitioners are aware, unprecedented—for the government to use *ex parte* arguments and evidence to defend such a sweeping speech restraint.

The public portions of the government's brief and declarations starkly confirm the dangers of this approach. In particular, the government's submissions make clear that its reliance on *ex parte* materials creates an unacceptable risk of error—a risk amplified by its aggressive approach to redactions in this case.

*First*, the government's public filings provide only generalized descriptions of its purported national security concerns, leaving Petitioners to guess about the specific evidence supporting the government's arguments. *See, e.g.*, Gov't App.4, 14-16, 26-30, 66-68. This creates an "unacceptable risk" of an erroneous decision, *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 265 (1987), as "there is no adversarial check" on the accuracy of the specific information on which the government relies, *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995) ("*AAADC*"), *vacated on other grounds*, 525 U.S. 471 (1999); *see also Al-Hela v. Biden*, 66 F.4th 217, 241 (D.C. Cir. 2023) (en banc) (describing the "extreme care" the district court undertook to ensure that the court's "reliance on *ex parte* evidence was tightly circumscribed and generally used not to break new ground, but rather to test whether other evidence was corroborated").

*Second*, the unredacted portions of the government's brief and declarations contain—and, indeed, premise important arguments on—a number of factual statements that are indisputably false. And because public portions of the submissions are indisputably false, there is, at the very least, a heightened risk that the secret portions are as well. These inaccuracies about key factual questions underscore the importance of putting the government's redacted statements to the test of an adversarial proceeding. "Common sense tells us that secret decisions based on only one side of the story will prove inaccurate more often than those made after hearing from both sides." *Kaley v. United States*, 571 U.S. 320, 355 (2014) (Roberts, C.J., dissenting).

For example, in arguing that "the platform itself, as a whole and as currently operated, creates unacceptable national-security risk," the government repeatedly asserts that the TikTok application collects "precise location" data from its U.S. users. Gov't Br. 1, 8-9, 18, 27-28, 75. This assertion is false. As TikTok has repeatedly explained, and as courts and others have recognized, current versions of the application do

14

not collect GPS location information.[2]  The government does not dispute (or even mention) that evidence.  Nor do the sources the government relies even support its assertion.[3]  This is a material factual inaccuracy in the government's submission, plain and simple.

Similarly, the government's brief and declarations repeatedly state that TikTok's recommendation engine is located in China.  Gov't Br. 2, 6, 8, 16-19, 48, 51, 53, 60-61, 72; Gov't App.25, 49, 81-82, 84.  But as the sworn testimony submitted by Petitioners makes clear, "TikTok's U.S. recommendation engine is stored in the Oracle cloud" in the United States, where "Oracle has full access to review … the algorithm," and it

---

[2] *See* App.765 n.12 (Weber Declaration); App.820 (Presser Declaration); *Privacy Policy*, TikTok (last updated July 1, 2024), https://perma.cc/AA4E-LH5U; *see also Alario v. Knudsen*, 2023 WL 8270811, at *2 (D. Mont. Nov. 30, 2023) (finding that TikTok does not know users' precise location "because it does not collect GPS information from [them]"); Decl. of Karen Sprenger 6-12, *Alario v. Knudsen*, No. CV 23-56-M-DWM (D. Mont. July 5, 2023), ECF No. 16 (explaining that unlike GPS data, IP addresses do not provide precise location information).

[3] The government cites only one source to support its assertion that TikTok collects precise location data: the House Committee Report on the Act.  That report in turn relies on a 2020 *Washington Post* article to support this conclusion.  *See* App.3 & n.9.  This four-year old *Washington Post* article does not reflect TikTok's current data collection practices, as explained above.  In other words, it is not evidence about "the platform … as currently operated."  Gov't Br. 75.

15

is TikTok U.S. Data Security Inc., not ByteDance Ltd., that "deploys the recommendation engine in the United States." App.824 (Presser Declaration). The government does not dispute this testimony, but rather simply ignores it.

In another glaring error, the first salvo in the government's attempt to show that Petitioners are under China's control—the very opening sentence of its brief—is that TikTok is "ultimately owned by the Chinese company ByteDance." Gov't Br. 1. But the assertion that TikTok is owned by a Chinese company is false. TikTok Inc. is ultimately owned by ByteDance Ltd., a Cayman Islands-incorporated holding company majority-owned by global institutional investors (such as General Atlantic and Susquehanna International Group).[4]

The government's erroneous assertion is highly material to its defense of the Act. Indeed, the first paragraph of the government's brief goes on to state that "concerns about the threat to national security posed by TikTok … arise primarily from the combination of certain features of

---

[4] *See* App.802 (58% of ByteDance Ltd. owned by global institutional investors; 21% owned by global workforce; 21% owned by Chinese national founder who lives in Singapore); TikTok Pet. 8-9; TikTok Corp. Disclosure Statement 1-2.

TikTok *and its ownership by a Chinese company*." Gov't Br. 1 (emphasis added). The true facts about Petitioners undermine the government's "China-control" narrative.

The government asserts that TikTok Inc. is owned by a Chinese company because it is purportedly "ultimately owned by Beijing ByteDance Technology, a Chinese internet technology company." Gov't Br. 7 (quotation marks omitted). But that assertion rests on a citation to erroneous information contained in a House Committee Report. *Id.* (citing App.3).[5] The government's own declarations nowhere claim that TikTok Inc. is owned by "Beijing ByteDance Technology," but rather correctly recognize that TikTok Inc.'s ultimate owner is the Cayman-incorporated ByteDance Ltd. *See, e.g.*, Gov't App.13, 45-48.

---

[5] The Committee Report states, in relevant part: "Beijing ByteDance Technology is a Chinese internet technology company headquartered in Beijing and operating in the United States through a holding company ('ByteDance Ltd.') incorporated in the Cayman Islands. ByteDance Ltd., founded and headquartered in Beijing, was formed in 2012 and launched a number of applications and products which became extremely popular, including TikTok." App.3. This paragraph of the Report contains a footnote, which adds: "Beijing ByteDance Technology and its Cayman Island holding company ByteDance Ltd., will interchangeably be referred to as 'ByteDance.'" *Id.*

These errors in the government's public submissions are illustrative of the many factually incorrect and misleading statements—as well as notable omissions—from the government's submissions, which will be described in Petitioners' forthcoming reply brief. And they underscore the importance of rigorous adversarial testing of whatever assertions are in the government's *ex parte* filings. *See Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007) ("Our system of justice, after all, is not a self-directed inquisitorial one; to avoid error, we are dependent on the full development of issues through the adversarial process."). If the government cannot get its *public* filings right, there is no telling what errors are buried in its *secret* filings; adversarial scrutiny is the only reliable basis to ensure the Court relies on accurate information.

*Third*, the risks arising from the government's *ex parte* submissions are increased by the government's aggressive approach to redactions. For example, the government entirely redacted one declarant's conclusion. *See* Gov't App.41 (Vorndran Declaration). Whatever justification the government might have for redacting the factual details of its declarations, it is hard to understand why the government believes

that the witness's bottom-line conclusions must be redacted in their entirety.

Moreover, the record demonstrates that certain of the redacted materials in the government's submissions were not even properly classified under the relevant authorities. *See* Exec. Order No. 13,526, 75 Fed. Reg. 707-08 (Dec. 29, 2009). On July 26, 2024, the government filed its brief and declarations in this case, with substantial redactions. In its motion to file *ex parte*, the government stated that "[t]he appropriate officials within the Executive Branch have conducted a review to ensure that the classified and unclassified information in the three declarations and the response brief have been appropriately identified." Mot. 8. Four days later, the government filed a notice, stating that it had "obtained authorization to lift redactions" from one paragraph of its original brief, and would file an amended brief to reflect this newly-unclassified information. *See* Notice, Doc. #2067515, at 2.

The newly-unredacted portion of the government's brief, however, quotes *exclusively* from public reporting and Petitioners' own filings. *See*

19

Gov't Br. 47-48.[6]  The public filing of those public materials plainly would not harm national security.  Accordingly, as the government now appears to concede, *see* Notice, Doc. #2067515, at 1-2, those materials should never have been classified and redacted from the government's brief, *see* Exec. Order No. 13,526, 75 Fed. Reg. 707-08 (Dec. 29, 2009).  The government's explanation that it needed to "obtain[] authorization" to reveal quotes from *Buzzfeed* and Petitioners' filings in this case

---

[6] That originally redacted paragraph reads:

> As of 2022, ByteDance employees 'repeatedly accessed nonpublic data about U.S. TikTok users, including the physical locations of specific U.S. citizens.' App.7 & n.39 (citing Emily Baker-White, *Leaked Audio from 80 Internal TikTok Meetings Shows that US User Data Has Been Repeatedly Accessed from China*, Buzzfeed News (June 17, 2022)).  Indeed, TikTok's U.S. employees '*had to* turn to their colleagues in China,' as the U.S. employees 'did not have permissions or knowledge of how to access [U.S. user data] on their own.'  Baker-White, *Leaked Audio*, *supra* (emphasis added). And, as petitioners themselves emphasize, the algorithm used for the TikTok platform actually resides within China and cannot be exported without China's permission, TikTok Br. 24, 31; *see also* App.817 ('The source code for TikTok's recommendation engine was originally developed by ByteDance engineers based in China.'); App.832-33 (noting that ByteDance engineers are 'responsible for maintaining and updating [TikTok's] code base').

Gov't Br. 47-48.

demonstrates the improperly aggressive approach it is taking to redactions in the first place.

Petitioners have no means to assess how much of the remaining text in the government's *ex parte* filings relies on this sort of publicly-available information or other information that plainly should not be classified. Indeed, the government's table of authorities confirms that at least two additional public sources are cited in portions of its brief that remain redacted. *See* Gov't Br. xi.

In short, the record in this case underscores the importance of giving Petitioners the opportunity to review and rebut the government's evidence against it; otherwise, there will be "insufficient assurance of the balanced analysis and careful conclusions which are essential in the area of First Amendment adjudication." *Carroll*, 393 U.S. at 183 & n.10.

### 2.    *Due process requirements reinforce the need to strike the government's* ex parte *submissions.*

Due process also requires that the government's *ex parte* submissions be stricken. "The fundamental requirement of due process is the opportunity to be heard in a meaningful time and in a meaningful manner" before being deprived of liberty or property. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation marks omitted). "Freedom

of speech and other freedoms encompassed by the First Amendment always have been viewed as fundamental components of the liberty safeguarded by the Due Process Clause." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 780 (1978).    The Act deprives 170 million Americans of this liberty, silences Petitioners as well, and deprives Petitioners of their property.

To determine the process that is due when the government seeks to silence someone's speech and strip them of their property, this Court looks to the three-part *Mathews* test, which balances (a) the private interest that will be affected; (b) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (c) the government's interest, including the costs of providing additional procedural safeguards. *Mathews*, 424 U.S. at 335; *see also Fares v. Smith*, 901 F.3d 315, 323 (D.C. Cir. 2018).    In the unique circumstances presented here, reliance on *ex parte* submissions fails this test.

*First*, this case implicates overwhelmingly important private interests.    The Act restricts the speech of Petitioners and more than 170 million Americans that use TikTok to express themselves on subjects

22

ranging from the trivial to those at the heart of the First Amendment's protection: politics, religion, current events, and other matters of opinion. And the Act has an enormously damaging economic impact on Petitioners, as well as on the many Americans who use TikTok to promote their small businesses. Creator Br. 63-64; App.826-27, 830-31 (Presser Declaration).

*Second*, as explained above, resolution of this case based on *ex parte* submissions poses a severe threat of erroneous deprivation. *See supra* pp.13-18. "[T]he very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error." *AAADC*, 70 F.3d at 1069. If Petitioners cannot know what is in the government's *ex parte* submissions, they cannot explain why the government's arguments and evidence are faulty. For this reason, "[o]ne would be hard pressed to design a procedure more likely to result in erroneous deprivations" than such "use of classified information without disclosure." *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012) (quotation marks omitted).

*Third*, the government's interest in using secret evidence appears to be weak at best. No doubt, as a general matter, the government has

an interest in shielding certain materials from public view. *See Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). But that general interest appears to be unusually weak *in this proceeding*: to the extent any of this information was previously made available to Congress, multiple Senators who attended a classified briefing reportedly said that it revealed little beyond what was already available through public sources.[7] That observation is consistent with the government's admission that it initially treated as classified a part of its brief discussing *only* press reports and Petitioners' own filings. *Supra* pp.19-21.

In any event, whatever deference to the Executive Branch's classification decisions may be appropriate, *cf. Egan*, 484 U.S. at 531, it does not follow that this Court—which bears independent responsibility for analyzing the government's proffered justifications for the Act—may or should rely on material the government has kept secret from all

---

[7] Cristiano Lima-Strong, *Senators Look to 'Make the Case' to The Public on TikTok*, Wash. Post (Mar. 21, 2024), https://www.washingtonpost.com/politics/2024/03/21/senators-look-make-case-public-tiktok ("Senators declined to discuss the contents of the classified briefing, but some [Senators Vance, Cotton, Cantwell, and Blackburn] suggested it featured little-to-no new information.").

affected parties. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (Supreme Court "precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role"). Indeed, history demonstrates that the government's invocation of national security has not always been fully accurate or justified.[8]

In short, the government's "use of undisclosed information" is "presumptively unconstitutional" and "[o]nly the most extraordinary circumstances could support" such "one-sided process." *AAADC*, 70 F.3d at 1070. The government has not established that such circumstances exist here.

---

[8] *See, e.g.*, *Korematsu v. United States*, 584 F. Supp. 1406, 1417-19 (N.D. Cal. 1984) (granting coram-nobis relief based on substantial evidence that government misled Supreme Court about military exigencies it claimed justified internment of individuals of Japanese descent); *cf. New York Times Co. v. United States*, 403 U.S. 713, 725-26 (1971) (Brennan, J., concurring) (explaining that government's arguments amounted at most to "surmise or conjecture" that revealing the classified information "'could,' or 'might,' or 'may' prejudice the national interest in various ways").

3.   **This case does not present the "very limited" circumstances where reliance on ex parte arguments and evidence has been tolerated.**

As the government's own motion makes clear, this case does not present the "very limited, statutorily recognized circumstances" in which courts have allowed the government to rely on *ex parte* arguments and evidence.  *See Fares*, 901 F.3d at 319.

The government first argues that the mere fact that material has been classified means it can be submitted *ex parte*.  *See* Mot. 5-9.  But, as explained above, the Executive Branch's classification decisions do not relieve the Court of its independent obligation to determine whether the merits of a dispute can be decided on the basis of *ex parte* evidence.  *See supra* p.12.  This principle applies *a fortiori* here, where the government has already admitted that it originally classified materials that are plainly not sensitive—let alone likely to cause "serious damage to national security" if disclosed.  *See supra* pp.19-21; Exec. Order No. 13,526, 75 Fed. Reg. 707-08 (Dec. 29, 2009).

The government next argues that its motion should be granted because "[t]his Court has repeatedly upheld filing materials under seal and *ex parte* to protect classified information."  Mot. 6.  But, even if the

materials the government seeks to keep secret are in fact properly classified, *see supra* pp.19-21, the cases it cites are very different from this one.

Several of the cases the government cites did not involve disputes over *ex parte* materials at all.[9]  In others, the court was evaluating whether an agency's decision was arbitrary and capricious or supported by substantial evidence—not considering *de novo* the merits of government action burdening First Amendment rights.[10]

And in all of the cases the government cites, the balance of interests was strikingly different from the balance here.  For example, in *Jifry*, the court considered a challenge to the Federal Aviation Administration's revocation of airman certificates of two nonresident alien pilots.  *See* 370

---

[9] *See Olivares v. TSA*, 819 F.3d 454, 462 (D.C. Cir. 2016) ("this case does not involve any materials of a sensitive nature that should not be disclosed due to security concerns"); *see also Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 489-90 (2011) (holding contract claim nonjusticiable under state-secrets doctrine).

[10] *See Zevallos v. Obama*, 793 F.3d 106 (D.C. Cir. 2015) (considering whether agency's denial of delisting request was arbitrary and capricious); *Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004) (reviewing agency's use of classified information to revoke license and evaluating whether "substantial evidence" supported the decision); *see also Ralls Corp. v. CFIUS*, 758 F.3d 296 (D.C. Cir. 2014) (considering due process challenge to agency's use of classified information).

F.3d at 1176.  The court explained that the pilots' interest in possessing certificates to fly foreign aircraft outside the United States "pales in significance to the government's security interests in preventing pilots from using civil aircraft as instruments of terror."  *Id.* at 1183.  Many of the other cases the government cites involved challenges to the Executive Branch's designation of particular entities or individuals as "foreign terrorists" or "narcotics traffickers."[11]   Another involved the required divestiture of rights to develop a handful of wind-farms.  *See Ralls*, 758 F.3d at 301-02.  This case involves incomparably more significant private interests—in both scope and kind.

The Act will shutter a medium of expression used by *170 million* U.S. TikTok users, and force Petitioners to shut down their operations in the United States.   TikTok Br. 21-24.  And while the cases the government cites involved deprivations of property, none implicated the deprivation of First Amendment liberties, as this case plainly does.  *See Holy Land*, 333 F.3d at 166 ("[T]here is no First Amendment right nor any other constitutional right to support terrorists …."); *cf. Freedman*,

---

[11] *See Zevallos*, 793 F.3d at 109; *Holy Land Found. v. Ashcroft*, 333 F.3d 156, 159 (D.C. Cir. 2003); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 195-96 (D.C. Cir. 2001) ("*NCORI*").

380 U.S. at 58 ("only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression").

Moreover, the government here has, at most, very limited legitimate interests in using *ex parte* submissions to defend the Act. When imposing sanctions, the government must act quickly and quietly to prevent asset flight. Here, by contrast, there are no "exigent reasons for" the government's action, *Fares*, 901 F.3d at 319, which by law takes effect only after 270 days have elapsed. Act § 2(a)(2). In fact, the government opens its brief by asserting that "Congress and the Executive Branch" have harbored their concerns "[f]or years." Gov't Br. 1.

And whereas in terrorism and narcotics-trafficking cases the government may have "pressing interests in the nondisclosure of … highly sensitive classified information," *Fares*, 901 F.3d at 319, the government's secret evidence reportedly shows little more than what has already been publicly discussed, *see supra* p.24, and contains "no information" that the Chinese government actually used TikTok to "covertly manipulate the information received by" U.S. TikTok users, *see* Gov't App.4 (Blackburn Declaration).

29

Finally, many of the cases the government cites involved statutes that specifically authorize the use of classified evidence *ex parte*.[12]  Here, by contrast, there is no statute authorizing the government to submit classified evidence *ex parte* to defend the Act's singling out of Petitioners.

The absence of statutory authority is highlighted by the contrast with the statutory process that applies when the President seeks to apply the Act's sanctions to an application owned by *any other* company.  There, the Act provides for the submission of classified evidence *to Congress*, together with a public report specifying the alleged national security concerns.  *See* Act § 2(g)(3)(B).  The existence of that provision underscores the lack of any comparable provision allowing the government to rely on classified information here.  Given the powerful reasons and strong norm against considering *ex parte* submissions to decide the merits of a case—and, in particular, a case involving First Amendment rights—the Court certainly should not tolerate such submissions without express congressional authorization.  *See Fares*, 901

---

[12] *See Ralls*, 758 F.3d at 319 (Defense Production Act, 50 U.S.C. § 4565(e)(3)); *Holy Land*, 333 F.3d at 164 (International Emergency Economic Powers Act, 50 U.S.C. § 1702(c)); *NCORI*, 251 F.3d at 196-97 (Anti-Terrorism and Effective Death Penalty Act, 8 U.S.C. § 1189(a)(3)(B)).

F.3d at 319 ("We have countenanced [the submission of *ex parte* classified information] in very limited, statutorily recognized circumstances").

### C.  The Court Should Deny the Motion for Leave to File *Ex Parte*.

Because the government's *ex parte* submissions are incompatible with the First Amendment and due process, and given the government's demonstrable factual errors in the public parts of its filings and admitted over-classifications in the secret parts, the Court should deny its motion to file *ex parte* and require the government to file a brief without redacted material.  No court can uphold such a sweeping deprivation of speech and other protected rights based on secret, untested evidence—particularly where, as here, the government's public filings cast serious doubt on the rigor of its secret evidence.  *See, e.g.*, *United States v. Abuhamra*, 389 F.3d 309, 331 (2d Cir. 2004) ("[G]overnment must either apprise the defendant of the substance of its sealed submission or forego the court's consideration of the evidence.").

Disregarding the submissions would also comport with the procedures for handling classified information in criminal cases governed by the Classified Information Procedures Act.  In those cases, the court may strike the government's classified submission when the United

31

States cannot offer an alternative means of allowing the defendant to respond to its submission and continues to object to the disclosure of that information to the defense. 18 U.S.C. app. 3 § 6(e)(2)(C). While the statute applies only to criminal cases, courts "have looked to [it] for guidance on handling classified materials in civil cases." *Kashem v. Barr*, 941 F.3d 358, 390 (9th Cir. 2019); *see also Parhat v. Gates*, 532 F.3d 834, 849 (D.C. Cir. 2008). Given the lack of *any* statutory guidance for the Court's consideration of *ex parte* evidence in adjudicating challenges to the Act, it is reasonable to look to the Classified Information Procedures Act for guidance and therefore to disregard the submissions.

## II. In the Alternative, This Court Should Appoint a Special Master to Implement Case-Specific Procedural Protections to Mitigate the Prejudice from the Government's *Ex Parte* Submissions.

As explained above, the government's request for the Court to decide this case on the basis of evidence Petitioners cannot see or rebut violates foundational First Amendment and due process principles and should be denied. If the Court nonetheless is inclined to grant the government's motion, the Court should not do so without first determining whether there are any case-specific procedural protections to sufficiently mitigate the substantial prejudice Petitioners will suffer

32

as a result of the Court considering the government's *ex parte* submissions.

Determining what "procedural protections … the particular situation demands," *NCORI*, 251 F.3d at 205 (quotation marks omitted), requires careful consideration of the content of the government's submissions, the resulting prejudice to Petitioners, and the range of available procedural protections. Because Petitioners are unable to see the *ex parte* evidence the government has lodged against them—and, indeed, have been given only a high-level description of the government's alleged national security concerns in the government's public filings, which contain material factual errors, *see supra* pp.13-18—Petitioners are not currently able to address whether any specific process would be sufficient to mitigate the prejudice they will suffer.

For these reasons, Petitioners respectfully request that the Court appoint a special master who, after hearing from the parties, would recommend to this Court what procedural protections—if any—could

mitigate the prejudice to Petitioners from admitting *ex parte* the government's classified submissions.[13]

The Federal Rules authorize the appointment of special masters to make such recommendations. *See* Fed. R. App. P. 48(a) (providing for appointment of special master "to hold hearings, if necessary, and to recommend factual findings and disposition in matters ancillary to proceedings in the court"); *cf.* Fed. R. Civ. P. 53(a)(1). And the use of special masters is consistent with this Court's precedent, *see In re DoD*, 848 F.2d 232, 235-37 (D.C. Cir. 1988), and with the approach adopted by courts when weighing government requests for secrecy, *see, e.g.*, *Wash. Post v. DoD*, 766 F. Supp. 1, 4-5 (D.D.C. 1991) (discussing use of special master to review documents withheld on national-security grounds).

Here, given the exceptional importance of the issues in dispute to Petitioners and 170 million Americans who use TikTok, Petitioners respectfully submit that a district judge from this Circuit may be an appropriate special master to receive briefing from the parties and

---

[13] Under Petitioners' proposal, this Court would retain jurisdiction over the ultimate determination of whether to permit the *ex parte* filings, what mitigation measures would be appropriate, and the relevance, if any, of any *ex parte* evidence to these proceedings.

provide this Court with recommendations about the appropriate mitigation measures to be ordered in this case. *See Al-Hela*, 66 F.4th at 240, 242 (describing the "rigorous," "judicious and common-sense" approach district judge took to the government's classified submission, resulting in "only a small number of documents in support of [petitioner's] detention [being] reviewed by the District Court *ex parte* at the merits stage" in national security case).

The use of a district judge as a special master is contemplated by Federal Rule of Appellate Procedure 48(b), which governs the use of special masters in appellate proceedings. *See* Fed. R. App. P. 48(b). And it is an approach courts have adopted in the past.[14]

The appointment of a special master would enable careful consideration of the prejudice-reducing potential of any appropriate procedural protections in light of Petitioners' First Amendment and due process interests and with Petitioners' full participation. Courts have

---

[14] *See, e.g.*, *United States v. Charmer Indus., Inc.*, 722 F.2d 1073, 1076 (2d Cir. 1983) (designating district judge as special master to make recommendations regarding contempt motion); *see also Bauchman for Bauchman v. West High School*, 132 F.3d 542, 546-47 n.4 (10th Cir. 1997) (similar); *N.L.R.B. v. A-Plus Roofing, Inc.*, 39 F.3d 1410, 1419 (9th Cir. 1994) (similar).

taken a range of approaches to mitigating the harm from *ex parte* classified submissions—starting from an exacting scrutiny of the government's *ex parte* submissions to ensure the government has proposed "the fewest possible redactions." *Al-Hela*, 66 F.4th at 240. Where *ex parte* submissions have been admitted, courts have considered access for cleared counsel or a court-appointed amicus to provide the court with an adversarial presentation regarding the information contained in the *ex parte* submission.[15] Courts have also considered whether unclassified summaries of the classified evidence could help mitigate prejudice, in combination with other protections.[16] As these

---

[15] *See, e.g.*, *Fares*, 901 F.3d at 322-323; *see also, e.g.*, *Al Haramain*, 686 F.3d at 983 (explaining that granting counsel security clearances may be necessary to satisfy due process, and noting that disclosure of classified information to counsel with clearance "does not implicate national security when viewing the classified material because, by definition, he or she has the appropriate security clearance"); *Horn v. Huddle*, 647 F. Supp. 2d 55, 66 (D.D.C. 2009), *vacated due to settlement*, 699 F. Supp. 2d 236 (D.D.C. 2010) (ordering government to "grant counsel for plaintiff and defendants, who have been favorably adjudicated for access to classified information, security clearances"); *In re NSA Telecomms. Recs. Litig.*, 595 F. Supp. 2d 1077, 1089 (N.D. Cal. 2009) (ordering government to expedite processing of clearances for plaintiff's counsel); 50 U.S.C. § 1803(i) (procedure for court-appointed amicus curiae in *ex parte* proceedings).

[16] *Al-Hela*, 66 F.4th at 240 ("the District Court required the government to provide an adequate summary of the highly sensitive information wherever possible, such that [Petitioner's] counsel had a sufficient

cases make clear, the process of fashioning appropriate procedural protections is nuanced and case-specific; for example, the special master could recommend at the outset that cleared counsel be given access to the government's *ex parte* submissions to enable more effective advocacy with respect to the appropriateness of any procedural protections.

Given the extent of the government's reliance on *ex parte* evidence, Petitioners are not currently in a position to assess whether any of these procedural protections will sufficiently mitigate the prejudice from allowing the government's submission—and it is possible that the only appropriate alternative is to deny the government's motion.  But that question is best considered by the special master in the first instance, following a fair and case-specific process, and then ultimately decided by this Court.

---

opportunity to rebut the government's asserted factual basis for Petitioner's detention (and to exploit exculpatory information)"); *see also Abuhamra*, 389 F.3d at 331 (discussing the Classified Information Procedures Act, which contemplates provision of summaries or substitute submissions).

### III.  The Government's Motion Reinforces The Potential Need for a Temporary Injunction.

Finally, Petitioners respectfully reiterate their request that this Court temporarily enjoin the Act's prohibitions from taking effect to the extent necessary to allow adequate time to fully and fairly litigate the issues raised by this case.  *See* TikTok Br. 71-72.  As explained above and in Petitioners' brief, the Act should be permanently enjoined without consideration of the government's *post hoc* evidence.  *See supra* pp.5-8.  Given the irreparable harm posed by the impending ban and the multiple legal flaws of the Act, the Court can and should proceed to adjudicate the matter on the existing schedule, without needing to confront the significant legal and factual problems caused by the government's classified submission.

But if this Court views the government's *ex parte* submissions as even potentially relevant, it should ensure that the Act does not take effect—thereby inflicting irreparable harm on Petitioners—before it fully and fairly adjudicates the disputed facts and legal issues raised by the *ex parte* filings.  Those issues include disputed factual questions, legal questions regarding the constitutionality of the government's *ex parte* submissions, and practical questions regarding the proper procedural

38

protections that should be considered to mitigate the substantial prejudice from any consideration of the government's *ex parte* submissions.

The government has substantially complicated this case by choosing to hide large parts of its case from Petitioners and the public. The Court should not allow the government to impose irreparable harm to the First Amendment rights of Petitioners and 170 million Americans while frustrating the Court's ability to perform meaningful review of its unprecedented actions.

## CONCLUSION

For the reasons set forth in Petitioner's opening brief, this Court should enjoin the Act regardless of the content of the government's *post hoc*, *ex parte* submissions. Should the Court conclude, however, that it needs to resolve the government's motion for leave to submit *ex parte* materials, the motion should be denied because consideration of those materials would violate the Constitution. Alternatively, if the Court grants the government's motion over Petitioners' objections, this Court should appoint a special master to evaluate the government's asserted need for secrecy, receive briefing from the parties on appropriate

procedures (if any) to mitigate the prejudice to Petitioners, and provide recommendations to this Court. And Petitioners reiterate their request for a temporary injunction so that the Court can address the complex issues the government has injected into this case in a careful, orderly, and fair manner. Respondent opposes Petitioners' request for additional relief.

DATED: August 5, 2024

Andrew J. Pincus
Avi M. Kupfer
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3220
apincus@mayerbrown.com
akupfer@mayerbrown.com

Respectfully submitted,

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut
  *Counsel of Record*
David M. Zionts
Megan A. Crowley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
aberengaut@cov.com
dzionts@cov.com
mcrowley@cov.com

John E. Hall
Anders Linderot
S. Conrad Scott
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
jhall@cov.com
alinderot@cov.com
cscott@cov.com

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limitation of D.C. Circuit Rule 27(c) because it contains 7,757 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This response complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Century Schoolbook font.

DATED: August 5, 2024                    Respectfully submitted,

                                         */s/ Alexander A. Berengaut*
                                         Alexander A. Berengaut
                                         COVINGTON & BURLING LLP
                                         One CityCenter
                                         850 Tenth Street, NW
                                         Washington, DC 20001
                                         Telephone: (202) 662-6000
                                         Email: aberengaut@cov.com

                                         *Counsel for Petitioners*
                                         *TikTok Inc. and ByteDance Ltd.*

42

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on August 5, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: August 5, 2024                    Respectfully submitted,

                    */s/ Alexander A. Berengaut*
                    Alexander A. Berengaut
                    COVINGTON & BURLING LLP
                    One CityCenter
                    850 Tenth Street, NW
                    Washington, DC 20001
                    Telephone: (202) 662-6000
                    Email: aberengaut@cov.com

                    *Counsel for Petitioners*
                    *TikTok Inc. and ByteDance Ltd.*

43