ORAL ARGUMENT HELD ON SEPTEMBER 16, 2024

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| TIKTOK INC., *et al.*,<br>            Petitioners,<br><br>                    v.<br><br>MERRICK B. GARLAND, in his official<br>  capacity as Attorney General of the United<br>  States,<br>            Respondent. | Nos. 24-1113, 24-1130,<br>24-1183 |

**RESPONSE TO PETITIONERS' EMERGENCY MOTIONS FOR
INJUNCTION PENDING SUPREME COURT REVIEW**

## INTRODUCTION

Petitioners ask this Court to enjoin a duly enacted Act of Congress that the Court recently and unanimously upheld, claiming such extraordinary relief is necessary to facilitate orderly review in the Supreme Court. But the schedule the parties jointly proposed was designed for the precise purpose of allowing orderly Supreme Court review before the Act takes effect without such an injunction. This Court issued its decision in line with that schedule. Petitioners are entitled to ask the Supreme Court to enjoin the law's application pending that Court's review, and they expressly reserved their right to do so and set a schedule that would allow time for it. They are not entitled, however, to an injunction against an Act of Congress when the only court to consider their constitutional challenge has rejected it. The Supreme Court can decide for itself whether the statute must be enjoined, as petitioners previously contemplated.

As this Court is well aware, the statute at issue reflects the considered judgment of Congress, informed by its interactions with the Executive Branch across two Administrations, that TikTok's continued operation under its current ownership poses a significant national-security threat to the United States. The relevant statutory prohibitions take effect on January 19, 2025, 270 days after the statute's enactment. Congress specifically focused on the question of the appropriate length of time to afford TikTok to divest, and the Act's 270-day

2

window reflects Congress's considered judgment regarding how best to balance the well-documented national-security interests implicated by continued Chinese control of the TikTok application against the interest in providing time for an orderly divestiture that would allow the application to continue to operate. Petitioners have not demonstrated any entitlement to override that congressional judgment in the face of this Court's rejection of all of petitioners' constitutional arguments.

Petitioners' arguments on the merits merely rehash the assertions this Court already rejected. They tout the alternative measures that Congress rejected as inadequate, a determination that this Court thoroughly reviewed. And they give short shrift to the national-security harms that all three branches of government have now credited.

Petitioners' presentation on the balance of harms likewise downplays the national-security concerns underlying both the statute and this Court's decision. Continued Chinese control of the TikTok application poses a continuing threat to national security, and both Congress and this Court took account of the competing interests of users of the application.

Petitioners' motions should be denied.

## BACKGROUND

**1.** On April 24, 2024, the President signed into law the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H, 138 Stat. 895 (2024) (Act). The Act regulates "foreign adversary controlled applications," which are defined to include certain applications that are owned by a Chinese, Iranian, North Korean, or Russian entity and "determined by the President to present a significant threat to the national security of the United States." Act § 2(g)(1), (3)(B), (4). The Act itself designates the social-media application TikTok; that application is owned by the company ByteDance, Ltd., whose operating entities are in China. *See id.* § 2(g)(3)(A).

It is unlawful for third parties to "distribute, maintain, or update" a designated application in the United States by, for example, offering the application in a mobile application store. Act § 2(a)(1). These prohibitions take effect 270 days after designation; in the case of the TikTok application, the effective date is 270 days after the Act's enactment—January 19, 2025. *Id.* § 2(a)(2). However, the Act permits the TikTok application to continue operating in the United States if its Chinese parent company, ByteDance, executes a "qualified divestiture" of its interest in the platform. *Id.* § 2(c)(1). And "the President may grant a 1-time extension of not more than 90 days" of the 270-day

effective date "if the President certifies to Congress" that various conditions regarding "progress toward executing" a qualified divestiture are met. *Id.* § 2(a)(3).

**2.** Pursuant to the Act's exclusive jurisdiction provision, *see* Act § 3, petitioners—TikTok and ByteDance, along with various U.S. users of the TikTok application—filed petitions for review in this Court, challenging the Act's provisions that require ByteDance to divest its interest in TikTok if the TikTok application is to continue operating in the United States. Petitioners claimed, as relevant here, that the divestment requirement violates the First Amendment.[1]

The parties worked together to develop a joint scheduling proposal to govern proceedings in this Court that would allow time for proceedings in the Supreme Court before January 19, 2025. Joint Motion to Set Briefing and Oral Argument Schedule (May 17, 2024). Pursuant to that agreement, the parties jointly moved for expedited briefing and argument. *Id.* at 8-9. And the parties requested a ruling from this Court by December 6, 2024, "[t]o ensure that there is adequate time before the Act's prohibitions take effect to request emergency relief from the Supreme Court." *Id.* at 8. This Court adopted the parties' proposed briefing schedule, Order (May 28, 2024), received briefs from the parties and numerous amici, and heard

---

[1] TikTok and ByteDance also raised additional constitutional claims, which this Court rejected. Petitioners' motions for an injunction pending Supreme Court review do not invoke those separate claims.

5

oral argument on September 16, 2024. In accordance with the parties' request, this Court issued its decision on December 6, 2024.

**3.** This Court unanimously rejected petitioners' claims. As to the First Amendment claims, the panel majority "assumed without deciding" that the Act is subject to strict scrutiny, Op. 24, 31, and held that it "passes muster even under" that "demanding standard," Op. 25 (quotations omitted). Relying solely on the public record, Op. 64-65 & n.11, the majority held that "[t]he Act clears th[e] high bar" and the "most searching review" that strict scrutiny requires, because it is narrowly tailored to further compelling government interests, Op. 32-33. As the majority "emphasize[d]," that holding—which was based on the extensive record before the Court recounting the national-security risks posed by TikTok—was "fact-bound." Op. 32.

At the outset, the majority explained that "both political branches" had engaged in "multi-year efforts" to "investigate the national security risks posed by the TikTok platform" and to determine how best to ameliorate those risks. Op. 32; *see also* Op. 11-16, 42, 51-52; Concurring Op. 2. Thus, as the majority noted, the Act "was the culmination of extensive, bipartisan action by the Congress and by successive Presidents." Op. 32.

Against that backdrop, the majority concluded that the government's two national-security justifications for the Act—countering the threat that China could

collect U.S. users' data and covertly manipulate content on the platform—were each "independently compelling" interests. Op. 33 (quotations omitted). As to the first, the Court noted that China has accumulated extensive datasets on U.S. persons "to support its intelligence and counterintelligence operations," including through "hacking operations" and by invoking Chinese law to require disclosure to the Chinese government of "data held by Chinese companies." Op. 34-35 (quotations omitted). And the "large swaths of data" that TikTok collects on its users—which include over 170 million Americans—and on non-users present a "significant vulnerability" because that data could be accessed by the Chinese government in order to undermine U.S. national security. Op. 38-39.

As to the second interest, the Court noted that China "uses its cyber capabilities to support its influence campaigns around the globe" to covertly "undermine democracy" and to increase the Chinese government's "influence abroad." Op. 36 (quotations omitted). That includes covertly "position[ing] itself to manipulate public discourse on TikTok in order to serve [the Chinese government's] own ends." Op. 43. Rather than constituting an effort to suppress protected expression, "the only change worked by the Act is that the [Chinese government] could not 'manipulate the public debate through coercion rather than persuasion.'" Op. 44.

The majority also rejected petitioners' arguments that the government's national-security justifications for the Act were overly speculative. It is well established that the government's national-security decisions "often must be based on informed judgment." Op. 41 (quotation omitted). And here, the majority concluded, Congress and the Executive Branch drew "reasonable inferences" from the available evidence in concluding that TikTok's continued operations subject to Chinese control posed serious national-security risks. Op. 39, 41-42, 47-48 (quotations omitted).

Next, the majority concluded that the Act was narrowly tailored to further that pair of national-security justifications because the Act is "limited to foreign adversary control of a substantial medium of communication and include[s] a divestiture exemption." Op. 48. And Congress and the Executive Branch reasonably concluded that no less-restrictive alternative would have adequately ameliorated the government's national-security concerns. In particular, the Act reflects the political branches' reasoned determination that TikTok's proposed national-security agreement would not provide sufficient government visibility into TikTok's operations or adequate "data protections for Americans." Op. 49; *see also* Op. 50-52 (describing why the proposed national security agreement would not satisfy the government's concerns); Op. 53-55 (rejecting various other

alternative approaches, including disclosure and reporting requirements); Op. 55-56 (concluding that the Act is neither overinclusive nor underinclusive).

Chief Judge Srinivasan concurred in the judgment with respect to the First Amendment claims. He agreed that the Act does not violate the First Amendment, but he would have held that the Act is subject to (and passes) intermediate scrutiny and would not have decided whether the Act would satisfy strict scrutiny. He reasoned that intermediate scrutiny applies because the Act's divestment requirement is directed to a "designated foreign adversary" based on "reasons lying outside the First Amendment's heartland": the Chinese government's ability "to exploit the TikTok platform" by "harvest[ing] abundant amounts of information about the 170 million" U.S. users and by "covertly manipulat[ing] the content flowing to" those users. Concurring Op. 1, 11; *see also* Concurring Op. 2-6 (surveying historical examples in which Congress has restricted foreign ownership of American mass communications channels). As Chief Judge Srinivasan explained, the Act's "data-protection rationale is plainly content neutral." Concurring Op. 12. And even if the interest in preventing the Chinese government's covert manipulation of content on TikTok were "connected to speech," Concurring Op. 13, that rationale for the Act would not trigger strict scrutiny. The Act does not regulate any particular content and instead "only

9

prevents the [Chinese government] from secretly manipulating content on a specific channel of communication that it ultimately controls." Concurring Op. 16.

Chief Judge Srinivasan concluded that the Act satisfies intermediate scrutiny because it advances important government interests without burdening more speech than necessary—for reasons similar to those that the majority identified in holding that the Act survives strict scrutiny. *See* Concurring Op. 18-23 (discussing the national-security interests in preventing the Chinese government's data-collection and content-manipulation); Concurring Op. 23-26 (concluding that the Act is not "substantially broader than necessary" to advance those interests (quotations omitted)).

**4.** Petitioners have now indicated that they intend to seek Supreme Court review of this Court's decision. In the meantime, they ask this Court to enter an injunction prohibiting enforcement of the Act until the Supreme Court decides whether to grant certiorari and, if it does, until the Supreme Court rules on the merits. In requesting that relief, petitioners have not committed to expeditiously pursuing Supreme Court review if an injunction is granted. Instead, petitioners suggest that they will instead give the "political branches" more "breathing room" to decide whether to enforce the Act, Firebaugh Mot. 13, and may seek further review at some future point "only if necessary," TikTok Mot. 14.

## ARGUMENT

### THE COURT SHOULD DENY PETITIONERS' MOTIONS

Now that this Court has issued a thorough decision rejecting petitioners' constitutional challenges to a duly enacted statute that addresses critical national-security concerns, petitioners urge this Court to enjoin that same statute for the duration of any Supreme Court proceedings. Like their briefs in the case, their motions do not engage with the compelling national-security justifications that led a majority of this Court to conclude that the Act survives strict scrutiny—nor do petitioners meaningfully engage with the two thorough opinions rejecting their challenges for independent reasons. Petitioners also fail to acknowledge that they requested that this Court engage in expedited review for the express purpose of enabling the Supreme Court to take up the question whether interim relief is appropriate before the Act's prohibitions go into effect. Petitioners offer no valid reason to pretermit the Supreme Court's prerogative to decide how proceedings before that Court should play out.

**1.** Petitioners request the "extraordinary remedy" of an injunction pending future proceedings. *Nken v. Holder*, 556 U.S. 418, 428 (2009) (quotation omitted). Such injunctive relief may "be used sparingly and only in the most critical and exigent circumstances," where "the legal rights at issue are indisputably clear." *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers)

11

(quotations omitted); *cf. id.* (distinguishing between an injunction against enforcement of a statute and a "stay of a lower court judgment"); *Nken*, 556 U.S. at 428-29 (explaining similar distinction).

Moreover, as petitioners recognize, any request to enjoin an Act of Congress in particular implicates "the gravest and most delicate duty that [courts are] called on to perform." TikTok Mot. 13 (quotation omitted); *see also* Concurring Op. 2. Indeed, in reviewing emergency applications, the Supreme Court has traditionally applied a strong presumption that Acts of Congress "should remain in effect pending a final decision on the merits by this Court." *Turner Broadcasting System, Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (Rehnquist, C.J., in chambers) (citation omitted); *see Wisconsin Right to Life, Inc. v. FEC*, 542 U.S. 1305, 1305-06 (2004) (Rehnquist, C.J., in chambers); *Doe v. Gonzales*, 546 U.S. 1301, 1308-09 (2005) (Ginsburg, J., in chambers); *Heart of Atlanta Motel, Inc. v. United States*, 85 S. Ct. 1, 2 (1964) (Black, J., in chambers). That practice reflects the "presumption of constitutionality which attaches to every Act of Congress." *Bowen v. Kendrick*, 438 U.S. 1304, 1304 (Rehnquist, C.J., in chambers).

Petitioners' motions provide no basis for flipping this strong presumption and enjoining the Act even though this Court has held it constitutional. Petitioners' motions focus on their First Amendment claims, TikTok Mot. 18-28; Firebaugh Mot. 14-18, but this Court has already unanimously rejected those arguments in

two thorough opinions that provide independent bases for upholding the Act. As explained, the majority assumed without deciding that the Act is subject to strict scrutiny and held that it survives that "most searching" review. Op. 33-57. And Chief Judge Srinivasan concluded that the Act is at most subject to (and survives) intermediate scrutiny. *See* Concurring Op. 18-27. To conclude that petitioners' First Amendment claims are correct, a court would be required to disagree with the analysis in both of those opinions—each of which provides an independent basis for upholding the Act and neither of which rejects the analysis contained in the other opinion. *See* Concurring Op. 1 ("I would thus answer the question my colleagues leave open while leaving open the question they answer.").

In rejecting the petitions, the Court was sensitive to the weighty concerns implicated by upholding the Act's divestment requirement, recognizing the "significant implications" from potentially forcing the closure of a platform used by millions of Americans. Op. 65; *see also* Concurring Op. 26-27 (noting the "significant interests at stake," including that "[s]ome 170 million Americans use TikTok to create and view all sorts of free expression and engage with one another and the world" and that they "may lose access to an outlet for expression"). Nonetheless, the Court determined, based on careful consideration of the national-security interests that the Act advances, that the Act passes muster under the First Amendment. As the Court recognized, TikTok's continued operation in the United

States under its current ownership poses substantial harms to national security by virtue of TikTok's data-collection practices and the covert intelligence and surveillance efforts of the Chinese government. Op. 33-48; *see also* Concurring Op. 11-17. The Court thus already determined both that petitioners' claims are incorrect on the merits and that the Act advances the public interest, both of which preclude any "temporary injunction," *see Nken*, 556 U.S. at 435.

Petitioners briefly recite a grab-bag of complaints with various pieces of the Court's analysis. But those objections are nothing more than attempts to relitigate contentions that this Court has already considered and rejected. For example, petitioners argue that the Court did not properly assess various alternatives to the Act. TikTok Mot. 20-25; Firebaugh Mot. 18. But this Court addressed at length petitioners' claims that the government failed to consider whether TikTok's proposed national security agreement was a less burdensome alternative to the Act. *See* Op. 49-53; Concurring Op. 24-26. And this Court labeled "naïve" petitioners' suggestion "that the Government can simply use speech of its own to counter the risk of content manipulation" by the Chinese government. Op. 54.

Petitioners similarly contend that the Court improperly accepted the government's "hypothetical" concerns about the ways in which China may exploit TikTok to undermine U.S. national security. TikTok Mot. 11-16; Firebaugh Mot. 11-13. But again, the Court carefully considered the extensive factual record

14

underlying the political branches' national-security judgments, ultimately concluding that the government's concerns regarding TikTok's continued operation subject to Chinese control "are well-founded, not speculative." Op. 41-42, 74; *see* Concurring Op. 19-22 (explaining that the national-security concerns are "hardly speculative or inadequately grounded"). Petitioners now try to brush aside the TikTok-specific concerns by urging that limitations on the other types of companies that might subsequently be designated as subject to the Act render the statute underinclusive, but that argument ignores this Court's conclusion that the provisions at issue here would be permissible "even if the Congress had not included the generally applicable framework to deal with other foreign adversary controlled platforms." Op. 56.

No more compelling is petitioners' complaint that this Court improperly relied "on secret evidence." TikTok Mot. 26-28. As petitioners acknowledge, this Court made clear that it rested its decision "solely on the unredacted, public filings in this case," TikTok Mot. 26 (quoting Op. 64-65 & n.11), and petitioners provide no serious reason to question the Court's explanation of the bases of its own decision. Of course, many of the judgments underpinning the Act are supported by both classified and unclassified evidence, and the Court thus occasionally relied on public conclusions by the government that were "supported" in part by classified evidence. TikTok Mot. 26. But nothing about the Court's reference to those public

conclusions inherently contradicts the Court's assurances that it relied only on the public portions of the record or demonstrates any prejudice to petitioners, even if petitioners were unable to learn every piece of evidence that the government believes supports those conclusions. And regardless, as the government has previously explained at length, there would have been nothing improper with the Court's relying on classified, ex parte submissions if it had determined that such reliance was necessary to properly assess the Act's constitutionality—a general principle that is particularly true in this case given that much of the relevant evidence relates to TikTok's own conduct.

Indeed, petitioners' explanation of the "[m]ost glaring[]" example of this supposed secret evidence only undermines their assertions. TikTok Mot. 26. TikTok complains that the Court credited, assertedly without sufficient public support and in the face of petitioners' response, the government's conclusion that "ByteDance and TikTok Global have taken action in response to PRC demands to censor content *outside* of China." *Id.* (quoting Op. 36). But petitioners' supposed "respon[se]" to this conclusion (in their Supplemental Appendix, not their brief) is all but an admission: in petitioners' words, "'many U.S. companies' have 'made editorial decisions outside the United States in response to requests or demands from foreign governments.'" TikTok Mot. 28 (quoting Supp. App. 882-83). And although petitioners claim that they "could not more specifically refute" the

government's assessment without additional detail, *id.*, it is indeed "striking," Op. 47, that TikTok claims it cannot admit or deny the government's charge about TikTok's own censorship practices until it knows how persuasive the specific evidence the government has amassed is.

Even setting all of that aside, petitioners' arguments on this score are misdirected. This Court has already considered and rejected petitioners' arguments on the merits. However the Supreme Court is inclined to approach petitioners' forthcoming submissions, it is most appropriate for that Court to determine whether petitioners are entitled to relief pending that Court's review. Petitioners' suggestion that this Court should pretermit the Supreme Court's consideration of that question "[o]ut of respect for the Supreme Court's vital role," TikTok Mot. 13, is self-refuting. Petitioners identify no sound basis for this Court to enjoin a duly enacted statute, based simply on what the Supreme Court might do.

**2.** Unable to undercut the reasoning reflected in the thorough opinions rejecting petitioners' claims on the merits, petitioners repeatedly suggest that an injunction is warranted for reasons unrelated to the merits of their claims. None of those suggestions is persuasive.

At the outset, petitioners repeatedly claim (at TikTok Mot. 7, 12, 13, 14; Firebaugh Mot. 5) that this Court should enjoin the Act to allow for more "orderly" or "deliberate" proceedings in the Supreme Court. But as explained, enjoining an

Act of Congress—much less an Act that this Court has already held advances sufficiently important national-security interests to survive strict scrutiny—requires an extremely compelling justification. Petitioners cite no authority for the proposition that simply permitting the Supreme Court to engage in a "more deliberate and orderly process," TikTok Mot. 13, than the Court could undertake in the next six weeks qualifies as such a justification.

Petitioners' suggestion that an emergency application in the Supreme Court would be impermissibly "hasty" or would "frustrate the Supreme Court's ability to" decide the case, TikTok Mot. 12-13, is particularly unavailing in this case, where petitioners specifically requested a decision from this Court by December 6, and this Court obliged. As the parties explained when they made that request, the requested December 6 decision date was chosen specifically "[t]o ensure that there is adequate time before the Act's prohibitions take effect to request emergency relief from the Supreme Court if necessary." Joint Motion to Grant Expedited Consideration 8 (May 17, 2024). Having agreed to a schedule that specifically contemplated the need to seek relief from the Supreme Court following a December 6 decision, petitioners cannot now reasonably turn around and claim that the schedule they proposed does not provide a reasonable opportunity for orderly proceedings in that Court—and that, as a result, this Court should enter an

emergency injunction against an Act of Congress based on claims that this Court has already rejected.

Petitioners are similarly wrong when they (at TikTok Mot. 8, 15; Firebaugh Mot. 13) attempt to leverage Congress's provision of a 270-day window to execute a qualified divestment before the Act's prohibitions take effect into a license to continue operating indefinitely while remaining under Chinese control. As this Court has already found, the Act advances national-security interests of the highest order. But "like all statutes," the Act "balances multiple, often competing interests," *Bartenwerfer v. Buckley*, 598 U.S. 69, 81 (2023)—including not just the national-security interests in preventing TikTok from continuing to operate in the United States while it remains under Chinese government control but also the interest in allowing sufficient time for an orderly change in ownership.

Congress determined that the appropriate balance of those competing interests was to permit TikTok a limited 270-day window (with a single possible 90-day extension if the President certifies that certain conditions are satisfied) to execute a qualified divestiture before the Act's prohibitions take effect. But nothing about Congress's attempt to permit an orderly divestiture by providing for such a window undercuts the serious national-security interests underlying the Act—or suggests that it would be appropriate for the courts to enjoin enforcement of the Act's prohibitions beyond the 270-day deadline that Congress chose.

Petitioners are on no firmer footing in arguing (at TikTok Mot. 7, 13-14; Firebaugh Mot. 13) that an injunction is warranted based on petitioners' speculation that a future Administration may choose to "pause" or "mitigate" enforcement of the Act. Petitioners provide no support for their assertion that such speculation—or a desire to provide "breathing room" to "the political branches," Firebaugh Mot. 13—could ever provide a firm basis for enjoining an Act of Congress. *Cf. Garcia v. Texas*, 564 U.S. 940, 941 (2011) (per curiam) ("[W]e are doubtful that it is ever appropriate to stay a lower court judgment in light of unenacted legislation. Our task is to rule on what the law is, not what it might eventually be."). In any event, the Act's prohibitions are not dependent upon any finding or action by the President; they will take effect on January 19, 2025, by operation of the statute absent further action.

Finally, petitioners' claims of immediate harm rest on the unsupported premise that, absent an injunction, there will be a "shutdown," TikTok Mot. 8, 9, 10, 10-11, or "ban," Firebaugh Mot. 5, of TikTok as soon as the Act's prohibitions take effect. But as petitioners correctly recognize, the Act does not directly prohibit the continued use of TikTok by those who have already downloaded the application. Instead, the Act simply "prohibits various entities, including online mobile app stores, from providing services" to support the application. TikTok Mot. 4. Although the government does not dispute that the effect of the Act's

20

prohibitions will eventually be to render the application unworkable, the parties have not explored how quickly the application will cease to function and the record accordingly does not demonstrate that this effect will be immediate. To the extent that they addressed the issue, petitioners appear to have previously recognized that some "users and creators" may "choose to stay on the platform" following the Act's prohibitions and that the application will only "eventually" be rendered "incompatible with the TikTok platform and therefore inoperable." TikTok App. 825.[2] Petitioners are not now entitled to presume, without explanation, that the application would be immediately banned. And petitioners do not address the harms that would ensue if, for example, petitioners execute a qualified divestiture or receive relief from the Supreme Court or the political branches before the application ceases to function entirely.

**3.** At an absolute minimum, this Court should reject petitioners' request for an open-ended injunction pending Supreme Court review, under which petitioners

---

[2] TikTok's previous submissions also assert that the Act's independent prohibition on "internet hosting services[']" enabling the "distribution, maintenance, or updating of" TikTok would "effectively shut[] down TikTok in the United States," but they provide no time frame for that to occur. TikTok App. 824-26 (quotation omitted). In particular, TikTok does not provide an evidentiary basis to conclude that this prohibition would have a materially different, or more immediate, effect on the TikTok application than the prohibition regarding provision of services to distribute, maintain, or update the platform. In both cases, it may be that TikTok's preexisting user base will continue to use the platform for at least some time, even if the application may not permissibly be further distributed or updated.

might delay seeking such review for months and thus effectively pretermit the Supreme Court's ability to hear and decide any future case this Term. Indeed, TikTok suggests that if it receives an injunction from this Court, it would not intend to file any petition for certiorari in the Supreme Court until it determines— seemingly following the forthcoming change in Administrations and perhaps additional months of non-litigation efforts—that "further orderly review" is "necessary." TikTok Mot. 14.

As the Court has already held, the Act's prohibitions are tailored to advance compelling national-security interests. As explained, any delay in those prohibitions that goes beyond what Congress determined was appropriate would be unwarranted. And the indefinite delay contemplated by petitioners—potentially for more than a year if Supreme Court review is delayed until the next Term—would be especially deleterious to the government's and the public's interests in enforcing the Act. Thus, if the Court were inclined to grant petitioners' request, it should condition any injunction on petitioners' filing a petition for a writ of certiorari in the Supreme Court within 7 days, which would allow the Supreme Court, if it chooses, to expedite consideration of the case and permit a decision during this Term. *Cf.* Judgment, *United States v. Trump*, No. 23-3228 (D.C. Cir. Feb. 6, 2024) (withholding the mandate on the condition that appellant file an application for a stay of the mandate in the Supreme Court within six days); Order, *Department of*

*Justice v. House Comm. on the Judiciary*, No. 19A1035 (U.S. May 20, 2020) (staying the D.C. Circuit's mandate on the condition that petitioner file a petition for a writ of certiorari within twelve days); Order, *Trump v. Mazars USA, LLP*, No. 19A545 (U.S. Nov. 25, 2019) (similar).

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny petitioners' motions for an emergency injunction pending Supreme Court review.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*
CATHERINE M.A. CARROLL
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
DANIEL TENNY
CASEN B. ROSS

 */s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

December 2024

## CERTIFICATION OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify this motion complies with the requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in 14-point Times New Roman, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A), because it contains 4796 words, according to the count of Microsoft Word.

*/s/ Sean R. Janda*
Sean R. Janda