ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024

No. 24-1113 (and consolidated cases)

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

———

TIKTOK INC. and BYTEDANCE LTD.,

*Petitioners*,

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent*.

———

*caption continued on inside cover*

———

On Petitions for Review of Constitutionality of
the Protecting Americans from Foreign Adversary Controlled
Applications Act

———

## BRIEF OF PETITIONERS TIKTOK INC. AND BYTEDANCE LTD.

———

Andrew J. Pincus
Avi M. Kupfer
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3220
apincus@mayerbrown.com

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

June 20, 2024

Alexander A. Berengaut
  *Counsel of Record*
David M. Zionts
Megan A. Crowley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com

*continued on inside cover*

BRIAN FIREBAUGH, et al.,

*Petitioners,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,

*Respondent.*

————

BASED Politics Inc.,

*Petitioner,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,

*Respondent.*

John E. Hall
Anders Linderot
S. Conrad Scott
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioners TikTok Inc. and ByteDance Ltd. certify as follows:

## I.    Parties and Amici

The parties to *TikTok Inc. v. Garland*, No. 24-1113, are petitioners TikTok Inc. and ByteDance Ltd. and respondent Merrick B. Garland, in his official capacity as Attorney General of the United States.  The parties to the first consolidated case, *Firebaugh v. Garland*, No. 24-1130, are petitioners Brian Firebaugh, Chloe Joy Sexton, Talia Cadet, Timothy Martin, Kiera Spann, Paul Tran, Christopher Townsend, and Steven King and respondent Merrick B. Garland, in his official capacity as Attorney General of the United States.  The parties to the second consolidated case, *BASED Politics Inc. v. Garland*, No. 24-1183, are petitioner BASED Politics Inc. and respondent Merrick B. Garland, in his official capacity as Attorney General of the United States.  No amicus curiae has appeared in any of the three actions.  Because these petitions were filed directly in this Court, there were no district-court proceedings in these cases.

## II.     Orders Under Review

Petitioners seek direct review of whether the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H (2024), is constitutional.   There are therefore no prior rulings under review.

## III.     Related Cases

These cases were not previously before this Court or any other court.   Counsel for Petitioners TikTok Inc. and ByteDance Ltd. are not aware of any other case currently pending before this or any other court that is related to these cases within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners state as follows: TikTok Inc. is a California-incorporated company that provides the TikTok platform in the United States.  TikTok Inc. is a wholly owned subsidiary of TikTok LLC, which is a wholly owned subsidiary of TikTok Ltd.  TikTok Ltd. is a wholly owned subsidiary of ByteDance Ltd., a privately held corporation incorporated in the Cayman Islands, the subsidiaries of which provide a suite of more than a dozen products and services that allow people to connect with, create, and consume content on the Internet.  TikTok Ltd. has no other parent, and ByteDance Ltd. has no parent.  No publicly traded company owns 10% or more of the stock of TikTok Inc. or ByteDance Ltd.

# TABLE OF CONTENTS

INTRODUCTION...................................................................................1

JURISDICTION ...................................................................................4

ISSUES ...............................................................................................4

STATUTE ...........................................................................................5

STATEMENT ......................................................................................5

    A.  TikTok Is a Popular and Unique Speech Platform. ....................5

    B.  The Law Banning TikTok. ........................................................8

        1.  The Act's prohibitions ........................................................9

        2.  The Act's definition of "foreign adversary controlled application"..................................................................10

        3.  The Act's "qualified divestiture" provision .............................13

    C.  The Act Followed Unsuccessful Past Efforts to Ban TikTok. ....14

    D.  Petitioners Negotiated an Unprecedented National Security Agreement and Have Spent $2 Billion Voluntarily Implementing Protections...................................................................15

    E.  Congress Enacted No Findings, While Legislators Articulated Varying Concerns. ..............................................................17

    F.  The Act's Effect Is a Ban on TikTok. .......................................21

SUMMARY OF ARGUMENT ...............................................................24

ARGUMENT .......................................................................................28

  I.  The Act Violates the First Amendment......................................28

    A.  The Act Is Subject to Strict Scrutiny.........................................29

        1.  Petitioners engage in protected expression. .............................29

        2.  The Act restricts speech.........................................................31

        3.  The Act draws speaker-based and content-based distinctions. ..................................................................33

    B.  The Act's Differential Treatment of Petitioners Is a Standalone Violation of the First Amendment and Equal Protection...................................................................39

iv

1. The Act treats Petitioners worse than other alleged "foreign adversary controlled applications." ............................................. 41

2. The Act's discriminatory treatment of Petitioners is not justified by any compelling or significant interest. ....................... 44

3. The Act's discriminatory treatment fails narrow tailoring and the least-restrictive-means requirement. ............................... 46

C. The Act's Burdens on Petitioners' Free Speech Rights Fail Strict Scrutiny. ............................................................................ 47

1. The Act does not advance a compelling or significant interest. ......................................................................................... 48

a) "Misinformation, disinformation, and propaganda" ............ 50

b) Data security ........................................................................ 53

2. The Act is not narrowly tailored. .......................................... 54

a) The Act is underinclusive. ................................................... 54

b) The Act is not the least restrictive means of advancing Congress's purported interests. ................................................. 57

II. The Act Is an Unconstitutional Bill of Attainder. ........................ 61

A. The Act Applies to Petitioners with Specificity. ......................... 62

B. The Act Punishes Petitioners. ..................................................... 62

III. The Act Effects an Unconstitutional Taking. ............................... 68

IV. The Court Should Declare the Act Unconstitutional and Enjoin Its Enforcement with Respect to Petitioners' Applications. ................... 70

A. The Court Should Enjoin Enforcement of Section 2(a) with Respect to Petitioners' Applications. ............................................. 70

B. In the Alternative, the Court Should Temporarily Enjoin the Act and Order Further Proceedings. ................................................ 71

C. The Court Should Declare Section 2(b) Non-Severable. ............ 72

CONCLUSION .................................................................................... 72

CERTIFICATE OF COMPLIANCE .................................................... 74

CERTIFICATE OF SERVICE ............................................................. 75

STATUTORY ADDENDUM .............................................................. A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abourezk v. Reagan,*
　785 F.2d 1043 (D.C. Cir. 1986) ........................................................ 71

*Abrams v. United States,*
　250 U.S. 616 (1919) .......................................................................... 3

*Alario v. Knudsen,*
　2023 WL 8270811 (D. Mont. Nov. 30, 2023) .................................... 30

*Ashcroft v. Am. Civil Liberties Union,*
　542 U.S. 656 (2004) .......................................................................... 72

*Associated Press v. United States,*
　326 U.S. 1 (1945) .............................................................................. 38

*Brown v. Ent. Merchants Ass'n,*
　564 U.S. 786 (2011) ..................................................................... 48, 57

*Burwell v. Hobby Lobby Stores, Inc.,*
　573 U.S. 682 (2014) .......................................................................... 46

*Cedar Point Nursery v. Hassid,*
　141 S.Ct. 2063 (2021) ....................................................................... 68

*Citizens United v. Fed. Election Comm'n,*
　558 U.S. 310 (2010) ..................................................................... 34, 58

*City of Cleburne v. Cleburne Living Ctr.,*
　473 U.S. 432 (1985) .......................................................................... 45

*Davis v. Passman,*
　442 U.S. 228 (1979) .......................................................................... 45

*De Jonge v. Oregon,*
　299 U.S. 353 (1937) .......................................................................... 28

*Dep't of Com. v. New York*,
  139 S.Ct. 2551 (2019) ........................................................................ 42

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  140 S.Ct. 1891 (2020) ................................................................... 43, 49

*Eastern Enters. v. Apfel*,
  524 U.S. 498 (1998) ........................................................................... 69

*Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*,
  479 U.S. 238 (1986) ........................................................................... 31

*Foretich v. United States*,
  351 F.3d 1198 (D.C. Cir. 2003) ................................. 62, 63, 64, 67, 68

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) .......................................................... 71

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ......................................................................... 48, 50

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) ........................................................................... 30

*Immigration & Naturalization Serv. v. Chadha*,
  462 U.S. 919 (1983) ........................................................................... 61

*Junior Sports Mags. Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023) .......................................................... 53

*Kalantari v. NITV, Inc.*,
  352 F.3d 1202 (9th Cir. 2003) .......................................................... 51

*Kaspersky Lab, Inc. v. Dep't of Homeland Sec.*,
  909 F.3d 446 (D.C. Cir. 2018) ............................. 62, 63, 64, 65, 67, 68

*Kennedy v. Bremerton Sch. Dist.*,
  142 S.Ct. 2407 (2022) ........................................................................ 71

*Kimball Laundry Co. v. United States*,
  338 U.S. 1 (1949) ............................................................................... 69

*Lamont v. Postmaster Gen.,*
    381 U.S. 301 (1965) ................................................................ 50

*Lingle v. Chevron U.S.A. Inc.,*
    544 U.S. 528 (2005) ................................................................ 69

*Marland v. Trump,*
    498 F. Supp. 3d 624 (E.D. Pa. 2020) .................................... 15

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ................................................................ 38

*Meese v. Keene,*
    481 U.S. 465 (1987) ................................................................ 58

*Miami Herald Pub. Co. v. Tornillo,*
    418 U.S. 241 (1974) ................................................................ 32

*Mills v. District of Columbia,*
    571 F.3d 1304 (D.C. Cir. 2009) ............................................ 70

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Rev.,*
    460 U.S. 575 (1983) ........................................................ 34, 35

*News Am. Pub., Inc. v. FCC,*
    844 F.2d 800 (D.C. Cir. 1988) ................................. 40, 45, 57

*Nixon v. Adm'r of Gen. Servs.,*
    433 U.S. 425 (1977) ................................................................ 63

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................ 71

*Packingham v. North Carolina,*
    582 U.S. 98 (2017) .................................................................... 1

*Pharm. Rsch. & Mfrs. of Am. v. Williams,*
    64 F.4th 932 (8th Cir. 2023) .................................................. 69

*Police Dept. of Chicago v. Mosley,*
    408 U.S. 92 (1972) .................................................................. 35

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)................................................. 34, 35, 36, 37, 55

*Reno v. Am. Civil Liberties Union,*
    521 U.S. 844 (1997)...................................................... 40, 58

*Sable Commc'ns of Cal., Inc. v. FCC,*
    492 U.S. 115 (1989).................................................... 58, 61

*Selective Serv. Sys. v. Minn. Pub. Interest Rsch. Grp.,*
    468 U.S. 841 (1984).................................................... 63, 67

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991).................................................... 30, 36

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)........................................................ 37

*TikTok Inc. v. Trump,*
    490 F. Supp. 3d 73 (D.D.C. 2020) ...................................... 15

*TikTok Inc. v. Trump,*
    507 F. Supp. 3d 92 (D.D.C. 2020) .................................. 14, 15

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994).................................................... 34, 52

*United States v. Alvarez,*
    567 U.S. 709 (2012).................................................... 37, 51

*United States v. Brown,*
    381 U.S. 437 (1965)........................................................ 61

*United States v. Mitchell,*
    463 U.S. 206 (1983)........................................................ 71

*United States v. Playboy Ent. Grp.,*
    529 U.S. 803 (2000)........................................ 28, 32, 39, 48

*Walsh v. Brady,*
    927 F.2d 1229 (D.C. Cir. 1991) .......................................... 50

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ........................................................... 70

## Constitutional Provisions

Art. I, § 9, cl. 3 ........................................... 61, 62, 63, 65, 66, 67

Art. III, § 2 ...................................................................... 4

Amend. I .................... 1, 3, 4, 14, 24, 25, 28, 29, 30, 21, 32, 33, 35, 36, 38,
.................................. 39, 40, 42, 45, 48, 50, 51, 52, 53, 37, 61, 65, 71

Amend. V
Due Process Clause........................................................ 45
Takings Clause ................................................... 27, 68, 69

## Statutes

10 U.S.C. § 4872(d)(2).................................................... 12

50 U.S.C.
§ 1702(b)(1).......................................................... 14
§ 1702(b)(3)..................................................... 14, 51
§ 4565 ................................................................ 15

No TikTok on Government Devices Act, Pub. L. No. 117-328,
div. R, 136 Stat. 4459 (2022) .......................................... 59

Protecting Americans from Foreign Adversary Controlled
Applications Act, Pub. L. No. 118-50, div. H (2024) ................. 1, 5
Sec. 2(a) ............................................................... 5
Sec. 2(a)(1).......................................................... 9, 10
Sec. 2(a)(2)(A)........................................................ 10
Sec. 2(a)(2)(B)........................................................ 10
Sec. 2(a)(3).......................................................... 14
Sec. 2(b)........................................................... 5, 72
Sec. 2(c)(1).......................................................... 13
Sec. 2(d)(1)(A)........................................................ 10
Sec. 2(e)(1).......................................................... 72
Sec. 2(g)(1)....................................................... 12, 57
Sec. 2(g)(1)(A)....................................................... 41

Sec. 2(g)(2)(A) ............................................................ 11, 41, 55
Sec. 2(g)(2)(A)(i) ................................................................... 35
Sec. 2(g)(2)(B) ................................................ 11, 36, 41, 42, 55
Sec. 2(g)(3)(A) ............................................................ 11, 62, 66
Sec. 2(g)(3)(A)(ii) ............................................................ 11, 33
Sec. 2(g)(3)(B) ....................................................................... 11
Sec. 2(g)(3)(B)(i) .................................................................. 12
Sec. 2(g)(3)(B)(ii) ..................................... 12, 13, 41, 44, 47, 64
Sec. 2(g)(3)(B)(ii)(II) .................................... 33, 41, 42, 43
Sec. 2(g)(4) ...................................................................... 12, 41
Sec. 2(g)(6) .............................................................................. 13
Sec. 2(g)(6)(B) ........................................................... 13, 22, 23
Sec. 3 ....................................................................................... 4
Sec. 3(a) ....................................................................... 13, 41, 42
Sec. 3(b) ................................................................................ 69

Protecting Americans' Data from Foreign Adversaries Act
    of 2024, Pub. L. No. 118-50, div. I, § 2(a) ......................... 59

## Legislative Materials

170 Cong. Rec. H1164 (daily ed. Mar. 18, 2024) .................................... 20

170 Cong. Rec. S2943 (daily ed. Apr. 23, 2024) ..................................... 19

H.R. Comm. on Energy & Com., *Protecting Americans from
    Foreign Adversary Controlled Applications Act*, H.R. Rep.
    No. 118-417 (2024) .................. 18, 19, 37, 50, 51, 52, 53, 55, 56, 59, 60

RESTRICT Act, S. 686, 118th Cong. § 13 (2023) .................................... 59

## Regulatory Materials

48 C.F.R. § 52.204-27 .......................................................... 59

85 Fed. Reg. 48,637 (Aug. 6, 2020) ........................................... 14

85 Fed. Reg. 51,297 (Aug. 19, 2020) ......................................... 15

**Foreign Regulations**

Digital Services Act, Regulation (EU) 2022/2065 of the
European Parliament and of the Council of 19 October
2022 on a Single Market For Digital Services and
amending Directive 2000/31/EC .......................................................... 58

## INTRODUCTION

TikTok is an innovative online platform used by 170 million Americans. These Americans form part of a unique global community with more than 1 billion users worldwide, with whom they create, share, and view videos—"speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

All that will end on January 19, 2025, when the Protecting Americans from Foreign Adversary Controlled Applications Act (the "Act") will ban TikTok throughout the country.

The Act is unprecedented. Never before has Congress expressly singled out and shut down a specific speech forum. Never before has Congress silenced so much speech in a single act.

The First Amendment requires this Court to examine such an extraordinary speech restriction with the utmost care and most exacting scrutiny. Yet Congress gave this Court almost nothing to review. Congress enacted no findings, so there is no way to know why majorities of the House and Senate decided to ban TikTok.

There is no indication Congress even considered TikTok Inc.'s exhaustive, multi-year efforts to address the government's concerns that Chinese subsidiaries of its privately owned parent company, ByteDance Ltd., support the TikTok platform—concerns that would also apply to many other companies operating in China.  In particular, Congress said nothing about the less restrictive alternatives to a ban, including the 90-page National Security Agreement that Petitioners negotiated with the government, which offers multi-layered safeguards and enforcement mechanisms.  And Congress provided no justification for banning TikTok by fiat, while creating substantive and procedural protections, as well as unexplained exclusions, for all other companies alleged to pose the same risks.

Without findings, the Court is left with statements of individual Members and a single committee report.  Many of those Members criticized cherry-picked content on TikTok, merely reinforcing the Act's unconstitutionality.  The report invoked national security, pointing to the speculative possibility that TikTok could be misused in the future.

But a claim of national security does not override the Constitution. "[A]gainst [those] dangers … as against others, the principle of the right

to free speech is always the same." *Abrams v. United States*, 250 U.S. 616, 628 (1919) (Holmes, J., dissenting).  The Act cannot survive First Amendment scrutiny at any step of the analysis: it advances no compelling interests, is not tailored, and disregards less restrictive alternatives.  In addition, and independently, the Act is unconstitutional because of its unique, two-tiered system of speech regulation, which singles out TikTok for disfavor.  That flaw is sufficient to invalidate the Act irrespective of any purported national security justification.

The government will deny that Congress banned TikTok, claiming the company can execute a "qualified divestiture."  But such a divestiture is not possible technologically, commercially, or legally—especially within the Act's arbitrary 270-day timeline.  Petitioners have repeatedly explained why this type of divestiture would not work, and Congress apparently never even considered whether it was possible.

Even if divestiture were feasible, TikTok in the United States would still be reduced to a shell of its former self, stripped of the innovative and expressive technology that tailors content to each user.  It also would become an island, preventing Americans from exchanging views with the

global TikTok community.  Such a speaker- and content-based divestiture requirement cannot survive scrutiny.

This law is a radical departure from this country's tradition of championing an open Internet, and sets a dangerous precedent allowing the political branches to target a disfavored speech platform and force it to sell or be shut down.  The Constitution does not allow Congress to single out one speech platform, make no findings, announce no justifications, ignore less restrictive alternatives, and discriminate based on speaker and content.  The Act is unconstitutional and must be enjoined.

## JURISDICTION

This Court has jurisdiction pursuant to Section 3 of the Act and Article III, section 2 of the Constitution.

## ISSUES

1. Whether the Act violates the First Amendment.

2. Whether the Act violates equal protection.

3. Whether the Act is a Bill of Attainder.

4. Whether the Act effects an unconstitutional taking.

5. Whether the Court should declare Section 2(a) of the Act unconstitutional and enjoin its enforcement with respect to Petitioners' applications, and declare Section 2(b) of the Act non-severable.

## STATUTE

The text of the Act (Pub. L. No. 118-50, div. H (2024)) is reproduced in an Addendum.

## STATEMENT

### A.     TikTok Is a Popular and Unique Speech Platform.

TikTok is an online platform for creating, sharing, and viewing videos.  App.802 (declaration of Adam Presser, TikTok's Head of Operations and Trust & Safety).[1]  People use TikTok to communicate about all manner of topics, from sports and entertainment to religion and politics.  App.805.  Users can communicate in a variety of ways, including by creating, sharing, and commenting on videos, direct messaging other users, "tagging" others to suggest that they view a video, and creating new content that incorporates and responds to other users' videos.  App.803.

---

[1] Because this Court is exercising original jurisdiction, Petitioners are submitting evidentiary material in an appendix.  *See* Joint Motion to Govern Proceedings, Doc. #2055129; Order, Doc. #2056398.

Since its launch in 2017, TikTok has grown to be one of the most widely used speech platforms in the world.  App.804.  TikTok has more than 170 million monthly users in the United States and more than 1 billion monthly users worldwide.  App.804-05.

Users view content primarily through TikTok's "For You" feed, which presents users with videos curated specifically for them by TikTok's innovative technology, including its proprietary recommendation engine.  App.807.  Because TikTok is a globally integrated platform, users can seamlessly access content created around the world. App.804.  In 2023, TikTok users in the United States uploaded more than 5.5 billion videos that were viewed more than 13 trillion times—half of these views by users outside the United States.  App.805.  That same year, TikTok users in the United States viewed content from outside the United States more than 2.7 trillion times, accounting for more than a quarter of all video views in the United States.  *Id.*

TikTok is provided in the United States by TikTok Inc.—an American company incorporated and headquartered in California, with thousands of employees in the United States.  App.801.  TikTok Inc.'s ultimate parent is ByteDance Ltd., a privately held Cayman Islands-

incorporated holding company that owns subsidiaries located around the world, including in China. App.801. ByteDance was founded in 2012 by two Chinese engineers. App.802. Today, ByteDance Ltd. is approximately 58%-owned by global institutional investors, 21%-owned by its global workforce, and 21%-owned by one of its founders, Zhang Yiming, a Chinese national who lives in Singapore. *Id.* ByteDance also provides several applications other than TikTok "for content sharing, video and music editing … e-commerce, gaming, and enterprise productivity." App.802.[2]

Like all social-media and entertainment platforms, TikTok must address important policy and operational challenges, including ensuring effective and appropriate data security, content moderation, and protections against improper influence. TikTok has devoted considerable attention to these challenges. In 2024, it anticipates spending $2 billion on Trust & Safety globally. App.811. Professor Steven Weber, who

---

[2] In this brief, "ByteDance Ltd." refers to the Cayman-incorporated holding company. "ByteDance" refers to the ByteDance group, including ByteDance Ltd. and subsidiaries and controlled affiliates. "TikTok Inc." refers to the U.S. corporate entity that publishes the TikTok platform in the United States. "TikTok" refers to the online platform, including the mobile application and web browser experience.

studies digital technologies and national security, observes that "TikTok's approach for dealing with these issues is in line with—and in many respects markedly better than—industry best practices, even for companies that hold significant sensitive user data." App.788.

Like others in the industry, TikTok moderates content on the platform to enforce publicly available Community Guidelines. App.811 (Presser Declaration). These Guidelines prohibit content such as videos featuring nudity, encouraging certain harmful behavior, or promoting hateful ideologies. App.812. In the last quarter of 2023, TikTok removed 176 million videos for violating the Guidelines. App.814.

Also like other platforms, TikTok works to combat "covert influence operations" on the platform. *Id.* TikTok publishes monthly reports on these efforts, with information about the accounts it detected and removed and the countries from which they operated. *Id.*

## B.    The Law Banning TikTok.

On March 5, 2024, a bill to ban TikTok was introduced in the House of Representatives. Six weeks later, the House packaged a nearly identical bill with must-pass aid for Israel and Ukraine. That omnibus

bill quickly passed the House and Senate, and on April 24, 2024, the President signed the Act into law.

The Act prohibits various entities, including online mobile application stores like the Apple and Google app stores, from providing services to "foreign adversary controlled applications."  It creates two definitions of "foreign adversary controlled application": one that applies automatically if the application is operated by TikTok Inc., ByteDance Ltd., or their affiliates, and one that creates standards and procedures for designating applications that are owned by other companies and publish similar types of content.  When an application falls within one of these definitions, the Act's prohibitions apply, unless its operator meets stringent conditions for executing a "qualified divestiture."

### 1.    *The Act's prohibitions*

The Act makes it "unlawful for an entity to distribute, maintain, or update" a "foreign adversary controlled application" in the United States, by "[p]roviding services" through an "online mobile application store" or other "marketplace," or by "[p]roviding internet hosting services to enable the distribution, maintenance, or updating of such [an] application." Sec. 2(a)(1).  Thus, operators of an "app store" may not allow users to

download or update foreign adversary controlled applications in the United States. And data centers would almost certainly conclude that they can no longer store such an application's code, content, or data.

As the statutory heading confirms, the point of these proscriptions is to effect a "Prohibition" of the application. Sec. 2(a)(1). Violators face substantial per-user penalties. Sec. 2(d)(1)(A).

If an application is a "foreign adversary controlled application" because it is operated by TikTok Inc. or ByteDance Ltd., the Act's prohibitions take effect 270 days from enactment, *i.e.*, on January 19, 2025. Sec. 2(a)(2)(A). Otherwise, the prohibitions take effect 270 days after the presidential determination that is part of the statutory designation process. Sec. 2(a)(2)(B).

### 2. The Act's definition of "foreign adversary controlled application"

The Act's first definition of "foreign adversary controlled application" is self-executing. An application is automatically deemed a "foreign adversary controlled application" if it is operated by "ByteDance[] Ltd." or "TikTok [Inc.]"; by a subsidiary or successor to ByteDance Ltd. or TikTok Inc. that is "controlled by a foreign adversary"; or by an entity owned or controlled by ByteDance Ltd., TikTok Inc., or

their subsidiary or successor.  Sec. 2(g)(3)(A).[3]  This includes ByteDance-operated applications other than TikTok.

For applications that publish similar types of content but are operated by any other company, a different standard applies, and imposes on the government substantive and procedural requirements.

*First*, the application must be operated by a "covered company." Sec. 2(g)(3)(B).  A "covered company" is one operating an application like TikTok that (i) "permits a user to create an account or profile to generate, share, and view text, images, videos, real-time communications, or similar content"; (ii) has more than 1,000,000 monthly active users; (iii) enables users to "generate or distribute content that can be viewed by other users"; and (iv) enables users "to view content generated by other users."  Sec. 2(g)(2)(A).  If a company's applications do not allow user-generated content, it cannot be a covered company.

Even if these criteria are met, however, "[t]he term 'covered company'" excludes a company that "operates a[n] [application] whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews."  Sec. 2(g)(2)(B).  If a company

---

[3] "TikTok" in Section 2(g)(3)(A)(ii) presumably refers to TikTok Inc.

operates one application with that primary purpose, and other applications with other purposes, the company is not "covered," and none of its applications can be "foreign adversary controlled applications."

*Second*, the covered company must be "controlled by a foreign adversary." Sec. 2(g)(3)(B)(i). The Act defines "foreign adversary country" by reference to 10 U.S.C. § 4872(d)(2), covering China, Iran, North Korea, and Russia. Sec. 2(g)(4). A company is "controlled by a foreign adversary" if it is a foreign person domiciled in, headquartered in, with its principal place of business in, or organized under the laws of one of those countries, if it is at least 20% owned by such persons, or if it is "subject to the direction or control of" such a person. Sec. 2(g)(1).

*Third*, the President must determine that the covered company "present[s] a significant threat to the national security of the United States." Sec. 2(g)(3)(B)(ii).

*Fourth*, the President must issue "a public notice" of such a determination, and submit a "public report to Congress" at least 30 days before the determination. *Id.* That report must "describ[e] the specific national security concern involved," "contain[] a classified annex," and

describe "what assets would need to be divested to execute a qualified divestiture." *Id.*

*Fifth*, the President's determination is subject to judicial review. Sec. 3(a).

### 3.    *The Act's "qualified divestiture" provision*

A "foreign adversary controlled application" can escape the Act's prohibitions through a "qualified divestiture." Sec. 2(c)(1). A divestiture is "qualified" if the President determines that it (i) results in the application "no longer being controlled by a foreign adversary," and (ii) "precludes the establishment or maintenance of any operational relationship" between the application's U.S. operations "and any formerly affiliated entities that are controlled by a foreign adversary." Sec. 2(g)(6). The prohibited "operational relationship" includes "any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing." Sec. 2(g)(6)(B).

The President may "grant a 1-time extension" of the prohibitions' effective date lasting no more than 90 days, but only if the President certifies that there is "a path to executing a qualified divestiture,"

"evidence of significant progress," and "binding legal agreements" in place. Sec. 2(a)(3).

## C. The Act Followed Unsuccessful Past Efforts to Ban TikTok.

This is not the first time the government has sought to shut down TikTok. In August 2020, the President issued two executive orders attempting to do just that.

The first order, invoking the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, attempted to ban TikTok purportedly because it "is owned by [a] China-based company," the Chinese Communist Party "might be able to 'access … Americans' personal and proprietary information," and "TikTok could be used to transmit [Communist Party]-approved propaganda." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 97 (D.D.C. 2020) (quoting 85 Fed. Reg. 48,637, 48,637 (Aug. 6, 2020)).

Courts enjoined the order. To protect Americans' First Amendment rights, Congress denied the President authority to regulate "personal communications" or the import or export of "information or informational materials." 50 U.S.C. § 1702(b)(1), (3). Courts concluded that the order

exceeded these statutory limitations and raised "serious" constitutional questions.[4]  The President subsequently withdrew the order.

The second order, invoking Section 721 of the Defense Production Act, 50 U.S.C. § 4565, directed ByteDance Ltd. to divest TikTok's U.S. business and user data.  85 Fed. Reg. 51,297 (Aug. 19, 2020).  Petitioners sought this Court's review. *TikTok Inc. v. Comm. on Foreign Inv.* (No. 20-1444).  In February 2021, the parties agreed that the petition should be held in abeyance to allow the parties to negotiate a resolution.

### D.    Petitioners Negotiated an Unprecedented National Security Agreement and Have Spent $2 Billion Voluntarily Implementing Protections.

Over the following 18 months, Petitioners continued to work with the Committee on Foreign Investment in the United States ("Committee") to address the government's concerns, culminating in a 90-page draft National Security Agreement ("Agreement").  *See* App.157-260.  As explained by Christopher Simkins, a former Senior Counsel at the Justice Department responsible for its participation in the Committee, the Agreement "effectively mitigates national security risk

---

[4] *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 83 (D.D.C. 2020); *TikTok Inc.*, 507 F. Supp. 3d at 112; *see also Marland v. Trump*, 498 F. Supp. 3d 624, 641 (E.D. Pa. 2020).

associated with" TikTok through "reliance on multiple trusted third parties," "complex and thorough technical mitigations," and "unprecedented oversight, monitoring, and very rigorous enforcement mechanisms." App.756.

The Agreement defines protected U.S. user data and provides that it would be stored in the United States in the cloud environment of U.S.-based Oracle Corporation. App.163 (art. 1, § 1.22); App.206 (art. 11, § 11.5). That data would be overseen by a new entity, TikTok U.S. Data Security, supervised by a special board including members subject to U.S. government approval. App.166 (art. 2, § 2.1); App.169-70 (art. 3, §§ 3.1-.2). The Agreement would guard against foreign manipulation of TikTok's content, including through third-party monitoring of TikTok's content moderation practices, recommendation engine, and other source code. App.190-201 (art. 9); App.219-22 (art. 16).

The Agreement would deter and punish violations by, among other things, affording the government an unprecedented "shut-down option." App.230-32 (art. 21, §§ 21.3-.5); App.747 (Simkins Declaration). The government would be permitted to suspend TikTok in the United States,

and impose significant monetary penalties and other remedies, in response to specified acts of noncompliance. App.230 (art. 21, §§ 21.1-.2).

Petitioners began to voluntarily implement many of these measures without waiting for the Agreement to be finalized. App.822 (Presser Declaration). That effort, sometimes referred to as "Project Texas," has cost Petitioners more than $2 billion to date. *Id.*

The Agreement was never signed, however, because the Committee ceased substantive engagement regarding the Agreement in September 2022. App.417 (Letter to Justice Department). Instead, Committee representatives informed Petitioners in March 2023 that "senior government officials" demanded divestment—without explaining why the Agreement was insufficient. App.417, 421. Petitioners repeatedly explained why such a divestment was not possible and requested meetings with senior officials. App.418-24. Petitioners again received no meaningful responses. *Id.*

### E. Congress Enacted No Findings, While Legislators Articulated Varying Concerns.

The Act contains no legislative findings, leaving no indication of what rationale—if any—majorities of the House and Senate and the President agreed to as the reason for banning TikTok.

In March 2024, the month before Congress passed the Act, the Justice Department provided members of Congress a one-page document describing "key national security concerns." App.156. *First*, the Department asserted that "TikTok collects tremendous amounts of sensitive data," without alleging that the Chinese government has ever obtained any such data. *Id. Second*, the Department asserted that TikTok's algorithm "creat[es] the potential for [China] to influence content on TikTok," without alleging that China has done so. *Id.* And *third*, the Department asserted that the location of "source code and some operations … creat[es] the potential" for Chinese influence, again without alleging that anything like that has ever occurred. *Id.* The document further asserts that Chinese law "requires any company doing business in China" to make its data accessible. *Id.* The Justice Department did not explain why these concerns could not be addressed through the protections in the National Security Agreement.

Shortly thereafter, a House committee issued a report on a precursor to the Act. App.1-18 (H.R. Comm. on Energy & Com., *Protecting Americans from Foreign Adversary Controlled Applications Act*, H.R. Rep. No. 118-417 (2024) ("House Committee Report")). The

report did not address the Act's two-tiered structure, or explain why it adopts one standard for TikTok and a different standard for everyone else.  Instead, the report stated that the Act's purpose is to address "foreign adversary controlled applications, *such as* TikTok."  App.1 (emphasis added).  The report asserted that "such applications" "can be used" by adversaries "to collect vast amounts of data on Americans, conduct espionage campaigns, and push misinformation, disinformation, and propaganda on the American public."  App.2.

The report then "list[ed]" "public statements that have been made" about TikTok.  App.5.  It cited news reports discussing Petitioners' implementation of Project Texas, but offered no indication that the House Committee considered the range of measures in the draft National Security Agreement.  App.4-5.

No Senate committee held hearings or issued a report on the Act.

Various legislators offered explanations for supporting the Act. Some were concerned that TikTok "exposes children to harmful content." App.553 (Sen. Cotton); *see also* App.609 (Sen. Fetterman) ("I voted yes … to make TikTok safer for our children and national security").  Others objected to particular content.  *See* App.125 (Sen. Ricketts) ("hashtag

19

'StandwithKashmir' has 20 times more posts than hashtag 'TaylorSwift'"); App.572 (Rep. Gallagher) ("information on the conflict between Israel and Hamas" is "one-sided"). Others focused on hypothetical future messages. *See* App.566 (Sen. Warner) (concern that "TikTok videos will be promoting that Taiwan ought to be part of China"). Some even took exception to TikTok urging users "to contact their Representatives" about the Act. App.40 (Rep. McMorris Rodgers).

Key legislators offered explanations for why the Act succeeded when prior bills had failed. Rep. Krishnamoorthi, one of the lead sponsors, explained that the Act gained support because of "a lot of things in the interim, including [the] Oct. 7[, 2023 Hamas terrorist attacks], including the fact that Osama bin Laden's 'Letter to America' went viral on TikTok and the platform continued to show dramatic differences in content relative to other social media platforms." App.562. Immediately after enactment, Sen. Romney stated that the reason for "such overwhelming support for us to shut down potentially TikTok" is that "[i]f you look at the postings on TikTok and the number of mentions of

Palestinians relative to other social media sites, it's overwhelmingly so among TikTok broadcasts." App.596.[5]

### F.    The Act's Effect Is a Ban on TikTok.

If the Act's prohibitions take effect, they will "render the TikTok platform inoperable in the United States." App.824-25 (Presser Declaration). Absent judicial relief, the prohibitions will take effect. Executing a "qualified divestiture" is technologically, commercially, and legally infeasible, particularly on the Act's timeframe of 270 days (or 360 days with a discretionary extension). Petitioners repeatedly explained to the government that this type of divestiture is infeasible. *See* App.418-24 (Letter to Justice Department).

**Technological and Operational Infeasibility.** Like other global platforms, TikTok runs on "billions of lines of code that have been developed over multiple years by a team of thousands of global engineers." App.832 (Presser Declaration). The Act's qualified divestiture requirements bar any continuing operational relationship

---

[5] To be clear, TikTok condemns and has in place policies and processes to promptly remove any content that promotes terrorism. The evidence does not support the allegations that TikTok has amplified support for either side of the Israeli-Palestinian conflict. App.781-84 (Weber Declaration).

with ByteDance, Sec. 2(g)(6)(B), which would preclude "thousands of ByteDance employees" from continuing to support TikTok in the United States, App.832-33. It would take "several years for an entirely new set of engineers to gain sufficient familiarity with the source code" to keep a hypothetical U.S.-only TikTok safe and functional, and even then such a team would "need access to custom-made ByteDance software tools," which the Act forbids. App.833.

The barriers to effectuating the type of divestiture required by the Act are not unique to TikTok. As explained by Professor Randal Milch, who served as general counsel and in other senior roles at Verizon for 21 years, "divestitures of highly integrated assets are complex and time-consuming processes." App.650. Professor Milch's analysis of technology-industry transactions demonstrates that "complex divestitures of highly integrated technical assets consistently take[] over 360 days and necessitate[] post-closing support from the seller." App.686. This conclusion is consistent with his professional experience: three complex divestitures at Verizon, involving a geographic separation of highly integrated assets, which "each took between two and three times as long as the maximum timeline the Act affords Petitioners." App.664.

Professor Milch concludes that because "TikTok's U.S. application is highly integrated with the global TikTok application," and a "qualified divestiture" requires a severing of all "operational relationships" between TikTok's U.S. application and its global application, "a 'qualified divestiture' of TikTok's U.S. application is not operationally feasible within 360 days (let alone within 270 days)." App.649, 686.

**Commercial Infeasibility.** To show global content to its U.S. users or vice versa, a new owner of TikTok in the United States would at minimum require a data-sharing agreement with ByteDance, App.830-31 (Presser Declaration), which the Act forbids, Sec. 2(g)(6)(B). Thus, any severed U.S. TikTok application would be a content "island," with U.S. users "unable to access the content posted by any non-U.S. TikTok users, and U.S. creators … unable to reach that audience abroad." App.831.

Without the "rich pool of global content" that "translates to more users and more traffic," a U.S.-only version of TikTok would be "significantly less attractive to global advertisers." *Id*. And while the costs of running and maintaining the platform are "mainly fixed," "the base of revenue to support them would be considerably smaller."

23

App.831-32.  A U.S.-only TikTok platform therefore could not compete with its global competitors.  App.831.

**Legal Infeasibility.**  TikTok's proprietary recommendation engine is critical to its success.  App.807; Creator Br. 9-12, 29-30.  Just as the United States restricts the export of U.S.-origin technologies (*e.g.*, certain computer chips), the Chinese government regulates the transfer of technologies developed in China.  The Chinese government has made clear in public statements that it would not permit a forced divestment of the recommendation engine.  App.611-16 (*New York Times* and *Xinhua* reports).

The effect of the Act is therefore a ban.

## SUMMARY OF ARGUMENT

**I. A.** Petitioners exercise First Amendment rights, including by curating content delivered to TikTok users, speaking on the platform, and owning a speech platform.  The Act burdens Petitioners' expression by shutting down TikTok in the United States.  A "qualified divestiture" is infeasible, but in any event would alter the platform and burden Petitioners' First Amendment rights.

The Act's burdens on speech are subject to strict scrutiny. Congress drew speaker-based distinctions, singling out specific speakers for less favorable treatment. It also drew content-based distinctions. On its face, the Act privileges applications that do not share speech generated by users, as well as speech about products, business, and travel. The House Committee Report and statements by legislators also reveal content- and viewpoint-based discrimination.

**B.** The Act's differential treatment of TikTok is a threshold constitutional flaw at the intersection of the First Amendment and equal protection. There is no compelling justification for singling out TikTok, and there is an obvious less restrictive alternative: subjecting TikTok to the provisions governing all other alleged "foreign adversary controlled applications." Congress's view was that these standards addressed the risks posed by companies allegedly presenting a significant threat to national security. Thus, no national security concern could justify denying TikTok the same standards.

**C.** Beyond this threshold flaw, the Act also fails strict or even intermediate scrutiny at every step.

Congress enacted no findings, making it impossible to identify and evaluate compelling interests it may have sought to advance.

One congressional committee suggested that TikTok could be used to spread propaganda, disinformation, or misinformation, and could pose risks to users' personal data. Those interests, even if credited, are insufficient. As the Supreme Court has held, the government cannot legitimately restrict speech by labeling it foreign propaganda. With respect to both asserted interests, conjecture of what "might" or "could" happen does not suffice to restrict speech.

The Act fails narrow tailoring because it is seriously underinclusive in addressing these purported interests. Any other company—even if it is "controlled by a foreign adversary" and poses a grave security risk—can avoid the Act simply by disabling user submissions, or operating a product-, business-, or travel-review application. The Act leaves untouched numerous vectors for disseminating propaganda, such as foreign state-owned media applications and influence campaigns on other platforms. It ignores many applications with substantial operations in China that collect large amounts of U.S. user data, as well as the many

U.S. companies that develop software and employ engineers in China, all of which pose the same purported risks.

Congress disregarded less restrictive means of addressing such issues. These include industry-wide privacy, disclosure, and vetting regimes, and the measures Petitioners offered in the National Security Agreement, including a significant role for a trusted U.S. technology provider and an unprecedented "shut-down option" for the government.

II. The Act is an unconstitutional Bill of Attainder because it applies to Petitioners with specificity and punishes them. The Act's arbitrary singling out of Petitioners for adverse treatment, and the gaping holes in its pursuit of any purported interests, confirm the Act is punitive.

III. The Act violates the Takings Clause. By banning the platform, the Act will destroy the value of the U.S. TikTok business and ByteDance Ltd.'s investment in TikTok Inc., without just compensation.

IV. The Court should declare the Act unconstitutional and enjoin its enforcement with respect to Petitioners' applications. Alternatively, the Court should temporarily enjoin enforcement and order further

proceedings to resolve any factual disputes. The Court should also declare the Act's data portability provision non-severable.

## ARGUMENT

### I. The Act Violates the First Amendment.

The First Amendment places a heavy burden on the government to justify restraints on speech. If the government were afforded "the benefit of the doubt when it attempted to restrict speech," it "would risk leaving regulations in place that sought to shape our unique personalities or to silence dissenting ideas." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 818 (2000).

TikTok is a unique and vibrant forum for speech. Congress cannot shut it down without satisfying the most searching constitutional scrutiny—it cannot demand the benefit of the doubt for whatever national security justifications the government's lawyers might now raise. To the contrary, when the government invokes national security to burden speech, it is all "the more imperative" to "preserve inviolate the constitutional rights of free speech, free press and free assembly." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937).

The government cannot meet its heavy burden of justifying the sweeping speech restriction the Act imposes. *First*, the Act is subject to strict scrutiny: Petitioners engage in expression protected by the First Amendment, the Act burdens that expression, and it does so through facially speaker- and content-based distinctions. *Second*, the Act has a threshold flaw under the First Amendment and equal protection, irrespective of any question of national security: it expressly singles out Petitioners while giving everyone else—including speakers the government accuses of threatening national security—more favorable standards and procedures. And *third*, beyond this threshold flaw, imposing a ban or divestiture requirement on TikTok cannot survive First Amendment scrutiny: the Act makes no statutory findings, advances no compelling interest, is not remotely tailored to any purported interest, and ignores less restrictive alternatives.

## A.    The Act Is Subject to Strict Scrutiny.

### 1.    *Petitioners engage in protected expression.*

Petitioners exercise First Amendment rights in several ways.

*First*, the First Amendment protects TikTok Inc.'s use of a recommendation engine to "present[] … an edited compilation of speech

29

generated by other[s]." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995); *see also Alario v. Knudsen*, 2023 WL 8270811, at *6 (D. Mont. Nov. 30, 2023) (enjoining Montana's attempt to ban TikTok and holding that "decisions related to how it selects, curates, and arranges content are … protected by the First Amendment"). As the government correctly recognizes, "companies that run social-media platforms are in the business of delivering curated compilations that primarily consist of speech created by others, but that constitute distinct expressive offerings." Br. for United States as Amicus Curiae at 18, *Moody v. NetChoice, LLC*, 2023 WL 8600432 (U.S. filed Dec. 7, 2023) (Nos. 22-277, 22-555) (quotation marks omitted).

*Second*, TikTok Inc. speaks to more than 80 million followers globally through its own TikTok account, promoting causes such as support for small businesses, Earth Day, and literacy. App.806 (Presser Declaration).

*Third*, ByteDance Ltd. has expressive interests in its ultimate ownership of an expressive publication. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (law

requiring book author's proceeds to be placed in escrow burdened publisher's First Amendment rights).

### 2. *The Act restricts speech.*

A statute's "practical effect" on protected speech is "sufficient to characterize [it] as an infringement on First Amendment activities." *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 255 (1986) (plurality op.). The practical effect of the Act is to shut TikTok down, because "qualified divestiture" is not technologically, commercially, or legally feasible. *Supra* pp.21-24.

As Professor Milch explains in detail, operational realities make a qualified divestiture on Congress's arbitrary timeline "entirely illusory." App.648. Commercial realities would place a post-divestiture TikTok, cut off from global content, in an untenable competitive position. *See* App.830-31 (Presser Declaration). And legal realities would preclude the sale of the recommendation engine that is central to TikTok's success. *Supra* pp.23-24.

The Act thus does not just burden Petitioners' speech—it silences Petitioners, along with 170 million regular TikTok users.

But even if a "qualified divestiture" were possible, the Act is still subject to First Amendment scrutiny because it burdens Petitioners' expressive activity. "[C]ontent-based burdens must satisfy the same rigorous scrutiny as … content-based bans." *Playboy*, 529 U.S. at 812.

*First*, the Act places onerous conditions on TikTok Inc.'s speech. Congress barred TikTok Inc. from continued speech unless it can attract a new owner and take expensive, resource-intensive steps to effect a complex transaction. *See* App.656-62 (Milch Declaration). Even if these conditions could be satisfied without *extinguishing* TikTok Inc.'s speech, they certainly *burden* TikTok Inc.'s speech. *See, e.g.*, *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256 (1974) ("penalty" on newspaper compelled to print editorial reply included "cost in printing and composing time and materials").

*Second*, any divestiture would change TikTok's speech. A post-divestiture, U.S.-only TikTok would lack the recommendation engine that has driven its success, eliminating its preferred means of "cho[osing the] material" that users view. *Id.* at 258; *see supra* pp.6, 13, 23-24. And it would lose access to TikTok's current global user base, restricting the content it could provide to U.S. users. *Supra* p.23; *see* Creator Br. 37.

*Third*, even if TikTok could continue operating, TikTok Inc. could lose its First Amendment right to curate and speak through that platform.  Petitioners cannot know if the President would certify a divestiture in which TikTok Inc. retained ownership, since Petitioners (unlike every other company) are denied a "description of what assets would need to be divested."  Sec. 2(g)(3)(B)(ii)(II).  That problem is compounded by a statutory anomaly: any application operated by TikTok Inc. would still be, by definition, a "foreign adversary controlled application," even if ByteDance divested TikTok Inc.  Sec. 2(g)(3)(A)(ii).

*Fourth*, divestiture burdens the rights of TikTok's ultimate owner, ByteDance Ltd.  *Supra* p.30.  No one would doubt the burden on protected speech if Congress ordered the Sulzberger family to sell *The New York Times*.  The same is true of the government dictating the sale of TikTok, one of the country's largest media platforms.

### 3. *The Act draws speaker-based and content-based distinctions.*

The Act's burdens on speech—whether viewed as a ban or a forced divestiture—do not fall neutrally.  Rather, they depend on who the speaker is and what they speak about.  The Act engages in textbook speaker-based and content-based regulation, triggering strict scrutiny.

**Speaker-Based Regulation.** "Quite apart from the purpose or effect of regulating content, … the Government may commit a constitutional wrong when by law it identifies certain preferred speakers." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). Thus, laws that "single out" particular speakers "present[] such a potential for abuse" that they are presumptively unconstitutional. *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 585, 592 (1983); *see also Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015) ("[S]peech restrictions based on the identity of the speaker are all too often simply a means to control content …." (quotation marks omitted)); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994) (speaker-based restrictions "demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)").

On its face, the Act privileges some speakers over others. Any company other than Petitioners is insulated from the Act's prohibitions unless the government satisfies substantive and procedural requirements. *Supra* pp.11-13. Petitioners' applications face the Act's prohibitions and divestiture demands irrespective of those requirements.

34

That is precisely the kind of "singling out" of particular speakers that demands the highest form of scrutiny. *Minneapolis Star*, 460 U.S. at 581, 585.

**Content-Based Regulation.** "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). "Government regulation of speech is content based," and strict scrutiny governs, "if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Laws that regulate speech "based on the specific motivating ideology or the opinion or perspective of the speaker" represent an especially "blatant and egregious form of content discrimination." *Id.* at 168 (quotation marks omitted).

The Act is facially content-based. A company is "covered" only if it operates an application that permits user-generated and -shared "text, images, videos, real-time communications, or similar content." Sec. 2(g)(2)(A)(i). Rather than applying equally to all applications that are controlled by a foreign adversary and pose alleged security risks, the Act targets only those that publish a disfavored category of speech.

35

Applications in which all content is provided by the operator are exempt. Thus, the Act's burdens—whether viewed as a ban or a financially onerous ownership restriction—expressly apply based on the content of the application operator's speech, *i.e.*, whether or not it shares user-generated content. *See, e.g.*, *Simon & Schuster*, 502 U.S. at 115 (invalidating escrow requirement for certain book proceeds because "[a] statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech").

The Act further discriminates based on "the topic discussed." *Reed*, 576 U.S. at 163.  If a company (other than Petitioners) operates an application "whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews," Sec. 2(g)(2)(B), then all of its applications escape regulation under the Act—again, no matter how grave a national security threat the company presents.  Congress thus privileged speech on the favored topics of

products, business, and travel, over speech on disfavored topics like politics, religion, and entertainment.[6]

Even apart from the Act's facial content-based discrimination, strict scrutiny applies "when the purpose and justification for the law are content based." *Reed*, 576 U.S. at 166; *accord Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011).

Although Congress here enacted no "expressed statement of purpose," *Sorrell*, 564 U.S. at 565, the House Committee Report emphasized concerns of "misinformation, disinformation, and propaganda." App.2. Whether something is "misinformation" depends on whether it is true or false—which is necessarily a judgment about its content. *See United States v. Alvarez*, 567 U.S. 709, 724 (2012) (plurality op.) (applying strict scrutiny to prohibition of false claims of military decoration). Similarly, whether speech is "propaganda" turns on its content and viewpoint.

Further, one of the Act's lead sponsors contended that the Act passed the House because of a perceived "dramatic difference[] in

---

[6] Even if the provision had exempted only review applications, rather than any *company* that operates such an application, the Act would still be content-based.

content" on TikTok "relative to other social media platforms." App.562. And a senator attributed the Act's overall support to the "number of mentions of Palestinians [on TikTok] relative to other social media sites." App.596; *see also supra* pp.19-21.

Legislators' perception of the content reflected on TikTok was misinformed. *Supra* p.21 n.5. But well-founded or not, governmental policing of content differences is antithetical to the First Amendment's "assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Associated Press v. United States*, 326 U.S. 1, 20 (1945).

* * *

In sum, the Act's extraordinary restriction on speech requires strict scrutiny. It is therefore unconstitutional unless it is "the least restrictive means of achieving a compelling [government] interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Even if intermediate scrutiny applied, the Act still would have to "serve a significant governmental interest" and be "narrowly tailored" to advance that interest. *Id.* at 486 (quotation marks omitted).

38

Under either test, "[w]hen the government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Playboy*, 529 U.S. at 816.

The government cannot meet this heavy burden, particularly given the absence of any legislative findings or other authoritative indication of the reasons majorities in Congress passed the Act. *First*, for the threshold reason that there is no justification for singling out TikTok as compared to other alleged "foreign adversary controlled applications." *Second*, because the Act fails at every step of the traditional First Amendment analysis.

## B. The Act's Differential Treatment of Petitioners Is a Standalone Violation of the First Amendment and Equal Protection.

The Act suffers from a fatal, threshold constitutional flaw: Congress singled out Petitioners by name and banned their applications outright, while affording everyone else a substantive standard and procedural protections. Congress offered no justification for treating Petitioners worse than all other speakers—even speakers alleged to be controlled by a foreign adversary and to present national security threats. That alone

requires invalidating the Act's application to TikTok, because there is no justification, national security or otherwise, for that distinction.

When Congress "burden[s] a single publisher[]," it raises issues that "lie at the intersection of the First Amendment's protection of free speech and the Equal Protection Clause's requirement that government afford similar treatment to similarly situated persons." *News Am. Pub., Inc. v. FCC*, 844 F.2d 800, 802, 804 (D.C. Cir. 1988). For that reason, this Court struck down a law that targeted "a corporation controlled by K. Rupert Murdoch" "with the precision of a laser beam," by preventing that one company from maintaining certain broadcast licenses. *Id*. at 804, 814. The Act here, which targets one company to *ban* any speech platform it operates, offends the same constitutional principles.[7]

---

[7] The law in *News America* was unconstitutional despite "special characteristics of broadcasting … giv[ing] Congress greater latitude in broadcast regulation." 844 F.2d at 805. Those characteristics "are not present in cyberspace"; there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to" the Internet. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 868, 870 (1997).

### 1. The Act treats Petitioners worse than other alleged "foreign adversary controlled applications."

The Act purports to address an issue broader than TikTok: "foreign adversary controlled applications."  And it adopts a general set of rules and procedures to govern that issue.  Under that standard, a company's applications are not subject to divestiture or prohibition unless:

- the company, its owners, or those who control it reside in specified countries, Sec. 2(g)(1)(A), 2(g)(4);

- the company operates an application that enables users to generate and share content, Sec. 2(g)(2)(A);

- the company does *not* operate an application whose primary purpose is the sharing of product, business, or travel reviews, Sec. 2(g)(2)(B);

- the President determines that the company presents a "significant threat" to national security, Sec. 2(g)(3)(B)(ii);

- the President submits a public report that describes the "specific" security concern, together with a classified annex and a description of assets requiring divestiture, Sec. 2(g)(3)(B)(ii)(II); and

- the justifications set forth in that presidential determination survive judicial review, Sec. 3(a).

But Petitioners' applications are subject to divestiture or prohibition *irrespective of* these standards and requirements.  Those

differences in treatment impose a substantially greater burden on Petitioners' First Amendment rights.

Substantively, for instance, any other company "controlled by a foreign adversary" can simply create a product-, business-, or travel-review application; it would then not be a "covered company," and its applications could not be subject to the Act. Sec. 2(g)(2)(B). Only Petitioners cannot take advantage of this exemption.

The Act's procedural protections are also important. The requirement of a "specific" presidential security threat determination, Sec. 2(g)(3)(B)(ii)(II), subject to judicial review, Sec. 3(a), ensures a "reasoned explanation" that "offer[s] genuine justifications for [an] important decision[], reasons that can be scrutinized by courts and the interested public," *Dep't of Com. v. New York*, 139 S.Ct. 2551, 2575-76 (2019). By targeting Petitioners without enacting any findings justifying its action, Congress deprived only Petitioners of the important disciplining effect of a public justification. And it deprived only Petitioners of judicial review based on contemporaneously articulated reasons for the deprivation of constitutional rights, which guards against the risk of improper *post hoc* rationalizations by government lawyers. *Cf.*

42

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1907 (2020) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." (quotation marks omitted)).

That risk is particularly acute here, because it is impossible for anyone to know why majorities of the House and Senate, and the President, concluded that it was appropriate to single out TikTok—or whether they even agreed on a reason for eliminating Petitioners' free speech rights.

Congress even made it easier for every other company to exercise the supposed "qualified divestiture" option.  Everyone else is entitled to a presidential "description of what assets would need to be divested to execute a qualified divestiture."  Sec. 2(g)(3)(B)(ii)(II).  Petitioners alone are left to guess what type of divestiture would satisfy the President.

In short, only Petitioners' applications are automatically banned, while any other company alleged to operate "foreign adversary controlled applications" is given superior pathways, both substantively and procedurally, to avoid a ban.

43

### 2. The Act's discriminatory treatment of Petitioners is not justified by any compelling or significant interest.

There is no compelling, important, or even rational justification for denying Petitioners the same standards and protections that Congress afforded *other alleged foreign adversary controlled applications*. For every company other than Petitioners that is allegedly controlled by a foreign adversary and poses national security concerns, Congress determined that there is a compelling need to ban its applications only if the Act's standards are met and its process followed. Nothing in the Act suggests why there is a compelling need to ban TikTok without at least following the same standards and process.

Nor is there any indication that Congress itself applied its generally applicable criteria to Petitioners. Congress found no facts at all, and the House Committee never assessed how Section 2(g)(3)(B) might apply to Petitioners. Certainly the Justice Department's cursory description of "national security concerns," App.156, is much different from a *public* finding by the *President* of a "*significant* threat" backed up by "*specific[s]*," Sec. 2(g)(3)(B)(ii) (emphasis added).

44

This unjustified discriminatory treatment violates not only the First Amendment but the equal protection component of the Due Process Clause. *See Davis v. Passman*, 442 U.S. 228, 234 (1979). As this Court has explained, "[n]owhere are the protections of the Equal Protection Clause more critical than when legislation singles out one or a few for uniquely disfavored treatment." *News Am.*, 844 F.2d at 813.

The Act defies the basic command of equal protection: "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Having laid out the criteria Congress believed relevant to whether an application should be divested or banned, the statutory text and legislative record provide no hint why Petitioners must be treated differently.

The First Amendment and equal protection problems are even more glaring in light of the Act's loophole for any company—except Petitioners—that operates an application whose primary purpose is product, business, or travel reviews. If a different company operated an application that posed exactly the same alleged risks as TikTok, and separately operated a travel review application, that company's applications would be left undisturbed. Meanwhile, any application

45

operated by Petitioners, including any application devoted to travel reviews, is subject to divestiture or ban. Two identical companies operating identical applications raising identical alleged risks would be treated differently. That is not how Congress is allowed to regulate speech, and it is not equal protection of the laws.

### 3. The Act's discriminatory treatment fails narrow tailoring and the least-restrictive-means requirement.

There is an obvious less restrictive and more tailored alternative to singling out Petitioners. Congress could have simply subjected Petitioners to the same standards, and the same process, that Congress deemed adequate for every other speaker allegedly "controlled by a foreign adversary." *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 730-31 (2014) (holding that law was not narrowly tailored when for-profit corporations were denied religious accommodation offered to non-profit corporations, without deciding whether accommodation itself was narrowly tailored).

It would be no answer for the government to retort that TikTok threatens national security. The same is true—*by statutory definition*—of any application subject to the generally applicable standard, which

46

reaches only companies that pose a "significant threat to the national security of the United States." Sec. 2(g)(3)(B)(ii). There is no conceivable reason why a less restrictive standard that *Congress tailored to security-threatening companies* would be insufficient to address any threat supposedly posed by TikTok.

* * *

In sum, any claim of national security is legally irrelevant here because it cannot justify the Act's unconstitutional singling out of TikTok. Congress itself laid down a generally applicable standard and process it deemed sufficient for regulating "foreign adversary controlled applications" that pose significant threats to national security. It just denied Petitioners alone the protections of that standard and process, for no reason it saw fit to share.

## C.   The Act's Burdens on Petitioners' Free Speech Rights Fail Strict Scrutiny.

The Act's constitutional deficiencies run even deeper than this threshold flaw. To justify banning TikTok—whether under the specific provision deeming it a foreign adversary controlled application, or under the generally applicable provision for covered companies—the government must satisfy strict scrutiny. Even if the Act were viewed as

47

a forced divestiture, the government bears the same burden.  *Supra* pp.31-33.  The government cannot meet that burden—or even save the Act under intermediate scrutiny.

> ### 1.    *The Act does not advance a compelling or significant interest.*

The First Amendment requires Congress to conduct a "careful assessment and characterization of an evil," corroborated by "hard evidence," to justify a restriction on speech.  *Playboy*, 529 U.S. at 819.  The government cannot rely upon "anecdote and supposition."  *Id.* at 822.  Instead, it "must specifically identify an actual problem in need of solving," *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (quotation marks omitted), and offer "proof" of "how widespread or how serious the problem … is," *Playboy*, 529 U.S. at 819.  And when the government invokes national security interests, the Supreme Court has relied on Congress's "*specific findings* regarding the serious threat posed."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 29 (2010) (emphasis added).

Here, Congress itself imposed an extremely broad and consequential speech restriction on a single, identified publisher—without findings documenting its reasons for acting, supported by hard

evidence. That is very different from Congress's usual approach of adopting a general standard and leaving its application to the Executive Branch and the courts, which will then justify any restriction on constitutional rights with specific findings.

Enacted findings are the bare minimum when Congress targets a specific speaker. "[P]articularly when so much is at stake, … the Government should turn square corners." *Regents of the Univ. of Cal.*, 140 S.Ct. at 1909 (quotation marks omitted). The government cannot meet its burden of satisfying strict scrutiny when it is impossible to know the reasons for Congress's decision. If Congress wishes to take the momentous step of shutting down a specific speech platform, it must *at least* say why. Requiring less would set a dangerous precedent: Congress could target particular speakers for wholly illegitimate reasons, and leave it to government lawyers to figure out some national security or other compelling justification—regardless of whether it was the reason for Congress's action.

Certainly a report of one committee of one house of Congress on a prior version of the bill, or comments by individual legislators, cannot

reliably indicate what *Congress* found. In this unique context, the absence of statutory findings by itself requires the Act's invalidation.

But even considering the interests proposed in the House Committee Report—preventing the dissemination of propaganda and protecting data security—the government still cannot meet its burden.

### a) *"Misinformation, disinformation, and propaganda"*

The House Committee Report's charge of "misinformation, disinformation, and propaganda," App.2, fails for two reasons: it is a complaint about the speech's content, not a "governmental interest[] *unrelated* to the suppression of free speech," *Humanitarian Law Project*, 561 U.S. at 26-27 (emphasis added); and in any event Congress made no showing that the Act is actually needed to address this concern.

*First*, the Supreme Court at the height of the Cold War held that the First Amendment barred efforts to ban receipt of "communist political propaganda" from foreign countries. *Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965) (quotation marks omitted). This Court has read *Lamont* to recognize a right "to receive information and ideas from abroad." *Walsh v. Brady*, 927 F.2d 1229, 1235 (D.C. Cir. 1991). And when Congress barred the President from restricting the cross-border

flow of "any information or informational materials," 50 U.S.C. § 1702(b)(3), it did so to "prevent the executive branch from restricting the international flow of materials protected by the First Amendment," *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003). Here, though, Congress asserts the power to control the information Americans can receive whether it originates abroad *or* within the United States—a clearly improper purpose.

Congress thus has no legitimate interest in insulating Americans from "divisive narratives," App.10 (House Committee Report), whether or not that is called "propaganda."

Policing "disinformation" and "misinformation" is no less suspect. Subject to narrow, well-established exceptions not applicable here, speech does not lose First Amendment protection because the government deems it untrue. *Alvarez*, 567 U.S. at 718 (plurality op.); *id.* at 733 (Breyer, J., concurring in the judgment). The usual "remedy for speech that is false is speech that is true." *Id.* at 727 (plurality op.).

*Second*, even if restricting speech to address propaganda and misinformation were legitimate, the Act does not advance such an interest. The House Committee Report stated only that "foreign

51

adversary controlled applications" "*can* be used" to "push misinformation, disinformation, and propaganda on the American public."    App.2 (emphasis added).    It quoted a 2020 presidential statement that ByteDance Ltd. "*might* take action" threatening national security.  App.6 (emphasis added).  And it quoted the FBI director's assertion that China "*could* … control the algorithm, which *could* be used for influence operations *if* they so chose," and "*could* use TikTok … to drive divisive narratives internationally."  App.8-10 (emphases added).  And even if these concerns were anything more than speculation, they raise industry-wide issues not unique to TikTok.  App.763 (Weber Declaration).

The Justice Department was equally speculative in informing Congress of its "key national security concerns": TikTok's use of a "[China]-based algorithm[] creat[es] the *potential* for [China] to influence content on TikTok," and there is a "*potential* for [China] to exploit" the source code.  App.156 (emphases added).

But to satisfy First Amendment scrutiny, the government "must demonstrate that the recited harms are real, not merely conjectural." *Turner*, 512 U.S. at 664.  While Congress can legislate to prevent concrete and imminent risks from materializing, it cannot "justif[y] its intrusion

on protected speech" by "spin[ning] a web of speculation" without "facts or evidence." *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1119 (9th Cir. 2023).  The collection of "cans," "coulds," "mights," and "potentials" in the spare congressional deliberations falls short of what the First Amendment requires—even if Congress had a legitimate interest in blocking speech it deems "propaganda."

### b)    Data security

The House Committee Report's data security concerns are equally speculative.  The Report asserted that applications "*can* be used … to collect vast amounts of data," and that "[o]utside reporting" "suggest[s]" TikTok collects such data.  App.3 (emphasis added).  Yet the Report offered no evidence of TikTok disclosing user data to Chinese authorities, just a general claim that China "*can* require" companies to surrender their data.  App.4 (emphasis added).  For its part, the Justice Department's "concern[]" was merely that "TikTok collects tremendous amounts of sensitive data," and that "any company doing business in China" can be instructed to turn over data.  App.156.[8]

---

[8] The Justice Department pointed to "[n]ews reports" that "ByteDance employees in China used TikTok to repeatedly access U.S. user data" for improper purposes.  App.156.  Those reports do not allege access by the

The lack of support in the legislative record is unsurprising. Professor Weber explains that "aggregate data about the user population's video uploading and consumption behavior" might be "commercially valuable," but "it is unlikely to be particularly valuable to a foreign state like China." App.767 (Weber Declaration) (quotation marks omitted). And if China did wish to obtain such data, it has many other ways of doing so, including purchasing it lawfully through a party in a third country and conducting open-source intelligence gathering. App.767-68. The suggestion that China would seek to acquire such data through the roundabout method of demanding it from TikTok's owners, while evading TikTok's measures to block such efforts, *supra* pp.15-17, is both speculative and counterintuitive.

### 2. *The Act is not narrowly tailored.*

#### a) *The Act is underinclusive.*

The Act is also not remotely tailored to these purported interests. It is both overinclusive, *see* Creator Br. 54, 60-62, and underinclusive.

---

Chinese government, and the allegations are similar to compliance challenges U.S. companies have faced. App.775-76 (Weber Declaration).

A "law cannot be regarded as protecting an interest of the highest order … when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 576 U.S. at 172 (quotation marks omitted). The Act's exclusions leave unaddressed numerous other applications that would pose the same, or greater, propaganda and data security risks.

For instance, as long as they do not share user-created content, *see* Sec. 2(g)(2)(A), companies "controlled by a foreign adversary" are free to operate applications that "collect vast amounts of data on Americans" and "push misinformation, disinformation, and propaganda on the American public," App.2 (House Committee Report).

The same is true of the product- and travel-review loophole. All a company need do is *also* operate a product-, business-, or travel-review application, preventing them from becoming a "covered company." Sec. 2(g)(2)(B). Such an inexpensive, easily exploited loophole makes the Act's prohibitions virtually optional for any company other than Petitioners, even if such a company poses a serious national security threat.

The House Committee's stated interest in blocking foreign "propaganda" is also undermined by Congress's tolerance for *state-owned*

media.  *Russia Today* and *Xinhua News* have been accused of pushing propaganda and misinformation, and they offer English-language applications in the United States.   App.787 (Weber Declaration). Congress left such applications free to do so, as long as they do not share user-generated content.  Nor does the Act try to stop foreign adversaries from continuing their practice of using U.S.-owned social-media platforms to advance their agendas.  App.767-68.

The Act is also woefully underinclusive in addressing data security. According to the Justice Department, Chinese law "requires any company *doing business in China* to make its data accessible to the [Chinese] government and to support its intelligence efforts."  App.156 (emphasis added); *accord* App.3 (House Committee Report) (any "individuals and entities" in China can be compelled to "provid[e] data"). But as Professor Weber explains, "many U.S. technology companies … have Chinese-headquartered subsidiaries and therefore face the same theoretical risk."  App.770.  "[M]any U.S. companies" also "maintain software and other engineering operations in China," posing the same alleged "risks that 'engineers and back-end support' may engage in 'problematic activities.'"  App.771.  Yet the Act exempts such companies

from coverage. *See* Sec. 2(g)(1). Many other companies with substantial Chinese operations also collect large amounts of data from Americans. *See, e.g.*, App.531-39 (U.S.-China Economic and Security Review Commission report) (discussing "data risks" posed by certain online shopping applications); App.770-71 (Weber Declaration). They are likewise exempted, as long as their applications do not enable users to create accounts to generate and share content, or if one of their applications triggers the product/business/travel review exclusion.

While "Congress ordinarily need not address a perceived problem all at once," "courts reject the facile one-bite-at-a-time explanation for rules affecting important First Amendment values." *News Am.*, 844 F.2d at 815. The Act's glaring "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint," *Brown*, 564 U.S. at 802—all the more so since many Members of Congress openly admitted to such motives, *supra* pp.19-21; *see generally* App.540-609.

### b) *The Act is not the least restrictive means of advancing Congress's purported interests.*

Given the "breadth" of the Act's restriction on speech—shuttering a speech platform with 170 million U.S. users—the First Amendment

"imposes an especially heavy burden on the Government to explain why a less restrictive provision would not be as effective." *Reno*, 521 U.S. at 879. Yet there is no indication that Congress even *considered* "evidence as to how effective or ineffective" less restrictive alternatives would be. *Sable Comm'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129-30 (1989) (emphasis omitted).

For example, in addressing the asserted propaganda and misinformation concern, Congress could have considered requiring (as the European Union does) that large online platforms disclose their content-moderation policies and provide approved researchers with data to assess whether they amplify or suppress particular viewpoints. App.633, 637-39 (EU Digital Services Act). "[D]isclosure" is frequently "a less restrictive alternative to more comprehensive regulations of speech." *Citizens United*, 558 U.S. at 369; *see also Meese v. Keene*, 481 U.S. 465, 482-85 (1987) (upholding disclosure requirements for dissemination of foreign political propaganda).

Congress could also have addressed data security concerns in a less restrictive way. As part of the same omnibus legislation containing the Act, Congress barred "data broker[s]" from "mak[ing] available

58

personally identifiable sensitive data of a United States individual" to certain countries and entities. Pub. L. No. 118-50, div. I, § 2(a) (2024). Rather than banning TikTok, Congress could have applied this prohibition more broadly, not just to "brokers." *See* App.768-69 (Weber Declaration).

And if Congress had been concerned about TikTok potentially "track[ing] the locations of Federal employees and contractors," App.6 (House Committee Report), it could have extended the ban on the use of TikTok on government devices to federal employees' and contractors' personal devices. *See* No TikTok on Government Devices Act, Pub. L. No. 117-328, div. R, 136 Stat. 4459, 5258 (2022); 48 C.F.R. § 52.204-27.

The government also could have executed the draft National Security Agreement.[9] Petitioners have already spent $2 billion voluntarily implementing many of its measures, but others require the government's cooperation, such as oversight by government-approved directors and the "shut-down option" Petitioners offered.

---

[9] In contrast with the Act, other bills have proposed exempting applications where there is a mitigation agreement with the Committee on Foreign Investment in the United States. *See* RESTRICT Act, S. 686, 118th Cong. § 13 (2023).

Christopher Simkins, drawing on his background leading the Justice Department's role in foreign investment review, concludes that this Agreement "effectively mitigates national security risk associated with" TikTok.  App.756.  He points to the Agreement's "combination" of features, including the "level of independence" of a new corporate entity, "reliance on multiple trusted third parties such as Oracle, the operational security processes, complex and thorough technical mitigations, as well as unprecedented oversight, monitoring, and very rigorous enforcement mechanisms."  *Id.*  Mr. Simkins "cannot conceive of a more technically secure mitigation scheme."  *Id.*

The House Committee Report briefly addressed Project Texas, noting that some activities like code development "would remain in China," but "subject to proposed safeguards."  App.4-5.  The House Committee Report did not conclude that the "proposed safeguards" were insufficient.  It merely noted that code development in China "potentially"—not actually—exposes U.S. users to risk.  App.5.

The House Committee Report also never *mentioned* the draft National Security Agreement or its additional protections, such as the "shut-down option."  The government cannot meet its burden where

60

Congress never even considered less restrictive alternatives, much less found them wanting. *See Sable Commc'ns*, 492 U.S. at 129 ("[T]he congressional record contains no legislative findings that would justify us in concluding that there is no constitutionally acceptable less restrictive means, short of a total ban, to achieve the Government's interest….").

In short, Congress reached for a sledgehammer without even considering if a scalpel would suffice. It ordered the closure of one of the largest platforms for speech in the United States and left Petitioners— and the public—to guess at the reasons why a wide range of less speech-restrictive alternatives were disregarded. The First Amendment demands much more.

## II.    The Act Is an Unconstitutional Bill of Attainder.

Article I of the Constitution forbids Congress from enacting any "Bill of Attainder or ex post facto Law." U.S. Const. art. I, § 9, cl. 3. Courts have long interpreted that provision "in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of specifically designated persons or groups." *United States v. Brown*, 381 U.S. 437, 447 (1965); *see also Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 962 (1983) (Powell, J., concurring in the

judgment) (Bill of Attainder Clause reflects Framers' "concern that a legislature should not be able unilaterally to impose a substantial deprivation on one person").

"[A] law is prohibited under the bill of attainder clause if it (1) applies with specificity, and (2) imposes punishment." *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (quotation marks omitted). The Act does both.

## A.    The Act Applies to Petitioners with Specificity.

"[S]pecificity may be satisfied if the statute singles out a person or class by name." *Id.* The Act does just that, singling out "ByteDance[] Ltd." and "TikTok [Inc.]" by name. Sec. 2(g)(3)(A).

## B.    The Act Punishes Petitioners.

To determine whether legislation "imposes punishment," courts conduct "three necessary inquiries," considering whether the law (1) "further[s] nonpunitive legislative purposes" (the "functional test"); (2) "falls within the historical meaning of legislative punishment" (the "historical test"); or (3) has a legislative record "evinc[ing] a congressional intent to punish" (the "motivational test"). *Kaspersky Lab, Inc. v. Dep't of Homeland Sec.*, 909 F.3d 446, 455, 460, 463 (D.C. Cir. 2018) (quoting

*Selective Serv. Sys. v. Minn. Pub. Interest Rsch. Grp.*, 468 U.S. 841, 852 (1984)). The "functional test" is the "most important." *Id.* at 455 (quotation marks omitted). The Act is punishment under all three.

**Functional Test.** The functional test asks whether a law, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 475-76 (1977). The Act's burdens are severe: Petitioners are forbidden from operating any application in the United States. *Supra* pp.21-24, 31. The Act's structure, and its extraordinary under- and over-inclusiveness, make it "reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Nixon*, 433 U.S. at 476.

"[B]ecause the Bill of Attainder Clause is principally concerned with [t]he *singling out* of an individual for legislatively prescribed punishment … the functional test necessarily takes account of the scope or selectivity of a statute in assessing the plausibility of alleged nonpunitive purposes." *Foretich*, 351 F.3d at 1224 (cleaned up). Thus, in *Foretich*, where Congress had intervened in a single child custody matter, this Court rejected the suggestion that Congress acted for the

63

non-punitive reason of protecting the best interests of the child. Congress "[e]vidently" believed that the "existing [custody] standard" "was perfectly adequate to protect" that interest "in all cases save one." *Id.* The fact that Congress *"singled out"* one person to apply a different standard "belie[d] the claim that Congress's purposes were nonpunitive." *Id.*

Likewise here, Congress evidently believed that its generally applicable standard for designating foreign adversary controlled applications was perfectly adequate to protect national security in all cases save one—Petitioners' applications. Indeed, Congress considered the generally applicable standard sufficient for companies specifically found by the President to pose a significant national security threat. Sec. 2(g)(3)(B)(ii). Singling out Petitioners to be treated *worse* than such companies belies the claim that Congress's purposes were nonpunitive.

The Act's structure makes this case much different from *Kaspersky*, where this Court upheld a law ordering the removal of a Russian cybersecurity firm's software from federal information systems. 909 F.3d at 465. The "severity of burden" from restricting a company from doing business with the federal government, *id.* at 455, is far less than banning

64

its business entirely.  And another key difference is Congress's view that "Kaspersky's Russian ties differ in degree and kind from [all] other companies'," putting Kaspersky "in a class of its own." *Id.* at 459.  Here, Congress singled out TikTok *despite* defining the problem at a higher level of generality ("foreign adversary controlled applications" generally), and making no findings explaining its refusal to apply the general standard to TikTok.

A law also fails "the functional test when its reach is underinclusive" or "overbroad." *Id.* at 456.  "The functional test is more exacting than rational basis review," with this Court sometimes mandating a "clear and convincing" showing of nonpunitive aims (and other times a "coherent and reasonable nexus … between the burden imposed and nonpunitive purpose furthered"). *Id.* (quotation marks omitted).[10]

The Act fails either articulation of the test.  Congress left other applications with substantial China operations free to collect reams of

---

[10] Although "the Bill of Attainder Clause does not require narrow tailoring," *Kaspersky*, 909 F.3d at 456, the First Amendment does.  But in light of the Act's dramatic lack of means-ends fit, the Act is an unconstitutional Bill of Attainder independent of its speech burdens.

U.S. user data. *Supra* pp.54-57. Foreign adversary-owned media can deliver their narratives to Americans through their own applications, newspapers, and cable networks, and by placing content on other major social-media platforms. *Supra* p.55. Any other "adversary controlled" social-media application is free to operate in the United States, provided its owner takes the trivially inexpensive step of setting up a product-, business-, or travel-review application. *Supra* pp.11-12, 45-46, 54-55. Meanwhile, the Act bans Petitioners from operating not just TikTok but *any* application, irrespective of any conceivable nexus to the asserted concerns. *See* Sec. 2(g)(3)(A). And the Act singles out Petitioners for this especially harsh treatment despite the billions of dollars they have spent protecting U.S. user data and content integrity, and despite the additional protections they offered the government, *supra* pp.15-17, which other alleged "foreign adversary controlled applications" need not do in order to avoid a ban, *supra* pp.41-43.

In short, Congress left gaping holes in the Act's ability to address any purported nonpunitive interest. That is a powerful indication that punishing Petitioners was the point.

66

**Historical Test.** Courts also ask "whether the challenged statute falls within the historical meaning of legislative punishment." *Selective Serv. Sys.*, 468 U.S. at 852. The Act bars Petitioners from their chosen business and orders them to relinquish their property or see it become worthless, close analogs to the "pains and penalties" the Bill of Attainder Clause historically prohibited. *See, e.g.*, *id.* ("legislative bars to participation ... in specific employments or professions"); *Kaspersky*, 909 F.3d at 454 ("confiscation of property"). Even without these analogs, the Act is "punishment" under the historical test because "the burden imposed so dramatically outweigh[s] the benefit gained that courts c[an] infer only a punitive purpose." *Kaspersky*, 909 F.3d at 460.

**Motivational Test.** The motivational test asks "whether the legislative record evinces a congressional intent to punish." *Selective Serv. Sys.*, 468 U.S. at 852 (quotation marks omitted). Here, the "legislative history, the context [and] timing of the legislation, [and] specific aspects of the text [and] structure" of the Act all confirm Congress's punitive intent. *Foretich*, 351 F.3d at 1225.

The record abounds with evidence that Members of Congress sought to punish TikTok based on the viewpoints they perceived were

being expressed. *See supra* pp.19-21. This case is unlike *Kaspersky*, where the company could produce only "isolated statements" from a single Member of Congress. 909 F.3d at 464.

The same conclusion follows from the "focus of the Act"—its striking two-tiered structure, its generous loopholes for every other company, and the "unusual" process through which it was passed. *Foretich*, 351 F.3d at 1225. Indeed, congressional leaders left no doubt that this was a "TikTok bill" or "TikTok legislation." App.621 (Speaker of the House); App.619 (Senate Majority Leader). All of this "demonstrate[s] that the legislative process in this case amounted to precisely that which the Bill of Attainder Clause was designed to prevent: a congressional determination of blameworthiness and infliction of punishment." *Foretich*, 351 F.3d at 1225.

## III. The Act Effects an Unconstitutional Taking.

The Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. A taking occurs not only when the government "appropriat[es] private property," but also when it "goes too far" in regulating its use. *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2071-72 (2021) (quotation marks

omitted). While a multifactor balancing test generally applies, a regulation is a per se taking if it deprives the owner of "all economically beneficial use of her property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (cleaned up).

The Act is such a taking, rendering the TikTok platform defunct in the United States and destroying its considerable value. *See* App.824-27 (Presser Declaration); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 10-12 (1949) (property interests protected by Takings Clause can include going-concern value of business). And since TikTok Inc.'s business is its operation of TikTok in the United States, *see* App.801 (Presser Declaration), ByteDance Ltd.'s investment in TikTok Inc. is likewise nullified.

The Act provides no just compensation. Ordinarily a claim for such compensation is "brought to the Court of Federal Claims …, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." *Eastern Enters. v. Apfel*, 524 U.S. 498, 520 (1998) (plurality op.). Congress did so here, making this Court's jurisdiction "exclusive." Sec. 3(b). An injunction is therefore required. *See, e.g.*, *Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 945 (8th Cir.

69

2023) (injunction of taking appropriate where there is no adequate legal remedy).

## IV.  The Court Should Declare the Act Unconstitutional and Enjoin Its Enforcement with Respect to Petitioners' Applications.

Pursuant to the Court's May 28, 2024 Order, Petitioners set out here their requests for relief "otherwise properly raised" in "dispositive motions."  For the reasons explained in support of Petitioners' request for expedited consideration, Petitioners respectfully request a decision by December 6, 2024.  *See* Joint Motion to Govern Proceedings, Doc. #2055129, at 8.

### A.  The Court Should Enjoin Enforcement of Section 2(a) with Respect to Petitioners' Applications.

For the reasons explained above, the Court should declare unconstitutional, and enjoin the enforcement of, the prohibitions of Section 2(a) with respect to Petitioners' applications.

"[T]he loss of constitutional freedoms … unquestionably constitutes irreparable injury," *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quotation marks omitted), as does the Act's "threat[]" to "the very existence of [Petitioners'] business," *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  There are no adequate

remedies at law because the United States has not consented to be sued for damages. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). The balance of hardships and public interest merge, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), and "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

### B. In the Alternative, the Court Should Temporarily Enjoin the Act and Order Further Proceedings.

It is not yet apparent how the government will seek to defend the Act. The government may offer post hoc justifications and attempt to introduce corresponding evidence. *But see Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2432 n.8 (2022) ("Government justification[s] for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation." (quotation marks omitted)). The government may follow through on its suggestion that it might seek to submit secret evidence concealed from Petitioners and the public. *See* Doc. #2055129. *But see Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) ("Only in the most extraordinary circumstances does our precedent countenance court reliance upon *ex parte* evidence to decide the merits of a dispute.").

71

Whatever the government does, there would remain purely legal grounds to invalidate the Act. *See, e.g.*, *supra* § I.B. If, however, the Court were to find genuine issues of material fact that preclude judgment at this stage, it should temporarily enjoin the Act and order further proceedings. *Cf. Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 671 (2004) (affirming injunction and "remanding for trial" to "require the Government to shoulder its full constitutional burden of proof").

## C.    The Court Should Declare Section 2(b) Non-Severable.

Section 2(b) requires the owner of a "foreign adversary controlled application" to provide users, upon request, "all the available data related to the account of such user." The time for compliance is "[b]efore the date on which a prohibition under subsection (a) applies." *Id.* When subsection (a) is enjoined, however, the "date on which a prohibition under subsection (a) applies" never arrives. Thus, Section 2(b) is non-severable under the Act's severability clause: it is not a "provision[] … that can be given effect without the invalid provision." Sec. 2(e)(1).

## CONCLUSION

The Court should enter judgment for Petitioners and award their requested relief.

72

Respectfully submitted,

/s/ Alexander A. Berengaut

Andrew J. Pincus
Avi M. Kupfer
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3220
apincus@mayerbrown.com
akupfer@mayerbrown.com

Alexander A. Berengaut
  Counsel of Record
David M. Zionts
Megan A. Crowley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-600
aberengaut@cov.com
dzionts@cov.com
mcrowley@cov.com

John E. Hall
Anders Linderot
S. Conrad Scott
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
jhall@cov.com
cscott@cov.com
alinderot@cov.com

Counsel for Petitioners
TikTok Inc. and ByteDance Ltd.

June 20, 2024

73

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations set by the Court's order of May 28, 2024 because this brief contains 12,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word using proportionally spaced, 14-point Century Schoolbook font.

June 20, 2024

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-600
aberengaut@cov.com

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

74

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on June 20, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

June 20, 2024

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-600
aberengaut@cov.com

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

# ADDENDUM

## TABLE OF CONTENTS

Protecting Americans from Foreign Adversary Controlled
    Applications Act, Pub. L. No. 118-50, div. H (2024)....................A-1

**Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H (2024)**

## SEC. 1. SHORT TITLE.

This division may be cited as the "Protecting Americans from Foreign Adversary Controlled Applications Act".

## SEC. 2. PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.

(a) IN GENERAL.—

(1) PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.—It shall be unlawful for an entity to distribute, maintain, or update (or enable the distribution, maintenance, or updating of) a foreign adversary controlled application by carrying out, within the land or maritime borders of the United States, any of the following:

(A) Providing services to distribute, maintain, or update such foreign adversary controlled application (including any source code of such application) by means of a marketplace (including an online mobile application store) through which users within the land or maritime borders of the United States may access, maintain, or update such application.

(B) Providing internet hosting services to enable the distribution, maintenance, or updating of such foreign adversary controlled application for users within the land or maritime borders of the United States.

(2) APPLICABILITY.—Subject to paragraph (3), this subsection shall apply—

(A) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(A), beginning on the date that is 270 days after the date of the enactment of this division; and

(B) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(B), beginning on the date that is 270 days after the date of the relevant determination of the President under such subsection.

(3) EXTENSION.—With respect to a foreign adversary controlled application, the President may grant a 1-time extension of not more than 90 days with respect to the date on which this subsection would otherwise apply to such application pursuant to paragraph (2), if the President certifies to Congress that—

(A) a path to executing a qualified divestiture has been identified with respect to such application;

(B) evidence of significant progress toward executing such qualified divestiture has been produced with respect to such application; and

(C) there are in place the relevant binding legal agreements to enable execution of such qualified divestiture during the period of such extension.

(b) DATA AND INFORMATION PORTABILITY TO ALTERNATIVE APPLICATIONS.—Before the date on which a prohibition under subsection (a) applies to a foreign adversary controlled application, the entity that owns or controls such application shall provide, upon request by a user of such application within the land or maritime borders of United States, to such user all the available data related to the account of such user with respect to such application. Such data shall be provided in a machine readable format and shall include any data maintained by such application with respect to the account of such user, including content (including posts, photos, and videos) and all other account information.

(c) EXEMPTIONS.—

(1) EXEMPTIONS FOR QUALIFIED DIVESTITURES.—Subsection (a)—

(A) does not apply to a foreign adversary controlled application with respect to which a qualified divestiture is executed before the date on which a prohibition under subsection (a) would begin to apply to such application; and

(B) shall cease to apply in the case of a foreign adversary controlled application with respect to which a qualified divestiture is executed after the date on which a prohibition under subsection (a) applies to such application.

(2) EXEMPTIONS FOR CERTAIN NECESSARY SERVICES.—Subsections (a) and (b) do not apply to services provided with respect to a foreign adversary controlled application that are necessary for an entity to attain compliance with such subsections.

(d) ENFORCEMENT.—

(1) CIVIL PENALTIES.—

(A) FOREIGN ADVERSARY CONTROLLED APPLICATION VIOLATIONS.—An entity that violates subsection (a) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $5,000 by the number of users within the land or maritime borders of the United States determined to have accessed, maintained, or updated a foreign adversary controlled application as a result of such violation.

(B) DATA AND INFORMATION VIOLATIONS.—An entity that violates subsection (b) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $500 by the number of users within the land or maritime borders of the United States affected by such violation.

(2) ACTIONS BY ATTORNEY GENERAL.—The Attorney General—

(A) shall conduct investigations related to potential violations of subsection (a) or (b), and, if such an investigation results in a determination that a violation has occurred, the

Attorney General shall pursue enforcement under paragraph (1); and

(B)  may bring an action in an appropriate district court of the United States for appropriate relief, including civil penalties under paragraph (1) or declaratory and injunctive relief.

(e)  SEVERABILITY.—

(1)  IN GENERAL.—If any provision of this section or the application of this section to any person or circumstance is held invalid, the invalidity shall not affect the other provisions or applications of this section that can be given effect without the invalid provision or application.

(2)  SUBSEQUENT DETERMINATIONS.—If the application of any provision of this section is held invalid with respect to a foreign adversary controlled application that satisfies the definition of such term pursuant to subsection (g)(3)(A), such invalidity shall not affect or preclude the application of the same provision of this section to such foreign adversary controlled application by means of a subsequent determination pursuant to subsection (g)(3)(B).

(f)  RULE OF CONSTRUCTION.—Nothing in this division may be construed—

(1)  to authorize the Attorney General to pursue enforcement, under this section, other than enforcement of subsection (a) or (b);

(2)  to authorize the Attorney General to pursue enforcement, under this section, against an individual user of a foreign adversary controlled application; or

(3)  except as expressly provided herein, to alter or affect any other authority provided by or established under another provision of Federal law.

(g)  DEFINITIONS.—In this section:

A-4

(1) CONTROLLED BY A FOREIGN ADVERSARY.—The term "controlled by a foreign adversary" means, with respect to a covered company or other entity, that such company or other entity is—

(A)  a foreign person that is domiciled in, is headquartered in, has its principal place of business in, or is organized under the laws of a foreign adversary country;

(B)  an entity with respect to which a foreign person or combination of foreign persons described in subparagraph (A) directly or indirectly own at least a 20 percent stake; or

(C)  a person subject to the direction or control of a foreign person or entity described in subparagraph (A) or (B).

(2)  COVERED COMPANY.—

(A)  IN GENERAL.—The term "covered company" means an entity that operates, directly or indirectly (including through a parent company, subsidiary, or affiliate), a website, desktop application, mobile application, or augmented or immersive technology application that—

(i)   permits a user to create an account or profile to generate, share, and view text, images, videos, real-time communications, or similar content;

(ii)  has more than 1,000,000 monthly active users with respect to at least 2 of the 3 months preceding the date on which a relevant determination of the President is made pursuant to paragraph (3)(B);

(iii) enables 1 or more users to generate or distribute content that can be viewed by other users of the website, desktop application, mobile application, or augmented or immersive technology application; and

(iv)  enables 1 or more users to view content generated by other users of the website, desktop application, mobile application, or augmented or immersive technology application.

A-5

(B) EXCLUSION.—The term "covered company" does not include an entity that operates a website, desktop application, mobile application, or augmented or immersive technology application whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews.

(3) FOREIGN ADVERSARY CONTROLLED APPLICATION.—The term "foreign adversary controlled application" means a website, desktop application, mobile application, or augmented or immersive technology application that is operated, directly or indirectly (including through a parent company, subsidiary, or affiliate), by—

(A) any of—

(i) ByteDance, Ltd.;

(ii) TikTok;

(iii) a subsidiary of or a successor to an entity identified in clause (i) or (ii) that is controlled by a foreign adversary; or

(iv) an entity owned or controlled, directly or indirectly, by an entity identified in clause (i), (ii), or (iii); or

(B) a covered company that—

(i) is controlled by a foreign adversary; and

(ii) that is determined by the President to present a significant threat to the national security of the United States following the issuance of—

(I) a public notice proposing such determination; and

(II) a public report to Congress, submitted not less than 30 days before such determination, describing the specific national security concern

A-6

involved and containing a classified annex and a description of what assets would need to be divested to execute a qualified divestiture.

(4) FOREIGN ADVERSARY COUNTRY.—The term "foreign adversary country" means a country specified in section 4872(d)(2) of title 10, United States Code.

(5) INTERNET HOSTING SERVICE.—The term "internet hosting service" means a service through which storage and computing resources are provided to an individual or organization for the accommodation and maintenance of 1 or more websites or online services, and which may include file hosting, domain name server hosting, cloud hosting, and virtual private server hosting.

(6) QUALIFIED DIVESTITURE.—The term "qualified divestiture" means a divestiture or similar transaction that—

(A) the President determines, through an interagency process, would result in the relevant foreign adversary controlled application no longer being controlled by a foreign adversary; and

(B) the President determines, through an interagency process, precludes the establishment or maintenance of any operational relationship between the United States operations of the relevant foreign adversary controlled application and any formerly affiliated entities that are controlled by a foreign adversary, including any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing.

(7) SOURCE CODE.—The term "source code" means the combination of text and other characters comprising the content, both viewable and nonviewable, of a software application, including any publishing language, programming language, protocol, or functional content, as well as any successor languages or protocols.

(8) UNITED STATES.—The term "United States" includes the territories of the United States.

## SEC. 3. JUDICIAL REVIEW.

(a) RIGHT OF ACTION.—A petition for review challenging this division or any action, finding, or determination under this division may be filed only in the United States Court of Appeals for the District of Columbia Circuit.

(b) EXCLUSIVE JURISDICTION.—The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over any challenge to this division or any action, finding, or determination under this division.

(c) STATUTE OF LIMITATIONS.—A challenge may only be brought—

(1) in the case of a challenge to this division, not later than 165 days after the date of the enactment of this division; and

(2) in the case of a challenge to any action, finding, or determination under this division, not later than 90 days after the date of such action, finding, or determination.