ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024

Case No. 24-1130
Consolidated With No. 24-1113

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

TIKTOK INC. and BYTEDANCE LTD.

*Petitioners,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,

*Respondent.*

*(continued on inside cover)*

---

ON PETITION FOR REVIEW OF THE PROTECTING AMERICANS
FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS
ACT (H.R. 815)

---

## OPENING BRIEF OF CREATOR PETITIONERS

Ambika Kumar
Tim Cunningham
Xiang Li
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
(206) 757-8030
ambikakumar@dwt.com
timcunningham@dwt.com
xiangli@dwt.com

Jeffrey L. Fisher
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, California 94025
(650) 473-2633
jlfisher@omm.com

*(continued on inside cover)*

*Attorneys for Creator Petitioners*

BRIAN FIREBAUGH, CHLOE JOY SEXTON, TALIA CADET, TIMOTHY MARTIN, KIERA SPANN, PAUL TRAN, CHRISTOPHER TOWNSEND, and STEVEN KING,

*Petitioners*,

v.

MERRICK B. GARLAND, in his capacity
as United States Attorney General,

*Respondent*.

———

BASED Politics Inc.,

*Petitioner*,

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent*.

Elizabeth A. McNamara
Chelsea T. Kelly
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 489-8230
lizmcnamara@dwt.com
chelseakelly@dwt.com

James R. Sigel
Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
50 California Street, Suite 2300
San Francisco, California 94111
(415) 276-6500
jamessigel@dwt.com
adamsieff@dwt.com

Joshua Revesz
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5261
jrevesz@omm.com

*Attorneys for Creator Petitioners*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rules 27(a)(4) and 28(a)(1)(A), Petitioners Brian Firebaugh, Chloe Joy Sexton, Talia Cadet, Timothy Martin, Kiera Spann, Paul Tran, Christopher Townsend, and Steven King ("Creator Petitioners") certify as follows.

**Parties and Amici:** The parties to *Firebaugh v. Garland*, No. 24-1130, are the Creator Petitioners and Respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. The parties to the consolidated case, *TikTok Inc. v. Garland*, No. 24-1113, are Petitioners TikTok Inc. and ByteDance Ltd., and Respondent Garland, in his official capacity as Attorney General of the United States. The parties to the second consolidated case, *BASED Politics Inc. v. Garland*, No. 24-1183, are Petitioner BASED Politics Inc. and Respondent Garland, in his official capacity as Attorney General of the United States. No amicus curiae has appeared in any of the three actions. Because these petitions were filed directly in this Court, there were no district-court proceedings in any of the cases.

**Rulings Under Review:** These petitions seek direct review of whether the Protecting Americans from Foreign Adversary Controlled

i

Applications Act (H.R. 815, Div. H, 118th Cong., Pub. L. No. 118-50 (April 24, 2024)) is constitutional. There are no prior rulings under review.

**Related Cases:** These petitions were not previously before this Court or any other court, nor is counsel for the Creator Petitioners aware of any other case pending before this or any other court that is related to this petition within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Ambika Kumar*
Ambika Kumar

*Counsel for Creator Petitioners*

## TABLE OF CONTENTS

INTRODUCTION ................................................................ 1

JURISDICTIONAL STATEMENT ........................................ 3

ISSUES PRESENTED FOR REVIEW ................................. 4

STATUTES AND REGULATIONS ...................................... 4

STATEMENT OF THE CASE ............................................. 4

    A.    TikTok Provides a Vibrant and Distinct Platform for Expression to Petitioners and Millions of Other Americans. ................................................................ 4

    B.    TikTok's Innovative Editorial Tools Allow Creators to Reach Substantial Audiences and Build Meaningful Communities. ............................................................ 7

    C.    Courts Block Attempts to Ban TikTok ................................. 13

    D.    TikTok Spends More than $2 Billion on Improvements ...... 14

    E.    Congress Bans TikTok ................................................. 15

SUMMARY OF ARGUMENT .............................................. 19

ARGUMENT ..................................................................... 23

    I.    The Act Suppresses Speech and Association that the First Amendment Protects. ............................................ 24

        A.    The Act Burdens Core First Amendment Activity. ...... 24

            1.    The Act bans a forum for protected expression.. 24

            2.    The Act bans a distinctive medium for protected expression. .......................................................... 27

            3.    The Act restricts Petitioners' right to associate with their chosen editor and publisher. ............. 30

            4.    The Act restricts Petitioners' rights to receive information and ideas. ........................................ 33

5.     The Act's divestiture provision does not eliminate, or even lessen, the burden ................ 35

B.     The Act's Burdens on Speech Violate the First Amendment ................................................................ 37

1.     The Act is an invalid prior restraint. ................ 38

a.     The Act imposes a prior restraint............. 38

b.     The Act's prior restraint is invalid. ........... 40

2.     The Act otherwise cannot survive means-ends scrutiny............................................................. 43

a.     The Act is subject to rigorous scrutiny...... 43

b.     The Act fails any applicable level of First Amendment scrutiny. ............................... 48

1.     The government cannot justify the Act on the ground that it prevents foreign propaganda. ..................................... 49

2.     The government cannot justify the Act based on an interest in data security. .......................................................... 55

3.     The Act does not leave open ample channels of communication. ............. 59

C.     Even if the Act legitimately restricted some speech, its total ban would still be overbroad. ........... 60

II.     The Court Should Enter a Permanent Injunction. ............. 62

CONCLUSION ...................................................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Alario v. Knudsen,*
⸺ F. Supp. 3d. ⸺, 2023 WL 8270811 (D. Mont. Nov. 30, 2023)
...................................................................... 14, 25, 56, 63, 64

*Alexander v. United States,*
509 U.S. 544 (1993)....................................................38

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.,*
78 F.4th 210 (5th Cir. 2023) ............................................64

*Americans for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021)..................................................30, 31

*Anderson v. City of Hermosa Beach,*
621 F.3d 1051 (9th Cir. 2010) ...........................................28

*Arkansas Writers' Project, Inc. v. Ragland,*
481 U.S. 221 (1987)....................................................43

*Ashcroft v. ACLU,*
535 U.S. 564 (2002)....................................................24

*Ashcroft v. Free Speech Coal.,*
535 U.S. 234 (2002)....................................................60

*Barr v. Am Ass'n of Political Consultants,*
591 U.S. 610 (2020)....................................................46

*Bay Area Peace Navy v. United States,*
914 F.2d 1224 (9th Cir. 1990)...........................................55

*Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus,*
482 U.S. 569 (1987)..................................................61, 62

*Boardley v. U.S. Dep't of Interior,*
615 F.3d 508 (D.C. Cir. 2010) ........................................59, 62

v

*Brown v. Ent. Merch. Ass'n,*
    564 U.S. 786 (2011) ................................................................ 45, 54

*City of Houston v. Hill,*
    482 U.S. 451 (1987) ...................................................................... 60

*City of Ladue v. Gilleo,*
    512 U.S. 43 (1994) ......................................................... 27, 28, 59

*City of Los Angeles v. Preferred Commc'ns, Inc.,*
    476 U.S. 488 (1986) ...................................................................... 52

*Craig v. Harney,*
    331 U.S. 367 (1947) ...................................................................... 40

*Elrod v. Burns,*
    427 U.S. 347 (1976) ...................................................................... 63

*FEC v. Cruz,*
    596 U.S. 289 (2022) ............................................................... 51, 52

*FEC v. Mass. Citizens for Life, Inc.,*
    479 U.S. 238 (1986) ...................................................................... 35

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ...................................................... 65

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
    527 U.S. 173 (1999) ...................................................................... 52

*Greatness v. FEC,*
    831 F.3d 500 (D.C. Cir. 2016) ...................................................... 65

*Grosjean v. American Press Co.,*
    297 U.S. 233 (1936) ............................................................... 39, 44

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995) ...................................................................... 31

*In re Sealed Case,*
    77 F.4th 815 (D.C. Cir. 2023) ...................................................... 38

*Initiative & Referendum Inst. v. U.S. Postal Serv.*,
  417 F.3d 1299 (D.C. Cir. 2005) ........................................... 59

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ............................................ 65

*Klein v. Facebook, Inc.*,
  580 F. Supp. 3d 743 (N.D. Cal. 2022) ................................. 29

*Lamont v. Postmaster Gen.*,
  381 U.S. 301 (1965) ............................................... 34, 49, 50

*Landmark Commc'ns, Inc. v. Virginia*,
  435 U.S. 829 (1978) ............................................................ 40

*Legend Night Club v. Miller*,
  637 F.3d 291 (4th Cir. 2011) .............................................. 64

*Linmark Assocs., Inc. v. Willingboro Twp.*,
  431 U.S. 85 (1977) .................................................. 50, 54, 59

*Lovell v. City of Griffin*,
  303 U.S. 444 (1938) ............................................................ 61

*Marland v. Trump*,
  498 F. Supp. 3d 624 (E.D. Pa. 2020) ..................... 14, 63, 64

*Martin v. City of Struthers*,
  319 U.S. 141 (1943) ............................................................ 33

*Meese v. Keene*,
  481 U.S. 465 (1987) ............................................................ 47

*Meyer v. Grant*,
  486 U.S. 414 (1988) ............................................................ 28

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983) ............................................................ 43

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ............................................................ 63

*N.Y. Times Co. v. United States,*
403 U.S. 713 (1971) ................................................................ 40, 42

*Near v. Minnesota,*
283 U.S. 697 (1931) ............................................................ 38, 39, 40

*Neb. Press Ass'n v. Stuart,*
427 U.S. 539 (1976) ...................................................................... 38

*News Am. Pub., Inc. v. FCC,*
844 F.2d 800 (D.C. Cir. 1988) ...................................................... 46

*Nken v. Holder,*
556 U.S. 418 (2009) ...................................................................... 65

*Packingham v. North Carolina,*
582 U.S. 98 (2017) ........................................................ 24, 25, 62, 65

*Reed v. Town of Gilbert,*
576 U.S. 155 ................................................................................. 46

*Reno v. ACLU,*
521 U.S. 844 (1997) ................................................................ 39, 61

*Rubin v. Coors Brewing Co.,*
514 U.S. 476 (1995) ...................................................................... 52

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
547 U.S. 47 (2006) ........................................................................ 30

*Sable Commc'ns, Inc. v. FCC,*
492 U.S. 115 (1989) ...................................................................... 58

*Se. Promotions, Ltd. v. Conrad,*
420 U.S. 546 (1975) ...................................................................... 38

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
502 U.S. 105 (1991) ...................................................................... 45

*Smith v. Daily Mail Publ'g Co.,*
443 U.S. 97 (1979) ........................................................................ 38

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ................................................................ 35, 54

*Stanley v. Georgia*,
394 U.S. 557 (1969) ................................................................ 33

*TikTok Inc. v. Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020) ................................. 13, 56, 63, 65

*TikTok Inc. v. Trump*,
507 F. Supp. 3d 92 (D.D.C. 2020) ..................................... 13

*Tinius v. Choi*,
77 F.4th 691 (D.C. Cir. 2023) ........................................... 48

*Tornillo v. Miami Herald Publ'g Co.*,
418 U.S. 241 (1974) ........................................................... 31

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ............................................ 43, 44, 47, 48, 52

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997) ..................................................... 27, 51

*U.S. WeChat Users All. v. Trump*,
488 F. Supp. 3d 912 (N.D. Cal. 2020) ............................... 38

*United States v. Doe*,
968 F.2d 86 (D.C. Cir. 1992) ............................................ 57

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) ..................................................... 48, 51

*United States v. Stevens*,
559 U.S. 460 (2010) ........................................................... 60

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ..................................................... 46, 59

## Constitutional Provisions

U.S. Const. amend I ................................................................ 1–64

## Federal Statutes

Protecting Americans from Foreign Adversary Controlled Applications
    Act, Pub. L. No. 118-50, Div. H, 138 Stat. 895, 955–60 (April 24,
    2024) ........................................................................................ 1–66

## Other Authorities

170 Cong. Rec. .................................................17, 25, 46, 47, 50, 56, 57

H.R. 742 (118th Cong.) ................................................................... 58

H.R. 750 (118th Cong.) ................................................................... 58

H.R. 784 (118th Cong.) ................................................................... 58

H.R. 1090 (117th Cong.) ................................................................. 58

H.R. 3991 (117th Cong.) ................................................................. 58

H.R. 4000 (117th Cong.) ................................................................. 58

H.R. 4793 (117th Cong.) ................................................................. 58

H.R. 6570 (116th Cong.) ................................................................. 58

H.R. Rep. No. 118-417 (2024) .................................................. 49, 52

## INTRODUCTION

Petitioners are among the 170 million Americans who use TikTok, a social media platform integral to the fabric of modern culture. TikTok is a place where Petitioners share, teach, advocate, commiserate, celebrate, grieve, entertain, and learn. TikTok stands apart from other social media apps, presenting a unique form of expression that has a different look, feel, and sound. It also offers a distinct editorial and publication system, which in turn provides access to a wide audience.

Because TikTok is a wellspring of free expression—indeed, one of our society's primary sources of communal engagement—the First Amendment safeguards the right of Americans to speak and associate using the platform. Yet in the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, Div. H, 138 Stat. 895, 955–60 (April 24, 2024) ("the Act"), Congress has singled out the content on TikTok for elimination. Worse, it has done so without making a single legislative finding; without providing TikTok any ability to address whatever concerns underlie the Act; and without first trying less drastic means of achieving any legitimate goals legislators may have.

This Court should permanently enjoin enforcement of the Act. Our

constitutional tradition leaves no room for the government to stop Petitioners from expressing their ideas through the editor and publisher they have chosen. The government could no more prohibit a freelance journalist from publishing in a magazine of her choice; forbid an actor from working with a particular director; or tell a musician what studio he can record in. Nor does it make any difference that the law has an exemption for so-called "qualified divestiture." Divestiture appears to be impossible—and, even if it were achievable, it would still sever Petitioners' ongoing association with TikTok as it currently exists, and with audiences they have garnered using TikTok's special content recommendation system.

Even if some governmental interest could theoretically overcome the First Amendment implications of the Act, the legislative record here would still fall far short. Certain lawmakers purportedly fear that TikTok could disseminate foreign propaganda and "influence[] the American public" through "the information we share and consume."[1] But the content or viewpoint of speech provides no justification for suppressing it. Plus, the Act itself belies any imminent or serious national security

---

[1] Add. 99–100, *available at* https://tinyurl.com/4m5hshp4.

risk of this sort, for it allows TikTok to continue operating through the rest of this year—including during an election that the very President who signed the bill says is existential for our democracy. Finally, lawmakers have asserted TikTok user data might be used for espionage or the like. Yet the government has never provided evidence supporting any such risk, nor any basis to conclude any such risk is limited to data held by TikTok. Even if the government could provide such evidence, there would be far narrower means to address any data-security concern—as Congress demonstrated in the very same legislation.

In many nations, the right to free speech is subject to the whims of politicians. Not in this one, where the First Amendment stands as a bulwark against governmental efforts to censor speech—and all the more so where the censorship is based on the content of speech, its speaker, or the editorial practices that facilitate its publication. The Court should enjoin enforcement of the Act.

## JURISDICTIONAL STATEMENT

This Court has original jurisdiction under Pub. L. No. 118-50, Div. H, § 3(a)–(b), 138 Stat. 895, 959–60.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the Protecting Americans From Foreign Adversary Controlled Applications Act violates the First Amendment.

2.    Whether the Court should declare the Act unconstitutional and enjoin its enforcement.

## STATUTES AND REGULATIONS

Petitioners attach a copy of the Act as an Addendum.

## STATEMENT OF THE CASE

### A.    TikTok Provides a Vibrant and Distinct Platform for Expression to Petitioners and Millions of Other Americans.[2]

The TikTok app provides a vital communicative forum for more than 170 million Americans (and more than one billion people worldwide).[3] TikTok allows users to create, publish, view, interact with, and share videos up to ten minutes long.[4] From dance challenges to book reviews to do-it-yourself tutorials, TikTok videos address topics as diverse as human thought.

---

[2] This Brief uses the term "creators" to refer to individuals who create and share videos, and the term "users" to describe both creators and individuals who consume such content.

[3] Add. 103–05, *available at* https://tinyurl.com/4dfa5u3u; *id.* 107–38, *available at* https://tinyurl.com/mup78jrs.

[4] Add. 140–43, *available at* https://tinyurl.com/yzd448jc; *id.* 145–48, *available at* https://tinyurl.com/35j47x5k.

Petitioners are just eight examples of the millions who use TikTok regularly to express themselves, learn, advocate for causes, share opinions, create communities, and even make a living:

- **Brian Firebaugh**, a first-generation rancher and U.S. Marine Corps veteran, educates the public about agricultural issues, promotes his ranch and products, and helps the ranching community through charitable endeavors. Firebaugh Decl. ¶¶ 2–3, 6, 8–9, Add. 18–22.

- **Chloe Joy Sexton** creates videos about parenting, mental health, and the cookie business that the platform enabled her to launch. Sexton Decl. ¶¶ 4–9, Add. 45–47.

- **Talia Cadet** shares book reviews and promotes Black authors and Black-owned-businesses. Cadet Decl. ¶ 4, Add. 9–10.

- **Timothy Martin**, a football coach, makes sports-commentary videos and connects with other fans and former athletes. Martin Decl. ¶¶ 2, 5, Add. 35–36.

- **Paul Tran** posts information about his skincare company, documents memories with his daughter, connects with other dads, follows martial arts, and researches travel and restaurants. Tran Decl. ¶¶ 3, 8, 11–12, Add. 73, 76, 78–79.

- **Steven King** creates humorous content about his daily life and spreads awareness about LGBTQ pride, self-confidence, and sober living. King Decl. ¶¶ 4, 6–7, Add. 29–31.

- **Kiera Spann** advocates for the rights of sexual-assault survivors, shares information about books, news, and politics, and encourages

political and social advocacy. Spann Decl. ¶¶ 3, 6, Add. 52–53, 54–55.

- **Christopher Townsend**, a U.S. Air Force veteran, shares music he writes and produces, posts light-hearted videos quizzing people on their biblical knowledge, and participates in "Conservative Hype House" on TikTok, which discusses and debates views on current events from a conservative perspective. Townsend Decl. ¶¶ 3, 4, 8, 9, 11, Add. 63–64, 67–68.

Petitioners and other creators use TikTok not only to exchange material of social and artistic import, but also for speech integral to our political culture. Spann and Townsend, for example, have used TikTok for issue advocacy. Spann Decl. ¶ 6, Add. 54–55; Townsend Decl. ¶ 9, Add. 67–68. Many politicians post on TikTok to reach a broad demographic, activate new supporters, and gain popularity. U.S. senators have for years reached their constituents on TikTok, and they continue to do so now.[5] The Biden and Trump presidential campaigns both have active TikTok accounts.[6] Indeed, on the same day President Biden signed the

---

[5] *See, e.g.*, Add. 150–51, *available at* https://tinyurl.com/msxmmv5c; *id.* 152–54, *available at* https://tinyurl.com/3smcxhm3.

[6] Add. 156–71, *available at* https://tinyurl.com/2b7as6vh; *id.* 173, *available at* https://tinyurl.com/mtwbxeda.

Act, his campaign's deputy manager stated it "would be silly to write off any place where people are getting information about the president."[7]

Finally, Petitioners—and millions of others—use TikTok to post and obtain information about news and current events. King finds TikTok to be one of the most unbiased and authentic places for news. King Decl. ¶ 11, Add. 33. Spann has found that TikTok has a unique ability to spread time-sensitive and important news faster than other platforms. Spann Decl. ¶ 14, Add. 59–60.

### B.   TikTok's Innovative Editorial Tools Allow Creators to Reach Substantial Audiences and Build Meaningful Communities.

Creators, including Petitioners, choose TikTok because it is different. Spann Decl. ¶¶ 7–9, 13–14, Add. 55–56, 58–60. TikTok owes its distinct identity and culture to many things.

First is its novel medium. TikTok provides users tools to amplify creators' expression, such as background music, filters, and special effects.[8] TikTok also lets users react to other videos through "duets," where creators post their videos alongside other videos; "stitches," where creators clip and integrate scenes from other videos into their own; and

_____

[7] Add. 177, *available at* https://tinyurl.com/4n5y3546.
[8] *See* Add. 183–85, *available at* https://tinyurl.com/nypwfbh2.

"remixes," where creators mix up more than one video to create another. *See, e.g.*, Townsend Decl. ¶ 13, Add. 69–70 (using "duet" to collaborate with another musical artist).

Similarly, CapCut, another app ultimately owned by ByteDance Ltd., provides innovative tools for making the type of "fast-paced, hyper-edited, short-form vertical video" that "TikTok mainstreamed" and has become "the dominant form of expression for millions of content creators."[9] The app's "green screen" feature, for example, allows creators to offer criticism or commentary in the style of a news presenter, with their heads floating over an image or a video. Content created on TikTok and CapCut thus looks and sounds different than content created elsewhere.

Unlike other social media platforms, TikTok does not require users to create profiles with information such as their backgrounds, likes, interests, education, employment, or relationship status, nor does it require users to "follow" or "friend" others. Instead, TikTok's "For You" page displays videos tailored to each user but not tied to such personal

_____

[9] Add. 188, *available at* https://tinyurl.com/yz9rcypd.

information.[10] This allows users to explore new and different content without seeking out specific content.[11] In this way, TikTok compiles and curates expression from millions of people globally to create personalized collections for each user.

The "For You" page is powered by TikTok's content recommendation system, which selects content for users based on judgments from their interaction with other content. Because this system amplifies creators' voices in distinct ways, even little-known creators can gain substantial organic reach, exposing their content not just to *more* viewers but to *specific* viewers most likely to enjoy their content.[12] *See* Martin Decl. ¶ 8, Add. 37–38; King Decl. ¶¶ 4, 7, Add. 29, 31. As a result, TikTok creators can—and often do—become sensations with simple,

---

[10] *See* Add. 195–99, *available at* https://tinyurl.com/8nhhert3; *id.* 201, *available at* https://tinyurl.com/2rm3b6ua.

[11] Add. 212, *available at* https://tinyurl.com/bdf5fu5x ("That means that every user has the chance of global fame. Even if you have no followers at all…."); *see id.* 218, *available at* https://tinyurl.com/2mks2euy ("After years of irrelevant, disconnected feeds, TikTok has revamped the scrolling experience, enabling discovery and curating interest-based entertainment."); *id.* 224, *available at* https://tinyurl.com/mvyjptkn (TikTok's algorithm "surface[s] content based on engagement with internet trends rather than metrics indirectly tied to follower count").

[12] Add. 228–33, *available at* https://tinyurl.com/22h7rtvx.

spontaneous videos.[13] *See* Firebaugh Decl. ¶ 5, Add. 19–20; Spann Decl. ¶¶ 4–5, Add. 53–54.

Petitioners have experienced this firsthand. Spann's video about a domestic assault, for example, has been viewed over nine million times. The video led to media coverage and advocacy that ultimately resulted in the perpetrator being held accountable, as well as meaningful reforms in Spann's community. Spann Decl. ¶¶ 4–5, Add. 53–54. Firebaugh created a video showing himself petting one of his Longhorn cattle to dispel the myth that the animals are vicious; the video went viral (that is, it spread rapidly among users) and led users to follow him and ask questions about ranching, agriculture, and livestock. Firebaugh Decl. ¶ 5, Add. 19–20.

TikTok's content recommendation system also opens doors for connection, even internationally. For instance, Spann and Cadet participate in BookTok, a large, well-known community of readers who share and engage with TikTok videos reviewing, recommending, and discussing books. Spann Decl. ¶ 6, Add. 54–55; Cadet Decl. ¶ 4, Add. 9–

---

[13] Add. 235–41, *available at* https://tinyurl.com/yc45ttt5; *id.* 243–48, *available at* https://tinyurl.com/22j6bxyt.

10.[14] Martin has used TikTok to build a community of former and current athletes and fans, connecting over their experiences and love of sports. Martin Decl. ¶ 11, Add. 39. About 39,000 of Martin's followers are based in the United Kingdom, including a passionate group of fans who follow him to learn about American football. Similarly, King has connected with other LGBTQ creators and audiences, often answering questions from his followers about his experience coming out as gay in Arizona, his 28-year marriage, and his experience with sober living. King Decl. ¶ 7, Add. 31. Like Martin, King has amassed a loyal international following and has even met fans when traveling abroad. *Id.* ¶ 8, Add. 31–32.

Other social media platforms have attempted but failed to recreate TikTok's "secret sauce."[15] It thus comes as no surprise that Petitioners have been far more successful sharing their ideas and views on TikTok than anywhere else. Despite efforts to grow their presence on other platforms, all of them have far fewer followers on those other apps. *See*

---

[14] Add. 250–70, *available at* https://tinyurl.com/kkvj3xur; *id.* 272, *available at* https://tinyurl.com/yt4muhv8.

[15] Add. 283–86, *available at* https://tinyurl.com/mrxx6xub; *id.* 288–90, *available at* https://tinyurl.com/y9ssbvz5; *id.* 292–95, *available at* https://tinyurl.com/5yp2s4ej; *id.* 300–03, *available at* https://tinyurl.com/25eh5zpb.

King Decl. ¶ 10, Add. 32 (6.8 million TikTok followers, 137,000 on Facebook); Sexton Decl. ¶ 12, Add. 48–49 (2.2 million TikTok, 50,000 Instagram); Townsend Decl. ¶ 7, Add. 66–67 (2.5 million TikTok, 1.9 million Facebook); Firebaugh Decl. ¶ 7, Add. 21 (443,000 TikTok, 23,000 Instagram); Martin Decl. ¶¶ 6–7, Add. 36–37 (1 million TikTok, 10,200 Instagram); Spann Decl. ¶ 9, Add. 56 (770,000 TikTok, less than 10,000 Instagram); Tran Decl. ¶ 9, Add. 76–77 (142,800 TikTok, less than 2,000 Facebook); Cadet Decl. ¶ 12, Add. 14–15 (129,000 TikTok, less than 10,000 Instagram). Some Petitioners have also found the same videos perform better on TikTok than on other platforms, which Sexton attributes to the fact that TikTok's algorithm gets her videos in front of the viewers most likely to find it compelling. Sexton Decl. ¶ 12, Add. 48–49; *see also* King Decl. ¶ 10, Add. 32; Martin Decl. ¶ 7, Add. 37.

Petitioners accordingly believe that changing the ownership or any editorial practices on TikTok would threaten the vitality—or at least the quality—of the forum. In fact, they have already had that experience with another platform. *See, e.g.*, Martin Decl. ¶ 16, Add. 42, Spann Decl. ¶ 16, Add. 60–61; Cadet Decl. ¶ 15, Add. 16 (explaining that their user experiences on "X", formerly Twitter, deteriorated after Elon Musk

acquired the company and made certain fundamental changes to the app).[16]

## C.    Courts Block Attempts to Ban TikTok.

Regulators have long scrutinized TikTok because its parent company has Chinese subsidiaries—both under the guise of data-security concerns and fear about China's purported ability to shape content that Americans see. But courts have put a swift end to attempts to shut down TikTok.

In 2020, then-President Trump tried to ban TikTok through an executive order, suggesting that the app presented a national security threat. But courts held that speech-protective provisions of the International Emergency Economic Powers Act precluded Trump from doing so, particularly in the absence of any evidence demonstrating any actual threat. *See TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 83 (D.D.C. 2020); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 112 (D.D.C. 2020) (noting absence of evidence), *dismissing appeal,* 2021 WL 3082803 (D.C. Cir. July 14, 2021); *Marland v. Trump*, 498 F. Supp. 3d 624, 642 (E.D.

---

[16] *See also* Add. 305–13, *available at* https://tinyurl.com/3bstx77m; *id.* 315–20, *available at* https://tinyurl.com/bp734skr.

Pa. 2020) (rejecting government's "descriptions of the national security threat posed by the TikTok app" as "hypothetical").

Earlier this year, another federal district court enjoined enforcement of a TikTok ban enacted by the Montana Legislature. *Alario v. Knudsen*, --- F. Supp. 3d. ----, 2023 WL 8270811, at *8, *13 (D. Mont. Nov. 30, 2023) (appeal filed). The court held that the ban censored protected speech and found unsupported the State's claim that Chinese officials could "gain access to Montanans' data without their consent." *Id.* at *13.

### D.    TikTok Spends More than $2 Billion on Improvements.

Even though it prevailed in these legal actions, TikTok works to appease governmental concerns. In particular, it is implementing numerous measures to safeguard U.S. user data and protect the platform against foreign government influence. TikTok Br. at 15–17, *TikTok v. Garland*, No. 24-1113 (D.C. Cir. June 20, 2024) ("TikTok Br."). TikTok has voluntarily invested more than $2 billion alone to build a system of technological and governance protections, sometimes referred to as "Project Texas."[17] TikTok has also reported making additional

---

[17] Add. 322–25, *available at* https://usds.tiktok.com/.

14

commitments in a proposed National Security Agreement developed through negotiations with the Committee on Foreign Investment in the United States, including agreeing to a "shut-down option" that would give the government authority to suspend TikTok in the United States if the company were found to violate certain obligations.[18] *Id.*

### E. Congress Bans TikTok.

Notwithstanding TikTok's actions—and the lack of evidence supporting any supposed data-security concerns—Congress recently passed the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50. The Act bans TikTok (and all other apps, like CapCut, ultimately owned by ByteDance Ltd.) throughout the United States, effective January 19, 2025.

The Act effectuates this ban by prohibiting a "foreign adversary controlled application" from being made available within the territorial borders of the United States. *See* Act § 2(a)(1)(A)-(B). The Act then makes clear that it targets one company: TikTok. The Act expressly defines "foreign adversary controlled application," first and foremost, as any app

---

[18] Add. 327–33, *available at* https://tinyurl.com/2rkmwyuw; *see also* TikTok Br. at 15–17.

15

operated by "TikTok" or its ultimate parent, "ByteDance Ltd." *Id.* § 2(g)(3)(A)(i)–(iii).

The Act also makes clear its focus is the type of speech TikTok publishes. In addition to singling out TikTok itself, the Act establishes a more general category of "covered compan[ies]" to which it theoretically applies. *Id.* § 2(g)(2)(A). Even for such companies, the Act applies only to entities that operate a platform with more than one million monthly active users during a specified time period that enables those users to "generate, share, and view text, images, videos, real-time communications, or similar content." *Id.* § 2(g)(2)(A)(i). At the same time, the Act excludes from that catchall definition of "covered company" any entity that offers any app "whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews." *Id.* § 2(g)(2)(B).

Although the Act contains no legislative findings or even a declaration of the basis for this ban, the Act's supporters have offered various reasons for singling out TikTok.[19] One of the bill's co-sponsors,

---

[19] *See, e.g.*, Add. 335–36, *available at* https://tinyurl.com/23j8st77; *id.* 342, *available at* https://tinyurl.com/njsz2zar (TikTok curates content to

Representative Krishnamoorthi (IL), claimed that "the CCP [Chinese Communist Party] has ultimate control of the algorithm which feeds the content of the platform."[20] Other supporters claimed TikTok "manipulate[s] the minds of Americans"[21]; disseminates "propaganda" that would "use our country's free marketplace to undermine our love for liberty"[22]; enables China "to engage in psychological warfare against the American people"[23]; and should be banned because it has become a "dominant news platform" to which young Americans increasingly turn for news and information.[24]

The only way the Act allows TikTok to continue publishing in the United States beyond early 2025 is through a "qualified divestiture." Under this exemption, TikTok's owners would have to sell the platform within 270 days to an entity approved by the President, following an

---

"drive certain messages to divide Americans, to destabilize our politics, to influence policymakers to denigrate policymakers, [and] to tear our country apart").

[20] Add. 344, *available at* https://tinyurl.com/ycxw6xpf (video timestamp at 0:39).

[21] 170 Cong. Rec. H1163, H1169 (daily ed. Mar. 13, 2024) (statement of Rep. Dan Crenshaw (TX)).

[22] Add. 346, *available at* https://tinyurl.com/tw8zdns5.

[23] Add. 349, *available at* https://tinyurl.com/mwaunwda.

[24] 170 Cong. Rec. at H1165 (statement of Rep. Mike Gallagher (WI)).

unspecified "interagency process." *Id.* § 2(a)(1)(A), § 2(a)(2)(A), § (2)(g)(6). The President would also have to ensure that any divested successor does not maintain "any operational relationship" between its U.S. operations and any "formerly affiliated entities that are controlled by a foreign adversary," including any "cooperation with respect to the operation of a content recommendation algorithm." *Id.* § 2(g)(6).

At any rate, TikTok has repeatedly explained that divestiture under the Act is not "commercially, technologically, or legally feasible." *See* Pet. For Review ¶¶ 25–29, *TikTok v. Garland*, No. 24-1113 (D.C. Cir. May 7, 2024); *see also* TikTok Br. at 21–24.[25] No governmental entity has made any findings suggesting otherwise.

Penalties for violating the Act are severe. The Act subjects any entity (such as an app store or webhost) that facilitates access to TikTok to a penalty of $5,000 "multipl[ied] … by the number of users within the land or maritime borders of the United States" who access, maintain, or update the app as a result of the violation. *Id.* § 2(d)(1)(A). Given TikTok's

_____

[25] *See also* Add. 352–56, *available at* https://tinyurl.com/bdp8mk74; *id.* 327–33, *available at* https://tinyurl.com/2rkmwyuw.

approximately 170 million users in the United States, such a fine could be as high as $850 billion.

## SUMMARY OF ARGUMENT

I. The Act suppresses protected speech and association without any permissible basis.

A. The Act restricts Petitioners' First Amendment rights to speak, associate, and receive speech from others.

1. To begin, the Act denies Petitioners' right to choose *where* they speak. TikTok is an online platform where nearly half the American population goes to find community and connect with others. It is also the forum where Petitioners prefer to express themselves. For good reason: TikTok empowers them to be their authentic selves in ways other platforms do not—to speak freely, be vulnerable, and share their beliefs—and to reach audiences with whom their messages will most resonate.

2. The Act similarly deprives Petitioners of their right to choose *how* they speak. TikTok is a distinct medium of expression. Like leafletting or rapping, creating content using TikTok has a special look, feel, and sound that makes TikTok a unique form of expression. The First Amendment

19

protects Petitioners' right to package and publish their content in this way.

3. The Act also restricts Petitioners' right of expressive association by denying them their chosen editor and publisher. Just as the First Amendment protects a freelance journalist's choice to publish her article with a magazine she chooses, or a musical artist's ability to record in the studio he chooses, it also protects Petitioners' desire to express themselves with their chosen editor and publisher: TikTok.

4. Finally, the Act inhibits Petitioners' right to receive speech. TikTok is Petitioners' preferred source to receive news and information about topics ranging from sports to politics. They believe the content is timely, unbiased, and diverse. Petitioners also watch TikTok for its sheer entertainment value—viewing skits, songs, and dances that others share. Yet the Act will prevent them from receiving these information and ideas from others.

5. The Act's divestiture exemption does not eliminate, or even lessen, these multifarious First Amendment burdens. Divestiture does not appear to be commercially, technologically, or legally feasible. Even if divestiture were possible, the Act would still curtail Petitioners' First

20

Amendment rights because the divested entity would no longer be TikTok as it exists today; the way the content recommendation system works would necessarily change. Divestiture would also have the effect of disconnecting Petitioners—along with all other Americans—from the rich and diverse content from the rest of TikTok's global platform and community.

B. The burdens the Act inflicts on Petitioners' constitutional right to speak and associate cannot be justified.

1. The Act imposes an impermissible prior restraint insofar as it preemptively shutters future expression without any legislative findings or opportunity to show that TikTok does not constitute what the Act elsewhere defines a "foreign adversary controlled application." A prior restraint is permissible on national security grounds only when necessary to prevent imminent, direct, and irreparable harm of the highest magnitude. Yet the Act on its face falls short of that standard. It allows TikTok at least nine months to keep publishing, making clear that the purported dangers the platform presents are anything but imminent. The Act also lacks any finding that the threat here is sufficiently grave and concrete to justify a prior restraint.

21

2. The Act otherwise is subject to and fails means-ends scrutiny. Strict scrutiny applies here because the Act restricts speech based on its content, viewpoint, publisher, and speaker. At a bare minimum, the Act's direct suppression of speech requires it to survive intermediate scrutiny.

The government cannot satisfy either level of scrutiny. For starters, various legislators' purported desire to shield Americans from foreign propaganda is not a legitimate purpose under the First Amendment. Nor is that interest supported by any evidence (much less substantial evidence) that any genuine threat exists. Finally, the Act does not materially or narrowly advance any interest in combatting foreign propaganda.

Other legislators' purported interest in data-security fares no better. No evidence has been produced demonstrating a concrete or likely harm along these lines. Nor does the Act advance any such interest. And even if it did, there are less speech-restrictive means of protecting the data of Americans who use TikTok—as evidenced by other legislation Congress enacted in the same omnibus package, as well as numerous alternatives TikTok has proposed. Lastly, given TikTok's unique nature, the Act does not leave open ample alternatives for Petitioners' speech.

22

3. Even if the Act legitimately restricted some speech or association, the Act would still violate the First Amendment because it is overbroad. The Act shuts down all expression on TikTok, regardless of whether it constitutes foreign propaganda or implicates any other supposed national security concern. And the vast majority of the speech posted on TikTok poses no threat whatsoever.

II. The Court should declare the Act unconstitutional and enter an order permanently enjoining its enforcement. In the alternative, the Court should temporarily enjoin the Act and order further proceedings as necessary to determine whether the Act passes constitutional muster.

## ARGUMENT

Petitioners—along with millions of other Americans—use TikTok to publish their views on politics, religion, literature, sports, entertainment, and other topics. Their content ranges from the lighthearted (like cooking tips) to the deeply serious (like advocacy for sexual assault survivors). Yet in one broad stroke, the Act promises to shutter this entire forum, preventing Petitioners from expressing themselves in this most communal of settings. This act of censorship prohibits speech and association that the First Amendment

23

unquestionably protects. And Congress has not remotely justified this dramatic measure. This unprecedented suppression of core First Amendment activity should be permanently enjoined.

## I.    The Act Suppresses Speech and Association that the First Amendment Protects.

### A.    The Act Burdens Core First Amendment Activity.

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend I. This provision embodies "our profound national commitment to the free exchange of ideas." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (citation omitted). Yet the Act regulates content on TikTok so as to restrict Petitioners' ability (1) to speak using their preferred forum; (2) to speak in their preferred medium; (3) to associate with a particular editor and publisher; and (4) to receive their fellow users' ideas. These burdens independently and collectively implicate core First Amendment activity.

#### 1.    The Act bans a forum for protected expression.

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). One such place is the Internet. Indeed,

24

"[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear." *Id.* "It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Id.* (citation omitted). The Supreme Court has therefore made clear that the First Amendment protects the right of individuals to access social networking sites, explaining that such sites are, for many, "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107.

This reasoning applies with full force to TikTok. TikTok is, by some Congress members' own admission, "one of the most dominant social media platforms in recent history."[26] On TikTok, Petitioners have found communities of "book lovers," Cadet Decl. ¶ 8, Add. 12; cattle ranchers and people interested in agriculture, Firebaugh Decl. ¶¶ 7, 10, Add. 21–23; sexual assault survivors and their advocates, Spann Decl. ¶ 7, Add.

---

[26] 170 Cong. Rec. at H1170 (statement of Rep. Sheila Jackson Lee (TX)); *see also Alario*, 2023 WL 8270811, at *6 (noting that Montana law banning TikTok restricted a "means of expression used by over 300,000 Montanans").

55; sports fans and former athletes, Martin Decl. ¶¶ 7, 11, Add. 37, 39; "Christians and conservative-minded people," Townsend Decl. ¶ 7, Add. 66–67; "mothers and other baking afficionados," Sexton Decl. ¶ 12, Add. 48–49; as well as LGBTQ audiences and individuals living in or working through sobriety, King Decl. ¶ 7, Add. 31.

These communities are essential to Petitioners' ability to speak as they choose. As Sexton explains, because of the "close-knit community that [she has] developed on TikTok," she is "comfortable being vulnerable and expressing [her]self on the app." Sexton Decl. ¶ 10, Add. 47–48. On other apps, by contrast, "there is more pressure to filter and sanitize one's life to convey an unrealistic image of perfection." *Id.* TikTok empowers Townsend to speak freely and authentically without fear of being "shouted down." Townsend Decl. ¶ 6, Add. 65–66; *see id.* ¶ 16, Add. 71 (TikTok is "a space for expressing myself that has come to mean so much to me"). In Martin's experience, "TikTok seems to know much better than the other apps[,] where to send [his] videos to allow them to have the most impact," which has allowed him to grow "a genuine and supportive following and reach many more people than on the other apps." Martin Decl. ¶¶ 7–8, Add. 37–38.

Preventing Petitioners from reaching their audiences on TikTok stymies their ability to spread their messages. Indeed, it amounts to nothing less than "a 'suppression of speech.'" *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 226 (1997) ("*Turner II*") (Breyer, J., concurring in part).

### 2.    The Act bans a distinctive medium for protected expression.

The First Amendment protects not only a speaker's right to pick where she expresses herself but also the medium she uses for that expression. Thus, just as banning speech in a particular forum implicates the First Amendment, so, too, does a law that "completely foreclose[s]" a particular "means of communication that is both unique and important." *City of Ladue v. Gilleo*, 512 U.S. 43, 54 (1994). The Supreme Court, for example, has applied First Amendment scrutiny to a ban on residential signs, explaining that the choice to display signs from one's home "often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means." *Id.* at 56. The Ninth Circuit likewise has invalidated an ordinance banning tattoo parlors, rejecting the government's argument that the First Amendment was not seriously implicated because tattoo artists could theoretically

27

express the same words, images, and symbols through other mediums. *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1065–66 (9th Cir. 2010). In short, even if alternative avenues of communication remain, the restriction of an important and distinctive medium of communication is a "burden on First Amendment expression." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

The Act unquestionably bans a special medium of expression. Like residential signs, posts on TikTok "carr[y] a message quite distinct from conveying the same text or picture[s] through some other" Internet app or website. *City of Ladue*, 512 U.S. at 56. The reasons are in part technological: Creators like Martin rely on tools like CapCut, a video editing app used to create posts, without which he cannot "create the exact same effects—or express myself the same way." Martin Decl. ¶ 9, Add. 38–39. Townsend relies on TikTok's duet and stitch features to collaborate with other musical artists. Townsend Decl. ¶ 13, Add. 69–79.

To be sure, other social media platforms have "tried to mimic TikTok's editing tools." *Id.* ¶ 5, Add. 64–65. But there is a "fundamental difference" between posting videos on TikTok and on other platforms: TikTok and Facebook, for example, have "distinct core functionalities"

28

that are not "reasonably interchangeable." *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 768–69 (N.D. Cal. 2022) (citation omitted). Townsend, for instance, finds "the experience on TikTok to be much more natural and intuitive." Townsend Decl. ¶ 5, Add. 64–65. Furthermore, TikTok allows creators to post longer videos on the main "For You Page" than on Facebook Stories. This gives Cadet "time to really delve into the details of a good book review or thoughtfully engage in a discussion about celibacy and self-care," and encourages her "to be a more real and less filtered version of [her]self and to truly express [her]self—more so than on the other apps." Cadet Decl. ¶ 13, Add. 15.

The medium of TikTok is also distinct because of TikTok's culture. Content created on TikTok not only looks and sounds different than content created elsewhere—it also is substantively different. *See, e.g.*, Townsend Decl. ¶ 6, Add. 65–66 ("TikTok's distinct culture allow[s] me to speak freely and share my authentic opinions"); Spann Decl. ¶ 8, Add. 55–56 (contrasting her experience on TikTok to speak candidly about issues such as sexual assault with her experience on other platforms). That is in large part due to TikTok's recommendation system, which allows creators and users to reach, and hear from, others with whom they

29

may not otherwise connect.[27] Unlike other platforms, TikTok's recommendation system seems to care little about how many followers the creator has.[28] As a result, the content on TikTok is, in Petitioners' experience, different and more authentic. *See* Spann Decl. ¶ 13, Add. 58–59 (demonstrating difference in search results for "France" on TikTok and Instagram).

### 3. The Act restricts Petitioners' right to associate with their chosen editor and publisher.

The Act also implicates Petitioners' First Amendment right of expressive association by denying Petitioners their chosen editor and publisher: TikTok.

That choice lies at the core of the "right to associate for the purpose of speaking," *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 68 (2006), and to "join with others to further shared goals," *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021). In other words, the First Amendment guards against government actions that prohibit individuals from choosing with whom they wish to join together to

---

[27] *See, e.g.*, Add. 358–65, *available at* https://tinyurl.com/4ujw8vfv; *id.* 208–14, *available at* https://tinyurl.com/bdf5fu5x.
[28] *See* Add. 208–14, *available at* https://tinyurl.com/bdf5fu5x.

express themselves. *Id.* at 616. Thus, in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), the Supreme Court applied the First Amendment to a state law regulating participation in a parade. And the Court did so even though the various "expressive units of the parade" would not collectively "produce a particularized message." *Id.* at 574. It was enough that changing with whom people express themselves would "essentially … alter the expressive content" of the expression. *Id.* at 572.

The right of expressive association is all the more important where it involves a speaker's right to choose their editor or publisher. *Cf. Tornillo v. Miami Herald Publ'g Co.*, 418 U.S. 241, 258 (1974) (invalidating law requiring editor to print specific editorials). Editors and publishers play important roles in curating and disseminating speech. The First Amendment would thus apply with special force if, for instance, the government prohibited a freelance journalist from placing stories with the magazine she chooses; a novelist from publishing with Macmillan instead of Simon & Schuster; a musician from releasing a record under her chosen label; or a political candidate from airing his views on the website he prefers.

31

To put a finer point on this principle, consider the famed recording studio in Muscle Shoals, Alabama. During the 1960's and 1970's, countless musical icons—from Aretha Franklin to the Rolling Stones to Paul Simon—"travel[ed] to the southern banks of the Tennessee river, searching for a bit of that Muscle Shoals magic."[29] The "[l]egendary Muscle Shoals [s]ound"—like TikTok's unique look and feel—stemmed from many factors.[30] It derived in part from the studio's particular group of backup musicians and sound engineers. It also owed to the particular construction and configuration of the studio itself: a room with "all the edges rounded off," and finished with "acoustic tile, louvered walls, and baffles."[31] Some even thought the laid-back vibe of the rural South brought out a different attitude in the artists. But whatever the sources of the studio's success, if a governmental entity had suddenly sought to prohibit musicians from recording at Muscle Shoals—perhaps concerned about the owner's views regarding civil rights or salacious lyrics in the artists' songs—it could not have escaped First Amendment scrutiny simply because the studio was one of many places to make records.

[29] Add. 367, *available at* https://tinyurl.com/3cxjyt9y.

[30] Add. 373–76, *available at* https://tinyurl.com/yw927cz4.

[31] Add. 385, *available at* https://tinyurl.com/2s3n8rbm.

32

The First Amendment likewise applies here, where Petitioners wish to express themselves using TikTok as their publisher and editor. TikTok offers distinctive tools that allow Petitioners to generate unique content. *See supra* at 8–10. The culture of the app creates its own special flavor. *See supra* at 8–12, 32. And in Petitioners' experience, TikTok's publishing and editorial decisions magnify their ability to connect with others, result in more awareness and engaging content, and can spread time-sensitive and important content faster than any other platform. Spann Decl. ¶¶ 13–14, Add. 58–60; King Decl. ¶¶ 4–5, Add. 29–30.

### 4. The Act restricts Petitioners' rights to receive information and ideas.

The First Amendment protects not only the right to speak and associate but also "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). Indeed, this right—regardless of the "social worth" of the content at issue—"is fundamental to our free society." *Id.* (collecting cases); *see also Martin v. City of Struthers,* 319 U.S. 141, 143 (1943) (First Amendment "necessarily protects the right to receive" information). And it applies equally to information produced domestically or abroad. *See Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965). Here, the Act directly restricts Petitioners' rights to receive

information. TikTok Br. at 23–24. Like many Americans, King gets all of his news about both domestic and international issues from TikTok—in part because he trusts certain "TikTok creators who are journalists … to produce unbiased and authentic news." King Decl. ¶ 11, Add. 33. Spann believes TikTok "to be one of the most authentic and timely sources where you can hear diverse and organic perspectives instead of the more curated and potentially biased accounts." Spann Decl. ¶ 13, Add. 58–59. Martin enjoys discussing football "with people living all over the world," while Firebaugh has international followings from countries with large ranching communities. Martin Decl. ¶ 16, Add. 42; Firebaugh Decl. ¶ 17, Add. 26. Almost 20 percent of Spann's followers are from outside the United States, and she values connecting "with survivors and advocates all over the world—bonding over and grieving our shared experiences while learning from our differences." Spann Decl. ¶ 7, Add. 55.

Last but not least, in Petitioners' experience, TikTok delivers news and other information more quickly than any other app. As Spann explains, "I always hear about news from TikTok first—it can sometimes be days or even longer before news on TikTok trickles down to the other

34

social media platforms." *Id.* ¶ 14, Add. 59–60. The First Amendment protects Petitioners' right to such timely content.

>    5.    **The Act's divestiture provision does not eliminate, or even lessen, the burden.**

The restrictions on Petitioners' speech are not alleviated by the Act's provision theoretically permitting TikTok to divest its United States operations.

For one thing, divestiture does not appear to be a realistic option. TikTok has repeatedly explained—and publicly available information confirms—that the Act's divestiture standard is not "commercially, technologically, or legally feasible." *See* TikTok Br. at 21–24. The purpose and effect of the Act is thus to ban TikTok—and, in turn, Petitioners' speech on the platform—entirely.

Even if divestiture were feasible, the Act would still burden Petitioners' speech. The availability of a burdensome alternative to speaking in a particular forum does not allow a regulation to escape First Amendment scrutiny. "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011); *see also FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 255 (1986) (plurality opinion)

(alternative avenues for expression irrelevant to whether First Amendment applies to a burden on speech).

Any divestiture would necessarily burden Petitioners' speech by limiting the effectiveness of TikTok as a forum for expression. The Act explicitly prohibits a divested successor from maintaining "any operational relationship" with "any formerly affiliated entities that are controlled by a foreign adversary," including "cooperation with respect to the operation of a content recommendation algorithm." Act § (2)(g)(6)(B). Accordingly, even if the current recommendation system could be transferred to another company (and TikTok says it cannot), the new owner would maintain and periodically update that system. And the new owner would almost certainly follow its own (different) publishing and editorial policies. These changes would alter Petitioners' expression just the same as if the government forced an actor to work with a different director, a musician to record her album with a different studio, or a freelance writer to publish in a different magazine. *See* Cadet Decl. ¶ 15, Add. 16; Spann Decl. ¶ 16, Add. 60–61; King Decl. ¶ 14, Add. 34.

Divestiture would also limit the audience to whom Petitioners can speak and the creators from whom they can hear. A substantial part of

36

TikTok's appeal is the richness of the international content that Petitioners regularly enjoy. *See* Martin Decl. ¶ 12, Add. 40; Sexton Decl. ¶ 15, Add. 50–51; Spann Decl. ¶ 7, Add. 55; Townsend Decl. ¶ 17, Add. 71–72. And Petitioners value their ability to speak to and learn from an international audience. *See supra* at 11–12, 37; Martin Decl. ¶ 12, Add. 40; Spann Decl. ¶ 7, Add. 55; Townsend Decl. ¶ 17, Add. 70–71; Cadet Decl. ¶ 10, Add. 13 (nearly 10 percent of her followers are abroad). A divestiture would take that away, disconnecting Americans from the rest of TikTok's global platform and community. TikTok Br. at 23–24. This, in turn, would shrink the creators' worlds. Cadet Decl. ¶ 15, Add. 16. As Sexton says, "If I could only interact with other Americans, my world would be much smaller." Sexton Decl. ¶ 15, Add. 50–51.

## B.    The Act's Burdens on Speech Violate the First Amendment

The Act's impingement upon Petitioners' First Amendment rights constitutes both a prior restraint and a substantive burden on speech and association. Viewed through either lens, nothing justifies this impingement.

37

### 1.    The Act is an invalid prior restraint.

#### a.    The Act imposes a prior restraint.

A prior restraint forbids communications before they occur, banning them as unlawful regardless of their content. *Alexander v. United States*, 509 U.S. 544, 550 (1993). Prior restraints present "the most serious and the least tolerable infringement on First Amendment rights" and bear a "heavy presumption" against their validity. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976) (citation omitted). Indeed, such restraints must survive "the most exacting scrutiny," *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979); *see also In re Sealed Case*, 77 F.4th 815, 830 n.5 (D.C. Cir. 2023), *pet. for cert. docketed* (U.S. June 3, 2024)—a standard more stringent than even strict scrutiny.

The Act imposes a prior restraint because it closes off Petitioners' ability to publish videos on TikTok in advance of any expression. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975); *see also U.S. WeChat Users All. v. Trump*, 488 F. Supp. 3d 912, 926 (N.D. Cal. 2020) (ban on Chinese-owned communications app imposed equivalent of prior restraint). Indeed, the Act sweeps even more broadly than the prior restraint in *Near v. Minnesota,* 283 U.S. 697 (1931), which enjoined

38

publication of a single newspaper, *id.* at 703–05, or the impermissible law in *Grosjean v. American Press Co.*, 297 U.S. 233, 240–41 (1936), which subjected a group of newspapers to a special tax, *id.* at 249–51. The Act does not just close down a means to receive content (like in *Near*) or burden the ability to disseminate content (like in *Grosjean*), but it also ends Petitioners' communications with more than a billion individuals in one fell swoop. *See Reno v. ACLU*, 521 U.S. 844, 870 (1997).

That the Act effectuates a prior restraint is underscored by the fact that Congress decided that TikTok—and, in turn, TikTok's content creators—must have their speech preemptively suppressed while other similar expression is allowed to continue absent various substantive findings. That is, the Act sets out a general (if problematic) framework to judge whether content on other apps is forbidden: the apps must have a minimum number of users; the company that owns the app must "present a significant threat to the national security of the United States"; and that company must not own an app whose "primary purpose" is hosting reviews of products or the like. *See* Act § 2(g)(2)(B)–(3)(B). Not so for TikTok: That forum, and only that forum, must shutter without any legislative findings or opportunity to show TikTok does not meet the test

that applies to all other companies. That preemptive suppression of Petitioners' speech—where "mere proof of publication" is all that is required to violate the law—is the hallmark of a prior restraint. *Near*, 283 U.S. at 709.

### b. The Act's prior restraint is invalid.

Prior restraints may be justified (at least on national security grounds) only by "direct, immediate, and irreparable damage to our Nation or its people." *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) ("*Pentagon Papers*") (Stewart, J., concurring). As one Justice in the *Pentagon Papers* case elaborated, there is an "extremely narrow class of cases in which the First Amendment's ban on prior judicial restraint may be overridden" on national security grounds: cases that arise "when the Nation 'is at war'" or when disclosure would "set in motion a nuclear holocaust." *Id.* at 726–27 (Brennan, J., concurring) (citation omitted). Accordingly, seeking to avert even *probable* danger or a threat that is less-than-grave is insufficient. *See Craig v. Harney*, 331 U.S. 367, 376 (1947). The evidence must show the need for urgent action. *See Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 845 (1978).

The Act, on its face, fails to meet these requirements.

40

*First*, the Act does not address any "immediate" danger. To the contrary, the Act allows TikTok to continue operations for at least nine months from enactment—including during the entirety of our upcoming election. This is so even though President Biden, who signed the Act, has said "[t]he stakes in this election couldn't be higher. What's at stake is nothing less than the fundamental ideal of America"[32] and "whether democracy is still America's sacred cause."[33] And the President has explained that foreign relations and national security are central aspects of this vital moment.[34] If TikTok can keep publishing during an election that may decide the fate of our democracy (indeed, if the President's own campaign thinks the app is sufficiently safe to use, *see supra* at 6), it is impossible to see how the app could constitute an immediate threat to national security. Nor is there any reason to believe TikTok would suddenly pose a sufficient threat to warrant the ban on January 19, 2025 (or 90 days thereafter, if the President opts to extend the period for divestiture).

———————————————

[32] Add. 402, *available at* https://tinyurl.com/5abbjw26.

[33] Add. 408, *available at* https://tinyurl.com/2d5ssb8c.

[34] Add. 414–18, *available at* https://tinyurl.com/4rjdfu5z.

41

*Second*, only "legislation by Congress, based on its own investigations and findings," can possibly justify imposing a prior restraint to respond to a national security threat. *Pentagon Papers*, 403 U.S. at 732 (White, J., concurring). Yet the Act contains no legislative findings that TikTok presents any sort of national security risk. By definition, therefore, there is no judicially cognizable "grave and irreparable danger" justifying the prior restraint it imposes. *See id.*

Even as to apps besides those operated by TikTok or ByteDance, the Act indicates that Congress believes an app can be shuttered based on "significant" national security concerns. Act § 2(g)(3)(B)(ii). That standard is lower than the "direct" and "irreparable damage" necessary to justify a prior restraint—something like the coordinates of a naval ship already at sea. *See Pentagon Papers*, 403 U.S. at 730 (Stewart, J., concurring). That is why the Supreme Court refused to enjoin publication of the Pentagon Papers—detailing the nation's involvement in the Vietnam War—even though Members of the Court were "confident" that their publication would do "substantial damage to public interests." *Id.* at 731 (White, J., concurring).

42

2.    **The Act otherwise cannot survive means-ends scrutiny.**

Even if the Act did not impose a prior restraint, it would still violate the First Amendment because the Act restricts speech and association, and the government cannot show these restrictions are tailored to serve any valid governmental interest.

a.    **The Act is subject to rigorous scrutiny.**

For several independent reasons, the Act is subject to strict—or at the very least, intermediate—scrutiny.

*First*, the Act singles out a distinctive medium and forum. When laws target specific media and fall upon "only a small number" of publishers, they are subject to strict scrutiny. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659–60 (1994) ("*Turner I*"). In *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), for example, the Supreme Court applied strict scrutiny to a law "target[ing] individual publications" for special taxation. *Id.* at 585, 592–93. Similarly, in *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987), the Court applied strict scrutiny to a selective tax regime that singled out particular media outlets (even without "burden[ing] the expression of particular *views* by specific magazines"). *Id.* at 230–31.

Both laws were suspect because their structure—identifying specific publishers for unfavorable tax treatment—risked suppressing certain ideas. *Turner I*, 512 U.S. at 660; *see also Grosjean*, 297 U.S. 233 (invalidating state law imposing tax on publications having weekly circulation of over 20,000 copies).

So, too, here. The Act singles out a category of speech platforms—those with a minimum number of users; those owned by a company that "present[s] a significant threat to the national security of the United States"; and those whose owner does not operate an app with a "primary purpose" of hosting reviews, *see* Act § 2(g)(2)(B)–(3)(B)—for disfavored treatment. And within that category, it isolates a single publisher, TikTok, for a more extreme form of disfavor: an outright ban without any legislative findings whatsoever. In doing so, the Act also singles out a specific group of content creators—Petitioners and other individuals in America who wish to post on TikTok—and prohibits them from engaging in the distinctive form of communal expression that is most important to them. *See supra* at 4–13, 33–37.

*Second*, strict scrutiny applies because the Act discriminates on the basis of content. The "government has no power to restrict expression

44

because of its message, its ideas, its subject matter, or its content." *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 790–91 (2011) (citation omitted); *see also Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.") (citation omitted).

Yet the Act imposes its restrictions solely on entities with apps that permit users to share content with one another. And for TikTok specifically, it goes further, expressly targeting TikTok and its content creators because of the substance of their creations. The Act excludes from its reach any company besides TikTok or ByteDance "that operates an [app or website] whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews." Act § 2(g)(2)(B). The Act also conditions any permissible divestiture on a finding that TikTok's new owner and publisher will not engage in "any cooperation with respect to the operation of a *content* recommendation algorithm," Act § 2(g)(6)(B) (emphasis added)—thereby targeting for extinction the very editorial presence on which Petitioners rely. These

45

content-based regulations trigger strict scrutiny. *Barr v. Am Ass'n of Political Consultants*, 591 U.S. 610, 618 (2020).

The Act is also content-based because those who enacted it repeatedly expressed concerns about the content and viewpoint of speech on TikTok. Even facially neutral laws restricting speech are deemed content-based when they were enacted "because of disagreement with the message [the speech at issue] conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also Reed v. Town of Gilbert*, 576 U.S. 155, 164 (similar). "The government's purpose is the controlling consideration" under this line of cases, *Ward*, 491 U.S. at 791, and courts can "infer censorial intent from legislative history and … invalidate laws so motivated," *News Am. Pub., Inc. v. FCC*, 844 F.2d 800, 809 (D.C. Cir. 1988).

Here, one Congress member after another supported the Act on the ground that they vehemently disagree with the "message" that they believe TikTok supports. For example, the Act's proponents claimed that TikTok "manipulate[s] the minds of Americans,"[35] disseminates propaganda that would "use our country's free marketplace to undermine

---

[35] 170 Cong. Rec. at H1169 (statement of Rep. Dan Crenshaw (TX)).

our love for liberty,"[36] enables China "to engage in psychological warfare against the American people,"[37] and should be banned precisely because it has become a "dominant news platform" to which young Americans increasingly turn for information.[38] This content-based focus is underscored by the Act's express limitation to apps the government believes are "controlled by a foreign *adversary*," *id.* § 2(g)(3)(B)(i) (emphasis added)—nomenclature that reflects Congress' purpose to target viewpoints (and only those viewpoints) supposedly "advers[e]" to U.S. interests. *Compare Meese v. Keene*, 481 U.S. 465, 469–70 (1987) ("The registration requirement is comprehensive, applying equally to agents of friendly, neutral, and unfriendly governments.").

Even if the Court were to hold that the Act were somehow exempt from strict scrutiny, the Act would at a minimum be subject to intermediate scrutiny. That is because it directly restricts the right to speak and associate, *see supra* at 23–37, and a law that does so must satisfy at least intermediate scrutiny. *See Turner I*, 512 U.S. at 662.

---

[36] Add. 347, *available at* https://tinyurl.com/tw8zdns5.
[37] Add. 349, *available at* https://tinyurl.com/mwaunwda.
[38] 170 Cong. Rec. at H1165 (statement of Rep. Mike Gallagher (WI)).

47

### b.    The Act fails any applicable level of First Amendment scrutiny.

Strict scrutiny requires the government to demonstrate that it has addressed a compelling interest through the least restrictive means to achieve that interest. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). Intermediate scrutiny requires the government to prove that the law serves a "substantial" government interest "unrelated to the suppression of free expression" that is "not merely conjectural"; would serve that interest in "a direct and material way"; is narrowly tailored to suppress no more speech than essential to further the interest; and leaves open ample alternative channels for speech. *Turner I*, 512 U.S. at 662, 664 (cleaned up); *see Tinius v. Choi*, 77 F.4th 691, 699 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 815 (2024). At bottom, the government must show that (1) its curtailment of speech actually advances a compelling or substantial interest; and (2) there is no means of serving that interest that would not impinge upon as much protected speech. The government cannot make this showing with respect to either of its purported interests.

48

1. **The government cannot justify the Act on the ground that it prevents foreign propaganda.**

The government cannot show that the Act is justified by a purported interest in preventing "misinformation, disinformation, and propaganda." H.R. Rep. No. 118-417, at 2 (2024). This concern, as articulated by certain legislators, appears to be grounded in a belief that "the CCP [Chinese Communist Party] has ultimate control of the algorithm which feeds the content of the platform."[39]

To start, suppressing content (or editorial involvement) from a foreign publisher is not a legally compelling or significant state interest. That is why, in *Lamont*, 381 U.S. 301, the government itself "expressly disavow[ed]" the notion that any such interest could justify censoring speech, *id.* at 309 (Brennan, J., concurring), and the Supreme Court held—at the height of the Cold War—that the government could not withhold mail containing communist propaganda, *id.* at 307. Doing so, a unanimous Court explained in no uncertain terms, was "at war with the 'uninhibited, robust, and wide open debate and discussion …

---

[39] Add. 344, *available at* https://tinyurl.com/ycxw6xpf (video timestamp at 0:39).

contemplated by the First Amendment.'" *Id.* at 302, 306–07 (internal quotation marks and citation omitted).

Here too, even if Congress believes foreign adversaries have the ability to shape the content American viewers see on TikTok,[40] the remedy is not to shut down TikTok. Quite the opposite: "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 97 (1977) (citation omitted).

Or, to use a modern example, Spotify is based in Sweden. Much like TikTok, that app is fueled by an algorithm that suggests music and podcasts to users, serves up playlists, recommends live shows, etcetera. Perhaps, theoretically, that mode of operation gives Spotify the power to push content to users that favors certain values or even political perspectives. (After all, many podcasts espouse political views, and music is a powerful medium known to influence people's perspectives.) But the First Amendment would never allow Congress to shut down Spotify for

---

[40] 170 Cong. Rec. at H1165 (statement of Rep. Frank Pallone (NJ)).

that reason. The marketplace of ideas leaves the curation of political content and evolution of musical taste to private choices.

Even if deterring foreign propaganda were a permissible reason to censor speech, that still would not save the Act. "Because the Government is defending a restriction on speech as necessary to prevent an anticipated harm, it must do more than 'simply posit the existence of the disease sought to be cured.'" *FEC v. Cruz*, 596 U.S. 289, 307 (2022) (citation omitted). "It must instead point to 'record evidence or legislative findings' demonstrating the need to address a special problem." *Id.* (citation omitted); *see also Playboy*, 529 U.S. at 822 (invaliding law under strict scrutiny due to "barren legislative record" supporting interest); *Turner II*, 520 U.S. at 196 (similar requirement under intermediate scrutiny).

The government has done nothing of the sort. Congress made no findings whatsoever to justify the Act. Nor did Congress rely on any evidence, much less substantial evidence, that could establish that the Act addresses any interest in fighting propaganda. The House Committee Report, for example, cites "[o]utside reporting" and "statements made by the Executive Branch regarding the tight interlinkages" between TikTok

51

and the CCP. H.R. Rep. No. 118-417, at 3. Such unsupported assertions are a far cry from what the First Amendment demands. *See, e.g.*, *Cruz*, 596 U.S. at 307–10 (finding insufficient "a few stray floor statements" and "a handful of media reports and anecdotes"). Even if they were concrete and formal, there is still no evidence that the Chinese government could or would use TikTok to spread propaganda.

What's more, a court may not assume that a law will "always advance the asserted state interests sufficiently to justify its abridgment of expressive activity." *City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 496 (1986) (citation omitted). The law must advance those interests "in a direct and material way." *Turner I*, 512 U.S. at 664. And that is impossible where the law is underinclusive—that is, when it targets only a portion of the speech that gives rise to the government's ostensible concerns. *See Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 193 (1999). All the more so where the law's omissions create an "irrational[]" and "puzzling … framework." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995).

The Act is irrational and puzzling in the extreme. TikTok is hardly alone in supplying videos to large U.S. audiences. Yet the Act does not

52

regulate any other apps that have reportedly been subject to foreign influence.[41] Nor does the Act even regulate content from foreign adversaries *themselves*. After the Act, as before, China, Russia, and other "foreign adversaries" may transmit content on state-owned media sites directly into this country. There is no plausible reason why federal law aimed at deterring propaganda should ban speech from American citizens on cooking, sports, and relationships, while allowing foreign adversaries themselves to transmit political content to U.S. viewers.

If that weren't enough of a head scratcher, there is more. Any other company that would otherwise be subject to a divestiture requirement can exempt itself from the Act's reach simply by creating another app whose primary purpose is product, travel, or business reviews. That is because the text of the exemption for hosting such reviews is keyed to "entit[ies] that operate[]" apps and websites, not apps or websites themselves. Act § 2(g)(2)(B). Even though TikTok could theoretically create an app for product reviews or the like—and even though TikTok hosts such reviews[42]—it does not have access to this safety valve.

---

[41] Add. 420–25, *available at* https://tinyurl.com/yc6kyv4u.
[42] *See, e.g.*, Cadet Decl. ¶ 4, Add. 9–10 (multimedia upload).

Finally, the government cannot show that the Act is narrowly tailored to advance any purported interest in squelching propaganda—much less that it is the least restrictive means to do so. Congress could, for example, have required that TikTok be more transparent about its content curation. Or the government could simply engage in speech of its own to counter any alleged foreign propaganda. *See Linmark Assocs*, 431 U.S. at 97. While some less dramatic measures might themselves trigger First Amendment problems, the existence of substantially more limited alternatives confirms that the Act's blunderbuss approach is not narrowly tailored.

The Act is also "vastly overinclusive." *Brown,* 564 U.S. at 804; *see also Sorrell*, 564 U.S. at 566 (law's overinclusiveness showed absence of tailoring under intermediate scrutiny). The Act bans not only TikTok but also CapCut, ByteDance's app that offers tools for editing videos. CapCut's tools can also be used to edit videos posted on platforms besides TikTok, or never posted at all. Such neutral tools cannot themselves threaten the government's purported interest in preventing propaganda.

54

### 2.    The government cannot justify the Act based on an interest in data security.

Nor can the government show that the Act survives scrutiny by asserting that the Act serves an interest in promoting data security.

To start, any data-security justification cannot itself support the Act. The Act's text provides that even a "qualified divestiture" would not enable TikTok to keep operating within the United States if the transaction allows the purchaser to obtain input from TikTok concerning the "content recommendation algorithm." Act § 2(g)(6)(B). Congress thus decided that, even if all purported data-security concerns were addressed, TikTok cannot continue operating as it currently exists. Only changes in how TikTok cultivates "content" will do.

Any data-security rationale also fails because any alleged concerns that China might obtain data to engage in espionage or the like are unproven. Even under intermediate scrutiny, speculation about risks is insufficient; otherwise, speech restrictions could "become essentially unreviewable." *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228–29 (9th Cir. 1990). But those who have defended the Act on data-security grounds appear to rely on mere speculation. Floor statements and an unclassified copy of a congressional briefing speak only in

55

hypotheticals, focusing on the "potential" for "abuse" and what the PRC "could" or "can" do.[43] And federal courts have found prior data-security concerns "factually unsupported." *Alario*, 2023 WL 8270811, at *10; *accord TikTok*, 507 F. Supp. 3d at 114–15 (no "specific evidence" of such threat); *TikTok*, 490 F. Supp. 3d at 85 (same). For the strong medicine of banning a global communication platform, the Act provides insufficient evidence of the claimed disease.

If, on the other hand, the government's data-security concerns had solid foundation in reality, the Act would be woefully underinclusive. "[I]t is well-established that other social media companies … collect similar data as TikTok, and sell that data to undisclosed third parties." *Alario*, 2023 WL 8270811, at *11. Even without TikTok, Congress members acknowledged that "China and other foreign adversaries will still be able to acquire vast amounts of Americans' data."[44]

---

[43] 170 Cong. Rec. at H1162 (statement of Rep. Nick Langworthy (NY)) and H1163 (statement of Rep. Anna Eshoo (CA)); *see also* Add. 427 ("Working through ByteDance, the PRC *could* use TikTok to access data on millions of U.S. users and control the software on millions of U.S. devices.") (emphasis added).

[44] 170 Cong. Rec. at H1165 (statement of Rep. Frank Pallone (NJ)).

Lastly, even if the government could show that the Act advanced genuine data-security interests, the Act is far from narrowly tailored to achieve those interests. *See United States v. Doe*, 968 F.2d 86, 90 (D.C. Cir. 1992) (applying narrow tailoring to speech restriction). Congress could have enacted a general consumer privacy statute that applies to all services that collect user data or created rules preventing companies from selling or providing user data to certain third parties.[45] Indeed, in the same omnibus package, Congress prohibited any data broker from selling, licensing, renting, trading, transferring, releasing, disclosing, providing access to, or otherwise making available personally identifiable sensitive data of an American citizen to any foreign adversary country or to any entity controlled by such a country. *See* Pub. L. No. 118-50, Div. I, § 2, 138 Stat. at 960.

Congress has also considered laws requiring, for example, TikTok to disclose to users purported data-security risks, annual reporting to the government regarding TikTok's data protection practices, and sanctions

---

[45] As Representative Greene put it, "If we cared about Americans' data, then we would stop the sale of Americans' data universally, not just with China." 170 Cong. Rec. at H1167 (statement of Rep. Marjorie Taylor Greene (GA)).

for any unauthorized transmission of American data to servers in China. *See, e.g.*, S. 4689 (116th Cong.); H.R. 4793 (117th Cong.); *cf.* H.R. 784 (118th Cong.); H.R. 750 (118th Cong.); H.R. 742 (118th Cong.); H.R. 4000 (117th Cong.); H.R. 3991 (117th Cong.); H.R. 1090 (117th Cong.); S. 47 (117th Cong.); H.R. 6570 (116th Cong.). Those are available alternatives that restrict far less speech.

TikTok itself has proposed alternatives to a ban. These include creating a U.S.-based subsidiary, providing government input into that subsidiary's board, housing sensitive U.S. user data in the United States, allowing oversight by Oracle (a U.S. corporation), and offering the government a shut-down option. *See, e.g.*, TikTok Br. at 15–17 (discussing Project Texas and alternatives proposed to Committee on Foreign Investment in the United States).[46] But the government has not suggested—in legislative findings or otherwise—that those alternatives are unworkable. That failure belies any assertion that the Act is narrowly tailored to address data-security concerns. *Cf. Sable Commc'ns, Inc. v. FCC*, 492 U.S. 115, 129 (1989) (invalidating law where "record contain[ed] no legislative findings" showing "no constitutionally

---

[46] *See also* Add. 327–33, *available at* https://tinyurl.com/2rkmwyuw.

acceptable less restrictive means, short of a total ban, to achieve" government interest).

### 3. The Act does not leave open ample channels of communication.

Finally, to the extent intermediate scrutiny applies, the Act violates the First Amendment because the government cannot show it leaves open to Petitioners adequate alternatives to TikTok. *Ward*, 491 U.S. at 797–800; *see also Linmark*, 431 U.S. at 93 (less effective media to communicate are unsatisfactory). In *City of Ladue*, for instance, the city defended a ban on residential signs on the ground that "residents remain free to convey their desired messages by other means." 512 U.S. at 56. The Court rejected that argument because it was "not persuaded that adequate substitutes exist for the important medium of speech." *Id.*; *see also Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 524–25 (D.C. Cir. 2010) (law requiring permit to distribute written materials in national parks failed to leave open ample alternatives despite option to distribute on other property nearby); *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1310 (D.C. Cir. 2005) (prohibition on soliciting signatures on Postal Service property did not leave open ample

alternatives "because it is...not enough that petitioners may solicit signatures at other locations" (citation omitted)).

Likewise here, the Act precludes Petitioners from using their primary method of engaging with audiences they cannot reconstitute elsewhere. Communicating through TikTok has unique expressive meaning for Petitioners, and TikTok is an irreplaceable medium and forum for expression. *See supra* 24–37. Even a divested TikTok (if that were possible) would not supply an adequate alternative. *Supra* at 38–40.

### C. Even if the Act legitimately restricted some speech, its total ban would still be overbroad.

The Act independently violates the First Amendment because it is overbroad. The Constitution prohibits "overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). A law is "overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted). It thus is not enough for a ban to have some legitimate applications. *City of Houston v. Hill*,

482 U.S. 451, 458–59 (1987). If it suppresses a substantial amount of protected speech, it is invalid. *Id.* at 465–66.

Applying the overbreadth doctrine, the Supreme Court has repeatedly invalidated absolute bans. In *Lovell v. City of Griffin*, 303 U.S. 444 (1938), for instance, the Court invalidated an ordinance banning "every sort of circulation" of printed material within a city's limits. *Id.* at 451. And in *Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus*, 482 U.S. 569, 574–75 (1987), the Court enjoined a ban on all First Amendment activities in the Central Terminal Area of the Los Angeles International Airport. Given the sheer volume of speech disseminated through online media—on topics "as diverse as human thought"—the Court has also explained that the overbreadth doctrine applies especially forcefully to laws targeting online communications. *Reno*, 521 U.S. at 852, 863.

Under these principles, the Act unquestionably bans a substantial array of protected speech, in relation to any legitimate applications. Petitioners, like hundreds of millions of other Americans, create, share, and view content that has nothing to do with the Act's apparent content-based concerns. Even President Biden and other elected officials continue

61

to post content on TikTok. *See supra* at 6. So even if some small amount of expression on the platform could be suppressed, that would still not justify prohibiting the diverse speech on the app that does not "remotely threaten[]" the government's interests. *Boardley,* 615 F.3d at 521–23.

That the Act primarily bans only one medium, leaving Petitioners and other speakers able to express themselves in other ways, does not save it from overbreadth. *Jews for Jesus* held a single-forum ban—applying only to one area of an airport—overbroad even though the affected speakers could communicate elsewhere. 482 U.S. at 574–75. If "a law prohibiting 'all protected expression' at a single airport is not constitutional, it follows with even greater force that the State may not enact [a] complete bar to the exercise of First Amendment rights on websites" singled out by statute. *Packingham*, 582 U.S. at 109 (citation omitted).

## II.    The Court Should Enter a Permanent Injunction.

A permanent injunction is warranted where plaintiffs satisfy four factors: (1) they will suffer "an irreparable injury"; (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction." *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57, 162 (2010) (citation omitted). Courts have found these factors supported injunctive relief against prior attempts to ban TikTok. *See, e.g.*, *Marland*, 498 F. Supp. 3d at 641–43; *Alario*, 2023 WL 8270811, at *17–18; *TikTok*, 490 F. Supp. 3d at 84–85; *TikTok*, 507 F. Supp. 3d at 113–15. All four factors are present here as well.

*First*, Petitioners will suffer irreparable harm absent an injunction. The Act will shutter Petitioners' preferred medium and forum for expression and deprive them of their right to choose TikTok as their editor and publisher. *See supra* at 27–41; Martin Decl. ¶¶ 14–17, Add. 41–43; Sexton Decl. ¶¶ 12–15, Add. 48–51; Spann Decl. ¶¶ 15–17, Add. 60–61; Townsend Decl. ¶¶ 13–18, Add. 69–72; King Decl. ¶¶ 12–14, Add. 33–34; Tran Decl. ¶¶ 13–14, Add. 79–80; Firebaugh Decl. ¶¶ 14–18, Add. 24–27; Cadet Decl. ¶¶ 14–15, Add. 15–16. This "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Petitioners will also suffer irreparable economic harm. *See* Martin Decl. ¶¶ 10, 14–

63

15, Add. 39, 41–42 (loss of brand deals and income from TikTok Creator Fund); Spann Decl. ¶ 9, Add. 56 (same); Firebaugh Decl. ¶¶ 11–13, Add. 23–24; Tran Decl. ¶¶ 6, 13, Add. 75, 79–80 (loss of income through TikTok Shop and other business opportunities); Sexton Decl. ¶¶ 8, 14, Add. 46–47, 50 (loss of free, effective marketing for cookie business); King Decl. ¶ 9, Add. 32; *see also, e.g.*, *Marland*, 498 F. Supp. 3d at 641–42 (TikTok ban would cause creators to suffer irreparable financial harm by shutting down their influencing activities); *Alario*, 2023 WL 8270811, at *17 (same).

*Second*, no remedy available at law can redress these injuries. Monetary damages are unavailable "where, as here, the defendant is entitled to sovereign immunity," *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 251 (5th Cir. 2023), *rev'd on other grounds*, *FDA v. All. for Hippocratic Med.,* 602 U.S. ----, 2024 WL 2964140 (June 13, 2024). And in any event, "monetary damages are inadequate to compensate for the loss of First Amendment freedoms." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (citing *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004)).

64

*Third and fourth*, equity and the public interest—which merge where the government is the party opposing injunctive relief, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—support an injunction because "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (collecting cases). As this Court has held, "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). That is particularly true where, as here, enforcement would infringe the rights of not only Petitioners but also others subject to the same restrictions. *See Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009); *TikTok*, 490 F. Supp. 3d at 84 ("courts consider the impacts of the injunction on nonparties as well").

The Act prohibits protected speech and denies access to a vital forum "integral to the fabric of our modern society and culture." *Packingham*, 582 U.S. at 109. All four factors weigh strongly in favor of an injunction.

## CONCLUSION

For these reasons, the Court should enjoin the Act. Alternatively, if

the Court believes further briefing or fact finding is necessary to determine whether the Act is constitutional, it should enter a preliminary injunction and order further proceedings as appropriate.


Dated: June 20, 2024

Respectfully submitted,

*/s/ Ambika Kumar*
Ambika Kumar
Tim Cunningham
Xiang Li
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
(206) 757-8030
ambikakumar@dwt.com
timcunningham@dwt.com
xiangli@dwt.com

Elizabeth A. McNamara
Chelsea T. Kelly
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 489-8230
lizmcnamara@dwt.com
chelseakelly@dwt.com

James R. Sigel
Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
50 California Street, Suite 2300
San Francisco, California 94111

Jeffrey L. Fisher
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, California 94025
(650) 473-2633
jlfisher@omm.com

Joshua Revesz
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5261
jrevesz@omm.com

(415) 276-6500
jamessigel@dwt.com
adamsieff@dwt.com

*Attorneys for Creator Petitioners*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit set by the Court's order of May 28, 2024, because this brief contains 12,803 words, excluding the parts of the brief exempted by Fed. R. App. 32(f).

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Century font.

Dated: June 20, 2024                    Respectfully submitted,

                                        */s/ Ambika Kumar*
                                        Ambika Kumar
                                        DAVIS WRIGHT TREMAINE LLP
                                        920 Fifth Avenue, Suite 3300
                                        Seattle, Washington 98104
                                        (206) 757-8030
                                        ambikakumar@dwt.com

                                        *Counsel for Creator Petitioners*