PUBLIC APPENDIX—
**SEALED MATERIAL IN SEPARATE SUPPLEMENT**
ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024
No. 24-1113 (and consolidated cases)

IN THE

# United States Court of Appeals
## for the District of Columbia Circuit

———————

TIKTOK INC. and BYTEDANCE LTD.

*Petitioners*,

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,

*Respondent.*

———————

*caption continued on inside cover*

———————

On Petitions for Review of Constitutionality of
the Protecting Americans from Foreign Adversary Controlled
Applications Act

———————

**APPENDIX TO BRIEF OF PETITIONERS
TIKTOK INC. AND BYTEDANCE LTD.
Volume I of III (Pages 1–260)**

———————

Andrew J. Pincus
Avi M. Kupfer
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3220
apincus@mayerbrown.com

*Counsel for Petitioners
TikTok Inc. and ByteDance Ltd.
(continued on inside cover)*

Alexander A. Berengaut
 *Counsel of Record*
David M. Zionts
Megan A. Crowley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com

BRIAN FIREBAUGH et al.,

*Petitioners*,

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent.*

_____

BASED Politics Inc.,

*Petitioner*,

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent.*

John E. Hall
Anders Linderot
S. Conrad Scott
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

# TABLE OF CONTENTS

## Volume I

H.R. Comm. on Energy & Com., *Protecting Americans from Foreign Adversary Controlled Applications Act*, H.R. Rep. No. 118-417 (2024) ..................................................................... 1

*Legislation to Protect American Data and National Security from Foreign Adversaries: Hearing Before the Comm. on Energy & Com.*, 118th Cong. (2024) (excerpts) ...................................................... 19

170 Cong. Rec. H1164 (daily ed. Mar. 13, 2024)................................... 39

170 Cong. Rec. S2629 (daily ed. Apr. 8, 2024) (excerpts) ...................... 48

170 Cong. Rec. H2561 (daily ed. Apr. 20, 2024) (excerpts) ................... 71

170 Cong. Rec. S2943 (daily ed. Apr. 23, 2024) (excerpts) .................... 98

Declaration of Alexander A. Berengaut................................................ 148

    Ex. A: Document Entitled "Threat Posed by TikTok (Department of Justice - March 6, 2024)"................................... 155

    Ex. B: Draft National Security Agreement (Aug. 23, 2022) (redacted version; full version filed under seal) .......................... 157

## Volume II

Declaration of Alexander A. Berengaut (continued)

    Ex. C: Governance Presentation to CFIUS (Sept. 17, 2021) ........... 261

    Ex. D: Protected Data Presentation to CFIUS (Oct. 13, 2021) (redacted version; full version filed under seal) .......................... 277

    Ex. E: Content Moderation Presentation to CFIUS (Nov. 29, 2021) ..................................................................................... 306

    Ex. F: Source Code Presentation to CFIUS (Nov. 30, 2021) (redacted version; full version filed under seal) .......................... 339

Ex. G: Content Assurance Process Summary (Apr. 26, 2022) ......... 357

Ex. H: Letter from D. Fagan and M. Leiter to Hon. W. Adeyamo (Dec. 28, 2022) ................................................................. 359

Ex. I: Letter from E. Andersen to Hon. W. Adeyamo and Hon. L. Monaco (Feb. 25, 2023) ........................................... 363

Ex. J: Email Exchange Between D. Fagan and M. Leiter and B. Reissaus (Mar. 2023) ................................................... 366

Ex. K: Email from D. Fagan and M. Leiter to B. Reissaus (Apr. 27, 2023) ........................................................... 372

Ex. L: NSA Updates Presentation to CFIUS (May 23, 2023) .......... 374

Ex. M: NSA Updates Presentation to CFIUS (Sept. 8, 2023) .......... 385

Ex. N: Letter from D. Fagan and M. Leiter to D. Newman (Apr. 1, 2024) (redacted version; full version filed under seal) ............ 412

## Volume III

Declaration of Alexander A. Berengaut (continued)

Ex. O: Nicholas Kaufman et al., U.S.-China Econ. & Sec. Rev. Comm'n, Shein, Temu, and Chinese e-Commerce: Data Risks, Sourcing Violations, and Trade Loopholes (Apr. 14, 2023) ................................................................. 530

Ex. P: Statements by Members of Congress ................................... 540

Transcript of Interview with Rep. Mike Gallagher, Fox News (Nov. 16, 2023) ........................................... 541

House Comm. on the Chinese Communist Party, Press Release, Gallagher, Bipartisan Coalition Introduce Legislation to Protect Americans from Foreign Adversary Controlled Applications, Including TikTok (Mar. 5, 2024) .................................................... 544

Transcript of Interview with Reps. Mike Gallagher and Krishnamoorthi, CNN (Mar. 7, 2024)...................................548

Sen. Tom Cotton (@SenTomCotton), X, https://x.com/SenTomCotton/status/1766875766111732082, https://perma.cc/UY6H-4ZCY (Mar. 10, 2024) ...................553

Transcript of Interview with Rep. Raja Krishnamoorthi, Meet the Press (Mar. 12, 2024)...........................................554

Sapna Maheshawri et al., *House Passes Bill to Force TikTok Sale from Chinese Owner or Ban the App*, N.Y. Times (Mar. 13, 2024) ...........................................558

Transcript of Interview with Sen. Mark Warner, Fox News (Mar. 14, 2024) (excerpts) .........................................565

Transcript of Interview with Rep. Mike Gallagher, Fox News (Mar. 16, 2024) ...........................................572

Jane Coaston, *What the TikTok Bill Is Really About, According to a Leading Republican*, N.Y. Times (Apr. 1, 2024)........................................................577

Sapna Maheshwari et al., *'Thunder Run': Behind Lawmakers' Secretive Push to Pass the TikTok Bill*, N.Y. Times (Apr. 24, 2024)...................................584

Transcript of Keynote Conversation Between Secretary of State Anthony Blinken and Sen. Mitt Romney, McCain Institute (May 3, 2024) (excerpts) .......................593

Prem Thakker et al., *In No Labels Call, Josh Gottheimer, Mike Lawler, and University Trustees Agree: FBI Should Investigate Campus Protests*, The Intercept (May 4, 2024) (excerpts).......................................597

Transcript of Interview with Rep. Elise Stefanik, Maria Bartiromo (May 5, 2024) (excerpts) ......................599

iii

Sen. John Fetterman (@SenFettermanPA), X,
        https://x.com/SenFettermanPA/status/
        1787891840022139280, https://perma.cc/2BW9-Z78H
        (May 7, 2024) .................................................................. 609

Ex. Q: Paul Mozur et al., *TikTok Deal Is Complicated by New
        Rules From China Over Tech Exports*, N.Y. Times
        (Aug. 29, 2020) .............................................................. 610

Ex. R: Xinhua News Agency, *Planned TikTok Deal Entails
        China's Approval Under Revised Catalogue: Expert*,
        XinhuaNet (Aug. 30, 2020) ........................................... 614

Ex. S: Letter from Sen. Charles E. Schumer (Apr. 5, 2024) ........... 617

Ex. T: Rachel Dobkin, *Mike Johnson's Letter Sparks New Flood
        of Republican Backlash*, Newsweek (Apr. 17, 2024) ................. 620

Ex. U:  Regulation (EU) 2022/2065 of the European Parliament
        and of the Council of 19 October 2022 on a Single Market
        For Digital Services and amending Directive 2000/31/EC
        (Digital Services Act) (excerpts) ..................................... 625

        European Commission, *DSA: Very Large Online Platforms
            and Search Engines*, https://digital-strategy. ec.
            europa. eu/en/policies/dsa-vlops, https://perma.cc/49D9-
            F2UZ (last accessed June 17, 2024) ................................. 626

        Digital Services Act, 2022 O.J. (L 277) (excerpts) ................. 632

Declaration of Randal S. Milch ............................................ 643

Ex. 1: Summary of Divestitures Reviewed .................................. 688

Appx. A: Curriculum Vitae ................................................. 705

Appx. B: Examples of Verizon's Divestitures of Highly
        Integrated Assets ....................................................... 711

Declaration of Christopher P. Simkins .................................... 719

Appx. 1: Curriculum Vitae ................................................. 758

iv

Declaration of Steven Weber .................................................. 760

 Appx. 1: Curriculum Vitae .............................................. 790

Declaration of Adam Presser ............................................... 799

| 118TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT 118–417 |
|---|---|---|

# PROTECTING AMERICANS FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS ACT

MARCH 11, 2024.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mrs. RODGERS of Washington, from the Committee on Energy and Commerce, submitted the following

# R E P O R T

[To accompany H.R. 7521]

The Committee on Energy and Commerce, to whom was referred the bill (H.R. 7521) to protect the national security of the United States from the threat posed by foreign adversary controlled applications, such as TikTok and any successor application or service and any other application or service developed or provided by ByteDance Ltd. or an entity under the control of ByteDance Ltd., having considered the same, reports favorably thereon without amendment and recommends that the bill do pass.

## CONTENTS

| | Page |
|---|---|
| Purpose and Summary | 2 |
| Background and Need for Legislation | 2 |
| Committee Action | 12 |
| Committee Votes | 12 |
| Oversight Findings and Recommendations | 14 |
| New Budget Authority, Entitlement Authority, and Tax Expenditures | 14 |
| Congressional Budget Office Estimate | 14 |
| Federal Mandates Statement | 14 |
| Statement of General Performance Goals and Objectives | 14 |
| Duplication of Federal Programs | 14 |
| Related Committee and Subcommittee Hearings | 14 |
| Committee Cost Estimate | 15 |
| Earmark, Limited Tax Benefits, and Limited Tariff Benefits | 15 |
| Advisory Committee Statement | 15 |
| Applicability to Legislative Branch | 15 |
| Section-by-Section Analysis of the Legislation | 15 |
| Changes in Existing Law Made by the Bill, as Reported | 18 |

49–006

2

PURPOSE AND SUMMARY

Communications applications that are owned and operated by companies controlled by foreign adversary countries present a clear threat to the national security of the United States. This is because such applications can be used by those countries to collect vast amounts of data on Americans, conduct espionage campaigns, and push misinformation, disinformation, and propaganda on the American public.

The United States has, for more than 100 years, restricted foreign governments and persons from owning media outlets and holding broadcast licenses. However, current law does not address the situation where a foreign adversary country has significant control over a company that operates a technology application, even where such application poses a significant threat to national security.

H.R. 7521, the "Protecting Americans from Foreign Adversary Controlled Applications Act" protects Americans from national security risks posed certain by applications controlled by a foreign adversary of the United States. If an application is determined to be a foreign adversary controlled application, such as TikTok's parent company ByteDance, the application must be divested so that is no longer in the foreign adversary's control. If the application is not divested within 180 days, entities in the United States would be prohibited from distributing the application through an application marketplace or store, and from providing web hosting services. The 180 days would begin upon enactment of the legislation for ByteDance, TikTok, and other subsidiaries; for other foreign adversary controlled applications, the 180 days begins after a Presidential determination that the application poses a significant threat to national security. The legislation includes a requirement that foreign adversary controlled applications provide users, upon request, information related to the user's account, including photos, videos, and posts, in a machine-readable format. This Act addresses the immediate national security risks posed by TikTok and establishes a framework for the Executive Branch to protect Americans from future foreign adversary controlled applications.

BACKGROUND AND NEED FOR LEGISLATION

Communications technologies and networks underpin the daily lives of the American public and economy. Foreign adversaries have used access to Americans' data, communications networks, devices, and applications as entry points to disrupt Americans' daily lives, conduct espionage activities, and push disinformation and propaganda campaigns in an attempt to undermine our democracy and gain worldwide influence and control. This is all a detriment to our national security interests.

One such adversary that has aggressively pursued this strategy is the People's Republic of China (PRC). It has backed hackers to disrupt our communications networks [1] and used "deceptive and coercive methods" to shape global information. As described by the U.S. Department of State, its goals are to promote "digital authoritarianism." [2] They have accomplished some of these goals

---

[1] https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-038a.
[2] https://www.state.gov/gec-special-report-how-the-peoples-republic-of-china-seeks-to-reshape-the-global-information-environment/.

**APP-2**

3

through coercion of companies headquartered in the PRC. One way it does so is through its National Intelligence Law of 2017, which requires PRC individuals and entities to support PRC intelligence services, including by providing data without regard to where that data was collected and without any mechanism of due process.[3]

Beijing ByteDance Technology is a Chinese internet technology company headquartered in Beijing and operating in the United States through a holding company ("ByteDance Ltd.") incorporated in the Cayman Islands.[4] ByteDance Ltd., founded and headquartered in Beijing, was formed in 2012 and launched a number of applications and products which became extremely popular, including TikTok.[5]

TikTok is now one of the most popular social media platforms in the world. It is available in over 150 countries and serves over 1 billion users.[6] In the United States, TikTok has over 170 million users and is especially popular among teenagers and young adults who represent 35 percent of its American user base.[7]

Foreign adversary controlled applications present a clear threat to the national security of the United States. This includes TikTok due to ByteDance, Ltd.'s ownership of the application.[8]

Outside reporting has indicated the breadth of TikTok's reach, suggesting that its data collection practices extend to age, phone number, precise location, internet address, device used, phone contacts, social network connections, the content of private messages sent through the application, and videos watched.[9] The risk posed by TikTok though is exacerbated by the difficulty in assessing precisely which categories of data it collects. For example, outside researchers have found embedded vulnerabilities that allow the company to collect more data than the app's privacy policy indicates.[10]

Additionally, public reporting has repeatedly confirmed statements made by the Executive Branch regarding the tight interlinkages between ByteDance Ltd., TikTok, and the Chinese Communist Party (CCP). For example, the Secretary of ByteDance Ltd.'s CCP committee, Zhang Fuping, also serves as ByteDance Ltd.'s Editor-in-Chief and Vice President and has vowed that the CCP committee would "take the lead" across "all product lines and business lines," which includes TikTok.

---

[3] U.S. Department of Homeland Security, Office of Strategy, Policy & Plans, Data Security Business Advisory: Risks and Considerations for Businesses Using Data Services and Equipment From Firms Linked to the People's Republic of China at 6 (December 22, 2020), https://www.dhs.gov/sites/default/files/publications/20_1222_data-security-business-advisory.pdf.

[4] Beijing ByteDance Technology and its Cayman Island holding company, ByteDance Ltd., will interchangeably be referred to as "ByteDance."

[5] Joe Tidy and Sophia Smith Galer, *TikTok: The story of a social media giant*, BBC News (5 August 2020), https://www.bbc.com/news/technology-53640724.

[6] *TikTok Statistics For 2024: Users, Demographics, Trend*, What's The Big Data (Nov. 29, 2023), https://whatsthebigdata.com/tiktok-statistics/.

[7] Jamie Ding, *Why TikTok is dangerously good at making you spend money*, L.A. Times (Dec. 3, 2023), https://www.latimes.com/business/story/2023-12-03/why-tiktok-is-dangerously-good-at-making-you-spend-money.

[8] Judy Woodruff, *CIA Director Bill Burns on War in Ukraine, Intelligence Challenges Posed by China*, PBS (Dec. 16, 2022, 6:50 P.M.), https://www.pbs.org/newshour/show/cia-director-bill-burns-on-war-in-ukraine-intelligence-challenges-posed-by-china.

[9] Geoffrey A. Fowler, *Is it time to delete TikTok? A guide to the rumors and the real privacy risks*, Wash. Post (July 13, 2020), https://www.washingtonpost.com/technology/2020/07/13/tiktok-privacy/. *See also Office of the Director of National Intelligence, National Counterintelligence and Security Center, "Operations Security (OPSEC) Advisory, TikTok Concerns and Vulnerabilities"* (Mar. 2023), https://www.dni.gov/files/NCSC/documents/nittf/OPSEC_Advisory_TikTok_Concerns_and_Vulnerabilities.pdf.

[10] Fowler, *supra* note 2.

4

Moreover, pursuant to the PRC's laws, the PRC can require a company headquartered in the PRC to surrender all its data to the PRC, making companies headquartered there an espionage tool of the CCP:

- The National Intelligence Law, passed in China in 2017, requires that "any organization" must assist or cooperate with CCP intelligence work.[11] Such assistance or cooperation must also remain secret at the PRC's request.[12]
- The PRC's 2014 Counter-Espionage Law requires that "relevant organizations . . . may not refuse" to collect evidence for an investigation.[13]
- The PRC's Data Security Law of 2021 establishes that the PRC has the power to access and control private data.[14]
- The PRC's Counter-Espionage Law grants PRC security agencies nearly unfettered discretion, if acting under an unrestricted understanding of national security, to access data from companies.[15]

As a result, the Department of Homeland Security has warned that "[t]he PRC's data collection actions result innumerous risks to U.S. businesses and customers, including: the theft of trade secrets, of intellectual property, and of other confidential business information; violations of U.S. export control laws; violations of U.S. privacy laws; breaches of contractual provisions and terms of service; security and privacy risks to customers and employees; risk of PRC surveillance and tracking of regime critics; and reputational harm to U.S. businesses."[16] These risks are imminent, but other, unforeseen risks may also exist.

Prior to 2022, several federal agencies, including the Departments of Defense, State, and Homeland Security, issued orders banning TikTok on devices for which those specific agencies are responsible.[17] A majority of states in the United States have banned TikTok on state government devices due to the national security threat posed by the application under its current ownership.[18]

As has been widely reported, TikTok. has proposed an alternative to a ban, a proposal referred to as "Project Texas," which is an initiative to try and satisfy concerns relating to TikTok's handling of U.S. user data. This proposal was rolled out in July 2022. Under the proposal, U.S. user data would be stored in the United States, using the infrastructure of a trusted third party.[19] How-

---

[11] Joe McDonald & Zen Soo, *Why Does US See Chinese-Owned TikTok as a Security Threat?*, AP News (Mar. 24, 2023, 10:24 A.M.), https://apnews.com/article/tiktok-bytedance-shou-zi-chew-8d8a6a9694357040d484670b7f4833be.

[12] U.S. Department of Homeland Security, Office of Strategy, Policy & Plans, Data Security Business Advisory: Risks and Considerations for Businesses Using Data Services and Equipment From Firms Linked to the People's Republic of China at 6 (December 22, 2020), https://www.dhs.gov/sites/default/files/publications/20_1222_data-security-business-advisory.pdf/.

[13] McDonald & Soo, *infra* note 5.

[14] Code Civil, Data Security Law of the People's Republic of China, 2021, art (China).

[15] Library of Congress, China: Counterespionage Law Revised, https://www.loc.gov/item/global-legal-monitor/2023-09-21/china-counterespionage-law-revised/.

[16] Data Security Business Advisory, *supra* note 6.

[17] *See, e.g.*, Neil Vigdor, "U.S. Military Branches Block Access to TikTok App Amid Pentagon Warning," N.Y. Times (Jan. 4, 2020), https://www.nytimes.com/2020/01/04/us/tiktok-pentagon-military-ban.html.

[18] Sawdah Bhainmiya, *Here's a full list of the US states that have introduced full or partial TikTok bans on government devices over mounting security concerns*, Business Insider (Jan. 15, 2023, 5:00 AM), https://www.businessinsider.com/tiktok-banned-us-government-state-devices-2023-1.

[19] TikTok Response to Sen Blackburn, June 30, 2022, https://www.blackburn.senate.gov/services/files/A5027CD8-73DE-4571-95B0-AA7064F707C1, p.2.

5

ever, under the initiative, the application algorithm, source code, and development activities would remain in China under ByteDance Ltd.'s control and subject to PRC laws, subject to proposed safeguards relating to cloud infrastructure and other data security concerns. Project Texas would also allow ByteDance Ltd. to continue to have a role in certain aspects of TikTok's U.S. operations.[20]

Additionally, Project Texas would allow TikTok to continue to rely on the engineers and back-end support in China to update its algorithms and the source code needed to run the TikTok application in the U.S.[21] But allowing code development in and access to U.S. user data from China potentially exposes U.S. users to malicious code, backdoor vulnerabilities, surreptitious surveillance, and other problematic activities tied to source code development. Furthermore, allowing back-end support, code development, and operational activities to remain in China would also require TikTok to continue to send U.S. user data to China to update the machine learning algorithms and source code for the application, and to conduct related back-end services, like managing users' accounts.[22]

As of March 2024, Project Texas has not been completed. Until Project Texas is complete, Beijing-based employees of TikTok can access U.S. user data.[23]

Finally, as TikTok's popularity continues to grow in the United States, so does the risk it poses. Attempted action by the Executive Branch to mitigate these risks has proven unsuccessful, and therefore Congress must act to provide congressional authority to protect U.S. national security.

Congress has previously taken such action with respect to media companies in passing the Communications Act of 1934, which limits foreign investment in television and radio broadcast licenses.[24] These foreign ownership restrictions were originally adopted to protect national security interests during wartime by preventing the airing of foreign propaganda on broadcast stations.[25] Today, applications like TikTok operate in similar manner as other media companies in the United States, and therefore they should be subject to foreign ownership scrutiny too.

Below is a list of public statements that have been made regarding the national security risks posed by ByteDance Ltd., TikTok, and the CCP as well as past and ongoing actions being taken to mitigate the national security risks associated with these entities and similarly situated companies:

- In May 2019, in connection with a review by the Committee on Foreign Investment in the United States (CFIUS), a company based in the PRC agreed to divest its interest in a popular software application reportedly due to concerns relat-

---

[20] *See, e.g.,* TikTok v. Trump, 490 F.Supp.3d 73 (D.D.C. Sept. 27, 2020); *Marland v. Trump, 20–cv–04597 (E.D. Pa. Sept. 18, 2020).*

[21] *Id.,* p.3-5.

[22] *See, e.g.,* Emily Baker White, EXCLUSIVE: TikTok Spied On Forbes Journalists, Forbes (December 22, 2022), https://www.forbes.com/sites/emilybaker-white/2022/12/22/tiktok-tracks-forbes-journalists-bytedance/?sh=68c05b5d7da5.

[23] Christianna Silva, What is Project Texas, TikTok's Best Chance to Avoid a Deal, Mashable (March 28, 2023), https://mashable.com/article/project-texas-tiktok.

[24] 47 U.S.C. 310(b).

[25] *In re Commission Policies and Procedures Under Section 310(b)(4) of the Communications Act, Foreign Investment in Broadcast Licenses,* 28 FCC Rcd 16244 (2013), https://www.fcc.gov/document/fcc-clarifies-policy-foreign-investment-broadcast-licensees-0.

6

ing to potential access by the PRC to American user data from the application.[26]

• On May 15, 2019, the President of the United States (President) issued an Executive Order on Securing the Information and Communications Technology and Services Supply Chain, which stated that "unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries . . . constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."[27]

• On August 2, 2020, then-Secretary of State Mike Pompeo stated that PRC-based companies "are feeding data directly to the Chinese Communist Party, their national security apparatus."[28]

• On August 6, 2020, the President concluded that TikTok "automatically captures vast swaths of information from its users" and that TikTok's ownership by ByteDance Ltd. enables the PRC and CCP to gain access to "Americans' personal and proprietary information," potentially allowing the CCP "to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage."[29]

• On August 6, 2020, the President issued an Executive Order (E.O. 13942) that directed the Secretary of Commerce to take actions that would have prohibited certain transactions related to TikTok in 45 days if ByteDance failed to divest its ownership of TikTok.[30] The companies and content creators using the TikTok mobile application filed lawsuits challenging those prohibitions, as a result of which two district courts issued preliminary injunctions enjoining the prohibitions.[31]

• On August 14, 2020, the President found "there is credible evidence . . . that ByteDance Ltd. . . . might take action that threatens to impair the national security of the United States."[32]

• On August 14, 2020, the President issued an Executive Order directing ByteDance Ltd. to divest any assets or property used to enable or support ByteDance Ltd.'s operation of the TikTok application in the United States and any data ob-

---

[26]Zack Whittaker, *Grindr sold by Chinese owner after US raised national security concerns, Tech Crunch.* (March 6, 2020, 1:06 PM), https://techcrunch.com/2020/03/06/grindr-sold-china-national-security/.

[27]Exec. Order No. 13,873, 84 FR 22689 (May 15, 2019), https://www.federalregister.gov/documents/2019/05/17/2019-10538/securing-the-information-and-communications-technology-and-services-supply-chain.

[28]Ronn Blitzer, *Pompeo Warns TikTok Users' Personal Info Could Be Going 'Directly to the Chinese Communist Party*, Fox News (Aug. 2, 2020, 12:39 P.M.), https://www.foxnews.com/politics/pompeo-warns-tiktok-users-data-including-facial-pattern-residence-phone-number-could-be-going-directly-to-the-chinese-communist-party.

[29]Exec. Order No. 13,942, 85 Fed. Reg. 48,637 (Aug. 6, 2020), https://www.federalregister.gov/documents/2020/08/11/2020-17699/addressing-the-threat-posed-by-tiktok-and-taking-additional-steps-to-address-the-national-emergency (revoked by Exec. Order No. 14,034 (June 9, 2021), https://www.federalregister.gov/documents/2021/06/11/2021-12506/protecting-americans-sensitive-data-from-foreign-adversaries).

[30]Exec. Order No. 13942, 85 Fed. Reg. 51297 (Aug. 6, 2020).

[31]*See, e.g., TikTok v. Trump*, 490 F.Supp.3d 73 (D.D.C. Sept. 27, 2020); *Marland v. Trump, 20-cv-04597 (E.D. Pa. Sept. 18, 2020).*

[32]Order of August 14, 2020, 85 Fed. Reg. 51,297 (Aug. 19, 2020), https://www.govinfo.gov/content/pkg/FR-2020-08-19/pdf/2020-18360.pdf.

7

tained or derived from TikTok application or musical.ly application users in the United States.[33] The Order, however, remains the subject of litigation.

• On September 17, 2020, the Department of Commerce concluded that the PRC, to advance "its intelligence-gathering and to understand more about who to target for espionage, whether electronically or via human recruitment," is constructing "massive databases of Americans' personal information" and that ByteDance Ltd. has close ties to the CCP, including a cooperation agreement with a security agency and over 130 CCP members in management positions.[34]

• Following the multiple judicial rulings that enjoined the Executive Branch from enforcing the regulations contemplated in E.O. 13942, on June 9, 2021, the President issued a new Executive Order that rescinded E.O. 13942 and directed the Secretary of Commerce to assess and take action, where possible, against connected software applications that pose a threat to national security more broadly.[35]

• On June 9, 2021, the President issued an Executive Order on Protecting Americans' Sensitive Data from Foreign Adversaries, which stated that "[f]oreign adversary access to large repositories of United States persons' data also presents a significant risk."[36] The EO stated that "the United States must act to protect against the risks associated with connected software applications that are designed, developed, manufactured, or supplied by persons owned or controlled by, or subject to the jurisdiction or direction of, a foreign adversary."[37]

• On October 26, 2021, lawmakers expressed concerns that TikTok's audio and user location data could be used by the CCP during the testimony of Michael Beckerman, TikTok head of public policy for the Americas and registered lobbyist for ByteDance Ltd., before a Senate Commerce Subcommittee on Consumer Protection hearing.[38]

• On June 17, 2022, public reporting revealed that leaked audio from more than 80 internal TikTok meetings, China-based employees of ByteDance Ltd. repeatedly accessed non-public data about U.S. TikTok users, including the physical locations of specific U.S. citizens.[39]

• On September 14, 2022, lawmakers expressed concerns over TikTok's algorithm and content recommendations posing a national security threat during a hearing before the Senate

---

[33] Order of Aug. 14, 2020, "Regarding the Acquisition of Musical.ly By Bytedance Ltd." 85 Fed. Reg. 51297 (Aug. 19, 2020).

[34] TikTok Inc. v. Trump, 490 F. Supp. 3d 73, 78 (D.D.C. 2020) (mem.). [BETTER CITATION: U.S. Dep't of Commerce, Mem. for the Sec'y, *Proposed Prohibited Transactions Related to TikTok Pursuant to Executive Order 13942* (Sept. 17, 2020), ECF No. 22–1]

[35] Exec. Order No. 14034, 86 Fed. Reg. 31423 (June 9, 2021).

[36] Exec. Order No. 14,034, 86 FR 31423 (Jun 9, 2021), https://www.federalregister.gov/documents/2021/06/11/2021-12506/protecting-americans-sensitive-data-from-foreign-adversaries.

[37] *Id.*

[38] Diane Bartz & Sheila Dang, *TikTok Tells U.S. Lawmakers It Does Not Give Information to China's Government,* Reuters (Oct. 26, 2021, 4:53 P.M.), https://www.reuters.com/technology/tiktok-tells-us-lawmakers-it-does-not-give-information-chinas-government-2021-10-26/.

[39] Emily Baket-White, Leaked Audio From 80 Internal TikTok Meetings Shows That US User Data Has Been Repeatedly Accessed From China, Buzzfeed. (June, 17, 2022), https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-tapes-us-user-data-china-bytedance-access.

8

Committee on Homeland Security and Governmental Affairs with Vanessa Pappas, Chief Operating Officer of TikTok.[40]

• On November 15, 2022, Federal Bureau of Investigation (FBI) Director Christopher Wray testified before the House Committee on Homeland Security that TikTok's national security concerns "include the possibility that the [CCP] could use it to control data collection on millions of users or control the recommendation algorithm, which could be used for influence operations if they so choose, or to control software on millions of devices, which gives it an opportunity to potentially technically compromise personal devices." [41]

• On December 2, 2022, FBI Director Wray stated that TikTok's data repositories on Americans "are in the hands of a government that doesn't share our values and that has a mission that's very much at odds with what's in the best interests of the United States. . . . The [CCP] has shown a willingness to steal Americans data on a scale that dwarfs any other." [42]

• On December 5, 2022, Director of National Intelligence Avril Haines stated, when asked about TikTok and PRC ownership, "It is extraordinary the degree to which [the PRC] . . . [is] developing [ ] frameworks for collecting foreign data and pulling it in, and their capacity to then turn that around and use it to target audiences for information campaigns and other things, but also to have it for the future so that they can use it for a variety of means." [43]

• On December 16, 2022, Central Intelligence Agency Director William Burns explained that "because the parent company of TikTok is a [PRC] company, the [CCP] is able to insist upon extracting the private data of a lot of TikTok users in this country, and also to shape the content of what goes on to TikTok as well to suit the interests of the Chinese leadership." [44]

• On December 22, 2022, public reporting revealed that ByteDance Ltd. employees accessed TikTok user data and IP addresses to monitor the physical locations of specific U.S. citizens.[45]

• On December 29, 2022, following its adoption by Congress, the President signed into law a bill banning the use of TikTok

---

[40] Vanessa Pappas, Testimony Before the U.S. Senate Committee on Homeland Security and Governmental Affairs, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/Testimony-Pappas-2022-09-14-REVISED.pdf.

[41] Ariana Figueroa, *Members of Congress Sign Up for TikTok, Despite Security Concerns*, IDAHO CAP. SUN (Jan. 19, 2023, 12:26 P.M.), https://idahocapitalsun.com/2023/01/19/members-of-congress-sign-up-for-tiktok-despite-security-concerns/.

[42] Anisha Kohli, *Why the FBI Is Concerned About TikTok*, TIME MAG. (Dec. 3, 2022, 3:42 P.M.), https://time.com/6238540/tiktok-fbi-security-concerns/.

[43] Transcript, Avril Haines, Dir. of Nat'l Intel., Fireside Chat with DNI Haines at the Reagan National Defense Forum (Dec. 3, 2022), https://www.dni.gov/index.php/newsroom/news-articles/news-articles-2022/3660-fireside-chat-with-dni-haines-at-the-reagan-national-defense-forum.

[44] Judy Woodruff, *CIA Director Bill Burns on War in Ukraine, Intelligence Challenges Posed by China*, PBS (Dec. 16, 2022, 6:50 P.M.), https://www.pbs.org/newshour/show/cia-director-bill-burns-on-war-in-ukraine-intelligence-challenges-posed-by-china.

[45] Emily Baker White, *EXCLUSIVE: TikTok Spied On Forbes Journalists*, Forbes (December 22, 2022), https://www.forbes.com/sites/emilybaker-white/2022/12/22/tiktok-tracks-forbes-journalists-bytedance/?sh=68c05b5d7da5.

9

on government devices due to the national security threat posed by the application under its current ownership.[46]

- On January 20, 2023, public reporting revealed that TikTok and ByteDance Ltd. employees regularly engage in practice called "heating," which is a manual push to ensure specific videos "achieve a certain number of video views."[47]

  ○ In a court filing in June 2023, a former employee of ByteDance Ltd. alleged that the CCP spied on pro-democracy protestors in Hong Kong in 2018 by using backdoor access to TikTok to identify and monitor activists' locations and communications.[48]

  ○ On November 1, 2023, public reporting revealed that TikTok's internal platform, which houses its most sensitive information, was inspected in person by CCP cybersecurity agents in the lead-up to the CCP's 20th National Congress.[49]

- In February 2023, Deputy Attorney General Lisa Monaco stated, "Our intelligence community has been very clear about [the CCP's] efforts and intention to mold the use of [TikTok] using data in a worldview that is completely inconsistent with our own."[50] Deputy AG Monaco also stated, "I don't use TikTok and I would not advise anybody to do so because of [national security] concerns."[51]

- On February 28, 2023, former Deputy National Security Advisor Matthew Pottinger emphasized that it has already been confirmed that TikTok's parent company ByteDance has used the app to surveil U.S. journalist as a means to identify and retaliate against potential sources. The PRC has also shown a willingness to harass individuals abroad who take stances that contradict the Communist Party lines.[52] The app can further be employed to help manipulate social discourse and amplify false information to tens of millions of Americans.[53]

---

[46] David Ingram, *Biden Signs TikTok Ban for Government Devices, Setting Up a Chaotic 2023 for the App*, NBC NEWS (Dec. 30, 2022, 4:24 P.M.), https://www.nbcnews.com/tech/tech-news/tiktok-ban-biden-government-college-state-federal-security-privacy-rcna63724.

[47] Emily Baker-White, *TikTok't's Secret 'Heating' Button Can Make Anyone Go Viral*, Forbes (Jan 20, 2023), https://www.forbes.com/sites/emilybaker-white/2023/01/20/tiktoks-secret-heating-button-can-make-anyone-go-viral/?sh=62d61d006bfd.

[48] Brian Fung, *Analysis: There is now some public evidence that China viewed TikTok data*, CNN (June 8, 2023, 10:28 A.M.), https://www.cnn.com/2023/06/08/tech/tiktok-data-china/index.html.

[49] Emily Baker-White, *A Platform Storing TikTok Corporate Secrets Was Inspected By The Chinese Government*, FORBES (Nov. 1, 2023, 6:30 A.M.), https://www.forbes.com/sites/emilybaker-white/2023/11/01/a-platform-storing-tiktok-corporate-secrets-was-inspected-by-the-chinese-government/?sh=193ba64e23b2.

[50] John D. McKinnon, *U.S. Threatens Ban if TikTok's Chinese Owners Don't Sell Stakes*, WALL ST. J. (Mar. 15, 2023, 6:45 P.M.), https://www.wsj.com/articles/u-s-threatens-to-ban-tiktok-if-chinese-founder-doesnt-sell-ownership-stake-36d7295c.

[51] Lauren Feiner, *High-Ranking DOJ Official Says She 'Would Not Advise' Consumers to Use TikTok, Citing Security Concerns*, CNBC (Feb. 16, 2023, 4:55 P.M), https://www.cnbc.com/2023/02/16/dojs-lisa-monaco-warns-against-tiktok-use-citing-security-concerns.html.

[52] On Hong Kong Authorities' Transnational Repression, Press Statement, Athony J. Blinken, Secretary of State (Dec. 15, 2023), https://www.state.gov/on-hong-kong-authorities-transnational-repression/; *Transnational Repression*, Freedom House, https://freedomhouse.org/report/transnational-repression; The PRC has also shown itself willing to harass Americans on U.S. soil. See, e.g., Josh Rogin, *Chinese police stations in NYC are part of a vast influence operation*, THE WASHINGTON POST (Apr. 19, 2023), https://www.washingtonpost.com/opinions/2023/04/19/chinese-police-new-york-city-foreign-influence/.

[53] Matthew Pottinger, Testimony Before the U.S. House Select Committee on the Chinese Communist Party, https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/2.28.2023-hearing-transcript.pdf.

10

- On March 8, 2023, FBI Director Christopher Wray testified before the Senate Permanent Select Committee on Intelligence that the CCP, through its ownership of ByteDance, could use TikTok to collect and control users' data and drive divisive narratives internationally.[54]
- On March 22, 2023, elements of the intelligence community provided a classified briefing on the threat to members of the U.S. House of Representatives Permanent Select Committee on Intelligence and leadership of the Committee on Energy and Commerce.
- On March 23, 2023, Secretary of State Antony Blinken testified before the House Committee on Foreign Affairs that TikTok is a threat to national security that should be "ended one way or another."[55]
- On March 23, 2023, during the testimony of TikTok CEO Shou Chew before the House Committee on Energy and Commerce, lawmakers expressed concerns about the safety and security of the app, including TikTok's relationship with the CCP.[56]
- On March 23, 2023, Nury Turkel, the Chair of the United States Commission on International Religious Freedom, raised the alarm that TikTok's parent company, ByteDance Ltd., has a strategic partnership with China's Ministry of Public Security, and China's domestic version of the app, Douyin, has been used to collect sensitive information from Uyghurs and other oppressed ethnic minority groups.[57]
- On April 26, 2023, the Executive Branch provided a classified briefing to members of the United States Senate Committee on Commerce, Science, and Transportation and the Senate Select Committee on Intelligence on the threat.
- On May 30, 2023, public reporting revealed that TikTok has stored sensitive financial information, including the Social Security numbers and tax identifications of TikTok influencers and United States small businesses, on servers in China accessible by ByteDance Ltd. employees.[58]
- On June 5, 2023, the Executive Branch provided a classified briefing to staff of the United States Senate Committee on Banking and the U.S. House of Representatives Committee on Energy and Commerce on the threat.
- In June 2023, at the request of the House Permanent Select Committee on Intelligence, the intelligence community provided a classified threat briefing open to all members in the U.S. House of Representatives.

---

[54] *FBI Chief Says TikTok 'Screams' of US National Security Concerns*, REUTERS (Mar. 9, 2023, 4:43 P.M.), https://www.reuters.com/technology/fbi-chief-says-tiktok-screams-us-national-security-concerns-2023-03-08/.

[55] Houston Keene, *Blinken Suggests TikTok 'Should Be Ended One Way or Another'*, FOX NEWS (Mar. 23, 2023, 6:11 P.M.), https://www.foxnews.com/politics/blinken-tiktok-should-be-ended.

[56] Dara Kerr, *Lawmakers Grilled TikTok CEO Chew for 5 Hours in a High-Stakes Hearing About the App*, NPR (Mar. 23, 2023, 5:34 P.M.), https://www.npr.org/2023/03/23/1165579717/tiktok-congress-hearing-shou-zi-chew-project-texas.

[57] Nury Turkel, Testimony Before the U.S. House Select Committee on the Chinese Communist Party, https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/3.23.23-hearing-transcript.pdf.

[58] Alexandra S. Levine, *TikTok Creators' Financial Info, Social Security Numbers Have Been Stored In China*, FORBES (May 30, 2023, 6:30 A.M.), https://www.forbes.com/sites/alexandralevine/2023/05/30/tiktok-creators-data-security-china/?sh=1af8f2657048.

11

• On July 26, 2023, William Evanina, the former director of the National Counterintelligence and Security Center, pointed to TikTok as just one of many areas of concern regarding the CCP's capabilities and intent as an adversarial, malign competitor.[59]

• On September 28, 2023, the U.S. Department of State's Global Engagement Center issued a report that found that "TikTok [c]reates [o]pportunities for PRC [g]lobal [c]ensorship. The report stated that U.S. Government information as of late 2020 showed that "ByteDance maintained a regularly updated internal list identifying people who were likely blocked or restricted from all ByteDance platforms, including TikTok, for reasons such as advocating for Uyghur independence."

• On November 15, 2023, elements of the intelligence community provided a classified briefing to the United States Senate Select Committee on Intelligence and the Committee on Commerce, Science, and Transportation on the PRC's conduct of global foreign malign influence operations, including through platforms such as TikTok.[60]

• On November 30, 2023, John Garnaut of the Australian Strategic Policy Institute remarked that TikTok has sophisticated capabilities that create the risk that TikTok can clandestinely shape narratives and elevate favorable opinions while suppressing statements and news that the PRC deems negative.[61]

• On January 18, 2024, the U.S. House of Representatives Select Committee on Strategic Competition between the United States and the Chinese Communist Party was briefed by a set of senior interagency officials to discuss these matters.

• On January 31, 2024, FBI Director Wray testified before the Select Committee on Strategic Competition between the United States and the Chinese Communist Party that TikTok gives the PRC "the ability to control data collection on millions of users, which can be used for all sorts of intelligence operations or influence operations," and "the ability, should they so choose, to control the software on millions of devices, which means the opportunity to technically compromise millions of devices."[62]

• On February 29, 2024, the U.S. House of Representatives Committee on Energy and Commerce was briefed by a set of senior interagency officials to discuss these matters.

---

[59] William Evanina, Testimony Before the U.S. House Select Committee on Strategic Competition between the United States and the Chinese Communist Party, https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/7.26.23-hearing-transcript.pdf.

[60] Reuters, U.S. to Brief Senators on Foreign Online Influence Focused on Israel, Ukraine (November 15, 2023), https://www.reuters.com/world/us/us-senators-get-classified-briefing-foreign-online-influence-2023-11-15/.

[61] John Garnaut, Testimony Before the U.S. House Select Committee on the Chinese Communist Party, https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/11.30.23-hearing-transcript.pdf.

[62] The CCP Cyber Threat to the American Homeland and National Security, Hearing, The Select Committee on the CCP (March. 1, 2024), https://selectcommitteeontheccp.house.gov/committee-activity/hearings/hearing-notice-ccp-cyber-threat-american-homeland-and-national-security.

12

COMMITTEE ACTION

On March 23, 2023, the Committee on Energy and Commerce held a full committee hearing. The title of the hearing was "TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms." The Committee received testimony from:

- Shou Chew, CEO, TikTok Inc.

On March 7, 2024, the Committee on Energy and Commerce held a full committee hearing to review H.R. 7521. The title of the hearing was "Legislation to Protect Americans from the National Security Threats Posed by Foreign Adversary Controlled Applications." The Committee met in executive session pursuant to a motion by Chair Rodgers, which was adopted by a record vote of 43 yeas and 0 nays.

On March 7, 2024, the full Committee on Energy and Commerce met in open markup session and ordered H.R. 7521 favorably reported, without amendment, to the House by a record vote of 50 yeas and 0 nays.

### COMMITTEE VOTES

Clause 3(b) of rule XIII requires the Committee to list the record votes on the motion to report legislation and amendments thereto. The following reflects the record votes taken during the Committee consideration:

13

**COMMITTEE ON ENERGY AND COMMERCE**
**118TH CONGRESS**
**ROLL CALL VOTE # 1**

**BILL:** H.R. 7521, Prohibition of Foreign Adversary Controlled Applications Act

**AMENDMENT:** A motion by Chair Rodgers to order H.R. 7521, Prohibition of Foreign Adversary Controlled Applications Act favorably reported to the House, without amendment. (Final Passage)

**DISPOSITION:** AGREED TO, by a roll call vote of 50 yeas to 0 nays.

| REPRESENTATIVE | YEAS | NAYS | PRESENT | REPRESENTATIVE | YEAS | NAYS | PRESENT |
|---|---|---|---|---|---|---|---|
| Rep. Rodgers | X | | | Rep. Pallone | X | | |
| Rep. Burgess | X | | | Rep. Eshoo | X | | |
| Rep. Latta | X | | | Rep. DeGette | X | | |
| Rep. Guthrie | X | | | Rep. Schakowsky | X | | |
| Rep. Griffith | X | | | Rep. Matsui | X | | |
| Rep. Bilirakis | X | | | Rep. Castor | X | | |
| Rep. Bucshon | X | | | Rep. Sarbanes | X | | |
| Rep. Hudson | X | | | Rep. Tonko | X | | |
| Rep. Walberg | X | | | Rep. Clarke | X | | |
| Rep. Carter | X | | | Rep. Cárdenas | X | | |
| Rep. Duncan | X | | | Rep. Ruiz | X | | |
| Rep. Palmer | X | | | Rep. Peters | X | | |
| Rep. Dunn | X | | | Rep. Dingell | X | | |
| Rep. Curtis | X | | | Rep. Veasey | X | | |
| Rep. Lesko | X | | | Rep. Kuster | X | | |
| Rep. Pence | X | | | Rep. Kelly | X | | |
| Rep. Crenshaw | X | | | Rep. Barragán | X | | |
| Rep. Joyce | X | | | Rep. Blunt Rochester | | | |
| Rep. Armstrong | X | | | Rep. Soto | X | | |
| Rep. Weber | X | | | Rep. Craig | X | | |
| Rep. Allen | X | | | Rep. Schrier | X | | |
| Rep. Balderson | X | | | Rep. Trahan | X | | |
| Rep. Fulcher | X | | | Rep. Fletcher | X | | |
| Rep. Pfluger | X | | | | | | |
| Rep. Harshbarger | X | | | | | | |
| Rep. Miller-Meeks | X | | | | | | |
| Rep. Cammack | X | | | | | | |
| Rep. Obernolte | X | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

03/07/2024

**APP-13**

14

### OVERSIGHT FINDINGS AND RECOMMENDATIONS

Pursuant to clause 2(b)(1) of rule X and clause 3(c)(1) of rule XIII, the Committee held hearings and made findings that are reflected in this report.

### NEW BUDGET AUTHORITY, ENTITLEMENT AUTHORITY, AND TAX EXPENDITURES

Pursuant to clause 3(c)(2) of rule XIII, the Committee finds that H.R. 7521 would result in no new or increased budget authority, entitlement authority, or tax expenditures or revenues.

### CONGRESSIONAL BUDGET OFFICE ESTIMATE

Pursuant to clause 3(c)(3) of rule XIII, at the time this report was filed, the cost estimate prepared by the Director of the Congressional Budget Office pursuant to section 402 of the Congressional Budget Act of 1974 was not available.

### FEDERAL MANDATES STATEMENT

The Committee adopts as its own the estimate of Federal mandates prepared by the Director of the Congressional Budget Office pursuant to section 423 of the Unfunded Mandates Reform Act.

### STATEMENT OF GENERAL PERFORMANCE GOALS AND OBJECTIVES

Pursuant to clause 3(c)(4) of rule XIII, the general performance goal or objective of this legislation is to force a divesture or prohibit the distribution, maintenance, or updating of foreign adversary controlled applications.

### DUPLICATION OF FEDERAL PROGRAMS

Pursuant to clause 3(c)(5) of rule XIII, no provision of H.R. 7521 is known to be duplicative of another Federal program, including any program that was included in a report to Congress pursuant to section 21 of Public Law 111–139 or the most recent Catalog of Federal Domestic Assistance.

### RELATED COMMITTEE AND SUBCOMMITTEE HEARINGS

Pursuant to clause 3(c)(6) of rule XIII, the following hearings were used to develop or consider H.R. 7521:

- On March 23, 2023, the Committee on Energy and Commerce held a full committee hearing. The title of the hearing was "TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms." The Committee received testimony from:
  - Shou Chew, CEO, TikTok Inc.
- On March 7, 2024, the Committee on Energy and Commerce held a full committee hearing to review H.R. 7521. The title of the hearing was "Legislation to Protect Americans from the National Security Threats Posed by Foreign Adversary Controlled Applications." The Committee met in executive session pursuant to a motion by Chair Rodgers, which was adopted by a record vote of 43 yeas and 0 nays.

**APP-14**

15

Pursuant to clause 3(d)(1) of rule XIII, the Committee adopts as its own the cost estimate prepared by the Director of the Congressional Budget Office pursuant to section 402 of the Congressional Budget Act of 1974. At the time this report was filed, the estimate was not available.

EARMARK, LIMITED TAX BENEFITS, AND LIMITED TARIFF BENEFITS

Pursuant to clause 9(e), 9(f), and 9(g) of rule XXI, the Committee finds that H.R. 7521 contains no earmarks, limited tax benefits, or limited tariff benefits.

ADVISORY COMMITTEE STATEMENT

No advisory committees within the meaning of section 5(b) of the Federal Advisory Committee Act were created by this legislation.

APPLICABILITY TO LEGISLATIVE BRANCH

The Committee finds that the legislation does not relate to the terms and conditions of employment or access to public services or accommodations within the meaning of section 102(b)(3) of the Congressional Accountability Act.

SECTION-BY-SECTION ANALYSIS OF THE LEGISLATION

*Section 1. Short title*

This Section provides that the Act may be cited as the "Protecting Americans from Foreign Adversary Controlled Applications Act".

*Section 2. Prohibition of Foreign-Adversary Controlled Applications*

Subsection (a)(1) makes it unlawful for an entity to distribute, maintain, update, or enable the distribution, maintenance, or updating of a foreign adversary controlled application in the United States.

Subsection (a)(2) provides the applicable dates of prohibitions in subsection (a)(1), which is 180 days after enactment for the foreign adversary controlled applications in (g)(3)(A), and beginning 180 days after the relevant determination in (g)(3)(B) that such application poses an unacceptable risk to national security.

Subsection (b) requires a foreign adversary controlled application to provide any U.S. user with all available data related to their account provided by that application, upon request by the user, in a machine readable format, including any data maintained by the application regarding the user's account, such as the user's content and all other account information.

Subsection (c) provides the exemptions for the prohibition in subsection (a). It provides that the prohibition in subsection (a) does not apply to a foreign adversary controlled application regarding which a qualified divestiture is executed and shall cease to apply if a qualified divestiture is executed after the effective date. This subsection also states that subsection (a) also does not apply to services provided with respect to a foreign adversary controlled application that are necessary for an entity to attain compliance with this Act.

16

Subsection (d) outlines the civil penalties for an entity found violating subsection (a) or subsection (b). An entity found violating subsection (a) shall be subject an amount not to exceed the amount that results from multiplying $5,000 by the number of U.S. users determined to have accessed, maintained, or updated an application. An entity found violating subsection (b) shall be subject to a civil penalty in an amount not to exceed $500 per U.S. user with an account provided by that application. This subsection also directs the Attorney General to conduct investigations related to potential violations of this Act and pursue enforcement if a violation has occurred.

Subsection (e) is a severability provision. If any provision of this section or the application of this section to any person or circumstance is held invalid, the invalidity shall not affect the other provisions or applications of this section that can be given effect without the invalid provision or application. This subsection also clarifies that any invalidity of subsection (g)(3)(A) shall not affect or preclude the application from a determination as a foreign adversary controlled application under subsection (g)(3)(B).

Subsection (f) is a rule of construction stating that nothing in this Act may be construed to authorize the Attorney General to pursue enforcement other than what is specifically stated in this Act. It does not authorize the Attorney General to pursue enforcement against any individual user of the foreign adversary controlled application, nor does it alter or affect any other authority provided by or established under another provision of Federal law.

Subsection (g) defines key terms used throughout Section 2, including:

(1) The term "Controlled by a Foreign Adversary" means (A) a foreign person that is domiciled in, headquartered in, has its principal place of business in, or is organized under the laws of a foreign adversary country; (B) an entity in which an entity or combination of entities identified in subparagraph (A), directly or indirectly owns a twenty percent stake or greater; or (C) an entity subject to the direction, or control, or of an entity identified in subparagraph (A) or (B).

(2) The term "Covered Company" means an entity that operates, directly or indirectly, including through its parent company, subsidiaries, or affiliates, a website, desktop application, mobile application, or augmented or immersive technology application that permits a user to create an account or profile to generate, share, and view text, images, videos, real-time communications, or similar content; has more than 1,000,000 monthly active users for a majority of months during the preceding 3 months the Presidential determination; enables one or more users to generate or distribute content that can be viewed by other users of the website, desktop application, mobile application, or augmented or immersive technology; and enables one or more users to view content generated by other users of the website, desktop application, mobile application, or augmented or immersive technology.

(3) The term does not include any website, desktop application, or mobile application in the United States whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews.

17

(4) The term "Foreign Adversary Controlled Application" means a website, desktop application, mobile application, or augmented or immersive technology application is that is operated, directly or indirectly, including through its parent company, subsidiaries, or affiliates by:

(A) any of (i) ByteDance, Ltd.; (ii) TikTok; (iii) a subsidiary of or a successor to ByteDance, Ltd. or TikTok that is controlled by a foreign adversary; or (iv) a company owned or controlled directly or indirectly by such an entity; or

(B) a covered company that is controlled by a foreign adversary; and that is determined by the President to present a significant threat to the national security of the United States following the issuance of a public notice of the proposed presidential determination, a public report to Congress, to be submitted not less than 30 days prior to the presidential determination, describing the specific national security concern, which shall contain a classified annex, and describing what assets would need to be divested to be a qualified divestiture.

(5) The term "Foreign Adversary Country" means the countries identified pursuant to section 4872(d)(2) of title 10, United States Code (North Korea, People Republic of China, Russia, Iran).

(6) The term "Internet Hosting Service" means a service through which storage and computing resources are provided to an individual or organization for the accommodation and maintenance of one or more websites or online services, and which may include file hosting, domain name server hosting, cloud hosting, and virtual private server hosting.

(7) The term "Qualified Divestiture" means a divestiture or similar transaction that the President, through an interagency process, determines results in the foreign adversary controlled application no longer being controlled by a foreign adversary; and the President determines, through an interagency process, precludes the establishment or maintenance of any operational relationship between the foreign adversary controlled application's United States operations after the date of the transaction and any formerly affiliated entities that are controlled by a foreign adversary, including, but not limited to, any cooperation with respect to the operation of a content recommendation algorithm or agreement with respect to data sharing.

(8) The term "Source Code" means the combination of text and other characters comprising the content, both viewable and nonviewable, of a software application, including any publishing language, programming language, protocol, or functional content, as well as any successor languages or protocols.

(9) The term "United States" means the "United States" including the territories of the United States.

*Section 3. Judicial review*

This section requires any review challenging this Act to be filed only in the United States Court of Appeals for the District of Columbia Circuit. Subsection (b) provides that the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over any challenge to this Act, or any action, finding, or determination under this Act. Subsection (c) places, upon enactment, a 165-day statute of limitation on any challenge

18

to this Act. This subsection also places a 90-day statute of limita-
tions on any challenges to an action, finding, or determination
under this Act.

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

This legislation does not amend any existing Federal statute.

○

# LEGISLATION TO PROTECT AMERICAN DATA AND NATIONAL SECURITY FROM FOREIGN ADVERSARIES

## HEARING

BEFORE THE

## COMMITTEE ON ENERGY AND COMMERCE

## HOUSE OF REPRESENTATIVES

ONE HUNDRED EIGHTEENTH CONGRESS

SECOND SESSION

MARCH 7, 2024

**Serial No. 118–107**



Published for the use of the Committee on Energy and Commerce

govinfo.gov/committee/house-energy

energycommerce.house.gov

U.S. GOVERNMENT PUBLISHING OFFICE

55–083 PDF                    WASHINGTON : 2024

## COMMITTEE ON ENERGY AND COMMERCE

CATHY McMORRIS RODGERS, Washington
*Chair*

MICHAEL C. BURGESS, Texas
ROBERT E. LATTA, Ohio
BRETT GUTHRIE, Kentucky
H. MORGAN GRIFFITH, Virginia
GUS M. BILIRAKIS, Florida
LARRY BUCSHON, Indiana
RICHARD HUDSON, North Carolina
TIM WALBERG, Michigan
EARL L. "BUDDY" CARTER, Georgia
JEFF DUNCAN, South Carolina
GARY J. PALMER, Alabama
NEAL P. DUNN, Florida
JOHN R. CURTIS, Utah
DEBBBIE LESKO, Arizona
GREG PENCE, Indiana
DAN CRENSHAW, Texas
JOHN JOYCE, Pennsylvania
KELLY ARMSTRONG, North Dakota, *Vice Chair*
RANDY K. WEBER, Sr., Texas
RICK W. ALLEN, Georgia
TROY BALDERSON, Ohio
RUSS FULCHER, Idaho
AUGUST PFLUGER, Texas
DIANA HARSHBARGER, Tennessee
MARIANNETTE MILLER–MEEKS, Iowa
KAT CAMMACK, Florida
JAY OBERNOLTE, California
VACANCY

FRANK PALLONE, Jr., New Jersey
*Ranking Member*
ANNA G. ESHOO, California
DIANA DeGETTE, Colorado
JAN SCHAKOWSKY, Illinois
DORIS O. MATSUI, California
KATHY CASTOR, Florida
JOHN P. SARBANES, Maryland
PAUL TONKO, New York
YVETTE D. CLARKE, New York
TONY CÁRDENAS, California
RAUL RUIZ, California
SCOTT H. PETERS, California
DEBBIE DINGELL, Michigan
MARC A. VEASEY, Texas
ANN M. KUSTER, New Hampshire
ROBIN L. KELLY, Illinois
NANETTE DIAZ BARRAGÁN, California
LISA BLUNT ROCHESTER, Delaware
DARREN SOTO, Florida
ANGIE CRAIG, Minnesota
KIM SCHRIER, Washington
LORI TRAHAN, Massachusetts
LIZZIE FLETCHER, Texas

———

PROFESSIONAL STAFF

NATE HODSON, *Staff Director*
SARAH BURKE, *Deputy Staff Director*
TIFFANY GUARASCIO, *Minority Staff Director*

(II)

**APP-20**

# C O N T E N T S

———

                                                                        Page
Hon. Cathy McMorris Rodgers, a Representative in Congress from the State
    of Washington, opening statement ..................................................    2
        Prepared statement ..................................................................    5
Hon. Frank Pallone, Jr., a Representative in Congress from the State of
    New Jersey, opening statement ......................................................    9
        Prepared statement ..................................................................   11

SUBMITTED MATERIAL

Vote on a motion to recess the hearing and reconvene in executive session ......   17
H.R. 7520, the Protecting Americans' Data from Foreign Adversaries Act
    of 2024 ................................................................................................   18
H.R. 7521, the Protecting Americans from Foreign Adversary Controlled Ap-
    plications Act ........................................................................................   27

**APP-21**

# LEGISLATION TO PROTECT AMERICAN DATA AND NATIONAL SECURITY FROM FOREIGN ADVERSARIES

———

### THURSDAY, MARCH 7, 2024

House of Representatives,
Committee on Energy and Commerce,
Washington, DC.

The committee met, pursuant to call, at 10:05 a.m., in Room 2322, Rayburn House Office Building, Hon. Cathy McMorris Rodgers [chairwoman of the committee] presiding.

Members present: Representatives Rodgers, Burgess, Latta, Guthrie, Griffith, Bilirakis, Bucshon, Hudson, Walberg, Carter, Duncan, Palmer, Dunn, Lesko, Pence, Joyce, Armstrong, Weber, Allen, Balderson, Fulcher, Pfluger, Harshbarger, Miller-Meeks, Cammack, Obernolte, Pallone, Eshoo, DeGette, Schakowsky, Matsui, Castor, Sarbanes, Tonko, Clarke, Cárdenas, Ruiz, Peters, Dingell, Veasey, Kuster, Kelly, Soto, Schrier, and Fletcher.

Staff present: Sarah Burke, Deputy Staff Director; Nick Crocker, Senior Advisor and Director of Coalitions; Sydney Greene, Director of Operations; Slate Herman, Counsel; Jessica Herron, Clerk; Nate Hodson, Staff Director; Tara Hupman, Chief Counsel; Noah Jackson, Clerk; Sean Kelly, Press Secretary; Lauren Kennedy, Clerk; Alex Khlopin, Staff Assistant; Peter Kielty, General Counsel; Emily King, Member Services Director; Giulia Leganski, Professional Staff Member; John Lin, Senior Counsel; Kate O'Connor, Chief Counsel; Karli Plucker, Director of Operations (WA–05); Carla Rafael, Senior Staff Assistant; Hannah Anton, Minority Policy Analyst; Keegan Cardman, Minority Staff Assistant; Jennifer Epperson, Minority Chief Counsel, Communications and Technology; Waverly Gordon, Minority Deputy Staff Director and General Counsel; Daniel Greene, Minority Professional Staff Member; Tiffany Guarascio, Minority Staff Director; Perry Hamilton, Minority Member Services and Outreach Manager; Lisa Hone, Minority Chief Counsel, Innovation, Data, and Commerce; Dan Miller, Minority Professional Staff Member; Francella Ochillo, Minority IDC Fellow; Joe Orlando, Minority Junior Professional Staff Member; Emma Roehrig, Minority Staff Assistant; Phoebe Rouge, FTC Detailee; Michael Scurato, Minority FCC Detailee; Andrew Souvall, Minority Director of Communications, Outreach and Member Services; Johanna Thomas, Minority Counsel;and C.J. Young, Minority Deputy Communications Director.

Mrs. Rodgers. The committee will come to order.

Before I recognize myself and Ranking Member Pallone, I would like to address the unusual circumstances of this hearing.

(1)

2

First, it is the custom of the committee and required under the House rules that a hearing will not commence earlier than 1 week after such hearing is announced.

However, pursuant to clause 2(g)(3)(B) of Rule XI of the House Rules, a hearing may begin sooner in one of two cases. Either (1) the chair and ranking minority member determine that there is good cause, or (2) the committee so determines by a majority vote the good cause exception.

In recent history, the committee has invoked the good cause exception to hold a hearing on short notice just a few times, when holding hearings at the start of a new Congress. In these cases, Mr. Pallone and I had a discussion on the matter.

Colleagues, I have remained and stayed true to our commitment, and the good cause exception has not become regular practice during my tenure as chair, and it will not become the practice for the duration.

Following a classified briefing last week, Mr. Pallone and I have determined that there is a national security interest and good cause to hold this hearing on these bills with shorter notice so that we can maintain regular order before marking up this important legislation later today.

Before we begin opening statements, do you have any initial comments, Mr. Pallone?

Mr. PALLONE. Well, I just want to thank you, Chair Rodgers, for your explanation and your commitment to continue with regular order as it pertains to the noticing of committee meetings. So thank you.

Mrs. RODGERS. OK.

I now recognize myself for 5 minutes for an opening statement.

Good morning, welcome to today's—oh, that's not where we are.

## OPENING STATEMENT OF HON. CATHY McMORRIS RODGERS, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF WASHINGTON

The Chinese Communist Party pose the greatest national security threat to the United States of our time. With applications like TikTok, these countries are able to target, surveil, and manipulate Americans.

Protecting Americans' data and addressing the serious national security threat posed by the CCP have been my top priorities all Congress.

This committee and others have been working diligently, in a bipartisan manner, to deliver solutions to address these critical issues.

Today we take action.

One year ago this month, the CEO of TikTok testified before this committee to answer for the threat his company poses to America's national security. During the hearing, he was asked several times if ByteDance uses information it collects from TikTok users to spy on Americans. His response was, and I quote, "I wouldn't describe it as spying."

TikTok has repeatedly been caught lying about its connection to ByteDance as well as the level of access the CCP has to our data, which they are using to weaponize our freedoms against us.

3

That ends now.

TikTok's access to 170 million American users makes it a valuable propaganda tool for the CCP to exploit and use for nefarious purposes.

Through this access, the app is able to collect nearly every data point imaginable—from people's location, to what they search for on their devices, to who they are connecting with, and other forms of sensitive information.

The app's trackers are embedded in sites across the web. So even if someone has never been on TikTok, their personal information is at risk of being collected and abused.

TikTok's parent company, ByteDance, is currently under investigation by the U.S. Department of Justice for surveilling on American journalists. And that is just one example. It gets much worse.

While TikTok may be the most well-known application subject to the CCP, it is certainly not the only one. Others, like Lemon8 and CapCut, are also subject to the CCP's influence through ByteDance.

That is why today we are discussing legislation that will prevent apps controlled by foreign adversaries from targeting, surveilling, and manipulating the American people.

I commend members of the Select Committee on the Chinese Communist Party, in particular Chairman Mike Gallagher and Ranking Member Raja Krishnamoorthi, for their partnership on this legislation to address the immediate threat that ByteDance ownership of TikTok poses, and I look forward to quickly advancing this bill to the full House.

This is a targeted approach to prohibit access to an application owned by a foreign adversary that poses a clear threat to U.S. national security.

Additionally, we will be discussing legislation to prevent data brokers from sharing Americans' sensitive information with foreign adversaries and the companies they control.

We know that data brokers sell our sensitive information to the highest bidder, and I am appreciative of Ranking Member Pallone bringing this legislation forward so that we may establish clear prohibitions on the sale of location and health information to our adversaries.

This is an important step in our continued efforts to establish comprehensive data privacy in order to effectively crack down on abuses of our personal information.

Companies controlled by a foreign adversary, like the CCP, will never embrace American values, virtues of our society and culture like freedom of speech, human rights, the rule of law, a free press, and others.

Our adversaries choose to rule through fear and control. If given the choice, they will always choose the path for more control, more surveillance, and more manipulation.

Apps like TikTok, Lemon8, and CapCut are spying by design. They have to. It is required by law in China.

This foreign interference and manipulation is not welcome here. The threats posed by TikTok are real, which is why today we will be hearing from the national intelligence community about the threats and how this legislation will neutralize them.

**APP-25**

4

   I look forward to our discussion today, and I yield to my col-
league, Ranking Member Frank Pallone.
   [The prepared statement of Mrs. Rodgers follows:]

5

**Opening Statement Prepared for House Energy and Commerce Committee Chair Cathy McMorris Rodgers "Legislation to Protect Americans from the National Security Threats Posed by Foreign Adversary Controlled Applications" March 7, 2024**

**CHAIR: I now recognize myself for 5 minutes for an opening statement.**

**INTRO**

The Chinese Communist Party pose the greatest national security threat to the United States of our time.

With applications like TikTok, these countries are able to target, surveil, and manipulate Americans.

Protecting American's data and addressing the serious national security threat posed by the CCP have been my top priorities all Congress.

This Committee and others have been working diligently in a bi-partisan manner to deliver solutions to address these critical issues. Today, we take action.

One year ago this month, the CEO of TikTok testified before this committee to answer for the threat his company poses to America's national security.

During the hearing, he was asked several times if ByteDance uses information it collects from TikTok users to spy on Americans.

**APP-27**

6

His response was, and I quote, "I wouldn't describe it as spying."

TikTok has repeatedly been caught lying about its connection to ByteDance…

…as well as the level of access the CCP has to our data, which they are using to weaponize our freedoms against us.

That ends now.

**SURVEILLING AMERICANS**

TikTok's access to 170 million American users makes it a valuable propaganda tool for the CCP to exploit and use for nefarious purposes.

Through this access, the app is able to collect nearly every data point imaginable, from people's location, to what they search on their devices, who they are connecting with, and other forms of sensitive information.

The app's trackers are embedded in sites across the web…

…so even if someone has never been on TikTok, their personal information is at risk of being collected and abused.

TikTok's parent company, ByteDance, is currently under investigation by the U.S. Department of Justice for surveilling American journalists…

That's just one example—it gets much worse.

While TikTok may be the most well-known application subject to the CCP, it is certainly not the only one—others, like Lemon8 and

**APP-28**

7

Capcut, are also subject to the CCP's influence through ByteDance.

**FOREIGN ADVERSARY-CONTROLLED APPS**

That is why today, we are discussing legislation that will prevent apps controlled by foreign adversaries from targeting, surveilling, and manipulating the American people.

I commend members of the Select Committee on the Chinese Communist Party, in particular Chair Mike Gallagher and Ranking Member Raja Krishnamoorthi…

…for their partnership on this legislation to address the immediate threat that Bytedance ownership of TikTok poses, and I look forward to quickly advancing this bill to the full House.

This is a targeted approach to prohibit access to an application owned by a foreign adversary that poses a clear threat to U.S. national security.

Additionally, we will be discussing legislation to prevent data brokers from sharing Americans' sensitive information with foreign adversaries and the companies they control.

We know that data brokers sell our sensitive information to the highest bidder.

I'm appreciative of Ranking Member Pallone bringing this legislation forward, so that we may establish clear prohibitions on the sale of location and health information to our adversaries.

This is an important step in our continued efforts to establish comprehensive data privacy in order to effectively crack down on abuses of our personal information.

**APP-29**

8

**CONCLUSION**

Companies controlled by a foreign adversary, like the CCP, will never embrace American values…

…virtues of our society and culture like freedom of speech, human rights, the rule of law, a free press, and others.

Our adversaries choose to rule through fear and control.

If given the choice, they will always choose the path for more control, more surveillance, and more manipulation.

Apps like TikTok, Lemon8, and Capcut are "spying-by-design"…. they have to—it is required by law in China.

This foreign interference and manipulation is not welcome here.

The threats posed by TikTok are real, which is why today we will be hearing from the national intelligence community about the threats and how this legislation will neutralize them.

I look forward to our discussion today and I yield to my colleague, Ranking Member Frank Pallone.

9

## OPENING STATEMENT OF HON. FRANK PALLONE, JR., A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW JERSEY

Mr. PALLONE. Thank you, Madam Chair.

Today the committee will consider two bills, H.R. 7520 and H.R. 7521, that are intended to protect the public from foreign adversaries.

Big Tech has transformed the information superhighway into a superspreader of harmful content, invasive surveillance practices, and addictive and damaging design features.

Foreign adversaries understand this and see access to Americans' data, communications networks, devices, and applications as the entry points to disrupt our daily lives and conduct espionage activities.

And we have seen too often bad actors using communication tools to launch cyber attacks. They have pushed disinformation and propaganda campaigns in the United States in an attempt to undermine our democracy and gain worldwide influence and control. And this is all a detriment of our national security interests.

And then there are the data brokers, who collect and sell vast amounts of Americans' most sensitive personal information for profit.

Right now, there are no restrictions on who they can sell this information to. It may be about members of our Nation's military and our children, or it may be information about where we go, how we spend our money, and the websites we visit. And this information can be purchased by anyone, including foreign adversary governments.

Most Americans are unaware that data brokers compile dossiers about their interests, beliefs, actions, and movements, and Americans are powerless to stop this invasion of their privacy.

While the answer to this problem is comprehensive national data privacy protections, I firmly believe that we must do what we can now to safeguard Americans' personal data while we work to advance privacy legislation.

So I am pleased that today we will consider H.R. 7520, the Protecting Americans' Data from Foreign Adversaries Act, which Chair Rodgers and I introduced this week. It will address this national security vulnerability by preventing data brokers from selling sensitive personal information of Americans to our foreign adversaries.

And we will also consider H.R. 7521, the Protecting Americans from Foreign Adversary Controlled Applications Act, introduced this week by Representatives Krishnamoorthi and Gallagher.

This bill sets forth a process to incentivize the divesture of TikTok and other applications from the operation and control of foreign adversary governments, like the People's Republic of China and Russia.

Social media companies effectively are modern-day media companies, and we must treat them that way. This includes examining the foreign investments in these companies.

Now, the Communications Act requires the FCC to undertake such an examination for our country's television and radio broadcast licenses. Congress placed this requirement on U.S. broadcasters to protect national security interests during wartime to pre-

10

vent the airing of foreign propaganda on our country's broadcast stations.

There is no reason social media companies should be exempt from this scrutiny. Given Russia, China, and others' actions on social media platforms during our recent elections, we know that, while the technology has evolved, the threat is very much the same.

The combination of TikTok's Beijing Communist-based ownership and the fact that well over 170 million Americans use this application exacerbates its dangers to our country and our privacy.

The laws in China allow the Chinese Communist Party to compel companies like TikTok to share data with them whether the companies want to or not. And this means that the CCP has the ability, with TikTok, to compromise device security, maliciously access Americans' data, promote pro-Communist propaganda, and undermine American interests.

So I look forward to hearing more today from our intelligence and national security community about how this bill can bolster their authorities to take action where it is needed to ensure that our modern-day media outlets are not subject to the influence of countries that see benefit in the weakening of our country.

I have serious national security concerns about TikTok, and I am sympathetic to the intent of this legislation, but I want to hear from our witnesses before making a final decision.

Now, finally, I must express my disappointment in how rushed this process has been.

This committee has worked together on a bipartisan basis on numerous occasions to advance legislation that furthers our national security interests, so committee Democrats would have appreciated more notice and time to digest the legislation before us before it advances to a markup this afternoon.

There are very complex constitutional concerns implicated by this bill, and I think we all would have benefited more from a more thorough process that results from regular order.

Nevertheless, I appreciate that Chair Rodgers agreed to my request to hold this hearing so Members can hear from experts and review the proposals before jumping to a vote later today.

And so, with that, Madam Chair, I yield back the balance of my time.

[The prepared statement of Mr. Pallone follows:]

11

**Committee on Energy and Commerce**

**Opening Statement as Prepared for Delivery**
**of**
**Ranking Member Frank Pallone, Jr.**

***Hearing on "Legislation to Protect Americans from the National Security Threats Posed by***
***Foreign Adversary Controlled Applications"***

**March 7, 2024**

Today, this Committee will consider two bills—H.R. 7520 and H.R. 7521—that are intended to protect the public from foreign adversaries.  Big Tech has transformed the information superhighway into a superspreader of harmful content, invasive surveillance practices, and addictive and damaging design features.

Foreign adversaries understand this, and see access to Americans' data, communications networks, devices, and applications as the entry points to disrupt our daily lives and conduct espionage activities.  And as we have seen too often, bad actors have used communications tools to launch cyberattacks.  They have pushed disinformation and propaganda campaigns in the United States in an attempt to undermine our democracy and gain worldwide influence and control. This is all a detriment of our national security interests.

And then there are data brokers, who collect and sell vast amounts of Americans' most sensitive personal information for profit.  Right now, there are no restrictions on who they can sell this information to.  It may be about members of our nation's military and our children, or it may be information about where we go, how we spend our money, and the websites we visit.  This information can be purchased by anyone, including foreign adversary governments.

Most Americans are unaware that data brokers compile dossiers about their interests, beliefs, actions, and movements. And Americans are powerless to stop this invasion of their privacy.  While the answer to this problem is comprehensive national data privacy protections, I firmly believe that we must do what we can now to safeguard Americans' personal data while we work to advance privacy legislation.

So, I am pleased that today we will consider H.R. 7520, the Protecting Americans' Data from Foreign Adversaries Act, which Chair Rodgers and I introduced this week.  It will address this national security vulnerability by preventing data brokers from selling sensitive personal information of Americans to our foreign adversaries.

We will also consider H.R. 7521, the Protecting Americans from Foreign Adversary Controlled Applications Act, introduced this week by Representatives Krishnamoorthi and Gallagher.  This bill sets forth a process to incentivize the divesture of TikTok and other applications from the operation and control of foreign adversary governments like the People's Republic of China and Russia. Social media companies effectively are modern-day media

**APP-33**

12

March 7, 2024
Page 2

companies, and we must treat them that way.  This includes examining the foreign investments in these companies.

The Communications Act requires the Federal Communications Commission to undertake such an examination for our country's television and radio broadcast licenses. Congress placed this requirement on U.S. broadcasters to protect national security interests during wartime to prevent the airing of foreign propaganda on our country's broadcast stations.

There is no reason social media companies should be exempt from this scrutiny.  Given Russia, China, and others' actions on social media platforms during our recent elections, we know that while the technology has evolved, the threat is very much the same.

The combination of TikTok's Beijing Communist-based ownership and the fact that well over 170 million Americans use this application exacerbates its dangers to our country and our privacy.  The laws in China allow the Chinese Communist Party (CCP) to compel companies, like TikTok, to share data with them whether the companies want to or not.  This means the CCP has the ability with TikTok to compromise device security, maliciously access Americans' data, promote pro-Communist propaganda, and undermine American interests.

I look forward to hearing more today from our intelligence and national security community about how this bill can bolster their authorities to take action where it is needed to ensure that our modern-day media outlets are not subject to the influence of countries that see benefit in the weakening of our country.

I have serious national security concerns about TikTok and am sympathetic to the intent of this legislation, but I want to hear from our witnesses before making a final decision.

Finally, I must express my disappointment in how rushed this process has been.  This Committee has worked together on a bipartisan basis on numerous occasions to advance legislation that furthers our national security interest, so Committee Democrats would have appreciated more notice and time to digest the legislation before us before it advances to a markup this afternoon.  There are very complex constitutional concerns implicated by this bill, and I think we all would have benefitted from a more thorough process that results from regular order.  Nevertheless, I appreciate that Chair Rodgers agreed to my request to hold this hearing so members can hear from experts and review the proposals before jumping to a vote later today.

And with that I yield back the balance of my time

**APP-34**

13

Mrs. RODGERS. Thank you, Mr. Pallone.

I now recognize myself to offer a motion pursuant to clause 2(g)(1) of Rule XI of the Rules of the House of Representatives to recess this hearing and reconvene in executive session because disclosure of matters to be considered would endanger national security.

I move that the committee do now recess and reconvene in executive session based on our determination that the disclosure of matters that need to be considered during this hearing would (1) endanger national security and (2) compromise sensitive law enforcement information.

The clerk will call the roll.

So the motion is before us to recess pursuant to clause 2(g)(1) of Rule XI of the House Rules.

The clerk will call the roll.

The CLERK. Burgess.

Mr. BURGESS. Burgess votes aye.

The CLERK. Burgess votes aye.

Latta.

Mr. LATTA. Aye.

The CLERK. Latta votes aye.

Guthrie.

Mr. GUTHRIE. Aye.

The CLERK. Guthrie votes aye.

Griffith.

Mr. GRIFFITH. Aye.

The CLERK. Griffith votes aye.

Bilirakis.

Mr. BILIRAKIS. Aye.

The CLERK. Bilirakis votes aye.

Bucshon.

Mr. BUCSHON. Aye.

The CLERK. Bucshon votes aye.

Hudson.

Mr. HUDSON. Aye.

The CLERK. Hudson votes aye.

Walberg.

Mr. WALBERG. Aye.

The CLERK. Walberg votes aye.

Carter.

Mr. CARTER. Aye.

The CLERK. Carter votes aye.

Duncan.

Mr. DUNCAN. Duncan votes aye.

The CLERK. Duncan votes aye.

Palmer.

Mr. PALMER. Aye.

The CLERK. Palmer votes aye.

Dunn.

Mr. DUNN. Aye.

The CLERK. Dunn votes aye.

Curtis.

[No response.]

The CLERK. Lesko.

14

Mrs. LESKO. Aye.
The CLERK. Lesko votes aye.
Pence.
Mr. PENCE. Aye.
The CLERK. Pence votes aye.
Crenshaw.
[No response.]
The CLERK. Joyce.
Mr. JOYCE. Aye.
The CLERK. Joyce votes aye.
Armstrong.
Mr. ARMSTRONG. Yes.
The CLERK. Armstrong votes aye.
Weber.
Mr WEBER. Aye.
The CLERK. Weber votes aye.
Allen.
Mr. ALLEN. Allen votes aye.
The CLERK. Allen votes aye.
Balderson.
Mr. BALDERSON. Aye.
The CLERK. Balderson votes aye.
Fulcher.
Mr. FULCHER. Aye.
The CLERK. Fulcher votes aye.
Pfluger.
Mr. PFLUGER. Aye.
The CLERK. Pfluger votes aye.
Harshbarger.
Mrs. HARSHBARGER. Aye.
The CLERK. Harshbarger votes aye.
Miller-Meeks.
Mrs. MILLER-MEEKS. Aye.
The CLERK. Miller-Meeks votes aye.
Cammack.
Mrs. CAMMACK. Aye.
The CLERK. Cammack votes aye.
Obernolte.
Mr. OBERNOLTE. Aye.
The CLERK. Obernolte votes aye.
Pallone.
Mr. PALLONE. Aye.
The CLERK. Pallone votes aye.
Eshoo.
Ms. ESHOO. Aye.
The CLERK. Eshoo votes aye.
DeGette.
Ms. DEGETTE. Aye.
The CLERK. DeGette votes aye.
Schakowsky.
Ms. SCHAKOWSKY. Aye.
The CLERK. Schakowsky votes aye.
Matsui.
Ms. MATSUI. Aye.

**APP-36**

15

The CLERK. Matsui votes aye.
Castor.
Ms. CASTOR. Aye.
The CLERK. Castor votes aye.
Sarbanes.
Mr. SARBANES. Aye.
The CLERK. Sarbanes votes aye.
Tonko.
Mr. TONKO. Aye.
The CLERK. Tonko votes aye.
Clarke.
[No response.]
The CLERK. Cárdenas.
[No response.]
The CLERK. Ruiz.
Mr. RUIZ. Aye.
The CLERK. Ruiz votes aye.
Peters.
Mr. PETERS. Aye.
The CLERK. Peters votes aye.
Dingell.
Mrs. DINGELL. Aye.
The CLERK. Dingell votes aye.
Veasey.
Mr. VEASEY. Aye.
The CLERK. Veasey votes aye.
Kuster.
Ms. KUSTER. Aye.
The CLERK. Kuster votes aye.
Kelly.
[No response.]
The CLERK. Barragán.
[No response.]
The CLERK. Blunt Rochester.
[No response.]
The CLERK. Soto.
Mr. SOTO. Aye.
The CLERK. Soto votes aye.
Craig.
[No response.]
The CLERK. Schrier.
Ms. SCHRIER. Aye.
The CLERK. Schrier votes aye.
Trahan.
[No response.]
The CLERK. Fletcher.
Mrs. FLETCHER. Aye.
The CLERK. Fletcher votes aye.
Chair Rodgers.
Mrs. RODGERS. Aye.
The CLERK. Chair Rodgers votes aye.
Ms. KELLY. Madam Clerk, how is Ms. Kelly recorded?
The CLERK. Ms. Kelly is not recorded.
Ms. KELLY. Aye.

**APP-37**

16

The CLERK. Kelly votes aye.

Mrs. RODGERS. The clerk will report the result.

The CLERK. Chair Rodgers, on that vote, we have 43 ayes and zero noes.

Mrs. RODGERS. The motion is agreed to.

We will now recess, and we will reconvene in a classified executive session in 2123 Rayburn. I ask the Members to move to our secure location, check in their electronic devices. We will reconvene in approximately 15 minutes to continue the hearing and take the witness testimony there.

The committee stands in recess.

[Whereupon, at 10:21 a.m., the committee proceeded in closed session.]

[Material submitted for inclusion in the record follows:]

**APP-38**

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 46 of 267

□ 0915

## ANNOUNCEMENT BY THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore (Mr. TIFFANY). Pursuant to clause 8 of rule XX, the Chair will postpone further proceedings today on motions to suspend the rules on which a recorded vote or the yeas and nays are ordered, or votes objected to under clause 6 of rule XX.

The House will resume proceedings on postponed questions at a later time.

## PROTECTING AMERICANS FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS ACT

Mrs. RODGERS of Washington. Mr. Speaker, I move to suspend the rules and pass the bill (H.R. 7521) to protect the national security of the United States from the threat posed by foreign adversary controlled applications, such as TikTok and any successor application or service and any other application or service developed or provided by ByteDance Ltd. or an entity under the control of ByteDance Ltd., as amended.

The Clerk read the title of the bill.

The text of the bill is as follows:

H.R. 7521

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the ''Protecting Americans from Foreign Adversary Controlled Applications Act''.

**SEC. 2. PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.**

(a) IN GENERAL.—

(1) PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.—It shall be unlawful for an entity to distribute, maintain, or update (or enable the distribution, maintenance, or updating of) a foreign adversary controlled application by carrying out, within the land or maritime borders of the United States, any of the following:

(A) Providing services to distribute, maintain, or update such foreign adversary controlled application (including any source code of such application) by means of a marketplace (including an online mobile application store) through which users within the land or maritime borders of the United States may access, maintain, or update such application.

(B) Providing internet hosting services to enable the distribution, maintenance, or updating of such foreign adversary controlled application for users within the land or maritime borders of the United States.

(2) APPLICABILITY.—Subsection (a) shall apply—

(A) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(A), beginning on the date that is 180 days after the date of the enactment of this Act; and

(B) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(B), beginning on the date that is 180 days after the date of the relevant determination of the President under such subsection.

(b) DATA AND INFORMATION PORTABILITY TO ALTERNATIVE APPLICATIONS.—Before the date on which a prohibition under subsection (a) applies to a foreign adversary controlled application, the entity that owns or controls such application shall provide, upon request by a user of such application within the land or maritime borders of United States, to such user all the available data related to the account of such user with respect to such application. Such data shall be provided in a machine readable format and shall include any data maintained by such application with respect to the account of such user, including content (including posts, photos, and videos) and all other account information.

(c) EXEMPTIONS.—

(1) EXEMPTIONS FOR QUALIFIED DIVESTITURES.—Subsection (a)—

(A) does not apply to a foreign adversary controlled application with respect to which a qualified divestiture is executed before the date on which a prohibition under subsection (a) would begin to apply to such application; and

(B) shall cease to apply in the case of a foreign adversary controlled application with respect to which a qualified divestiture is executed after the date on which a prohibition under subsection (a) applies to such application.

(2) EXEMPTIONS FOR CERTAIN NECESSARY SERVICES.—Subsections (a) and (b) do not apply to services provided with respect to a foreign adversary controlled application that are necessary for an entity to attain compliance with such subsections.

(d) ENFORCEMENT.—

(1) CIVIL PENALTIES.—

(A) FOREIGN ADVERSARY CONTROLLED APPLICATION VIOLATIONS.—An entity that violates subsection (a) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $5,000 by the number of users within the land or maritime borders of the United States determined to have accessed, maintained, or updated a foreign adversary controlled application as a result of such violation.

(B) DATA AND INFORMATION VIOLATIONS.—An entity that violates subsection (b) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $500 by the number of users within the land or maritime borders of the United States affected by such violation.

(2) ACTIONS BY ATTORNEY GENERAL.—The Attorney General—

(A) shall conduct investigations related to potential violations of subsection (a) or (b), and, if such an investigation results in a determination that a violation has occurred, the Attorney General shall pursue enforcement under paragraph (1); and

(B) may bring an action in an appropriate district court of the United States for appropriate relief, including civil penalties under paragraph (1) or declaratory and injunctive relief.

(e) SEVERABILITY.—

(1) IN GENERAL.—If any provision of this section or the application of this section to any person or circumstance is held invalid, the invalidity shall not affect the other provisions or applications of this section that can be given effect without the invalid provision or application.

(2) SUBSEQUENT DETERMINATIONS.—If the application of any provision of this section is held invalid with respect to a foreign adversary controlled application that satisfies the definition of such term pursuant to subsection (g)(3)(A), such invalidity shall not affect or preclude the application of the same provision of this section to such foreign adversary controlled application by means of a subsequent determination pursuant to subsection (g)(3)(B).

(f) RULE OF CONSTRUCTION.—Nothing in this Act may be construed—

(1) to authorize the Attorney General to pursue enforcement, under this section, other than enforcement of subsection (a) or (b);

(2) to authorize the Attorney General to pursue enforcement, under this section, against an individual user of a foreign adversary controlled application; or

(3) except as expressly provided herein, to alter or affect any other authority provided by or established under another provision of Federal law.

(g) DEFINITIONS.—In this section:

(1) CONTROLLED BY A FOREIGN ADVERSARY.—The term ''controlled by a foreign adversary'' means, with respect to a covered company or other entity, that such company or other entity is—

(A) a foreign person that is domiciled in, is headquartered in, has its principal place of business in, or is organized under the laws of a foreign adversary country;

(B) an entity with respect to which a foreign person or combination of foreign persons described in subparagraph (A) directly or indirectly own at least a 20 percent stake; or

(C) a person subject to the direction or control of a foreign person or entity described in subparagraph (A) or (B).

(2) COVERED COMPANY.—

(A) IN GENERAL.—The term ''covered company'' means an entity that operates, directly or indirectly (including through a parent company, subsidiary, or affiliate), a website, desktop application, mobile application, or augmented or immersive technology application that—

(i) permits a user to create an account or profile to generate, share, and view text, images, videos, real-time communications, or similar content;

(ii) has more than 1,000,000 monthly active users with respect to at least 2 of the 3 months preceding the date on which a relevant determination of the President is made pursuant to paragraph (3)(B);

(iii) enables 1 or more users to generate or distribute content that can be viewed by other users of the website, desktop application, mobile application, or augmented or immersive technology application; and

(iv) enables 1 or more users to view content generated by other users of the website, desktop application, mobile application, or augmented or immersive technology application.

(B) EXCLUSION.—The term ''covered company'' does not include an entity that operates a website, desktop application, mobile application, or augmented or immersive technology application whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews.

(3) FOREIGN ADVERSARY CONTROLLED APPLICATION.—The term ''foreign adversary controlled application'' means a website, desktop application, mobile application, or augmented or immersive technology application that is operated, directly or indirectly (including through a parent company, subsidiary, or affiliate), by—

(A) any of—

(i) ByteDance, Ltd.;

(ii) TikTok;

(iii) a subsidiary of or a successor to an entity identified in clause (i) or (ii) that is controlled by a foreign adversary; or

(iv) an entity owned or controlled, directly or indirectly, by an entity identified in clause (i), (ii), or (iii); or

(B) a covered company that—

(i) is controlled by a foreign adversary; and

(ii) that is determined by the President to present a significant threat to the national security of the United States following the issuance of—

(I) a public notice proposing such determination; and

(II) a public report to Congress, submitted not less than 30 days before such determination, describing the specific national security concern involved and containing a classified annex and a description of what assets would need to be divested to execute a qualified divestiture.

(4) FOREIGN ADVERSARY COUNTRY.—The term "foreign adversary country" means a country specified in section 4872(d)(2) of title 10, United States Code.

(5) INTERNET HOSTING SERVICE.—The term "internet hosting service" means a service through which storage and computing resources are provided to an individual or organization for the accommodation and maintenance of 1 or more websites or online services, and which may include file hosting, domain name server hosting, cloud hosting, and virtual private server hosting.

(6) QUALIFIED DIVESTITURE.—The term "qualified divestiture" means a divestiture or similar transaction that—

(A) the President determines, through an interagency process, would result in the relevant foreign adversary controlled application no longer being controlled by a foreign adversary; and

(B) the President determines, through an interagency process, precludes the establishment or maintenance of any operational relationship between the United States operations of the relevant foreign adversary controlled application and any formerly affiliated entities that are controlled by a foreign adversary, including any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing.

(7) SOURCE CODE.—The term "source code" means the combination of text and other characters comprising the content, both viewable and nonviewable, of a software application, including any intelligible human-readable language, protocol, or functional content, as well as any successor languages or protocols.

(8) UNITED STATES.—The term "United States" includes the territories of the United States.

**SEC. 3. JUDICIAL REVIEW.**

(a) RIGHT OF ACTION.—A petition for review challenging this Act or any action, finding, or determination under this Act may be filed only in the United States Court of Appeals for the District of Columbia Circuit.

(b) EXCLUSIVE JURISDICTION.—The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over any challenge to this Act or any action, finding, or determination under this Act.

(c) STATUTE OF LIMITATIONS.—A challenge may only be brought—

(1) in the case of a challenge to this Act, not later than 165 days after the date of the enactment of this Act; and

(2) in the case of a challenge to any action, finding, or determination under this Act, not later than 90 days after the date of such action, finding, or determination.

The SPEAKER pro tempore. Pursuant to the rule, the gentlewoman from Washington (Mrs. RODGERS) and the gentleman from New Jersey (Mr. PALLONE) each will control 20 minutes.

Mr. MASSIE. Mr. Speaker, I rise in actual opposition to the bill.

The SPEAKER pro tempore. Is the gentleman from New Jersey opposed to the motion?

Mr. PALLONE. Mr. Speaker, no.

The SPEAKER pro tempore. The gentleman from New Jersey is not opposed to the motion.

The gentleman from Kentucky (Mr. MASSIE) will control 20 minutes in opposition.

The Chair recognizes the gentlewoman from Washington (Mrs. RODGERS).

GENERAL LEAVE

Mrs. RODGERS of Washington. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days in which to revise and extend their remarks and include extraneous material in the RECORD on the bill.

The SPEAKER pro tempore. Is there objection to the request of the gentlewoman from Washington?

There was no objection.

Mrs. RODGERS of Washington. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I rise today in support of H.R. 7521, the Protecting Americans from Foreign Adversary Controlled Applications Act.

Foreign adversaries, like the Chinese Communist Party, pose the greatest national security threat of our time. TikTok's access to 177 million American users makes it a valuable propaganda tool for the CCP to exploit.

Over the past week, we saw in real time how CCP-controlled TikTok used its influence and power to force users to contact their Representatives if they even wanted to continue using the app. This is just a small taste of how the CCP weaponizes applications it controls to manipulate tens of millions of people to further its agenda.

Today's legislation will end this abuse by preventing apps controlled by foreign adversaries from targeting, surveilling, and manipulating the American people. We have given TikTok a clear choice: Separate from your parent company, ByteDance, which is beholden to the CCP, and remain operational in the United States, or side with the CCP and face the consequences. The choice is TikTok's.

Companies controlled by a foreign adversary, like the CCP, will never embrace American values like the freedom of speech, human rights, the rule of law, and a free press. If given the choice, they will always choose the path of more control, more surveillance, and more manipulation. In the case of TikTok, we wouldn't even know it.

Today, we send a clear message that we will not tolerate our adversaries weaponizing our freedoms against us.

Mr. Speaker, I encourage my colleagues to support this bill, and I reserve the balance of my time.

Mr. MASSIE. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I know the sponsors of this bill are sincere in their concerns and in their effort to protect Americans. They have described the TikTok application as a Trojan horse, but there are some of us who feel that, either intentionally or unintentionally, this legislation to ban TikTok is actually a Trojan horse. Some of us are concerned that there are First Amendment implications here.

Americans have the right to view information. We don't need to be protected by the government from information. Some of us just don't want the President picking which apps we can put on our phones or which websites we can visit. We don't think that is appropriate.

We also think it is dangerous to give the President that kind of power, to give him the power to decide what Americans can see on their phones and on their computers. To give him that sort of discretion, we also think, is dangerous.

People say that this TikTok ban will only apply to TikTok or maybe another company that pops up just like TikTok, but the bill is written so broadly that the President could abuse that discretion and include other companies that aren't just social media companies and that aren't, as some people would believe, controlled by foreign adversaries. Again, we are giving the President that discretion to decide whether it is controlled by a foreign adversary.

There were some people who were legitimately concerned that this was an overly broad bill, and they got an exclusion written into the bill that I want to read. It says: "The term 'covered company' does not include an entity that operates a website . . . or . . . application whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews."

Why is this exception in the bill? Why did somebody feel like they needed this exception if the bill itself only covers social media applications that foreign adversaries are running? These and other questions we hope to answer in the course of this debate, and I reserve the balance of my time.

Mrs. RODGERS of Washington. Mr. Speaker, I yield 10 minutes to the gentleman from New Jersey (Mr. PALLONE) and ask unanimous consent that he be permitted to control that time.

The SPEAKER pro tempore. Is there objection to the request of the gentlewoman from Washington?

There was no objection.

Mr. PALLONE. Mr. Speaker, I yield myself 3 minutes.

Mr. Speaker, I rise in support of H.R. 7521, the Protecting Americans from Foreign Adversary Controlled Applications Act.

Big Tech has transformed social media platforms into modern-day media companies. Unfortunately, these networks engage in invasive surveillance practices by collecting Americans' most sensitive personal data.

Foreign adversaries also see access to Americans' data communication networks, devices, and applications as the entry points to disrupt our daily lives and conduct espionage activities. All of this endangers our national security interests.

We have a long history of restricting our television and radio airwaves from ownership by foreign governments and

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 48 of 267

individuals due to the national security concerns that these arrangements pose. Social media companies should also face similar scrutiny. After all, while technology has evolved, the threats are very much the same.

I also take the concerns raised by the intelligence community very seriously. They have asked Congress to give them more authority to act in narrowly defined situations. I believe this bill would do just that by addressing the national security risks posed by applications operated by companies controlled by foreign adversaries.

While this bill establishes a national security framework that could apply to other applications, much of the public attention has focused on TikTok. The combination of TikTok's Beijing Communist-based ownership and the fact that over 170 million Americans use it exacerbates its dangers to our country and our privacy.

Laws in China allow the Chinese Communist Party to compel companies like TikTok to share data with them whether the companies want to or not. This means the CCP has the ability with TikTok to compromise device security, maliciously access Americans' data, promote pro-Communist propaganda, and undermine our Nation's interests.

This is extremely troubling. Beijing, China, should not have the control over Americans that TikTok gives them. It is my hope that, if enacted, this legislation will force divestment of TikTok so that Americans will be able to continue to use this platform without the risk that it is being operated and controlled by Beijing, China.

However, even if TikTok is divested, China and other foreign adversaries will still be able to acquire vast amounts of Americans' data. That is because we place no restrictions on who data brokers can sell data to, and that must stop as well. I look forward to the House considering next week legislation that I introduced with Chair RODGERS that would stop this from happening.

We must begin to hold Big Tech accountable for transforming the information superhighway into a super-spreader of harmful content, invasive surveillance practices, and addictive and damaging design features, all with the goal of collecting more data. We must enact a comprehensive data privacy bill so that we finally give Americans control over how their data is used and collected.

I thank Representatives KRISHNAMOORTHI and GALLAGHER for their bipartisan work on this bill, which unanimously passed out of the Energy and Commerce Committee last week, and I urge my colleagues to support H.R. 7521.

Mr. Speaker, I reserve the balance of my time.

Mr. MASSIE. Mr. Speaker, I reserve the balance of my time.

Mrs. RODGERS of Washington. Mr. Speaker, I yield 1½ minutes to the gentleman from Wisconsin (Mr. GALLAGHER).

Mr. GALLAGHER. Mr. Speaker, TikTok is a threat to our national security because it is owned by ByteDance, which does the bidding of the Chinese Communist Party. We know this because ByteDance leadership says so and because Chinese law requires it.

This bill, therefore, would force TikTok to break up with the Chinese Communist Party. It does not apply to American companies. It only applies to companies subject to the control of foreign adversaries defined by Congress. It says nothing about election interference and cannot be turned against any American social media platform.

It does not impact websites in general. The only impacted sites are those associated with foreign adversary apps, such as TikTok.com.

It can never be used to penalize individuals. The text explicitly prohibits that.

It cannot be used to censor speech. It takes no position at all on the content of speech, only foreign adversary control, foreign adversary control of what is becoming the dominant news platform for Americans under 30.

Mr. Speaker, this is a commonsense measure to protect our national security, and I urge my colleagues to support this critical bipartisan legislation.

Mr. MASSIE. Mr. Speaker, I reserve the balance of my time.

Mr. PALLONE. Mr. Speaker, I yield 3 minutes to the gentleman from Illinois (Mr. KRISHNAMOORTHI), who is the Democratic sponsor of the bill.

Mr. KRISHNAMOORTHI. Mr. Speaker, I thank Ranking Member PALLONE; Mr. GALLAGHER, my partner on this bill; Chairwoman McMORRIS RODGERS; and all the members of the select committee.

First, this bill is not a ban, and it is not about TikTok. It is about ByteDance. Let me tell you about ByteDance. ByteDance is a 100-percent owner of TikTok. ByteDance is controlled by the Chinese Communist Party.

In fact, the editor in chief of ByteDance is the secretary of the Chinese Communist Party cell embedded at the very highest ranks of the company. He has been charged with making sure that TikTok and all products of ByteDance adhere to "correct political direction."

This particular bill ensures that ByteDance divests itself of the vast majority of the ownership of TikTok. Our intention is for TikTok to continue to operate but not under the control of the Chinese Communist Party.

Secondly, this divestment requirement is not new. It is not without precedent. When the app Grindr, a popular LGBTQ app, was acquired by a Chinese company and the United States Government determined that sensitive data of LGBTQ members of the military and U.S. Government officials got into the hands of the Chinese Communist Party, they required divestment.

This happened quickly. Why? Because Grindr was a very valuable social media company. The same is true with regard to TikTok. There will be no disruption to users, just as there was with Grindr.

The third point, unfortunately, when TikTok has appeared before Congress, whether it is before the House Energy and Commerce Committee or otherwise, it has not been candid.

First, TikTok has said its data is not accessible to China-based ByteDance employees. False. China-based employees routinely access this data, even unbeknownst to employees of TikTok USA.

In addition, TikTok said its data will not be weaponized and has not been weaponized against American citizens. Again, false. Published reports have shown that TikTok data, geolocation data, has been used to surveil American journalists who reported on problems with Chinese-based employees having access to American user data.

Finally, last week, under the leadership of the chairwoman and the ranking member, they brought up for consideration our bill before the House Energy and Commerce Committee. On the morning of that vote, TikTok delivered a push notification and a popup to thousands of user across the country. They used geolocation data targeting minor children to then force them to call congressional offices in order to continue using the app. In doing so, these children called and asked the question: What is Congress, and what is a Congressman? This influence campaign illustrates the need for this bill.

Mr. MASSIE. Mr. Speaker, I yield 3 minutes to the gentleman from Ohio (Mr. DAVIDSON), a data privacy champion.

Mr. DAVIDSON. Mr. Speaker, I thank the gentleman for yielding time.

Mr. Speaker, I think it is important we solve the right problem. The gentleman from New Jersey, who isn't actually opposed to the bill, seems to have identified the real issue, which is data privacy. I think it is important that we solve the correct problem.

Our problem with all these companies, social media and otherwise—your car, your phone, you name it—is surveillance. The spying that goes on of American citizens does need to be addressed, and it should be addressed by the Energy and Commerce Committee.

□ 0930

I have long pleaded with Members of both sides of the aisle to pass H.R. 4639 to reclaim the privacy rights that are so deeply infringed in our country, and by avoiding that problem, we take away the energy and momentum to address the root issue.

Frankly, the people sponsoring this bill today claim that the real issue is ownership.

Nonetheless, who owns this company?

USCA Case #24-1113     Document #2060757     Filed: 06/20/2024     Page 49 of 267

It is not 100 percent owned by ByteDance. Mr. Speaker, 60 percent of it is owned by investors, including American investors; 20 percent is owned by the founders; and 20 percent is owned by employees, over 7,000 employees. The company's headquarters is not in China, it is in Singapore. The American user data isn't housed in China, it is housed in Texas controlled by a database owned by Oracle.

The administration seems to believe that they can ban the export of Americans' sensitive data not just on TikTok but on all platforms because they just issued an executive order banning the export.

Now, I wish this were the bill that PRAMILA JAYAPAL and I have sponsored that we were moving, the Fourth Amendment Is Not For Sale Act. It passed Judiciary, but its complement to prevent foreigners from buying it would also address the privacy concerns.

So if we think we can address the privacy concerns, then what is left to address?

Frankly, it is content moderation.

Mr. Speaker, do you remember before Elon Musk bought the crime scene at Twitter? It was all a conspiracy theory that these algorithms were silencing and canceling people. You guys are crazy.

No. When Elon Musk bought Twitter he did keep it operating with 80 percent fewer employees, but what we found is a lot of the employees were trying to do content moderation, shape who sees what and how they see it, which algorithms are used, and how does it promote certain people and filter others.

So, really, Mr. Speaker, what you are saying here is that if you are not fully engaged with America's three-letter agencies in content moderation, we plan to TikTok you.

Moreover, this bill isn't just limited to TikTok. It is a coercive power that can be applied to others, apps like Telegram and TUR. Things that provide privacy would be targeted by this bill—perhaps Tether, one of the things that they can't control as a monetary system.

When you look at companies, Mr. Speaker, if it enables one user to see content that isn't approved, it is subject to a $500 million fine per user.

The SPEAKER pro tempore. The time of the gentleman has expired.

Mr. MASSIE. Mr. Speaker, I yield an additional 30 seconds to the gentleman from Ohio.

Mr. DAVIDSON. Mr. Speaker, this is meant to be able to take out anything, including email where its one user sees it. So it could target an infinite number of companies, but not an infinite number of places.

So, for that, I do applaud the work that was done to back off from the dystopian RESTRICT Act, but this is essentially a downpayment on the RESTRICT Act. I encourage everyone to look up the RESTRICT Act.

This is what the administration really wanted to do. What Members of Congress on both sides of the aisle wanted to do is to create a bigger surveillance state, and that is what the Intel Committee wants to do with FISA, is to make it bigger. We have to shrink it and protect our Fourth Amendment right to privacy.

Mrs. RODGERS of Washington. Mr. Speaker, it is not true that this is a downpayment on the RESTRICT Act—not interested in the RESTRICT Act.

Mr. Speaker, I yield 30 seconds to the gentleman from Ohio (Mr. LATTA).

Mr. LATTA. Mr. Speaker, the CEO of TikTok appeared before the Energy and Commerce Committee and admitted to me during questioning that ByteDance has access to U.S. user data.

This should be an alarm to every TikTok user. There is no reason why the Chinese Communist Party should be in control of an app that can access information on a user's phone. Moreover, because companies who are owned or linked to the Chinese Communist Party are forced to comply with their laws, ByteDance and its employees are taking orders from this Communist regime.

This is not a ban, but it provides Communist China-controlled ByteDance, the parent company of TikTok, a choice. If ByteDance divests their ownership of TikTok, then TikTok would be available to its U.S. users.

Mr. Speaker, I urge all my colleagues to support this legislation.

Mr. PALLONE. Mr. Speaker, I yield 2 minutes to the gentlewoman from California (Ms. PELOSI), the Speaker Emerita.

Ms. PELOSI. Mr. Speaker, I thank the gentleman for yielding and for his leadership on this very important issue. I thank the distinguished chairwoman of the Energy and Commerce Committee and associate myself with her remarks as well as with Mr. PALLONE. I thank Mr. KRISHNAMOORTHI and Chairman GALLAGHER of the Select Committee on China for their great leadership bringing this legislation forward to the committee of legislative jurisdiction.

Mr. Speaker, I have a few points to make, and it is interesting to hear this respectful debate.

First of all, this is not a ban on TikTok. I am a grandmother of teenagers. I understand the entertainment value, the educational value, the communication value, and the business value for some businesses on this. This is not an attempt to ban TikTok. It is an attempt to make TikTok better, tic-tac-toe, a winner.

Here is what I have to say: The people of China have come forth. The Tibetans have come forth and said on TikTok that in China they are suppressed. They cannot put their message out. Not only that, but the Chinese Government misrepresents the situation in Tibet.

Let me just tell you about Hong Kong, Mr. Speaker. During the Hong Kong election, TikTok TikToked into Taiwan that the Uyghurs on whom there is a genocide exercised by the Chinese Government, they have told the people in Taiwan that the Uyghurs like that genocide, and they told them that the people of Hong Kong liked the destruction of their democracy. They don't frame it that way, but that is their message. Again, they are suppressing the communications from Tibet.

Then, just yesterday on the steps, we heard from the Taiwan people, we heard from the Tibetans, we heard from Hong Kong, and we heard from a woman whose husband was arrested because of his communications with somebody with a shared view.

So this is controlled by the Chinese Communist Government. I can't forget this.

The SPEAKER pro tempore. The time of the gentlewoman has expired.

Mr. PALLONE. Mr. Speaker, I yield an additional 30 seconds to the gentlewoman from California.

Ms. PELOSI. Forgetting that, if you can—Mr. Speaker, I can't—think of this: The Chinese Government will control the algorithm, and they can change it any time in the United States.

Mr. Speaker, I urge a "yes" vote.

Mr. MASSIE. Mr. Speaker, I yield 4 minutes to the gentleman from North Carolina (Mr. BISHOP), who is my friend and fellow colleague on the Judiciary Committee.

Mr. BISHOP of North Carolina. Mr. Speaker, this is not the first time that restricting speech has been pursued in the interests of national security. In fact, in 5 days' time, next Monday, I will go to the Supreme Court for the first time where I will attend an oral argument in the case of Murphy v. Missouri.

It is a case where agents from the White House, the Department of Justice, and other Federal agencies embedded themselves with American social media companies to manipulate what could appear on social media: expression by the American people.

It has been described by the lower court as the most massive attack on free speech in U.S. history.

Even as that pends for a decision by the Supreme Court, Congress would in this legislation say, in effect: Hold my beer.

I don't use TikTok. I think it is ill-advised to do so. Members of this body are famous on TikTok, and I think that is unwise. Be that as it may, I respect the choices of 170 million users in the United States.

The Trump administration attempted to ban TikTok in 2020. It was held that it couldn't do so in two court decisions because under the International Emergency Economic Powers Act, he is subject to the Berman amendment, passed in 1988 by this body, to provide that in the interest of dealing with hostile foreign powers, the President can do all sorts of things

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 50 of 267

with respect to commerce, but he cannot ban the free flow of information across international boundaries.

I have heard that described as a gap in the law, but it is a feature. It is not a bug.

This legislation cannot be described as other than receding from the Berman amendment. That principle in American law—which did not, by the way, emerge from the brow of Representative Berman in 1988—was predicated on a much earlier principle of First Amendment law established in 1965 by the United States Supreme Court in the case Lamont v. Postmaster General which said the American people have a First Amendment right of access to foreign propaganda.

At first, it may be remarkable or strike one as odd to hear that. However, it is because the proper relationship between government and citizen in the United States is that the citizen decides what to be exposed to and what ideologies to embrace and consider and is always free to engage in expression including across international boundaries. That remains the prevailing constitutional law today.

It begs this question: How could it be that Congress should be working hard to devise a means to circumvent that prevailing principle of the First Amendment against the use of a particular means of expression by 170 million Americans?

Isn't it ironic that the technical advisers in the construction of this legislation to design it so that it can get around legislation challenges, including isolating litigation challenges to 180 days and only in the court of appeals in the District of Columbia, those technical advisers are the same folks at the Department of Justice who devised that plan to embed agents of the Department of Justice and other Federal agencies with social media platforms in the United States to restrict what Americans could say online.

Mr. Speaker, America confronts a grave challenge in China, and it will not prevail by becoming more like them.

Mr. MASSIE. Mr. Speaker, I yield back the balance of my time.

Mrs. RODGERS of Washington. Mr. Speaker, I yield 30 seconds to the gentleman from Kentucky (Mr. GUTHRIE).

Mr. GUTHRIE. Mr. Speaker, I want to emphasize this bill does not ban TikTok. It simply would require the Chinese Communist Party-affiliated ByteDance to sell TikTok and divest their interest.

I was asked: Does this affect TikTok? No. It is any foreign adversary or any app that is owned, controlled, or unduly influenced by any foreign adversary.

We must protect our national security and help keep America's private data out of the hands of our foreign adversaries.

Mr. Speaker, I urge support of this bill.

Mr. PALLONE. Mr. Speaker, I yield 2 minutes to the gentlewoman from California (Ms. ESHOO), who is a member of the committee.

Ms. ESHOO. Mr. Speaker, I thank the ranking member of the Energy and Commerce Committee for yielding.

Mr. Speaker, I rise today in support of H.R. 7521, the Protecting Americans from Foreign Adversary Controlled Applications Act.

This bill will ensure the divestiture of TikTok from its People's Republic of China-controlled parent company, ByteDance.

Why is it essential for Congress to do this?

It is because the PRC controls ByteDance, and this presents a serious national security threat to our country.

TikTok has 170 million-plus U.S. users, and it collects tremendous amounts of sensitive data. They also collect substantial background data that may be proprietary which may only be available to TikTok.

The national security law of the PRC requires all Chinese organizations to "support, assist, and cooperate with national intelligence efforts." Under this law, ByteDance could be compelled by the Chinese Government to provide data on every American TikTok user. They can weaponize this data to exploit and manipulate Americans through surveillance and disinformation.

This legislation separates TikTok's data, algorithms, and source code from ByteDance.

Importantly, this bill does not ban TikTok, something I do not support.

I support divestiture because our first and most important responsibility as Members of Congress is to defend our Constitution and protect and defend the United States of America. The bill would also give Americans secure ownership of their data, including posts, photos, and videos, and give this administration and future administrations the authority to respond to future national security threats.

For all these reasons, I urge all my colleagues to vote for this legislation in the name of our national security.

□ 0945

The SPEAKER pro tempore. The gentleman from New Jersey's time has expired.

Mr. MASSIE. Mr. Speaker, I yield 4 minutes to the gentlewoman from Georgia (Ms. GREENE).

Ms. GREENE of Georgia. Mr. Speaker, I rise today as the only Member of Congress that has ever been banned by social media.

On January 2, 2022, Twitter banned me, banned my personal account on which I was campaigning for Congress, raising money, and using my free speech to inform the voters in my district they can vote for me.

This was not done by a company owned by China. That was done by American-owned Twitter. This came on the heels of our own United States Government working with Big Tech and working with social media companies to censor and ban Americans' free speech.

I believe that this bill can cause future problems. It is opening Pandora's box, and I am opposed to this bill.

Most Americans don't trust the United States Government because of our experience dealing with it. Never forget that the United States Government also was the one that provided the Russia hoax to Americans. It also worked to ban Americans' free speech. It also has worked in so many ways to illegally spy on Americans through FISA without a warrant.

If we wanted to be serious about stopping a foreign adversary, if we wanted to be serious about stopping China, we would stop China from buying our U.S. farmland. We would raise up our American energy independence. We would also stop the Green New Deal and not rely on China who owns and operates 85 percent of the battery market worldwide.

There are dangers that lie ahead in this. This is really about controlling Americans' data. If we cared about Americans' data, then we would stop the sale of Americans' data universally, not just with China.

There is some further issues. This is a Pandora's box. What is to stop Congress or the United States Government in the future from forcing the sale of another social media company claiming that it is protecting Americans' data from foreign adversaries.

I think we can see in the future another Russia, Russia, Russia, and possibly force the sale of X as many Members in this body claim that Elon Musk is altering the algorithms of X.

By the way, it was Elon Musk's purchase of X that restored my social media account on Twitter and allowed me to have my free speech back on Twitter.

There are also Democrat Members of this body claiming that election meddling can happen on social media.

Well, we can never forget Mark Zuckerberg and Facebook. We can never forget the election meddling that happened there. By the way, American-owned Facebook and Instagram is where most of the garbage like the gender lies and the woke lies exist.

Many Americans and many teenagers believe awful things and they don't just see them on TikTok, they see them on Facebook and Instagram, too. I don't think this will accomplish what the goal is to accomplish.

The other concern is that when the government moves in to force the sale of TikTok, who is going to buy it? That is the question that we should be asking. Who is going to buy it? Who will be the next to control the data of over 170 million Americans? Are we going to trust Mark Zuckerberg to control their data? I certainly don't.

By the way, most of the time, my posts on Facebook are shadow banned, and I certainly don't have the reach on that social media account.

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 51 of 267

I think that there are many other ways to protect data, and I think this body is capable of it if we choose to do it.

Mr. Speaker, I oppose the bill.

Mrs. RODGERS of Washington. Mr. Speaker, I yield 1½ minutes to the gentleman from Texas (Mr. ROY).

Mr. ROY. Mr. Speaker, we are in a cold war with China and some of my colleagues want to ignore this fact. We have legislation before us that is 12 pages long.

The bill is not a ban. It forces foreign adversaries, including Chinese Communists, to divest. The bill is not a bill of attainder; it is prospective, not retrospective.

The bill does not violate the First Amendment. It focuses on conduct, not content. It requires both being controlled by a foreign adversary and conduct that itself is espionage. If you just had one alone, it might be debatable, as the gentleman from North Carolina or Senator PAUL notes, in that it might protect Americans' rights to seek out and obtain foreign propaganda. However, again, that is not this case because we have, and have as a trigger in the bill, demonstrated national security conduct harm.

To be clear, we have properly taken action at the device layer by banning Huawei and ZTE spy gear. We have taken action at the carrier level, prohibiting China Mobile and China Telecom from connecting to our networks based on a determination they are controlled by the CCP and a national security threat.

We now need to take action at the application level when malign CCP control has been demonstrated lest we render meaningless our past actions to protect the United States of America.

We should ban Chicom ownership of our farmland or drug manufacturing, but we should fight them here and ban the foreign ownership and control of American data and stop apologizing for the Chinese Communists.

Mr. MASSIE. Mr. Speaker, I yield 1 minute to the gentleman from California (Mr. ROBERT GARCIA), my friend on the other side of the aisle.

Mr. ROBERT GARCIA of California. Mr. Speaker, I have enormous respect for the efforts of my colleagues to focus on security and data protection and I share many of their concerns; however, I disagree with this approach and this bill that could impact 170 million Americans who use TikTok.

One-third of all U.S. adults use the app and millions of entrepreneurs and small business owners use the platform to support their family.

Yes, just like every other social media platform, there is misinformation and privacy concerns on TikTok, and I share those; however, it is important that we don't treat TikTok differently than other platforms.

If we are going to address this issue, we have to take the same approach to all social media platforms. We can't just single out one.

I join many of my colleagues and the ACLU in voicing concern over the freedom of expression. I am a strong supporter of ensuring that TikTok remains an open marketplace. There is no guarantee in this bill that there won't be an interruption of service that could lead to an end of this app. I don't think we will fully appreciate the impact this is going to have. Mr. Speaker, I am a strong "no."

Mrs. RODGERS of Washington. Mr. Speaker, I yield 30 seconds to the gentleman from Indiana (Mr. BUCSHON).

Mr. BUCSHON. Mr. Speaker, one of the most important duties the Constitution assigns to Congress is to protect the American people and to safeguard our national security.

After hearing from national security experts last week, it is clear the prolific use of media platforms controlled by the Chinese Communist Party and other foreign adversaries poses a danger to our country.

I am grateful to my bipartisan colleagues for moving this legislation, showing we will take action to protect the American people by protecting their personal data and security from foreign interference and manipulation. We took an oath to do so.

Mr. MASSIE. Mr. Speaker, I yield 1 minute to the gentlewoman from California (Ms. KAMLAGER-DOVE), my friend on the other side of the aisle.

Ms. KAMLAGER-DOVE. Mr. Speaker, I rise today to oppose H.R. 7521.

Banning TikTok is an insufficient Band-Aid solution to the genuine national security concerns the app raises and exposes. The bill seriously undermines civil liberties by essentially banning a platform that 150 million Americans use to engage in free speech and expression. A statewide TikTok ban has already been paused by a Federal judge on First Amendment grounds.

Even without TikTok, the PRC could still be able to conduct influence operations on other social media platforms and obtain sensitive U.S. user data through hacking or data brokers.

Finally, this bill would greatly expand the executive's authority to ban tech companies with zero congressional oversight. I cannot sign a blank check to some future President who would easily and dangerously weaponize this legislation to profit and silence.

The creatives, artists, content creators, and businesses in my district will get caught in the cross fire of this bill, and deserve better than Federal overreach as a substitute for a thoughtful and incisive solution to this complicated national security challenge.

Mrs. RODGERS of Washington. Mr. Speaker, I yield 40 seconds to the gentlewoman from Iowa (Mrs. HINSON).

Mrs. HINSON. Mr. Speaker, I rise today in support of this simple bill. It forces TikTok to cut ties with the CCP or lose American users.

The day after we introduced our bill, TikTok went into panic mode. They lied to their users saying Congress was going to ban TikTok, using young kids as political pawns.

TikTok's gross stunt proved our point. What if on election day, TikTok sent out an alert saying our elections were canceled. We must act now.

Today, we are sending a message to the CCP that we are going to deflate the 140 million spy balloons that they have installed on American phones. We must act and pass this bill today.

Mr. MASSIE. Mr. Speaker, I reserve the balance of my time.

Mrs. RODGERS of Washington. Mr. Speaker, I yield 1 minute to the gentlewoman from Florida (Mrs. CAMMACK).

Mrs. CAMMACK. Mr. Speaker, today, we take a stand against the Chinese Communist Party and their efforts to turn content creators in America into foot soldiers for the CCP.

We aren't banning a company, as the highest paid lobbyist for ByteDance, which is owned by China, would lead you to believe. We aren't infringing on constitutionally protected speech or growing the size of government.

All we are saying is break up with the Chinese Communist Party. As a constitutional conservative, I don't want my government or Big Tech to have unfettered access to my private data, so why in the hell would we want and allow the Chinese Communist Party to have access to our private data?

The CCP is an adversary of the United States, and this legislation narrowly, thoughtfully, and directly addresses the national security threat and protects Americans' data and, by extension, their First Amendment rights, because let us not pretend for one second that TikTok is not infringing on our First Amendment rights.

I would say, as Representative ROY from Texas said, this bill is about conduct, not content.

The SPEAKER pro tempore. The time of the gentlewoman has expired.

Mrs. CAMMACK. There is no restriction mentioned on content in this bill.

The SPEAKER pro tempore. The time of the gentlewoman has expired.

Mrs. CAMMACK. But I will mention, Mr. Speaker, that the espionage is not covered or protected as one of the five tenets of the First Amendment.

The SPEAKER pro tempore. The gentlewoman is no longer recognized.

Mr. MASSIE. Mr. Speaker, I yield 1 minute to my good friend from Arizona (Mr. SCHWEIKERT).

Mr. SCHWEIKERT. Mr. Speaker, I actually am about to try to make everyone mad. I actually believe data is a private property right. It belongs to you as an American citizen. The problem with our design here, it is really well-meaning, but it doesn't get at the structural problem.

Let's say you have an entity over here that divests. What makes them not then take the data, sell it to a data broker, and it gets washed and ends up still in the bad actors' hands?

You have to understand, there is even articles out this week of even our

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 52 of 267

own three-letter agencies buying their data now from data brokers instead of doing the tracking.

We need to think dramatically more globally. Your data is a private property right. That will be the only way we end up protecting ourselves from bad actors and sometimes even our own selves.

Mrs. RODGERS of Washington. Mr. Speaker, I yield 30 seconds to the gentleman from Michigan (Mr. WALBERG).

Mr. WALBERG. Mr. Speaker, last March when I asked about Americans' data being stored and accessed by China, TikTok CEO stated under oath that it was not accessible by the CCP. However, this statement was a lie. As their own internal recording said, ''everything is seen in China.''

H.R. 7521 gives TikTok and similar apps 6 months to divest from their parent company ByteDance. It is their choice. TikTok needs to decide whether they value their users or their ties to the Chinese Communist Party more. It is as simple as that. I urge a vote for this bill.

□ 1000

Mr. MASSIE. Mr. Speaker, I yield myself the balance of my time to close.

Mr. Speaker, I know the other side is sincere. We have not questioned that here today, and I won't question their sincerity.

In fact, I think they have identified at least three problems that we have in America: moral decay of our society, invasion of Americans' privacy, and our competitiveness with China. However, in this case, their cure is worse than the diseases.

There are ways to get at these root problems. We just haven't taken it upon ourselves to address those root problems with actual legislative solutions that have been put forth here in Congress.

For instance, Mr. WARREN DAVIDSON's Fourth Amendment Is Not For Sale Act would put a strong stake in the ground to protect Americans' privacy, whether it is from our own government or some foreign governments. That is the kind of thing we need.

We need warrants in the FISA program. Our government shouldn't be able to spy on Americans without a warrant, yet they are. Let's bring that to the floor and vote on it.

These are the kinds of cures we need, not the bill that is offered here today.

The bill that is offered here today, even though I know it is offered genuinely, could also be named the Facebook protection and enhancement act because it is not the American people who are going to benefit most from this. It will be Facebook. Their stock is going to go up if this bill should pass the Senate.

What are some ways that we could improve this bill? It should at least have a sunset. That is the only reason we are able to debate whether FISA should have warrants in it, because it sunsets. What have we observed? FISA has been abused.

That is my concern with this TikTok ban. It will be abused. If it is just banning TikTok and ByteDance and copies of that, why does it need to be 13 pages long?

I know they say it doesn't ban it, but it forces divestiture of the company. This sounds like when American companies try to do business in Third World countries and a dictator says: You can do business here. You just have to give me your company, and now you can continue to do business.

We wouldn't let another country take over Ford Motor Company for selling Ford cars in their country, yet that is what we are wanting to do here.

Again, this is a cure that is worse than the disease. Who is going to be prosecuted by this bill? Is it ByteDance or TikTok? Will they be taken to court? No. They are the target of this, but how do you elicit or effect a ban on them? By prosecuting Americans.

The only way my colleagues can ban TikTok and the other companies from being here is to say what this bill says, which is the government will bring a civil action suit against you if you so much as host them here. If you have an app store that allows them to be here, and you are an American or an American company, you will be the target of this bill. Those are the only people who can be pursued under this bill. I know it is in order to go after TikTok, or so they say.

I close by saying that we are sitting here with phones made in China. We are wearing suits made in China. We drove cars here with chips that are made in China.

They are a foreign adversary, and, by golly, we are going to do something about it. What are we going to do? My colleagues are going to tell Americans they can't put a piece of software on their computer and can't go to certain websites that the President designates.

Mr. Speaker, I urge my colleagues to oppose this well-intentioned bill because it will have bad consequences, and I yield back the balance of my time.

Mrs. RODGERS of Washington. Mr. Speaker, I yield the remainder of my time to the gentleman from Texas (Mr. CRENSHAW).

Mr. CRENSHAW. Mr. Speaker, I want to address all of my colleagues who I think are confused about the First Amendment, confused about the nature of TikTok, and confused about the intentions of the Chinese Communist Party.

Let me explain this very simply. TikTok is owned by ByteDance. ByteDance is in China, and when you are in China, you have to do whatever the Chinese Communist Party says you have to do. That is according to the National Intelligence Law passed in 2017. If they want you to spy for them, you will spy for them. That is how that works.

They have a board member from the Chinese Communist Party on ByteDance. My colleagues wouldn't allow a radio tower owned by the Chinese to be put up right in the middle of Washington, D.C., and then allow it to put out Chinese propaganda. My colleagues would probably complain about that.

That is exactly what TikTok can be used for because millions of Americans are addicted to it. They see it, and the Chinese can absolutely manipulate those algorithms.

The First Amendment does not give the Chinese Communist Party the right to American data or the right to manipulate the minds of Americans. That would be a really weird interpretation of the First Amendment.

The primary counterarguments to this bill seem to be as shallow as it doesn't do everything I want, and Facebook is really mean, and I don't want them to make money. Does that mean we owe the Chinese access to all of our data and access to manipulate the minds of Americans? I don't think so.

This is a very specific bill, very specifically tailored. It does not harm American companies or American individuals. You know it. You have to read it. Pass this bill.

Mrs. RODGERS of Washington. Mr. Speaker, I yield back the balance of my time.

Mr. SMITH of New Jersey. Mr. Speaker, I urge my colleagues to join me in supporting H.R. 7521, the Protecting Americans from Foreign Adversary Controlled Applications Act, a bipartisan bill introduced by our colleagues MIKE GALLAGHER and RAJA KRISHNAMOORTHI.

It is aimed at countering the Chinese Communist Party's efforts to sway public opinion in its favor—especially that of the younger generation—through the use of the social media app TikTok, as well as to counter the use of the app to collect data on Americans.

Indeed, just this last week we saw a real time demonstration of the insidious use of TikTok: the targeting of American children with Communist Party propaganda—during school hours—and the recruiting of minors to act unwittingly as foreign agents of the Chinese Communist Party.

On March 7, members of Congress—including me—were inundated with a phone call advocacy campaign that utilized children while we were debating the efforts of the CCP to sabotage the American economy. And the CCP connection with TikTok and its Chinese parent is something that is very tangible.

TikTok's parent ByteDance, headquartered in Bejing, is compelled to participate in a strategic partnership with the Chinese Ministry of Public Security.

Indeed, under China's Cybersecurity Law, companies are required to provide any information asked for to police or intelligence agencies. One former ByteDance official, Yintao Yu, has said that the CCP has access to all the company's data—including data stored in the U.S.

Indeed TikTok has conceded as much—just look at the company's privacy policy, which says it can share user data with ByteDance and various governments around the world if required: ''We may disclose any of the Information we collect to respond to . . . government inquires,'' as well as to ''comply with any applicable law.''

We also know that the CCP has punished executives and companies that do not tow the Party line—just ask Jack Ma, one of the richest men in the world, what happens when you buck the Party.

Indeed, ByteDance, like many Chinese companies, has an internal Communist Party Committee within its corporate structure, which is led by ByteDance Vice President Zhang Fuping.

So what is TikTok's response to all this?

After being deluged with phone calls in my office, that very day, I wrote to TikTok, at their American headquarters in Culver City, California, asking them to provide all internal documentation relating to the "genesis, approval and execution of the advocacy campaign initiated by TikTok on March 7," so that Congress may determine the role of the CCP in recruiting children to lobby Congress on its behalf. Four days later, TikTok Vice President for Public Policy Michael Beckerman responded, with piratical defiance, claiming that congressional interest in this issue was "offensive" and "patently false."

Really? You don't think that this is an issue that is in the national interest?

We shall see about that.

I will vote in favor of H.R. 7521 and urge my colleagues to do the same.

Mr. DUNN of Florida. Mr. Speaker, a year ago, I asked TikTok CEO Shou Zi Chew point blank if ByteDance, its parent company, has spied on Americans on behalf of the Chinese Communist Party.

He told me: "I don't think spying is the right way to describe it."

Congress has overwhelming evidence that TikTok collects search and browsing histories, keystroke patterns, biometric identifiers, draft messages, metadata, geolocation data, and more.

We're talking an overwhelming amount of sensitive user-data.

This is not just data on adults, but the personal information of our children.

That is the very definition of spying.

TikTok and ByteDance present a serious national security threat.

TikTok functions as a sophisticated surveillance tool—an organization that is bound to the Chinese Communist Party and required by their National Intelligence Law to support Chinese intelligence services.

My esteemed colleagues and I are trying to protect Americans from this dangerous, destructive spyware masked as a simple social media app.

The Protecting Americans from Foreign Adversary Controlled Applications Act will incentivize the divestment of TikTok so that it is no longer controlled by a China-based entity.

This bill does not punish individual social media users, censor speech, or impact apps or websites that sever ties with companies controlled by foreign adversaries.

The First Amendment does not protect espionage.

I urge my colleagues to support this bill.

Ms. JACKSON LEE. Mr. Speaker, I rise today to speak on H.R. 7521, the Protecting Americans from Foreign Adversary Controlled Applications Act.

This bill would prohibit the distribution, maintenance, or provision of internet hosting services for any foreign adversary controlled application unless they execute a qualified divestiture as determined by the President.

More specifically, under this bill, ByteDance would be required to divest themself from Tiktok in order for the application to remain in operation.

As one of the most dominant social media platforms in recent history, it currently has over 150 million active users in the United States alone.

Much of this success could be attributed to the application's algorithms being used to generate specifically curated content for each user on their respective "For You" pages in a short-form, infinite scroll format.

Upon the rapid success of this content format, other social media platforms, including Facebook, Instagram, and Youtube have all followed suit.

This has only further entrenched the massive success of the company among its users. This success is not without caveat, however.

Recent studies conducted by researchers at Rutgers University found a disturbing underrepresentation of certain topics on the platform.

Though pop culture and political terms were represented roughly proportional to other platforms, topics involving Uyghurs, Tibet, Tiananmen Square, and the Hong Kong protests were severely underrepresented.

In addition, many valid concerns have been raised regarding the issue of national security and foreign government interference.

Many stakeholders argue that the vast amount of data harvested from American users poses a threat to our data security and democracy.

With the vast amount of American users on the platform, particularly individuals under the age of 24, I recognize the need to ensure security in our national democracy.

I hope, moving forward, that we can join together in taking action to protect our youth from harmful actors while also safeguarding their freedom of thought.

More investigation must happen to decide the next steps for TikTok. I will pursue the next steps before finalizing a complete ban. What company will be the purchaser? All must be answered before the best decision can be made.

The SPEAKER pro tempore. The question is on the motion offered by the gentlewoman from Washington (Mrs. RODGERS) that the House suspend the rules and pass the bill, H.R. 7521, as amended.

The question was taken.

The SPEAKER pro tempore. In the opinion of the Chair, two-thirds being in the affirmative, the ayes have it.

Mr. MASSIE. Mr. Speaker, on that I demand the yeas and nays.

The yeas and nays were ordered.

The vote was taken by electronic device, and there were—yeas 352, nays 65, answered "present" 1, not voting 14, as follows:

[Roll No. 86]

YEAS—352

| | | |
|---|---|---|
| Adams | Arrington | Barragán |
| Aderholt | Auchincloss | Bean (FL) |
| Aguilar | Babin | Beatty |
| Alford | Bacon | Bentz |
| Allen | Baird | Bera |
| Allred | Balderson | Bergman |
| Amo | Balint | Beyer |
| Amodei | Banks | Bice |
| Armstrong | Barr | Bilirakis |
| Bishop (GA) | Gimenez | Mills |
| Blumenauer | Golden (ME) | Molinaro |
| Blunt Rochester | Goldman (NY) | Moolenaar |
| Boebert | Gonzales, Tony | Moore (UT) |
| Bost | Gonzalez, | Moran |
| Brecheen | Vicente | Morelle |
| Brown | Good (VA) | Moskowitz |
| Brownley | Gooden (TX) | Moulton |
| Buchanan | Gottheimer | Mrvan |
| Buck | Graves (LA) | Murphy |
| Bucshon | Graves (MO) | Napolitano |
| Budzinski | Green (TN) | Neguse |
| Burchett | Green, Al (TX) | Nehls |
| Burgess | Griffith | Newhouse |
| Burlison | Grothman | Nickel |
| Calvert | Guest | Norcross |
| Cammack | Guthrie | Norman |
| Caraveo | Hageman | Nunn (IA) |
| Carbajal | Harris | Obernolte |
| Cárdenas | Harshbarger | Owens |
| Carey | Hern | Pallone |
| Carl | Hill | Palmer |
| Carson | Hinson | Panetta |
| Carter (GA) | Houchin | Pappas |
| Carter (LA) | Houlahan | Pascrell |
| Carter (TX) | Hoyer | Payne |
| Cartwright | Hudson | Pelosi |
| Case | Huffman | Peltola |
| Casten | Huizenga | Pence |
| Castor (FL) | Hunt | Perez |
| Chavez-DeRemer | Issa | Peters |
| Cherfilus- | Ivey | Pettersen |
| McCormick | Jackson (NC) | Pfluger |
| Chu | Jackson (TX) | Pingree |
| Ciscomani | James | Posey |
| Clarke (NY) | Jeffries | Quigley |
| Cleaver | Johnson (GA) | Raskin |
| Cline | Johnson (LA) | Reschenthaler |
| Cloud | Johnson (SD) | Rodgers (WA) |
| Clyde | Jordan | Rogers (AL) |
| Cohen | Joyce (OH) | Rogers (KY) |
| Cole | Joyce (PA) | Rose |
| Collins | Kaptur | Rosendale |
| Comer | Kean (NJ) | Ross |
| Correa | Keating | Rouzer |
| Costa | Kelly (IL) | Roy |
| Courtney | Kelly (MS) | Ruiz |
| Craig | Kelly (PA) | Ruppersberger |
| Crane | Kiggans (VA) | Rutherford |
| Crawford | Kildee | Ryan |
| Crenshaw | Kiley | Salazar |
| Crow | Kilmer | Salinas |
| Cuellar | Kim (CA) | Sánchez |
| Curtis | Krishnamoorthi | Sarbanes |
| D'Esposito | Kuster | Scalise |
| Davids (KS) | Kustoff | Scanlon |
| Davis (NC) | LaHood | Schiff |
| De La Cruz | LaLota | Schneider |
| Dean (PA) | LaMalfa | Scholten |
| DeGette | Lamborn | Schrier |
| DeLauro | Landsman | Scott (VA) |
| DelBene | Langworthy | Scott, Austin |
| Deluzio | Latta | Scott, David |
| DeSaulnier | LaTurner | Self |
| Diaz-Balart | Lawler | Sessions |
| Dingell | Lee (FL) | Sewell |
| Doggett | Lee (NV) | Sherman |
| Donalds | Leger Fernandez | Sherrill |
| Duncan | Lesko | Slotkin |
| Dunn (FL) | Letlow | Smith (MO) |
| Edwards | Levin | Smith (NE) |
| Ellzey | Lieu | Smith (NJ) |
| Emmer | Loudermilk | Smith (WA) |
| Escobar | Lucas | Smucker |
| Eshoo | Luetkemeyer | Sorensen |
| Estes | Luna | Soto |
| Evans | Luttrell | Spanberger |
| Ezell | Lynch | Spartz |
| Fallon | Magaziner | Stansbury |
| Feenstra | Malliotakis | Stanton |
| Ferguson | Maloy | Stauber |
| Finstad | Mann | Steel |
| Fischbach | Manning | Stefanik |
| Fitzgerald | Mast | Steil |
| Fitzpatrick | Matsui | Stevens |
| Fleischmann | McBath | Strickland |
| Fletcher | McCaul | Strong |
| Flood | McClain | Suozzi |
| Foster | McClellan | Sykes |
| Foushee | McCollum | Takano |
| Foxx | McCormick | Tenney |
| Franklin, Scott | McHenry | Thanedar |
| Fry | Menendez | Thompson (CA) |
| Fulcher | Meuser | Thompson (MS) |
| Gallagher | Mfume | Thompson (PA) |
| Garamendi | Miller (IL) | Tiffany |
| Garbarino | Miller (OH) | Timmons |
| Garcia (TX) | Miller (WV) | Titus |
| Garcia, Mike | Miller-Meeks | Tokuda |

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 54 of 267

| | | |
|---|---|---|
| Tonko | Veasey | Wexton |
| Torres (NY) | Walberg | Wild |
| Trahan | Waltz | Williams (NY) |
| Trone | Wasserman | Wilson (FL) |
| Turner | Schultz | Wilson (SC) |
| Underwood | Waters | Wittman |
| Valadao | Watson Coleman | Womack |
| Van Drew | Weber (TX) | Yakym |
| Van Duyne | Webster (FL) | Zinke |
| Van Orden | Wenstrup | |
| Vasquez | Westerman | |

### NAYS—65

| | | |
|---|---|---|
| Biggs | Himes | Moore (AL) |
| Bishop (NC) | Horsford | Moore (WI) |
| Bonamici | Hoyle (OR) | Mullin |
| Bowman | Jackson (IL) | Nadler |
| Boyle (PA) | Jackson Lee | Neal |
| Bush | Jacobs | Ocasio-Cortez |
| Casar | Jayapal | Omar |
| Castro (TX) | Kamlager-Dove | Perry |
| Clark (MA) | Khanna | Phillips |
| Clyburn | Larsen (WA) | Pocan |
| Davidson | Larson (CT) | Porter |
| Duarte | Lee (CA) | Pressley |
| Espaillat | Lee (PA) | Ramirez |
| Frost | Lofgren | Schakowsky |
| Gaetz | Mace | Schweikert |
| Gallego | Massie | Steube |
| Garcia (IL) | McClintock | Swalwell |
| Garcia, Robert | McGarvey | Torres (CA) |
| Gomez | McGovern | Vargas |
| Greene (GA) | Meeks | Velázquez |
| Hayes | Meng | Williams (GA) |
| Higgins (LA) | Mooney | |

### ANSWERED "PRESENT"—1

Crockett

### NOT VOTING—14

| | | |
|---|---|---|
| Connolly | Granger | Simpson |
| Davis (IL) | Grijalva | Tlaib |
| DesJarlais | Harder (CA) | Wagner |
| Frankel, Lois | Kim (NJ) | Williams (TX) |
| Gosar | Ogles | |

□ 1033

Mr. LARSON of Connecticut changed his vote from "yea" to "nay."

Messrs. WENSTRUP, CLEAVER, Ms. BALINT, Mr. CARSON, Mses. BOEBERT, and BROWNLEY changed their vote from "nay" to "yea."

Ms. CROCKETT changed her vote from "yea" to "present."

So (two-thirds being in the affirmative) the rules were suspended and the bill, as amended, was passed.

The result of the vote was announced as above recorded.

A motion to reconsider was laid on the table.

Stated for:

Ms. GRANGER. Madam Speaker, I missed today's votes due to circumstances beyond my control. Had I been present, I would have voted "yea" on rollcall no. 86.

Mr. OGLES. Madam Speaker, I was unavoidably detained. Had I been present, I would have voted "yea" on rollcall No. 86.

Stated against:

Mr. CONNOLLY. Madam Speaker, I was absent from the vote today due to illness. Had I been present, I would have voted "nay" on rollcall No. 86.

### ROSA PARKS FEDERAL BUILDING

The SPEAKER pro tempore (Ms. VAN DUYNE). Pursuant to clause 8 of rule XX, the unfinished business is the question on suspending the rules and passing the bill (S. 1278) to designate the Federal building located at 985 Michigan Avenue in Detroit, Michigan, as the "Rosa Parks Federal Building", and for other purposes.

The Clerk read the title of the bill.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from New York (Mr. MOLINARO) that the House suspend the rules and pass the bill.

The question was taken; and (two-thirds being in the affirmative) the rules were suspended and the bill was passed.

A motion to reconsider was laid on the table.

### ADJOURNMENT FROM WEDNESDAY, MARCH 13, 2024, TO FRIDAY, MARCH 15, 2024; AND ADJOURNMENT FROM FRIDAY, MARCH 15, 2024, TO TUESDAY, MARCH 19, 2024

Mr. MOLINARO. Mr. Speaker, I ask unanimous consent that when the House adjourns today, it adjourn to meet at 11 a.m. on Friday, March 15, 2024; and further, when the House adjourns on that day, it adjourn to meet on Tuesday, March 19, 2024, when it shall convene at noon for morning-hour debate and 2 p.m. for legislative business.

The SPEAKER pro tempore (Mr. BURLISON). Is there objection to the request of the gentleman from New York?

There was no objection.

### RECOGNIZING WARREN PETERSEN

(Mrs. LESKO asked and was given permission to address the House for 1 minute.)

Mrs. LESKO. Mr. Speaker, I rise today to recognize someone whose service will be felt by future generations of Arizonans—Arizona Senate President Warren Peterson.

Senator Petersen's service to the people of Arizona began in 2012 when he was elected to the Arizona House of Representatives.

Throughout his time in the House, he served as chairman of the Judiciary Committee and majority leader. Once his time in the House came to an end, Senator Petersen was elected to the Arizona Senate where he became President in 2023.

Under his leadership, Arizona has accomplished school choice, passed tax cuts for families across the State, and worked hard to enforce border security in the face of opposition from the left.

During my own time in the Arizona House of Representatives, I was lucky enough to serve alongside President Petersen where he was a respected colleague and a friend.

Petersen's service to Arizona could not be overstated, and his leadership is appreciated by all Arizonans.

### RECOGNIZING MICHAEL COSTEIRA

(Mr. PAYNE asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. PAYNE. Mr. Speaker, I rise today to celebrate the Eagle Scout project of Michael Costeira.

Michael Costeira is a Boy Scout from Union, New Jersey, and he wanted to upgrade the almost 300-year-old Caldwell Parsonage.

The Caldwell Parsonage was the home of the Reverend James Caldwell, a strong patriot supporter during the American Revolution.

The original Caldwell Parsonage was burned by loyalist mobs in 1780. Later that year, Caldwell's wife, Hannah, was killed by British soldiers during the Battle of Connecticut Farms.

The current Caldwell Parsonage was built in 1782 and added to the National Registry of Historic Places in 1982.

Michael Costeira wanted to preserve that history for his Eagle Scout project, so he researched various artifacts in the parsonage and he created more accurate exhibit labels for each of the items found.

I congratulate Michael. He has made a valuable contribution to an historic location in this country's great fight in the Revolution.

□ 1045

### BIDENFLATION

(Mr. ROSE asked and was given permission to address the House for 1 minute and to revise and extend his remarks.)

Mr. ROSE. Mr. Speaker, prices for everyday goods continue to climb due to the economic policies of the Biden administration. The latest Consumer Price Index report was up 3.2 percent from last year.

Mr. Speaker, I rise in support of hardworking families I represent in Tennessee who are making hard choices to stay afloat. If they are having to tighten their belts, the Federal Government should do the same.

President Biden's answer is to raise taxes even more, but we don't have a revenue problem, in Washington we have a spending problem.

In fiscal year 2022, the Federal Government collected $850 billion more in tax revenue than the year before. Yet, the Federal Government spent $1.4 trillion more than we brought in.

Last year, the Federal Government spent $1.7 trillion more than it collected. That is just one of many reasons why I am opposed to the President's $7.3 trillion budget.

We cannot continue spending more money that we don't have.

### ROTARY CLUB OF BARBERTON CHAMPION OF THE WEEK

(Mrs. SYKES asked and was given permission to address the House for 1 minute and to revise and extend her remarks.)

Mrs. SYKES. Mr. Speaker, today, I rise to recognize the Rotary Club of Barberton as Ohio's 13th Congressional District Champion of the Week.

The Rotary Club of Barberton has been a staple in the City of Barberton for over 100 years, providing life-changing services and investing in the community and its members.

# Congressional Record

**United States of America**

**PROCEEDINGS AND DEBATES OF THE** *118th* **CONGRESS, SECOND SESSION**

*Vol. 170* | WASHINGTON, MONDAY, APRIL 8, 2024 | *No. 59*

# House of Representatives

The House was not in session today. Its next meeting will be held on Tuesday, April 9, 2024, at 12 p.m.

# Senate

MONDAY, APRIL 8, 2024

The Senate met at 3 p.m. and was called to order by the Honorable TAMMY DUCKWORTH, a Senator from the State of Illinois.

## PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Precious Lord, we praise You with all our hearts because even when wrong seems to rule, you remain sovereign. You are our strength for today and our hope for tomorrow.

As our lawmakers open their hearts to You, may they sense that Your presence is as pervasive in statecraft as in religion. Illuminate their finite minds with Your eternal light, giving them wisdom beyond their own. Lord, remind our Senators that some problems You will not solve until they are ready to be used by You in working out the solutions.

We pray in your awesome Name. Amen.

## PLEDGE OF ALLEGIANCE

The Presiding Officer led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## APPOINTMENT OF ACTING PRESIDENT PRO TEMPORE

The PRESIDING OFFICER. The clerk will please read a communication to the Senate from the President pro tempore (Mrs. MURRAY).

The legislative clerk read the following letter:

U.S. SENATE,
PRESIDENT PRO TEMPORE,
*Washington, DC, April 8, 2024.*
*To the Senate:*
Under the provisions of rule I, paragraph 3, of the Standing Rules of the Senate, I hereby appoint the Honorable TAMMY DUCKWORTH, a Senator from the State of Illinois, to perform the duties of the Chair.
PATTY MURRAY,
*President pro tempore.*

Ms. DUCKWORTH thereupon assumed the Chair as Acting President pro tempore.

## RECOGNITION OF THE MAJORITY LEADER

The ACTING PRESIDENT pro tempore. The majority leader is recognized.

## MEASURES PLACED ON THE CALENDAR—S.J. RES. 67, S.J. RES. 68, S.J. RES. 69

Mr. SCHUMER. Madam President, I understand there are three joint resolutions at the desk due for a second reading en bloc.

The ACTING PRESIDENT pro tempore. The clerk will read the joint resolutions by title for the second time en bloc.

The legislative clerk read as follows:

A joint resolution (S.J. Res. 67) to provide for related procedures concerning the articles of impeachment against Alejandro Nicholas Mayorkas, Secretary of Homeland Security.

A joint resolution (S.J. Res. 68) providing for the issuance of a summons, providing for the appointment of a committee to receive and to report evidence, and establishing related procedures concerning the articles of impeachment against Alejandro Nicholas Mayorkas.

A joint resolution (S.J. Res. 69) concerning the articles of impeachment against Alejandro Nicholas Mayorkas, Secretary of Homeland Security.

Mr. SCHUMER. Madam President, in order to place the joint resolutions on the calendar under the provisions of rule XIV, I would object to further proceedings en bloc.

The PRESIDING OFFICER. Objection having been heard, the joint resolutions will be placed on the calendar.

## BUSINESS BEFORE THE SENATE

Mr. SCHUMER. Madam President, the Senate gavels back into session today to pick up right where we left off in March: confirming more of President Biden's outstanding nominees and advancing legislation that protects and serves the American people.

There is much the Senate has to accomplish in the coming weeks, and getting anything done—anything—will require bipartisan cooperation. It is not easy but nevertheless essential.

Today, the Senate will commence by voting to invoke cloture on the nomination of Susan Bazis to be a U.S. district court judge for the District of Nebraska. I have also filed cloture on the nominations of Robert White to be a district judge for the Eastern District of Maryland and the nomination of

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.

S2629



Printed on recycled paper.

USCA Case #24-1113   Document #2060737   Filed: 06/20/2024   Page 56 of 267

Ann Marie McIff Allen to be a district judge for the District of Utah.

On the legislative front, Congress has until April 19 to pass an extension of FISA's national security authorities. That is the next major deadline we face on the calendar. Preventing FISA from lapsing will take bipartisan cooperation and swift action. The House is currently working on the best path forward on FISA, and the Senate stands ready to jump into action to prevent this important national security authority from lapsing. We must get FISA done this work period.

As the Congress gavels back into session, I also urge Speaker JOHNSON and House Republicans to snap out of their paralysis and pass the Senate's national security supplemental. The situation in Ukraine is desperate. Speaker JOHNSON has now sat on his hands for 55 days as the national security supplemental has collected dust in the House. That is 55 days of America standing on the sidelines while our friends in Ukraine fight and die on the battlefield with no support; 55 days of our European allies wondering when the United States will step up. With each passing day, Ukraine continues to run out of ammo, continues to run out of soldiers, and continues to run out of hope that it can successfully expel the Russians from their borders.

Let's be blunt. The biggest reason Ukraine is losing the war is because the hard right in Congress has paralyzed the United States from acting. That is it. That is the reason. Speaker JOHNSON has to decide for himself whether or not he will do the right thing for Ukraine, for America, and for democracy, or if he will allow MAGA Republicans to hand Vladimir Putin a large victory.

I am confident that if the Speaker puts the Senate's national security supplemental on the floor, it will pass. It remains the best, quickest, and most realistic way to get Ukraine the help it needs.

So, again, there is a lot that the Senate must do in the coming weeks and months, and to get anything done will require bipartisan cooperation. I thank my colleagues for their good work so far in 2024 and look forward to working with all of them to keep delivering for the American people.

## CAPITAL ONE AND DISCOVER MERGER

Mr. SCHUMER. Madam President, now on Capital One and Discover, nearly 2 months ago, Capital One and Discover quietly announced plans for an unprecedented, multibillion-dollar merger that in the long run could risk higher costs for consumers and small businesses alike.

Capital One and Discover are two of the largest credit card-issuing institutions in America. If they merge, the new company would likely become the largest credit card issuer in the United States, with over 400 million customers. That could risk higher interest rates, bigger fees, and diminished competition.

But even so, most Americans today have no idea that this merger is coming, so yesterday I sent a letter to both Capital One and Discover asking them to share with my office more information regarding antitrust and consumer protections. I want to know more about market shares in this industry. We have already had plenty of consolidation throughout the economy. I want to know about a potential increase in fees. I want to know if workers will be laid off. I would like to hear how consumers are being made aware of this deal.

One thing is certain about credit card companies: Much of their bread and butter is a myriad of fees and sometimes—sometimes—eye-popping interest rates. That is why the proposed merger of Capital One and Discover is such a concern. History is very clear that when big financial institutions get even bigger, the American consumer usually gets the short end of the stick. So before a credit card merger takes a potential swipe at consumers, every question should be answered.

## STUDENT LOAN DEBT

Mr. SCHUMER. Madam President, now on student loan debt, since the day the President took office, I have urged him to use every tool available to cancel as much student debt as possible. Yesterday, the American people received some exciting news. President Biden, to his credit, announced a new Executive action to provide student debt relief to nearly 30 million more Americans. Specifically, the President's plan will automatically forgive interest accrued on existing student loans for 25 million borrowers. The President's plan will also automatically cancel the full amount of debt for over 4.5 million Americans who have already qualified for forgiveness through a decade in a repayment program, and it will provide more than 10 million borrowers with at least $5,000 in debt relief.

This announcement is a clear sign that the President is listening. He is listening to Congress's call to take action, which I have done for years, and he is listening to the pleas of millions of borrowers who want to get their lives back on track. So today's announcement is good news. It is good news for everyone, particularly for young people and people of color. Democrats will continue exploring every option under the Sun to lower costs and make college more affordable.

Already, the President's plan has removed the total debt burden for over 4 million Americans. This plan goes much further. But, on the other hand, unfortunately, our Republican colleagues continue to oppose student debt relief and have wrapped their arms firmly around the MAGA Supreme Court's cruel decision to block student debt cancellation for millions of Americans, and Democrats are going to make sure the American people won't forget it.

## RYAN CORBETT

Mr. SCHUMER. Madam President, now on the Ryan Corbett resolution, it has sadly been over 600 days since Ryan Corbett, a New York native, has been unjustly detained by the Taliban. Ryan traveled there to renew his visa and pay the local staff of his nonprofit when he was taken without cause, without explanation, without any semblance of process.

Later this afternoon, I will meet with the Corbett family to talk about our efforts to bring Ryan home. His wife Anna and their three children have been so brave. I have met them already a few times. They have been brave through this tragic situation, and I am in constant awe of their strength and resolve.

Today, I am introducing a resolution, alongside Leader McCONNELL, calling for Ryan's immediate and unconditional release. I urge the Senate to pass this resolution before Ryan's birthday, which is April 13.

Throughout this process, I have worked closely with the Corbett family, the White House, the State Department, and other high-ranking officials to make sure that Ryan's safe return remains a top priority. We made progress last September when Ryan was designated as "wrongfully detained" by the State Department, giving his case a higher diplomatic priority, but we are still working.

Anna has spoken with Ryan a few times, and he has been reportedly being held in terrible conditions, which has caused his health to deteriorate rapidly. So time is of the essence to get him back.

As long as Ryan is held by the Taliban, I will never stop fighting to bring him back home and reunite him with Anna, his children, and his family as quickly as possible.

I want to thank Leader McCONNELL for joining me in this resolution and everyone on both sides who has supported this resolution.

## JUDICIAL CONFERENCE

Mr. SCHUMER. Madam President, now on forum shopping, last month, I wrote a letter to the chief judge of the Northern District of Texas urging the district to apply new reforms adopted by the Judicial Conference to limit the practice of judge shopping. I was disappointed to learn that the chief judge and his court have decided to ignore the Judicial Conference's reforms and allow judge shopping to continue to run rampant in his district.

The bottom line is this. It is very simple. Judge shopping jaundices the fairness of our entire legal system. No one, regardless of ideology, should tolerate when interest groups cherry-pick

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 57 of 267

judges of their choice to get a favorable outcome.

If courts like the Northern District of Texas refuse to adopt commonsense reforms to limit judge shopping, Congress should consider legislation to end this dangerous practice and restore trust in our Federal judiciary.

___

### CHIPS AND SCIENCE

Mr. SCHUMER. Madam President, on Chips, well, this morning, another good announcement from President Biden. He and Commerce Secretary Raimondo announced the preliminary agreement with TSMC Arizona to provide billions in Chips and Science incentives to support more than $65 billion in investments for three leading-edge fabs in Phoenix, AZ.

Just like the announcement of GlobalFoundries, Intel, and others, today's announcement proves Democrats are delivering in a big way on our promise to bring manufacturing back to the United States, to strengthen our national security, and to get ahead of rising costs from supply chain shortages. Today's announcement is precisely the kind of economic good news we have worked for for years in the Senate.

Five years ago, I approached my friend Senator YOUNG and told him we should work together on bipartisan legislation to boost U.S. investment and innovation in advanced manufacturing. I knew that if America wanted to remain No. 1 in terms of scientific might and industry, we had to get serious about getting the Federal Government to invest.

Thanks to the efforts of people like Senators KELLY and BROWN and CANTWELL and WYDEN and WARNER and many more, we passed Chips and Science into law, and we are now delivering these historic investments to power a new generation of American manufacturing. And there is yet more to come, with further investments in projects like Micron's proposed $100 billion project in Upstate New York.

So I am thrilled to see that Chips and Science is delivering as intended and congratulate President Biden and Secretary Raimondo on this tremendous effort.

___

### SOLAR ECLIPSE

Mr. SCHUMER. Madam President, finally, I have these glasses today, which were given to me by the president of Fordham University—special Fordham eclipse glasses—so now I am going outside to my balcony to take a look at the eclipse, which is reaching its peak at about 87 percent right now.

I yield the floor.

___

### RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

### CONCLUSION OF MORNING BUSINESS

The ACTING PRESIDENT pro tempore. Morning business is closed.

___

### EXECUTIVE SESSION

___

### EXECUTIVE CALENDAR

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will proceed to executive session to consider the following nomination, which the clerk will report.

The legislative clerk read the nomination of Susan M. Bazis, of Nebraska, to be United States District Judge for the District of Nebraska.

#### RECOGNITION OF THE MINORITY LEADER

The ACTING PRESIDENT pro tempore. The Republican leader is recognized.

#### NATIONAL SECURITY

Mr. McCONNELL. Madam President, America's adversaries are working overtime to undermine our interests and erode the alliances that protect them.

And it is easy to concede that these challenges as playing out exclusively on the high seas of the Indo-Pacific or the borderlands of Europe or the Middle East. But in reality, the competition is not an "away game." America's greatest strategic rival is threatening our security right here on U.S. soil in tens of millions of American homes.

I am speaking, of course, of TikTok. Today, 170 million Americans are active users of the social media platform that the People's Republic of China treats as a tool of surveillance and propaganda.

TikTok officials like to insist that U.S. users' personal information, browsing histories, keystrokes, and other sensitive data are kept out of the reach of the PRC's teams of censors and propagandists. They claim that what it shows young Americans is what they want to see, not what the PRC wants them to think. But the company's own words shatter this fantasy:

Everything is seen in China.

That is the truth TikTok officials were willing to admit in a leaked recording from behind closed doors. And it shouldn't be all that surprising anyway: Chinese law requires that TikTok's Beijing-based parent company coordinate closely with the PRC.

All sorts of social media platforms can be fountains of disinformation and propaganda. Just look at last week's news about the PRC's efforts to manipulate Taiwan's elections with Twitter accounts driven by AI.

But with TikTok, we are not talking about meddling with or hijacking an American platform. In this case, PRC influence and control has been baked in from the very beginning.

With Beijing's blessing, TikTok's algorithm pours gasoline on alarming trends from the glorification of Hamas terrorists to a particularly outrageous

fad that emerged last year where young people "discovered" the wisdom of Osama bin Laden.

I wish I was making this up. But let's be absolutely clear: This isn't a debate about restricting speech. After all, the PRC does enough of that itself. Chinese citizens are barred from accessing TikTok at all.

No matter how loudly TikTok's apologists claim that reining in PRC influence violates the First Amendment, the question we will face is about conduct, not content. I take a backseat to no one when it comes to protecting Americans' First Amendment rights. I have firmly defended American's right to even the most noxious forms of free speech like flag burning. But there is a serious difference between the views that Americans might express on TikTok and the actions taken by a platform that is beholden to our foremost strategic competitor.

Let me borrow an analogy from someone who has been relentless on this issue—FCC Commissioner Brendan Carr. Here is what he had to say:

You can use a pen to write salacious anti-American propaganda, and the government can't censor that content. Nor can it stop Americans from seeking such messages out. But if you use the same pen to pick a lock to steal somebody else's property, the government could prosecute you for illegal conduct.

The PRC has spent years trying to pick the lock of America's communications infrastructure, and the Federal Government has a long history of frustrating Beijing's efforts.

Requiring the divestment of Beijing-influenced entities from TikTok would land squarely within established constitutional precedent, and it would begin to turn back the tide of an enormous threat to America's children and to our Nation's prospects in defining the competition of the 21st century.

This is a matter that deserves Congress's urgent attention, and I will support commonsense, bipartisan steps to take one of Beijing's favorite tools of coercion and espionage off the table.

#### SUPPLEMENTAL GOVERNMENT FUNDING

Madam President, on a related matter, America's national security depends on sustained investment in both cutting-edge capabilities and expanded defense industrial capacity. That is why I continue to insist on overdue steps like the full-year Defense appropriations and national security supplemental the Senate passed earlier this year. As I have said repeatedly, outcompeting our top strategic adversary, the PRC, means projecting American strength far, far beyond the Indo-Pacific.

Beijing continues to menace Taiwan, the Philippines, and other Asian partners, but it is also conducting influence campaigns across the developing world and deepening its partnership with Moscow and Tehran.

Our closest and strongest allies in China's backyard understand this reality. Even as Japan deals with Chinese

maritime incursions and predatory trade practices at home, its leaders continue to remind us that the threats to Western prosperity and security are all connected.

Prime Minister Kishida, who will visit Washington this week and address a joint session of Congress, said just last week that ''Russia's aggression against Ukraine . . . shakes the foundation of the international order'' and that ''Japan will continue its cooperation [with] Ukraine.''

Critically, our ally's words are backed up by actions. Over the past 2 years since Putin's escalation, Japan has pledged $12 billion to Ukraine's resistance. Prime Minister Kishida's trip to Kyiv last year made him the first Japanese leader to visit a conflict zone since World War II.

Just as importantly, Japan's growing investments in its Self-Defense Force, including in cutting-edge capabilities like long-range strike—have made Japan an essential partner in deterring aggression in the Indo-Pacific.

Today, there is still room to work even more closely with committed allies like Japan to protect our technology from Chinese theft, leverage our advanced industries to improve collective security, and build more resilient supply chains.

More and more, America's allies and partners—like the one we will welcome this week—understand both the gravity of the threats we face and the links between them. But, if America intends to remain the primary guarantor of our own security, we have to lead by example, and Congress has an opportunity to do that this week.

### RYAN CORBETT

Now, Madam President, on another matter, the disastrous consequences of America's withdrawal from Afghanistan were both foreseeable and foreseen, and as Taliban rule terrorizes the region and brutalizes the Afghan people, it has also inflicted terrible pain on American families.

I have worked closely with the family of Ryan Corbett, an American citizen detained in Afghanistan by the Taliban.

For over a decade, prior to the fall of Kabul, Ryan and his family lived amongst the Afghan people, where they served the community and ran a business focused on providing Afghans with education and training to start their own businesses. As the Taliban returned to power, the Corbett family was forced to flee, but Ryan made the difficult decision to return, hoping to pay his staff and keep his business afloat. And, on August 10, 2022, the Taliban detained him without charge.

For 607 days, Ryan has been confined to a 9-by-9 basement cell, with scraps for food, little to no sunlight, and intermittent contact with his family. After nearly 2 years of wrongful detention, his hopes of ever returning to America are dimming.

Earlier this afternoon, I had a chance to meet with Ryan's wife, Anna, their three teenaged children, and his parents, Drue and Evelyn, from Louisville. Now, more than ever, they fear for Ryan's life.

Today, the Democratic leader and I have introduced a resolution calling for Ryan's immediate release. It reaffirms America's commitment to freeing Ryan and raising the international stakes of the Taliban's wrongful detention of American citizens.

Unfortunately, while Ryan languishes in captivity, the Biden administration sends a different message to his captors. Since his detention, the U.S. Government has sent roughly $1 billion in aid to a country in the tight grip of a medieval, theocratic regime.

It is time to put the Taliban's violent rule on notice. It is time to show our enemies that the United States will not let American citizens be used as bargaining chips. It is time to bring Ryan Corbett home.

The ACTING PRESIDENT pro tempore. The senior Senator from Illinois.

### WORLD CENTRAL KITCHEN

Mr. DURBIN. Madam President, last week, we saw another tragedy in Gaza—an attack that killed seven people delivering desperately needed, lifesaving humanitarian aid. The victims were employees of the World Central Kitchen, an amazing organization run by an extraordinary individual, Jose Andres.

They started to feed people in Haiti after the 2010 earthquake, and they have continued their mission in some of the most challenging parts of the world. Andres' innovative and courageous team has been helping people in Gaza since the crisis began in October, providing critical food to millions of innocents caught in the conflict.

I joined Mr. Andres in a meeting in our Capitol just a few weeks ago with a few other Senators. He told us of his ambitious plans to increase food aid to Gaza.

I have always admired his ingenuity and tenacity in taking on these truly lifesaving operations for those most in need. Mr. Andres is truly a hero. So my heart goes out to him and the families of those on his team who were recklessly and avoidably killed last week, adding to the more than 200 aid workers who have been killed in Gaza.

We have seen a series of seemingly cascading crises in this conflict, and the list keeps growing: October 7, the Hamas attack on Israel that killed 1,200 and took more than 200 people hostage; the widespread destruction and loss of civilian life and growing humanitarian crisis in Gaza amid Israel's response that lacks any long-term strategy and is made worse by Hamas's hiding among civilians; the continued holding of Israeli hostages, including one with ties to our home State of Illinois, by Hamas and Hamas's refusal to accept a ceasefire in exchange for their release; the bewildering and inexcusable failure of Israel to set up deconfliction mechanisms for adequate aid delivery; and the failure to recognize that a massive military-only response by Israel will never provide a long-term path to stability and end the cycle of violence.

I have long said that I do not think the current Israeli or Palestinian leadership is really up to the challenge needed to bring hope, stability, or a viable two-state solution to the region. Early in the conflict, I cautioned the Israelis not to be blinded by their pain from October 7 and make the same types of mistakes we made after September 11—a warning I believe the current leadership in Israel has failed to heed.

But, if unable to learn from our missteps, then perhaps they should listen to former Mossad Chief Meir Dagan, who, before his death years ago, concluded that Israel, over the decades, ''achieved a long string of impressive tactical successes but also disastrous strategic failures.'' Tragically, I am worried that that is the same case today.

Chef Andres has made a similar point with which I agree—that Israel's strategy in Gaza is futile and indefensible with so much innocent loss of human life.

I have long called for a ceasefire that includes the release of the remaining hostages as well as a sustained, U.S.-led Gaza relief operation that includes food, medicine, and other critical basics. The inexcusable deaths of the World Central Kitchen staff in Gaza are reminders that these steps are needed now more than ever.

(The remarks of Mr. DURBIN pertaining to the introduction of S. Res. 629 are printed in today's RECORD under ''Statements on Introduced Bills and Joint Resolutions.'')

Mr. DURBIN. I yield the floor.

I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. CORNYN. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

### MAYORKAS IMPEACHMENT

Mr. CORNYN. Madam President, as we all know, 2 months ago, the House of Representatives impeached Homeland Security Secretary Alejandro Mayorkas, who has led the Department of Homeland Security since the beginning of the Biden administration.

For 3 years, Secretary Mayorkas has overseen the record-breaking crisis at the southern border. During that time, Customs and Border Protection have logged more than 7.4 million migrant encounters—more than two previous administrations combined—and that was over a period of 12 years. In 3 years, the Biden administration has accomplished what took 12 years for the Obama and Trump administrations.

Law enforcement's focused response on migrant crossings has caused security missions, including drug interdiction, to take a hit. Staffing shortages

USCA Case #24-1113    Document #2060737    Filed: 06/20/2024    Page 59 of 267

have led the Agency to temporarily close international bridges and ports, which have had a severe and negative impact on Texas border communities. And cities across the country, including those located thousands of miles from the border, are being crushed by the weight of caring for migrants.

Well, that is hardly a positive reflection on Secretary Mayorkas's tenure as DHS Secretary. Throughout the Secretary's tenure, rather than acknowledge the reality and double down on efforts to deal with it, he essentially tried to gloss over it or ignore it. The American people have watched as he has repeatedly downplayed the severity of the border crisis, using watered-down language like it is a ''challenge'' or ''situation.'' They have disputed his claims that the border is secure as they saw footage of migrants walking virtually unimpeded across the border and filling shelters to capacity and beyond.

The American people have raised their eyebrows as he tried to blame Congress for the crisis, even though there are no new laws in effect or no fewer laws in effect than there were during the Trump administration, certainly nothing that Congress has done or did not do which has prompted the dramatic spike in illegal immigration.

The truth is, Secretary Mayorkas is bad at his job. That is not news to anyone. But incompetence, by itself, is not an impeachable offense. We have had a number of inept Cabinet Secretaries throughout our country's history who ended their career without the stain of impeachment.

Well, despite what some of our Democratic colleagues have claimed, Secretary Mayorkas was not impeached because he is unpopular or just because he is incompetent. He was impeached for two serious offenses, in my opinion, the first of which is his willful and systematic refusal to enforce our immigration laws. Secretary Mayorkas has consistently defied the laws that Congress has passed and which have been signed into law by the President of the United States. He has defied the law and the will of Congress by ignoring detention mandates.

Before the U.S. Supreme Court, his lawyer said the words ''shall detain'' are permissive; it really means ''may.'' Earlier this year, he told Border Patrol agents in Eagle Pass, TX, that the current release rate for migrants caught crossing the border illegally was above 85 percent. So you had a 15-percent chance of not being detained even if you were caught. Apparently, he is proud of that.

Secretary Mayorkas has made catch-and-release the de facto policy of the U.S. Government, which is in direct contravention of our immigration laws. And we can't ignore the Secretary's unprecedented abuse of a process known as parole. Parole was designed to grant temporary entry to foreign nationals in rare and dire circumstances, such as someone experiencing a medical emergency at a port of entry or donating a kidney or being a witness in a trial. It was never designed to be used categorically or more than on a case-by-case basis.

Congress has made clear that parole is intended for urgent circumstances and should be only granted in extraordinary individual cases. But the Secretary violated that law, too, and has used parole to wave broad classes of migrants into the United States.

In less than 2 years, the Biden administration has used this case-by-case authority to grant parole for more than 1.6 million migrants. That is in clear and blatant violation of the law, but that is OK with Secretary Mayorkas, apparently.

The Secretary's failures, though, extend far beyond policy decisions. As I noted, he was impeached for two offenses, the second of which is breaching the public trust. The American people have watched as Secretary Mayorkas went on cable news programs or testified under oath before congressional committees repeatedly proclaiming that the border was secure. It was clearly a lie. It doesn't take an immigration policy expert to see that his claim has no basis in reality.

Day after day, the American people have seen footage that shows how insecure America's southern border is. From the roughly 15,000 migrants who set up camp in Del Rio, TX, a few years ago to the hundreds of migrants who rushed Texas National Guard troops in El Paso last month, there has been no shortage of evidence about our insecure border.

It is not just the misleading and false statements on cable news networks. On more than one occasion, Secretary Mayorkas lied under oath to Congress. He told Members of Congress that the border was secure when, clearly, it was anything but.

The United States will be dealing with the consequences of this crisis for years, maybe even decades. And Secretary Mayorkas must be held accountable. The House of Representatives was completely correct to impeach Secretary Mayorkas, and now the Senate has a duty under the Constitution to hold a trial.

Unfortunately, this has become a familiar process for a majority of our Senate colleagues. In both 2019 and 2021, the Democratic-controlled House impeached President Trump. At the time, my Republican colleagues and I criticized the motivations and process behind these impeachment inquiries, but those concerns didn't impact the process on the Senate floor.

Despite our personal views about the House's actions, the Republican-led Senate still carried out our constitutional duty to convene a Court of Impeachment. In both cases, Senators were sworn as jurors. We listened patiently to both sides as they presented their arguments. And, in the end, we had a fair ''guilty'' or ''not guilty'' vote.

Prior to the impeachment of Secretary Mayorkas, the House had sent impeachment articles to the Senate 21 times, and the Senate has held a full trial in all but four instances. In three cases, all of whom were Federal judges, the person resigned before the Senate could vote to convict or acquit. And in the final case, the impeached Senator was expelled from this Chamber before his trial.

There has never ever in U.S. history been a case in which the Senate dismissed or tabled impeachment articles and moved on. Not once. Unfortunately, if reports in the news are correct, that is likely to change this week. The House is expected to transmit the Articles of Impeachment this Wednesday.

Senators haven't received direct guidance, but according to the press, the majority leader is expected to take the completely unprecedented step of voting to table the impeachment articles and eliminate a trial entirely, in violation of the Constitution. As I said, this would be the first time in our Nation's history that the Senate failed to do its duty to consider evidence, hear witnesses, and allow Senators to vote guilty or not guilty.

This would be a dangerous precedent to set. It would give future Senates carte blanche to dispense with serious charges against our Nation's most senior officials. What goes around comes around. If Secretary Mayorkas's impeachment articles are tabled, that will become the common practice in the future.

Impeachment is one of the most solemn features in our democracy, and the majority leader must not brush these articles under the rug. I can understand why he may want to because the evidence that will be adduced at trial will be damning, both for Secretary Mayorkas and for the Biden administration's policies, which are essentially open-border policies. But at least House impeachment managers and Secretary Mayorkas's defense team deserve the opportunity to present their best case before the Senate. And the majority leader should not prevent that from happening.

I would like to remind the majority leader of some words he spoke himself back in 2019. At that point, the balance of power in Washington was completely the inverse of what it is today. We had a Republican majority in the Senate, a Democratic majority in the House, and a Republican in the White House.

After House Democrats impeached President Trump, the majority leader, the Senator from New York, came to the Senate floor to talk about the process he would like to see in a Republican-led Senate. He said:

To my Republican colleagues: Our message is a simple one. Democrats want a fair trial that examines the relevant facts . . . The message from Leader MCCONNELL, at the moment, is that he has no intention of conducting a fair trial, no intention of acting impartially, no intention of getting the facts.

But contrary to what Senator SCHUMER predicted, the Senate went on to

USCA Case #24-1113 Document #2060737 Filed: 06/20/2024 Page 60 of 267

fulfill its constitutional responsibility to hold a trial. We spent more than 2 weeks hearing arguments from both sides—so the American people could judge for themselves—before holding a vote at the conclusion of the presentation of the evidence.

So now I would like to echo the Senator's statement from a few years ago, but with a few small changes. To my Democratic colleagues, our message is a simple one: Republicans want a fair trial that examines the relevant facts.

The message from Leader SCHUMER, at the moment, is that he has no intention of conducting a fair trial, no intention of acting impartially, and no intention of getting to the facts.

It would be completely unprecedented and unjustified for the Senate to shirk its constitutional role as a Court of Impeachment. The House voted to impeach Secretary Mayorkas, and the Senate has a duty to hold a trial. The majority leader should perform his duty and should not impede or ignore that constitutional requirement.

So I urge the majority leader to take his own advice from 2019 and to give the Senate an opportunity to hold a thorough and fair impeachment trial and let the chips fall where they may.

The ACTING PRESIDENT pro tempore. The Senator from Maryland.

FRANCIS SCOTT KEY BRIDGE

Mr. CARDIN. Madam President, on Tuesday morning, March 26, I received a phone call early in the morning informing me of a major tragedy in our community.

The Francis Scott Key Bridge is a vital link on the I–95 corridor. It is a bridge that is about a mile and a half long. It goes across the channel that is for the Port of Baltimore, and it is incredibly important to our local economy and to our image. It is iconic to Baltimore.

I was shocked to see the image. There was a video that showed that this bridge—a mile and a half long—came down in a matter of seconds. It was hit by a vessel, the Dali. That is a container vessel. It is about the size of the Eiffel Tower, a little less than a thousand feet long, fully contained with containers. Over several thousand were on the Dali at the time.

It lost power, and, when you lose power on this type of vessel, you cannot steer. It hit the main support beam of the suspension bridge, and it collapsed almost immediately. Within a minute, it was down.

It was just a tragic sight to see. When we saw this sight, we recognized that there was loss of life. That was our first concern, as to how many people were trapped on that bridge and how many people were at risk of losing their lives.

I want to tell you that there was an immediate Federal response. I am going to show you a picture of what we saw on the morning when we woke up. You saw the bridge before. This is the bridge that came down in a matter of a

minute, less than a minute. This is the Dali, fully loaded with containers.

You can see that the bridge is actually lying in part on top of the Dali ship, actually entrapping some of the containers. And this is the main channel—the 50-foot main channel—to the Port of Baltimore, completely blocking the Port of Baltimore.

There was an immediate Federal response, and I want to thank President Biden. He initially said that the government would be there to do whatever was needed, whatever we called upon. He called each member of our stakeholders—the Governor, our mayor, Senator VAN HOLLEN, Congressman MFUME, and myself—and pledged the full support of the Federal Government. In a matter of literally hours, the personnel and resources of the Federal Government were deployed to Baltimore.

So I just really want to thank the President, first, for this immediate response, and let me just bring you up to date on some of the facts concerning this tragedy.

We now know that six immigrant workers lost their lives. They were trapped in the water and could not escape. They were on the bridge at the time that it collapsed. They were doing dangerous work—keeping our roads safer, building America. They went to work early that morning to work on the bridge—or late at night—and did not return home.

I need to point out that the first responders saved lives. We have looked at the recordings. In a matter of just a couple of minutes after the pilot broadcast an SOS, basically saying they lost control of the vessel and it was aimed toward the bridge, the first responders went into action. Miraculously, they closed the bridge within those couple of minutes, so that there were no passenger cars on the bridge when it collapsed.

They were able to rescue two of the workers. One was able to escape the bridge by being called off the bridge. The other went into the water and was rescued and had, basically, minor injuries.

But we lost six souls from this tragedy, and our prayers, our thoughts are with those families. We have not yet brought closure to those families. You see, we are still in a recovery mission to locate the remains so the families can bring full closure.

The Port of Baltimore is so critical to our economy. The 50-foot channel that is 700 feet long, which is totally blocked by the bridge collapse, basically shut down the Port of Baltimore.

Now, the Port of Baltimore has been a port of commerce since the 1700s. It is the third largest port in the United States. It is the largest port for roll-on, roll-off of automobiles, of farm equipment, and construction equipment. It moves about $80 billion—$80 billion—of import-export products a year. It is estimated that there is between $100 and $200 million of cargo moving every day

through the Port of Baltimore. It moves 1.1 million containers a year through the Port of Baltimore.

So, as you can see, this catastrophic event—yes, it affected the people of Baltimore and our workers, but it also affected the entire nation. Twenty thousand workers are directly dependent upon the Port of Baltimore, and their jobs have been put at risk.

But the supply chains of autos affect auto dealers throughout our Nation. The farm equipment that comes through the Port of Baltimore affects farmers throughout the Nation. The raw materials, the coal, the steel, the aluminum, the iron—and the list goes on and on and on—affect our entire country. In fact, 20 percent of the exported coal from the United States is exported through the Port of Baltimore. So, yes, we have workers who are out of work, and one of our top priorities is to help them during this period of time.

I met, for example, with a truckdriver. He has two employees. This is typical. Remember, moving 1.1 million containers—many of those goes by truck. Most of those trucking companies are small businesses.

As the Presiding Officer knows, in the Small Business Committee, we are very concerned about the strength of small businesses during these types of events. I am very pleased that we were able to get the Small Business Administrator to Baltimore, and an emergency declaration was made. But it not only affects small businesses in Baltimore, with this emergency, but also in Pennsylvania, also in Virginia, also in Delaware, also in West Virginia, and also in DC. This is a national issue.

Our next priority is to reopen the channel. This is a vessel that is almost a thousand feet long and is fully loaded. I am going to show you a photo that shows you the challenges that we have.

This is the Dali, which you can clearly see. This is the bridge that is lying on top of the Dali. It is actually trapping a lot of the containers. This is part of what came down. This is a 4,000-ton piece of the bridge that is on the bow of the ship. That is going to have to be removed.

We have looked at underground photos of what is underneath the channel from the collapsed bridge, and we see a real mess. We see concrete, rebar, steel, all mixed together. And here is the challenge—and I want to give a shout-out to the Army Corps. I want to give a shout-out to the divers who have been under dangerous conditions and have been going down and taking a look at what is in the channel. Once they remove a piece of the bridge, they are going to have to cut it and make it into smaller pieces to be able to remove it. We don't know whether that will cause a shift in the debris.

Our first priority is the safety of the people performing this work. It is like cutting a spring. You could have a reaction. And we have to do surveys

USCA Case #24-1113 Document #2060737 Filed: 06/20/2024 Page 61 of 267

again after each one of the removals. This is very, very difficult work, and it is being done by true professionals. And, again, I thank the Federal Government for providing the experts who are all now in Baltimore, figuring out how to get that channel open.

And we are going to need a replacement bridge. This is a main corridor along the I–95 east coast of the United States, and 30,000 vehicles travel through it a day. So we need to replace that bridge. The bridge was built in 1977, 1.76 miles. It is an engineering marvel of its time for a suspension bridge, and it took 5 years to build. So we have an enormous challenge.

I had the chance to personally visit the site. Actually, I think I took this photo from a Coast Guard vessel. You see it. It is just a horrific site to see the work that is being done.

But I want to give a shout-out to the unified command headed by the Coast Guard. They started the day of the tragedy, and they have been there every day, 24/7, leading a unified command that includes the Army Corps of Engineers, which will do most of the salvage work within the channel itself. The Coast Guard, of course, is keeping everyone safe.

We also have the Department of Defense because we need some of their equipment in order to be able to move the debris.

It includes the Department of Transportation. Secretary Buttigieg was there the day of the incident. I talked to him early in the morning. A few hours later, I was with him at the site. And his team has been there every day, and he has returned to provide relief.

I want to thank him for giving us the emergency relief funds, immediately approved, so we could start doing the work in regards to the traffic problems that we had and starting to plan for the replacement of the bridge. I want to thank him for that. Those emergency funds of $60 million were desperately needed. We got it immediately thanks to the commitment of the Biden administration.

I want to thank Administrator Guzman, of the Small Business Administration. She was there. I talked to her, I think, a day or two after the episode. She came to Baltimore and had a roundtable discussion to talk to the small businesses as to what they need. They are doing EIDL loans, and they have set up business recovery centers—one in Dundalk and one in Baltimore City—so the businesses can get the help they need on site.

And I was there. I have met with a lot of small business owners. They have lots of questions. They impressed upon me the urgency of their needs and that we need to coordinate our response.

I want to give a shout-out also to the Department of Labor, which has been there. They have provided us with displaced worker grants in order to help those who cannot get work so that we can deal with those who have been directly impacted.

Mayor Scott of Baltimore has been one of our true great leaders throughout this. County Executive Olszewski from Baltimore County and County Executive Steuart Pittman from Anne Arundel County—all have been involved in this, along with Senator VAN HOLLEN and Congressman MFUME.

I want to thank our colleagues. Senator SCHUMER was right there at the beginning, saying he is there to help wherever the Senate can.

I want to thank Senator MCCONNELL for his comments, where he said: In situations like this, whether it is a hurricane in Florida or an accident like this, the Federal Government will step up.

Now, the result of this has been that we have provided support for the families of the victims who lost their lives. We have met with the workers—the ILA workers—and we are trying to make sure they can get through this period of time.

We have met with small business owners.

The engineers here have been unbelievable. The Army Corps has been here 24/7. They have opened two alternative channels—one 14 feet, one 11 feet. That gets just a minimal amount of traffic through. But they are working on the northern part of the channel—that is not where the *Dali* is, but the other side of the channel—to open a 35-foot channel by the end of this month. If we can do that, that will return about 75 percent of the business to the Port of Baltimore, which will be extremely important for our economy. By the end of May, the engineers believe they can have the entire 50-foot channel opened.

In the meantime, we have improved Tradepoint Atlantic. Tradepoint Atlantic is not affected by the bridge. We were able to secure a grant for Tradepoint Atlantic in 2020 to help prepare it as a port facility. Those funds were reallocated in a matter of days from the accident so they could use it to pave 10 acres of property for roll-on/roll-off cargo that would normally go to a port inside of the bridge that will be now offloaded and can be done immediately.

The bridge. We already started with the design of the bridge. It may take some time. Remember, it took 5 years to build this originally. It may take more time before we can get that done. We need your support. We are going to need our colleagues to help us through this.

In Minnesota, the full-cost legislation was passed in a matter of days. We are going to be coming to Congress asking for some help in regard to the funding to make sure that 100 percent of it is paid for by the Federal Government. We recognize that when you have a catastrophic event like this, that we come together as a nation. We have done it in the past, and we are going to ask for help this time.

I know that there is going to be third-party liabilities. We hope there are moneys that can be recovered from those responsible for this tragedy—insurance proceeds, et cetera. Those funds will go to reimburse the taxpayers. We are going to be aggressive getting every dollar we can. But it cannot delay the opening of the channel and rebuilding of the bridge. We have to make sure that is done as properly as possible. Right now, traffic is detoured. It is a mess through that area. We have to get that bridge replaced.

The story of the Francis Scott Key Bridge does not end here. We will rebuild the bridge. In the 70 years that bridge has been open, the capacity has grown. Cargo capacity has grown in our region by 3,000 percent. The Port of Baltimore will remain strong and we will, as Governor Moore said, be "Maryland tough" and "Baltimore strong."

I want to thank my colleagues for their understanding of this tragedy and their support as we move forward to open the Baltimore channel and to rebuild the bridge.

I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. WICKER. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

## ISRAEL

Mr. WICKER. Madam President, in 1948, President Truman recognized the State of Israel on behalf of the United States. He clearly called for the world "to accord the State of Israel the right of self-defense."

In the decades since, American leaders have stood by Israel. Our support has been reliable, spanning Presidential administrations and congressional terms. It has been bipartisan. President Eisenhower continued President Truman's promise to stand with Israel, establishing a bipartisan tradition cemented by Presidents from Kennedy to Reagan, from Clinton to Trump.

In America, voters regularly select new parties to lead our country. Administrations come and go. Congresses come and go. That volatility makes it all the more profound that we have always kept our solemn promise to stand with our allies.

It has now been 75 years since President Truman made this vow. For those many decades, Israel's position has always been and will be to live peacefully in its ancestral land alongside its Arab and largely Muslim neighbors.

Slowly, often grudgingly, other nations in that region have come around to that position.

Egypt agreed to peace with Israel in 1979. Jordan has been a longtime U.S. partner and has lived in peace with Israel since 1994. Recently, the United Arab Emirates and Bahrain agreed to partnership with Israel in the Abraham Accords.

USCA Case #24-1113    Document #2060737    Filed: 06/20/2024    Page 62 of 267

One regime that has continually rejected the international consensus about Israel is the Islamic Republic of Iran. Three decades into the 21st century, Iran and its proxies continue to pursue Israel's absolute annihilation. Coexistence has never been the policy of Iran or its terrorist proxy group Hamas.

Disturbingly, we find adherents of that view here at home. Last week in Michigan, protesters chanted "Death to Israel" and "Death to America," rejecting either country's right to even exist. This is one example of the rise of anti-Israel and anti-Semitic incidents we have seen since October 7. They show us what our Jewish friends and allies fight against every day.

Of course, the protests and chants remind us of a pivotal event. Yesterday, we marked the 6-month anniversary of the October 7 attacks. Hamas, backed by Iran, demonstrated both its goal—the annihilation of Israel—and its strategy—the murder and hostage-taking of civilians.

October 7 was one of the worst attacks on the Jewish people since the Holocaust. It was a nightmare scenario that eight decades of Israeli citizens have had to guard against. In light of those atrocities, our task is clear: We need to reaffirm Israel's right to self-defense.

Since October 7, Hamas has continued to pursue its goal by the same strategies. It single-mindedly seeks to wipe Israel off the map and does not care how many innocent people are lost on the way, how many families are burned alive. Hamas's entire operation is a violation of international law. By contrast, Israel has essentially been striving to administer civilian aid while uprooting terrorists who hide behind those civilians—all in dense urban settings.

International friends and allies can and should give advice and counsel to each other on issues of mutual security and diplomacy. That has always been the practice between Israel and the United States. On the other hand, it is wrong to make demands of an ally and to suggest that vital aid to them will be withheld unless those demands are met. This is especially true when those conditions are ones which we ourselves could never accept.

War is always a tragedy. On top of that, it also carries accidental sorrows in its wake. The killing of seven World Central Kitchen aid workers was an avoidable and unmitigated tragedy. Our hearts break for their loved ones, their colleagues, and others delivering humanitarian assistance around the world.

And this is personal to me. Teams from World Central Kitchen have come to the aid of my State of Mississippi. World Central Kitchen was there on the ground during the recent Jackson water crisis. They answered the call in the wake of the 2023 tornadoes. I am an advocate and friend of Jose Andres. I have worn the "World Central Kitch-en" cap in Poland when I spent time serving meals to refugees from the brutal Russian invasion.

I believe that Israel takes the workers' deaths seriously too. The Israeli Defense Forces assumed responsibility right away. Its leaders promptly launched an investigation. Since then, the Israeli Government has said that the military committed "serious violations" of protocol. They have admitted this about themselves. They fired two officers and disciplined three others for mishandling information and breaking the Israeli Defense Forces' rules of engagement.

That is more than the Biden administration can say about themselves. In the chaos of our disastrous Afghanistan withdrawal, our military shelled a car in Kabul. Leaders initially feared the vehicle carried explosives destined for American servicemembers, but it turned out to be a civilian vehicle, and 10 innocent people, including 7 children, died at our hands. The Biden administration took far longer than Israel to own up to that mistake. I am glad our country did eventually acknowledge our fault.

This shows that the free world holds ourselves to exacting standards of care for the innocent caught in harm's way—including the thousands who have died in Gaza since October 7.

Time and again, Israeli combatants have published warnings before taking a building. They regularly give evacuation notices to civilians. In so protecting the innocent, they risk giving the enemy a heads-up, but they do this. Yet it has become fashionable to hold Israel to unachievable standards, benchmarks to which we do not hold ourselves or any other ally.

Hamas does not place itself under such handicaps. This Iranian proxy, Hamas, has no regard for the standards of civilian protection. For one of many examples, look no further than the hostages taken October 7 and their often brutal treatment.

Unfortunately, our President's recent call for a cease-fire plays directly into Hamas's hands. Our Commander in Chief's priority should be the release of hostages and victory for our ally. But instead of displaying American resolve, our President seems to be mollifying the left wing of his party.

Calling for a cease-fire instead of hostage release and unconditional victory creates a false equivalence between Israel and Hamas. After Pearl Harbor, no one asked us about a cease-fire. After 9/11, no one asked the United States about a cease-fire.

We need to remember that Israel is fighting terrorists bent only on the destruction of the Jewish State. Hamas's leadership has vowed to commit repeats of the October 7 massacres. If this terrorist group is not totally eradicated, it will continue killing and kidnapping.

To paraphrase former Israeli Prime Minister Golda Meir, if Hamas put down their weapons today, there would be no more violence; if Israel put down their weapons today, there would be no more Israel.

Hamas started this conflict, and they could end it today. Hamas could let hostages walk out of the tunnels and into the sunshine. Its militants could stop using women and children and aid workers and healthcare workers as human shields.

We need to give our steadfast ally what it needs to win this battle. Victory has to be our position.

I believe we should keep our promises to our friends. Our Commander in Chief threatens to break that promise to Israel today.

The President's call for an immediate cease-fire is tantamount to a call for Hamas to remain in business, to reestablish itself for future atrocities. That is not something Israel will allow—nor should they—and it is not something we should ask of Israel or any other partner or ally.

A world in which a terrorist organization can win by committing mass murder is a more dangerous world for us all. The allies who have stood by us for 7½ decades and who stood by us after 9/11 understood that then, and we should not forget that now.

I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. MORAN. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Ms. BUTLER). Without objection, it is so ordered.

TRIBUTE TO RICK WEBB

Mr. MORAN. Madam President, I rise today to recognize Watco Executive Chairman Rick Webb, who recently was inducted into the American Short Line and Regional Railroad Association's Short Line Hall of Fame.

Watco is a transportation and supply chain service company headquartered in Pittsburg, KS, with a 40-year legacy of excellence in industrial transportation. Rick Webb has been, and continues to be, an integral part of that legacy.

Rick's father, Dick Webb, founded the company in 1983, and Rick began working on the Watco team while he was finishing his degree at the local Pittsburg State University.

He joined the family business full time after graduating in 1984, taking on a diverse portfolio of responsibilities including operations, marketing, hiring personnel, and raising capital.

In 1987, Watco purchased its first short line to primarily serve its own railcar repair shop. In 1998, Webb became Watco's chief executive officer, taking the reins from his father. After two decades of service as Watco's chief executive, Rick turned over leadership to Dan Smith and took on the role of executive chairman, where he continues to steward the growth of the business and the family's customer-first model of service.

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 63 of 267

Rick Webb has been with Watco from the beginning, and during his tenure with the company, it has grown from one facility to more than 190 locations operating in four countries. That growth is in no small part due to Rick Webb's leadership.

Rick is the kind of person you want to follow. He is the kind of person you can always take at his word. When I think about what it means to be a Kansan—a person of good character, strong integrity, authenticity—Rick is that person.

But I cannot talk about Rick's character without recognizing the person who played a tremendous role in shaping him. Kaye Lynne Webb, his mom, helped build Watco and raised a son of the highest caliber. She is an amazing woman and an integral part of the Webb family and the company.

Knowing Rick and the quality of his character, I was pleased to learn that he was inducted into the American Short Line and Regional Railroad Association's Hall of Fame on March 25, 2024.

An article in the Pittsburg Morning Sun notes that the American Short Line and Regional Railroad Association established this award in 2020 to acknowledge ''visionaries and stars who through their dedication, commitment and achievement best exemplify the qualities of innovation, entrepreneurialism, perseverance and service that have advanced the short line railroad industry.'' Rick has met and continues to exceed this standard.

The same article highlighted the current Watco CEO Dan Smith's praise of Rick for his consistency as a leader. The article included the following description of Rick by Smith:

He's truly a great man. I would say that he's the best teammate I've ever had; he's the best coach I've ever had; he's the best friend I've had.

Throughout his time at Watco, Rick has been driven by an unrelenting desire to serve the best team possible to serve customers in the best manner. Rick has carried with him the belief that if you want to learn how to grow the top line, you listen to your customer, and if you want to learn how to grow the bottom line, you listen to your team.

Rick's business knowledge and Kansas work ethic have earned him many accolades over the years, including being named the 2010 Ernst & Young Entrepreneur of the Year in the Central Midwest Region and winning the 2022 Railroad Innovator Award from Progressive Railroading magazine.

In addition to Rick's induction into the American Short Line Hall of Fame, the American Short Line and Regional Railroad Association has honored Watco with the Veterans Engagement Award for their dedication to veteran recruitment.

I want to congratulate Rick and the entire Watco team on their successful accomplishments and achievements. It is certainly nice to have a great businessman and a great business in Kansas called Watco, but even better, it is great to have a person of Rick's caliber, his character, and his interest in the community.

Many towns the size of Pittsburg, KS, and many communities in Kansas, generally, have a set of people who are always involved in whatever good happens in the community. Rick Webb and his family have been consistent in their support for the Pittsburg and Southeast Kansas communities and for their support for Pittsburg State University.

I look forward to seeing their business continue to flourish as they fulfill the mission of serving their customers, their employees, and elevating the standard for short line railroads for Kansas, our Nation, and the world. But I especially thank him for how much difference he makes in Pittsburg, in Kansas, in the country, and the world.

I yield the floor.

The PRESIDING OFFICER. The Senator from Illinois.

Ms. DUCKWORTH. I ask unanimous consent that the scheduled vote begin immediately.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

CLOTURE MOTION

The PRESIDING OFFICER. Pursuant to rule XXII, the Chair lays before the Senate the pending cloture motion, which the clerk will state.

The legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Executive Calendar No. 534, Susan M. Bazis, of Nebraska, to be United States District Judge for the District of Nebraska.

Charles E. Schumer, Richard J. Durbin, Peter Welch, Laphonza Butler, Richard Blumenthal, Alex Padilla, Tim Kaine, Christopher A. Coons, Robert P. Casey, Jr., Margaret Wood Hassan, Sheldon Whitehouse, Gary C. Peters, Catherine Cortez Masto, Jeanne Shaheen, Tammy Duckworth, Tina Smith, Chris Van Hollen.

The PRESIDING OFFICER. By unanimous consent, the mandatory quorum call has been waived.

The question is, Is it the sense of the Senate that debate on the nomination of Susan M. Bazis, of Nebraska, to be United States District Judge for the District of Nebraska, shall be brought to a close?

The yeas and nays are mandatory under the rule.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Ohio (Mr. BROWN), the Senator from Pennsylvania (Mr. FETTERMAN), the Senator from New Hampshire (Ms. HASSAN), the Senator from Maine (Mr. KING), the Senator from New Mexico (Mr. LUJÁN), the Senator from Connecticut (Mr. MURPHY), the Senator from Washington (Mrs. MURRAY), and the Senator from Vermont (Mr. WELCH) are necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Louisiana (Mr. CASSIDY), the Senator from North Dakota (Mr. CRAMER), the Senator from Iowa (Ms. ERNST), the Senator from Utah (Mr. ROMNEY), the Senator from Florida (Mr. RUBIO), and the Senator from Ohio (Mr. VANCE).

The yeas and nays resulted—yeas 68, nays 18, as follows:

[Rollcall Vote No. 115 Ex.]

YEAS—68

| | | |
|---|---|---|
| Baldwin | Heinrich | Ricketts |
| Barrasso | Hickenlooper | Risch |
| Bennet | Hirono | Rosen |
| Blackburn | Hyde-Smith | Rounds |
| Blumenthal | Johnson | Sanders |
| Booker | Kaine | Schatz |
| Butler | Kelly | Schumer |
| Cantwell | Kennedy | Shaheen |
| Capito | Klobuchar | Sinema |
| Cardin | Lee | Smith |
| Carper | Lummis | Stabenow |
| Casey | Manchin | Tester |
| Collins | Markey | Thune |
| Coons | McConnell | Tillis |
| Cornyn | Menendez | Van Hollen |
| Cortez Masto | Merkley | Warner |
| Crapo | Moran | Warnock |
| Duckworth | Murkowski | Warren |
| Durbin | Ossoff | Whitehouse |
| Fischer | Padilla | Wicker |
| Gillibrand | Paul | Wyden |
| Graham | Peters | Young |
| Grassley | Reed | |

NAYS—18

| | | |
|---|---|---|
| Boozman | Daines | Mullin |
| Braun | Hagerty | Schmitt |
| Britt | Hawley | Scott (FL) |
| Budd | Hoeven | Scott (SC) |
| Cotton | Lankford | Sullivan |
| Cruz | Marshall | Tuberville |

NOT VOTING—14

| | | |
|---|---|---|
| Brown | Hassan | Romney |
| Cassidy | King | Rubio |
| Cramer | Luján | Vance |
| Ernst | Murphy | Welch |
| Fetterman | Murray | |

The PRESIDING OFFICER (Mr. HEINRICH). On this vote, the yeas are 68, the nays are 18.

The motion was agreed to.

The PRESIDING OFFICER. The Senator from Indiana.

MAYORKAS IMPEACHMENT

Mr. BRAUN. Mr. President, I come to the floor this evening because we have some serious business ahead of us soon.

For Laken Riley, Ruby Garcia, and the countless Americans who have died from fentanyl, the Senate must hold a full impeachment trial for Secretary Alejandro Mayorkas. Secretary Mayorkas is breaking the law every day he releases illegal immigrants into the United States. The Department of Homeland Security is required under law to detain these immigrants. Biden and Mayorkas's catch-and-release policy releases illegal aliens into the United States without even issuing a notice to appear for immigration proceedings.

Secretary Mayorkas is the most important player in President Biden's open border agenda, but we must first remember it is the President who is calling the shots. President Biden took the actions that opened our border. On day one, he personally stopped construction of the wall. He alone signed

USCA Case #24-1113 Document #2060757 Filed: 06/20/2024 Page 64 of 267

the Executive order to allow illegals to be counted in the census to decide how large congressional districts are. This is a direct attack on our most important democratic institution. It was President Biden who ended the "Remain in Mexico" policy, leading to millions released into our communities.

It was a criminal coward who killed Laken Riley, but it was President Biden and Secretary Mayorkas who welcomed him into the country. It was sanctuary city policies that kept him here. Laken Riley's death was a complete failure of our government to protect our own citizens. Yet not one person has lost a job due to it.

It is no wonder President Biden's allies want to sweep this impeachment under the rug and break the rules of the Senate by failing to hold an impeachment trial.

Every Senator must stand up for the American people and vote down the motion to kill the impeachment trial. The American people deserve to hear the truth of how President Joe Biden opened their country's borders to the world and the American lives lost because of it.

I will be voting to hold a full impeachment trial of Secretary Alejandro Mayorkas. If a full trial does not happen, he has clearly lost the faith of the American people to protect our borders and he should resign immediately and President Biden should be held accountable by the American public this November.

I yield the floor.

The PRESIDING OFFICER. The Senator from Missouri.

Mr. SCHMITT. Mr. President, I rise to bring attention to the matter of grave importance to the Senate. My friend and colleague from Indiana just spoke about this just a few minutes ago. We are going to be delivered Articles of Impeachment to this Chamber, which is a very important role that the Senate plays in our constitutional structure, our constitutional order. All of us are sworn in as jurors. This is a solemn act. We swear when we take our oath that we will abide by the Constitution, we will protect the Constitution. This is something we are supposed to do.

Politically speaking, Secretary Mayorkas has been a disaster. If you could have a Mount Rushmore of worst Cabinet members in the history of the United States of America, he would be on that Mount Rushmore. Legally speaking, he has undermined the laws of the United States.

But before we get there, we actually have to have a trial. In no instance in the history of this great Republic—in 240-plus years—has this body, the world's greatest deliberative body ever, in the history of our country, dismissed or tabled Articles of Impeachment for someone who is still serving in office or alive. Let me repeat that: It has never happened.

To quote my colleague from New York who often says this: History is

watching. CHUCK SCHUMER, history is watching, because 200 years from now, God willing, in this Republic, people will be in our chairs. We don't know their names. They will be referring back to the precedent that is set in this Chamber to go down a road we have never gone down.

Vote how you want to vote based on the evidence, your point of view. Vote how you want to vote. But the idea that we would be setting this very dangerous precedent because CHUCK SCHUMER doesn't want it in the news cycle for a couple of days is ridiculous. For my friends on both sides of the aisle that care about this place, this is, perhaps, the most dangerous act you could inflict upon us, short of blowing up the filibuster, to say that we are not going to hear the evidence; that we are not going to vote as Senators because we are afraid of a news cycle, which, by the way, would highlight the total and utter disaster that happens at our border.

Mr. President, 9 million people have come across illegally. I rise to point out just one aspect of that that is incredibly dangerous for this country—the number of Chinese nationals that are coming here. There have been 22,233 encounters of Chinese nationals crossing illegally at the northern and southern borders so far in fiscal year 2024. There were 24,125 encounters last year. To put that scale in perspective, there were just 342 apprehensions of Chinese nationals in 1987 and fiscal year 2022. That is a dramatic increase.

They are our greatest adversary. The 21st century will be defined by who wins this great power struggle. And if you don't think—there have been documented cases—that some of these folks are coming here to spy on us, including military installations, I have some oceanfront property in Missouri I would like to sell you.

Secretary Mayorkas, in his own memo, advocated for ignoring U.S. law. This is a big deal. Again, regardless of how you feel about how you are going to vote on this, my point of view is: There is a lot of evidence that could be presented and will be presented to show that he has purposefully undermined the sovereignty of the United States of America. That is a serious charge. The House of Representatives has voted to send that here. Let's hear it out. Let's do our constitutional duty. Let's not be afraid to do our jobs.

I yield the floor.

The PRESIDING OFFICER. The Senator from Kansas.

Mr. MARSHALL. Mr. President, make no mistake about it, a vote to block the impeachment of Secretary Mayorkas is a vote to keep our borders open. It is a vote to continue the deadly track of lawlessness. It is a vote that tells Laken Riley's family and all those who have been victims of violent and gruesome crimes at the hands of illegal aliens, as well as the over 250,000 people who have died from fentanyl poisoning—what it says is the Democrats don't care.

Ask any American and they will tell you that every State is now a border State. We don't feel safe in our own communities. From inner cities to suburbs and throughout rural America, we are living in the consequences of this wide-open southern border. So it should come as no surprise to my colleagues across the aisle that Americans are demanding accountability. They want to know why the cartel has more control of our border than the DHS does.

Disgracefully, this week, we will witness a complete political charade that undermines this Chamber's responsibility and the oath we swore to protect this great Nation. Skirting justice, accountability in the very fabric of our democracy, the Senate Democratic leader has taken a historical measure to heighten the deadly border crisis his party has created and embraced.

And why, you might ask, would they do this? They are so afraid that if Americans witnessed an open trial of Secretary Mayorkas and his record was exposed, it would seal the deal on the Democratic Party losing the White House and the majority of the Senate. They are very clearly worried about the next election and not the national security threat our wide-open borders pose to the sovereignty of our Nation.

My hope here today is that America is watching. They will see the Senate Democrats line up to block the impeachment of Secretary Mayorkas and prevent his record from ever enduring a public trial.

But make no mistake about this. Come November, the good people from Montana and Ohio, from Michigan and Wisconsin, from Pennsylvania and Nevada will make their voices heard and hold their Senators accountable. These Democrats had the opportunity this week to address the border crisis and send a clear message to the White House to address our most immediate national security threat and close the border now. Unfortunately, they won't stand up. They will not allow the American people to see the true lawlessness that has been the direct result of the abject failures of Secretary Mayorkas. Their silence will send a clear message to the thousands of families that have been torn apart by the consequences of our wide-open border. They simply don't care.

My colleagues across the aisle don't want answers. They want to shield Secretary Mayorkas and the White House from any accountability and spare their party from the backlash in the press when Senate Republicans outline how dire the situation at our Nation's border is.

In orchestrating this cover-up, they are willing to undermine our Constitution and disrespect the honor and integrity of the impeachment process that has been observed and held fast by this body for over 200 years.

In our Nation's history, the Senate has never tabled an impeachment trial. That alone should tell every American

USCA Case #24-1113    Document #2060737    Filed: 06/20/2024    Page 65 of 267

how scared Senate Democrats are to share the true realities of the lawlessness happening right now at our borders across the United States. Secretary Mayorkas has failed his duty to protect our borders and uphold our laws.

We have 11 million reasons to hold him accountable and impeach him. That is the 11 million encounters, including nearly 2 million "got-aways" who have shown up here on our soil under Mayorkas's watch. He is not just derelict in his duties, he is complicit in endangering the safety of every American.

Yes, we understand the Democratic majority has the votes to table this hearing. But know this: History will not be so forgiving of this decision. The American people will not forget the betrayal of this Chamber and their family's safety. Come November, we the people will speak loudly. The people, the citizens of this great Republic, they are the true judges and the final jury.

So, please, to my colleagues across the aisle, there is still time to do the right thing: to vote in support of holding Secretary Mayorkas accountable. The American people will be watching. We must impeach Secretary Mayorkas for his failure to uphold his oath. If this Chamber skirts its responsibility, we shall hold every one of the Senators who block this impeachment trial accountable at the ballot box.

I yield the floor.

The PRESIDING OFFICER (Ms. SMITH). The Senator from North Carolina.

Mr. BUDD. Madam President, in order to be a strong Nation, we have to have strong borders. Right now, we don't have that. We haven't had that for 3 years. I talk with sheriffs from all over all of North Carolina—100 counties—and many of them tell me the same things over and over: Every single county is now a border county because of Joe Biden's policies. And those policies have been implemented by his Secretary of Homeland Security, Alejandro Mayorkas. From the very beginning of his tenure at DHS, Secretary Mayorkas has intentionally undermined security at the southern border again and again and again.

I have a list right here. Now, I know I have limited time, but let's try and run through some of the worst examples. On February 1, 2021, DHS implemented a policy requiring "alternatives to removal including, but not limited to, staying or reopening cases, alternative forms of detention, custodial detention, whether to grant temporary deferred action, or other appropriate action." This telegraphed the Department's complete unwillingness to enforce the law and to detain illegal aliens.

On March 20, 2021, the Mayorkas DHS began issuing illegal border crossers a Notice to Report to U.S. Immigration and Customs Enforcement, as opposed to the standard notice to appear. The notice to report policy allows illegal aliens to simply be released into the United States, and it relies on them to self-report to ICE at a later date. Now, this, ladies and gentlemen, marked the return of catch-and-release.

On July of 2021, the Mayorkas DHS released at least 50,000 aliens without giving them a notice to appear at all. They were advised to self-report to ICE on their own. To the shock of no one, 87 percent of them didn't even report.

On August 17, 2021, the Mayorkas DHS announced an expansion of alternatives to detention. It announced the expansion of taxpayer-funded services to illegal aliens in removal proceedings. This further supercharged the policy of catch-and-release.

On August 31, 2021, the Biden administration disclosed that they released over 100,000 aliens into the United States without giving them a notice to appear.

Again, they were asked to self-report to ICE on their own. Nearly half of them didn't check in with ICE within the 60-day deadline. On September 30, 2021, Secretary Mayorkas issued a memo stating that "the fact an individual is a removable [alien] should [not be the sole] basis of an enforcement action."

This is willful misuse of prosecutorial discretion, and it effectively gave deportable aliens a path to stay in the United States.

On October 8, 2021, the Mayorkas DHS canceled another large group of border wall contracts related to the Laredo and Rio Grande Valley border sectors.

On October 27, 2021, Secretary Mayorkas issued another memo prohibiting enforcement of immigration laws in the following areas—now listen to these: schools, healthcare facilities, recreational areas, social service facilities, ceremonial locations, as well as at demonstrations and at political rallies.

On October 29, 2021, Secretary Mayorkas formally terminated the "Remain in Mexico" policy, inviting illegal aliens to America's doorstep.

I could go on, but the bottom line is that this is nothing short of a dereliction of duty on the part of Secretary Mayorkas. He must be held accountable, and that is why he was the second Cabinet Secretary in American history ever to be impeached by the House of Representatives.

The U.S. Senate has a constitutional duty to take these charges seriously and to conduct a full trial on the merits. To do anything less would be an insult to the victims of these open-border policies.

We can't wait. Too many people are suffering. Too many people are dying. We must say enough.

This administration must face accountability for causing the worst border crisis in American history. Now is the time to act.

I yield the floor.

The PRESIDING OFFICER. The Senator from Louisiana.

Mr. KENNEDY. Madam President, a lot of history has unfolded in this room. The U.S. Senate has been home to some of the most formative debates in our Nation's tenure. These are fierce arguments among passionate, intelligent people. It is not all that different from the debates today.

The Senate has always welcomed these sometimes intense disagreements by respecting the rules and the traditions of the institution. It is how a Senator like me, who is a Member of the minority party, can stand here and speak freely about the issues that matter to the American people and to the people of Louisiana.

Now, my Democratic colleagues in the Senate, today, may be about to make some new history in this room. Apparently, they think it is a brave new world, and they want to set a dangerous new precedent. For the very first time, Senate Democrats are seeking to table—maybe even dismiss—an impeachment of a sitting Cabinet official without even holding a trial. They are summoning spirits they won't be able to control.

Please, my colleagues, don't do it.

I fear though that Senate Democrats are going to try to take the Articles of Impeachment that our colleagues in the U.S. House of Representatives thoughtfully crafted and passed with a majority vote and toss them into the trash without hearing from either side.

They don't want to let the House impeachment managers make their case. They don't want to let Secretary Mayorkas make his case. They just want to ignore the House's evidence, summarily sweep it under the rug, and move on. And that is wrong.

The Senate has never in its history tabled an impeachment—never. In the more than 200 years that this body has existed, the House of Representatives has impeached an official 21 times, and we have never once tabled the impeachment—not once.

Now, Senator SCHUMER may also try to dismiss these charges instead of tabling them, but that has never been done before, either. If the Senate dismisses these charges without a trial, it will be the first time in the Senate's long history that it has dismissed impeachment charges against an official it has jurisdiction over without that official first resigning. And that is a fact.

I want you to consider this: The U.S. House of Representatives has voted to impeach an official 21 times—only 21 times—in our long history. The U.S. Senate has only dismissed 3 of those cases—3 out of 21.

Now, why did they dismiss them? In two of those cases, the impeached official chose to resign instead of facing a trial. As a result, the Senate dismissed the charges. In this case, Secretary Mayorkas has not resigned. In one of those dismissed cases, the impeached official was a U.S. Senator, and the Senate concluded that the Constitution did not give it jurisdiction to remove a

USCA Case #24-1113　　Document #2060737　　Filed: 06/20/2024　　Page 66 of 267

U.S. Senator through the impeachment process.

Here, everyone agrees that the Constitution gives Congress the power to impeach and remove a sitting Cabinet Secretary.

Now, listen to me carefully on this. The U.S. Senate has the right and the responsibility to hold this trial. Yet Senate Democrats want to ignore our Chamber's history and forfeit our constitutional authority by tabling or dismissing these charges without even considering the evidence—without even considering the evidence.

Americans need to hear what I am about to say, even if my Democratic colleagues won't listen. Let me say it again: A majority of the duly elected Members of the U.S. House of Representatives, who represent all of the communities across America, spent months investigating the allegations against Secretary Mayorkas. They spent months drafting the Articles of Impeachment, and a majority of the House then voted yes to bring two very serious charges.

The Senate Democrats are now treating those charges—those Articles of Impeachment—like spam that landed in their inbox.

Americans, however, are not nearly so sanguine about the border crisis that has brought death, drugs, violence, chaos, criminals, and mayhem into their neighborhoods. The Biden administration's border crisis is as unprecedented as the majority leader's move to bury the evidence of who could be to blame here.

I, for one, want to hear the House's evidence, and so do the American people. The majority leader's move is unprecedented. It is undemocratic. And I am confident that my Democratic colleagues, if they do this—please, don't—but if they do it, will regret this new precedent when they find themselves in the minority, just as they regretted breaking the Senate precedent for confirming judicial nominees.

You see, Republicans do not like to break precedent when we are in the majority. We respect the traditions of this Chamber because we respect the voters who sent all 100 of us here.

If my Democratic colleagues set a new precedent that tramples the rights of the minority party and silences the voices of the Americans who elected them—if they do that—Senate Democrats will have to own that decision and bear its consequences.

Now, I have listened to the loon wing of the Democratic Party spend the better part of the past decade making passionate speeches about how important it is to protect democracy, to uphold the rule of law, and they are right. President Biden even ran his campaign on the idea of "restoring our norms," as he called it, and "defending democracy." Apparently though, the rules of the loon wing were of the "for thee and not for me" variety. Whenever protecting democracy and upholding the rule of law becomes politically challenging, the loon wing has been happy to ignore the rule of law and the will of the people. Isn't that special?

Their political expedience is in full view today, but it is not the first time that their cynicism has reared its ugly Democratic head.

I am sure, Madam President, you will remember. I will give you just two examples. The loon wing spent several years promoting a conspiracy that the Trump campaign was an arm of the Kremlin, despite no objective evidence to tie President Trump to Russia. Democrats and several members of the national security community rushed to dismiss any information found on Mr. Hunter Biden's laptop as "Russian misinformation," despite not having any objective evidence, as we now know, to make that claim. And those are just two of many examples that I could give.

Secretary Mayorkas' impeachment may be the best example of this hypocrisy to date. The same Senate Democrats who have shouted for years about defending democracy and upholding the rule of law seem ready to disregard serious impeachment charges without so much as a second glance. These Senators, if they do that, won't just be silencing the House of Representatives. They will be silencing the American people—the American people who want their border's security back.

You can pick any poll—any one you want—and you will find President Biden's approval rating on the issue of immigration and border security is on a journey to the center of the Earth. A recent Associated Press poll, for example, found that more than two-thirds of Americans—69 percent of Americans—disapprove of how the Biden administration is handling border security.

I can't imagine that these same Americans would approve of Democrats' refusal to even hear the evidence that Americans see play out in their communities every day.

This poll is only surprising if you peaked in high school. Under President Biden and Secretary Mayorkas, the southern border has become an open, bleeding wound. It has become a cesspool of misery. Drug trafficking, human trafficking, sexual abuse of women, sexual abuse of children, drowning, dehydration, widespread illnesses, death—all have become commonplace.

In total, the Border Patrol has encountered illegal immigrants at the southern border more than 9 million times since President Biden took office. That is four Nebraskas. The Biden administration has failed to remove 99 percent of foreign nationals that it has released into this country.

The backlog of immigrant court cases has doubled under the Biden administration's watch. These foreign nationals have overwhelmed American cities. Instead of investing in American citizens, cities throughout the country are raising taxes. They are cutting programs to fund prepaid debit cards for migrants.

America's children have to stay home from school because Democratic officials turned their classrooms into housing units. Democratic leaders in New York City, Chicago, Denver, Houston, and Los Angeles have begged the Biden administration to do something to curb the flow of unvetted people into their cities.

Of course, it is not just people flowing illegally over that border; cartels have flooded the United States with poisonous fentanyl over that border, too. Customs and Border Protection seized nearly 53,000 pounds of fentanyl from 2021 to 2023—not 53,000 grams, 53,000 pounds. That is enough to kill the entire population of our planet. This poison actually did kill more than 70,000 Americans in 2022. It is now the leading cause of death among Americans 18 to 40.

The Biden administration's border policies bring Americans nothing but suffering. If you hate America, however, the Biden border strategy has been a blessing. Cartels' smuggling operations saw revenues increase from $500 million in 2012 to $12 billion—that is "b" as in "billion"—in 2022.

The policies that President Biden and Secretary Mayorkas have implemented are directly responsible for this disaster at our southern border. At every turn, the Biden administration has ignored the laws of this land and this Congress and the will of the American people to facilitate their own broken border security policies.

The House has detailed several examples in their Articles of Impeachment, and we ought to hear their evidence.

To start, the law requires that all foreign nationals who are not clearly admissible must be "retained for a removal proceeding." Instead, Secretary Mayorkas established a catch-and-release—catch, release, repeat—a catch-and-release scheme that incentivized illegal immigrants to flood our country.

The law also requires that law enforcement take an illegal immigrant who commits a crime or has ties to terrorism or both into Federal custody. That is the law. Yet Secretary Mayorkas told his Department not to follow that law regarding the "mandatory arrest and detention" of criminal aliens.

Our law also says that law enforcement must detain illegal immigrants. Instead, Secretary Mayorkas has paroled them wholesale by the thousands into our country, where they could catch a bus or a plane to any unsuspecting community they desire. Not only that, Secretary Mayorkas even gave them the money to do it.

Secretary Mayorkas killed the "Remain in Mexico" program. He quashed contracts to build a border wall. He ended the safe third country agreements that allowed America to work with other countries to find protection for migrants in need.

By tabling or dismissing the Articles of Impeachment without so much as a

USCA Case #24-1113     Document #2060757     Filed: 06/20/2024     Page 67 of 267

tial, my Senate Democratic colleagues will be endorsing the Biden administration's lawless approach to the southern border. They will be setting a precedent that the next administration can ignore the laws of Congress and the will of the American people too.

Impeachment matters. It is an important check we have on the executive branch, and we have an obligation to take it seriously. We have an obligation to give any charges brought the full trial they deserve.

I am going to have a resolution, if I am allowed to present it, that will give the procedures we need to conduct this trial fairly and efficiently. I will be bringing that at the appropriate time. It will be efficient. It will be fair. It will be honest. It won't uproot the longstanding precedent we have given to Articles of Impeachment in the past.

If the majority leader and my Democratic colleagues table or dismiss these charges and destroy Senate precedent—precedent that we have established to conduct full and fair impeachment trials—they will regret it. They will regret it. Senate Democrats, if they do that, will show the world that their proclamations about rule of law and protecting democracy are just tools of their own political experience and arrogance. Senate Democrats will let the American people know that they endorse the lawlessness and the misery the Biden administration's broken border has brought to this country.

I don't think Americans' future should be beholden to the politics of the moment, and that is why I want the Senate to do its job and hear this evidence.

I yield the floor.

The PRESIDING OFFICER. The Senator from Florida.

Mr. SCOTT of Florida. Madam President, I want to make one thing clear to my Democrat colleagues: Your attempt to brush Secretary Mayorkas's impeachment trial under the rug is disgusting and unacceptable. It is truly unprecedented, violates Senate rules, and is possibly unconstitutional.

The House of Representatives adopted two Articles of Impeachment against Secretary Mayorkas. Let me quote for you:

Throughout his tenure as Secretary of Homeland Security, Alejandro N. Mayorkas has repeatedly violated laws enacted by Congress regarding immigration and border security. In large part because of his unlawful conduct, millions of aliens have illegally entered the United States on an annual basis with many unlawfully remaining in the United States.

Alejandro N. Mayorkas has knowingly made false statements, and knowingly obstructed lawful oversight of the Department of Homeland Security, principally to obfuscate the result of his willful and systemic refusal to comply with the law.

Now, it is the constitutional duty of the U.S. Senate to conduct an impeachment trial to determine if Secretary Mayorkas should be removed from office based on those Articles of Impeachment.

I want to stress this again: Never in the history of the U.S. Senate has such a procedural move been attempted to completely avoid an impeachment trial.

Senate Democrats' efforts to avoid fulfilling their constitutional duty to conduct this trial are just the latest attack by the left against our democratic process and institution. Senate Democrats want to eliminate the filibuster. They want to radically change the U.S. Supreme Court. Now they want to trash the impeachment process. This is a disturbing series of direct attacks on our democratic institutions.

My colleagues and I have called on Senate leadership to conduct a trial. I have also personally called on Vice President KAMALA HARRIS, urging her to fulfill her constitutional duty to serve as the presiding officer of Secretary Mayorkas's trial. Her appointment as President Biden's border czar only makes her role in the Mayorkas impeachment trial more critical.

President Biden and his administration have created a crisis at our southern border. Secretary Mayorkas—a complete puppet for this lawless administration—has the audacity to come falsely testify before Senate and House committees that the border is secure. Not just once but multiple times Mayorkas has lied under oath in committee that our border is secure. He is lying to the American public. He is not taking the action needed to defend the homeland by securing the border or upholding the law. That is his job, and he is simply not doing it.

Our Nation is reeling from the consequences of Mayorkas's failures. Our Nation is a more dangerous place because of Secretary Mayorkas's failures. He is allowing criminals, drugs, terrorists, and others into our communities. These are real consequences, and each victim has a name. Real Americans here to live their dream are being killed. Real American families are being torn apart by vicious crimes and deadly drugs because we have a wide-open border. Biden and Mayorkas refuse to enforce Federal law to secure the border, and innocent Americans like Laken Riley are paying the ultimate price for his failures.

Ten million people—ten million people—have illegally crossed, and 6 million have been let into our country. There have been sexual assaults and murders committed by illegal aliens all across the country—even Florida, where a young man was recently killed. The man charged for his death is an illegal alien.

I don't get it. I do not understand why my Democrat colleagues don't care. They don't care about 70,000 people dying of fentanyl overdose. They don't care about vicious crimes. They don't care about terrorists being let go in our country. Senate Democrats are saying they simply do not care.

They are using every power they have to ignore this crisis, while innocent Americans die, and keep Congress from holding Mayorkas accountable. The proof is not just in this disgraceful effort to dismiss the impeachment trial. Let's remember what Democrats voted against. Democrats voted against a bill to stop illegal aliens from getting on a commercial flight with no verifiable ID. Think about that. You have to have an ID; they don't. Democrats voted against deporting illegal aliens who hurt police, the people who are here to take care of us. Democrats voted against the Laken Riley Act, which simply requires—it is a simple act—simply requires ICE to take illegal aliens who commit crimes into custody before tragedy strikes.

Does Biden hope that millions of immigrants will vote for him? Many in his party want to allow illegal immigrants to vote. They even voted to allow the census to keep counting illegal aliens. It is because they want sanctuary cities and States to have more electoral votes and representation in Congress—not from Americans but from illegal aliens. That is the future the Democrats want.

Biden has intentionally dismantled every ounce of border security Trump put in place and completely undermined our immigration system, and Mayorkas has done absolutely nothing to stop it.

Mayorkas has clearly been derelict in his duties. He has neglected to protect the homeland—his job. He has allowed criminals to come into our country, into each and all of our communities, drugs to flow into our country. When I talk to Floridians, they are terrified. They are concerned about their family's safety because of who and what are coming across the southern border and into each and all of our communities.

Mayorkas may simply be a puppet for the administration, but he is fully responsible for his negligence and failure to do his job. Mayorkas needs to either resign or needs to have the full and thorough trial that we are constitutionally obligated to conduct, as the American people, through their representatives, voted for.

We must have an administration and DHS Secretary who is willing to secure the border, not ignore failure that is killing our citizens.

I yield the floor.

The PRESIDING OFFICER. The Senator from Utah.

Mr. LEE. Madam President, an invasion is taking place on American soil. Over 8 million people have crossed our border illegally since Mayorkas became Secretary, and the numbers just keep rising. They are not going away. This unprecedented, lawless influx includes gang members. It includes drug traffickers and dangerous individuals from every country in the world, including many thousands of military-age males from China. What could go wrong? In December alone, the Department of Homeland Security reported 302,000 encounters—in 1 month. This is the highest month ever on record.

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 68 of 267

To be clear, Secretary Mayorkas has the tools to stop the invasion today. He could do it right now if he wanted to. It is almost turnkey. It is abracadabra. If he decided to do it, we could have a secure border, and we would. Not only does he have the tools, but he has an obligation and a responsibility, an affirmative duty under the laws of the United States—laws that he agreed he would faithfully enforce.

Let me say that again just to be very clear. Just by enforcing the laws currently on the books, he could bring our state of utter lawlessness on the border to a state of order.

Secretary Mayorkas could bring a complete stop to the crisis. He doesn't need legislative action from Congress. This isn't a policy disagreement. No, it is a blatant defiance of the laws that are already on the books and have been for years.

So to my colleagues: If you are so confident that the charges against Secretary Mayorkas are baseless, then why not hold a trial? Why try to just sweep this under the rug? You realize, don't you, that when you do that, all that does is just make you look more conscious of what is going on, of what is being done that is so very, very wrong—especially where, as here, it is such a departure from nearly two and a half centuries of this institution operating faithfully as a Court of Impeachment, nearly two and a half centuries in which we have had 21 Articles of Impeachment destined for the Senate; at least 20 of those arrived. In 18 of those total of 21 cases during the Senate's existence, 18 of those 21 culminated in a trial resulting in a verdict of guilty or not guilty. Those other three involved cases that were rendered moot in between the time the House of Representatives adopted the Articles of Impeachment and the time they were presented over here. They were rendered moot because of the death or departure—a new vacancy in the office that had been occupied by the impeached official.

So this isn't just an ordinary act of sweeping it under the rug. It is an act of sweeping it under the rug under the circumstances where sweeping it under the rug was never an option. It never has been. We haven't done it.

This isn't just some invisible "Casper the Friendly Ghost" coming in to get rid of it. They are actively doing it, and they are doing it under the full view of the American people.

The American people should be really upset by this, because Article I of the Constitution gives the House of Representatives the power to impeach and the Senate the power to try all impeachments.

Remember, the Senate has only three states of being—exactly three states of being: the legislative calendar, where we do a lot of our work, where we consider law; Executive Calendar, where we do things like confirm Presidential nominees and consider treaties for ratification; and the third state of being for the Senate is as a Court of Impeachment. We are always in one of those three states of being, and yet we have never operated in that third state of being unless the case has been rendered moot where the Senate doesn't hold a trial, as it is required to do under the Constitution, culminating in a verdict of guilty or not guilty.

Now, if you trust that Secretary Mayorkas didn't authorize millions of individuals to enter illegally into our country for swift and precursory release, then let's hold a trial.

If you are certain that Secretary Mayorkas hasn't increased the pull factors incentivizing parents across the globe to send 430,000 unaccompanied children illegally into the United States, in many cases to have them end up in the hands of traffickers—drug traffickers and human sex traffickers and otherwise—then let's hold a trial.

If you are confident that Secretary Mayorkas hasn't created at least 13 illegal immigration parole programs designed to increase the flow of people into this country by the hundreds of thousands, then let's hold a trial.

If you are so sure that Secretary Mayorkas—under Secretary Mayorkas' leadership, Customs and Border Protection hasn't dramatically decreased its vetting process for allowing Chinese immigrants to cross our border, including military-aged Chinese males, then let's hold a trial.

If you believe that we haven't seen a dramatic increase in the known terrorist encounters at our border, then let's hold a trial.

If you are confident that Secretary Mayorkas hasn't allowed enough fentanyl to flow across the southern border to kill every man, woman, and child in this country, then let's hold a freaking trial.

These are not victimless crimes.

The tragic case of Laken Riley, a life cut short by an illegal alien, one of the millions whom Secretary Mayorkas has recklessly, intentionally, deliberately, and maliciously allowed to enter our country unchecked, unvetted, is a reminder of the human cost of this abdication of duty. Laken isn't alone. Her case represents hundreds of thousands of families across this Nation whose lives have been upended by the invasion that our leaders allowed to happen.

Think about that for a minute. They allowed it to happen not by negligence, oversight, carelessness, inattentiveness. No, no, no. They encouraged it to happen.

Should Secretary Mayorkas be found guilty, these are crimes of the highest order. This sort of thing doesn't happen very often in this country—the sort of thing that I hope we will never have to experience again; the sort of thing that otherwise would result in a Toby Keith song, may he rest in peace; the sort of thing that unites Americans in surprising ways. The American people understand something is terribly wrong, and they expect us to act.

In all previous impeachments sent to the Senate, we held a trial, save those rare circumstances where the case was rendered moot by death or vacancy of the office—not facts present here. We held a trial, and that trial culminated, in each and every instance, in a verdict of guilty or not guilty.

But the majority leader CHUCK SCHUMER now seems to want to take the radical step, the unprecedented step, the lawless step, the counter- and anti-constitutional step of trying to table these Articles of Impeachment without even letting us examine the evidence.

This begs the question: What would he do—what would he do—if he were confident, if the majority leader were confident that Secretary Mayorkas had acted lawfully, honorably, in this office?

What would he do if he were confident the American people wouldn't turn on his party because of this act of lawlessness, this interminable succession of absurdities imposed by the myopic logic of their own border non-enforcement strategy? This is exactly what it looks like when someone is aware that there is a problem and wants to sweep the problem under the rug.

There is no rug here. You can't hide this. There is no rug big enough to accommodate that. And shame on us if we play into that strategy.

To colleagues on my side of the aisle and on the other, I implore you. I know many of us are institutionalists. Whether you are a Democrat or a Republican, no matter how far to the leftwing or rightwing or somewhere in between you are, I appeal to your sense that we have an obligation to take seriously our oath to the Constitution. We have an obligation that must be honored to look out for the institutional interests of the Senate and the role that it plays in the sacred order created by the U.S. Constitution.

When the Articles of Impeachment arrive, we have a job to do. The Constitution and our rules and our precedents make that abundantly clear. To ignore the evidence before us is to betray the trust of those who sent us here.

There is no doubt, at this point, that the invasion at the southern border has inflicted indescribable, incalculable, intolerable pain and suffering on the part of the American people. We are obligated to figure out who is responsible and hold them accountable, beginning with Secretary Mayorkas. I urge each of my colleagues to oppose this shameless effort to sidestep our constitutional duty and, by so doing, subvert the constitutional order.

I yield the floor.

The PRESIDING OFFICER. The majority leader.

## LEGISLATIVE SESSION

### MORNING BUSINESS

Mr. SCHUMER. Madam President, I ask unanimous consent that the Senate proceed to legislative session and

be in a period of morning business, with Senators permitted to speak therein for up to 10 minutes each.

The PRESIDING OFFICER. Without objection, it is so ordered.

---

ADDITIONAL STATEMENTS

---

TRIBUTE TO STEVE SHAVER

● Mr. DAINES. Madam President, today I have the distinct honor of recognizing Steve Shaver of Flathead County for his courage and swift action that ultimately saved a fellow Montanan's life.

On a routine day working on a project in Hungry Horse, MT, a woman emerged from her home signaling to Steve that she needed help because her husband was in the home unconscious. Steve acted without hesitation and sprang into action as he began facilitating lifesaving cardiopulmonary resuscitation—CPR—until the man regained consciousness and emergency service personnel arrived to the scene. Steve's calm composure and effective responsiveness demonstrated his ability to lead in a stressful emergency situation that many will never face.

Here in the Treasure State, folks hold dear the principles of an honest work ethic and lending a helping hand when someone is in need. Steve's actions exemplify Montanans' commitment to looking out for one another, no matter the time of day or circumstances, and a man's life was saved because of his actions. Our famous Montana skies cannot truly be measured and neither can a man's ability to help out his neighbor when he is needed the most.

Today, as we acknowledge Steve's act of bravery, we also pay homage to the deep-rooted values that Montana is known for, further attributing to our beloved State's title as the Last Best Place. John 13:34 states, "A new command I give you: Love one another. As I have loved you, so you must love one another." Steve's actions show that Montanans live that verse out every day.

It is my distinct honor to recognize Steve Shaver for his heroic act of selfless service that saved a fellow Montanan's life. May his bravery and compassion serve as inspiration to each of us to stand by our neighbors in times of trouble. You make Montana proud.●

---

RECOGNIZING BROWNELL, INC.

● Ms. ERNST. Madam President, as ranking member of the Senate Committee on Small Business and Entrepreneurship, each week I recognize an outstanding Iowa small business that exemplifies the American entrepreneurial spirit. This week, it is my privilege to recognize Brownells of Grinnell, IA, as the Senate Small Business of the Week.

In 1938, Frank "Bob" Brownell II founded Brownells in Montezuma, IA.

He owned and operated a gas station and sandwich shop in Montezuma in addition to being an avid gunsmithing hobbyist. Bob combined his business experience with his passion and founded Brownells to fill a niche in the gunsmithing industry: selling hard-to-find gunsmithing tools to other gunsmiths. In 1947, Brownells began printing their catalog, and by 1951, he had shifted the business from a gunsmith store to a gunsmith product supplier. In 1973, Brownells moved their headquarters to a larger location in Montezuma until 2014 and have since moved to nearby Grinnell. Brownells current location in Grinnell includes a 200,000-square-foot warehouse, corporate offices, and a retail store that opened in 2016. Today, Brownells maintains a supply of over 50,000 gun parts. They supply and ship their products across the world.

Three generations of the Brownell family have worked at the company. Bob's son Frank joined Brownells in 1964 and became president in 1983 after Bob became chairman of the board. Before working at Brownells, Frank Brownell served in the U.S. Navy. Frank's son Pete joined the family business in 1997 and became vice president in 2000. In 2008, Pete became president, with his father serving as the chief executive officer. Bob Brownell passed away in 1991, leaving behind a legacy of hard work, community involvement, and dedication to the firearm industry.

Brownells is actively involved in both the Poweshiek County community and the national firearm industry. Pete Brownell previously served on the board of the National Rifle Association—NRA—and served as president of the NRA from 2017 until 2018. In 2014, Frank Brownell received the NRA Golden Bullseye Pioneer Award for his continued dedication to the firearm industry. Pete Brownell has also been involved in the Grinnell College Ignite Program, a yearly program that brings students from prekindergarten to eighth grade experience workshops at the college. Brownells celebrated its 85th business anniversary in 2024.

Brownells' commitment to providing high-quality gunsmithing tools while maintaining its Poweshiek County roots is clear. I want to congratulate the Brownell family and the entire team at Brownells for their continued dedication to the firearm industry. I look forward to seeing their continued growth and success in Iowa.●

---

RECOGNIZING CANTEEN LUNCH IN THE ALLEY

● Ms. ERNST. Madam President, as ranking member of the Senate Committee on Small Business and Entrepreneurship, each week I recognize an outstanding Iowa small business that exemplifies the American entrepreneurial spirit. This week, it is my privilege to recognize Canteen Lunch in the Alley of Ottumwa, IA, as the Senate Small Business of the Week.

After finding success selling loose meat sandwiches to farmers, Dusty Rhoades opened Canteen Lunch in the Alley in 1927 with just five stools and a single steamer to cook sandwiches. The business's name was inspired by its signature dish: delicious loose meat sandwiches often called canteens. Today, in addition to their signature sandwiches, Canteen Lunch in the Alley serves homemade pies, ice cream, hot dogs, and egg sandwiches. Their current location has 17 seats and uses around 800 pounds of ground beef weekly to keep up with demand.

From 1929 to 1936, Bill and Ruth Carter were the proud owners of Canteen Lunch in the Alley. Following their passing, their daughter Bernita Carter Popchuck became the sole owner. In 1936, the business was moved to its current location on 2nd Street in Ottumwa. Husband and wife Earnest and Shirley McBeth purchased the restaurant in 1976 with the help of Shirley's sister Lauralee Staley and operated Canteen Lunch in the Alley until 2015, when Scott and Janice Pierce purchased it. Scott, an Ottumwa native, has been eating at the restaurant since his childhood and understands the significant role the business plays in the community.

The mom-and-pop shop is well-recognized for great food, hard work, and commitment to customer satisfaction. Owners Scott and Janice Pierce have brought the community together by hosting the World Championship Canteen Eating Contest thrice since 2018. In 2019, professional competitive eater Joey Chestnut won the competition by eating 28 and a half canteens in 10 minutes. Notably, the award-winning television show Roseanne used Canteen Lunch in the Alley as inspiration for the show's fictional restaurant "Lanford Lunch Box." In 2019, Canteen Lunch in the Alley won the People Choice Award from the Iowa Tourism Office, and in 2017, the business was named the best loose meat sandwich in Iowa by USA Today. Due to their hard work, the Canteen Lunch in the Alley team celebrated its 97th business anniversary in 2024.

For nearly 100 years, Canteen Lunch in the Alley has preserved the essence of tradition in Ottumwa by providing a sprinkle of love with their well-loved canteen sandwiches and desserts. I want to congratulate the Pierce family and the entire Canteen Lunch in the Alley team for their continued dedication to serving Iowans while maintaining an important piece of Ottumwa history. I look forward to seeing their continued success in Iowa.●

---

RECOGNIZING KEG CREEK BREWING COMPANY

● Ms. ERNST. Madam President, as ranking member of the U.S. Senate Committee on Small Business and Entrepreneurship, each week I recognize an outstanding Iowa small business that exemplifies the American entrepreneurial spirit. This week, it is my

USCA Case #24-1113     Document #2060737     Filed: 06/20/2024     Page 70 of 267

privilege to recognize Keg Creek Brewing Company of Glenwood, IA, as the Senate Small Business of the Week.

In 2011, Randy Romens, John Bueltel, Art Renze, and Grant Hebel founded Keg Creek Brewing in Glenwood, IA. Randy, John, Art, and Grant started in the beer industry as homebrewers in their garages and basements, brewing 10 gallons of beer at a time. After their beer became a hit with friends and family, they decided to start Keg Creek Brewing Company, named after Keg Creek in Glenwood. What began as one location with three barrels quickly expanded. In 2016, the team expanded their production facility and, 2 years later, moved into their current location, where they now have 15 barrels. In 2015, Keg Creek Brewing added a new owner, Matt Kirsch, who has remained instrumental in their continued success.

Keg Creek Brewing offers 18 beers on tap while distributing bottles and kegs of beer throughout the Midwest. The Brewery has a lively taproom and a patio for customers and regularly hosts trivia nights, live music, and karaoke. During the spring and summer, they hold sand volleyball and cornhole leagues. In addition to beer, they also support other local small businesses by hosting food trucks, pizzas from Roberto's Pizzas of Dunlap, and MinDee's Nuts of Malvern.

Keg Creek Brewing is actively involved in the Glenwood community and has been recognized for its rapid climb in the brewery industry and craft beers. In 2020, they were awarded a bronze medal by the U.S. Open Beer Championship for their "Deviant of the Depths" beer in the Rum Barrel Aged Beer category and another bronze medal for their "Old Marathon" barley wine in the Barrel-Aged Barley Wine category. In 2017, the Brewers Association's list of 50 Fastest-Growing Small and Independent Craft Breweries in the United States recognized the Keg Creek Brewery. Their beers have also won awards at the Iowa State Fair and are a staple at the craft beer tent. Keg Creek Brewery has also hosted fundraising events for Relay for Life, the Mills County K9 Unit, and the local libraries. In 2024, Keg Creek Brewing celebrated its 13th business anniversary.

Keg Creek Brewing Company's commitment to Glenwood and the craft beer industry is clear. I want to congratulate Matt Kirsch, Randy Romens, John Bueltel, Art Renze, Grant Hebel, and the entire Keg Creek Brewing Company team for their continued dedication to the Glenwood community. I look forward to seeing their continued growth and success in Iowa.●

## TRIBUTE TO TOM HENKE

● Mr. SCHMITT. Madam President, I rise today to recognize and honor a model citizen Tom Henke. Tom's outstanding support of his family and other families who have children with developmental disorders has earned him the title of "Champion of Missouri."

In addition to the accomplishment of winning the World Series Championship with the St. Louis Cardinals as a pitcher, his efforts in raising support for a cause near and dear to him have established him as a cornerstone of the Jefferson City community. But before I break down what makes him a cut above the rest, let me tell you a little about his family and what inspires him.

Tom's family motivates him both professionally and personally. He and his father used to play catch with a baseball when he was a child. This simple act enabled him with a passion for the sport that would serve him throughout his life as he went on to play on the highest stage possible, the MLB. While in college, he met his wife Kathy, married, and had four wonderful children: Linsay, Ryan, Kim, and Amanda. His family and his faith are the centerpiece of his life.

Tom's commitment to his family has served as an inspiration in support of the Special Learning Center in Jefferson City. Inspired by his daughter Amanda, Tom established the Tom Henke Charity Classic Golf Tournament, which pairs celebrities and participants to play a round of golf together in support of the center. Through his efforts, this event has been pivotal in support of those with disabilities and has raised over $1 million in charity for the Special Learning Center in Jefferson City. This center empowers parents and their children with skills that will serve them for their entire lives.

Tom Henke is truly a Champion of Missouri. As a father, I appreciate the unwavering dedication it takes to support a family. I understand from personal experience that caring for someone with a special need requires love and patience. My experiences with my wife and children's family have pushed me to stand here today and honor this distinguished man in his life's journey.●

## TRIBUTE TO SCOTT CROISANT

● Mr. TUBERVILLE. Madam President, in a time when we are facing shortages in the trucking industry, Alabama's veterans are helping fill this vital need in our economy. One such veteran is Scott Croisant of Florence. Scott joined the U.S. Marine Corps in 1982, after graduating from Wilson High School.

While in the Marines, he trained to become a truck driver. Scott deployed twice to Lebanon, following the 1983 Beirut bombings. There, he helped transport food, water, and ammunition in combat zones. He was also part of Operation Urgent Fury in Grenada. After completing his time in the military, Scott served in law enforcement before entering the trucking industry.

And for more than 24 years, he has driven a truck for Greenbush Logistics in Abbeville, out of its Tuscumbia location. Scott spends many, many early mornings and late nights on the road, to keep our supply chains moving. He is committed to ensuring folks across the southeast get the building materials that they need on time. Scott has an incredible record of more than 2 million accident-free miles.

Travis Williams, the director of Logistics for Greenbush, says that Scott "epitomizes the essence of a professional driver. His unwavering dedication, skill, and attention to detail make him a role model for all drivers."

Scott is also a trusted mentor for upcoming truckers. He has helped train nearly 100 new truck drivers. Alabama is thankful for Scott's service to our country, and his tireless efforts to keep America's economy moving.

It is my honor to recognize him as the April Veteran of the Month.●

## MESSAGES FROM THE PRESIDENT

Messages from the President of the United States were communicated to the Senate by Mrs. Stringer, one of his secretaries.

## EXECUTIVE MESSAGES REFERRED

In executive session the Presiding Officer laid before the Senate messages from the President of the United States submitting sundry nominations and a withdrawal which were referred to the appropriate committees.

(The messages received today are printed at the end of the Senate proceedings.)

## MEASURES PLACED ON THE CALENDAR

The following joint resolutions were read the second time, and placed on the calendar:

S.J. Res. 67. Joint resolution to provide for related procedures concerning the articles of impeachment against Alejandro Nicholas Mayorkas, Secretary of Homeland Security.

S.J. Res. 68. Joint resolution providing for the issuance of a summons, providing for the appointment of a committee to receive and to report evidence, and establishing related procedures concerning the articles of impeachment against Alejandro Nicholas Mayorkas.

S.J. Res. 69. Joint resolution to provide for related procedures concerning the articles of impeachment against Alejandro Nicholas Mayorkas, Secretary of Homeland Security.

## EXECUTIVE AND OTHER COMMUNICATIONS

The following communication was laid before the Senate, together with accompanying papers, reports, and documents, and was referred as indicated:

EC–3960. A communication from the President of the United States transmitting, pursuant to law, a report relative to the designation as emergency requirements all funding (including the transfer and repurposing of funds) so designated by the Congress in the Consolidated Appropriations

Act, 2024 pursuant to section 251(b)(2)(A) of the of the Balanced Budget and Emergency Deficit Control Act of 1985, as outlined in the enclosed list of accounts received during adjournment of the Senate on March 25, 2024; to the Committee on the Budget.

## REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. MANCHIN, from the Committee on Energy and Natural Resources, with an amendment in the nature of a substitute:

S. 2581. A bill to extend the Secure Rural Schools and Community Self-Determination Act of 2000 (Rept. No. 118–163).

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first and second times by unanimous consent, and referred as indicated:

By Mr. TESTER (for himself and Mr. CASSIDY):

S. 4074. A bill to amend title 38, United States Code, to authorize the Secretary of Veterans Affairs to approve interstate commerce carrier apprenticeship programs for purposes of veterans educational assistance, and for other purposes; to the Committee on Veterans' Affairs.

By Mr. HAGERTY:

S. 4075. A bill to prohibit payment card networks and covered entities from requiring the use of or assigning merchant category codes that distinguish a firearms retailer from a general merchandise retailer or sporting goods retailer, and for other purposes; to the Committee on Banking, Housing, and Urban Affairs.

By Mr. CASEY (for himself and Mr. FETTERMAN):

S. 4076. A bill to designate the facility of the United States Postal Service located at 1077 River Road, Suite 1, in Washington Crossing, Pennsylvania, as the "Susan C. Barnhart Post Office"; to the Committee on Homeland Security and Governmental Affairs.

By Mr. PADILLA (for himself and Ms. BUTLER):

S. 4077. A bill to designate the facility of the United States Postal Service located at 180 Steuart Street in San Francisco, California, as the "Dianne Feinstein Post Office"; to the Committee on Homeland Security and Governmental Affairs.

By Mr. SCOTT of South Carolina (for himself, Mr. MORAN, Mr. CRAMER, Mr. ROUNDS, Mr. BARRASSO, Mr. THUNE, Mr. TILLIS, Mr. BRAUN, Mr. DAINES, Mr. HAGERTY, Mr. BOOZMAN, Mrs. BRITT, Mrs. BLACKBURN, and Mr. BUDD):

S.J. Res. 70. A joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Bureau of Consumer Financial Protection relating to "Credit Card Penalty Fees (Regulation Z)"; to the Committee on Banking, Housing, and Urban Affairs.

## SUBMISSION OF CONCURRENT AND SENATE RESOLUTIONS

The following concurrent resolutions and Senate resolutions were read, and referred (or acted upon), as indicated:

By Mr. CARDIN (for himself, Mr. RISCH, Mr. HAGERTY, Ms. HIRONO, Mr. VAN HOLLEN, and Mr. ROMNEY):

S. Res. 626. A resolution recognizing the importance of the United States-Japan alliance and welcoming the visit of Prime Minister Kishida Fumio to the United States; to the Committee on Foreign Relations.

By Mr. SCOTT of Florida (for himself and Mr. RUBIO):

S. Res. 627. A resolution honoring the memory of Jereima "Jeri" Bustamante on the sixth anniversary of her passing; to the Committee on the Judiciary.

By Mr. SCHATZ:

S. Res. 628. A resolution supporting the goals and ideals of the Rise Up for LGBTQI+ Youth in Schools Initiative, a call to action to communities across the country to demand equal educational opportunity, basic civil rights protections, and freedom from erasure for all students, particularly LGBTIQI+ young people, in K–12 schools; to the Committee on Health, Education, Labor, and Pensions.

By Mr. DURBIN (for himself, Mr. KAINE, Mr. FETTERMAN, Mr. VAN HOLLEN, Mr. BLUMENTHAL, Mr. CASEY, Mr. COONS, Mr. WHITEHOUSE, Mr. KING, Mrs. MURRAY, Ms. CORTEZ MASTO, Ms. STABENOW, Ms. KLOBUCHAR, Mr. BENNET, Mrs. SHAHEEN, Mr. MERKLEY, Mr. BOOKER, Mr. WELCH, Mr. SANDERS, Mr. WYDEN, and Ms. WARREN):

S. Res. 629. A resolution condemning the arbitrary arrest of United States citizens by the Government of the Russian Federation and calling for the immediate and unconditional release of such citizens; to the Committee on Foreign Relations.

## ADDITIONAL COSPONSORS

### S. 133

At the request of Ms. COLLINS, the name of the Senator from Vermont (Mr. WELCH) was added as a cosponsor of S. 133, a bill to extend the National Alzheimer's Project.

### S. 134

At the request of Ms. COLLINS, the name of the Senator from Vermont (Mr. WELCH) was added as a cosponsor of S. 134, a bill to require an annual budget estimate for the initiatives of the National Institutes of Health pursuant to reports and recommendations made under the National Alzheimer's Project Act.

### S. 334

At the request of Mr. LANKFORD, the name of the Senator from Texas (Mr. CRUZ) was added as a cosponsor of S. 334, a bill to modify the restriction in section 3326 of title 5, United States Code, relating to the appointment of retired members of the Armed Forces to positions in the Department of Defense to apply to positions at or above the GS–14 level.

### S. 566

At the request of Mr. LANKFORD, the name of the Senator from Alaska (Mr. SULLIVAN) was added as a cosponsor of S. 566, a bill to amend the Internal Revenue Code of 1986 to modify and extend the deduction for charitable contributions for individuals not itemizing deductions.

### S. 740

At the request of Mr. BOOZMAN, the names of the Senator from California (Ms. BUTLER), the Senator from Maryland (Mr. VAN HOLLEN), the Senator from Nebraska (Mrs. FISCHER) and the Senator from Nevada (Ms. CORTEZ MASTO) were added as cosponsors of S. 740, a bill to amend title 38, United States Code, to reinstate criminal penalties for persons charging veterans unauthorized fees relating to claims for benefits under the laws administered by the Secretary of Veterans Affairs, and for other purposes.

### S. 815

At the request of Mr. TESTER, the names of the Senator from Nevada (Ms. ROSEN) and the Senator from Oregon (Mr. MERKLEY) were added as cosponsors of S. 815, a bill to award a Congressional Gold Medal to the female telephone operators of the Army Signal Corps, known as the "Hello Girls".

### S. 1426

At the request of Mr. DURBIN, the name of the Senator from California (Mr. PADILLA) was added as a cosponsor of S. 1426, a bill to improve the identification and support of children and families who experience trauma.

### S. 1462

At the request of Mr. KENNEDY, the name of the Senator from Tennessee (Mr. HAGERTY) was added as a cosponsor of S. 1462, a bill to amend title 18, United States Code, to improve the Law Enforcement Officers Safety Act of 2004 and provisions relating to the carrying of concealed weapons by law enforcement officers, and for other purposes.

### S. 1567

At the request of Mr. DURBIN, the name of the Senator from New Mexico (Mr. HEINRICH) was added as a cosponsor of S. 1567, a bill to amend the Internal Revenue Code of 1986 to address the teacher and school leader shortage in early childhood, elementary, and secondary education, and for other purposes.

### S. 1714

At the request of Mrs. GILLIBRAND, the name of the Senator from Wisconsin (Ms. BALDWIN) was added as a cosponsor of S. 1714, a bill to provide paid family leave benefits to certain individuals, and for other purposes.

### S. 1979

At the request of Mrs. GILLIBRAND, the name of the Senator from Hawaii (Ms. HIRONO) was added as a cosponsor of S. 1979, a bill to amend title 9 of the United States Code with respect to arbitration of disputes involving age discrimination.

### S. 2307

At the request of Mr. CRAPO, the name of the Senator from Arizona (Ms. SINEMA) was added as a cosponsor of S. 2307, a bill to support and strengthen the fighter aircraft capabilities of the Air Force, and for other purposes.

### S. 2477

At the request of Mr. THUNE, the names of the Senator from Delaware (Mr. COONS) and the Senator from Alaska (Ms. MURKOWSKI) were added as cosponsors of S. 2477, a bill to amend title

USCA Case #24-1113     Document #2060757     Filed: 06/20/2024     Page 72 of 267

XVIII of the Social Security Act to provide pharmacy payment of certain services.

S. 2496

At the request of Mr. CARDIN, the name of the Senator from Indiana (Mr. BRAUN) was added as a cosponsor of S. 2496, a bill to amend the National Housing Act to include information regarding VA home loans in the Informed Consumer Choice Disclosure required to be provided to prospective FHA borrowers.

S. 2515

At the request of Mr. CARDIN, the names of the Senator from New Hampshire (Ms. HASSAN) and the Senator from Louisiana (Mr. KENNEDY) were added as cosponsors of S. 2515, a bill to amend the Internal Revenue Code of 1986 and the Small Business Act to expand the availability of employee stock ownership plans in S corporations, and for other purposes.

S. 2825

At the request of Mr. CORNYN, the names of the Senator from Washington (Mrs. MURRAY), the Senator from Iowa (Ms. ERNST), the Senator from Illinois (Ms. DUCKWORTH) and the Senator from New Mexico (Mr. HEINRICH) were added as cosponsors of S. 2825, a bill to award a Congressional Gold Medal to the United States Army Dustoff crews of the Vietnam War, collectively, in recognition of their extraordinary heroism and life-saving actions in Vietnam.

S. 2932

At the request of Mr. MARKEY, the name of the Senator from Maryland (Mr. VAN HOLLEN) was added as a cosponsor of S. 2932, a bill to direct the Secretary of Health and Human Services to provide guidance to State Medicaid agencies, public housing agencies, Continuums of Care, and housing finance agencies on connecting Medicaid beneficiaries with housing-related services and supports under Medicaid and other housing resources, and for other purposes.

S. 3231

At the request of Mr. HEINRICH, the name of the Senator from New York (Mrs. GILLIBRAND) was added as a cosponsor of S. 3231, a bill to enable the people of Puerto Rico to choose a permanent, nonterritorial, fully self-governing political status for Puerto Rico and to provide for a transition to and the implementation of that permanent, nonterritorial, fully self-governing political status, and for other purposes.

S. 3254

At the request of Ms. ROSEN, the name of the Senator from Minnesota (Ms. SMITH) was added as a cosponsor of S. 3254, a bill to amend the Internal Revenue Code of 1986 to allow expenses for parents to be taken into account as medical expenses, and for other purposes.

S. 3264

At the request of Ms. CORTEZ MASTO, the name of the Senator from California (Ms. BUTLER) was added as a cosponsor of S. 3264, a bill to establish a manufactured housing community improvement grant program, and for other purposes.

S. 3519

At the request of Mr. MANCHIN, the names of the Senator from Pennsylvania (Mr. CASEY) and the Senator from California (Mr. PADILLA) were added as cosponsors of S. 3519, a bill to direct the Secretary of Health and Human Services to issue guidance on whether hospital emergency departments should implement fentanyl testing as a routine procedure for patients experiencing an overdose, and for other purposes.

S. 3558

At the request of Mr. PETERS, the name of the Senator from Florida (Mr. RUBIO) was added as a cosponsor of S. 3558, a bill to prohibit contracting with certain biotechnology providers, and for other purposes.

S. 3740

At the request of Mr. CORNYN, the name of the Senator from Georgia (Mr. OSSOFF) was added as a cosponsor of S. 3740, a bill to amend the Omnibus Crime Control and Safe Streets Act of 1968 to reauthorize the residential substance use disorder treatment program, and for other purposes.

S. 3961

At the request of Mr. DURBIN, the name of the Senator from North Dakota (Mr. CRAMER) was added as a cosponsor of S. 3961, a bill to amend the Foreign Intelligence Surveillance Act of 1978 to reform certain authorities and to provide greater transparency and oversight.

S. 3992

At the request of Mr. SCOTT of South Carolina, the name of the Senator from Mississippi (Mrs. HYDE-SMITH) was added as a cosponsor of S. 3992, a bill to prohibit the Administrator of the Small Business Administration from directly making loans under the 7(a) loan program, and for other purposes.

S. 3998

At the request of Mr. CRUZ, the name of the Senator from Kansas (Mr. MORAN) was added as a cosponsor of S. 3998, a bill to provide for the permanent appointment of certain temporary district judgeships.

S.J. RES. 57

At the request of Mr. SCHMITT, the name of the Senator from Utah (Mr. LEE) was added as a cosponsor of S.J. Res. 57, a joint resolution providing for congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Department of the Treasury relating to "Coronavirus State and Local Fiscal Recovery Funds".

S. CON. RES. 32

At the request of Mr. SCHATZ, the names of the Senator from California (Ms. BUTLER) and the Senator from Rhode Island (Mr. WHITEHOUSE) were added as cosponsors of S. Con. Res. 32, a concurrent resolution supporting the goals and ideals of International Transgender Day of Visibility.

S. RES. 537

At the request of Mr. ROUNDS, the name of the Senator from Delaware (Mr. COONS) was added as a cosponsor of S. Res. 537, a resolution expressing the sense of the Senate that the United States should recognize the 1994 genocide in Rwanda as "the genocide against the Tutsi in Rwanda".

S. RES. 616

At the request of Mr. TILLIS, the name of the Senator from New Jersey (Mr. BOOKER) was added as a cosponsor of S. Res. 616, a resolution condemning the treatment of Dr. Gubad Ibadoghlu by the Government of Azerbaijan and urging his immediate release, and for other purposes.

---

STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. PADILLA (for himself and Ms. BUTLER):

S. 4077. A bill to designate the facility of the United States Postal Service located at 180 Steuart Street in San Francisco, California, as the "Dianne Feinstein Post Office"; to the Committee on Homeland Security and Governmental Affairs.

Mr. PADILLA. Madam President, I rise to speak in support of my bill to rename a post office in San Francisco after my former colleague, mentor, and dear friend, the late Senator Dianne Feinstein.

Dianne was a towering figure not just in modern California politics, but in the history of our State and our Nation. She broke barriers throughout her career. Her leadership as the first woman to serve as the mayor of San Francisco in the aftermath of the tragic assassination of Mayor George Moscone and Supervisor Harvey Milk showcased her unique ability to lead with grace and strength in the face of adversity.

As we look to honor her memory, I believe that one small, but important, way to remember Dianne would be to rename a post office in her beloved hometown after her. Just as Dianne had a keen ability to bridge divides and connect with people from all walks of life, our local post offices symbolize the importance of keeping Americans connected to each other.

My bill would rename the postal facility at 180 Steuart Street in San Francisco as the "Dianne Feinstein Post Office."

The site of this post office is rich with decades of history for the Postal Service, the city of San Francisco, and Dianne's career. It is located adjacent to the Rincon Annex, which served as the city's main postal processing and distribution center from 1940 to 1979. This building is designed in the Streamline Moderne style and is adorned with 27 murals depicting the history of San Francisco, which was

funded through the New Deal-era Works Progress Administration. Due to its history and timeless artwork, the Rincon Annex is listed as a San Francisco Designated Landmark and on the U.S. National Register of Historic Places.

After the postal operations at the Rincon Annex were relocated in 1979, then-Mayor Feinstein oversaw the development of the Rincon Center, which opened in 1988. This large complex, which includes the historic Rincon Annex, contains a network of shops, restaurants, offices, apartments, and the post office that is the subject of my bill.

Located just off the Embarcadero in downtown San Francisco, the ''Dianne Feinstein Post Office'' would serve all kinds of people—from workers on their lunch break sending a letter, to local residents picking up a package, to tourists sending postcards back home to family—all with a stunning view of the Bay Bridge from its front door.

This post office dedication is just one small way to remember Dianne's legacy. And just as she served her beloved San Francisco for so many years, I know that this post office will continue to serve San Franciscans for years to come.

I thank Senator BUTLER for joining me in this effort, and I urge my colleagues to support this bill.

─────

SUBMITTED RESOLUTIONS

─────

SENATE RESOLUTION 626—RECOGNIZING THE IMPORTANCE OF THE UNITED STATES-JAPAN ALLIANCE AND WELCOMING THE VISIT OF PRIME MINISTER KISHIDA FUMIO TO THE UNITED STATES

Mr. CARDIN (for himself, Mr. RISCH, Mr. HAGERTY, Ms. HIRONO, Mr. VAN HOLLEN, and Mr. ROMNEY) submitted the following resolution; which was referred to the Committee on Foreign Relations:

S. RES. 626

Whereas the United States-Japan alliance remains a cornerstone of peace, security, and prosperity and underscores the unwavering commitment of United States to Japan and the Indo-Pacific region;

Whereas the United States and Japan established diplomatic relations with the signing of the Treaty of Peace and Amity on March 31, 1854;

Whereas January 19, 2024, marked the 64th anniversary of the signing of the Treaty of Mutual Cooperation and Security between the United States and Japan;

Whereas, in May 2016, then-President Barack Obama made a historic visit to Hiroshima Memorial Peace Park, and in December 2016, then-Prime Minister Abe Shinzo made a historic visit to Pearl Harbor, demonstrating the willingness both nations to overcome the most sensitive aspects of our shared history to form the powerful alliance that exists today;

Whereas, during the U.S.-Japan Security Consultative Committee (2+2) on January 11, 2023, both countries resolved to advance bilateral alliance modernization initiatives to build a more capable, integrated, and agile alliance that bolsters deterrence and addresses evolving regional and global security challenges;

Whereas, under the premiership of Kishida Fumio, the Government of Japan has taken historic steps to modernize Japan's national security strategy and defense policy through the release of the 2022 National Security Strategy, the National Defense Strategy, and Defense Buildup Program, including commitments to increase defense spending to 2 percent of GDP within 5 years and to develop counterstrike capabilities;

Whereas the United States and Japan have deepened their defense cooperation through various bilateral and multilateral exercises and across domains that include space and cyber;

Whereas the Government of Japan shares the costs of stationing approximately 55,000 members of the United States Armed Forces, civilians, and family members in Japan, and enables the United States to forward deploy significant military resources such as the USS Ronald Reagan and the F–35 Joint Strike Fighter, to meet the alliance's current and future security challenges;

Whereas the United States' extended deterrence commitments to Japan remain ironclad and backed by the full range of United States capabilities;

Whereas the Senkaku Islands fall within the scope of Article V of the U.S.-Japan Treaty of Mutual Cooperation and Security;

Whereas a strong trilateral relationship between and among the United States, the Republic of Korea, and Japan is vital for promoting Indo-Pacific security, defending freedom and democracy, and upholding human rights and rule of law;

Whereas, in August 2023, Japan Prime Minister Kishida Fumio, Republic of Korea President Yoon Suk Yeol, and United States President Joseph R. Biden announced a ''new era of trilateral partnership'' at the Camp David Summit, including a ''commitment to consult'' in an expeditious manner regarding regional challenges, provocations, and threats affecting trilateral collective interests and security;

Whereas the United States, Japan, and the Republic of Korea have deepened mutual cooperation and dialogue in a series of fields, including—

(1) the trilateral Indo-Pacific Dialogue;

(2) the expansion of a multi-year schedule for trilateral military exercises, including the first-ever trilateral aerial exercise;

(3) the activation of the real-time Democratic People's Republic of Korea (DPRK) missile warning data sharing mechanism;

(4) the establishment of new trilateral people-to-people exchanges, including a trilateral youth summit and a technology leaders training program; and

(5) the creation of a trilateral Diplomatic Working Group to counter cyber threats posed by the DPRK;

Whereas the trilateral partnership currently faces a unique opportunity to drive shared priorities at the United Nations Security Council, while both Japan and the Republic of Korea serve as nonpermanent representatives;

Whereas, in May 2023, during the G7 Hiroshima Summit, G7 leaders underscored their enduring support for Ukraine's sovereignty, reaffirmed the importance of peace and stability in the Taiwan Strait, took steps to secure critical supply chains, demonstrated ongoing commitments to strengthening global health security, and more;

Whereas Japan continues to work closely with the United States and other G7 partners to stand against economic coercion by adversaries, including through the establishment of the G7 Coordination Platform on Economic Coercion;

Whereas, since the beginning of Russia's unprovoked and unjustified invasion of Ukraine, Japan has demonstrated its strong support for Ukraine, including through high-level diplomatic engagements, humanitarian and security assistance, financial support, and coordinating sanctions against Russia with the United States and other G7 countries;

Whereas, in February 2024, Japan hosted the Japan-Ukraine Conference for Promotion of Economic Growth and Reconstruction, which facilitated cooperation between Japan and Ukraine, including public-private partnerships, to support Ukraine's future development across sectors, including infrastructure, energy, agriculture, and information technology, and announced the opening of a new government trade office in Kyiv, as well as $105,000,000 in new aid for Ukraine;

Whereas Japan has contributed to supporting the Indo-Pacific region's development, stability, and prosperity through the Quad's positive, practical agenda with the United States, Australia, and India, including through the third in-person Quad Leaders' Summit in May 2023, where Quad members reaffirmed their commitment to a ''free and open Indo-Pacific that is inclusive and resilient'';

Whereas Japan has worked with the members of the Quad to strengthen cooperation on health security, environment, maritime domain awareness, critical and emerging technologies, space, infrastructure development, cyber resilience, and more;

Whereas Japan has contributed to the promotion of quality infrastructure investment, and the United States and Japan continue to share an interest in energy security and cooperation on advanced energy technologies;

Whereas Japan has made critical contributions to the development of Open Radio Access Network (O-RAN) technology and worked closely with the United States to promote an open, free, interoperable, reliable, and secure internet, including through initiatives such as the Global Digital Connectivity Partnership;

Whereas, in June 2023, Japan joined the United States and Australia in signing an agreement to develop a $95,000,000 undersea cable project that is expected to connect more than 100,000 individuals across three countries in the Pacific;

Whereas Japan is one of the largest trading partners of the United States, with bilateral trade totaling over $300,000,000,000 in 2022, and Japan continues to hold the largest share of Foreign Direct Investment (FDI) in the United States, making the United States-Japan bilateral economic relationship one of the world's strongest;

Whereas, during an official visit in November 2017 to Japan, President Donald J. Trump underscored the importance of expanding trade and foreign direct investment between the United States and Japan to strengthen economic growth and job creation, and on October 7, 2019, the Governments of the United States and Japan signed the U.S.-Japan Trade Agreement and U.S.-Japan Digital Trade Agreement, and these agreements entered into force on January 1, 2020;

Whereas, in January 2022, the United States and Japan established the Economic Policy Consultative Committee (''Economic 2+2''), which convened for a second ministerial meeting in November 2023, on the sidelines of the Asia-Pacific Economic Cooperation (APEC) Summit;

Whereas the Government of Japan-sponsored Japan Exchange and Teaching (JET) program has more than 35,000 United States

USCA Case #24-1113 Document #2060737 Filed: 06/20/2024 Page 74 of 267

alumni and represents one of many exchanges that have cemented our close people-to-people ties;

Whereas, every year, more than 1,000,000 individuals visit Washington, D.C., to celebrate the National Cherry Blossom Festival, which serves as a reminder of the enduring friendship between the United States and Japan; and

Whereas, in April 2024, Prime Minister Kishida Fumio will visit the United States at the invitation of President Joseph R. Biden, Jr.: Now, therefore, be it

*Resolved,* That the Senate—

(1) welcomes Prime Minister Kishida Fumio to the United States;

(2) reaffirms the strong and long-standing partnership between the Governments of the United States and Japan, rooted in a shared commitment to upholding peace, security, and prosperity in the Indo-Pacific region and beyond;

(3) stands ready to support efforts to build a more capable and modernized alliance to address regional and global security challenges;

(4) applauds the commitment of the Government of Japan to defense modernization, including its goal to increase defense spending to 2 percent of GDP by 2027;

(5) reaffirms the commitment of the United States to the defense of Japan under Article V of the U.S.-Japan Security Treaty;

(6) reaffirms that the Senkaku Islands fall within the scope of Article V of the U.S.-Japan Treaty of Mutual Cooperation and Security, and that the United States remains opposed to any unilateral attempts to change the status quo in the East China Sea or undermine Japan's administration of these islands;

(7) recognizes the unprecedented convergence of the national security and defense strategies between our two nations, as well as the need to further bolster deterrence in the Indo-Pacific;

(8) supports Japan's efforts to expand security cooperation with other United States allies and partners, most notably with the Republic of Korea, Australia, the United Kingdom, the Philippines and India;

(9) applauds recent advancements in trilateral cooperation among the United States, Japan, and the Republic of Korea (ROK), as well as bilateral Japan-ROK relations;

(10) encourages efforts to strengthen engagement with Japan in bilateral and multilateral forums, including the Quad;

(11) acknowledges Japan's leadership as the G7 host nation in 2023, including its coordination among G7 members to address economic coercion, as well as the announcement of the G7 AI Principles and Code of Conduct, and focus on support for Ukraine;

(12) calls for continued cooperation between the Governments of the United States and Japan in promoting our shared democratic values and respect for human rights; and

(13) commits to strengthening and deepening diplomatic, economic, security, and people-to-people ties between the United States and Japan.

---

SENATE RESOLUTION 627—HONORING THE MEMORY OF JEREIMA "JERI" BUSTAMANTE ON THE SIXTH ANNIVERSARY OF HER PASSING

Mr. SCOTT of Florida (for himself and Mr. RUBIO) submitted the following resolution; which was referred to the Committee on the Judiciary:

S. RES. 627

Whereas Jereima "Jeri" Bustamante (referred to in this preamble as "Jeri Bustamante") lived the American Dream;

Whereas, after moving from Panama to the United States with her family, Jeri Bustamante—

(1) attended Miami Beach Senior High School; and

(2) earned a Bachelor's Degree in Communication and Media Sciences and a Master's Degree in Public Administration from Florida International University;

Whereas Jeri Bustamante had a tireless work ethic and a passion for communication and paid for her education by working while enrolled in school;

Whereas that tireless work ethic propelled Jeri Bustamante to professional success, beginning with an internship at a Miami television station and culminating in a period of service as press secretary to Governor Rick Scott;

Whereas the enthusiasm, compassion, tenacity, and vibrant energy of Jeri Bustamante are greatly missed by her family, friends, and coworkers;

Whereas the spirit of Jeri Bustamante lives on through the Jereima Bustamante Memorial Scholarship, which aims to help graduates of Miami Beach Senior High School achieve their goals and pursue the American Dream through a college education; and

Whereas April 8, 2024, marks 6 years since the life of Jeri Bustamante was tragically cut short in a fatal boating accident: Now, therefore, be it

*Resolved,* That the Senate—

(1) honors the life and memory of Jereima "Jeri" Bustamante (referred to in this resolution as "Jeri Bustamante");

(2) offers heartfelt condolences to the family, loved ones, and friends of Jeri Bustamante;

(3) recognizes that living the American Dream remains possible for any individual who, following the example of Jeri Bustamante, works hard to pursue and achieve a goal; and

(4) encourages the recipients of the Jereima Bustamante Memorial Scholarship to carry on the legacy of Jeri Bustamante.

---

SENATE RESOLUTION 628—SUPPORTING THE GOALS AND IDEALS OF THE RISE UP FOR LGBTQI+ YOUTH IN SCHOOLS INITIATIVE, A CALL TO ACTION TO COMMUNITIES ACROSS THE COUNTRY TO DEMAND EQUAL EDUCATIONAL OPPORTUNITY, BASIC CIVIL RIGHTS PROTECTIONS, AND FREEDOM FROM ERASURE FOR ALL STUDENTS, PARTICULARLY LGBTIQI+ YOUNG PEOPLE, IN K–12 SCHOOLS

Mr. SCHATZ submitted the following resolution; which was referred to the Committee on Health, Education, Labor, and Pensions:

S. RES. 628

Whereas young people, teachers, school staff, families, and communities must be free from transphobia, homophobia, racism, sexism, and ableism in K–12 schools;

Whereas K–12 schools must be safe and inclusive learning environments that include and affirm LGBTQI+ young people, especially those who are transgender, nonbinary, intersex, Black, Indigenous, people of color, and people with disabilities and those who are from communities that experience marginalization;

Whereas, for more than 2 decades, Congress has supported a resolution for a National Day of Silence, and, for a decade, Congress has supported a resolution for No Name-Calling Week;

Whereas advocates have designated 2024 to 2025 as a time for communities to support the Rise Up for LGBTQI+ Youth in Schools Initiative in support of LGBTQI+ young people in schools by building on the goals of National Day of (No) Silence and No Name-Calling Week to create a sustained call to action to demand equal educational opportunities, basic civil rights protections, and freedom from erasure for all students;

Whereas LGBTQI+ young people frequently experience bias-based bullying and harassment, discrimination, and punitive discipline that increases the likelihood they will enter the school-to-prison pipeline;

Whereas over 200 anti-LGBTQI+ education bills have been introduced each year in State legislatures across the country, the majority of which specifically target transgender and nonbinary young people, including—

(1) in Idaho, where on March 30, 2020, Governor Brad Little signed the first bill into law barring transgender students from playing on the school sports teams that correspond with their gender identity;

(2) in 24 additional States that enacted policies between 2021 and 2024 that prohibit transgender students from playing alongside their peers on school sports teams;

(3) in Tennessee, where in 2021, Governor Bill Lee signed a bill that allows any student, parent, or employee to sue if they interact with a transgender person in a school bathroom or other facility; and

(4) in 10 States that, between 2021 and 2024, enacted laws that prevent transgender students from using the school bathroom or locker room that corresponds with their gender identity;

Whereas GLSEN's 2021 National School Climate Survey found that LGBTQI+ students who experienced discrimination on the basis of their LGBTQI+ identity at school in the past year, including being prevented from using the restroom that aligns with their gender identity and being barred from playing on the school sports team that aligns with their gender identity, were nearly 3 times as likely to have missed school in the past month, had lower GPAs, reported lower feelings of school belonging, and had higher levels of depression compared to LGBTQI+ students who had not experienced similar discrimination;

Whereas LGBTQI+ young people are more likely than their non-LGBTQI+ peers to experience mental health concerns, including stress, anxiety, and depression;

Whereas nearly half of LGBTQI+ young people seriously considered suicide in the last year, a trend that increases among Indigenous, Black, and multiracial LGBTQI+ young people;

Whereas the GLSEN's 2021 National School Climate Survey found that, among LGBTQI+ students who said that they were considering dropping out of school, 31.4 percent indicated that they were doing so because of the hostile climate created by gendered school policies and practices;

Whereas States have passed or attempted to pass legislation that erases or censors LGBTQI+ individuals, history, and contributions from classroom literature and curricula, including—

(1) in Florida, where in March 2022, Governor Ron DeSantis signed HB 1557 into law, censoring instruction related to LGBTQI+ people, commonly referred to as the "Don't Say LGBTQ+'' law;

(2) in the 6 additional States that enacted laws between 2022 and 2024 censoring instruction related to LGBTQI+ people;

USCA Case #24-1113    Document #2060737    Filed: 06/20/2024    Page 75 of 267

(3) in Arizona, where in May of 2021, Governor Doug Ducey signed HB 2035, which requires parental consent for a child to learn about topics such as the United States Supreme Court ruling in Obergefell v. Hodges, 576 U.S. 644 (2015), in which the Court held that the fundamental right to marry is guaranteed to same-sex couples; and

(4) in Arkansas, Florida, Montana, and Tennessee, which in 2021 enacted laws that treat instruction related to LGBTQI+ individuals in history, science, the arts, or any academic class as a sensitive topic that requires parental notification and allows parents to opt their child out of such instruction;

Whereas these laws harm students and force families to consider leaving their homes, as demonstrated in a Williams Institute report, which found that 56 percent of LGBTQI+ parents of students in Florida considered moving out of Florida and 16.5 percent have taken steps to move out of Florida because of HB 1557;

Whereas States have gone farther by specifically targeting transgender students and their families with policies that attack mental health counseling and gender-affirming care for transgender students, including—

(1) in Texas, where in 2022, Governor Greg Abbott issued a directive to the Department of Family and Protective Services to investigate the parents of young people seeking gender-affirming care for child abuse, which purported to require school professionals to report parents who are supportive of their transgender child for investigation; and

(2) the introduction of at least 55 bills in 22 States, since the beginning of the 2024 legislative session, that prohibit or create barriers to the social affirmation of transgender and nonbinary students in schools, such as using a student's chosen name and pronouns, regardless of the risk to the student's choice, health, and well-being;

Whereas 85 percent of transgender and nonbinary young people say that recent debates prompted by State legislation restricting the rights of transgender individuals have negatively impacted their mental health;

Whereas data provided by the Department of Justice shows that the number of reported anti-LGBTQI+ hate crimes in schools has increased from 145 reported incidents in 2019 to 251 reported incidents in 2022;

Whereas every young person must have equal educational opportunity and freedom from the fear that their basic civil and educational rights will be taken away from them;

Whereas young people who develop in positive school climates, free from bullying, harassment, and discrimination, report greater physical and psychological safety, greater mental well-being, and improved educational and life outcomes;

Whereas positive school transformation must recognize that safety is too low of a bar and that all communities deserve to be acknowledged and affirmed in schools;

Whereas students and families, educators, and community members in Arizona, Arkansas, Florida, Idaho, Montana, Tennessee, Texas, and in all States and territories are advocating for safe and inclusive learning environments that affirm LGBTQI+ young people, particularly those who are transgender, nonbinary, Black, Indigenous, people of color, and people with disabilities;

Whereas affirming policies, such as enumerated anti-bullying protections, gender neutral dress code guidelines, and inclusive learning practices, are proven strategies to address hostile learning environments for all students; and

Whereas we must all demand the best possible future for all young people in schools, particularly those who identify as LGBTQI+, without exception: Now, therefore, be it

*Resolved,* That the Senate—

(1) supports the goals and ideals of the Rise Up for LGBTQI+ Youth in Schools Initiative in demanding the best possible future for all young people in schools, particularly those who identify as LGBTQI+;

(2) recognizes the contributions of students and families, educators, and community members who participate in the Day of (No) Silence to draw attention to the bullying, harassment, assault, and discrimination faced by LGBTQI+ students; and

(3) encourages each State, territory, and locality to support the Rise Up for LGBTQI+ Youth in Schools Initiative and adopt laws and policies that prohibit bias-based victimization, exclusion, and erasure.

───────────

SENATE RESOLUTION 629—CONDEMNING THE ARBITRARY ARREST OF UNITED STATES CITIZENS BY THE GOVERNMENT OF THE RUSSIAN FEDERATION AND CALLING FOR THE IMMEDIATE AND UNCONDITIONAL RELEASE OF SUCH CITIZENS

Mr. DURBIN (for himself, Mr. KAINE, Mr. FETTERMAN, Mr. VAN HOLLEN, Mr. BLUMENTHAL, Mr. CASEY, Mr. COONS, Mr. WHITEHOUSE, Mr. KING, Mrs. MURRAY, Ms. CORTEZ MASTO, Ms. STABENOW, Ms. KLOBUCHAR, Mr. BENNET, Mrs. SHAHEEN, Mr. MERKLEY, Mr. BOOKER, Mr. WELCH, Mr. SANDERS, Mr. WYDEN, and Ms. WARREN) submitted the following resolution; which was referred to the Committee on Foreign Relations:

S. RES. 629

Whereas the Government of the Russian Federation has arbitrarily and cruelly arrested United States citizens under false pretenses in order to extract bargaining leverage on unrelated matters;

Whereas the Russian Federation is a permanent member of the United Nations Security Council;

Whereas, on March 29, 2023, the Government of the Russian Federation arrested United States citizen and accredited Wall Street Journal reporter Evan Gershkovich on fraudulent charges of espionage for his reporting on the Russian economy;

Whereas Gershkovich has spent more than one year in pretrial detention in the notorious Lefortovo prison in Moscow, including in isolation with limited access to medical care and attorneys;

Whereas, even during the Cold War, the Soviet Union never held a journalist from the United States for similar long-term detention, with the closest parallel being the 1986 arrest and 13-day detainment of U.S. News and World Report journalist Nicholas Daniloff;

Whereas the Department of State determined on April 10, 2023, that Gershkovich has been wrongfully detained by the Government of the Russian Federation;

Whereas, on December 28, 2018, the Government of the Russian Federation arrested United States citizen Paul Whelan and later convicted him on June 15, 2020, on fraudulent espionage charges;

Whereas Whelan has spent nearly four years in various high-security jails and labor camps in the Russian Federation, while enduring solitary confinement, forced labor, and the denial of medical care;

Whereas the Department of State determined on April 10, 2023, that Whelan has been

wrongfully detained by the Government of the Russian Federation;

Whereas United States Ambassador to the Russian Federation Lynne Tracy publicly stated on March 26, 2024, following Evan Gershkovich's court hearing, ''Evan's case is not about evidence, due process, or rule of law. It is about using American citizens as pawns to achieve political ends, as the Kremlin is doing in the case of Paul Whelan'';

Whereas, on June 2, 2023, the Government of the Russian Federation arrested United States citizen and Radio Free Europe/Radio Liberty journalist Alsu Kurmasheva on politically motivated charges of working as a foreign agent and ''spreading falsehoods about the Russian military,'' and who now faces a prison sentence up to 15 years;

Whereas the Government of the Russian Federation has repeatedly denied consular access, basic medical care, and ordered Kurmasheva to remain in pre-trial detention in prison conditions Kurmasheva described as ''inhumane'';

Whereas, on August 14, 2021, the Government of the Russian Federation arrested United States citizen and international schoolteacher Marc Fogel for possession of medical marijuana prescribed by his physician, then sentenced him on June 16, 2022, to an excessive 14-year sentence in a Russian labor camp;

Whereas lawyers from the Russian Federation informed Fogel's family that the typical sentence for the offense is five years of probation, and in 2019, the same Russian court sentenced a Russian defendant to eight years in prison for the possession of 1,500 grams of various narcotics;

Whereas the Government of the Russian Federation sentenced Fogel to punishment vastly disproportionate to the severity of his nonviolent crime, wildly dissimilar to the typical punishments for comparable offenses in the Russian Federation, and clearly motivated by ongoing political tensions between the Russian Federation and the United States;

Whereas, on January 28, 2024, the Government of the Russian Federation arrested United States citizen and amateur ballerina Ksenia Khavana on fraudulent charges of high treason during a visit to the Russian Federation after she donated $50 to a charity supporting humanitarian aid for Ukraine;

Whereas Khavana has been held in a high-security prison with no access to hot water or heat during winter, and faces a 20-year sentence with limited means of legal defense;

Whereas, on February 17, 2022, the Government of the Russian Federation arrested Brittney Griner on trumped-up charges, kept her in detention for approximately ten months, and eventually released her on December 8, 2022, in exchange for notorious Russian arms dealer Viktor Bout;

Whereas, on April 11, 2022, the Government of the Russian Federation arrested United States permanent resident Vladimir Kara-Murza for criticizing renewed invasion of Ukraine by the Russian Federation and resulting ongoing war and the criminality of the Government of the Russian Federation, and sentenced Kara-Murza on April 17, 2023, to a 25-year sentence for ''high treason'';

Whereas human rights groups in the Russian Federation estimate that the Government of the Russian Federation holds nearly 20,000 political prisoners in Russian jails, including, until his February 2024 death in a Siberian gulag, opposition leader Alexei Navalny;

Whereas the Government of the Russian Federation has kidnapped more than 19,000 Ukrainian children and abducted them to the Russian Federation, resulting in President Vladimir Putin being indicted by the International Criminal Court for war crimes;

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 76 of 267

Whereas, under Vladimir Putin, Russian courts are neither independent nor fair in the administration of justice and are entirely beholden to the political whims of Putin;

Whereas the Government of the Russian Federation has refused to provide neither minimal due process nor fair independent legal proceedings for United States citizens Gershkovich, Whelan, Kurmasheva, Fogel, and Khavana;

Whereas the Department of State has called for the release of Gershkovich, Whelan, Kurmasheva, Fogel, and Khavana;

Whereas the arrest and continued detention of Gershkovich, Whelan, Kurmasheva, Fogel, and Khavana amount to hostage taking by the Government of the Russian Federation: Now, therefore, be it

*Resolved,* That the Senate—

(1) condemns—

(A) the arbitrary arrest and continued detention of United States citizens Evan Gershkovich, Paul Whelan, Alsu Kurmasheva, Marc Fogel, and Ksenia Khavana, and United States permanent resident Vladimir Kara-Murza by the Government of the Russian Federation;

(B) the hostage taking of United States citizens by a Permanent Member of the United Nations Security Council; and

(C) the ongoing persecution, arrest, and political imprisonment of ordinary Russian citizens and human rights defenders who call for the end of the war in Ukraine and demand freedom in the Russian Federation;

(2) urges the Department of State to determine that Alsu Kurmasheva, Marc Fogel, Ksenia Khavana, and Vladimir Kara-Murza have been wrongfully detained by the Government of the Russian Federation; and

(3) calls on the immediate and unconditional release of United States citizens Evan Gershkovich, Paul Whelan, Alsu Kurmasheva, Marc Fogel, and Ksenia Khavana, and United States permanent resident Vladimir Kara-Murza.

Mr. DURBIN. Madam President, I want to address what can only be called the hostage-taking of Americans by the government of Vladimir Putin of Russia. The list is troubling and growing.

This month marks the 1-year anniversary of Wall Street Journal reporter Evan Gershkovich's dubious arrest in Russia. He has spent more than a year in pretrial detention in a notorious Moscow prison, including in isolation, with limited medical attention. Even during the height of the Cold War, the Soviet police state didn't arrest and hold American journalists in such a brazen and transparently crude manner. The longest was a U.S. News & World Report reporter, who was released after 13 days.

But it is not just Evan whom Vladimir Putin is holding hostage. In 2018, Russia arrested American citizen Paul Whelan and sentenced him to 16 years in prison on fraudulent espionage charges. He has spent 4 years in various Russian high-security jails and labor camps, enduring solitary confinement and forced labor.

Last year, Russia arrested American citizen and Radio Free Europe journalist Alsu Kurmasheva for being a foreign agent. She is facing a 5-year sentence. While in pretrial detention, her conditions are being described as ''inhumane.''

In August 2021, Russia arrested American citizen and international schoolteacher Marc Fogel for possessing medical marijuana prescribed by his physician. Then they sentenced him to a ludicrous 14-year sentence in Russian labor camps.

Earlier this year, Russia arrested American citizen Ksenia Khavana on nonsense charges of high treason after she donated—get this—$50 to a charity supporting humanitarian aid for Ukraine. For that, she is facing a 20-year sentence in prison.

Two years ago, Russia also arrested U.S. legal permanent resident Vladimir Kara-Murza, sentencing him to 25 years for criticizing Putin's disastrous war in Ukraine.

These are some of the photographs of the individuals whom I have just described.

Mr. Kara-Murza was a visitor in my office. I know him personally. I met with him a month before his arrest. And, despite two murder attempts by poisoning, he was determined to go back to Russia to fight for democracy. Evgenia, his wife, is here this week for a bipartisan event on the anniversary of his arrest.

And let us not forget Brittney Griner, whose arrest in 2022 on trumped-up charges was cynically used to secure the release of notorious Russian arms merchant Viktor Bout.

It is outrageous that Russia, a permanent member of the United Nations Security Council, is holding hostage American citizens. It is the act of a desperate rogue regime, similar to the criminal actions of countries like Iran, North Korea, and Venezuela.

Today, I am introducing a resolution condemning Russia's hostage-taking, calling for the immediate release of these hostages and urging the administration to consider ''wrongfully detained'' status.

And, to those detained and their families, I want you to know you are not forgotten. We will continue to advocate for your release.

## APPOINTMENT FOR MARCH 22, 2024

The PRESIDING OFFICER. The Chair announces, on behalf of the Republican Leader, pursuant to the provisions of Public Law 114–196, the appointment of the following individual to serve as a member of the United States Semiquincentennial Commission: Member of the Senate: the Honorable SHELLEY MOORE CAPITO of West Virginia.

## ORDERS FOR TUESDAY, APRIL 9, 2024

Mr. SCHUMER. Madam President, this is a very short one tonight.

I ask unanimous consent that when the Senate completes its business today, it stand adjourned until 10 a.m. on Tuesday, April 9; that following the prayer and pledge, the morning hour be deemed expired, the Journal of proceedings be approved to date, the time for the two leaders be reserved for their use later in the day, and morning business be closed; that upon the conclusion of morning business, the Senate proceed to executive session to resume consideration of the Bazis nomination postcloture; further, that all time on the Bazis nomination be considered expired at 11:30 a.m. and that following the cloture vote on the White nomination, the Senate recess until 2:15 p.m. to allow for the weekly caucus meetings, with all time during recess counting postcloture; finally, that if any nominations are confirmed during Tuesday's session, the motions to reconsider be considered made and laid upon the table and the President be immediately notified of the Senate's action.

The PRESIDING OFFICER. Without objection, it is so ordered.

## ADJOURNMENT UNTIL 10 A.M. TOMORROW

Mr. SCHUMER. Madam President, if there is no further business to come before the Senate, I ask that it stand adjourned under the previous order.

There being no objection, the Senate, at 7:46 p.m., adjourned until Tuesday, April 9, 2024, at 10 a.m.

## NOMINATIONS

Executive nominations received by the Senate:

NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

SUBJECT TO QUALIFICATIONS PROVIDED BY LAW, THE FOLLOWING FOR DIRECTOR, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION COMMISSIONED OFFICER CORPS AND OFFICE OF MARINE AND AVIATION OPERATIONS.

*To be rear admiral*

CHAD M. CARY

IN THE AIR FORCE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT IN THE RESERVE OF THE AIR FORCE TO THE GRADE INDICATED UNDER TITLE 10, U.S.C., SECTION 12203:

*To be brigadier general*

COL. KIMBERLY A. MCCUE

THE FOLLOWING NAMED AIR NATIONAL GUARD OF THE UNITED STATES OFFICER FOR APPOINTMENT IN THE RESERVE OF THE AIR FORCE TO THE GRADE INDICATED UNDER TITLE 10, U.S.C., SECTIONS 12203 AND 12212:

*To be brigadier general*

COL. JOHN A. CLUCK

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT IN THE UNITED STATES AIR FORCE TO THE GRADE INDICATED UNDER TITLE 10, U.S.C., SECTION 624:

*To be brigadier general*

COL. JACK R. ARTHAUD
COL. ANTHONY D. BABCOCK
COL. CATHERINE V. BARRINGTON
COL. ARIEL G. BATUNGBACAL
COL. CASSIUS T. BENTLEY III
COL. MICHAEL D. CURRY
COL. LINDSAY D. DROZ
COL. MASON R. DULA
COL. TODD R. DYER
COL. TRAVIS L. EDWARDS
COL. CHAD R. ELLSWORTH
COL. PAUL G. FILCEK
COL. BRIAN A. FILLER
COL. JOHN B. GALLEMORE
COL. TIMOTHY A. HERRITAGE
COL. JAMES V. HEWITT
COL. JAY A. JOHNSON
COL. MATTHEW E. JONES
COL. MICHELE A. LOBIANCO
COL. SEAN E. LOWE
COL. ROBERT P. LYONS III
COL. MARK A. MASSARO
COL. CRAIG D. PRATHER
COL. JOSEPH L. SHEFFIELD

COL. ANDREW J. STEFFEN
COL. KRISTEN D. THOMPSON
COL. SHANE S. VESELY
COL. DOUGLAS P. WICKERT

THE FOLLOWING NAMED AIR NATIONAL GUARD OF THE UNITED STATES OFFICER FOR APPOINTMENT IN THE RESERVE OF THE AIR FORCE TO THE GRADE INDICATED UNDER TITLE 10, U.S.C., SECTIONS 12203 AND 12212:

### *To be brigadier general*

COL. BRIAN E. VAUGHN

### IN THE ARMY

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT IN THE UNITED STATES ARMY TO THE GRADE INDICATED WHILE ASSIGNED TO A POSITION OF IMPORTANCE AND RESPONSIBILITY UNDER TITLE 10, U.S.C., SECTION 601, AND FOR APPOINTMENT AS A SENIOR MEMBER OF THE MILITARY STAFF COMMITTEE OF THE UNITED NATIONS UNDER TITLE 10, U.S.C., SECTION 711:

### *To be lieutenant general*

MAJ. GEN. JOSEPH P. MCGEE

### IN THE MARINE CORPS

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT IN THE UNITED STATES MARINE CORPS TO THE GRADE INDICATED WHILE ASSIGNED TO A POSITION OF IMPORTANCE AND RESPONSIBILITY UNDER TITLE 10, U.S.C., SECTION 601:

### *To be lieutenant general*

MAJ. GEN. MICHAEL J. BORGSCHULTE

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT IN THE UNITED STATES MARINE CORPS TO THE GRADE INDICATED WHILE ASSIGNED TO A POSITION OF IMPORTANCE AND RESPONSIBILITY UNDER TITLE 10, U.S.C., SECTION 601:

### *To be lieutenant general*

MAJ. GEN. ROBERTA L. SHEA

THE FOLLOWING NAMED OFFICER FOR APPOINTMENT IN THE UNITED STATES MARINE CORPS TO THE GRADE INDICATED WHILE ASSIGNED TO A POSITION OF IMPORTANCE AND RESPONSIBILITY UNDER TITLE 10, U.S.C., SECTION 601:

### *To be lieutenant general*

MAJ. GEN. PAUL J. ROCK, JR.

### IN THE SPACE FORCE

THE FOLLOWING NAMED OFFICERS FOR APPOINTMENT IN THE UNITED STATES SPACE FORCE TO THE GRADE INDICATED UNDER TITLE 10, U.S.C., SECTION 624:

### *To be major general*

BRIG. GEN. DENNIS O. BYTHEWOOD
BRIG. GEN. JAMES E. SMITH

---

## WITHDRAWALS

Executive Message transmitted by the President to the Senate on April 8, 2024 withdrawing from further Senate consideration the following nominations:

COAST GUARD NOMINATIONS BEGINNING WITH JENNIFER J. ANDREW AND ENDING WITH CHRISTOPHER J. YOUNG, WHICH NOMINATIONS WERE SENT TO THE SENATE ON NOVEMBER 1, 2023.

# Congressional Record

United States
of America

**PROCEEDINGS AND DEBATES OF THE 118th CONGRESS, SECOND SESSION**

*Vol. 170* WASHINGTON, SATURDAY, APRIL 20, 2024 *No. 70*

# *House of Representatives*

HOUSE OF REPRESENTATIVES
SATURDAY, APRIL 20, 2024

The House met at 9 a.m. and was called to order by the Speaker pro tempore (Ms. FOXX).

## DESIGNATION OF THE SPEAKER PRO TEMPORE

The SPEAKER pro tempore laid before the House the following communication from the Speaker:

WASHINGTON, DC,
*April 20, 2024.*

I hereby appoint the Honorable VIRGINIA FOXX to act as Speaker pro tempore on this day.

MIKE JOHNSON,
*Speaker of the House of Representatives.*

## PRAYER

The Chaplain, the Reverend Margaret Grun Kibben, offered the following prayer:

Oh Lord our God, we approach Your throne of grace that we may receive Your help in this time of need. You have laid on each of us a high and daunting calling to serve You and this world with humility and sincerity.

On this day especially, may we bring with us to our decisionmaking not earthly wisdom, but a strength of conscience and integrity of faith so that when this day is done, we may face this Nation, our world, and each other without reproach. More importantly, we pray that, in all that we accomplish this day, we would be found blameless in Your sight.

For it is only by Your grace that we are where we are and who we are. May Your grace toward us not be in vain, but may our efforts today bring faithful testimony to Your grace and work within us.

In the name of the one whose grace is our salvation, we pray.

Amen.

## THE JOURNAL

The SPEAKER pro tempore. The Chair has examined the Journal of the last day's proceedings and announces to the House the approval thereof.

Pursuant to clause 1 of rule I, the Journal stands approved.

## PLEDGE OF ALLEGIANCE

The SPEAKER pro tempore. Will the gentleman from New Jersey (Mr. PALLONE) come forward and lead the House in the Pledge of Allegiance.

Mr. PALLONE led the Pledge of Allegiance as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

## COMMUNICATION FROM THE CLERK OF THE HOUSE

The SPEAKER pro tempore laid before the House the following communication from the Clerk of the House of Representatives:

OFFICE OF THE CLERK,
HOUSE OF REPRESENTATIVES,
*Washington, DC, April 19, 2024.*

Hon. MIKE JOHNSON,
*Speaker, House of Representatives,*
*Washington, DC.*

DEAR MR. SPEAKER: Pursuant to the permission granted in Clause 2(h) of Rule II of the Rules of the U.S. House of Representatives, the Clerk received the following message from the Secretary of the Senate on April 19, 2024, at 2:00 p.m.

That the Senate passed S. 2958.

That the Senate agreed to Relative to the death of the Honorable Joseph I. Lieberman, former United States Senator from the State of Connecticut S. Res. 655.

That the Senate passed without amendment H.R. 4389.

With best wishes, I am,

Sincerely,

KEVIN F. MCCUMBER,
*Acting Clerk.*

## COMMUNICATION FROM THE CLERK OF THE HOUSE

The SPEAKER pro tempore laid before the House the following communication from the Clerk of the House of Representatives:

OFFICE OF THE CLERK,
HOUSE OF REPRESENTATIVES,
*Washington, DC, April 20, 2024.*

Hon. MIKE JOHNSON,
*The Speaker, House of Representatives,*
*Washington, DC.*

DEAR MR. SPEAKER: Pursuant to the permission granted in Clause 2(h) of the Rules of the U.S. House of Representatives, the Clerk received the following message from the Secretary of the Senate on April 20, 2024, at 12:54 a.m.

That the Senate passed without amendment H.R. 7888.

With best wishes, I am,

Sincerely,

KEVIN F. MCCUMBER,
*Acting Clerk.*

## ANNOUNCEMENT BY THE SPEAKER

The SPEAKER pro tempore (Mr. HILL). Pursuant to clause 4 of rule I, the following enrolled bill was signed by the Speaker on Saturday, April 20, 2024:

H.R. 7888, To reform the Foreign Intelligence Surveillance Act of 1978.

## 21ST CENTURY PEACE THROUGH STRENGTH ACT

GENERAL LEAVE

Mr. MCCAUL. Madam Speaker, I ask unanimous consent that all Members may have 5 legislative days to revise and extend their remarks and include extraneous material on H.R. 8038.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Texas?

There was no objection.

The SPEAKER pro tempore. Pursuant to House Resolution 1160 and rule XVIII, the Chair declares the House in the Committee of the Whole House on

---

☐ This symbol represents the time of day during the House proceedings, e.g., ☐ 1407 is 2:07 p.m.

Matter set in this typeface indicates words inserted or appended, rather than spoken, by a Member of the House on the floor.



Printed on recycled paper.

H2561

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 79 of 267

the state of the Union for the consideration of the bill, H.R. 8038.

The Chair appoints the gentlewoman from North Carolina (Ms. FOXX) to preside over the Committee of the Whole.

□ 0905

IN THE COMMITTEE OF THE WHOLE

Accordingly, the House resolved itself into the Committee of the Whole House on the state of the Union for the consideration of the bill (H.R. 8038) to authorize the President to impose certain sanctions with respect to Russia and Iran, and for other purposes, with Ms. Foxx in the chair.

The Clerk read the title of the bill.

The CHAIR. Pursuant to the rule, the bill is considered read the first time.

General debate shall be confined to the bill and shall not exceed 30 minutes equally divided and controlled by the chair and ranking minority member of the Committee on Foreign Affairs or their respective designees.

The gentleman from Texas (Mr. MCCAUL) and the gentleman from New York (Mr. MEEKS) each will control 15 minutes.

The Chair recognizes the gentleman from Texas (Mr. MCCAUL).

Mr. MCCAUL. Madam Chair, I yield myself such time as I may consume.

Madam Chair, the most serious matters that any committee deals with are matters of war and peace. It is those votes that are the most consequential votes of your career.

This is one of those moments. As Secretary Pompeo and General Keane recently wrote in a letter to Congress: " . . . we write at a pivotal moment in our Nation's history to applaud your efforts to secure vital support to America's allies and to strengthen America's defenses."

They know that the world is on fire, from Putin's full-scale invasion of Ukraine; to Chairman Xi threatening Taiwan and the Pacific; to the Ayatollah rearing his ugly head, invading Israel through his proxies.

The eyes of the world are upon us, and history will judge us by what we do here and now.

I thank Speaker JOHNSON, who has been under enormous pressure. He has said he wants to be on the right side of history, and with this vote today, he absolutely is. He put the interests of the Nation above himself. He is truly a profile in courage.

President Reagan taught us that peace is achieved through strength, and that is what this bill is about. It is about providing the deterrence so we don't have another war as we did during my father's generation, and that is why I titled it, "The 21st Century Peace Through Strength Act."

This bill includes my REPO Act that allows the transfer of frozen Russian sovereign assets in the United States so that Putin pays for the war he started. This is not just morally the right thing to do, it is also the fiscally responsible thing to do on behalf of the American taxpayer. Let Putin pay for it.

That is why President Trump's former economic advisor, Larry Kudlow, supports this provision.

This bill also protects Americans, especially our children, from the malign influence of the Chinese Communist Party-controlled TikTok. This app is a spy balloon in Americans' phones. It is a modern-day Trojan horse of the CCP used to surveil and exploit Americans' personal information.

This bill also includes the most comprehensive sanctions against Iran that Congress has ever passed, including sanctions on exports of Iranian energy. China has bought $80 billion worth of energy from Iran. Madam Chair, that is money that Iran is using to fund terror operations like the ones that we saw last weekend. This bill also imposes sanctions on anyone involved in Iran's drone and missile program.

Think about this, Madam Chair: Iran makes the drones and the missiles that are bought by Russia to kill Ukrainians. As we saw last Saturday, Iran is also manufacturing these drones, with Russia's support, to kill Israelis. This must be stopped.

As Reagan said: "When it comes to keeping America strong, when it comes to keeping America great, when it comes to keeping America at peace, then none of us can afford to be simply a Democrat or a Republican. We must all stand united as Americans."

Once again today, we need to speak with one voice, as one Nation, especially when addressing our adversaries, for Putin is watching us, Chairman Xi is watching us, and the Ayatollah is watching us.

Now is the time to act.

Madam Chair, I reserve the balance of my time.

Mr. MEEKS. Madam Chair, I yield myself such time as I may consume.

Madam Chair, this is indeed a historic moment. Sometimes when we are living history, as we are today, we don't understand the significance of the actions, of the votes that we make on this House floor, and of the effect that it will have down the road for children yet unborn. This is a historic moment.

Yesterday, one of the rarest things that has ever happened on this floor took place. Generally, in this body, it takes the majority party to pass its rule, and the minority party never votes for it. However, this moment is so big that House Democrats said: We are not playing politics with this. This is too important for our Nation's security. This is too important for our allies' security. This is too important for the free world's security.

Therefore, we did something that we have never done before. We voted in a bipartisan way to pass the rule to get these bills on the floor. Quite frankly, I would have loved to have done this 2, 3, 4 months ago. However, this is a historic moment. Ukraine is now on the brink. The humanitarian catastrophes in Gaza and Sudan and Haiti and elsewhere require immediate aid.

Israel faced an unprecedented, direct attack from Iran less than 1 week ago, and we need to rebuild our industrial base and support a free and open Indo-Pacific.

We stand here today, finally, doing the people's work; doing, as I said just a few minutes ago, what we should have done months ago—supporting our friends, supporting our allies around the world, and quieting the doubts about whether America is a reliable partner or not; whether the United States will continue leading on the world stage or not. I am so proud of President Biden because he has displayed that leadership time and time again.

Now, today, we have a number of bills that we need to pass for our national security. On REPO, pertaining to the seizure of Russian sovereign assets, there is no doubt that Russia should pay for its crimes against humanity in Ukraine, as Vice President HARRIS has termed it. This bill, importantly, irons out legal questions that make sure that the United States does not act alone, but rather in coordination with our G7 and other partners, and we have seen President Biden pull them together immediately. Coordinating with our allies on this issue is important, not just for our standing as a paragon of the rule of law, but for our long-term economic interests.

□ 0915

There is an array of Middle East sanction bills included in this package, including several we voted on this week.

Importantly, the majority agreed to add a humanitarian exception in three of those bills. I had been requesting that for a while. Fortunately and thankfully, we got it in now.

I hope that, going forward, including these exceptions is a matter of course rather than something added via last-second negotiation, but I thank my friend, Chairman MCCAUL, for the good-faith negotiations on the Middle East section of this legislation.

The Foreign Affairs Committee sanctions section is not perfect, but it does provide important humanitarian exceptions and waivers throughout the bill. Given the focus on the REPO bill the last few days, I will highlight that a key authority in the bill is permissive.

I do not think that a sanction should be the opening salvo of diplomacy. Many may have heard me talking about how I believe in diplomacy so strongly, but sanctions are an important instrument of economic statecraft that can, on occasion, deter bad actors, curb human rights abuses, and promote diplomatic outcomes. I believe we lose our moral credibility if American sanctions are seen as causing indiscriminate deprivation, and we lose our policy flexibility if we tie the executive branch's hands instead of giving it useful tools.

Yet, it is important that would-be invaders and dictators around the world

USCA Case #24-1113　　Document #2060757　　Filed: 06/20/2024　　Page 80 of 267

see they will face real consequences if they undermine the international order.

This legislation also contains several bills in the Financial Services and Energy and Commerce lanes. Important changes were made to these bills.

I had voted against H.R. 7521 on the floor out of concern that it would be a broad authorization that could be misused far beyond what we in Washington are currently debating, beyond just TikTok. However, I think the bill took a step in the right direction with a more realistic timeframe for a complex divestiture process.

Let me say for the record that I believe this bill is about one company and that additional authorities provided to the executive branch are to be interpreted narrowly.

Let me also take a moment to speak to those who oppose this legislation and say we can't support Ukraine in its fight against Russia's invasion because, to use their words, we are facing an invasion here at home. That is an absurd comparison.

Vladimir Putin invaded Ukraine because he wanted to topple the democratically elected Government of Ukraine and reconstitute the Soviet Union. He launched his unprovoked war of aggression with a willingness to kill millions of Ukrainians, not to mention his own forces.

By contrast, people come to our border because of the tumult in their home countries or in search of a better life for themselves and their children. They do so because this is the greatest Nation, the greatest country, in the history of this planet.

With all of our ills, with all of our faults, with all that we need to do, we come together. There is no question that the example that we show, by the people and the citizens of this great country, it is the greatest Nation on this planet.

Today, once again, on this House floor, where we are right now, we are proving that fact by overcoming, by proving that this is the greatest country in the world, and by proving that we are the leaders of the free world. We are doing this by overcoming our partisan divides, by showing that we will work together and stand together, Democrats and Republicans, for the right thing and for our country.

We are passing a historic bill, a bill that our children and grandchildren will be reading and looking at in the years to come. It promotes not just U.S. national security but the security of democracy over authoritarianism, law over lawlessness, and prosperity over chaos or famine.

Madam Chair, the camera of history is rolling, and when they play it back, they will see we stood together. When they play it back, they will see that we stood for freedom, justice, and equality.

Madam Chair, I reserve the balance of my time.

Mr. McCAUL. Madam Chair, I yield 1 minute to the gentleman from Arkansas (Mr. HILL), a member of the Foreign Affairs Committee.

Mr. HILL. Madam Chair, once again, dear friends, into the breach. We stand in the breach again for freedom. We stand in this historic Chamber with Washington on one side and Lafayette on the other.

In 2 years, we will celebrate the 250th anniversary of this country, this freedom, this democracy, which would not have happened without money from the Netherlands, money from France, guns from France, a navy from France. Allies stood at the side of the birth of this Nation.

The birth of freedom was born here, so today, we come to this House floor to see that freedom is fought for here in this House.

Last week, Prime Minister Kishida of Japan stood on this floor and called this Nation the indispensable Nation— not to do it alone, not to stand in the breach alone, but to lead. Today, the United States will once again step up and lead.

Today, we will send the world the message: We stand with those who stand for freedom, and we hold to account those who are against freedom.

This bill supports our allies. This bill condemns our rivals and our enemies.

Madam Chair, I urge my colleagues to vote for this bill.

Madam Chair,

America 250—in two years, this House will celebrate the 250th birthday of our Declaration of Independence.

As Americans, we are all versed in our Founding, our struggles in the American revolution. We recall the lack of food and pay for our troops, the misery of winter at Valley Forge.

What we must remember is that we did not win our independence alone.

From 1775 through 1781, the United States would not have seen victory at Yorktown ending the American Revolution were it not for allied nations making a bet on the grit and tenacity of Colonial Americans taking on the world's largest army and navy. France, the bankers in Amsterdam, and the Spanish opposed Britian backed Washington's struggling ragtime army.

80 percent of the muskets and uniforms worn by the Continental Army were supplied by France. French and Dutch loans, Spanish gunpowder, and the French Navy were all critical.

Without the help of these other nations, we would not have had the resources to win the Revolutionary War and become an independent Nation.

As Americans, we understand the sense of partnership that it takes when you are fighting for freedom.

In February, for the second time in six months I traveled to Ukraine to speak with President Zelenskyy and other U.S. officials in country on a bipartisan CODEL led by House Intelligence Committee Chairman Mike Turner to deliver our message directly to Ukraine on behalf of the American people.

Along with dozens of allied Nations, the United States should continue to back the freedom fighting, freedom loving Ukrainians to ensure that Vladimir Putin knows that he's not going to stay in Ukraine.

Let me be clear—he will be denied that opportunity.

In polling, the American people make clear that they do not want Putin to be victorious in Ukraine.

It's bad for Europe, the sovereignty of Ukraine, and for the world.

The innocent people of Ukraine have been under unprovoked attack for over two years, their lives upended by the vengeance of a megalomaniac illegally invading and attempting to overthrow a sovereign neighbor.

This war commenced in 2014 in the Donbas and Crimea and exploded into a full invasion on February 24, 2022.

American military aid to Ukraine is running out and Ukrainians battling on the frontlines to defend their homeland are running out of ammunition and other crucial military supplies.

They are losing the ability to defend themselves and win this war that they have so valiantly fought for 24 months—and politically and emotionally for a painful decade.

To my colleagues in Congress, it is essential that we pass further aid to Ukraine.

Time is running out.

And when the war ends, and we hope Ukraine hails victory, Putin must bear the responsibility for the death and destruction he has caused in their sovereign Nation.

He must bear responsibility of paying for Ukraine's reconstruction.

In the 21st Century Peace Through Strength Act, House Foreign Affairs Committee Chairman MIKE McCAUL and I have collaborated to add the Rebuilding Economic Prosperity and Opportunity for Ukrainians (REPO) Act to seize Russian sovereign assets for the sole purpose of Ukraine's eventual reconstruction.

Similar legislation has successfully been passed by the Senate Foreign Relations Committee.

Considering most Russian sovereign assets are located outside of the United States, it is critical that our allies around the world draft and pass companion legislation.

In January, European Union (EU) members unanimously agreed to set aside frozen Russian central bank assets in Europe, taking the first step to benefit Ukraine and its reconstruction from Russia's destruction.

This is a strong signal from our European allies that we are one step closer to seeing crucial draft legislation.

Although the EU has taken a step in the right direction, their action needs to go further. Their eventual proposed draft legislation needs to encompass all Russian assets, not just legal central bank accounts.

In the meantime, the United States and our allies need to continue to press Putin with further sanctions to deter his aggression.

We also need to ensure Ukraine remains an open economy.

Despite the damages caused by the war, over the past two years, Ukraine's economy is hanging in there.

Ukraine's battlefield victories in 2023, including pushing the Russian Navy off the Ukrainian coast of the Black Sea, reopening it to Ukrainian exports of grain, iron, and fertilizer.

Although Russia's invasion drove Ukraine's GDP down in 2022, their economy is reported to have grown by roughly 3 to 4 percent in 2023.

More economic recovery and more exports mean Ukraine is generating reprieve to support itself.

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 81 of 267

Given the nation's current state in the face of devastation and in the wake of Putin's madness, this is remarkable.

As Ukraine is one of the world's largest grain producers, it's key that they continue to maintain an open, thriving economy.

In sum, it's simple: we need to continue to support Ukraine with financial, military, and humanitarian assistance; hold Putin responsible for paying for the damages he has caused in this sovereign nation; and discourage him with further and more aggressive sanctions, including on all nations that fuel his terror.

For if Russia wins, it opens the door for other foreign adversaries like China to follow in their pursuit of taking over Taiwan, jumpstarting a global war.

If Russia wins, it threatens the 75 years of peace and prosperity in Europe, and risks dragging the United States into a war like we have never seen.

Ukraine will stop Russia dead in their tracks—if we see their struggle for freedom in the same way we fought for ours nearly 250 years ago.

Failure in Ukraine is not an option.

Mr. MEEKS. Madam Chair, I yield 2 minutes to the gentleman from Virginia (Mr. CONNOLLY), a member of the House Foreign Affairs Committee.

Mr. CONNOLLY. Madam Chair, I thank my friend and Mr. MCCAUL for their leadership.

Madam Chair, today, with the vote on Ukraine security aid, we rededicate ourselves to who we are. We meet today under the white dome above us, a universal symbol of freedom and freedom-loving people everywhere.

Today, we cannot disappoint those who seek what we have, freedom—the freedom to self-determine, the freedom to decide their sovereignty, their alliances, and their form of government.

America has always stood for that. Will we retreat from that today? Do we understand the choices in front of us? They are clear. Some say that we have to deal with our border first. The Ukrainian-Russian border is our border. It is the border between depraved autocracy and freedom-loving people seeking our democratic way of life.

Do we have a stake in that outcome? Yes. Undeniably, yes.

Will we rise to the occasion? Will we stand shoulder to shoulder with our Ukrainian brothers and sisters who, for 1,151 days, have been holding off the depraved, thuggish dictator of Vladimir Putin, who has respected no norms of warfare? He has targeted children, hospitals, and schools. He has bombed apartment blocks, killing thousands. He has an advantage right now, because of our dithering, of 10–1 in terms of artillery shells, yet our brave Ukrainian brothers and sisters continue to fight.

We must meet this test today. We must stand with Ukraine.

''Slava Ukraini.'' ''Glory to Ukraine.''

Mr. MCCAUL. Madam Chair, I yield 1 minute to the gentleman from New Jersey (Mr. KEAN), the chairman of the Europe Subcommittee.

Mr. KEAN of New Jersey. Madam Chair, I thank my good friend, the chairman of the Foreign Affairs Committee, for yielding me time and for his steadfast leadership.

Madam Chair, I rise today in support of H.R. 8038, the 21st Century Peace through Strength Act.

As someone who grew up during the Cold War, I recall when President Reagan quoted and displayed the philosophy of ''peace through strength.''

Europe is facing the largest war on the Continent since World War II. The Middle East is volatile, and every day, the CCP prepares itself for its ultimate goal of invading Taiwan. In the fields of Ukraine, every day in which aid is delayed means more territory for Putin, and it further emboldens Xi and the Ayatollah in Iran.

This is not the time for the United States to back down. In order to preserve peace in the world, we must seize the moment and project strength.

Madam Chair, I urge passage of this bill and the entire foreign aid package.

Mr. MEEKS. Madam Chair, I yield 2 minutes to the gentleman from Texas (Mr. CASTRO), the ranking member of the Foreign Affairs Subcommittee on the Western Hemisphere.

Mr. CASTRO of Texas. Madam Chair, I rise in opposition to H.R. 8038 and today's vote to fund Benjamin Netanyahu's war in Gaza.

All of us have seen the tragedy of Gaza. We have seen how Prime Minister Netanyahu's government has used American weapons to kill indiscriminately and to force famine, with over 25,000 women and children dead and tens of thousands of missiles and bombs levied on innocent civilians.

We cannot escape what we see before us every day. That is the blessing of today's technology—TikTok, Instagram, Facebook, all of it. When we see it, we have to decide what we are going to do about it. Are we going to participate in that carnage or not? I choose not to.

Prime Minister Netanyahu has been reckless. His actions have not led to the release of the remaining hostages. He has ignored the pleas of the families of hostages. He has ignored the pleas of the President of the United States. He has ignored his own people. He has engaged in self-preservation.

We should not be sending offensive weapons to Israel right now, and I hope that this body will not.

Mr. MCCAUL. Madam Chair, I yield 1 minute to the gentleman from New York (Mr. LAWLER), a member of the Foreign Affairs Committee.

Mr. LAWLER. Madam Chair, I rise in support of the 21st Century Peace through Strength Act.

This bill reverses the Biden administration's relaxed stance toward Iran and China and starts to hold these bad actors accountable.

Two of my bills, the SHIP Act and the Iran-China Energy Sanctions Act, are included in this package. Both of these bills target the illicit oil trade between Iran and China.

One of my bills imposes sanctions on foreign ports and refineries that process Iranian oil, many of which are located in China.

My other bill imposes sanctions on Chinese financial institutions that process transactions involving Iranian oil as well as anyone involved in Iran's missile and drone program.

Iran is exporting millions of barrels of petroleum every day. Eighty percent of these exports go to China. Iran has taken in over $88 billion from their illicit oil trade since President Biden took office, and they must not earn a cent more.

To be clear, these illicit funds are used to fund Iran's regime of terror, including backing Hamas, Hezbollah, the Houthis, and other terrorist groups, as well as their direct assault on Israel last weekend.

The CHAIR. The time of the gentleman has expired.

Mr. MCCAUL. Madam Chair, I yield an additional 15 seconds to the gentleman from New York.

Mr. LAWLER. Madam Chair, now is the time for America to lead, to support our allies, to combat our adversaries, and to continue our role as leader of the free world.

□ 0930

Mr. MEEKS. Madam Chair, may I inquire how much time I have remaining.

The CHAIR. The gentleman from New York has 1½ minutes remaining.

Mr. MEEKS. Madam Chair, I yield 1 minute to the gentleman from New Jersey (Mr. PALLONE).

Mr. PALLONE. Madam Chair, I rise in strong support of H.R. 8038.

National security experts are sounding the alarm, warning that our foreign adversaries are using every tool at their disposal, including apps like TikTok, to amass troves of sensitive data on all Americans.

This bill takes decisive action to mitigate our foreign adversaries' ability to collect Americans' data and use it against us.

First, it creates a framework intended to force divestment of TikTok from its Chinese Communist Party-controlled parent company, ByteDance.

Second, this bill includes my bipartisan Protecting Americans' Data from Foreign Adversaries Act. This bill prohibits data brokers from selling Americans' sensitive personal information to China, Russia, North Korea, and Iran, as well as to entities controlled by those countries.

I thank my partner in this effort, Chair RODGERS, for her tireless work to advance these important provisions, and I strongly urge my colleagues to support this legislation.

Mr. MCCAUL. Madam Chair, I have no further speakers, and I reserve the balance of my time.

Mr. MEEKS. Madam Chair, I yield the remainder of my time to the gentleman from Illinois (Mr. KRISHNAMOORTHI), the ranking member

on the Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party.

Mr. KRISHNAMOORTHI. Madam Chair, I rise in support of this bill, and specifically on the TikTok divestment bill. I want to say a special thank you to GREG MEEKS, MIKE MCCAUL, MIKE GALLAGHER, FRANK PALLONE, CATHY MCMORRIS RODGERS, and Chair CANTWELL in the Senate for working on this bill.

First of all, this bill is not a ban; it is about a divestment. It is not really about TikTok; it is about ByteDance, the company that owns TikTok and is indisputably controlled by the Chinese Communist Party. The CCP's secretary of the cell embedded in the company is the editor and chief of ByteDance. That is why we are so concerned about this particular app.

Since the bill passed with 352 votes previously, we increased the divestment period, which is the least restrictive way to deal with the CCP threat, from 6 months to upwards of a year.

Madam Chair, I strongly urge support of this bill.

Mr. MEEKS. Madam Chair, I yield back the balance of my time.

Mr. MCCAUL. Madam Chair, in the late 1930s, Winston Churchill described what he saw as the gathering storm, the forces of Hitler and the axis of evil threatening freedom and democracy.

I recall when Mr. MEEKS and I were on the border between Poland and Ukraine watching thousands of mothers and their children fleeing their own country in fear after the invasion. The Poles told us: This is just like 1939 when Hitler invaded Poland.

Today, we are at a similar inflection point in history. The fall of Afghanistan sent a powerfully dangerous message to our adversaries that America was weak. Almost immediately after, the Russian Federation began moving toward Ukraine.

Once Chairman Xi met with Putin at the Olympics and cemented their unholy alliance, they invaded. Chairman Xi has become more aggressive in the Pacific; and mark my words, Xi is watching what happens in Ukraine to determine whether he invades Taiwan in the Pacific.

Then the Ayatollah raised his ugly head in the Middle East. Last Saturday, the world watched as Iran for the first time in history invaded Israel, sending 300 missiles and drones to kill innocent Israelis.

These dictators, including North Korea, are all tied together. They are all tied together. We cannot separate them. We don't pick and choose our enemies; they choose us.

My father served as a bombardier in World War II. He was part of the Greatest Generation. I recently took my son to the air base in England where my father was stationed. While there, we visited the church where my father prayed, not knowing if he would live or die.

I took my son to the national cemetery for the U.S. airmen who never made it home, and I pointed to the 4,000 crosses and said: Son, those are the ones who did not make it home. In the chapel there is inscribed on the ceiling:

In honor of the airmen who on their last flight met the face of God.

Met the face of God.

It was a moving experience, father and son, teaching my son, like my father taught me, about the importance of patriotism and the cost of freedom. It was also a reminder of the dangers that we face today, for today like then, it could have been prevented. Deterrence is the key.

As Churchill wrote in his book, ''The Gathering Storm:''

''One day, President Roosevelt told me that he was asking publicly for suggestions about what the war should be called. I said at once, 'The Unnecessary War.' ''

Think about that, the unnecessary war. He said: ''There never was a war more easy to stop than that which has just wrecked what was left of the world from the previous struggle.''

I often think about the blood and treasure that could have been saved from my father's generation had we simply stopped Hitler earlier. Now we are faced with a similar opportunity.

As Ronald Reagan told us: ''We know only too well that war comes not when the forces of freedom are strong, but when they are weak.''

He was right. Our adversaries are working together to undermine our Western values and demean our democracy. We cannot be afraid at this moment in time. We cannot be afraid of our shadows. We must be strong. We have to do what is right. Evil is on the march.

History is calling, and now is the time to act, for the world is watching. Our adversaries are watching us here today, and history will judge us all by our actions here today and now.

As we deliberate on this vote, you have to ask yourself the question: Am I Chamberlain or am I Churchill?

Madam Chair, I yield back the balance of my time.

The CHAIR. All time for general debate has expired.

Pursuant to the rule, the bill shall be considered for amendment under the 5-minute rule.

The amendment printed in Part D of House Report 118–466 shall be considered as adopted. The bill, as amended, shall be considered as read.

The text of the bill is as follows:

H.R. 8038

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the ''21st Century Peace through Strength Act''.

**SEC. 2. TABLE OF CONTENTS.**

Sec. 1. Short title.
Sec. 2. Table of contents.
Sec. 3. References.

DIVISION A—FEND OFF FENTANYL ACT

Sec. 3001. Short titles.
Sec. 3002. Sense of Congress.
Sec. 3003. Definitions.

TITLE I—SANCTIONS MATTERS

Subtitle A—Sanctions in Response to National Emergency Relating to Fentanyl Trafficking

Sec. 3101. Finding; policy.
Sec. 3102. Use of national emergency authorities; reporting.
Sec. 3103. Imposition of sanctions with respect to fentanyl trafficking by transnational criminal organizations.
Sec. 3104. Penalties; waivers; exceptions.
Sec. 3105. Treatment of forfeited property of transnational criminal organizations.

Subtitle B—Other Matters

Sec. 3111. Ten-year statute of limitations for violations of sanctions.
Sec. 3112. Classified report and briefing on staffing of office of foreign assets control.
Sec. 3113. Report on drug transportation routes and use of vessels with mislabeled cargo.
Sec. 3114. Report on actions of People's Republic of China with respect to persons involved in fentanyl supply chain.

TITLE II—ANTI-MONEY LAUNDERING MATTERS

Sec. 3201. Designation of illicit fentanyl transactions of sanctioned persons as of primary money laundering concern.
Sec. 3202. Treatment of transnational criminal organizations in suspicious transactions reports of the financial crimes enforcement network.
Sec. 3203. Report on trade-based money laundering in trade with Mexico, the People's Republic of China, and Burma.

TITLE III—EXCEPTION RELATING TO IMPORTATION OF GOODS

Sec. 3301. Exception relating to importation of goods.

DIVISION B—REBUILDING ECONOMIC PROSPERITY AND OPPORTUNITY FOR UKRAINIANS ACT

TITLE I—REBUILDING ECONOMIC PROSPERITY AND OPPORTUNITY FOR UKRAINIANS ACT

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.

TITLE II—REPURPOSING OF RUSSIAN SOVEREIGN ASSETS

Sec. 101. Findings; sense of Congress.
Sec. 102. Sense of Congress regarding importance of the Russian Federation providing compensation to Ukraine.
Sec. 103. Prohibition on release of blocked Russian sovereign assets.
Sec. 104. Authority to ensure compensation to Ukraine using seized Russian sovereign assets and Russian aggressor state sovereign assets.
Sec. 105. International mechanism to use Russian sovereign assets and Russian aggressor state sovereign assets to provide for the reconstruction of Ukraine.
Sec. 106. Report on use of transferred Russian sovereign assets for reconstruction.
Sec. 107. Assessment by Secretary of State and Administrator of USAID on reconstruction and rebuilding needs of Ukraine.
Sec. 108. Extensions.

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 83 of 267

DIVISION C—OTHER MATTERS

Sec. 1. Report and imposition of sanctions to harmonize with allied sanctions.

DIVISION D—PROTECTING AMERICANS FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS ACT

Sec. 1. Short title.
Sec. 2. Prohibition of foreign adversary controlled applications.
Sec. 3. Judicial review.

DIVISION E—PROTECTING AMERICANS' DATA FROM FOREIGN ADVERSARIES ACT OF 2024

Sec. 1. Short title.
Sec. 2. Prohibition on transfer of personally identifiable sensitive data of United States individuals to foreign adversaries.

DIVISION F—SHIP ACT

Sec. 1. Short title.
Sec. 2. Statement of policy.
Sec. 3. Imposition of sanctions with respect to Iranian petroleum.
Sec. 4. Report on Iranian petroleum and petroleum products exports.
Sec. 5. Strategy to counter role of the People's Republic of China in evasion of sanctions with respect to Iran.
Sec. 6. Definitions.

DIVISION G—FIGHT CRIME ACT

Sec. 1. Short title.
Sec. 2. Findings.
Sec. 3. Statement of policy.
Sec. 4. Report.
Sec. 5. Sanctions to combat the proliferation of Iranian missiles.
Sec. 6. Report to identify, and designation as foreign terrorist organizations of, Iranian persons that have attacked united states citizens using unmanned combat aerial vehicles.
Sec. 7. Definitions.

DIVISION H—MAHSA ACT

Sec. 1. Short title.
Sec. 2. Imposition of sanctions on Iran's supreme leader's office, its appointees, and any affiliated persons.
Sec. 3. Severability.

DIVISION I—HAMAS AND OTHER PALESTINIAN TERRORIST GROUPS INTERNATIONAL FINANCING PREVENTION ACT

Sec. 1. Short title.
Sec. 2. Statement of policy.
Sec. 3. Imposition of sanctions with respect to foreign persons supporting acts of terrorism or engaging in significant transactions with senior members of Hamas, Palestinian Islamic jihad and other Palestinian terrorist organizations.
Sec. 4. Imposition of measures with respect to foreign states providing support to Hamas, Palestinian Islamic jihad and other Palestinian terrorist organizations.
Sec. 5. Reports on activities to disrupt global fundraising, financing, and money laundering activities of Hamas, Palestinian Islamic jihad, al-aqsa martyrs brigade, the lion's den or any affiliate or successor thereof.
Sec. 6. Termination.
Sec. 7. Definitions.

DIVISION J—NO TECHNOLOGY FOR TERROR ACT

Sec. 1. Short title.
Sec. 2. Application of foreign-direct product rules to Iran.

DIVISION K—STRENGTHENING TOOLS TO COUNTER THE USE OF HUMAN SHIELDS ACT

Sec. 1. Short title.
Sec. 2. Statement of policy.
Sec. 3. Modification and extension of Sanctioning the Use of Civilians as Defenseless Shields Act.
Sec. 4. Report on countering the use of human shields.
Sec. 5. Confronting asymmetric and malicious cyber activities.
Sec. 6. Sanctions with respect to threats to current or former united states officials.

DIVISION L—ILLICIT CAPTAGON TRAFFICKING SUPPRESSION ACT

Sec. 1. Short title.
Sec. 2. Findings.
Sec. 3. Statement of policy.
Sec. 4. Imposition of sanctions with respect to illicit captagon trafficking.
Sec. 5. Determinations with respect to the government of Syria, hizballah, and networks affiliated with the government of Syria or hizballah.
Sec. 6. Definitions.

DIVISION M—END FINANCING FOR HAMAS AND STATE SPONSORS OF TERRORISM ACT

Sec. 1. Short title.
Sec. 2. Report on financing for Hamas.
Sec. 3. Multilateral Strategy to Disrupt Hamas Financing.

DIVISION N—HOLDING IRANIAN LEADERS ACCOUNTABLE ACT

Sec. 1. Short title.
Sec. 2. Findings.
Sec. 3. Report on financial institutions and assets connected to certain Iranian officials.
Sec. 4. Restrictions on certain financial institutions.
Sec. 5. Exceptions for national security; implementation authority.
Sec. 6. Sunset.
Sec. 7. Definitions.

DIVISION O—IRAN-CHINA ENERGY SANCTIONS ACT OF 2023

Sec. 1. Short title.
Sec. 2. Sanctions on foreign financial institutions with respect to the purchase of petroleum products and unmanned aerial vehicles from Iran.

DIVISION P—BUDGETARY EFFECTS

Sec. 1. Budgetary effects.

## SEC. 3. REFERENCES.

Except as expressly provided otherwise, any reference to ''this Act'' contained in any division of this Act shall be treated as referring only to the provisions of that division.

## DIVISION A—FEND OFF FENTANYL ACT

### SEC. 3001. SHORT TITLES.

This division may be cited as the ''Fentanyl Eradication and Narcotics Deterrence Of Fentanyl'' or the ''FEND Off Fentanyl Act''.

### SEC. 3002. SENSE OF CONGRESS.

It is the sense of Congress that—

(1) the proliferation of fentanyl is causing an unprecedented surge in overdose deaths in the United States, fracturing families and communities, and necessitating a comprehensive policy response to combat its lethal flow and to mitigate the drug's devastating consequences;

(2) the trafficking of fentanyl into the United States is a national security threat that has killed hundreds of thousands of United States citizens;

(3) transnational criminal organizations, including cartels primarily based in Mexico,

are the main purveyors of fentanyl into the United States and must be held accountable;

(4) precursor chemicals sourced from the People's Republic of China are—

(A) shipped from the People's Republic of China by legitimate and illegitimate means;

(B) transformed through various synthetic processes to produce different forms of fentanyl; and

(C) crucial to the production of illicit fentanyl by transnational criminal organizations, contributing to the ongoing opioid crisis;

(5) the United States Government must remain vigilant to address all new forms of fentanyl precursors and drugs used in combination with fentanyl, such as Xylazine, which attribute to overdose deaths of people in the United States;

(6) to increase the cost of fentanyl trafficking, the United States Government should work collaboratively across agencies and should surge analytic capability to impose sanctions and other remedies with respect to transnational criminal organizations (including cartels), including foreign nationals who facilitate the trade in illicit fentanyl and its precursors from the People's Republic of China; and

(7) the Department of the Treasury should focus on fentanyl trafficking and its facilitators as one of the top national security priorities for the Department.

### SEC. 3003. DEFINITIONS.

In this division:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term ''appropriate congressional committees'' means—

(A) the Committee on Banking, Housing, and Urban Affairs of the Senate;

(B) the Committee on Foreign Relations of the Senate;

(C) the Committee on Financial Services of the House of Representatives; and

(D) the Committee on Foreign Affairs of the House of Representatives.

(2) FOREIGN PERSON.—The term ''foreign person''—

(A) means—

(i) any citizen or national of a foreign country; or

(ii) any entity not organized under the laws of the United States or a jurisdiction within the United States; and

(B) does not include the government of a foreign country.

(3) KNOWINGLY.—The term ''knowingly'', with respect to conduct, a circumstance, or a result, means that a person has actual knowledge, or should have known, of the conduct, the circumstance, or the result.

(4) TRAFFICKING.—The term ''trafficking'', with respect to fentanyl, fentanyl precursors, or other related opioids, has the meaning given the term ''opioid trafficking'' in section 7203(8) of the Fentanyl Sanctions Act (21 U.S.C. 2302(8)).

(5) TRANSNATIONAL CRIMINAL ORGANIZATION.—The term ''transnational criminal organization'' includes—

(A) any organization designated as a significant transnational criminal organization under part 590 of title 31, Code of Federal Regulations;

(B) any of the organizations known as—

(i) the Sinaloa Cartel;

(ii) the Jalisco New Generation Cartel;

(iii) the Gulf Cartel;

(iv) the Los Zetas Cartel;

(v) the Juarez Cartel;

(vi) the Tijuana Cartel;

(vii) the Beltran-Leyva Cartel; or

(viii) La Familia Michoacana; or

(C) any successor organization to an organization described in subparagraph (B) or as otherwise determined by the President.

(6) UNITED STATES PERSON.—The term ''United States person'' means—

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 84 of 267

(A) a United States citizen or an alien lawfully admitted for permanent residence to the United States;

(B) an entity organized under the laws of the United States or of any jurisdiction within the United States, including a foreign branch of such an entity; or

(C) any person in the United States.

## TITLE I—SANCTIONS MATTERS

### Subtitle A—Sanctions in Response to National Emergency Relating to Fentanyl Trafficking

#### SEC. 3101. FINDING; POLICY.

(a) FINDING.—Congress finds that international trafficking of fentanyl, fentanyl precursors, or other related opioids constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and is a national emergency.

(b) POLICY.—It shall be the policy of the United States to apply economic and other financial sanctions to those who engage in the international trafficking of fentanyl, fentanyl precursors, or other related opioids to protect the national security, foreign policy, and economy of the United States.

#### SEC. 3102. USE OF NATIONAL EMERGENCY AUTHORITIES; REPORTING.

(a) IN GENERAL.—The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) to carry out this subtitle.

(b) REPORT REQUIRED.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, and annually thereafter, the President shall submit to the appropriate congressional committees a report on actions taken by the executive branch pursuant to this subtitle and any national emergency declared with respect to the trafficking of fentanyl and trade in other illicit drugs, including—

(A) the issuance of any new or revised regulations, policies, or guidance;

(B) the imposition of sanctions;

(C) the collection of relevant information from outside parties;

(D) the issuance or closure of general licenses, specific licenses, and statements of licensing policy by the Office of Foreign Assets Control;

(E) a description of any pending enforcement cases; and

(F) the implementation of mitigation procedures.

(2) FORM OF REPORT.—Each report required under paragraph (1) shall be submitted in unclassified form, but may include the matters required under subparagraphs (C), (D), (E), and (F) of such paragraph in a classified annex.

#### SEC. 3103. IMPOSITION OF SANCTIONS WITH RESPECT TO FENTANYL TRAFFICKING BY TRANSNATIONAL CRIMINAL ORGANIZATIONS.

(a) IN GENERAL.—The President shall impose the sanctions described in subsection (b) with respect to any foreign person the President determines—

(1) is knowingly involved in the significant trafficking of fentanyl, fentanyl precursors, or other related opioids, including such trafficking by a transnational criminal organization; or

(2) otherwise is knowingly involved in significant activities of a transnational criminal organization relating to the trafficking of fentanyl, fentanyl precursors, or other related opioids.

(b) SANCTIONS DESCRIBED.—The President, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), may block and prohibit all transactions in property and interests in property of a foreign person described in subsection (a) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(c) REPORT REQUIRED.—Not later than 180 days after the date of the enactment of this Act, and annually thereafter, the President shall submit to the appropriate congressional committees a report on actions taken by the executive branch with respect to the foreign persons identified under subsection (a).

#### SEC. 3104. PENALTIES; WAIVERS; EXCEPTIONS.

(a) PENALTIES.—Any person that violates, attempts to violate, conspires to violate, or causes a violation of this subtitle or any regulation, license, or order issued to carry out this subtitle shall be subject to the penalties set forth in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) to the same extent as a person that commits an unlawful act described in subsection (a) of that section.

(b) NATIONAL SECURITY WAIVER.—The President may waive the application of sanctions under this subtitle with respect to a foreign person if the President determines that such waiver is in the national security interest of the United States.

(c) EXCEPTIONS.—

(1) EXCEPTION FOR INTELLIGENCE ACTIVITIES.—This subtitle shall not apply with respect to activities subject to the reporting requirements under title V of the National Security Act of 1947 (50 U.S.C. 3091 et seq.) or any authorized intelligence activities of the United States.

(2) EXCEPTION FOR COMPLIANCE WITH INTERNATIONAL OBLIGATIONS AND LAW ENFORCEMENT ACTIVITIES.—Sanctions under this subtitle shall not apply with respect to an alien if admitting or paroling the alien into the United States is necessary—

(A) to permit the United States to comply with the Agreement regarding the Headquarters of the United Nations, signed at Lake Success on June 26, 1947, and entered into force November 21, 1947, between the United Nations and the United States, or other applicable international obligations of the United States; or

(B) to carry out or assist law enforcement activity of the United States.

(3) HUMANITARIAN EXEMPTION.—The President may not impose sanctions under this subtitle with respect to any person for conducting or facilitating a transaction for the sale of agricultural commodities, food, medicine, or medical devices or for the provision of humanitarian assistance.

#### SEC. 3105. TREATMENT OF FORFEITED PROPERTY OF TRANSNATIONAL CRIMINAL ORGANIZATIONS.

(a) TRANSFER OF FORFEITED PROPERTY TO FORFEITURE FUNDS.—

(1) IN GENERAL.—Any covered forfeited property shall be deposited into the Department of the Treasury Forfeiture Fund established under section 9705 of title 31, United States Code, or the Department of Justice Assets Forfeiture Fund established under section 524(c) of title 28, United States Code.

(2) REPORT REQUIRED.—Not later than 180 days after the date of the enactment of this Act, and every 180 days thereafter, the President shall submit to the appropriate congressional committees a report on any deposits made under paragraph (1) during the 180-day period preceding submission of the report.

(3) COVERED FORFEITED PROPERTY DEFINED.—In this subsection, the term "covered forfeited property" means property—

(A) forfeited to the United States under chapter 46 or section 1963 of title 18, United States Code; and

(B) that belonged to or was possessed by an individual affiliated with or connected to a transnational criminal organization subject to sanctions under—

(i) this subtitle;

(ii) the Fentanyl Sanctions Act (21 U.S.C. 2301 et seq.); or

(iii) Executive Order 14059 (50 U.S.C. 1701 note; relating to imposing sanctions on foreign persons involved in the global illicit drug trade).

(b) BLOCKED ASSETS UNDER TERRORISM RISK INSURANCE ACT OF 2002.—Nothing in this subtitle may be construed to affect the treatment of blocked assets of a terrorist party described in section 201(a) of the Terrorism Risk Insurance Act of 2002 (28 U.S.C. 1610 note).

### Subtitle B—Other Matters

#### SEC. 3111. TEN-YEAR STATUTE OF LIMITATIONS FOR VIOLATIONS OF SANCTIONS.

(a) INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT.—Section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) is amended by adding at the end the following:

"(d) STATUTE OF LIMITATIONS.—

"(1) TIME FOR COMMENCING PROCEEDINGS.—

"(A) IN GENERAL.—An action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, under this section shall not be entertained unless commenced within 10 years after the latest date of the violation upon which the civil fine, penalty, or forfeiture is based.

"(B) COMMENCEMENT.—For purposes of this paragraph, the commencement of an action, suit, or proceeding includes the issuance of a pre-penalty notice or finding of violation.

"(2) TIME FOR INDICTMENT.—No person shall be prosecuted, tried, or punished for any offense under subsection (c) unless the indictment is found or the information is instituted within 10 years after the latest date of the violation upon which the indictment or information is based.".

(b) TRADING WITH THE ENEMY ACT.—Section 16 of the Trading with the Enemy Act (50 U.S.C. 4315) is amended by adding at the end the following:

"(d) STATUTE OF LIMITATIONS.—

"(1) TIME FOR COMMENCING PROCEEDINGS.—

"(A) IN GENERAL.—An action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, under this section shall not be entertained unless commenced within 10 years after the latest date of the violation upon which the civil fine, penalty, or forfeiture is based.

"(B) COMMENCEMENT.—For purposes of this paragraph, the commencement of an action, suit, or proceeding includes the issuance of a pre-penalty notice or finding of violation.

"(2) TIME FOR INDICTMENT.—No person shall be prosecuted, tried, or punished for any offense under subsection (a) unless the indictment is found or the information is instituted within 10 years after the latest date of the violation upon which the indictment or information is based.".

#### SEC. 3112. CLASSIFIED REPORT AND BRIEFING ON STAFFING OF OFFICE OF FOREIGN ASSETS CONTROL.

Not later than 180 days after the date of the enactment of this Act, the Director of the Office of Foreign Assets Control shall provide to the appropriate congressional committees a classified report and briefing on the staffing of the Office of Foreign Assets Control, disaggregated by staffing dedicated to each sanctions program and each country or issue.

#### SEC. 3113. REPORT ON DRUG TRANSPORTATION ROUTES AND USE OF VESSELS WITH MISLABELED CARGO.

Not later than 180 days after the date of the enactment of this Act, the Secretary of

the Treasury, in conjunction with the heads of other relevant Federal agencies, shall provide to the appropriate congressional committees a classified report and briefing on efforts to target drug transportation routes and modalities, including an assessment of the prevalence of false cargo labeling and shipment of precursor chemicals without accurate tracking of the customers purchasing the chemicals.

### SEC. 3114. REPORT ON ACTIONS OF PEOPLE'S REPUBLIC OF CHINA WITH RESPECT TO PERSONS INVOLVED IN FENTANYL SUPPLY CHAIN.

Not later than 180 days after the date of the enactment of this Act, the Secretary of the Treasury, in conjunction with the heads of other relevant Federal agencies, shall provide to the appropriate congressional committees a classified report and briefing on actions taken by the Government of the People's Republic of China with respect to persons involved in the shipment of fentanyl, fentanyl analogues, fentanyl precursors, precursors for fentanyl analogues, and equipment for the manufacturing of fentanyl and fentanyl-laced counterfeit pills.

## TITLE II—ANTI-MONEY LAUNDERING MATTERS

### SEC. 3201. DESIGNATION OF ILLICIT FENTANYL TRANSACTIONS OF SANCTIONED PERSONS AS OF PRIMARY MONEY LAUNDERING CONCERN.

(a) IN GENERAL.—Subtitle A of the Fentanyl Sanctions Act (21 U.S.C. 2311 et seq.) is amended by inserting after section 7213 the following:

"SEC. 7213A. DESIGNATION OF TRANSACTIONS OF SANCTIONED PERSONS AS OF PRIMARY MONEY LAUNDERING CONCERN.

"(a) IN GENERAL.—If the Secretary of the Treasury determines that reasonable grounds exist for concluding that 1 or more financial institutions operating outside of the United States, 1 or more classes of transactions within, or involving, a jurisdiction outside of the United States, or 1 or more types of accounts within, or involving, a jurisdiction outside of the United States, is of primary money laundering concern in connection with illicit opioid trafficking, the Secretary of the Treasury may, by order, regulation, or otherwise as permitted by law—

"(1) require domestic financial institutions and domestic financial agencies to take 1 or more of the special measures provided for in section 9714(a)(1) of the National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 31 U.S.C. 5318A note); or

"(2) prohibit, or impose conditions upon, certain transmittals of funds (to be defined by the Secretary) by any domestic financial institution or domestic financial agency, if such transmittal of funds involves any such institution, class of transaction, or type of accounts.

"(b) CLASSIFIED INFORMATION.—In any judicial review of a finding of the existence of a primary money laundering concern, or of the requirement for 1 or more special measures with respect to a primary money laundering concern made under this section, if the designation or imposition, or both, were based on classified information (as defined in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.)), such information may be submitted by the Secretary to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review of any finding made or any requirement imposed under this section.

"(c) AVAILABILITY OF INFORMATION.—The exemptions from, and prohibitions on, search and disclosure referred to in section 9714(c) of the National Defense Authorization Act

for Fiscal Year 2021 (Public Law 116–283; 31 U.S.C. 5318A note) shall apply to any report or record of report filed pursuant to a requirement imposed under subsection (a). For purposes of section 552 of title 5, United States Code, this subsection shall be considered a statute described in subsection (b)(3)(B) of such section.

"(d) PENALTIES.—The penalties referred to in section 9714(d) of the National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 31 U.S.C. 5318A note) shall apply to violations of any order, regulation, special measure, or other requirement imposed under subsection (a), in the same manner and to the same extent as described in such section 9714(d).

"(e) INJUNCTIONS.—The Secretary of the Treasury may bring a civil action to enjoin a violation of any order, regulation, special measure, or other requirement imposed under subsection (a) in the same manner and to the same extent as described in section 9714(e) of the National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283; 31 U.S.C. 5318A note).".

(b) CLERICAL AMENDMENT.—The table of contents for the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92) is amended by inserting after the item relating to section 7213 the following:

"Sec. 7213A. Designation of transactions of sanctioned persons as of primary money laundering concern.".

### SEC. 3202. TREATMENT OF TRANSNATIONAL CRIMINAL ORGANIZATIONS IN SUSPICIOUS TRANSACTIONS REPORTS OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK.

(a) FILING INSTRUCTIONS.—Not later than 180 days after the date of the enactment of this Act, the Director of the Financial Crimes Enforcement Network shall issue guidance or instructions to United States financial institutions for filing reports on suspicious transactions required under section 1010.320 of title 31, Code of Federal Regulations, related to suspected fentanyl trafficking by transnational criminal organizations.

(b) PRIORITIZATION OF REPORTS RELATING TO FENTANYL TRAFFICKING OR TRANSNATIONAL CRIMINAL ORGANIZATIONS.—The Director shall prioritize research into reports described in subsection (a) that indicate a connection to trafficking of fentanyl or related synthetic opioids or financing of suspected transnational criminal organizations.

### SEC. 3203. REPORT ON TRADE-BASED MONEY LAUNDERING IN TRADE WITH MEXICO, THE PEOPLE'S REPUBLIC OF CHINA, AND BURMA.

(a) IN GENERAL.—In the first update to the national strategy for combating the financing of terrorism and related forms of illicit finance submitted to Congress after the date of the enactment of this Act, the Secretary of the Treasury shall include a report on trade-based money laundering originating in Mexico or the People's Republic of China and involving Burma.

(b) DEFINITION.—In this section, the term "national strategy for combating the financing of terrorism and related forms of illicit finance" means the national strategy for combating the financing of terrorism and related forms of illicit finance required under section 261 of the Countering America's Adversaries Through Sanctions Act (Public Law 115–44; 131 Stat. 934), as amended by section 6506 of the National Defense Authorization Act for Fiscal Year 2022 (Public Law 117–81; 135 Stat. 2428).

## TITLE III—EXCEPTION RELATING TO IMPORTATION OF GOODS

### SEC. 3301. EXCEPTION RELATING TO IMPORTATION OF GOODS.

(a) IN GENERAL.—The authority or a requirement to block and prohibit all transactions in all property and interests in property under this division shall not include the authority or a requirement to impose sanctions on the importation of goods.

(b) GOOD DEFINED.—In this section, the term "good" means any article, natural or manmade substance, material, supply or manufactured product, including inspection and test equipment, and excluding technical data.

## DIVISION B—REBUILDING ECONOMIC PROSPERITY AND OPPORTUNITY FOR UKRAINIANS ACT

### TITLE I

### SEC. 1. SHORT TITLE; TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Rebuilding Economic Prosperity and Opportunity for Ukrainians Act" or the "REPO for Ukrainians Act".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

TITLE I

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.

TITLE II—REPURPOSING OF RUSSIAN SOVEREIGN ASSETS

Sec. 101. Findings; sense of Congress.
Sec. 102. Sense of Congress regarding importance of the Russian Federation providing compensation to Ukraine.
Sec. 103. Prohibition on release of blocked Russian sovereign assets.
Sec. 104. Authority to ensure compensation to Ukraine using seized Russian sovereign assets and Russian aggressor state sovereign assets.
Sec. 105. International mechanism to use Russian sovereign assets and Russian aggressor state sovereign assets to provide for the reconstruction of Ukraine.
Sec. 106. Report on use of transferred Russian sovereign assets for reconstruction.
Sec. 107. Assessment by Secretary of State and Administrator of USAID on reconstruction and rebuilding needs of Ukraine.
Sec. 108. Extensions.

### SEC. 2. DEFINITIONS.

In this Act:

(1) RUSSIAN AGGRESSOR STATE.—The term "Russian aggressor state" means—

(A) the Russian Federation; and

(B) Belarus, if the President determines Belarus has engaged in an act of war against Ukraine related to Russia's ongoing February 24, 2022, invasion of Ukraine.

(2) RUSSIAN AGGRESSOR STATE SOVEREIGN ASSET.—The term "Russian aggressor state sovereign asset" means any Russian sovereign assets or any funds or property of another Russian aggressor state determined by the President to be of the same sovereign character as the assets described in paragraph (7).

(3) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate; and

(B) the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives.

(4) FINANCIAL INSTITUTION.—The term "financial institution" means a financial institution specified in subparagraph (A), (B), (C),

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 86 of 267

(D), (E), (F), (G), (H), (I), (J), (M), or (Z) of section 5312(a)(2) of title 31, United States Code.

(5) G7.—The term "G7" means the countries that are member of the informal Group of 7, including Canada, France, Germany, Italy, Japan, the United Kingdom, and the United States.

(6) RUSSIAN SOVEREIGN ASSET.—The term "Russian sovereign asset" means any of the following:

(A) Funds and other property of—

(i) the Central Bank of the Russian Federation;

(ii) the Russian National Wealth Fund; or

(iii) the Ministry of Finance of the Russian Federation.

(B) Any other funds or other property that are owned by the Government of the Russian Federation, including by any subdivision, agency, or instrumentality of that government.

(7) UNITED STATES.—The term "United States" means the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, the United States Virgin Islands, and any other territory or possession of the United States.

(8) UNITED STATES FINANCIAL INSTITUTION.—The term "United States financial institution" means a financial institution organized under the laws of the United States or of any jurisdiction within the United States, including a foreign branch of such an institution.

(9) SEIZE OR SEIZURE.—The term "seize" or "seizure" means confiscation of all right, title, and interest whatsoever in a Russian sovereign asset or a Russian aggressor state sovereign asset and vesting of the same in the United States.

## TITLE II—REPURPOSING OF RUSSIAN SOVEREIGN ASSETS

### SEC. 101. FINDINGS; SENSE OF CONGRESS.

(a) FINDINGS.—Congress makes the following findings:

(1) On February 24, 2022, the Government of the Russian Federation violated the sovereignty and territorial integrity of Ukraine by engaging in a premeditated, second illegal invasion of Ukraine.

(2) The international community has condemned the illegal invasions of Ukraine by the Russian Federation, as well as the commission of the crime of aggression, war crimes, crimes against humanity, and genocide by officials of the Russian Federation, including through the deliberate targeting of civilians and civilian infrastructure, the forcible transfer of children, and the commission of sexual violence.

(3) The leaders of the G7 have called the Russian Federation's "unprovoked and completely unjustified attack on the democratic state of Ukraine" a "serious violation of international law and a grave breach of the United Nations Charter and all commitments Russia entered in the Helsinki Final Act and the Charter of Paris and its commitments in the Budapest Memorandum".

(4) On March 2, 2022, the United Nations General Assembly adopted Resolution ES–11/1, entitled "Aggression against Ukraine", by a vote of 141 to 5. That resolution "deplore[d] in the strongest terms the aggression by the Russian Federation against Ukraine in violation of Article 2(4) of the [United Nations] Charter" and demanded that the Russian Federation "immediately cease its use of force against Ukraine" and "immediately, completely and unconditionally withdraw all of its military forces from the territory of Ukraine within its internationally recognized borders".

(5) On March 16, 2022, the International Court of Justice issued a provisional measures order requiring the Russian Federation to "immediately suspend the military operations that it commenced on 24 February 2022 in the territory of Ukraine" and, in this regard, observed that "orders on provisional measures . . . have binding effect".

(6) On November 14, 2022, the United Nations General Assembly adopted a resolution—

(A) recognizing that the Russian Federation has committed a serious breach of the most fundamental norms of international law and its gross and systematic refusal to obey its obligations has affected the entire international community;

(B) recognizing the need for the establishment, in cooperation with Ukraine, of an international mechanism for compensation for financially assessable damages caused by the Russian Federation's internationally wrongful acts; and

(C) recommending "the creation . . . of an international register of damage to serve as a record . . . of evidence and claims information on damage, loss or injury to all natural and legal persons concerned, as well as the State of Ukraine, caused by internationally wrongful acts of the Russian Federation in or against Ukraine . . . .".

(7) The Russian Federation bears international legal responsibility for its aggression against Ukraine and, under international law, must cease its internationally wrongful acts. Because of this breach of the prohibition on aggression under international law, the United States is legally entitled to take counter measures that are proportionate and aimed at inducing the Russian Federation to comply with its international obligations.

(8) Approximately $300,000,000,000 of Russian sovereign assets have been immobilized worldwide. Only a small fraction of those assets, 1 to 2 percent, or between $4,000,000,000 and $5,000,000,000, are reportedly subject to the jurisdiction of the United States.

(9) The vast majority of immobilized Russian sovereign assets, approximately $190,000,000,000, are reportedly subject to the jurisdiction of Belgium. The Government of Belgium has publicly indicated that any action by that Government regarding those assets would be predicated on support by the G7.

(b) SENSE OF CONGRESS.—It is the sense of Congress that, having committed an act of aggression, as recognized by the United Nations General Assembly on March 2, 2022, the Russian Federation is to be considered as an aggressor state. The extreme illegal actions taken by the Russian Federation, including an act of aggression, present a unique situation, justifying the establishment of a legal authority for the United States Government and other countries to confiscate Russian sovereign assets in their respective jurisdictions.

### SEC. 102. SENSE OF CONGRESS REGARDING IMPORTANCE OF THE RUSSIAN FEDERATION PROVIDING COMPENSATION TO UKRAINE.

It is the sense of Congress that—

(1) the Russian Federation bears responsibility for the financial burden of the reconstruction of Ukraine and for countless other costs associated with the illegal invasion of Ukraine by the Russian Federation that began on February 24, 2022;

(2) the most effective ways to provide compensation for the damages caused by the Russian Federation's internationally wrongful acts should be assessed by an international mechanism charged with determining compensation and providing assistance to Ukraine;

(3) at least since November 2022 the Russian Federation has been on notice of its opportunity to comply with its international obligations, including to make full compensation for injury, or, by agreement with Ukraine, to authorize an international mechanism to resolve issues regarding compensation to Ukraine;

(4) the Russian Federation can, by negotiated agreement, participate in any international process to assess the damages caused by the Russian Federation's internationally wrongful acts and make funds available to compensate for these damages, and if it fails to do so, the United States and other countries should explore all avenues for ensuring compensation to Ukraine;

(5) the President should lead robust engagement on all bilateral and multilateral aspects of the response by the United States to acts by the Russian Federation that undermine the sovereignty and territorial integrity of Ukraine, including on any policy coordination and alignment regarding the repurposing or ordered transfer of Russian sovereign assets in the context of determining compensation and providing assistance to Ukraine;

(6) as part of the robust engagement on bilateral and multilateral responses to acts by the Russian Federation that undermine the sovereignty and territorial integrity of Ukraine, the President should endeavor to facilitate creation of, and United States participation in, an international mechanism regarding the repurposing or seizure of sovereign assets of the Russian Federation for the benefit of Ukraine;

(7) the repurposing of Russian sovereign assets is in the national interests of the United States and consistent with United States and international law;

(8) the United States should work with international allies and partners on the repurposing of Russian sovereign assets as part of a coordinated, multilateral effort, including with G7 countries and other countries in which Russian sovereign assets are located; and

(9) any effort by the United States to confiscate and repurpose Russian sovereign assets should be undertaken alongside international allies and partners as part of a coordinated, multilateral effort, including with G7 countries, the European Union, Australia, and other countries in which Russian sovereign assets are located.

### SEC. 103. PROHIBITION ON RELEASE OF BLOCKED RUSSIAN SOVEREIGN ASSETS.

(a) IN GENERAL.—No Russian sovereign asset that is blocked or effectively immobilized by the Department of the Treasury before the date specified in section 104(j) may be released or mobilized, except as otherwise authorized by this Act, until the date on which the President certifies to the appropriate congressional committees that—

(1) hostilities between the Russian Federation and Ukraine have ceased; and

(2)(A) full compensation has been made to Ukraine for harms resulting from the invasion of Ukraine by the Russian Federation; or

(B) the Russian Federation is participating in a bona fide international mechanism that, by agreement, will discharge the obligations of the Russian Federation to compensate Ukraine for all amounts determined to be owed to Ukraine.

(b) NOTIFICATION.—Not later than 30 days before the release or mobilization of a Russian sovereign asset that is blocked or effectively immobilized by the Department of the Treasury, the President shall submit to the appropriate congressional committees—

USCA Case #24-1113 Document #2060757 Filed: 06/20/2024 Page 87 of 267

(1) a notification of the decision to take the action that releases or mobilizes the asset; and

(2) a justification in writing for such decision.

(c) JOINT RESOLUTION OF DISAPPROVAL.—
(1) IN GENERAL.—No Russian sovereign asset that is blocked or effectively immobilized by the Department of the Treasury may be released or mobilized if, within 30 days of receipt of the notification and justification required under subsection (b), a joint resolution is enacted into law prohibiting the proposed release or mobilization.

(2) EXPEDITED PROCEDURES.—Any joint resolution described in paragraph (1) introduced in either House of Congress shall be considered in accordance with the provisions of section 601(b) of the International Security Assistance and Arms Export Control Act of 1976 (Public Law 94–329; 90 Stat. 765), except that any such resolution shall be subject to germane amendments. If such a joint resolution should be vetoed by the President, the time for debate in consideration of the veto message on such measure shall be limited to 20 hours in the Senate and in the House of Representatives shall be determined in accordance with the Rules of the House.

(d) COOPERATION ON PROHIBITION OF RELEASE OF CERTAIN RUSSIAN SOVEREIGN ASSETS.—Notwithstanding subsection (a), the President may take such actions as may be necessary to seek to obtain an agreement or arrangement to which the Government of Ukraine is party that discharges the Russian Federation from further obligations to compensate Ukraine.

## SEC. 104. AUTHORITY TO ENSURE COMPENSATION TO UKRAINE USING SEIZED RUSSIAN SOVEREIGN ASSETS AND RUSSIAN AGGRESSOR STATE SOVEREIGN ASSETS.

(a) REPORTING ON RUSSIAN ASSETS.—
(1) NOTICE REQUIRED.—Not later than 90 days after the date of the enactment of this Act, the President shall, by means of such instructions or regulations as the President may prescribe, require any financial institution at which Russian sovereign assets are located, and that knows or should know of such assets, to provide notice of such assets, including relevant information required under section 501.603(b)(ii) of title 31, Code of Federal Regulations (or successor regulations), to the Secretary of the Treasury not later than 10 days after detection of such assets.

(2) REPORT REQUIRED.—
(A) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, and annually thereafter for 3 years, the President shall submit to the appropriate congressional committees a report detailing the status of Russian sovereign assets with respect to which notice has been provided to the Secretary of the Treasury under paragraph (1).

(B) FORM.—The report required by subparagraph (A) shall be submitted in unclassified form, but may include a classified annex.

(b) SEIZURE OR TRANSFER OF ASSETS.—
(1) SEIZURE OF RUSSIAN AGGRESSOR STATE SOVEREIGN ASSETS.—On and after the date that is 30 days after the President submits to the appropriate congressional committees the certification described in subsection (c), the President may seize, confiscate, transfer, or vest any Russian aggressor state sovereign assets, in whole or in part, and including any interest or interests in such assets, subject to the jurisdiction of the United States for the purpose of transferring those funds to the Ukraine Support Fund established under subsection (d).

(2) VESTING.—For funds confiscated under paragraph (1), all right, title, and interest shall vest in the United States Government,

provided that no use of those funds other than the use of those funds consistent with subsection (f) shall be permitted.

(3) LIQUIDATION AND DEPOSIT.—The President shall—
(A) deposit any funds seized, transferred, or confiscated under paragraph (1) into the Ukraine Support Fund established under subsection (d);

(B) liquidate or sell any other property seized, transferred, or confiscated under paragraph (1) and deposit the funds resulting from such liquidation or sale into the Ukraine Support Fund; and

(C) make all such funds available for the purposes described in subsection (f).

(4) METHOD OF SEIZURE, TRANSFER, OR CONFISCATION.—The President may seize, transfer, confiscate or vest Russian aggressor state sovereign assets under paragraph (1) through instructions or licenses or in such other manner as the President determines appropriate.

(c) CERTIFICATION.—The certification described in this subsection, with respect to Russian aggressor state sovereign assets, is a certification that—
(1) seizing, confiscating, transferring, or vesting Russian aggressor state sovereign assets for the benefit of Ukraine is in the national interests of the United States;

(2) the President has meaningfully coordinated with G7 leaders to take multilateral action with regard to any seizure, confiscation, vesting, or transfer of Russian sovereign assets for the benefit of Ukraine; and

(3) either—
(A) the President has received an official and legitimate request from a properly constituted international mechanism that includes the participation of the Government of Ukraine and the United States and that has been established for the purpose of, or otherwise tasked with, compensating Ukraine for damages arising or resulting from the internationally wrongful acts of the Russian Federation regarding the repurposing of sovereign assets of the Russian Federation; or

(B) either—
(i) the Russian Federation has not ceased its unlawful aggression against Ukraine; or

(ii) the Russian Federation has ceased its unlawful aggression against Ukraine, but—
(I) has not provided full compensation to Ukraine for harms resulting from the internationally wrongful acts of the Russian Federation; and

(II) is not participating in a bona fide process to provide full compensation to Ukraine for harms resulting from Russian aggression.

(d) ESTABLISHMENT OF THE UKRAINE SUPPORT FUND.—
(1) UKRAINE SUPPORT FUND.—The President shall establish an account, to be known as the "Ukraine Support Fund", to consist of any funds with respect to which a seizure is ordered pursuant to subsection (b).

(2) USE OF FUNDS.—The funds in the accounts established under paragraph (1) shall be available to be used only as specified in subsection (f).

(e) RULE OF CONSTRUCTION.—Nothing in this section may be construed to provide the President with the authority to seize, transfer, confiscate, or vest title to foreign sovereign assets that are not Russian aggressor state sovereign assets in the United States or transfer any foreign sovereign assets to any recipient for any use other than the uses described in this Act.

(f) FURTHER TRANSFER AND USE OF FUNDS.—
(1) IN GENERAL.—Subject to paragraphs (2) and (3), Funds in the Ukraine Support Fund shall be available to the Secretary of State, in consultation with the Administrator of the United States Agency for International

Development, for the purpose of providing assistance to Ukraine for the damage resulting from the unlawful invasion by the Russian Federation that began on February 24, 2022.

(2) SPECIFIC PERMISSIBLE USES.—Subject to paragraph (3), the following are permissible uses of the funds in the Ukraine Support Fund pursuant to paragraph (1):
(A) Making contributions to an international body, fund, or mechanism established consistent with section 105(a) that is charged with determining and administering compensation or providing assistance to Ukraine.

(B) Supporting reconstruction, rebuilding, and recovery efforts in Ukraine.

(C) Providing economic and humanitarian assistance to the people of Ukraine.

(3) NOTIFICATION.—
(A) IN GENERAL.—The Secretary of State shall notify the appropriate congressional committees not fewer than 15 days before providing any funds from the Ukraine Support Fund to any other account for the purposes described in paragraph (1).

(B) ELEMENTS.—A notification under subparagraph (A) with respect to the transfer of funds to another account pursuant to paragraph (1) shall specify—
(i) the amount of funds to be provided;
(ii) the specific purpose for which such funds are provided; and
(iii) the recipient of those funds.

(g) LIMITATION ON TRANSFER OF FUNDS.—No funds may be transferred or otherwise expended from the Ukraine Support Fund pursuant to subsection (f) unless the President certifies to the appropriate congressional committees that—
(1) a plan exists to ensure transparency and accountability for all funds transferred to and from any account receiving the funds; and

(2) the President has transmitted the plan required under paragraph (1) to the appropriate congressional committees in writing.

(h) JOINT RESOLUTION OF DISAPPROVAL.—No funds may be transferred pursuant to subsection (f) if, within 15 days of receipt of the notification required under subsection (f)(3), a joint resolution is enacted into law prohibiting such transfer.

(i) REPORT.—Not later than 90 days after the date of the enactment of this Act, and not less frequently than every 180 days thereafter, the President shall submit to the appropriate congressional committees a report that includes the following:
(1) An accounting of funds in the Ukraine Support Fund.

(2) Any information regarding the disposition of funds in any account to which funds have been transferred pursuant to subsection (f) that has been transmitted to the President by the institution housing said account during the period covered by the report.

(3) A description of United States multilateral and bilateral diplomatic engagement with allies and partners of the United States that also have immobilized Russian sovereign assets to compensate for damages caused by the Russian Federation's internationally wrongful acts during the period covered by the report.

(4) An outline of steps taken to carry out the establishment of the international mechanism described by section 105(a) during the period covered by the report.

(j) EXCEPTION FOR UNITED STATES OBLIGATIONS UNDER TREATIES.—The authorities provided by this section may not be exercised in a manner inconsistent with the obligations of the United States under—
(1) the Convention on Diplomatic Relations, done at Vienna April 18, 1961, and entered into force April 24, 1964 (23 UST 3227);

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 88 of 267

(2) the Convention on Consular Relations, done at Vienna April 24, 1963, and entered into force on March 19, 1967 (21 UST 77);

(3) the Agreement Regarding the Headquarters of the United Nations, signed at Lake Success June 26, 1947, and entered into force November 21, 1947 (TIAS 1676); or

(4) any other international agreement to which the United States is a state party on the day before the date of the enactment of this Act.

(k) JUDICIAL REVIEW.—

(1) EXCLUSIVENESS OF REMEDY.—Notwithstanding any other provision of law, any action taken under this section shall not be subject to judicial review, except as provided in this subsection.

(2) LIMITATIONS FOR FILING CLAIMS.—A claim may only be brought with respect to an action under this section—

(A) that alleges that the action will deny rights under the Constitution of the United States; and

(B) if the claim is brought not later than 60 days after the date of such action.

(3) JURISDICTION.—

(A) IN GENERAL.—A claim under paragraph (2) of this subsection shall be barred unless a complaint is filed prior to the expiration of such time limits in the United States District Court for the District of Columbia.

(B) APPEAL.—An appeal of an order of the United States District Court for the District of Columbia issued pursuant to a claim brought under this subsection shall be taken by a notice of appeal filed with the United States Court of Appeals for the District of Columbia Circuit not later than 10 days after the date on which the order is entered.

(C) EXPEDITED CONSIDERATION.—It shall be the duty of the United States District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia Circuit to advance on the docket and to expedite to the greatest extent possible the disposition of any claim brought under this subsection.

(l) SUNSET.—The authorities conferred under this section shall terminate on the earlier of—

(1) the date that is 5 years after the date of the enactment of this Act; or

(2) the date that is 120 days after the date on which the President determines and certifies to the appropriate congressional committees that—

(A) the Russian Federation has reached an agreement relating to the respective withdrawal of Russian forces and cessation of military hostilities that is accepted by the free and independent Government of Ukraine; and

(B)(i) full compensation has been made to Ukraine for harms resulting from the invasion of Ukraine by the Russian Federation;

(ii) the Russian Federation is participating in a bona fide international mechanism that, by agreement, will discharge the obligations of the Russian Federation to compensate Ukraine for all amounts determined to be owed to Ukraine; or

(iii) the Russian Federation's obligation to compensate Ukraine for the damage caused by the Russian Federation's aggression has been resolved pursuant to an agreement between the Russian Federation and the Government of Ukraine.

**SEC. 105. INTERNATIONAL MECHANISM TO USE RUSSIAN SOVEREIGN ASSETS AND RUSSIAN AGGRESSOR STATE SOVEREIGN ASSETS TO PROVIDE FOR THE RECONSTRUCTION OF UKRAINE.**

(a) IN GENERAL.—The President shall take such actions as the President determines appropriate to coordinate with the G7, the European Union, Australia, and other partners and allies of the United States regarding the disposition of immobilized Russian aggressor state sovereign assets, including seeking to establish an international mechanism with foreign partners, including Ukraine, the G7, the European Union, Australia, and other partners and allies of the United States, for the purpose of assisting Ukraine, which may include the establishment of an international fund to be known as the "Ukraine Compensation Fund", that may receive and use assets in the Ukraine Support Fund established under section 104(c) and contributions from foreign partners that have also frozen or seized Russian aggressor state sovereign assets to assist Ukraine, including by—

(1) supporting a register of damage to serve as a record of evidence and for assessment of the financially assessable damages to Ukraine resulting from the invasions of Ukraine by the Russian Federation and operations or actions in support thereof;

(2) establishing a mechanism to compensate Ukraine for damages caused by Russia's internationally wrongful acts connected with the invasions of Ukraine;

(3) ensuring distribution of those assets or the proceeds of those assets based on determinations under that mechanism; and

(4) taking such other actions as may be necessary to carry out this section.

(b) AUTHORIZATION FOR DEPOSIT IN THE UKRAINE COMPENSATION FUND.—Upon the President reaching an agreement or arrangement to establish a common international mechanism pursuant to subsection (a) or at any time thereafter, the Secretary of State may, pursuant to the authority conferred by and subject to the limitations described in section 104(f) and subject to the limitations described in subsection (e), transfer funds from the Ukraine Support Fund established under section 104(d) to a fund or mechanism established consistent with subsection (a).

(c) NOTIFICATION.—The President shall notify the appropriate congressional committees not later than 30 days after entering into any new bilateral or multilateral agreement or arrangement under subsection (a).

(d) GOOD GOVERNANCE.—The Secretary of State, in consultation with the Secretary of the Treasury, shall—

(1) seek to ensure that any fund or mechanism established consistent with subsection (a) operates in accordance with established international accounting principles;

(2) seek to ensure that any fund or mechanism established consistent with subsection (a) is—

(A) staffed, operated, and administered in accordance with established accounting rules and governance procedures, including providing for payment of reasonable expenses from the fund for the governance and operation of the fund and the tribunal;

(B) operated transparently as to all funds transfers, filings, and decisions; and

(C) audited on a regular basis by an independent auditor, in accordance with internationally accepted accounting and auditing standards;

(3) seek to ensure that any audits of any fund or mechanism established consistent with subsection (a) shall be made available to the public; and

(4) ensure that any audits of any fund or mechanism established consistent with subsection (a) shall be reviewed and reported on by the Government Accountability Office to the appropriate congressional committees and the public.

(e) LIMITATION ON TRANSFER OF FUNDS.—No funds may be transferred from the Ukraine Support Fund to a fund or mechanism established consistent with subsection (a) unless the President certifies to the appropriate congressional committees that—

(1) the institution housing the fund or mechanism has a plan to ensure transparency and accountability for all funds transferred to and from the fund or mechanism established consistent with subsection (a); and

(2) the President has transmitted the plan required under paragraph (1) to the appropriate congressional committees in writing.

(f) JOINT RESOLUTION OF DISAPPROVAL.—No funds may be transferred from the Ukraine Support Fund to a fund or mechanism established consistent with subsection (a) if, within 30 days of receipt of the notification required under subsection (c)(2), a joint resolution is enacted prohibiting the transfer.

(g) REPORT.—Not later than 90 days after the date of the enactment of this Act, and not less frequently than every 90 days thereafter, the President shall submit to the appropriate congressional committees a report that includes the following:

(1) An accounting of funds in any fund or mechanism established consistent with subsection (a).

(2) Any information regarding the disposition of any such fund or mechanism that has been transmitted to the President by the institution housing the fund or mechanism during the period covered by the report.

(3) A description of United States multilateral and bilateral diplomatic engagement with allies and partners of the United States that also have immobilized Russian sovereign assets to allow for compensation for Ukraine during the period covered by the report.

(4) An outline of steps taken to carry out this section during the period covered by the report.

**SEC. 106. REPORT ON USE OF TRANSFERRED RUSSIAN SOVEREIGN ASSETS FOR RECONSTRUCTION.**

Not later than 90 days after the date of the enactment of this Act, and every 180 days thereafter, the Secretary of State, in consultation with the Secretary of the Treasury, shall submit to the appropriate congressional committees a report that contains—

(1) the amount and source of Russian sovereign assets seized, transferred, or confiscated pursuant to section 104(b);

(2) the amount and source of funds deposited into the Ukraine Support Fund under section 104(b)(3); and

(3) a detailed description and accounting of how such funds were used to meet the purposes described in section 104(f).

**SEC. 107. ASSESSMENT BY SECRETARY OF STATE AND ADMINISTRATOR OF USAID ON RECONSTRUCTION AND REBUILDING NEEDS OF UKRAINE.**

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Secretary of State, in consultation with the Administrator of the United States Agency for International Development, shall submit to the appropriate congressional committees an assessment of the most pressing needs of Ukraine for reconstruction, rebuilding, and humanitarian aid.

(b) ELEMENTS.—The assessment required by subsection (a) shall include the following:

(1) An estimate of the rebuilding and reconstruction needs of Ukraine, as of the date of the assessment, resulting from the unlawful invasion of Ukraine by the Russian Federation, including—

(A) a description of the sources and methods for the estimate; and

(B) an identification of the locations or regions in Ukraine with the most pressing needs.

(2) An estimate of the humanitarian needs, as of the date of the assessment, of the people of Ukraine, including Ukrainians residing inside the internationally recognized borders of Ukraine or outside those borders, resulting from the unlawful invasion of Ukraine by the Russian Federation.

USCA Case #24-1113     Document #2060757     Filed: 06/20/2024     Page 89 of 267

(3) An assessment of the extent to which the needs described in paragraphs (1) and (2) have been met or funded, by any source, as of the date of the assessment.

(4) A plan to engage in robust multilateral and bilateral diplomacy to ensure that allies and partners of the United States, particularly in the European Union as Ukraine seeks accession to the European Union, increase their commitment to Ukraine's reconstruction.

(5) An identification of which such needs should be prioritized, including any assessment or request by the Government of Ukraine with respect to the prioritization of such needs.

**SEC. 108. EXTENSIONS.**

Section 5(a) of the Elie Wiesel Genocide and Atrocities Prevention Act of 2018 (Public Law 115–441; 132 Stat. 5587) is amended, in the matter preceding paragraph (1), by striking ''six years'' and inserting ''12 years''.

## DIVISION C—OTHER MATTERS

**SEC. 1. REPORT AND IMPOSITION OF SANCTIONS TO HARMONIZE WITH ALLIED SANCTIONS.**

(a) REPORT REQUIRED.—Not later than 90 days after the date of the enactment of this Act, the President shall submit to the Committee on Foreign Affairs of the House of Representatives and the Committee on Foreign Relations of the Senate a report identifying—

(1) each foreign person currently subject to—

(A) sanctions issued by the European Union pursuant to European Union Council Regulation No. 269/2014 of 17 March, 2014, as amended; or

(B) sanctions issued by the United Kingdom pursuant to the Russia (Sanctions) (EU Exit) Regulations 2019, as amended; and

(2) each such foreign person that also meets the criteria for imposition of sanctions by the United States pursuant to—

(A) the Global Magnitsky Human Rights Accountability Act of 2016 (22 U.S.C. 10101 et seq.);

(B) Executive Order 14024 (50 U.S.C. 1701 note, relating to blocking property with respect to specified harmful foreign activities of the Government of the Russian Federation), as amended;

(C) Executive Order 14068 (50 U.S.C. 1701 note, relating to prohibiting certain imports, exports, and new investment with respect to continued Russian Federation aggression), as amended; or

(D) Executive Order 14071 (50 U.S.C. 1701 note, relating to prohibiting new investment in and certain services to the Russian Federation in response to continued Russian Federation aggression), as amended.

(b) IMPOSITION OF SANCTIONS.—The President may impose the sanctions authorized by the applicable provision of law listed in subsection (a)(2) with respect to each foreign person identified in the report required under subsection (a)(1) who is not already subject to sanctions under United States law pursuant to one or more statutory sanctions authorities as of the date of the submission of such report.

## DIVISION D—PROTECTING AMERICANS FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS ACT

**SEC. 1. SHORT TITLE.**

This division may be cited as the ''Protecting Americans from Foreign Adversary Controlled Applications Act''.

**SEC. 2. PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.**

(a) IN GENERAL.—

(1) PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.—It shall be unlawful for an entity to distribute, maintain, or update (or enable the distribution, maintenance, or updating of) a foreign adversary controlled application by carrying out, within the land or maritime borders of the United States, any of the following:

(A) Providing services to distribute, maintain, or update such foreign adversary controlled application (including any source code of such application) by means of a marketplace (including an online mobile application store) through which users within the land or maritime borders of the United States may access, maintain, or update such application.

(B) Providing internet hosting services to enable the distribution, maintenance, or updating of such foreign adversary controlled application for users within the land or maritime borders of the United States.

(2) APPLICABILITY.—Subject to paragraph (3), this subsection shall apply—

(A) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(A), beginning on the date that is 270 days after the date of the enactment of this Act; and

(B) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(B), beginning on the date that is 270 days after the date of the relevant determination of the President under such subsection.

(3) EXTENSION.—With respect to a foreign adversary controlled application, the President may grant a 1-time extension of not more than 90 days with respect to the date on which this subsection would otherwise apply to such application pursuant to paragraph (2), if the President certifies to Congress that—

(A) a path to executing a qualified divestiture has been identified with respect to such application;

(B) evidence of significant progress toward executing such qualified divestiture has been produced with respect to such application; and

(C) there are in place the relevant binding legal agreements to enable execution of such qualified divestiture during the period of such extension.

(b) DATA AND INFORMATION PORTABILITY TO ALTERNATIVE APPLICATIONS.—Before the date on which a prohibition under subsection (a) applies to a foreign adversary controlled application, the entity that owns or controls such application shall provide, upon request by a user of such application within the land or maritime borders of United States, to such user all the available data related to the account of such user with respect to such application. Such data shall be provided in a machine readable format and shall include any data maintained by such application with respect to the account of such user, including content (including posts, photos, and videos) and all other account information.

(c) EXEMPTIONS.—

(1) EXEMPTIONS FOR QUALIFIED DIVESTITURES.—Subsection (a)—

(A) does not apply to a foreign adversary controlled application with respect to which a qualified divestiture is executed before the date on which a prohibition under subsection (a) would begin to apply to such application; and

(B) shall cease to apply in the case of a foreign adversary controlled application with respect to which a qualified divestiture is executed after the date on which a prohibition under subsection (a) applies to such application.

(2) EXEMPTIONS FOR CERTAIN NECESSARY SERVICES.—Subsections (a) and (b) do not apply to services provided with respect to a foreign adversary controlled application that are necessary for an entity to attain compliance with such subsections.

(d) ENFORCEMENT.—

(1) CIVIL PENALTIES.—

(A) FOREIGN ADVERSARY CONTROLLED APPLICATION VIOLATIONS.—An entity that violates subsection (a) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $5,000 by the number of users within the land or maritime borders of the United States determined to have accessed, maintained, or updated a foreign adversary controlled application as a result of such violation.

(B) DATA AND INFORMATION VIOLATIONS.—An entity that violates subsection (b) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $500 by the number of users within the land or maritime borders of the United States affected by such violation.

(2) ACTIONS BY ATTORNEY GENERAL.—The Attorney General—

(A) shall conduct investigations related to potential violations of subsection (a) or (b), and, if such an investigation results in a determination that a violation has occurred, the Attorney General shall pursue enforcement under paragraph (1); and

(B) may bring an action in an appropriate district court of the United States for appropriate relief, including civil penalties under paragraph (1) or declaratory and injunctive relief.

(e) SEVERABILITY.—

(1) IN GENERAL.—If any provision of this section or the application of this section to any person or circumstance is held invalid, the invalidity shall not affect the other provisions or applications of this section that can be given effect without the invalid provision or application.

(2) SUBSEQUENT DETERMINATIONS.—If the application of any provision of this section is held invalid with respect to a foreign adversary controlled application that satisfies the definition of such term pursuant to subsection (g)(3)(A), such invalidity shall not affect or preclude the application of the same provision of this section to such foreign adversary controlled application by means of a subsequent determination pursuant to subsection (g)(3)(B).

(f) RULE OF CONSTRUCTION.—Nothing in this division may be construed—

(1) to authorize the Attorney General to pursue enforcement, under this section, other than enforcement of subsection (a) or (b);

(2) to authorize the Attorney General to pursue enforcement, under this section, against an individual user of a foreign adversary controlled application; or

(3) except as expressly provided herein, to alter or affect any other authority provided by or established under another provision of Federal law.

(g) DEFINITIONS.—In this section:

(1) CONTROLLED BY A FOREIGN ADVERSARY.—The term ''controlled by a foreign adversary'' means, with respect to a covered company or other entity, that such company or other entity is—

(A) a foreign person that is domiciled in, is headquartered in, has its principal place of business in, or is organized under the laws of a foreign adversary country;

(B) an entity with respect to which a foreign person or combination of foreign persons described in subparagraph (A) directly or indirectly own at least a 20 percent stake; or

(C) a person subject to the direction or control of a foreign person or entity described in subparagraph (A) or (B).

(2) COVERED COMPANY.—

(A) IN GENERAL.—The term ''covered company'' means an entity that operates, directly or indirectly (including through a parent company, subsidiary, or affiliate), a website, desktop application, mobile application, or augmented or immersive technology application that—

(i) permits a user to create an account or profile to generate, share, and view text, images, videos, real-time communications, or similar content;

(ii) has more than 1,000,000 monthly active users with respect to at least 2 of the 3 months preceding the date on which a relevant determination of the President is made pursuant to paragraph (3)(B);

(iii) enables 1 or more users to generate or distribute content that can be viewed by other users of the website, desktop application, mobile application, or augmented or immersive technology application; and

(iv) enables 1 or more users to view content generated by other users of the website, desktop application, mobile application, or augmented or immersive technology application.

(B) EXCLUSION.—The term ''covered company'' does not include an entity that operates a website, desktop application, mobile application, or augmented or immersive technology application whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews.

(3) FOREIGN ADVERSARY CONTROLLED APPLICATION.—The term ''foreign adversary controlled application'' means a website, desktop application, mobile application, or augmented or immersive technology application that is operated, directly or indirectly (including through a parent company, subsidiary, or affiliate), by—

(A) any of—

(i) ByteDance, Ltd.;

(ii) TikTok;

(iii) a subsidiary of or a successor to an entity identified in clause (i) or (ii) that is controlled by a foreign adversary; or

(iv) an entity owned or controlled, directly or indirectly, by an entity identified in clause (i), (ii), or (iii); or

(B) a covered company that—

(i) is controlled by a foreign adversary; and

(ii) that is determined by the President to present a significant threat to the national security of the United States following the issuance of—

(I) a public notice proposing such determination; and

(II) a public report to Congress, submitted not less than 30 days before such determination, describing the specific national security concern involved and containing a classified annex and a description of what assets would need to be divested to execute a qualified divestiture.

(4) FOREIGN ADVERSARY COUNTRY.—The term ''foreign adversary country'' means a country specified in section 4872(d)(2) of title 10, United States Code.

(5) INTERNET HOSTING SERVICE.—The term ''internet hosting service'' means a service through which storage and computing resources are provided to an individual or organization for the accommodation and maintenance of 1 or more websites or online services, and which may include file hosting, domain name server hosting, cloud hosting, and virtual private server hosting.

(6) QUALIFIED DIVESTITURE.—The term ''qualified divestiture'' means a divestiture or similar transaction that—

(A) the President determines, through an interagency process, would result in the relevant foreign adversary controlled application no longer being controlled by a foreign adversary; and

(B) the President determines, through an interagency process, precludes the establishment or maintenance of any operational relationship between the United States operations of the relevant foreign adversary controlled application and any formerly affiliated entities that are controlled by a foreign adversary, including any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing.

(7) SOURCE CODE.—The term ''source code'' means the combination of text and other characters comprising the content, both viewable and nonviewable, of a software application, including any publishing language, programming language, protocol, or functional content, as well as any successor languages or protocols.

(8) UNITED STATES.—The term ''United States'' includes the territories of the United States.

SEC. 3. JUDICIAL REVIEW.

(a) RIGHT OF ACTION.—A petition for review challenging this division or any action, finding, or determination under this division may be filed only in the United States Court of Appeals for the District of Columbia Circuit.

(b) EXCLUSIVE JURISDICTION.—The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over any challenge to this division or any action, finding, or determination under this division.

(c) STATUTE OF LIMITATIONS.—A challenge may only be brought—

(1) in the case of a challenge to this division, not later than 165 days after the date of the enactment of this Act; and

(2) in the case of a challenge to any action, finding, or determination under this division, not later than 90 days after the date of such action, finding, or determination.

DIVISION E—PROTECTING AMERICANS' DATA FROM FOREIGN ADVERSARIES ACT OF 2024

SEC. 1. SHORT TITLE.

This division may be cited as the ''Protecting Americans' Data from Foreign Adversaries Act of 2024''.

SEC. 2. PROHIBITION ON TRANSFER OF PERSONALLY IDENTIFIABLE SENSITIVE DATA OF UNITED STATES INDIVIDUALS TO FOREIGN ADVERSARIES.

(a) PROHIBITION.—It shall be unlawful for a data broker to sell, license, rent, trade, transfer, release, disclose, provide access to, or otherwise make available personally identifiable sensitive data of a United States individual to—

(1) any foreign adversary country; or

(2) any entity that is controlled by a foreign adversary.

(b) ENFORCEMENT BY FEDERAL TRADE COMMISSION.—

(1) UNFAIR OR DECEPTIVE ACTS OR PRACTICES.—A violation of this section shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B)).

(2) POWERS OF COMMISSION.—

(A) IN GENERAL.—The Commission shall enforce this section in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made a part of this section.

(B) PRIVILEGES AND IMMUNITIES.—Any person who violates this section shall be subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act.

(3) AUTHORITY PRESERVED.—Nothing in this section may be construed to limit the authority of the Commission under any other provision of law.

(c) DEFINITIONS.—In this section:

(1) COMMISSION.—The term ''Commission'' means the Federal Trade Commission.

(2) CONTROLLED BY A FOREIGN ADVERSARY.—The term ''controlled by a foreign adversary'' means, with respect to an individual or entity, that such individual or entity is—

(A) a foreign person that is domiciled in, is headquartered in, has its principal place of business in, or is organized under the laws of a foreign adversary country;

(B) an entity with respect to which a foreign person or combination of foreign persons described in subparagraph (A) directly or indirectly own at least a 20 percent stake; or

(C) a person subject to the direction or control of a foreign person or entity described in subparagraph (A) or (B).

(3) DATA BROKER.—

(A) IN GENERAL.—The term ''data broker'' means an entity that, for valuable consideration, sells, licenses, rents, trades, transfers, releases, discloses, provides access to, or otherwise makes available data of United States individuals that the entity did not collect directly from such individuals to another entity that is not acting as a service provider.

(B) EXCLUSION.—The term ''data broker'' does not include an entity to the extent such entity—

(i) is transmitting data of a United States individual, including communications of such an individual, at the request or direction of such individual;

(ii) is providing, maintaining, or offering a product or service with respect to which personally identifiable sensitive data, or access to such data, is not the product or service;

(iii) is reporting or publishing news or information that concerns local, national, or international events or other matters of public interest;

(iv) is reporting, publishing, or otherwise making available news or information that is available to the general public—

(I) including information from—

(aa) a book, magazine, telephone book, or online directory;

(bb) a motion picture;

(cc) a television, internet, or radio program;

(dd) the news media; or

(ee) an internet site that is available to the general public on an unrestricted basis; and

(II) not including an obscene visual depiction (as such term is used in section 1460 of title 18, United States Code); or

(v) is acting as a service provider.

(4) FOREIGN ADVERSARY COUNTRY.—The term ''foreign adversary country'' means a country specified in section 4872(d)(2) of title 10, United States Code.

(5) PERSONALLY IDENTIFIABLE SENSITIVE DATA.—The term ''personally identifiable sensitive data'' means any sensitive data that identifies or is linked or reasonably linkable, alone or in combination with other data, to an individual or a device that identifies or is linked or reasonably linkable to an individual.

(6) PRECISE GEOLOCATION INFORMATION.—The term ''precise geolocation information'' means information that—

(A) is derived from a device or technology of an individual; and

(B) reveals the past or present physical location of an individual or device that identifies or is linked or reasonably linkable to 1 or more individuals, with sufficient precision to identify street level location information of an individual or device or the location of an individual or device within a range of 1,850 feet or less.

(7) SENSITIVE DATA.—The term ''sensitive data'' includes the following:

USCA Case #24-1113 Document #2060757 Filed: 06/20/2024 Page 91 of 267

(A) A government-issued identifier, such as a Social Security number, passport number, or driver's license number.

(B) Any information that describes or reveals the past, present, or future physical health, mental health, disability, diagnosis, or healthcare condition or treatment of an individual.

(C) A financial account number, debit card number, credit card number, or information that describes or reveals the income level or bank account balances of an individual.

(D) Biometric information.

(E) Genetic information.

(F) Precise geolocation information.

(G) An individual's private communications such as voicemails, emails, texts, direct messages, mail, voice communications, and video communications, or information identifying the parties to such communications or pertaining to the transmission of such communications, including telephone numbers called, telephone numbers from which calls were placed, the time calls were made, call duration, and location information of the parties to the call.

(H) Account or device log-in credentials, or security or access codes for an account or device.

(I) Information identifying the sexual behavior of an individual.

(J) Calendar information, address book information, phone or text logs, photos, audio recordings, or videos, maintained for private use by an individual, regardless of whether such information is stored on the individual's device or is accessible from that device and is backed up in a separate location.

(K) A photograph, film, video recording, or other similar medium that shows the naked or undergarment-clad private area of an individual.

(L) Information revealing the video content requested or selected by an individual.

(M) Information about an individual under the age of 17.

(N) An individual's race, color, ethnicity, or religion.

(O) Information identifying an individual's online activities over time and across websites or online services.

(P) Information that reveals the status of an individual as a member of the Armed Forces.

(Q) Any other data that a data broker sells, licenses, rents, trades, transfers, releases, discloses, provides access to, or otherwise makes available to a foreign adversary country, or entity that is controlled by a foreign adversary, for the purpose of identifying the types of data listed in subparagraphs (A) through (P).

(8) SERVICE PROVIDER.—The term ''service provider'' means an entity that—

(A) collects, processes, or transfers data on behalf of, and at the direction of—

(i) an individual or entity that is not a foreign adversary country or controlled by a foreign adversary; or

(ii) a Federal, State, Tribal, territorial, or local government entity; and

(B) receives data from or on behalf of an individual or entity described in subparagraph (A)(i) or a Federal, State, Tribal, territorial, or local government entity.

(9) UNITED STATES INDIVIDUAL.—The term ''United States individual'' means a natural person residing in the United States.

(d) EFFECTIVE DATE.—This section shall take effect on the date that is 60 days after the date of the enactment of this Act.

## DIVISION F—SHIP ACT

### SEC. 1. SHORT TITLE.

This division may be cited as the ''Stop Harboring Iranian Petroleum Act'' or the ''SHIP Act''.

### SEC. 2. STATEMENT OF POLICY.

It is the policy of the United States—

(1) to deny Iran the ability to engage in destabilizing activities, support international terrorism, fund the development and acquisition of weapons of mass destruction and the means to deliver such weapons by limiting export of petroleum and petroleum products by Iran;

(2) to deny Iran funds to oppress and commit human rights violations against the Iranian people assembling to peacefully redress the Iranian regime;

(3) to fully enforce sanctions against those entities which provide support to the Iranian energy sector; and

(4) to counter Iran's actions to finance and facilitate the participation of foreign terrorist organizations in ongoing conflicts and illicit activities due to the threat such actions pose to the vital national interests of the United States.

### SEC. 3. IMPOSITION OF SANCTIONS WITH RESPECT TO IRANIAN PETROLEUM.

(a) IN GENERAL.—On and after the date that is 180 days after the date of the enactment of this Act, and except as provided in subsection (e)(2), the President shall impose the sanctions described in subsection (c) with respect to each foreign person that the President determines knowingly engaged, on or after such date of enactment, in an activity described in subsection (b).

(b) ACTIVITIES DESCRIBED.—A foreign person engages in an activity described in this subsection if the foreign person—

(1) owns or operates a foreign port at which, on or after the date of the enactment of this Act, such person knowingly permits to dock a vessel—

(A) that is included on the list of specially designated nationals and blocked persons maintained by the Office of Foreign Assets Control of the Department of the Treasury for transporting Iranian crude oil or petroleum products; or

(B) of which the operator or owner of such vessel otherwise knowingly engages in a significant transaction involving such vessel to transport, offload, or deal in significant transactions in condensate, refined, or unrefined petroleum products, or other petrochemical products originating from the Islamic Republic of Iran;

(2) owns or operates a vessel through which such owner knowingly conducts a ship to ship transfer involving a significant transaction of any petroleum product originating from the Islamic Republic of Iran;

(3) owns or operates a refinery through which such owner knowingly engages in a significant transaction to process, refine, or otherwise deal in any petroleum product originating from the Islamic Republic of Iran;

(4) is a covered family member of a foreign person described in paragraph (1), (2), or (3); or

(5) is owned or controlled by a foreign person described in paragraph (1), (2), or (3), and knowingly engages in an activity described in paragraph (1), (2), or (3).

(c) SANCTIONS DESCRIBED.—The sanctions described in this subsection with respect to a foreign person described in subsection (a) are the following:

(1) SANCTIONS ON FOREIGN VESSELS.—Subject to such regulations as the President may prescribe, the President may prohibit a vessel described in subsection (b)(1)(A) or (b)(1)(B) from landing at any port in the United States—

(A) with respect to a vessel described in subsection (b)(1)(A), for a period of not more than 2 years beginning on the date on which the President imposes sanctions with respect to a related foreign port described in subsection (b)(1)(A); and

(B) with respect to a vessel described in subsection (b)(1)(B), for a period of not more than 2 years.

(2) BLOCKING OF PROPERTY.—The President shall exercise all of the powers granted to the President under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) to the extent necessary to block and prohibit all transactions in property and interests in property of the foreign person if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(3) INELIGIBILITY FOR VISAS, ADMISSION, OR PAROLE.—

(A) VISAS, ADMISSION, OR PAROLE.—An alien described in subsection (a) is—

(i) inadmissible to the United States;

(ii) ineligible to receive a visa or other documentation to enter the United States; and

(iii) otherwise ineligible to be admitted or paroled into the United States or to receive any other benefit under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.).

(B) CURRENT VISAS REVOKED.—

(i) IN GENERAL.—An alien described in subsection (a) is subject to revocation of any visa or other entry documentation regardless of when the visa or other entry documentation is or was issued.

(ii) IMMEDIATE EFFECT.—A revocation under clause (i) shall take effect immediately and automatically cancel any other valid visa or entry documentation that is in the alien's possession.

(C) EXCEPTIONS.—Sanctions under this paragraph shall not apply with respect to an alien if admitting or paroling the alien into the United States is necessary—

(i) to permit the United States to comply with the Agreement regarding the Headquarters of the United Nations, signed at Lake Success June 26, 1947, and entered into force November 21, 1947, between the United Nations and the United States, or other applicable international obligations; or

(ii) to carry out or assist law enforcement activity in the United States.

(4) PENALTIES.—The penalties provided for in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) shall apply to a person that violates, attempts to violate, conspires to violate, or causes a violation of this section or any regulations promulgated to carry out this section to the same extent that such penalties apply to a person that commits an unlawful act described in section 206(a) of that Act.

(d) RULES OF CONSTRUCTION.—

(1) For purposes of determinations under subsection (a) that a foreign person engaged in activities described in subsection (b), a foreign person shall not be determined to know that petroleum or petroleum products originated from Iran if such person relied on a certificate of origin or other documentation confirming that the origin of the petroleum or petroleum products was a country other than Iran, unless such person knew or had reason to know that such documentation was falsified.

(2) Nothing in this division shall be construed to affect the availability of any existing authorities to issue waivers, exceptions, exemptions, licenses, or other authorization.

(e) IMPLEMENTATION; REGULATIONS.—

(1) IN GENERAL.—The President may exercise all authorities under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) for purposes of carrying out this section.

(2) DEADLINE FOR REGULATIONS.—Not later than 180 days after the date of the enactment of this Act, the President shall prescribe such regulations as may be necessary for the implementation of this division.

(3) NOTIFICATION TO CONGRESS.—Not later than 10 days before the prescription of regulations under paragraph (2), the President shall brief and provide written notification to the appropriate congressional committees regarding—

(A) the proposed regulations; and

(B) the specific provisions of this division that the regulations are implementing.

(f) EXCEPTION FOR HUMANITARIAN ASSISTANCE.—

(1) IN GENERAL.—Sanctions under this section shall not apply to—

(A) the conduct or facilitation of a transaction for the provision of agricultural commodities, food, medicine, medical devices, or humanitarian assistance, or for humanitarian purposes; or

(B) transactions that are necessary for or related to the activities described in subparagraph (A).

(2) DEFINITIONS.—In this subsection:

(A) AGRICULTURAL COMMODITY.—The term "agricultural commodity" has the meaning given that term in section 102 of the Agricultural Trade Act of 1978 (7 U.S.C. 5602).

(B) MEDICAL DEVICE.—The term "medical device" has the meaning given the term "device" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

(C) MEDICINE.—The term "medicine" has the meaning given the term "drug" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

(g) EXCEPTION FOR SAFETY OF VESSELS AND CREW.—Sanctions under this section shall not apply with respect to a person providing provisions to a vessel otherwise subject to sanctions under this section if such provisions are intended for the safety and care of the crew aboard the vessel, the protection of human life aboard the vessel, or the maintenance of the vessel to avoid any environmental or other significant damage.

(h) WAIVER.—

(1) IN GENERAL.—The President may, on a case-by-case basis and for periods not to exceed 180 days each, waive the application of sanctions imposed with respect to a foreign person under this section if the President certifies to the appropriate congressional committees, not later than 15 days after such waiver is to take effect, that the waiver is vital to the national interests of the United States.

(2) SPECIAL RULE.—The President shall not be required to impose sanctions under this section with respect to a foreign person described in subsection (a) if the President certifies in writing to the appropriate congressional committees that the foreign person—

(A) is no longer engaging in activities described in subsection (b); or

(B) has taken and is continuing to take significant, verifiable steps toward permanently terminating such activities.

(i) TERMINATION.—The authorities provided by this section shall cease to have effect on and after the date that is 30 days after the date on which the President certifies to the appropriate congressional committees that—

(1) the Government of Iran no longer repeatedly provides support for international terrorism as determined by the Secretary of State pursuant to—

(A) section 1754(c)(1)(A) of the Export Control Reform Act of 2018 (50 U.S.C. 4318(c)(1)(A));

(B) section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371);

(C) section 40 of the Arms Export Control Act (22 U.S.C. 2780); or

(D) any other provision of law; and

(2) Iran has ceased the pursuit, acquisition, and development of, and verifiably dismantled, its nuclear, biological, and chemical weapons, ballistic missiles, and ballistic missile launch technology.

## SEC. 4. REPORT ON IRANIAN PETROLEUM AND PETROLEUM PRODUCTS EXPORTS.

(a) IN GENERAL.—Not later than 120 days after the date of enactment of this Act, and annually thereafter until the date described in subsection (d), the Administrator of the Energy Information Administration shall submit to the appropriate congressional committees a report describing Iran's growing exports of petroleum and petroleum products, that includes the following:

(1) An analysis of Iran's exports and sale of petroleum and petroleum products, including—

(A) an estimate of Iran's petroleum export and sale revenue per year since 2018;

(B) an estimate of Iran's petroleum export and sale revenue to China per year since 2018;

(C) the amount of petroleum and crude oil barrels exported per year since 2018;

(D) the amount of petroleum and crude oil barrels exported to China per year since 2018;

(E) the amount of petroleum and crude oil barrels exported to countries other than China per year since 2018;

(F) the average price per petroleum and crude oil barrel exported per year since 2018; and

(G) the average price per petroleum and crude oil barrel exported to China per year since 2018.

(2) An analysis of Iran's labeling practices of exported petroleum and petroleum products.

(3) A description of companies involved in the exporting and sale of Iranian petroleum and petroleum products.

(4) A description of ships involved in the exporting and sale of Iranian petroleum and petroleum products.

(5) A description of ports involved in the exporting and sale of Iranian petroleum and petroleum products.

(b) FORM.—The report required by subsection (a) shall be submitted in unclassified form but may include a classified annex.

(c) PUBLICATION.—The unclassified portion of the report required by subsection (a) shall be posted on a publicly available website of the Energy Information Administration.

(d) TERMINATION.—The requirement to submit reports under this section shall be terminated on the date on which the President makes the certification described in section 3(i).

## SEC. 5. STRATEGY TO COUNTER ROLE OF THE PEOPLE'S REPUBLIC OF CHINA IN EVASION OF SANCTIONS WITH RESPECT TO IRAN.

(a) IN GENERAL.—Not later than 120 days after the date of the enactment of this Act, the Secretary of State, in consultation with the heads of other appropriate Federal agencies, shall submit to the appropriate congressional committees a written strategy, and provide to those committees an accompanying briefing, on the role of the People's Republic of China in evasion of sanctions imposed by the United States with respect to Iranian-origin petroleum products that includes an assessment of options—

(1) to strengthen the enforcement of such sanctions; and

(2) to expand sanctions designations targeting the involvement of the People's Republic of China in the production, transportation, storage, refining, and sale of Iranian-origin petroleum products.

(b) ELEMENTS.—The strategy required by subsection (a) shall include—

(1) a description and assessment of the use of sanctions in effect before the date of the enactment of this Act to target individuals and entities of the People's Republic of China that are directly or indirectly associated with smuggling of Iranian-origin petroleum products;

(2) an assessment of—

(A) Iranian-owned entities operating in the People's Republic of China and involved in petroleum refining supply chains;

(B) the People's Republic of China's role in global petroleum refining supply chains;

(C) how the People's Republic of China leverages its role in global petroleum supply chains to achieve political objectives;

(D) the People's Republic of China's petroleum importing and exporting partners;

(E) what percent of the People's Republic of China's energy consumption is linked to illegally imported Iranian-origin petroleum products; and

(F) what level of influence the Chinese Communist Party holds over non-state, semi-independent "teapot" refineries;

(3) a detailed plan for—

(A) monitoring the maritime domain for sanctionable activity related to smuggling of Iranian-origin petroleum products;

(B) identifying the individuals, entities, and vessels engaging in sanctionable activity related to Iranian-origin petroleum products, including—

(i) vessels—

(I) transporting petrochemicals subject to sanctions;

(II) conducting ship-to-ship transfers of such petrochemicals;

(III) with deactivated automatic identification systems; or

(IV) that engage in "flag hopping" by changing national registries;

(ii) individuals or entities—

(I) storing petrochemicals subject to sanctions; or

(II) refining or otherwise processing such petrochemicals; and

(iii) through the use of port entry and docking permission of vessels subject to sanctions;

(C) deterring individuals and entities from violating sanctions by educating and engaging—

(i) insurance providers;

(ii) parent companies; and

(iii) vessel operators;

(D) collaborating with allies and partners of the United States engaged in the Arabian Peninsula, including through standing or new maritime task forces, to build sanctions enforcement capacity through assistance and training to defense and law enforcement services; and

(E) using public communications and global diplomatic engagements to highlight the role of illicit petroleum product smuggling in bolstering Iran's support for terrorism and its nuclear program; and

(4) an assessment of—

(A) the total number of vessels smuggling Iranian-origin petroleum products;

(B) the total number of vessels smuggling such petroleum products destined for the People's Republic of China;

(C) the number of vessels smuggling such petroleum products specifically from the Islamic Revolutionary Guard Corps;

(D) interference by the People's Republic of China with attempts by the United States to investigate or enforce sanctions on illicit Iranian petroleum product exports;

(E) the effectiveness of the use of sanctions with respect to insurers of entities that own or operate vessels involved in smuggling Iranian-origin petroleum products;

(F) the personnel and resources needed to enforce sanctions with respect to Iranian-origin petroleum products; and

(G) the impact of smuggled illicit Iranian-origin petroleum products on global energy markets.

(c) FORM.—The strategy required by subsection (a) shall be submitted in unclassified form, but may include a classified index.

## SEC. 6. DEFINITIONS.

In this division:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Foreign Affairs, the Committee on the Judiciary, and the Committee on Financial Services of the House of Representatives; and

(B) the Committee on Foreign Relations, the Committee on the Judiciary, and the Committee on Banking, Housing, and Urban Affairs of the Senate.

(2) COVERED FAMILY MEMBER.—The term "covered family member", with respect to a foreign person who is an individual, means a spouse, adult child, parent, or sibling of the person who engages in the sanctionable activity described under section 3 or who demonstrably benefits from such activity.

## DIVISION G—FIGHT CRIME ACT

### SEC. 1. SHORT TITLE.

This division may be cited as the "Fight and Combat Rampant Iranian Missile Exports Act" or the "Fight CRIME Act".

### SEC. 2. FINDINGS.

Congress makes the following findings:

(1) Annex B to United Nations Security Council Resolution 2231 (2015) restricts certain missile-related activities and transfers to and from Iran, including all items, materials, equipment, goods, and technology set out in the Missile Technology Control Regime Annex, absent advance, case-by-case approval from the United Nations Security Council.

(2) Iran has transferred Shahed and Mohajer drones, covered under the Missile Technology Control Regime Annex, to the Russian Federation, the Government of Ethiopia, and other Iran-aligned entities, including the Houthis in Yemen and militia units in Iraq, without prior authorization from the United Nations Security Council, in violation of the restrictions set forth in Annex B to United Nations Security Council Resolution 2231.

(3) Certain missile-related restrictions in Annex B to United Nations Security Council Resolution 2231 expired in October 2023, removing international legal restrictions on missile-related activities and transfers to and from Iran.

### SEC. 3. STATEMENT OF POLICY.

It is the policy of the United States—

(1) to urgently seek the extension of missile-related restrictions set forth in Annex B to United Nations Security Council Resolution 2231 (2015);

(2) to use all available authorities to constrain Iran's domestic ballistic missile production capabilities;

(3) to combat and deter the transfer of conventional and non-conventional arms, equipment, material, and technology to, or from Iran, or involving the Government of Iran; and

(4) to ensure countries, individuals, and entities engaged in, or attempting to engage in, the acquisition, facilitation, or development of arms and related components and technology subject to restrictions under Annex B to United Nations Security Council Resolution 2231 are held to account under United States and international law, including through the application and enforcement of sanctions and use of export controls, regardless of whether the restrictions under Annex B to United Nations Security Council Resolution 2231 remain in effect following their anticipated expiration in October 2023.

### SEC. 4. REPORT.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, and annually thereafter for two years, the Secretary of State, in coordination with the heads of other appropriate Federal agencies, shall submit to the appropriate congressional committees an unclassified report, with a classified annex if necessary, that includes the following:

(1) A diplomatic strategy to secure the renewal of international restrictions on certain missile-related activities, including transfers to and from Iran set forth in Annex B to United Nations Security Council Resolution 2231 (2015).

(2) An analysis of how the expiration of missile-related restrictions set forth in Annex B to United Nations Security Council Resolution 2231 impacts the Government of Iran's arms proliferation and malign activities, including as the restrictions relate to cooperation with, and support for, Iran-aligned entities and allied countries.

(3) An assessment of the revenue, or in-kind benefits, accrued by the Government of Iran, or Iran-aligned entities, as a result of a lapse in missile-related restrictions set forth in Annex B to United Nations Security Council Resolution 2231.

(4) A detailed description of a United States strategy to deter, prevent, and disrupt the sale, purchase, or transfer of covered technology involving Iran absent restrictions pursuant to Annex B to United Nations Security Council Resolution 2231.

(5) An identification of any foreign person engaging in, enabling, or otherwise facilitating any activity involving Iran restricted under Annex B to United Nations Security Council Resolution 2231, regardless of whether such restrictions remain in effect after October 2023.

(6) A description of actions by the United Nations and other multilateral organizations, including the European Union, to hold accountable foreign persons that have violated the restrictions set forth in Annex B to United Nations Security Council Resolution 2231, and efforts to prevent further violations of such restrictions.

(7) A description of actions by individual member states of the United Nations Security Council to hold accountable foreign persons that have violated restrictions set forth in Annex B to United Nations Security Council Resolution 2231 and efforts to prevent further violations of such restrictions.

(8) A description of actions by the People's Republic of China, the Russian Federation, or any other country to prevent, interfere with, or undermine efforts to hold accountable foreign persons that have violated the restrictions set forth in Annex B to United Nations Security Council Resolution 2231, including actions to restrict United Nations-led investigations into suspected violations of such restrictions, or limit funding to relevant United Nations offices or experts.

(9) An analysis of the foreign and domestic supply chains in Iran that directly or indirectly facilitate, support, or otherwise aid the Government of Iran's drone or missile program, including storage, transportation, or flight-testing of related goods, technology, or components.

(10) An identification of any foreign person, or network containing foreign persons, that enables, supports, or otherwise facilitates the operations or maintenance of any Iranian airline subject to United States sanctions or export control restrictions.

(11) An assessment of how the continued operation of Iranian airlines subject to United States sanctions or export control restrictions impacts the Government of Iran's ability to transport or develop arms, including covered technology.

(b) SCOPE.—The initial report required by subsection (a) shall address the period beginning on January 1, 2021, and ending on the date that is 90 days after date of the enactment of this Act, and each subsequent report shall address the one-year period following the conclusion of the prior report.

### SEC. 5. SANCTIONS TO COMBAT THE PROLIFERATION OF IRANIAN MISSILES.

(a) IN GENERAL.—The sanctions described in subsection (b) shall apply to any foreign person the President determines, on or after the date of the enactment of this Act—

(1) knowingly engages in any effort to acquire, possess, develop, transport, transfer, or deploy covered technology to, from, or involving the Government of Iran or Iran-aligned entities, regardless of whether the restrictions set forth in Annex B to United Nations Security Council Resolution 2231 (2015) remain in effect after October 2023;

(2) knowingly provides entities owned or controlled by the Government of Iran or Iran-aligned entities with goods, technology, parts, or components, that may contribute to the development of covered technology;

(3) knowingly participates in joint missile or drone development, including development of covered technology, with the Government of Iran or Iran-aligned entities, including technical training, storage, and transport;

(4) knowingly imports, exports, or re-exports to, into, or from Iran, whether directly or indirectly, any significant arms or related materiel prohibited under paragraph (5) or (6) to Annex B of United Nations Security Council Resolution 2231 (2015) as of April 1, 2023;

(5) knowingly provides significant financial, material, or technological support to, or knowingly engages in a significant transaction with, a foreign person subject to sanctions for conduct described in paragraph (1), (2), (3), or (4); or

(6) is an adult family member of a person subject to sanctions for conduct described in paragraph (1), (2), (3), or (4).

(b) SANCTIONS DESCRIBED.—The sanctions described in this subsection are the following:

(1) BLOCKING OF PROPERTY.—The President shall exercise all authorities granted under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) to the extent necessary to block and prohibit all transactions in property and interests in property of the foreign person if such property and interests in property are in the United States, come within the United States, or come within the possession or control of a United States person.

(2) INELIGIBILITY FOR VISAS, ADMISSION, OR PAROLE.—

(A) VISAS, ADMISSION, OR PAROLE.—An alien described in subsection (a) shall be—

(i) inadmissible to the United States;

(ii) ineligible to receive a visa or other documentation to enter the United States; and

(iii) otherwise ineligible to be admitted or paroled into the United States or to receive any other benefit under the Immigration and Nationality Act (8 U.S.C. 1101 et 16 seq.).

(B) CURRENT VISAS REVOKED.—

(i) IN GENERAL.—The visa or other entry documentation of any alien described in subsection (a) is subject to revocation regardless of the issue date of the visa or other entry documentation.

(ii) IMMEDIATE EFFECT.—A revocation under clause (i) shall, in accordance with section 221(i) of the Immigration and Nationality Act (8 U.S.C. 1201(i))—

(I) take effect immediately; and

(II) cancel any other valid visa or entry documentation that is in the possession of the alien.

(c) PENALTIES.—Any person that violates, or attempts to violate, subsection (b) or any regulation, license, or order issued pursuant to that subsection, shall be subject to the penalties set forth in subsections (b) and (c) of section 206 of the International Economic Powers Act (50 U.S.C. 1705) to the same extent as a person that commits an unlawful

act described in subsection (a) of that section.

(d) WAIVER.—The President may waive the application of sanctions under this section with respect to a foreign person for renewable periods not to exceed 180 days only if, not later than 15 days after the date on which the waiver is to take effect, the President submits to the appropriate congressional committees a written determination and justification that the waiver is in the vital national security interests of the United States.

(e) IMPLEMENTATION.—The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) to carry out any amendments made by this section.

(f) REGULATIONS.—

(1) IN GENERAL.—The President shall, not later than 120 days after the date of the enactment of this Act, promulgate regulations as necessary for the implementation of this division and the amendments made by this division.

(2) NOTIFICATION TO CONGRESS.—Not less than 10 days before the promulgation of regulations under subsection (a), the President shall notify the appropriate congressional committees of the proposed regulations and the amendments made by this division that the regulations are implementing.

(g) EXCEPTIONS.—

(1) EXCEPTION FOR INTELLIGENCE ACTIVITIES.—Sanctions under this section shall not apply to any activity subject to the reporting requirements under title V of the National Security Act of 1947 (50 U.S.C. 3091 et seq.) or any authorized intelligence activities of the United States.

(2) EXCEPTION TO COMPLY WITH INTERNATIONAL OBLIGATIONS AND FOR LAW ENFORCEMENT ACTIVITIES.—Sanctions under this section shall not apply with respect to an alien if admitting or paroling the alien into the United States is necessary—

(A) to permit the United States to comply with the Agreement regarding the Headquarters of the United Nations, signed at Lake Success June 26, 1947, and entered into force November 21, 1947, between the United Nations and the United States, or other applicable international obligations; or

(B) to carry out or assist authorized law enforcement activity in the United States.

(h) TERMINATION OF SANCTIONS.—This section shall cease to be effective beginning on the date that is 30 days after the date on which the President certifies to the appropriate congressional committees that—

(1) the Government of Iran no longer repeatedly provides support for international terrorism as determined by the Secretary of State pursuant to—

(A) section 1754(c)(1)(A) of the Export Control Reform Act of 2018 (50 U.S.C. 4318(c)(1)(A));

(B) section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371);

(C) section 40 of the Arms Export Control Act (22 U.S.C. 2780); or

(D) any other provision of law; and

(2) Iran has ceased the pursuit, acquisition, and development of, and verifiably dismantled its, nuclear, biological, and chemical weapons and ballistic missiles and ballistic missile launch technology.

**SEC. 6. REPORT TO IDENTIFY, AND DESIGNATION AS FOREIGN TERRORIST ORGANIZATIONS OF, IRANIAN PERSONS THAT HAVE ATTACKED UNITED STATES CITIZENS USING UNMANNED COMBAT AERIAL VEHICLES.**

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, and every 180 days thereafter, the Secretary of State shall submit to the appropriate congressional committees a report that identifies, for the period specified in subsection (b), any Iranian person that has attacked a United States citizen using an unmanned combat aerial vehicle, as defined for the purpose of the United Nations Register of Conventional Arms.

(b) PERIOD SPECIFIED.—The period specified in this subsection is—

(1) for the initial report, the period—

(A) beginning on October 27, 2023; and

(B) ending on the date such report is submitted; and

(2) for the second or a subsequent report, the period—

(A) beginning on the date the preceding report was submitted; and

(B) ending on the date such second or subsequent report is submitted.

(c) DESIGNATION OF PERSONS AS FOREIGN TERRORIST ORGANIZATIONS.—

(1) IN GENERAL.—The President shall designate any person identified in a report submitted under subsection (a) as a foreign terrorist organization under section 219 of the Immigration and Naturalization Act (8 U.S.C. 1189).

(2) REVOCATION.—The President may not revoke a designation made under paragraph (1) until the date that is 4 years after the date of such designation.

(d) WAIVER.—The Secretary of State may waive the requirements of this section upon a determination and certification to the appropriate congressional committees that such a waiver is in the vital national security interests of the United States.

(e) SUNSET.—This section shall terminate on the date that is 4 years after the date of the enactment of this Act.

(f) IRANIAN PERSON DEFINED.—In this section, the term "Iranian person"—

(1) means an entity organized under the laws of Iran or otherwise subject to the jurisdiction of the Government of Iran; and

(2) includes the Islamic Revolutionary Guard Corps.

**SEC. 7. DEFINITIONS.**

In this division:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Foreign Affairs, the Committee on Financial Services, and the Committee on the Judiciary of the House of Representatives; and

(B) the Committee on Foreign Relations, the Committee on the Judiciary, and the Committee on Banking, Housing, and Urban Affairs of the Senate.

(2) FOREIGN PERSON.—The term "foreign person"—

(A) means an individual or entity that is not a United States person; and

(B) includes a foreign state (as such term is defined in section 1603 of title 28, United States Code).

(3) GOVERNMENT OF IRAN.—The term "Government of Iran" has the meaning given such term in section 560.304 of title 31, Code of Federal Regulations, as such section was in effect on January 1, 2021.

(4) UNITED STATES PERSON.—The terms "United States person" means—

(A) a United States citizen;

(B) a permanent resident alien of the United States;

(C) an entity organized under the laws of the United States or of any jurisdiction within the United States, including a foreign branch of such an entity; or

(D) a person in the United States.

(5) IRAN-ALIGNED ENTITY.—The term "Iran-aligned entity" means a foreign person that—

(A) is controlled or significantly influenced by the Government of Iran; and

(B) knowingly receives material or financial support from the Government of Iran, including Hezbollah, the Houthis, or any other proxy group that furthers Iran's national security objectives.

(6) COVERED TECHNOLOGY.—The term "covered technology" means—

(A) any goods, technology, software, or related material specified in the Missile Technology Control Regime Annex, as in effect on the day before the date of the enactment of this Act; and

(B) any additional goods, technology, software, or related material added to the Missile Technology Control Regime Annex after the day before the date of the enactment of this Act.

(7) FAMILY MEMBER.—The term "family member" means—

(A) a child, grandchild, parent, grandparent, sibling, or spouse; and

(B) any spouse, widow, or widower of an individual described in subparagraph (A).

(8) KNOWINGLY.—The term "knowingly" has the meaning given that term in section 14 of the Iran Sanctions Act of 1996 (50 U.S.C. 1701 note).

(9) MISSILE TECHNOLOGY CONTROL REGIME.—The term "Missile Technology Control Regime" means the policy statement, between the United States, the United Kingdom, the Federal Republic of Germany, France, Italy, Canada, and Japan, announced on April 16, 1987, to restrict sensitive missile-relevant transfers based on the Missile Technology Control Regime Annex, and any amendments thereto or expansions thereof, as in effect on the day before the date of the enactment of this Act.

(10) MISSILE TECHNOLOGY CONTROL REGIME ANNEX.—The term "Missile Technology Control Regime Annex" means the Guidelines and Equipment and Technology Annex of the Missile Technology Control Regime, and any amendments thereto or updates thereof, as in effect on the day before the date of the enactment of this Act.

**DIVISION H—MAHSA ACT**

**SEC. 1. SHORT TITLE.**

This Act may be cited as the "Mahsa Amini Human rights and Security Accountability Act" or the "MAHSA Act".

**SEC. 2. IMPOSITION OF SANCTIONS ON IRAN'S SUPREME LEADER'S OFFICE, ITS APPOINTEES, AND ANY AFFILIATED PERSONS.**

(a) FINDINGS.—Congress finds the following:

(1) The Supreme Leader is an institution of the Islamic Republic of Iran.

(2) The Supreme Leader holds ultimate authority over Iran's judiciary and security apparatus, including the Ministry of Intelligence and Security, law enforcement forces under the Interior Ministry, the Islamic Revolutionary Guard Corps (IRGC), and the Basij, a nationwide volunteer paramilitary group subordinate to the IRGC, all of which have engaged in human rights abuses in Iran. Additionally the IRGC, a United States designated Foreign Terrorist Organization, which reports to the Supreme Leader, continues to perpetuate terrorism around the globe, including attempts to kill and kidnap American citizens on United States soil.

(3) The Supreme Leader appoints the head of Iran's judiciary. International observers continue to criticize the lack of independence of Iran's judicial system and maintained that trials disregarded international standards of fairness.

(4) The revolutionary courts, created by Iran's former Supreme Leader Ruhollah Khomeini, within Iran's judiciary, are chiefly responsible for hearing cases of political offenses, operate in parallel to Iran's criminal justice system and routinely hold grossly unfair trials without due process, handing down

USCA Case #24-1113 Document #2060757 Filed: 06/20/2024 Page 95 of 267

predetermined verdicts and rubberstamping executions for political purpose.

(5) The Iranian security and law enforcement forces engage in serious human rights abuse at the behest of the Supreme Leader.

(6) Iran's President, Ebrahim Raisi, sits at the helm of the most sanctioned cabinet in Iranian history which includes internationally sanctioned rights violators. Raisi has supported the recent crackdown on protestors and is a rights violator himself, having served on a ''death commission'' in 1988 that led to the execution of several thousand political prisoners in Iran. He most recently served as the head of Iran's judiciary, a position appointed by Iran's current Supreme Leader Ali Khamenei, and may likely be a potential candidate to replace Khamenei as Iran's next Supreme Leader.

(7) On September 16, 2022, a 22-year-old woman, Mahsa Amini, died in the detention of the Morality Police after being beaten and detained for allegedly transgressing discriminatory dress codes for women. This tragic incident triggered widespread, pro-women's rights, pro-democracy protests across all of Iran's 31 provinces, calling for the end to Iran's theocratic regime.

(8) In the course of the protests, the Iranian security forces' violent crackdown includes mass arrests, well documented beating of protestors, throttling of the internet and telecommunications services, and shooting protestors with live ammunition. Iranian security forces have reportedly killed hundreds of protestors and other civilians, including women and children, and wounded many more.

(9) Iran's Supreme Leader is the leader of the ''Axis of Resistance'', which is a network of Tehran's terror proxy and partner militias materially supported by the Islamic Revolutionary Guard Corps that targets the United States as well as its allies and partners.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) the United States shall stand with and support the people of Iran in their demand for fundamental human rights;

(2) the United States shall continue to hold the Islamic Republic of Iran, particularly the Supreme Leader and President, accountable for abuses of human rights, corruption, and export of terrorism; and

(3) Iran must immediately end its gross violations of internationally recognized human rights.

(c) IN GENERAL.—

(1) DETERMINATION AND REPORT REQUIRED.— Not later than 90 days after the date of the enactment of this Act, and annually thereafter, the President shall—

(A) determine whether each foreign person described in subsection (d) meets the criteria for imposition of sanctions under one or more of the sanctions programs and authorities listed in paragraph (2);

(B) impose applicable sanctions against any foreign person determined to meet the criteria for imposition of sanctions pursuant to subparagraph (A) under the sanctions programs and authorities listed in subparagraph (A) or (F) of subsection (c)(2) and pursue applicable sanctions against any foreign person determined to meet the criteria for imposition of sanctions pursuant to subparagraph (A) under the sanctions programs and authorities listed in subparagraph (B), (C), (D), or (E) of subsection (c)(2); and

(C) submit to the appropriate congressional committees a report in unclassified form, with a classified annex provided separately if needed, containing—

(i) a list of all foreign persons described in subsection (d) that meet the criteria for imposition of sanctions under one or more of the sanctions programs and authorities listed in paragraph (2); and

(ii) for each foreign person identified pursuant to clause (i)—

(I) a list of each sanctions program or authority listed in paragraph (2) for which the person meets the criteria for imposition of sanctions;

(II) a statement which, if any, of the sanctions authorized by any of the sanctions programs and authorities identified pursuant to subclause (I) have been imposed or will be imposed within 30 days of the submission of the report; and

(III) with respect to which any of the sanctions authorized by any of the sanctions programs and authorities identified pursuant to subclause (I) have not been imposed and will not be imposed within 30 days of the submission of the report, the specific authority under which otherwise applicable sanctions are being waived, have otherwise been determined not to apply, or are not being imposed and a complete justification of the decision to waive or otherwise not apply the sanctions authorized by such sanctions programs and authorities.

(2) SANCTIONS LISTED.—The sanctions listed in this paragraph are the following:

(A) Sanctions described in section 105(c) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (22 U.S.C. 8514(c)).

(B) Sanctions applicable with respect to a person pursuant to Executive Order 13553 (50 U.S.C. 1701 note; relating to blocking property of certain persons with respect to serious human rights abuses by the Government of Iran).

(C) Sanctions applicable with respect to a person pursuant to Executive Order 13224 (50 U.S.C. 1701 note; relating to blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism).

(D) Sanctions applicable with respect to a person pursuant to Executive Order 13818 (relating to blocking the property of persons involved in serious human rights abuse or corruption).

(E) Sanctions applicable with respect to a person pursuant to Executive Order 13876 (relating to imposing sanctions with respect to Iran).

(F) Penalties and visa bans applicable with respect to a person pursuant to section 7031(c) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2021.

(3) FORM OF DETERMINATION.—The determination required by paragraph (1) shall be provided in an unclassified form but may contain a classified annex provided separately containing additional contextual information pertaining to justification for the issuance of any waiver issued, as described in paragraph (1)(C)(ii). The unclassified portion of such determination shall be made available on a publicly available internet website of the Federal Government.

(d) FOREIGN PERSONS DESCRIBED.—The foreign persons described in this subsection are the following:

(1) The Supreme Leader of Iran and any official in the Office of the Supreme Leader of Iran.

(2) The President of Iran and any official in the Office of the President of Iran or the President's cabinet, including cabinet ministers and executive vice presidents.

(3) Any entity, including foundations and economic conglomerates, overseen by the Office of the Supreme Leader of Iran which is complicit in financing or resourcing of human rights abuses or support for terrorism.

(4) Any official of any entity owned or controlled by the Supreme Leader of Iran or the Office of the Supreme Leader of Iran.

(5) Any person determined by the President—

(A) to be a person appointed by the Supreme Leader of Iran, the Office of the Supreme Leader of Iran, the President of Iran, or the Office of the President of Iran to a position as a state official of Iran, or as the head of any entity located in Iran or any entity located outside of Iran that is owned or controlled by one or more entities in Iran;

(B) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of any person whose property and interests in property are blocked pursuant to any sanctions program or authority listed in subsection (c)(2);

(C) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly any person whose property and interests in property are blocked pursuant to any sanctions program or authority listed in subsection (c)(2); or

(D) to be a member of the board of directors or a senior executive officer of any person whose property and interests in property are blocked pursuant to any sanctions program or authority listed in subsection (c)(2).

(e) CONGRESSIONAL OVERSIGHT.—

(1) IN GENERAL.—Not later than 60 days after receiving a request from the chairman and ranking member of one of the appropriate congressional committees with respect to whether a foreign person meets the criteria of a person described in subsection (d)(5), the President shall—

(A) determine if the person meets such criteria; and

(B) submit an unclassified report, with a classified annex provided separately if needed, to such chairman and ranking member with respect to such determination that includes a statement of whether or not the President imposed or intends to impose sanctions with respect to the person pursuant to any sanctions program or authority listed in subsection (c)(2).

(2) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this subsection, the term ''appropriate congressional committees'' means—

(A) the Committee on Foreign Affairs, and the Committee on Financial Services of the House of Representatives; and

(B) the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate.

**SEC. 3. SEVERABILITY.**

If any provision of this division, or the application of such provision to any person or circumstance, is found to be unconstitutional, the remainder of this division, or the application of that provision to other persons or circumstances, shall not be affected.

## DIVISION I—HAMAS AND OTHER PALESTINIAN TERRORIST GROUPS INTERNATIONAL FINANCING PREVENTION ACT

**SEC. 1. SHORT TITLE.**

This division may be cited as the ''Hamas and Other Palestinian Terrorist Groups International Financing Prevention Act''.

**SEC. 2. STATEMENT OF POLICY.**

It shall be the policy of the United States—

(1) to prevent Hamas, Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, or any affiliate or successor thereof from accessing its international support networks; and

(2) to oppose Hamas, the Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, or any affiliate or successor thereof from using goods, including medicine and dual use items, to smuggle weapons and other materials to further acts of terrorism, including against Israel.

**SEC. 3. IMPOSITION OF SANCTIONS WITH RESPECT TO FOREIGN PERSONS SUPPORTING ACTS OF TERRORISM OR ENGAGING IN SIGNIFICANT TRANSACTIONS WITH SENIOR MEMBERS OF HAMAS, PALESTINIAN ISLAMIC JIHAD AND OTHER PALESTINIAN TERRORIST ORGANIZATIONS.**

(a) IN GENERAL.—Not later than 180 days after the date of enactment of this Act, the President shall impose the sanctions described in subsection (c) with respect to each foreign person that the President determines, on or after the date of the enactment of this Act, engages in an activity described in subsection (b).

(b) ACTIVITIES DESCRIBED.—A foreign person engages in an activity described in this subsection if the foreign person knowingly—

(1) assists in sponsoring or providing significant financial, material, or technological support for, or goods or other services to enable, acts of terrorism; or

(2) engages, directly or indirectly, in a significant transaction with—

(A) a senior member of Hamas, Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, or any affiliate or successor thereof; or

(B) a senior member of a foreign terrorist organization designated pursuant to section 219 of the Immigration and Nationality Act (8 U.S.C. 1189) that is responsible for providing, directly or indirectly, support to Hamas, Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, or any affiliate or successor thereof.

(c) SANCTIONS DESCRIBED.—The President shall exercise all of the powers granted to the President under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) to the extent necessary to block and prohibit all transactions in property and interests in property of a foreign person described in subsection (a) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(d) PENALTIES.—The penalties provided for in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) shall apply to a person that violates, attempts to violate, conspires to violate, or causes a violation of this section or any regulations promulgated to carry out this section to the same extent that such penalties apply to a person that commits an unlawful act described in section 206(a) of that Act.

(e) IMPLEMENTATION; REGULATIONS.—

(1) IN GENERAL.—The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) for purposes of carrying out this section.

(2) REGULATIONS.—Not later than 60 days after the date of the enactment of this Act, the President shall issue regulations or other guidance as may be necessary for the implementation of this section.

(f) WAIVER.—The President may waive, on a case-by-case basis and for a period of not more than 180 days, the application of sanctions under this section with respect to a foreign person only if, not later than 15 days prior to the date on which the waiver is to take effect, the President submits to the appropriate congressional committees a written determination and justification that the waiver is in the vital national security interests of the United States.

(g) HUMANITARIAN ASSISTANCE.—

(1) IN GENERAL.—Sanctions under this section shall not apply to—

(A) the conduct or facilitation of a transaction for the provision of agricultural commodities, food, medicine, medical devices, or humanitarian assistance, or for humanitarian purposes; or

(B) transactions that are necessary for or related to the activities described in subparagraph (A).

(2) DEFINITIONS.—In this subsection:

(A) AGRICULTURAL COMMODITY.—The term "agricultural commodity" has the meaning given that term in section 102 of the Agricultural Trade Act of 1978 (7 U.S.C. 5602).

(B) MEDICAL DEVICE.—The term "medical device" has the meaning given the term "device" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

(C) MEDICINE.—The term "medicine" has the meaning given the term "drug" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

(h) RULE OF CONSTRUCTION.—The authority to impose sanctions under this section with respect to a foreign person is in addition to the authority to impose sanctions under any other provision of law with respect to a foreign person that directly or indirectly supports acts of international terrorism.

**SEC. 4. IMPOSITION OF MEASURES WITH RESPECT TO FOREIGN STATES PROVIDING SUPPORT TO HAMAS, PALESTINIAN ISLAMIC JIHAD AND OTHER PALESTINIAN TERRORIST ORGANIZATIONS.**

(a) IN GENERAL.—Not later than 180 days after the date of enactment of this Act, the President shall impose the measures described in subsection (c) with respect to a foreign state if the President determines that the foreign state, on or after the date of the enactment of this Act, engages in an activity described in subsection (b).

(b) ACTIVITIES DESCRIBED.—A foreign state engages in an activity described in this subsection if the foreign state knowingly—

(1) provides significant material or financial support for acts of international terrorism, pursuant to—

(A) section 1754(c) of the Export Control Reform Act of 2018 (50 U.S.C. 4813(c)(1)(A));

(B) section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371);

(C) section 40 of the Arms Export Control Act (22 U.S.C. 2780); or

(D) any other provision of law;

(2) provides significant material support to Hamas, the Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, or any affiliate or successor thereof; or

(3) engages in a significant transaction that materially contributes, directly or indirectly, to the terrorist activities of Hamas, the Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, or any affiliate or successor thereof.

(c) MEASURES DESCRIBED.—The measures described in this subsection with respect to a foreign state are the following:

(1) The President shall suspend, for a period of at least 1 year, United States assistance to the foreign state.

(2) The Secretary of the Treasury shall instruct the United States Executive Director to each appropriate international financial institution to oppose, and vote against, for a period of 1 year, the extension by such institution of any loan or financial or technical assistance to the government of the foreign state.

(3) The President shall prohibit the export of any item on the United States Munitions List (established pursuant to section 38 of the Arms Export Control Act (22 U.S.C. 2778)) or the Commerce Control List set forth in Supplement No. 1 to part 774 of title 15, Code of Federal Regulations, to the foreign state for a period of 1 year.

(d) PENALTIES.—The penalties provided for in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) shall apply to a person that violates, attempts to violate, conspires to violate, or causes a violation of this section or any regulations promulgated to carry out this section to the same extent that such penalties apply to a person that commits an unlawful act described in section 206(a) of that Act.

(e) WAIVER.—The President may waive, on a case-by-case basis and for a period of not more than 180 days, the application of measures under this section with respect to a foreign state only if, not later than 15 days prior to the date on which the waiver is to take effect, the President submits to the appropriate congressional committees a written determination and justification that the waiver is in the vital national security interests of the United States.

(f) IMPLEMENTATION; REGULATIONS.—

(1) IN GENERAL.—The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) for purposes of carrying out this section.

(2) REGULATIONS.—Not later than 60 days after the date of the enactment of this Act, the President shall issue regulations or other guidance as may be necessary for the implementation of this section.

(g) ADDITIONAL EXEMPTIONS.—

(1) STATUS OF FORCES AGREEMENTS.—The President may exempt the application of measures under this section with respect to a foreign state if the application of such measures would prevent the United States from meeting the terms of any status of forces agreement to which the United States is a party or meeting other obligations relating to the basing of United States service members.

(2) AUTHORIZED INTELLIGENCE ACTIVITIES.—Measures under this section shall not apply with respect to any activity subject to the reporting requirements under title V of the National Security Act of 1947 (50 U.S.C. 3091 et seq.) or any authorized intelligence activities of the United States.

(3) HUMANITARIAN ASSISTANCE.—

(A) IN GENERAL.—Measures under this section shall not apply to—

(i) the conduct or facilitation of a transaction for the provision of agricultural commodities, food, medicine, medical devices, or humanitarian assistance, or for humanitarian purposes; or

(ii) transactions that are necessary for or related to the activities described in clause (i).

(B) DEFINITIONS.—In this subsection:

(i) AGRICULTURAL COMMODITY.—The term "agricultural commodity" has the meaning given that term in section 102 of the Agricultural Trade Act of 1978 (7 U.S.C. 5602).

(ii) MEDICAL DEVICE.—The term "medical device" has the meaning given the term "device" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

(iii) MEDICINE.—The term "medicine" has the meaning given the term "drug" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

(h) RULE OF CONSTRUCTION.—The authority to impose measures under this section with respect to a foreign state is in addition to the authority to impose measures under any other provision of law with respect to foreign states that directly or indirectly support acts of international terrorism.

**SEC. 5. REPORTS ON ACTIVITIES TO DISRUPT GLOBAL FUNDRAISING, FINANCING, AND MONEY LAUNDERING ACTIVITIES OF HAMAS, PALESTINIAN ISLAMIC JIHAD, AL-AQSA MARTYRS BRIGADE, THE LION'S DEN OR ANY AFFILIATE OR SUCCESSOR THEREOF.**

(a) IN GENERAL.—Not later than 90 days after the date of enactment of this Act, and

every 180 days thereafter, the President shall submit to the appropriate congressional committees a report that includes—

(1) an assessment of the disposition of the assets and activities of Hamas, the Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, or any affiliate or successor thereof related to fundraising, financing, and money laundering worldwide;

(2) a list of foreign states that knowingly providing material, financial, or technical support for, or goods or services to Hamas, the Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, or any affiliate or successor thereof;

(3) a list of foreign states in which Hamas, the Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, or any affiliate or successor thereof conducts significant fundraising, financing, or money laundering activities;

(4) a list of foreign states from which Hamas, the Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, or any affiliate or successor thereof knowingly engaged in the transfer of surveillance equipment, electronic monitoring equipment, or other means to inhibit communication or the free flow of information in Gaza; and

(5) with respect to each foreign state listed in paragraph (2), (3), or (4)—

(A) a description of the steps the foreign state identified is taking adequate measures to restrict financial flows to Hamas, the Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, or any affiliates or successors thereof; and

(B) in the case of a foreign state failing to take adequate measures to restrict financial flows to Hamas, Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den or any other designated entity engaged in significant act of terrorism threatening the peace and security of Israel—

(i) an assessment of the reasons that government is not taking adequate measures to restrict financial flows to those entities; and

(ii) a description of measures being taken by the United States Government to encourage the foreign state to restrict financial flows to those entities; and

(b) FORM.—Each report required by subsection (a) shall be submitted in unclassified form to the greatest extent possible, and may contain a classified annex.

**SEC. 6. TERMINATION.**

This division shall terminate on the earlier of—

(1) the date that is 7 years after the date of the enactment of this Act; or

(2) the date that is 30 days after the date on which the President certifies to the appropriate congressional committees that—

(A) Hamas or any successor or affiliate thereof is no longer designated as a foreign terrorist organization pursuant to section 219 of the Immigration and Nationality Act (8 U.S.C. 1189);

(B) Hamas, the Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, and any successor or affiliate thereof are no longer subject to sanctions pursuant to—

(i) Executive Order No. 12947 (January 23, 1995; relating to prohibiting transactions with terrorists who threaten to disrupt the Middle East peace process); and

(ii) Executive Order No. 13224 (September 23, 2001; relating to blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism); and

(C) Hamas, the Palestinian Islamic Jihad, Al-Aqsa Martyrs Brigade, the Lion's Den, and any successor or affiliate thereof meet the criteria described in paragraphs (1) through (4) of section 9 of the Palestinian Anti-Terrorism Act of 2006 (22 U.S.C. 2378b note).

**SEC. 7. DEFINITIONS.**

In this division:

(1) ACT OF TERRORISM.—The term ''act of terrorism'' means an activity that—

(A) involves a violent act or an act dangerous to human life, property, or infrastructure; and

(B) appears to be intended to—

(i) intimidate or coerce a civilian population;

(ii) influence the policy of a government by intimidation or coercion; or

(iii) affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage-taking.

(2) ADMITTED.—The term ''admitted'' has the meaning given such term in section 101(a)(13)(A) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(13)(A)).

(3) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term ''appropriate congressional committees'' means—

(A) the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives; and

(B) the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate.

(4) FOREIGN STATE.—The term ''foreign state'' has the meaning given such term in section 1603 of title 28, United States Code.

(5) HUMANITARIAN AID.—The term ''humanitarian aid'' means food, medicine, and medical supplies.

(6) MATERIAL SUPPORT.—The term ''material support'' has the meaning given the term ''material support or resources'' in section 2339A of title 18, United States Code.

(7) UNITED STATES PERSON.—The term ''United States person'' means—

(A) a United States citizen or an alien lawfully admitted for permanent residence to the United States; or

(B) an entity organized under the laws of the United States or of any jurisdiction within the United States, including a foreign branch of such an entity.

## DIVISION J—NO TECHNOLOGY FOR TERROR ACT

**SEC. 1. SHORT TITLE.**

This Act may be cited as the ''No Technology for Terror Act''.

**SEC. 2. APPLICATION OF FOREIGN-DIRECT PRODUCT RULES TO IRAN.**

(a) IN GENERAL.—Beginning on the date that is 90 days after the date of the enactment of this Act, a foreign-produced item shall be subject to the Export Administration Regulations (pursuant to the Export Control Reform Act of 2018 (50 U.S.C. 4801 et seq.)) if the item—

(1) meets—

(A) the product scope requirements described in subsection (b); and

(B) the destination scope requirements described in subsection (c); and

(2) is exported, reexported, or in-country transferred to Iran from abroad or involves the Government of Iran.

(b) PRODUCT SCOPE REQUIREMENTS.—A foreign-produced item meets the product scope requirements of this subsection if the item—

(1) is a direct product of United States-origin technology or software subject to the Export Administration Regulations that is specified in a covered Export Control Classification Number or is identified in supplement no. 7 to part 746 of the Export Administration Regulations; or

(2) is produced by any plant or major component of a plant that is located outside the United States, if the plant or major component of a plant, whether made in the United States or a foreign country, itself is a direct product of United States-origin technology or software subject to the Export Administration Regulations that is specified in a

covered Export Control Classification Number.

(c) DESTINATION SCOPE REQUIREMENTS.—A foreign-produced item meets the destination scope requirements of this subsection if there is knowledge that the foreign-produced item is destined to Iran or will be incorporated into or used in the production or development of any part, component, or equipment subject to the Export Administration Regulations and produced in or destined to Iran.

(d) LICENSE REQUIREMENTS.—

(1) IN GENERAL.—A license shall be required to export, reexport, or in-country transfer a foreign-produced item from abroad that meets the product scope requirements described in subsection (b) and the destination scope requirements described in subsection (c) and is subject to the Export Administration Regulations pursuant to this section.

(2) EXCEPTIONS.—The license requirements of paragraph (1) shall not apply to—

(A) food, medicine, or medical devices that are—

(i) designated as EAR99; or

(ii) not designated under or listed on the Commerce Control List; or

(B) services, software, or hardware (other than services, software, or hardware for end-users owned or controlled by the Government of Iran) that are—

(i) necessarily and ordinarily incident to communications; or

(ii) designated as—

(I) EAR99; or

(II) Export Control Classification Number 5A992.c or 5D992.c, and classified in accordance with section 740.17 of title 15 Code of Federal Regulations; and

(iii) subject to a general license issued by the Department of Commerce or Department of Treasury.

(e) NATIONAL INTEREST WAIVER.—The Secretary of Commerce may waive the requirements imposed under this section if the Secretary—

(1) determines that the waiver is in the national interests of the United States; and

(2) submits to the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives and to the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate a report explaining which requirements are being waived and the reasons for the waiver.

(f) SUNSET.—The authority provided under this section shall terminate on the date that is 7 years after the date of the enactment of this Act.

(g) DEFINITIONS.—In this section—

(1) the term ''Commerce Control List'' means the list maintained pursuant to part 744 of the Export Administration Regulations;

(2) the term ''covered Export Control Classification Number'' means an Export Control Classification Number in product group D or E of Category 3, 4, 5, 6, 7, 8, or 9 of the Commerce Control List;

(3) the terms ''Export Administration Regulations'', ''export'', ''reexport'', and ''in-country transfer'' have the meanings given those terms in section 1742 of the Export Control Reform Act of 2018 (50 U.S.C. 4801); and

(4) the terms ''direct product'', ''technology'', ''software'', ''major component'', ''knowledge'', ''production'', ''development'', ''part'', ''component'', ''equipment'', and ''government end users'' have the meanings given those terms in section 734.9 or part 772 of the Export Administration Regulations, as the case may be.

## DIVISION K—STRENGTHENING TOOLS TO COUNTER THE USE OF HUMAN SHIELDS ACT

### SEC. 1. SHORT TITLE.

This Act may be cited as the "Strengthening Tools to Counter the Use of Human Shields Act".

### SEC. 2. STATEMENT OF POLICY.

It shall be the policy of the United States to fully implement and enforce sanctions against terrorist organizations and other malign actors that use innocent civilians as human shields.

### SEC. 3. MODIFICATION AND EXTENSION OF SANCTIONING THE USE OF CIVILIANS AS DEFENSELESS SHIELDS ACT.

(a) IN GENERAL.—Section 3 of the Sanctioning the Use of Civilians as Defenseless Shields Act (Public Law 115–348; 50 U.S.C. 1701 note) is amended—

(1) in subsection (b)—

(A) by redesignating paragraph (3) as paragraph (4); and

(B) by inserting after paragraph (2) the following:

"(3) Each foreign person that the President determines, on or after the date of the enactment of the Strengthening Tools to Counter the Use of Human Shields Act—

"(A) is a member of Palestine Islamic Jihad or is knowingly acting on behalf of Palestine Islamic Jihad; and

"(B) knowingly orders, controls, or otherwise directs the use of civilians protected as such by the law of war to shield military objectives from attack.";

(2) by redesignating subsections (e), (f), (g), (h), and (i) as subsections (f), (g), (h), (i), and (j), respectively; and

(3) by inserting after subsection (d) the following:

"(e) CONGRESSIONAL REQUESTS.—Not later than 120 days after receiving a request from the chairman and ranking member of one of the appropriate congressional committees with respect to whether a foreign person meets the criteria of a person described in subsection (b) or (c), the President shall—

"(1) determine if the person meets such criteria; and

"(2) submit a written justification to the chairman and ranking member detailing whether or not the President imposed or intends to impose sanctions described in subsection (b) or (c) with respect to such person.".

(b) DEFINITIONS.—Section 4 of the Sanctioning the Use of Civilians as Defenseless Shields Act (Public Law 115–348; 50 U.S.C. 1701 note) is amended—

(1) by redesignating paragraph (7) as paragraph (8); and

(2) by inserting after paragraph (6) the following:

"(7) PALESTINE ISLAMIC JIHAD.—The term 'Palestine Islamic Jihad' means—

"(A) the entity known as Palestine Islamic Jihad and designated by the Secretary of State as a foreign terrorist organization pursuant to section 219 of the Immigration and Nationality Act (8 U.S.C. 1189); or

"(B) any person identified as an agent or instrumentality of Palestine Islamic Jihad on the list of specially designated nationals and blocked persons maintained by the Office of Foreign Asset Control of the Department of the Treasury, the property or interests in property of which are blocked pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.).".

(c) SUNSET.—Section 5 of the Sanctioning the Use of Civilians as Defenseless Shields Act (Public Law 115–348; 50 U.S.C. 1701 note) is amended by striking "December 31, 2023" and inserting "December 31, 2030".

(d) SEVERABILITY.—The Sanctioning the Use of Civilians as Defenseless Shields Act (Public Law 115–348; 50 U.S.C. 1701 note) is amended by adding at the end the following:

### "SEC. 6. SEVERABILITY.

"If any provision of this Act, or the application of such provision to any person or circumstance, is found to be unconstitutional, the remainder of this Act, or the application of that provision to other persons or circumstances, shall not be affected.".

### SEC. 4. REPORT ON COUNTERING THE USE OF HUMAN SHIELDS.

(a) IN GENERAL.—Not later than 120 days after the date of the enactment of this Act, the Secretary of Defense shall submit to the congressional defense committees, the Committee on Foreign Affairs of the House of Representatives, and the Committee on Foreign Relations of the Senate a report that contains the following:

(1) A description of the lessons learned from the United States and its allies and partners in addressing the use of human shields by terrorist organizations such as Hamas, Hezbollah, Palestine Islamic Jihad, and any other organization as determined by the Secretary of Defense.

(2) A description of a specific plan and actions being taken by the Department of Defense to incorporate the lessons learned as identified in paragraph (1) into Department of Defense operating guidance, relevant capabilities, and tactics, techniques, and procedures to deter, counter, and address the challenge posed by the use of human shields and hold accountable terrorist organizations for the use of human shields.

(3) A description of specific measures being developed and implemented by the United States Government to mobilize and leverage allied nations, including member nations of the North Atlantic Treaty Organization (NATO), to deter, counter, and hold accountable terrorist organizations for the use of human shields.

(4) The current status of joint exercises, doctrine development, education, and training on countering the use of human shields in multinational centers of excellence.

(5) The current status of participation of members of the Armed Forces and Department of Defense civilian personnel in any multinational center of excellence for the purposes of countering the use of human shields.

(6) The feasibility and advisability of beginning or continuing participation of members of the Armed Forces and Department of Defense civilian personnel to promote the integration of joint exercises, doctrine development, education, and training on countering the use of human shields into multinational centers of excellence.

(b) DEFINITION.—In this section, the term "multinational center of excellence" has the meaning given that term in section 344 of title 10, United States Code.

### SEC. 5. CONFRONTING ASYMMETRIC AND MALICIOUS CYBER ACTIVITIES.

(a) IN GENERAL.—On and after the date that is 180 days after the date of the enactment of this Act, the President may impose the sanctions described in subsection (b) with respect to any foreign person that the Secretary of the Treasury, in consultation with the Attorney General and the Secretary of State determines, on or after such date of enactment—

(1) is responsible for or complicit in, or has engaged knowingly in, significant cyber-enabled activities originating from, or directed by persons located, in whole or in substantial part, outside the United States that are reasonably likely to result in, or have materially contributed to, a significant threat to the national security, foreign policy, or economic health or financial stability of the United States;

(2) materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity described in this subsection or any person whose property and interests in property are blocked pursuant to this section;

(3) is owned or controlled by, or has acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this section; or

(4) has attempted to engage in any of the activities described in paragraph (1), (2), or (3).

(b) SANCTIONS DESCRIBED.—The sanctions described in this subsection are the following:

(1) INADMISSIBILITY TO UNITED STATES.—In the case of an alien—

(A) ineligibility to receive a visa to enter the United States or to be admitted to the United States; or

(B) if the individual has been issued a visa or other documentation, revocation, in accordance with section 221(i) of the Immigration and Nationality Act (8 U.S.C. 1201(i)), of the visa or other documentation.

(2) BLOCKING OF PROPERTY.—The blocking, in accordance with the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), of all transactions in all property and interests in property of a foreign person if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(c) REQUESTS BY APPROPRIATE CONGRESSIONAL COMMITTEES.—

(1) IN GENERAL.—Not later than 120 days after receiving a request that meets the requirements of paragraph (2) with respect to whether a foreign person has engaged in an activity described in subsection (a), the Secretary of the Treasury, in consultation with the Attorney General and the Secretary of State shall—

(A) determine if that person has engaged in such an activity; and

(B) submit a classified or unclassified report to the chairperson and ranking member of the committee or committees that submitted the request with respect to that determination that includes—

(i) a statement of whether or not the Secretary of the Treasury, in consultation with the Attorney General and the Secretary of State imposed or intends to impose sanctions with respect to the person;

(ii) if the President imposed or intends to impose sanctions, a description of those sanctions; and

(iii) if the President does not intend to impose sanctions, a description of actions that meet the threshold for the President to impose sanctions.

(2) REQUIREMENTS.—A request under paragraph (1) with respect to whether a foreign person has engaged in an activity described in subsection (a) shall be submitted to the President in writing jointly by the chairperson and ranking member of one of the appropriate congressional committees.

(d) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Affairs, the Committee on Financial Services, and the Committee on the Judiciary of the House of Representatives; and

(2) the Committee on Foreign Relations, the Committee on the Judiciary, and the Committee on Banking, Housing, and Urban Affairs of the Senate.

**SEC. 6. SANCTIONS WITH RESPECT TO THREATS TO CURRENT OR FORMER UNITED STATES OFFICIALS.**

(a) IN GENERAL.—On and after the date that is 180 days after the date of the enactment of this Act, the President shall impose the sanctions described in subsection (b) with respect to any foreign person the President determines has, on or after such date of enactment, ordered, directed, or taken material steps to carry out any use of violence or has attempted or threatened to use violence against any current or former official of the Government of the United States.

(b) SANCTIONS DESCRIBED.—The sanctions described in this subsection are the following:

(1) INADMISSIBILITY TO UNITED STATES.—In the case of a foreign person who is an individual—

(A) ineligibility to receive a visa to enter the United States or to be admitted to the United States; or

(B) if the individual has been issued a visa or other documentation, revocation, in accordance with section 221(i) of the Immigration and Nationality Act (8 U.S.C. 1201(i)), of the visa or other documentation.

(2) BLOCKING OF PROPERTY.—The blocking, in accordance with the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), of all transactions in all property and interests in property of a foreign person if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(c) ENFORCEMENT OF BLOCKING OF PROPERTY.—A person that violates, attempts to violate, conspires to violate, or causes a violation of a sanction described in subsection (b)(2) that is imposed by the President or any regulation, license, or order issued to carry out such a sanction shall be subject to the penalties set forth in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) to the same extent as a person that commits an unlawful act described in subsection (a) of that section.

(d) WAIVER.—The President may waive the application of sanctions under this section for renewable periods not to exceed 180 days if the President—

(1) determines that such a waiver is in the vital national security interests of the United States; and

(2) not less than 15 days before the granting of the waiver, submits to the appropriate congressional committees a notice and justification for the waiver.

(e) TERMINATION AND SUNSET.—

(1) TERMINATION OF SANCTIONS.—The President may terminate the application of sanctions under this section with respect to a person if the President determines and reports to the appropriate congressional committees not later than 15 days before the termination of the sanctions that—

(A) credible information exists that the person did not engage in the activity for which sanctions were imposed;

(B) the person has credibly demonstrated a significant change in behavior, has paid an appropriate consequence for the activity for which sanctions were imposed, and has credibly committed to not engage in an activity described in subsection (a) in the future; or

(C) the termination of the sanctions is in the vital national security interests of the United States.

(2) SUNSET.—The requirement to impose sanctions under this section shall terminate on the date that is 4 years after the date of the enactment of this Act.

(f) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Affairs and the Committee on the Judiciary; and

(2) the Committee on Foreign Relations and the Committee on the Judiciary.

**DIVISION I—ILLICIT CAPTAGON TRAFFICKING SUPPRESSION ACT**

**SEC. 1. SHORT TITLE.**

This Act may be cited as the "Illicit Captagon Trafficking Suppression Act of 2023".

**SEC. 2. FINDINGS.**

Congress finds the following:

(1) Industrial scale production of the amphetamine-type stimulant also known as captagon, and the illicit production of precursor chemicals, in territories held by the regime of President Bashar al Assad in Syria are becoming more sophisticated and pose a severe challenge to regional and international security.

(2) Elements of the Government of Syria are key drivers of illicit trafficking in captagon, with ministerial-level complicity in production and smuggling, using other armed groups such as Hizballah for technical and logistical support in captagon production and trafficking.

(3) As affiliates of the Government of Syria and other actors seek to export captagon, they undermine regional security by empowering a broad range of criminal networks, militant groups, mafia syndicates, and autocratic governments.

**SEC. 3. STATEMENT OF POLICY.**

It is the policy of the United States to target individuals, entities, and networks associated with the Government of Syria to dismantle and degrade the transnational criminal organizations, including narcotics trafficking networks, associated with the regime of President Bashar al Assad in Syria and Hizballah.

**SEC. 4. IMPOSITION OF SANCTIONS WITH RESPECT TO ILLICIT CAPTAGON TRAFFICKING.**

(a) IN GENERAL.—The sanctions described in subsection (b) shall be imposed with respect to any foreign person the President determines, on or after the date of enactment of this Act—

(1) engages in, or attempts to engage in, activities or transactions that have materially contributed to, or pose a significant risk of materially contributing to, the illicit production and international illicit proliferation of captagon; or

(2) knowingly receives any property or interest in property that the foreign person knows—

(A) constitutes or is derived from proceeds of activities or transactions that have materially contributed to, or pose a significant risk of materially contributing to, the illicit production and international illicit proliferation of captagon; or

(B) was used or intended to be used to commit or to facilitate activities or transactions that have materially contributed to, or pose a significant risk of materially contributing to, the illicit production and international illicit proliferation of captagon.

(b) SANCTIONS DESCRIBED.—The sanctions described in this subsection are the following:

(1) BLOCKING OF PROPERTY.—The President shall exercise all authorities granted under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) to the extent necessary to block and prohibit all transactions in property and interests in property of the foreign person if such property and interests in property are in the United States, come within the United States, or come within the possession or control of a United States person.

(2) INELIGIBILITY FOR VISAS, ADMISSION, OR PAROLE.—

(A) VISAS, ADMISSION, OR PAROLE.—An alien described in subsection (a) shall be—

(i) inadmissible to the United States;

(ii) ineligible to receive a visa or other documentation to enter the United States; and

(iii) otherwise ineligible to be admitted or paroled into the United States or to receive any other benefit under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.).

(B) CURRENT VISAS REVOKED.—

(i) IN GENERAL.—The visa or other entry documentation of any alien described in subsection (a) is subject to revocation regardless of the issue date of the visa or other entry documentation.

(ii) IMMEDIATE EFFECT.—A revocation under clause (i) shall, in accordance with section 221(i) of the Immigration and Nationality Act (8 U.S.C. 1201(i))—

(I) take effect immediately; and

(II) cancel any other valid visa or entry documentation that is in the possession of the alien.

(c) PENALTIES.—Any person that violates, or attempts to violate, subsection (b) or any regulation, license, or order issued pursuant to that subsection, shall be subject to the penalties set forth in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) to the same extent as a person that commits an unlawful act described in subsection (a) of that section.

(d) WAIVER.—

(1) IN GENERAL.—The President may waive the application of sanctions under this section with respect to a foreign person only if, not later than 15 days prior to the date on which the waiver is to take effect, the President submits to the appropriate congressional committees a written determination and justification that the waiver is important to the national security interests of the United States.

(2) BRIEFING.—Not later than 60 days after the issuance of a waiver under paragraph (1), and every 180 days thereafter while the waiver remains in effect, the President shall brief the appropriate congressional committees on the reasons for the waiver.

(e) IMPLEMENTATION.—The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) to carry out this section.

(f) REGULATIONS.—

(1) IN GENERAL.—The President shall, not later than 120 days after the date of the enactment of this Act, promulgate regulations as necessary for the implementation of this section.

(2) NOTIFICATION TO CONGRESS.—Not later than 10 days before the promulgation of regulations under this subsection, the President shall notify the appropriate congressional committees of the proposed regulations and the provisions of this section that the regulations are implementing.

(g) EXCEPTIONS.—

(1) EXCEPTION FOR INTELLIGENCE ACTIVITIES.—Sanctions under this section shall not apply to any activity subject to the reporting requirements under title V of the National Security Act of 1947 (50 U.S.C. 3091 et seq.) or any authorized intelligence activities of the United States.

(2) EXCEPTION TO COMPLY WITH INTERNATIONAL OBLIGATIONS AND FOR LAW ENFORCEMENT ACTIVITIES.—Sanctions under this section shall not apply with respect to an alien if admitting or paroling the alien into the United States is necessary—

(A) to permit the United States to comply with the Agreement regarding the Headquarters of the United Nations, signed at Lake Success June 26, 1947, and entered into

force November 21, 1947, between the United Nations and the United States, or other applicable international obligations; or

(B) to carry out or assist authorized law enforcement activity in the United States.

(3) HUMANITARIAN ASSISTANCE.—

(A) IN GENERAL.—Sanctions under this Act shall not apply to—

(i) the conduct or facilitation of a transaction for the provision of agricultural commodities, food, medicine, medical devices, humanitarian assistance, or for humanitarian purposes; or

(ii) transactions that are necessary for or related to the activities described in clause (i).

(B) DEFINITIONS.—In this subsection:

(i) AGRICULTURAL COMMODITY.—The term "agricultural commodity" has the meaning given that term in section 102 of the Agricultural Trade Act of 1978 (7 U.S.C. 5602).

(ii) MEDICAL DEVICE.—The term "medical device" has the meaning given the term "device" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

(iii) MEDICINE.—The term "medicine" has the meaning given the term "drug" in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321).

**SEC. 5. DETERMINATIONS WITH RESPECT TO THE GOVERNMENT OF SYRIA, HIZBALLAH, AND NETWORKS AFFILIATED WITH THE GOVERNMENT OF SYRIA OR HIZBALLAH.**

(a) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the President shall—

(1) determine whether each foreign person described in subsection (b) meets the criteria for sanctions under this Act; and

(2) submit to the appropriate congressional committees a report containing—

(A) a list of all foreign persons described in subsection (b) that meet the criteria for imposition of sanctions under this Act;

(B) for each foreign person identified pursuant to subparagraph (A), a statement of whether sanctions have been imposed or will be imposed within 30 days of the submission of the report; and

(C) with respect to any person identified pursuant to subparagraph (A) for whom sanctions have not been imposed and will not be imposed within 30 days of the submission of the report, the specific authority under which otherwise applicable sanctions are being waived, have otherwise been determined not to apply, or are not being imposed and a complete justification of the decision to waive or otherwise not apply such sanctions.

(b) FOREIGN PERSONS DESCRIBED.—The foreign persons described in this subsection are the following:

(1) Maher Al Assad.

(2) Imad Abu Zureiq.

(3) Amer Taysir Khiti.

(4) Taher al-Kayyali.

(5) Raji Falhout.

(6) Mohammed Asif Issa Shalish.

(7) Abdellatif Hamid.

(8) Mustafa Al Masalmeh.

**SEC. 6. DEFINITIONS.**

In this Act:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Foreign Affairs, the Committee on Financial Services, and the Committee on the Judiciary of the House of Representatives; and

(B) the Committee on Foreign Relations, the Committee on Banking, Housing, and Urban Affairs, and the Committee on the Judiciary of the Senate.

(2) CAPTAGON.—The term "captagon" means any compound, mixture, or preparation which contains any quantity of a stimu-

lant in schedule I or II of section 202 of the Controlled Substances Act (21 U.S.C. 812), including—

(A) amphetamine, methamphetamine, and fenethylline;

(B) any immediate precursor or controlled substance analogue of such a stimulant, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802); and

(C) any isomers, esters, ethers, salts, and salts of isomers, esters, and ethers of such a stimulant, whenever the existence of such isomers, esters, ethers, and salts is possible within the specific chemical designation.

(3) FOREIGN PERSON.—The term "foreign person"—

(A) means an individual or entity that is not a United States person; and

(B) includes a foreign state (as such term is defined in section 1603 of title 28, United States Code).

(4) ILLICIT PROLIFERATION.—The term "illicit proliferation" refers to any illicit activity to produce, manufacture, distribute, sell, or knowingly finance or transport.

(5) KNOWINGLY.—The term "knowingly" has the meaning given that term in section 14 of the Iran Sanctions Act of 1996 (Public Law 104–172; 50 U.S.C. 1701 note).

(6) UNITED STATES PERSON.—The term "United States person" means—

(A) a United States citizen;

(B) a permanent resident alien of the United States;

(C) an entity organized under the laws of the United States or of any jurisdiction within the United States, including a foreign branch of such an entity; or

(D) a person in the United States.

**DIVISION M—END FINANCING FOR HAMAS AND STATE SPONSORS OF TERRORISM ACT**

**SEC. 1. SHORT TITLE.**

This Act may be cited as the "End Financing for Hamas and State Sponsors of Terrorism Act".

**SEC. 2. REPORT ON FINANCING FOR HAMAS.**

Not later than 180 days after the date of the enactment of this Act, the Secretary of the Treasury shall submit to the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives and to the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate a report (which shall be in unclassified form but may include a classified annex) that includes—

(1) an analysis of the major sources of financing to Hamas;

(2) a description of United States and multilateral efforts to disrupt illicit financial flows involving Hamas;

(3) an evaluation of United States efforts to undermine the ability of Hamas to finance armed hostilities against Israel; and

(4) an implementation plan with respect to the multilateral strategy described in section 3.

**SEC. 3. MULTILATERAL STRATEGY TO DISRUPT HAMAS FINANCING.**

The Secretary of the Treasury, through participation in the G7, and other appropriate fora, shall develop a strategy in coordination with United States allies and partners to ensure that Hamas is incapable of financing armed hostilities against Israel.

**DIVISION N—HOLDING IRANIAN LEADERS ACCOUNTABLE ACT**

**SEC. 1. SHORT TITLE.**

This Act may be cited as the "Holding Iranian Leaders Accountable Act of 2024".

**SEC. 2. FINDINGS.**

The Congress finds the following:

(1) Iran is characterized by high levels of official and institutional corruption, and substantial involvement by Iran's security

forces, particularly the Islamic Revolutionary Guard Corps (IRGC), in the economy.

(2) The Department of Treasury in 2019 designated the Islamic Republic of Iran's financial sector as a jurisdiction of primary money laundering concern, concluding, "Iran has developed covert methods for accessing the international financial system and pursuing its malign activities, including misusing banks and exchange houses, operating procurement networks that utilize front or shell companies, exploiting commercial shipping, and masking illicit transactions using senior officials, including those at the Central Bank of Iran (CBI).".

(3) In June 2019, the Financial Action Task Force (FATF) urged all jurisdictions to require increased supervisory examination for branches and subsidiaries of financial institutions based in Iran. The FATF later called upon its members to introduce enhanced relevant reporting mechanisms or systematic reporting of financial transactions, and require increased external audit requirements, for financial groups with respect to any of their branches and subsidiaries located in Iran.

(4) According to the State Department's "Country Reports on Terrorism" in 2021, "Iran continued to be the leading state sponsor of terrorism, facilitating a wide range of terrorist and other illicit activities around the world. Regionally, Iran supported acts of terrorism in Bahrain, Iraq, Lebanon, Syria, and Yemen through proxies and partner groups such as Hizballah and Hamas.".

**SEC. 3. REPORT ON FINANCIAL INSTITUTIONS AND ASSETS CONNECTED TO CERTAIN IRANIAN OFFICIALS.**

(a) FINANCIAL INSTITUTIONS AND ASSETS REPORT.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, and every 2 years thereafter, the President shall submit a report to the appropriate Members of Congress containing—

(A) the estimated total funds or assets that are under direct or indirect control by each of the natural persons described under subsection (b), and a description of such funds or assets, except that the President may limit coverage of the report to not fewer than 5 of such natural persons in order to meet the submission deadline described under this paragraph;

(B) a description of how such funds or assets were acquired, and how they have been used or employed;

(C) a list of any non-Iranian financial institutions that—

(i) maintain an account in connection with funds or assets described in subparagraph (A); or

(ii) knowingly provide significant financial services to a natural person covered by the report; and

(D) a description of any illicit or corrupt means employed to acquire or use such funds or assets.

(2) EXEMPTIONS.—The requirements described under paragraph (1) may not be applied with respect to a natural person or a financial institution, as the case may be, if the President determines:

(A) The funds or assets described under subparagraph (A) of paragraph (1) were acquired through legal or noncorrupt means.

(B) The natural person has agreed to provide significant cooperation to the United States for an important national security or law enforcement purpose with respect to Iran.

(C) A financial institution that would otherwise be listed in the report required by paragraph (1) has agreed to—

(i) no longer maintain an account described under subparagraph (C)(i) of paragraph (1);

(ii) no longer provide significant financial services to a natural person covered by the report; or

(iii) provide significant cooperation to the United States for an important national security or law enforcement purpose with respect to Iran.

(3) WAIVER.—The President may waive for up to 1 year at a time any requirement under paragraph (1) with respect to a natural person or a financial institution after reporting in writing to the appropriate Members of Congress that the waiver is in the national interest of the United States, with a detailed explanation of the reasons therefor.

(b) PERSONS DESCRIBED.—The natural persons described in this subsection are the following:

(1) The Supreme Leader of Iran.

(2) The President of Iran.

(3) The members of the Council of Guardians.

(4) The members of the Expediency Council.

(5) The Minister of Intelligence and Security.

(6) The Commander and the Deputy Commander of the IRGC.

(7) The Commander and the Deputy Commander of the IRGC Ground Forces.

(8) The Commander and the Deputy Commander of the IRGC Aerospace Force.

(9) The Commander and the Deputy Commander of the IRGC Navy.

(10) The Commander of the Basij-e Mostaz'afin.

(11) The Commander of the Qods Force.

(12) The Commander in Chief of the Police Force.

(13) The head of the IRGC Joint Staff.

(14) The Commander of the IRGC Intelligence.

(15) The head of the IRGC Imam Hussein University.

(16) The Supreme Leader's Representative at the IRGC.

(17) The Chief Executive Officer and the Chairman of the IRGC Cooperative Foundation.

(18) The Commander of the Khatam-al-Anbia Construction Head Quarter.

(19) The Chief Executive Officer of the Basij Cooperative Foundation.

(20) The head of the Political Bureau of the IRGC.

(21) The senior leadership as determined by the President of the following groups:

(A) Hizballah.

(B) Hamas.

(C) Palestinian Islamic Jihad.

(D) Kata'ib Hizballah.

(c) FORM OF REPORT; PUBLIC AVAILABILITY.—

(1) FORM.—The report required under subsection (a) and any waiver under subsection (a)(3) shall be submitted in unclassified form but may contain a classified annex.

(2) PUBLIC AVAILABILITY.—The Secretary shall make the unclassified portion of such report public if the Secretary notifies the appropriate Members of Congress that the publication is in the national interest of the United States and would substantially promote—

(A) deterring or sanctioning official corruption in Iran;

(B) holding natural persons or financial institutions listed in the report accountable to the people of Iran;

(C) combating money laundering or the financing of terrorism; or

(D) achieving any other strategic objective with respect to the Government of Iran.

(3) FORMAT OF PUBLICLY AVAILABLE REPORTS.—If the Secretary makes the unclassified portion of a report public pursuant to paragraph (2), the Secretary shall make it available to the public on the website of the Department of the Treasury—

(A) in English, Farsi, Arabic, and Azeri; and

(B) in precompressed, easily downloadable versions that are made available in all appropriate formats.

### SEC. 4. RESTRICTIONS ON CERTAIN FINANCIAL INSTITUTIONS.

(a) IN GENERAL.—Not later than the date that is 90 days after submitting a report described under section 3(a)(1), the Secretary shall undertake the following with respect to a financial institution that is described under section 3(a)(1)(C) and listed in the report:

(1) If the financial institution is a United States financial institution, require the closure of any account described in section 3(a)(1)(C)(i), and prohibit the provision of significant financial services, directly or indirectly, to a natural person covered by the report.

(2) If the financial institution is a foreign financial institution, actively seek the closure of any account described in section 3(a)(1)(C)(i), and the cessation of significant financial services to a natural person covered by the report, using any existing authorities of the Secretary, as appropriate.

(b) SUSPENSION.—The Secretary may suspend the application of subsection (a) with respect to a financial institution upon reporting to the appropriate Members of Congress that the suspension is in the national interest of the United States, with a detailed explanation of the reasons therefor.

### SEC. 5. EXCEPTIONS FOR NATIONAL SECURITY; IMPLEMENTATION AUTHORITY.

The following activities shall be exempt from requirements under sections 3 and 4:

(1) Any activity subject to the reporting requirements under title V of the National Security Act of 1947 (50 U.S.C. 3091 et seq.), or to any authorized intelligence activities of the United States.

(2) The admission of an alien to the United States if such admission is necessary to comply with United States obligations under the Agreement between the United Nations and the United States of America regarding the Headquarters of the United Nations, signed at Lake Success June 26, 1947, and entered into force November 21, 1947, or under the Convention on Consular Relations, done at Vienna April 24, 1963, and entered into force March 19, 1967, or other applicable international obligations of the United States.

(3) The conduct or facilitation of a transaction for the sale of agricultural commodities, food, medicine, or medical devices to Iran or for the provision of humanitarian assistance to the people of Iran, including engaging in a financial transaction relating to humanitarian assistance or for humanitarian purposes or transporting goods or services that are necessary to carry out operations relating to humanitarian assistance or humanitarian purposes.

### SEC. 6. SUNSET.

The provisions of this Act shall have no force or effect on the earlier of—

(1) the date that is 5 years after the date of enactment of this Act; or

(2) 30 days after the Secretary reports in writing to the appropriate Members of Congress that—

(A) Iran is not a jurisdiction of primary money laundering concern; or

(B) the Government of Iran is providing significant cooperation to the United States for the purpose of preventing acts of international terrorism, or for the promotion of any other strategic objective that is important to the national interest of the United States, as specified in the report by the Secretary.

### SEC. 7. DEFINITIONS.

For purposes of this Act:

(1) APPROPRIATE MEMBERS OF CONGRESS.—The term "appropriate Members of Congress" means the Speaker and Minority Leader of the House of Representatives, the Majority Leader and Minority Leader of the Senate, the Chairman and Ranking Member of the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives, and the Chairman and Ranking Member of the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate.

(2) FINANCIAL INSTITUTION.—The term "financial institution" means a United States financial institution or a foreign financial institution.

(3) FOREIGN FINANCIAL INSTITUTION.—The term "foreign financial institution" has the meaning given that term in section 561.308 of title 31, Code of Federal Regulations.

(4) FUNDS.—The term "funds" means—

(A) cash;

(B) equity;

(C) any other asset whose value is derived from a contractual claim, including bank deposits, bonds, stocks, a security as defined in section 2(a) of the Securities Act of 1933 (15 U.S.C. 77b(a)), or a security or an equity security as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)); and

(D) anything else that the Secretary determines appropriate.

(5) KNOWINGLY.—The term "knowingly" with respect to conduct, a circumstance, or a result, means that a person has actual knowledge, or should have known, of the conduct, the circumstance, or the result.

(6) SECRETARY.—The term "Secretary" means the Secretary of the Treasury.

(7) UNITED STATES FINANCIAL INSTITUTION.—The term "United States financial institution" has the meaning given the term "U.S. financial institution" under section 561.309 of title 31, Code of Federal Regulations.

## DIVISION O—IRAN-CHINA ENERGY SANCTIONS ACT OF 2023

### SEC. 1. SHORT TITLE.

This Act may be cited as the "Iran-China Energy Sanctions Act of 2023".

### SEC. 2. SANCTIONS ON FOREIGN FINANCIAL INSTITUTIONS WITH RESPECT TO THE PURCHASE OF PETROLEUM PRODUCTS AND UNMANNED AERIAL VEHICLES FROM IRAN.

Section 1245(d) of the National Defense Authorization Act for Fiscal Year 2012 (22 U.S.C. 8513a(d)) is amended—

(1) by redesignating paragraph (5) as paragraph (6); and

(2) by inserting after paragraph (4) the following new paragraph:

"(5) APPLICABILITY OF SANCTIONS WITH RESPECT TO CHINESE FINANCIAL INSTITUTIONS.—

"(A) IN GENERAL.—For the purpose of paragraph (1)(A), a 'significant financial transaction' shall include, based on relevant facts and circumstances, any transaction—

"(i) by a Chinese financial institution (without regard to the size, number, frequency, or nature of the transaction) involving the purchase of petroleum or petroleum products from Iran; and

"(ii) by a foreign financial institution (without regard to the size, number, frequency, or nature of the transaction) involving the purchase of Iranian unmanned aerial vehicles (UAVs), UAV parts, or related systems.

"(B) DETERMINATION REQUIRED.—Not later than 180 days after the date of the enactment of this paragraph and every year thereafter for 5 years, the President shall—

"(i) determine whether any—

"(I) Chinese financial institution has engaged in a significant financial transaction as described in paragraph (1)(A)(i); and

"(II) financial institution has engaged in a significant financial transaction as described in paragraph (1)(A)(ii); and

"(iii) transmit the determination under clause (i) to the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives and to the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate.".

## DIVISION P—BUDGETARY EFFECTS

### SEC. 1. BUDGETARY EFFECTS.

(a) STATUTORY PAYGO SCORECARDS.—The budgetary effects of division A and each subsequent division of this Act shall not be entered on either PAYGO scorecard maintained pursuant to section 4(d) of the Statutory Pay-As-You-Go Act of 2010.

(b) SENATE PAYGO SCORECARDS.—The budgetary effects of division A and each subsequent division of this Act shall not be entered on any PAYGO scorecard maintained for purposes of section 4106 of H. Con. Res. 71 (115th Congress).

(c) CLASSIFICATION OF BUDGETARY EFFECTS.—Notwithstanding Rule 3 of the Budget Scorekeeping Guidelines set forth in the joint explanatory statement of the committee of conference accompanying Conference Report 105–217 and section 250(c)(8) of the Balanced Budget and Emergency Deficit Control Act of 1985, the budgetary effects of division A and each subsequent division of this Act shall not be estimated—

(1) for purposes of section 251 of such Act;

(2) for purposes of an allocation to the Committee on Appropriations pursuant to section 302(a) of the Congressional Budget Act of 1974; and

(3) for purposes of paragraph (4)(C) of section 3 of the Statutory Pay-As-You-Go Act of 2010 as being included in an appropriation Act.

The CHAIR. No further amendment to the bill, as amended, shall be in order except those printed in part E of House Report 118–466. Each such further amendment may be offered only in the order printed in the report, by the Member designated in the report, shall be considered as read, shall be debatable for the time specified in the report, equally divided and controlled by the proponent and an opponent, shall not be subject to amendment, and shall not be subject to a demand for division of the question.

AMENDMENT NO. 1 OFFERED BY MR. GIMENEZ

The CHAIR. It is now in order to consider amendment No. 1 printed in part E of House Report 118–466.

Mr. GIMENEZ. Madam Chair, I have an amendment at the desk.

The CHAIR. The Clerk will designate the amendment.

The text of the amendment is as follows:

At the end of division C, add the following:

SEC. ____. INCLUSION OF INFORMATION ON EMERGING TECHNOLOGICAL DEVELOPMENTS IN ANNUAL CHINA MILITARY POWER REPORT.

(a) IN GENERAL.—As part of each annual report submitted under section 1202 of the National Defense Authorization Act for Fiscal Year 2000 (Public Law 106-65; 10 U.S.C. 113 note)(commonly referred to as the "China Military Power report"), the Secretary of Defense and Secretary of State, in consultation with the heads of such other Federal departments and agencies as the Secretary of Defense and Secretary of State may determine appropriate, shall include a component on emerging technological developments involving the People's Republic of China.

(b) MATTERS.—Each report component referred to in subsection (a) shall include an identification and assessment of at least five fields of critical or emerging technologies in which the People's Republic of China is invested, or for which there are Military-Civil Fusion Development Strategy programs of the People's Republic of China, including the following:

(1) A brief summary of each such identified field and its relevance to the military power and national security of the People's Republic of China.

(2) The implications for the national security of the United States as a result of the leadership or dominance by the People's Republic of China in each such identified field and associated supply chains.

(3) The identification of at least 10 entities domiciled in, controlled by, or directed by the People's Republic of China (including any subsidiaries of such entity), involved in each such identified field, and an assessment of, with respect to each such entity, the following:

(A) Whether the entity has procured components from any known United States suppliers.

(B) Whether any United States technology imported by the entity is controlled under United States regulations.

(C) Whether United States capital is invested in the entity, either through known direct investment or passive investment flows.

(D) Whether the entity has any connection to the People's Liberation Army, the Military-Civil Fusion program of the People's Republic of China, or any other state-sponsored initiatives of the People's Republic of China to support the development of national champions.

(c) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Affairs of the House of Representatives;

(2) the Committee on Armed Services of the House of Representatives;

(3) the Committee on Foreign Relations of the Senate; and

(4) the Committee on Armed Services of the Senate.

The CHAIR. Pursuant to House Resolution 1160, the gentleman from Florida (Mr. GIMENEZ) and a Member opposed each will control 5 minutes.

The Chair recognizes the gentleman from Florida.

Mr. GIMENEZ. Madam Chair, I yield myself such time as I may consume.

Madam Chair, be it through technology transfers or monetary investments, we must stop funding our own destruction through tacit support of the PLA's technological advancement.

This amendment requires the annual China Military Power Report to provide an assessment of the PRC's development in critical and emerging technologies, relevant to any advancement of the PLA capabilities, any involvement in the CCP's Military-Civil Fusion program, or any involvement in the development of the CCP's state surveillance initiatives.

This amendment also calls on the Department of Defense, the Department of State, and other interagency partners to list all Chinese companies involved in the development of this critical technology and determine if any U.S. technology components are used by these companies or if any U.S. capital is invested in these companies.

This is critical information to have. American dollars and ingenuity should not be building the CCP's techno-totalitarian surveillance state and should not be funding its gross human rights abuses. We must recognize the risk of support for entities involved in Xi's Military-Civil Fusion program and understand any technological development made in China on the civil side instantly goes to support military advancements.

Right now, Americans—usually unwittingly—are funding the People's Liberation Army, paying for things like aircraft carriers, fighter jets, and artillery shells, and facilitating a mass surveillance and oppression of the Chinese people.

I think the bottom line, from my perspective, is that the CCP is an adversary, and you don't defeat an adversary or deter an adversary by shoveling billions of dollars into their military and technology programs. Every time we allow this to happen, we are closing the capability gap between our military and the PLA, giving the upper hand to our greatest adversary, the only country with the intent, will, and capability to reshape the international order, and that is China.

Madam Chair, I now yield 2 minutes to the gentleman from Illinois (Mr. KRISHNAMOORTHI), the ranking member of the Select Committee on the CCP.

Mr. KRISHNAMOORTHI. Madam Chair, I rise in strong support of this amendment, which requires the China Military Power Report, which the Department of Defense puts out each year to include a new section on the PRC's development of critical and emerging technologies. Through its Military-Civil Fusion strategy, the CCP has effectively combined its civilian and military sectors, meaning that American investment into China often finds its way into the hands of the People's Liberation Army.

We simply cannot allow this to happen. By tracking the PRC's development of critical technologies, as well as any American support for these efforts, this amendment will help prevent the power of American innovation and financing from fueling the continued growth of China's military power.

Madam Chair, I urge strong support for this amendment.

Mr. GIMENEZ. Madam Chair, I yield 30 seconds to the gentleman from Texas (Mr. MCCAUL).

Mr. MCCAUL. Madam Chair, I support this amendment. I believe it will greatly enhance the Department of Defense's China Military Power Report by increasing our understanding of China's critical and emerging technology sector, which is a central feature of the great power competition that we have with China.

USCA Case #24-1113   Document #2060757   Filed: 06/20/2024   Page 103 of 267

I thank the gentleman for bringing this amendment.

□ 0945

Mr. GIMENEZ. Madam Chair, in closing, the PRC is the only competitor with the intent, the will, and the capability to reshape the international order. We must stop fueling our own demise.

Madam Chair, I urge support of this amendment, and I yield back the balance of my time.

The CHAIR. The question is on the amendment offered by the gentleman from Florida (Mr. GIMENEZ).

The amendment was agreed to.

AMENDMENT NO. 2 OFFERED BY MR. NUNN OF IOWA

The CHAIR. It is now in order to consider amendment No. 2 printed in part E of House Report 118–466.

Mr. NUNN of Iowa. Madam Chair, I have an amendment at the desk.

The CHAIR. The Clerk will designate the amendment.

The text of the amendment is as follows:

At the appropriate place in section 3 of division N, insert the following:

(__) REPORT AND BRIEFING ON IRANIAN ASSETS AND LICENSES.—

(1) IN GENERAL.—Not later than 30 days after the date of the enactment of this Act, the Secretary of the Treasury shall submit to the appropriate members of Congress a report and provide to the appropriate congressional committees a briefing—

(A) identifying—

(i) all assets of the Government of Iran or covered persons valued at more than $5,000,000 and blocked by the United States pursuant to any provision of law; and

(ii) for each such asset—

(I) the country in which the asset is held;

(II) the financial institution in which the asset is held; and

(III) the approximate value of the asset; and

(B) setting forth a list of all general licenses, specific licenses, action letters, comfort letters, statements of licensing policy, answers to frequently asked questions, or other exemptions issued by the Secretary with respect to sanctions relating to Iran that are in effect as of the date of the report.

(2) FORM.—

(A) ASSETS.—The report and briefing required by paragraph (1) shall be submitted or provided, as the case may be, in unclassified form.

(B) EXEMPTIONS.—The report and briefing required by paragraph (1) shall be submitted or provided, as the case may be, in classified form.

(3) COVERED PERSON DEFINED.—In this section, the term "covered person" means—

(A) an individual who is a citizen or national of Iran and is acting on behalf of the Government of Iran;

(B) an entity organized under the laws of Iran or otherwise subject to the jurisdiction of the Government of Iran; and

(C) an individual or entity that provides material, tactical, operational, developmental, or financial support to—

(i) the Islamic Revolutionary Guard Corps;

(ii) any agency or instrumentality of the armed forces of Iran;

(iii) any agency or instrumentality related to the nuclear program of Iran; or

(iv) any organization designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), including Hamas, Hezbollah, Palestinian Islamic Jihad, alQa'ida, and al-Shabaab.

The CHAIR. Pursuant to House Resolution 1160, the gentleman from Iowa (Mr. NUNN) and a Member opposed each will control 5 minutes.

The Chair recognizes the gentleman from Iowa.

Mr. NUNN of Iowa. Madam Chair, I yield myself such time as I may consume.

Iran is the largest sponsor of state terrorism. Their tactics of terror know no bounds, and they will stop at nothing to destroy our strongest allies in the Middle East.

Indeed a week ago today, we saw them unleash a barrage of weapons intended to kill thousands: Christians, Jews, Muslims. No discretion in between, but for a 99 percent repulse rate by Israel, America, and our allies, we stood firm.

This isn't a kinetic world. As an Air Force officer, we have done this many times, but we must also combat terrorism at its source: its funding.

As a counterintelligence officer, I know the enemy must be fought on the battlefield. But behind the scenes, we must also commit to crippling them with their lack of ability to gain financial services that they then supply the funding for Hamas, Hezbollah, Houthi rebels, and the IRGC.

My amendment will require the U.S. Government to diligently review all of Iranian assets above $5 million to accurately understand where their funding is coming from, where it is going, and who is benefiting from it.

Right now, Congress lacks critical information surrounding U.S. Treasury's nonenforcement of current sanctions. It will allow more than $80 billion in illicit oil sales alone to come into this country.

This amendment requires transparency so Congress and the American people never have to hear about billions potentially being transferred to Iran through the press and not through this administration.

This amendment also gives Congress knowledge that we require to effectively ensure oversight and draft targeted legislation to ensure the Iranian regime doesn't have access to the funds necessary for it to finance terror.

Finally, this amendment holds Iran directly accountable for their direct funding of terrorism, ensuring that Iran does not have access to the financial assets to enable their reign of terror throughout the Middle East and to those right here in the United States.

Madam Chair, I urge my colleagues to support this amendment.

Congress must be aware of Treasury Department's relaxation and nonenforcement of current sanctions on Iran today, and this amendment should be implemented immediately.

Madam Chair, I reserve the balance of my time.

Mr. MEEKS. Madam Chair, I claim the time in opposition to this amendment.

The CHAIR. The gentleman from New York is recognized for 5 minutes.

Mr. MEEKS. Madam Chair, the Treasury opposes this amendment because they believe the reporting time is so short, and the requirements are so onerous. They believe it is so onerous that they will have to pull people away from doing the important work on finding illicit actors that should be sanctioned and make them work on this report.

There are also concerns about business confidentiality here. I am guessing, if there were more time, we could make changes in this bill. We could work together to make it more workable and strike a deal here. But given that this is an up-or-down vote on the floor for an amendment now, I must oppose.

Madam Chair, I yield back the balance of my time.

Mr. NUNN of Iowa. Madam Chair, I appreciate the gentleman's comments. I would state the Constitution establishes Congress as a coequal branch. Time delays alone cannot be the reason to not move forward immediately.

Madam Chair, I yield 30 seconds to the gentleman from Texas (Mr. McCAUL) for his great work in defending Israel and supporting a sanction regime in Iran.

Mr. McCAUL. Madam Chair, I thank the gentleman from Iowa for this amendment, and I support this amendment. It enhances congressional oversight as he talked about. Under Article I, we have a responsibility over restricted Iranian assets and accounts, including those in Qatar and Iraq.

For too long, this administration has not been transparent with the Congress and the American people about sanctions and the like in reporting that to Congress, so I think this is a good step forward.

Mr. NUNN of Iowa. Madam Chair, I yield 30 seconds to the gentleman from Arkansas (Mr. HILL).

Mr. HILL. Madam Chair, I thank Mr. NUNN and Chairman McCAUL for their leadership.

Madam Chair, I stand in support of this amendment. We have to counter Iran's illicit use of funds any way we can to stop their reign of terror and their attack on our ally, Israel. The key to that is stopping their invasion of sanctions. These funds go directly to attacking our friends and partners, and Iran uses new and creative ways to do that.

This amendment from Congressman NUNN ensures that we are stopping funds at the source by instructing the Treasury Department to examine the source and benefactor of all Iranian assets over $5 million.

Madam Chair, I stand in support of this amendment, and I stand in support of the underlying bill.

Mr. NUNN of Iowa. Madam Chair, I yield 30 seconds to the gentleman from New York (Mr. LAWLER).

Mr. LAWLER. Madam Chair, I rise in support of this amendment, and I am

USCA Case #24-1113   Document #2060757   Filed: 06/20/2024   Page 104 of 267

proud to be a cosponsor of Representative NUNN's legislation, the Revoke Iranian Funding Act, that this came out of. In the wake of the appalling terrorist attack against Israel, it is clear that we must work to confront Iran and its surrogates in the region with a strong sanctions regime.

Iran is the largest state sponsor of terrorism in the world, spending its money on terror, on developing nuclear capabilities, on taking hostages to use for bargaining purposes, and on funding the criminal IRGC.

Among other provisions, this commonsense measure would provide transparency on which sanctions authorities the President is failing to exercise and where we can continue to cut off Iran's funding.

Madam Chair, I urge all of my colleagues to support this amendment.

Mr. NUNN of Iowa. Madam Chair, I yield 30 seconds to the gentleman from Nebraska (Mr. BACON), my colleague and wing commander.

Mr. BACON. Madam Chair, I stand in support of this amendment.

We have to be clear-eyed. Iran is our adversary. They have killed 609 Americans in Iraq. They have fueled and energized or armed Hamas that conducted the attacks on October 7. They armed the Hezbollah. They armed the Houthis. We should go after all their assets. We should take every dollar that we can because every dollar that they have fuels terrorism.

Madam Chair, I stand in support of Mr. NUNN's amendment.

Mr. NUNN of Iowa. Madam Chair, today we stand at a crossroads on a precipice.

The result is the effect of an Iranian regime that is directly threatening not just our allies in the Middle East, but has access to funds that directly threaten us.

While I respect my colleagues on the other side of the aisle, I would ask that they come forward at this important juncture to make sure that these funds are restricted from the use of terrorism that flows directly to harm those American soldiers who lost their lives just months ago, fellow veterans and combat in arms.

I thank the 9/11 Families, the Foundation for Defense Fund, and all of those who have come forward to support this very important measure.

Madam Chair, I yield back the balance of my time.

The CHAIR. The question is on the amendment offered by the gentleman from Iowa (Mr. NUNN).

The question was taken; and the Chair announced that the ayes appeared to have it.

Mr. MEEKS. Madam Chair, I demand a recorded vote.

The CHAIR. Pursuant to clause 6 of rule XVIII, further proceedings on the amendment offered by the gentleman from Iowa will be postponed.

Mr. McCAUL. Madam Chair, I move that the Committee do now rise.

The motion was agreed to.

Accordingly, the Committee rose; and the Speaker pro tempore (Ms. FOXX) having assumed the chair, Mr. MOYLAN Chair of the Committee of the Whole House on the state of the Union, reported that that Committee, having had under consideration the bill (H.R. 8038) to authorize the President to impose certain sanctions with respect to Russia and Iran, and for other purposes, had come to no resolution thereon.

───────────────

## INDO-PACIFIC SECURITY SUPPLEMENTAL APPROPRIATIONS ACT, 2024

Mr. COLE. Mr. Speaker, pursuant to House Resolution 1160, I call up the bill (H.R. 8036) making emergency supplemental appropriations for assistance for the Indo-Pacific region and for related expenses for the fiscal year ending September 30, 2024, and for other purposes, and ask for its immediate consideration in the House.

The Clerk read the title of the bill.

The SPEAKER pro tempore. Pursuant to House Resolution 1160, the bill is considered read.

The text of the bill is as follows:

H.R. 8036

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2024, and for other purposes, namely:

### TITLE I

### DEPARTMENT OF DEFENSE

#### OPERATION AND MAINTENANCE

OPERATION AND MAINTENANCE, NAVY

For an additional amount for "Operation and Maintenance, Navy", $557,758,000, to remain available until September 30, 2024, to support improvements to the submarine industrial base and for related expenses: *Provided,* That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

OPERATION AND MAINTENANCE, DEFENSE-WIDE
(INCLUDING TRANSFERS OF FUNDS)

For an additional amount for "Operation and Maintenance, Defense-Wide", $1,900,000,000, to remain available until September 30, 2025, to respond to the situation in Taiwan and for related expenses: *Provided,* That such funds may be transferred to accounts under the headings "Operation and Maintenance", "Procurement", and "Revolving and Management Funds" for replacement, through new procurement or repair of existing unserviceable equipment, of defense articles from the stocks of the Department of Defense, and for reimbursement for defense services of the Department of Defense and military education and training, provided to Taiwan or identified and notified to Congress for provision to Taiwan or to foreign countries that have provided support to Taiwan at the request of the United States: *Provided further,* That funds transferred pursuant to the preceding proviso shall be merged with and available for the same purposes and for the same time period as the appropriations to which the funds are transferred: *Provided further,* That the Secretary of Defense shall notify the congressional de-

fense committees of the details of such transfers not less than 15 days before any such transfer: *Provided further,* That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back and merged with this appropriation: *Provided further,* That any transfer authority provided herein is in addition to any other transfer authority provided by law: *Provided further,* That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

#### PROCUREMENT

SHIPBUILDING AND CONVERSION, NAVY

For an additional amount for "Shipbuilding and Conversion, Navy", $2,155,000,000, to remain available until September 30, 2028, to support improvements to the submarine industrial base and for related expenses: *Provided,* That of the total amount provided under this heading in this Act, funds shall be available as follows:

Columbia Class Submarine (AP), $1,955,000,000; and

Virginia Class Submarine (AP), $200,000,000: *Provided further,* That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

OTHER PROCUREMENT, NAVY

For an additional amount for "Other Procurement, Navy", $293,570,000, to remain available until September 30, 2026, to support improvements to the submarine industrial base and for related expenses: *Provided,* That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

DEFENSE PRODUCTION ACT PURCHASES

For an additional amount for "Defense Production Act Purchases", $132,600,000, to remain available until expended, for activities by the Department of Defense pursuant to sections 108, 301, 302, and 303 of the Defense Production Act of 1950 (50 U.S.C. 4518, 4531, 4532, and 4533): *Provided,* That such amounts shall be obligated and expended by the Secretary of Defense as if delegated the necessary authorities conferred by the Defense Production Act of 1950: *Provided further,* That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

#### RESEARCH, DEVELOPMENT, TEST AND EVALUATION

RESEARCH, DEVELOPMENT, TEST AND EVALUATION, NAVY

For an additional amount for "Research, Development, Test and Evaluation, Navy", $7,000,000, to remain available until September 30, 2025, to support improvements to the submarine industrial base and for related expenses: *Provided,* That such amount is designated by the Congress as being for an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act of 1985.

#### GENERAL PROVISIONS—THIS TITLE

SEC. 101. For an additional amount for the Department of Defense, $542,400,000, to remain available until September 30, 2024, for transfer to operation and maintenance accounts, procurement accounts, and research, development, test and evaluation accounts, in addition to amounts otherwise made available for such purpose, only for unfunded



**United States**
*of America*

# Congressional Record

## PROCEEDINGS AND DEBATES OF THE 118th CONGRESS, SECOND SESSION

*Vol. 170*  WASHINGTON, TUESDAY, APRIL 23, 2024  *No. 71*

# Senate

The Senate met at 10 a.m. and was called to order by the Honorable RAPHAEL G. WARNOCK, a Senator from the State of Georgia.

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

O Lord, our Redeemer, abide with our Senators through the passing hours of another day. Strengthen them to stand firm for those good and eternal values that keep a nation strong. Lord, give them the courage to do the right even when others are doing wrong. Remind them that You are the pilot of their lives who can guide them to a desired destination. Let discretion preserve them, understanding keep them, and faith fortify them. Lead them not into temptation, but deliver them from the forces of evil. Save them from pride that mistakes their abilities for possessions, and keep them humble enough to see their need of You.

We pray in Your Holy Name. Amen.

### PLEDGE OF ALLEGIANCE

The Presiding Officer led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

### APPOINTMENT OF ACTING PRESIDENT PRO TEMPORE

The PRESIDING OFFICER. The clerk will please read a communication to the Senate from the President pro tempore (Mrs. MURRAY).

The senior assistant legislative clerk read the following letter:

U.S. SENATE,
PRESIDENT PRO TEMPORE,
*Washington, DC, April 23, 2024.*
*To the Senate:*
Under the provisions of rule I, paragraph 3, of the Standing Rules of the Senate, I hereby appoint the Honorable RAPHAEL G. WARNOCK, a Senator from the State of Georgia, to perform the duties of the Chair.

PATTY MURRAY,
*President pro tempore.*

Mr. WARNOCK thereupon assumed the Chair as Acting President pro tempore.

### RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

### CONCLUSION OF MORNING BUSINESS

The ACTING PRESIDENT pro tempore. Morning business is closed.

### LEGISLATIVE SESSION

### SECURING GROWTH AND ROBUST LEADERSHIP IN AMERICAN AVIATION ACT—MOTION TO PROCEED—Resumed

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will resume consideration of the motion to proceed to H.R. 3935, which the clerk will report.

The senior assistant legislative clerk read as follows:

Motion to proceed to Calendar No. 211, H.R. 3935, a bill to amend title 49, United States Code, to reauthorize and improve the Federal Aviation Administration and other civil aviation programs, and for other purposes.

RECOGNITION OF THE MAJORITY LEADER

The ACTING PRESIDENT pro tempore. The majority leader is recognized.

### NATIONAL SECURITY ACT, 2024

Mr. SCHUMER. Mr. President, it is my understanding that the Senate has received a message from the House of Representatives to accompany H.R. 815.

The ACTING PRESIDENT pro tempore. The Senator is correct.

Mr. SCHUMER. I ask that the Chair lay before the Senate the message to accompany H.R. 815.

The ACTING PRESIDENT pro tempore. The Chair lays before the Senate a message from the House.

The senior assistant legislative clerk read as follows:

Resolved, That the House agree to the amendment of the Senate to the bill (H.R. 815) entitled "An Act to amend title 38, United States Code, to make certain improvements relating to the eligibility of veterans to receive reimbursement for emergency treatment furnished through the Veterans Community Care program, and for other purposes.", with a House amendment to the Senate amendment.

MOTION TO CONCUR

Mr. SCHUMER. I move to concur in the House amendment to the Senate amendment to H.R. 815, and I ask for the yeas and nays.

The ACTING PRESIDENT pro tempore. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays are ordered.

CLOTURE MOTION

Mr. SCHUMER. Mr. President, I send a cloture motion to the desk.

The ACTING PRESIDENT pro tempore. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The senior assistant legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the motion to concur in the House amendment to the Senate amendment to H.R. 815, a bill to amend title 38, United States Code, to make certain improvements relating to the eligibility of veterans to receive reimbursement for emergency treatment furnished through the Veterans Community Care program, and for other purposes.

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.



Printed on recycled paper.

Charles E. Schumer, Patty Murray, Chris Van Hollen, Mark Kelly, Richard J. Durbin, Alex Padilla, Sheldon Whitehouse, Jack Reed, Michael F. Bennet, Gary C. Peters, Jon Tester, Robert P. Casey, Jr., Tammy Duckworth, Richard Blumenthal, Jeanne Shaheen, Angus S. King, Jr., Margaret Wood Hassan, Benjamin L. Cardin.

MOTION TO CONCUR WITH AMENDMENT NO. 1842

Mr. SCHUMER. I move to concur in the House amendment to H.R. 815, with an amendment.

The ACTING PRESIDENT pro tempore. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER] moves to concur in the House amendment to the Senate amendment, with an amendment numbered 1842.

Mr. SCHUMER. I ask consent that further reading of the amendment be dispensed with.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To add an effective date)
At the end add the following:

SEC. EFFECTIVE DATE.

This Act shall take effect on the date that is 1 day after the date of enactment of this Act.

Mr. SCHUMER. I ask for the yeas and nays.

The ACTING PRESIDENT pro tempore. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays are ordered.

AMENDMENT NO. 1843 TO AMENDMENT NO. 1842

Mr. SCHUMER. Mr. President, I have a second-degree amendment at the desk.

The ACTING PRESIDENT pro tempore. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER] proposes an amendment numbered 1843 to amendment No. 1842.

Mr. SCHUMER. I ask consent that further reading of the amendment be dispensed with.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To add an effective date)
On page 1, line 3, strike "1 day" and insert "2 days".

MOTION TO REFER WITH AMENDMENT NO. 1844

Mr. SCHUMER. Mr. President, I move to refer H.R. 815 to the Committee on Appropriations with instructions to report back forthwith with an amendment.

The ACTING PRESIDENT pro tempore. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER] moves to refer the House message to accompany H.R. 815 to the Committee on Appropriations with instructions to report back forthwith with an amendment numbered 1844.

Mr. SCHUMER. I ask consent that further reading of the motion be dispensed with.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To add an effective date)
At the end add the following:

SEC. EFFECTIVE DATE.

This Act shall take effect on the date that is 3 days after the date of enactment of this Act.

Mr. SCHUMER. I ask for the yeas and nays.

The ACTING PRESIDENT pro tempore. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays are ordered.

AMENDMENT NO. 1845

Mr. SCHUMER. Mr. President, I have an amendment to the instructions at the desk.

The ACTING PRESIDENT pro tempore. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER] proposes an amendment numbered 1845 to the instructions of the motion to refer.

Mr. SCHUMER. I ask consent that further reading of the amendment be dispensed with.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To add an effective date)
On page 1, line 3, strike "3 days" and insert "4 days".

Mr. SCHUMER. I ask for the yeas and nays.

The ACTING PRESIDENT pro tempore. Is there a sufficient second?

There appears to be a sufficient second.

The yeas and nays are ordered.

AMENDMENT NO. 1846 TO AMENDMENT NO. 1845

Mr. SCHUMER. Mr. President, I have a second-degree amendment at the desk.

The ACTING PRESIDENT pro tempore. The clerk will report.

The senior assistant legislative clerk read as follows:

The Senator from New York [Mr. SCHUMER] proposes an amendment numbered 1846 to amendment No. 1845.

Mr. SCHUMER. I ask consent that further reading of the amendment be dispensed with.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To add an effective date)
On page 1, line 1, strike "4 days" and insert "5 days".

H.R. 815

Mr. SCHUMER. Mr. President, the Senate convenes at a moment nearly 6 months in the making.

A few days ago, the House of Representatives, at long last, approved essential national security funding for Ukraine, for Israel, for the Indo-Pacific, and for humanitarian assistance. Today is the Senate's turn to act.

For the information of Senators, at 1 p.m. this afternoon, the Senate will hold two rollcall votes related to the supplemental: one on a procedural motion and then a vote to invoke cloture.

The time has come to finish the job to help our friends abroad once and for all. I ask my colleagues to join together to pass the supplemental today as expeditiously as possible and send our friends abroad the aid they have long been waiting for. Let us not delay this. Let us not prolong this. Let us not keep our friends around the world waiting for a moment longer.

I yield the floor.

I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. McCONNELL. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

RECOGNITION OF THE MINORITY LEADER

The Republican leader is recognized.

Mr. McCONNELL. Mr. President, to provide for the common defense is one of Congress's primary responsibilities.

I have been at this business for quite a while, and I have found that making and explaining sensible decisions about advancing our Nation's interests is easier when you start from the right set of assumptions.

Here is what I know to be true: American prosperity and security are the products of decades of American leadership. Our global interests come with global responsibilities. Healthy alliances lighten the burden of these responsibilities. And at the end of the day, the primary language of strategic competition is strength.

These are the facts that led me to urge Presidents of both parties not to abandon Afghanistan to terrorists, to fight efforts from both sides of the aisle to tie America's hands in critical parts of the world, to push consecutive administrations to equip Ukraine with lethal weapons before—before—Russia escalated, and to continue fighting for the sort of sustained investments in our military and defense industrial base necessary to meet the challenges that we face.

The responsibilities of leadership, the value of alliances, the currency of hard power—these are foundational principles. They are not driven by the fickle politics of any one moment. They are tested and proven by the workings of a dangerous world.

Today, the Senate sits for a test on behalf of the entire Nation. It is a test of American resolve, our readiness, and our willingness to lead. And the stakes of failure are abundantly clear.

Failure to help Ukraine stand against Russian aggression now means inviting escalation against our closest

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 107 of 267

treaty allies and trading partners. It means greater risk that American forces would become involved in conflict. It means more costly deployments of our military and steeper military requirements to defend against aggression.

Failure to reestablish deterrence against Iran means encouraging unchecked terrorist violence against American personnel, our ally Israel, and the international commerce that underpins our prosperity.

And failure to match the pacing threat—the People's Republic of China—means jeopardizing the entire system of alliances that preserve American interests and reinforce American leadership.

Colleagues on both sides of the aisle who dismiss the values of our allies and partners ignore what history teaches about times when we lacked such friendships. Our adversaries understand the stakes, and they are responding with a coordinated full-court press.

Iran and North Korea are literally arming Russia's war in Ukraine. China is helping Iran skirt international sanctions. A ''friendship without limits'' has blossomed between Moscow and Beijing.

The authoritarians of the world may have caught the West flatfooted. They may be betting big that American influence is in decline. But, increasingly, our friends understand the stakes too.

In Asia, nations with every excuse to be preoccupied by Chinese aggression understand that, in fact, defeating authoritarian conquest halfway around the world is actually in their interests. They know China will benefit from Russian advances, and they know Beijing is waiting for us to waver.

In Europe, allies that had long neglected the responsibilities of collective security are making historic new investments in their own defense.

Finland and Sweden, two high-tech nations, responded to Russian escalation by bringing real military capabilities to the most successful military alliance in world history. And when the House passed the supplemental last week, the Prime Minister of Sweden reiterated that our allies have even more work to do.

The holiday from history is over.

And in the Middle East, our close ally is locked in a fight for its right to literally exist. The people of Israel require no reminders of the stakes of hard-power competition or deterrence.

The remaining question is whether America does. Do our colleagues share the view of the Japanese Prime Minister that ''the leadership of the United States is indispensable''? Or would we rather abdicate both the responsibilities and the benefits of global leadership?

Will the Senate indulge the fantasy of pulling up a drawbridge? Will we persist in the 21st century with an approach that failed in the 20th? Or will we dispense with the myth of isolationism and embrace reality?

For those who insist that America cannot do what the moment requires, the facts are inconveniently clear:

First, supplemental investment in the capabilities America and our friends need to defeat Russian aggression are not a distraction from China. Without the investments we have made over the past 2 years, America's defense industrial base would be even further behind the clear requirements of long-term competition with the PRC.

You don't believe me? Just ask the former chairman of the House Select Committee on the Chinese Communist Party, who stayed in Congress long enough to support the legislation now before us.

Second, supplemental investments have expanded our capacity to produce critical munitions. This supplemental contains additional investments aimed at expanding production capacity of critical munitions and weapons systems needed in the Indo-Pacific. Higher production rates and lower unit costs of critical munitions are a no-brainer for colleagues who are actually interested in strategic competition with the PRC.

Colleagues on the other side of the aisle who say they are concerned over the defense industrial base today would have done well to have joined me—months before Russian escalation in Ukraine—in supporting a massive proposed investment under reconciliation led by our former colleagues Senator Shelby and Senator Inhofe. If some of our Republican colleagues hadn't joined the Democratic leader in opposition, we would have begun to rebuild our capacity even sooner.

And, finally, investment in American hard power and leadership isn't coddling our allies. By every objective measure, they have helped drive our allies to make historic—historic—investments of their own in collective defense.

Across Europe, the acceleration of defense spending is outpacing our own. And, right now, allies and partners from Europe to the Indo-Pacific have contracted more than $100 billion worth of cutting-edge American weapons and capabilities. That is right. Our allies across the world are buying expensive, sophisticated American weapons produced in American factories by American workers.

Do my colleagues really think that will continue if America decides that global leadership is too heavy a burden?

So much of the hesitation and shortsightedness that has delayed this moment is premised on sheer fiction, and I take no pleasure in rebutting misguided fantasies.

I wish sincerely that recognizing the responsibilities of American leadership was the price of admission for serious conversations about the future of our national security.

Make no mistake, delay in providing Ukraine the weapons to defend itself has strained the prospects of defeating Russian aggression. Dithering and hesitation have compounded the challenges we face.

Today's action is overdue, but our work does not end here. Trust in American resolve is not revealed overnight. Expanding and restocking the arsenal of democracy doesn't just happen by magic.

And even as our allies take on a greater share of the burden of collective security, our obligation to invest in our own defense is as serious as ever.

So I will continue to hold the Commander in Chief to account for allowing America's adversaries to deter us, for hesitating in the face of escalation, and for providing anything less than full support for allies like Israel as they fight to restore their security and their sovereignty. At the same time, I will not mince words when Members of my own party take the responsibilities of American leadership lightly.

Today, the Senate faces a test, and we must not fail it.

I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. GRASSLEY. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

SUPPLEMENTAL FUNDING

Mr. GRASSLEY. Mr. President, a recent article by Peter Pomerantsev in TIME Magazine starts this way. It is about a Ukrainian held prisoner by the Russians. I quote:

After they beat Azat Azatyan so bad blood came out of his ears; after they sent electric shocks up his genitals; after they wacked him with pipes and truncheons, the Russians began to interrogate him about his faith. ''When did you become a Baptist? When did you become an American spy?'' Azat tried to explain that in Ukraine there was freedom of religion, you could just choose your faith. But his torturers saw the world the same way as their predecessors at the KGB did: An American church is just a front for the American state.

Since Soviet times, the Russian Orthodox Church has been used as a tool of the state, so Russians assume Protestants in Ukraine are American agents.

The world was horrified after the Kyiv suburb of Bucha was liberated, revealing that civilians had been massacred simply for being loyal Ukrainians. But Bucha is not an exception. In every part of Ukraine that Russia has occupied, civilians have been murdered, women systematically raped, and Christians not loyal to Moscow have been persecuted, tortured, and killed. Every day, the Russian military fires rockets, drones, and shells at civilian areas to demoralize the population in hopes of taking more Ukrainian land. Yet, with every Russian missile attack, every Ukrainian town destroyed, and every report of murdered pastors, the Ukrainian people become

USCA Case #24-1113 Document #2060757 Filed: 06/26/2024 Page 108 of 267

more determined to prevent any more territory falling under Russian occupation.

You can understand why calls by some American politicians to negotiate with Russia seem so absurd to Ukrainians under daily attack. Ukraine knows that if it allows any more territory to fall under Russian control, it will mean more Ukrainians tortured and killed. Likewise, for most Ukrainians, giving up on their fellow countrymen currently suffering under Russian occupation is unthinkable.

There is also zero indication from Russia that Russia is looking to negotiate. The lack of any new U.S. military assistance from Congress for over a year has actually bolstered Putin's belief that he can outlast the West despite being outnumbered and outmatched in economic and military power.

Now, we all know that Russia is in violation of multiple treaties recognizing Ukraine's borders and promising to respect its sovereignty. Start out with the United Nations Charter that guarantees the sovereignty of individual countries. But beyond that, the United States and Russia, plus the United Kingdom, all signed the Budapest Memorandum in 1993 in which Ukraine gave up its nuclear weapons inherited from the Soviet Union in return for a guarantee of its sovereignty and territorial integrity. If you believe in the rule of law, that Budapest Memorandum ought to mean something.

Just like in 2014, if Russia gets away with any territory it took by force, it will send the message that force pays off. Before long, Russia will be back for more territory. And who is to say they would stop with Ukraine? Anyone claiming that there is no threat to the rest of Europe is choosing to ignore comments by people in Putin's inner circle threatening NATO allies like Poland and the Baltic nations.

I think Putin made it very clear back in 2005 when he said that ''the demise of the Soviet Union was the greatest geopolitical catastrophe of the century.'' We all hear Putin talking a lot about Peter the Great and restoring the Russian Empire. The Russian Empire grew and grew throughout history, irrespective of national, ethnic, religious, or cultural borders. That provides the context when Putin repeats the phrase ''Russia's borders do not end anywhere.''

I believe in the lesson we took from World War II for the Cold War that an ounce of prevention is worth a pound of cure. When we see the flame of aggression, we ought to stamp it out before the whole world is engulfed.

Neville Chamberlain bet everything on the hope that letting Hitler take Sudetenland from Czechoslovakia would satisfy him and there would be, according to his own words, ''peace in our time.'' It is not 1938, but it could be, and hopefully no world war confronts us like it did in 1938 when Prime Minister Neville Chamberlain made that trip to Germany and had that meeting that ended with the words ''peace in our time.''

We all know that Hitler took the rest of Czechoslovakia and then, in a short period of time, invaded Poland. We stayed out of that war until we were attacked at Pearl Harbor, and then World War II was raging both in the Pacific and in Europe.

So can we learn from history? Today, we have to decide again whether to respond to aggression with strength while the threat is manageable or opt for appeasement and hope, against experience, that it will not lead to a wider war as it did in the late 1930s.

Think about how much was lost in World War II, not just in dollars but in American lives. Now think about how much it would cost in American blood and treasure if Russia is emboldened to attack a NATO ally and article 5 of the NATO treaty would kick in and all 31 countries would be involved in that effort—and the United States would likewise be involved.

The United States has been spending about 5 percent of our annual military budget to arm Ukraine, and U.S. intelligence believes the war has severely degraded Russia's military power and its ability to threaten NATO allies. Ukraine has taken back about half the territory Russia occupied in 2022. But without American aid, Ukraine is almost out of ammunition, and Russia sees an opportunity.

Europe has spent more than twice as much as the United States on aid to Ukraine in total dollars. Think of the humanitarian aid that Europe lends to all those millions of Ukrainians who have sought refuge in other countries. Compared to Europe, when you look at it as a share of the economy, the United States ranks No. 32. No. 1 ranking Estonia has provided more than 12 times as much assistance as a share of its economy because Estonia knows what it was like to be occupied by the Soviet Union from 1940 to 1991.

Europe has stepped up big-time and keeps finding ways to do more. You read daily in the newspapers about European leaders wondering whether the U.S. Congress is going to step up, and they have tried to fill in the vacuum while we dither here, waiting to make a decision on more help for Ukraine.

The Czechs and the Estonians have led two efforts to pool Europe's funds to purchase shells from other countries to patch the gap left by the United States while Congress dithers on this issue, but the Czechs and Estonians do not have the military industrial base that we do, so they cannot do it all.

Opponents of Ukraine aid have started talking down our industrial base's ability to produce everything needed to stop Russian aggression while also preparing for China, which may just follow Russia's example against Taiwan if Russia is successful in Ukraine. These people argue that Ukraine can't win so we should cut our losses and worry about China. I disagree. The fact is, Russia has lost much of its experienced military and advanced equipment. Russia does have a vast population and has put its economy on full war footing, so it has been able to reconstitute; however, Russian soldiers are poorly trained, and the morale of these Russian soldiers is in the toilet.

Russia has resorted to its old tactic of ''meat assaults,'' where hundreds of poorly trained infantry try to overwhelm Ukrainian defenses with sheer numbers and great deaths.

Russia has only been able to make incremental advances while taking huge casualties in the face of superior Ukrainian morale and equipment.

Russia's economy is feeling the strain. Word has gotten out about how freely Russian commanders sacrifice the lives of their soldiers. It will only get a lot harder to replace the tens of thousands of Russian soldiers sent to their death in Ukraine.

Russia is pinning its hopes on U.S. military aid not coming and Ukraine running out of ammunition. I, for one, am happy to help dash Putin's hopes. The good news is that our defense industrial base is ramping up. That includes the Iowa Army Ammunition Plant, which has more than doubled production using its current facilities. It is also undergoing a major modernization program, accelerated by previous Ukraine supplemental bills.

In the near future, it will have a brandnew facility that will be able to produce many more 155mm shells and do it much faster.

Those arguing that the United States is no longer up to the task of producing the necessary military equipment are underestimating our economy.

I am reminded of President Carter's famous 1979 malaise speech where he identified a crisis of confidence among the American people. That was 1979.

In 1980, Ronald Reagan came along with his signature optimism that America's best days are ahead. And he worked to overcome the challenges that we faced, including the lagging economy and an underresourced military.

Just recently, the Japanese Prime Minister spoke to our Congress and delivered a message as a very good friend. He said he detected an undercurrent of self-doubt about Americans. The Japanese Prime Minister spoke movingly about the role of American leadership in championing freedoms and fostering the stability and prosperity of nations like Japan. That Japanese Prime Minister explained that while American leadership is indispensable, Americans are not alone in this world.

With allies like Japan and many countries in Europe stepping up, the free world has never been stronger or more united. So this is hardly a time for a crisis of confidence.

In fact, I am shocked to hear some people in my own party—the Republican Party—accepting American decline and advocating a return to the

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 109 of 267

Obama head-in-the-sand policy toward Russia.

Remember, back then, Obama was so afraid of escalation that he tried to appease Putin after Russia's 2014 invasion of Ukraine. Look at that mistake we made. Do we want to overdo it again?

Obama refused to provide any lethal aid—not one bullet for Ukraine under Obama. He pushed Ukraine to negotiate with a gun to its head.

President Trump came in, reversed the Obama policy, and provided equipment and training to the Ukrainian military. Thank God Trump did that. The Javelins provided by the United States played a major role in stopping the Russian advance towards Kyiv.

Take it from this Senator, elected to this body alongside President Reagan: The conservative position is to believe in America, to invest in our military, and to support freedom.

Like the Senate-passed bill, most of the money in this package goes straight to our military to replenish stockpiles—spent in the United States, using American labor. It will allow for more drawdowns to send vital military aid to Ukraine. This includes Patriot interceptors that can take down Russia's most advanced missiles and save lives at the same time.

Ukraine will get more Iowa-made howitzer shells that are far more accurate and reliable than those that Russia has begged from North Korea.

And an improvement added by Reagan Republicans in the House is a requirement for the Biden administration to provide the long-range ATACM missiles needed to take out Russia's supply lines.

I have been calling for these ATACMS to be provided for a long time. I think the reason they have not been provided by the Biden administration is due to the holdover of the Obama fear of escalation. That fear has proven to be misguided.

The only way to lasting peace is strength. That is what Ronald Reagan showed Americans. Strength is what we need now in the face of aggression from Russia and Iran and threats from China.

I don't buy this notion that it is a conservative or Republican position to abandon the American leadership that has kept the peace since World War II, meaning no World War III. I certainly do not think it is conservative to advocate a return to a weak and failed Obama policy.

I make no apologies for supporting Ukraine, Israel, and Taiwan in the face of threats from the axis of anti-American dictatorships. And, now, instead of the axis of the 1940s—Germany, Italy, and Japan—it is now the axis of the 21st century—Russia, Iran, China, North Korea. They have their sights set upon replacing the United States as leaders of this Earth. It is an investment worth making to prevent the United States getting sucked into World War III. It is also the right thing to do.

I yield the floor.

The PRESIDING OFFICER (Mr. PADILLA). The Senator from Alaska.

Mr. SULLIVAN. Mr. President, like my good friend from Iowa, Senator GRASSLEY, I am going to come down to the Senate floor to talk about the national security supplemental we are voting on today. I commend the senior Senator from Iowa. He is a great U.S. Senator. It was a really good speech. I am going to reinforce some of what he just said on the importance of this bill, but, importantly, the broader context of how we actually got here and where we need to be going in terms of our Nation's defense.

In my view, the current occupant of the White House, President Biden, has gotten a free pass on his numerous huge national security missteps that have been undermining our Nation's security and have forced the Congress of the United States to actually take action.

That is the whole point. We are taking action. I am a supporter of this legislation, but we are doing it because of the failures of the current occupant of the White House. I am going to encourage my colleagues, particularly my Republican Senate colleagues, to vote in favor of this bill.

But I think it is important to put it in the broader context of what is going on in the world. I made a couple of speeches on this before. I am just going to reiterate some and add to some of the challenges we are facing because of the Biden administration.

First, I think it is pretty obvious to everybody—to anyone who is watching—that we are in a new era of authoritarian aggression led by this dictator, Xi Jinping. Look at him. He gets in his ''cammies'' every now and then, threatening his neighbors.

By the way, China is going through the largest peacetime military buildup in the history of the world. If that doesn't make you a little nervous about what is going on around the world, it should. This guy is a brutal dictator. But it is led by him, Putin, the ayatollahs in Iran, the terrorists in Iran—the largest state sponsor of terrorism—and the ''Mini-Me'' North Korean dictator. They are all working together. They want to undermine our interest. They want to undermine the interest of our allies. They are driven by historical grievances. They are paranoid about their democratic neighbors. They are more than willing to invade them, as we are seeing across the world—whether Israel, whether Ukraine.

Again, they are working together, and they are spending boatloads of money on national security issues, military buildups. This is actually led by this guy. He is the big one that we have to keep a close eye on. That is No. 1.

We are in a real, real dangerous era. This is one thing I do agree with the Biden administration on.

We have had the Secretary of Defense, the Chairman of the Joint Chiefs come and say: Hey, we are in the most dangerous time since probably the end of World War II.

Dictators are on the march. They are invading their neighbors. They are massively building up their military, and they are all working together. It sounds a little bit like the 1930s to me.

The second reason we need a defense industrial base supplemental is our own industrial base—our ability to produce weapons for us, for America—has completely atrophied. I could give a speech for hours. This, again, is part of the Biden administration's fault.

But we can't build Navy ships. We can't build Navy subs. Every component of our industrial base is shrinking. It is brittle. It has atrophied. Yet we are in this dangerous period. So that is pretty alarming.

By the way, it is our responsibility, in article I of the U.S. Constitution, for the Senate and the House to raise an army, to provide and maintain a navy. My view is it is the No. 1 constitutional duty we have—securing this Nation. Yet we are behind.

The Navy just put out, 3 weeks ago, this alarming report saying the U.S. Navy is behind on every ship platform that they are building—3 to 5 years behind—carriers, subs. Almost 40 percent of our attack sub fleet is in maintenance, not even out to sea.

He is scared to death of U.S. subs. What is this guy doing? He is cranking out 10 to 12 ships—high-end navy ships—a year. The Chinese Communist Party's navy is now bigger than the U.S. Navy. The danger is our industrial base can't produce weapons the way it could.

And then the third reason I think we need a national security supplemental is given how weak the Biden administration has been on national security. The current budget of this President shrinks the Army, shrinks the Navy, shrinks the Marine Corps. Do you think Xi Jinping is impressed by that? He is not—neither is Putin, neither are the ayatollahs. That is what they are doing.

By the way, this President, in every budget he submits to Congress for the military during these really dangerous times, what does he do? He cuts it. He cuts the military. I am going to get more into that.

These are the big three reasons that I have been supportive of this bill. But here is the thing. When you read the bill and look at it and dig into the details, it is less of a foreign aid bill and much more of a bill to enhance our industrial capacity. It is not a perfect bill, and I am going to get into that in a minute. There is no such thing as a perfect bill, by the way, but almost 60 percent of this national security supplemental bill that we are going to be voting on goes directly into our industrial base, directly into our ability to build submarines—like $6 billion for submarines, $6 billion with the AUKUS agreement, $5 billion for 150mm artillery shells, over half a billion for

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 110 of 267

counter-UAS systems—Patriots, Javelins, Harpoons, Tomahawks, HARM missiles, TOW missiles—built by Americans for our own defense. That is in this bill. It is in the bill. That is a really important component. Almost 60 percent of this bill goes into that.

And it has other things in it: $3 billion for our troops in the CENTCOM area of responsibility, right now—who are in combat right now, taking incoming missiles from the Houthis. The USS *Carney* almost took 100 different missiles and drones. With sailors in combat, this replenishes their weapons systems and helps our troops in combat.

By the way, in my view, just that element alone is enough to support this bill. You have American troops in combat in the Middle East.

And, of course, this bill does go to help our allies and partners—Israel, Taiwan, Ukraine—who are facing existential threats, literally, from their very aggressive neighbors.

But, again, a lot of this is going to stay home. We are not sending subs to any of those countries. We are building submarines to be ready, if we have to, in a conflict with China. Xi Jinping—that dictator I was just showing you there—is scared to death of the nuclear sub capability of the United States.

This is mostly about us protecting our country and our industrial base to produce weapons for America. I think it is going to put a lot of workers to work. But this bill, primarily, if you read it, is about protecting our Nation.

As I said, it is not a perfect bill. There are a number of things—there are some amendments we were debating a couple months ago here on the Senate floor. For example, I think the direct budget support, the economic aid—that should go to our European allies to help the Ukrainians with that, that should go to the Gulf Arab allies who want to support Gaza in terms of economic aid. We should be providing the lethal aid.

But, I will say, Speaker JOHNSON definitely improved the bill from what the Senate sent over a couple of months ago. I applaud him for his impressive leadership.

There are a number of improvements, like the direct budget support and economic aid are now in the form of forgivable loans. That was a President Trump idea. That was a good idea.

On the REPO Act, Senator RISCH has been pushing on that hard. He has done a great job on that. That would enable us to seize Russian assets and use them to help pay for the Ukraine war.

There is a requirement that makes the Biden administration lay out a much more detailed strategy on Ukraine and forces them to provide Ukrainians ATACMS weapon systems.

It focuses on fentanyl. It focuses on TikTok and the improvements there, breaking the tie between the Chinese Communist Party and control of this popular app.

The House did try to take up some border security issues. I certainly wish those would have passed. I am not sure my Senate Democratic colleagues would have voted on it. That would have made it better.

But there are many improvements. The Speaker did a good job on it.

Mr. President, we had some critics on the left and on the right of this bill. I want to just address a few of those as we are getting ready to vote on this. Some are quite serious.

Some of my Republican colleagues have said: Hey, the Europeans need to do more, particularly when it comes to Ukraine.

I actually agree with that. No one in this Chamber has worked harder on the issue of making sure our NATO allies meet their 2-percent obligation in terms of defense spending.

I had an amendment to the Sweden and Finland accession treaties that we voted on here that said it is the sense of the Senate that all of these countries have to meet their 2-percent-of-GPD obligation on defense as a NATO member. That passed 98 to 0 here in the Senate.

I had an NDAA provision that is now law that says the Secretary of Defense shall prioritize training and troop deployments for countries in NATO with U.S. forces that meet their 2 percent obligation.

So I agree with those critiques, but some of the critiques from some of my colleagues—let's just say they weren't serious.

You might remember one—that this national security supplemental is some kind of secret trap for a future impeachment of President Trump. I am pretty sure that is not what Speaker JOHNSON was working on the last 2 months.

That this national security bill will "strain our industrial base." Actually, it will do the opposite. I think that is clear. It is going to make generational investments in our industrial base that hopefully will continue for years. They will continue for years.

That the national security supplemental sends the "wrong signal" to what the warfighter in America needs for actual threats we face. Well, I find that really curious. Let me give one example. I worked directly with the INDOPACOM Commander, Admiral Aquilino, on exactly what he thought he needed to help American forces defend Taiwan and the Taiwan Strait. That is in the bill. The original bill from the Biden administration had very little on that. We made it a lot better, a lot stronger. But working directly with INDOPACOM and the admiral—there is no better expert in the world on what they need to fight in the Taiwan Strait. So, again, that criticism seems really off base and not a serious critique if you actually are one of the Senators doing the homework on what our warfighters need.

But the biggest issue I have with some of the arguments and critiques of this national security supplemental that are actually coming from the left

and the right in the House and in the Senate is their claim that deterrence is divisible—deterrence is divisible. Now, what do I mean by that? Their argument, and I have heard it a lot, is that you can cut off aid to Ukraine, let Putin roll over them, roll over that country, move up to the borders of the Baltics and Poland—NATO allies, by the way—but somehow we can still be strong in the Taiwan Strait with regard to Xi Jinping and the ayatollahs in Iran.

So deterrence is divisible. You can kind of show weakness with regard to Putin but strength with regard to Xi Jinping and the ayatollahs. Well, that is not how the world works. Deterrence is not divisible. How do we know that? Well, I think we know that because of this debacle.

Joe Biden's failed approach to national security has shown us that deterrence is not divisible. What am I talking about? When this happened, the botched Afghanistan withdrawal—"Biden's debacle," as The Economist put it on their front cover—many in this Chamber—Democrats and Republicans, by the way, myself included—predicted that, given this botched Afghanistan withdrawal, dictators around the world are going to be emboldened to press us other places. Stand by. Putin and Xi are going to invade somewhere else because of this. I didn't only hear that from people here; I have talked to world leaders who have said there was no way Putin would have invaded Ukraine if it hadn't been for this Biden debacle.

So deterrence is not divisible, and that is exhibit A, which brings me to my final point here.

The press, our friends in the media, as usual are missing the bigger story on what is going on on this national security supplemental. All the focus has been on the House and how Republicans in the House have delayed the Senate bill for 2 months, that we Republicans in the Congress are not taking foreign policy seriously, and that this bill's passage is some kind of victory for President Biden's foreign policy leadership. But here is what I think is going on: This national security supplemental bill actually exposes even further the weakness of the Biden administration's approach to Ukraine on foreign policy that has only brought the world chaos.

I was at a Sunday talk show the other day and made the point—a very simple question: Is the world a safer place for America and its allies today relative to 4 years ago? I think everybody knows the answer is no, it is not even close. There is chaos all over the world.

I think what is really important is to focus on how we actually got to this point, why we need this defense supplemental in the first place. The reason we do is the failure of the current occupant of the White House's policies with regard to foreign policy and national security. That is the entire reason we

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 111 of 267

have to bring this bill, this national security bill, to the floor and why it is so urgently needed now. This bill is not some kind of exhibit of Joe Biden's foreign policy triumph; it is a needed correction of Joe Biden's foreign policy failure.

First, as I noted, the Afghan debacle certainly emboldened Putin to invade Ukraine. I think that is a view that is commonly held.

Secondly, our own border debacle has been something that has made it so Republicans who would normally support strong national security were, with a lot of good reasons, saying: Hey, let's take care of our own open borders and national security at the southern border first. The President has not done that. We have an open border that is a humanitarian and national security fiasco in America.

Third, this President, with regard to Ukraine, has not been in it to win it. What do I mean by that? Every major weapons system that the Ukrainians have said they need, they have delayed and delayed and delayed because they were fearful of Putin. Let's just call it like it is. The list is long: HIMARS, Stingers, Javelins, tanks, Abrams tanks, F16s, even the ATACMS that are in the House bill, forcing the President to say that we are going to get these really important, long-range, accurate artilleries to the Ukrainians. This is the No. 1 issue we heard from President Zelenskyy a couple months ago when we were in Munich—that they are just not getting weapons they need.

Imagine if the Biden administration had gotten all the weapons systems I just mentioned to Ukrainians a year and a half ago. And what has happened every time? This body—Democrats and Republicans—has gone to the President, saying: Mr. President, give them these weapons.

Well, we are going to delay. We don't want to escalate with Putin.

Escalate with Putin? He invaded a country.

They are not in it to win it.

The President called an LNG pause on our allies. Our allies in Europe are apoplectic about that.

Not in it to win it.

Finally, this President has never explained the stakes of why this is so important. He has given two speeches on Ukraine. Two. Two major speeches. And do you know what he does? He attacks Republicans in his speeches. That is not leadership. That is not leadership. Especially on a big national security issue, you want to bring people together and explain the stakes. Speaker Johnson has done more to explain the stakes in a calm, reassuring manner in the last 2 weeks than President Biden has done in 3 years.

Finally, again, in terms of lack of seriousness on national security issues, I think the most damning issue is the lack of seriousness with regard to our national defense. As I mentioned, the President puts forward budgets to cut defense spending every year.

I have asked the Secretary of Defense and the Chairman of the Joint Chiefs— three hearings in a row in the Armed Services Committee—if this is the most dangerous time since World War II, why are you cutting defense spending? Why are you going to bring defense spending in America next year to below 3 percent of GDP? We have only been there four times since World War II. Why are you dramatically undermining readiness?

They don't want to do that. The Secretary of Defense doesn't want to do that. The Chairman of the Joint Chiefs doesn't want to do that. So why are they doing it? The answer to that is, this is where our Democratic colleagues always are. Since Vietnam, just look at what every President who is a Democrat who has occupied the White House has done—Carter, Clinton, Obama, and now Biden. They come in, and they cut defense spending, and they cut readiness. This is in the DNA of the national party.

Republicans have a different tradition. It is this tradition: Peace through strength. Peace through strength—that is our tradition.

To my Republican colleagues and friends in the Senate, our tradition is much more serious, it is prouder, and I will tell you this: It is much more supported by the American people. Peace through strength, not American retreat.

As I am encouraging my Republican Senate colleagues to vote on this national security supplemental, this is in line with the peace through strength tradition we have in this party. Think about it—Teddy Roosevelt; Eisenhower; Reagan, of course; the Bush Presidencies; and, very much in the tradition of peace through strength, the Trump Presidency. I was here. Heck, I ran for the U.S. Senate in 2014 primarily because the second term of the Obama administration cut defense spending by 25 percent. Readiness plummeted—plummeted. Shocking how badly ready our troops were. When the Trump administration came in, working with Senate Republicans when we were in the majority, we reversed it. Peace through strength.

So through arguments, facts, understanding history, a serious view of the world, peace through strength—my Republican colleagues, we need to keep this tradition going, especially during these dangerous times. We certainly can't rely on our Democratic colleagues to support that. We certainly can't rely on this White House. President Biden cuts defense spending every year to support that. That is a really important reason why I encourage my colleagues to support this national security supplemental—imperfect bill, yes, but needed during these very dangerous times.

I yield the floor.

The PRESIDING OFFICER. The Senator from Vermont.

Mr. SANDERS. Mr. President, the Senate will soon vote on a $95 billion

supplemental spending package, and $95 billion—that is a lot of money, especially at a time when many Americans are unable to afford their rent or pay their mortgages, pay their bills, afford healthcare, struggling with student debt, and many other needs. Mr. President, $95 billion is a lot of money.

All told, this package includes tens of billions of dollars in additional military spending and major policy changes, many of which are controversial, many of which are disagreed with by the American people. Yet, unlike the House of Representatives, the Senate will not have the opportunity to hold separate votes on the various components of this bill.

I have heard from many of my Democratic colleagues—and I agree—who talk about the dysfunctionality taking place in the House of Representatives. In fact, I don't know if we are quite sure who the Speaker of the House will be in a couple of weeks or whether the extreme-right wing is going to get rid of Mr. JOHNSON. But what we can say about the House is that they at least gave their Members the opportunity to vote yes or no on funding for Ukraine, yes or no on aid to Israel, yes or no on TikTok, and yes or no on aid to Asian countries. That is more than can be said for the U.S. Senate right now.

I remind my colleagues that this is supposedly the greatest deliberative body in the world—except we don't have very many deliberations around here. You have one bill, up or down.

We need to have a serious debate on these issues. I think the American people want us to have a serious debate on these issues, and that is why I am trying my best to secure amendment votes, which, in my view, will significantly improve this bill.

As it happens, I strongly support the humanitarian aid included in this bill, which will save many thousands of lives in Gaza, Sudan, Ukraine, and many other places. Strongly support it. I strongly support getting Ukraine the military aid it needs to defend itself against Putin's Imperialist war. I support the Iron Dome to protect Israeli civilians from missile and drone attacks.

But let me be very clear: I strongly support ending the provision which will give $8.9 billion in unfettered offensive military aid to the extremist Israeli government, a government led by Prime Minister Netanyahu, who is continuing his unprecedented assault against the Palestinian people.

I also strongly oppose language in this legislation that would prohibit funding for UNRWA, the U.N. organization that is the backbone of the humanitarian relief operation in Gaza and the only organization that experts say has the capability to provide the humanitarian aid that is desperately needed there.

And I have filed two amendments to address these issues. These amendments would not touch funding for the Iron Dome and other purely defensive

systems to protect Israel against incoming missiles.

As we all know, Hamas, a terrorist organization, began this war with a horrific attack on Israel that killed 1,200 innocent men, women, and children and took more than 230 captives, some of whom remain today in captivity.

As I have said many times, Israel has and had the absolute right to defend itself against this terrorist attack, but Israel did not and does not have the right to go to war against the entire Palestinian people, which is exactly what it is doing.

Regarding offensive military aid to Israel, what we will be voting on is pretty simple: First, has Netanyahu and his government violated U.S. and international law in Gaza? Which, if he has, should automatically result in the cessation of all U.S. military aid to Israel. That is a pretty simple question.

Second—maybe even more importantly—as U.S. taxpayers, do we want to be complicit in Netanyahu's unprecedented and savage military campaign against the Palestinian people? Do we want to continue providing the weapons and the military aid that is causing this massive destruction? Do we want that war in Gaza to be not only Israel's war, but America's war?

On the first question, the legal issue, the answer is very clear. Netanyahu and his extremist government are clearly in violation of U.S. and international law and, because of that, should no longer receive U.S. military aid.

International law requires that warring parties facilitate rapid and unimpeded passage of humanitarian relief for civilians in need. That is international law. Israel has clearly not done that. Only in the last several weeks, after pressure from President Biden, has aid access begun to improve somewhat; though, it is still grossly insufficient given the scale of the humanitarian catastrophe.

Maybe more importantly is that U.S. law on this subject is extremely clear. There is no ambiguity. The foreign assistance act says that no U.S. security assistance may be provided to any country that "prohibits or otherwise restricts, directly or indirectly, the transport or delivery of United States humanitarian assistance." That is the law. Israel is clearly in violation of this law. For 6 months, it has severely limited the amount of humanitarian aid entering Gaza. The result has been a catastrophic humanitarian disaster with hundreds of thousands of children facing malnutrition and starvation. Israel's violation of this law is not in debate. It is a reality repeatedly confirmed every day by numerous humanitarian organizations. Israeli leaders themselves admit it.

At the start of this war, the Israeli Defense Minister declared a total siege on Gaza, saying—this is the Israeli defense minister:

We are fighting human animals and we [are acting] accordingly.

There will be no electricity, no food . . . no fuel . . . Everything [is] closed.

And they kept their word on that. In January, Netanyahu himself said that Israel is only allowing in the absolute minimum amount of aid. For months, thousands of trucks carrying lifesaving supplies have sat just miles away from starving children—trucks with food miles away from children who are starving. And Israel has kept these trucks from reaching people in desperate need.

Israel's blockade pushed the United States—this is rather incredible—to extreme measures, including airdropping supplies and the construction of an emergency pier in order to get food to starving people. In other words, the President and the United States did the right thing. Children are starving. We are trying to do airdrops, build a pier. In other words, we are now in the absurd situation where Israel is using U.S. military assistance to block the delivery of U.S. humanitarian aid to Palestinians. If that is not crazy, I don't know what is; but it is also a clear violation of U.S. law.

Given that reality, we should not today even be having this debate. It is illegal to continue current military aid to Israel, let alone send another $9 billion with no strings attached.

Let me take a moment to describe what is happening in Gaza right now to further explain why these amendments are absolutely necessary and why we must end U.S. complicity in Netanyahu's war in Gaza.

More than 34,000 Palestinians have been killed and 77,000 wounded since this war began; 70 percent of whom are women and children—70 percent of whom are women and children. That means some 5 percent of the 2.2 million residents of Gaza have been killed or wounded in 6½ months—5 percent of the entire population in 6½ months have been killed or wounded. That is a staggering, rather unbelievable number.

Mr. President, 19,000 children in Gaza are now orphans—19,000 children are orphans—having lost their parents in this war. And I might add, for the children of Gaza, the psychic damage that has been done to them will never cease in their lives. They have witnessed—little kids; Gaza is a young community, a lot of children—they have witnessed unbelievable carnage, destruction of houses. They have experienced hunger, thirst. They have been thrown out of their homes. What is being done to these many hundreds of thousands of children is unforgiveable.

And the killing has not stopped. Over the weekend, 139 Palestinians were killed and 251 were injured. Of these, 29 were killed in and around Rafah, including 20 children and 6 women, 1 of whom was pregnant.

Roughly 1.7 million people, over 75 percent of the population, have been driven from their homes in Gaza. Satellite data shows that 62 percent of homes in Gaza have been either damaged or destroyed, including 221,000 housing units that have been completely destroyed—221,000 housing units completely destroyed. That is more than 1 million people made homeless by Israeli bombing.

Not only housing, it is Gaza's entire civilian infrastructure that has been devastated. In Gaza today, there is no electricity, apart from generators or solar power, and most roads are badly damaged. More than half of the water and sanitation systems are out of commission. Clean drinking water is severely limited, and sewage is running through the streets spreading disease.

Israel has not only destroyed the housing stock in Gaza, not only destroyed the infrastructure, they have systemically destroyed the healthcare system in Gaza. Mr. President, 26 out of 37 hospitals are completely out of service in a country which now has tens and tens of thousands of people who are sick and wounded. Only 11 hospitals are partially functioning, but they are overwhelmed by the many, many people who are sick and injured, and they are all short of medical supplies. Doctors have had to perform countless surgeries without anesthesia or antibiotics, only three hospitals are now providing maternal care in Gaza, where 180 women are giving birth every day. Overall, 84 percent of health facilities have been damaged or destroyed in Gaza, and more than 400 healthcare workers have been killed.

But it is not only the housing that has been destroyed, not only the infrastructure, not only the healthcare system, the education system in Gaza has collapsed, with 56 schools destroyed and 219 damaged. The last of Gaza's universities was demolished in January. Some 625,000 students now have no access to education. I really do not understand what the military utility of destroying a university is. Mr. President, above and beyond the destruction of homes, the destruction of the infrastructure, the destruction of the healthcare system, the destruction of schools, universities, and the educational system, unbelievably, there is something even worse now taking place in Gaza, and that is that more than 1 million Palestinians, including hundreds of thousands of children, face starvation.

People in Gaza are foraging for leaves. They are eating animal feed or surviving off the occasional aid package. At least 28 children have already died of malnutrition and dehydration. The real number is likely much, much higher. But without sustained humanitarian access throughout Gaza, it is impossible to know. Recently, USAID Administrator Samantha Power said that famine was already present in northern Gaza.

Without food, clean water, sanitation or sufficient healthcare, hundreds of thousands of people are at severe risk from dehydration, infection, and easily preventable diseases.

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 113 of 267

I keep hearing discussion from the pundits and the experts about the "day after in Gaza," when the war is over. But what kind of "day after" can there be amidst this incredible destruction? Gaza today can barely sustain human life.

Hamas started this war. That is true. But this war stopped being about defending Israel a long time ago. What is going on now is the destruction of the very fabric of Palestinian life. It is impossible to look at these facts and not conclude that the Israeli Government's policy has been quite deliberately to make Gaza uninhabitable for Palestinians. And, clearly, there are powerful voices in Israel's extreme-rightwing government who have been quite open about their desire to drive the Palestinian people out of both Gaza and the West Bank.

This is not the Israel of Golda Meir. Netanyahu's government is beholden to outright racists and religious fanatics who believe that they have exclusive right to dominate the land.

That is why we must end our complicity in this terrible war. That is why we should support the amendment I am offering to end unfettered military aid to Netanyahu's war machine.

Let's be clear: Cutting military aid to Netanyahu's government is not just my view. It is what the American people believe and are demanding. The American people, in fact, are fed up with Netanyahu and his war. They do not want to see their taxpayer dollars support the slaughter of innocent civilians and the starvation of children.

A recent Gallup poll showed that just 36 percent of Americans approve of Israel's military action, with 55 percent disapproving. A Quinnipiac poll showed that U.S. voters oppose sending more military aid to Israel by 52 percent to 39 percent. An earlier YouGov poll also showed that 52 percent of Americans said the United States should stop sending weapons to Israel until it stops attacks in Gaza.

Maybe—and here is a very radical idea—maybe it is time for Congress to listen to the American people. I would urge strong support for my amendment.

Mr. President, my second amendment would remove the ban on funding for UNRWA, a U.N. organization with 30,000 employees that is delivering essential humanitarian aid in Gaza and supporting basic services in other neighboring countries, including Jordan. Millions of people rely on those services.

Israel has said that 12 UNRWA employees were involved in the October 7 terrorist attack. These are serious charges and, obviously, any involvement with Hamas by UNRWA employees is unacceptable. That is why every year UNRWA provides Israel with a list of its staff and goes to great lengths to cooperate with Israeli authorities. UNRWA learned about Israel's accusations from the media, and immediately fired the accused employees while the U.N. launched an investigation.

Thus far, Israel has refused to cooperate with the U.N. investigation. I should add, importantly, that most major donors have now restored funding to UNRWA and are satisfied by the agency's protocols to ensure independence from Hamas.

The U.S. National Intelligence Council, meanwhile, said that Israel's claims were plausible but could not be confirmed, and noted that Israel has tried to undermine UNRWA for years. In the last 6 months, Israel has harassed UNRWA employees, blocked shipments of supplies including medicines, frozen its bank accounts, and killed 181 U.N. staff.

UNRWA plays a critical role both in Gaza and across the region. Whatever the investigation shows in the end, it is my view that you do not deny humanitarian aid to millions of people because of the alleged actions of 12 UNRWA employees out of a workforce of 30,000.

And, by the way, when we talk about investigations, maybe—just maybe—we should not just be talking about investigating UNRWA. Maybe we should also investigate what is going on in the West Bank. Last weekend, after an Israeli teenager was killed, large groups of armed Israeli settlers—vigilantes—rampaged through 17 villages, shooting dozens of people and burning homes. Israeli soldiers watched the attacks unfold, doing nothing to stop them. No arrests have been announced. Maybe we need an investigation there as well.

This past weekend, the Israeli military killed 14 more Palestinians in the West Bank. An ambulance driver was shot and killed as he tried to recover people wounded in another violent attack by Israeli settlers.

Since October 7, Israeli soldiers and settlers have killed more than 470 Palestinians in the West Bank, including more than 100 children. But for some reason, I don't know why, I just don't hear any of my colleagues calling for an investigation of that.

We are in a critical moment, not just in terms of what is happening in Gaza but, in many ways, what is happening right here in America and what is happening here in the U.S. Senate. Given the fact that a majority of the American people now want to stop funding for Netanyahu's war machine, I find it incomprehensible that we are not going to be able to vote on that issue.

I find it outrageous that, at a time when Netanyahu's government has clearly broken the law, Members of this Congress, Members of the Senate, are not going to be able to vote as to whether or not they want to continue providing billions more of unfettered military aid to Netanyahu's war machine.

So I would hope that we will have the decency to allow a little bit of democracy here in the U.S. Senate. I would hope that we will allow the Members to vote on some of these very, very important issues, and I certainly hope that we will pass these amendments.

I yield the floor.

The PRESIDING OFFICER. The Senator from Kansas.

Mr. MORAN. Mr. President, my colleagues, we live in a dangerous world. Fellow Americans and Kansans, we live in dangerous times, and the world is a real challenge.

The national security crises abroad and here at home are increasing. They are ever increasing. Iran launched a full-scale attack on Israel. Hamas has stated its intent to wipe Israel off the map. Russia continues its brutal aggression in Ukraine. And China is rapidly modernizing its military and using companies to spy and track Americans.

Each of these conflicts is interconnected, and it would be naive to send aid to Israel but take a pass on supporting Ukraine, Taiwan or our other allies. It is vital the United States be a steadfast and reliable partner in the midst of so many dangers that threaten the world and our own nation's peace and prosperity.

In a joint FOX News op-ed with former Secretary Mike Pompeo, we stated:

The preservation of freedom requires enormous effort; indeed, liberty demands the marshaling of every resource necessary in its defense against those who would see it destroyed.

Vladimir Putin has chosen to pursue the reconstitution of the Russian Empire according to his own vision of Russian history. He has made clear that his aspirations go beyond Ukraine and that he views NATO as Russia's enemy. Under Putin's leadership, Russia is increasingly collaborating with other nations that oppose us—Iran and our most powerful adversary, communist China.

Allowing the war in Ukraine to fester will only prolong and deepen the instability already wrought, and it puts at greater risk the 100,000 U.S. service-members defending NATO's borders, including those from Fort Riley in Kansas.

I have said, from the beginning, the world is a better and safer place if Ukraine wins and Russia loses. Ending the war on terms favorable to Kyiv will leave Ukraine and the NATO front in a stronger and better position to deter further Russian aggression.

Just a week ago, Iran launched a full-scale attack on Israel from its own soil. Through an impressive and coordinated effort with the United States and other countries, Israel successfully defended itself from the barrage of missiles fired at it. It was a victory for Israel, but Iran has demonstrated that it is capable and willing to act on its desire to eliminate the State of Israel.

Standing with Israel and Ukraine also means standing with our Indo-Pacific partners. We cannot be tough on China and weak on defending Ukraine and Israel.

The Pentagon describes China as the most "comprehensive and serious challenge" to U.S. security. The Japanese Prime Minister stood before Congress,

USCA Case #24-1113      Document #2060757      Filed: 06/26/2024      Page 114 of 267

just a few days ago, and reaffirmed that "Japan is already standing shoulder to shoulder with the United States." The United States must send the message that we are committed and that we are standing shoulder to shoulder with our allies in the Indo-Pacific.

The bill that we are about to debate, discuss, and presumably vote on allows the United States to respond to immediate needs as China increases its military provocation of Taiwan, while also modernizing our own U.S. fleet to compete in the Pacific.

It is in America's—it is in America's—vital national interest to assist Ukraine in repelling Russian invasion, assist Israel in driving out terrorism, and assist our Indo-Pacific partners in standing up to China's threats. We must project strength. Failure to do otherwise undermines our credibility, and that undermining of credibility, unfortunately, resonates around the globe. That credibility was already damaged after the administration's disastrous and chaotic withdrawal from Afghanistan.

Additionally, in this funding package, a majority of those funds provided to Ukraine—and those provided in previous packages—will be directly injected back into the U.S. economy.

There has been a significant amount of misinformation on this bill, and that is important to clarify: 70 percent of funding in the Ukraine bill—$42 billion of the $60.8 billion—will be used to replenish U.S. stockpiles and develop, produce, and purchase U.S.-made weapons, including weapons from production facilities in Kansas and the Kansas City area.

This package also requires the administration to develop a strategy to support Ukrainian victory.

The American people deserve to know the objectives of supporting Ukraine, our interests as they relate to this war, the cost of not satisfying those interests, and an estimate of the resources that are needed. The supplemental will deliver on all of these aspects.

There is no path forward for Ukraine; there is no path forward for Israel or for Taiwan if the United States of America disengages in the world. The pricetag is significant. But in the absence of taking a stand now, we have to take a stand tomorrow. Do what we need to do today or pay a price later, and later will be even more costly, but these costs must be shared with our NATO allies and our partners elsewhere in the world.

I commend NATO and the European nations that have, up to now, pledged more support to Ukraine's cause even than our own country has. Europe has pledged more money than the United States; yet it is critical to rapidly fulfill these commitments, such as through the delivery of necessary equipment like air defense systems, to help Ukraine better withstand Russia's onslaught.

I am reluctant—and so are many Kansans—to spend more money or to be engaged further in the world, especially with a crisis at our own southern border. I share my colleagues' frustrations that we were unsuccessful. We came close, but we were unsuccessful in including border policies in this package. The crisis at the southern border is a grave national security threat. There are lots of reasons to be concerned about people coming across our borders, but I would highlight, in this conversation, it is a security threat. The administration's continued inaction at the border is particularly frustrating when the administration has many of the tools that it needs to improve the situation.

I will continue working to pass legislation to protect the border, but at the same time, we must work to bolster our national security in the areas that we can agree upon. We can't wait for a new administration or a new Congress to try and pass perfect border legislation, if such a thing exists. Some of the national security challenges we face are not strictly military in nature and reflect the changing nature of what conflict is. What does "conflict" mean today?

Our adversaries use technology companies to collect vast amounts of personal data from Americans. This information can be used to control or influence each of us, often without our even realizing it is happening. This bill takes the first step to protect U.S. data, but significant work is left to ensure America's data is secured by a Federal comprehensive data privacy and security law.

The challenges we face, unfortunately, will not just go away. They will not resolve themselves on their own, and the preservation of freedom requires enormous effort. I have always believed that our greatest responsibility as American citizens is to make sure that those who follow us live with the freedom and liberties that were guaranteed by our Constitution and that were fought to protect and defend by those who sacrificed, many of them who sacrificed their own lives. This week, we have an opportunity to deliver on that effort—to do, to live up to our responsibilities as Americans to be a steadfast and reliable partner.

I am grateful to my colleagues in the House for their work in getting the National Security Supplemental passed and sent back to the Senate.

I underscore to my colleagues in the Senate the importance of doing the work we were elected to do. Americans who will be directly impacted, they are paying attention—but so are our adversaries and allies. I hope we are successful in fighting for and defending the liberties and freedoms of America and Americans and in protecting and helping to secure the remainder of the world. It is in our benefit—in America's benefit—to do so.

I yield the floor.

The PRESIDING OFFICER (Ms. KLOBUCHAR). The Senator from Illinois.

Mr. DURBIN. Madam President, I feel fortunate, of course, to serve in the Senate and equally fortunate to represent the State of Illinois and the city of Chicago. What an amazing gathering place for America Chicago has been over the years—and still is to this day.

When we talk about issues here in Washington, many times I can relate them not just to neighborhoods but to people in Chicago who feel so intensely about the land of their birth or causes of other countries. I have gone through that same experience myself—my mother an immigrant from Lithuania. I was fortunate to witness the freedom struggle in Lithuania when they finally broke from the Soviet Union. If you go down Chicago Avenue west of Michigan Avenue, you go into an area known as Ukrainian Village. That nomenclature speaks for itself. There are churches and gathering places, schools, and families who are watching the war in Ukraine with personal intensity. To them, it is a land where their mothers and fathers were born and where many of them were born, and they have prayers and pleas to the politicians not to forget.

You can also step right outside of this Chamber, a few steps away, and find a group of Ukrainian Americans who have been demonstrating on behalf of the cause of Ukraine for as long as this war has gone on. I saw them this morning, and as we go by, the typical greeting in the Ukrainian Village is "Slava Ukraini"—"Long Live Ukraine"—to which they reply that they agree with me. It is a great feeling to see these demonstrators peacefully demonstrating for a cause that means so much to them and to realize that, as a Senator, I am going to have a vote today or tomorrow that can make a real difference in whether Ukraine prevails against Vladimir Putin or whether it doesn't.

Last week, my Ukrainian Caucus co-chair, Senator ROGER WICKER—the Republican of Mississippi—and I hosted the Ukrainian Prime Minister. The Presiding Officer was there, and we were joined by several colleagues from both sides of the aisle. It was truly a bipartisan turnout.

The Prime Minister's point was simple: With continued U.S. and allied support, Ukraine can defeat Russia's brutal war and, in doing so, help defend greater security in Europe.

I agree. That is why the weekend vote in the House and the vote here this week in the Senate are so important.

We always have had an isolationist sentiment in the United States. If you are a student of history, you know that we had to overcome that sentiment in both World Wars; but in both cases and here today with Ukraine, in the larger national security supplemental bill which we are considering, it was not only in our interest to stop wars of aggression but also to help maintain the international world order that reflects our values and benefits here at home.

USCA Case #24-1113     Document #2060757     Filed: 06/26/2024     Page 115 of 267

Russia's unprovoked invasion of Ukraine and its earlier seizure of land in Georgia and Moldova threaten decades of hard-won peace and stability in Europe. Make no mistake, China, Iran, and North Korea are watching to see if the United States and our allies allow Russia's aggression to stand. Doing so not only would embolden Putin to try for more European land, including from NATO allies like the Baltics and Poland, but it would also raise the risks faced by allies in the Indo-Pacific and the Middle East. That is why I am so pleased that this supplemental includes security assistance for our key allies in those regions of the world as well.

It also includes considerable humanitarian aid to help with the number of growing needs, including in Gaza, Sudan, and in drought-stricken areas of the world that are facing food insecurity.

Quite simply, what we do today has consequences—global historic consequences. NATO Secretary General Stoltenberg recently issued his blanket warning to us all.

He said:

If Vladimir Putin wins in Ukraine, there is a real risk that his aggression will not end there.

Putin will continue to wage his war beyond Ukraine, with grave consequences.

Stoltenberg went further to remind us:

Our support is not charity; it is an investment in our own security.

I want to remind my Republican colleagues that President Ronald Reagan understood this 37 years ago when he said at the Brandenburg Gate dividing East and West Berlin: "Mr. Gorbachev, tear down this wall." I was lucky enough to be in Berlin when the wall was coming down. The euphoria felt by the people of Berlin was palpable. I remember groups coming to the Brandenburg Gate, bringing little hammers with them to try to chip off a piece of the wall and save it for their children and grandchildren. It meant that much to them.

Only a few years after his historic speech, the Soviet Union collapsed, ushering in decades of freedom and prosperity in Eastern Europe and a welcomed end to the Cold War. Vladimir Putin called this historic wave of liberation from the shackles of Communism "the greatest geopolitical catastrophe of the 20th century"—a wave of freedom he clearly wants to reverse that continues to this day.

And my friend and former colleague John McCain, with whom I will never forget walking through the makeshift shrines to those killed fighting for democracy in Ukraine's Maidan Square, saw this battle of ideas and freedom so clearly.

Recently, House Foreign Affairs Committee chair MIKE MCCAUL happily noted:

The eyes of the world are watching, and our adversaries are watching, and history is watching—and that's what I kept telling my colleagues: Do you want to be a Chamberlain or a Churchill?

So I urge a strong bipartisan vote this week to send a clear message to Putin that he cannot prevail in Ukraine; to ensure that other key allies and humanitarian crises will receive much needed aid; and to uphold basic international norms.

The Washington Post called the House's approval of the supplemental "the vote heard around the world." Let's make sure our actions in the Senate this week are also heard around the world.

This package contains many elements beyond aid to Ukraine. The Indo-Pacific section provides $2 billion in weapons for Taiwan and $3.3 billion for a submarine base, and provisions relating to humanitarian aid to Gaza, Sudan, and other vulnerable populations around the world will make a difference between life and death.

We want to crack down on the fentanyl trafficking. I recently had Anne Milgram, who is the head of the Drug Enforcement Administration, back to my office to give me a briefing on the fentanyl crisis in this country. It bears repeating what she said over and over again:

One pill can kill.

That message has to be communicated to our children and families all across the United States. We lost over 100,000 Americans last year to fentanyl. Some of them had no idea what they were ingesting. What they did, of course, was to take a fatal dose of fentanyl, which can be very small.

Yesterday, I was at O'Hare Airport in Chicago and was taken on a tour to show the efforts to intercept precursor drugs and pill pressers, tablet pressers, that are coming into this country and killing so many people. So many innocent people have no idea of the danger. A young person, a teenager in Chicago, felt that he was ordering a Percocet pill—a harmless Percocet pill—over the internet. It was laced with fentanyl, and he died on the spot. One pill can kill.

We take significant steps forward in the enforcement of laws against fentanyl and drug trafficking, as we should.

We also have new sanctions on Iran, Russia, and China. And, of course, there was a controversial issue, the sale of TikTok, which is included in this.

My greatest fear is that Netanyahu and his rightwing coalition, once they receive these American funds, will act irresponsibly. I am afraid that they will revert to their devastating tactics in Gaza. In the name of stopping Hamas, they will, unfortunately, revert to their devastating tactics, which kill many innocent people, mainly women and children—Palestinian women and children—who have no place to turn, no place to escape. These innocent people living in Gaza should not be victims of this war.

There are requirements for all civilized nations in wartime when it comes to protecting individuals and civilians, and they certainly should apply in this situation. There is no question—and it bears repeating every time we talk about this topic—that Israel has the right to exist; it has the right to defend itself; and it had the right to strike back at Hamas after the atrocities of October 7, but the humanitarian crisis which was unleashed in Gaza is unspeakable, indefensible, and we cannot be a party to it.

There are provisions in the law for those who receive aid from the United States, and that would include all of the countries that I have mentioned here—provisions in the law which require them to adhere to international standards when it comes to protecting the innocent and when it comes to facilitating the delivery of humanitarian aid. We must hold Israel and all recipients of U.S. aid to those standards to make certain that they are doing everything in their power to protect the innocent.

This is an important vote, and, as usual, in the Senate, we find that it is not a single issue that we will be voting on but, in fact, perhaps, a dozen key issues, any one of which could be a major bill debated at length on the floor of the Senate. But time is wasting. We passed this defense supplemental for the first time in February of this year, and here we are in April. It is time to get this done for the relief and the support of the people in Ukraine and for the good of American values all around the world.

I yield the floor.

The PRESIDING OFFICER. The Senator from South Dakota.

Mr. THUNE. Madam President, less than 2 weeks ago, Iran attacked Israel with a barrage of more than 300 missiles and drones. The attack was a notable escalation on Iran's part since the weapons were fired not just by Iranian proxies but also directly from Iran.

It was a reminder of two things:

First and foremost, the attack was a reminder of the need for the United States and the free world to make it clear to Iran that we are not going to stand idly by while Iran attacks Israel and continues to foment terror in the Middle East.

Iran's malign activities have been allowed to go on for far too long, and it is past time not just for the United States but for nations in Europe, the Middle East, and elsewhere to call a halt to Iran's activities.

On a larger scale, Iran's attack on Israel was a reminder that bad actors and hostile powers are going to fill any space that they think they can fill. And if the United States and other free countries abdicate leadership or telegraph weakness on the global stage, bad actors are going to be happy to step in to fill the vacuum.

I would not be surprised if the Biden administration's all-too-frequent posture of appeasement toward Iran—and the lack of clarity the administration

USCA Case #24-1113     Document #2060757     Filed: 06/20/2024     Page 116 of 267

has telegraphed about U.S. support for Israel—has emboldened Iran to reach further and engage in the kind of escalation that we saw this month.

Bad actors around the world are flexing their power right now: Iran in the Middle East, Russia in Europe, China in the Indo-Pacific and beyond. And these powers are forging alliances with each other to advance their activities.

Iran has provided Russia with weapons to use in its war on Ukraine and is working with Russia to produce drones at a Russian facility. Meanwhile, Russia has committed to supplying Iran with fighter jets and air defense technology—assets which, as a recent Washington Post article noted, "could help Tehran harden its defenses against any future airstrike by Israel or the United States."

When it comes to China, the Secretary of State recently reported:

We see China sharing machine tools, semiconductors, other dual-use items that have helped Russia rebuild the defense industrial base that sanctions and export controls had done so much to degrade.

In the face of increased aggression from these powers, the United States' response needs to be one of strength. That includes not just having a strong military and a strong economy but engaging on the global stage.

As I said, bad actors will fill any space they think they can fill. And when the United States and other free countries abdicate leadership on the global stage, bad actors will step in to fill the vacuum.

The foreign aid contained in this bill is an important part of telegraphing America's refusal to cede the global stage to hostile powers.

It will help demonstrate to Iran our support for Israel and help our ally rid itself of the threat of Hamas on its border.

It will help make it clear to Russia that the United States is not going to give Russia free rein in Eastern Europe.

It will help make a credible investment in our own industrial base and replenish interceptors that we used in the Red Sea.

And it will let China know that while Taiwan may be small, its backing is not.

Sending these messages is important. It is in our Nation's interest to ensure that a newly victorious and emboldened Putin isn't sitting on the doorstep of four NATO states that we are bound by treaty to protect.

It is in our Nation's interest to ensure that a China inspired by a Russian victory in Ukraine doesn't decide it is time to invade Taiwan.

And it is in our Nation's interest to ensure that Israel is equipped to defend itself from Iran and its terrorist proxies.

I am pleased that in addition to the funding for Israel, Taiwan, and Ukraine we considered before, the bill before us today includes some new measures. Notable among them is legislation to ban TikTok if the company is not purchased by an entity unaffiliated with the Chinese Communist Party.

Currently, the Chinese Communist Party is able to gain unlimited access to the account information of TikTok users if it so chooses. And the news that emerged last week that the Chinese Embassy has actually lobbied congressional staff against legislation to force the sale of TikTok was a stunning confirmation of the value the Chinese Government places on its ability to access Americans' information and shape their TikTok experience. So I am very pleased that the bill before us today would ban TikTok if it is not sold to a company without ties to the Chinese Communist Party.

I am also pleased that this legislation includes the Rebuilding Economic Prosperity and Opportunity for Ukrainians Act—or the REPO Act—which would direct frozen Russian assets to rebuilding efforts in Ukraine. Russia has caused a horrifying amount of destruction in Ukraine, and it is right that Russian assets should go toward its rebuilding.

This bill also contains additional accountability measures for our support for Ukraine, including a provision that would turn some of the funding into loans to be repaid by Ukraine when it is back on its feet.

Does this bill cover everything we should be doing on the national security front either at home or abroad? No, it doesn't. But it will provide essential support to our allies that will not only help them preserve their freedom but will advance U.S. interests around the globe.

So I look forward to the Senate's passing this legislation this week and sending a clear message about American resolve and about American strength.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. CARDIN. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. CARDIN. Madam President, I come to the floor to talk about the pending business, the supplemental appropriations bill that came over to us from the House of Representatives.

In February of this year, I was in Munich for the security conference, and the question that was asked of me the most by just about every world leader is whether the Congress would pass the Ukraine supplemental appropriations bill. Our colleagues around the world understood how important the supplemental appropriation passage was to the security of Ukraine and its ability to defend itself.

I want to tell you, when I was asked that question by the world leaders, I said, yes, we would pass it. I don't know if they were so convinced that we would get it done, and I am not so sure how convinced I was at that time that we would be able to reach a point where we would be able to keep the supplemental intact and be able to pass it. For, you see, the aid in that supplemental is so critical to the defense in Ukraine. Ukraine is literally running out of ammunition. The U.S. leadership is absolutely indispensable.

It also, of course, includes the humanitarian assistance and so many other important issues. But it also represents U.S. leadership, the ability for us to keep the coalition of the democratic states and the West together in our campaign to make sure that Mr. Putin does not succeed in taking over Ukraine and then moving to other countries in Europe.

Now we can definitely answer the question. By our actions in this body, we can tell our friends around the world that, yes, the supplemental appropriation will pass, will be signed by President Biden, and the aid will be flowing to Ukraine to defend itself.

So much depends on the passage of this supplemental. First and foremost, it is the defense of Ukraine—incredibly brave people in Ukraine who are holding up the defense against a great, mighty Russian army. They have been very, very successful, but they need to have the ability to defend themselves. That is what they are asking the United States to do: not to provide the soldiers but to provide the wherewithal so we will not have to send our soldiers to Europe.

It is the frontline for defense of democratic states, where we all know that Russia will not stop with Ukraine if they are successful; that Moldova and Georgia, the Baltic States, and Poland are all very much in the view of what Mr. Putin wants to take over.

But there is more to the supplemental than just Ukraine. There is the financing for the Middle East. Israel is defending unprecedented Iranian drone attacks. We saw that last week. They need our assistance to make sure that they can protect against these missiles and drones.

We know the leaders of Taiwan are looking to passage of this supplemental because they have to look across the Taiwan Strait at the People's Republic of China and their aggressive language and their concerns about whether China will use force against Taiwan. The passage of this supplemental gives great hope to Taiwan that the United States is with them.

Then, as I mentioned earlier, the humanitarian workers who are desperate to help in the Sudan need our resources in order to meet that crisis that is going on every day. The passage of this supplemental will help the humanitarian workers deal with the humanitarian crisis that we have in the Sudan, that we have in Gaza, and that we have in Ukraine and so many other areas around the world.

So, yes, it has been difficult to understand the delay in getting this done, and it has affected Ukraine's ability to defend itself, the delay in getting the supplemental to the finish line. So it is absolutely essential, as Senator SCHUMER said, that we complete our work as quickly as possible and to remove any doubt about America's support of Ukraine. If there was any doubt, the vote in the House of Representatives on the Ukraine package passed by a strong bipartisan vote of 311 to 112.

Now, the entire package enjoys strong bipartisan support, and that is critically important for the success of our foreign policy—$60 billion for Ukraine, $26 billion for Israel, $8 billion for Taiwan and our Indo-Pacific partners, and $9 billion for global humanitarian assistance. But in addition to the appropriations that were in the bill when we passed it in the Senate months ago, the House added some additional provisions which, quite frankly, I think all strengthen the bill.

It provides a way to hold Russia accountable for its own actions, the damage it has caused. That is a positive addition to the package. It strengthens our sanctions against some of our most extreme adversaries. That also strengthens the bill.

I was pleased that there was a reauthorization of the Elie Wiesel Genocide and Atrocities Prevention Act, a bill that I authored that deals with trying to avoid conflicts from turning into genocide or atrocities so we can prevent having to deal with the challenges we see in so many parts of the world. We need to invest in prevention, and the Elie Wiesel Act gives us the tool to do that.

I want to recognize President Biden for his leadership on these issues, his leadership globally in keeping the coalition together in support of Ukraine and our foreign policy objectives in the free world, and also for what he did here in the United States: staying true to the principles, connecting the dots for the American people, and dealing with the strategy so we can finally get this bill to the finish line. I congratulate the Biden administration for staying with this and helping us reach this moment where we are on the verge of passing the Supplemental Appropriations Act.

It reinforces our foreign policy that is rooted in our values that promote human rights and defend democracy—a foreign policy drawn by basic human decency. That is what the U.S. foreign policy is about, and this supplemental reinforces our objectives in each one of those categories.

This gives the world a credible vision of the future—a future that discourages dictators and autocrats, a future for a Europe whole and free, a future for a thriving Indo-Pacific, a future for a peaceful and prosperous Middle East, and a future that prioritizes civil society movements and human rights around the world.

I know that the challenges we face today on the global stage seem immense because they are. Anyone can see that. Russia is relentlessly bombing Ukraine's oil and gas sector. Ukraine is running out of ammunition. But, shortly, we will take a historic vote—a vote that, as President Zelenskyy says, gives Ukraine "a chance at victory."

So I urge my colleagues to join me in voting for the supplemental that passed the House of Representatives. I urge them to vote yes to funding America's foreign policy and national security priorities, yes to supporting the war-stricken people of the world who will not give up hope for democracy, yes to standing up with our allies and partners across the globe, and yes to a future American leadership on the global stage that is based on our values.

EARTH DAY

Madam President, on Monday, April 22, we celebrate Earth Day. Since April 22, 1970, millions have come together worldwide to highlight the urgent action needed to save our planet.

In 1970, the American environmental movement began in earnest as concerned individuals mobilized en masse to protect the planet.

The status quo was unacceptable—rivers so polluted they caught fire, children getting sick just from playing outside, and wildlife showing clear signs of distress.

In Congress, Senator Gaylord Nelson of Wisconsin championed the Earth Day movement, with the hope of bringing environmental awareness to the political and national stage.

Back then, the exact causes of our planet and people's ailments were not totally understood. The American people were not aware the extent to which the reliance on fossil fuels, fertilizers, and pesticides were causing irreparable harm.

We know a lot more now. However, we are still learning about how harmful everyday products are. Items that we accept as part of our daily life—plastic products, for example—are ubiquitous.

This year's Earth Day theme, planet vs. plastics, reminds us that the threat of plastic pollution continues to grow. Plastics are actively causing harm to human life, animal life and our Earth.

It is estimated that the average American ingests more than 70,000 microplastics in their drinking water supply. The origins of these plastics range from littering to stormwater runoff, to poor wastewater management in treatment facilities.

Plastic pollution is one of the most pressing environmental issues we currently face. Microplastics and microfibers are smaller than 5 millimeters in size. An estimated 50 to 75 trillion pieces of microplastics are in the ocean. Because these microplastics are so small, many animals mistake them for food. These microplastics have been found to attract and carry pollutants that are present in the water, making them carriers of various harmful chemicals.

Evidence such as this prompted then-President Barack Obama to pass the Microbead-Free Waters Act. The Microbead-Free Waters Act helped to ban plastic microbeads in certain products from being sold in the United States.

However, this same regulation does not apply to the limiting of microplastics in bottled water or microfibers in clothing.

When synthetic clothes are washed in the washing machine, an estimated 3.5 quadrillion microfibers are released—a process known as microfiber shedding. This particle is the most prevalent type of microplastic found in the Chesapeake Bay. With over 3,000 miles of coastline, Maryland is extremely vulnerable to plastic marine debris and its environmental consequences.

A study by NOAA took samples of various locations of the Chesapeake Bay watershed and found that 98 percent of the samples contained microplastics.

A modeling exercise conducted by researchers from Pennsylvania State University and the Virginia Institute of Marine Science found that the majority of plastic pollution in the Chesapeake Bay stays within the local waters and is not exported to the ocean.

The study suggests that the bay acts as a catchall for plastics, with about 94 percent of microplastics staying in the system, most likely on or along the shores. Only 5 percent of the particles were carried from the bay to the ocean, and 1 percent remained suspended in the water column.

In 2020, Maryland produced nearly 12 million tons of solid waste, with 13 percent attributed from plastics, including plastic bags.

Research concluded that the COVID–19 pandemic led to a rise in carryout services and grocery store visits, resulting in a 30 percent increase in plastic waste in 2020.

My home state of Maryland has taken many steps to combat plastic pollution. In September 2020, Maryland made history by becoming the first State to enact a ban on expanded polystyrene foodware, the single-use plastic foam that is often used for takeout cups and containers.

In October 2021, Baltimore effectively banned the use of plastic bags used for grocery and restaurant services, while also imposing a 5-cent bag tax on alternative bag use. The Salisbury City Council unanimously approved a ban on certain types of plastic bags that took effect on July 1, 2023. These are all significant steps my home State has taken to address plastic waste.

Plastics not only threaten the marine life, like oysters and crabs, that call the Chesapeake Bay home, but they can also negatively impact the economy and health of Maryland and the region at large.

In light of the threat of microplastics and the broader environmental challenges we face, I am proud of the accomplishments we have made to address the plastic pollution crisis.

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 118 of 267

The Save Our Seas 2.0 Act was signed into law in December 2020. One of the crucial components to this Act was the authorization of the NOAA Marine Debris Program. The NOAA Marine Debris Program serves as a model for finding ways to track marine debris, including plastics, around the world.

Congress must continue to take action to support legislation that seek to reduce the use and production of plastic and improve recycling facilities.

I am proud to be a cosponsor of the Plastic Pellet Free Waters Act, introduced by my colleague Senator DICK DURBIN.

Last year, I was privileged to lead a bipartisan delegation to Dubai for COP28. During this summit, we emphasized that the United States is concerned about the impacts of climate change and is ready to continue taking action to combat it.

At the summit, Under-Secretary-General of the United Nations and Executive Director of the U.N. Environment Programme warned of the climate implications of plastics to our coastal ecosystems and oceans. He urged the plastic industry to find non-plastic alternatives for products to help the environment.

When Earth Day was first celebrated, the topic of environmental protection was not as partisan as it is today. Our focus should be on passing legislation that works to protect and preserve our Earth. We see the evidence before us. The longevity of our Earth is at stake.

While Earth Day only comes around once a year, it should be celebrated every day. We must not forget the responsibility we have to protect our planet. On this Earth Day, I celebrate the progress we have made so far and ask that we reaffirm our commitment to environmental stewardship and sustainable development.

With that, I would yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. KELLY. Madam President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

H.R. 815

Mr. KELLY. Madam President, these are dangerous times for our national security, and the actions we take here this week will shape the world that our kids and our grandkids grow up in.

Putin continues to wage a brutal war to annex Ukraine and has been making gains as Ukraine runs low on ammunition. Israel is under threat from not just Iran's proxy terrorist groups like Hamas and Hezbollah but Iran itself. Just 10 days ago, we saw them launch hundreds of ballistic missiles, cruise missiles, and drones against Israel. China continues its aggression toward its neighbors in Asia as it renews its threats to take Taiwan by force.

Our partners and allies and the democratic values we hold dear are in real danger. That should be enough to compel us to act, but it is bigger than that. Iran, China, and even North Korea are helping to supply Russia's desperate war machine. China's President Xi is watching to see if we can hold together the coalition supporting Ukraine. He is judging what the cost would be if he were to invade Taiwan.

Our adversaries are testing us, and they see instability and dysfunction as an opportunity. That creates a real risk that one or more of these threats could boil over into a wider conflict that would be much more costly for the United States and potentially put more Americans in harm's way.

I spent yesterday at the Naval Air Station in Patuxent River, MD, with U.S. Naval Academy midshipmen. They shouldn't have to go to war years from now in Europe, the Middle East, or the Pacific because of a failure of leadership in Washington, DC, this week. That must be avoided at all costs.

So what do we do? We get our allies and partners—Ukraine, Israel, and Taiwan—the weapons and ammunition to help them defend themselves; we modernize our own forces so our adversaries know they will lose any fight they pick with us; and we provide humanitarian support to those harmed by these conflicts, including innocent Palestinians in Gaza.

The Senate is once again preparing to vote on a national security bill that will accomplish these goals and meet the dangerous moment we find ourselves in, but let's get something straight here. We should have gotten this done shortly after the President proposed it in October. The Senate spent months negotiating before we ultimately passed it with 70 votes. And then the House—well, they let it sit for more than 2 months before sending it back to us with 311 votes.

It should disappoint all of us that partisanship and obstruction meant it took 6 months—6 months—for Congress to pass something that clearly the vast majority of us—in fact, 71 percent of us—in the Congress agreed on. Ultimately, bipartisanship will win the day. It will win the day in the House and in the Senate. But the delays have come at a real cost, especially on the battlefield in Ukraine.

There are a lot of factors that go into winning a war. Russia is a massive country, and even with its heavy losses, it can throw a lot of manpower at the problem to overcome and cover up its incompetent leadership, its culture of corruption, and its underperforming weapons systems.

At the same time, I have seen in my two trips to Ukraine since the war broke out that the Ukrainians have a remarkable spirit that can only come from a unified country fighting for its own existence. They are literally fighting for their own lives. But because of delays in getting this bill passed, Ukraine's fighters are desperately low on artillery shells, on missiles, and even on small arms ammunition. That is tying the hands of their commanders at the same time that Russia is revitalizing its war effort with increased domestic military production and a lot of help from China and Iran.

With the right equipment and enough of it, Ukraine can win this war. Passing this bill will allow us to transfer them more of the weapons, armored vehicles, and ammunition from our stockpiles that Ukraine needs to turn the tide, and then we will be able to replenish our own stockpiles with modern equipment to deter our adversaries from testing us any further. This is a win-win for us.

At a very dangerous time, this is what we must do to prevent further destabilization and conflict that will cost us more in the end. I know that a majority of my colleagues agree with me.

Let's not wait any longer. Let's not wait a day longer. Let's get this done right now and show the world that the United States continues to lead, continues to stand by our allies, and continues to be the strongest force for peace and stability in the world.

I yield the floor.

The PRESIDING OFFICER. The Senator from Maine.

Ms. COLLINS. Madam President, I rise to urge my colleagues to strongly support the national security supplemental appropriations package before us. This important legislation, which was approved overwhelmingly by the House of Representatives, reflects, in many ways, the bipartisan bill that Chair MURRAY and I negotiated and the Senate passed in February by a vote of 70 to 29.

This bill would strengthen our military's readiness, rebuild our defense industrial base, and assist our partners and allies at a volatile and dangerous time in world history.

The national security package before us totals $95 billion. Now, 71 percent of that funding—$67 billion—is defense funding. It will be used to continue vital U.S. military support to Europe and the Middle East, where our partners and allies are under attack by authoritarian regimes, rogue states, terrorists, and other extremists. It will expand and modernize U.S. defense production capacity. It will replenish our own stockpiles with updated, more capable weapons and equipment. And it will strengthen the U.S. submarine industrial base.

In the past few months, I have received briefings from two combatant Commanders—General Kurilla of the U.S. Central Command and Admiral Aquilino of the U.S. Indo-Pacific Command. Each of them has told me that this is the most dangerous global environment that they have seen. One said in 40 years; the other said in 50 years.

The point is, the threats that the United States faces from an aggressive Iran and its proxies, an imperialistic Russia, and a hegemonic China are interconnected. How we respond to one affects how the other will operate. They require a strong response.

The package before us provides the resources to address each of those threats. Let me take just a few moments to highlight some of the bill's key components.

With regard to Iran and its proxies, earlier this month, as we are all painfully aware, Iran attacked Israel with more than 300 drones and missiles. Thanks to the U.S. Navy's heroic response in assisting Israel, as well as the great coordination and response from our allies and partners, fewer than 1 percent of Iran's weapons reached their targets in Israel.

In all, more than 80 incoming drones and at least 6 missiles were intercepted by American forces, including the crews of two destroyers, I am proud to say, that were built in Bath, ME—the USS *Carney* and the USS *Arleigh Burke*.

But let us make no mistake about what was going on with this attack. Iran fully intended to kill as many Israelis as possible and to cause horrific damage. It was only the skill, the bravery, and the precision of Israel, the United States, the United Kingdom, France, Jordan, and Saudi Arabia that prevented that from happening.

This national security package includes $2.4 billion to support the ongoing U.S. Central Command operations in the Middle East, such as those that I have just mentioned, but, also, to keep open vital shipping lanes and to protect commercial ships from all over the world from attack as they are transiting.

It also includes $4 billion to replenish Iron Dome and David's Sling air defense systems, which have proven to be so critical to Israel's self-defense, as well as $1.2 billion for Iron Beam, a promising new air defense capability.

This legislation would also provide vital assistance to Ukrainians battling a brutal, unprovoked Russian invasion. And I know how strongly the Presiding Officer feels about this issue, as do I.

It includes $15.4 billion to help Ukraine purchase American-made weapons to use in its defense and $11.3 billion to support our servicemembers in Poland and Germany who are helping our allies equip and train Ukrainian forces.

But let me underscore an important point. It is not our troops who are dying on the Ukrainian battlefield. It is the Ukrainians who are bravely defending their country. If, however, Putin is allowed to succeed in Ukraine, he will continue to pursue his goal of re-creating the former Soviet Union. He has made no bones about that. He has said that repeatedly.

In my judgment, he would likely seize Moldova next; again, invade Georgia, as he did in 2008; continue to menace the Baltic nations; and threaten Poland. And then, our troops would be involved in a much wider European war because Putin would be ultimately attacking our native NATO allies.

The funding in this package aims to prevent such an outcome by supporting Ukraine as it defends itself against Putin's aggression.

And let me debunk a myth that I keep hearing over and over again, and that is that the Europeans somehow are not doing their part in helping to equip Ukraine. That is just inaccurate.

I have a chart that I used a few months ago, when the supplemental was on the floor, that ranked our European allies. Well, today, the United States would be even further down on this list, which measures security assistance to Ukraine as a percentage of GDP of that nation.

Today, we rank 16th on that list. In other words, 15 other countries—Estonia, Denmark, Latvia, Lithuania, Finland, Poland, Sweden, North Macedonia, Albania, Romania, Netherlands, Germany, the Czech Republic, and the United Kingdom—are all spending more of their GDP to help Ukraine than we are.

I think that is such an important point, and yet we hear, over and over again, by those who are opposed to assistance that the Europeans are not doing their part. They are clearly doing their part.

With regard to the Indo-Pacific, this package would help deter a menacing China, whose navy now exceeds the size of ours. And in the budget that the President just sent up, that would only grow worse, since the President is requesting the lowest number of new ships in 15 years. And we cannot allow that to happen.

This legislative package also includes $1.9 billion to replenish U.S. military inventories transferred under Taiwan Presidential drawdown authority, as authorized by last year's National Defense Authorization Act. This is the fastest way for DoD to get Taiwan the weapons it needs to strengthen its own defense.

The bill also includes $2 billion to provide Indo-Pacific allies and partners with American defense equipment and training, as well as $542 million for the U.S. Indo-Pacific Command's top unfunded requirements.

The package includes humanitarian assistance to address global needs, such as in Sudan and Gaza. It prohibits, however, funding from being provided to the U.N. Relief and Works Agency, known as UNRWA, which employed several terrorists who participated in the October 7 attack on Israel.

Finally, I want to note that this bill includes the FEND Off Fentanyl Act, which I am proud to be a cosponsor of. This bill would help disrupt the flow of fentanyl into the United States, including by requiring the President to sanction criminal organizations and drug cartels involved in trafficking fentanyl and its precursors.

We are losing too many of our family friends, coworkers, and neighbors to this scourge, and we must be more aggressive in combating it. And I thank my colleague Senator TIM SCOTT for his leadership on this piece of the package.

I once again call on my colleagues to recognize the perilous times in which we are living and to vote for this essential national security legislation. We must pass it without further delay.

Our adversaries are watching. With our vote on this package, let us send them a strong message. Terrorists will not succeed in wiping Israel off the map. Authoritarian states will not be allowed to invade their free, independent, and democratic neighbors without consequences. And this Congress, despite its divisions, will come together to ensure that the United States and its military have what they need to stand tall, firm, and beside our allies.

The PRESIDING OFFICER. The Senator from Washington is recognized.

Mrs. MURRAY. Madam President, I ask unanimous consent that I be recognized for up to 10 minutes, Senator SCHMITT be recognized for up to 5 minutes, Senator LEE be recognized for up to 10 minutes, and Senator SANDERS be recognized for up to 2 minutes prior to the scheduled vote.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mrs. MURRAY. Madam President, I have been warning for months about the need to meet this moment of global uncertainty and chaos with a robust, national security supplemental—not delay, not half steps, but investments that show the world we are serious about standing by all of our allies, providing humanitarian aid, and maintaining America's leadership on the world stage, which is why I am glad the House sent us legislation that includes every pillar of the package we passed overwhelmingly here in the Senate.

And I hope now we can all come together to pass these policies once again. We cannot send the message that division has won out against action, that isolationism has won out against leadership, because the challenges that we face and that our allies face are immense, urgent, and interconnected.

Putin is waging a brutal invasion of Ukraine, which is running low on supplies.

The war between Israel and Hamas threatens to escalate into a far more dangerous regional conflict. Civilians caught in conflict desperately need food, water, medical care, and other humanitarian aid. And the Chinese Government is making aggressive moves to grow its influence in the Indo-Pacific.

Those are the stakes of this moment, as I have reminded my colleagues time and time and time again. Inaction cannot be an option. We need to meet this moment, address all the challenges before us, and show the world American leadership is still strong.

I believe that strongly, and I know, when push comes to shove, a clear majority of Members on both sides of the aisle, in both Chambers of Congress, feel the same way.

That is why I have come to the floor so many times over the past several months to lay out in painstaking detail

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 120 of 267

how much is at stake, how crucial it is that we meet this moment with a robust package that addresses the many interconnected challenges before us. It is why here in the Senate we took action over 2 months ago now and overwhelmingly passed a bipartisan national security supplemental. I and many others—Vice Chair COLLINS, Leader SCHUMER, Leader MCCONNELL—all worked very hard over months to craft legislation that could pass both the Senate and the House, that both Democrats and Republicans could get behind.

So I am glad we are now working to pass the national security supplemental the House sent over, particularly since it is materially identical to the Senate package we cleared with such great support.

I have to say I am relieved to see Speaker JOHNSON finally do the right thing, ignore the far right, and send us what is essentially the bill we wrote and passed months ago. But let's be clear about a few things. This delay has not been harmless. Putin's forces have been on the march. His missiles and Iranian-made drones have been striking critical Ukrainian infrastructure. We measure time in hours; Ukrainians are measuring it in how many bullets they have left, how many more missiles fall on their cities, and how much closer Putin's tanks are getting. That was clear even before I said that 2 months ago.

The path forward, the path we are finally now on, was painfully clear because unfortunately we have seen this movie before in debt limit negotiations and in funding the government.

I believe Congress can actually work together. We can actually hammer out a compromise.

This is not the bill either party would have written on their own but one that gets the job done. Let's be clear. The package before us gets the job done. It gets aid to soldiers in Ukraine, who are counting their bullets and wondering how long they can hold out. It gets support to Israel, which faces serious threats on all fronts. It gets support to our allies in the Indo-Pacific, where the Chinese Government has been posturing aggressively. It gets critical humanitarian aid to civilians in Ukraine, Sudan, and Gaza, including kids who are caught in the crossfire who are in desperate need of food and water and medical care.

That was a redline for me. I pushed hard at every stage of this to make sure we provide humanitarian aid. At every stage of these negotiations, I made clear Congress will not advance a supplemental that fails civilians. I will not let us turn our backs on women and children who are suffering and who are often hit hardest by the fallout of chaos and conflict.

Madam President, at a time when the world is watching and wondering if the United States is still capable of meeting the challenges before us, if we are still united enough to meet them, this package won't just send aid, it will send a message. It will show our allies that our word is still good and that we will stand by them in times of need. It will show dictators that our warnings are serious and that we will not let their flagrant attacks go unchecked. And it will show the world that American leadership is still alive and well and that we are still a strong protector of democracy and provider of humanitarian aid. That is a message that is well worth sending now more than ever.

I wish we were able to wrap this up much sooner. I am glad we are at this final threshold now. I urge my colleagues to vote yes on the final package.

Before I wrap up, I absolutely have to recognize some of the people who have worked incredibly hard to get us here today. It starts with my vice chair on the Appropriations Committee, Senator COLLINS, and our House colleagues, former Chairwoman GRANGER, Ranking Member DELAURO, and Chairman COLE, and their staffs for help getting this package through the House. It includes Leader SCHUMER and Leader MCCONNELL, as well, and in the House, Leader JEFFRIES and Speaker JOHNSON.

We also would not have gotten here without Members on both sides of the aisle coming together and understanding that this is a moment we cannot leave our allies behind and then all pulling in the same direction so we can deliver support to our allies in Ukraine, Israel, and the Indo-Pacific, humanitarian aid to civilians, and that message to the world.

Most importantly, we wouldn't have gotten here without the tireless work of our dedicated staff. The stakes have been high, the nights have been very long, and the men and women working to get this package together and get it across the finish line have absolutely risen to the challenge.

Madam President, from Vice Chair COLLINS' team, I want to recognize Betsy McDonnell, Matt Giroux, Ryan Kaldahl, Paul Grove, Viraj Mirani, Lindsay Garcia, Patrick Magnuson, and Lindsey Seidman for their hard work.

I owe a huge thanks to many members of my excellent team. Excuse me for one moment. It is a list, but every one of them deserves recognition and for us to all hear who they are. From my team, I want to thank Evan Schatz, John Righter, Carly Rush, Kate Kaufer, Mike Clementi, Robert Leonard, Ryan Pettit, Abigail Grace, Brigid Kolish, Gabriella Armonda, Katy Hagan, Kimberly Segura, Laura Forrest, Alex Carnes, Drew Platt, Kali Farahmand, Sarita Vanka, Doug Clapp, Jennifer Becker-Pollet, Aaron Goldner, Kami White, Elizabeth Lapham, Jim Daumit, Michelle Dominguez, Jason McMahon, Mike Gentile, Ben Hammond, Valerie Hutton, and Dylan Stafford.

I know there are many others as well, including House staffers who have worked tirelessly on this. I want to personally thank each and every one of them.

Madam President, we hammer out a lot of meaningful bills here. Just about every bill we pass touches the lives of the American people directly—every one. But, as I said before, in this moment of global uncertainty, the balance of world power and the strength of American leadership are at stake. So I am deeply grateful to every Member, every staffer, and every person who came together to make sure we pass this test by passing the resources that are so clearly needed.

I reserve the balance of my time.

The PRESIDING OFFICER (Mr. LUJÁN). The Senator from Missouri.

Mr. SCHMITT. Mr. President, I will speak for just a moment. I know that as the day goes on, I am sure we will have a mutual admiration society of the Wilsonian view that permanent Washington has about foreign policy in this country, so I do not wish to speak about that at this time. I do believe that view is on a collision course with history and the will of the American people. But I rise to speak about sort of the process of the Senate—where we are, how we got here—and to quote a famous St. Louisan, Yogi Berra, ''It's like deja vu all over again.''

Here we are debating. Senator LEE, my friend from Utah, has a motion to table, essentially, Senator SCHUMER's effort to fill the tree. To the American people who are watching or listening or being reported upon, that means that the majority leader of this Chamber is boxing out everyone. That is right. The 99 other people who were elected by an entire State to advocate for their interests don't get a say. They don't get to offer an amendment. They don't get to say: I would like to build a unique coalition with either somebody from my own party or somebody on the other side of the aisle on something we might agree upon.

I think the world's most deliberative body has been reduced to Kabuki theater. There is no uncertainty ever. The only time—and this is the cold, hard truth to my friends in the Gallery—the only time you get to offer an amendment in this place is if it is sure to fail. Think about that. Senator SCHUMER won't allow U.S. Senators to offer ideas unless he knows they will fail.

So, to my Republican and Democrat colleagues, colleagues who may be watching on TV, or their staff, it doesn't need to be that way. This is perhaps one of the most obstructive measures that the majority leader employs, and I don't pretend it is just him. I think one of the things that all of us have to look in the mirror about is whether or not that is what we want this place to be.

Mr. President, if we think we have come together on an issue that affects both of our States, we should be allowed to offer those things up. We don't get a chance to do that.

Appropriations bills—I know the Senate appropriators have worked hard on

USCA Case #24-1113   Document #2060757   Filed: 06/26/2024   Page 121 of 267

individual bills. CHUCK SCHUMER didn't allow those bills to be debated on the floor. It never happened. We ended up with a few minibuses.

That would be a great reform. How about, instead of every hour maybe you show up, what if we sat in our seats and actually voted on this stuff for 4 or 5 hours? We could get through a lot. But the Senator from New York is allergic to work unless he can control the outcome; or, say, if you object now, everyone has to change their plans last minute; or if you don't support this without an opportunity to affect it, you are against—pick the poison—you want to shut down the government or you are for Putin. All these ridiculous things get thrown out here.

Open it up. I will tell you why it won't happen—because it is a real threat. It is a threat to him because the idea that other Senators who aren't part of the two who get to make all the calls—that we would find a different way. That is a threat to his power because right now he gets to say: Come to me with everything. I will put it in some omnibus. There won't be any time to debate it. They probably won't be able to read it. But if they don't vote for it, you want to shut down the government.

So to all the Senators, I would like to work with you to dislodge this concentration of power that no doubt our Founders would be rolling in their graves over. This diffusion of power that is defined by our separation of powers and federalism was meant to spread it out to protect individual liberty. It certainly was never intended for one person in the Senate who can always be recognized and, like last week, did something that had never happened in the history of our Republic, which was to dismiss Articles of Impeachment even though we are supposed to have a trial. Granted, he had accomplices in that. Every single Democrat voted with him. But he is recognized first. He can fill the tree. There are no amendments. We have to beg to be heard, which is why I objected to that farce last week. I don't think it is becoming of a U.S. Senator to say: Oh, thank you, Senator SCHUMER, for giving me 2 minutes to speak.

Anyway, there is a better way.

It is playing out again here today because we are essentially taking what the House gives us. The upper Chamber is capitulating to the House to say that we can't actually affect this thing, we can't change anything, and if you do it—pick the poison—you are threatening the security of another country or something ridiculous.

I would just hope that this is a clarion call for reform. The Senate is broken.

I yield the floor.

The PRESIDING OFFICER. The Senator from Utah.

Mr. LEE. I echo and endorse the wise comments just uttered by my friend and colleague, the distinguished Senator from Missouri. What we are witnessing here is the destruction of the legislative process in the Senate.

The Senate is here today preparing to vote on one of the most significant pieces of legislation this entire Congress—that is, a bill to send nearly $100 billion overseas—and Senators are unable even to offer an amendment to that bill.

By filling the amendment tree this afternoon, the majority leader has prevented every single Member of this body from offering amendments to the legislation, any efforts to improve it. If we want to have any amendment considered, we have to beg the majority leader to let it come before the full Senate for a vote.

You may remember that just a couple of months ago, we were in a very similar position on a very, very similar bill.

Senator SCHUMER promised a "fair and open" amendment process on the national security supplemental in February of this year, but not one amendment—not a single amendment—was considered on the Senate floor.

Republicans filed over 150 proposed amendments to improve the bill, but not one vote on a single one of those amendments or any other was allowed. Why? Why?

Well, Senator SCHUMER blocked every amendment from even being considered by filling the amendment tree. That blocked all of the other 99 Senators from participating meaningfully in that process.

Now, why wouldn't he want amendments? That is, after all, the hallmark characteristic of what defines us as a body. It is why we call ourselves the world's greatest deliberative legislative body. So why wouldn't he want those?

Well, I think it has a lot to do with the fact that an amendment might point to some of the weaknesses in the bill, some of the defects of the bill. It might prompt Members to—I don't know—slow down and ask whether this is a prudent idea—to send a lot of humanitarian aid to Gaza, up to $9 billion, $9.5 billion that could go there with minimal guardrails, where Hamas will, with certainty, seize it to wage war against Israel; or if the U.S. taxpayer should be footing the bill for "gender advisors" in Ukraine's military. Should they really vote for a bill that does this? That is what an amendment forces all of us to ask ourselves and decide on one particular question or another.

But leadership in the Senate wants to avoid these thorny questions that might rock the boat. Leadership wants to ram this bill through the Senate with minimal debate and perhaps no amendments because they know that aspects of it, especially the $60 billion for Ukraine, are massively controversial with the American people, those who elected us, those who pay taxes to fund these efforts.

Now, my colleagues and I are working in good faith to reach a unanimous consent agreement to bring forward a handful of amendments and set up a stand-alone vote in exchange for expediting the passage of the bill.

We nearly had that agreement locked in late Friday night—an agreement to vote on just two amendments and one stand-alone bill—but a couple of Senators on the other side of the aisle panicked and started objecting to any and all agreements.

They panicked because they knew that one of those items set up as part of a UC—the stand-alone legislation to redesignate the Houthis as a foreign terrorist organization, as has been offered by my friend and colleague the Senator from Texas—might actually pass. Remember, this is the same entity that has been firing on U.S. forces in the region and those of our allies, and yet they couldn't let that happen. Democrats will agree only to amendments that they find politically palatable or know will not pass.

Now, it has not always been this way in the Senate. When I first joined this body in 2011 as a new Member, individual Members could call up our amendments freely and then make them pending, and the Senate would then have to dispose of them as it does with pending amendments, either by voting them in; voting them out, up or down; or by a motion to table or reject them.

But Members had to vote. They had to take ownership for their opinions in public. They had to let their constituents know where they stood.

Today, the majority leader hides the ball from the public by filling the amendment tree, ensuring that the amendments that he and his party dislike will never see the light of day.

This is a circus. It is a madhouse. Filling the amendment tree isn't about creating an orderly process. It is about limiting real debate.

When we had an open process, when Members could call up their amendments and make them pending on most bills, it actually sped up consideration of a bill. Members knew that they would have a fair shot in the debate and debate eventually. So they would be more cooperative, would be more willing to collapse time, and wait until the next bill to offer their amendment or take a motion to table as a proxy for their amendment vote.

But in today's Senate, we do nothing on the floor for hours while Members and the staff hide in the cloakroom and argue about what we can and cannot vote for. They twist arms, pressure Members in private, and make assurances they can't and don't intend to keep, saying: Oh, you will get the amendment in the base text of the next bill or you will get it as a free-standing measure another time.

And then they shrug their shoulders when it just doesn't work out.

Why not have these debates in public? Why not allow our Senators and their constituents to know what is

USCA Case #24-1113     Document #2060757     Filed: 06/26/2024     Page 122 of 267

going on? Well, it is because the majority leader doesn't want to give up control.

Sadly, while the Democrats pioneered this change in the amendment process, Republican leadership chose to tolerate the practice and even continue it while we were in the majority by filling the amendment tree so that no one could offer an amendment without the leadership's blessing. For both sides, it is about control. It is about protecting Members from voting, the very thing we all came to this body to do.

On the Republican side of the aisle, our aspiring leaders need to ask if they want to perpetuate this awful trend. Will they tolerate blocking out Members, including Members of their own party from offering amendments? Will they continue to lock down the floor? Will they continue to disenfranchise Members and, more importantly, those they represent, by preemptively blocking them from exercising their procedural rights? Or will they finally stop this barbaric practice of filling the amendment tree? Will they let Members make their amendments pending so that Senators must actually debate and vote?

Republicans need to ask these questions of anyone desiring to lead our conference.

The PRESIDING OFFICER. The Senator from Vermont.

Mr. SANDERS. I rise finding myself in the unusual position of supporting Senator LEE's effort of opening this bill up to amendment votes. I don't often agree with Senator LEE. I know that it is a radical idea. But, maybe, in the greatest deliberative body in the world, we might, on rare occasion, actually have debate and votes on major issues.

To that end, I plan on offering two very important amendments to this legislation. Members can agree with me on these issues or disagree, but they should be voted upon.

My first amendment would ensure that we are not providing any more offensive military aid to Netanyahu's war machine while he continues to violate U.S. and international law.

This amendment would not touch funding for the Iron Dome or other purely defensive systems, but it would end aid to a war machine which has already killed 34,000 Palestinians and wounded 77,000, 70 percent of whom are women and children. And, right now, as we speak, hundreds of thousands of children face starvation as a result of that war machine.

Poll after poll shows that the American people are sick and tired of seeing their taxpayer dollars support the slaughter of innocent civilians and the starvation of children.

And while there is strong Republican support for ending aid to Netanyahu's war machine, the support, I should tell my Democratic colleagues, is overwhelming.

The second amendment that I am offering would remove the prohibition on funding for UNRWA, the backbone of the humanitarian relief operation in Gaza and the only organization that experts say has the capability to provide the humanitarian aid that is desperately needed.

Israel has alleged that 12 UNRWA employees out of 30,000 were involved in the Hamas terrorist attack on October 7. That is being investigated.

I ask unanimous consent for 30 seconds.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SANDERS. That is being investigated, and it should be. But you don't allow thousands of children to starve because of the alleged violations and actions of 12 people.

The bottom line: We are debating one of the most serious issues we have faced in a long time. The American people want us to vote and debate these issues, and we should be able to do so.

I yield the floor.

The PRESIDING OFFICER. The Senator from Washington.

Mrs. MURRAY. A bipartisan majority has been working for months to get this aid across the finish line and, after so long, we are at the threshold. Any further delay will waste time we do not have, that our allies do not have. That is exactly what this motion is. We need to get this bill passed ASAP.

Let's remember: This bill is essentially the same bill we already passed overwhelmingly 2 months ago. There is no reason, no excuse for delay, not when bombs are falling on our allies, not when civilians, including kids, are suffering and starving, not when the world is watching to see if America is still united enough to lead.

I urge my colleagues to vote no on the table motion.

The PRESIDING OFFICER. The Senator from Utah.

Mr. LEE. Mr. President, we just heard the astounding claim that it would be a waste of time to allow individual Senators to come here and do what they were elected to do, which is to offer improvements to pending legislation.

We are not a rubberstamp for the House. We are not a rubberstamp for either party's leadership in either Chamber. We are U.S. Senators, and we should be able to vote as such.

And so I am asking for the support of my colleagues in tabling the amendment tree so we can have the "fair and open" process that Senator SCHUMER promised the last time we addressed the national security supplemental.

If we table the tree, Members can actually, finally, be able to call up their amendments on the floor, instead of begging Senator SCHUMER to give his blessing for their consideration.

If you support a fair and open amendment process, if you want to improve the bill, you should support my motion to table.

This will not create the post-apocalyptic hellscape that those in leadership would have us believe will ensue.

There will not be dogs and cats living together in the streets, nothing out of the Book of Revelations. We will just find ourselves in the position of being able to do our job.

MOTION TO TABLE

To that end, I move to table the motion to refer.

I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The clerk will call the roll.

The legislative clerk called the roll.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. HAWLEY) and the Senator from Kentucky (Mr. PAUL).

The result was announced—yeas 48, nays 50, as follows:

[Rollcall Vote No. 151 Leg.]

YEAS—48

| | | |
|---|---|---|
| Barrasso | Fischer | Ricketts |
| Blackburn | Graham | Risch |
| Boozman | Grassley | Romney |
| Braun | Hagerty | Rounds |
| Britt | Hoeven | Rubio |
| Budd | Hyde-Smith | Sanders |
| Capito | Johnson | Schmitt |
| Cassidy | Kennedy | Scott (FL) |
| Collins | Lankford | Scott (SC) |
| Cornyn | Lee | Sullivan |
| Cotton | Lummis | Thune |
| Cramer | Marshall | Tillis |
| Crapo | McConnell | Tuberville |
| Cruz | Moran | Vance |
| Daines | Mullin | Wicker |
| Ernst | Murkowski | Young |

NAYS—50

| | | |
|---|---|---|
| Baldwin | Heinrich | Reed |
| Bennet | Hickenlooper | Rosen |
| Blumenthal | Hirono | Schatz |
| Booker | Kaine | Schumer |
| Brown | Kelly | Shaheen |
| Butler | King | Sinema |
| Cantwell | Klobuchar | Smith |
| Cardin | Luján | Stabenow |
| Carper | Manchin | Tester |
| Casey | Markey | Van Hollen |
| Coons | Menendez | Warner |
| Cortez Masto | Merkley | Warnock |
| Duckworth | Murphy | Warren |
| Durbin | Murray | Welch |
| Fetterman | Ossoff | Whitehouse |
| Gillibrand | Padilla | Wyden |
| Hassan | Peters | |

NOT VOTING—2

| | |
|---|---|
| Hawley | Paul |

The motion was rejected.

The PRESIDING OFFICER. The majority leader.

Mr. SCHUMER. Mr. President, I ask unanimous consent that the mandatory quorum call with respect to the cloture motion on the House message to accompany H.R. 815 be waived.

The PRESIDING OFFICER. Is there objection?

Without objection, it is so ordered.

CLOTURE MOTION

The PRESIDING OFFICER. Pursuant to rule XXII, the Chair lays before the Senate the pending cloture motion, which the clerk will state.

The senior assistant legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the motion to concur in the House amendment to

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 123 of 267

the Senate amendment to H.R. 815, a bill to amend title 38, United States Code, to make certain improvements relating to the eligibility of veterans to receive reimbursement for emergency treatment furnished through the Veterans Community Care program, and for other purposes.

Charles E. Schumer, Patty Murray, Chris Van Hollen, Mark Kelly, Richard J. Durbin, Alex Padilla, Sheldon Whitehouse, Jack Reed, Michael F. Bennet, Gary C. Peters, Jon Tester, Robert P. Casey, Jr., Tammy Duckworth, Richard Blumenthal, Jeanne Shaheen, Angus S. King, Jr., Margaret Wood Hassan, Benjamin L. Cardin.

The PRESIDING OFFICER. By unanimous consent, the mandatory quorum call has been waived.

The question is, Is it the sense of the Senate that debate on the motion to concur in the House amendment to the Senate amendment to H.R. 815, a bill to amend title 38, United States Code, to make certain improvements relating to the eligibility of veterans to receive reimbursement for emergency treatment furnished through the Veterans Community Care program, and for other purposes, shall be brought to a close?

The yeas and nays are mandatory under the rule.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. THUNE. The following Senator is necessarily absent: the Senator from Kentucky (Mr. PAUL).

The yeas and nays resulted—yeas 80, nays 19, as follows:

[Rollcall Vote No. 152 Leg.]

YEAS—80

| | | |
|---|---|---|
| Baldwin | Graham | Reed |
| Bennet | Grassley | Ricketts |
| Blumenthal | Hassan | Risch |
| Booker | Heinrich | Romney |
| Boozman | Hickenlooper | Rosen |
| Britt | Hirono | Rounds |
| Brown | Hoeven | Schatz |
| Butler | Hyde-Smith | Schumer |
| Cantwell | Kaine | Scott (SC) |
| Capito | Kelly | Shaheen |
| Cardin | Kennedy | Sinema |
| Carper | King | Smith |
| Casey | Klobuchar | Stabenow |
| Cassidy | Lankford | Sullivan |
| Collins | Luján | Tester |
| Coons | Manchin | Thune |
| Cornyn | Markey | Tillis |
| Cortez Masto | McConnell | Van Hollen |
| Cotton | Menendez | Warner |
| Cramer | Moran | Warnock |
| Crapo | Mullin | Warren |
| Duckworth | Murkowski | Welch |
| Durbin | Murphy | Whitehouse |
| Ernst | Murray | Wicker |
| Fetterman | Ossoff | Wyden |
| Fischer | Padilla | Young |
| Gillibrand | Peters | |

NAYS—19

| | | |
|---|---|---|
| Barrasso | Hawley | Sanders |
| Blackburn | Johnson | Schmitt |
| Braun | Lee | Scott (FL) |
| Budd | Lummis | Tuberville |
| Cruz | Marshall | Vance |
| Daines | Merkley | |
| Hagerty | Rubio | |

NOT VOTING—1

Paul

The PRESIDING OFFICER. On this vote, the yeas are 80, the nays are 19.

Three-fifths of the Senators duly chosen and sworn having voted in the affirmative, the motion is agreed to.

The motion was agreed to.

The PRESIDING OFFICER. Cloture having been invoked, the motion to refer and the amendments pending thereto fall.

The majority leader.

Mr. SCHUMER. Mr. President, today, the Senate sends a unified message to the entire world: America will always defend democracy in its hour of need.

We tell our allies: We will stand with you.

We tell our adversaries: Don't mess with us.

We tell the world: We will do everything to defend democracy and our way of life.

In a resounding bipartisan vote, the relentless work of 6 long months has paid off. Congress is sending the supplemental to President Biden's desk.

Getting this done was one of the greatest achievements the Senate has faced in years, perhaps decades. A lot of people inside and outside Congress wanted this package to fail. But, today, those in Congress who stand on the side of democracy are winning the day.

To our friends in Ukraine, to our allies in NATO, to our allies in Israel, and to civilians around the world in need of help: Help is on the way.

To our friends in Ukraine: America will deliver more ammo and air defenses and basic supplies that you need to resist Putin on the battlefield.

To our friends in Israel: America will soon deliver aid to help you fight the scourge of Hamas and stand up to Iran.

To innocent civilians in the midst of war, from Gaza to Sudan: America will deliver food and medicine and clothing.

To our friends in the Indo-Pacific: We will stand with you to resist the Chinese Communist Party.

And to the whole world: Make no mistake, America will deliver on its promise to act like a leader on the world stage, to hold the line against autocratic thugs like Vladimir Putin.

A few months ago, Putin made a bet that American aid would sooner or later come to an end. We are showing Putin that betting against America is always—always—a grave mistake.

Over the past few months, I have spoken repeatedly and at length about the supreme importance of getting this supplemental package done. Starting in October and through Thanksgiving and Christmas and New Year's and into the spring, I said again and again that we had to work in a bipartisan way, Democrats and Republicans alike, if we wanted to pass this bill.

When we succeeded in getting the supplemental through the Senate the first time in February, it was for two reasons above all: persistence and bipartisanship. At certain points, it might have seemed hard to see how we would reach our goal, but we never lost hope that if we persisted, we could finish the job.

Today, thank God, our persistence has been validated, and the bill sent to us by the House is largely the same as the bill in substance as what the Senate has championed all along.

It wasn't easy to reach this point, but today's outcome yet again confirms another thing we have stressed from the beginning of this Congress: In divided government, the only way to ever get things done is bipartisan. I am very pleased that in this moment, when it mattered most, both parties found a way to work together even when it wasn't easy.

Again, persistence and bipartisanship are what saved the day. Leader McCONNELL and I, who don't always agree, worked hand in hand and shoulder to shoulder to get this bill done. Together, we were bipartisan and persisted.

Now, it is troubling that a very small minority within the hard right tried desperately for months to prevent Congress from doing the right thing. These isolationists have now secured their ignominious place in history as the ones who would see America stick its head in the sand as our enemies sought to undermine us. Had they won, they would have presided over a declining America. I am glad that today we will see that effort fail.

This is an inflection point in history. Western democracy faces perhaps its greatest test since the end of the Cold War. The conflicts we see right now in Europe, in the Middle East, and the tensions of the Indo-Pacific will go a long way in shaping the balance of power between democracy and autocracy in the decades to come, and the consequences for America's long-term security will be profound.

If Putin is allowed to seize the territory of a neighboring sovereign nation, if the Chinese Communist Party is allowed to consume the Indo-Pacific, if Iran is allowed to dominate the Middle East, and if America were to stand by and do nothing, it is the United States that would suffer the consequences most of all in the long run.

Failure to act now could not only undermine the legitimacy of our democratic values, it would have impacts across American life. It would hurt us politically, economically, militarily, and socially. It would harm the competitiveness of U.S. businesses, endanger the safety of our troops, cripple America's innovative potential, and make the world a more hostile place for our civic values—individual liberty, freedom of expression, equal justice under law, and opportunity for all. We always try to live up to these ideals, but they will not survive if autocratic powers like Putin and the Chinese Communist Party overtake America in this century.

That is what is at stake in the war in Ukraine, where we face Putin. That is what is at stake in the Indo-Pacific, where we face Xi. That is what is at stake in conflicts in the Middle East, where we face Iran. Nothing less—nothing less—than the future of American security and the future of the democratic order that has survived since the end of the Second World War.

So we have a choice. We can either make a downpayment on defending our

USCA Case #24-1113      Document #2060757      Filed: 06/26/2024      Page 124 of 267

security or find ourselves on the back foot, facing much graver threats in years and decades to come. The only answer is the right one: We must act now.

We have learned in recent years that democracy is a fragile and precious thing. It will not survive the threats of this century—the new threats—if we aren't willing to do what it takes to defend it. And if America will not lead the way to protect democracy in this age, no other nation will. That is the burden, that is the duty of a nation as great as ours.

There are so many people on both sides of the aisle who deserve credit for this immense accomplishment.

I thank President Biden for his stalwart leadership. He never flinched or winced. He knew how important this was and was always working with us and importuning us to move forward.

I thank Leader McCONNELL, as I have mentioned before, for working hand in hand with us, not letting partisanship get in the way.

I thank Speaker JOHNSON, who rose to the occasion. In his own words, he said he had to do the right thing despite the enormous political pressure on him.

I thank Leader JEFFRIES, who worked so well together in his bipartisan way with Speaker JOHNSON.

Let me say this once again about my friend the Republican leader: We were of one mind to get this bill done. It was our bipartisanship, our linking of arms together, that got this large and difficult bill through the Congress despite many political ideologues who wanted to bring it down. Bipartisanship once again prevailed, and I thank him for his leadership.

I want to thank my Senate colleagues, particularly in my caucus. The dedication and unity and strength you have shown have made this possible. I was able, as leader, to work with the Republican leader in the House, the Speaker, the minority leader in the House, and the President because I knew I had our full caucus behind us—strongly, fervently.

The speeches that we heard at our Tuesday lunches, made by many who are sitting here, would make every American proud, and I thank you, thank you, thank you for that.

For the past 6 months, our friends and allies across the world have been watching what has been going on in Congress and asking themselves the same thing: Will America stand by her friends to face down the forces of autocracy? Will America follow through on its commitment to be a leader on the world stage and safeguard the cause of democracy? Will America summon the strength to come together, overcome the centrifugal pull of partisanship, and rise once again to meet the magnitude of the moment? Today, with both parties working together, the Senate answers these questions with a thunderous and resounding yes.

I yield the floor.

The PRESIDING OFFICER (Mr. WELCH). The Senator from Washington.

Ms. CANTWELL. Mr. President, I rise to urge my colleagues to pass this important legislation, and I want to thank Leader SCHUMER for his tremendous leadership on this entire package. It is amazing. His dedication and support to getting this done. He really, really held steadfast as well as our caucus, as he just described, and so many of our colleagues on both sides of the aisle.

I also want to thank Senator MURRAY for her continued leadership on appropriations bills.

This supplemental will supply Ukraine with desperately needed equipment, weapons, training, and logistics.

For over 2 years, the Ukrainian people have shown courage and resilience, enabling them to resist Russian aggression. As just described by our leader, it would be disastrous for our national security and democracy and human rights if we had not supported them.

This bill also continues to support American taxpayers by authorizing the President to use an estimated $5 billion in frozen Russian assets. These assets will help pay for Ukraine's reconstruction. And it designates the U.S. economic assistance, which Ukrainians will have to pay back once they have repelled the Russians.

The supplemental also includes support for our Middle East ally Israel, including support to make sure, just like these past few days, of shooting down 99 percent of missiles and drone attacks by Iran.

It also includes $9 billion of humanitarian aid for Gaza, Ukraine, and for people caught in conflicts around the world. These conflicts have taken an immeasurable toll on the Palestinian and Ukrainian people.

The supplemental also contains a range of sanctions that will make it harder for each of Israel's adversaries—Iran and Hamas—to finance their operations.

It contains the SHIP Act, which requires the President to post sanctions against individuals and companies that knowingly help evade oil sanctions. Illegal revenues funnel tens of billions to designated organizations and terrorist groups. And it builds on legislation Senator MURKOWSKI and I enacted over a decade ago that helped expose the middlemen who were enabling Iran to evade these sanctions.

This package also includes over $8 billion to support Taiwan and other Indo-Pacific allies in this critical part of the world where we stand shoulder to shoulder with these democracies.

It also contains legislation, the FEND Off Fentanyl Act, of which I was proud to be a cosponsor—It is critically important legislation that does a couple of things. One, it declares that fentanyl is a national emergency. This enables the President to impose sanctions on fentanyl traffickers, enabling the U.S. Treasury to better fight

fentanyl-related money laundering. Those fentanyl traffickers and money launderings have ties to organized crime and to drug cartels.

These issues have been clearly outlined in my State by communities, health providers, law enforcement, and others who want help in stopping the traffickers.

Part of the solution is stemming the flow of fentanyl. This supplemental would allow the proceeds from those seized assets of those narco-traffickers to be used by law enforcement in our local communities to fight this fentanyl scourge.

We must give our communities all the tools they need to stop this product from flooding across our borders, and this legislation will do just that.

I also want to address that technology should be a tool to help solve our greatest challenges, to improve the human condition, and to drive innovation and support economic opportunity. But foreign adversaries use technology for social and political control.

There is no individual right to privacy or freedom of speech in these autocracies. U.S. social media companies are not allowed to operate in China. In fact, China leads the world in using surveillance and censorship to keep tabs on its own population and to repress dissent.

Governments that respect freedom of speech do not build backdoors into hardware or software, into apps on phones, or into laptops. Backdoors allow foreign adversaries to target vulnerable Americans based on their user name or sensitive data. Backdoors allow foreign adversaries to use proxy bots to bombard—bombard—vulnerable populations—Americans—with harmful content or even to blackmail people.

The U.S. Department of Justice has stated: "Hostile foreign powers are weaponizing bulk data and the power of artificial intelligence to target Americans."

I do not want technology in the United States used this way. I want the United States to work with our most sophisticated technologically advanced countries, like-minded democracies—places like Japan, South Korea, our European allies—and set the global standards for technology and data protection. I want to see a technology NATO, one in which our allies come together and say there cannot be a government backdoor to any hardware or software if it wants to see global adoption.

We should have a trusted framework for cross-border data flows, as has been discussed by the Organization for Economic Cooperation and Development and the G7. And criteria for trusted data flow should include commitments to democratic governance, the rule of law, and the protection of property rights and free speech.

I believe in trade, and I want trade. And I believe that business should be about business. But business is not

USCA Case #24-1113     Document #2060757     Filed: 06/26/2024     Page 125 of 267

about business when foreign adversaries weaponize data, weaponize technology, and weaponize business approaches that hurt Americans.

I want to yield to my colleague, the chairman of the Senate Intelligence Committee, for his perspective on why this legislation before us is so important.

The PRESIDING OFFICER. The Senator from Virginia.

Mr. WARNER. Mr. President, first of all, I want to agree with my friend, the chairman of the Commerce Committee, on issues she already outlined, whether it be the need for aid for Ukraine, support for Israel, humanitarian aid for Gaza, or the necessary funding that has taken place for the Indo-Pacific, and, obviously, legislation that we all supported on fending off fentanyl.

But I want to particularly commend her for comments she has made on these technology issues. Over the last 7 years, as vice chair and now chairman of the Intelligence Committee, I spent an awful lot of time looking at what I think is one of the most significant intelligence failures of the last half century, and that was the failure we had to anticipate and disrupt Russian efforts to meddle in our elections. Since that time, though, we have seen a wide spectrum of foreign adversaries who tried to copy the Russian playbook.

But don't just take it from me. A succession of now-declassified intelligence assessments has described the ways in which foreign adversaries like Iran, like the People's Republic of China, and others are seeking to stoke social, racial, and political tensions in the United States. They are seeking to undermine confidence in our institutions and our elections systems and even to sow violence amongst Americans. The extent to which our adversaries have exploited American social media platforms is a matter of public record.

The committee I chair has held many hearings—open hearings—on the failure of U.S. social media platforms to identify the exploitation of their products by foreign intelligence services. As a Senator, along with the Senator from Washington, I have been among the leading critics of these platforms for their repeated failures to protect consumers.

While the exploitation of U.S. communication platforms by adversaries continues to be a serious issue, at the end of the day, our platforms are at least independent businesses. They do not have a vested interest in undermining our basic democratic system.

The truth is, though, I can't say the same for TikTok, the fastest growing social media platform in the United States, whose parent company ByteDance is based in the PRC. Even as U.S. social media platforms have fumbled in their response to foreign influence operations, there was never any concern that these platforms would operate at the direction of a foreign adversary. Again, I cannot say the same for TikTok.

I yield back to Senator CANTWELL.

The PRESIDING OFFICER. The Senator from Washington.

Ms. CANTWELL. I thank Senator WARNER for his perspective as chairman of the Intelligence Committee and his hard work. He and I both drafted legislation more than a year ago trying to give our government the tools to deal with this issue.

In 2020, India concluded that TikTok and other Chinese-controlled apps were national security threats and prohibited them. As a result, India TikTok users migrated to other platforms, including Google's YouTube, and Indian small businesses found other ways to operate on other platforms.

This supplemental contains the Protecting Americans from Foreign Adversary Controlled Applications Act. Congress has a nonpunitive policy purpose in passing this legislation. Congress is not acting to punish ByteDance, TikTok, or any other individual company. Congress is acting to prevent foreign adversaries from conducting espionage, surveillance, and malign operations harming vulnerable Americans, our servicemen and women, and our U.S. Government personnel.

The PRESIDING OFFICER. The Senator from Virginia.

Mr. WARNER. I would like to expound a little bit on what Senator CANTWELL just said. It has been made absolutely clear that a number of Chinese laws require Chinese companies and their subsidiaries to assist PRC security agencies and abide by the secret and unchallengeable government directives. The truth is, these Chinese companies, at the end of the day, don't owe their obligation to their customers or their shareholders, but they owe it to the PRC Government.

In the context of social media platforms used by nearly half of Americans, it is not hard to imagine how a platform that facilitates so much commerce, political discourse, and social debate could be covertly manipulated to serve the goals of an authoritarian regime, one with a long track record of censorship, transnational oppression, and promotion of disinformation.

In recent weeks, we have seen direct lobbying by the Chinese Government, indicating, perhaps, more than anything we will say on the floor here, how dearly Xi Jinping is invested in this product—a product, by the way, that is not even allowed to operate in the Chinese domestic market, itself.

Story after story, over the last 18 months, have exposed the extent to which TikTok had grossly misrepresented its data security and corporate governance practice, as well as its relationship with its parent company. Countless stories have refuted the claims made by TikTok executives and lobbyists that it operates independently from its controlling company ByteDance.

We have also seen documented examples of this company surveilling journalists. We have seen corresponding guidance from leading news organizations, not just here in America but across the world, advising their investigative journalists not to use TikTok. These public reports, based on revelations of current and former employees, also reveal that TikTok has allowed employees to covertly amplify content.

Unfortunately, those who suggest that the United States can address the data security and foreign influence risk of TikTok through traditional mitigation have not been following TikTok's long track record of deceit and lack of transparency.

I yield back to Senator CANTWELL.

Ms. CANTWELL. I thank Senator WARNER for his comments.

I find it most disturbing that they used TikTok to repeatedly access U.S. user data and track multiple journalists covering the company. Researchers have found that TikTok restricts the information that Americans and others receive on a global basis.

As of December 2023, an analysis by Rutgers University found that TikTok posts mentioning topics that are sensitive to the Chinese Government, including Tiananmen Square, Uighurs, and the Dalai Lama were significantly less prevalent on TikTok than on Instagram, the most comparable social media.

Foreign policy issues disfavored by China and Russian Governments also had fewer hashtags on TikTok, such as pro-Ukraine or pro-Israel hashtags. Here are some of those hashtags on TikTok:

The example of Tiananmen Square, which we all know was an example of students standing up to the military, and yet for Tiananmen Square, there are 8,000 percent more hashtags on Instagram than on TikTok.

The Uighur genocide protecting a Muslim population, there are 1,970 percent more hashtags about that on Instagram than on TikTok.

And my personal favorite, just because I had the privilege of meeting the Dalai Lama here in the Capitol, 5,520 percent more hashtags where the Dalai Lama is mentioned on Instagram than on TikTok.

And pro-Ukraine, 750 percent more hashtags on Instagram than on TikTok about Ukraine and support for Ukraine.

I think that says it all in this debate today. Are we going to continue to allow people to control the information by using an export-controlled algorithm and China-based source code?

My colleagues and I are urging for this deweaponization by saying that TikTok should be sold. Now, I know that the Chinese have an export control on that algorithm. Congress believes that you have to have adequate time to sufficiently address this issue posed by our foreign adversaries. That is why the legislation before us is for ByteDance to sell its stake in TikTok.

We think a year is ample time to allow potential investors to come forward, for due diligence to be completed, and for lawyers to draw up and

USCA Case #24-1113     Document #2060757     Filed: 06/20/2024     Page 126 of 267

finalize contracts. This is not a new concept to require Chinese divestment from U.S. companies.

The Committee on Foreign Investment in the United States requires Chinese divestment from hotel management platforms—StayNTouch, from a healthcare app called PatientsLikeMe, from the popular LGBTQI dating app Grindr, among other companies. And even after the Chinese owner divested from Grindr in 2020, Americans had continuity of service on this platform.

So I turn it back to my colleague, but we are giving people a choice here to improve this platform and have the opportunity for Americans to make sure that they are not being manipulated by our foreign adversaries.

Mr. President, I ask unanimous consent that H. Res. 1051, the House resolution originally on this legislation, be printed in the RECORD.

There being no objection, the material as ordered to be printed in the RECORD, as follows:

### H. RES. 1051

Whereas TikTok collects vast amounts of data on Americans, though the total extent of its collection is unknown:

(1) On August 6, 2020, the President concluded that TikTok "automatically captures vast swaths of information from its users" and that TikTok's ownership by ByteDance Ltd. enables the People's Republic of China (referred to in this resolution as the "PRC") and Communist Party of China (referred to in this resolution as the "CCP") to gain access to "Americans' personal and proprietary information," potentially allowing the CCP "to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage".

(2) Outside reporting has confirmed the breadth of TikTok's reach, concluding that its data collection practices extend to age, phone number, precise location, internet address, device used, phone contacts, social network connections, content of private messages sent through the application, and videos watched.

(3) On November 11, 2022, Federal Communications Commissioner Brendan Carr explained that "underneath [TikTok], it operates as a very sophisticated surveillance app." He characterized it as a "big risk" for multiple reasons, including espionage. The risk posed by TikTok is exacerbated by the difficulty in assessing precisely which categories of data it collects. For example, outside researchers have found embedded vulnerabilities that allow the company to collect more data than the application's privacy policy indicates.

Whereas PRC law requires obligatory, secret disclosure of data controlled by Chinese companies at the PRC's unilateral request:

(1) Pursuant to PRC law, the PRC can require a company headquartered in the PRC to surrender all its data to the PRC, making it an espionage tool of the CCP.

(2) The National Intelligence Law, passed in China in 2017, states that "any organization" must assist or cooperate with CCP intelligence work. Such assistance or cooperation must also remain secret at the PRC's request.

(3) The PRC's 2014 Counter-Espionage Law states that "relevant organizations . . . may not refuse" to collect evidence for an investigation.

(4) The PRC's Data Security Law of 2021 states that the PRC has the power to access and control private data.

(5) The PRC's Counter-Espionage Law grants PRC security agencies nearly unfettered discretion, if acting under an effectively limitlessly capacious understanding of national security, to access data from companies.

(6) On September 17, 2020, the Department of Commerce concluded that the PRC, to advance "its intelligence-gathering and to understand more about who to target for espionage, whether electronically or via human recruitment," is constructing "massive databases of Americans' personal information" and that ByteDance has close ties to the CCP, including a cooperation agreement with a security agency and over 130 CCP members in management positions.

(7) On December 2, 2022, the Director of the Federal Bureau of Investigation, Christopher Wray, stated that TikTok's data repositories on Americans "are in the hands of a government that doesn't share our values and that has a mission that's very much at odds with what's in the best interests of the United States. . . . The [CCP] has shown a willingness to steal Americans data on a scale that dwarfs any other".

(8) On December 5, 2022, the Director of National Intelligence, Avril Haines, stated, when asked about TikTok and PRC ownership, "It is extraordinary the degree to which [the PRC] . . . [is] developing frameworks for collecting foreign data and pulling it in, and their capacity to then turn that around and use it to target audiences for information campaigns and other things, but also to have it for the future so that they can use it for a variety of means".

(9) On December 16, 2022, the Director of the Central Intelligence Agency, William Burns, explained that "because we parent company of TikTok is a [PRC] company, the [CCP] is able to insist upon extracting the private data of a lot of TikTok users in this country, and also to shape the content of what goes on to TikTok as well to suit the interests of the Chinese leadership".

(10) On August 2, 2020, then-Secretary of State, Mike Pompeo, stated that PRC-based companies "are feeding data directly to the Chinese Communist Party, their national security apparatus".

(11) Public reporting has repeatedly confirmed statements made by the Executive Branch regarding the tight interlinkages between ByteDance, TikTok, and the CCP.

(A) The Secretary of ByteDance's CCP committee, Zhang Fuping, also serves as ByteDance's Editor-in-Chief and Vice President and has vowed that the CCP committee would "take the lead" across "all product lines and business lines", which include TikTok.

(B) On May 30, 2023, public reporting revealed that TikTok has stored sensitive financial information, including the Social Security numbers and tax identifications of TikTok influencers and United States small businesses, on servers in China accessible by ByteDance employees.

(C) On December 22, 2022, public reporting revealed that ByteDance employees accessed TikTok user data and IP addresses to monitor the physical locations of specific United States citizens.

(D) On June 17, 2022, public reporting revealed that, according to leaked audio from more than 80 internal TikTok meetings, China-based employees of ByteDance repeatedly accessed nonpublic data about United States TikTok users, including the physical locations of specific United States citizens.

(E) On January 20, 2023, public reporting revealed that TikTok and ByteDance employees regularly engage in practice called "heating," which is a manual push to ensure specific videos "achieve a certain number of video views".

(F) In a court filing in June 2023, a former employee of ByteDance alleged that the CCP spied on pro-democracy protestors in Hong Kong in 2018 by using backdoor access to TikTok to identify and monitor activists' locations and communications.

(G) On November 1, 2023, public reporting revealed that TikTok's internal platform, which houses its most sensitive information, was inspected in person by CCP cybersecurity agents in the lead-up to the CCP's 20th National Congress.

Whereas the PRC's access to American users' data poses unacceptable risks to United States national security:

(1) As a general matter, foreign adversary controlled social media applications present a clear threat to the national security of the United States.

(2) The Department of Homeland Security has warned that the PRC's data collection activities in particular have resulted in "numerous risks to U.S. businesses and customers, including: the theft of trade secrets, of intellectual property, and of other confidential business information; violations of U.S. export control laws; violations of U.S. privacy laws; breaches of contractual provisions and terms of service; security and privacy risks to customers and employees; risk of PRC surveillance and tracking of regime critics; and reputational harm to U.S. businesses". These risks are imminent and other, unforeseen risks may also exist.

(3) On September 28, 2023, the Department of State's Global Engagement Center issued a report that found that "TikTok creates opportunities for PRC global censorship". The report stated that United States Government information as of late 2020 showed that "ByteDance maintained a regularly updated internal list identifying people who were likely blocked or restricted from all ByteDance platforms, including TikTok, for reasons such as advocating for Uyghur independence".

(4) On November 15, 2022, the Director of the Federal Bureau of Investigation, Christopher Wray, testified before the Committee on Homeland Security of the House of Representatives that TikTok's national security concerns "include the possibility that the [CCP] could use it to control data collection on millions of users or control the recommendation algorithm, which could be used for influence operations if they so choose, or to control software on millions of devices, which gives it an opportunity to potentially technically compromise personal devices".

(5) On March 8, 2023, the Director of the Federal Bureau of Investigation, Christopher Wray, testified before the Select Committee on Intelligence of the Senate that the CCP, through its ownership of ByteDance, could use TikTok to collect and control users' data and drive divisive narratives internationally.

Whereas Congress has extensively investigated whether TikTok poses a national security threat because it is owned by ByteDance:

(1) On October 26, 2021, during the testimony of Michael Beckerman, TikTok head of public policy for the Americas, before a hearing of the Subcommittee on Consumer Protection of the Committee on Commerce, Science, and Transportation of the Senate, lawmakers expressed concerns that TikTok's audio and user location data could be used by the CCP.

(2) On September 14, 2022, lawmakers expressed concerns over TikTok's algorithm and content recommendations posing a national security threat during a hearing before the Committee on Homeland Security and Governmental Affairs of the Senate with Vanessa Pappas, Chief Operating Officer of TikTok.

(3) On March 23, 2023, during the testimony of TikTok CEO, Shou Chew, before the Committee on Energy and Commerce of the House of Representatives, lawmakers expressed concerns about the safety and security of the application, including TikTok's relationship with the CCP.

(4) On February 28, 2023, former Deputy National Security Advisor, Matthew Pottinger, emphasized that it has already been confirmed that TikTok's parent company ByteDance has used the application to surveil United States journalists as a means to identify and retaliate against potential sources. The PRC has also shown a willingness to harass individuals abroad who take stances that contradict the Communist Party lines. The application can further be employed to help manipulate social discourse and amplify false information to tens of millions of Americans.

(5) On March 23, 2023, Nury Turkel, the Chair of the United States Commission on International Religious Freedom, raised the alarm that TikTok's parent company, ByteDance, has a strategic partnership with China's Ministry of Public Security, and China's domestic version of the application, Douyin, has been used to collect data and sensitive information from Uyghurs and other oppressed ethnic minority groups.

(6) On July 26, 2023, William Evanina, the former Director of the National Counterintelligence and Security Center, pointed to TikTok as just one of many areas of concern that combine to paint a concerning picture of the CCP's capabilities and intent as an adversarial, malign competitor.

(7) On November 30, 2023, John Garnaut of the Australian Strategic Policy Institute (ASPI) remarked that TikTok has sophisticated capabilities that create the risk that TikTok can clandestinely shape narratives and elevate favorable opinions while suppressing statements and news that the PRC deems negative.

(8) On January 18, 2024, the Select Committee on Strategic Competition between the United States and the Chinese Communist Party of the House of Representatives was briefed by a set of senior interagency officials to discuss these matters.

(9) On March 22, 2023, elements of the intelligence community provided a classified briefing on the threat to members of the Permanent Select Committee on Intelligence of the House of Representatives and leadership for the Committee on Energy and Commerce of the House of Representatives.

(10) On April 26, 2023, the Executive Branch provided a classified briefing on the threat to members of the Committee on Commerce, Science, and Transportation and the Select Committee on Intelligence of the Senate.

(11) On June 5, 2023, the Executive Branch provided a classified briefing on the threat to staff of the Committee on Banking of the Senate and the Committee on Energy and Commerce of the House of Representatives.

(12) In June 2023, at the request of the Permanent Select Committee on Intelligence of the House of Representatives, the intelligence community provided a classified threat briefing open to all Members of the House of Representatives.

(13) On November 15, 2023, elements of the intelligence community provided a classified briefing to the Select Committee on Intelligence and the Committee on Commerce, Science, and Transportation of the Senate on, inter alia, the Peoples Republic of China's conduct of global foreign malign influence operations, including through platforms such as TikTok.

Whereas Congress and the Executive Branch are of one mind on the risks presented by TikTok's data collection practices:

(1) On May 15, 2019, the President issued an Executive Order on Securing the Information and Communications Technology and Services Supply Chain, which stated that "unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries . . . constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States".

(2) On June 9, 2021, the President issued an Executive Order on Protecting Americans' Sensitive Data from Foreign Adversaries, which stated that "[f]oreign adversary access to large repositories of United States persons' data also presents a significant risk." The EO stated that "the United States must act to protect against the risks associated with connected software applications that are designed, developed, manufactured, or supplied by persons owned or controlled by, or subject to the jurisdiction or direction of, a foreign adversary".

(3) In May 2019, in connection with a review by the Committee on Foreign Investment in the United States (CFIUS), a company based in the PRC agreed to divest its interest in a popular software application reportedly due to concerns relating to potential access by the PRC to American user data from the application.

(4) On July 8, 2020, then-National Security Advisor, Robert O'Brien, stated that the CCP uses TikTok and other PRC-owned applications to collect personal, private, and intimate data on Americans to use "for malign purposes".

(5) On August 14, 2020, the President found "there is credible evidence . . . that ByteDance, Ltd. . . . might take action that threatens to impair the national security of the United States".

(6) In February 2020, the Deputy Attorney General, Lisa Monaco, stated, "Our intelligence community has been very clear about [the CCP's] efforts and intention to mold the use of [TikTok] using data in a worldview that is completely inconsistent with our own." Deputy Attorney General Monaco also stated, "I don't use TikTok and I would not advise anybody to do so because of [national security] concerns".

(7) On July 13, 2022, Federal Communications Commission Commissioner, Brendan Carr, testified before the Subcommittee on National Security of the Committee on Oversight and Reform of the House of Representatives that "there is a unique set of national security concerns when it comes to [TikTok]".

(8) On March 23, 2023, the Secretary of State, Antony Blinken, testified before the Committee on Foreign Affairs of the House of Representatives that TikTok is a threat to national security that should be "ended one way or another".

Whereas the Executive Branch has sought to address the risks identified above through requiring ByteDance to divest its ownership of TikTok:

(1) On August 14, 2020, the President issued an Executive Order directing ByteDance to divest any assets or property used to enable or support ByteDance's operation of the TikTok application in the United States and any data obtained or derived from TikTok application or Musical.ly application users in the United States. The Order, however, remains the subject of litigation.

(2) On August 6, 2020, the President issued an Executive Order (E.O. 13942) that directed the Secretary of Commerce to take actions that would have prohibited certain transactions related to TikTok in 45 days if ByteDance failed to divest its ownership of TikTok. The companies and content creators using the TikTok mobile application filed lawsuits challenging those prohibitions, as a result of which two district courts issued preliminary injunctions enjoining the prohibitions.

(3) Following the multiple judicial rulings that enjoined the Executive Branch from enforcing the regulations contemplated in E.O. 13942, on June 9, 2021, the President issued a new Executive Order that rescinded E.O. 13942 and directed the Secretary of Commerce to more broadly assess and take action, where possible, against connected software applications that pose a threat to national security.

Whereas Congress has passed, and the Executive Branch has implemented, a ban on ByteDance-controlled applications like TikTok from government networks because of the national security threat such applications pose; even so, the application's widespread popularity limits the effectiveness of this step:

(1) Prior to 2022, several Federal agencies, including the Departments of Defense, State, and Homeland Security, had issued orders banning TikTok on devices for which those specific agencies are responsible.

(2) On December 29, 2022, following its adoption by Congress, the President signed into law a bill banning the use of TikTok on government devices due to the national security threat posed by the application under its current ownership.

(3) A majority of States in the United States have also banned TikTok on State government devices due to the national security threat posed by the application under its current ownership.

(4) To date, as long as TikTok is subject to the ownership or control of ByteDance, no alternative to preventing or prohibiting TikTok's operation of the application in the United States has been identified that would be sufficient to address the above-identified risks.

(5) The national security risks arise from and are related to the ownership or control of TikTok by a foreign adversary controlled company. Severing ties to such foreign adversary controlled company, for example by a full divestment, would mitigate such risks.

(6) As has been widely reported, TikTok, Inc. has proposed an alternative, a proposal referred to as "Project Texas," which is an initiative to try and satisfy concerns relating to TikTok's handling of United States user data.

(A) Under the proposal, United States user data would be stored in the United States, using the infrastructure of a trusted third party.

(B) That initiative would have allowed the application algorithm, source code, and development activities to remain in China under ByteDance's control and subject to PRC laws, albeit subject to proposed safeguards relating to cloud infrastructure and other data security concerns. Project Texas would also have allowed ByteDance to continue to have a role in certain aspects of TikTok's United States operations.

(C) Project Texas would have allowed TikTok to continue to rely on the engineers and back-end support in China to update its algorithms and the source code needed to run the TikTok application in the United States.

(D) Allowing code development in and access to United States user data from China potentially exposes United States users to malicious code, backdoor vulnerabilities, surreptitious surveillance, and other problematic activities tied to source code development.

(E) Allowing back-end support, code development, and operational activities to remain in China would also require TikTok to

USCA Case #24-1113 Document #2060757 Filed: 06/26/2024 Page 128 of 267

continue to send United States user data to China to update the machine learning algorithms and source code for the application, and to conduct related back-end services, like managing users' accounts.

(7) On January 31, 2024, the Director of the Federal Bureau of Investigation, Christopher Wray, testified before the Select Committee on Strategic Competition between the United States and the Chinese Communist Party of the House of Representatives that TikTok gives the PRC "the ability to control data collection on millions of users, which can be used for all sorts of intelligence operations or influence operations," and "the ability, should they so choose, to control the software on millions of devices, which means the opportunity to technically compromise millions of devices".

(8) The risks posed by TikTok's data collection would be addressed by the Protecting Americans from Foreign Adversary Controlled Applications Act, despite the potential that the PRC might purchase similar types of data from private data brokers.

(9) The degree of risk posed by TikTok has increased alongside the application's immense popularity in the United States.

*Resolved,* That the House of Representatives has determined that ByteDance and TikTok pose an unacceptable risk to the national security of the United States.

Ms. CANTWELL. I turn it back to my colleague Senator WARNER and again thank him for his leadership.

Mr. WARNER. Mr. President, I want to commend the Senator from Washington for her leadership going through the disparate effects of TikTok versus other social media platforms.

And let's acknowledge, TikTok, I think, realized they had a problem over a year ago. So they tried to develop a response—it was something called Project Texas—to allegedly address concerns related to TikTok's handling of America's data.

However, Project Texas would still allow TikTok's algorithm, source code, and development activities to remain in China. They would remain so under ByteDance control and subject to Chinese Government exploitation.

Project Texas allows TikTok to continue to rely on engineers and back-end support from China to update its algorithm and source code needed to run TikTok in the United States.

How can they say there is not the possibility of interference? This reliance on resources based in China, again, makes it vulnerable to Chinese Government exploitation.

That is why Project Texas does not resolve the United States' national security concern about ByteDance's ownership of TikTok.

Now, let me acknowledge—and I think Senator CANTWELL and I worked on a more, frankly, comprehensive approach that, in a perfect world, we might have been debating today, but we work in the world of getting things right.

So I stand firmly in support, as Senator CANTWELL has, of taking action now to prevent the kind of intelligence failure we first saw back in 2016.

And, again, the chair of the Commerce Committee has indicated this is not some draconian or novel approach.

For decades, we have had systems in place to examine foreign ownership of U.S. industry. We have seen even more scrutiny in instances where foreign buyers have sought to control U.S. telecom and broadcast media platforms.

Frankly, this country should have adopted a similar regulatory approach for social media—again, something that Senator CANTWELL and I worked on—which has considerably more scale and barriers to entry than broadcast media had a decade ago.

But this bill is an important step in fixing that glaring gap. It goes a long way toward safeguarding our democratic systems from covert foreign influence, both in its application to TikTok and forward-looking treatment of other foreign adversary control over future online platforms.

Before I yield back, I want to make clear to all Americans: This is not an effort to take your voice away. For several months now, we have heard from constituents how much they value TikTok as a creative platform. And yesterday was the 4-year anniversary of my once-viral tuna melt video on another social media platform. I can kind of understand why TikTok has become such a cultural touchstone.

To those Americans, I would emphasize: This is not a ban of a service you appreciate.

Many Americans, particularly young Americans, are rightfully skeptical. At the end of the day, they have not seen what Congress has seen. They have not been in the classified briefings that Congress has held, which have delved more deeply into some of the threat posed by foreign-controlled TikTok. But what they have seen, beyond even this bill, is Congress's failure to enact meaningful consumer protections on Big Tech and may cynically view this as a diversion or, worse, a concession to U.S. social media platforms.

To those young Americans, I want to say: We hear your concern, and we hope that TikTok will continue under new ownership, American or otherwise.

It could be bought by a group from Britain, Canada, Brazil, France. It just needs to be no longer controlled by an adversary that is defined as an adversary in U.S. law.

And with that, I urge that we take action on this item, and, again, appreciate the great leadership of the chairman of the Commerce Committee on working with our friends in the House to bring this important legislation to the floor of the Senate.

I yield the floor.

I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. TUBERVILLE. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

The Senator from Alabama.

Mr. TUBERVILLE. Mr. President, I cannot believe we are here again. Americans cannot believe what we are witnessing here today.

Less than a week ago, House Republican leadership sold out Americans and passed a bill that sends $95 billion to other countries. With the Speaker's blessing, the House Rules Committee approved a package of foreign aid bills that undermines America's interest abroad and paves our Nation's path to bankruptcy.

The Speaker relied on Democrats to force this $95 billion package through committee, over the objection of three conservative Members.

Unfortunately, our leadership here in the Senate, both Democratic and Republican, are complicit.

The Senate is about to follow the House's lead, further violating the trust of those who sent us here. We are about to vote on another $60 billion for Ukraine; this, on top of the $120 billion American taxpayers have already sent to this black hole, with no accountability.

We are a country that is $35 trillion in debt. We are a country whose southern border is wide open thanks to the Biden administration. Illegal immigrants are invading our country. Drugs, including fentanyl, are flooding across, killing hundreds—hundreds—of Americans a day.

We are printing money for other countries while inflation continues to crush the American citizen. Not one dollar of this bill is paid for or offset. Not one. We will have to print more money or borrow it from China, all to fund foreign wars while we are losing the fight at our own southern border.

What we are doing is a slap in the face to the Americans who sent us here to represent them. Instead of debating legislation to close the border and fix the economy, we are about to send billions of dollars to one of the most corrupt countries in the world.

The war in Ukraine is a stalemate. It has been for a while. Pouring more money into Ukraine's coffers will only prolong the conflict and lead to more loss of life. No one at the White House, Pentagon, or the State Department can articulate what victory looks like in this fight.

They couldn't when we sent the first tranche of aid over 2 years ago and they still can't do it over 2 years later. We should be working with Ukraine and Russia to negotiate an end to this madness. That is called diplomacy, by the way, a tactic this administration has been completely unwilling to use.

Instead, Congress is rushing to further bankroll the waging of a war that has zero chance of a positive outcome.

The Speaker claims he is privy to special, classified information that justifies support for this massive package.

If this critical information exists, all elected representatives who are being asked to vote on this massive spending package should have access to it.

Republican leaders in the Senate argue that Russia will roll through

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 129 of 267

Ukraine and into NATO if we don't immediately send another $60 billion we don't have.

I wouldn't be surprised if we get a letter signed by fifty or so "high ranking, former intelligence officials" confirming this and the dire consequences of delay. Don't fall for it.

I had a classified briefing from the Department of Defense just this morning. I can tell you there is no justification to prioritize Ukraine's security before our own. None.

To add insult to injury, we are financing this conflict on the backs of the American taxpayer. As I said earlier, this country is $35 trillion in debt. Today we are borrowing $80,000 a second—you heard that right—$80,000 a second, $4.6 million a minute. And I want this body to explain that to the American people next election. This is irresponsible and unsustainable.

On top of that, we are now considering adding another $95 billion to that mountain of debt with this foreign aid package. This funding will be financed by deficit spending the American people will eventually have to pay back.

This group doesn't have to pay it; the American people do. It is easy to spend somebody else's money.

Unlike the so-called loan to Ukraine—loan, we are hearing, which will never be repaid—don't be fooled—unfortunately, some of my colleagues will vote yes on this bill claiming that, hey, this money for Ukraine is a loan. This was a concept originally floated by President Trump.

However, this bill not only allows the President to set the terms of loan repayment, it lets him cancel the payment any time and the interest on it. Sounds a little fishy to me.

I and the majority of Americans are highly skeptical that we will ever see a cent paid back to the American taxpayer. The chickens are going to come home to roost, and when they do, it is going to get really, really ugly. Every Member of this body should be laser-focused on getting our own house in order, not bankrolling foreign wars.

Mr. President, $46 billion of this foreign aid package is supposedly for Israel. Sadly, that is not reality.

If you read the fine print, $9 billion of that funding would go to the Palestinians for what is being billed as humanitarian aid for Gaza. Of course, sending any money to Gaza will immediately be used to line the pockets of Hamas terrorists. They will provide zero relief to the civilians suffering under their control.

There is no requirement that any hostages—also in this bill—be released for any exchange of this money. Why is that not happening? We have American citizens and we have Israeli citizens who have been captive for 5, 6 months. We are giving $20-something billion—$9 billion to the people who are holding hostages—and we are not getting any relief for the people who have been suffering as hostages going on 6 months.

Why in the world would America agree to funding both sides of this war?

Israel is our greatest ally in the Middle East. We should be standing firm in support of our friends in their battle against Hamas. Sadly, the White House is more focused on playing politics and appeasing their radical, pro-Palestinian base. Why else would we send billions of dollars to Hamas? Is this a political payoff in an election year? Sounds like it to me. What a sad state of affairs this country is in.

While Congress rushes—rushes—today to bankroll Ukraine and the Palestinians, our leadership is avoiding the key crisis facing our Nation: our southern border. Wake up.

According to a recent Gallop poll, immigration is the top concern of people in this country who pay our bills, but the American people were just sold out. It is that simple.

You are witnessing the swamp at its worst—a swamp more concerned about maintaining power and being smarter than everybody else and lining the pockets of their friends than representing the interests of the American people.

Colleagues, wake up. The clock is ticking. How many Americans must die before we take on our own security as seriously as we are taking on other people's borders, including Ukraine's?

We lose 100,000 people to fentanyl. Does anybody care in this body? I haven't heard it. This is a direct result of the border policy under President Biden. Fentanyl is manufactured in China and ran by the cartel in Mexico. At what point does that horrific reality become important enough for us to come in here and vote and shut this dang border down? The left loves to tell you about threats. What kills more Americans than the Biden border policy? Nothing. It is the biggest disaster in history since I have been alive and a citizen of this country. Ukraine is losing soldiers by far fewer than the number of Americans who are dying from fentanyl. We have to take care of our own people before we take care of the rest of the world.

The Biden administration is failing this country. We know what the problem is. We know the solution. But nobody wants to solve it. That is an ineffective government.

President Trump proved that we can get operational control of our border. He had control. The problem is, no one in this administration or this body actually wants to solve this problem, which means we are also failing this country.

Americans are counting on this body to stand up and correct the course. I hope we don't let them down.

For these reasons, I will be voting against this massive supplement of taxpayer money that we don't have today going to Ukraine.

I yield the floor.

The PRESIDING OFFICER. The Senator from North Carolina.

Mr. BUDD. Mr. President, you know, we meet this week at a critical time. The threats we face on the world stage are demanding our attention in a way that we have not seen in decades.

From the Middle East, to Europe, to the Indo-Pacific, weakness from President Biden has allowed chaos to spread across this globe. In Israel, they are in a fight for survival against genocidal Hamas terrorists. In the Indo-Pacific, China is saber-rattling and making provocative moves towards Taiwan and the Philippines. In Ukraine, Russia continues its brutal war of aggression by committing war crimes against innocent civilians. But right here at home, we are facing a crisis of our own—most notably, the worst border crisis in American history.

The truth is that the consequences of our border crisis affect our citizens the most. For example, in my home State of North Carolina, we have seen a 22-percent increase in drug overdose deaths—the highest level ever recorded. This is primarily due to deadly fentanyl that was transported into our country through an open southern border on President Biden's watch.

Police departments from Charlotte to Raleigh have uncovered tens of thousands of pounds of fentanyl—enough to kill every man, woman, and child not just in North Carolina but in the whole country. Right now, we have an administration ignoring that crisis, and the only attempt the Senate made to address it—it fell far short of what is needed.

So as we again debate foreign aid and foreign spending, I will repeat what I have said throughout the process. We must secure our own border before we help other countries protect theirs. In order to be a strong nation, we first have to have a strong border here at home.

During one of my recent telephone townhalls a few month ago, I asked a poll question to the thousands of people who had joined me that evening on the phone. I asked: If you could be assured that the southern border was secure, would you then support sending aid to allies and partners? Roughly two-thirds of the respondents said yes. You see, most people aren't opposed to helping our friends; they just think we need to take care of our own country first.

For me, "America First" does not mean "America Only," so when I oppose this package, it won't be because I oppose helping our friends and our allies. We should send Israel the weapons they need to eliminate Hamas and free the remaining hostages—one, by the way, who is a North Carolinian. We should counter the Chinese Communist Party's military aggression in the Indo-Pacific and its social media subversion inside our country. We should counter Russia's brutality and force Putin to the negotiating table on terms most favorable to Ukraine. We should rebuild the arsenal of democracy and make significant investments in our national defense. We should do all of those things but not before we fix what affects our own citizens first.

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 130 of 267

Too many Americans are suffering. Too many Americans are dying. This is an order of priorities, and my first priority as a U.S. Senator will always be to make life better for us here in the United States and back home in North Carolina.

I will oppose this foreign aid package because we must put America first—not alone, not alone, but first.

I yield the floor.

The PRESIDING OFFICER. The Senator from Massachusetts.

Mr. MARKEY. Mr. President, I rise today not in defense of TikTok but in defense of TikTok's users, especially the 170 million American users. Congress is rapidly heading towards passing legislation that will likely result in the blocking of the most popular application among young people in this country—an app whose fundamental purpose is to facilitate and promote speech; an app that has revolutionized how people connect, share, do business, and communicate online; an app that is bringing competition to the heavily concentrated social media market.

It should be a serious flag that a bill with such significant implications for freedom of speech and online competition has gone from being an idea in the House of Representatives to all of a sudden being passed on the floor of the Senate in a matter of weeks, just weeks.

So when political elites who otherwise fiercely disagree with each other come together to pass legislation that may result in significant censorship—yes, censorship—often in the name of national security, we should be hypervigilant about the true intentions of this legislation.

Episodes in history of using national security as a pretext to crack down on dissenting or unpopular speech loom as warnings about the ease of compromising our values when national security is supposedly at stake.

I want to be clear. I rise today on this greatest of debate floors not to defend TikTok. I don't deny that TikTok poses some national security risks. Instead, I come here today with a plea to my colleagues to think carefully about the impact of this bill, the consequences of its implementation, and the tradeoff between supposed national security threats and freedom of expression and basic rights to free speech.

This legislation may address or at least mitigate a national security risk, but it could and likely will result in widespread censorship. This censorship would predominantly impact young people in our country, many of whom are just gaining their political consciousness and obtaining the right to vote. We should be clear-eyed about these stakes.

Censorship is not who we are as a people. We should not downplay or deny this tradeoff. Some say the legislation merely forces ByteDance to sell TikTok within a year. That is a sale that won't affect its users at all. The ownership will change, so bill supporters say, but the app will stay the same.

Realistically, the actual chances of divestment in a year, if ever, are very small. A TikTok sale would be one of the most complicated and expensive transactions in history, requiring months, if not years, of due diligence by both government and business actors.

We should be very clear about the likely outcome of this law: It is really just a TikTok ban. And once we properly acknowledge that this bill is a TikTok ban, we can better see its impact on free expression: 170 million users—170 million Americans use TikTok to watch videos, learn about the news, run a business, and keep up with the latest pop culture trends. They connect with friends and family, sell new products and build community. The culture and expression on TikTok are unique and unavailable anywhere else on the internet.

In fact, TikTok is a threat to business, a threat to Facebook and Instagram and other American companies precisely because of its unique style and community which cannot be replicated anywhere else.

And while many of my colleagues are sincere in their fears for U.S. national security, others appear to support this legislation for a far more dangerous reason: They want to ban TikTok because of its users' content, because of TikTok's viewpoints. They don't like that many TikTok users support progressive or liberal politics or perspectives that they simply don't agree with.

The bill's supporters dress up this censorship by arguing that the Chinese Government is manipulating TikTok's algorithm to promote certain viewpoints. In this view, a TikTok ban is about combating Chinese propaganda, not penalizing TikTok's content.

TikTok, from their perspective, is "poison[ing] the minds of young Americans with pro-Communist China propaganda." This isn't just some hypothetical risk, critics say, but an actual ongoing operation by the Chinese Communist Party.

Don't be fooled by these arguments. Although the Chinese Government certainly censors online speech in China, there is no credible evidence that the CCP has done so in the United States through TikTok. In fact, when U.S. national security officials talk about the risk of China manipulating TikTok's algorithm, they refer to it as a "hypothetical" risk—a hypothetical risk. This is the real objection, an objection to the political content, the most valuable and protected speech in a democracy.

We should be very clear about the impact and intent of this legislation. This bill is, for all intents and purposes, a ban on TikTok, and it is intended to suppress disfavored speech on the platform, plain and simple. We could see that in the cross-examination—the questioning in the House of Representatives hearing—on this subject.

For my colleagues who are awake to this reality, they may, nevertheless, believe that such speech suppression is a small cost to pay to keep Americans safe. To them, I urge a strong note of caution. The defense that a little speech suppression is necessary when our national security is at stake is ultimately un-American. This reasoning may seem convincing, but American history has too many examples of controversial laws that ultimately infringe on civil liberties in the name of national security. In the United States, we often look back on these episodes with regret. We should not add TikTok to that history.

Don't get me wrong. TikTok has its problems. No. 1, TikTok poses a serious risk to the privacy and mental health of our young people. In fact, TikTok paid a fine for violating my Children's Online Privacy Protection Act just 5 years ago. But that problem isn't unique to TikTok, and it certainly doesn't justify a TikTok ban, which is what we heard over and over again in the House of Representatives in their hearing on this issue. The reason is that YouTube, Facebook, Instagram, and Snapchat are making our children sick, as well, and exploiting our children and teenagers and their information for profit. American companies are doing the same thing, too, to children and teenagers in our country, as is TikTok.

So why aren't we thinking of this as a common goal that we are going to have in order to protect those teenagers and children?

If the bill's supporters truly wanted to protect the well-being of our young people, they would broaden their lens and address the youth mental health crisis plaguing our children and teenagers that has, in part, been caused by Big Tech in the United States—in the United States—along with TikTok.

I want you to hear the statistics. To my colleagues, it is powerful. One in three high school girls in the United States just 2 years ago considered suicide. At least 1 in 10 American high school teenage girls attempted suicide that year—attempted suicide. Amongst LGBTQ youth, the number is more like 1 in 5 attempted suicides just 2 years ago.

Now, it is not exclusively because of social media, what TikTok, Instagram, Facebook, Discord—all of them are doing it, but it plays a big role according to our own Centers for Disease Control. It plays a big role according to our own Surgeon General. It plays a big role, and we should be talking about that out here. That is a clear and present danger. That is not a hypothetical danger. That is not a hypothetical threat that may occur sometime in the long, distant future. It is happening right now. If we are talking about TikTok, we should be talking about all the other companies at the same time.

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 131 of 267

Instead of suppressing speech on a single application, we should be addressing the root causes of the mental health crisis by targeting Big Tech's pernicious privacy invasion business model of teenagers and children in our country. We could be passing our bipartisan Children and Teens' Online Privacy Protection Act and banning targeted ads to kids and teens on TikTok and everywhere else.

My legislation with Senator BILL CASSIDY has been intensely vetted, passed through Senate committee, and is supported by the chair and ranking member of the Senate Commerce Committee. And unlike a TikTok ban, it addresses the problem that is universally recognized, the compromised health and well-being of all of our children and teenagers.

Today, if you hear out on the floor Senators talking about the impact TikTok is having upon young people in our country, it is a good question, and we should be dealing with it, but you can't deal with it just by talking about TikTok. You have to talk about every American company that actually created the model that has led to this mental health crisis, and we are not doing that today. That is something that is a clear and present danger right now, not a hypothetical threat in the future, which is what we are actually doing by passing this legislation.

Instead of protecting young people online, we are censoring their speech, and this is a grave mistake. We should be having a much bigger discussion about what the implications of this legislation are for the future. I thank the Presiding Officer for giving me the opportunity to come out here on the Senate floor to talk about this very important issue.

I yield the floor.

The PRESIDING OFFICER. The Senator from Florida.

Mr. RUBIO. In a few hours here, the press headlines are going to read that the Senate just passed the Ukraine funding bill. That is what they will call it. This bill is about a lot more than just Ukraine. There is a lot in this bill, and I want to go through some of it.

First of all, it provides something I have strongly supported, which is providing, in this case, $26 billion to the State of Israel to defeat Hamas, to defend itself against its enemies. This is actually something we tried to pass on its own or could have passed on its own months ago. It was blocked. It was held hostage for Ukraine funding, but it is something we should have done months ago.

It is interesting. I think Israel, in and of itself, is a miracle country. On the first day of its existence, it was invaded, I believe, by 12 separate armies. The whole world thought they would be overrun and defeated very quickly, and they survived. And they have throughout their entire existence had to deal with the fact that everywhere they turn, they have enemies all around them.

It also happens to be the only pro-American democracy in the Middle East. Today, it is engaged in a battle to not just defeat these vicious criminals and terrorists who committed a slaughter on the 7th of October of last year, but they also have to deal with rockets being launched against them from Lebanon. You have 90-something thousand, potentially, Israelis permanently displaced in their own country. They can't go back to where they live in the northern part of their country. And then there is the threat from Iran and the threat from all the terror groups—Hezbollah and the like—that are constantly targeting Israel and then having to face all the things that are happening around the world, as well, in this effort to delegitimize their right to be a Jewish State.

I am a strong supporter of Israel's defense. We should have done this weeks and months ago, and it could have been done as its own bill, but it was held hostage.

This bill provides, as well, $8 billion to help nations in the Indo-Pacific, particularly Taiwan, and the purpose of that is to build up the military capacity of our partners in the region, frankly, to dissuade and prevent the Chinese Communist Party from starting a war in the Indo-Pacific that would make the one going on in Europe look like child's play—far more dangerous.

By the way, that is something I have been trying to do since 2019. I believe I was the first Member of Congress to call for a banning—not a banning of TikTok, a banning of ByteDance, which is the company that owns TikTok. If ByteDance sells TikTok, TikTok could continue to operate. But we should not have a company operating in the United States with the algorithm that it has and the access to the data that it has that powers the algorithm. We should not have a company like that operating in the United States that happens to do whatever the Chinese Communist Party tells them to do.

But the reason why the headlines are going to be about Ukraine funding is because that is the part of this bill that, frankly, has been controversial and has people who oppose it.

I, personally, believe it is in the national interest of the United States to help Ukraine. Ukraine was invaded, not once but twice, by Vladimir Putin. I supported Ukraine in helping Ukraine back in 2014 when they were first invaded by Putin; and President Obama would only supply them with blankets and meals, ready-to-eat. And I support continuing to help them now to defend themselves. They didn't start this war. I support helping them defend themselves to the extent we can afford it and to the extent we can sustain it.

But while this invasion of Ukraine most certainly poses a national security risk to the United States and a risk to our country, the invasion of America across our southern border is even more important. It is even more a severe threat.

Today, and every single day for the last 3 years, thousands of people—many if not most of whom we know very little about—are pouring into the United States across our southern border.

I made it clear months ago that while I support helping Ukraine, I would only vote to do so if the President issued Executive orders that would help stop this. It was his Executive orders ordering us not to enforce immigration laws that created the incentive and the driver that has led to this crisis and only that. Only Executive orders to begin to enforce our immigration laws will allow us to stop what is happening now.

But the President continues to refuse to issue those Executive orders. He continues to refuse to enforce our immigration laws, and so the crisis continues. And sadly, just a few moments ago, we took a vote here that basically says that we here in the Senate will not be allowed to vote on amendments to make changes to this bill.

So we are left with the choice. I am left with this choice. If I want to help Israel, if I want to help Taiwan, if I want to ban ByteDance from operating TikTok in the United States, then I have to drop my demand that the President enforce our immigration laws, and, by the way, I have to vote for billions of dollars to be spent on all kinds of programs around the world that I will describe in a moment, including for people who are illegally entering this country. This is moral extortion.

First of all, 9 million people over 3 years—that is how many have entered our country. This is not immigration. We should always be a country that welcomes immigration. It enriches our country. Controlled immigration, in which we control how many people come, who comes, knowing enough about them—that is immigration. But 9 million people and counting in 3 years? That is mass migration, and mass migration is never good. There is never such a thing as positive mass migration, particularly of 9 million people in 3 years. At a time when our country, from the inside and the outside, is being infiltrated by people and by movements that seek to destroy America, mass migration is catastrophically dangerous.

Last week, in a coordinated effort—and it was a coordinated effort; they admitted it—to cause the most economic impact possible in the United States, at least until our leaders abandoned Israel—that was their demand—we had pro-terrorist mobs, which is what they are—these are not protesters; these are pro-terrorist mobs—shut down traffic on an interstate highway in Oregon. They blocked passengers from getting to the airport in Chicago and Seattle. They closed down the Golden Gate Bridge in San Francisco.

At this very moment—right now, as I speak on the Senate floor—at some of

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 132 of 267

our most prestigious universities, their campuses are closed because they have been taken over by pro-terrorist mobs, chanting things and harassing Jewish students to go back to Poland, they say. Others are chanting: "Go Hamas. We love you. We support your rockets too." Others—I have heard these chants—here it goes: "We say justice. You say how. Burn Tel Aviv to the ground."

The situation has gotten so intolerable that, just 2 days ago, a rabbi advised Jewish students to leave Columbia University and go home for their safety.

This morning, I got a text message from a friend—a Jewish friend—and I read something I never thought I would ever have to read. Here is what he wrote me:

I have to tell you, for the first time in my life, I see Jewish people scared for their safety and considering exit strategies from the USA, including buying homes in foreign countries and looking to liquidate USA assets.

I never thought I would ever read that from anybody in America.

These mobs, by the way, don't just want to destroy Israel. They want to destroy America. Some of these mobs are out there chanting "death to America" in the streets of American cities.

As for one of the mob leaders at one of these riots, this is what he said into a microphone:

It is not just "Genocide Joe" that has to go; it is the entire system that has to go. Any system that would allow such atrocities and devilry to happen and would support it—such a system does not deserve to exist on God's Earth.

Do you know what system he is talking about? This system—our system, our system of government—that is what he was talking about.

Where did all of this come from? How did all of this happen from one day to the next? How can things that we once only saw happening in the streets of Tehran, manufactured by the evil regime—how are those things now being chanted in our streets in our country? Where did this come from? The clues are everywhere.

Hamas and Hezbollah have been very, very public about how these violent, anti-Israel, anti-Semitic mobs are part of their strategy to intimidate American leaders to support policies that will help destroy Israel.

Hamas, Hezbollah, and other terror groups have repeatedly called on their supporters around the world to protest "in cities everywhere," and they boast about how their friends—or who they call their "friends on the global left"—were actually now responding to their calls.

By the way, they openly brag. This is all coming from interviews that they do on television programs that can be monitored. They openly brag that this is "because of the introduction of colonialism, racism, and slavery studies into history curricula."

They go on to say that many young Americans have been—this is my term, a term I read today in the Wall Street Journal—have been groomed to "support armed resistance," to support intifada in the United States.

By the way, it is not just the mobs that we are seeing. Beyond that, as the Director of the FBI has acknowledged, ISIS generates income—they generate revenue—by running a human smuggling ring that brings migrants to the United States.

Just the bare minimum common sense would lead you to conclude that, if ISIS has a business to smuggle migrants into the United States, why wouldn't they use that to smuggle a few terrorists here to do in America what they did in Moscow a few weeks ago?

So we have Hamas, and we have Hezbollah, and we have all of these terror groups encouraging and supporting violent mobs calling for intifada inside America. We already have people here, on student visas, calling for "Death to America," and ISIS controls a migrant smuggling ring that they can use to bring people into the United States to conduct attacks.

But if I want to help Israel, if I want to help Taiwan, if I want to help Ukraine, if I want to ban TikTok, I have to agree; I have to vote to do nothing to stop thousands of people a day whom we know literally nothing about—just allow them to come across our border and be released into our country.

As far as some of the money that is being spent all over the world, I have always supported the United States being engaged in the world, and I continue to be, but I ask you this: I have senior citizens, and I have veterans, and they call my office, and they call our offices, and they say: I have nowhere to live. Housing is too expensive.

I met a senior, a couple of days ago, in his eighties. He still has to work nights as a security guard, and he literally lives in a mobile home—not even a mobile home, in like a trailer parked in someone's backyard.

These people call. They have lived in this country their whole lives. They have served our country. They call for help, and the most we can often do is help get them on a waiting list for section 8 housing. This is a problem that exists in America right now.

But if I want to help Israel, if I want to help Taiwan, if I want to help Ukraine, if I want to ban TikTok, I have to vote for spending billions of dollars to give to charity groups so they can fly people around the country here and put them up in hotel rooms or so they can help for resettlement in another country.

We have rich countries in the Middle East, allies of ours. Their leaders own some of the largest yachts in the world. Some of their leaders own some of the most expensive horses you could possibly buy in the world. They have built some of the most extravagant and luxurious resorts on the planet in some of these countries. These are rich countries and strong supporters of the Palestinian cause, as they call it.

But if I want to help Israel, if I want to help Taiwan, if I want to help Ukraine, if I want to ban TikTok, I have to vote to send American taxpayer money to deal with the catastrophe that has been created by Hamas in Gaza—100 percent by Hamas. There was no war. There was a ceasefire before Hamas crossed over and slaughtered and raped and kidnapped. But now the American taxpayer is on the hook.

Look, I understand that, in our Republic, in our system of government, compromise is necessary. We have to do it all the time. I have passed a lot of bills—I am very proud of that—and every one of them involved my finding someone from a different ideological perspective, from the other side of the aisle. You have to compromise, meaning you are not going to get everything you want. You are going to have to give them something they want in exchange for something you want or you may have to change the way you wrote what you want. That is what you have to do in order to pass laws.

I understand compromise—I do—but this bill is not that. This bill is not a compromise. This bill is basically saying that, if I don't agree to drop my demands that the President secure our border, if I don't agree to spend billions of taxpayer dollars all over the world to resettle people here and in other places in the midst of our own migratory crisis—if I don't agree to all of that, then Israel and Taiwan and Ukraine do not get the help they need and that I support, and TikTok does not get banned. This is not compromise. This is legislative blackmail, and I will not vote for blackmail.

I yield the floor.

The PRESIDING OFFICER. The Senator from Nebraska.

Mr. RICKETTS. Mr. President, does anybody believe that hashtag "StandwithKashmir" is organically more popular than hashtag "TaylorSwift"? No, of course not, but right now, on TikTok, hashtag "StandwithKashmir" has 20 times more posts than hashtag "TaylorSwift."

This is a direct example of the Chinese Communist Party using their control of TikTok to skew public opinion on foreign events in their favor. China is our chief foreign adversary in the world. They are a threat to our national security, our values, our economy, and the CCP works tirelessly every day to undermine our entire way of life. TikTok is one of the ways they are doing that.

I understood that as Governor. That is why I was the first Governor in the country to ban the use of TikTok on State devices back in 2020, and that is why I will be voting for this bill today. Today, we are taking action to end the Chinese Communist Party's ability to own and operate TikTok in the United States.

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 133 of 267

TikTok's active users include over 150 million Americans. That is almost half of our country's entire population. It has become the most influential news platform in the country. The percentage of TikTok users who regularly get their news from this app has doubled since 2020. The problem, however, is that what that news is, what slant that news has, is being entirely controlled by the Chinese Communist Party. We don't allow this for TV stations or radio stations. You have to be a U.S. citizen to own a TV station or a radio station in this country. Why are we letting our greatest adversary in the world own a news platform?

TikTok, under CCP ownership, promotes or demotes content based on whether it aligns with the CCP's interests and its agenda. This has major, real-world implications here at home and around the world.

Look at what is happening on our college campuses right now in this country. Pro-Hamas activists are taking over public spaces and making it impossible for campuses to operate. Jewish students are being told to leave campus because their universities can't guarantee their safety. There are a lot of other things wrong with this, including the failure to prioritize student safety over appeasement of terrorist sympathizers.

But why is this happening?

Well, let's look at where young people are getting their news. Nearly a third of adults 18 to 29 years old—these young people in the United States—are regularly getting their news exclusively from TikTok. Pro-Palestinian and pro-Hamas hashtags are generating 50 times the views on TikTok right now despite the fact that polling shows Americans overwhelmingly support Israel over Hamas. These videos have more reach than the top 10 news websites combined.

This is not a coincidence. The Chinese Communist Party is doing this on purpose. They are pushing this racist agenda with the intention of undermining our democratic values, and if you look at what is happening at Columbia University and other campuses across the country right now, they are winning.

I want to talk about another example that means a lot to folks back home whom I represent in Nebraska.

We know that the COVID–19 pandemic originated in China. Instagram and TikTok currently have about the same number of users in the United States; However, if you look at the content, there is a 400-to-1 ratio for content that blames China for this pandemic on Instagram compared to TikTok. Again, Instagram has 400 times the number of posts blaming China for COVID than on TikTok.

On TikTok, the Chinese Communist Party has quashed dissent or criticism. They have done this for Tiananmen Square—which, again, on Instagram, there are 80 times the posts around Tiananmen Square than there are on TikTok, and on Hong Kong, there are 180 times the posts on Hong Kong being censored or being repressed versus on TikTok.

The Federal Government's job is to protect Americans against foreign and domestic threats. TikTok is a major foreign threat. The bill we are passing today puts an end to that. This bill ensures that our citizens are not improperly targeted, surveilled, or influenced by any foreign adversary.

Right now, the major threat is TikTok, but China can make another TikTok. That is why, instead of going after any specific app, this bill simply prohibits marketplaces, like the App Store or Google Play, from hosting applications controlled by foreign adversaries. This is just common sense.

It also establishes a narrow framework to protect against future apps. It allows the Federal Government to require divestment of applications controlled by a foreign adversary or face a prohibition on app stores and be denied access to web-hosting services in the United States. That power has very strict guidelines. The authority can only be exercised if an application is under the control of an adversarial foreign entity, presents a national security threat, and has over 1 million active users annually.

It also protects individual users. No enforcement action can be taken against individual users of banned applications. Civil enforcement actions may only be initiated against companies that violate the act.

The bill incentivizes China to divest from TikTok or TikTok will face a ban. If TikTok is divested from the CCP, it can continue to operate in the United States. If the restrictions are already in effect and TikTok is divested later, the restrictions will be lifted.

I believe the Chinese Communist Party is the greatest threat we face in this Nation. They are fighting smart, trying to undermine us from within, and using technology like TikTok to do it. Together, by passing this bill, it is my hope that we will send a loud message and a clear message that America is not open to the CCP for influence.

We are taking a stand to protect our own, protect our values, and end a major Communist Chinese Party tool to attack us.

I yield the floor.

The PRESIDING OFFICER. The Senator from Delaware.

Mr. CARPER. Mr. President, long before I ever thought of running for office, I was a little kid born in a West Virginia coal mining town called Beckley. My sister and I ended up going to the same grade school not too far from our house.

As a kid, I was pretty well behaved and didn't get into much trouble, but in the first grade, I got in a fight. I got in a fight because some kid was picking on my sister, who was a year older, in the second grade. He was a much bigger guy, and it was not a fair fight. I got involved in it and took him out with one swing. That was the last punch that I think I had thrown in anger. But I didn't like the idea of a big guy, a bully, trying to push around somebody, whether it was my sister or not. I have never cared for that in other situations growing up and watching the behavior of people in all kinds of different situations.

Our country, if you go back to our founding, if you recall, we took on the biggest nation on Earth, the strongest nation on Earth, Great Britain. It was not a fair fight. They had us badly outgunned, outnumbered. And somebody came to our rescue. The persons who came to our rescue were the French. If it weren't for the French, we would still be, maybe, a colony of Great Britain. But the French stood up and said: We are here to help.

There is a time for people to stand—countries to stand by and allow things to happen, and there is a time to stand up and be heard. We were helped as a nation over 200 years ago by the French. We have, I think, a moral obligation to help make sure that Ukraine has an opportunity to continue to go forward and to be a democratic nation. They are a democratic nation. They actually choose—they elect their own leaders. Vladimir Putin doesn't care very much for that. He thinks they shouldn't be allowed to do so and has decided to use force to be able to take away the opportunity to be a free nation.

We have a couple of opportunities. We can criticize Putin, the Russians, for what they are doing or we can actually do something about it.

I think I may be the last Vietnam veteran serving here in the U.S. Senate. When we go out from here, I like to run. Many, many mornings when I have gone for a run near the Capitol, I have run out to the Lincoln Memorial. On my way back, I run right by the Vietnam Memorial. It is black granite. There are names of I want to say maybe 59,000 people who died in that war I served in.

We got involved in that war. It was not a popular war. It wasn't popular with my generation. But we got involved in that war. The communists in North Vietnam were coming in and trying to take over the south. We ended up, for better or for worse, aligning with the south. We know what the outcome turned out to be. A lot of people died. A lot of people died in that war. I know a number of them, and my guess is my colleagues do as well.

I tell that story because we have a situation here that is not altogether different in which the Ukrainian people, who want to defend themselves—they want to preserve their democracy, and they are willing to make the tough fight if we will help them and the rest of the free world will help them.

God bless our President and leaders of a bunch of other countries who said: We are not going to walk away and let

USCA Case #24-1113 Document #2060757 Filed: 06/26/2024 Page 134 of 267

Putin have his way and take away the democracy of the people of Ukraine. We are going to help them. We are going to help them not by sending—as we did in the Vietnam war—our own young soldiers, sailors, and airmen. We are not going to send them to Ukraine to defend Ukraine. We are going to send them munitions. We are going to send them drones. We are going to send them missiles. We are going to send them ships and aircraft. We will do that.

That is really all the Ukrainians are asking for. That is all they are asking for. They are asking for that kind of help. We ought to provide it. We ought to provide it.

I used to fly missions. I was a naval flight officer, P–3 aircraft mission commander. We used to fly a lot of surveillance missions around the world, track Soviet submarines everywhere across the planet. We also flew a lot of missions off the coast of Vietnam and a lot of missions in the South China Sea.

Even decades ago when I was flying missions with my squad in the South China Sea, we were concerned about the militarization of the South China Sea by China and China taking over islands that were not theirs, that maybe had been claimed by the Philippines and other nations. The Chinese were taking them over with the idea of militarizing them and ultimately making maritime trafficking—the moving of ships and aircraft through the South China Sea—more difficult.

We used to fly missions in the Vietnam war. We used to fly missions out of Vietnam. I was commissioned in 1968. By that time, we pulled a lot of land-based aircraft—B–52s, P–3s, just land-based aircraft with the Navy—we pulled them out of Vietnam, and we flew our missions out of Thailand, a big Air Force base.

We flew missions out of Taiwan, places in the southern part of the island, Tainan, which is an Air Force base in Taiwan. I had a chance to be deployed there from time to time. I got to know some of the people who lived in Taiwan—wonderful people, lovely people. Do you know what they were concerned about all those years ago? They were concerned about China coming in and taking them over, trying to take away their independence—not just militarize the South China Sea and transfer a bunch of islands into bases, if you will, for the Chinese military but actually take over a democratic country that has never been a part of China and make them do the bidding of China.

Mark my words. If Vladimir Putin is successful in prevailing in Ukraine, if he is successful, Taiwan will be next. As sure as I am standing here today, President Xi, the leader of China who says Taiwan is theirs, will hunt right into the fight. That would trigger a real-world conflict between them and us. It wouldn't be good for either of us, but we would, I think, be beholden to defend Taiwan.

Why don't we bring a halt to that idea of China getting involved and trying to come after Taiwan and having to commit our own troops? Why don't we just take care of it by making sure the people of Ukraine have the ships, the aircraft, the tanks, the missiles, and the armament they need to prevail on their own against Russia?

We wouldn't have to commit our own troops. We wouldn't have to worry about the kind of body bags that came back from Vietnam when I was serving in the Vietnam war. We would end up with a free Ukraine, and I think we would have a much better chance of making sure that the folks in Taiwan would continue to enjoy their independence as well.

I am wearing a lapel pin here that people ask me about from time to time—even today. They say: What kind of lapel pin is that? It is an American flag, and it is a Ukrainian flag as well.

A couple of days after Russia invaded Ukraine, I sent somebody over from my staff to the Ukrainian Embassy to get this lapel pin. I have worn it every day since, every day since.

And I get a lot of people—I go back and forth on the train, as my colleagues know. I live in Delaware and go back and forth on the train almost every day. It is amazing how many people I run into on the train, at the train stations, or traveling around the country. They will say: What is that that you are wearing? And when I explain it, I don't recall one person ever saying: You shouldn't wear that, or, That is a bad idea. People say: Good for you. Good for you. We ought to help them.

The Presiding Officer may recall a couple of months ago when—in fact, this year and maybe even last year—President Zelenskyy came here. Not to this Chamber, but he came into the Old Senate Chamber just down the hall. And he spoke in a closed room to Members of the Senate, Democrats and Republicans, in very emotional, very compelling language where he laid out the situation that they faced, laid out how important our support was and how grateful that they were for us being willing to stand by them, stand up for them.

And his speech was interrupted any number of times by standing ovations by Democrats and by Republicans. I happened to be sitting right in front of his podium when he was speaking, about as far away as our stenographer is standing from me today. And during the course of his speech, a couple of times he made eye contact, and I tried to give him encouragement in a sort of way. And I think I did.

But when it was over, he walked away from the podium, and I walked up to him and I shook his hand and I hugged him. I don't get to hug international leaders every day, but I hugged him and he hugged me. And I said to him, "You are a hero." I said to him, "You are a hero." And he reached over and touched my lapel pin, and he said to me, "No, no. You are our heroes." He said, "You are our heroes."

Now, I just want to say, in the months that have passed since then when we have floundered, kind of waffling around and trying to figure out how we are going to continue to provide aid and support for Ukraine, and I thought—he was back a couple of months later, and I had a chance to talk to him again. And again he said, "You are our heroes; you are our heroes," talking about us in this body and the House of Representatives.

And I said to my staff later that day and my colleagues later in the day: You know what—it is funny—I don't feel much like a hero.

This was a couple of months ago when he was here because we were on the verge of pulling the plug on the aid and the assistance we were going to provide for Ukraine. There was a very real chance that we could pull the plug, take away the help, and Putin and the Russians would just move in and take over. And I didn't feel like a hero with that sort of staring us in the face.

When we leave this week and go back to our districts, our States, and our homes across the country and reflect back on what we have done, what we have decided, I want to feel like a hero. I want all of us to feel like a hero and a heroine and deserve to be feeling that way.

I am a great student of World War II, and some of my colleagues are as well. I remember a time when Churchill was leading the allied world and rising and standing up and warning against the threat that Germany provided for the rest of us, urging us to be brave and be strong, be vigilant, come to the aid of Europe.

There was another guy named Chamberlain whose name is sort of thought of in terms of appeasement. Churchill: engage, defend, be strong. Chamberlain: appease. We have a chance here to be more like Churchill and less like Chamberlain. And I hope and pray, when we vote here today—maybe even tomorrow—that is exactly what we will do.

I want us to make not just the folks in Ukraine, Taiwan, and—I don't want them just to be grateful. I want the people who we serve, who elect us and sent us here—I want them to be proud of what we have done and the work that we have done on their behalf and on behalf of these other countries who need our help.

We are the beacon for democracy for the world. Our Constitution is the longest living constitution in the history of the world. It lays out how the democracy should operate; and for all these years, we have. We need to hold that to our heart, and we need to do the right thing.

The last point I would say is this: My mom was a deeply religious woman. I have shared this with some of my colleagues before. She would drag my sister and me, in the West Virginia coal-mining town in West Virginia—she would drag us to church every Sunday morning, every Sunday night, every

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 135 of 267

Wednesday night, and even on Thursday night. And then we would go home, and she would turn on the TV and we would watch Billy Graham on television. She wanted us to have a deep faith, but she really wanted us to hold dear the Golden Rule, the idea that we should treat other people the way we want to be treated.

How would we want to be treated if we were the Ukrainian people today? How would we want to be treated if we were Taiwanese people today, facing the kind of threats that they face? We would want the rest of the free world to come to their aid—not to send troops, not to send fighter pilots and all, but give them the tools that they need to take on this fight and to win it. When we do that, if we do that—and I am encouraged that we will—we will deserve the words of President Zelenskyy when he said, "You are our hero. You are our hero." Let's be that hero.

I yield the floor.

The PRESIDING OFFICER. The Senator from Ohio.

Mr. VANCE. Mr. President, with respect to my colleagues who voted in the other direction on this particular piece of legislation, let me offer some serious concerns about the direction we are headed as a country and about what this vote represents in terms of American readiness; American capacity to defend itself and its allies in the future; and, most importantly, the American leadership's ability to acknowledge where we really are as a country: our strengths, our weaknesses, what can be built upon, and what must be rebuilt entirely.

I am extraordinarily aware of a couple of historical analogies that should inform this debate, one that seems to always inform debate and another that seems to never come up. Now, opponents of further aid in Ukraine—and I count myself among them—say that this is a Chamberlain vs. Churchill kind of moment. You just heard my distinguished colleague from Delaware make this observation.

With no disrespect to my friend from Delaware, we need to come up with some different analogies in this Chamber. We need to be able to understand history as not just World War II replaying itself over and over and over again. Vladimir Putin is not Adolf Hitler. It doesn't mean he is a good guy, but he has significantly less capability than the German leader did in the late 1930s. America is not the America of the late 1930s or the early 1940s. We possess substantially less manufacturing might, in relative terms, than we did almost 100 years ago. And most importantly, there are many ways in which the analogy falls apart even if you ignore America's capacity, Russia's capacity, and the like.

There are ways in which we should be looking at other historical analogies, and I would like to point to just a couple of those right now. The Second World War, of course, was the most devastating war, arguably, in the history of the world. Close behind it is the First World War. And what is the lesson of the First World War? It is not that there are always people appeasing the bad guys or fighting against the bad guys. The lesson of World War I is that, if you are not careful, you can blunder yourself into a broader regional conflict that kills tens of millions of people, many of them innocent. In 1914, alliances, politics, and the failure of statesmanship dragged two rival blocs of militaries into a catastrophic conflict.

In the past week alone, the Council on Foreign Relations has published an essay calling for European troops to sustain Ukraine's lines as Ukraine struggles to raise troops. Some European leaders have said they might send troops to support Ukraine in a conflict.

Perhaps the history lesson we should be teaching ourselves isn't Chamberlain vs. Churchill. Perhaps we should be asking ourselves how an entire continent, how an entire world's set of leaders allowed itself to blunder into world conflict.

Is there possibly a diplomatic solution to the conflict in Ukraine? Yes, I believe that there is. Indeed, as multiple people—both critics of Vladimir Putin and supporters of Ukraine—have pointed out, there was, in fact, a peace deal on the table approximately 18 months ago. What happened to it? The Biden administration pushed Zelenskyy to set aside the peace agreement and to engage in a disastrous counteroffensive, a counteroffensive that killed tens of thousands of Ukrainians, that depleted an entire decade's worth of military stocks, and that has left us in the place that we are now, where every single objective observer of the Ukraine war acknowledges today that the war is going worse for Ukraine than it was 18 months ago.

Could we have avoided it? Yes, we could, and we should have avoided it. We would have saved a lot of lives, we would have saved a lot of American weapons, and we would have had this country in a much, much more stable and much better place if we had.

Now, there is another historical analogy that I think is worth pointing out, and that is the historical analogy of the early 2000s. Now, in 2003, I was a high school senior, and I had a political position back then. I believed the propaganda of the George W. Bush administration that we needed to invade Iraq, that it was a war for freedom and democracy, that those who were appeasing Saddam Hussein were inviting a broader regional conflict.

Does that sound familiar to anything that we are hearing today? It is the same exact talking points, 20 years later, with different names. But have we learned anything over the last 20 years? No, I don't think that we have. We have learned that if we beat our chest instead of engage in diplomacy, that it will somehow produce good outcomes. That is not true. We learned that if we talk incessantly about World War II, we can bully people and cause them to ignore their basic moral impulses and lead the country straight into catastrophic conflict.

Now, as one of the great ironies of my time in the U.S. Senate for the last 18 months, I have been accused by multiple people of being a stooge of Vladimir Putin. Well, I take issue to that because in 2003, yes, I made the mistake of supporting the Iraq war. I also, a couple months later, enlisted in the U.S. Marine Corps, one of two kids from my small block on McKinley Street in Middletown, OH, to enlist in the marines just that year. I served my country honorably, and I saw when I went to Iraq that I had been lied to, that the promises of the foreign policy establishment of this country were a complete joke.

Just a few days ago, we saw our friends in the House waving Ukrainian flags on the floor of the U.S. House—which, I would love to see them waving the American flag with such gusto. And I won't complain about the fact that it was a violation of the rules of decorum, though it certainly was. But it reminded me—it reminded me—and I believe, 2005, maybe it was 2006—when that same exact Chamber, the Members were raising their fingers, stained with purple ink, to commemorate the incredible Iraqi elections that had happened in 2005.

I was in Iraq for both the constitutional referendum of October of 2005 and the parliamentary elections of December of 2005. And I remember the people in Iraq, happily voting, raising their fingers in the air.

What I am saying is, not that the people of Iraq were bad or that they were bad for voting in their elections, what I am saying is the obsessive focus on moralism—democracy is good, Saddam Hussein is bad; America, good; tyranny, bad—that is no way to run a foreign policy, because then you end up with people waving their fingers on the floor of the U.S. House of Representatives, even though they have walked their country into a disaster.

And I say this as a proud Republican. I say this as somebody who supports Republican colleagues who agree with me and disagree with me on this issue. It is, perhaps, the most shameful period in the Republican Party's history of the last 40 years that we supported George W. Bush in the prosecution at military conflict.

Now, my excuse is that I was a high school senior. What is the excuse of many people who were in this Chamber or in the House of Representatives at the time and are now singing the exact same song when it comes to Ukraine?

Have we learned nothing? Have we updated nothing about our mental thinking, about the standard that we apply for when we should get involved in military conflicts? Have we learned nothing about how precarious and precious U.S. life is and other life around the world and that we should be a little bit more careful about protecting it?

USCA Case #24-1113     Document #2060757     Filed: 06/26/2024     Page 136 of 267

Back then, in 2003, we actually had an anti-war left in this country. Now, nobody, really, is anti-war. Nobody is worried about prosecuting military conflicts overseas. Nobody seems to worry about unintended consequences. But Iraq had a lot of unintended consequences—a lot of consequences that were, maybe, foreseen by a few smart people; a lot of them that weren't foreseen by anybody—one of which is that we gave Iran a regional ally instead of a regional competitor.

Did George W. Bush stand before the American people and say: We are going to invade this country and give one of our strongest enemies in the region a massive regional ally? Did we think that 20 years later, Iraq would become a base to attack American troops in the Middle East? Did we think it would empower one of the most dangerous regimes in that area of the world?

We are now funding Israel, as I think that we should, to defend itself against attacks that are originating in Iran when the same people who are calling for more war all over the world were the same people who caused us to start a war that empowered Iran.

There is a certain irony in this, a certain sadness that I have that we never seem to learn the lessons of the past. We never seem to ask ourselves why it is that we keep on screwing up American foreign policy, why it is that we keep on making our country weaker, even though we say we intend to make it stronger.

Here is another thing that we should learn from the Iraq war, something that I as a Christian care a lot about and I think that even many of my colleagues who are not Christians, many of my fellow Americans who are not Christians, should care about. The United States remains, to this day, the world's largest majority Christian nation. We are the largest Christian nation by population in the entire world. And yet what are the fruits—"By your fruits ye shall know them," the Bible tells us. What are the fruits of American foreign policy when it comes to Christian populations all over the world over the last few decades?

Well, in Iraq, before we invaded, there were 1.5 million Christians in Iraq. Many of them were ancient communities—Chaldeans, people who trace their lineage and their ancestors to people who knew the literal Apostles of Jesus Christ.

Now, nearly every single one of those historical Christian communities is gone. That is the fruits of American labor in Iraq—a regional ally of Iran and the eradication and decimation of one of the oldest Christian communities in the world.

Is that what we were told was going to happen? Did the American people—the world's largest majority Christian nation in the world—did they think that is what they were getting themselves into? I certainly didn't. And I am ashamed that I didn't, but we did. We did all of those things because we

weren't thinking about how war and conflict lead to unexpected places.

Now, it sounds farfetched, I am sure, when we apply these lessons to the Ukraine conflict. Certainly—certainly—this has no risk of spilling over into a broader regional or even world conflict. Well, certainly not, in fact. I was being sarcastic. It obviously does. As European allies propose sending troops to fight Vladimir Putin, drawing NATO further into this conflict, yes, the Ukraine war threatens to become a broader regional conflict.

What about the assault on traditional Christian communities? Just today, the Ukrainian parliament is considering enacting a law that would dispossess large numbers of Christian churches and Christian communities in the country of Ukraine.

Now, they say it is because these churches are too close to Russia. That is what they say. And maybe some of the churches are too close to Russia. But you don't deprive an entire religious community of their religious freedom because some of its adherents don't agree with you about the relevant conflict of the day.

I believe, standing here, that this war will eventually lead to the displacement of a massive Christian community in Ukraine. And that will be our shame—our shame in this Chamber for not seeing it coming; our shame in this Chamber for doing nothing to stop it; our shame for refusing to use the hundreds of billions of dollars that we send to Ukraine as leverage to ensure and guarantee real religious freedom.

The other thing—one final point on this historical contingency point. It was true then, and it was true today, there is this weird way where the debate in this country has gotten warped, where people can't engage in good-faith disagreement with our Ukraine policy. You will immediately be attacked for being on the wrong team, for being on the wrong side.

I remember, as a young conservative high schooler, how opponents from the conservative side of the Iraq War: Well, you are just all for Saddam Hussein, and you believe that Saddam Hussein should be allowed to continue to brutalize the Iraqi people; you have no love for these innocent Iraqi people; you don't believe in America. And the same exact arguments are being applied today, that you are a fan of Vladimir Putin if you don't like our Ukraine policy, or you are a fan of some terrible tyrannical idea because you think maybe America should be more focused on the border of its own country than on someone else's.

This war fever, this inability for us to actually process what is going on in our world to make rational decisions is the scariest part of this entire debate.

You see people who served their country, who have been advocating for good public policies—agree or disagree with them—for their entire careers smeared as agents of a foreign government simply because they don't like

what we are doing in Ukraine. That is not good-faith debate; that is slander. And it is the type of slander that is going to lead us to make worse and worse decisions.

It should make us all feel pretty weird when you see your fellow Americans making an argument, and the response to that argument is not: Well, no, no, here is why you are wrong, or, Here is substantively why I disagree with you. But they fling their finger in your face and say: You are a Putin puppet; you are an asset of a foreign regime.

This way of making decisions democratically is how we bankrupt this country and start a third world war. We should stop doing it.

So let me make some arguments for why our Ukraine policy doesn't make any sense. The first, we do not have the manufacturing base to support a land war in Europe. This must be appreciated. And it is interesting, when I was making this argument that we didn't have the manufacturing base to support a military conflict in Eastern Europe, to support a military conflict in East Asia, and then also to actually support our own national defense, that America was spread too thin, I was commonly met 18 months ago with a very common rejoinder. I was told that the Ukraine war represented a fraction of a fraction of American GDP, that we could do everything all at once and it would not stress America's capabilities.

Now, everyone seems to agree with me. Now, everyone seems to acknowledge that we are severely limited, not in the number of dollars that we can send to Ukraine—because there are limits there—but in the number of weapons, of artillery shells and missiles, that we don't make enough of the critical weapons of war to send them to all four corners of the world and also keep ourselves safe.

But people will say: Well, J.D. is right, we need to rebuild the defense industrial base; we need to rebuild our capacity to manufacture weapons. But now the desire and the need to manufacture more weapons is an argument for the Ukraine conflict instead of an argument against it.

It is interesting how advocates of this conflict always find a new justification when the justification of a few months ago falls apart.

So let's deal with some very cold, hard facts. Ukrainians have argued publicly—their defense minister has said this—that they require thousands of air defense interceptor missiles every single year in order to keep themselves safe from Russian attack. Do we make thousands? No.

If this supplemental passes, as I expect it will in a few hours, we will go from making about 550 PAC-3 interceptor missiles to about 650. And there are a few other weapons systems that could provide protection in terms of air defense. But Ukraine's air defenses are being overwhelmed right now because

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 137 of 267

we don't make enough air defenses. Europe doesn't make enough air defenses. And, by the way, we are being stretched in multiple different directions.

The Israelis need them to push back against Iranian attacks. The Ukrainians need them to push back against Russian attacks. We may, God forbid, need them. And the Taiwanese would need them if China ever invaded. We don't make enough air defense weapons and neither do the Europeans. And so rather than stretching ourselves too thin, America should be focused on the task of diplomacy and making it possible for our friends and our allies to do as much as they can but to recognize the limitations and to ensure that we—most of all, our own people in our own country—can look after our own defense.

It is not just air defense missiles. Martin 155mm artillery shells—these are one of the most critical weapons for the land war in Europe, maybe the single most critical weapon for the land war in Europe. The United States makes a fraction of what the Ukrainians need. And if you combine what the United States provides with what the Europeans are able to provide and what other figures are able to provide, we are massively limited in whether we can help Ukraine close the gap it currently has with Russia.

Now, you have heard senior figures in our defense administration say that unless this bill passes—unless this bill passes—the Ukrainians will face a 10-to-1 disadvantage when it comes to critical munitions like artillery—10 to 1.

What gets less headlines is that currently the Ukrainians have a 5-to-1 disadvantage, and there is no credible pathway to give them anything close to parity. And I am not even talking about this year; I am talking about next year too. During a conversation with the senior national security official of the Biden administration, I was told that if the United States radically ramps up production and if the Europeans radically ramp up production, the Ukrainians will have a 4-to-1 disadvantage in artillery by the end of 2025. And that was treated as good news.

You cannot win a land war in Europe with a 4-to-1 disadvantage in artillery, especially when the country that you are going up against has four times the population that you do.

And, of course, the most important resource in war, even in modern war, is not just air defense missiles and is not just artillery shells; the most important resource is human beings. Human beings still fight our wars, as tragic as that is and as much as we wish that it wasn't true, and Ukraine has a terrible manpower problem too.

The New York Times recently wrote a story about how they had conscripted—perhaps accidentally; I certainly hope so—they conscripted a mentally handicapped person into service in their conflict. They have now dropped the conscription age. And, still, they are engaged in draconian measures to conscript people into this conflict. That says nothing about the fact, by the way, that approximately 600,000 military-age men fled the country.

This war is often compared, as I said earlier, to the UK's fight against Nazi Germany. In the height of World War II, did a million Brits—over a million Brits leave Britain to avoid being conscripted by the Germans? I highly doubt it. So there is a deep reserve problem—a reserve of weapons, there aren't enough of them; a reserve of manpower, there aren't enough men.

This is the problem that Ukraine confronts. I say this not to attack the Ukrainians who have fought admirably—many of them have died defending their country. But if we want to respect the sacrifice of the people who have died in this conflict, we have to deal with reality. And the reality is that the longer that this goes on, the more people will needlessly die, the fewer people will actually be left to rebuild the country of Ukraine, and the less capable Ukraine will be of actually functioning as a country in the future.

But I am not just worried about that; I am not just worried about whether Ukraine can win. I also worry about, as I said earlier, unintended consequences. And now we should spend a little bit of time discussing some more of those.

A few things come from our obsessive focus on Ukraine. No. 1, we have, at multiple levels in this Congress, passed pieces of legislation that deal with Ukraine that attempt to explicitly curtail the diplomacy powers of the next Presidential administration. I know we don't often talk so directly about politics, and I am sure I disagree with my friends on the other side of the aisle about who the next President should be, but we want to empower the next President, whoever that is, to actually engage in diplomacy, not make it harder to engage in diplomacy.

Multiple provisions of this legislation—but also other legislation this Chamber has passed and I opposed—try explicitly to tie the next President's hands. Let's just say that the next President, whoever that might be, decides that he wants to stop the killing and engage in diplomacy. This Chamber will be giving a predicate to impeach that next President for engaging in basic diplomacy. Hard to imagine a more ridiculous judgment on the priorities of American leadership that we are already trying to make it impossible for the next President to engage in any measure of diplomacy. That is not leadership, and that is not toughness; that is a blind adherence to a broken foreign policy consensus, which is unfortunately exactly what we have.

The Ukraine supplemental that is, again, likely to be passed in the next few hours, funds Ukraine's border while turning a blind eye to the United States own border crisis. The bill includes hundreds of millions that could be used to strengthen Ukrainian border security and support the State Border Guard Service of Ukraine. Good for them. I am glad that they care about their own border security.

The supplemental extends benefits for Ukrainian parolees in the United States. It includes $481 million for refugees and interim assistance, which could be used, in part, for the Office of Refugee Resettlement to provide resettlement assistance to Ukrainians arriving in the United States and also to other organizations that also, because money is fungible, could resettle other migrants from other countries into our country.

So the very same moment that we are supporting the Ukrainians to secure their own border, we are not just ignoring our own border, we are funding NGOs that will worsen Joe Biden's migration crisis. It is completely senseless. Yet that is what we are doing.

Let's talk about something else. This bill includes a provision that is wildly popular called the REPO Act. In short, the REPO Act does something very simple. The REPO Act allows the Treasury Department to seize Russian assets to help them pay for the war. That sounds great. Of course, Russia shouldn't have invaded Ukraine and, of course, they should have to pay for some of the consequences—all of the consequences—that they have created. But ask yourself, are there unintended consequences that come from seizing tens of billions of dollars from foreign assets? In fact, there are.

A number of economists from across the political spectrum have argued that the REPO Act could potentially make it harder to sell U.S. Treasuries. This is something a lot of Americans don't care about. I am sure their eyes might glaze over a little bit. But this country is running almost $2 trillion deficits every single year. You ask: Where do those $2 trillion come from? They come from selling Treasury bonds on the open market. That is how we pay for the deficit spending in this country. And what happens when people start to worry that U.S. Treasuries are not a good investment? Well, we have already seen the consequences over the last couple of years. Interest rates go up. Inflation goes up. Home mortgages become more expensive. Are we at least a little bit worried that the bond markets could react negatively to us seizing tens of billions or hundreds of billions of dollars from assets? We should certainly be worried about it because we already can't afford the deficit spending in this country to begin with. Treasury yield rates are already extraordinarily high. Thanks to the Biden spending programs, they have actually shown a remarkable stubbornness over the last few months.

Here is another unintended consequence. Germany is an important American ally, and it has, by some

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 138 of 267

standards, the fourth or fifth largest economy in the entire world. It is a very, very important country, a very important ally. By the way, it is a beautiful country with beautiful people. But Germany, under the influence of a series of so-called green energy policies, is rapidly deindustrialized.

Germany, by the way, was one of the few countries in the wake of World War II—especially in the seventies, eighties, and nineties—that actually kept its industrial might largely intact. Think about German cars and all the other manufacturing things that come from the country of Germany. Well, Germany is much less powerful in terms of manufacturing today than it was 10 years ago. Why? Because it takes cheap energy to manufacture things. You need cheap energy if you want to manufacture steel. You need cheap energy if you want to manufacture cars. That is one of the reasons, by the way, the manufacturing economy has done so poorly under the Biden administration—because their energy policies don't make any sense.

But Germany should be told that the United States will not subsidize its ridiculous energy policies and its policies that weaken German manufacturing. We should send a message to the Germans that they have to manufacture their own weapons; they have to field their own army; and they have the priority and they have the responsibility to defend Europe from Vladimir Putin or anyone else.

I ask the question: How many mechanized brigades could the German army field today? By some estimates, the answer is zero; by other estimates, the answer is one. So the fourth most powerful economy in the world is unable to field sufficient mechanized brigades to defend itself from Vladimir Putin. Now, this isn't 5 years ago or 10 years ago; this is yesterday. So for 3 years, the Europeans have told us that Vladimir Putin is an existential threat to Europe, and for 3 years they have failed to respond as if that were actually true.

Donald Trump famously told European nations they have to spend more on their own defense. He was chastised by Members of this Chamber for having the audacity to suggest Germany should step up and pay for its own defense. Even today, Germany, by some estimates, fails to hit its 2-percent-of-GDP threshold where it is supposed to spend 2 percent of its economy on military. And even if it hits that 2-percent threshold in 2024, it will have hit it barely after, literally, decades of being chastised. Is it fair that the Americans are forced to front this burden? I don't think that it is.

But I am actually less worried about the fairness and more worried about the signal this sends to Europe. If we keep on carrying a substantial share of the military burden, if we keep on giving the Europeans everything that they want, they are never going to become self-sufficient, and they are never going to produce sufficient weapons so they can defend their own country.

You hear all the time from folks who support endless funding to Ukraine that unless—that unless—we send resources to Ukraine, Vladimir Putin will march all the way to Berlin or Paris. Well, first of all, this don't make any sense. Vladimir Putin can't get to western Ukraine; how is he going to get all the way to Paris? Second of all, if Vladimir Putin is a threat to Germany and France, if he is a threat to Berlin and Paris, then they should spend more money on military equipment.

Some of my fellow Americans have been lucky enough to travel to Europe. It is a beautiful place. But one of the things that Europeans often say about Americans is that we have way too many guns and way too little healthcare. One of the reasons why we have less healthcare access than the Europeans do is because we subsidize their military and their defense. If the Europeans were forced to step up and provide for their own security, we could actually take care of some more domestic problems at home. No, too many in this Chamber have decided that we should police the entire world. The American taxpayer be damned.

Let me make one final point here, cognizant I have colleagues who wish to speak.

May I ask, how much time do I have?

The PRESIDING OFFICER (Mr. MARKEY). The Senator has 28 minutes remaining.

Mr. VANCE. I see my colleague from Florida, so I will be relatively brief here.

For 40 years, this country has made, largely, I would say, a bipartisan mistake. It has allowed our manufacturing might to get offshored and to get outsourced, while simultaneously increasing the commitments that we have all over the world. We basically outsourced our ability to manufacture critical weapons while stepping up our responsibilities to police the world. And, of course, if we are going to police the world, then it is American troops who need those weapons.

With one hand, we have weakened our own country; with the other, we have overextended. There is a certain irony that if you look at the voting records and the commitments of this Chamber, the people who have been most aggressive—my colleagues, some of them my friends—who have been most aggressive sending our good manufacturing jobs to China are now the ones who are most aggressive to assert we can police the world.

What are we supposed to police the world with? Our artillery manufacturing, our weapons, our air defense manufacturing, our basic military industrial complex has become incredibly weakened. And this bill, you will hear people say, fixes it. It doesn't fix it at all. This bill, while it does invest some—and this is a good thing, by the way, it is not all bad—while it does invest some in critical manufacturing of American weapons, it sends those weapons overseas faster than it even replenishes them. This is not a bill to rebuild the defense industrial base; this is a bill to further extend this country.

I will yield the floor, recognizing my friend from Florida wants to speak.

The PRESIDING OFFICER. The Senator from Florida.

Mr. SCOTT of Florida. Mr. President, I want to thank my colleague from Ohio for his hard work and his commitment to making sure he protects our country.

President Biden has shown the American people that he will pander to his anti-Semitic base over supporting Israel. Israel, one of America's greatest allies and the only democracy in the Middle East—the only democracy in the Middle East.

One of President Biden's first actions was to resurrect the failed Iran deal. Since then, he has green-lit billions of dollars in sanctions relief to Iran, the world's largest state sponsor of terrorism.

His pandering can be seen in our cities and on college campuses where radical extremists rally violently in support of Hamas and the extermination of the Jewish people. This cancer has taken over the Democratic Party and caused violence against our Jewish communities.

President Biden has made clear with his decisions that the American people cannot trust his administration. I certainly do not, which is why I am highly concerned that without proper safeguards, the Biden administration will use this aid package as leverage against our great ally, Israel.

On October 7, Iran-backed Hamas terrorists burned people alive in their homes, beheaded babies, raped women and young girls, and murdered parents in front of their children. They brutally murdered 1,200 innocent people in Israel, including Americans. And 200 days since the attacks, they are still holding 8 Americans and more than 100 other innocent people hostage in Gaza.

I was in Israel last month, my sixth visit to the Jewish State in my years as Florida's Governor and now a U.S. Senator, and I have helped lead the charge in the Senate to support our great ally Israel. I have voted for the Israel aid in this bill only to see it fail the Senate with all the Democrats—all Democrats—voting against it.

For years, I have voted for significant funding for the Iron Dome, David's Sling, and other key military assets to help Israel defend itself from Iran-backed terrorism.

I am leading the Stop Taxpayer Funding of Hamas Act to condition aid to Gaza on the release of hostages and ensure we don't send a single dollar—not a single dollar—of American taxpayer money to Gaza unless the President certifies that it won't end up in the hands of a Hamas terrorist—a pretty simple ask.

Unfortunately, the Democrats have blocked this bill from consideration or

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 139 of 267

passage in the Senate three separate times, including when I tried to include it in the Senate-passed foreign aid supplemental in February. It should not be difficult to say that we won't risk even one dollar of American taxpayer money going to Hamas and pass commonsense legislation to stop that from happening. That shouldn't be hard.

Here is what makes me so angry and worried about our country: We have a President who is a fool who is stuck in a war that is raging—not overseas but within the Democratic Party right here in America. Joe Biden has ignited a civil war in the Democratic Party because he is allowing and in some cases actively encouraging the takeover of his party by Hamas-loving, terrorist sympathizers.

Thankfully, there are still some Democrats who oppose this takeover and continue to stand with Israel, but they are very few, and their voices are being drowned out by the scream of anti-Semitic hate from the radical Hamas lovers in Michigan and New York.

We cannot avoid the hard truth here. Joe Biden is destroying U.S. foreign policy in an attempt to pacify Democrats who support terrorism.

They have chanted "Death to America" in Iran for years, but now Democrat activists are chanting it in New York and Michigan. Look at what is happening at Columbia University. How is this happening in the United States of America? But Democrats are letting this happen because Michigan is crucial for Biden to win. He knows he is losing there, so he is bending over backwards to support the small minority of people in Michigan who support terrorism, and he is doing it hoping it will help him win reelection.

I want to stress this because it shows the American people exactly what is wrong with the platform of my colleagues across the aisle.

Every single day, we hear Democrats scream about protecting democracy and how democracy is under attack. While they love to point fingers at Republicans as being responsible for this, the truth is that it is them.

Between Israel and Hamas, which do you think is a stronger example of democracy? Pretty simple answer. Hamas hates everything that Americans support, especially democracy. If you are a woman, if you are gay, if you like equality, democracy, freedom of speech, none of these things is supported by Hamas—none of them—and some of them will get you killed by Hamas. All of them are supported by Israel.

But Democrats are so obsessed with winning an election, they have taken the fringe radicals in their party and put them front and center—center stage. Think about that. Democrats are so terrified of the Hamas-loving lunatics in New York City and in Michigan, they are tearing down the only true democracy in the Middle East and propping up a terror organization that, if given power again, will create one of the most oppressive regimes in the world.

Democrats are giving power and voices to people who support terrorism. It is so bad that over the weekend, Jewish students at Columbia University in New York City were told to go home and not return to campus because it is not safe for them. They were told to go home and not return to campus because it is not safe for them. Jewish students at Columbia University in New York City, of all places, are not safe because the campus is being overrun by dangerous, pro-Hamas extremists. Is anyone paying attention?

Look at what is happening in our country. We have a President of the United States who is leading a Democratic Party that is cowering to the radical left of their party in a disgusting and dangerous attempt to get votes from Hamas sympathizers. His cowering means that all over our country, even in New York City, Jewish Americans aren't safe. No one, not one Member of the U.S. Senate should be OK with what is happening in our country today.

I know that terrorists are being glorified at Columbia University right now, but let me remind my Democratic colleagues who Hamas is as we consider a bill that could provide billions of dollars in aid to these monsters.

When I was in Israel, I saw the absolute evil of Israel's enemies—Hamas, Hezbollah—all backed by Iran, and their brutality. Hamas stormed into Israel on October 7 and murdered Jewish people who were killed for one reason: just for being Jewish.

I stood in places where it happened, where the blood of these innocent Jewish people still stains the floors and the walls of their homes and the streets where they once lived and played.

When Hamas stormed in, they raped women, murdered families, and butchered and beheaded babies. You cannot imagine. Hamas burned parents alive in front of their children. They dragged people out of their homes and are now holding them hostage.

What happened on October 7 horrified the world and struck me personally. One of the places where I saw the devastation of Hamas's terror was Kfar Aza. It wasn't the first time I had visited that small kibbutz. In 2019, my wife Ann and I visited Kfar Aza for the first time.

As early reports were coming out, I was really worried about the kibbutz because of its proximity to Gaza, about half a mile away. You can see Gaza right there. It is right there, half a mile away. Open fields. When I heard the news that it was the site of some of the most horrific and barbaric activities, my heart sank. I wanted to vomit.

In 2019, my wife and I had spent an afternoon there, and it was the most peaceful place. I keep thinking about the moms and kids who were playing outside, enjoying the warm summer weather. It is gut-wrenching to think of the fate of the families we met that day.

I spoke with Chen, the woman who led our tour of the kibbutz. She was traveling outside of Israel that day and fortunately survived.

When I was in Israel a few weeks ago, I talked with Chen and other people who experienced the attack firsthand and thankfully survived, and they told me what happened to them, their families, and friends. I saw parents setting up memorials at the Nova music festival site for their children who have been taken hostage or murdered. I stood in a destroyed home and listened to the last words of a young Israeli woman via audio recording as she talked to her father before Hamas gunned her down. I met with the families of American hostages, whose devastation and grief are overwhelming. I saw firsthand what Israel faces from Iran and its proxies and what they would do to us, too, if they could. They would absolutely do it to us.

I have placed a poster outside my office that features the faces of the hostages being held by Hamas, and I am not going to take it down until they all come home.

I have been clear that we cannot see a cease-fire until every Hamas terrorist is dead. I want every single one of them dead.

I know I said this before, but I won't stop saying what Hamas did. These monsters beheaded children and babies, raped girls, burned innocent civilians alive, and shot people at point-blank just because they were Jewish. They dragged innocent people through the streets and are now holding them as hostages in Gaza, which these terrorists absolutely control.

It is unimaginable that the United States would ever consider sending money to a place where we know—we absolutely know—that it will be used to help terrorists who are holding American hostages. That is exactly what this bill does today.

I want to make sure everyone understands what I am saying here, which is a fact: Every dollar that goes to Gaza directly benefits Hamas.

I have spent every day since October 7 telling the stories of those being held hostage in Gaza by Iran-backed Hamas terrorists. As I said, I have a poster outside my office that features the faces of the hostages being held by Hamas, and I am not going to take it down until they are all released.

It has been 200 days since the attacks, and some parents are still waiting for their children to come home. Can you imagine? A parent waiting for their child to come home.

Little baby Kfir Bibas's first birthday was spent as a hostage in Gaza. His 4-year-old brother, Ariel, a beautiful little boy, is still being held hostage. I have a milk carton in my office that has Ariel's picture on it. I see it every day, and it makes me think of my own grandkids.

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 140 of 267

Kfir and Ariel's parents have been waiting for 200 days to hold their babies again. Can you imagine? Sadly, we have heard horrible reports that these innocent children may no longer be alive. It just makes you sick to think about it, and you think about your own family.

While Israel is dealing with the recovery from these attacks in its own country, it is still fighting the terrorists who want to destroy it. It is still fighting with these terrorists who want to destroy every Jew and destroy Israel.

So here is the other takeaway from my recent trip to Israel. In meetings with Prime Minister Netanyahu and Israeli leaders, I saw that while Israel is still dealing with the recovery of its own people, they are also overseeing incredible and unprecedented work to preserve civilian life and get aid into Gaza.

War is hell. Tragedies happen, and we wish we could prevent all of them. We wish there could be zero civilian impact of war, but that is simply not possible.

When tragic incidents occur, we are right to expect accountability. Israel has shown full accountability for every misstep taken as it fights for its existence against brutal Iran-backed terrorism.

Israel is doing more to prevent civilian deaths than any warfighting nation has been expected to do in history and taking responsibility when tragic incidents happen. But it seems that accountability from Israel is not enough for President Biden; it is not enough for the Democrats.

It is insane to me that the same President who has never held anyone accountable for the deaths of 13 American warriors at Abbey Gate in Afghanistan and never held anyone accountable for the deaths of the innocent Afghan family killed in a U.S. drone strike during his botched Afghanistan withdrawal is openly attacking Israel for mistakes that it is taking full responsibility for.

When President Biden and Democrats again and again attack Israel and talk about sanctions on the IDF, they do the bidding of Iran and Hamas. Let us all remember who the enemy is. Let us all remember who the enemy is and has always been—the evil terror-supporting regime in Iran.

Since its first days, the Biden administration has emboldened Iran with appeasement, freeing billions and billions and billions of dollars to fuel Iran's support of terrorism and turning its back on Israel.

Israel is the only democracy in the Middle East and one of America's strongest allies, but it took President Biden months to meet or speak with Prime Minister Netanyahu after he took office, and the world took notice.

Since October 7, President Biden and Democrats in Washington have continued to undermine Israel's fight against Iran-backed Hamas terrorists, further isolating our ally in its greatest time of need.

America and the freedom-loving nations of the world are less safe and secure because of President Biden's weakness and appeasement of evil regimes and the terror each supports.

Now the Senate wants to again pass legislation that gives billions of dollars to Gaza, which is 100 percent run by Hamas—100 percent run by Hamas. I am not opposed to humanitarian aid to people in war-torn places like Gaza, but I am not OK with giving aid that has even the slightest possibility of going to terrorists who want to destroy Israel and the United States.

I am especially disturbed by the idea of giving aid that could go to terrorists who want to destroy Israel and the United States and who are also at this point holding American hostages.

Can you imagine giving aid to a country that wants to—anybody who wants to hold American hostages? Why would we do that? How is that a minority opinion in the U.S. Senate? How has the Democratic Party fallen so far to the radical pro-Hamas lunatics in its base that saying "No, we won't provide humanitarian aid unless we can certify it won't go to terrorists who are holding American hostages" is not an OK position to take, an OK position to even vote on?

The eight Americans who are being held hostage in Hamas have been held in captivity for 200 days. We believe five are still alive and three are dead, and Hamas is holding their bodies and robbing their families of the ability to bury their loved ones. Even when we know they are dead, Hamas holds their bodies.

Do we see President Biden or senior members of his administration and Democrats in Washington talking about that every day? Absolutely not. What we do see from Democrats is they continue to attack Israel, call for the ousting of its democratically elected government—they call for the ousting of its democratically elected government—and allow the abandonment of our ally at the United Nations. They abandoned our ally Israel at the United Nations and on the world stage.

And it is disgusting that, while they launch these attack on our ally, Democrats say little or nothing about the fact that American citizens—American citizens—are being held hostage by a brutal terrorist organization that we know is committing horrific sexual abuse against these innocent people.

Why has Biden given money to Gazans who are holding American hostages? Why would he do that? Why would we allow Biden to give more money to Gazans who are holding American hostages?

When will this stop? Why the heck are we allowing Biden to send more money to Gaza in this bill when we know that every dollar—every dollar—that goes to Gaza funds the terrorism of Hamas?

What are we doing to get American hostages released? What has happened? Have we sent the troops in? Have we done anything? Have you heard anything? Have you watched Biden in the Situation Room do anything? Absolutely nothing.

I won't stop stating this fact: Every dollar that goes into Gaza directly benefits Hamas. That is the undeniable truth, and it is why I have been fighting for years to pass—for years—to pass a simple bill, the Stop Taxpayer Funding of Hamas Act, which simply prevents U.S. taxpayer dollars from going to Gaza unless the Biden administration can certify that not a single cent will go to Hamas—pretty simple. This isn't a solution in search of a problem. It addresses a very real threat of taxpayer money funding Iran-backed terrorism that seeks to destroy Israel and is holding hostages.

How can it be fair to allow an American family with a family member being held hostage in Gaza to see their tax dollars go to the same people who are holding their family member hostage.

We have seen reports that the Palestinian Authority has been paying over $300 million a year in monthly salaries to terrorist prisoners, in monthly allowances to families of dead terrorists. The Palestinian Authority that pays terrorists and their families should not receive U.S. tax dollars, and this bill is going to allow more of that.

In 2021, President Biden's State Department said:

We're going to be working in partnership with the United Nations and the Palestinian Authority to "kind of"—

"Kind of"—

channel aid there in a manner that does its best to go to the people of Gaza.

The official went on to say:

As we've seen in life, as we all know in life, there are no guarantees, but we're going to do everything that we can to ensure that this assistance reaches the people who need it the most.

The Biden administration thinks the risk of resources going to Hamas terrorists is OK because "in life, there are no guarantees."

I reject that. I do not believe we should leave anything to chance when it comes to preventing U.S. taxpayer dollars from being sent to the brutal terrorists that slaughtered so many Israelis and Americans and are holding American hostages.

Senate Democrats have made clear that they are so terrified of losing the votes of radical, Hamas-loving leftists that they cannot bring themselves to support something that simply makes sure we aren't sending money to the thugs who brutally murdered 1,200 innocent people, including more than 30 Americans, on October 7 and are still holding American hostages. They won't even allow us to have a vote on it.

It is hard to imagine that this is where we are today, and this bill that is before us does nothing to address this, while approving billions in aid for Gaza that we know will go straight to Hamas. Nothing—absolutely nothing—

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 141 of 267

in this bill says that money will not go to Hamas, because there is nothing in this bill that prevents it. Again, there is nothing in this bill that prevents your taxpayer money from going to Gaza, where it will directly benefit Hamas.

I have heard about my colleagues on the left talking about needing to support the children of Gaza. No child should suffer, but the children of Gaza suffer every day not because of Israel, not because of America but because of Hamas. They suffer every day because Hamas takes aid dollars that come into Gaza to fund its terror against Israel and the United States.

If my Democrat colleagues wanted to make sure any U.S. tax dollars only go to help the children of Gaza, they would fully support my Stop Taxpayer Funding of Hamas Act, but they won't even let me have a vote on it. It would make certain that no aid goes to Hamas. It would not stop all aid from going to the children of Gaza. It would just make sure that that is the only place it goes and not to Hamas terrorists. But, again and again, Democrats have blocked the Senate from even voting on this. It makes no sense to me.

We should aid our ally Israel now. I have been trying to get that done for months, and Senate Democrats have blocked it five times. While it is extremely important to continue to fund Israel's defense efforts—as I have fought to do for years—I fear that President Biden will use this as the leverage he needs to advance his radical, anti-Israel foreign policy to appease the anti-Semites in his own party.

I was just in Israel and clearly understood the urgency in delivering aid to Israel. But without safeguards in place to ensure that no money goes to Hamas or that Biden cannot say "strings attached," this aid doesn't protect Israel from being forced into an unacceptable compromise by the Biden administration while it is at war. What Prime Minister Netanyahu said is: Give us time and space to destroy Hamas, and we will.

Too often in Washington, compromise means that everyone gets what they want so nobody has to make a tough choice. The bill before the Senate today is a perfect example of this broken way of doing business that has become the norm in Washington.

If given the opportunity to vote on these issues independently, as the House did, I would vote to support aid to Israel in a heartbeat, with strong safeguards, as I have in the Senate multiple times—all of which have been blocked by Democrats prior to this vote. I would vote to ban TikTok, unless we see a total divestment from it by entities controlled by communist China. I would vote to sanction the evil regime in Iran. I would vote to support aid for Taiwan so it can fend off threats of invasion by communist China. And I would vote for the REPO Act, which allows for the confiscation of Russian assets, and of which I am a

proud cosponsor, while opposing the fact that this bill allows President Biden to send billions of U.S. taxpayer dollars in unaccountable aid to Ukraine—unaccountable aid to Ukraine—including billions to pay the salaries of Ukrainian politicians.

Why are we borrowing our money to pay for the salaries of Ukrainian politicians? It makes no sense for the United States to borrow dollar after dollar after dollar so we can pay the salaries of politicians in the Ukraine while our border—our border—is wide open.

I have had a redline in the debate about the future of any aid to Ukraine. First, it must be lethal only; and, second, any action taken by the United States to secure the borders of Ukraine must be tied to forcing—it is the only way it is going to happen. You have to force the Biden administration to secure the U.S. southern border.

In some of his first actions as President, Joe Biden took multiple Executive actions to dismantle the border security policies enacted by President Trump, which created the most secure U.S. southern border in recent history. The catastrophic results of Biden's open border policies are being felt by nearly every American family.

Since Biden took office, more than 10 million—10 million—illegal aliens, unvetted, have unlawfully crossed our border, and more than 6 million have been released into the United States. We have no idea who these people are.

Deadly fentanyl, the precursors of which are supplied by communist China and manufactured by the savage Mexican drug cartels, are killing more than 70,000 Americans every year. Why don't the Democrats care about that?

Terrorists and dangerous criminals are coming across the border in droves. Why don't Democrats care about this?

The FBI Director admitted to me, under oath, that we now have terror cells in the United States because of the open southern border. And we have all seen the horror brought to our communities by violent illegal aliens murdering innocent Americans like Laken Riley.

But the Senate won't have the chance to vote on each bill which passed the House individually. No, we won't have a chance to do that individually, the way it was done in the House, and we are not going to have a chance to change this bill. It is up or down. If you don't like a provision, tough luck. You don't get an amendment vote. It is a sad day for our body to be shut out of the process like this.

While some politicians will claim that the bill before the Senate today is some magic bullet that will restore order and protect democracy around the world, we know that is a lie. Most bills have some good policy. This one is no different. However, I cannot bring myself to look the other way and vote for policies that will, in many ways, prolong the suffering that Biden's weaknesses and appeasement have caused for Americans and our friends

and allies around the world each and every day.

I yield to my colleague and I now retain the balance of my time.

The PRESIDING OFFICER. The Senator from South Carolina.

Mr. GRAHAM. Mr. President, thank you very much. I would like to be recognized. Can you let me know when it is 40 minutes?

Thank you.

The PRESIDING OFFICER. You will be notified.

Mr. GRAHAM. Mr. President, so our colleagues are talking today about how they are going to vote, why they are going to vote. I think the support of history will judge what we do here today.

Let me say one thing up front: There is no border security in this package. I regret that. I wish there were. There should be.

On the bill from the Senate, I voted no regarding the border security provisions. I thought it was sort of inadequate tabs on parole and on a few other things. My hope was it would get over to the House, and we could negotiate a stronger border security package. That did not happen, and I regret that.

So to everybody who comes on this floor and says our border is broken, we should do something about it. You are absolutely right. And, unfortunately, we didn't get there. President Trump opposed the Senate bill. We couldn't find a better way forward that would get 60 votes. I hate that, but now we have to deal with what is left for us to take care of in the world.

So the fact that we did not get provisions for our border, in my view, doesn't mean we can't deal with the other problems the world faces. We actually have to because, if we don't get Ukraine right and we don't get Taiwan right and we don't get Israel right, then our broken border is going to be a bigger problem.

So the first thing I want to say is: To those who want border security, you are right. Don't give up. But this is not just about border security.

This is a statement from the Minister of Defense in Israel:

The supplemental package submitted to the U.S. Senate today is critical and urgent in supporting Israel's capabilities to face threats posed by Iran and its proxies. We thank our friends in Congress, and urge our partners to stand with Israel in the face of Iranian terrorism.

Now what is he talking about? This was issued earlier today. This is the Minister of Defense in Israel. I know him very well. He is a very accomplished man, and he is urging us to vote for this package because Israel needs it because they have been threatened by Iran.

Now, since we took up this debate in the Senate, a lot has happened. The Iranians attacked Israel from Iran. Over 300 drones and missiles were launched at Israel from Iran and successfully engaged. Nobody lost their

USCA Case #24-1113 Document #2060757 Filed: 06/26/2024 Page 142 of 267

life, but it wasn't because the Iranians weren't trying.

We are voting today on a package to help our friends in Israel replenish Iron Dome. This is Passover. It is so ironic, right? We are having this debate on Passover. Here is my Passover gift to the Israeli people: More weapons—replenish the Iron Dome so that you can defend yourself and have another Passover, so that this won't be the last one. If you left it up to Iran, it would be.

So to those who are wondering what we should do: We failed on the border; you are right about that. We should vote yes to help our friends in Israel. I can't think of a time since I have been here that they need more help than right now. They don't need any speeches. They don't need us to attend events. They need us to send them military aid that they are desperate to have.

They have diminished their Iron Dome stockpile. They need it replenished. They are dealing with Hamas on one front, Hezbollah on the other, and now they have been attacked by the Iranian Ayatollah from Iranian soil.

So the Defense Minister of Israel is asking us for a "yes" vote because it is urgent to help our friends in Israel. So if you are pro-Israel—which most people in this body are—they need you, and they need you now. The 20-something billion dollars of aid in this package is absolutely imperative to help the Jewish State survive against Iran and its proxies, as the Defense Minister said. So from an Israeli point of view, this is the most critical time maybe since its founding because the efforts to destroy the Jewish State are real.

Here is what I worry about. If we don't help Israel now, we will be encouraging more attacks by the Iranians, and this war will get really out of hand. It is already out of hand.

There are about 100,000-plus rockets in the hands of Hezbollah in Lebanon. If they were all unleashed at the same time, that would be a nightmare for Israel. They have about 300 drones and missiles, but that is a fraction of what is available. I want to deter Iran from going to the next step. Now, how do you do that? Let Iran know that we have Israel's back, that we are going to help them with their military needs in perpetuity so they can defend themselves, that we are not going to abandon Israel at this critical time.

What does Israel have to do? Not only do they have to knock down the rockets that have come their way—they need weapons to do that—they have to create deterrence. The best way for Israel to deter the enemies of the Jewish State is to let the world and the enemies know that America has Israel's back.

Now, I want to say something about Speaker Johnson and Democratic Leader Jeffries: Well done. Speaker JOHNSON and Hakim Jeffries worked together to pass a package we have before us. We need more of this, not less, in a time of great peril for our allies and the United States.

So this was a moment where the people in the House rose to the occasion. They set aside their party differences. They focused on giving us a package that I think is stronger but needed now more than ever.

Since we last had this debate in the Senate, what has happened? A direct attack on the State of Israel by Iran. They need the money, and they need it now. Vote yes. A great Passover gift to the Israeli people would be this aid package.

Now, I want to put this debate in a greater context. I have had a lot of my friends come to the floor talking about whether or not Ukraine is in our vital national interest. I think it is. Here is what is happening in Europe as I speak: You have Russia who has launched an effort to destroy Ukraine—not just the Crimea, but to take Kyiv and turn it into a part of Russia. Ukraine, a sovereign nation that gave up 1,700 nuclear weapons they had in their possession after the end of the Cold War in the Budapest Memorandum in the mid-nineties. Ukrainians gave up 1,700 nuclear weapons with the assurance their sovereignty would be protected. The map used had Crimea as part of Ukraine.

So what do we have then? We have a situation where, for the second time, Russia has invaded Ukraine. They did it in 2014. We had some kind of a peace agreement. It didn't hold. Why? Because Putin wants all of Ukraine. I will talk about that in a moment.

He wants more than just Ukraine. He wants to reconstruct the Russian empire, the old Soviet Union. Listen to him, not me. I will talk about that in a moment.

Go back in time to the thirties. If you could go back in time and you could talk to the leaders in the thirties, knowing what you know now, what would you tell them? "You should stop Hitler as soon as you can." You have got opportunity after opportunity to hold him to account before he got too strong. You had plenty of chances to lay down the gauntlet.

But every time there was a chance to stop him, people blinked. People believed that he wanted German-speaking territory and that was all. They did not believe he wanted to kill all the Jews. That was a big mistake, because he did. He wanted a master race.

He wrote a book. The biggest miscalculation of the 20th century was not to understand what Adolf Hitler actually wanted. He didn't want German-language countries. He wanted everybody to speak German. He wanted a master race where there is no place for the Jewish people and others. And 50 million people died because we got it wrong.

In 1941, in this body, Senator Nye—I don't know him:

Getting into this return engagement of war to Europe is only as inevitable as we the people of America will permit it to be. Staying out of this war is inevitable if only the people will continue and multiply their forceful demands upon the Government at Washington to keep its promise to the people to keep our country out of this mess, which seems destined to wreck every civilization that lends its hand to it.

He is on the floor of the Senate in June of 1941, telling his colleagues: This war in Europe, stay out of it.

Well, how well did that age? Because in December of 1941, we were attacked by the Japanese.

Here is a rule that has stood the test of time: When forces rear their ugly heads anywhere in the world wanting to dominate other people, destroy their religion, put them under the yoke of tyranny, it will eventually come back to us.

When the Taliban blew up statues of Buddha, even though I am not a Buddhist, it came back to me. Evil unchecked and appeased, we always pay a heavier price than if we confront it.

Charles Lindbergh—an American hero in many ways, a very brave guy—this is what he said on April 24, 1941:

When history is written, the responsibility for the downfall of the democracies of Europe will rest squarely upon the shoulders of interventionists who led their nations into war uninformed and unprepared.

When history is written, the responsibility for the downfall of the democracies of Europe will rest squarely upon the shoulders of the interventionists who led their nations into war uninformed and unprepared.

How well did this age? The democracies in Europe failed because we allowed Hitler to get strong. Every time he would go into the Sudetenland, you named the early intervention. We wrote it off. We appeased him.

No, Mr. Lindbergh, you were wrong. The reason democracies in Europe were at risk and failed is because we did not stand up to Adolf Hitler while it really mattered. The reason that 50 million people died is because you didn't get it.

Father Coughlin—the demagoguery from this guy is being used today: demonizing people, trying to convince the American people "those people over there don't matter to you."

Let me tell you what matters to the American people. When forces like Putin rear their ugly head to take Ukraine, they are not going to stop; they are going to keep going. And we have NATO commitments to countries around Ukraine. Vote yes for this package to help the Ukrainians continue to fight the Russians before Americans are fighting the Russians. And how does America get into this conflict? If a NATO nation is attacked.

This is my favorite: September 11, 1941. Now, when I say "September the 11th," most Americans kind of listen, because that day does live in infamy.

So Charles Lindbergh made a speech on September 11, 1941, in Des Moines, IA. And here is what he said:

When this war started in Europe, it was clear that the American people were solidly opposed to entering it. Why shouldn't we be? We had the best defensive position in the world; we had a tradition of independence from Europe; and the one time we did take part in a European war left European problems unsolved, and debts to America unpaid.

It is obvious and perfectly understandable that Great Britain wants the United States in the war on her side. England is now in a desperate position. Her population is not large enough and her armies are not strong enough to invade the continent of Europe and win the war she declared against Germany.

If England can draw this country into the war, she can shift to our shoulders a large portion of the responsibility for waging it and paying its cost.

He is arguing that the Lend-Lease Program that President Roosevelt came up with to help the island nation withstand invasion by the Germans was a foolish endeavor, that this small group of people in England cannot possibly win and we are betting on a loser.

The loser is Lindbergh. The winner is Churchill and the British people.

This attitude exists today. People in this body, right before I spoke, talk about "we can't help Ukraine because we have too many problems in other places. They can't win."

They were supposed to fall in 4 days.

Look what has happened: 200-something days later, they have destroyed half of the Russian army, taken back half the territory Russia seized, and now they need our weapons in a desperate fashion. They are trying to defend their homeland, and they are asking from us not troops, but weapons that can matter. And I will say to everybody in this body: You sell the Ukrainians short at your own peril. You are in the camp of Lindbergh trying to convince the American people: Pull the plug on England. They are in a fight they can't possibly win. What Lindbergh and others didn't realize was that their fight was our fight.

Let me tell you why Ukraine's fight matters to us. If we don't stop Putin now, he will keep going. And let's talk about what he says.

Just as people in the thirties—Lindbergh and Father Coughlin and Chamberlain, let's bring them back to light here:

How horrible, fantastic, incredible it is that we should be digging trenches and trying on gas-masks here because of a quarrel in a far-away country between people of whom we know nothing.

This is when Hitler annexed the Sudetenland in violation of all the agreements they signed in World War I. He was telling the British people: This is sort of a German thing. I know he is violating the agreements we had to end World War I; but, you know, it really doesn't matter.

Boy, were you wrong. He didn't want the Sudetenland. He wanted the world. He wanted a master race. And guess what? Mr. Chamberlain's analysis of Hitler is not aging too well in history.

To the people of this body who are going to vote today: You are miscalculating Putin if you think it is just about some dispute with Ukraine or he is threatened by NATO. No. Yes, I am sure he is threatened by NATO, but he has an ambition here.

Putin in 2016:

The borders of Russia never end.

Putin in 2022:

[When Peter the Great] was at war with Sweden taking something away from it. . . . He was not taking away anything, he was returning.

When he founded the new capital, none of the European countries recognized this territory as part of Russia; everyone recognized it as part of Sweden.

He is telling you, in Russian history, because you claim it, he wants it, the Russians are going to take it.

This is Medvedev:

One of Ukraine's former leaders once said Ukraine is not Russia. That concept needs to disappear forever. Ukraine is definitely Russia.

This is the former President of Russia. He is telling you—and you are not listening—that they want more than Ukraine. Ukraine is part of Russia. The Ukrainians don't believe that. They are fighting like tigers. I don't believe that. If you give him Ukraine, he will want Moldova and then the Baltic nations. He will make claims to them because they used to be part of the Russian Empire.

Hitler wrote a book, and nobody believed him. Putin and Medvedev, to their credit, are telling you exactly what their ambitions are, and you are not getting it. You are making the same miscalculations that they made in the thirties. You are making the same arguments: They can't win. It is not our problem. Stay out of it. Don't help people fighting for their freedom.

That gets you more war, not less. Fifty million people died in World War II because they got it wrong in the thirties when they could have gotten it right.

We haven't lost one American soldier, but if you don't help Ukraine now, that will change unless you want to completely abandon NATO. I am saying it as loudly as I can say it—that if we don't help Ukraine now, this war will spread, and Americans who are not involved will be involved. You think this war costs a lot now? Wait until you are in a war with Russia and NATO, and see what that costs. I am not telling you things that I made up. I am quoting people who are in charge of Russia. Nobody believed Hitler. You should have. You should believe these people. They have a mission.

Isolationism leads to more war, not less. Isolationism takes off the table confronting evil at a time it is the weakest. Isolationists, in the name of peace, create more war than they ever avoid because the bad guy won't stop.

Here is what you have got to understand: The Ayatollah, what does he want? He tells us he wants to destroy the Jewish State. I believe it. He tells us he wants to purify Islam in his own image—the image of Shiism. I believe it. He tells us that we are the Great Satan, and he is coming after us. I believe him. So the Ayatollah has an agenda that Israel can't accommodate. You cannot accommodate somebody who wants to kill you.

Hamas doesn't want to advocate for the Palestinian people a better life;

they want to kill all the Jews. The agenda of Hamas is not to make the Palestinian people more prosperous; it is to destroy the Jewish State—"from the river to the sea." These people are religious Nazis. What do you expect Israel to do? October 7 was an attack not to restore the dignity of the Palestinian people but literally to rape and murder and kill the Jews.

Isolationism allows that to go unchecked. "America First" says: Let's help Israel. Let's help Ukraine. Let's turn it into a loan rather than a grant. Let's get Europe to do more and pay more. That is a big difference to me.

To the people in this body, if you don't help Israel now, you are sending the worst possible signal to the Ayatollah. If you believe as I do, that he wishes to destroy the Jewish State, how can you vote no?

I know our border is broken, but voting no to Israel doesn't make our border more secure. It makes us less safe.

If you believe Hamas wants to destroy every Jewish person they can get their hands on and destroy the Jewish State, how can you vote no?

If you believe, as I do, that Putin won't stop in Ukraine, how do you vote no? You have to believe that Putin won't go any further when he says he will.

To vote no to Israel, you are taking off the table money they desperately need because they are under attack from forces they haven't been under attack from before. Hamas and Hezbollah have attacked Israel, and they are proxies of Iran, but the Iranians launched an attack toward the Jewish State from Iran. Don't vote no. Israel needs you now.

Nothing we can do will fix the border, but we can help Israel, and we can help Ukraine. Helping Ukraine means we are less likely to get in a war with the Russians. Helping Israel means we are helping an ally, and the same people who want to kill Israel want to kill you too. So there is 20-something billion dollars to help Israel replenish the Iron Dome. There is $60 billion—some of it is in the form of a loan—to help replenish our stockpile. Most of this money is for us, but some of it goes to Ukraine to stay in the fight; they need an air defense capability.

So to the isolationists—and I know you don't want to be called an isolationist, but you are. When you don't support your allies from threats because you don't want to get involved and you think it doesn't matter, I think you really are an isolationist. You would have to believe that Putin does not mean what he says. I believe him when he wants to take over the old Russian Empire and reconstruct the Soviet Union. I believe it. I want to stand up to it. I believe the Ayatollah wants to kill all the Jews. I want to help the Jewish people. This is Passover for God's sake—we are taking this vote on Passover—and not one of the people we are talking about here of the countries wants one American soldier.

USCA Case #24-1113     Document #2060757     Filed: 06/26/2024     Page 144 of 267

Have we learned nothing? We withdrew from Iraq in 2011. Senator McCain, Senator Lieberman, and myself—we all spoke up. Well, those two are gone, and I miss them desperately at times like this, but we told the Obama administration: If you pull all the troops out of Iraq, you are going to regret it and that ISIS was not the JV team. They came back in full force, and they established a caliphate. Al-Qaida and ISIS didn't even exist. This idea of leaving radical Islam unchecked and thinking it won't hurt you is insane. These people are not going to stop fighting us or our allies. You may be tired of fighting them. They are not tired of fighting you. I would rather fight them over there before they get here. Every one of these terrorists whom Israel kills is one less terrorist who will attack us. Containing Putin and Ukraine means it is less likely for us to get in a war.

Here is what I said: I feel all we have worked for and fought for and sacrificed for is very much in jeopardy by today's announcements. I hope I am wrong and the President is right, but I fear the decision has set in motion events that will come back to haunt our country.

Well, I was right, and I didn't want to be. Al-Qaida came back, and Iraq fell apart. We had to go back in. The Yazidi people were pretty much wiped out. Thousands of people were slaughtered. ISIS, you know, attacked the French, and they killed people all over the world because we let them come back.

So here is what I would say to the people who vote no: Not one country we are helping wants any of our soldiers to come in and fight; they just want the weapons to do the fighting. If you don't give them these weapons at a time of critical need, you are setting in motion America being deeper involved in conflict, not less. If they take Israel down, I promise you, you are next, and if you don't help Israel replenish their conventional weapons, there will be a day when Israel, if they have to, will play the nuclear card. I promise you this: The Jewish people are not going down, this time, without a fight. The State of Israel will do whatever it takes to survive.

I want to let the Ayatollah know America has Israel's back, which I think will create deterrence, but if the Ayatollah ever thought we pulled the plug on Israel, then I think it would be more emboldened, and you have got 100,000 rockets—precision-guided—to be fired at Israel en masse. That is a nightmare for the Iron Dome. So Israel has to tell the region, when it comes to defending the Jewish State, all bets are off. This thing could escalate big time.

So, when you vote no today, you are making it more likely the Ayatollah does more, not less. When you vote no today, you incentivize Putin to do more, not less. When you vote no today, you make China wonder if we really are serious about helping Taiwan.

I understand that the American people have needs here at home. I get it. Our border is broken, and you are right to want to fix it, but we are not right to abandon our allies in great need. If history has taught us anything—for those who are willing to learn from history—it is that, when evil rears its head, stand up; be firm; be unequivocal. It will save a lot of lives and a lot of heartache.

I am going to end where I started: What does China want? They want to turn world order upside down. They don't believe in the rule of law. They steal our intellectual property; they intimidate their neighbors; and they will go after Taiwan if they believe we are weak and not helping Taiwan. If you want to avoid a war between Taiwan and China, give Taiwan the capability that would deter China. Eighty percent of the semiconductors in the world are made in Taiwan, and the digital economy would be dominated by China. We have a chance here to harden the defenses of Taiwan to deter China.

We have a $24 billion package to replenish the weapons that Israel desperately needs to stand up in the face of multiple threats from Iran and its proxies. They need the money. They need it now. This is Passover. Help our friends in Israel.

We have a chance to replenish the stockpile of the Ukrainians, who fought like tigers—but not just give them 155 rounds; give them the ATACMS that can reach out and knock the bridge down between Crimea and Russia.

The bill before us allows us to go after Russian sovereign wealth funds that are frozen all over the world—about $300 billion. It allows us to take money from the Russian invader to pay for the reconstruction of Ukraine. This is a package worth your support. It makes Russia pay more. There is a loan component in this: Pay us back if you can because we are in debt. I get that part of it.

This package coming back from the House was not only bipartisan, I thought it was smart. The component in this package to allow us to seize Russian assets I think will have a deterrent effect all of its own. The oligarchs around Putin are now in more jeopardy, not less, and it is proper to go after Russian sovereign wealth assets when Russia has brutally invaded Ukraine in violation of every agreement they made with Ukraine and the world at large.

The bottom line for me is that this package doesn't address the border, and I am sorry it doesn't. This package addresses threats that exist to our allies, and it is in our national security interest to meet the needs of those allies before it gets worse. Whether you want Iran to stop or not, they will not. Israel needs the weapons, and they need them now. Our friends in Ukraine, with the right set of weapons, can go back on the offensive, and if you don't stop Putin now, you will regret it later.

This is one of the moments in history that really matters. I always wondered, How could the people in the thirties not get it about Hitler? Now I know. It is complicated. I have very good friends who are going to vote no. I have very good friends who do not see Putin in the same way I see him. I see him as a guy with ambitions that won't end in Ukraine and that he will get us into a bigger war if we don't stand up now. I believe him when he says the thing he says about taking more territory. I have friends who are strongly supportive of Israel but who are going to vote no.

The bottom line is, Israel needs you now more than ever. The Ayatollah upped the ante by attacking Israel directly from Iranian soil. For God's sake, let's help Israel and help them now.

There is a chance here to seize Russian assets to pay for the war to take the burden off the taxpayer. Let's vote yes.

As for Taiwan, there is almost universal acknowledgment in this body that China will keep going until somebody stops them and that we want to deter war between Taiwan and China. In this package, we have vital military assistance to Taiwan to make it harder for the Chinese to attack and take it over by military force.

Do you think the Chinese are watching what we do with Ukraine? If you don't think they are watching, you don't know much about China. They are sizing us up, and if we pull the plug on Ukraine, you are inviting more aggression from China to Taiwan. If we send a signal that we are not—if you vote no and we are not giving the package to Israel to replenish their defenses, it will make the Iranians more emboldened to keep going.

This vote you are about to take is probably one of the most important votes we have had since I have been here. This is the defining moment in world history. The world is on fire. It all started with Afghanistan. Once we pulled out of Afghanistan, people thought we were weak, and they took advantage.

Here is what I would say: If you agree with me, don't vote no; vote yes because a "no" vote, I think, continues that theme that America is unreliable. A "no" vote will make Russia believe that there is a growing sentiment in America that, if we just outlast Ukraine, we will not only get Ukraine, we will get more. A "no" vote emboldens the Ayatollah to think support for Israel is being diminished. A "no" vote to help Taiwan would encourage China, in my view, to be more aggressive.

Now, how does this all end? Here is my fear: These are the Twin Towers. This is what happens when something over there gets out of hand, and we don't deal with it. This is what happens when you ignore the Taliban takeover of Afghanistan, and you sit on the sidelines and think it doesn't matter to

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 145 of 267

you. This is what happens when a group of people take women in a soccer stadium and kill them for sport, thinking it won't bother us. The 18 to 19 hijackers who were able to do this were able to do it because they had a safe haven in Afghanistan.

We didn't get involved. We looked the other way, thinking it doesn't matter to us. We missed all the warning signs.

Remember when they said the lights were blinking red before September 11, 2001? Let me tell you what the FBI Director says: I have never seen so many blinking lights as I do now. Wherever I turn, I see threats. I have never seen a time in American history that I have been involved as FBI Director with this many threats all at once. Everywhere I look, I see blinking lights.

The response to that is to help our allies, not turn away. How can you say we are under great threat, and we are not willing to provide aid to people who are on the tip of the spear?

So this aid package coming back from the House is better than it was when it left the Senate. It has more for Israel. It has the ability to get Russian assets to help the American taxpayer and reconstruct Ukraine with Russian money, not American money or other money. It has a component in here to let the Ayatollah know we are not going to bend in Israel, and it reinforces Taiwan's military defense at a time when they are very vulnerable.

This is a good package. It has a loan component, recognizing that we are in debt. It is not a perfect package. I wish it had border security. I was hoping it would, but it doesn't.

Since we last had this discussion about what to do, Iran launched an attack on Israel—300 drones—and everything is really getting out of hand here.

The Ukrainians are down to their last artillery shells. That can all change when we vote yes. They will get not only more artillery shells, they are going to get more advanced weapons. And we are going to go after Russian money. We are going to put Putin on his back foot.

If you vote yes, it is a bad day for Putin; it is a bad day for the Ayatollah; and it is a wake-up call to China. If you vote no, you are going to encourage everybody I just talked about to do more.

We are friends. I respect everybody in here, no matter how you vote. I just see this as clear as a bell.

There were people in the 1930s, like Churchill and others, who saw Hitler for who he really was. And a lot of people didn't want to confront that because they were weary of the war they just fought called World War I. They wanted to believe that Hitler was just all talk. They didn't want to get in another war because millions of people had died. The last thing they wanted was another war. What they didn't realize is that Hitler wanted things they couldn't give them.

We have been at war since September 11, 2001. We are in debt. We are all tired. The last thing we want is to keep it going.

Well, let me tell you about our adversaries. They are not going to stop. It is wise for us to help people do the fighting so we don't have to, to have their backs at a time of great need because if we abandon them and say this doesn't matter to us, everything you saw happen in the 1930s is going to happen again.

If Russia believes we can't stick with Ukraine, they are going to keep going. If the Ayatollah believed that American support for the Jewish State was deteriorating, he is going to up the ante.

These college campus protests make me sick to my stomach. You have people on college campuses in this country supporting the terrorists, supporting Hamas. They are not supporting a better life for the Palestinian people; they are supporting the destruction of the Jewish people.

Hamas doesn't want a better life for the Palestinians; they want to kill all the Jews.

My good friend from Connecticut just walked in. His grandparents were involved in the Holocaust. I know where he is going to be.

So what is going on in America is very similar to the 1930s but in many ways worse.

To those who are out there protesting to stop aid to Israel: You are fools. You are progressive. Do you think Hamas is progressive? Do you think Hamas will tolerate a society that you have come accustomed to, where women can do whatever they want, people can live their lives? You are empowering people who are despicable. They are religious Nazis.

You are dumb as dirt if you think abandoning Israel makes us safer and that Hamas gives a damn about the Palestinian people. They don't.

I am urging a "yes" vote.

I understand this is not a perfect package, but this is a really good package at an important time in world and American history. So I would urge a "yes" vote. And a "no" vote, in my view, makes it more likely we spend more money and Americans die who are not dying now.

I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from Wyoming.

Ms. LUMMIS. Mr. President, I have such respect for the remarks of the gentleman who just completed his remarks. I know he feels very passionately. And I agree with him about what he said, especially about Israel and what they are going through.

The attacks on October 7 were unspeakable horrors imposed on the people of Israel, and I want to come to their defense. I want to come to their defense so badly that I have joined my colleagues repeatedly to pass standalone $14 billion funding for Israel multiple times since October 7.

By unanimous consent, we came to the floor multiple times and said: Let's send money to Israel. And who stopped it? The Democrats. The Democrats. The Democrats stopped money going to Israel.

Now we are here with a package of bundled things so we can roll enough stuff together so that we can get passage of a piece of legislation that is highly imperfect.

One of the main things that my constituents object to is that we are spending money for every country in this bill except our own. We will not defend our southern border. We will not spend money to protect our country from the invasion of terrorists and people whom we don't know, and we don't know why they are here.

The number of people who are coming into this country whom we don't know, we don't know why they are here, we are not identifying them, and we are turning them loose in this country is a crazy way to then turn around and say: We are not going to protect our borders. Y'all come, but we are going to send $95 billion to other countries to protect their borders.

That doesn't fly with my constituents.

But, interestingly, that is not even my biggest concern about this bill. Regarding this bill, I filed an amendment to ensure the $95 billion pricetag of this package is fully paid for by reducing the Fiscal Responsibility Act spending caps for fiscal year 2025 in both nondefense and defense areas.

In other words, this is yet another thing we are doing that is not paid for. If we are that passionate about helping our friends in Ukraine, in Taiwan, in Israel, then let's pay for it.

The American people are living paycheck to paycheck right now. They are going to the grocery store and paying twice as much for food, in some cases, than they were in 2020.

The price of gas is up. The price of food is up. The price of rent is up. More people right now are living paycheck to paycheck in this country than were in 2020. They can't afford health insurance, and they are cutting back on important things in their diets and for their families.

So we are going to let our people endure these kinds of insults that are brought on by us, and yet we want to send $95 billion to other countries that we are going to pay for with borrowed money?

We are $34 trillion in debt. In 22 months during COVID, the U.S. Government printed 80 percent of all the money that has ever been printed in the entire history of the United States. In 22 months during COVID, we printed 80 percent of all the money that the United States has ever printed in its history.

Now, when you print that much money and you put it in an economy, you get inflation. Why? Because you have too much money facing too few goods. That is kind of the definition of inflation.

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 146 of 267

We got ourselves into this. Between the Federal Reserve and Treasury, that printed money, with nothing behind it except the full faith and credit of the United States—which is not nothing—but when they did, they put us in a position where this year, we are going to owe more interest on the national debt than our entire defense budget and our entire budget for Medicare. And last year, we already passed legislation spending more on interest than the entire budget for Medicaid. We are spending money on interest because we refuse to pay for the things we think are critical.

I agree with the last gentleman who spoke. The world is in crisis, and I agree that we should help them. But we should pay for helping them, not run up debt, not put this burden on people in this country in the future.

This is wrong, and I am voting no. If we vote no, this bill is not the end of it. How many bills have we dealt with since October 7 dealing with funding for Ukraine or Taiwan or Israel or some combination of them?

Both parties have people who want to help Ukraine, Israel, and Taiwan. We understand the world risks that are posed by China if we sit on our hands, the risks that are posed by Russia if we sit on our hands and Iran and North Korea, and we are not going to sit on our hands. We are going to pass a bill. We are going to fund these things. But since we know we are going to do it, why don't we do it right? Why don't we pay for it?

You know, if we had only passed a budget a few weeks ago that was at fiscal year 2019 levels—we actually collect enough revenue in this country to pay for that—we could have had a year where we balanced our budget.

Now hearken back to 2019. Is there anything the government is doing now that they weren't doing in 2019 that is a total game changer in your life? I will bet the answer is no. So if we only would have gone back to the spending levels of 2019, I don't think it would have made a difference in anybody's lives, the way that they live their personal lives, and we would have balanced the budget. But we keep spending more and more money that is not paid for. Our national debt per citizen now exceeds $103,000. Debt per taxpayer is nearly $267,000.

Since I became a Senator in 2021, our national debt has increased $7.8 trillion. When I first entered Congress in 2008, our national debt was just over $10 trillion—$10 trillion. Now we are at $34 trillion. This is not sustainable. In just 15 years, our national debt has more than tripled. Our debt is the greatest threat our country faces today—not China, not Russia.

The American people will continue to shoulder the burden of our unhinged spending. When we have changing priorities, we should be doing what we do in our own personal lives. If something is more important to me than something else, I don't do this; I do the thing that is more important to me.

We never have those discussions here. In fact, the way our committees work, they never talk to each other. The people on the committee that crafts the budget don't talk to the people who are spending the money. They don't talk to the committee that is collecting the taxes. Once the budget is set, the appropriators go to work. Are they talking to the committee that collects the taxes and oversees our Tax Code? No. They don't talk to each other. In fact, they are completely divorced of each other.

If you look at the charts around here that are spread around the Senate, it will show you how much we are spending on discretionary spending and mandatory spending and defense and non-defense, but where does it ever compare it to the revenues we are taking in? We don't talk to each other about it. We are $34 trillion in debt, and, by golly, we ought to start talking about it.

Now, in the last few weeks, we turned the Constitution on its head. The U.S. House sent over impeachment articles that they had worked hard on. Now, whether or not you thought that Alejandro Mayorkas was guilty of the crimes that were asserted and whether or not you felt that you would vote to impeach him doesn't matter. The Constitution set up a process where the House impeaches and the Senate sits as the jury.

For the first time in our history, we didn't have a trial. We didn't get a chance to say he is guilty or he is not guilty. And given the partisan politics of the day, we would have found him not guilty—you know. But people in this body didn't want to hear the evidence against him. People in this body don't want to know how many terrorists are coming across our border, how many people are coming across the border and we don't know whether they came from a Venezuelan prison. So the motion was tabled, and then we dismissed it. We pushed it under the rug.

Now, the same week, we had a bill come over from the House on section 702 of FISA. We were told that it was just an extension of the expiring provisions of section 702. It wasn't. It expanded 702. It expanded the opportunity for the government to tell communications providers: You will give us this information without a warrant. They expanded the warrantless searches in that bill. The Fourth Amendment was under attack, and there again, we just swept it under the rug.

Now we are passing a bill to spend $95 billion that is unpaid for.

You know, we have good reasons for making the decisions we do around here. My colleague Senator GRAHAM just voiced very articulately why we should help Ukraine, why we should help Israel, why we should help Taiwan, that our enemies are watching. Well, let's fix this bill and make it better and then pass it. But we are not allowed to do that. We are not allowed to have a debate. We are not allowed to have amendments. We are not allowed to make it better. We have one choice: yes or no.

If you vote no, by golly, you must be an isolationist. Well, I am voting no. I am not an isolationist. I have previously voted many times to help Israel. I have helped bring motions to fund Israel specifically to the floor of this Senate as a stand-alone bill, and the Democrats shot us down. And the Democrats shot us down from having a trial that was required by the Constitution.

Further, we didn't get to amend the bill that came to us regarding section 702 of FISA. Now, that debate was bipartisan. There were a lot of Democrats and Republicans who wanted to join together and fix that bill, and the people who encouraged us to vote for that bill knew it was faulty. They knew it was faulty. They knew that language was too broad. They knew we should fix it.

They said: You know what, let's pass it now because the time is about to expire. It is 11:30 p.m. FISA 702 expires in half an hour, and we don't have time to fix it.

Yet we sat on our hands and fiddled around the whole day. We could have fixed that, but the proponents—on both sides of the aisle, by the way—said: No, no. Let's fix it later. We need to get this passed now. It is important to get it done before the clock expires, but we will work on it maybe when we get to the NDAA.

We put off the big decisions. We are trying to get things done, but we don't care if they are right. Let's just sweep this one under the rug. Let's let this one pass today and deal with it another time.

That is what we are doing with this bill. We are saying: Yeah, let's help Ukraine and Israel and Taiwan. We are not going to pay for it. Let's worry about that later.

But the American people expect more of us, and we should demand more of ourselves. What we are doing here is wrong. We have been wrong year after year by ignoring this debt.

You know, I rarely come to the floor and make this argument, especially when people want to go home. I mean, this is a week we were supposed to be out of session. We were supposed to be getting a week off, and it would have been richly deserved because what happened here last week had a lot of people ready for a cooling-off period. But we don't get a cooling-off period because it was decided by the leadership that we need to march forward with this. We can't amend it because then we would have to send it back to the House, and the House isn't in session.

You know, this is not the way this institution was designed to function. We shouldn't ram things down each other's throats. We shouldn't use the calendar as a weapon to force people to vote for things that could be fixed, that could be better.

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 147 of 267

I would like to vote for this bill, but I am not voting for something that is not paid for.

In 2008, after the financial crisis, we printed $3 trillion basically to bail out the banks, and we got addicted to easy money—to quantitative easing, it is called. Then, when COVID came around, we printed $5 trillion more. We are so addicted to easy money, to money where we just turn on the printing press and keep it going 24/7, that we are causing inflation and we are making it worse.

Last week, the International Monetary Fund said the United States faces "significant risks" from "loose fiscal policy" stemming from "fundamental imbalances between spending and revenues." It is sad that the IMF has to point that out to us.

Additionally, Federal Reserve Chairman Jay Powell remarked recently that "the U.S. is on an unsustainable fiscal path" and that "effectively, we are borrowing from future generations." These are quotes from the Chairman of the Fed.

I have been working on bipartisan legislation since I was elected to the Senate to address our addiction to spending. I introduced the bipartisan, bicameral Sustainable Budget Act in 2021 and 2023 to establish a fiscal Commission. There are so many proposals outside of that that we could address.

We ought to be listening to our fellow Senator BILL CASSIDY, who is coming up with some great ideas that we can sustain and reform and nurture and keep the solvency of Social Security. Social Security is going to go broke in 2034. We are down to 10 years. The law says that when Social Security is drained of its excess funds, by law, the amount of money that comes in and is collected each year is the amount that can go out. We can't subsidize it in another way. If that happened, 70 million Americans would see their Social Security benefits cut by a quarter.

The highway trust fund goes broke in about 2028. We haven't fixed that. We are not talking about fixing that. Yet we know that EVs—electric vehicles—don't pay fuel taxes, and the more EVs that are on the road, the less money we collect to maintain our roads. Our highway trust fund is going broke. It is going to be insolvent in about 4 years. We are not talking about fixing that.

Let's look at Medicare Part A. That is hospitalization. It goes insolvent in the 2030s. We are not talking about that.

We are talking about spending $95 billion more today so we can pat our chests and say we did something great for our colleagues around the world. In fact, we are doing something great for them, but we are doing something that is extremely harmful to ourselves because we will not address our own unsustainable fiscal path.

You know, I sit in my office and listen to my colleagues, and there are so many really worthy arguments, brilliant arguments, articulate people in this body. And I rarely come to the floor and have these conversations because I feel: I know this bill is going to pass tonight. I am going to vote no. The vast majority of people are voting yes. Nobody cares that we are spending this much money and it is unpaid for.

I am tired. I woke up at 2 a.m. in Wyoming this morning to try to get back here for these votes. I am tired. A lot of people want to go home tomorrow. A lot of people wish this debate was not occurring because the vote is a foregone conclusion. But, you know, I have been here now for 3½ years, and I have watched all of this happen, all this spending that we never pay for—we never pay for it. We don't talk about it. We pretend it is not a problem. We hear it is unsustainable. We hope the Nation doesn't go broke while we are here. Maybe people who are sitting in our chairs can deal with it when we are gone, but we are leaving them an unsustainable fiscal path and a big mess.

I would like to support this bill tonight. I would like to vote yes. But it is not paid for, and I will be voting no.

I encourage my colleagues to want to do better. We can do better. We can improve these bills. But we have to be allowed to amend them. We have to have these conversations before the tree is filled, as we say in the Senate, before amendment opportunities are lost.

This process is designed to cram the product down the throats of U.S. Senators and their constituents, without debate, meaning without the opportunity to amend and debate the amendments.

I know we can do better because I know the people in this room. There are so many smart, thoughtful, patriotic, caring Senators on both sides of the aisle. I know we can do better. But we have to want to.

We have to want to deal with the elephant in the room. The elephant in the room is that we are $34 trillion in debt, and we will not talk about it. We will not address it. We will not try to fix it.

Every time, in the last year, that we have been talking about Ukraine funding, I have said: Let's go get our money that we have at the IMF and lend it, interest-free, for, heck, 30 years to Ukraine.

Nobody wants to talk about that. I don't know why. We just want to use taxpayer dollars to pay for things—taxpayer dollars, meaning printed money down at the Federal Reserve and the Treasury. Just churn those printing presses, send money out the door, and export to other countries our inflation.

Other countries use our dollar because we are the world's reserve currency and because they are trying to do business with us and among other countries, in some common language, some common fiat currency, and the common fiat currency of the world is the U.S. dollar. Well, the more we print it and send out monopoly money, the more we export to other countries our inflation.

Every Senator in this room makes $174,000 a year. That is our salary. By the way, our salary is the exact same as it was when I arrived in Congress in 2009. Congressional salaries have been frozen since 2009. So $174,000 then is worth $122,000 today. That is how much inflation has eroded the paychecks of every Member of Congress. Yet we think we can live with frozen salaries since 2009. Why can't other people live with frozen dollars in Federal Agencies?

Do you know that our Federal Government is bigger than China's? This place has got to do some homework about its own spending, about its own fiscal situation, about what we are doing to the value of our dollar, about how we are threatening the dollar as the world's reserve currency because we are not nurturing and caring for and being good stewards of the U.S. fiat currency. It is time to face reality.

So this isn't the first time nor is it the last time that I will be discussing this on the floor of the Senate. And I wish that we could work together to have a more perfect Union. I know my colleagues and I can do it, but we have got to have the will, the gumption, the moral integrity, the virtue, the faith, and the freedom to do it.

I yield the floor.

Mr. President, I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The senior assistant legislative clerk proceeded to call the roll.

Mr. LEE. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER (Mr. KELLY). Without objection, it is so ordered.

UNANIMOUS CONSENT REQUESTS

Mr. LEE. Mr. President, it wasn't too long ago when Republicans made a promise to ourselves and to the American people that before we sent another dollar, another dime, another nickel, another penny to Ukraine, we would ensure that our own house was in order, that our own country was secure, that our own border was secure, that we would pass a real border security measure. And yet here we are, months later, preparing to dispatch nearly $100 billion. If you say it slowly, you sound a little bit like Dr. Evil in the original Austin Powers movie—$100 billion to foreign countries while the security of our own homeland languishes.

House Republicans have broken their promise and at least a critical mass of them, under the direction of House Republican leadership, has betrayed the American people because they have gone back completely on what they—what we—promised.

Tonight, we are seeing the same movie played out on the Senate floor. This occurs at a time when about 60 percent of Americans live paycheck to paycheck, and yet Congress continues to add to a national debt that is about

USCA Case #24-1113 Document #2060757 Filed: 06/26/2024 Page 148 of 267

to blow past the $35 trillion mark. How can we justify this to the American people as a Congress?

Are we really more concerned with the borders of a foreign country—Ukraine—and with foreign wars around the world than we are with the safety and the security of the United States and its citizens?

This bill tells the American people that the answer to that question is an unambiguous resounding "yes." Congress cares more about sending billions to wage endless war in foreign countries, cares more about this than saving our own country, especially at a time when we are being invaded. We have seen an invasion of between 8 and 13 million people over the last few years alone. That is a big deal.

We are forgetting the wise caution left to us by our first President, the Father of our Country, George Washington, who warned against entangling our peace and our prosperity with the affairs of other nations. He said:

Why, by interweaving our destiny with that of any part of Europe, entangle our peace and prosperity in the toils of European ambition, rivalship, interest, humor, or caprice?

It seems no price is too high, no weapon system is off limits. Our only strategy appears to be "spend, spend, spend, and then spend some more," with little to no thought given to the consequences. It is the continuation of a lackluster approach to the Ukraine-Russia conflict, devoid of coherent strategy, while allocating the vast majority of its funding to Europe and the Middle East, neglecting, of course, the looming threats from China and the warnings from great national policy experts, like Elbridge Colby, who warn us, time and time again, that the same weapons that we are depleting, sending to other parts of the world, sending to Ukraine, are those that are in such dire need in Taiwan and elsewhere.

The $13 billion in military aid to Israel is juxtaposed with the up to $9.1 billion in civilian aid going to Hamas. Now, some would say: You mean Gaza. And I say: No, I mean Hamas.

You cannot send this aid. Even if it is labeled as humanitarian or for some other noble-sounding purpose, if you send it to Gaza, it is aid to Hamas—Hamas terrorists. These are the same terrorists who massacred, who butchered, who savagely mutilated innocent men, women, and children in Israel just a few months ago in October. The architects of this bill undermine their own goal to secure stability and peace in the region.

So I have come to the floor in an attempt to soften the blow to the American people. To that end, I would like to call up Lee amendment No. 1902 for consideration. My amendment would require Ukraine to repay the money loaned to it and that the funds repaid be used to secure our border. If Congress is so determined to send taxpayer money abroad, then the repayment of this loan should not be waivable and must be used to secure our border.

It is sad that shoring up our border and protecting our own citizens has to come at the mercy of our debtors. But that is what this administration thinks of everyday Americans—that they don't deserve protection.

We should be voting on H.R. 2, and we should be doing that today. We should be addressing the crisis at the border. Instead, we are focused on sending money to secure Ukraine's border, not our own.

I ask unanimous consent to set aside the pending amendments and motions in order to call up my motion to concur with amendment No. 1902.

The PRESIDING OFFICER. Is there objection?

Mrs. MURRAY. Mr. President, I object.

The PRESIDING OFFICER. Objection is heard.

Mr. LEE. If the objection is that my proposal is somehow not germane, then I will offer up another amendment. I want to bring up Lee amendment No. 1857 for consideration. It would ensure that the repayment of the loan Congress seems so determined to give Ukraine is exclusively used to pay down the U.S. national debt.

This bill demands the American people dig deeper into their pockets, funding the salaries and pensions of Ukrainian officials as humanitarian efforts under the guise of a loan. The unsettling truth is that this loan can and almost certainly will be waived, possibly leaving Americans without any reimbursement. I think that is part of the plan, in fact. It makes it easier to swallow. It makes it look like something less than what it is.

My amendment addresses this concern by prohibiting any cancellation of a debt owed by Ukraine and making sure repayments go directly to the U.S. national debt.

By presenting this amendment, I aim to offer the American people the financial security and oversight this bill currently lacks, deliberately so, effectively serving as an insurance policy against irresponsible fiscal gambles half a world away.

I ask unanimous consent to set aside the pending amendments and motions in order to call up my motion to concur with amendment No. 1857.

The PRESIDING OFFICER. Is there objection?

Mrs. MURRAY. Mr. President, I object.

The PRESIDING OFFICER. Objection is heard.

Mr. LEE. Next, I am going to call up, in a moment, Lee amendment No. 1882 for consideration. If we are genuinely concerned about security, let's just start by securing our own citizens' personal information, securing it from foreign adversaries. My amendment would prohibit the sale, transfer, or sharing of American personal data to governments like China, Russia, North Korea, and Iran without explicit consent from the individual.

For weeks, proponents of the House-passed bill to force the sale of TikTok—legislation included in the package we are debating—have told us this legislation is vital to protecting the security of Americans' data.

The reality, however, is far more complicated. Indeed, forcing the sale of TikTok through that legislation won't, itself, secure the data of users. Instead, it will simply allow another company to purchase TikTok and do with their users' data what they may.

Only by changing the underlying law and preventing companies from handing over Americans' information to our adversaries can Congress secure the personal information of every American. My amendment aims to do just that rather than engage in a regulatory game of Whac-A-Mole, whereby we allow ourselves to be distracted by whatever company happens to be making headlines at the moment. My amendment would implement a comprehensive prohibition on any individual or company operating in the United States from selling, transferring, or sharing the data of an American citizen to the government of a foreign adversary without that individual's express consent.

This is a serious solution to a serious problem. No company should profit by exposing the personal information of an American citizen to a hostile foreign power, whether that company is owned by a foreign national or by an American citizen.

To that end, I ask unanimous consent to set aside any pending amendments and motions in order to call up my motion to concur with amendment No. 1882.

The PRESIDING OFFICER. Is there objection?

Mrs. MURRAY. Mr. President, I object.

The PRESIDING OFFICER. Objection is noted.

Mr. LEE. This really is too bad. These are some really good amendments. Apparently, we are not allowed to have those. We are just allowed to sing off of whatever hymnal they happen to hand us that has been preblessed by the law firm of SCHUMER, McCONNELL, JOHNSON, and JEFFRIES. That is unfortunate.

Next, I want to call up Lee amendment No. 1860 for consideration, which proposes to strike all emergency spending designations from the bill. We cannot continue to spend under the guise of an emergency, especially when an actual emergency—a real-life, present-tense, presently located emergency—involving the security of our own Nation's national border is not even being addressed in this bill. It is not just that it is not being resolved. It is not even being addressed at all.

This irresponsible practice has led to a ballooning national debt now nearing $35 trillion. It will soon blow past that. If this spending is necessary, it should be subject to the same budgetary constraints as all other government expenditures. This bill spends almost $100 billion—$100 billion we don't have—on

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 149 of 267

top of the more than $100 billion Congress has already appropriated for the war in Ukraine over the last 2 years—in excess of $113 billion, if I am not mistaken. It will spend more money on interest payments on our national debt this year than on all base defense spending. And, within a year, I believe, we are likely to be spending well over $1 trillion a year just in interest on the debt.

If Congress believes it is worth spending $100 billion we don't have, Congress should be making sure that sum of money will be fully offset or subject to appropriate budgetary enforcement.

My amendment would strike the emergency designations of this bill to subject this additional spending to the annual caps Congress agreed to last year, while simultaneously predicting the bill's budgetary effects from escaping proper enforcement.

Mr. President, I ask unanimous consent to set aside any pending amendments and motions in order to call up my motion to concur with amendment No. 1860.

The PRESIDING OFFICER. Is there objection?

Mrs. MURRAY. Mr. President, I object.

The PRESIDING OFFICER. Objection is noted.

Mr. LEE. Mr. President, it is profoundly distressing—disappointing, to say the least—that these commonsense amendments have been so cavalierly objected to and have been met only with one-word objections.

Although my amendment to strike the emergency designations—all of them drew an objection—pursuant to section 314(e) of the Congressional Budget Act of 1974, I intend to raise a point of order against these same emergency designations for international disaster assistance and migration and refugee assistance for Gaza.

We are, in the end, going to have to acknowledge that we are at a critical juncture, compelled to reevaluate our priorities as a nation and our responsibilities to the American people. Every decision we make must be weighed against the best interests of those we are sworn to serve, not those people abroad but those who are right here at home.

Waving the flag of another nation in Congress as you vote to send them tens of billions of dollars doesn't inspire confidence; it creates distrust.

As legislators, we fail in our duty if we don't heed the call to prioritize the American people first.

So to all out there who find this distressing—the distressed Americans, the distressed carpenters, the distressed plumbers, the distressed poets—I am sorry that we weren't able and willing to secure the border. We should have been able to do that. We made a promise, and we as Republicans shouldn't have deviated from that promise—certainly not with the critical mass necessary to facilitate passage of this in the House and then, before the night is finished, likely the Senate; certainly not under the leadership of our own elected Republican leaders, who themselves have repeated this promise not too many weeks ago—a promise that is now apparently a thing of the past that we are supposed to forget.

This $95 billion aid package to foreign countries is a stark testament of the misguided priorities of our current congressional leadership and a clear indication that we have let ourselves and, perhaps more critically, the American people down. The situation demands a wake-up call.

To every Member of this body, by failing to address the fundamental needs of our own people, the American people, in favor of international interests, we risk not only the prosperity but also the security of our Nation.

And make no mistake, this isn't free, although it can feel free to those of us who work in this hallowed Chamber. It can feel free to us. It can feel as if we draw from an endless, unlimited well, but we don't.

As we have seen to an acute degree over the last few years, every time we spend more money than we have, that comes at a cost. Sure, we borrow the money, and sure, the credit of the United States is still just good enough that it can feel like we have the capacity to just print our own money, which is essentially what we are doing. But every time we do that, every dollar earned by every hard-working American—every mom and dad, married or single, in this country, just trying to put food on their table for their kid, suffers, as they are having to shell out an additional $1,000 a month every single month just to live, just to put a roof over their head and keep food on the table.

I agree with the assessment of Nobel laureate and famed economist Milton Friedman, who said that in any given moment, the true level of taxation in America can best be measured not by the top marginal tax rate or even the average effective tax rate but, instead, by the overall level of government spending.

This, he explained—perhaps referring to an odd combination of credit rating, the way our deficit spending works—in effect, every year when we look at overall government spending, especially Federal spending, that is the true cost of the Federal Government because what we don't collect in taxes, we effectively print and thereby devalue every dollar that is earned by every American by degrees. Unlike other expenses that people have—the monthly bills they receive or the annual tax return they file—there is no billing moment attached to this, there is no pricetag. You don't ever see the overall amount that you are spending on this, as you do at least once a year when you file your Federal income tax return. No. It is very different with inflation. Each dollar is diminished bit by bit.

The Federal Government is costly, and when it sends money abroad that we don't have to fund somebody else in fighting a war against somebody else, that costs money.

Another thing we learn about these proxy wars is that in the United States of America, which has assembled the greatest military force the world has ever known—certainly the strongest military force that exists today—proxy wars carry on for going on 2-plus years now. We are in our third year of this effort. They don't remain proxy wars forever.

It becomes especially startling when the proxy war is being fought against a nuclear-armed adversary. That is not to say we can never push back against any nuclear-armed adversary, but it does mean we should be darn careful when we do that. We should know exactly what our objective is, what it is going to take to secure the peace so that we don't have to fight that war.

We don't avoid the profound risk to our own national security simply by funneling money through a proxy, whether that proxy is a great steward of the funds, weapons, and resources that we send or not. Whether that country happens to be one that has proven impervious to fraud, corruption, money laundering, and grift or not, we should be concerned about what happens to that money because it is ours and because how it is spent is going to have a very direct, very real potential outcome on the American people.

We cannot pretend anymore that we have the money to do this, that the economic cost is free, or that the military risk is free. None of them are.

Shame on us if we don't turn this around. Shame on us if we pass this tonight. Shame on us if we do this without taking any steps to secure the integrity of our own border.

I yield the floor.

The PRESIDING OFFICER. The Senator from Washington.

Mrs. MURRAY. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. SANDERS. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SANDERS. Mr. President, here is the good news: A few weeks ago, the approval rating for Congress was 10 percent. It has gone up to 14 percent. According to a recent YouGov poll, 14 percent approve of what Congress is doing and 68 percent oppose.

And I would tell my friends on both sides that it is about equal. In terms of whom people want to elect, it is about half Democrats, half Republicans. Why is that? Why do we have a 14-percent approval rating? Well, it might have something to do with things like we are witnessing today and the degree to which the Congress is completely out of touch with where the American people are.

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 150 of 267

So let me read some other polls, not on favorability but on people's feelings toward the role the United States is now playing in the war in Gaza. April 10, Economist YouGov poll, 37 percent support decreasing military aid to Israel; 18 percent support an increase.

And to my Democratic colleagues, I would say 48 percent of Democrats support decreasing aid; 10 percent support increasing aid.

Then there is a March 29 poll from Axios-Ipsos-Telemundo poll of Latinos—Latino people: 16 percent of Latinos said the United States should continue to support Israel with arms and funds; 39 percent said the U.S. should not be involved in the conflict.

March 27 Gallup poll: 36 percent of Americans approve of Israel's military action; 55 percent disapprove. Among Democrats, 18 percent approve; 75 percent disapprove.

March 27 Quinnippiac poll: Overall, voters oppose sending more military aid to Israel by 52 percent to 39 percent—52 percent oppose more aid; 39 percent support more aid—Democrats, 63 percent oppose sending more military aid; 25 percent support it.

March 11, YouGov: 52 percent of Americans said the United States should hold weapons shipments to Israel until it stops attacks in Gaza.

So you got a whole bunch of polls. They differ a little bit, but they say, pretty overwhelmingly, that the American people do not want to give more military aid to the Netanyahu war machine to continue its horrendous destructive policies in Gaza. That is what the American people are saying.

Earlier today, I tried to bring up two amendments dealing with the crisis in Gaza. One of them basically said that the United States should not support—should not supply any more offensive—offensive—military aid to the Netanyahu government. I support defensive measures—the Iron Dome. The Israeli people have a right not to be attacked with missiles and drones. That amendment not only—that amendment could not even get a vote. That is the U.S. Senate today. People overwhelmingly are in opposition to more U.S. aid. We can't even discuss this issue and have a vote.

Why are the American people as opposed as they are to more aid for the military in Israel? Well, among other things, it may have something to do with what some of the Israeli leaders are saying and, in fact, who they are. And I think the American people are catching on that what we have today in Israel is not the Israel of Golda Meir, Yitzhak Rabin. It is a government now significantly controlled not only by rightwing extremists but by religious zealots.

Today, what we are seeing is a situation where Netanyahu himself has never favored a two-state solution, and he has made that very clear and has worked to systematically undermine the prospects for a deal. And I might mention that a two-state solution is the policy of the U.S. Government. His party's—Netanyahu's party's—founding charter reinforced in the current coalition agreement says ''between the Sea and the Jordan [River] there will only be Israeli sovereignty.'' For many years before October 7, Netanyahu told his allies, in private, that it was important to bolster Hamas to ensure that the Palestinians could never unify and form their own government.

In January, in terms of the humanitarian crisis in Gaza, Netanyahu said:

We provide minimal humanitarian aid. If we want to achieve our war goals, we give the minimal aid.

The rest of the government or many others in that government is similarly extreme. At the start of the war, the Israeli Defense Minister declared a total siege, saying:

We are fighting human animals, and we are acting accordingly.

There will be no electricity, no food, no fuel. Everything is closed.

Another minister, at the start of the war, posted a picture of a devastated area in Gaza, saying it was ''more beautiful than ever, bombing and flattening everything.''

Another Israeli lawmaker said:

[T]he Gaza Strip should be flattened, and there should be one sentence for everybody there—death. We have to wipe the Gaza Strip off the map. There are no innocents there.

Several officials have openly talked about reestablishing Israeli settlements in Gaza. The current Intelligence Minister, among others, openly talks of permanently displacing Palestinians from Gaza.

Israeli National Security Minister Itamar Ben-Gvir, who oversees the police, has long advocated for the forceful expulsion of Palestinians from the region. This is the current Israeli National Security Minister.

Finance Minister Bezalel Smotrich, responsible for much of the occupied West Bank has, likewise, long expressed the extreme racist views and has called for the expulsion of Palestinians from their lands. He has called for segregated hospital wards for Jews and Arabs because ''Arabs are my enemies.'' As a younger man, he was arrested by the Israeli authorities on suspicion of anti-Palestinian terrorism.

That is the man who is the current Israeli Finance Minister.

This is a significant part of Netanyahu's government. Those are some of the people whose war we are subsidizing.

We can pretend to ignore all of this. We can pretend that today's Israel is the Israel of 20 or 30 years ago, but that is just not the case. And the reason I raise these issues and talk about some of the people in the Israeli Government is to understand that what is happening today in Gaza is not an accident. It is a bringing forth the doing of what many of these people have wanted to do for a long time.

It should come as no surprise that this extreme government in Israel, right now, is not simply waging a war against Hamas—and Israel has the right to defend itself from the terrorist organization of Hamas—but it is at war with the entire Palestinian people and fighting that war in a deeply reckless and immoral way. And that is why the Netanyahu government has consistently ignored President Biden's request that they do more to minimize civilian casualties, that they be more targeted in their approach, and that they let more humanitarian aid in.

And so given the attitude and the beliefs—the racist beliefs of a number of people in the Netanyahu government, let us take a look and see what is happening today in Gaza.

We all know that Hamas, a terrorist organization, began this war with a horrific attack on Israel that killed 1,200 men, women, and children and took more than 230 captives, some of whom are still in captivity today. And as I have said many times and repeated a moment ago, Israel has the right to defend itself; but it does not have the right to go to war against the entire Palestinian people, including women and children.

Let's take a deep breath and listen to some of these facts—and no one disputes these facts. The war is about 6½ months old. More than 34,000 Palestinians have been killed, and 77,000 have been wounded—70 percent of whom are women and children. That is 70 percent of whom are women and children. That means that 5 percent, 5 percent of the 2.2 million people in Gaza have been killed or wounded in a 6½-month period. That is an astronomical figure—astronomical. The number of people getting wounded—70 percent are women and children—is almost beyond comprehension.

Mr. President, 19,000 children are now orphans in Gaza—19,000—having lost their parents in this war. And when you think about the children in Gaza, literally, it is hard to imagine.

Imagine a 7-year-old in an area where the whole community has been flattened, where there is massive death, where there is no food, there is no water, no schools. Your parents may or may not be alive. Your relatives are dead. That is what the children in Gaza are going through right now, and I doubt that any of them will ever fully recover from the psychic trauma—the terrible, unbelievable trauma that they are experiencing at this moment.

And the killing has not stopped. Over the weekend, 139 Palestinians were killed and 251 were injured. Of these, 29 were killed in and around Rafah, including 20 children and 6 women, one of whom was pregnant.

Just today, more news emerged about mass graves found by Palestinian health authorities and U.N. observers at the Nasser Hospital in Khan Younis and the Al-Shifa Hospital in Gaza City. So far, more than 300 bodies have been found. The U.N. Human Rights Office reports that the dead include elderly people, women, and wounded people, and that some had

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 151 of 267

been bound and stripped of their clothes. Some of these bodies apparently had their hands tied, the U.N. said.

What can we say about this horror? Roughly 1.7 million people—and it is, again, hard to understand. Maybe think—Members of Congress, think about your own State and what this would mean and look like in your own States. We are dealing with a population of 2.2 million people which is about 3½ times the size of the State of Vermont.

Roughly 1.7 million people—over 75 percent of the population—have been driven from their homes. It is not a community which has been forced to evacuate in order for a military action to take place. This is three-quarters of the population driven from their homes.

Satellite data shows that 62 percent of the homes in Gaza have been damaged or destroyed, including 221,000 housing units that have been completely destroyed.

A number of months ago in Vermont, we had a terrible flood, and dozens of houses were destroyed. And I saw the impact of what the destruction of dozens of houses in my small State meant. We are talking about 221,000 housing units that have been completely destroyed.

But it is not just housing. Gaza's civilian infrastructure has been devastated. There is little or no electricity apart from generators or solar power. Most of the roads are badly damaged. More than half of the water and sanitation systems are out of commission. Clean water is severely limited, and sewage—raw sewage—is running through the streets, creating disease. But it is not just housing and civilian infrastructure.

And this is quite unbelievable, but there is a reason, I think, for all of this. None of this is happening by accident. Israel has systematically destroyed the healthcare system in Gaza. We are not talking about an occasional accidental bomb that destroys a medical unit or a hospital. Those things happen. What we are talking about is the reality that 26 out of 37 hospitals are completely out of service. They have been bombed and attacked in all kinds of ways. The 11 hospitals that are remaining are partially functioning, but they are being overwhelmed by tens of thousands of trauma patients, and they are short on medical supplies.

So you got 77,000 people who have been wounded, and you got almost all of the hospitals out of commission.

I met recently with a group of American and British doctors who recently returned from Gaza where they had gone, bravely risking their own lives, to try to help alleviate the terrible suffering taking place there. And it is difficult to relate the unspeakable things they witnessed. They saw thousands of patients, many young children, killed or maimed in Israeli bombings. They operated on little children, already orphaned, on dirty hospital floors. On many days, they had no morphine; on other days, no water or clean gloves. They knew that many victims, even if they survived the week, would die of infection without access to sanitary environments or antibiotics.

They reported that the Israelis would not allow them to bring in wheelchairs or syringes, claiming they might have some military use. They witnessed Israeli forces systematically cutting off electricity, food, and water to hospitals and abducting medical workers with no affiliation to Hamas. They reported that Israeli soldiers destroyed medical equipment, like MRIs, oxygen tanks, and CT scanners, for no apparent reason. These are American doctors who witnessed these things.

Overall, 84 percent of health facilities have been damaged or destroyed, and more than 400 healthcare workers have been killed—an extraordinary number.

But we are not just talking about housing being decimated. We are not just talking about physical infrastructure being decimated. We are not just talking about a healthcare system being decimated. Gaza is a young community. A lot of children live there, and their educational system has been destroyed. Fifty-six schools have been bombed and completely destroyed, and 219 have been damaged—schools. The last of Gaza's universities—I think they had 12 universities in Gaza, and the last one was demolished in January. Now, I am not quite sure how fighting Hamas has anything to do with destroying universities, but it does lead to the fact that some 625,000 students in Gaza have, today, no access to education.

Just today, David Satterfield, the U.S. Special Envoy for the Gaza humanitarian crisis, said that the risk of famine throughout war-devastated Gaza, especially in the north, is "very high" and that more aid must reach those areas.

He said:

We have always stressed that we were in a man-made situation, and it can only be addressed by political will and decisions.

So, on top of the destruction of housing, infrastructure, healthcare, and education, we are now looking at mass starvation and malnutrition. The United Nations estimates that more than 1 million Palestinians, including hundreds of thousands of children, face starvation. Desperate Gazans have been scraping by for months, foraging for leaves or eating animal feed. At least 28 children have died of malnutrition and dehydration. That is a number that came out several weeks ago, and there is no reason to believe the real number is not much, much higher. USAID Administrator Samantha Power said that famine was already present in northern Gaza.

Without food, clean water, sanitation, or sufficient healthcare, hundreds of thousands of people are at a severe risk of dehydration, infection, and easily preventable diseases. Yet, for months, thousands of trucks carrying lifesaving food, medicine, and other supplies have sat just miles away from starving children. Got that? I hope we all try to put that image in our minds: starving children over here and trucks loaded with food on the other side of the border that are unable to get through and kept from entering Gaza by Israeli restrictions in a brutal war fought with little regard for civilians.

But let us be clear, and I think this is the main point I want to make this evening. This war stopped being about defending Israel and going to war against Hamas a long time ago. This is not any longer a war against the terrorist organization called Hamas. This is now a war that has everything to do with the destruction of the very fabric of Palestinian life. That is the goal of this war.

It is impossible to look at these facts and not conclude that the Israeli Government's policy has been to make Gaza uninhabitable. That is what some of their government leaders have wanted, and that is, in fact, what is happening. These are not accidents of war—mistakes. This is calculated policy. Indeed, this is what has been going on systematically over the last 6 months. These cruel actions are entirely consistent with the public statements of numerous Israeli senior officials, including Prime Minister Netanyahu himself.

That brings us to the role of the United States in this horrific war. Put simply, we are deeply complicit in what is happening. This is not an Israeli war; this is an Israeli-American war. Most of the bombs and most of the military equipment the Israeli Government is using in Gaza is provided by the United States and subsidized by American taxpayers. The U.S. military is not dropping 2,000-pound bombs on civilian apartment buildings. The U.S. military is not doing that, but we are supplying those bombs. The United States of America is not blocking the borders and preventing food, water, and medical supplies from getting to desperate people. We are not doing that, but we have supplied billions of dollars to the Netanyahu government, which is doing just that.

So this is not just an Israeli war; this is an American war as well. Yet, despite the massive financial and military support the United States has provided to Israel for many years, Netanyahu's extremist government has ignored urgent calls from the President and others to alter their military approach and to end this humanitarian disaster.

In my view, the U.S. unconditional financial and military support for Israel must end. That is why I offered an amendment to this bill—to do, in fact, what a majority of the American people wants us to do, and that is to no longer provide military aid to the destructive Netanyahu government.

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 152 of 267

I would have welcomed the chance to vote for the humanitarian aid provision in this bill. It is terribly important that we start feeding people not only in Gaza but in Sudan and all over the world. It is an important provision, and I support it. I believe very strongly we should support Ukraine and help them end—defeat—the imperialist ventures of Putin and the Russian army. But I am not going to be able to do that because I am going to stand with the American people today who oppose more money for Netanyahu.

Let me conclude by simply saying this: What we are doing today is very bad policy. We are aiding and abetting the destruction of the Palestinian people. What we are doing today is not what the American people want, and I say to my Democratic friends, it is absolutely not. A lot of Republicans don't want us to continue that as well, but a strong majority of Democrats is saying: Enough with Netanyahu's war. You just can't give him another $10 billion for unfettered military aid.

But I suppose, in a little while, as things happen here in Congress, we will ignore the needs of the American people; we will not pay attention to what they want. Then we are shocked—just shocked—that we have a 14-percent approval rating.

With that, I yield the floor.

Mr. VAN HOLLEN. Mr. President, as our Nation and our allies face a host of challenges across the globe, it is critical that we deploy the necessary resources to protect freedom, support democracy, and address humanitarian crises abroad. For Ukraine, especially, this assistance could not come at a more crucial time. While Putin continues to wage his war of aggression against the Ukrainian people and on democracy itself, Ukraine is running dangerously low on artillery and air defense munitions, as well as other vital supplies. This aid is critical not only to support the Ukrainian people in their fight against Putin, but also to defend freedom and democracy worldwide. Our allies and adversaries alike are watching closely to see if the United States and our partners will keep our promises to the people of Ukraine in their hour of need or whether we will retreat.

In particular, we know that President Xi has one eye on the war in Ukraine and the other eye on Taiwan. As Taiwan prepares to inaugurate its newly elected President next month, the PRC has ratcheted up diplomatic and military pressure against Taipei. We have also recently seen increasingly provocative maneuvers by China's coast guard against the Philippines' vessels in the South China Sea. These actions underscore the need for increased security cooperation between the U.S. and our allies and partners in the Indo-Pacific. This is why I am glad this bill provides additional funding for security assistance to our partners there.

This bill also includes important provisions to protect our security here at home by investing more in the Nonprofit Security Grant Program—NSGP—which helps protect various community institutions that are at risk of hate crimes, including synagogues, mosques, and certain other houses of worship. The alarming rise of anti-Semitism, Islamophobia, and anti-Arab incidents since the October 7 attacks underscores the vital need for more resources to help protect our communities from bigotry and hate. As we confront these challenges across the country, I believe it is critical that all Americans feel safe in their houses of worship. This legislation makes that possible with investments to install essential security measures. Additionally, it boosts screenings and inspections at border points of entry to better protect American families from the threat posed by the deadly flow of fentanyl into our Nation, a drug that has caused pain and loss for far too many.

In addition to these provisions, this legislation includes over $9 billion in humanitarian aid that will reach people in desperate need around the world, from Gaza to Sudan and elsewhere. Last week, we marked the solemn anniversary of the start of the civil war in Sudan, where more than 25 million people currently need humanitarian assistance. This aid will also support innocent civilians in Gaza, where four out of five of the hungriest people anywhere in the world currently reside. I am glad to support this funding that will provide necessities like food, water, shelter, and medical care to the world's most vulnerable people. That being said, I am deeply disappointed that this bill prohibits any of the available funds from going to UNRWA, which provides vital services to Palestinian refugees in many countries and is the main humanitarian aid distribution entity in Gaza. According to USAID Administrator Samantha Power, famine is already occurring in Gaza. Amid such a crisis, it is unconscionable to cut off funding, without a mechanism to reinstate it, for the primary distributor of urgently needed aid to starving people. To rectify this, I put forward an amendment to provide a process to restore that funding following the ongoing investigation and appropriate remedial actions. While we did not have an opportunity to vote on that amendment, I will continue to seek to reverse the current ban—which Republicans demanded be included in the recent government funding bill—on U.S. funding for UNRWA through March 2025. I will also press the Biden administration to encourage other countries to continue to support UNRWA and use our support for international organizations in a way that advances that goal. The underlying bill does include substantial assistance that is desperately needed at this time in Gaza and around the world and is better than our alternative at this point—which is to provide nothing.

Within this legislation, I also support the funding for defensive weapons systems, like the Iron Dome, to protect Israel from Hamas, the Islamic Republic of Iran, Hezbollah, and other threats in the region. The October 7 Hamas terrorist attack on Israel was horrific; we must prevent any such future horrors and secure the release of all remaining hostages. I fully support Israel's right—indeed, its duty—to defend itself. But while this war is just, it must be fought justly. I do not support a blank check for offensive weapons for the Netanyahu government's current campaign in Gaza. I will continue to press for a cease-fire and the return of all the hostages but, in the meantime, we cannot turn a blind eye to what President Biden has described as "indiscriminate" bombing or to the failure of the Netanyahu government to meet its obligations to facilitate, and not arbitrarily restrict, the delivery of assistance to address the humanitarian catastrophe in Gaza. Given these concerns, had this been an up or down vote strictly on military assistance for Israel, I would have insisted on amendments to ensure that no funds for offensive weapons would flow to the Netanyahu government until it cooperates fully in the delivery of humanitarian assistance to starving people in Gaza; agrees not to launch an invasion into Rafah, where over 1.3 million Palestinians were told to seek safety; and allows an independent investigation into the deaths of all humanitarian aid workers killed in Gaza. For now, I will continue to press the administration to pause any further transfers of offensive military aid until the Netanyahu government meets President Biden's demands and will use the congressional review process to reinforce that position. A partnership should not be a one-way street.

I appreciate that President Biden issued National Security Memorandum 20, based on the amendment that I, together with 18 of my colleagues, proposed when the supplemental was first considered in the Senate months ago. That amendment, and the ensuing NSM–20, are designed to better ensure that American taxpayer dollars are used in a manner consistent with our values and our interests. Specifically, NSM–20 requires recipients of U.S. security assistance to use our support in accordance with international law and to facilitate the delivery of humanitarian assistance in conflict areas where they are using U.S.-supplied weapons. It also requires the Biden administration to submit to Congress by May 8 a written report on whether recipients of U.S. security assistance have been complying with those obligations. The administration's report will be a test of whether they are willing to apply those standards to allies as well as adversaries and take any actions necessary to ensure accountability.

This sweeping national security bill has many provisions that raise concerns, but on balance, it provides the resources that are vital to support the people of Ukraine and advance important American priorities around the

USCA Case #24-1113    Document #2060757    Filed: 06/26/2024    Page 153 of 267

world. That is why, despite certain reservations, I support this legislation.

The PRESIDING OFFICER. The Senator from Washington.

Mrs. MURRAY. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

The PRESIDING OFFICER. The Senator from Washington.

Mrs. MURRAY. Mr. President, it has been no easy task to get us to this point. The world has been watching; the clock has been ticking; but we are finally at the finish line.

I am not just glad but relieved we are finally about to pass the bill from the House that, as many of us noted, includes every pillar of the package we passed overwhelmingly here in the Senate back in February, essentially identical in the funding that we are providing.

I think it is fair to say, thanks to the bipartisanship and a shared commitment to doing what is best for America, the Senate has made its voice heard in this process.

In particular, I want to, once again, thank my counterpart and vice chair, Senator COLLINS. We don't agree on everything, but we both had a real appreciation for the seriousness of this work and the importance of negotiating a bill that would pass both Chambers. As I have said, this package is not the product I would have written just by myself; it is the result of a difficult bipartisan process. Crafting this package has required serious, sober discussion, not partisanship, not political show.

So thanks to Senator COLLINS, Leader SCHUMER, the minority leader, and many others, this legislation provides the resources necessary to make the world safer for America and its allies. We are delivering investments to address the challenges of today and investing in our strategy for the future. This package makes clear that Congress understands that the conflict in Ukraine is not disjointed from future aggression by the Chinese Communist Party.

From the beginning I was clear: The challenges we face around the world are interconnected. We have to deliver a comprehensive package. Half steps cannot cut it. This package ensures that America keeps its word to all of our allies and stands by all of our commitments.

Especially important to me: in passing this package, we do not lose sight of the human reality on the ground, the fact that in the middle of every conflict are civilians—people displaced from their homes, people facing obstacles getting basic medical services, and kids and families who desperately need food and water.

I made certain at every step that this bill delivers badly needed humanitarian assistance for Gaza, Sudan, Ukraine, and many other regions caught in conflict.

So now we are at the finish line. Let's vote to stand by our allies, to say to dictators like Putin that they cannot invade sovereign democracies freely and unchecked and that America will not ignore the humanity and the cries for help from civilians who are caught in the middle of conflict and crossfire whom we must protect.

Tonight, Moscow and Beijing are watching closely to see whether we have the vision to recognize how these crises are related and the resolve to come together and respond forcefully to them. Our adversaries are cheering for dysfunction. Let's show them unity instead. Let's show them the strength of democracy. Let's vote yes.

The PRESIDING OFFICER. The Senator from Utah.

POINT OF ORDER

Mr. LEE. Mr. President, the pending measure, the House message to accompany H.R. 815, contains an emergency designation: on page 12, lines 3 through 6, and another emergency designation on page 12, lines 12 through 15. I, therefore, raise a point of order pursuant to section 314(e) of the Congressional Budget Act of 1974 against both of these designations.

The PRESIDING OFFICER. The Senator from Washington.

MOTION TO WAIVE

Mrs. MURRAY. Mr. President, pursuant to section 904 of the Congressional Budget Act of 1974 and the waiver provisions of applicable budget resolutions, I move to waive all applicable sections of that act and applicable budget points of order for the purposes of the pending measure, and I ask for the yeas and nays.

The PRESIDING OFFICER. Is there a sufficient second?

There appears to be a sufficient second.

The question is on agreeing to the motion.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. DURBIN. I announce that the Senator from Maryland (Mr. CARDIN) is necessarily absent.

Mr. THUNE. The following Senators are necessarily absent: the Senator from Missouri (Mr. HAWLEY), the Senator from Kentucky (Mr. PAUL), the Senator from South Carolina (Mr. SCOTT), and the Senator from Alabama (Mr. TUBERVILLE).

The result was announced—yeas 75, nays 20, as follows:

[Rollcall Vote No. 153 Leg.]

YEAS—75

| | | |
|---|---|---|
| Baldwin | Coons | Hickenlooper |
| Bennet | Cornyn | Hirono |
| Blumenthal | Cortez Masto | Hoeven |
| Booker | Cramer | Hyde-Smith |
| Boozman | Crapo | Kaine |
| Brown | Duckworth | Kelly |
| Butler | Durbin | Kennedy |
| Cantwell | Fetterman | King |
| Capito | Fischer | Klobuchar |
| Carper | Gillibrand | Lankford |
| Casey | Graham | Lujan |
| Cassidy | Hassan | Manchin |
| Collins | Heinrich | Markey |
| McConnell | Ricketts | Tester |
| Menendez | Risch | Thune |
| Merkley | Romney | Tillis |
| Moran | Rosen | Van Hollen |
| Mullin | Rounds | Warner |
| Murkowski | Schatz | Warnock |
| Murphy | Schumer | Warren |
| Murray | Shaheen | Welch |
| Ossoff | Sinema | Whitehouse |
| Padilla | Smith | Wicker |
| Peters | Stabenow | Wyden |
| Reed | Sullivan | Young |

NAYS—20

| | | |
|---|---|---|
| Barrasso | Daines | Marshall |
| Blackburn | Ernst | Rubio |
| Braun | Grassley | Sanders |
| Britt | Hagerty | Schmitt |
| Budd | Johnson | Scott (FL) |
| Cotton | Lee | Vance |
| Cruz | Lummis | |

NOT VOTING—5

| | | |
|---|---|---|
| Cardin | Paul | Tuberville |
| Hawley | Scott (SC) | |

The PRESIDING OFFICER (Mr. OSSOFF). On this vote, the yeas are 75, the nays are 20.

Three-fifths of the Senators duly chosen and sworn having voted in the affirmative, the motion is agreed to and the point of order falls.

The PRESIDING OFFICER. The Republican leader.

Mr. McCONNELL. This has been an extremely important day in the history of our country and the free world. They are all watching, waiting to see what we would do.

When Putin escalated his war against Ukraine, I told our colleagues that allies and adversaries, alike, would pay very close attention to America's response. When Iran-backed terrorists invaded the Jewish State on October 7 to slaughter innocent Israelis, I warned that the world would watch closely for signs that American leadership was actually weakening.

For months, our friends have watched to see whether America still had the strength that won the Cold War or the resolve that has underpinned peace and prosperity, literally, for decades. Our enemies have tested whether the arsenal of democracy is, in fact, built to endure.

Well, tonight, the Senate will send a clear message. History will record that, even if allies and partners have worried about the depth of our resolve; even as Moscow, Beijing, and Tehran grew more convinced that our influence had run its course; and even as loud voices here at home insisted on abandoning responsibilities of leadership, America stepped up and the Senate held firm.

It is time to reaffirm some basic truths. Alliances matter. Foreign nations' respect for American interests depends on our willingness to defend them. And the peace, prosperity, and security are not accidents. They are products of American leadership and American sacrifice.

The votes we are about to cast will be among the most consequential. But the difficult work of restoring and sustaining hard power, defense, industrial capacity, and global influence must continue beyond this supplemental.

So I will just say to my colleagues: We can wish for a world where the responsibilities of leadership don't fall on

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 154 of 267

us or we can act like we understand that they do. Tonight, as in so many moments in our history, idle calls for America to lower its guard ring hollow. None of us is absolved of our duty to see the world as it actually is. None of us is excused from our obligation to equip the United States to face down those who wish us harm.

I said it before: History settles every account. And I welcome the eyes of posterity on what the Senate does tonight.

The PRESIDING OFFICER. The majority leader.

Mr. SCHUMER. Mr. President, finally, finally, finally, tonight, after more than 6 months of hard work and many twists and turns in the road, America sends a message to the entire world: We will not turn our back on you.

Tonight, we tell our allies: We stand with you.

We tell our adversaries: Don't mess with us.

We tell the world: The United States will do everything to safeguard democracy and our way of life.

This bill is one of the most consequential measures Congress has passed in years to protect America's security and the future—the very future—of Western democracy. And after overcoming a lot of opposition, tonight, Congress finishes the job.

To our friends in Ukraine, to our friends in Israel, to our friends in the Indo-Pacific, and to innocent civilians caught in the midst of a war from Gaza to Sudan: America hears you. We will be there for you.

And to the whole world, rest assured. Rest assured that America will never shrink from its responsibilities as a leader on the world stage.

Tonight, we make Vladimir Putin regret the day he questioned American resolve.

I thank President Biden for his unflinching leadership. I thank Speaker JOHNSON and Leader JEFFRIES for working together valiantly to pass this bill. I thank Chair MURRAY and Vice Chair COLLINS for their excellent work.

And I particularly want to thank my caucus for standing firm. We were always united. You gave us strength to get this job done. I salute you.

And, particularly, I want to thank Leader MCCONNELL. We worked on this bill arm in arm, together, shoulder to shoulder. Without that kind of strong bipartisan leadership, this difficult bill would never have passed.

We now come to the end of a long, difficult, and Herculean effort. Our allies around the world have been watching Congress for the last 6 months and wondering the same thing: When it matters most, will America summon the strength to come together, overcome the centrifugal pull of partnership, and meet the magnitude of this moment? Tonight, under the watchful eye of history, the Senate answers this question with a thunderous and resounding yes.

For a little more good news, for the information of Senators, the Senate will not be in session on Monday, April 29. The next rollcall vote will be at 5:30 p.m. on Tuesday, April 30.

Mr. President, I ask unanimous consent that all postcloture time be deemed expired.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SCHUMER. I ask unanimous consent that the pending motion to concur with amendment No. 1842 be withdrawn.

The PRESIDING OFFICER. Without objection, it is so ordered.

MOTION TO CONCUR

The PRESIDING OFFICER. The question occurs on the motion to concur.

Mr. PETERS. I ask for the yeas and nays.

The PRESIDING OFFICER. The yeas and nays were previously ordered.

The clerk will call the roll.

The senior assistant legislative clerk called the roll.

Mr. THUNE. The following Senators are necessarily absent: The Senator from Kentucky (Mr. PAUL), the Senator from South Carolina (Mr. SCOTT), and the Senator from Alabama (Mr. TUBERVILLE).

The result was announced—yeas 79, nays 18, as follows:

[Rollcall Vote No. 154 Leg.]

YEAS—79

| | | |
|---|---|---|
| Baldwin | Gillibrand | Peters |
| Bennet | Graham | Reed |
| Blumenthal | Grassley | Ricketts |
| Booker | Hassan | Risch |
| Boozman | Heinrich | Romney |
| Britt | Hickenlooper | Rosen |
| Brown | Hirono | Rounds |
| Butler | Hoeven | Schatz |
| Cantwell | Hyde-Smith | Schumer |
| Capito | Kaine | Shaheen |
| Cardin | Kelly | Sinema |
| Carper | Kennedy | Smith |
| Casey | King | Stabenow |
| Cassidy | Klobuchar | Sullivan |
| Collins | Lankford | Tester |
| Coons | Luján | Thune |
| Cornyn | Manchin | Tillis |
| Cortez Masto | Markey | Van Hollen |
| Cotton | McConnell | Warner |
| Cramer | Menendez | Warnock |
| Crapo | Moran | Warren |
| Daines | Mullin | Whitehouse |
| Duckworth | Murkowski | Wicker |
| Durbin | Murphy | Wyden |
| Ernst | Murray | Young |
| Fetterman | Ossoff | |
| Fischer | Padilla | |

NAYS—18

| | | |
|---|---|---|
| Barrasso | Hawley | Rubio |
| Blackburn | Johnson | Sanders |
| Braun | Lee | Schmitt |
| Budd | Lummis | Scott (FL) |
| Cruz | Marshall | Vance |
| Hagerty | Merkley | Welch |

NOT VOTING—3

| | | |
|---|---|---|
| Paul | Scott (SC) | Tuberville |

The PRESIDING OFFICER. The motion to concur in the House amendment to the Senate amendment to H.R. 815 is agreed to.

The motion was agreed to.

LEGISLATIVE SESSION

Mr. SCHUMER. Mr. President, I move to proceed to legislative session.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

EXECUTIVE SESSION

EXECUTIVE CALENDAR

Mr. SCHUMER. Mr. President, I move to proceed to executive session to consider Calendar No. 598.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

The PRESIDING OFFICER. The clerk will report the nomination.

The senior assistant legislative clerk read the nomination of Georgia N. Alexakis, of Illinois, to be United States District Judge for the Northern District of Illinois.

CLOTURE MOTION

Mr. SCHUMER. Mr. President, I send a cloture motion to the desk.

The PRESIDING OFFICER. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The senior assistant legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the nomination of Executive Calendar No. 598, Georgia N. Alexakis, of Illinois, to be United States District Judge for the Northern District of Illinois.

Charles E. Schumer, Richard J. Durbin, Alex Padilla, Amy Klobuchar, Jack Reed, Tina Smith, Tammy Duckworth, Richard Blumenthal, Robert P. Casey, Jr., Catherine Cortez Masto, Margaret Wood Hassan, Peter Welch, Sheldon Whitehouse, Brian Schatz, Mark Kelly, Debbie Stabenow, Michael F. Bennet.

LEGISLATIVE SESSION

Mr. SCHUMER. Mr. President, I move to proceed to legislative session.

The PRESIDING OFFICER. The question is on agreeing to the motion.

The motion was agreed to.

CLOTURE MOTION

Mr. SCHUMER. Mr. President, I send a cloture motion to the desk.

The PRESIDING OFFICER. The cloture motion having been presented under rule XXII, the Chair directs the clerk to read the motion.

The senior assistant legislative clerk read as follows:

CLOTURE MOTION

We, the undersigned Senators, in accordance with the provisions of rule XXII of the Standing Rules of the Senate, do hereby move to bring to a close debate on the motion to proceed to Calendar No. 211, H.R. 3935, a bill to amend title 49, United States Code, to reauthorize and improve the Federal Aviation Administration and other civil aviation programs, and for other purposes.

Charles E. Schumer, Maria Cantwell, Peter Welch, Brian Schatz, Edward J. Markey, Thomas R. Carper, Patty Murray, Sheldon Whitehouse, Amy Klobuchar, Richard Blumenthal, Mark

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

|  |  |  |
|---|---|---|
| TIKTOK INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BYTEDANCE LTD., | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | No. 24-1133 |
| | ) | |
| | ) | |
| MERRICK B. GARLAND, in his official | ) | |
| Capacity as United States Attorney | ) | |
| General, | ) | |
| | ) | |
| *Respondent*. | ) | |
| | ) | |

_____

## <u>DECLARATION OF ALEXANDER A. BERENGAUT</u>

1.      I am a Partner of Covington & Burling LLP and am counsel for Petitioners TikTok Inc. and ByteDance Ltd. in the above-captioned matter.  In this position I have personal knowledge of the matters set forth herein.

2.      Attached hereto as "Exhibit A" is a true and correct copy of a document prepared by the U.S. Department of Justice, which is dated

**APP-148**

March 6, 2024, and entitled "Threat Posed by TikTok."  Counsel for Respondent has confirmed that the document is authentic.

3.    Attached hereto as "Exhibit B" is a true and correct copy of the draft National Security Agreement ("NSA") submitted by Petitioners to the Committee on Foreign Investment in the United States ("CFIUS") on August 23, 2022.

4.    Attached hereto as "Exhibit C" is a true and correct copy of a presentation on proposed mitigation measures regarding governance delivered to CFIUS on September 17, 2021.

5.    Attached hereto as "Exhibit D" is a true and correct copy of a presentation on proposed mitigation measures to ensure the protection of certain U.S. person data delivered to CFIUS on October 13, 2021.

6.    Attached hereto as "Exhibit E" is a true and correct copy of a presentation on the TikTok recommendation engine, content moderation, and video promotion and filtering approach delivered to CFIUS on November 29, 2021.

7.    Attached hereto as "Exhibit F" is a true and correct copy of a presentation on TikTok source code development and proposed mitigation measures delivered to CFIUS on November 30, 2021.

2

**APP-149**

8.     Attached hereto as "Exhibit G" is a true and correct copy of the Content Assurance Process Summary, summarizing the content assurance mitigation proposal provided to CFIUS on April 26, 2022.

9.     Attached hereto as "Exhibit H" is a true and correct copy of the December 28, 2022 letter from David Fagan and Michael Leiter to The Honorable Wally Adeyemo, Deputy Secretary, U.S. Department of the Treasury, requesting a meeting with the Deputy Secretaries of the CFIUS member agencies (the "CFIUS Deputies").

10.     Attached hereto as "Exhibit I" is a true and correct copy of the February 25, 2023 letter from Erich Andersen, Petitioners' General Counsel, to The Honorable Wally Adeyemo and The Honorable Lisa Monaco, Deputy Attorney General, U.S. Department of Justice, requesting a meeting with the CFIUS Deputies.

11.     Attached hereto as "Exhibit J" is a true and correct copy of the March 2023 email exchange between David Fagan and Michael Leiter and Brian Reissaus, Deputy Assistant Secretary for Investment Security Operations, Department of Justice, regarding a meeting to continue discussions following a call between representatives of CFIUS and counsel for Petitioners' on March 6, 2023.

12.    Attached hereto as "Exhibit K" is a true and correct copy of the April 27, 2023 email from David Fagan and Michael Leiter to Brian Reissaus and other Treasury and Department of Justice representatives to CFIUS, regarding an update on conversations between representatives of CFIUS and counsel for Petitioners on March 6 and March 23, 2023.

13.    Attached hereto as "Exhibit L" is a true and correct copy of a presentation on the draft NSA and next steps delivered to CFIUS on May 23, 2023.

14.    Attached hereto as "Exhibit M" is a true and correct copy of a presentation on the draft NSA and next steps delivered to CFIUS on September 8, 2023.

15.    Attached hereto as "Exhibit N" is a true and correct copy of the April 1, 2024 letter from David Fagan and Michael Leiter to David Newman, Principal Deputy Assistant Attorney General for National Security at the U.S. Department of Justice.

16.    Attached hereto as "Exhibit O" is a true and correct copy of a document published by the U.S.-China Economic and Security Review

Commission on April 14, 2023, entitled "Shein, Temu, and Chinese e-Commerce: Data Risks, Sourcing Violations, and Trade Loopholes."

17.    Attached hereto as "Exhibit P" is a collection of true and correct copies of the following publications including statements made by legislators about Petitioners, the TikTok application, or the Protecting Americans from Foreign Adversary Controlled Applications Act:

- Transcript of Interview with Rep. Mike Gallagher, Fox News (Nov. 16, 2023)

- House Comm. on the Chinese Communist Party, Press Release, Gallagher, Bipartisan Coalition Introduce Legislation to Protect Americans from Foreign Adversary Controlled Applications, Including TikTok (Mar. 5, 2024)

- Transcript of Interview with Reps. Mike Gallagher and Krishnamoorthi, CNN (Mar. 7, 2024)

- Sen. Tom Cotton (@SenTomCotton), X [https://perma.cc/UY6H-4ZCY] (Mar. 10, 2024)

- Transcript of Interview with Rep. Raja Krishnamoorthi, Meet the Press (Mar. 12, 2024)

- Sapna Maheshawri et al., House Passes Bill to Force TikTok Sale from Chinese Owner or Ban the App, N.Y. Times (Mar. 13, 2024)

- Transcript of Interview with Sen. Mark Warner, Fox News (Mar. 14, 2024) (excerpts)

○ Transcript of Interview with Rep. Mike Gallagher, Fox News (Mar. 16, 2024)

○ Jane Coaston, What the TikTok Bill Is Really About, According to a Leading Republican, N.Y. Times (Apr. 1, 2024)

○ Sapna Maheshwari et al., 'Thunder Run': Behind Lawmakers' Secretive Push to Pass the TikTok Bill, N.Y. Times (Apr. 24, 2024)

○ Transcript of Keynote Conversation Between Secretary of State Anthony Blinken and Sen. Mitt Romney, McCain Institute (May 3, 2024) (excerpts)

○ Prem Thakker et al., In No Labels Call, Josh Gottheimer, Mike Lawler, and University Trustees Agree: FBI Should Investigate Campus Protests, The Intercept (May 4, 2024) (excerpts)

○ Transcript of Interview with Rep. Elise Stefanik, Maria Bartiromo (May 5, 2024) (excerpts)

○ Sen. John Fetterman (@SenFettermanPA), X [https://perma.cc/2BW9-Z78H] (May 7, 2024)

18.    Attached hereto as "Exhibit Q" is a true and correct copy of an article from the New York Times from August 29, 2020, entitled "TikTok Deal Is Complicated by New Rules From China Over Tech Exports."

19.    Attached hereto as "Exhibit R" is a true and correct copy of an article from Xinhua News Agency from August 30, 2020, entitled

"Planned TikTok Deal Entails China's Approval Under Revised Catalogue: Expert."

20.     Attached hereto as "Exhibit S" is a true and correct copy of a letter sent by Senate Majority Leader Charles E. Schumer and dated April 5, 2024.

21.     Attached hereto as "Exhibit T" is a true and correct copy of an article from Newsweek from April 17, 2024 entitled "Mike Johnson's Letter Sparks New Flood of Republican Backlash."

22.     Attached hereto as "Exhibit U" are true and correct copies of a webpage published by the European Commission, which provides an overview of the Regulation (EU) 2022/2065 of the European Parliament and of the Council of 19 October 2022 on a Single Market For Digital Services and amending Directive 2000/31/EC (Digital Services Act), and excerpts from that Act.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this day June 18, 2024.

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut

7
**APP-154**

# Exhibit A

**THREAT POSED BY TIKTOK**
(Department of Justice – March 6, 2024)

- **National security risk.** TikTok and its parent company ByteDance present key national security concerns.

  - ***Data Security.*** TikTok collects tremendous amounts of sensitive data. TikTok also collects substantial back end data that may be proprietary, which may be available only to TikTok—and those with whom TikTok shares it. This is not publicly available data and can include customer information like name, age, phone number, and email address. It may also include IP address and approximate location, as well as other, unknown categories of personal data.[1]

  - ***PRC Influence.*** TikTok's content selection relies on a proprietary PRC-based algorithm, creating the potential for the PRC to influence content on TikTok—without United States visibility.

  - ***Application Security.*** TikTok's source code and some operations are based in the PRC, which creates the potential for the PRC to exploit them for other potentially malign uses.

- **Why does this matter?** Working through ByteDance, the PRC could use TikTok to access data on millions of U.S. users and control the software on millions of U.S. devices.

  - The PRC government leads the world in using surveillance and censorship to keep tabs on its populations, repress dissent, and counter perceived threats abroad. Its national security law requires any company doing business in China to make its data accessible to the PRC government and to support its intelligence efforts. Any such cooperation must remain secret, limiting visibility into the extent of data shared with PRC entities.

  - News reports have warned that ByteDance employees in China used TikTok to repeatedly access U.S. user data and track multiple journalists covering the company.[2]

  - The ability to weaponize data and conduct sophisticated influence campaigns will only advance over time, as artificial intelligence enables new capabilities. Given the sophistication of TikTok's PRC-based algorithm, it would be difficult to detect malicious changes to it.

- **What to do about it?** The ultimate goal is to protect Americans' data security and our national security. To achieve that goal, any legislative solution would need to (1) separate TikTok the company from Beijing and its PRC-based parent company and (2) separate the data TikTok collects, its algorithm, and source code from Beijing. If these conditions are not met—whether through divestment or some other means—Beijing will continue to have the authority to demand ByteDance hand over sensitive personal data and intellectual property of its U.S. TikTok users, likely without those users' awareness.

  - ***Our existing laws (IEEPA, CFIUS) have limits that make it challenging to effectuate that separation and fully address the national security risks.***

  - We would be in a stronger legal position if any new legislation authorizes the government to order divestment and/or other alternatives, not just impose a ban. In addition, an orderly divestment of TikTok from the PRC would give Americans secure ownership of their data, including posts, photos, and videos, while minimizing the disruption to the over 100 million TikTok accounts in the United States.

- **What about American apps?** Because ByteDance is headquartered in Beijing, TikTok is subject to the control of the PRC government in a way that American social media apps are not. That puts TikTok's American users at risk. While a broader conversation may be warranted about the collection of data by American social media companies, that conversation is separate from the national security risk posed by social media apps controlled—directly or indirectly—by foreign governments like the PRC that are known for their surveillance and censorship. The Department stands ready to provide technical assistance to Congress on legislation addressing other concerns related to social media apps, including concerns related to the safety of our children.

---

[1] *See* Brian Fung, *TikTok collects a lot of data. But that's not the main reason officials say it's a security risk*, CNN (Mar. 24, 2023), https://www.cnn.com/2023/03/24/tech/tiktok-ban-national-security-hearing (also mentioning contact lists, messages, biometric identifiers, keystroke patterns, and information gathered from interaction with the app, such as user-generated content, interests, preferences, and associated metadata); Geoffrey A. Fowler, *Is it time to delete TikTok?  A guide to the rumors and the real privacy risks*, WASH. POST (July 13, 2020), https://www.washingtonpost.com/technology/2020/07/13/tiktok-privacy.

[2] *E.g.,* Emily Baker-White, *EXCLUSIVE: TikTok Spied On Forbes Journalists*, FORBES (Dec. 22, 2022), https://www.forbes.com/sites/emilybaker-white/2022/12/22/tiktok-tracks-forbes-journalists-bytedance.

**APP-156**

# Exhibit B

## Redacted Version

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

## DRAFT NATIONAL SECURITY AGREEMENT

This NATIONAL SECURITY AGREEMENT ("**Agreement**") is made as of [date] (the "**Effective Date**"), by and among: (i) ByteDance Ltd., a Cayman Islands exempted company ("**ByteDance**"); (ii) TikTok Ltd., a Cayman Islands exempted company ("**TikTok Ltd.**"); (iii) TikTok Inc., a California corporation ("**TikTok Inc.,**" and together with ByteDance, TikTok Ltd., and, upon its joinder to this Agreement, TikTok U.S. Data Security Inc. ("**TTUSDS**"), the "**Transaction Parties**"); and (iv) [•], (together, the "**CFIUS Monitoring Agencies**," or "**CMAs**," and the CMAs together with the Transaction Parties, the "**Parties**") on behalf of the Committee on Foreign Investment in the United States ("**CFIUS**").

### RECITALS

WHEREAS, CFIUS received written notification, dated May 27, 2020, including all information and documentary materials subsequently submitted in connection therewith, pursuant to Section 721 of the Defense Production Act of 1950, as amended ("**Section 721**"), of a transaction that was the subject of CFIUS Case 20-100;

WHEREAS, the transaction involved the merger of a wholly owned subsidiary of ByteDance with and into musical.ly ("**Musical.ly**"), a Cayman Islands exempted company, on November 23, 2017 (the "**Transaction**");

WHEREAS, CFIUS determined that the Transaction constituted a "covered transaction" for purposes of Section 721;

WHEREAS, CFIUS undertook a review and investigation of the effects of the Transaction on the national security interests of the United States, including a risk-based analysis, as required by Section 721, and determined that there were risks to the national security of the United States that arose as a result of the Transaction;

WHEREAS, CFIUS informed ByteDance, by a letter dated July 30, 2020, that CFIUS had not identified any mitigation options that would resolve CFIUS's concerns regarding the national security risks arising from the Transaction;

WHEREAS, pursuant to Section 721, CFIUS referred the Transaction to the President of the United States;

WHEREAS, the President of the United States determined that provisions of law, other than Section 721 and the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), do not provide adequate and appropriate authority to protect the national security of the United States;

WHEREAS, the President of the United States issued the Order of August 14, 2020, Regarding the Acquisition of Musical.ly by ByteDance Ltd. (85 Fed. Reg. 51,297 (Aug. 19, 2020)) ("**August 14 Order**") prohibiting the acquisition by ByteDance of Musical.ly to the extent that Musical.ly or any of its assets is used in furtherance or support of, or relating to, Musical.ly's

**APP-158**

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

activities in interstate commerce in the United States ("**Musical.ly in the United States**"), prohibiting ByteDance's direct or indirect ownership of any interest in Musical.ly in the United States, and in order to effectuate the August 14 Order, on such written conditions as CFIUS may impose, requiring ByteDance, its subsidiaries, affiliates, and Chinese shareholders to divest all interests and rights in: (i) any tangible or intangible assets or property, wherever located, used to enable or support ByteDance's operation of the TikTok application in the United States, as determined by CFIUS; and (ii) any data obtained or derived from TikTok application or Musical.ly application users in the United States (clauses (i) and (ii), collectively, the "**Divestment**");

WHEREAS, the August 14 Order authorizes CFIUS, until such time as the Divestment is completed and verified to the satisfaction of CFIUS, to implement measures it deems necessary and appropriate to verify compliance with the August 14 Order and to ensure that the operations of the TikTok application are carried out in such a manner as to ensure protection of the national security interests of the United States;

WHEREAS, ByteDance filed a petition for review of the August 14 Order and the related CFIUS actions in the U.S. Court of Appeals for the District of Columbia Circuit on November 10, 2020 (the "**Petition**"), and the adjudication of such action has been held in abeyance pending ongoing discussions with CFIUS;

WHEREAS, without admission of fault or liability, ByteDance and the CMAs, on behalf of CFIUS, are entering into this Agreement with the understanding that this Agreement will resolve the findings and concerns reflected in the August 14 Order, including the aforementioned Petition; and

WHEREAS, each of the Transaction Parties as of the Effective Date affirms that it is acknowledging and entering into this Agreement with the understanding that: (i) there is no presumption that a waiver or exception will be granted to any provision of this Agreement; and (ii) failure to abide by this Agreement is subject to all remedies available to the U.S. Government ("**USG**"), including those stated herein;

NOW, THEREFORE, pursuant to applicable law, including Section 721 and the August 14 Order, the CMAs, acting on behalf of CFIUS, hereby enter into this Agreement with the Transaction Parties:

**ARTICLE I**

**DEFINITION OF TERMS**

Definitions.  As used in this Agreement, capitalized terms shall be defined as set forth below; *provided* that capitalized terms used in this Agreement and not defined in this Article I shall have the meanings assigned to them elsewhere in the Agreement:

1.1    "**Access**" means to, or the right or ability to: (1) enter a physical space ("**Physical Access**"); or (2) obtain, read, copy, edit, divert, release, affect, alter the state of, or otherwise

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

view the subject data or systems in any form, directly or indirectly, whether remotely or electronically, including through information technology ("**IT**") systems, cloud computing platforms, networks, security systems, software, and hardware ("**Logical Access**").  Access shall be construed broadly to include rather than exclude considered conduct.

1.2     "**Affiliate**" or "**Affiliates**" means, with respect to a specified Person, another Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with the Person specified; *provided* that for purposes of this Agreement, (i) TTUSDS and its Personnel shall not be considered Affiliates of ByteDance, and (ii) third-party shareholders of ByteDance also shall not be considered Affiliates of ByteDance.

1.3     "**Architecture Diagrams**" means one or more high-level outlines, using functional blocks and line illustrations for graphical description, of the end-to-end system concept and relationships, constraints, and boundaries between components for or supporting the TikTok U.S. App or TikTok U.S. Platform and that include detailed explanations or annotations identifying: (1) operational functionality; (2) ownership, control, and Logical Access rights, capabilities, and limitations; and (3) system input and output capabilities and limitations.

1.4     "**CFIUS Restricted Persons**" means, wherever located: (1) the government of any country identified in 22 C.F.R. §§ 126.1(d)(1) and (2) (each, a "**CFIUS Restricted Country**") or any department, agency, or instrumentality thereof; (2) any Person organized, domiciled, headquartered, or with its principal place of business in a CFIUS Restricted Country; (3) any natural Person with nationality of a CFIUS Restricted Country who is not also (a) a U.S. citizen, (b) lawfully admitted for permanent residence as defined by 8 U.S.C. § 1101(a)(20), or (c) a protected individual as defined by 8 U.S.C. § 1324b(a)(3); or (4) any natural Person working or residing in a CFIUS Restricted Country.  CFIUS Restricted Persons include any Person who, to the best of the Transaction Parties' knowledge based on information reasonably available to them, is owned, Controlled by, or acting on behalf of a CFIUS Restricted Person; *provided, however*, that for purposes of this Agreement, TTUSDS shall not be considered a CFIUS Restricted Person.

1.5     "**Content Delivery Network**" or "**CDN**" means servers and related infrastructure that is used for the delivery of static and live content to the TikTok U.S. App (including livestreaming and communication services) that require geographical distribution to address latency issues and cannot reside exclusively within the TTP's secure cloud infrastructure.

1.6     "**Content Promotion and Filtering**" means the promotion or filtering of content on the TikTok U.S. App outside the context of the Recommendation Engine, either through human intervention or technical measures, including relevant algorithms, rules, logic and guidelines.

1.7     "**Control**" (including the terms "**Controlled by**" and "**under common Control with**") means the power, direct or indirect, whether or not exercised, to determine, direct, or decide important matters affecting a Person, whether by ownership of equity interests, contract, or otherwise.

3

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

1.8    "**Creator**" means a TikTok U.S. User who has a contractual relationship with TikTok Inc. or one of its Affiliates (other than contractual relationships applicable to all TikTok U.S. Users, e.g., acceptance of the Terms of Service) for the purpose of promoting the individual or his or her brand, to earn revenue from his or her creative output, or for another promotional purpose that is intended to advance the commercial interests, following, or brand of the individual.

1.9    "**Data Flow Diagrams**" means one or more high-level outlines, using functional blocks and line illustrations for graphical description and detailed explanation, of the end-to-end flow of data to support or operate the TikTok U.S. App or TikTok U.S. Platform, including what data or information will be input and output from the system, where the data or information will come from and go to, and where the data or information will be stored.  Data Flow Diagrams shall also identify: (1) the operation performed; and (2) ownership, control, and Logical Access rights, capabilities, and limitations.

1.10    "**Dedicated Transparency Center**" or "**DTC**" means physical facilities, processing resources, and network storage that are established by ByteDance in the DTC Approved Countries for the express purpose of enabling security inspections, reviews, and verification of the Source Code and Related Files by TTUSDS, the TTP, and other third parties pursuant to this Agreement.

1.11    "**Excepted Data**" means each of the following:

(1)    data that Creators affirmatively authorize to be shared, or otherwise initiate the sharing, with TikTok Inc. or its Affiliates for the purpose of advancing the Creators' commercial position on the TikTok U.S. App;

(2)    data fields in the formats specified in Annexes A and B hereto that are: (i) categories of engineering and business data metrics or (ii) categories of interoperability data, respectively;

(3)    data fields in the formats specified in Annex C that are categories of e-commerce data for transactions conducted through the TikTok U.S. App and TikTok U.S. Platform ("**E-Commerce Data**"), *provided* that:

(i)    the data is necessary for commercial purposes related to the sale of the goods and services initiated by the TikTok U.S. User, including the data required to be shared with third parties involved in the transaction;

(ii)    prior to the use of said data as E-Commerce Data, a TikTok U.S. User is notified that such data may be shared outside the United States with ByteDance and affiliates for the purposes described in the aforementioned subparagraph; and

(iii)    after one (1) year from the date of sale, E-Commerce Data shall be maintained exclusively by TTUSDS except when the data is required to fulfill an

4

**APP-161**

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

authorized e-commerce function as described in Annex C, which may be modified in consultation with the Security Committee through a protocol approved by the CMAs;

(4)    hashes of username, phone number, email address, or OpenID, solely for the purpose of determining whether a user should be routed to the TikTok U.S. Platform, shall not be considered Protected Data; and

(5)    additional categories of data, as approved by the CMAs, in their sole discretion pursuant to Section 11.1

1.12    "**Executable Code**" means the binary, machine-readable Software code derived from Source Code and Related Files.

1.13    "**Existing Network Diagram**" means a diagram providing a complete description of the Transaction Parties' network topology, router and server technology of its U.S. network and any U.S. networks of its Affiliates for operating or supporting the TikTok U.S. App or TikTok U.S. Platform as of the Effective Date.

1.14    "**Key Management**" means any Personnel involved in the leadership of TTUSDS, including the general manager, president, chief executive officer, chief information officer, chief technology officer, chief operating officer, general counsel, or equivalent positions (to the extent that such positions exist), such other officers who directly report to the TTUSDS Board or the TTUSDS general manager or equivalent, security leadership roles, and any Personnel of TTUSDS designated as Key Management by the CMAs in their sole discretion pursuant to Section 5.1.

1.15    "**Lawful U.S. Process**" means U.S. federal, state, or local orders or authorizations, and other orders or legal process, statutory authorizations, or certifications from U.S. federal, state, or local law enforcement officials for Access to or disclosure of information, user communications, or content.

1.16    "**Malicious Code**" means code that facilitates the circumvention of this Agreement, facilitates surveillance by unauthorized parties, or delivers nefarious applications or programs to the devices of TikTok U.S. Users; and/or software or firmware intended to perform an unauthorized process that will have adverse impacts on the confidentiality, integrity, or availability of a system including a virus, worm, trojan horse, spyware, forms of adware, or any other code-based entity that infects a host.

1.17    "**Master Services Agreement**" or "**MSA**" means the master services agreement among ByteDance, TTUSDS, and the TTP (the first TTP being Oracle Corporation ("**Oracle**")).

1.18    "**NIST**" means the National Institute of Standards and Technology.

1.19    "**Person**" means any individual or entity.

1.20    "**Personal Identifier Information**" means an individual's: (1) full name (last, first, middle name); (2) all other names and aliases used; (3) business address; (4) country and

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

city of residence; (5) date of birth; (6) place of birth; (7) U.S. Social Security number (where applicable); (8) national identity number, including nationality, date and place of issuance, and expiration date (where applicable); (9) U.S. or foreign passport number (if more than one, all must be fully disclosed), nationality, date and place of issuance, and expiration date and, if a U.S. visa holder, the visa type and number, date and place of issuance, and expiration date; and (10) dates and nature of foreign government and foreign military service (where applicable), other than military service at a rank below the top two non-commissioned ranks of the relevant foreign country.

1.21    "**Personnel**" means any employee, director, officer, manager, agent, contractor, or other representative of an entity, and includes the respective successor or assigns of the foregoing.

1.22    "**Protected Data**" means any data collected from a TikTok U.S. User, including: (1) user data (including username, password, email address, phone number, nickname, birth date or age, profile thumbnail, biographical information, genetic or biometric data or information, appearance, device contacts list, and any third-party social media credentials, list of third-party applications installed on the same device as the TikTok U.S. App, or payment account information); (2) user content (including videos, music, pictures, articles, hashtags, captions, comments, direct messages, and other material uploaded by users including private or unpublished content); (3) behavioral data (including user interaction with content, such as likes given, likes received, not interested, video playtime, shares, follows, followers, block list, favorites, downloads, log-in history, browsing history, search history, keystroke patterns and rhythms, and purchase history); (4) any data that is collected on U.S. user interaction with content on the TikTok U.S. Platform as an input into the Recommendation Engine, including video completion, not interested markings, and video viewing time, ("**User Interaction Data**"); (5) device and network data (including Internet Protocol ("**IP**") address, cookie data, device identifiers, MAC address, mobile carrier, network settings, time zone settings, app and file names, device clipboard, device contacts, device calendars, device media, source of user, Android ID, Apple ID for Advertisers, Google Advertising ID, any other ID for Advertisers, device model and characteristics, operating system ("**OS**"), list of installed apps, system language and region, and geographic location, such as the city, state, country, or GPS coordinates of the device's location); (6) any other personally identifiable information; and (7) any other information provided by or derivative of TikTok U.S. Users in connection with their use of the TikTok U.S. App.  Protected Data includes all of the foregoing even if de-identified, anonymized, or aggregated but shall not include Excepted Data or Public Data. TikTok U.S. Platform systems log data that has had all Protected Data removed by the TTP shall not be Protected Data.

1.23    "**Public Data**" means data that is generally accessible to users of the TikTok U.S. App, including videos, comments, and similar user content and includes each of the following:

(1) feature categories as specified in Annex E;

(2) any content that TikTok U.S. Users affirmatively decide to make public;

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

(3) any hash of Public Data; and.

(4) additional feature categories added pursuant to Section 11.2.

1.24    "**Recommendation Engine**" means the algorithms and related data models used by the TikTok U.S. App and TikTok U.S. Platform to rank content and select content for recommendation to TikTok U.S. Users, including their Source Code and Related Files, such as machine learning processes, statistical weights and parameters, and outputs.  For the avoidance of doubt, the Recommendation Engine does not include the Content Promotion and Filtering algorithms.

1.25    "**Resident Sole U.S. Citizen**" means an individual who holds U.S. citizenship and currently has, and maintains for the duration of his or her responsibilities in connection with this Agreement, residency in the United States as determined by meeting the substantial presence test set forth in 26 U.S.C. § 7701(b)(3), and who is not a citizen of any other country.

1.26    "**Resident U.S. Citizen**" means an individual who holds U.S. citizenship and currently has, and maintains for the duration of his or her responsibilities in connection with this Agreement, residency in the United States as determined by meeting the substantial presence test set forth in 26 U.S.C. § 7701(b)(3).

1.27    "**Software**" means a set of instructions that are generated from source code and used to operate electronic devices and execute specific tasks on a device or a system, including executable code, tools, platforms, and related user manuals.

1.28    "**Source Code and Related Files**" means: (1) all of the actual, human-intelligible Software code, including files, libraries, data schemas and algorithms from ByteDance and its Affiliates used to operate the TikTok U.S. App or TikTok U.S. Platform; and (2) any other documentation, specifications, and artifacts from ByteDance and its Affiliates that are used to design, develop, maintain, modify, operate, improve, or define the behavior of the TikTok U.S. Platform or the TikTok U.S. App. For the avoidance of doubt, "Source Code and Related Files" shall not include (1) or (2) when developed by TTUSDS.

1.29    "**Source Code Review Diagrams**" means one or more high-level outlines, using descriptive functional blocks and line illustrations for graphical description, of the process for reviewing Source Code and Related Files that identify: (1) the operation performed; (2) who among the Transaction Parties or the TTP has obligations or actions to perform; and (3) who among the Transaction Parties or TTP has ownership, Logical Access, or control.

1.30    "**SPAC Transaction**" means the consummation of a transaction or series of transactions (whether by merger, consolidation, or transfer or issuance of equity interests or otherwise) whereby a special purpose acquisition company acquires all of the equity interests of a company (or any surviving or resulting company) or a transaction having a similar effect.

1.31    "**Test Accounts**" means accounts established by the Transaction Parties and verified and approved by the TTP as accounts not associated with any individual for the purpose

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

of testing operational functionality and enabling continued innovation and refinement of user features of the TikTok U.S. App and TikTok U.S. Platform.

1.32    "**TikTok Global App**" means each of the following, in their current and future versions and as the service may evolve:

(1)    the TikTok-branded application(s), including any regional or other jurisdiction-specific versions, that are accessible by the public through an online application store (e.g.*,* one offered by Apple, Google, or Amazon) or an equivalent method of accessing the application and that allows users to consume, create, share, and otherwise interact with content; and

(2)    the TikTok web application(s) that are used to provide web browser users with a TikTok product experience similar to the product experience provided through the TikTok-branded application(s) described in clause (1) of this definition on mobile devices.

1.33    "**TikTok U.S. Application**" or "**TikTok U.S. App**" means all versions of the TikTok Global App provided to, or accessible by, TikTok U.S. Users.

1.34    "**TikTok U.S. Platform**" means the infrastructure, including the IT systems, cloud computing platforms, servers, networks, security systems, and equipment (software and hardware), and all related services and program elements that host, operate, maintain, deploy, support, and run the service and storage facilities for the TikTok U.S. App.  For avoidance of doubt, the Recommendation Engine shall be contained and deployed from within the TikTok U.S. Platform.

1.35    "**TikTok U.S. User**" means:

(1)    an individual signing into the TikTok Global App through an account that, at the time of registration, was attributable to the United States based upon any of the following means (with respect to Sections 1.32(1)(i)–(iv), in order of priority):

(i)    Country code of the device subscriber identity module ("**SIM**") card;

(ii)    IP Address;

(iii)    Mobile Country Code associated with the mobile subscription of the device; or

(iv)    OS/System Region (i.e., obtained via an application programming interface ("**API**") call provided by the OS (either Android or iOS), which returns a country code);

(2)    an individual signing into the TikTok Global App through an account that has been designated a "TikTok U.S. User" account pursuant to Section 11.3; or

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(3)    for users who are not signing into the TikTok Global App with a registered account, a device that first accesses the TikTok Global App from an IP address located in the United States.

(4)    For the avoidance of doubt, Test Accounts shall not be considered TikTok U.S. Users.

1.36    "**Trust and Safety Moderation**" means the removal or downgrading of content or user accounts that are viewable or eligible for recommendation on the TikTok U.S. App, either through technical measures or human review, in order to meet trust and safety guidelines. Trust and Safety Moderation excludes Content Promotion and Filtering.

1.37    "**Trusted Technology Provider**" or "**TTP**" means Oracle in its capacity as the TTP, or any successor TTP, in each case operating under an MSA consistent with the requirements of Section 8.2.

1.38    "**United States**" or "**U.S.**" means the several States, the District of Columbia, and any territory or possession of the United States.

## ARTICLE II

## FORMATION OF TIKTOK U.S. DATA SECURITY INC.

2.1    Formation of TikTok U.S. Data Security Inc. By no later than one-hundred and eighty (180) days following the Effective Date (the "**Operational Date**"), ByteDance shall establish TTUSDS as a wholly owned subsidiary of TikTok Inc. that is incorporated in the United States.  The Transaction Parties may request an extension of the Operational Date no later than one-hundred and sixty-six (166) days following the Effective Date, in which case the Transaction Parties shall submit to the CMAs a written request that includes a summary of the actions taken to date, the reason for the delay, and the requested new Operational Date.  The CMAs may non-object, non-object with predicate conditions, or object to the request for an extension in their sole discretion.  In the event that the CMAs non-object with predicate conditions to the request, the Operational Date shall be extended only if the Transaction Parties meet the specified conditions to the satisfaction of the CMAs in the CMAs' sole discretion.  In the event that the CMAs object to the request, the Operational Date shall not be extended.  If the CMAs do not either object or non-object with predicate conditions to the request within seven (7) days of receipt, the lack of action shall constitute a non-objection.

2.2    Headquarters.  By no later than the Operational Date and at all times thereafter, ByteDance shall ensure that TikTok Inc. and TTUSDS maintain their respective headquarters offices exclusively in the United States and that TTUSDS's offices are not co-located with any offices of ByteDance or its Affiliates without prior written approval of the CMAs.  Immediately following the Operational Date, TTUSDS shall also ensure that its headquarters offices are maintained in the United States and that its offices are not co-located with any offices of ByteDance or its Affiliates without prior written approval of the CMAs.  Following the

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

Operational Date, TTUSDS shall ensure that only its Personnel are responsible for the day-to-day operations and management of TTUSDS's business.

2.3     <u>TTUSDS Joinder</u>.  By no later than the Operational Date, ByteDance shall ensure that TTUSDS joins this Agreement by submitting to the CMAs a joinder agreement signed by a duly authorized representative of TTUSDS that is in the form at Annex D.

2.4     <u>CFIUS Functions</u>.  By no later than the Operational Date and at all times thereafter, the Transaction Parties shall ensure that TTUSDS owns or has a license to, and manages, all of the assets and employs all of the Personnel related to the following aspects of the TikTok U.S. App's operations (collectively, the "**CFIUS Functions**"):

(1)     overseeing the storage and protection of Protected Data, including through TTUSDS's activities pursuant to the MSA;

(2)     facilitating and assisting with the TTP's receipt and inspection of Source Code and Related Files via the DTC, as well as TTUSDS's and the TTP's deployment of Executable Code;

(3)     TikTok U.S. App trust and safety operations and functions that require Access to any Protected Data (except as otherwise expressly provided for in this Agreement);

(4)     content, user, and advertising operations, including Content Promotion and Filtering, that require Access to any Protected Data;

(5)     identifying and implementing remediations for the Recommendation Engine in response to the review by the TTP pursuant to this Agreement;

(6)     overseeing, authorizing, and documenting the sale or transfer of Protected Data to any third parties, to the extent that such sale or transfer is permitted under this Agreement; and

(7)     maintaining primary responsibility for ensuring day-to-day compliance with this Agreement.

2.5     <u>Enabling TTUSDS</u>. By no later than the Operational Date, and to ensure that TTUSDS can effectively and independently perform the CFIUS Functions, ByteDance shall, and shall ensure that its Affiliates:

(1)     take all necessary actions to ensure that all commercial agreements with third parties for the operation and delivery of the TikTok U.S. App and TikTok U.S. Platform are transferred, assigned, licensed, or otherwise contributed, as applicable, to TTUSDS;

(2)     subject to Section 5.4, transfer the employment agreements of all Personnel responsible for performing the CFIUS Functions to TTUSDS;

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(3)    enter into a license and service agreement with TTUSDS, to be developed in coordination with the CMAs and the TTP to ensure that the terms of such license and service agreement are consistent with this Agreement, that:

(i)    ensures TTUSDS has all necessary rights to ByteDance technology, including Source Code and Related Files and all updates thereto, Executable Code, and other Software required to operate and manage the TikTok U.S. App and TikTok U.S. Platform, for the purposes set forth in this Agreement;

(ii)    provides TTUSDS with support to perform the CFIUS Functions; and

(iii)    provides that in the event of a conflict between the terms of such license and service agreement and this Agreement, the terms of this Agreement shall prevail; and

(4)    sub-license to TTUSDS, or arrange for new licenses for TTUSDS to, all third-party Software and technologies for which ByteDance is a licensee that are necessary to operate and manage the TikTok U.S. App and TikTok U.S. Platform.

2.6    Formation and Operational Plan.  ByteDance shall submit a plan to the CMAs within fourteen (14) days following the Effective Date that describes the steps ByteDance will take to:

(1)    ensure that TTUSDS owns or has a license to, and manages, all of the assets and employs all Personnel related to the CFIUS Functions;

(2)    contribute, assign, or license to TTUSDS, as applicable, all assets necessary to comply with this Agreement; and

(3)    ensure that TTUSDS will become operational by the Operational Date, which at a minimum means that TTUSDS can manage its day-to-day operations and perform the CFIUS Functions as set forth in this Agreement separate and apart from ByteDance and its Affiliates.

2.7    TTUSDS Independence.  By no later than the Operational Date and at all times thereafter, ByteDance shall not play any role in or make any attempt to influence, determine, direct, or decide the operations, management, or leadership of TTUSDS, except as otherwise expressly provided for in this Agreement.  ByteDance shall ensure that none of its Affiliates plays any role in or makes any attempt to influence, determine, direct, or decide the operations, management, or leadership of TTUSDS, except as otherwise expressly provided for in this Agreement.

2.8    TTUSDS Funding.  ByteDance shall provide sufficient financial resources to enable TTUSDS to fully perform the CFIUS Functions and fulfill its obligations under this Agreement.  TTUSDS shall promptly notify the Third-Party Monitor and CMAs if TTUSDS

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

believes, in its sole discretion, that it lacks sufficient funds to perform the CFIUS Functions and fulfill its obligations under this Agreement.  The Transaction Parties shall provide semi-annual updates to the Third-Party Monitor and CMAs regarding the budgeting and funding of TTUSDS.

2.9    Ownership of TTUSDS.  At least seven (7) days prior to entering into any agreement or completing any transaction through which: (1) any Person other than TikTok Inc. will acquire a direct economic or voting interest in TTUSDS; or (2) there will be a greater than five percent (5%) change to the ownership of the indirect economic or voting interests in ByteDance, TikTok Inc., or TTUSDS as of the Effective Date, the Transaction Parties shall provide written notification to the CMAs of the identity of the Person to own the interest, the percentage and nature of the interest to be owned, and all relevant transaction documents and side agreements; *provided, however*, that prior notice of any transaction described in Section 2.9(2) shall not be required if such transaction would not involve a change in the direct economic or voting interests in TikTok Inc., TTUSDS, or any other subsidiary of ByteDance, and ByteDance is a publicly listed company at the time of such transaction.  The Transaction Parties shall also submit to the CMAs a quarterly summary capitalization table of ByteDance identifying all shareholders holding a more than one percent (1%) equity interest or voting interest in ByteDance as of the end of the quarter.

## ARTICLE III

## GOVERNANCE OF TIKTOK U.S. DATA SECURITY INC.

3.1    TTUSDS Board Composition.  The Transaction Parties shall ensure that TTUSDS is at all times governed by a board of directors (the "**TTUSDS Board**") of three (3) directors who: are Resident Sole U.S. Citizens, unless otherwise approved by the CMAs; have no current or prior employment, or contractual, financial, or fiduciary relationship with ByteDance or any of its Affiliates; have strong credentials in national security or extensive experience in IT, cybersecurity, or data security; and have, or are eligible for, a U.S. personnel security clearance (the "**Security Directors**").

(1)    The Transaction Parties shall ensure that the composition of the TTUSDS Board is limited exclusively to the Security Directors.  The Transaction Parties shall designate, subject to CMA non-objection concurrent with the appointment process in Section 3.2, one of the Security Directors as Chair of the TTUSDS Board (the "**TTUSDS Chair**"), and a second Security Director as Chair of the Security Committee established pursuant to Section 3.8.  For the avoidance of doubt, the Transaction Parties may appoint the TTUSDS Chair as chair of the Security Committee.  Subject to CMA approval, the Transaction Parties shall be able to set term limits and/or stagger the terms for each Security Director, the expiration of a Security Director term being treated as a vacancy pursuant to Section 3.09 of the Agreement, including for purposes of triggering the timing requirements for replacements.

3.2    Initial TTUSDS Board Appointments.  The Transaction Parties shall ensure that no Security Director is appointed or otherwise becomes a director without the prior non-objection of the CMAs.  At least [X] days prior to the Operational Date, the Transaction Parties shall submit to the CMAs complete Personal Identifier Information, a *curriculum vitae* or similar

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

professional synopsis, contact information, and any other information requested for each Security Director nominee for the CMAs to assess whether the nominee can effectively perform the functions set forth in this Agreement. The Transaction Parties shall ensure that the CMAs may, at their request, interview the Security Director nominees. If the CMAs do not object in writing within twenty-one (21) days following receipt of all necessary information about the Security Director nominees, as determined by the CMAs in their sole discretion, the lack of action shall constitute a non-objection. If the CMAs object to one or more Security Director nominees, the Transaction Parties shall nominate a different candidate within twenty-one (21) days following receipt of any such objection, subject to the same procedures as the initial nomination. The Transaction Parties shall ensure that a Security Director is appointed for each Security Director position on the TTUSDS Board following the non-objection of the CMAs by no later than the Operational Date. After the Operational Date, if all the board seats are not filled, the Transaction Parties shall ensure that any initial Security Director nominee is appointed within three (3) days following the non-objection of the CMAs. For the avoidance of doubt, the appointment of replacement nominees shall be subject to the terms of Section 3.09 below.

3.3     TTUSDS Voting. The Transaction Parties shall ensure that each Security Director is entitled to cast one (1) vote on each matter presented to the TTUSDS Board and any committee thereof, and that all decisions of the TTUSDS Board and any committee thereof require the affirmative vote of: a majority of the directors in office.

3.4     TTUSDS Quorum. TTUSDS shall ensure that a minimum of two (2) Security Directors, which must include the chair of the Security Committee, are required to be present in order to establish a quorum at any meeting of, or for any action by, the TTUSDS Board or any committee thereof. TTUSDS shall ensure that neither the TTUSDS Board nor any committee thereof convenes or takes any action in the absence of a quorum. TTUSDS shall further ensure that, in the event that the chair of the Security Committee is vacant or otherwise unable to fulfill his or her role, or fails to attend a meeting twice without justification, the Security Directors present and voting select one of the other Security Directors to serve as acting chair of the Security Committee for the purposes of establishing quorum and breaking ties.

3.5     TTUSDS Board Attendance and Meetings. TTUSDS shall ensure that attendance at all meetings of the TTUSDS Board and any committee thereof is limited to the Security Directors, the TTUSDS general manager or equivalent, the TTUSDS General Counsel, the Corporate Secretary of the TTUSDS Board, the Security Officer, the Third-Party Monitor, and such other individuals whose attendance is approved in advance by the CMAs, and, with respect to meetings of the Security Committee, the Technology Officer.

(1)     TTUSDS shall ensure that apart from those individuals expressly permitted to attend meetings of the TTUSDS Board under this Section 3.5, any other observers or attendees at meetings of the TTUSDS Board or any committee thereof are approved in writing in advance by the CMAs. At least seven (7) days in advance of a meeting of the TTUSDS Board or any committee thereof, TTUSDS shall submit a written request to the CMAs of any individual, other than those specifically listed in this Section 3.5, who is proposed to attend the meeting and provide their title, affiliation, and the purpose of their participation.

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(2)     TTUSDS shall ensure that the Security Officer and Third-Party Monitor are given advance notice of, and the opportunity to, participate in all meetings of the TTUSDS Board and any committee thereof in a non-voting observer capacity, and that the Technology Officer participates in all meetings of the Security Committee in a non-voting observer capacity.

(3)     TTUSDS, in conjunction with the Security Committee, shall submit to the Security Officer, Third-Party Monitor, and CMAs: (1) copies of all board and committee materials at least one (1) day prior to any meeting, unless the Security Committee certifies in writing that exceptional circumstances require an emergency meeting of the TTUSDS Board, and in such case TTUSDS shall submit concurrent notice to the Security Officer, Third-Party Monitor, and CMAs; and (2) copies of the complete unredacted meeting minutes no more than seven (7) days following any board or committee meeting.

3.6     <u>Security Director Duties</u>.  The Transaction Parties shall ensure that in exercising their duties, the Security Directors owe fiduciary duties exclusively to the CMAs and TTUSDS; *provided* that the Security Directors shall discharge their duties in a manner that they reasonably believe in good faith to be, in descending order: first, in the national security interest of the United States as determined by the CMAs; and second, where not inconsistent with the national security interest of the United States, in the best interests of TTUSDS, in each case subject to this Agreement.  Following their appointment as Security Directors and for so long as they serve on the TTUSDS Board, TTUSDS shall ensure that none of the Security Directors has any employment, contractual, financial, or fiduciary relationship with ByteDance or any of its Affiliates.  The terms of compensation for the Security Directors, including any benefits or stock incentive awards of any of the Transaction Parties, shall be negotiated between TikTok Inc. and the Security Director and shall be paid by TTUSDS.  The terms of compensation, to include the grant of any stock incentive awards, shall be fixed for the Security Directors' terms.

3.7     <u>Security Committee</u>.  By no later than the Operational Date, the Transaction Parties shall ensure that the TTUSDS Board forms a permanent, board-level committee composed exclusively of the Security Directors to serve as the committee with the full and sole authority to decide all matters related to data security, cybersecurity, and national security for TTUSDS (the "**Security Committee**").  The Transaction Parties shall ensure that the TTUSDS governance documents reflect the Security Committee's responsibilities and provide that such governance documents cannot be further amended to eliminate the Security Committee or modify the Security Committee's rights and responsibilities without the prior written consent of the CMAs.  TTUSDS shall ensure that the presence of at least two (2) Security Directors, including the Security Director who is chair of the Security Committee, is required to establish quorum for the Security Committee and that all meetings of, and action by, the Security Committee include the Security Officer.  TTUSDS shall ensure that the Security Committee:

(1)     serves as the primary liaison between the TTUSDS Board and the CMAs, provides timely responses to inquiries from the CMAs, and maintains availability, upon reasonable notice from the CMAs, for discussions with the CMAs, in each case on matters relating to TTUSDS' governance and compliance with this Agreement;

14

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(2)    oversees the implementation of all policies, procedures, protocols, and other matters relating to the TTUSDS' compliance with this Agreement;

(3)    oversees and periodically reviews TTUSDS' activities in performance of the CFIUS Functions;

(4)    meets regularly, and at least quarterly, to perform its obligations under this Agreement; and

(5)    annually certifies TTUSDS's compliance with this Agreement to the CMAs within seven (7) days of each anniversary of the Effective Date.  Such certification shall be signed by all members of the Security Committee and may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall be deemed to constitute one and the same certification.

3.8    <u>TTUSDS Recordkeeping and Related Certifications</u>.

(1)    TTUSDS shall ensure that the TTUSDS Board prepares and retains all preparatory materials, records, journals, and minutes of all meetings and deliberations of the TTUSDS Board and any committee thereof for inspection by the CMAs for a period of at least five (5) years.

(2)    TTUSDS shall provide to the CMAs, within seven (7) days following a meeting of the TTUSDS Board or any committee thereof:

(i)    all materials provided or used at the meeting, including board presentations and related exhibits, and final versions of any draft materials previously provided;

(ii)    copies of meeting minutes certified by a Security Director to be accurate and complete as to the topics discussed at each meeting of the TTUSDS Board and any committee thereof;

(iii)    a roster of attendees at the meeting; and

(iv)    a signed certification by a Security Director in attendance that the meeting was conducted in accordance with the obligations set forth in this Agreement.

3.9    <u>TTUSDS Director Vacancies</u>.  TTUSDS shall notify the Security Committee, Security Officer, Third-Party Monitor, and CMAs within two (2) days of receiving notice of any Security Director's planned or actual resignation, death, disability, or other circumstance creating a vacancy on the TTUSDS Board.  Within twenty-one (21) days following a vacancy, TikTok Inc. shall nominate an individual to fill such vacancy consistent with the initial appointment process under Section 3.2.

3.10    <u>TTUSDS Director Removal</u>.  The Transaction Parties shall ensure that any removal or replacement of a Security Director is subject to the following processes:

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(1)     The Transaction Parties shall have the right to remove any Security Directors subject to all conditions included herein.  The Transaction Parties shall not remove any Security Director until all of the following conditions are met: (1) TTUSDS has notified the Security Director, the Security Committee, the Security Officer, the Third-Party Monitor, and the CMAs at least twenty (20) days prior to the proposed removal date; (2) TTUSDS has provided a written justification to the CMAs for the removal with the notice provided at least twenty (20) days prior to the proposed removal date; (3) the CMAs have provided a written non-objection to the removal; and (4) a replacement has been nominated consistent with the initial appointment process under Section 3.2.

(2)     The Transaction Parties shall ensure that, should the CMAs provide written notice setting forth their determination (including a written justification for the removal), in their sole discretion, that any director of the TTUSDS Board has, intentionally or through gross negligence, failed to meet his or her obligations or has undermined the effectiveness of this Agreement, the CMAs may direct the Transaction Parties to remove the director and the Transaction Parties shall promptly, and in any event within two (2) days, remove such director. Within twenty-one (21) days following such removal, TikTok Inc. shall nominate a replacement consistent with the initial appointment process in Section 3.2.  The Transaction Parties may, in response to such direction, seek consultations with the CMAs to resolve the concerns associated with any director, which the CMAs may engage in at their discretion but any such consultation shall not toll the deadline to remove such director or nominate a replacement.

(3)     Regardless of whether there is a vacancy among the Security Director positions, the Transaction Parties may, at their discretion, provide the names of up to five (5) nominees to serve as Security Directors for consideration by the CMAs.  The CMAs may notify the Transaction Parties of their provisional approval or disapproval of the nominees to be eligible to serve as Security Directors should a position become vacant.  If the CMAs provide provisional approval, TikTok Inc. shall still be required to formally nominate the potential Security Director pursuant to the initial appointment process in Section 3.2.

3.11   TTUSDS Governance Documents.  ByteDance shall submit draft copies of all governance documents of TTUSDS (e.g., articles of association, bylaws, charter, and any other documents that govern TTUSDS, collectively the "**TTUSDS Governance Documents**") to the CMAs at least fourteen (14) days prior to the Operational Date and from time to time after the Operational Date at the request of the CMAs or prior to any proposed amendment thereto.  The Transaction Parties shall promptly, and in any event within five (5) days following receipt of a request from the CMAs, make any change to such governance documents requested by the CMAs to incorporate the terms of this Agreement, to the CMAs' satisfaction in their sole discretion.

(1)     ByteDance shall ensure that the TTUSDS Governance Documents cover all matters within the authority of TTUSDS shareholder and the TTUSDS Board.  The Transaction Parties shall ensure that the consent of the TTUSDS shareholder is not required for any decision by the TTUSDS Board or any committee thereof, however, the TTUSDS Board shall not have the authority to approve the following material corporate actions without the affirmative consent of the TTUSDS shareholder:

(i)     Corporate and tax structuring and intercompany matters, including requesting TikTok Inc. make capital contributions, determining TTUSDS' annual net profits or net losses for financial accounting and tax purposes, or making profit distributions to TikTok Inc.;

(ii)    Entering into, amending, modifying, renewing, terminating, or waiving any rights under any material agreement or arrangement with the TTP related to the service levels, fees, liability allocations, indemnifications, or such other matters;

(iii)   Corporate policies implemented at TTUSDS establishing the term, compensation and benefits parameters for Key Management Personnel, including the general manager, head of human resources, head of technology, and head of finance, or their equivalents consistent with ByteDance's global corporate policies;

(iv)    Entering into a new material line of business of TTUSDS or its subsidiaries; making any material changes to the scope of any existing lines of business, products, or services of TTUSDS or its subsidiaries; or otherwise making any material change to the purpose or scope of the business as set forth in the Governance Documents;

(v)     Issuance of new equity (including convertible instruments such as options, warrants, and convertible bonds) or any rights to subscribe for any equity (including convertible instruments such as options, warrants, and convertible bonds);

(vi)    Pursuing an initial public offering or a SPAC Transaction or any other financing transaction for TTUSDS or its subsidiaries;

(vii)   Entering into, amending, renewing, or terminating the following transactions, agreements, or arrangements:

(1)     The sale, merger, consolidation, reorganization, dissolution, liquidation, disposal, or winding up in any manner of capital assets or businesses of TTUSDS;

(2)     The merger or acquisition of the assets, equity, or business of another entity, or the issuance of equity to or a joint venture with any third party;

(3)     A material investment, material licensing relationship, or other material strategic relationships in or with any third party;

(4)     (x) Incurring or guaranteeing indebtedness; (y) pledging, mortgaging, leasing, or encumbering the assets of TTUSDS or any of its subsidiaries; and (z) creating or authorizing the creation of any debt security or the issuance of any liens, where the aggregate total of (x)

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

through (z) is greater than five percent (5%) of the TTUSDS annual operating budget for the given year;

        (5)     Any transaction that:

        (A)    Is with a ByteDance competitor listed in Annex F or an Affiliate of a ByteDance competitor listed in Annex F;

        (B)    Results in any material negative deviation from the standards for the TikTok U.S. App and TikTok U.S. Platform set by ByteDance; *provided* that such standards are consistent with this Agreement in all respects as determined by the CMAs or the Security Committee as applicable; or

        (C)    Violates in any material respect any contracts and license agreements among the Transaction Parties and their respective subsidiaries.

        (viii)   Waiver of litigation rights, or agreement of settlement or admission of liability, fault, or noncompliance of TTUSDS or its subsidiaries;

        (ix)    Settling any litigation or other proceedings (a) for an amount exceeding [$1 million] individually or [$10 million] in the aggregate per calendar year; or (b) that involve the grant of an injunction or other equitable relief or otherwise impose any material restriction on the Transaction Parties' business and their respective subsidiaries;

        (x)    Making any material change to the accounting policies, practices, or methodologies for TTUSDS or its subsidiaries, unless otherwise required by law;

        (xi)    The filing or making of any petition under the U.S. federal bankruptcy laws or any similar law or statute of any state or any foreign country;

        (xii)   Making any changes to the existing legal rights or preferences of the shareholder interests, rights, preferences, or privileges in the ownership and governance documents of TTUSDS or any of its subsidiaries;

        (xiii)   To the extent not otherwise covered above, making any amendments to the ownership and governance documents of TTUSDS or any of its subsidiaries;

        (xiv)   The creation of any new direct or indirect subsidiary of TTUSDS or issuance or transfer of equity of any direct or indirect subsidiary of TTUSDS, in each case, other than the creation of TTUSDS itself or of a wholly owned direct or indirect subsidiary of TTUSDS;

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(xv)    adoption of the overall annual budget and key performance indicators ("**KPIs**"), but only if the budget or KPIs, as applicable, do not meet the following requirements:

(1)    The budget and KPIs are within the parameters set by the TikTok, Inc. Board, and presented to and discussed with the TTUSDS Board and management; provided that the TTUSDS board confirms that the budget parameters provide sufficient funding for TTUSDS consistent with Section 2.8;

(2)    TTUSDS has provided the TikTok, Inc. Board a reasonable opportunity to review the budget and KPIs prior to TTUSDS Board approval; and

(3)    The budget's assumptions and projections are reasonable and consistent with the performance of TTUSDS as it develops.

(xvi)    Such other matters as may be added to this list with the prior written approval of the CMAs in their sole discretion.

(2)    The TTUSDS Shareholder shall be entitled to all relevant and material information necessary to make an informed decisions regarding any action or decision taken in connection with Paragraph 3.13(1) except information that the Security Committee determines in their sole discretion to be information that cannot be shared consistent with this Agreement including those matters relating to data security, cybersecurity or national security ("**Confidential Matters**").

(3)    The TTUSDS Governance Documents shall also provide that:

(i)  the TTUSDS Board shall consult with the TikTok Inc. Board on determining compensation and benefits of Key Management Personnel, including the general manager, head of human resources, head of technology, and head of finance, or their equivalents.  For the avoidance of doubt, the TTUSDS Board shall retain the final authority to determine the compensation and benefits of Key Management Personnel; and

(ii)  the TTUSDS Board shall adopt and maintain policies that are materially consistent with corresponding policies that are produced and maintained at by the TikTok, Inc. Board of Directors to ensure consistency in operations, including, by way of example, budget planning and reporting, key performance indicators, principles on finance operations, principles on compliance and governance, principles on tax, and principles on auditing, provided such policies, as adopted by the TTUSDS Board, are consistent with this Agreement.

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

## ARTICLE IV

## GOVERNANCE OF TIKTOK INC.

4.1    <u>TikTok Inc. Board Composition</u>.  ByteDance and TikTok Ltd. shall ensure that TikTok Inc., at least thirty (30) days prior to the Operational Date, and at all times thereafter, is governed by a board of directors (the "**TikTok Inc. Board**") of at least five (5) directors consistent with the following composition:

(1)    at least two (2) directors who are not CFIUS Restricted Persons, unless otherwise approved by the CMAs, who are employed by ByteDance or its Affiliates (the "**Inside Directors**");

(2)    at least two (2) directors who are Resident U.S. Citizens or citizens of other countries of the National Technology and Industrial Base, as defined by 10 U.S.C. § 2500 ("**NTIB**"), unless otherwise approved by the CMAs, who are not employed by ByteDance or its Affiliates (the "**Outside Directors**"); and

(3)    the TTUSDS Chair appointed pursuant to Section 3.1.

4.2    <u>Business of TikTok Inc.</u> By no later than the Operational Date, ByteDance and TikTok Inc. shall each ensure that the TikTok Inc. Board is responsible for the governance of the business related to the TikTok U.S. App and TikTok U.S. Platform other than those related to the CFIUS Functions, which shall be solely owned or licensed, and managed, by TTUSDS, and except as otherwise expressly provided for in this Agreement.  Other than as they relate to compliance with this Agreement, the TikTok Inc. Board shall have exclusive management authority over the following matters:

(1)    Business strategy for the United States;

(2)    Coordination between the TikTok business in the United States with the rest-of-world TikTok business;

(3)    Product feature development for the United States;

(4)    Internal tool development to be used and deployed in the TikTok U.S. Platform;

(5)    TikTok U.S. User experience, including user feedback;

(6)    U.S. trust and safety;

(7)    Setting standards and measuring for the TikTok business in the United States the following: core business practices, policies, and metrics, including human resources policies, KPIs, employee morale and sentiment, and compensation policies;

**APP-177**

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

(8)     Reviewing recruitment, hiring or termination, compensation, benefits, and performance of senior officers and managers for the United States to ensure consistency with the rest of the world and company policies;

(9)     Setting facilities and real estate standards for consistency with rest-of-world real estate practices;

(10)    U.S. financials and other related matters, including:

(i)     Revenue, operating expenses, and related metrics;

(ii)    Audits and reporting;

(iii)   Budgets and forecast;

(iv)    Treasury, cash, and debt;

(v)     Taxes;

(vi)    Valuation;

(11)    Legal compliance matters unrelated to this Agreement; and

(12)    such other matters that are necessary to give effect to the aforementioned listed items.

4.3    <u>TikTok Inc. Board Voting and Quorum Requirements</u>.

(1)     TikTok Inc. shall ensure that each director of the TikTok Inc. Board is entitled to cast one (1) vote on each matter presented to the TikTok Inc. Board and any committee thereof, and that all decisions of the TikTok Inc. Board and any committee thereof require the affirmative vote of a majority of the directors in office.

(2)     TikTok Inc. shall ensure that the presence of the TTUSDS Chair is required in order to establish a quorum at any meeting of, or for any action by, the TikTok Inc. Board or any committee thereof, unless the TTUSDS Chair has received written notice of such meetings and twice failed to attend without reasonable justification.  Prior to holding any meeting of the TikTok Inc. Board without the presence of the TTUSDS Chair, TikTok Inc. shall notify the CMAs of the TTUSDS Chair's failure to attend and provide the relevant justification (if any).  Whether the TTUSDS Chair's justification for his or her failure to attend constitutes "reasonable justification" for purposes of Section 4.3(2) shall be in the sole discretion of the CMAs.  If the CMAs do not object in writing within ten (10) days following receipt of the TTUSDS Chair's justification for his or her failure to attend, the lack of action shall constitute a non-objection.  TikTok Inc. shall ensure that neither the TikTok Inc. Board nor any committee thereof convenes or takes any action in the absence of a quorum.

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(3)    TikTok Inc. shall ensure that the affirmative vote of the TTUSDS Chair is required for any decision of the TikTok Inc. Board or any committee thereof that involves any of the following with respect to TikTok Inc. or its subsidiaries, each as determined in accordance with the TTUSDS Chair's reasonable discretion and in conformance with said Director's fiduciary duties:

(i)    matters dealing with the relationship with or responsibilities of the TTP, each solely as they relate to this Agreement; and

(ii)    issues that directly impact the Transaction Parties' compliance with this Agreement.

4.4    <u>Board Conflicts</u>.  The Transaction Parties shall ensure the business and affairs of TikTok Inc. and TTUSDS are managed, and all corporate powers are exercised by or under the direction of, the TikTok Inc. Board and TTUSDS Board, respectively.  If during a meeting of the TikTok Inc. Board, the TTUSDS Chair objects to a topic of discussion, the matter shall be tabled until the Security Committee can convene to determine whether the matter appropriately falls within the scope of Section 2.4 or 4.2.

4.5    <u>TTUSDS Chair Duties</u>.  ByteDance, TikTok Ltd., and TikTok Inc. shall ensure that in exercising his or her duties, the TTUSDS Chair owes fiduciary duties exclusively to the CMAs and TikTok Inc.; *provided* that the TTUSDS Chair shall discharge his or her duties in a manner that he or she reasonably believe in good faith to be, in descending order: first, in the national security interest of the United States as determined by the CMAs; and second, where not inconsistent with the national security interest of the United States, in the best interests of TikTok Inc., in each case subject to this Agreement.

4.6    <u>TikTok Inc. Recordkeeping</u>.  TikTok Inc. shall ensure that the TikTok Inc. Board prepares and retains all records, journals, and minutes of all meetings and deliberations of the TikTok Inc. Board and any committee thereof for a period of at least five (5) years for inspection by the CMAs.

4.7    <u>TTUSDS Chair Vacancy and Removal</u>.

(1)    The TTUSDS Chair shall be subject to the same vacancy and removal provisions as in his or her capacity as a Security Director of the TTUSDS Board in accordance with Section 3.10.

(2)    The TTUSDS Chair may be removed from the TikTok Inc. Board on the same terms and conditions as set forth for Security Directors in Section 3.10.  In the event of a vacancy in the TTUSDS Chair position, ByteDance shall select one (1) of the remaining Security Directors of the TTUSDS Board to assume the TTUSDS Chair position on the TikTok Inc. Board, subject to prior notice to and non-objection by the CMAs.

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

(3)     For the avoidance of doubt, the lapse of a term limit for any TTUSDS Chair of the TikTok Inc. Board shall trigger the processes under this Section 4.7 for the replacement of such TTUSDS Chair, including the timing requirements for replacements.

4.8     <u>TTUSDS Board and TikTok Inc. Board Coordination</u>.  Notwithstanding any other provision of this Agreement, the TTUSDS Board and TikTok Inc. Board shall be permitted to meet jointly to facilitate discussion of any matters not prohibited by this Agreement.  Until the one-year anniversary of the Operational Date, the TTUSDS Board and TikTok Inc. Board are recommended to meet (in-person or virtually) monthly.  Following the first anniversary of the Operational Date, the TTUSDS Board and TikTok Inc. Board are recommended to meet quarterly.

**ARTICLE V**

**MANAGEMENT OF TTUSDS**

5.1     <u>Key Management</u>.

(1)     Within seven (7) days following the appointment of the TTUSDS Board, TTUSDS shall ensure that the TTUSDS Board nominates individuals to serve as Key Management, and concurrently shall submit to the CMAs a list of such individuals, full internal organizational charts, and any other details reasonably requested by the CMAs for the CMAs to designate, in their sole discretion, any Personnel as Key Management.  If the CMAs designate any Personnel of TTUSDS as Key Management, TTUSDS shall ensure that such Personnel are subject to the nomination, appointment, removal, and replacement processes for Key Management under Sections 5.1 and 5.2.  TTUSDS shall ensure that all nominees for Key Management are Resident U.S. Citizens and hold no position within ByteDance or any of its Affiliates, in both cases for the duration of his or her service as Key Management and unless otherwise approved by the CMAs.

(2)     The appointment of any individual as Key Management shall be subject to the prior non-objection of the CMAs.  For each nominee, TTUSDS shall submit complete Personal Identifier Information, a *curriculum vitae* or similar professional synopsis, contact information, and any other information requested by the CMAs to ensure that the nominee can effectively perform the functions set forth in this Agreement.  TTUSDS shall ensure that each nominee is available for an interview with the CMAs, at their request.  If the CMAs do not object in writing within twenty-one (21) days following receipt of all necessary information about a nominee, as determined by the CMAs in their sole discretion, the lack of action shall constitute a non-objection.  If the CMAs object to one or more nominees, TTUSDS shall ensure that the TTUSDS Board nominates a different candidate within twenty-one (21) days following receipt of any such objection, subject to the same procedures as the initial nomination.

(3)     TTUSDS shall ensure that the TTUSDS Board appoints each individual to serve as Key Management within three (3) days following the designation by or non-objection of the CMAs.  TTUSDS shall ensure that each of the Key Management maintains his or her primary work location at a TTUSDS office location in the United States, that Key Management

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

are the senior officers with authority over the TikTok U.S. App and TikTok U.S. Platform in the United States, and that neither Key Management nor their subordinates report to any Personnel of ByteDance or its Affiliates.

5.2    Removal of Key Management.  TTUSDS shall submit prior written notice to the CMAs before removing, replacing, or appointing any Key Management and shall not effect any such change in the event that the CMAs object in writing within fourteen (14) days following such notice; *provided, however*, that TTUSDS may immediately remove any Key Management for cause, subject to compliance with applicable law and the governance documents of TTUSDS, in which case TTUSDS shall notify the CMAs within one (1) day of such removal with an explanation of the cause.  TTUSDS shall not remove any Key Management for his or her actual or attempted efforts to ensure compliance with this Agreement.  TTUSDS shall ensure that the replacement and appointment of any Key Management are subject to the same process as the initial nomination and appointment process under Section 5.1.

5.3    Hiring Protocols.

(1)    Existing ByteDance Personnel.  The Transaction Parties shall notify the CMAs of any ByteDance or Affiliate Personnel, including a description of their job responsibilities, who (a) are not Resident U.S. Citizens and whose employment will be transferred from ByteDance or any of its Affiliates to TTUSDS, or (b) who may have Access to Protected Data under the Limited Access Protocol, no less than thirty (30) days prior to any such Personnel beginning to work for or support TTUSDS or having Access to Protected Data under the Limited Access Protocol, as relevant.  The CMAs may, within twenty-one (21) days following receipt of such notification, object in writing to such Personnel, in which event TTUSDS shall not employ, independently engage the services of, or accept the transfer of employment contracts for such Personnel.  For the avoidance of doubt, this provision does not apply to Key Management whose appointment, removal, and replacement shall follow the processes under Sections 5.1 and 5.2.

(2)    Newly Hired Personnel.  Within thirty (30) days following the Operational Date, TTUSDS shall develop and implement hiring protocols for onboarding newly hired Personnel (i.e., Personnel other than those originally transferred to or hired by TTUSDS as of the Operational Date) to TTUSDS.  TTUSDS shall ensure that the hiring protocols provide for the vetting of whether the prospective Personnel is a CFIUS Restricted Person or has any current or prior employment, contractual, financial, or fiduciary relationship with ByteDance or any of its Affiliates for a period of one (1) year prior to his or her potential employment or support date.  In the event that such a current or prior relationship exists, TTUSDS shall obtain the CMAs' prior written consent prior to hiring, onboarding, or granting or facilitating Physical Access to facilities or Logical Access to IT systems to such prospective Personnel.  For the avoidance of doubt, this provision does not apply to Key Management whose appointment, removal, and replacement shall follow the processes under Sections 5.1 and 5.2.

(3)    Reporting Lines.  TTUSDS shall ensure that any Personnel transferred from ByteDance or any of its Affiliates to TTUSDS report solely to Key Management (or other

designated Personnel of TTUSDS) and do not report to any Personnel of ByteDance or its Affiliates, consistent with Section 5.1(3).

(4)    Post-Separation.  ByteDance shall not employ, independently engage the services of, or accept the transfer of employment contracts for any current or former employees of TTUSDS (including Key Management) for a period of one (1) year following the employee's separation from TTUSDS without the prior written consent of the CMAs.  ByteDance shall ensure that none of its Affiliates, after conducting due diligence, knowingly employs, independently engages the services of, or accepts the transfer of employment contracts for any current or former employees of TTUSDS (including Key Management) for a period of one (1) year following the employee's separation from TTUSDS without the prior written consent of the CMAs except as approved in the Hiring Protocols.

(5)    TTP Hiring.

TTUSDS shall ensure that the MSA requires the TTP to implement hiring protocols consistent with Subsection 5.4(2) for any prospective Personnel of the TTP who will perform services under the MSA, and TTUSDS shall enforce such requirement of the MSA against the TTP.

5.4    Content Advisory Council.  Within sixty (60) days following the Operational Date, TTUSDS shall establish and maintain an external council of at least three (3) leading experts with experience in social media platforms, content moderation, free speech, or foreign influence who are Resident U.S. Citizens to advise TTUSDS on the Content Promotion and Filtering, Trust and Safety Moderation, and other content moderation policies for the TikTok U.S. App and TikTok U.S. Platform that are relevant to Trust and Safety Moderation (the "**Content Advisory Council**").  For the avoidance of doubt, the Content Advisory Council's role with respect to Content Promotion and Filtering, Trust and Safety Moderation, and other content moderation practices shall be advisory, not operational, and members of the current Content Advisory Council (established in March 2020) may serve on the Content Advisory Council under this Section 5.5.  TTUSDS shall submit the name and a *curriculum vitae* or similar professional synopsis to the Third-Party Monitor and CMAs for each member of the Content Advisory Council, initially and upon any change to its composition.  TTUSDS shall ensure that, at the Content Advisory Council's or CMAs' request, or at its own discretion, the Third-Party Monitor reviews human exclusions of content to ensure actions were taken consistent with Trust and Safety Moderation guidelines and delivers such reports to the Content Advisory Council upon completion.  TTUSDS shall ensure that the Content Advisory Council may, as needed in its discretion, periodically engage with the Third-Party Monitor and CMAs about trends in foreign influence, propaganda, censorship, disinformation, and similar topics.

5.5    Communications Between Personnel of TTUSDS, ByteDance, and ByteDance Affiliates.  Notwithstanding any other provision of this Agreement, communications between TTUSDS Personnel and Personnel of ByteDance or its Affiliates shall be permitted.  Electronic communications between TTUSDS Personnel, on the one hand, and Personnel of ByteDance or its Affiliates, on the other hand, shall be logged for auditing purposes.

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

## ARTICLE VI

## BYTEDANCE POC, COMPLIANCE OFFICER, AND SECURITY OFFICER

6.1    Point of Contact.  ByteDance shall at all times maintain a point of contact for the Third-Party Monitor and CMAs regarding ByteDance's compliance with this Agreement (the "**ByteDance POC**").  ByteDance shall notify the CMAs of the identity of the ByteDance POC within fourteen (14) days following the Effective Date, and within three (3) days following any change in the ByteDance POC.

6.2    Compliance Officer.  TikTok Inc. shall at all times employ a compliance officer (the "**Compliance Officer**") who meets the qualifications set forth in Section 6.4, serves as the senior liaison between TikTok Inc. and the Third-Party Monitor and CMAs, and is responsible for overseeing compliance with this Agreement on behalf of TikTok Inc.

6.3    Security Officer.  TTUSDS shall at all times employ a security officer (the "**Security Officer**") who meets the qualifications set forth in Section 6.4, serves as the senior liaison between TTUSDS and the Third-Party Monitor and CMAs, and is responsible for overseeing compliance with this Agreement on behalf of TTUSDS.  TTUSDS shall ensure that the Security Officer reports directly and exclusively to the Security Committee.

6.4    Qualifications.  TikTok Inc., with respect to the Compliance Officer, and TTUSDS, with respect to the Security Officer, shall ensure that the Compliance Officer and Security Officer:

(1)    are Resident Sole U.S. Citizens who have, or are eligible for, a U.S. personnel security clearance;

(2)    are qualified employees of TikTok Inc. or TTUSDS, respectively;

(3)    have sufficient and appropriate senior-level authority and resources within TikTok Inc. or TTUSDS, respectively, and the necessary technical skills and experience to ensure compliance with this Agreement and to fulfill all other obligations of the position;

(4)    have no current or prior contractual, financial, or fiduciary relationship with ByteDance or any of its Affiliates; *provided* that the initial Compliance Officer and Security Officer may be individuals who were previously employed in the United States by TikTok Inc. or ByteDance, Inc. as of the Effective Date and, in the case of the Security Officer, who will be transferred to TTUSDS by no later than the Operational Date; and

(5)    have Physical Access and Logical Access to all of the facilities, systems, records, and meetings of TikTok Inc. or TTUSDS, respectively, that in the sole discretion of the Third-Party Monitor and CMAs, are necessary to ensure compliance with this Agreement.

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

The Compliance Officer and Security Officer may hold other titles and responsibilities at TikTok Inc. and TTUSDS, respectively; *provided* that such other responsibilities do not prevent the officer from performing his or her obligations in connection with the Agreement.

6.5     Nomination and Appointment.  The appointment of the Compliance Officer and Security Officer shall be subject to the prior non-objection of the CMAs.  Within fourteen (14) days following the Effective Date, the Transaction Parties shall nominate an initial Compliance Officer and initial Security Officer (in the case of the Security Officer, to be transferred to TTUSDS as of the Operational Date) and submit complete Personal Identifier Information, a *curriculum vitae* or similar professional synopsis, contact information, and any other information requested by the CMAs to assess whether the individual can effectively perform the obligations of the Compliance Officer or Security Officer, as applicable, under this Agreement.  If the CMAs do not object in writing within twenty-one (21) days following receipt of all necessary information about the nominee, as determined by the CMAs in their sole discretion, the lack of action shall constitute a non-objection.  If the CMAs object, the Transaction Parties shall nominate a different candidate within seven (7) days following receipt of any such objection, subject to the same procedures as the initial nomination.  TikTok Inc. and TTUSDS, respectively, shall appoint the Compliance Officer and the Security Officer within three (3) days following non-objection by the CMAs.

6.6     Removal and Replacement.

(1)     Neither TikTok Inc. nor TTUSDS shall remove any Compliance Officer or Security Officer without the prior non-objection of the CMAs.  TikTok Inc. and TTUSDS, respectively, shall notify the CMAs at least fourteen (14) days before the proposed removal of a Compliance Officer or Security Officer unless such removal is for cause, and such removal shall only be proposed in conjunction with the nomination of a new candidate for the position, subject to the same procedures as the initial nomination.  For the avoidance of doubt, such cause must consist of willful misconduct, gross negligence, reckless disregard, violation of applicable law, violation of company policy, or failure of the individual to perform his or her job duties.  At no time shall TikTok Inc. or TTUSDS remove, penalize, or negatively change the terms of employment, including compensation and benefits, of the Compliance Officer or Security Officer for such officer's actual or attempted efforts to comply with or ensure compliance with this Agreement.

(2)     Should the CMAs, in their sole discretion, determine that the Compliance Officer or Security Officer has failed to meet his or her respective obligations or has otherwise undermined the effectiveness of this Agreement, the CMAs may direct TikTok Inc. or TTUSDS, respectively, to remove the Compliance Officer or Security Officer, and TikTok Inc. or TTUSDS, respectively, shall promptly, and in any event within two (2) days, remove such officer.

(3)     In the event of any vacancy in the Compliance Officer or Security Officer position, TikTok Inc. or TTUSDS, respectively, shall notify the CMAs within one (1) day and, within fourteen (14) days following such vacancy occurring, nominate a replacement Compliance Officer or Security Officer, subject to the same procedures as the initial nomination.

During any vacancy of the Security Officer position, TTUSDS shall ensure that the chairman of the Security Committee fulfills the obligations of the Security Officer.

6.7    Communication with the Third-Party Monitor and CMAs.  TikTok Inc. and TTUSDS shall ensure that the Compliance Officer and Security Officer, respectively, provide timely responses to inquiries from the Third-Party Monitor and CMAs about TikTok Inc.'s and TTUSDS's respective compliance with this Agreement.  TikTok Inc. and TTUSDS shall ensure that the Compliance Officer and Security Officer, respectively, maintain availability for discussions with the Third-Party Monitor and CMAs on matters relating to compliance with this Agreement.

6.8    Reporting of Violations.  TikTok Inc. and TTUSDS shall ensure that the Compliance Officer and Security Officer, respectively, report any actual or potential violation of this Agreement to the Third-Party Monitor and CMAs as soon as practicable, but in any event within one (1) day of learning of the actual or potential violation.

6.9    Costs.  TikTok Inc. shall be responsible for all costs associated with the Compliance Officer and TTUSDS shall be responsible for all costs associated with the Security Officer.

6.10    Applicability Rule.  Prior to the Operational Date, and unless otherwise specified in this Article VI, ByteDance and TikTok Inc. shall fulfill the requirements of this Article VI. Following the Operational Date, TTUSDS shall assume exclusive responsibility for the Security Officer.

## ARTICLE VII

## LAWFUL U.S. PROCESS

7.1    Lawful U.S. Process.  TikTok Inc. and TTUSDS acknowledge their respective obligations to comply with valid Lawful U.S. Process.  Without limiting such obligations, TikTok Inc. and TTUSDS agree that TTUSDS shall be principally responsible for complying with Lawful U.S. Process requests, whether directed at TikTok Inc. or TTUSDS, unless otherwise provided for in the Limited Access Protocol pursuant to Section 11.9.  To this end, TTUSDS shall maintain policies relating to Lawful U.S. Process-related activities, regarding the security measures for handling, retaining, managing, and deleting information about Lawful U.S. Process-related activities.  Those policies shall be subject to review by the Security Officer and approval by the Security Committee.  No later than ninety (90) days after the Operational Date, TTUSDS shall deliver the Security Committee-approved policies relating to Lawful U.S. Process-related activities to the CMAs for their review and written approval.  Subsequent changes to such policies also will be subject to the CMAs' written approval, excluding non-substantive revisions (e.g., typographical corrections).

## ARTICLE VIII

## TRUSTED TECHNOLOGY PROVIDER

8.1    Independence.  At all times during any TTP's provision of services in connection with this Agreement, the Transaction Parties shall not have, and shall ensure that their respective Affiliates do not have, any financial or voting interest in, or otherwise possess an ability to Control, the TTP or its provision of services in connection with this Agreement, except to the extent necessary to enforce and ensure compliance with the MSA executed following the non-objection of the CMAs.  The Transaction Parties shall treat the TTP as an arm's-length commercial vendor, and none of the Transaction Parties shall engage in any transaction following the Effective Date through which the TTP gains an equity interest in, or any governance rights with respect to, any of the Transaction Parties.

8.2    Master Services Agreement.

(1)    Within forty five (45) days following the Effective Date, the Transaction Parties shall, in coordination with the TTP, submit an initial draft MSA to the CMAs.  The MSA, including any amendments thereto, shall be subject to the prior non-objection of the CMAs.  The Transaction Parties, in coordination with the TTP, shall subsequently submit a draft of the MSA, and any amendments thereto, to the CMAs, and resolve any concerns raised by the CMAs to the CMAs' satisfaction prior to the execution of the MSA or any amendment thereto.  If the CMAs do not object in writing within forty-five (45) days following receipt of a draft MSA or amendment, the lack of action shall constitute a non-objection.  The Transaction Parties shall execute the MSA or any amendment thereto within three (3) days following the non-objection of the CMAs (if executed prior to the Operational Date, the Transaction Party shall ensure that TTUSDS joins as a party to the MSA by no later than the Operational Date).  The Transaction Parties shall submit a copy of the final MSA and any amendment thereto to the CMAs within three (3) days following execution.  In the event that Oracle (or a successor TTP) is replaced as the TTP, the Transaction Parties shall execute an MSA with the replacement TTP following the non-objection of the CMAS to the replacement TTP under Section 8.2(6), in accordance with the procedures and requirements for the initial MSA.

(2)    The Transaction Parties shall ensure that the MSA incorporates all of the provisions applicable to the TTP, Protected Data, Source Code and Related Files, Recommendation Engine, and the TikTok U.S. App and TikTok U.S. Platform under this Agreement, and further incorporates the obligations of the Transaction Parties under this Agreement to ensure that the TTP takes the actions specified in this Agreement and that TTUSDS fully cooperates with the TTP to ensure that the TTP can take such actions as specified in this Agreement, in all cases to the CMAs' satisfaction in their sole discretion.

(3)    The Transaction Parties shall ensure the TTP receives all submissions of findings arising from the public bug bounty program for the TikTok U.S. App.

(4)    The Transaction Parties shall ensure that the MSA sets forth specific commitments by TTUSDS and Oracle (or a successor TTP), including submitting to oversight

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

and auditing by the CMAs and third parties designated under this Agreement of services performed under the MSA. The Transaction Parties shall ensure the MSA grants the TTP the right, in its sole discretion, to seek the views of the Third-Party Monitor and CMAs in the event of any disagreement between the Transaction Parties and the TTP regarding the security of Protected Data and Source Code and Related Files.

(5)     The Transaction Parties shall amend the MSA upon written direction from the CMAs, in their sole discretion; *provided* that any amendments to the MSA initiated by the CMAs shall be for purposes of ensuring compliance with this Agreement and after consultation with the Transaction Parties, the TTP, and the Third-Party Monitor.

(6)     The Transaction Parties may, solely based on evidence that the TTP has failed to comply with the material terms of the MSA and with notice to the CMAs regarding the provision(s) breached and supporting evidence, request that the CMAs permit the Transaction Parties to remove the TTP for cause. The Transaction Parties shall not remove the TTP without the prior written consent of the CMAs. The CMAs, in their sole discretion, may require the Transaction Parties to remove and replace the TTP. The Transaction Parties shall ensure that the MSA provides for a process to effectively transition responsibilities in connection with this Agreement to a new TTP in the event of a removal or replacement. Within thirty (30) days following any vacancy in the TTP position, the Transaction Parties shall submit for the prior non-objection of the CMAs the name and any additional information requested by the CMAs of a proposed vendor to serve as the TTP. If the CMAs object, the Transaction Parties shall not engage the vendor and shall submit another proposed vendor to the CMAs within thirty (30) days following receipt of the CMAs' objection. If the CMAs do not object within thirty (30) days following receipt of all necessary information regarding a proposed replacement TTP, the lack of action shall constitute a non-objection.

(7)     The Transaction Parties shall provide sufficient financial resources, consistent with industry-standard rates for comparable services and determined in coordination with the TTP, to enable the TTP to fully perform the responsibilities designated to the TTP in connection with this Agreement and under the MSA. The Transaction Parties shall ensure that the MSA requires the TTP to promptly notify the CMAs if the TTP believes, in its sole discretion that it lacks sufficient funding or related resources under the MSA to adequately conduct the tasks required of it under the MSA and in connection with this Agreement. The Transaction Parties shall provide semi-annual updates to the Third-Party Monitor and CMAs regarding the budgeting and funding of the TTP under the MSA and in connection with this Agreement.

8.3     Rule of Construction. Any provision of this Agreement that requires any Transaction Party, individually or collectively, to ensure that the TTP takes a specified action shall be deemed to require the applicable Transaction Party to enforce, contractually through the MSA, the TTP's fulfillment of and compliance with its obligations in connection with this Agreement.

8.4     TikTok U.S. Platform Deployment. By no later than the Operational Date, the Transaction Parties shall, in coordination with the TTP, take all steps necessary to facilitate TTUSDS's initial deployment of the TikTok U.S. Platform in the TTP's secure cloud

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

infrastructure in the United States, which shall be logically separate from the DTC, and thereafter the Transaction Parties shall ensure that TTUSDS continues to maintain and operate the TikTok U.S. Platform exclusively in the TTP's secure cloud infrastructure in the United States, except as otherwise provided in this Agreement (including with respect to CDNs). The Transaction Parties shall ensure that TTUSDS's deployment of the TikTok U.S. Platform includes the creation of secure testing, build, integration, and deployment environments for the TikTok U.S. App and TikTok U.S. Platform that are permissioned and auditable. The Transaction Parties shall ensure the TTP implements processes and controls to monitor these environments to ensure compliance with this Agreement related to Source Code and Related Files and Logical Access to Protected Data.

8.5    Content Delivery Networks.  TTUSDS shall not be required to maintain and operate CDNs solely within the TTP's secure cloud infrastructure; *provided* that TTUSDS shall maintain, operate, and contract for any CDN that is not within the TTP's secure cloud infrastructure in accordance with the following requirements:

(1)    Commercial CDNs: TTUSDS shall ensure that the use of any third-party CDN providers for the TikTok U.S. Platform complies with the vendor approval requirements, including the Vendor Program Policy pursuant to Article XIII of this Agreement.

(i)    TTUSDS shall ensure that all such CDN servers utilized for the delivery of content in the United States reside exclusively in the United States.

(ii)    TTUSDS shall consult with the TTP and Third-Party Monitor on configuration changes related to a CDN. All such changes shall be logged in auditable fashion, with the logs made available to the Third-Party Monitor, the Third-Party Auditor, and the CMAs. TTUSDS shall involve the TTP in any discussions or work with the third-party CDN provider related to such configuration changes.

(iii)    TTUSDS shall ensure that the TTP has the ability to monitor and audit configuration changes related to CDNs through a gateway in the TTP's secure cloud infrastructure for Access to the CDN network elements or the built-in capability provided by the commercial CDN. TTUSDS shall ensure that the gateway or built-in capability of the commercial CDN includes an alert system that notifies both TTUSDS and the TTP of any change of origin settings or that otherwise results in unexpected traffic routing patterns.

(2)    Proprietary CDNs.

(i)    All Source Code and Related Files for any proprietary CDN servers maintained by TTUSDS shall be subject to the applicable software assurance requirements of Article IX, including review and testing by the TTP in parallel with deployment of Executable Code.

(ii)    TTUSDS shall work with the TTP to develop technical means that enable (a) the TTP to monitor the interaction of the servers with the other elements of the

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

TikTok U.S. Platform and systems operated by or on behalf of ByteDance serving non-TikTok U.S. Users, and (b) the TTP to block any such interactions that are unexpected or unauthorized and report, within one (1) day of discovery and validation, any such interactions to the Third-Party Monitor and CMAs.

(iii)    Any proprietary CDN servers maintained by TTUSDS shall not Access any Protected Data other than IP addresses, which TTUSDS shall ensure are masked when stored on the CDN server, unless TTUSDS requests, and the CMAs approve, Access by the CDN to any other Protected Data.

(iv)    On an annual basis, TTUSDS shall, with input from the TTP and Third-Party Monitor, reevaluate and report to the CMAs regarding the feasibility of third-party vendors adequately supporting services covered by proprietary CDNs.  When TTUSDS concludes that third-party vendors can adequately support the services provided by proprietary CDNs consistent with industry-standard rates for comparable services, TTUSDS shall transition those services to a third-party vendor on a timeline established in consultation with the TTP, Third-Party Monitor, and CMAs.

(3)    For the avoidance of doubt, neither ByteDance nor any of its Affiliates shall have Access to the CDNs supporting the TikTok U.S. Platform.

8.6    <u>Diagrams</u>.  By no later than thirty (30) days prior to the Operational Date, and thereafter within fourteen (14) days following a request from the CMAs, the Transaction Parties shall submit, and shall ensure the TTP submits, respectively as applicable to their individual obligations or collectively as appropriate, Architecture Diagrams, Data Flow Diagrams, Existing Network Diagrams, and Source Code Review Diagrams for the TikTok U.S. Platform to the Third-Party Monitor and CMAs.  The Transaction Parties shall promptly respond, and shall ensure the TTP promptly responds, to inquiries from the Third-Party Monitor and CMAs for further or clarifying information regarding any submission of Architecture Diagrams, Data Flow Diagrams, Existing Network Diagrams, and Source Code Review Diagrams.

## <u>ARTICLE IX</u>

## <u>DEDICATED TRANSPARENCY CENTER AND SOURCE CODE SECURITY</u>

9.1    <u>DTC Locations and Protocols</u>.  The Transaction Parties shall mutually develop with the TTP the locations and Physical Access and Logical Access procedures of the DTC, as well as the security requirements, infrastructure, technical and architectural parameters, and equipment to be used within the DTC (together, the "**DTC Operating Protocols**").  The Transaction Parties shall ensure that the DTC is located at all times in the United States; *except that* supporting DTCs may be located in the United Kingdom, Australia, New Zealand, and Canada (the "**DTC Approved Countries**").  The Transaction Parties shall at all times comply with the DTC Operating Protocols (as amended from time to time, at the request of the Transaction Parties or TTP, or at the direction of the CMAs).  The Transaction Parties shall not amend the DTC Operating Protocols without the prior written consent of the TTP.

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(1)    The DTC Operating Protocols and any amendments thereto shall be subject to the prior non-objection of the CMAs.  The Transaction Parties shall submit the DTC Operating Protocols to the CMAs within seven (7) days following the Effective Date.  The Transaction Parties shall submit written confirmation to the CMAs of the TTP's agreement to the initial DTC Operating Protocols and any amendment thereto.  If the CMAs do not object in writing within fourteen (14) days following receipt of the DTC Operating Protocols or any amendment thereto, the lack of action shall constitute a non-objection.  If the CMAs object, the Transaction Parties shall fully resolve the CMAs' concerns to the satisfaction of the CMAs in their sole discretion before implementing the DTC Operating Protocols or any amendment thereto.  The Transaction Parties shall adopt and implement the DTC Operating Protocols with the TTP following the non-objection of the CMAs and by no later than the Operational Date.

(2)    The Transaction Parties shall not, and shall ensure that their respective Affiliates do not, Access or use the DTC except in accordance with the DTC Operating Protocols.

9.2    <u>Provision of Source Code and Related Files via the DTC</u>.

(1)    ByteDance shall provide, and shall ensure that its Affiliates provide, all current and future Source Code and Related Files to the TTP and the Source Code Inspector via the DTC for the purposes of software assurance and secure deployment of the TikTok U.S. App and TikTok U.S. Platform, as well as the performance of all related services under the MSA.  ByteDance shall initially provide, and shall ensure that its Affiliates provide, all current Source Code and Related Files to the TTP via the DTC by no later than the Operational Date and on an ongoing basis thereafter.  The transfer of Source Code and Related Files to the TTP via the DTC shall not be deemed to transfer any title that ByteDance or any of its Affiliates has in the Source Code and Related Files.

(2)    In connection with its provision of all current and future Source Code and Related Files to the TTP via the DTC, ByteDance shall produce a software bill of materials (the "**SBOM**") or its equivalent, that inventories, for each version of the Source Code and Related Files, all components and their origin, including sufficient data for the TTP to verify each component and to cross-reference with known vulnerabilities.  The Transaction Parties shall ensure the TTP, through signature verification (to the extent possible), verifies that the software versions and other components identified in the SBOM or its equivalent matches the Source Code and Related Files where source code is available (e.g., third-party libraries), and any third-party software, including for any build artifacts that are incorporated into the TikTok U.S. App or the TikTok U.S. Platform by reference to software repositories.  The Transaction Parties shall also ensure the TTP verifies, to the extent that it determines necessary and feasible, third-party software where the source code is not available (e.g., commercial-off-the-shelf software and open source tools).

(3)    The Transaction Parties shall designate Personnel who are based in the United States, Australia, New Zealand, Canada, and the United Kingdom, unless otherwise approved in writing by the CMAs, as primary points of contact with the TTP and the CMAs for requirements related to the DTC and Source Code and Related Files.

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

9.3    <u>DTC Access</u>.

(1)    ByteDance shall not withhold, and shall ensure that none of its Affiliates withhold, Physical Access to the DTC without just cause (e.g., for the protection of its intellectual property) and on terms consistent with the MSA and this Agreement.  ByteDance shall ensure that all Persons designated in writing by the CMAs, in their sole discretion, have Access to the DTC.  Any Person designated by the CMAs pursuant to this section shall treat all information such Person observes or has Access to as confidential information consistent with 31 C.F.R. § 800.802.

(2)    ByteDance shall ensure that any confidentiality requirements for Access to the DTC do not impede the ability of the Third-Party Monitor or the CMAs to conduct monitoring pursuant to this Agreement.

(3)    ByteDance shall grant, and shall ensure that its Affiliates grant, all Personnel of TTUSDS, the TTP, the Source Code Inspector, and the Third-Party Monitor Physical Access to the DTC, consistent with the DTC Operating Protocols.  ByteDance shall ensure that such Personnel have a constant and consistent right and ability to have Physical Access to the DTC.  ByteDance shall not take, and shall ensure that none of its Affiliates take, any action to delay or prevent Physical Access to the DTC by Personnel of TTUSDS, the TTP, the Source Code Inspector, or the Third-Party Monitor.  The Transaction Parties shall ensure the TTP promptly reports any non-compliance with this Section 9.3(3) to the Third-Party Monitor and CMAs.

(4)    ByteDance shall grant, and shall ensure that its Affiliates grant, Personnel of TTUSDS and the TTP full Logical Access to, and the practical ability to review and inspect, all Source Code and Related Files in the DTC, consistent with the licensing terms under Section 2.5 (including any confidentiality terms) and this Agreement, without any interference by ByteDance.  ByteDance may maintain monitoring within the DTC to the extent necessary to protect its intellectual property; *provided* that such monitoring shall not impede or compromise the integrity of the TTP's confidential inspection of Source Code and Related Files.  The Transaction Parties shall ensure the TTP promptly reports any non-compliance with this Section 9.3(4) to the Third-Party Monitor and CMAs.

9.4    <u>Source Code and Related Files Location</u>.  ByteDance may require in the DTC Operating Protocols that the TTP Personnel shall not review or inspect Source Code and Related Files other than via the DTC and that the Source Code and Related Files be used solely for the purposes required under this Agreement.  ByteDance shall ensure that at least one (1) location of the DTC is within the facilities of the TTP.  TTUSDS shall ensure the TTP maintains Logical Access to Source Code and Related Files via the DTC, consistent with the DTC Operating Protocols, to conduct automated and manual review of Source Code and Related Files.

9.5    <u>Software Assurance Process</u>.  As part of the software assurance process, the Transaction Parties shall ensure that the Source Code and Related Files and Executable Code do not include Malicious Code.

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

9.6 <u>Vulnerability Reporting</u>.  TTUSDS shall report promptly, and shall ensure the TTP reports promptly, via a format mutually acceptable to the CMAs and TTUSDS, and in any event within one (1) business day of discovery and validation, any findings of zero day vulnerabilities designated by the TTP as at least high severity or equivalent (following consultation with TTUSDS and based on recognized criteria such as the Common Vulnerability Scoring System and the TTP's judgment regarding whether the vulnerabilities are exploitable) or any instance of Malicious Code in the Source Code and Related Files or Executable Code to ByteDance, the Third-Party Monitor, and the CMAs, subject to the following:

(1)     In the event that the TTP discovers what it believes to be, in its sole discretion, the presence of Malicious Code in the Source Code and Related Files or Executable Code, TTUSDS shall ensure the TTP submits the written report directly to the CMAs and Third-Party Monitor prior to notifying ByteDance, and, at the direction of the CMAs, provide a copy to ByteDance soon thereafter in which the TTP may redact information, in its sole discretion or at the direction of the CMAs.

(2)     The Transaction Parties shall not disclose, and shall ensure the TTP does not disclose, to the public any findings of zero days, vulnerabilities, or Malicious Code in the Source Code and Related Files or Executable Code discovered by the TTP or the Transaction Parties unless:

(i)     they are required to do so by applicable law or regulation or in relation to a judicial or administrative proceeding;

(ii)    there is no disagreement among ByteDance, TTUSDS, and the TTP regarding the findings; or

(iii)   in the event that there is such a disagreement among ByteDance, TTUSDS, and the TTP, TTUSDS or the TTP determines, after consultation with the Security Committee, that disclosure is merited given industry practices on responsible disclosure, such as the International Organization for Standardization ("**ISO**") 29147 Standard.

(3)     TTUSDS shall ensure that the timing and contents of any public disclosure pursuant to this Section are consistent with industry practices on responsible disclosure, such as the ISO 29147 standard, to ensure that the zero day, vulnerability, or Malicious Code is remediated or otherwise patched prior to disclosure, and that the disclosure does not lead to exploitation of the zero day, vulnerability, or Malicious Code.

(4)     TTUSDS shall ensure that any public disclosure of a zero day, vulnerability, or Malicious Code is first notified to the other Transaction Parties, the TTP, the Security Committee, the Third-Party Monitor, and the CMAs.  The Transaction Parties shall not disclose, shall ensure the TTP and the Third-Party Monitor do not disclose, and shall ensure that the Security Committee does not disclose, any zero day, vulnerability, or Malicious Code that is so pre-notified to them, until after it is made public by TTUSDS or the TTP consistent with this

Section 9.6(4), and the Transaction Parties shall ensure that any such disclosure is limited to the content made public by TTUSDS or the TTP.

      9.7    <u>Source Code and Related Files Review Process</u>.  Upon receiving Source Code and Related Files via the DTC, initially and for any subsequent change, TTUSDS shall ensure the TTP deploys, immediately and on an ongoing basis, a team of engineers to examine all aspects of the Source Code and Related Files using all tools required in the TTP's sole discretion, including both automated tools and human inspection, to assess the presence of any zero days, vulnerabilities, or Malicious Code, that could affect the confidentiality, integrity, or availability of the TikTok U.S. App, TikTok U.S. Platform, or Protected Data.  The Transaction Parties shall permit, and shall ensure that their respective Affiliates permit, use by the TTP of all tools necessary to perform the obligations in connection with this Agreement.

      9.8    <u>TikTok U.S. App Mobile Security Measures</u>.  Within sixty (60) days following the Operational Date, or as otherwise extended by the CMAs, TTUSDS shall submit to the CMAs protocols developed with the TTP that ensure the TTP creates protections to ensure that the TikTok U.S. App cannot Access or transmit Protected Data in an unauthorized manner or exploit the mobile devices of TikTok U.S. Users (the "**Security Protocols**").  TTUSDS shall ensure that the protections are effective no later than one hundred and twenty (120) days following the Operational Date, unless otherwise extended by the CMAs.  TTUSDS shall ensure the TTP agrees, in writing, with the extent and scope of the security measures in the initial protocols for each of the different apps comprising the TikTok U.S. App. For the iOS and Android mobile apps, the initial protocols shall include measures such as: activation logic to enable the mobile security measures for all TikTok U.S. Users; rules-based interceptors to analyze and, if necessary, block data flows; auditing and logging of application behavior to alert the TTP of any issues; and configuration services to enable the TTP to adjust the mobile sandbox as needed in its sole discretion.  Within seven (7) days following the implementation of the Security Protocols, ByteDance shall ensure that all TikTok U.S. Users must download or update to the version of the TikTok U.S. App that includes the protections of the Security Protocols (e.g., that includes the mobile security measures to use the TikTok U.S. App).  TTUSDS shall ensure the TTP submits monthly reports to the Third-Party Monitor and CMAs on its progress implementing the mobile security measures.  The Transaction Parties shall ensure the TTP promptly reports any non-compliance with the Security Protocols to the Third-Party Monitor and CMAs.

      9.9    <u>Initial Source Code and Related Files Inspection</u>.

      (1)    Within one hundred and eighty (180) days following the Operational Date, or as otherwise extended by the CMAs, TTUSDS shall ensure the TTP completes the initial inspection of Source Code and Related Files pursuant to Section 9.7 (the "**Initial Inspection**"), with the timing (other than the due date) and manner of the Initial Inspection determined by the TTP in its sole discretion.  TTUSDS shall ensure the TTP submits to the Third-Party Monitor and CMAs no later than three (3) days following the completion of the Initial Inspection a certification of completion of the Initial Inspection, which shall include a summary of the findings of the Initial Inspection and no later than ten (10) days following the completion of the Initial Inspection a plan and timeline for any resulting remediations to the Source Code and

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

Related Files requested of or made by ByteDance as a result of the Initial Inspection. TTUSDS shall ensure the TTP submits monthly reports to the Third-Party Monitor and CMAs on its progress completing the Initial Inspection.

(2) During the Initial Inspection, ByteDance and its Affiliates may continue to update the Source Code and Related Files or subsets thereof; *provided, however*, that ByteDance shall ensure that any such updates do not impede the Initial Inspection and are clearly identifiable as updates upon inspection by the TTP. Prior to the deployment of any updates to the Source Code and Related Files prior to the completion of the Initial Inspection, ByteDance shall consult with TTUSDS and the TTP regarding the impact of any such updates on the Initial Inspection and, where in the TTP's sole discretion such updates will impede the timely completion of the Initial Inspection, ByteDance shall not make, and shall ensure that none of its Affiliates make, such updates. TTUSDS shall ensure the TTP reports ByteDance's or its Affiliates' failure to refrain from updating the Source Code and Related Files as required by this Section 9.9(2) to the Third-Party Monitor and CMAs and includes any updates to the Source Code and Related Files in the Initial Inspection, with the Initial Inspection considered incomplete until all updates are evaluated.

9.10    Prohibition on Deployment without TTP Security Processes.

(1) The Transaction Parties shall not deploy, and shall ensure that none of their respective Affiliates deploys, to the TikTok U.S. App or TikTok U.S. Platform any changes, updates, alterations, or improvements to the Source Code and Related Files that are not subject to security review and inspection by the TTP. For changes, updates, alterations, or improvements to the Source Code and Related Files for the TikTok U.S. App, the Transaction Parties shall ensure the TTP completes its inspection before such updates are deployed, and made available to TikTok U.S. Users. For changes, updates, alterations, or improvements to the Source Code and Related Files for the TikTok U.S. Platform, the Transaction Parties shall ensure the TTP conducts its inspection asynchronously in accordance with the Software Assurance Protocols but no later than thirty (30) days following deployment. The Transaction Parties shall ensure that only Source Code and Related Files for which the SBOM or its equivalent has been digitally signed by the TTP is deployed to the TikTok U.S. Platform. The Transaction Parties shall further ensure that any executable files derived from the Source Code and Related Files and deployed on the TikTok U.S. Platform are compiled exclusively within the TTP's secure cloud infrastructure. The Transaction Parties shall ensure the TTP promptly reports any non-compliance with this Section 9.10(1) to the Third-Party Monitor and CMAs.

(2) ByteDance shall address, and shall ensure that its Affiliates address, all issues with the Source Code and Related Files to the satisfaction of TTUSDS and the TTP, in their sole discretion. In the event of a disagreement between TTUSDS and the TTP regarding the security of the Source Code and Related Files, the view of the Security Committee shall prevail; *provided* that should the TTP seek the view of the CMAs in the event of a disagreement with the Security Committee, the view of the CMAs shall prevail. The Transaction Parties shall ensure the TTP promptly reports any non-compliance with this Section 9.10(2) to the Third-Party Monitor and CMAs.

**APP-194**

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

(3)    In all cases, the Transaction Parties shall ensure the TTP determines, in its sole discretion, when its security review and inspection pursuant to this Section 9.10 is complete.

(i)    If at any time there are insufficient funds or time for the TTP to fulfill its obligations, TTUSDS shall ensure the TTP immediately informs ByteDance and the Third-Party Monitor of the insufficiency.  If, upon notification of a perceived funding insufficiency, the Security Committee determines unanimously that the TTP's request is inconsistent with industry-standard rates for comparable services, TTUSDS and the TTP shall resolve the disagreement consistent with the terms of the MSA and the timelines under Section 9.10(3)(ii) shall be tolled during such resolution.  For the avoidance of doubt, tolling under this Section 9.10(3)(i) shall not affect the requirement that all changes, updates, alterations, or improvements to the Source Code and Related Files must undergo security review and inspection by the TTP consistent with Section 9.10(1), including the requirement that any such changes to the Source Code and Related Files for the TikTok U.S. App be reviewed and inspected prior to deployment to TikTok U.S. Users.

(ii)    ByteDance shall resolve any insufficiency of funding or time within fifteen (15) days of receipt of the notice under Section 9.10(3)(i).  If such funding or timing insufficiency is not resolved within five (5) days, TTUSDS shall ensure the TTP immediately reports such insufficiency to the Third-Party Monitor and CMAs.

9.11    Source Code Inspector.

(1)    The Transaction Parties shall engage a third-party selected by TTUSDS and the TTP to serve as an independent inspector (the "**Source Code Inspector**") of the Source Code and Related Files in the DTC.  The engagement of the Source Code Inspector shall be subject to the prior non-objection of the CMAs.  The Transaction Parties shall submit for the CMAs' review a proposed Source Code Inspector within sixty (60) days following the Operational Date.  If the CMAs object, the Transaction Parties shall submit another proposed candidate for the CMAs' review within thirty (30) days following receipt of the objection.  If the CMAs do not object within fourteen (14) days following receipt of all necessary information about a candidate, as determined by the CMAs in their sole discretion, the lack of action shall constitute a non-objection.  The Transaction Parties shall annually place funds in escrow to retain the Source Code Inspector.  The Transaction Parties shall ensure that the CMAs are third-party beneficiaries of their agreement with the Source Code Inspector.

(2)    The Transaction Parties shall ensure that the Source Code Inspector is granted all Physical Access and Logical Access necessary to conduct a security vulnerability assessment within the DTC pursuant to protocols approved in advance by the CMAs and submits reports directly to the CMAs and Third-Party Monitor, with a copy to the Transaction Parties and the TTP, on a schedule determined by the CMAs.

(3)    The Transaction Parties shall ensure that the Source Code Inspector submits quarterly reports to the Transaction Parties, the TTP, and the Third-Party Monitor detailing any findings of concern, or if none, stating so.  The Transaction Parties shall submit a

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

copy of any such report to the CMAs within three (3) days following a request by the CMAs. The CMAs may, in their sole discretion, change the frequency of the Source Code Inspector's reporting obligations.

(4)     The Transaction Parties, in coordination with the TTP, shall promptly address all findings of concern identified by the Source Code Inspector.

9.12    Source Code Lifecycle.

(1)     ByteDance shall develop the Source Code and Related Files and provide a mirror repository of it to the TTP, including the SBOM or its equivalent, via the DTC such that the TTP can at all times maintain full and simultaneous visibility into the Source Code and Related Files and any changes thereto via the DTC.  Any changes, updates, alterations, or improvements to the Source Code and Related Files must: (i) for the TikTok U.S. App, be batched in logical collections according to a regular release schedule (except for time-sensitive changes, updates, alterations, or improvements); and (ii) for the TikTok U.S. App and TikTok U.S. Platform, only use build artifacts, whether proprietary or third-party build artifacts, from a repository within the TTP's secure cloud infrastructure and to be included in the SBOM or its equivalent.

(2)     The Transaction Parties shall meet regularly, and no less than quarterly, with the TTP and Third-Party Monitor to discuss planned changes, updates, alterations, or improvements to the Source Code and Related Files for the TikTok U.S. App and TikTok U.S. Platform, including new features, functionality, and other product roadmaps, and their implications for security and the TTP's assurance processes and responsibilities.

(3)     Only TTUSDS and the TTP shall compile the Source Code and Related Files.  Once compiled, TTUSDS and the TTP shall generate the SBOM for the code they have respectively compiled, and the TTP shall digitally sign each such SBOM, exclusively via the DTC.

(4)     TTUSDS and the TTP shall only deploy Executable Code to the TikTok U.S. App and TikTok U.S. Platform in compliance with the security review and inspection requirements of Section 9.10 and may remove Executable Code from the DTC for that purpose.

(5)     The Transaction Parties shall ensure that the DTC affords the TTP and TTUSDS an end-to-end secure deployment system established by the TTP and TTUSDS for the deployment of the TikTok U.S. App and TikTok U.S. Platform, respectively, that implements the following operations with respect to Source Code and Related Files:

(i)     Any Source Code and Related Files shall not be deployed to the TikTok U.S. App and TikTok U.S. Platform unless it is subject to the security review and inspection protocols of the TTP pursuant to Section 9.10;

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(ii)     TTUSDS and the TTP shall have the ability to securely monitor and inspect the end-to-end Source Code and Related Files deployment lifecycle to ensure the integrity of the chain of custody; and

(iii)     Source Code and Related Files shall not be removed from the DTC.

9.13    Recommendation Engine and Content Moderation Processes.

(1)     On or before the Operational Date, TTUSDS shall provide to the Content Advisory Council, the TTP, and the Third-Party Monitor a copy of the U.S. playbook for human moderators, which shall be subject to approval by the Security Committee. Subsequently, TTUSDS shall provide an updated copy of this playbook to the Content Advisory Council and Security Committee any time changes are made to it. An updated copy shall also be provided to the Third-Party Monitor, the TTP, and the CMAs upon request.

(2)     Within sixty (60) days following the Operational Date:

(i)     The Transaction Parties shall ensure the TTP begins conducting periodic software inspection and testing of the Software and associated data implementing the Recommendation Engine to ensure that its machine-implemented rules and algorithms conform to the documentation provided to the TTP by TTUSDS and that the Software and data associated with Content Promotion and Filtering and Trust and Safety Moderation systems (together, "**Content Moderation Processes**") also conform to the published policies for the TikTok U.S. App. TTUSDS shall ensure that the Recommendation Engine is trained exclusively within the TTP's secure cloud infrastructure.

(ii)     If the TTP or the Third-Party Monitor determine that the documentation and policies described in Section 9.13(1)(i) are insufficient to support the inspections and reviews described in this Section 9.13, then either the TTP or the TPM may inform TTUSDS and TTUSDS shall promptly deliver supplementary documentation. TTUSDS shall update the documentation described in this Section 9.13 from time to time as the Recommendation Engine, and Content Moderation Processes evolve.

(iii)     The TTP and TPM shall report any findings under this Section 9.13(2) to the Security Committee on an ongoing basis, including any findings of material inconsistencies between the Recommendation Engine and the Content Moderation Processes and the related documentation and policies within one (1) day of discovery and validation. Upon receipt of a report from the TTP, the Security Committee and TPM, in consultation with the TTP and Content Advisory Council, shall evaluate and determine whether results of the inspection and testing of the source code implementing the Recommendation Engine and Content Moderation Processes are not operating in material conformance with the documentation and policies ("**Adverse Findings**"). For the avoidance of doubt, it is understood that the operation of the Recommendation Engine

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

and Content Moderation Processes in conformance with related documentation and policies may result in diverse content being published via the TikTok U.S. App because of the nature of the underlying machine learning technologies and not because of inconsistencies between the operation of the Software and the related documentation and policies and so Adverse Findings shall not be based solely on outcome-based evidence.

(iv)    At the request of the Security Committee, the CMAs, or the TTP, the Third-Party Auditor shall conduct an audit of the Content Moderation Processes' implementation for consistency with approved Content Moderation Processes policies and guidelines.

(v)    In the event of an Adverse Finding, ByteDance shall, in consultation with TTUSDS and the TTP, as appropriate and necessary, promptly implement any necessary changes or updates to the Software implementing the Recommendation Engine and Content Moderation Processes, as applicable, to the extent necessary to address such findings.  If ByteDance is unable or unwilling to do so the CMAs shall, in consultation with TTUSDS, the Content Advisory Council, and the Security Committee, determine whether—contrary to ByteDance's conclusion—a remediation plan is feasible within a reasonable period of time.

(1)    If on the basis of the consultation required by the prior paragraph the CMAs determine:

(X) it is not feasible within a reasonable period of time for a remediation plan to be implemented; or

(Y) ByteDance, in consultation with TTUSDS and the TTP, as appropriate and necessary, fails to implement any necessary changes or updates required by the remediation plan to the Software implementing the Recommendation Engine and Content Moderation Processes, as applicable,

then the CMAs may make the Adverse Findings public following the process described in this section and after first consulting with the Security Committee regarding the content of any such public statement and providing ByteDance with the opportunity to review and provide comments on the content of the statement at least two (2) days prior to release of the public statement.

9.14    <u>Further Testing of Source Code and Related Files</u>.  At the request of the CMAs in their sole discretion, ByteDance shall promptly allow the TTP to conduct security testing (e.g., static or dynamic testing or other generally accepted practices) of Source Code and Related Files and Executable Code via the DTC to ensure the security of the Source Code and Related Files and Executable Code.

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

9.15    Source Code and Related Files Alterations.

(1)    ByteDance shall retain the exclusive right to alter the Source Code and Related Files, subject to the requirements and prohibitions in this Agreement.

(2)    ByteDance shall promptly alter the Source Code and Related Files at the request of TTUSDS, the TTP, the Third-Party Monitor, or the CMAs, to ensure compliance with this Agreement, and shall submit a response and initial implementation plan to TTUSDS and the TTP within three (3) days of receipt of any such request, subject to the following:

(i)    If ByteDance rejects such a request, ByteDance shall submit the rejection and its rationale in writing to the TTP, the Security Committee, the Third-Party Monitor, and the CMAs promptly and, in any event, within one (1) day of the rejection;

(ii)    If ByteDance rejects such a request to alter the Source Code and Related Files, fails to alter the Source Code and Related Files as requested in a timely manner and consistent with the implementation plan, or fails to respond to the requested alteration within three (3) days, TTUSDS shall ensure the TTP, in coordination with the Third-Party Monitor, evaluates practicable options to ensure compliance with this Agreement absent the requested alteration.  If after due consideration of all options, the TTP determines that there is no adequate option to ensure compliance with this Agreement without the requested Source Code and Related Files alteration, TTUSDS shall ensure the TTP, in consultation with the Security Committee, notifies ByteDance (the "**Suspension Notice**"), with a copy to the CMAs, the Third-Party Monitor, and the Security Committee, of the TTP's intent to suspend user access to the TikTok U.S. Platform, in whole or in part, in no less than two (2) days and no more than four (4) days (the period between the date of the notice and the suspension, the "**Remediation Window**").  TTUSDS shall ensure the TTP implements any suspension as set forth in a Suspension Notice upon expiration of the Remediation Window unless: (a) ByteDance has remediated the issue to the TTP's satisfaction in its sole discretion; (b) ByteDance has obtained a waiver from the CMAs; or (c) a majority of the Security Committee has determined and certified to the CMAs that the suspension is not necessary to ensure the Transaction Parties' compliance with this Agreement, accompanied by a reasoned and detailed analysis and explanation for the decision;

(iii)    At the request of the CMAs, TTUSDS shall ensure the TTP submits to the CMAs a confidential report regarding any rejected request pursuant to this Section 9.15, as well as any Security Committee override of a suspension; and

(iv)    If a suspension is implemented, once ByteDance provides Source Code and Related Files alterations to address the identified issue, TTUSDS shall ensure the TTP promptly reviews ByteDance's Source Code and Related Files alterations and, if acceptable to the TTP in its sole discretion, immediately reinstates user access to the TikTok U.S. Platform.

9.16    Location-Based Source Code Changes.  Within thirty (30) days following the Operational Date, the Transaction Parties, in coordination with the TTP, shall, if necessary, update the Source Code and Related Files to reasonably ensure that TikTok U.S. Users physically located in the United States are restricted to the fullest extent possible from manipulating their geographic location within any version of the TikTok Global App to a country other than the United States, such that TikTok U.S. Users may solely use the TikTok U.S. App maintained and operated by the TTP.  The Transaction Parties shall not take any action to degrade the user experience of TikTok U.S. Users in a manner designed to encourage TikTok U.S. Users to use a version of the TikTok Global App in a country other than the United States version, if multiple versions exist, or to log into the TikTok Global App not as a TikTok U.S. User.

9.17    Monitoring of TikTok U.S. App and TikTok U.S. Platform Interactions and Systems for Non-U.S. TikTok Users.

(1)    TTUSDS shall identify and monitor, and TTUSDS shall ensure the TTP identifies and monitors, for auditing purposes, all interactions and data elements exchanged between the TikTok U.S. App and TikTok U.S. Platform, on one hand, and systems operated by or on behalf of ByteDance serving non-U.S. TikTok Users, on the other hand.  TTUSDS shall employ, and shall ensure that the TTP employs, technical means to block any such interactions that are unexpected or unauthorized, in the sole discretion of the TTP, and reports, within one (1) day of discovery and validation, any such interactions that have resulted or could reasonably result in unauthorized Access to, or other anomalous activity within, the TikTok U.S. App or the TikTok U.S. Platform to the Third-Party Monitor and the CMAs.

(2)    TTUSDS shall ensure the TTP identifies and monitors for auditing purposes all interactions and data elements exchanged between the TikTok U.S. App and TikTok U.S. Platform, on one hand, and any Internet host and any other system or infrastructure, on the other hand.  TTUSDS shall ensure the TTP employs technical means to block any such interactions that are unexpected or unauthorized, in the sole discretion of the TTP, and reports, within one (1) day of discovery and validation, any such interactions that have resulted or could reasonably result in unauthorized Access to, or other anomalous activity within, the TikTok U.S. App or TikTok U.S. Platform to the Third-Party Monitor and CMAs.

(3)    The Transaction Parties shall ensure that encryption does not prevent the TTP from performing its obligations in connection with this Section 9.17.

(4)    To the extent that the TTP's identification and monitoring activities under Sections 9.17(1)–(2) conflict with General Data Protection Regulation ("**GDPR**") or other legal requirements, TTUSDS shall, within fourteen (14) days following the conflict arising: (i) provide written notice to the CMAs, including a detailed description of the legal requirements that create a conflict with citations to the relevant governing source(s); and (ii) coordinate with the TTP to present solutions to the CMAs that could be implemented to minimize the conflict to the greatest extent possible.

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

9.18    <u>Ongoing Risk Analysis</u>.  TTUSDS shall ensure the TTP assesses on an ongoing basis the risks posed to the national security of the United States and the privacy of TikTok U.S. Users, based on analysis of Source Code and Related Files, architectural analysis, and analysis of data flows, and that the TTP reports such findings to the Security Committee, Third-Party Monitor, and CMAs on a quarterly basis.

9.19    <u>TTP Communications</u>.  ByteDance shall not inhibit, and shall ensure that none of its Affiliates inhibit, whether through the MSA or other means, TTUSDS's or the TTP's ability to communicate with each other, with the Third-Party Monitor, with the CMAs, or with any other appropriate USG authority, in each case independently and without the involvement or awareness of ByteDance or its Affiliates.

## **ARTICLE X**

## **TECHNOLOGY OFFICER**

10.1    <u>Technology Officers</u>.  The Transaction Parties shall ensure the TTP appoints one (1) or more technology officers (the "**Technology Officers**") in each country where TTP Personnel are performing responsibilities in connection with the MSA to serve as the primary liaisons between the TTP and the Third-Party Monitor and CMAs and that the MSA fully incorporates the requirements of this Article X.

10.2    <u>Qualifications of the Technology Officers</u>.  The Transaction Parties shall ensure that each Technology Officer:

(1)    is a Resident Sole U.S. Citizen who has, or is eligible for, a U.S. personnel security clearance for any Technology Officer in the United States, and if not in the United States, is a citizen of their country of residence;

(2)    has the appropriate senior-level authority and resources within the TTP and the necessary technical skills and experience to ensure compliance with this Agreement and to fulfill all other obligations of the position;

(3)    has no current or prior employment, contractual, financial, or fiduciary relationship with ByteDance or any of its Affiliates;

(4)    has Physical Access and Logical Access to all of the facilities, systems, records, and meetings of the TTP; and

(5)    regularly has Physical Access to the DTC necessary to ensure compliance with this Agreement.

The Transaction Parties shall ensure that if any Technology Officer holds other titles and responsibilities beyond serving as a Technology Officer for the purposes of this Agreement, such other responsibilities do not prevent the Technology Officer from performing his or her

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

obligations in connection with this Agreement and that the Technology Officer remains an employee of the TTP.

10.3    Initial Nomination of the Technology Officer.

(1)     The appointment of each Technology Officer shall be subject to the prior non-objection of the CMAs.  Within thirty (30) days following the Effective Date, the Transaction Parties shall ensure the TTP nominates each Technology Officer and submits complete Personal Identifier Information, a *curriculum vitae* or similar professional synopsis of the nominee, and any other information requested by the CMAs to assess whether the individual can effectively perform the obligations of the Technology Officer consistent with this Agreement.  If the CMAs do not object within twenty-one (21) days following receipt of all necessary information about a nominee, the lack of action shall constitute a non-objection to that nominee.  If the CMAs object, the Transaction Parties shall ensure the TTP nominates a different candidate within seven (7) days following receipt of any such objection, subject to the same procedures as the initial nomination.  The Transaction Parties shall ensure the TTP appoints each Technology Officer within three (3) days following non-objection by the CMAs to that nominee.

10.4    Removal and Replacement.

(1)     The Transaction Parties shall ensure the TTP does not remove any Technology Officer without the prior non-objection of the CMAs.  The Transaction Parties shall ensure the TTP notifies the CMAs at least fourteen (14) days before the proposed removal of a Technology Officer unless such removal is for cause, and such a removal shall only be proposed in conjunction with the nomination of a new candidate for the position, to prevent a vacancy from taking place, subject to the same procedures as the initial nomination.  Such cause must consist of willful misconduct, gross negligence, reckless disregard, violation of applicable law, violation of company policy, or failure of the individual to perform his or her job duties.  The Transaction Parties shall ensure the TTP does not remove any Technology Officer for the Technology Officer's actual or attempted efforts to comply with or ensure compliance with this Agreement.

(2)     Should the CMAs, in their sole discretion, determine that any Technology Officer has intentionally or through gross negligence failed to meet his or her obligations or has otherwise undermined the effectiveness of this Agreement, the CMAs may direct the TTP to remove such Technology Officer and the Transaction Parties shall ensure the TTP promptly, and in any event within two (2) days of such direction, removes such Technology Officer.

(3)     In the event of any vacancy in any Technology Officer position, the Transaction Parties shall ensure the TTP notifies the CMAs within one (1) day and, within fourteen (14) days following such vacancy occurring, nominates a replacement Technology Officer, subject to the same process as the initial nomination.

10.5    Communication with the Third-Party Monitor and CMAs.  The Transaction Parties shall ensure that each Technology Officer maintains reasonable availability for discussions with the Third-Party Monitor and CMAs on matters relating to compliance with this

Agreement and has the ability to communicate with the Third-Party Monitor and CMAs independently and without the involvement or awareness of any of the Transaction Parties.

10.6    Reporting of Violations.  The Transaction Parties shall ensure that each Technology Officer reports any actual or potential violation of this Agreement to the Security Officer, the Third-Party Monitor, and the CMAs as soon as practicable, but in any event within one (1) day of learning of the actual or potential violation.

10.7    Costs.  The Transaction Parties shall be responsible for all costs associated with each Technology Officer.

## ARTICLE XI

## PROTECTED DATA

11.1    Excepted Data.

(1)    Any proposed change to the categories of Excepted Data under Section 1.11, including Annexes A, B, and C, as applicable, shall be subject to the prior written consent of the CMAs.  Prior to making any such change, the Transaction Parties shall submit a request to the CMAs identifying the additional data fields and formats proposed to become Excepted Data and shall include in the request the rationale for their designation as Excepted Data and any other information requested by the CMAs, in their sole discretion, to assess the request.  The Transaction Parties shall not treat, and shall ensure the TTP does not treat, any Protected Data as Excepted Data without the prior written consent of the CMAs.  If a change involves the categories outlined in Section 1.11(2) or (3), the Transaction Parties shall update Annexes A, B, and C, as applicable, and submit such updated Annexes to the Third-Party Monitor and CMAs within three (3) days following the Transaction Parties' receipt of the CMAs' consent.

(2)    TTUSDS shall ensure that Excepted Data does not contain any Protected Data except in accordance with, as applicable, the fields and formats specified in Annexes A, B, and C before transmitting any Excepted Data to ByteDance, TikTok Inc., or their respective Affiliates, and shall make available, upon the request of the Third-Party Monitor or CMAs, evidence of compliance with this requirement.  TTUSDS shall ensure that such evidence includes a review of logs from the gateways through which Excepted Data will transit, a review of system architecture to ensure those gateways are the sole transmission method for Excepted Data, and interviews with relevant TTUSDS and TTP Personnel.  The Transaction Parties shall ensure that the Third-Party Monitor promptly, and in any event within one (1) day of discovery, reports to the CMAs any disclosure of Protected Data.

11.2    Public Data.

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(1)    The Transaction Parties shall not add new Public Data feature categories or implement any such changes in the TikTok U.S. App to collect additional Public Data feature categories, unless and until all of the following conditions are met:

(i)    The Security Committee reviews and approves the designation of such feature categories as Public Data following a determination that public release of such feature categories is consistent with the privacy policy for the TikTok U.S. App (either existing or updated to address the release of such feature categories), the DPCP, and standard industry practice by U.S. social media companies, such as YouTube, Facebook, Instagram, and Twitter;

(ii)    The Transaction Parties provide notice to the Third-Party Monitor and CMAs, including an updated version of Annex E, highlighting any new feature categories designated as Public Data with a rationale for each addition and screenshots of the TikTok U.S. App from the perspective of a TikTok U.S. User demonstrating that the data will be generally public unless an individual user makes such data private, in which case such data shall remain Protected Data for such individual;

(iii)    TTUSDS provides notice using plain language to TikTok U.S. Users of any change to the privacy policy, if required, for the TikTok U.S. App, highlighting any new feature categories, and the rationale for making such change; and

(iv)    The Transaction Parties have resolved any objections raised by the CMAs with the additional feature categories.  If the CMAs do not raise any objections within sixty (60) days following receipt of notice under Section 11.2(1)(ii), the lack of action shall constitute a non-objection.

(2)    The CMAs may raise objections to the collection of Public Data within approved feature categories or data fields within the feature categories by providing notice to the Security Committee.  The Transaction Parties may explain why any such Public Data should remain public and the potential business and operational impact of changing it to Protected Data. If, after this process, the CMAs, in consultation with the Security Committee, determine that the relevant feature category or data field within a feature category should be re-designated as Protected Data, the Transaction Parties shall implement a plan to re-designate the applicable Public Data as Protected Data within ninety (90) days of receiving the request from the CMAs; *provided, however*, that such a re-designation shall not be required if the Security Committee confirms that such feature category or data field within a feature category is consistent, at the time of consideration, with the DPCP and standard industry practice by similar U.S. companies such as YouTube, Facebook, Instagram, and Twitter.

(3)    TTUSDS shall not provide, and shall ensure the TTP does not provide, to ByteDance or any of its Affiliates any reports or datasets providing insights into Public Data to a greater extent than what a public Internet user could reasonably view or ascertain, without the prior review and approval by the Security Committee.  For the avoidance of doubt, the limitations in this Section 11.2(3) shall not restrict ByteDance or any of its Affiliates from receiving: (i) videos at a higher resolution than is ultimately published on the TikTok U.S. App;

47

(ii) other Public Data and/or datasets related to Public Data where the Public Data elements are accessible to Internet users, but not ordinarily in volumes and at speeds needed to operate the TikTok global platform; and (iii) any reports that otherwise can be or are produced by third parties based on or derived from Public Data.

11.3    Expatriate TikTok U.S. User Requests.

(1)    TTUSDS shall classify as a TikTok U.S. User any U.S. citizen who, upon registering through any version of the TikTok Global App, is not classified as a TikTok U.S. User and requests re-classification as a TikTok U.S. User, in accordance with a protocol to be developed by TTUSDS and subject to the prior non-objection of the CMAs (the "**Expatriate Request Protocol**").  At a minimum, TTUSDS shall ensure that such protocol provides for: (i) the option during new user registration on all versions of the TikTok Global App to allow U.S. citizens to select an option, and cause such user, to be re-classified as a TikTok U.S. User; (ii) sending a push notification to existing users of all versions of the TikTok Global App when first opened from a U.S. IP address notifying them of the option to be re-classified as a TikTok U.S. User if they are U.S. citizens; (iii) posting an article in the TikTok Global App Help Center regarding the option for U.S. citizens to be re-classified as a TikTok U.S. User; and (iv) including a feature within all versions of the TikTok Global App that enables users to select an option to be re-classified as a TikTok U.S. User if they are U.S. citizens.  In order to minimize risks of conflicts of laws, TTUSDS may, subject to non-objection by the CMAs, implement a protocol that allows users outside the United States to present identification to a third party, who is not an Affiliate of ByteDance, that will confirm whether the user should be treated as a TikTok U.S. User.  The Transaction Parties shall ensure that re-classification as a TikTok U.S. User is straightforward for users to find and complete.

(2)    By no later than the Operational Date, the Transaction Parties shall submit the Expatriate Request Protocol to the Third-Party Monitor and CMAs.  If the CMAs do not object in writing within fourteen (14) days following receipt of the Expatriate Request Protocol, the lack of action shall constitute a non-objection.  If the CMAs object to the proposed Expatriate Request Protocol, the Transaction Parties shall address all concerns raised by the CMAs to the CMAs' satisfaction in a revised Expatriate Request Protocol submitted to the CMAs within fourteen (14) days following receipt of the written objection, which revisions shall be subject to the prior non-objection of the CMAs in accordance with the same procedures as the initial Expatriate Request Protocol.  The Transaction Parties shall implement, and shall ensure the TTP implements, the Expatriate Request Protocol within three (3) days following the non-objection of the CMAs.

(3)    To the extent that a request or class of requests by U.S. Citizens to re-classify as TikTok U.S. Users pursuant to Section 11.3(1) conflicts with GDPR or other legal requirements, TTUSDS shall: (i) provide written notice to the Security Committee and Third-Party Monitor, including a detailed description of the legal requirements that create a conflict with citations to the relevant governing source(s); and (ii) coordinate with the TTP to present solutions to the Security Committee and Third-Party Monitor that could be implemented to minimize the conflict to the greatest extent possible.  TTUSDS shall ensure that the Security

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

Committee consults quarterly with the CMAs regarding any such conflicts and works in good faith to address any concerns raised by the CMAs.

(4)     TTUSDS shall ensure that the Security Committee reviews all requests by users of the TikTok U.S. App or other versions of the TikTok Global App to de-classify as TikTok U.S. Users, and only approves such requests, with the balance weighed in favor of denial, where: (i) the user has not within the past sixty (60) days accessed the TikTok U.S. App or any other versions of the TikTok Global App from within the United States; and (ii) the user identifies his or her appropriate country of citizenship.

11.4    <u>End User Agreements and User Policies</u>.  TikTok Inc. and TTUSDS shall submit advance notice to the CMAs of any intention to change materially the Terms of Service, with such materiality to be determined in consultation with the Third-Party Monitor, the privacy policy for the TikTok U.S. App, content moderation policy, or other published policies similar thereto (each, a "**User Agreement**") so the CMAs may review such User Agreements for consistency with this Agreement.  Any material change, as determined in consultation with the Third-Party Monitor, to a User Agreement shall be subject to the prior non-objection of the CMAs except as otherwise provided herein.  If the CMAs do not raise any objections within fifteen (15) days following receipt of the proposed change, the lack of action shall constitute a non-objection.  TikTok Inc. and TTUSDS shall address all feedback from the CMAs prior to finalizing changes to any User Agreement; *provided, however*, that there shall be no limitation on finalizing such changes prior to the non-objection of the CMAs as long as TikTok Inc. and TTUSDS, as the case may be: (1) include in the original notice to the CMAs a clear explanation of the need for urgent implementation; and (2) address any feedback from the CMAs as promptly as possible after receipt.  Notice to the CMAs pursuant to this Section 11.4 shall constitute notice only under this Section 11.4 and shall not satisfy any other notice requirements.  Any feedback or non-objection by the CMAs under this Section 11.4 is specific to the change to the particular User Agreement and does not represent a USG determination applicable to any other context.

11.5    <u>Protected Data Storage</u>.  The Transaction Parties shall ensure that all Protected Data, while such Protected Data remains in the possession of the Transaction Parties, is stored and remains: (1) exclusively in the United States, with no transmittal outside of the United States except as otherwise provided in this Agreement; and (2) within the TTP's secure cloud environment, both except as expressly provided in this Agreement or otherwise by the prior written consent of the CMAs.  The Transaction Parties shall ensure that any Protected Data transferred to third parties (and therefore not in the possession of the Transaction Parties) is subject to the vendor reviews and policies under Article XIII.  For the avoidance of doubt, Section 11.5(1) shall not prohibit TTUSDS Personnel in DTC Approved Countries from Accessing Protected Data through the TTP's secure cloud environment.  The Transaction Parties shall ensure the TTP promptly reports any non-compliance with this Section 11.5 to the Third-Party Monitor and CMAs.

11.6    <u>User Interaction Data Deletion</u>.  The Transaction Parties shall ensure that all User Interaction Data in the possession of the Transaction Parties is deleted no later than eighteen (18) months after it is stored on the TikTok U.S. Platform or otherwise deleted in accordance with applicable law.  For the avoidance of doubt, this deletion requirement applies to all data related

USCA Case #24-1113    Document #2060757    Filed: 06/20/2024    Page 214 of 267

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

to individual users and their private interactions with content on the TikTok U.S. App (e.g., data on specific individuals who viewed or liked a video) but does not apply to aggregated data (e.g., the total number of views or likes a video has received).

11.7    <u>Initial Transfer of Protected Data</u>.  By no later than the Operational Date, ByteDance shall transfer, and shall ensure that its Affiliates transfer, all Protected Data held by ByteDance and its Affiliates as of the Effective Date or acquired thereafter (collectively, the "**Legacy Protected Data**") to the TTP (the date of such transfer, the "**Transfer Date**"); *provided, however*, that if any Legacy Protected Data is subject to any litigation hold or legal preservation requirement as of the Transfer Date, ByteDance may transfer such Protected Data to a third-party approved in advance by the CMAs to hold such data in escrow pending satisfaction of the applicable litigation hold or legal preservation requirement.  On or prior to the Transfer Date, ByteDance shall notify the CMAs in writing of any litigation hold or legal preservation requirement applicable to any Legacy Protected Data.  ByteDance shall provide written confirmation to the Third-Party Monitor and CMAs promptly upon the successful transfer of all Legacy Protected Data, or report ByteDance's failure to transfer all Legacy Protected Data by the Transfer Date.

(1)    Within one-hundred twenty (120) days following confirmation that all Legacy Protected Data has been successfully transferred (the "**Deletion Date**"), ByteDance shall irretrievably destroy, or cause to be irretrievably destroyed, all Protected Data, including copies thereof, wherever located, in the possession or control of ByteDance or any of its Affiliates, in accordance with the "Clear" level articulated in the NIST principles for sanitization and destruction of data.  ByteDance shall submit monthly reports to the Third-Party Monitor and CMAs on its progress destroying Protected Data by the deadline herein.

(2)    Within sixty (60) days following the Deletion Date, the Transaction Parties shall ensure that all assets and operations in the United States of the Transaction Parties and their respective Affiliates that support, or have supported, the TikTok U.S. App and TikTok U.S. Platform undergo one or more audits (each, a "**U.S. Deletion Audit**") to confirm the irretrievable destruction of all Protected Data.  The auditor, timing, scope, and methodology of the U.S. Deletion Audits shall be subject to the prior non-objection of the CMAs.  By no later than the Deletion Date, the Transaction Parties shall submit sufficient information regarding the proposed auditor and scope of the U.S. Deletion Audits for the CMAs to assess the nominee and proposal.  If the CMAs do not object in writing to the nominee and proposal within twenty-one (21) days following receipt, the lack of action shall constitute a non-objection.  The Transaction Parties shall ensure that the auditor starts the initial U.S. Deletion Audit within five (5) days following the CMAs' non-objection and completes the initial U.S. Deletion Audit consistent with the proposal.  If the CMAs object to the proposed auditor or proposal, the Transaction Parties shall submit an alternative auditor or modified proposal, as applicable, which resolves the concerns raised to the CMAs' satisfaction, within fourteen (14) days following the Transaction Party's receipt of any such objection, subject to the same procedures as the initial review.  The Transaction Parties shall ensure that the auditor provides the results of each U.S. Deletion Audit to the CMAs within three (3) days following its completion.  The Transaction Parties shall take, and shall ensure that their respective Affiliates take, all remedial actions deemed necessary by

the auditor or CMAs, in their sole discretion, based upon the results of any U.S. Deletion Audit within thirty (30) days of its completion unless otherwise extended in writing by the CMAs (including shutting down IT systems that continue to store or provide Access to Protected Data until such time that all Protected Data is irretrievably destroyed). The Transaction Parties shall provide, and shall ensure that their respective Affiliates provide, the auditor with all Physical Access and Logical Access necessary to interview Personnel and to conduct the U.S. Deletion Audits within the scope approved by the CMAs, including Physical Access and Logical Access to inspect any IT systems, networks, hardware and software, data, communications systems, properties, records and documents, and correspondence in the possession or control of the Transaction Parties. The Transaction Parties shall be responsible for all costs and expenses in connection with the U.S. Deletion Audits.

(3)     Within sixty (60) days following the Deletion Date, ByteDance shall further certify, through verification processes developed in coordination with a third party retained by and at the sole expense of ByteDance and subject to the CMAs' approval, that all Protected Data has been irretrievably destroyed globally (the "**Global Deletion Verification**"). ByteDance shall take, and shall ensure that its Affiliates take, all remedial actions identified by the third party, in its sole discretion, as a result of the Global Deletion Verification within thirty (30) days of its completion unless otherwise extended in writing by the CMAs (including shutting down IT systems that continue to store or provide Access to Protected Data until such time that all Protected Data is irretrievably destroyed). ByteDance shall provide, and shall ensure that its Affiliates provide, the third party with all Physical Access and Logical Access necessary to conduct the Global Deletion Verification, including Physical Access and Logical Access to interview Personnel and to inspect any IT systems, networks, hardware and software, data, communications systems, properties, records and documents, and correspondence in the possession or control of the Transaction Parties. ByteDance shall deliver the certification of the Global Deletion Verification to the CMAs no later than fourteen (14) days following completion of the Global Deletion Verification. Thereafter, ByteDance shall annually certify, on behalf of itself and its Affiliates, to the CMAs that it does not possess, and cannot Access, any Protected Data or copies thereof.

11.8    Restricted Access to Protected Data.  Following the Deletion Date, ByteDance and TikTok Inc. shall not take possession of or Access, and shall ensure that none of their respective Affiliates take possession of or Access, any Protected Data, whether Legacy Protected Data or Protected Data collected, derived, or stored on or after the Transfer Date, without the prior written consent of the CMAs. For the avoidance of doubt, this Section 11.8 shall not limit ByteDance's Access to Excepted Data or Public Data in accordance with this Agreement. TTUSDS shall ensure that Access to Protected Data is limited to those Personnel who require Access to fulfill their assigned job responsibilities. The Transaction Parties shall ensure the TTP implements controls and safeguards to ensure compliance with these requirements, including: (1) Physical and Logical Access controls necessary to safeguard Protected Data generally; and (2) the ability to refuse Logical Access by the Transaction Parties or any Affiliate thereof to Protected Data. In the event that a TTP is removed or replaced, TTUSDS shall ensure the previous TTP retains control of all Protected Data unless and until the CMAs consent to a new TTP or an alternate custodian of Protected Data. The Transaction Parties shall ensure the TTP

promptly reports any non-compliance with this Section 11.8 to the Third-Party Monitor and CMAs.

11.9     Limited Access to Protected Data.  Notwithstanding the restrictions in Sections 11.8 and 11.10, in addition to TTUSDS Personnel who require Access to Protected Data to fulfill their assigned job responsibilities, certain Personnel of the Transaction Parties and their Affiliates may Access certain fields of Protected Data for the limited purposes of addressing legal and compliance matters and certain other emergency situations involving the health, safety, and security of TikTok users and the public in and outside the United States; *provided* that any such Access is strictly in accordance with a protocol (the "**Limited Access Protocol**") developed by the Transaction Parties and the TTP and subject to the prior non-objection of the CMAs.

(1)     In the Limited Access Protocol, the Transaction Parties shall, among other issues, identify all circumstances under which certain ByteDance or TikTok Inc. Personnel may Access Protected Data; the requirements related to those Personnel, including any citizenship, residency, location, and screening requirements; the particular fields and formats of the Protected Data such Personnel may Access; and the method for providing such Access to Protected Data, which shall be through a secure, auditable environment created and maintained by the TTP.

(2)     Prior to ByteDance, TikTok Inc., or any of their respective Affiliates having any Access to Protected Data under this Section 11.9, the Transaction Parties shall submit the Limited Access Protocols to the Third-Party Monitor and CMAs.  If the CMAs do not object in writing within thirty (30) days following receipt of the Limited Access Protocol, the lack of action shall constitute a non-objection.  If the CMAs object to the proposed Limited Access Protocol, the Transaction Parties shall address all concerns raised by the CMAs to the CMAs' satisfaction in a revised Limited Access Protocol submitted to the CMAs within thirty (30) days following receipt of the written objection, which shall be subject to the prior non-objection of the CMAs in accordance with the same procedures as the initial Limited Access Protocol.  The Transaction Parties shall fully implement, and shall ensure the TTP fully implements, the Limited Access Protocol prior to ByteDance, TikTok Inc., or any of their respective Affiliates having any Access to Protected Data under this Section 11.9.  The Transaction Parties shall ensure the TTP promptly reports any non-compliance with the Limited Access Protocol or this Section 11.9 to the Third-Party Monitor and CMAs.

11.10     Restricted Persons.  The Transaction Parties shall not transfer, and shall ensure that none of their respective Affiliates or the TTP transfer, any Protected Data to any CFIUS Restricted Persons unless otherwise approved by the CMAs.  The Transaction Parties shall ensure that any Protected Data transferred to third parties (and therefore not in the possession of the Transaction Parties) is subject to the vendor reviews and policies under Article XIII.  The Transaction Parties shall ensure the TTP promptly reports any non-compliance with this Section 11.10 to the Third-Party Monitor and CMAs.

11.11     Separate Credentials.  By no later than the Operational Date, TTUSDS shall ensure the TTP implements controls such that any Logical Access to Protected Data requires additional, separate credentials.  TTUSDS shall ensure that the controls implemented jointly by the TTP via the MSA and TTUSDS require credentials that are based on security best practices

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

(e.g., multiple factors of authentication) and restrict Logical Access based on a Person's physical location to the fullest extent possible and need to Access Protected Data to fulfill his or her assigned job responsibilities, in order to ensure compliance with this Agreement. TTUSDS shall ensure the TTP only allows Personnel of the TTP and TTUSDS who need Access to fulfill their assigned job responsibilities, or other Persons only in accordance with the Limited Access Protocol or with prior written consent of the CMAs, to hold credentials that allow Logical Access to Protected Data.

      11.12   <u>Data Security Certifications</u>.  Each of the Transaction Parties shall submit, and shall ensure the TTP submits, to the CMAs, on a semiannual basis, a certification regarding its full compliance with this Agreement's requirements related to Protected Data.

      11.13   <u>Training by the TTP</u>.  TTUSDS shall ensure the TTP regularly, and not less than annually, trains the TTP's relevant Personnel (including training new relevant Personnel as part of the initial onboarding process) on the MSA and this Agreement's requirements related to Protected Data.

## ARTICLE XII

## DATA PRIVACY AND CYBERSECURITY PROGRAM

      12.1   <u>Program Establishment</u>.  TTUSDS shall establish and maintain, and shall ensure the TTP establishes and maintains, a comprehensive data privacy and cybersecurity program (each, a "**DPCP**") that shall include policies and procedures to ensure compliance with this Agreement, including measures to safeguard Protected Data, Excepted Data, and Public Data (each as within the respective possession of TTUSDS and the TTP) and to enforce the Physical Access and Logical Access restrictions and Source Code and Related Files security measures. For the avoidance of doubt, the TTP DPCP shall only apply with respect to the TTP's roles and responsibilities as defined by the MSA.

      (1)   TTUSDS, in coordination with the TTP and Third-Party Monitor, shall develop the DPCP in accordance with standards developed or published by the following standards organizations and/or as further specified: (i) NIST, including NIST Special Publication 800-82, Guide to Industrial Control Systems (2015); (ii) the NIST Framework for Improving Critical Infrastructure Cybersecurity, Draft Version 1.1 (January 10, 2017); (iii) NIST Special Publications 800-53 and 800-171, Revision 4; (iv) ISO, including ISO/IEC 27001 and 27002 standards; (v) the successor versions of each of Section 12.1(1)(i)-(iv); (v) the Center for Internet Security; or (vi) another standards organization with provisions pertaining to data protection as communicated by the Third-Party Monitor or CMAs.

      (2)   TTUSDS, in coordination with the TTP and Third-Party Monitor, shall ensure that the DPCP includes, consistent with the framework on which it is based, provisions for: the encryption of all Protected Data, Excepted Data, and Public Data in transit and select Protected Data, Excepted Data, and Public Data at rest as identified in the DPCP; inventory of authorized devices, software, hardware, applications, and credentials; secure configurations of systems and devices; data recovery; security training; Physical Access and Logical Access

controls; log controls; incident detection, handling, and response; penetration testing; and other robust processes and protections necessary for the activities set forth in this Agreement, including the secure submission and inspection of Source Code and Related Files, persistent monitoring of interactions of the TikTok U.S. App and TikTok U.S. Platform, unauthorized Access to or transmission of Protected Data, and other requirements set forth under this Agreement.

(3)     TTUSDS, in coordination with the Third-Party Monitor, shall ensure that the DPCP provides for independent IT systems, networks, communications systems, and other resources that are logically segregated from those of ByteDance or any of its Affiliates, and to which none of ByteDance or any of its Affiliates has any Access.

(4)     TTUSDS, in coordination with the TTP and Third-Party Monitor, shall ensure that the DPCP provides for an annual vulnerability assessment of the TikTok U.S. App and TikTok U.S. Platform to be conducted by the TTP.  TTUSDS shall ensure that the Security Officer and Technology Officer jointly report the findings of such vulnerability assessments to the Third-Party Monitor and CMAs, along with their plans to address any such findings.

(5)     As part of the DPCP, TTUSDS shall develop, and shall ensure the TTP implements, a violation reporting plan requiring all Personnel to report actual or potential violations of this Agreement or the DPCP to the Security Officer (in the case of TTUSDS) or Technology Officer (in the case of the TTP).  Such plan shall include protections against retaliation for all Personnel.

12.2    Adoption.  The adoption of the DPCP shall be subject to the prior non-objection of the CMAs.  TTUSDS, in coordination with the TTP and Third-Party Monitor, shall submit a draft of the DPCP to the CMAs within thirty (30) days following the Operational Date.  If the CMAs do not object in writing to the draft DPCP within thirty (30) days following receipt, the lack of action shall constitute a non-objection.  If the CMAs object to the proposed DPCP, TTUSDS shall address, and shall ensure the TTP addresses, all concerns raised by the CMAs to the CMAs' satisfaction in a revised draft of the DPCP submitted to the CMAs within thirty (30) days following receipt of the written objection, which revised draft shall be subject to the prior non-objection of the CMAs in accordance with the same procedures as the initial draft.  TTUSDS shall implement, and shall ensure the TTP implements, the DPCP within three (3) days following non-objection of the CMAs.

12.3    Amendment.  If at any time TTUSDS (including the Security Committee), the TTP, or the CMAs determine that the DPCP should be amended, TTUSDS shall engage, in coordination with the TTP and Third-Party Monitor, with the CMAs to amend the DPCP.  Any amendment of the DPCP shall be subject to the prior non-objection of the CMAs in accordance with the same procedures as the initial draft of the DPCP.

12.4    Dissemination and Training.  Within thirty (30) days following the non-objection of the CMAs to the DPCP, TTUSDS shall disseminate, and shall ensure the TTP disseminates, the DPCP to all appropriate Personnel.  TTUSDS, in coordination with the TTP, shall ensure that all appropriate existing and new Personnel of TTUSDS and the TTP receive training on the

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

DPCP (the "**Training**").  TTUSDS shall ensure that all appropriate new Personnel of TTUSDS and the TTP receive the DPCP and complete the Training, and that all such existing Personnel complete a refresher Training at least annually.  TTUSDS shall ensure that the Security Officer (in the case of TTUSDS) and the Technology Officer (in the case of the TTP) implement and oversee the dissemination and Training processes.

12.5    <u>Confidentiality</u>.  TTUSDS shall not share, and shall ensure the TTP does not share, the DPCP or any contents thereof with ByteDance or any of its Affiliates, including their respective Personnel, without the prior written consent of the CMAs.

12.6    <u>Violations</u>.  TTUSDS shall ensure that the Security Officer and Technology Officer report any actual or potential violation of the DPCP and any remedial actions taken to the CMAs as soon as practicable, and in any event within one (1) day of discovery of the actual or potential violation.  TTUSDS shall ensure that the Security Officer and Technology Officer each independently maintain a log of any reports received from individuals regarding perceived violations of the DPCP, whether or not ultimately reported to the CMAs.  Any violation of the DPCP shall be deemed to constitute a violation of this Agreement, and the failure by TTUSDS or the TTP to obtain authorizations and approvals that are necessary to comply with the DPCP shall not excuse a violation of the DPCP.

## <u>ARTICLE XIII</u>

## <u>VENDOR APPROVALS</u>

13.1    <u>Identification of Vendors</u>.  Within ninety (90) days following the Effective Date, the Transaction Parties shall submit to the Security Committee, Third-Party Monitor, and CMAs (or, if the Third-Party Monitor has not been engaged by the time of submission, within three (3) days following its engagement):

(1)    a list and description of all third-party contracts and other arrangements as of the Effective Date with third parties that support or will support the TikTok U.S. App or the TikTok U.S. Platform, or that otherwise support TTUSDS and have Access to Protected Data or systems on which Protected Data is stored, or that otherwise provide for the sale of Protected Data, other than those on the Existing Vendors and Contracts List (as defined below).

(2)    a list and description of contracts that are with the TTP or vendors directly contracted by the TTP as of the Effective Date (the lists and summaries identified in clauses (1) and (2) of this Section 13.1 collectively, the "**Existing Vendors and Contracts List**").

The Transaction Parties shall ensure that the Existing Vendors and Contracts List identifies the following information for each contract: the vendor (including its place of legal organization and principal place of business), the service provided, and any equipment supplied.

13.2    Thereafter, TTUSDS shall, periodically and no less frequently than semi-annually, review the same information described in Section 13.1(1) for each such contract, vendor, and other arrangement that is in place, update it as necessary to be accurate and complete

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

as of the date of review, and submit the updated information to the Third-Party Monitor (each such list, a "**Vendors and Contracts List**").  The Transaction Parties shall ensure that the Third-Party Monitor reviews the Existing Vendors and Contracts List used by TTUSDS and each Vendors and Contracts List and identifies all contracts that could permit a vendor to Access Protected Data or the TikTok U.S. Platform through TTUSDS (collectively, the "**Existing Vendor Contracts**") and notifies the Security Committee and the CMAs of all Existing Vendor Contracts.  TTUSDS shall ensure that the Security Committee and Third-Party Monitor provide to the CMAs, within seven (7) days of a request by the CMAs, information regarding any current or prospective third-party vendors, contracts with third-party vendors, or information regarding the review of any current or prospective third-party vendor.

13.3    <u>Review of Existing Vendor Contracts</u>.  TTUSDS shall ensure that, within forty-five (45) days following any submission under Section 13.1, the Security Committee evaluates all of the Existing Vendor Contracts, with review and oversight by the Third-Party Monitor, to determine if they are consistent with the obligations under this Agreement, and identify, in the Security Committee's sole discretion, any Existing Vendor Contracts that may allow for actions contrary to this Agreement and any information regarding any vendor party to any Existing Vendor Contract that causes the Security Committee to believe that the vendor's engagement under such Existing Vendor Contract has undermined, or would be reasonably likely to undermine, the effectiveness of this Agreement, including, as appropriate, the vendor's ability to meet its obligations under such Existing Vendor Contract.  In evaluating any Existing Vendor Contract, TTUSDS shall ensure that the Security Committee and Third-Party Monitor consider any concerns identified by the CMAs.  TTUSDS shall ensure that, upon a conclusion by the Security Committee and Third-Party Monitor, or, in the event that the Security Committee and the Third-Party Monitor do not reach consensus, by the CMAs, that any Existing Vendor Contract undermines or is contrary to this Agreement or that information regarding any vendor party to an Existing Vendor Contract supports a concern that engagement of the vendor under an Existing Vendor Contract has undermined, or is reasonably likely to undermine, the effectiveness of this Agreement, including, as appropriate, a concern that the vendor is unable to meet its obligations under an Existing Vendor Contract (each such determination, a "**Contrary Determination**"), the Security Committee and/or the Third-Party Monitor shall notify TTUSDS to which the Existing Vendor Contract relates, and TTUSDS shall immediately: (1) cause the termination or modification of such Existing Vendor Contract so that it no longer allows for actions contrary to this Agreement, as determined by the Security Committee and/or Third-Party Monitor in their sole discretion; (2) cause the termination of any role by a vendor party to such Existing Vendor Contract so that it is no longer a party to the Existing Vendor Contract; (3) take all actions necessary to end and prevent Logical Access to Protected Data or the TikTok U.S. Platform by the vendor at issue until a revised contract is executed or a new vendor is substituted, if applicable, that resolves the concerns of the Security Committee and Third-Party Monitor, in their sole discretion, and if applicable; and (4) notify the CMAs within three (3) days of the Contrary Determination.

(1)    Within fourteen (14) days following the later of the completion by the Security Committee and Third-Party Monitor of a review of Existing Vendor Contracts and by TTUSDS of action regarding any Contrary Determination, TTUSDS shall notify the Third-Party

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

Monitor and the CMAs of: (i) any Existing Vendor Contracts that have been terminated or modified; (ii) any vendors terminated as a party to an Existing Vendor Contract; (iii) the reason for such termination or modification; and (iv) all other actions taken to address a Contrary Determination.

13.4    <u>New Vendor Contracts</u>.  TTUSDS shall not enter into, and shall ensure that its Affiliates do not enter into, any contract with a vendor that undermines or is contrary to this Agreement.  TTUSDS, with the oversight of the Third-Party Monitor, shall ensure that the Security Committee continues to review all potential (other than routine commercial transactions between TTUSDS and advertising or e-commerce customers) contracts with new vendors or existing vendors providing a new type of service, in each case that will support the TikTok U.S. App, the TikTok U.S. Platform, or that otherwise support TTUSDS and have Access to Protected Data or systems on which Protected Data is stored (any such contract, a "**New Vendor Contract**").  TTUSDS shall ensure that the Security Committee notifies the Security Officer, Third-Party Monitor, and CMAs of any New Vendor Contracts that undermine or are contrary to this Agreement, including based on information regarding any vendor party to a New Vendor Contract that supports a concern that engagement of the vendor under a New Vendor Contract has undermined, or is reasonably likely to undermine, the effectiveness of this Agreement, including, as appropriate, a concern that the vendor will be unable to meet its obligations under a New Vendor Contract.  Where the Security Committee determines that a potential New Vendor Contract is not consistent with this Agreement in its sole discretion, the Transaction Parties shall not execute such contract.  Upon request by the CMAs, TTUSDS shall provide the CMAs with a list of New Vendor Contracts.

13.5    <u>Vendor Program Policy</u>.  TTUSDS, in coordination with the Third-Party Monitor, shall implement a program (the "**Vendor Program**") whereby all New Vendor Contracts (including, for the avoidance of doubt, the vendors who are parties to such contracts) will be subject to initial and periodic review and non-objection by the Third-Party Monitor against criteria and risk factors to be identified, and TTUSDS shall adopt a written policy for the Vendor Program (the "**Vendor Program Policy**"), subject to the prior review and non-objection of the Security Committee and the CMAs.  The Transaction Parties shall comply with the requirements of the Vendor Program Policy and shall share all necessary information with TTUSDS and the Third-Party Monitor to implement the Vendor Program Policy.

(1)    TTUSDS shall submit a draft Vendor Program Policy to the Third-Party Monitor and CMAs by no later than ninety (90) days following the Operational Date.

(2)    The adoption of the Vendor Program Policy shall be subject to the prior non-objection of the CMAs.  If the CMAs do not object in writing to the draft Vendor Program Policy within thirty (30) days following receipt, the lack of action shall constitute a non-objection.  If the CMAs object to the draft Vendor Program Policy, TTUSDS shall address all concerns raised to the CMAs' satisfaction and submit a revised draft of the Vendor Program Policy to the CMAs within twenty-one (21) days following receipt of the written objection, which subsequent draft shall be subject to the same procedures as the initial draft.  TTUSDS shall adopt the Vendor Program Policy within three (3) days following the non-objection of the CMAs.  Upon adoption of the Vendor Program Policy, the Transaction Parties shall not execute,

57

finalize, or implement any New Vendor Contract that is inconsistent with the Vendor Program Policy, including the requirement to obtain the prior non-objection of the Third-Party Monitor. Any revisions or amendments to the Vendor Program Policy shall be subject to the prior non-objection of the CMAs, subject to the same procedures as the initial draft.

(3)     TTUSDS shall ensure that the Security Committee, with oversight by the Third-Party Monitor, oversees and maintains the Vendor Program Policy governing New Vendor Contracts to ensure compliance with this Agreement and the Vendor Program Policy. TTUSDS shall ensure that the Security Committee and the Third-Party Monitor have the authority to approve, reject, mitigate, or otherwise condition the engagement of any New Vendor Contract or any vendor party to a New Vendor Contract. TTUSDS shall ensure that any New Vendor Contract: (i) explicitly incorporates the requirements of this Agreement, as applicable, and (ii) provides TTUSDS with any contractual rights it will require to comply with the Vendor Program Policy, including to assess the risk factors set forth in the Vendor Program Policy and to periodically review third-party vendors.

(4)     TTUSDS shall ensure that the Security Committee and Third-Party Monitor considers any information provided by the CMAs regarding current or prospective New Vendor Contracts or vendors party to New Vendor Contracts and implements any recommendations from the CMAs regarding approving, rejecting, mitigating, or otherwise conditioning the engagement of any New Vendor Contract or any vendor party to a New Vendor Contract. To support any such recommendation, the CMAs may provide a justification to the Security Committee and Third-Party Monitor, based on relevant available unclassified information. To the extent that the recommendation is predicated on classified information, or other information that cannot be shared with the Security Committee and Third-Party Monitor, the CMAs may indicate so and share the relevant information with those Security Committee members, if any, who do possess the requisite qualifications for Access to such information.

(5)     TTUSDS shall ensure that the Vendor Policy Program, at a minimum, evaluates third-party vendors based on risk factors including: (a) the type, functionality and intended location of equipment, products, or services to be provided by the third-party vendor; (b) the intended usage and deployment of such equipment, products, or services to or within a DTC and the TikTok U.S. Platform; (c) the nature of Access to Protected Data, Source Code and Related Files, the TikTok U.S. Platform, or other sensitive operations of TTUSDS or the TTP to be granted to the third-party vendor; (d) the third-party vendor's record of compliance with relevant U.S. laws, regulations, standards, and contracts, as well as any applicable domestic or international data protection laws and regulations; (e) the third-party vendor's record of compliance with cybersecurity standards and any security breaches, to the extent known; (f) the country in which the third-party vendor maintains its principal place of business or conducts substantial operations; and (vi) any other risk factors identified by the Third-Party Monitor or CMAs in their sole discretion.

13.6    CMA Waivers. In connection with the review of the Existing Vendors and Contracts List, each Vendors and Contracts List, New Vendor Contracts, and the development and implementation of a Vendor Program Policy, TTUSDS may request, and the CMAs may

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

grant in their sole discretion, a waiver for any individual third-party vendors to be exempt for a specified period of time or completely from such future reviews.

13.7    <u>TTP Access to Vendor Information</u>.  TTUSDS shall ensure the TTP has Access to all vendor information it needs to discharge its responsibilities under this Agreement.  For the avoidance of doubt, there is a presumption that the sharing of commercially sensitive competitive pricing or related information shall not be necessary for the TTP to discharge its responsibilities under this Agreement.

**ARTICLE XIV**

**CYBERSECURITY AUDITS**

14.1    <u>Cybersecurity Audit</u>.  TTUSDS shall engage, at its own expense, a U.S.-based independent third party that has no current or prior contractual, financial, or fiduciary relationship with ByteDance or any of its Affiliates, unless otherwise agreed to by the CMAs (the "**Cybersecurity Auditor**"), to conduct and complete a cybersecurity audit and prepare a report regarding its findings (the "**Cybersecurity Audit**").  TTUSDS shall, in coordination with the TTP, propose the terms, scope, methodology, and timeframe for completion of the Cybersecurity Audit (the "**Cybersecurity Audit Plan**").  The Cybersecurity Auditor and Cybersecurity Audit Plan shall be subject to the prior non-objection of the CMAs.  TTUSDS shall ensure that the Cybersecurity Audit is undertaken in accordance with the Cybersecurity Audit Plan and includes an audit of each of the following:

> (1)    the TTP's deployment of the TikTok U.S. Platform;

> (2)    the establishment of the DTC and implementation of the DTC Operating Protocols;

> (3)    TTUSDS's and the TTP's processes and tools for reviewing, inspecting, and compiling Source Code and Related Files and deployment of Executable Code in accordance with Section 9.10;

> (4)    the identification of any vulnerabilities designated as high severity or equivalent, including any instance of Malicious Code in the Source Code and Related Files or Executable Code, and the remediation of such issues;

> (5)    the implementation and effectiveness of the mobile sandbox for the TikTok U.S. App pursuant to Section 9.8;

> (6)    the storage and protection of Protected Data, including verification of the newly created credentials for Logical Access to Protected Data and that none of the Transaction Parties has Access to Protected Data except as permitted under this Agreement;

59

**APP-216**

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

(7)    the secure and fully auditable environment through which Personnel of the ByteDance and its Affiliates may Access certain fields of Protected Data pursuant to the Limited Access Protocol; and

(8)    TTUSDS's and the TTP's implementation of and compliance with the DPCP.

14.2    Cybersecurity Auditor and Audit Plan.

(1)    Within one hundred and eighty (180) days following the Operational Date, TTUSDS shall submit to the CMAs the name of the proposed Cybersecurity Auditor, the proposed terms of engagement, and any other information requested by the CMAs to assess the proposal.  If the CMAs do not object in writing within thirty (30) days following receipt of all necessary information, as determined by the CMAs in their sole discretion, the lack of action shall constitute a non-objection.  If the CMAs object to the proposed Cybersecurity Auditor or terms of engagement, TTUSDS shall, within fourteen (14) days following receipt of any such objection, propose a different Cybersecurity Auditor and make changes to the proposed terms of engagement, in each case subject to the same procedures as the initial proposal.  If the CMAs object to the second proposed Cybersecurity Auditor, TTUSDS shall, within fourteen (14) days following receipt of such objection, propose three (3) Cybersecurity Auditors, from which the CMAs may select the Cybersecurity Auditor.  TTUSDS shall engage the Cybersecurity Auditor within three (3) days following the non-objection of, or (if applicable) selection by, the CMAs.

(2)    TTUSDS, in coordination with the TTP and Third-Party Monitor, shall develop the Cybersecurity Audit Plan and, no later than twenty-one (21) days following the engagement of the Cybersecurity Auditor, submit the proposed Cybersecurity Audit Plan to the CMAs.  If the CMAs do not object in writing within twenty-one (21) days following receipt of the Cybersecurity Audit Plan, the lack of action shall constitute a non-objection.  If the CMAs object, TTUSDS shall, in coordination with the TTP and Third-Party Monitor and within fourteen (14) days following receipt of such objection, resolve all concerns raised by the CMAs and submit a revised Cybersecurity Audit Plan to the CMAs, subject to the same procedures as the initial proposal.  TTUSDS shall ensure that the Cybersecurity Auditor fully completes the Cybersecurity Audit in accordance with the Cybersecurity Audit Plan.

14.3    Review of Findings.  TTUSDS shall ensure that the Security Officer and Technology Officer, in consultation with the Security Committee, have the opportunity to review and comment on the preliminary findings of the Cybersecurity Audit.  TTUSDS shall ensure that the Cybersecurity Auditor submits to the CMAs the preliminary and final Cybersecurity Audit report findings within three (3) days of the completion of each such report, and that the Security Officer and Technology Officer submit to the CMAs their responses to such reports.

14.4    Implementation Plan.  Following completion of the Cybersecurity Audit and submission of the final Cybersecurity Audit report, TTUSDS shall ensure that the Security Officer submits to the CMAs a plan for implementing all recommendations arising from the Cybersecurity Audit within sixty (60) days following receipt of the final Cybersecurity Audit report.  TTUSDS shall fully implement such plan within sixty (60) days following its submission

of its remediation plan to the CMAs, absent an objection by the CMAs to such plan or CMA approval for another timeline.  If the CMAs object to the plan, TTUSDS shall resolve any concerns raised by the CMAs, including by submitting a revised implementation plan for CMA review if requested by the CMAs, within such reasonable period of time as determined by the CMAs in their sole discretion.

    14.5    <u>Additional Cybersecurity Audits</u>.  The CMAs may, in their sole discretion, require TTUSDS to undertake additional Cybersecurity Audits, subject to the same procedures as the initial Cybersecurity Audit, but no more than once (1) per year.

    14.6    <u>Costs of the Cybersecurity Audits</u>.  TTUSDS shall be responsible for all fees, costs, and expenses related to any Cybersecurity Audit.

**<u>ARTICLE XV</u>**

**<u>THIRD-PARTY AUDITS</u>**

    15.1    Upon a request by the CMAs, but no more than once (1) per year, each Transaction Party shall, at its own expense, engage a U.S.-based third-party independent auditor (the "**Third-Party Auditor**") to assess its overall compliance with this Agreement (the "**Audit**").  For the avoidance of doubt, the Transaction Parties may propose the same third-party independent auditor.  The relevant Transaction Party shall ensure that the Third-Party Auditor is available to meet and confer with the CMAs independent of any of the other Transaction Parties.

    (1)    <u>Review by CMAs</u>.  The Third-Party Auditor and the scope, methodology, and timeframe for completion of the Audit (the "**Audit Plan**") shall be subject to prior non-objection of the CMAs.  The relevant Transaction Party shall submit sufficient information for the proposed Third-Party Auditor and Audit Plan for the CMAs to assess the nominee and proposal within thirty (30) days following the request of the CMAs.  If the CMAs do not object in writing to the Third-Party Auditor and the Audit Plan within thirty (30) days following receipt, the lack of action shall constitute a non-objection.  The relevant Transaction Party shall ensure that the Third-Party Auditor starts the Audit within five (5) days following the CMAs' non-objection and fully completes the Audit in accordance with the Audit Plan.  If the CMAs object to the proposed Third-Party Auditor or Audit Plan, the Transaction Party shall submit an alternative Third-Party Auditor or modified Audit Plan, which in each case shall resolve the concerns raised to the CMAs' satisfaction, within fifteen (15) days following the Transaction Party's receipt of any such objection, subject to the same procedures as the initial nominee or proposal, as applicable.  The Transaction Parties shall be responsible for all fees, costs, and expenses related to any Audits.

    (2)    <u>Audit Report</u>.  Each Transaction Party shall require the respective Third-Party Auditor to produce a written final Audit report, which shall include a list of any identified vulnerabilities or deficiencies that have affected or could affect such Transaction Party's compliance with this Agreement.  The Transaction Party shall ensure that the audit report is provided to the Security Committee, the Security Officer, the Third-Party Monitor, and the

61

**APP-218**

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

CMAs.  The CMAs may require supplemental reports if any final audit report is not consistent with the CMAs' expectations related to the details of the analysis and conclusions presented.

**ARTICLE XVI**

**THIRD-PARTY MONITOR**

16.1    Engagement.  Within thirty (30) days following the Effective Date, the Transaction Parties shall nominate an independent third-party monitor (the "**Third-Party Monitor**") to monitor the Transaction Parties' compliance with this Agreement and serve as a point of contact for the CMAs.  The engagement of the Third-Party Monitor shall be subject to the prior non-objection of the CMAs.  The Transaction Parties shall submit sufficient information to allow the CMAs to assess the nominee.  If the CMAs do not object in writing within thirty (30) days following receipt of all information necessary to assess the nominee, as determined by the CMAs in their sole discretion, the lack of action shall constitute a non-objection.  If the CMAs object to the proposed nominee, the Transaction Parties shall nominate a different candidate within five (5) days following receipt of any such objection, subject to the same procedures as the initial nomination.  If the CMAs object to the second proposed Third-Party Monitor, within fourteen (14) days following receipt of such objection, the Transaction Parties shall propose three (3) candidates meeting the qualifications set forth in Section 16.2, from which the CMAs may select the Third-Party Monitor.  TTUSDS shall engage the Third-Party Monitor within three (3) days following the non-objection of, or (if applicable) selection by, the CMAs.  TTUSDS shall not remove or replace the Third-Party Monitor without the prior written consent of the CMAs, and TTUSDS shall nominate a replacement Third-Party Monitor within five (5) days following such removal, subject to the same procedures as the initial nomination.  The CMAs, in their sole discretion, may direct TTUSDS to terminate the Third-Party Monitor and TTUSDS shall promptly, and in any event within three (3) days of such direction, terminate the Third-Party Monitor.  In the event that there is a vacancy in the Third-Party Monitor position due to removal by the CMAs, resignation by the Third-Party Monitor, or otherwise, TTUSDS shall nominate a replacement Third-Party Monitor within twenty-one (21) days following such vacancy, subject to the same procedures as the initial nomination.

16.2    Qualifications.  The Transaction Parties shall ensure that the Third-Party Monitor is an entity incorporated and with its principal place of business in the United States and uses only Resident U.S. Citizens to monitor compliance with this Agreement, in each case unless otherwise approved by the CMAs.  The Transaction Parties shall ensure that the Third-Party Monitor possesses qualifications appropriate for monitoring compliance with this Agreement, including experience relevant to monitoring the obligations of this Agreement such as experience with: IT systems, cybersecurity, data privacy, social media platforms, content moderation, designing compliance programs, drafting policies and procedures for large companies, and related national security issues.  For each Third-Party Monitor nominee, the Transaction Parties shall submit to the CMAs a detailed professional synopsis of the nominated Third-Party Monitor's experience, as well as any additional information requested by the CMAs.  At the time of the nomination and for the duration of a Third-Party Monitor's engagement in connection with this Agreement, the Transaction Parties shall ensure that the nominated Third-Party Monitor has

62

**APP-219**

no current or prior contractual, financial, or fiduciary relationship with any of the Transaction Parties or their Affiliates. TTUSDS shall ensure that the Third-Party Monitor, for the duration of its engagement in connection with this Agreement, does not owe any obligation to any of the Transaction Parties or their Affiliates that would limit the independence of the Third-Party Monitor or inhibit the Third-Party Monitor from sharing any information with the CMAs that the Third-Party Monitor or the CMAs deem relevant to ensuring the Transaction Parties' compliance with this Agreement.

16.3    Monitoring Agreement. TTUSDS shall negotiate a monitoring agreement (the "**Monitoring Agreement**") with each Third-Party Monitor. The execution of the Monitoring Agreement shall be subject to the prior non-objection of the CMAs. TTUSDS shall submit a draft of the Monitoring Agreement to the CMAs within ten (10) days following the non-objection of the CMAs to the Third-Party Monitor. If the CMAs do not object in writing to the draft Monitoring Agreement within thirty (30) days following receipt, the lack of action shall constitute a non-objection. If the CMAs object to the draft Monitoring Agreement, TTUSDS shall resolve the concerns to the satisfaction of the CMAs in the CMAs' sole discretion and submit a revised Monitoring Agreement to the CMAs within fourteen (14) days following receipt of the CMAs' comments, subject to the same procedures as the initial draft.

16.4    Within three (3) days following the non-objection of the CMAs to the Monitoring Agreement, TTUSDS shall enter into the Monitoring Agreement with the Third-Party Monitor. TTUSDS shall not amend or terminate the Monitoring Agreement without the prior written consent of the CMAs. TTUSDS shall ensure that the Monitoring Agreement includes at least the following terms:

(1)    the CMAs shall be third-party beneficiaries of the Monitoring Agreement;

(2)    the Third-Party Monitor shall report directly to the CMAs and shall owe a fiduciary duty to the CMAs;

(3)    the Third-Party Monitor shall owe no obligation to any of the Transaction Parties or any other Person that would limit the sharing of information with the CMAs that the Third-Party Monitor or the CMAs deem relevant, in the CMAs' sole discretion, to the Transaction Parties' compliance with this Agreement;

(4)    the Third-Party Monitor shall attend all meetings of the TTUSDS Board and the Security Committee, and otherwise review and observe TTUSDS's and the Security Committee's activities to ensure the security of Protected Data and that TTUSDS and the TTP do not engage in activities that undermine or are inconsistent with this Agreement;

(5)    the Third-Party Monitor shall monitor the relationships, communications, and interactions between ByteDance and its Affiliates, on the one hand, and TTUSDS, on the other hand, to ensure that any such relationships, communications, or interactions do not interfere with TTUSDS's independence and are consistent with this Agreement;

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(6)    the Third-Party Monitor may, in its sole discretion or at the direction of the CMAs, have the authority to conduct or trigger red or blue-team testing or exercises, the cost of which shall be borne by TTUSDS;

(7)    the Third-Party Monitor shall inform the CMAs of any actual or potential violation of this Agreement within one (1) day of becoming aware of the actual or potential violation and shall provide, upon request, any information to the CMAs pertaining to the Transaction Parties' compliance with this Agreement;

(8)    the Third-Party Monitor shall provide the CMAs with periodic reports as requested by the CMAs detailing the Transaction Parties' status implementing and complying with this Agreement, including any actual or potential violations of this Agreement;

(9)    the Third-Party Monitor shall abide by the CMAs' guidance and protocols in performing its functions under this Agreement;

(10)    the Third-Party Monitor shall have, and TTUSDS shall provide the Third-Party Monitor with, the complete ability to operate and have Access within TTUSDS in order to carry out its responsibilities under the Monitoring Agreement;

(11)    the Third-Party Monitor shall not disclose any information it obtains in connection with the Monitoring Agreement or its services thereunder to any third party, except for the TTP, Source Code Inspector, Cybersecurity Auditor, or Third-Party Auditor as permitted under this Agreement, without the prior written consent of the CMAs;

(12)    TTUSDS shall be responsible for all expenses and fees in connection with the Third-Party Monitor and the Monitoring Agreement;

(13)    the Transaction Parties shall provide the Third-Party Monitor with any information that the Third-Party Monitor, in its sole discretion, deems necessary to verify compliance with this Agreement;

(14)    upon the request of the CMAs, the Third-Party Monitor shall share with the CMAs any information provided to it from the Transaction Parties; and

(15)    the CMAs, in their sole discretion, may direct TTUSDS to terminate the Third-Party Monitor at any time for any reason without approval from the Transaction Parties, and TTUSDS shall promptly, and in any event within three (3) days of such direction, terminate the Third-Party Monitor.

16.5    Non-Retaliation.  None of the Transaction Parties shall take any retaliatory actions, including withholding payment, for actions taken by the Third-Party Monitor in order to evaluate and report on compliance with this Agreement.

16.6    Responsibilities.  In addition to the responsibilities of the Third-Party Monitor set forth in this Agreement, TTUSDS shall ensure that the Third-Party Monitor takes all steps necessary to continuously monitor the Transaction Parties' compliance with this Agreement,

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

including through: regular interaction with the Transaction Parties' Personnel, including their management and directors, and the Security Officer, Compliance Officer, ByteDance POC, and Technology Officer; inspection of the Transaction Parties' documents, records, policies, and access logs; oversight of TTUSDS's operations involving IT systems, Protected Data, Source Code and Related Files, Content Moderation Processes, and vendors; and any other activities deemed necessary by the Third-Party Monitor to ensure the Transaction Parties' compliance with this Agreement.

16.7    <u>Annual Performance Summary</u>.  TTUSDS shall ensure that the Third-Party Monitor submits to the CMAs, within seven (7) days following each anniversary of the Effective Date, a confidential annual performance summary (each, an "**Annual Performance Summary**").  None of the Transaction Parties shall, and the Transaction Parties shall ensure the TTP shall not, request or receive a copy of any Annual Performance Summary.  Each Annual Performance Summary shall generally summarize the Third-Party Monitor's actions, decisions, and work performance, as well as the resources devoted to such efforts, from the prior year to carry out its obligations under the Monitoring Agreement, and also shall detail any restrictions experienced in carrying out its obligations.  TTUSDS shall ensure that the Third-Party Monitor promptly addresses any questions from the CMAs regarding the Annual Performance Summary.

16.8    <u>TikTok Inc.</u>  TikTok Inc. shall share documentation with the Third-Party Monitor, and grant the Third-Party Monitor Physical Access, which may be escorted, as requested by the Third-Party Monitor, in its sole discretion, to facilitate the Third-Party Monitor's assessment of the Transaction Parties' compliance with this Agreement.

## <u>ARTICLE XVII</u>

## <u>CFIUS MONITORING AGENCY REVIEW AND INSPECTION RIGHTS</u>

17.1    <u>Access and Inspection</u>.  Upon one (1) day's notice, each of the Transaction Parties shall allow and afford the CMAs access to meet with its Personnel or the Personnel of its Affiliates, and to inspect the books and records, equipment, servers, and facilities, and premises owned, leased, managed, or operated in the United States by such Transaction Party or its Affiliates for the purposes of monitoring compliance with or enforcing this Agreement; *provided* that in exigent circumstances, no advance notice is required.  This right to access and inspect extends to the Personnel, books and records, equipment, servers, facilities, and premises of any third-party contractor or agent working on behalf of any Transaction Party or its Affiliates.  If any Transaction Party does not possess the authority or capability to afford such access, such Transaction Party shall use best efforts to obtain whatever is required from the third-party contractor or agent for such access to be afforded.  Each of the Transaction Parties shall cooperate with the CMAs and promptly provide the CMAs with information as may be requested by the CMAs in their sole discretion to enforce and monitor compliance with this Agreement.

17.2    <u>Access to the TTP</u>.  TTUSDS shall ensure, through the MSA, that the TTP provides Physical Access to and tours of its facilities to the CMAs, and facilitates meetings with its Personnel with the CMAs, for on-site reviews or audits during normal business hours to assess the implementation of this Agreement, and allows the CMAs to inspect company records

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

to verify compliance with this Agreement, in each case with no greater than one (1) day's prior notice. TTUSDS shall ensure, through the MSA, that the TTP cooperates with the CMAs and provides the CMAs with all information as may be requested by the CMAs, in their sole discretion, to enforce and monitor compliance with this Agreement.

## ARTICLE XVIII

## COMPLIANCE

18.1    <u>Approvals and Authorizations</u>.  The Transaction Parties shall obtain and maintain, and shall ensure that their Affiliates obtain and maintain, all legal, statutory, regulatory, or other required authorizations and approvals, including those required by the government of the People's Republic of China, that are necessary to fully satisfy their obligations under this Agreement.  Each of the Transaction Parties intends to be bound by all of the obligations under this Agreement regardless of impossibility or foreign compulsion and waives any and all defenses arising out of an inability to obtain any legal, statutory, regulatory, or other required authorization or approval necessary.  The Transaction Parties shall promptly report to the Third-Party Monitor and CMAs any non-compliance with this Section 18.1.

18.2    <u>Compliance Policies</u>.  Each of the Transaction Parties, in coordination with the Security Committee, the Security Officer, Compliance Officer, or ByteDance POC (as applicable to such Transaction Party), and the Third-Party Monitor, shall adopt and implement, and shall ensure that its respective Personnel follow, a separate compliance policy (each a "**Compliance Policy**") to govern its respective implementation of and compliance with this Agreement.  Each Compliance Policy shall be subject to the prior non-objection of the CMAs.  Each of the Transaction Parties shall submit a draft of its Compliance Policy to the CMAs within sixty (60) days following the Operational Date, resolve any concerns raised by the CMAs with respect to its Compliance Policy, and submit a revised draft to the CMAs within twenty-one (21) days following receipt of any comments from the CMAs.  If the CMAs do not object within thirty (30) days following receipt of any draft of a Compliance Policy, the lack of action shall constitute a non-objection with respect to that Compliance Policy and the relevant Transaction Party shall formally adopt the Compliance Policy within three (3) days following the non-objection of the CMAs.  TTUSDS shall ensure that the Security Officer and Security Committee are responsible for the oversight, implementation, and maintenance of the Compliance Policy for TTUSDS.

(1)    Each Transaction Party shall ensure that its respective Compliance Policy provides, at a minimum:

(i)    procedures for providing, receiving, and responding to information, reports, and requests from the TTP, Third-Party Monitor, and CMAs as required under this Agreement within the specified timelines;

(ii)    procedures for coordination between the relevant Transaction Party, its respective Affiliates, the TTP, the Security Committee, the Security Officer, the Content Advisory Council, the Technology Officer, the Source Code Inspector, the

66
**APP-223**

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

Third-Party Monitor, the Cybersecurity Auditor, the Third-Party Auditor, and other designees and third parties as applicable and as required under this Agreement;

(iii)     procedures and requirements for facilitating all necessary Access by the TTP, Source Code Inspector, Third-Party Monitor, Cybersecurity Auditor, Third-Party Auditor, CMAs, and other third parties as applicable and as required under this Agreement;

(iv)     processes for informing and training its Personnel regarding this Agreement;

(v)     a notification and reporting policy to govern the prompt reporting of any actual or potential violation of this Agreement to the CMAs;

(vi)     guidance on the roles and responsibilities of relevant Personnel to ensure its compliance with this Agreement;

(vii)     a policy of non-retaliation for Personnel who report actual or potential violations of this Agreement;

(viii)     procedures for periodically reviewing and updating the Compliance Policy as needed to ensure compliance with this Agreement; and

(ix)     any other matters identified by the CMAs as necessary to ensure the Transaction Party's compliance with this Agreement.

(2)     TTUSDS shall ensure that its Compliance Policy includes procedures for the Security Officer to delegate his or her obligations under this Agreement in circumstances where the Security Officer is unavailable or requires assistance.

18.3     CMA Approvals Required.  All protocols and policies required under this Agreement shall be subject to the prior non-objection of the CMAs, unless this Agreement expressly provides otherwise.  The Transaction Parties shall not implement protocols and policies, or amend or modify such protocols and policies, without the prior non-objection of the CMAs.  The Transaction Parties shall comply with the provisions of all protocols and policies that received the consent, non-objection, or approval of the CMAs under this Agreement.  Any violation of the protocols and policies implemented pursuant to this Agreement shall be deemed to constitute a violation of this Agreement, and the failure by the Transaction Parties to obtain authorizations and approvals that are necessary to comply with such protocols and policies shall not excuse a violation thereof.

18.4     Board Resolutions.  Each of the Transaction Parties shall ensure that its respective board of directors implements and maintains board resolutions as applicable and as necessary to enable and ensure compliance with this Agreement, and shall submit copies of such board resolutions to the Third-Party Monitor and CMAs within three (3) days following their adoption.

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

18.5     Quarterly Meetings.  At the request of the CMAs, but not less than once every ninety (90) days unless waived in writing by the CMAs, the Transaction Parties shall meet, and shall ensure through the MSA that the TTP meets, with the Third-Party Monitor and CMAs at a mutually agreed upon time and location or by telephone (each such meeting, a "**Quarterly Meeting**").  At each Quarterly Meeting, the Transaction Parties shall provide, and shall ensure the TTP provides, all information requested, and answer all questions posed, by the Third-Party Monitor and CMAs.  The CMAs may, in their sole discretion, exclude one or more of the Transaction Parties from all or part of a Quarterly Meeting.  If the CMAs pose written questions to any Transaction Party or the TTP in advance of or following a Quarterly Meeting, such Transaction Party shall submit, and the Transaction Parties shall ensure the TTP submits, written responses to the CMAs within seven (7) days following receipt of the questions, unless otherwise extended by the CMAs.

18.6     Recordkeeping.  The Transaction Parties shall ensure that the ByteDance POC, Compliance Officer, Security Officer, and Technology Officer create and maintain adequate records to monitor each of the Transaction Parties' and the TTP's respective compliance with this Agreement.  If the TTP is replaced, the Transaction Parties shall ensure that the previous TTP retains copies of any records related to the performance of its obligations in connection with this Agreement and the MSA until advised otherwise by the CMAs.

18.7     Obligation to Report.  The Transaction Parties shall: (1) require the ByteDance POC, Compliance Officer, Security Officer, and Technology Officer promptly, and in any event within one (1) day of discovery, to report any actual or potential violation of this Agreement to the Third-Party Monitor and CMAs; and (2) each maintain procedures that require Personnel to promptly inform the ByteDance POC, Compliance Officer, Security Officer, or Technology Officer, as applicable, of any actual or potential violation of this Agreement.

18.8     Defining a Violation.  The CMAs may, in their sole discretion, provide interpretive guidance to the Transaction Parties and TTP as to what constitutes an actual or potential violation of this Agreement.

## ARTICLE XIX

## ANNUAL REPORTS

19.1     Annual Reports.  Each of the Transaction Parties shall submit, within seven (7) days following each anniversary of the Effective Date, an annual report (each, an "**Annual Report**") to the Third-Party Monitor and CMAs that summarizes its compliance with this Agreement from the prior year, and includes, with respect to the preceding year:

(1)     organizational charts showing the equity and voting interests held in the entity, the dates of any transactions resulting in changes to such equity and voting interests, and with respect to ByteDance, a summary capitalization table identifying all shareholders holding more than one percent (1%) equity interest or voting interest in ByteDance as of the end of each quarter;

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(2)     the address of the headquarters office location of the entity;

(3)     the full name (last, first, middle name) and telephone and email contact information for the ByteDance POC, the Compliance Officer, and the Security Officer, as applicable;

(4)     with respect to ByteDance, an organizational chart demonstrating and explaining which ByteDance Affiliates (including their location) perform work, services, operations, or support in relation to the TikTok U.S. App or TikTok U.S. Platform;

(5)     with respect to TTUSDS: (i) a summary of the funding provided by ByteDance; and (ii) a statement by TTUSDS regarding the sufficiency of such funds to perform its functions under this Agreement;

(6)     a certification of compliance with the hiring protocols required by Section 5.4;

(7)     a headcount of Personnel, and with respect to TTUSDS, a list of the names and titles of Key Management;

(8)     with respect to TTUSDS, the number of Personnel with a prior relationship with ByteDance or its Affiliates, and the percentage of such workforce within TTUSDS;

(9)     with respect to TTUSDS, a summary from the Security Committee of its activities from the prior year pursuant to this Agreement;

(10)    with respect to TTUSDS, a summary from the Content Advisory Council of its activities from the prior year pursuant to this Agreement;

(11)    current Architecture Diagrams, Data Flow Diagrams, and Source Code Review Diagrams;

(12)    a summary of any findings and reports of vulnerabilities designated as high severity or equivalent, including any instance of Malicious Code in the Source Code and Related Files, pursuant to Section 9.6;

(13)    a certification that all changes, updates, alterations, and improvements to the Source Code and Related Files were deployed to the TikTok U.S. App or TikTok U.S. Platform in accordance with the TTP's review and inspection processes pursuant to Section 9.10;

(14)    an update regarding any remediations or alterations to Source Code and Related Files made at the request of the TTP pursuant to Sections 9.10 or 9.15;

(15)    with respect to ByteDance, a certification that all individuals subject to classification as TikTok U.S. Users pursuant to Sections 1.35 and 11.3 are so classified as of the date of the Annual Report;

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(16)    with respect to TTUSDS, a monthly breakdown of: (i) the total number of registered TikTok U.S. User accounts, and (ii) the number of TikTok U.S. Users who were monthly active users of the TikTok U.S. App;

(17)    a summary of any unexpected or unauthorized interactions pursuant to Section 9.17 and whether the circumstances permitting such interactions persist or have been resolved;

(18)    a summary of any changes or remediations made to the Recommendation Engine or Content Moderation Processes in response to issues identified by the TTP or Third-Party Monitor pursuant to Section 9.13;

(19)    a summary of all changes to Excepted Data and Public Data;

(20)    a certification that all Protected Data in the possession of the Transaction Parties is stored and subject to Access controls consistent with the requirements of this Article XI;

(21)    with respect to ByteDance, a certification, signed by a duly authorized representative, that none of ByteDance or its Affiliates holds, possesses, or has any Access to Protected Data in violation of this Agreement, or a summary of any findings of and remediations in relation to ByteDance or its Affiliates holding, possessing, or having any Access to Protected Data after the Deletion Date;

(22)    a summary of Access instances and compliance efforts in relation to the Limited Access Protocol, including the number of Personnel who used the Limited Access Protocol, their location, the reason for their Access, and the Protected Data Accessed;

(23)    with respect to TTUSDS, a summary of compliance efforts in relation to the DPCP, including Training;

(24)    with respect to TTUSDS, a summary of any actual or potential violations of the DPCP;

(25)    with respect to TTUSDS, updates regarding any remediation efforts in relation to findings from the Cybersecurity Audits conducted pursuant to Article XIV;

(26)    updates regarding any remediation efforts in relation to the Audits conducted pursuant to Article XV;

(27)    a summary of any challenges experienced in obtaining and maintaining the authorizations and approvals under Section 18.1, including any legal or regulatory changes affecting compliance with this Agreement;

(28)    a summary of any actual or potential violations of this Agreement and the remediation efforts in relation thereto;

(29)    as applicable, copies of the most recent versions of the DTC Operating Protocols, the Limited Access Protocol, the DPCP, Excepted Data, Public Data, and the Compliance Policies; and

(30)    any other subjects identified by the CMAs, in their sole discretion, as relevant to compliance with the Agreement.

19.2    TTUSDS shall ensure, through the MSA, that the TTP submits to the Third-Party Monitor and CMAs, within seven (7) days following each anniversary of the Effective Date, a confidential annual account (each, an "**Annual Account**") that summarizes the TTP's compliance with the requirements of this Agreement from the prior year, and includes, with respect to the preceding year:

(1)    current Architecture Diagrams, Data Flow Diagrams, and Source Code Review Diagrams;

(2)    a description of whether the TTP is sufficiently funded by the Transaction Parties;

(3)    a headcount of Personnel of the TTP whose job responsibilities are covered by the MSA and this Agreement;

(4)    a certification of compliance with the hiring protocols required by Section 5.4;

(5)    the number of Personnel with a prior relationship with ByteDance or its Affiliates, and the percentage of such workforce within the TTP;

(6)    a summary of any Physical Access to the DTC withheld by ByteDance or any of its Affiliates and the resolution of the same;

(7)    a statement as to the sufficiency of the DTC Operating Protocols in enabling the TTP to fully perform its obligations under the MSA and in connection with this Agreement;

(8)    a summary of any interference by ByteDance or any of its Affiliates with the TTP's Access to the DTC or Source Code and Related Files, or its inspection efforts in the DTC, and the resolution of the same;

(9)    a summary of any findings of vulnerabilities designated as high severity or equivalent, including any instance of Malicious Code in the Source Code and Related Files, pursuant to Section 9.6;

(10)    any changes to the TTP's processes, tools, and techniques used for reviewing and inspecting Source Code and Related Files and monitoring and blocking unexpected or unauthorized interactions pursuant to Article IX;

**APP-228**

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

(11)    any deployment of Source Code and Related Files inconsistent with Section 10;

(12)    a summary of any findings that the Recommendation Engine operated inconsistently with the requirements under Section 9.13;

(13)    an update regarding any remediations or alterations to Source Code and Related Files made at the request of the TTP pursuant to Sections 9.10 or 9.15, and any issues with the Transaction Parties' obligation to address such requested remediations or alterations;

(14)    a summary of any unexpected or unauthorized interactions pursuant to Section 9.17 and whether the circumstances permitting such interactions persist or have been resolved;

(15)    the full name (last, first, middle name) and telephone and email contact information for the Technology Officer;

(16)    any indications that ByteDance or any of its Affiliates possessed or had Access to any Protected Data after the Deletion Date;

(17)    any issues with the restrictions on storage of and Access to Protected Data required under Article XI;

(18)    a summary of Training efforts pursuant to Sections 11.13 and 12.4;

(19)    a summary of any actual or potential violations of this Agreement and the remediation efforts in relation thereto; and

(20)    any other subjects identified by the CMAs, in their sole discretion, as relevant to compliance with the Agreement.

19.3    TTUSDS shall ensure the TTP does not provide any Annual Account to any of the Transaction Parties or their respective Affiliates.

19.4    Each of the Transaction Parties shall promptly submit, and shall ensure the TTP promptly submits, responses and relevant documentation to any requests by the CMAs for further or clarifying information regarding the content of any Annual Report or Annual Account.

## ARTICLE XX

## CONFIDENTIALITY

20.1    <u>Confidentiality</u>.  This Agreement and all information provided by the Parties pursuant to this Agreement and the preceding term sheets will be accorded the confidential treatment required by Section 721(c) and 31 C.F.R. § 800.802 (2020).

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

20.2    Public Summary.  Within seven (7) days following the Effective Date, ByteDance and its relevant Affiliates, including TikTok Inc., shall publish a press release and post on the Newsroom of their respective websites and their social media accounts a statement containing the summary of this Agreement at Annex G (the "**Public Summary**").  ByteDance hereby consents that the USG may also publicly disclose the Public Summary.  The Transaction Parties shall consult in good faith on any amendments the CMAs may propose to the Public Summary, and the CMAs will consider in good faith any amendments the Transaction Parties may propose to the Public Summary.

20.3    Accuracy Certification.  On the Effective Date, each of the Transaction Parties shall submit to the CMAs a certification that satisfies the requirements in Section 721(n) with respect to all information provided to CFIUS from May 27, 2020, through the Effective Date, including in connection with CFIUS Case 20-100 and this Agreement.

## ARTICLE XXI

## REMEDIES

21.1    Penalties for Violations of the Agreement.  Each of the Transaction Parties acknowledges and agrees that if it violates any of the provisions of this Agreement, the Transaction Party may be liable to the United States for a civil penalty ("**Penalty**"), or subject to further action by the United States, consistent with 50 U.S.C. § 4565 and 31 C.F.R. §§ 800.901 and 800.902 (2020) for violations of mitigation agreements and conditions entered into or imposed under Section 721(*l*).  The CMAs, in their sole discretion, may determine whether a violation has occurred, if such violation warrants the imposition of a Penalty or further action, and the appropriate Penalty amount or action, if any.  The CMAs may consider a number of factors in determining the amount of a Penalty due for a violation of this Agreement, including the nature of the violation, the materiality of the violation, whether the conduct was willful or reckless, and the damage to the national security resulting from the violation.

21.2    United States Government Remedies.  Each of the Transaction Parties acknowledges that if it fails to comply with any of the terms of this Agreement, the CMAs or any other appropriate USG authority may seek any and all remedies available under applicable law, including injunctive or other judicial relief, in addition to the remedies described in Section 21.1 of this Agreement.  The taking of any action by the CMAs or other appropriate USG authority in the exercise of any remedy shall not be considered as a waiver by the CMAs or such other USG authority of any other rights or remedies.  Nothing in this Agreement is intended to create rights to damages enforceable at law by the Transaction Parties against the USG, or to limit any rights the USG may have under law or regulation or this Agreement.

21.3    Temporary Stop.  The Transaction Parties shall prevent, and shall ensure that their respective Affiliates and the TTP prevent, users from accessing the TikTok U.S. Platform (in each case, a "**Temporary Stop**") within three (3) days following the occurrence of any of the following:

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

(1)     the failure by the Transaction Parties to establish TTUSDS and ensure that TTUSDS owns or has a license to, and manages, all of the assets and employs all of the Personnel related to the CFIUS Functions by the Operational Date in accordance with Article II;

(2)     the failure by the Transaction Parties to ensure that TTUSDS becomes a Transaction Party to this Agreement by the Operational Date as required under Section 2.3;

(3)     the failure by the Transaction Parties to execute a final MSA to which the CMAs have non-objected in accordance with the timelines under Section 8.2(1); *provided, however*, that a Temporary Stop shall not be required if: (i) the CMAs do not timely respond to an MSA submitted by the Transaction Parties due to a government shutdown; or (ii) the failure to execute the MSA is solely due to the TTP either having (a) failed to execute the MSA in a timely fashion, or (b) unreasonably withheld its consent;

(4)     the failure by the Transaction Parties to execute a final MSA to which the CMAs have non-objected with a replacement TTP (i.e.*,* not Oracle) in accordance with the timelines under Sections 8.2; *provided, however*, that a Temporary Stop shall not be required if: (i) the CMAs do not timely respond to an MSA submitted by the Transaction Parties due to a government shutdown; or (ii) the failure to execute the MSA is solely due to the replacement TTP either having (a) failed to execute or respond to the MSA draft in a timely fashion, or (b) unreasonably withheld its consent;

(5)     notification to the CMAs by TTUSDS or the TTP that ByteDance and its Affiliates have not provided sufficient funds for TTUSDS or the TTP to perform their respective obligations in connection with this Agreement in accordance with Section 2.8 (with respect to TTUSDS) and Section 9.10(3) (with respect to the TTP); *provided* that*:* (i) TTUSDS or the TTP has first notified ByteDance of the insufficiency and ByteDance has not resolved such insufficiency to the satisfaction of TTUSDS or the TTP, as applicable, within a timely manner; and (ii) after the CMAs have consulted with ByteDance regarding such notification of insufficiency, the CMAs do not provide their written determination that such circumstances do not warrant a Temporary Stop;

(6)     notification to the CMAs by the TTP that it has been denied Physical Access to the DTC or Logical Access to review or inspect Source Code and Related Files, or that ByteDance has interfered with the TTP's inspection activities, in violation of the DTC Operating Protocols or Section 9.3, unless the CMAs provide their written determination that such circumstances do not warrant a Temporary Stop;

(7)     notification to the CMAs by the TTP of the deployment to the TikTok U.S. App or TikTok U.S. Platform of any changes, updates, alterations, or improvements to the Source Code and Related Files that were not reviewed and inspected by the TTP in accordance with Section 9.10, including the requirement that only Source Code and Related Files for which the SBOM or its equivalent has been digitally signed by the TTP is deployed to the TikTok U.S. App or TikTok U.S. Platform;

(8)    notification to the CMAs by the TTP of the failure to, within 120 days of the Operational Date, incorporate into the Source Code and Related Files for the TikTok U.S. App a protective solution in accordance with Section 9.8;

(9)    notification to the CMAs by the TTP, or any results of the U.S. Deletion Audits, Global Deletion Verification, Cybersecurity Audits, Third-Party Audits, or any other audits or monitoring activities performed pursuant to this Agreement, that indicate that ByteDance or any of its Affiliates, intentionally or through gross negligence, did not irretrievably destroy Protected Data as of the Deletion Date or that ByteDance or any of its Affiliates, intentionally or through gross negligence, maintained or maintains Access to Protected Data after the Deletion Date;

(10)    notification to the CMAs by the TTP that Protected Data is not stored or subject to Access controls in accordance with Article XI, unless the CMAs provide their written determination that such circumstances do not warrant a Temporary Stop;

(11)    the failure by any of the Transaction Parties to remove any individual or entity appointed to any role under this Agreement at the written direction of the CMAs in accordance with the processes for such removals under this Agreement; or

(12)    the failure by the Transaction Parties or any of their Affiliates to obtain and maintain all legal, statutory, regulatory, or other required authorizations and approvals, including those required by the government of the People's Republic of China, in a manner that prevents the Transaction Parties or any of their Affiliates from fulfilling their obligations under this Agreement in violation of Section 18.1.

For the avoidance of doubt, as part of a Temporary Stop the Transaction Parties, their Affiliates, and the TTP may allow TikTok users who are not TikTok U.S. Users to access a TikTok platform other than the TikTok U.S. platform.

21.4    <u>Lifting a Temporary Stop</u>.  Upon the occurrence of a Temporary Stop, the Transaction Parties shall not resume, and shall ensure the TTP does not resume, allowing users to access the TikTok U.S. Platform until the Transaction Parties have received the written consent of the CMAs to resume such access, upon the CMAs' finding, in their sole discretion, that the event triggering the Temporary Stop has been remedied or otherwise addressed to the satisfaction of the CMAs.

21.5    <u>Suspension of Service</u>.  If the Transaction Parties or their Affiliates do not fully implement a Temporary Stop as required under Section 21.44, the CMAs may direct the TTP to suspend, and the Transaction Parties shall ensure through the MSA that the TTP suspends, user access to the TikTok U.S. Platform until the TTP has received the written consent of the CMAs to lift such suspension.

CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565
EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552
Parties' Draft as of 8/23/22

## ARTICLE XXII

## GENERAL PROVISIONS

22.1    <u>Effectiveness</u>.  Except as otherwise specifically provided in this Agreement, the obligations imposed by this Agreement shall take effect immediately upon the Effective Date and shall remain in effect until this Agreement is terminated in accordance with the terms hereof.

22.2    <u>Valid and Binding Obligation</u>.  Each Transaction Party agrees that this Agreement constitutes a legal, valid, and binding obligation of such Transaction Party, enforceable against such Transaction Party in accordance with its terms.  Each Transaction Party hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any and all legal, equitable and other defenses to the enforcement of this Agreement or any obligation hereunder it may have (now or in the future) by reason of any illegality or lack of validity or enforceability of this Agreement or any obligation hereunder.

22.3    <u>Release</u>.  Upon the execution this Agreement, each of the Transaction Parties, for itself, its administrators, heirs, representatives, successors, or assigns, hereby waives, releases, abandons, and forever discharges CFIUS and its successors, the United States, and any department, agency, or establishment of the United States, and any officers, employees, agents, successors, or assigns of such department, agency, or establishment, from any and all claims, demands and causes of action of every kind, nature, or description, whether known or unknown, which have been, could have been, or could be asserted in connection with CFIUS Case 20-100 or any related orders (including the August 14 Order), regardless of whether they were named in any complaints filed by the Transaction Parties and regardless of whether they were included in the complaint, including any claims for costs, expenses, attorney fees, and damages of any sort.

In connection with such waiver and relinquishment, each of the Transaction Parties acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows, with respect to the matters released herein.  Nevertheless, it is the intention of each of the Transaction Parties, through such release, and with the advice of counsel, to settle and release all such matters, and all claims as described above relative thereto, which heretofore have existed, now exist, or hereafter may exist between the Transaction Parties and CFIUS, the United States, and any department, agency, or establishment of the United States, and officers, agents, employees and former employees, individually or in their official capacities, arising out of or related to any or all of this Agreement, CFIUS Case 20-100, or any related orders (including the August 14 Order); *provided, however*, that nothing herein shall operate to release or discharge any claim for breach of this Agreement.

22.4    <u>Interpretation</u>.  The section headings and numbering in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of the terms of this Agreement.  All references herein to Articles, Sections, and Annexes shall be deemed references to Articles, Sections, and Annexes of this Agreement unless the context shall otherwise require.  The words "hereof," "herein," and "hereunder" and words of like import used in this Agreement refer to this Agreement as a whole and not to any particular provision of this

Agreement.  Whenever the words "include," "includes," or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."  The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends and such phrase shall not mean simply "if."  Whenever any provision in this Agreement refers to action to be taken by any Person, or which any Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.  The definitions given for terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.

22.5    <u>Notice Regarding Legal Representation</u>.  The Transaction Parties shall provide notice to the CMAs, including contact information, of any legal representation in connection with obligations under this Agreement, whether outside legal counsel or internal general counsel, within five (5) days following the Effective Date and thereafter within five (5) days following any change to such legal representation.

22.6    <u>Choice of Law</u>.  This Agreement shall be governed by and interpreted according to the federal laws of the United States.

22.7    <u>Direct Communications</u>.  The Transaction Parties acknowledge that the CMAs may communicate directly with the Security Committee, the ByteDance POC, the Compliance Officer, the Security Officer, the Technology Officer and TTP, the Source Code Inspector, the Third-Party Auditor, the Third-Party Monitor, the Cybersecurity Auditor, and any point of contact designated by the Transaction Parties.  The Transaction Parties further acknowledge that the CMAs may communicate directly with any Personnel who initiate or are included on communications with the CMAs regarding this Agreement.  These acknowledgments shall in no way prohibit or otherwise restrict the Transaction Parties from consulting with, obtaining advice from, or communicating with the CMAs through counsel.

22.8    <u>Forum Selection</u>.  A civil action brought by any Party for judicial relief with respect to any dispute or matter whatsoever arising under, in connection with, or incident to, this Agreement shall be brought, if at all, in accordance with Section 721(e)(2) to the extent applicable.  If Section 721(e)(2) is not applicable, such civil action shall be brought in the U.S. District Court for the District of Columbia.

22.9    <u>Other Laws</u>.  Nothing in this Agreement is intended to limit, alter, or constitute a waiver of:

(1)    any obligation imposed on the Transaction Parties by any U.S. federal, State, or local law;

(2)    any enforcement authority available under any U.S. federal, State, or local law;

(3)    the sovereign immunity of the United States; or

(4)    any authority or jurisdiction the USG may possess over the activities of the Transaction Parties or their agents located within or outside the United States.

22.10    Conflict with Applicable Laws.  In the event that any provision of law to which the Transaction Parties are subject is inconsistent with any provision of this Agreement, the Transaction Parties shall immediately notify the CMAs of the discrepancy and resolve the conflict to the satisfaction of the CMAs.

22.11    Change in Circumstances.  If, after this Agreement takes effect, the CMAs or the Transaction Parties believe that changed circumstances warrant a modification or termination of this Agreement (including if the CMAs determine that the terms of this Agreement are inadequate or no longer necessary to address national security concerns), then the Transaction Parties shall negotiate in good faith with the CMAs to modify or terminate this Agreement.  For the avoidance of doubt, if any of the Transaction Parties completes an initial public offering or if a sale or transfer of any Transaction Party to any Person that is not a foreign person (as defined at 31 C.F.R. § 800.224 (2020)) occurs, the Transaction Parties may petition the CMAs for a modification or termination (in the event of a requested termination, pursuant to Section 22.15) of this Agreement, which modification or termination shall be in the sole discretion of the CMAs.  Rejection of a proposed modification alone does not constitute evidence of a failure to negotiate in good faith.

22.12    Severability.  The provisions of this Agreement shall be severable, and if any provision hereof or the application of such provision under any circumstances is held invalid by a court of competent jurisdiction, it shall not affect the validity or enforceability of any other provision of this Agreement or the application of any other provision, which shall remain in full force and effect.

22.13    Waivers.  The failure of the CMAs to insist on strict performance of any of the provisions of this Agreement, or to exercise any right granted herein, shall not be construed as a relinquishment or future waiver; rather, the provision or right shall continue in full force.  No waiver by the CMAs of any provision of, or right under, this Agreement shall be valid unless it is in writing and expressly provides for the waiver of a specified requirement under a particular provision of this Agreement.  The CMAs shall have the authority to grant or revoke any waiver, exception, consent, or approval in their sole discretion.  The Transaction Parties understand and acknowledge that the CMAs will consider requests for a waiver or exception to any provision of this Agreement with a presumption of denial.

22.14    Successors and Assigns.  This Agreement is binding upon, and inures to the benefit of, the Transaction Parties and their respective successors and assigns.  For purposes of this Agreement, successors and assigns under this Section includes any corporate name changes.  No Transaction Party may assign any obligation under this Agreement without the prior written consent of the CMAs.  The Transaction Parties shall remain liable for all obligations under this Agreement that are assigned to any other Person.  In the event that any Transaction Party effects the transfer, separation, or sale of a material portion of its business operations or assets that are subject to requirements under this Agreement, including by way of a sale of assets, spin-off, split-off, reorganization, or similar transaction, such Transaction Party shall immediately notify

78

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

the CMAs in writing and, after consultation with the CMAs, the transferee, successor, or acquirer, as applicable, may, without any further action required of the Transaction Parties, execute a joinder agreement under which such transferee, successor, or acquirer, as applicable, takes on the relevant obligations under this Agreement and becomes a Party hereto.  In the event that any Transaction Party effects the transfer, separation, or sale of a material portion of its business operations or assets that are subject to requirements under this Agreement to an Affiliate, such Transaction Party shall, at the time of such transaction, cause the relevant Affiliate to execute a joinder agreement under which the Affiliate takes on the relevant obligations under this Agreement and becomes a Party hereto.

22.15  <u>Termination of this Agreement</u>.  After this Agreement takes effect, it shall terminate only upon written notice by the CMAs to the Transaction Parties.  Termination of this Agreement shall not relieve a Transaction Party from liability for any breach or violation of this Agreement occurring while the Agreement was in effect or for fraud.  Article I (Definition of Terms) and Article XXII (General Provisions) shall survive a termination of this Agreement.

22.16  <u>Amendment</u>.  This Agreement may be amended only by written agreement signed by all of the Parties.

22.17  <u>Tolling of Deadlines</u>.  Any non-objection, consent, or approval provision applicable to the CMAs under this Agreement shall be tolled during a shutdown in federal government operations due to a lapse in appropriations.

22.18  <u>Computing Time</u>.  All references to "days" in this Agreement mean calendar days unless otherwise expressly provided.  In computing any time period pursuant to this Agreement:

(1)  For any period stated in days:

(i)  the day of the event that triggers the period is excluded; and

(ii)  the last day of the period is included, but if the last day is a Saturday, Sunday, or federal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or federal holiday.

(2)  For any period stated in "months," such period means once every thirty (30) days.

(3)  For any period stated in "quarters," such period means once every ninety (90) days.

(4)  For any period stated in "years," such period means once every three hundred and sixty-five (365) days.

(5)  For any period stated "semi-annually," such period means twice per year.

22.19  <u>Notices</u>.  All notices and other communications given or made relating to this Agreement shall be in writing, shall be deemed to have been duly given or made as of the date of

receipt, and shall be sent by electronic mail addressed to the Parties' designated representatives at the addresses shown below, or to such other representatives at such other addresses as the applicable Party may designate in accordance with this Section:

If to the CMAs:

[XXX]

If to TTUSDS

[XXX]

With a copy to (which shall not constitute notice):

[XXX]

If to TikTok Inc.:

[XXX]

With a copy to (which shall not constitute notice):

[XXX]

If to TikTok Ltd.:

[XXX]

With a copy to (which shall not constitute notice):

[XXX]

If to ByteDance:

[XXX]

With a copy to (which shall not constitute notice):

[XXX]

22.20    Entire Agreement.  This Agreement, together with any Annexes and Exhibits hereto, constitutes the entire understandings of the Parties hereto and supersedes all prior agreements or understandings with respect to the subject matter hereof.

22.21    Counterparts.  This Agreement may be executed in one (1) or more counterparts, including portable document format (.pdf) or other electronic counterparts, each of which shall be deemed an original, but all of which together shall be deemed to constitute one and the same agreement.

80

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

This Agreement is executed on behalf of the Parties:

ByteDance Ltd.

Date: _____      By: _____
                                      Printed Name:
                                      Title:


TikTok Ltd.

Date: _____      By: _____
                                      Printed Name:
                                      Title:


TikTok Inc.

Date: _____      By: _____
                                      Printed Name:
                                      Title:


TTUSDS

Date: _____      By: _____
                                      Printed Name:
                                      Title:


For [•]

Date: _____      By: _____
                                      Printed Name:
                                      Title:

**APP-239**

**CONFIDENTIAL PURSUANT TO 50 U.S.C. § 4565**
**EXEMPT FROM DISCLOSURE UNDER 5 U.S.C. § 552**
**Parties' Draft as of 8/23/22**

For [•]

Date: _____        By: _____
                                        Printed Name:
                                        Title:

For [•]

Date: _____        By: _____
                                        Printed Name:
                                        Title:

*Business Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure Under 5 U.S.C. § 552*
*8/19/2022*

### Updated Definition of Terms Used in Annexes A and B

This table lists and defines various terms used in the descriptions laid out in Annexes A and B to the Term Sheet, related to Engineering and Business Related data and Interoperability data, respectively. Note that consistent with the categories laid out in Annex A, this data will be aggregated and will not contain identifiable information.

| Term | Definition |
|---|---|
| *3P data sharing requested* | advertising engagement behavior (*e.g.*, views and clicks of an advertisement) that is shared with third-party partners to measure advertising performance |
| *Account property* | user account data (*e.g.*, register time, signature, number of videos published, number of followers) |
| *Account status* | indicates the status of the user account (*e.g.*, registered, unregistered, banned) |
| *Action placement and history* | data on each step of the user engagement funnel (*e.g.*, how many users start recording video, then edit their video, then publish their video); allows measurement of the total click-through rate and loss rate of each step |
| *Action source user attributes* | user behavior attributes (*e.g.*, 'live_duration_d30_avg_layer_byda_v1', which is calculated by the host's 30 day average live streaming duration time) |
| *Activity attributes* | data related to the attributes of live streaming activity (*e.g.*, activity name, activity time) |
| *Addebug* | data from each module in the advertising process that enables advertising optimization |
| *Ads attributes* | data related to the attributes of an advertising campaign (*e.g.*, advertising objective, targeting criteria, bidding settings, delivery schedule) |
| *Ad property* | data related to the creative aspects of an advertising campaign (*e.g.*, content, graphics, text, comments) |
| *Ads experiment attributes* | data related to the attributes of an advertising campaign experiment (*e.g.*, advertising objective, targeting criteria, bidding settings, delivery schedule, experiment details) |
| *Ads review attributes* | indicates whether a specific advertisement has passed or failed the advertisement review process and the associated reason (*e.g.*, "rejected because of violence content") |
| *Ads tracking option* | indicates an option for sending engagement behavior data between users and advertisements to third-party partners (*e.g.*. domain name) |
| *Adset property* | Same as "Ad property" |

**APP-241**

*Business Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure Under 5 U.S.C. § 552*

| | |
|---|---|
| *Agency property* | segmented user acquisition metrics (*e.g.*, installs, retention, cost) by advertising agency names |
| *Anchor fans range* | a range indicating the number of fans identified in a live-streaming anchor (an anchor is a special link on a video that enables users to enter an application or website if the user is interested in a deeper exploration of related content within a video. It's composed of 3 basic parts: icon, title, landing page) |
| *App attributes* | app installation package attributes (*e.g.*, app version, app name) |
| *App page* | indicates which of the two potential app homescreens is designated (*i.e.*, the "For You" page or the "Following" page) |
| *App property* | basic information of the application (*e.g.*, app id, app version, iOS/Android) |
| *Arbit trigger* | indicates whether a push is triggered by Arbit (Arbit is the name of a system that triggers content/video pushes by the push algorithm) |
| *Basic user interaction* | commonly used aggregated metrics of user engagement with advertisements (*e.g.*, impression, click, video play) |
| *Bid* | offer by an advertiser of a specific price for a unit of result for their advertisement groups (*e.g.,* a system generated id which equates to "paying $15 for 1K impressions") |
| *Bidding (settings)* | settings that allow advertisers to set their bid strategy (for further information on bid strategies, see https://ads.tiktok.com/help/article?aid=9685) |
| *Campaign property* | segmented paid advertisement metrics by campaign names |
| *Channel* | type of subdivision for media source traffic (*e.g.*, Google can be divided into search channel and YouTube channel) |
| *Channel property* | same as "Channel" |
| *Client interaction* | actions taken by a user through the TikTok app or website (*e.g.*, like, save, favorite, watch video to completion) |
| *Comment push off/on* | indicates whether a user has turned on push notification for comments |
| *Content type* | type of content (*e.g.,* video, music, user card, comment, live streaming) |
| *Conversion (settings)* | settings that allow advertisers to set a conversion goal for their advertisement groups from the conversion types |
| *Conversion type* | type of conversion goal advertisers set for their advertisement groups (*e.g.*, app download, installation, activation, registration) |
| *Coarse location* | information that describes the location of a device with lower resolution than a latitude and longitude with three or more decimal places |

2

**APP-242**

*Business Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure Under 5 U.S.C. § 552*

| | |
|---|---|
| *Comment attributes* | action types such as comment posts and comment likes; comment characteristics (*e.g.*, whether the comment is spam, whether the comment is posted by friends) |
| *Creative* | reference to the specific images or videos that are presented to users, to facilitate evaluation of how users responded to that specific image or video advertisement |
| *Creative property* | creative characteristics (*e.g.*, creative media types, including image, video and text) |
| *Creator power of influence* | measurement of creator's influence (*e.g.*, how many followers, frequency of engagement) |
| *Customer service attributes* | segment users by customer service-related attributes (*e.g.*, feedback types such as bugs, suggestions, and help) |
| *Device attributes* | characteristics of the device being used to access the TikTok platform (*e.g.,* make, model, OS type, OS version) |
| *Device health statistics* | statistics that can be used to check whether the app resource usage is normal (e.g., CPU utilization, memory usage, battery usage) |
| *Digg push off/on* | indicates whether a user has turned on system notifications for likes their content receives |
| *E-commerce product attributes* | characteristics of an e-commerce product (*e.g.*, product category, price range) |
| *Engineering Shard Group* | identifies from which "shards" given data originated (*i.e.,* for systems too large to host in a single machine, the system is split into different shards, each shard handles different parts of data and each shard consists of several processes).  This identifier allows the engineering team to identify if there are certain shards/systems that are not meeting performance expectations. |
| *Evaluation metrics* | metrics which can be used to evaluate the performance of AI models or other technical optimizations (*e.g.*, network optimization) |
| *Execution attribute* | tag for moderation purposes (*e.g.*, pornography, hate speech, language) to facilitate queueing for review |
| *Experiment group* | randomized sampling of users, with no identifying information (will only ever be generated by the TTP, with no ByteDance/TikTok insight into identifiable user data) |
| *Flow control* | attributes related to a mechanism for controlling how many and how fast advertisements should be delivered to users; there is a module in the advertisements delivery system to enable the mechanism |
| *Follow new story push off/on* | indicates whether a user has turned on push notifications for following of new stories |
| *Follow push off/on* | indicates whether a user has turned on push notifications for follows |

3

**APP-243**

*Business Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure Under 5 U.S.C. § 552*

| | |
|---|---|
| *General statistics* | general statistics (*e.g.*, sum, average, standard deviation) |
| *Geo* | geographic information (*i.e.*, country, state, county, city, Nielsen designated market area) |
| *Gift attributes* | attributes of a live streaming gift, which users in the audience can send to a live streaming host (*e.g.*, gift name, gift price) |
| *Grade level* | user's age range |
| *Growth attributes* | attributes related to how TikTok has acquired a user (*e.g.*, advertising campaign id, media source, new user status, activation date) |
| *Impression* | one measure of users' engagement with the advertisement (*e.g.*, user clicked like, user watch advertisement until completion) |
| *Im push off/on* | indicates whether a user has turned on push notifications for instant messages |
| *Inner or out app push* | whether a push is an in-app notification or system push notification |
| *IVT* | abbreviation for "invalid traffic;" it relates to advertising traffic that has been identified through in-house or third party solutions as highly unlikely to be human-triggered and therefore should not be considered in aggregated reporting for advertisers |
| *Labeling results* | video labeling flag by a content moderator (*e.g.*, violation, video not recommended, or pass) |
| *Lift or Lift_study* | one measure of the performance of an advertisement (*e.g.*, percentage increase in advertiser conversions attributable to the advertisement) |
| *Live attributes* | attributes associated with live streaming activities (*e.g.*, the mode of live streaming: Open Broadcaster Studio (OBS) Studio, live studio) |
| *Live inner push off/on* | indicates whether a user has turned on push notifications for live onsite events |
| *Live push off/on* | indicates whether a user has turned on push notifications for live offsite events |
| *Media property* | advertisement platforms (*e.g.*, Google ads, Facebook ads, Twitter ads) |
| *Mention push off/on* | indicates whether a user has turned on push notifications for mentions |
| *Network environment* | indicates whether a user is accessing the TikTok platform through a wifi network or a cellular data network; the name and address of the network is not provided |
| *Order attributes* | attributes related to a user recharge or refund order for sales via the TikTok platform (*e.g.*, recharge reason, order status) |
| *Order status* | indicates whether sales orders via the TikTok platform have been placed, paid, shipped, delivered, returned/refunded, or cancelled |
| *Play event* | event of a user playing a video in the application |

4

**APP-244**

*Business Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure Under 5 U.S.C. § 552*

| | |
|---|---|
| *Pbole* | indicates whether user and their device information is stored in pBole; pBole is an internal system that is responsible for push-related activities |
| *Pbole pushable* | indicates whether user and device information can be pushed through pBole. |
| *Performance event* | designation of an event where a user encounters a problem (*e.g.,* delay, lag, crash (used for improvement/optimization purposes)) |
| *Placement (settings)* | settings that allow advertisers to determine where their ads will be delivered (*e.g.,* TikTok landing page, interspersed in "For You" feed) |
| *Predicted age group* | user's age group predicated by AI model |
| *Predicted gender* | user's gender predicted by AI model |
| *Prediction model* | AI models used to predict what users will like; prediction model performance measurements, commonly referred to as "area under the curve", represents how successful the AI model is |
| *Pricing (settings)* | settings that allow advertisers to determine the goal on which they will be charged; the possible values are: 1: cpm (Cost Per Mille); 2: cpc (Cost Per Click); 3: cpt (Cost Per Time); 4: noc (self-operated non-charging); 5: gd (Guaranteed delivery); 6: ocpc (Optimization Cost Per Click); 7: cpa (Cost Per Action); 8: ocpm (Optimization Cost Per Mille); 9: cpv (Cost Per View) |
| *Promoted ad attributes* | attributes of the promoted mobile apps (*e.g.,* app name registered in TikTok ads platform, the event type that takes place in the app) |
| *Promoted product* | types of advertising products that TikTok provides (*e.g.,* dynamic product ads, coupon ads) |
| *Psort cover* | indicates whether the pSort system has user or device information; pSort is an internal system for algorithm-based push notifications |
| *Psort send* | indicates whether the pSort systems sends push notifications to a user |
| *Push attributes* | attributes of the push notification (*e.g.,* priority level, timeframe) |
| *Push type* | type of push notification |
| *PV* | abbreviation for "page views" |
| *Query* | designation for any specific user search term; to request aggregated results associated with that term (*e.g.,* how many users have searched for "superbowl2020", "charlidamelio", "addisonre", etc. during a specific period) |
| *Reason* | designation indicating reason for failure of a backend request (*e.g.,* backend service is not available; invalid request) |
| *Recommend video push off/on* | indicates whether a user has turned on push notification for recommended videos |

5

**APP-245**

*Business Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure Under 5 U.S.C. § 552*

| | |
|---|---|
| *Referral sources* | website or app that led the user to the TikTok platform (*e.g.,* a user searches for a topic using Google and one of the search result is a link to a TikTok video; "Google" would be the referral source) |
| *Referral user attributes* | attributes of users who referred other users (*e.g.,* referral action date, activation channel, activation date of referred user, and other common user attributes such as operating system, state, region) |
| *Rule_id* | internal unique id of security control rules |
| *Rule hits* | number of positive hits of a specific security control rule |
| *Search attributes* | characteristics of search behavior within the TikTok app.(*e.g.,* where within the app the search activity is occurring and the document type clocked after a given search) |
| *Search channel attributes* | attributes of users acquired through search channel (*e.g.,* search source, search keyword, if search page has result) |
| *Search scenario* | source/channel for the initiation of the search within the TikTok app (*e.g.,* tab at the bottom of the app where the searches can be initiated like "Discover" tab, "Video" tab, and "Music" tab) |
| *Search user type* | type of users who performed search (*e.g.,* registered user, unregistered user) |
| *Security attributes* | Security attributes refer to security control decisions (e.g., pass, observe and block) and security engineering features (e.g., type of event, past security verdict of account, account signup channel) |
| *Shop* | seller/shop that is providing the merchandise (*e.g.,* Nike official) |
| *Shopping process flow* | designation for the steps in the in-app shopping process (*e.g.,* viewing, added to cart, review cart, checkout) |
| *Stages of delivery system* | internal steps in the ads delivery pipeline (*e.g.,* target setting mapping, regional risk-control, ads frequency control, ads-blocking, ecpm ranking) |
| *Status of followship* | user tier by number of followers |
| *Story interaction push off/on* | indicates whether a user has turned on push notifications for story interactions |
| *Survey attributes* | attributes of the user completed survey (*e.g.,* questionnaire ID, questionnaire name, questionnaire type – long text v. multiple choice) |
| *Tag status & availability* | tags for the audience targeting implementation; they indicate the status and availability of the tag generating process |
| *Targeting (settings)* | settings that allow advertisers to set to whom they want their ad groups delivered; could be a combination of targeting attributes and their values (*e.g.,* "female 18-24 users who are in NYC") |
| *Targeting attributes* | attributes that are associated with a group that the advertiser wants to target (*e.g.,* age range, gender, country and region, device platform) |
| *Tasks* | tasks assigned to a content moderator (*e.g.,* labeling a video) |

6

**APP-246**

*Business Confidential Pursuant to 50 U.S.C. § 4565*
*Protected from Disclosure Under 5 U.S.C. § 552*

| | |
|---|---|
| *Task attributes* | attributes of a live streaming task, which the operator can configure in the operation platform (*e.g.*, task name, task time, task config) |
| *Tbase* | indicates whether a user device is in Tbase; Tbase is an internal system that stores user device information for content delivery |
| *Ttpush* | indicates whether a user or device is in TTPush; TTPush is an internal system for push notifications |
| *Union attributes* | attributes of a live streaming union, which is a business organization managing a list of live streaming hosts (*e.g.*, union name, country of a union) |
| *User active history* | user's historical engagement with the app (*e.g.*, number of days the user is active in the app) |
| *User attributes* | segment users by source (*e.g.*, paid ads, referral, organic); location (*e.g.*, regions, countries, states); behaviors (*e.g.*, lifetime, active date) |
| *User properties* | same as "User attributes" |
| *User grouping* | same as "User attributes" |
| *User Scenario* | designation for the relevant page of the TikTok app (*e.g.*, "For You" feed, profile, search) |
| *UV* | abbreviation for "unique visitor" or "unique user"; refers to a person who has visited the website at least once and is counted only once in the reporting time period, even if through multiple sessions |
| *UX performance metrics* | user experience performance data (*e.g.*, latency, time to load first video, crash metrics) |
| *Video attributes* | designation for certain video characteristics (*e.g.*, video effects, filters, hashtags, music) |
| *Video content attribution* | technical attributes of the video content (*e.g.*, height, width, resolution, duration, music, album) |

7

ANNEX A – Engineering and Business Related Metrics

# Material Under Seal Deleted

# Material Under Seal Deleted

# Material Under Seal Deleted

# Material Under Seal Deleted

ANNEX B – Interoperability Data

# Material Under Seal Deleted

Annex C – E-Commerce Data

# Material Under Seal Deleted

Annex D – Form of Joinder Agreement for TTUSDS

Annex E – Feature Categories as of the Effective Date

ANNEX F – List of ByteDance Competitors

ANNEX G – Public Summary