ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024

Case No. 24-1113 (and consolidated cases)

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

TIKTOK INC. AND BYTEDANCE LTD.,

*Petitioners,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent.*

*(caption continued)*

On Petitions for Review of Constitutionality of the Protecting Americans from Foreign Adversary Controlled Applications Act

**BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, FREEDOM OF THE PRESS FOUNDATION, TECHFREEDOM, MEDIA LAW RESOURCE CENTER, INC., CENTER FOR DEMOCRACY AND TECHNOLOGY, FIRST AMENDMENT COALITION, AND FREEDOM TO READ FOUNDATION IN SUPPORT OF PETITIONERS**

David Greene
Brendan Gilligan
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Tel: (415) 436-9333
Fax: (415) 436-9993
davidg@eff.org

June 26, 2024                    *Attorneys for Amici Curiae*

BRIAN FIREBAUGH, CHLOE JOY SEXTON, TALIA CADET, TIMOTHY MARTIN, KIERA SPANN, PAUL TRAN, CHRISTOPHER TOWNSEND, and STEVEN KING,

*Petitioners,*

v.

MERRICK B. GARLAND, in his capacity as United States Attorney General,

*Respondent.*

---

BASED Politics, Inc.

*Petitioner,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent.*

---

## CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES AND STATUTES

Pursuant to D.C. Circuit Rules 26.1and 28(a)(1) and Fed. R. App. P. 26.1 the Undersigned counsel certifies as follows:

### A.    Parties and *Amici*

The parties to Firebaugh v. Garland, No. 24-1130, are the Creator Petitioners and Respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. The parties to the consolidated case, TikTok Inc. v. Garland, No. 24-1113, are Petitioners TikTok Inc. and ByteDance Ltd., and Respondent Garland, in his official capacity as Attorney General of the United States. The parties to the second consolidated case, BASED Politics Inc. v. Garland, No. 24-1183, are Petitioner BASED Politics Inc. and Respondent Garland, in his official capacity as Attorney General of the United States. As of the finalization of this brief, the following *amici* have filed notices of intent to participate as *amici curiae*: Electronic Frontier Foundation, Freedom of the Press Foundation, TechFreedom, Media Law Resource Center, Center for Democracy and Technology, First Amendment Coalition, Freedom to Read Foundation, The Cato Institute, and Professor Matthew Steilen. Because these petitions were filed directly in this Court, there were no district-court proceedings in any of the cases.

ii

**B.     Rulings Under Review**

The petitions seek direct review of the constitutionality of the

Protecting Americans from Foreign Adversary Controlled Applications Act

(H.R. 815, Div. H, 118th Cong., Pub. L. No. 118-50 (April 24, 2024). There

were no district-court proceedings in any of the cases.

**C.     Related Cases**

*Amici* not aware of any other cases pending before this or any other

court that is related.


June 26, 2024                              */s/ David Greene*
                                          David Greene

                                          *Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1 and Federal Rule of Appellate

Procedure 26.1, *amici* submit the following corporate disclosure statement:

*Amici Curiae* Electronic Frontier Foundation, Freedom of the Press

Foundation, TechFreedom, Media Law Resource Center, Center for

Democracy and Technology, First Amendment Coalition, and Freedom to

Read Foundation are donor-funded, nonprofit organizations. They have no

parent corporations and do not issue stock.

June 26, 2024                         */s/ David Greene*
                                      David Greene

iv

# GLOSSARY OF ABBREVIATIONS

EFF          Electronic Frontier Foundation

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE AS TO PARTIES, RULINGS, RELATED
    CASES AND STATUTES ....................................................................ii

CORPORATE DISCLOSURE STATEMENT ...............................................iv

GLOSSARY OF ABBREVIATIONS ...........................................................v

TABLE OF AUTHORITIES ........................................................................viii

STATEMENT OF IDENTITY AND INTEREST OF *AMICI
    CURIAE* AND SOURCE OF AUTHORITY TO FILE .........................1

STATEMENT OF AUTHORSHIP AND FINANCIAL
    CONTRIBUTIONS ...............................................................................3

STATUTES AND REGULATIONS ..............................................................4

INTRODUCTION ........................................................................................4

ARGUMENT ...............................................................................................6

    I.    The Act targets core First Amendment speech ...........................6

    II.    First Amendment rights are not diminished when
        the government asserts national security concerns to
        justify restrictions ....................................................................12

    III.    The Act is a prior restraint subject to the most exacting
        scrutiny ....................................................................................15

        A.    Prior restraints are historically the least tolerable
            infringement on First Amendment rights .........................15

        B.    The Act is a prior restraint on TikTok and its users ...........17

        C.    Prior restraints are subject to extraordinarily
            exacting scrutiny ..............................................................20

    IV.    The Act is a total ban on speech and subject to a
        heightened tailoring requirement. ..............................................22

    V.    The Act's ban raises different First Amendment issues
        than other foreign ownership restrictions. .................................26

CONCLUSION ............................................................................................29

CERTIFICATE OF SERVICE ....................................................................... 30

CERTIFICATE OF COMPLIANCE ............................................................ 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alario v. Knudsen,*
   No. CV 23-56-M-DWM,
   2023 WL 8270811 (D. Mont. Nov. 30, 2023) .................................................6

*Alexander v. United States,*
   509 U.S. 544 (1993).................................................................................5, 15

*Al-Haramain Islamic Found., Inc. v. Bush,*
   507 F.3d 1190 (9th Cir. 2007) ....................................................................13

*Aptheker v. Sec. of State,*
   378 U.S. 500 (1964).....................................................................................12

*Arcara v. Cloud,*
   478 U.S. 697 (1986).....................................................................................10

\* *Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963).........................................................10, 14, 16, 18, 19, 21

*Brandenburg v. Ohio,*
   395 U.S. 444 (1969).....................................................................................13

*Carroll v. President & Comm'rs of Princess Anne,*
   393 U.S. 175 (1968)................................................................................19, 22

\* *City of Ladue v. Gilleo,*
   512 U.S. 43 (1994).......................................................................5, 23, 24, 25

*City of Lakewood v. Plain Dealer Pub. Co.,*
   486 U.S. 750 (1988).....................................................................................23

*Columbia Broad. Sys., Inc. v. U.S. Dist. Ct.,,*
   729 F.2d 1174 (9th Cir. 1984) ....................................................................20

*Craig v. Harney,*
   331 U.S. 367 (1947).....................................................................................21

*De Jonge v. Oregon*,
    299 U.S. 353 (1937)...................................................................................13

*Frisby v. Schultz*,
    487 U.S. 474 (1988)...................................................................................26

*Ground Zero Ctr. For Non-Violent Action v. Dep't of Navy*,
    860 F.3d 1244 (9th Cir. 2017) .................................................................14

*Halperin v. Dep't of State*,
    565 F.2d 699 (D.C. Cir. 1977) ................................................................14

\* *Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004)...................................................................................13

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995).....................................................................................9

*In re Murphy-Brown, LLC*,
    907 F.3d 788 (4th Cir. 2018) ...................................................................20

*Landmark Communications, Inc. v. Virginia*,
    435 U.S. 829 (1978)...................................................................................21

\* *Lebron v. Washington Metro. Area Transit Auth.*,
    749 F.2d 893 (D.C. Cir. 1984).......................................................5, 15, 17

\* *Liberty Lobby v. Person*,
    390 F.2d 489 (D.C. Cir. 1967) ................................................................16

*Lovell v. City of Griffin*,
    303 U.S. 444 (1938)...................................................................................25

*Martin v. City of Struthers*,
    319 U.S. 141 (1943)...................................................................................24

*Members of City Council of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984).............................................................................5, 26

*Minneapolis Star & Tribune Company v. Minnesota
    Commissioner of Revenue*,
    460 U.S. 575 (1983)...................................................................................23

Mitchell v. Forsyth,
    472 U.S. 511 (1985)...................................................................13

\* N.Y. Times Co. v. United States,
    403 U.S. 713 (1971).............................................5, 13, 14, 18, 21

\* Near v. Minnesota,
    283 U.S. 697 (1931)..............................................14, 15, 16, 17, 18

\* Nebraska Press Ass'n v. Stuart,
    427 U.S. 539 (1976)..................................................16, 17, 21, 22

\* Organization for a Better Austin v. Keefe,
    402 U.S. 415 (1971).......................................14, 17, 18, 19, 21, 22

Packingham v. North Carolina,
    582 U.S. 98 (2017)..........................................................6, 24, 25

Patterson v. Colorado,
    205 U.S. 454 (1907)...................................................................16

\* Reno v. ACLU,
    521 U.S. 844 (1997)...............................................................6, 27

Rosen v. Port of Portland,
    641 F.2d 1243 (9th Cir. 1981) .................................................22

Schad v. Mount Ephraim,
    452 U.S. 61 (1981)...................................................................26

Schneider v. New Jersey,
    308 U.S. 147 (1939)................................................................24

Sindi v. El-Moslimany,
    896 F.3d 1 (1st Cir. 2018).......................................................20

Smith v. Daily Mail Pub.,
    443 U.S. 97 (1979)..................................................................20

Southeastern Promotions Ltd. v. Conrad,
    420 U.S. 546 (1975)................................................................15

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)..........................................................................23, 27, 28

*Twitter, Inc. v. Garland*,
    61 F.4th 686 (9th Cir. 2023) .........................................................14

*United States v. Grace*,
    461 U.S. 171 (1983)......................................................................25

*United States v. Quattrone*,
    402 F.3d 304 (2d Cir. 2005) ........................................................20

*United States v. Robel*,
    389 U.S. 258 (1967)......................................................................12

*United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*,
    407 U.S. 297 (1972)......................................................................13

*Vance v. Universal Amusement Co.*,
    445 U.S. 308 (1980)......................................................................16

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)......................................................................26

*Whitney v. California*,
    274 U.S. 357 (1927)......................................................................13

**Statutes**

42 U.S.C. § 2133(d) ...........................................................................27

Protecting Americans from Foreign Adversary Controlled
    Applications Act, Pub. L. No. 118-50
    (Apr. 24, 2024)..................................4, 5, 6, 10, 11, 12, 15, 18, 19, 24, 25, 27

**Other Authorities**

Abby Ohlheiser, TikTok has become the soul of the LGBTQ Internet,
    Wash. Post (Jan. 28, 2020) ..........................................................8

Arlyssa Becenti, Native *TikTok Creators Worry a Ban Would Take Away
    Connections*, Communities, AZCentral. (Apr. 3, 2023) ...............8

Bess Pierre & R.J. Cross, *Demystifying TikTok Data Collection*,
PIRG (June 15, 2023) ...................................................................19

Bobby Allyn, TikTok Pivots from Dance Moves to a Racial Justice
Movement, NPR (June 7, 2020) ....................................................8

David Shepardson, TikTok hits 150 mln U.S. monthly users, up
from 100 million in 2020, Reuters (March 20, 2023)....................7

EFF (@efforg), TikTok...................................................................9

Fernando Alfonso III, How these Latinx TikTok creators are filling
a void and making history, CNN (Oct. 17, 2021).........................8

Ganesh Sitaraman, *The Regulation of Foreign Platforms*,
74 Stan. L. Rev. 1073 (2022).......................................................27

Gene Del Vecchio, TikTok Is Pure Self-Expression. This Is Your
Must-Try Sampler, Forbes (June 6, 2020).....................................6

H. Rept. 118-417 – Protecting Americans From Foreign Adversary
Controlled Applications Act (March 11, 2024) ............................11

Ian M. Rose, Barring Foreigners from Our Airwaves: An
Anachronistic Pothole on the Global Information Highway,
95 Colum L. Rev. 1188 (1995) ....................................................28

John Brandon, One Reason TikTok Is the Most Popular Social
Media App of the Year So Far, Forbes (Apr. 28, 2022) ...............20

Kalhan Rosenblatt, From the renegade to Black Lives Matter:
How Black creators are changing TikTok culture,
NBC News (July 30, 2020)............................................................8

Kyle Chayka, *Watching the World's "First TikTok War,"*
New Yorker (March 3, 2022) ........................................................7

Madison Malone Kircher, *After the Trump Verdict, the
TikTok Trial Began*, N.Y. Times (May 31, 2024) .........................7

matisseazul (@matisseazul), TikTok (July 7, 2021) ............................8

Matt Binder, X/Twitter use is down by nearly a quarter since
    the Musk era started, Mashable (March 27, 2024) .......................................10

Neiman Lab, Here's a running list of publishers and journalists
    on TikTok ..................................................................................................9

Office of the Director of National Intelligence, *Annual Threat
Assessment of the U.S. Intelligence Community* (Feb. 5, 2024) .................12

PBS News, TikTok (June 12, 2024) ....................................................................7

PBS Newshour, Why TikTok's parent company could face
    divestment or U.S. ban of the platform (March 12, 2024) ..........................12

Rynnstar (@Rynnstar), TikTok ............................................................................8

Stacy Jo Dixon, Most popular social networks worldwide as
    of April 2024, ranked by number of monthly active users,
    Statista (May 22, 2024) ................................................................................7

Stephen R. Barnett, *The Puzzle of Prior Restraint*,
    29 Stan. L. Rev. 539 (1977) ........................................................................15

Supaman (@supamantiktok), TikTok (July 25, 2023) .........................................8

Taylor Lorenz, Why TikTok videos on the Israel-Hamas war
    have drawn billions of views, Wash. Post (Oct. 10, 2023) ...........................7

*TikTok For Good*, https://www.tiktok.com/forgood ...........................................9

**Constitutional Provisions**

U.S. Const. amend. I…..…iv, 2, 4, 5, 6, 10, 11, 12, 13, 14, 16, 17, 21, 23, 25, 27,
    28, 29

*\*Authorities upon which we chiefly rely are marked with asterisks*

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE* AND SOURCE OF AUTHORITY TO FILE

*Amici curiae* are nonprofit organizations that share a common commitment to promoting and protecting freedom of speech and of the press to a wide array of constituents, and who see the government's act against TikTok as a direct and serious threat to such freedoms. They each frequently file amicus briefs in this Court and courts around the country in cases, like this one, that address significant First Amendment issues, including when the government invokes national security interests to justify restrictions on First Amendment freedoms.

The Electronic Frontier Foundation (EFF) is a member-supported civil liberties organization that has worked for over 30 years to protect free speech, privacy, and innovation in the digital world. EFF, with over 30,000 active donors, represents the interests of technology users in court cases and broader policy debates surrounding the application of law to the Internet and other technologies.

Freedom of the Press Foundation protects and defends public-interest journalism, including against prior restraints and other restrictions on journalists' right to gather and publish news on the platforms of their choice.

The Center for Democracy & Technology is public interest organization that for over twenty-five years, has represented the public's interest in an open,

decentralized Internet and worked to ensure that the constitutional and democratic values of free expression and privacy are protected in the digital age.

The First Amendment Coalition is a public interest organization dedicated to defending freedom of speech, freedom of the press, and the people's right to know.

Media Law Resource Center, Inc. is a membership organization for organizations and attorneys who advocate for media and First Amendment rights, including those working in law firm and in-house practice as well as those in academia, at non-profit organizations, and in other settings. The views expressed in this brief are those of MLRC and do not necessarily reflect the views of any of its individual or organizational members.

TechFreedom is a nonpartisan think tank based in Washington, D.C. dedicated to promoting technological progress that improves the human condition. It seeks to advance public policy that makes experimentation, entrepreneurship, and investment possible.

The Freedom to Read Foundation was founded to establish legal precedent for the freedom to read of all citizens; protect the public against efforts to suppress or censor speech; and support the right of libraries to

collect, and individuals to access, information that reflects the diverse voices of a community.

Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), *amici* certify that no person or entity, other than *amici curiae*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. Pursuant to District of Columbia Circuit Rule 29(b), Electronic Frontier Foundation certifies that all parties have consented to the filing of this amicus brief.  Pursuant to District of Columbia Circuit Rule 29(b), EFF certifies that this separate amicus brief is necessary provide alternative arguments that the law in questions must be subject to the most exacting First Amendment scrutiny because the law imposes a prior restraint on TikTok and all TikTok users, and the prior restraint doctrine is not diminished by claims of countervailing national security interests.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief. No person other than amicus EFF, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

**STATUTES AND REGULATIONS**

The Protecting Americans from Foreign Adversary Controlled

Applications Act, Pub. L. No. 118-50 (Apr. 24, 2024).

**INTRODUCTION**

The Protecting Americans from Foreign Adversary Controlled

Applications Act, Pub. L. No. 118-50 (Apr. 24, 2024) ("the Act"), the federal

law banning TikTok—an application that millions of Americans use to

communicate, learn about the world, and express themselves—under its existing

ownership and editorial policy, is unconstitutional. The Act directly restricts

protected speech and association, deliberately singles out a particular medium of

expression for a blanket prohibition, and imposes a prior restraint that will make

it impossible for users to speak, access information, and associate through

TikTok.

As a result, the statute triggers an especially exacting form of First

Amendment scrutiny. And it does so for at least two, independent reasons.

First, the Act constitutes a prior restraint on TikTok and its users, an

especially disfavored means of restricting First Amendment rights. This is

because the statute will shut down the app, blocking millions of users, as well as

TikTok itself, from engaging in protected expression "in advance of the time

that [their] communications are to occur." *Alexander v. United States*, 509 U.S.

544, 550 (1993). *See Lebron v. Washington Metro. Area Transit Auth.*, 749 F.2d 893, 896 (D.C. Cir. 1984).

Second, even if this Court does not subject the Act to the strict scrutiny due prior restraints, the government would still have to satisfy a strict narrow-tailoring requirement because the statute is a total ban on a unique and important means of communication. *See City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994). In these circumstances, courts still apply an exacting standard: a total ban of that type fails unless it "curtails no more speech than is necessary to accomplish its purpose." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984).

The government's burden to justify an infringement on First Amendment rights is the same in the national security context as in any other. *See, e.g.*, *N.Y. Times Co. v. United States* ("*Pentagon Papers*"), 403 U.S. 713; *id.* at 729–30 (1971) (Stewart, J., concurring). In fact, the judiciary has an especially critical role to play in ensuring that the government meets its burden when the government invokes national security.

*Amici* urge the Court to see the Act for what it is: a sweeping ban on free expression that triggers the exacting scrutiny under the First Amendment. Applying the proper test, this Court should grant preliminary injunctive relief under the First Amendment.

## ARGUMENT

### I.    The Act targets core First Amendment speech.

The use of TikTok by its millions of American users to share and receive ideas, information, opinions, and entertainment from other users around the world lies squarely within the protections of the First Amendment. *See Alario v. Knudsen*, No. CV 23-56-M-DWM, 2023 WL 8270811, *6 (D. Mont. Nov. 30, 2023). As the Supreme Court recognized in holding that the First Amendment protected one's use of social media, the "most important places . . . for the exchange of views" are "the 'vast democratic forums of the Internet' in general . . . and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (quoting *Reno v. ACLU*, 521 U.S. 844, 868 (1997)).

TikTok hosts a wide universe of expressive content, from musical performances and comedy to politics and current events. *See, e.g.*, Gene Del Vecchio, *TikTok Is Pure Self-Expression. This Is Your Must-Try Sampler*, Forbes (June 6, 2020), https://perma.cc/6UJ6-JEPS.

And with over 150 million users in the United States[1] and over 1.5 billion users worldwide,[2] TikTok is host to enormous national and international communities that most U.S. users cannot readily reach elsewhere. This expansive reach allows US users to communicate with people far beyond their local communities—and vice versa. Recently, TikTok has been an essential platform for users to learn about and engage with the everything from the Israel-Hamas conflict,[3] to Russia's invasion of Ukraine,[4] to the convictions of Donald Trump and Hunter Biden.[5]

---

[1] David Shepardson, *TikTok hits 150 mln U.S. monthly users, up from 100 million in 2020*, Reuters (March 20, 2023), *available at* https://www.reuters.com/technology/tiktok-tell-congress-it-has-150-million-monthly-active-us-users-2023-03-20/.

[2] Stacy Jo Dixon, *Most popular social networks worldwide as of April 2024, ranked by number of monthly active users*, Statista (May 22, 2024), *available at* https://www.statista.com/statistics/272014/global-social-networks-ranked-by-number-of-users/.

[3] *See, e.g.*, Taylor Lorenz, *Why TikTok videos on the Israel-Hamas war have drawn billions of views*, Wash. Post (Oct. 10, 2023), *available at* https://www.washingtonpost.com/technology/2023/10/10/tiktok-hamas-israel-war-videos/.

[4] Kyle Chayka, *Watching the World's "First TikTok War,"* New Yorker (March 3, 2022), *available at* https://www.newyorker.com/culture/infinite-scroll/watching-the-worlds-first-tiktok-war.

[5] Madison Malone Kircher, *After the Trump Verdict, the TikTok Trial Began*, N.Y. Times (May 31, 2024), *available at* https://www.nytimes.com/2024/05/31/style/trump-verdict-tiktok-cohen.html; PBS News, TikTok (June 12, 2024), *available at* https://www.tiktok.com/@pbsnews/video/7379656504133094698 (Hunter Biden conviction).

TikTok plays an especially important and outsized role for minority communities seeking to foster solidarity online and to highlight issues vital to them.[6] For example, @Rynnstar, a Black TikTok creator, uses her account—with 1.2 million followers—to advocate against racism.[7]  Likewise, TikTok user Matisse Azul Rainbolt uses her account to share her Hispanic culture and dance.[8]

---

[6] *See, e.g.*, Arlyssa Becenti, Native *TikTok Creators Worry a Ban Would Take Away Connections*, Communities, AZCentral. (Apr. 3, 2023), https://perma.cc/475N-D9NW; Bobby Allyn, *TikTok Pivots from Dance Moves to a Racial Justice Movement*, NPR (June 7, 2020), https://perma.cc/4CEX-CP46; Abby Ohlheiser, *TikTok has become the soul of the LGBTQ Internet*, Wash. Post (Jan. 28, 2020), *available at* https://www.washingtonpost.com/technology/2020/01/28/tiktok-has-become-soul-lgbtq-internet/.

[7] Kalhan Rosenblatt, *From the renegade to Black Lives Matter: How Black creators are changing TikTok culture*, NBC News (July 30, 2020), *available at* https://www.nbcnews.com/news/nbcblk/renegade-black-lives-matter-how-black-creators-are-changing-tiktok-n1235255; Rynnstar (@Rynnstar), TikTok, *available at* https://www.tiktok.com/@rynnstar. *See also* Supaman (@supamantiktok), TikTok (July 25, 2023), *available at* https://www.tiktok.com/@supamantiktok/video/7259916703394565418.

[8] Fernando Alfonso III, *How these Latinx TikTok creators are filling a void and making history*, CNN (Oct. 17, 2021), *available at* https://www.cnn.com/2021/10/17/us/latinx-tik-tok-creators/index.html; matisseazul (@matisseazul), TikTok (July 7, 2021), *available at* https://www.tiktok.com/@matisseazul/video/6982303582313893126.

TikTok is also widely used by publishers and journalists in the United States and around the world.[9]

TikTok is also a unique expressive platform for non-profits like *amici*. Non-profits use TikTok to grow their base, communicate with their supporters, and elevate their causes, and TikTok specifically offers tools for non-profits to achieve these goals. *See TikTok For Good*, https://www.tiktok.com/forgood. For example, amicus curiae EFF, whose TikTok posts have received 31,000 views,[10] uses the platform for these purposes—to show the human impact of government policies, inform people of their rights, and alert its supporters to new legislation.[11]

The First Amendment protects not only TikTok's U.S. users, but TikTok itself, which posts its own content and makes editorial decisions about what user content to carry and how to curate it for each individual user. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) (recognizing the First Amendment right to curate numerous independent

---

[9] Neiman Lab, *Here's a running list of publishers and journalists on TikTok*, *available at* https://www.niemanlab.org/reading/heres-a-running-list-of-publishers-and-journalists-on-tiktok/ (last visited June 25, 2024).

[10] *See* EFF (@efforg), TikTok, *available at* https://www.tiktok.com/@efforg (last visited June 25, 2024).

[11] *See, e*.g.*,* EFF (@efforg), TikTok (June 10, 2024), *available at* https://www.tiktok.com/@efforg/video/7379030543330970911 (telling supporters about a California state legislature bill).

speakers); *cf. Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963)

(recognizing the First Amendment rights of book publishers to decide which

books to publish).

Because the Act bans[12] a communications platform because of the way

users communicate on it, it clearly must survive First Amendment scrutiny. The

Act directly targets TikTok and its users as they exercise their First Amendment

rights. And it "singl[es] out" one platform and all of the speakers who use it "to

shoulder its burden." *Arcara v. Cloud*, 478 U.S. 697, 704 (1986) (citing

*Minneapolis Star*, 460 U.S. 575, 591–92 (1983)). The Act both governs

"conduct that has an expressive element" and "impose[s] a disproportionate

burden upon those engaged in protected First Amendment activities." *Id.* at 702–

07 (1986).

Congress's content-based justifications for the ban confirm that the

government is targeting TikTok because it finds speech that Americans receive

from it to be harmful. *Cf. id.* at 706 n.3. The House Committee Report that

---

[12] As TikTok thoroughly explains in its brief, while this law is styled as a
divestiture requirement, it is functionally a ban on TikTok under its current
ownership and current editorial policy. As many former users of Twitter
discovered, a change in ownership can significantly change the user experience
and editorial policy. *See* Matt Binder, *X/Twitter use is down by nearly a quarter
since the Musk era started*, Mashable (March 27, 2024), *available at*
https://mashable.com/article/x-twitter-daily-active-users-mobile-app-decline-
report-x-disputes. And generally, the government cannot accomplish indirectly
what it is barred from doing directly.

accompanied the bill that became the Act linked the national security concerns

that justify the ban to the content of the speech on TikTok. The report explained

that the purported national security threat arose "because such applications can

be used by those countries to collect vast amounts of data on Americans,

conduct espionage campaigns, and *push misinformation, disinformation, and*

*propaganda on the American public*."[13] H. Rept. 118-417 – Protecting

Americans From Foreign Adversary Controlled Applications Act (March 11,

2024) (emphasis added). That report is consistent with the TikTok content

concerns described in the 2024 Annual Threat Assessment of the U.S

Intelligence Community, which immediately preceded the introduction of the

Act in Congress and which mentions TikTok only once. The threat assessment

notes that "TikTok accounts run by a PRC propaganda arm reportedly targeted

candidates from both political parties during the U.S. midterm election cycle in

---

[13] Such "misinformation, disinformation, and propaganda" would be protected
speech since U.S. persons have a First Amendment right to receive propaganda
from a foreign adversary. *See Lamont v. Postmaster General*, 381 U.S. 301, 307
(1965). There may still be compelling governmental interests in combatting
these categories of speech in certain contexts. But that is assessed through the
First Amendment scrutiny that applies to restrictions on protected speech, as set
forth below.

2022" and that "PRC actors' have increased their capabilities to conduct covert influence operations and disseminate disinformation."[14]

## II. First Amendment rights are not diminished when the government asserts national security concerns to justify restrictions.

As the Supreme Court has repeatedly held, the government's invocation of "national security" does not diminish First Amendment protections or the scrutiny applied to laws infringing on those rights. The Court has emphasized that the First Amendment must be still applied consistently, *United States v. Robel*, 389 U.S. 258, 266 (1967), and that "precision must be the touchstone" of legislation affecting basic freedoms, *Aptheker v. Sec. of State*, 378 U.S. 500, 514 (1964), even when national security concerns apply. Courts must still fulfill their "time-honored and constitutionally mandated roles of reviewing and resolving claims" that allege violations of constitutional rights. *Hamdi v. Rumsfeld*, 542

---

[14] Office of the Director of National Intelligence, *Annual Threat Assessment of the U.S. Intelligence Community*, 12 (Feb. 5, 2024), *available at* https://www.odni.gov/files/ODNI/documents/assessments/ATA-2024-Unclassified-Report.pdf. For their part, the sponsors of the Act also publicly voiced content-based concerns with TikTok. Rep. Mike Gallagher told PBS Newshour that the "broader" of the two concerns TikTok raises is "the potential for this platform to be used for the propaganda purposes of the Chinese Communist Party." On that same program, Representative Raja Krishnamoorthi, a Democratic co-sponsor of the bill, similarly voiced content concerns, claiming that TikTok promotes "drug paraphernalia, oversexualization of teenagers" and "constant content about suicidal ideation." PBS Newshour, *Why TikTok's parent company could face divestment or U.S. ban of the platform* (March 12, 2024), *available at* https://www.pbs.org/newshour/show/why-tiktoks-parent-company-could-face-divestment-or-u-s-ban-of-the-platform.

U.S. 507, 535 (2004). "The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment." *New York Times v United States*, 403 U.S. 713, 719 (1971) ("*Pentagon Papers*") (Black, J., concurring). *See also Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007) ("Simply saying 'military secret,' 'national security' or 'terrorist threat' . . . is insufficient to [carry the government's burden].").

Historically, diminished First Amendment standards, deferential to asserted national security harms, have been "thoroughly discredited" and replaced with rigorous and consistent standards. *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969) (discussing *Whitney v. California*, 274 U.S. 357 (1927)). "Such must be the rule if authority is to be reconciled with freedom." *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring).

Indeed, the courts must be more vigilant in the face of such assertions, given the serious threats national security cases pose to First Amendment values, *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972) ("*Keith*"), and the possibility that government officials may "disregard constitutional rights in their zeal to protect the national security," *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985). For example, in *De Jonge v. Oregon*, 299 U.S. 353, 364–65 (1937), the Court reversed as unconstitutional the defendant's

conviction for involvement in a Communist meeting, observing that "[t]he greater the importance of safeguarding the community from incitements," the "more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly."

In precedent that is particularly relevant to this case, in *Pentagon Papers,* the Court held the government's national security-motivated prohibition against publishing the Pentagon Papers during the Vietnam War to the same "heavy burden" applied to other prior restraints. 403 U.S. at 714 (quoting *Bantam Books*, 372 U.S. at 70 and *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)). Lower courts following this precedent have affirmed that "national security interests . . . are generally insufficient to overcome the First Amendment's 'heavy presumption' against the constitutionality of prior restraints." *Ground Zero Ctr. For Non-Violent Action v. Dep't of Navy*, 860 F.3d 1244, 1260 (9th Cir. 2017). *See also Halperin v. Dep't of State*, 565 F.2d 699, 707 (D.C. Cir. 1977) (holding in a FOIA case that the evaluation of national security concerns "should be guided by an exacting standard similar to that suggested in *Near v. Minnesota*, [283 U.S. 697 (1931)]," the exacting standard applied to prior restraints, as discussed below).[15]

---

[15] *Twitter, Inc. v. Garland*, 61 F.4th 686, 708 (9th Cir. 2023) is not to the contrary. There, the Ninth Circuit applied a lesser form of scrutiny not because

**III.    The Act is a prior restraint subject to the most exacting scrutiny.**

**A.    Prior restraints are historically the least tolerable infringement on First Amendment rights.**

The Act is not merely a regulation of expression, it is a prior restraint, the most disfavored type of speech restriction, which the Supreme Court has described as "the essence of censorship." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931). *See also Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975); *Lebron*, 749 F.2d at 896.

Prior restraints are "orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander*, 509 U.S. at 550. *See Lebron*, 749 F.2d at 896 (finding a prior restraint in an official action that prevented the speaker from saying "what he wants to say"). The "historical paradigm" of a prior restraint was the English system of licensing all presses and printers, which forbade printing without government permission. Stephen R. Barnett, *The Puzzle of Prior Restraint*, 29 Stan. L. Rev. 539, 544 (1977). But over time, the Supreme Court has recognized that prior restraints can take many other forms—ranging from administrative schemes that wield informal sanctions, like a state board that issues advisory

---

of the national security dimension, but because the information to which the prior restraint applied was supplied by the government itself as part of a confidential governmental process.

notices about the suitability of books for minors, *see Bantam Books*, *Inc.*, 372 U.S. at 66–71, to a complete ban on publication, like a court injunction against the printing of a particular newspaper, *see Near*, 283 U.S. at 711–13; *see also Liberty Lobby v. Person*, 390 F.2d 489, 490–91 (D.C. Cir. 1967) (holding an injunction to be a prior restraint).

The First Amendment has always uncontroversially protected against prior restraints. The Founders debated only whether it included other restrictions on speech as well. *Near*, 283 U.S. at 714–15. The Court recognized 116 years ago that "the main purpose of [the First Amendment] is to prevent all such Previous restraints upon publications as had been practiced by other governments." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 557 (1976) (quoting *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) (cleaned up) (distinguishing prior restraints from subsequent punishment of speech)).

And although the First Amendment was ultimately interpreted to also protect against post-publication intrusions on the freedoms of speech and the press, prior restraints remained more strongly disfavored. By barring expression *before* it is uttered, prior restraints prevent speech altogether, rather than merely chilling speech through risk of subsequent sanction. *See Vance v. Universal Amusement Co.*, 445 U.S. 308, 316 n.13 (1980). In *Nebraska Press*, the Court explained: "[i]f it can be said that a threat of criminal or civil sanctions after

publication 'chills' speech, prior restraint 'freezes' it at least for the time." 427 U.S. at 559. "Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) (emphasis added).

For a solid century, the Supreme Court has repeatedly held that because prior restraints present such unique dangers, they are permissible only in the rarest cases. In 1931, the Court observed that the use of prior restraints was so far outside our constitutional tradition that "there ha[d] been almost an entire absence of attempts to impose" them—a consistency that reflects "the deep-seated conviction that such restraints would violate constitutional right[s]." *Near*, 283 U.S. at 718. Thereafter, "the principles enunciated in *Near* were so universally accepted that the precise issue did not come before" the Court for another 40 years. *Nebraska Press*, 427 U.S. at 557–58 (citing *Keefe*, 402 U.S. 415).

**B.      The Act is a prior restraint on TikTok and its users.**

The Act's ban of TikTok in its current form is a classic prior restraint. The Act functionally bars TikTok users from speaking or receiving speech through it, and it directly bars TikTok from curating speech for its users before that speech can be published. *See Lebron*, 749 F.2d at 896.

The Act's no-TikTok-at-all prohibition is even more sweeping than the prior restraint in *Pentagon Papers*, in which the Court held that an order barring the *New York Times* only from publishing the Pentagon Papers, but not other articles, was an unconstitutional prior restraint. 403 U.S. at 729–30 (Stewart, J., concurring). Congress has not merely forbidden particular communications or speakers on TikTok, it has banned the entire platform—suppressing an extraordinary amount of protected expression.

The Act is thus analogous to *Near*, in which the Supreme Court found that banning future publication of the newspaper as a whole on the grounds that it was in the past a public nuisance was an impermissible prior restraint. 283 U.S. at 713, 723. Outside of the newspaper context, the Supreme Court overturned as an unconstitutional prior restraint an injunction that barred a group from pamphleting and picketing as a whole: while the injunction was entered in response to certain content, it applied to all pamphleting, not just specific speech. *See, e.g.*, *Keefe*, 402 U.S. at 417–20.

That Congress directed its prohibitions at TikTok instead of TikTok's users directly is irrelevant. In *Bantam Books*, for example, the Supreme Court held that book publishers could challenge a state censorship scheme that purported "only to regulate [book] distribution," the intermediaries the publishers relied on, because, in practice, it also operated as a restraint on

publishers. 372 U.S. at 64 n.6; *id.* at 67 (instructing courts to "look through forms to the substance" when assessing prior restraints that suppress speech).

The Act's TikTok ban embodies the particular dangers that the prior restraint doctrine was designed to prevent and is exactly the type of law that warrants courts' special distrust. It is a blunt instrument that blocks far more speech than necessary—the entire platform—to serve its stated purposes. It also plainly raises the issue of political bias and motivation, singling out TikTok because of its foreign ownership even as other major social media platforms raise similar privacy and content-moderation issues. *See, e.g.*, Bess Pierre & R.J. Cross, *Demystifying TikTok Data Collection*, PIRG (June 15, 2023), https://perma.cc/VW5V-NU9H.

Prior restraints that target intermediaries remain exceptionally disfavored even if the speaker has another means of speaking or the audience another means of receiving the speech. *See, e.g., Bantam Books*, 372 U.S. at 64 n.6 (noting that Rhode Island commission had no jurisdiction over the out-of-state plaintiffs, who thus remained free to have their books distributed in other states); *Keefe*, 402 U.S. at 417–19 (holding injunction against leafletting and picketing to be a prior restraint even though protestors had other ways to protest); *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 182–85 (1968)

(finding injunction only against protests, but no other speech, in the county for 10 days to be a prior restraint).

But even if there were such a "sole means" requirement, the speech and expression that U.S. users watch, enjoy, and engage with on TikTok is unique and uniquely curated for them. *See* John Brandon, *One Reason TikTok Is the Most Popular Social Media App of the Year So Far*, Forbes (Apr. 28, 2022), https://perma.cc/GE4M-8ERD. TikTok is not interchangeable with other social media apps—indeed, if it were, Congress would not be treating TikTok in such an exceptional way.

## C.    Prior restraints are subject to extraordinarily exacting scrutiny.

Because the Act constitutes a prior restraint, this Court should apply "the most exacting scrutiny." *Smith v. Daily Mail Pub.*, 443 U.S. 97, 102 (1979). *See Columbia Broad. Sys., Inc. v. U.S. Dist. Ct. (CBS),* 729 F.2d 1174, 1178 (9th Cir. 1984); *United States v. Quattrone,* 402 F.3d 304, 310 (2d Cir. 2005); *Sindi v. El-Moslimany*, 896 F.3d 1, 31–32 (1st Cir. 2018). Indeed, as both a prior restraint and a restriction on speech that is aimed to blunt particular expression on the platform, the Act, "even among First Amendment claims," warrants *"a most rigorous form of review." In re Murphy-Brown, LLC*, 907 F.3d 788, 796–97 (4th Cir. 2018) (explaining that such orders "rest at the intersection of two

disfavored forms of expressive limitations: prior restraints and content-based restrictions.").

Prior restraints must overcome "a heavy presumption" of unconstitutionality, *Bantam Books*, 372 U.S. at 70, and as such, both prongs of traditional "strict scrutiny"—the requirements that the challenged government action advance a compelling interest and that it be narrowly tailored to achieve that interest—are heightened.

First, to pass constitutional muster, a prior restraint must do more than merely further a compelling interest; it must be necessary to further an urgent interest of the highest magnitude. *See Keefe*, 402 U.S. at 419 (finding individual privacy interest insufficient to justify prior restraint); *Nebraska Press*, 427 U.S. at 561 (explaining that the "barriers to prior restraint remain high" even in the face of another constitutional right). The government must show that the harm it seeks to prevent is not only extremely serious but "direct, immediate, and irreparable," *Pentagon Papers*, 403 U.S. at 730 (Stewart, J., concurring). *See also id.* at 726–27 (Brennan, J., concurring). The government must also show that the harm is not merely possible, or even probable, but that its "degree of imminence [is] extremely high" as demonstrated by a "solidity of evidence." *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 845 (1978); *accord Craig v. Harney*, 331 U.S. 367, 376 (1947).

Second, when analyzing prior restraints, the Supreme Court has imposed an especially defending form of the narrow-tailoring requirement. Prior restraints must be "couched in the narrowest terms that will accomplish the pinpointed objective permitted by constitutional mandate and the essential needs of the public order." *Carroll*, 393 U.S. at 183. The government must show both that the prior restraint will serve its purpose, and that it is the only way to do so. *Nebraska Press*, 427 U.S. at 562, 565, 569–70. *See also Rosen v. Port of Portland*, 641 F.2d 1243, 1250 (9th Cir. 1981) ("Any 'prior restraint,' therefore, must be held unconstitutional, unless no other choice exists."). Thus, the government "carries a heavy burden of showing justification for the imposition of [] a [prior] restraint." *Keefe*, 402 U.S. at 419.

For the reasons discussed by the TikTok users and the company, the government cannot meet its burden under this demanding standard, or even a lesser one. *See* TikTok Br. 47–61; User Br. 37–60.

## IV. The Act is a total ban on speech and subject to a heightened tailoring requirement.

Even if this Court does not classify the Act as a prior restraint, it still must apply an exacting form of scrutiny because the government has imposed a "total ban" on TikTok, a unique and important medium of expression. As the Supreme Court explained in *Minneapolis Star & Tribune Company v. Minnesota Commissioner of Revenue*, "facially discriminatory" regulations that "singl[e]

out" a particular means of expression trigger exacting First Amendment scrutiny. 460 U.S. 575, 581, 585–86, 591–93 (1983). *See also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).

In *City of Ladue*, the Supreme Court recognized a category of prohibitions on speech that cause "particular concern" because they "foreclose an entire medium of expression"—and so, like prior restraints, can silence too much speech. 512 U.S. at 55. The Supreme Court has struck down a variety of such bans, from "the distribution of pamphlets" to "handbills on the public streets" to "the door-to-door distribution of literature" to "live entertainment." *Id.* Even if the bans are "completely free of content or viewpoint discrimination, the danger [that they] pose to the freedom of speech is readily apparent—by eliminating a common means of speaking, such measures can suppress too much speech." *Id.*

These restrictions, often called "total bans," *see, e.g.*, *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 762 (1988), consist of two elements: they completely "foreclose" speech, and they do so with respect to "an entire medium of expression," *i.e.*, a "means of communication that is both unique and important." *City of Ladue*, 512 U.S. at 54.

The Act has both of these elements.

As discussed above, the Act completely forecloses users' speech on the app under its current editorial policy and ownership.

23

Moreover, that editorial policy, reflected in its customized curation of content to its millions of users, makes TikTok unique and important. The Supreme Court has explained that "[t]he widespread use of [a] method of communication by many groups espousing various causes atests [sic] its major importance." *Martin v. City of Struthers*, 319 U.S. 141, 145–46 (1943). A lack of practical substitutes and the medium's ease of use are also strong evidence of its importance. *See City of Ladue*, 512 U.S. at 57 (because "[r]esidential signs are [] unusually cheap[,] . . . for persons of modest means or limited mobility, a yard or window sign may have no practical substitute"); *Schneider v. New Jersey*, 308 U.S. 147, 164 (1939). TikTok has all these qualities. It has an immense audience—nearly half of the U.S. population and even more users worldwide—that would be extraordinarily hard to replace; these millions of users chose TikTok even though they had other well established social media options available to them. In addition, it offers a multitude of expressive and educational functions for many different groups, *see* Section I, *supra*, and is easy and free to use.

In considering the uniqueness and importance of TikTok, the Supreme Court's discussion of social media in *Packingham* is instructive. There, the Court, calling "cyberspace" the "most important place[] . . . for the exchange of views," and noting that social media in particular "can provide perhaps the most

24

powerful mechanisms available to a private citizen to make his or her voice heard," struck down a state prohibiting the use of social networking websites by people previously convicted of sex offenses, describing it as a "complete bar to the exercise of First Amendment rights on websites integral to the fabric of our modern society and culture." *Packingham*, 582 U.S. at 104, 107, 109.[16] TikTok is similarly important in today's society and culture, with its millions of US users relying on it for sharing news, learning about the world, developing new skills, and countless other forms of expression.

As a total ban, the Act is subject to exacting judicial scrutiny. Total bans are qualitatively different, and more suspect, for example, than the content-neutral time, place, and manner restrictions that trigger only intermediate scrutiny: total bans "foreclose an entire medium of expression" and do not merely "merely shift the time, place, or manner of its use." *City of Ladue*, 512 U.S. at 56. *See also United States v. Grace*, 461 U.S. 171, 177 (1983); *Lovell v. City of Griffin*, 303 U.S. 444, 451 (1938) ("The ordinance is comprehensive with

---

[16] In *Packingham*, the Supreme Court did not need to determine what level of scrutiny governed the prohibitions at issue because they easily failed even intermediate scrutiny. 582 U.S. at 105–06.

respect to the method of distribution. . . . There is thus no restriction in its application with respect to time or place.").[17]

This difference is reflected in a more rigorous legal analysis. Time, place, or manner restrictions need not "be the least restrictive or least intrusive means" of achieving the government's objectives, *Ward*, 491 U.S. at 798. But total bans must "curtail no more speech than is necessary to accomplish [the State's] purpose," *Vincent*, 466 U.S. at 810. A complete ban can be sufficiently "narrowly tailored" only "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citation omitted).

## V. The Act's ban raises different First Amendment issues than other foreign ownership restrictions.

Nor does the Act fit comfortably within a tradition of restricting foreign ownership of American critical infrastructure—the First Amendment issues the Act raises are much different and compel a different result.

Almost none of the various foreign-ownership restrictions in the U.S. Code regulates expressive conduct that triggers the First Amendment. *See, e.g.*,

---

[17] Even cases suggesting that total bans are a subset of time, place, or manner restrictions hold that such bans fail intermediate scrutiny by not "leav[ing] open ample alternative channels of communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989). *See also Schad v. Mount Ephraim*, 452 U.S. 61, 75–76 (1981).

42 U.S.C. § 2133(d) (barring foreign ownership or control of nuclear power plants).

The few such restrictions that do trigger the First Amendment pertain to broadcast radio and television. And the Supreme Court has held that the peculiar factors that lead broadcast radio and television to be subject to somewhat less demanding First Amendment protections, "are not present in cyberspace." *Reno*, 521 U.S. at 868. But those who broadcast via airwaves are (at least theoretically) limited by a "scarcity of available frequencies"—such that the government has an interest in equitably parceling out broadcast licenses. *Reno*, 521 U.S. at 868. It is *only* because of this potential scarcity that broadcasting is afforded less than full First Amendment protection. *Turner Broad. Sys.*, 512 U.S. at 637 ("The justification for our distinct approach to broadcast regulation rests upon the unique physical limitations of the broadcast medium."). There is "no basis," by contrast, "for qualifying the level of First Amendment scrutiny" that applies to the "relatively unlimited" channels of the Internet. *Reno*, 521 U.S. at 870.

Some, searching for a way to "update" the scarcity rationale and analogize TikTok to a broadcasting station, claim that, because of network effects, only a few social media platforms can thrive. *See generally* Ganesh Sitaraman, *The Regulation of Foreign Platforms*, 74 Stan. L. Rev. 1073, 1085–86 (2022). Per this argument, TikTok is a key chokepoint for information.

27

But this maneuver is not new—and it has been rejected. "The special physical characteristics of broadcast transmission, not the economic characteristics of the broadcast market, are what underlies" the Supreme Court's "broadcast jurisprudence." *Turner Broad. Sys*., 512 U.S. at 640. Thus, "the mere assertion of dysfunction or failure in a speech market, without more, is not sufficient to shield a speech regulation from the First Amendment standards applicable to nonbroadcast media." *Id*.

If anything, the question shouldn't be whether a new online foreign-ownership restriction is constitutional, but whether the old broadcast foreign-ownership restrictions are *unconstitutional*. Those restrictions "represent[] an anachronistic attempt to limit free speech in America based on xenophobic fears of foreign ideas and influence." Ian M. Rose, *Barring Foreigners from Our Airwaves: An Anachronistic Pothole on the Global Information Highway*, 95 Colum L. Rev. 1188, 1190 (1995). They "should be viewed" as "content-based and viewpoint discriminatory restriction[s] on speech," and, if ever challenged, be "subjected to strict judicial scrutiny" and struck down. *Id*. at 1190-91. In any event, what is clear is that old broadcast ownership restrictions provide no support for the statute currently before the Court.

## CONCLUSION

*Amici* respectfully urge the Court to apply the extraordinarily exacting scrutiny required by the First Amendment and grant the preliminary injunction.

June 26, 2024                                                  Respectfully submitted,

*/s/ David Greene*
David Greene
Brendan Gilligan
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Tel: (415) 436-9333
Fax: (415) 436-9993
davidg@eff.org

*Attorneys for Amici Curiae Electronic Frontier Foundation, Freedom of the Press Foundation, TechFreedom, Media Law Resource Center, Inc., First Amendment Coalition, and Freedom to Read Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2024 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ David Greene*
David Greene

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(G)(1)**

I hereby certify as follows:

1.     The undersign certifies under Rule 32(g)(1) that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(b). The brief is printed in proportionally spaced 14-point type, and the brief has 6,182 words according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and with the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac 365 in 14-point Times New Roman font.

June 26, 2024                              */s/ David Greene*
                                          David Greene

                                          *Attorneys for Amici Curiae*