**ORAL ARGUMENT: SEPTEMBER 16, 2024**

# United States Court of Appeals
# for the District of Columbia Circuit

## No. 24-1130

(Consolidated with 24-1183 & 24-1113)

BRIAN FIREBAUGH; CHLOE JOY SEXTON; TALIA CADET; TIMOTHY MARTIN; KIERA SPANN; PAUL TRAN; CHRISTOPHER TOWNSEND; STEVEN KING,

*Petitioners,*

*v.*

MERRICK B. GARLAND, in his capacity as United States Attorney General,

*Respondent.*

_____

*From the Department of Justice in DOJ-Pub. L. No. 118-50*

## BRIEF OF AMICI CURIAE FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, INSTITUTE FOR JUSTICE, AND REASON FOUNDATION IN SUPPORT OF PETITIONERS

AARON TERR
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut St., Suite 900
Philadelphia, PA 19106
(215) 717-3473
aaron.terr@thefire.org

ROBERT-CORN REVERE
*Counsel of Record*
FOUNDATION FOR INDIVIDUAL RIGHTS AND
  EXPRESSION
700 Pennsylvania Avenue, SE, Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amici curiae* submit this certificate as to parties, rulings, and related cases.

### A.    PARTIES AND *AMICI*

The parties to *Firebaugh v. Garland*, No. 24-1130, are Petitioners Brian Firebaugh, Chloe Joe Sexton, Talia Cadet, Timothy Martin, Kiera Spann, Paul Tran, Christopher Townsend, and Steven King, and Respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. The parties to the consolidated case, *TikTok Inc. v. Garland*, No. 24-1113, are Petitioners TikTok Inc. and ByteDance Ltd., and Respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. The parties to the second consolidated case, *BASED Politics Inc. v. Garland*, No. 24-1183, are Petitioner BASED Politics Inc. and Respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. As of the finalization of this brief, the following parties are participating in the consolidated cases as *amici curiae*: Foundation for Individual Rights and Expression, Institute for Justice, Reason Foundation, Electronic Frontier Foundation, Freedom of the Press Foundation, TechFreedom, Media Law Resource Center, Center for Democracy and Technology, First Amendment Coalition, Freedom to Read Foundation, Cato Institute, Matthew Steilen, Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition, Asian

American Federation, Asian Americans Advancing Justice Southern California, Calos Coalition, Hispanic Heritage Foundation, Muslim Public Affairs Council, Native Realities, OCA-Asian Pacific American Advocates of Greater Seattle, South Asian Legal Defense Fund, Sikh Coalition, Sadhana, and San Francisco. Because these petitions were filed directly in this Court, there were no district-court proceedings in any of the cases.

**B.    RULINGS UNDER REVIEW**

Petitioners seek direct review of the constitutionality of the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, Div. H (Apr. 24, 2024). There were no district court proceedings.

**C.    RELATED CASES**

These cases have not previously been before this Court or any other court. *Amici* are not aware of any other related cases.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1, *amici* submit the following corporate disclosure statement: (1) *amici* are nongovernmental corporations; (2) *amici* do not have any parent corporations, and (2) no publicly held corporations hold 10% or more of the stock or ownership interest in *amici*.

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

    A.    PARTIES AND *AMICI* ..............................................................i

    B.    RULINGS UNDER REVIEW ......................................... ii

    C.    RELATED CASES ....................................................... ii

CORPORATE DISCLOSURE STATEMENT ...................................... iii

TABLE OF AUTHORITIES ................................................... vi

GLOSSARY OF ABBREVIATIONS ...................................... xi

STATUTES AND REGULATIONS ......................................... 1

STATEMENT OF IDENTITY AND INTEREST OF *AMICI* ................. 2

SUMMARY OF ARGUMENT ..................................... 6

ARGUMENT ..................................................... 8

    I.    The Act Regulates Speech by Targeting Online Speech Platforms and Effectively Banning a Specified Platform for Communication ................................................... 8

        A.    TikTok is an important platform for expression in the United States ............................................... 9

        B.    The First Amendment protects both TikTok and its users when they publish or view content on the platform ......................................................11

        C.    Laws targeting speech platforms inherently raise serious First Amendment issues ...............................12

    II.    The Act Fails Any Level of First Amendment Scrutiny ....................18

        A.    Disagreement with views expressed on TikTok, or a desire to tilt debate in a preferred direction, is not a legitimate basis for regulating it ...............................18

iv

B.      The Act is a content-based prior restraint that fails
        strict scrutiny.................................................................21

C.      The Act fails intermediate First Amendment scrutiny .............28

CONCLUSION .......................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alario v. Knudsen*,
  No. CV 23-56-M-DWM, 2023 U.S. Dist. LEXIS 213547
  (D. Mont. Nov. 30, 2023) ................................................................. 9, 26

*Anderson v. City of Hermosa Beach*,
  621 F.3d 1051 (9th Cir. 2010) ............................................................12

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ........................................................................ 21-22

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ..................................................................... 13, 25

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ..................................................................... 23, 27

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ..........................................................................21

*City of Ladue v. Gilleo*,
  512 U.S. 43 (1994) ...................................................................... 12, 13

*Edwards v. District of Columbia*,
  755 F.3d 996 (D.C. Cir. 2014) ............................................................4

*FCC v. Pacifica Found.*,
  438 U.S. 726 (1978) ..........................................................................18

*Freedman v. Maryland*,
  380 U.S. 51 (1965) ............................................................................21

*Gonzalez v. Trevino*,
  No. 22-1025 (decided June 20, 2024) .................................................4

*Iancu v. Brunetti*,
  588 U.S. 388 (2019) ..........................................................................24

*In re Sealed Case*,
  77 F.4th 815 (D.C. Cir. 2023) ...........................................................21

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021)............................11

*Lamont v. Postmaster General*,
381 U.S. 301 (1965) ........................................................................19

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
460 U.S. 575 (1983) ........................................................................21

*Moody v. NetChoice, LLC*,
No. 22-277 (U.S. argued Feb. 26, 2024), *granting cert. to NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022)...................................17

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) ........................................................................25

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976) ........................................................................21

*NetChoice, LLC v. Att'y Gen., Fla.*,
34 F.4th 1196 (11th Cir. 2022), *cert. granted sub nom.*
*Moody v. NetChoice, LLC*, 144 S. Ct. 478 (2023), *argued*,
No. 22-277 (Feb. 26, 2024) ....................................................... 11-12

*NetChoice, LLC v. Bonta*,
No. 22-cv-08861-BLF, 2023 U.S. Dist. LEXIS 165500 (N.D. Cal. Sep. 18, 2023), *appeal docketed* No. 23-2969 (9th Cir. Oct. 23, 2023) ... 2, 16, 17

*NetChoice, LLC v. Paxton*,
49 F.4th 439 (5th Cir. 2022), *cert. granted*, 144 S. Ct. 477 (2023),
*argued*, No. 22-555 (Feb. 26, 2024)...............................................12

*NetChoice, LLC v. Yost*,
No. 2:24-cv-00047, 2024 U.S. Dist. LEXIS 24129
(S.D. Ohio Feb. 12, 2024) ...............................................................16

*Nixon v. Shrink Mo. Gov't PAC*,
528 U.S. 377 (2000) ................................................................. 24-25

*NRA of Am. v. Vullo*,
144 S. Ct. 1316 (2024) ....................................................................18

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ..........................................................................11

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ................................................................ 19, 22, 23

*Reno v. ACLU*,
   521 U.S. 844 (1997) ................................................................ 11, 12, 15

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
   515 U.S. 819 (1995) ................................................................ 19, 24, 28

*Schneider v. State (Town of Irvington)*,
   308 U.S. 147 (1939) ....................................................................... 12

*Se. Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975) ...................................................................... 21, 22

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ................................................................ 17, 19, 20

*Stanley v. Georgia*,
   394 U.S. 557 (1969) ....................................................................... 19

*Turner Broad. Sys. v. FCC*,
   512 U.S. 622 (1994) ....................................................................... 28

*United States v. Playboy Ent. Grp.*,
   529 U.S. 803 (2000) ...................................................................... 23, 24

*United States v. U.S. Dist. Court*,
   407 U.S. 297 (1972) ....................................................................... 25

*Volokh v. James*,
   656 F. Supp. 3d 431 (S.D.N.Y. 2023), *appeal argued*, No. 23-356
   (2d Cir. Feb. 16, 2024) .................................................................. 2-3

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ...................................................................... 19, 23

*Wash. Post v. McManus*,
   944 F.3d 506 (4th Cir. 2019) ............................................................ 12

**Statutes and Other Authorities:**

U.S. Const., amend. I .......................................... 2, 3, 6, 7, 11, 12, 13, 15, 16, 17, 18, 19, 21, 23, 24, 25, 28, 29

Cal. Civ. Code §§ 1798.99.28–.40 ........................................................................16

D.C. Cir. R. 29(d) ................................................................................................2

Fed. R. App. P. 29 ...............................................................................................2

Fed. R. App. P. 29(a)(2) ......................................................................................2

Fed. R. App. P. 29(a)(4)(E) .................................................................................2

*About Project Texas*, TikTok, https://usds.tiktok.com/usds-about .........................26

Brief of FIRE as *Amicus Curiae* in Support of Petitioner, *Lindke v. Freed*, 601 U.S. 187 (2024) ...........................................................................................3

Brief of FIRE as *Amicus Curiae* in Support of Petitioners, *NetChoice, LLC v. Paxton*, No. 22-555 (U.S. argued Feb. 26, 2024) ........................................ 3, 17

Brief of FIRE as *Amicus Curiae* in Support of Respondent, *O'Connor-Ratcliff v. Garnier*, 601 U.S. 205 (2024) .................................................................3

Brief of FIRE as *Amicus Curiae* in Support of Respondents, *Moody v. NetChoice, LLC*, No. 22-277 (U.S. argued Feb. 26, 2024) ....................................3

Brief of Reason Foundation as *Amicus Curiae* Supporting Respondent, *Gonzalez v. Google*, 598 U.S. 617 (2023) .................................................................5

Brief of Reason Foundation et al. as *Amici Curiae* in Support of Petitioners, *Moody v. NetChoice, LLC*, No. 22-277 (U.S. argued Feb. 26, 2024) ...................5

Brief of Reason Foundation et al. as *Amici Curiae* in Support of Respondents, *NetChoice, LLC v. Paxton*, No. 22-555 (U.S. argued Feb. 26, 2024) ........................................................................................................5

*Bill to Protect Americans From Foreign Adversary Controlled Applications, Including TikTok*, Select Comm. on the CCP (Mar. 5, 2024), https://selectcommitteeontheccp.house.gov/media/bills/bill-protect-americans-foreign-adversary-controlled-applications-including-tiktok ....... 14, 20

FIRE (@thefireorg), TikTok, https://www.tiktok.com/@thefireorg .........................3

H.R. Rep. No. 118-417 (2024) ......................................................................... 14, 20

IJ (@instituteforjustice), TikTok, https://www.tiktok.com/
    @instituteforjustice ................................................................................4

Jane Coaston, *What the TikTok Bill Is Really About, According to a Leading
    Republican*, N.Y. Times (Apr. 1, 2024), https://www.nytimes.com/2024/
    04/01/opinion/mike-gallagher-tiktok-sale-ban.html ..................................... 14-15

Jeffrey Gottfried, *Americans' Social Media Use*, Pew Rsch. Ctr. (Jan. 31,
    2024), https://www.pewresearch.org/internet/2024/01/31/americans-
    social-media-use ................................................................................10

Katerina Eva Matsa, *More Americans Are Getting News on TikTok, Bucking
    the Trend Seen on Most Other Social Media Sites*, Pew Rsch. Ctr. (Nov.
    15, 2023), https://www.pewresearch.org/shortreads/2023/11/15/more-
    americans-are-getting-news-on-tiktok-bucking-the-trend-seen-on-most-
    other-social-media-sites ........................................................................10

Kirsten Eddy, *6 Facts About Americans and TikTok*, Pew Rsch. Ctr. (Apr. 3,
    2024), https://www.pewresearch.org/shortreads/2024/04/03/6-facts-about-
    americans-and-tiktok ............................................................................10

Meghan Bobrowsky & Georgia Wells, *TikTok's American Growth Is
    Already Stalling*, Wall St. J. (Mar. 17, 2024), https://www.wsj.com/tech/
    tiktoks-american-growth-is-already-stalling-980aa276 .......................................10

Naheed Rajwani-Dharsi & Tasha Tsiaperas, *TikTok ban could affect Texas
    data security initiative*, Axios (Mar. 18, 2024), https://www.axios.com/
    local/dallas/2024/03/18/tiktok-ban-project-texas-oracle-data.............................26

Ohio Rev. Code § 1349.09..............................................................................15

Pub. L. No. 118-50.......................................................... 1, 6, 8, 9, 13, 15, 22, 23, 27

Reason Magazine (@reasonmagazine), TikTok, https://www.tiktok.com/
    @reasonmagazine..................................................................................5

Sapna Maheshwari & David McCabe, *TikTok Sues U.S. Government
    Over Law Forcing Sale or Ban*, N.Y. Times (May 7, 2024),
    https://www.nytimes.com/2024/05/07/business/tiktok-ban-appeal.html...............9

Tom Taulli, *TikTok: Why The Enormous Success?*, Forbes (Jan. 31, 2020),
    https://www.forbes.com/sites/tomtaulli/2020/01/31/tiktok-why-the-
    enormous-success ................................................................................10

## GLOSSARY OF ABBREVIATIONS

FIRE        Foundation for Individual Rights and Expression

IJ           Institute for Justice

HECC      House Energy and Commerce Committee

## STATUTES AND REGULATIONS

The Protecting Americans from Foreign Adversary Controlled

Applications Act, Pub. L. No. 118-50, Div. H (Apr. 24, 2024).

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the rights of all Americans to the freedoms of speech, expression, and conscience—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights on college campuses nationwide through public advocacy, targeted litigation, and *amicus curiae* filings in cases that implicate expressive rights. In June 2022, FIRE expanded its public advocacy beyond the university setting and now defends First Amendment rights both on campus and in society at large.

Through litigation and advocacy across the United States, FIRE seeks to vindicate First Amendment rights without regard to the speakers' views. These cases include matters involving state attempts to regulate the internet and social media platforms, both directly and indirectly. *See, e.g.*, *NetChoice, LLC v. Bonta*, No. 22-cv-08861-BLF, 2023 U.S. Dist. LEXIS 165500 (N.D. Cal. Sep. 18, 2023), *appeal docketed* No. 23-2969 (9th Cir. Oct. 23, 2023).; *Volokh v. James*, 656 F. Supp. 3d

---

[1] In accordance with Federal Rule of Appellate Procedure 29, all parties have consented to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E). Pursuant to D.C. Circuit Rule 29(d), *amici* certify that this separate *amicus* brief is necessary because *amici* offer the court unique expertise on First Amendment questions as well as first-hand experience of using TikTok for issue advocacy.

431 (S.D.N.Y. 2023), *appeal argued*, No. 23-356 (2d Cir. Feb. 16, 2024); *see also* Brief of FIRE as *Amicus Curiae* in Support of Petitioner, *Lindke v. Freed*, 601 U.S. 187 (2024); Brief of FIRE as *Amicus Curiae* in Support of Respondent, *O'Connor-Ratcliff v. Garnier*, 601 U.S. 205 (2024); Brief of FIRE as *Amicus Curiae* in Support of Petitioners, *NetChoice, LLC v. Paxton*, No. 22-555 (U.S. argued Feb. 26, 2024); Brief of FIRE as *Amicus Curiae* in Support of Respondents, *Moody v. NetChoice, LLC*, No. 22-277 (U.S. argued Feb. 26, 2024).

*Amicus* FIRE also has a particular interest in the outcome of this case given its own use of TikTok as an advocacy tool. FIRE regularly posts videos updating followers about its First Amendment case work and about threats to expressive rights nationwide. FIRE also uses its TikTok account to educate viewers on their own First Amendment rights.[2] Since FIRE's 2022 expansion, it has posted 284 videos garnering 13,228,776 views. Given that FIRE's TikTok account has 65,162 followers, loss of the platform would curtail its own free speech advocacy.

The Institute for Justice (IJ) is a nonprofit, public interest law firm that seeks to end widespread abuses of government power and secure the constitutional rights that allow all Americans to pursue their dreams. Its free-speech advocacy particularly focuses on governmental attempts to silence speech through economic

---

[2] FIRE (@thefireorg), TIKTOK, https://www.tiktok.com/@thefireorg.

regulations, *see Edwards v. District of Columbia*, 755 F.3d 996 (D.C. Cir. 2014), and on government officials' attempts to use their power to retaliate against individuals and businesses whose speech they dislike, *see Gonzalez v. Trevino*, No. 22-1025 (decided June 20, 2024). Both interests are implicated by this case, where the United States Congress has, in the guise of an economic regulation, prohibited an entire channel of communication and explicitly done so, at least in part, because of concern about what might be said through that channel. IJ also engages in public advocacy about constitutional rights, through which it has (for example) saved tens of thousands of homes and businesses from eminent-domain abuse. As an advocate, IJ constantly seeks new avenues to reach the American public to convey messages about important legal issues—and, in its direct experience, TikTok is one of those avenues.[3] It therefore has an interest in this case both as a defender of free speech and as a speaker in its own right.

Reason Foundation ("Reason") is a nonpartisan and nonprofit public policy think tank, founded in 1978. Reason's mission is to promote free markets, individual liberty, equality of rights, and the rule of law. Reason advances its mission by publishing the critically acclaimed Reason magazine, as well as commentary on its websites, www.reason.com and www.reason.org. To further Reason's commitment

---

[3] IJ (@instituteforjustice), TikTok, https://www.tiktok.com/@instituteforjustice.

4

to "Free Minds and Free Markets," Reason has participated as *amicus curiae* in numerous cases raising significant legal and constitutional issues, including cases implicating free expression and social media platforms. *See, e.g.*, Brief of Reason Foundation et al. as *Amici Curiae* in Support of Petitioners, *Moody v. NetChoice, LLC*, No. 22-277 (U.S. argued Feb. 26, 2024); Brief of Reason Foundation et al. as *Amici Curiae* in Support of Respondents, *NetChoice, LLC v. Paxton*, No. 22-555 (U.S. argued Feb. 26, 2024); Brief of Reason Foundation as *Amicus Curiae* Supporting Respondent, *Gonzalez v. Google*, 598 U.S. 617 (2023). Reason also has an interest in this case as a speaker because it uses TikTok to promote its messages to an audience of over 18,000 followers.[4]

---

[4] Reason Magazine (@reasonmagazine), TIKTOK, https://www.tiktok.com/@reasonmagazine.

## SUMMARY OF ARGUMENT

This case presents an unprecedented threat to Americans' expressive rights: Congress has singled out and effectively banned an entire platform for communication that half the country uses to share and consume ideas, news, advocacy, and creative content. Shuttering TikTok will deny millions of Americans access to a unique and important platform for exercising their right to free speech.

The Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, Div. H (Apr. 24, 2024) ("the Act"), is a direct regulation of speech subject to the highest level of First Amendment scrutiny. It explicitly calls out and regulates a specific platform for expression, imposes a prior restraint, and draws content-based restrictions on speech.

In enacting the law, Congress failed to meet its burden of proving it satisfies strict scrutiny—or any level of scrutiny. There are not even published legislative findings or any other official public record that attempts to explain or provide evidence why this severe encroachment on Americans' right to speak and to receive information is needed to address a real and serious problem. The existing evidence of the law's purpose—a single congressional committee report and various lawmakers' public statements—reveals illegitimate intent to suppress disfavored speech and generalized concerns about data privacy and national security. These concerns fall far short of satisfying the relevant constitutional standards. Nor is the

Act narrowly tailored to any compelling or substantial government interest, as the First Amendment requires.

This Court should grant the Petitions for Review and enjoin enforcement of the Act as unconstitutional.

## ARGUMENT

I.   **The Act Regulates Speech by Targeting Online Speech Platforms and Effectively Banning a Specified Platform for Communication.**

Congress has effectively banned an important channel of communication and exposed other online platforms to onerous regulations, including potential bans. The Act prohibits distributing or maintaining (or enabling the distribution or maintenance of) a "foreign adversary controlled application" ("FACA"), Pub. L. No. 118-50, Div. H § 2(a)(1), defined explicitly to include TikTok and parent company ByteDance, Ltd., *id.* § 2(g)(3)(a). The Act also covers companies operating websites and applications "controlled by a foreign adversary" that the President of the United States determines "present a significant threat to the national security of the United States," *id.* § 2(g)(3)(b), but draws content-based distinctions by exempting those websites and applications that do not enable users to "generate or distribute content" or "whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews." *Id.* §§ 2(g)(2)(A)(iii), 2(g)(2)(B). Further, the Act broadly defines "controlled by a foreign adversary" to include (1) companies operating websites or apps headquartered or principally based in a country designated as a foreign adversary, (2) those in which an entity based in a foreign adversary has at least a 20% stake, and (3) those "subject to the direction or control of a foreign person or entity" that meets the conditions of (1) or (2). *Id.* § 2(g)(1).

8

TikTok and other companies that operate FACAs can avoid the Act's prohibition only by divesting within 270 days from any entity "controlled by a foreign adversary." *Id.* §§ 2(a)(2)(A), (c)(1), (g)(1). TikTok argues that such a "qualified divestiture" is a legal and practical impossibility, meaning it effectively faces a nationwide ban.[5] Other online platforms with only indirect connections to foreign adversaries also face potential bans under the Act, depending in part on the type of content they host. There should be no question the Act directly regulates speech.

## A.    TikTok is an important platform for expression in the United States.

Like Facebook, X, and other social media platforms, people across the globe "use TikTok for a variety of reasons, including for entertainment, religious, and political purposes," or for "generat[ing] revenue for themselves and their businesses." *Alario v. Knudsen*, No. CV 23-56-M-DWM, 2023 U.S. Dist. LEXIS 213547, at *5 (D. Mont. Nov. 30, 2023). Organizations like *amici* FIRE, IJ, and Reason regularly use TikTok to advocate their views and to reach new audiences. In

---

[5] Sapna Maheshwari & David McCabe, *TikTok Sues U.S. Government Over Law Forcing Sale or Ban*, N.Y. TIMES (May 7, 2024), https://www.nytimes.com/2024/05/07/business/tiktok-ban-appeal.html.

the U.S. alone, TikTok has more than 170 million users as of March 2024.[6] Recent research shows 33 percent of U.S. adults (including 62 percent of U.S. adults under 30) and 63 percent of teens aged 13 to 17 use TikTok.[7] Moreover, a "growing share of U.S. adults say they regularly get news on TikTok. This is in contrast with many other social media sites, where news consumption has either declined or stayed about the same in recent years."[8]

TikTok's personalized feeds and content recommendation system make it a unique platform. Observers attribute its meteoric rise in popularity in part to its focus on content as opposed to social connections.[9] Like newspapers and bookstores, social media platforms like TikTok are not fungible—their content varies as do their user bases and approaches to content curation. By any measure, TikTok is an

---

[6] Meghan Bobrowsky & Georgia Wells, *TikTok's American Growth Is Already Stalling*, WALL ST. J. (Mar. 17, 2024), https://www.wsj.com/tech/tiktoks-american-growth-is-already-stalling-980aa276.

[7] Kirsten Eddy, *6 Facts About Americans and TikTok*, PEW RSCH. CTR. (Apr. 3, 2024), https://www.pewresearch.org/shortreads/2024/04/03/6-facts-about-americans-and-tiktok; Jeffrey Gottfried, *Americans' Social Media Use*, PEW RSCH. CTR. (Jan. 31, 2024), https://www.pewresearch.org/internet/2024/01/31/americans-social-media-use.

[8] Katerina Eva Matsa, *More Americans Are Getting News on TikTok, Bucking the Trend Seen on Most Other Social Media Sites*, PEW RSCH. CTR. (Nov. 15, 2023), https://www.pewresearch.org/shortreads/2023/11/15/more-americans-are-getting-news-on-tiktok-bucking-the-trend-seen-on-most-other-social-media-sites.

[9] Tom Taulli, *TikTok: Why The Enormous Success?*, FORBES (Jan. 31, 2020), https://www.forbes.com/sites/tomtaulli/2020/01/31/tiktok-why-the-enormous-success.

important and distinctive platform for communication and individual expression in the United States.

**B.    The First Amendment protects both TikTok and its users when they publish or view content on the platform.**

When TikTok users publish and view videos on the platform, those acts receive full First Amendment protection. Speech on "social media is entitled to the same First Amendment protections as other forms of media." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021). The Supreme Court has made clear that "social media in particular" is one of today's "most important places (in a spatial sense) for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). The medium "offers 'relatively unlimited, low-cost capacity for communication of all kinds,'" *id.* (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)), and "allows users to gain access to information and communicate with one another about it on any subject that might come to mind," *id.* at 107. "In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quoting *Reno*, 521 U.S. at 870). In addition to extending First Amendment protections to internet users, courts have recognized the rights of online intermediaries to "disseminate third-party created" speech and exercise editorial control on their platforms. *NetChoice, LLC v. Att'y Gen., Fla.*, 34

F.4th 1196, 1212 (11th Cir. 2022) (citing cases), *cert. granted sub nom. Moody v. NetChoice*, *LLC*, 144 S. Ct. 478 (2023), *argued*, No. 22-277 (Feb. 26, 2024). "[W]hether, to what extent, and in what manner to disseminate third-party-created content to the public are editorial judgments protected by the First Amendment." *Id.* A "platform-oriented structure" for regulating speech "poses First Amendment problems of its own." *Wash. Post v. McManus*, 944 F.3d 506, 515 (4th Cir. 2019). *But see NetChoice, LLC v. Paxton*, 49 F.4th 439, 463–65 (5th Cir. 2022), *cert. granted*, 144 S. Ct. 477 (2023), *argued*, No. 22-555 (Feb. 26, 2024).

**C.    Laws targeting speech platforms inherently raise serious First Amendment issues.**

The Supreme Court has repeatedly "voiced particular concern with laws that foreclose an entire medium of expression." *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994). The First Amendment protects the "process of expression through a medium" as well as "the expression itself." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010). And it is no answer to observe that other platforms exist, for "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Reno*, 521 U.S. at 880 (quoting *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 163 (1939)). Even when such prohibitions are "completely free of content or viewpoint discrimination," which this Act is not, "the danger they pose to the freedom of speech is readily apparent—by eliminating a common means of

12

speaking, such measures can suppress too much speech." *City of Ladue*, 512 U.S. at 55. And if anything can be said to be a common means of speaking, it is a social media platform used by 170 million Americans.

Although the Act provides that TikTok can avoid a ban if sold within 270 days to an approved entity, Pub. L. 118-50, Div. H §§ 2(a)(2)(A), (c)(1), TikTok has stated the "divestiture of the TikTok U.S. business and its severance from the globally integrated platform of which it is an integral part is not commercially, technologically, or legally feasible." Pet'rs TikTok and ByteDance Ltd.'s Pet. Review 15. A forced divestiture to which TikTok cannot and will not submit is the functional equivalent of a ban.

A nationwide ban on a particular bookstore would no doubt trigger First Amendment scrutiny. A nationwide prohibition on a specific social media platform is no different, as "regulation of a medium inevitably affects communication itself." *City of Ladue*, 512 U.S. at 48; *see also Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("acts of 'disclosing' and 'publishing' information . . . constitute speech" itself, "distinct from the category of expressive conduct" (citation omitted)).

Despite the Act's unabashed and intentional targeting of a medium of communication, it contains no legislative findings, and Congress otherwise failed to create an official public record explaining the Act's purpose and rationale. The public is thus left to piece together the reasons Congress passed the Act. The only

available materials are a House committee report on a prior version of the Act and comments by members of Congress who supported its enactment. Some lawmakers raised concerns about data privacy and national security related to U.S. TikTok users' data potentially falling into the hands of the Chinese government.[10] But many other comments reveal the Act's purpose, at least in part, of suppressing disfavored speech on TikTok. The House Energy and Commerce Committee Report ("HECC Report"), for example, states the Act is in part intended to prevent TikTok and other regulated communications platforms from "push[ing] misinformation, disinformation, and propaganda on the American public" (which foreign actors nevertheless remain free to do on other platforms).[11] Similarly, the Act's co-sponsor, Rep. Mike Gallagher, cited the "propaganda threat" as the "greater concern" about TikTok.[12]

---

[10] For example, Rep. John Moolenaar said, "I encourage all Americans using TikTok to strongly consider the personal risks of having their data owned by the Chinese Communist Party and hope they will stop using the app as this bipartisan legislation moves forward." *Bill to Protect Americans From Foreign Adversary Controlled Applications, Including TikTok*, SELECT COMM. ON THE CCP (Mar. 5, 2024), https://selectcommitteeontheccp.house.gov/media/bills/bill-protect-americans-foreign-adversary-controlled-applications-including-tiktok. And Rep. Kat Cammack remarked, "We have every right to protect Americans' constitutional rights, data privacy, and national security, and it's only become clear over the last several years how dangerous these foreign-owned tech platforms truly are." *Id.*

[11] H.R. Rep. No. 118-417 at 2 (2024).

[12] Jane Coaston, *What the TikTok Bill Is Really About, According to a Leading Republican*, N.Y. TIMES (Apr. 1, 2024),

14

Even if Congress characterized the Act as addressing only legitimate, non-speech concerns like national security, it would not change the fact that it explicitly targets a specific channel of communication and will potentially eliminate other platforms within the United States based in part on the content they host. This is most obvious insofar as the Act applies only to platforms that feature user-generated content and exempts those dedicated to product, business, or travel reviews. Pub. L. 118-50, Div. H §§ 2(g)(2)(A), (B).

It has been obvious from the beginning of internet regulation that laws targeting this medium inherently present serious First Amendment concerns. *See Reno*, 521 U.S. at 868–70. This is true even when the government attempts to evade First Amendment scrutiny by recharacterizing social media regulations as advancing some non-speech purpose. In 2023, for example, Ohio enacted the Parental Notification by Social Media Operators Act, Ohio Rev. Code § 1349.09, which required online platforms "that target[] children, or [are] reasonably anticipated to be accessed by children" to either obtain parental consent for a child to use the platform or bar all children younger than 16 from using the platform altogether. *Id.* §§ 1349.09(A)(2), (B), (E). The State attempted to "cast the Act—and this case—as not about the First Amendment, but about . . . the ability of minors to contract."

---

https://www.nytimes.com/2024/04/01/opinion/mike-gallagher-tiktok-sale-ban.html; *see also* Pet'rs Firebaugh et al.'s Pet. Review 20–23.

*NetChoice, LLC v. Yost*, No. 2:24-cv-00047, 2024 U.S. Dist. LEXIS 24129, at *16–18 (S.D. Ohio Feb. 12, 2024).

In preliminarily enjoining the law, the court roundly rejected this argument, explaining that "the Act is an access law masquerading as a contract law" and thus "implicate[s] the First Amendment." *Id.* at *19 (citation and internal quotation marks omitted). It found the Ohio law regulated both "operators' ability to publish and distribute speech *to minors* and speech *by minors*" as well as their "ability to both *produce speech* and *receive speech*." *Id.* at *17. And as a speech regulation, the court held the Act was content-based and not narrowly tailored to the state's asserted interest in "protect[ing] minors against oppressive contracts" *Id.* at *31–34. So too here, where the Act favors some types of content over others and effectively bans an online platform from publishing speech in the U.S. *at all*, preventing the entire country from receiving that speech.

Another court similarly enjoined enforcement of California's Age-Appropriate Design Code Act, Cal. Civ. Code §§ 1798.99.28–.40, which the state defends as "merely regulat[ing] business practices regarding the collection and use of children's data." *NetChoice, LLC*, 2023 U.S. Dist. LEXIS 165500, at *17. The court rejected that characterization, holding the law was a speech regulation masquerading as a privacy law that regulated protected expression because it "restrict[ed] the 'availability and use' of information by some speakers but not

others, and for some purposes but not others." *Id.* at \*21–22 (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570–71 (2011)). The court went on to hold the law failed any level of heightened scrutiny—even "the lesser standard of intermediate scrutiny"—and preliminarily enjoined its enforcement. *Id.* at \*32, \*43–44.[13]

The Act here similarly restricts the flow of information based on speaker- and content-based factors, including a *de facto* ban on an entire platform for expression. The Act's inexplicable exemption for platforms not used for specified expressive activity—even if they are "controlled by a foreign adversary" and collect user data—indicates its purpose is not simply to protect data privacy. These provisions—and comments by various members of Congress supporting the Act—reveal its purpose of regulating speech and the platform used to express it.

---

[13] Two other states' attempts to justify social media regulations under the guise of regulating platforms' nonexpressive conduct are currently before the Supreme Court. *Moody v. NetChoice, LLC*, No. 22-277 (U.S. argued Feb. 26, 2024), *granting cert. to NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022); *NetChoice, LLC v. Paxton*, No. 22-555 (U.S. argued Feb. 26, 2024), *granting cert. to* 49 F.4th 439 (5th Cir. 2022). *See generally* Brief of FIRE as *Amicus Curiae* in Support of Petitioners, *NetChoice, LLC v. Paxton*, No. 22-555 (U.S. argued Feb. 26, 2024) (arguing social media platforms' content-moderation decisions are editorial judgments that receive First Amendment protection).

## II. The Act Fails Any Level of First Amendment Scrutiny.

The Act is unconstitutional for two independent reasons. First, it targets a specific platform for expression, the speaker who provides it, and the users who express themselves and receive information on it, for the purpose of purging disfavored viewpoints from the marketplace of ideas—which is never a legitimate government interest. Second, the Act's *de facto* ban of a particular platform for expression imposes a prior restraint and regulates speech based on content, subjecting it to strict scrutiny that it cannot withstand. Either is grounds for the Court to invalidate the Act, under *any* level of scrutiny.

### A. Disagreement with views expressed on TikTok, or a desire to tilt debate in a preferred direction, is not a legitimate basis for regulating it.

At least one purpose of the Act is to banish disfavored viewpoints from public discourse—a constitutionally infirm basis for regulating speech. It is a "central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *FCC v. Pacifica Found.*, 438 U.S. 726, 745–46 (1978). As the Supreme Court recently reaffirmed: "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *NRA of Am. v. Vullo*, 144 S. Ct. 1316, 1326 (2024). The government therefore "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for

18

the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

The First Amendment protects not only the right to voice disfavored ideas but also the right to hear them, including alleged "propaganda" from abroad. In *Lamont v. Postmaster General*, 381 U.S. 301 (1965), the Supreme Court invalidated a federal law that required the Postal Service to detain "communist political propaganda" from foreign countries and deliver it only upon the addressee's request, on grounds the law unconstitutionally attempted "to control the flow of ideas to the public." *Id.* at 306–07; *see also Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (First Amendment "protects the right to receive information and ideas").

In determining whether "the government has adopted a regulation of speech because of disagreement with the message," the "government's purpose is the controlling consideration." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). A law may violate the First Amendment because it "is content based on its face *or* when the purpose and justification for the law are content based." *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015) (emphasis added). Even a measure that "on its face appear[s] neutral as to content and speaker" is unconstitutional if "its purpose [is] to suppress speech" and it imposes "unjustified burdens on expression." *Sorrell*, 564 U.S. at 566.

19

Again, there are no legislative findings or public congressional records explaining why the Act explicitly singles out and regulates a medium of communication, but comments from legislators offer evidence of its purpose, at least in part, of censoring information and ideas that the government does not want Americans to see. The HECC report's and Rep. Gallagher's comments about "propaganda" noted above are just the tip of the iceberg.[14]

When the Act was introduced, numerous lawmakers made statements expressing concerns about viewpoints expressed on TikTok. Rep. Mikie Sherrill claimed the Chinese Communist Party uses TikTok to "promote propaganda."[15] Rep. John Moolenaar said "we cannot allow the CCP to indoctrinate our children."[16] Rep. Ashley Hinson claimed China uses TikTok to "push harmful propaganda, including content showing migrants how to illegally cross our Southern Border, supporting Hamas terrorists, and whitewashing 9/11."[17] And Rep. Elise Stefanik accused TikTok of "proliferating videos on how to cross our border illegally" and "supporting Osama Bin Laden's Letter to America."[18]

---

[14] *See* H.R. Rep. No. 118-417, *supra* note 10, at 2; Coaston, *supra* note 11.

[15] *Bill to Protect Americans From Foreign Adversary Controlled Applications, Including TikTok*, *supra* note 9.

[16] *Id.*

[17] *Id.*

[18] *Id.*

These lawmakers' rationale for the Act, based on concerns about how TikTok content shapes public opinion, takes the law into forbidden constitutional territory. It is difficult to imagine a graver First Amendment offense than effectively banning an entire platform for expression used by millions of Americas because the legislature disapproves of some of the perceived messages on that medium. The Act's viewpoint-discriminatory purpose alone renders it unconstitutional.

**B.    The Act is a content-based prior restraint that fails strict scrutiny.**

Even were the Act not intended to discriminate against views with which government officials disagree, it would still violate the First Amendment as a prior restraint and as a content-based regulation. The Act cannot, on either accord, satisfy strict scrutiny—"the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

Prior restraints that "deny use of a forum in advance of actual expression," *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975), are "the most serious and least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). They are "presumptively unconstitutional" and "generally call for strict scrutiny," *In re Sealed Case*, 77 F.4th 815, 829 (D.C. Cir. 2023), and can take the form of licensing regimes, *Freedman v. Maryland*, 380 U.S. 51 (1965), taxation, *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 586 n.9 (1983), or even informal coercion. *Bantam Books, Inc. v. Sullivan*, 372

U.S. 58, 67, 70–71 (1963). A prior restraint does not require that the government cut off *all* access to information or to *all* platforms of a particular category, but only that it block in advance whatever expression it restricts. In *Southeastern Promotions*, a municipal board's denial of the use of a city auditorium for a theatrical production constituted a prior restraint, regardless of whether some other venue might have hosted the production. 420 U.S. at 547–48, 556.

Established law leaves no doubt that a statute that cuts off millions of Americans from their preferred social media platform is a prior restraint. Unlike a law that punishes speech *after* it is uttered, the Act's scheduled ban on TikTok will, "in advance of actual expression," prevent anyone from using the platform to speak or receive information. *Se. Promotions, Ltd.*, 420 U.S. at 553. The Act further threatens other U.S.-based speech platforms with prior restraints if they are "controlled by a foreign adversary"—which could merely mean that a company or individual based in a foreign adversary nation holds a 20% stake in the platform— and the President deems the platform "a significant threat" to national security. Pub. L. 118-50, Div. H §§ 2(g)(1)(B), 2(g)(3)(b).

The Act is also subject to—and fails—strict scrutiny as a content-based speech restriction. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed *or* the idea or message expressed." *Reed*, 576 U.S. at 163 (emphasis added). Treating speakers differently

22

can also be a form of content discrimination: "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* at 170 (citation omitted). Here, the Act explicitly discriminates against TikTok as a speech platform and as a speaker, and against the millions of speakers who use it. It also targets TikTok "because of disagreement with the message it conveys," *Ward*, 491 U.S. at 791, a "more blatant and egregious form of content discrimination." *Reed*, 576 U.S. at 168 (citation and quotation marks omitted). Compounding the content discrimination, the Act exempts websites or apps that do not host user-generated content or "whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews." Pub. L. 118-50, Div. H § 2(g)(2)(B).

"It is rare that a regulation restricting speech because of its content will ever be permissible." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (citation omitted). Congress bears the burden to show the Act's restriction of speech "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative," and—as is particularly germane here—the First Amendment forbids a "blanket ban if the [objective] can be accomplished by a less restrictive alternative." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813–14 (2000) (citation omitted). Congress has not met its heavy burden in these regards.

23

First, Congress has not identified with sufficient specificity the governmental interest the Act purports to serve. It lacks legislative findings and a statement of purpose, and Congress otherwise failed to build a public record of alleged harms sufficient to justify the Act's extraordinary restriction on speech. For that reason alone, it flunks strict scrutiny.

Consideration of the HECC Report and statements by members of Congress cannot change that result. Those sources make plain lawmakers' desires to suppress disfavored viewpoints, which is never a permissible basis for regulating speech—let alone a compelling government interest. *See Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys." (citing *Rosenberger*, 515 U.S. at 829–30)). While members of Congress also have raised concerns about national security, which can be a compelling interest, the government must provide evidence of a specific national security threat and prove the Act is necessary to address it. *See Playboy*, 529 U.S. at 819, 827 (content-based speech regulation violated First Amendment due to "little hard evidence of how widespread or how serious the problem" it sought to address was and government's failure to use "least restrictive means" to address it). Generalized or hypothetical concerns cannot suffice.

The Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392

24

(2000). With respect to national security, the Court has observed: "The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect 'domestic security.' Given the difficulty of defining the domestic security interest, the danger of abuse in acting to protect that interest becomes apparent." *United States v. U.S. Dist. Court*, 407 U.S. 297, 314 (1972); *see also N.Y. Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring) ("The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment."). Likewise, generalized privacy concerns do not automatically trump First Amendment rights, particularly "when balanced against the interest in publishing matters of public importance." *Bartnicki*, 532 U.S. at 534.

The government must provide actual evidence of *what* TikTok does, with *which* personal data, and *how* that causes clear, specific harm the government has a compelling interest in preventing. Even though TikTok launched in the U.S. in 2017, the HECC report provides no evidence of whether TikTok's parent company ByteDance has actually disclosed or will disclose TikTok user data to the Chinese government, what that data includes, what the Chinese government has done or would do with it, or how those actions will harm U.S. national security. Notably, last November, a federal district court preliminarily enjoined Montana's TikTok ban on First Amendment grounds, holding that the state's argument that China "can gain

access to Montanan[s'] data without their consent" lacked supporting evidence. *Alario v. Knudsen*, No. CV 23-56-M-DWM, 2023 U.S. Dist. LEXIS 213547, at *40 (D. Mont. Nov. 30, 2023).

The Act also fails strict scrutiny because it is not narrowly tailored to serving any asserted compelling interest. Under no stretch of the imagination may a wholesale ban on a platform for expression be characterized as "narrow." More to the point here, the government had obvious less-restrictive alternatives available, but it chose to ignore them in favor of a legislative cudgel. For example, Congress could have enacted generally applicable legislation addressing the specific data practices about which many of the Act's supporters are concerned. Congress offers no evidence as to why this less-restrictive alternative would be inadequate.

Moreover, TikTok states it has taken significant steps to safeguard U.S. user data, including the "Project Texas" initiative, which aims to prevent TikTok or ByteDance employees from accessing U.S. user data by isolating it on servers managed by the U.S.-based tech company Oracle.[19] TikTok also reports it reached a national security agreement through negotiations with the Committee on Foreign Investment in the United States, "including agreeing to a 'shut-down option' that

---

[19] Naheed Rajwani-Dharsi & Tasha Tsiaperas, *TikTok ban could affect Texas data security initiative*, AXIOS (Mar. 18, 2024), https://www.axios.com/local/dallas/2024/03/18/tiktok-ban-project-texas-oracle-data; *About Project Texas*, TIKTOK, https://usds.tiktok.com/usds-about.

would give the government the authority to suspend TikTok in the United States if [TikTok and ByteDance] violate certain obligations under the agreement." Pet'rs TikTok and ByteDance Ltd.'s Pet. Review 5. Congress has failed to provide public evidence proving these less-restrictive means of addressing alleged threats to data privacy or national security are inadequate.

The Act's underinclusiveness further demonstrates its sloppy tailoring. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802. If the Act's purpose is to prevent platforms that collect user data from turning it over to foreign adversaries, it is not at all clear why the Act would apply only to platforms that permit users to "generate or distribute content," Pub. L. 118-50, Div. H, § 2(g)(2)(A)(iii), or why it exempts platforms "whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews." *Id*. § 2(g)(2)(B). The asserted interests in data privacy and national security would seem to apply generally to *any* website or application that collects user data and is "controlled by a foreign adversary," regardless of whether its users generate content or whether its content centers on product, business, and travel reviews rather than, say, political speech.

27

### C.     The Act fails intermediate First Amendment scrutiny.

Even if strict scrutiny did not apply, the Act cannot survive intermediate scrutiny, either. To support the Act's constitutionality under intermediate scrutiny, which applies to content-neutral speech regulations, it is Congress's burden to prove the asserted governmental interest in regulating speech is "substantial" and "unrelated to the suppression of free expression"; that the regulation will "in fact" serve that interest in "a direct and material way" that is "not merely conjectural"; and that it will do so in a manner that is narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642, 662–64 (1994) (citations omitted).

The Act fails this test for largely the same reasons it cannot satisfy strict scrutiny. Just as Congress has not officially identified or shown how the Act serves a compelling interest, it has not done so with respect to any substantial government interest. Lawmakers' asserted interest in censoring "propaganda" and disfavored views expressed on TikTok do not constitute a legitimate government interest of any kind. *Rosenberger*, 515 U.S. at 829. And no public record exists demonstrating how the Act serves asserted concerns about data privacy and national security in "a direct and material way" that is "not merely conjectural," *Turner*, 512 U.S. at 662–64, or how effectively banning a channel of communication is narrowly tailored to serving those interests.

## CONCLUSION

Never before has Congress taken the extraordinary step of effectively banning a platform for communication, let alone one used by half the country. Congress might be expected to furnish a legislative record that explains why such a dramatic restriction of the right to speak and receive information is necessary, and provides compelling evidence in support, but it failed to do so here. What little Congress did place on the public record includes statements from lawmakers raising diffuse concerns about national security and, more disturbingly, their desire to control the American public's information diet in a way that strikes at the heart of the First Amendment. This Court should grant the Petitions for Review and enjoin enforcement of the Act on grounds it violates the First Amendment.

Dated: June 27, 2024

*/s/ Robert Corn-Revere*
ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL RIGHTS
AND EXPRESSION
700 PENNSYLVANIA AVENUE, SE
SUITE 340
WASHINGTON, DC 20003
BOB.CORN-REVERE@THEFIRE.ORG

AARON TERR
FOUNDATION FOR INDIVIDUAL RIGHTS
AND EXPRESSION
510 WALNUT STREET
SUITE 900
PHILADELPHIA, PA 19106
AARON.TERR@THEFIRE.ORG

29

**CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains <u>6,225</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using MS Word 2016 in <u>Times New Roman 14-point font</u>.

Dated: June 27, 2024                    <u>*/s/ Robert Corn-Revere*</u>
                                        ROBERT CORN-REVERE*
                                        FOUNDATION FOR INDIVIDUAL RIGHTS
                                          AND EXPRESSION
                                        700 Pennsylvania Ave., SE
                                        Suite 340
                                        Washington, DC 20003
                                        (215) 717-3473
                                        bob.corn-revere@thefire.org

                                        *Counsel of Record*