ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024

## No. 24-1113 (and consolidated cases)

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

TikTok Inc. and ByteDance Ltd.,

*Petitioners,*

v.

Merrick B. Garland, in his official capacity as Attorney General of the United States,

*Respondent.*

*caption continued on inside cover*

On Petitions for Review of Constitutionality of the Protecting Americans from Foreign Adversary Controlled Applications Act

### BRIEF OF *AMICI CURIAE* THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, FREE PRESS, AND PEN AMERICAN CENTER, IN SUPPORT OF PETITIONERS

Jameel Jaffer
Hannah Vester
Eric Columbus
Ramya Krishnan
Xiangnong Wang
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Amici Curiae*

Brian Firebaugh, et al.,

*Petitioners,*

v.

Merrick B. Garland, in his official capacity as Attorney General of the
United States,

*Respondent.*

————————————————

BASED Politics Inc.,

*Petitioner,*

v.

Merrick B. Garland, in his official capacity as Attorney General of the
United States,

*Respondent.*

**Certificate as to Parties, Rulings, Related Cases and Statutes**

Pursuant to D.C. Circuit Rules 26.1 and 28(a)(1) and Fed. R. App. P. 26.1 the undersigned counsel certifies as follows:

**A.    Parties and Amici**

The parties to *TikTok Inc. v. Garland*, No. 24-1113, are Petitioners TikTok Inc. and ByteDance Ltd., and Respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. The parties to the first consolidated case, *Firebaugh v. Garland*, No. 24-1130, are the Creator Petitioners and Respondent Garland, in his official capacity as Attorney General of the United States. The parties to the second consolidated case, *BASED Politics Inc. v. Garland*, No. 24-1183, are Petitioner BASED Politics Inc. and Respondent Garland, in his official capacity as Attorney General of the United States. As of the finalization of this brief, the following amici have filed notices of intent to participate as amici curiae: Electronic Frontier Foundation, Freedom of the Press Foundation, TechFreedom, Media Law Resource Center, Center for Democracy and Technology, First Amendment Coalition, Freedom to Read Foundation, The Cato Institute, Professor Matthew Steilen, Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition, Asian American Federation, Asian Americans Advancing Justice Southern California, Calos Coalition, Hispanic Heritage Foundation, Muslim Public Affairs Council, Native Realities, OCA-Asian Pacific

i

American Advocates of Greater Seattle, OCA-Asian Pacific American Advocates: San Francisco, Sadhana, Sikh Coalition, and South Asian Legal Defense Fund. Because these petitions were filed directly in this Court, there were no district-court proceedings in any of the cases.

**B.     Rulings Under Review**

The petitions seek direct review of the constitutionality of the Protecting Americans from Foreign Adversary Controlled Applications Act (H.R. 815, Div. H, 118th Cong., Pub. L. No. 118-50 (April 24, 2024). There were no district-court proceedings in any of the cases.

**C.     Related Cases**

Amici are not aware of any other case pending before this or any other court that is related.

 /s/ *Jameel Jaffer*
Jameel Jaffer
Knight First Amendment Institute at
   Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Amici Curiae*

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel certifies that *amici curiae* the Knight First Amendment Institute at Columbia Unversity, Free Press, and PEN American Center have no parent corporations and that no publicly held corporation owns 10 percent or more of their stock.

 /s/ *Jameel Jaffer*
Jameel Jaffer
Knight First Amendment Institute at
   Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Amici Curiae*

## Table of Contents

Certificate as to Parties, Rulings, Related Cases and Statutes ....................................i

Corporate Disclosure Statement................................................................ iii

Table of Authorities ..................................................................................v

Interest of Amici Curiae ...........................................................................1

Introduction ............................................................................................2

Argument.................................................................................................3

    I.    The Act implicates the First Amendment because it restricts the right of Americans to access ideas, information, and media from abroad...........................................................................................3

    II.    The Court should scrutinize the Act especially closely because it recalls practices that have long been associated with repressive governments. .......................................................................7

    III.    The Act is subject to strict scrutiny because it is viewpoint-motivated and its effect is to broadly restrict protected expression online......................................................................................18

    IV.    The Act fails First Amendment scrutiny because suppressing speech is not a permissible means of countering misinformation, and because the government could achieve its other goals with less restrictive means. ......................................................................24

Conclusion............................................................................................28

Certificate of Compliance ......................................................................29

# Table of Authorities

## Cases

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) ............................................15

*Alario v. Knudsen*, No. CV 23-56-M-DWM, 2023 WL 8270811 (D. Mont. Nov. 30, 2023) ..........................................................................27

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010) ....................24

*Brown v. Hartlage*, 456 U.S. 45 (1982) ...............................................................25

*Cernuda v. Heavey*, 720 F. Supp. 1544 (S.D. Fla. 1989)...................................6, 17

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994).........................................19, 23, 24, 26

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275 (D.C. Cir. 1989) ..................................................................................................6

*Frederick Douglass Found., Inc., v. Dist. of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) ..............................................................................19, 23

*Kalantari v. NITV, Inc.*, 352 F.3d 1202 (9th Cir. 2003).........................................17

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ............................................................5

*Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) ..........................................4, 5, 25

*Martin v. City of Struthers*, 319 U.S. 141 (1943)...................................................3, 4

*Meese v. Keene*, 481 U.S. 465 (1987) .......................................................................5

*Packingham v. North Carolina*, 582 U.S. 98 (2017)...............................................6, 7

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)........................................................19

*Reno v. ACLU*, 521 U.S. 844 (1997)....................................................................6, 23

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ..........19, 23

*Stanley v. Georgia*, 394 U.S. 557 (1969) .................................................................3

*Teague v. Reg'l Comm'r of Customs*, 404 F.2d 441 (2d Cir. 1968) ........................6

*The Nation v. Haig*, No. 81-2988 (D. Mass. Feb. 12, 1980) ...................................16

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ..........................................26

*United States v. Alvarez*, 567 U.S. 709 (2012).......................................................25

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ..................................26, 27, 28

**Statutes**

Pub. L. No. 103-236, 108 Stat. 382 (1994) ............................................................18

Pub. L. No. 103-236, 108 Stat. 382 (1994) ............................................................18

Pub. L. No. 65-91, 40 Stat. 411 (1917) ..................................................................15

Pub. L. No. 82-414, 66 Stat. 163 (1952) ................................................................12

Pub. L. No. 95-105, 91 Stat. 844 (1977) ................................................................14

**Other Authorities**

132 Cong. Rec. 6550 (1986) ...................................................................................18

170 Cong. Rec. S2963 (Apr. 23, 2024)..............................................................21, 22

98 Cong. Rec. 8084 (1952) .....................................................................................12

Aaron Gregg & Eva Dou, *Apple Pulls WhatsApp, Threads and Signal
    from App Store in China*, Wash. Post (Apr. 19, 2024),
    https://perma.cc/6Z63-YZ6U ....................................................................9

Anna Gordon, *Here's All the Countries With TikTok Bans as
    Platform's Future in U.S. Hangs in Balance*, Time (Apr. 25, 2024),
    https://perma.cc/35ZD-J4UE ..................................................................10

*Bill to Protect Americans From Foreign Adversary Controlled
    Applications, Including TikTok*, Select Committee on the CCP
    (Mar. 5, 2024), https://perma.cc/BV43-VYXJ.................................................20

Burt Neuborne & Steven R. Shapiro, *The Nylon Curtain: America's National Border and the Free Flow of Ideas*, 26 Wm. & Mary L. Rev. 719 (1985) ...................................................................15, 16, 17

Christopher A. Casery, Dianne E. Rennack & Jennifer K. Elsea, Cong. Rsch. Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use* (2024), https://perma.cc/X9GC-U9A4 ................16

Claire Fu & Daisuke Wakabayashi, *There Is No TikTok in China, but There Is Douyin. Here's What It Is*, N.Y. Times (Apr. 25, 2024), https://perma.cc/QH2B-7MFV ...........................................................10

Clifford D. May, *Washington Talk; A McCarthy Era Act, Used to Block Visits by Foreigners, Is About to Fall*, N.Y. Times (June 1, 1989), https://perma.cc/FQH5-Q8QB ..............................................14

Comm. to Protect Journalists, *CPJ Calls on Taliban to Drop Plans to Restrict Facebook Access in Afghanistan* (Apr. 8, 2024), https://perma.cc/7SAL-F8YT...........................................................10

Dahlia Scheindlin, *Netanyahu's Assault on Democracy*, Haaretz (Aug. 8, 2023), https://perma.cc/7KLB-CH93 ..........................................9

David Margolick, *Bar Panel Urges End of Law that Limits Entry Into U.S.*, N.Y. Times (Apr. 4, 1984), https://perma.cc/P7FW-XXDC...................13

*Deportation Bid Based on McCarthy-Era Law*, L.A. Times (Jan. 29, 1987), https://perma.cc/QM6D-7Y98 ...............................................13

Eugene Volokh, *When Are Lies Constitutionally Protected?*, Knight First Amend. Inst. (Oct. 19, 2022), https://perma.cc/4PWU-FWUT ................25

Freedom House, *Freedom on the Net 2023: China*, https://perma.cc/U9J5-2WGQ .......................................................8, 9

Freedom House, *Freedom on the Net 2023: Iran*, https://perma.cc/KG9C-DMG2 ..................................................9, 10

Freedom House, *Freedom on the Net 2023: Jordan*, https://perma.cc/SZW5-Q2HG........................................................10

Freedom House, *Freedom on the Net 2023: Kyrgyzstan*,
https://perma.cc/H8DP-W2VU ..........................................................................11

Freedom House, *Freedom on the Net 2023: Russia*,
https://perma.cc/XZ47-TFT3 .............................................................................8

Freedom House, *Freedom on the Net 2023: Saudi Arabia*,
https://perma.cc/422H-94KJ ..............................................................................9

Freedom House, *Freedom on the Net 2023: Uzbekistan*,
https://perma.cc/5PAS-C7BA ..........................................................................11

H.R. Rep. No. 100-40 (1987) .................................................................................17

H.R. Rep. No. 103-482 (1994) ...............................................................................18

H.R. Rep. No. 118-417 (2024) ...............................................................................21

*ICYMI on Fox News: Blackburn: TikTok Must Find New Ownership
Or Be Banned In U.S.,* Marsha Blackburn – U.S. Senator for
Tennessee (Mar. 13, 2024), https://perma.cc/3UB4-2DY3 ..............................22

Jarred O. Taylor III, *Information Wants to be Free (of Sanctions):
Why the President Cannot Prohibit Foreign Access to Social
Media Under U.S. Export Cannot Prohibit Foreign Access to
Social Media Under U.S. Export Regulations*, 54 Wm. & Mary L.
Rev. 297 (2012) .................................................................................................17

John A. Scanlan, *Aliens in the Marketplace of Ideas: The
Government, the Academy, and the McCarran-Walter Act*, 66 Tex.
L. Rev. 1481, 1496-97 (1988) ...........................................................................13

Josh Hawley, @HawleyMO, X (Nov. 16, 2023),
https://perma.cc/63RB-4YHC ...........................................................................23

Marco Rubio, *TikTok Parent Company Poses a National Security
Threat*, Newsweek (Apr. 3, 2024), https://perma.cc/8HVA-JBH5 ...................23

Ngouda Dione, *Senegal Cuts Internet Again Amid Widening
Crackdown on Dissent*, Reuters (Feb. 13, 2024),
https://perma.cc/SRV4-ZKM9 ..........................................................................11

Nikki McCann Ramirez, *Lawmakers Admit They Want to Ban TikTok over Pro-Palestinian Content*, Rolling Stone (May 6, 2024), https://perma.cc/RVJ8-9CK7 ...............................................................22

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988) ..............................................................17

*Pelosi Statement on House Passage of Protecting Americans from Foreign Adversary Controlled Applications Act*, Congresswoman Nancy Pelosi (Mar. 13, 2024), https://perma.cc/JAV6-Y9TJ ...........................21

Prem Thakker & Akela Lacy, *In No Labels Call, Josh Gottheimer, Mike Lawler, and University Trustees Agree: FBI Should Investigate Campus Protests*, The Intercept (May 4, 2024), https://perma.cc/EUC5-7F8L ...............................................................22

Reporters Without Borders, *Modi Ramps Up Online Censorship in India* (Apr. 9, 2023), https://perma.cc/43HV-9N9N .........................................10

Representative Mike Gallagher, *Why Do Young Americans Support Hamas? Look at TikTok.*, Free Press (Nov. 1, 2023), https://perma.cc/QGU6-2L65...............................................................19

Robert McMahon, *Russia Is Censoring News on the War in Ukraine. Foreign Media Are Trying to Get Around That*, Council on Foreign Rels. (Mar. 18, 2022), https://perma.cc/H7BU-BXZ3 ....................................8

Rochelle B. Price, *Jamming and the Law of International Communications*, 5 Mich. J. Int'l L. 391 (1984)...................................8

Sidney Blumenthal, *Congress Lifts Political-Beliefs Bar to Aliens Under McCarran-Walter Act*, Wash. Post (Dec. 17, 1987), https://perma.cc/5ETL-5W5V..............................................................12

Statement of Arthur C. Helton, Exclusion and Deportation Amendments of 1983: Hearing Before the Subcommittee on Immigration, Refugees, and International Law of the Committee on the Judiciary, House of Representatives, Ninety-Eighth Congress, Second Session, on H.R. 4509 and H.R. 5227 (June 28, 1984), https://perma.cc/C77S-MYTR ..............................................13

Steven A. Holmes, *Legislation Eases Limits on Aliens*, N.Y. Times (Feb. 2, 1990), https://perma.cc/Z2DV-B3RS .............................................13, 15

Steven R. Shapiro, *Ideological Exclusions: Closing the Border to Political Dissidents*, 100 Harv. L. Rev. 930 (1987).....................................13, 14

Testimony of Larry McMurtry, Free Trade in Ideas: Hearings Before the Subcommittee on Courts, Intellectual Property, and the Administration of Justice of the Committee on the Judiciary, House of Representatives, One Hundred First Congress, First Session (May 3, 1989), https://perma.cc/7DNH-W9HR ..................................14

Tia Goldenberg & Jon Gambrell, *Israel Orders Al Jazeera to Close Its Local Operation and Seizes Some of Its Equipment*, Associated Press (May 5, 2024), https://perma.cc/ST7A-BEA6............................................9

Transcript of Chairman Gallagher's Press Conference Response to TikTok Intimidation Campaign Against U.S. Users (Mar. 7, 2024), https://perma.cc/7VL5-UTCH ...................................................................20

U.S. Dep't of State, *Democratic People's Republic of Korea 2022 Human Rights Report*, https://perma.cc/7XBJ-DQWP .....................................11

U.S. Dep't of State, *Nepal 2022 Human Rights Report*, https://perma.cc/ZNX9-EK45 .........................................................................11

U.S. Dep't of State, *Somalia 2022 Human Rights Report*, https://perma.cc/YF8N-3HAJ ..........................................................................11

x

## Interest of Amici Curiae[1]

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.

Free Press is a nonpartisan, non-profit, nationwide media and technology advocacy organization. It believes that positive social change, racial justice, and meaningful engagement in public life require equitable access to open channels of communication, diverse and independent ownership of media platforms, and journalism that holds leaders accountable. For nearly two decades, Free Press has engaged in litigation, congressional advocacy, and administrative agency proceedings to advance these goals, including cases, legislative hearings, and agency proceedings concerning freedom of expression and freedom of the press.

PEN American Center ("PEN America") is a non-partisan, not-for-profit organization dedicated to creative expression and the liberties that make it possible.

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief. The parties have consented to the filing of this amicus brief.

Founded in 1922, PEN America engages in advocacy, research, and public programming related to free expression in the United States and around the world. PEN America works to ensure that people everywhere have the freedom to create literature, to convey information and ideas, express their views, and access the views, ideas, and literatures of others. PEN America has engaged in research and advocacy related to free expression on social media platforms and is committed to fostering a healthy climate for public discourse online.

## Introduction

This case concerns the constitutionality of the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, Div. H, 138 Stat. 895, 955–60 (2024) ("the Act"), which bans TikTok, the social media platform, throughout the United States, effective January 19, 2025. While the technology of social media is relatively new, official efforts to restrict Americans from accessing ideas, information, and media from abroad are unfortunately not. This Court's analysis of the Act should be informed by that history, as well as by the experiences of other societies that have restricted their citizens' access to speech in analogous ways.

Amici submit this brief to make four points: **First**, the Act implicates the First Amendment because it prevents U.S. citizens and residents from using a social media platform. Using a social media platform involves multiple First Amendment

rights—among them the rights to speak, hear, associate, and inquire. Any official effort to restrict Americans' access to a social media platform—including a foreign one—must be subject to First Amendment scrutiny. **Second**, this Court should scrutinize the Act especially closely because it recalls practices that have long been associated with repressive governments. For good reasons, the United States' own past efforts at curtailing citizens' access to speech from abroad are remembered now with embarrassment and shame. Thus, our own history and the experience of other societies supply ample reason to approach restrictions on access to foreign media with skepticism. **Third**, the Act should be subject to strict scrutiny because it is viewpoint-motivated and forecloses an entire medium of expression online. **Finally**, the First Amendment does not permit the government to ban access to foreign media where, as here, less restrictive means are available.

For the reasons below, amici respectfully urge the Court to grant the relief requested by Petitioners.

## Argument

## I.    The Act implicates the First Amendment because it restricts the right of Americans to access ideas, information, and media from abroad.

It is "well established" that the First Amendment "protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). The Supreme Court first recognized that the public has a right to receive information more than 80 years ago in *Martin v. City of Struthers*, 319 U.S. 141 (1943). In that case, the Court

3

invalidated a local ordinance that forbade persons "distributing handbills, circulars or other advertisements" from ringing doorbells or knocking on doors. *Id.* at 142 (citation omitted). While the Court recognized that the ordinance was aimed at "the protection of the householders from annoyance," it held that a blanket ban failed to accord "due respect for the constitutional rights of those desiring to distribute literature *and those desiring to receive it*." *Id.* at 144, 149 (emphasis added) . The Court indicated that the right to receive information was central to its holding, noting that "[f]reedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society." *Id.* at 146–47.

This right to receive information extends to ideas, information, and media from abroad. In *Lamont v. Postmaster General*, the Supreme Court struck down a law requiring individuals who wanted to receive communist propaganda "printed or otherwise prepared in a foreign country" to notify the post office in advance. 381 U.S. 301, 302 (1965) (citation omitted). The Court explained that this obligation unconstitutionally burdened recipients' First Amendment right to receive information—a right not diluted by the material's foreign origin. *Id.* at 307. Notably, the law was invalidated even though it did not bar individuals from accessing the relevant foreign speech altogether. The Court struck down the law because it burdened willing listeners with an "affirmative obligation," thereby interfering with

the "'uninhibited, robust, and wide-open' debate and discussion . . . contemplated by the First Amendment." *Id.* at 307 (citation omitted).

Since *Lamont*, the Supreme Court has repeatedly reaffirmed Americans' First Amendment right to access speech from foreign sources. In *Meese v. Keene*, the Court considered a First Amendment challenge to a law requiring the plaintiff to identify three Canadian films he wished to exhibit as "political propaganda." 481 U.S. 465, 473 (1987). The Court rejected the plaintiff's claim only because it determined that, unlike in *Lamont*, the challenged statute "d[id] not pose *any* obstacle to [plaintiff's] access to the [foreign] materials." *Id.* at 480 (emphasis added). Likewise, in *Kleindienst v. Mandel*, the Court reasoned that the government's exclusion of a Belgian journalist from the United States implicated the First Amendment rights of U.S. listeners who sought to meet with him. 408 U.S. 753, 764–65 (1972). Although the Court ultimately rejected the plaintiffs' First Amendment challenge because of Congress's "plenary power to make rules for the admission of [noncitizens]," *id.* at 766 (citation omitted), it nevertheless reaffirmed that the "First Amendment right to receive information and ideas" extends to information and ideas from abroad, *id.* at 762 (cleaned up) .

Lower courts have likewise emphasized that the First Amendment's protections for receiving information and ideas extend to foreign speech and association. *See, e.g.*, *Teague v. Reg'l Comm'r of Customs*, 404 F.2d 441, 445 (2d

Cir. 1968) ("[t]o the extent" that the challenged provisions "result in some limitation on the availability of publications and films originating in China, North Korea, and North Vietnam," they "impinge on First Amendment freedoms"); *Cernuda v. Heavey*, 720 F. Supp. 1544, 1554 (S.D. Fla. 1989) (the exhibition and auction of "paintings of Cuban origin" is "expression protected by the First Amendment"); *DKT Mem'l Fund Ltd. v. Agency for Int'l. Dev.*, 887 F.2d 275, 295 (D.C. Cir. 1989) (association with foreigners implicates the First Amendment). The upshot of these cases is that the First Amendment protects Americans' right to access, engage with, and disseminate foreign speech and ideas, just as it protects the right to receive "domestic" information.

These protections encompass the right to engage with, and on, foreign-owned social media platforms. The First Amendment protects online speech just as robustly as any other speech. *See Reno v. ACLU*, 521 U.S. 844, 870 (1997) ("[O]ur cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to [online speech]."). Indeed, as the Supreme Court noted in *Packingham v. North Carolina*, social media platforms are now "the most important places . . . for the exchange of views." 582 U.S. 98, 104 (2017). In *Packingham*, the Court considered a state law that forbade registered sex offenders from accessing social media websites on which minors may have accounts. *Id.* at 101, 106–07. The Court

recognized that use of social media is vital to the modern-day exercise of multiple

First Amendment rights:

> Social media offers relatively unlimited, low-cost capacity for communication of all kinds. On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos. On LinkedIn, users can look for work, advertise for employees, or review tips on entrepreneurship. And on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. . . . In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought.

*Id.* at 104–05 (cleaned up). After emphasizing the importance of social media to

modern public discourse, the Court invalidated the ban, finding it was not narrowly

tailored to serve the state's interest in protecting minors. *See id.* at 105–06.

Against this background, it is plain that the TikTok ban must be subject to

First Amendment scrutiny. By preventing access to TikTok, the Act precludes

Americans from publishing content and viewing content posted by others on that

platform. More broadly, it prevents Americans from participating in the expressive

communities of their choosing. The Act therefore "foreclose[s] [Americans']

access" to media they would otherwise seek out, burdening the "legitimate exercise

of [their] First Amendment rights." *Id*. at 108.

## II.  The Court should scrutinize the Act especially closely because it recalls practices that have long been associated with repressive governments.

The Court should assess the Act with particular care because restricting access

to foreign media is a practice that has long been associated with repressive regimes.

Before the internet, shortwave radio technology enabled people to receive timely information from abroad. Foreign radio broadcasts became a threat to totalitarian governments seeking to control the information available to their citizens. After World War II, the Soviet Union began jamming shortwave transmissions to deny its citizens access to potentially subversive information and ideas from abroad.[2] It was not alone in this practice: China jammed Radio Moscow, Taiwanese Radio, and the Voice of Vietnam.[3]

Many of these same basic practices persist to this day in repressive regimes the world over. Shortly after invading Ukraine in 2022, Russia blocked access to Facebook, Twitter, and major foreign news outlets.[4] The notorious "Great Firewall" of China has for decades restricted Chinese citizens' access to foreign sources of information online. Leading news sites, such as the *New York Times* and the British Broadcasting Corporation, are blocked.[5] So too are popular American social media

---

[2] *See* Rochelle B. Price, *Jamming and the Law of International Communications*, 5 Mich. J. Int'l L. 391, 391 (1984).

[3] *Id.*

[4] Freedom House, *Freedom on the Net 2023: Russia*, https://perma.cc/XZ47-TFT3; Robert McMahon, *Russia Is Censoring News on the War in Ukraine. Foreign Media Are Trying to Get Around That*, Council on Foreign Rels. (Mar. 18, 2022), https://perma.cc/H7BU-BXZ3.

[5] Freedom House, *Freedom on the Net 2023: China*, https://perma.cc/U9J5-2WGQ.

platforms like Facebook, X, Instagram, and YouTube.[6] Earlier this year, the Chinese government ordered Apple to remove WhatsApp, Threads, Signal, and Telegram from its app store in China.[7]

Other rights-abusing regimes also restrict their citizens' ability to access information from abroad. Iran blocks a wide array of international news websites and social media platforms.[8] Saudi Arabia blocks certain news sites affiliated with countries with which the Saudi government has tensions, such as Qatar, Iran, and Turkey.[9] And just last month, Israeli Prime Minister Benjamin Netanyahu's government, which in recent years has conducted what the Israeli newspaper *Haaretz* has characterized as "an assault on democracy,"[10] shut down the Israeli operations of the Qatari network Al Jazeera and pulled its television station off the air.[11]

---

[6] *Id*.

[7] Aaron Gregg & Eva Dou, *Apple Pulls WhatsApp, Threads and Signal from App Store in China*, Wash. Post (Apr. 19, 2024), https://perma.cc/6Z63-YZ6U.

[8] Freedom House, *Freedom on the Net 2023: Iran*, https://perma.cc/KG9C-DMG2.

[9] Freedom House, *Freedom on the Net 2023: Saudi Arabia*, https://perma.cc/422H-94KJ.

[10] Dahlia Scheindlin, *Netanyahu's Assault on Democracy*, Haaretz (Aug. 8, 2023), https://perma.cc/7KLB-CH93.

[11] Tia Goldenberg & Jon Gambrell, *Israel Orders Al Jazeera to Close Its Local Operation and Seizes Some of Its Equipment*, Associated Press (May 5, 2024), https://perma.cc/ST7A-BEA6.

The list of countries that have banned TikTok should itself be a warning because these countries do not share American commitments to a free and open internet. According to a recent report, there are eleven such countries, not counting those that merely disallow the app on government devices.[12] China, ironically, bans TikTok, allowing only a Chinese version called Douyin that is subject to heavy censorship.[13] The ten other countries—Afghanistan,[14] India,[15] Iran,[16] Jordan,[17]

---

[12] Anna Gordon, *Here's All the Countries With TikTok Bans as Platform's Future in U.S. Hangs in Balance*, Time (Apr. 25, 2024), https://perma.cc/35ZD-J4UE.

[13] Claire Fu & Daisuke Wakabayashi, *There Is No TikTok in China, but There Is Douyin. Here's What It Is*, N.Y. Times (Apr. 25, 2024), https://perma.cc/QH2B-7MFV.

[14] Comm. to Protect Journalists, *CPJ Calls on Taliban to Drop Plans to Restrict Facebook Access in Afghanistan* (Apr. 8, 2024), https://perma.cc/7SAL-F8YT.

[15] *Modi Ramps Up Online Censorship in India*, Reporters Without Borders (Apr. 9, 2023), https://perma.cc/43HV-9N9N.

[16] Freedom House, *Freedom on the Net 2023: Iran*, supra note 8.

[17] Freedom House, *Freedom on the Net 2023: Jordan*, https://perma.cc/SZW5-Q2HG.

Kyrgyzstan,[18] Nepal,[19] North Korea,[20] Senegal,[21] Somalia,[22] and Uzbekistan[23]—also restrict politically disfavored online material or restrict internet access.

Even the United States has throughout its history sometimes restricted its citizens' access to foreign speech, but many of those efforts are seen today as shameful and wrong. Cold War restrictions blocked Americans' access to a wide array of political and cultural figures, as well as foreign materials from so-called "enemy" countries. The main effect of these provisions—which Congress has since largely rescinded—was to keep information from abroad away from Americans and to cause others to question our nation's dedication to its ideals.

In 1952, Congress passed the McCarran-Walter Act, which barred from entry to the United States anarchists, Communists, and persons whose "activities" would

---

[18] Freedom House, *Freedom on the Net 2023: Kyrgyzstan*, https://perma.cc/H8DP-W2VU.

[19] U.S. Dep't of State, *Nepal 2022 Human Rights Report*, at 11–13, https://perma.cc/ZNX9-EK45.

[20] U.S. Dep't of State, *Democratic People's Republic of Korea 2022 Human Rights Report*, at 24–26, https://perma.cc/7XBJ-DQWP.

[21] Ngouda Dione, *Senegal Cuts Internet Again Amid Widening Crackdown on Dissent*, Reuters (Feb. 13, 2024), https://perma.cc/SRV4-ZKM9.

[22] U.S. Dep't of State, *Somalia 2022 Human Rights Report*, at 16–17, https://perma.cc/YF8N-3HAJ.

[23] Freedom House, *Freedom on the Net 2023: Uzbekistan*, https://perma.cc/5PAS-C7BA.

be "prejudicial to the public interest."[24] While waivers of inadmissibility were sometimes available, no waiver was available for denials under the "prejudicial to the public interest" standard.[25] In passing the Act, Congress overrode the veto of President Truman, who characterized the provisions as "thought control" and "inconsistent with our democratic ideals," remarking that "[s]eldom has a bill exhibited the distrust evidenced here for citizens and aliens alike."[26]

The McCarran-Walter Act was used to target a vast array of political and cultural figures. "From the time it was enacted in the fever of McCarthyism," said Senator Daniel Patrick Moynihan in 1987, "there has been an annual scandal. Some writer, some painter, some minister could not be allowed to enter the United States."[27] The Act kept out novelists such as Gabriel García Márquez, Czesław Miłosz, Carlos Fuentes, Jorge Luis Borges, Graham Greene, and Doris Lessing. It kept out actors like Maurice Chevalier, Yves Montand, and Simone Signoret. It kept out poets like Pablo Neruda. It kept out a former prime minister—Ian Smith of Rhodesia—and a future one—Pierre Trudeau of Canada. Persons on the left and the right were excluded. Even NATO's former vice supreme commander in Europe for

---

[24] Pub. L. No. 82-414, § 212(a)(28), (27), 66 Stat. 163, 184–185 (1952).

[25] *Id.* § 212(d)(3), 66 Stat. 187.

[26] 98 Cong. Rec. 8084 (1952).

[27] Sidney Blumenthal, *Congress Lifts Political-Beliefs Bar to Aliens Under McCarran-Walter Act*, Wash. Post (Dec. 17, 1987), https://perma.cc/5ETL-5W5V.

nuclear affairs, Nino Pasti, was kept out of the United States after he criticized the Reagan administration's effort to install new missiles in Europe.[28]

Predictably, the government's power to exclude individuals on the basis of viewpoints it deemed dangerous or undesirable was used to exclude individuals who had done nothing more than criticize the United States. The casual dismissiveness with which the Act was deployed was exemplified in the exclusion of Italian playwright Dario Fo. "Nobody in State thinks that Fo is going to foment revolution or throw bombs," said a State Department official to a reporter. "It's just that Fo's record of performance with regard to the United States is not good. Dario Fo has never had a good word to say about" the United States.[29]

These practices had serious costs beyond limiting Americans' ability to access speech. They undermined America's ability to hold other nations accountable for

---

[28] *See id.*; *Deportation Bid Based on McCarthy-Era Law*, L.A. Times (Jan. 29, 1987), https://perma.cc/QM6D-7Y98; John A. Scanlan, *Aliens in the Marketplace of Ideas: The Government, the Academy, and the McCarran-Walter Act*, 66 Tex. L. Rev. 1481, 1496–97 (1988); Steven R. Shapiro, *Ideological Exclusions: Closing the Border to Political Dissidents*, 100 Harv. L. Rev. 930, 930 (1987); David Margolick, *Bar Panel Urges End of Law that Limits Entry Into U.S.*, N.Y. Times (Apr. 4, 1984), https://perma.cc/P7FW-XXDC; Steven A. Holmes, *Legislation Eases Limits on Aliens*, N.Y. Times (Feb. 2, 1990), https://perma.cc/Z2DV-B3RS.

[29] Statement of Arthur C. Helton, Exclusion and Deportation Amendments of 1983: Hearing Before the Subcommittee on Immigration, Refugees, and International Law of the Committee on the Judiciary, House of Representatives, Ninety-Eighth Congress, Second Session, on H.R. 4509 and H.R. 5227 (June 28, 1984), at 107–08 (quoting Erika Munk, *Cross Left*, Village Voice (June 2, 1980) at 86), https://perma.cc/C77S-MYTR.

repressing their own citizens. Senator Moynihan observed that the McCarran-Walter Act "made us seem hypocritical" and "made us easy to caricature and deride."[30] As the writer Larry McMurtry testified before Congress in 1989:

> [T]he very existence of ideologically-based legislation undermines the effectiveness and moral authority of American organizations . . . that are dedicated to promoting free and open communication "within all nations" and "between all nations" . . . . How can we presume to be the "leaders of the free world" and criticize the more egregious practices of other governments when we fail to live up to the standards we set for ourselves – that serve as a model for the internationally recognized human rights standards against which all nations are judged?[31]

The practice of ideological exclusion gradually came to be regarded as irreconcilable with the values of an open society. In 1977, in order to comply with its commitment under the Helsinki Accords to facilitate travel between states, Congress passed the McGovern Amendment, which modified the McCarran-Walter Act by providing that the State Department "should" recommend a waiver of inadmissibility when the noncitizen was inadmissible "by reason of membership in or affiliation with a proscribed organization."[32] In 1986, the D.C. Circuit held that

---

[30] Clifford D. May, *Washington Talk; A McCarthy Era Act, Used to Block Visits by Foreigners, Is About to Fall*, N.Y. Times (June 1, 1989), https://perma.cc/FQH5-Q8QB.

[31] Testimony of Larry McMurtry, Free Trade in Ideas: Hearings Before the Subcommittee on Courts, Intellectual Property, and the Administration of Justice of the Committee on the Judiciary, House of Representatives, One Hundred First Congress, First Session (May 3, 1989), at 56, https://perma.cc/7DNH-W9HR.

[32] *See* Pub. L. No. 95-105 § 112, 91 Stat. 844, 848 (1977); Shapiro, *supra* note 28, at 931 n.13.

the government could exclude someone on the separate grounds that admission would be prejudicial to the United States only if that determination was independent of the fact of membership or affiliation with a proscribed organization. *See Abourezk v. Reagan*, 785 F.2d 1043, 1058 (D.C. Cir. 1986), *aff'd by an equally divided court*, 484 U.S. 1 (1987). Congress passed legislation temporarily repealing the ideological exclusion provisions of the McCarran-Walter Act in 1987 and 1988 before repealing them permanently in 1990.[33] The Senate vote in favor of repeal was unanimous.[34]

Ideological exclusion is not the only means the U.S. government has used to limit citizens' access to foreign ideas. In 1917, Congress enacted the Trading with the Enemy Act (TWEA), which granted the President the authority to control trade with foreign adversaries, including the power to restrict the purchase of books, films, and periodicals produced in those nations.[35] The law was used repeatedly during World War II and the Korean War, and was expanded to cover peacetime national emergencies in 1933.[36] However, what were intended to be temporary restrictions during times of exigency "were transformed into a permanent fixture of postwar American life" when President Truman's declaration of a national emergency on the

---

[33] *See* Holmes, *supra* note 28.

[34] *Id*.

[35] Pub. L. No. 65-91, 40 Stat. 411 (1917).

[36] Burt Neuborne & Steven R. Shapiro, *The Nylon Curtain: America's National Border and the Free Flow of Ideas*, 26 Wm. & Mary L. Rev. 719, 728–29 (1985).

eve of the Korean War remained in effect even after the end of the conflict in 1953.[37]

As a result, during the late 1960s, a time of intense national debate over the United States' participation in the Vietnam War, "access to books, newspapers, magazines and films produced in North Vietnam and China was virtually cut off."[38] Although Congress ultimately limited the TWEA to wartime use in 1977, it subsequently granted peacetime sanctions authority to the President through the International Emergency Economic Powers Act (IEEPA), and grandfathered all restrictions—including stringent limitations on trade with Cuba, North Korea, Vietnam, and Cambodia—then in effect.[39]

Scrutiny of the executive branch's authority to restrict the exchange of ideas across the border came to a flashpoint in 1981, when the Treasury Department directed customs and postal authorities to seize thousands of publications from Cuba destined for American readers.[40] Over 100 plaintiffs, including prominent news outlets like the *Nation* and the *Guardian*, sued on First Amendment grounds.[41] The

---

[37] *Id.* at 729.

[38] *Id.* at 730.

[39] Christopher A. Casey, Dianne E. Rennack & Jennifer K. Elsea, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, at 8 n.57 (2024), https://perma.cc/X9GC-U9A4.

[40] *See* Neuborne and Shapiro, *supra* note 36, at 731.

[41] *See id.*; *see also The Nation v. Haig*, No. 81-2988 (D. Mass. Feb. 12, 1980).

day before its response was due, the government capitulated and released the materials without requiring a license.[42]

In recognition of the serious First Amendment interests at stake, Congress in 1988 passed legislation, known as the Berman Amendment, to make clear that TWEA and IEEPA did not authorize restrictions on the dissemination of information.[43] The Berman Amendment exempted from regulation "the importation from any country, or the exportation to any country, whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials."[44] As the accompanying House Report made clear, the Berman Amendment reflects "the principle that no prohibitions should exist on imports to the United States of ideas and information if their circulation is protected by the First Amendment."[45] Congress

---

[42] *See* Neuborne and Shapiro, *supra* note 36, at 731.

[43] Jarred O. Taylor III, *Information Wants to be Free (of Sanctions): Why the President Cannot Prohibit Foreign Access to Social Media Under U.S. Export Regulations*, 54 Wm. & Mary L. Rev. 297, 307 (2012).

[44] Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 2502, 102 Stat. 1107, 1371–72 (1988).

[45] H.R. Rep. No. 100-40, pt. 3, at 113 (1987); *see also Cernuda*, 720 F. Supp. at 1547–53 (citing the House Report and holding that the Berman Amendment applied to original paintings); *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003) ("The Berman Amendment was designed to prevent the executive branch from restricting the international flow of materials protected by the First Amendment."). In 1994, Congress clarified that the Berman Amendment applied to informational materials "whether commercial or otherwise, regardless of format or medium of

17

later expanded the scope of the Berman Amendment in 1994 through the Free Trade in Ideas Act,[46] seeking to "protect the constitutional rights of Americans to educate themselves about the world by communicating with peoples of other countries in a variety of ways."[47]

Congress's repeal of the McCarran-Walter Act's ideological exclusion provisions and recognition of First Amendment-oriented limitations on the President's sanctions authority helped turn the page on ill-advised Cold War efforts to restrict Americans' access to information and ideas from abroad. As Senator Charles Mathias cogently articulated in a speech on the Senate floor: "Diversity, dialog, and exchange of ideas are the life-giving elements—the water and air—of American tradition; exclusion, restriction, repression of ideas are the features of far more troubled, less confident nations."[48]

## III. The Act is subject to strict scrutiny because it is viewpoint-motivated and its effect is to broadly restrict protected expression online.

The Act should be evaluated under the most stringent form of constitutional review because it was substantially motivated by a "disagreement with the

---

transmission" and adding further examples of covered media to the list. Pub. L. No. 103-236 § 525(b), (c), 108 Stat. 382, 474 (1994).

[46] Pub. L. No. 103-236 § 525(a), 108 Stat. 382, 474 (1994).

[47] H.R. Rep. No. 103-482, at 239 (1994).

[48] 132 Cong. Rec. 6550 (1986).

message[s] . . . convey[ed]" by and on TikTok, *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citation omitted), and because it effectively "foreclose[s] an entire medium of expression," *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994).

To start, the history of this legislation leaves no doubt that by banning TikTok Congress intended to suppress disfavored viewpoints. As this Court has noted, viewpoint-motivated discrimination is "so pernicious to liberty and democratic decisionmaking that [it] will almost always be rendered unconstitutional." *Frederick Douglass Found., Inc., v. Dist. of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (cleaned up); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional.").

Here, legislators made little effort to hide their viewpoint-discriminatory motives. In November 2023, the bill's eventual lead sponsor, Chairman of the House Select Committee on the Chinese Communist Party Mike Gallagher, published an article calling for a ban on TikTok, which he characterized as "digital fentanyl" through which the CCP can "push its propaganda" on a wide range of issues.[49] Two days after introducing the bill in March 2024, Chairman Gallagher noted "privacy" and "espionage" concerns regarding TikTok, but made clear that the "most

---

[49] Representative Mike Gallagher, *Why Do Young Americans Support Hamas? Look at TikTok.*, Free Press (Nov. 1, 2023), https://perma.cc/QGU6-2L65.

important[]" reason for a ban was the possibility that "young Americans are getting all their news from Tik[T]ok."[50]

When Chairman Gallagher introduced the bill, the Select Committee issued a statement in which several members made clear that they were motivated by the alleged predominance of certain viewpoints on TikTok.

- Representative Elise Stefanik, the House Republican Conference Chair, slammed TikTok as "Communist Chinese malware that is poisoning the minds of our next generation . . . . From proliferating videos on how to cross our border illegally to supporting Osama Bin Laden's Letter to America, Communist China is using TikTok as a tool to spread dangerous propaganda that undermines American national security."

- Representative Mikie Sherrill, a Democrat, condemned TikTok for "promot[ing] propaganda that is favorable to autocratic rulers like President Xi."

- Representative John Moolenaar backed the bill because the United States "cannot allow the CCP to indoctrinate our children."

- Representative Ashley Hinson slammed TikTok as a way for the Chinese government to "push harmful propaganda, including content showing migrants how to illegally cross our Southern Border, supporting Hamas terrorists, and whitewashing 9/11."[51]

---

[50] Transcript of Chairman Gallagher's Press Conference Response to TikTok Intimidation Campaign Against U.S. Users 4 (Mar. 7, 2024), https://perma.cc/7VL5-UTCH.

[51] *Bill to Protect Americans From Foreign Adversary Controlled Applications, Including TikTok*, Select Committee on the CCP (Mar. 5, 2024), https://perma.cc/BV43-VYXJ.

A House report on the bill likewise declared that communications applications owned by foreign adversaries "present a clear threat" because, *inter alia*, they can "push . . . propaganda on the American public."[52] The report repeated concerns that the Chinese Communist Party (CCP) could use TikTok for "influence operations" and to "drive divisive narratives internationally."[53] Representative (and former House Speaker) Nancy Pelosi similarly cited concerns over CCP "propaganda" in explaining her vote in favor of the TikTok ban.[54]

In the brief debate on the Senate floor, senators also cited viewpoint-based motivations for supporting the legislation. Senator Maria Cantwell alleged that "[f]oreign policy issues disfavored by China and Russian governments . . . had fewer hashtags on TikTok, such as pro-Ukraine or pro-Israeli hashtags."[55] Similarly, Senator Pete Ricketts supported the ban because the CCP allegedly uses TikTok "to skew public opinion on foreign events in their favor," including by promoting hashtags that align with its foreign policy perspectives such as "StandwithKashmir" and "[p]ro-Palestinian and pro-Hamas hashtags."[56] Indeed, multiple lawmakers have

---

[52] H.R. Rep. No. 118-417, at 2 (2024).

[53] *Id.* at 8, 10.

[54] *Pelosi Statement on House Passage of Protecting Americans from Foreign Adversary Controlled Applications Act*, Congresswoman Nancy Pelosi (Mar. 13, 2024), https://perma.cc/JAV6-Y9TJ.

[55] 170 Cong. Rec. S2963 (Apr. 23, 2024).

[56] *Id.* at S2970–71.

cited the prevalence of pro-Palestinian content on TikTok as a reason for supporting the Act.[57]

The only senator to speak in the Senate in opposition to the bill, Senator Ed Markey, noted that his colleagues "want to ban TikTok . . . because of TikTok's viewpoints"—a course of action that, he warned, carried grave First Amendment implications.[58]

Off the Senate floor, several senators echoed concerns over the viewpoints expressed and circulated on TikTok. Senator Marsha Blackburn argued that TikTok is "soft propaganda" and endorsed a ban because the CCP must not "be able to control what our young people see and say and think."[59] Senator Marco Rubio likewise asserted that ByteDance uses TikTok to mold public opinion in a manner

---

[57] Nikki McCann Ramirez, *Lawmakers Admit They Want to Ban TikTok over Pro-Palestinian Content*, Rolling Stone (May 6, 2024), https://perma.cc/RVJ8-9CK7; Prem Thakker & Akela Lacy, *In No Labels Call, Josh Gottheimer, Mike Lawler, and University Trustees Agree: FBI Should Investigate Campus Protests*, The Intercept (May 4, 2024), https://perma.cc/EUC5-7F8L.

[58] 170 Cong. Rec. S2968 (Apr. 23, 2024).

[59] *ICYMI on Fox News: Blackburn: TikTok Must Find New Ownership Or Be Banned In U.S.*, Marsha Blackburn – U.S. Senator for Tennessee (Mar. 13, 2024), https://perma.cc/3UB4-2DY3.

favorable to the CCP,[60] and, in November, Senator Josh Hawley called TikTok a "propaganda machine for the Communists" and demanded a ban.[61]

Many of the statements catalogued above are probably wrong; certainly, many of them are contestable. But the important point is that many legislators were motivated by disagreement with what they perceived to be TikTok's message. *Cf. Frederick Douglass Found.*, 82 F.4th at 1141; *Rosenberger*, 515 U.S. at 828.

Even if legislators' frankly expressed motivations were not sufficient to trigger strict scrutiny, this stringent standard of review would be appropriate because the Act's effect is to shutter an entire medium of expression. *City of Ladue*, 512 U.S. at 54. Of course, the Act does not preclude Americans from using *other* social media platforms, like Facebook, YouTube, and Twitch. But this doesn't matter. Plainly, an American's right to read (say) the *Columbia Daily Spectator* can't be set aside on the grounds that she can read the *New York Post* instead. As the Court observed in *Reno*, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." 521 U.S. at 880 (quoting *Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939)). The

---

[60] Marco Rubio, *TikTok Parent Company Poses a National Security Threat*, Newsweek (Apr. 3, 2024), https://perma.cc/8HVA-JBH5.

[61] Josh Hawley, @HawleyMO, X (Nov. 16, 2023), https://perma.cc/63RB-4YHC.

First Amendment protects Americans' right to access their preferred media, even if the government would prefer they access other media instead.

This principle is especially important here because social media platforms are not interchangeable expressive products. They offer meaningfully different features, user bases, and expressive environments. TikTok utilizes a different algorithm from other platforms and provides users with a distinct set of affordances. *See* Creators' Br. 28–30. It accordingly attracts a distinct user base (and therefore fosters a different expressive community) from other platforms and provides its users with the opportunity to engage with its audience through unique means. *Cf. City of Ladue*, 512 U.S. at 56 (explaining that a residential sign "often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means"); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1065–66 (9th Cir. 2010) (distinguishing tattooing as a medium of expression distinct from other means of "applying the exact same words, images, and symbols to skin" like airbrushing and henna). Foreclosing entirely Americans' ability to access TikTok therefore warrants strict scrutiny.

## IV.   The Act fails First Amendment scrutiny because suppressing speech is not a permissible means of countering misinformation, and because the government could achieve its other goals with less restrictive means.

The Act fails strict scrutiny—and, indeed, even intermediate scrutiny. It fails, first, because the suppression of speech is almost always a constitutionally

24

illegitimate means of addressing concerns about misinformation and propaganda. It also fails because, even if one disregards the evidence of Congress's viewpoint-discriminatory motives and assumes Congress's true aim was to protect individual privacy, far less restrictive means are available for that purpose.

As an initial matter, the suppression of speech is not a permissible means of addressing concerns about misinformation and propaganda. The First Amendment forecloses the government from suppressing speech on the basis of its truth or falsity. *United States v. Alvarez*, 567 U.S. 709, 718–19 (2012) (plurality); *id.* at 730–31 (Breyer, J., concurring).[62] The Supreme Court has long asserted that the remedy for misleading speech is "more speech, not enforced silence." *Brown v. Hartlage*, 456 U.S. 45, 61 (1982). Concerns about misinformation on social media platforms may well be legitimate, but the First Amendment requires that the government address them with means other than outright censorship. *Lamont*, discussed above, makes clear that this principle holds even if Congress's concern is about foreign propaganda specifically, and not misinformation more generally. The mail restrictions in *Lamont*—which undeniably targeted "foreign government[]" "propaganda," 381 U.S. at 308 (Brennan, J., concurring)—were unlawful precisely because they sought to "control the flow of ideas to the public," *id.* at 306 (majority opinion).

---

[62] There are important exceptions to this rule, but none of them has any application here. *See generally* Eugene Volokh, *When Are Lies Constitutionally Protected?*, Knight First Amend. Inst. (Oct. 19, 2022), https://perma.cc/4PWU-FWUT.

Even if Congress's viewpoint-discriminatory motives are not independently fatal to the ban, its data privacy justifications fail on their own terms.[63] This is because, while the government may have a substantial interest in protecting Americans' privacy, far less restrictive alternatives are available for that purpose. For example, the government could pass comprehensive privacy laws to regulate the collection, transfer, and misuse of Americans' personal information—including, but not limited to, its potential misuse by China. Unlike banning TikTok, such measures would address privacy concerns directly and would do so without restricting Americans' access to a popular medium of expression. That the government could satisfy its aims in this way makes clear that a "substantial portion of the burden on speech" imposed by banning TikTok does nothing to "advance [the government's data privacy] goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

Indeed, courts frequently invalidate "total ban[s]" on a particular form of expressive activity for precisely this reason. *See Ward*, 491 U.S. at 799 n.7 (citing *Martin*, 319 U.S. 141); *City of Ladue*, 512 U.S. at 55 (collecting cases). It is the "essence of narrow tailoring" that a restriction actually "focus[] on the source of the

---

[63] The government has offered no evidence—much less the "substantial evidence" required—that the Chinese government has a "real, not merely conjectural" ability to access data collected by TikTok or to exercise control over the platform. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666, 664 (1994). In light of those deficits, the danger the government asserts is speculative. But even accepting the danger as real, the government's intervention cannot withstand scrutiny for the reasons discussed below.

evils the [government] seeks to eliminate," and not "suppress a great quantity of speech that does not [itself] cause th[ose] evils." *Ward*, 491 U.S. at 799 n.7. In this case, the "evil[]" the government seeks to address is the dissemination and use of Americans' personal information. This stems from platforms' data collection practices, not the expressive aspects of online communications. Therefore, just as a total ban on handbilling is plainly overbroad in relation to the problems of "fraud, crime, litter, traffic congestion, or noise" that could result from it, so too a total ban on TikTok is "substantially broader than necessary to achieve the interests justifying it." *Id.* (citing *Martin*, 319 U.S. at 145–46); *see also Alario v. Knudsen*, No. CV 23-56-M-DWM, 2023 WL 8270811, at *10 (D. Mont. Nov. 30, 2023) (observing that, in attempting to ban TikTok, the Montana "[l]egislature used an axe to solve its professed concerns when it should have used a constitutional scalpel").

Notably, Congress has already recognized that it is possible to further data privacy aims directly and without resorting to the suppression of vast amounts of protected speech. In the same omnibus legislation as the TikTok ban, Congress passed another law that prohibits data brokers from transferring "personally identifiable sensitive data" to designated foreign adversaries, including China.[64]

---

[64] Protecting Americans' Data from Foreign Adversary Controlled Applications Act of 2024, Pub. L. No. 118-50, Div. I, § 2(a).

Congress could build on that law—without restricting speech—by limiting the collection and transfer of personal data by online platforms such as TikTok.

The Act is not narrowly tailored because there is no evidence that the government's interest in protecting data privacy would be "achieved less effectively absent the regulation," *Ward*, 491 U.S. at 799 (citation omitted), and because less intrusive measures would actually serve that interest better. Under these circumstances, there is no constitutionally adequate justification for abridging Americans' First Amendment rights.

### Conclusion

For the reasons outlined above, amici respectfully urge the Court to grant the relief requested by Petitioners.


June 27, 2024                                    Respectfully submitted,

                                                 /s/ *Jameel Jaffer*
                                                 Jameel Jaffer
                                                 Hannah Vester
                                                 Eric Columbus
                                                 Ramya Krishnan
                                                 Xiangnong Wang
                                                 Knight First Amendment Institute at
                                                     Columbia University
                                                 475 Riverside Drive, Suite 302
                                                 New York, NY 10115
                                                 (646) 745-8500
                                                 jameel.jaffer@knightcolumbia.org

                                                 *Counsel for Amici Curiae*

**Certificate of Compliance**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,461 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: June 27, 2024          /s/ *Jameel Jaffer*          
Jameel Jaffer
Knight First Amendment Institute at
  Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
jameel.jaffer@knightcolumbia.org

*Counsel for Amici Curiae*