# United States Court of Appeals for the District of Columbia Circuit

### No. 24-1113

#### (and Consolidated Cases 24-1130 & 24-1183)

TIKTOK INC. and BYTEDANCE LTD.,

*Petitioners,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

*(For Continuation of Caption See Inside Cover)*

*On Petition for Review of Constitutionality of the Protecting
Americans from Foreign Adversary Controlled Applications Act*

## BRIEF OF *AMICUS CURIAE* HUNGRYPANDA US, INC.
## IN SUPPORT OF PETITIONERS

EDWARD ANDREW PALTZIK
SERGE KRIMNUS
MEREDITH LLOYD
Bochner PLLC
1040 Avenue of the Americas,
15th Floor
New York, NY 10018
(516) 526-0341
edward@bochner.law

*Counsel for Amicus Curiae*

June 27, 2024

 (800) 4-APPEAL • (130076)

BRIAN FIREBAUGH, *et al.*,

*Petitioners,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

---

BASED POLITICS INC.,

*Petitioner,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

**CERTIFICATE AS TO THE PARTIES, RULINGS, RELATED CASES, AND NEED FOR SEPARATE AMICUS BRIEF**

Pursuant to D.C. Circuit Rules 28(a)(1) and 29, counsel for Amicus Curiae HungryPanda U.S., Inc. ("HungryPanda") hereby certifies as follows:

**A. Parties and Amici.** The Parties to *TikTok, Inc. v. Garland*, No. 24-1113, are Petitioners TikTok, Inc. and ByteDance, Ltd and Respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. The Parties to *Firebaugh v. Garland*, No. 24-1130, are Brian Firebaugh, Chloe Joy Sexton, Talia Cadet, Timothy Martin, Kiera Spann, Paul Tran, Christopher Townsend, and Steven King (the "Creator Petitioners") and Respondent Garland, in his official capacity as Attorney General of the United States. The parties to *BASED Politics Inc., v. Garland*, No. 24-1183, are petitioner BASED Politics Inc. and Respondent Garland, in his official capacity as Attorney General of the United States.

**B. Ruling Under Review.** There is no ruling by a court under review. Pursuant to Sections 3(a) and 3(b) of the Protecting Americans From Foreign Adversary Controlled Applications Act ("PAFACA" or the "Act"), this Court has original and exclusive jurisdiction over any challenge to the constitutionality of the Act.

**C. Related Cases.** Counsel for HungryPanda is not aware of any other case pending before this or any other court that is related to this petition within the meaning of Circuit Rule 28(a)(1)(C).

**D.** A separate brief is necessary because HungryPanda US, Inc. is uniquely situated as the leading platform for Asian food delivery services and as one of the preeminent connectors of Chinese communities across the globe. Accordingly, no other amici can adequately represent HungryPanda's interests.

*/s/ Edward Andrew Paltzik*
Edward Andrew Paltzik

*Counsel for Amicus Curiae*

Dated: June 27, 2024

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, *amicus curiae* HungryPanda states that it is a corporation wholly owned by HungryPanda Ltd. No publicly held corporation has a 10% or greater ownership interest in HungryPanda US, Inc.

*/s/ Edward Andrew Paltzik*
Edward Andrew Paltzik

*Counsel for Amicus Curiae*

Dated: June 27, 2024

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO THE PARTIES, RULINGS, RELATED CASES, AND NEED FOR SEPARATE *AMICUS* BRIEF ............................................ i

DISCLOSURE STATEMENT ...................................................................... iii

TABLE OF CONTENTS ............................................................................... iv

TABLE OF AUTHORITIES ......................................................................... v

GLOSSARY .................................................................................................. viii

STATEMENT OF *AMICUS CURIAE* ......................................................... 1

SUMMARY OF ARGUMENT ..................................................................... 3

ARGUMENT ................................................................................................. 5

    I.     Equal Protection Analysis ............................................................ 5

    II.    Analogous Discriminatory Laws in American History ................. 7

    III.   Evidence of Discriminatory Purpose ......................................... 11

           A.    Statements Made During Testimony of TikTok's CEO Shou Chew ........................................................................ 11

           B.    Other Legislative Testimony ............................................... 14

           C.    Other Authorities ................................................................ 16

CONCLUSION ............................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adarand Constructors, Inc. v. Peña*,
   515 U.S. 200 (1995)........................................................5

*Alario v. Knudsen*,
   No. CV 23-56, 2023 WL 8270811 (D. Mont. Nov. 30, 2023),
   *appeal docketed*, No. 24-00034 (9th Cir. Jan. 3, 2024)......................17

*Bolling v. Sharpe*,
   347 U.S. 497 (1954)........................................................3

*Buckley v. Valeo*,
   424 U.S. 1 (1976)..........................................................4

*Detroit Bank v. United States*,
   317 U.S. 329 (1943)........................................................3

*Fisher v. University of Tex. at Austin*,
   570 U.S. 297 (2013)........................................................6

*Fong Yue Ting v. United States*,
   149 U.S. 698 (1893)...................................................... 7, 11

*Grutter v. Bollinger*,
   539 U.S. 306 (2003)........................................................6

*Hirabayashi v. United States*,
   320 U.S. 81 (1943).........................................................6

*Korematsu v. United States*,
   323 U.S. 214 (1944).................................................... 9, 10, 11

*Rice v. Cayetano*,
   528 U.S. 495 (2000)........................................................6

*Shen v. Simpson*,
   687 F. Supp. 3d 1219 (N.D. Fla. 2023), *appeal docketed*, No. 23-13737
   (11th Cir. Aug. 23, 2023)............................................... 18, 19

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023).......................................................5, 6

*The Chinese Exclusion Case*,
  130 U.S. 581 (1889)...................................................................7

*TikTok Inc. v. Trump*,
  490 F. Supp. 3d 73 (D.D.C. 2020)..........................................16

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ................................................... 9, 10

*U.S. WeChat Users All. v. Trump*,
  488 F. Supp. 3d 912 (N.D. Cal. 2020) ....................................18

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977)...............................................................6, 7

*Washington v. Davis*,
  426 U.S. 229 (1976).................................................................3

*Weinberger v. Wiesenfeld*,
  420 U.S. 636 (1975).................................................................4

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886).............................................................5, 9

**Statutes & Other Authorities:**

U.S. Const., Amend. I ................................................................18

U.S. Const., Amend. V ...................................................... 3, 4, 5

U.S. Const., Amend. XIV .......................................................3, 4

50 App. U.S.C. § 1989a .............................................................10

Chinese Exclusion Repeal Act, ch. 344, 57 Stat. 600 (1943)....................9

Executive Order 13943 .............................................................18

Fla. Stat. § 692.201(4)(d)...........................................................18

H. Res. 683, 112th Cong. (2012) .......................................... 9, 10

H.R. 815, Div. H, 118th Cong., Pub. L. No. 118-50 (Apr. 24, 2024) ......................3

James Q. Whitman, *Hitler's American Model: The United States and the
  Making of Nazi Race Law* (Princeton Univ. Press 2017) ......................8

*National Security (Executive Session)*, 118th Cong. 13 ..........................15

Press Release, Marco Rubio, *Rubio, Gallagher Introduce Bipartisan Legislation to Ban TikTok* (Dec. 13, 2022) ...........................................................15

Press Release, Mike Gallagher, Chairman, House Committee on the Chinese Communist Party, *Response to TikTok Intimidation Campaign Against U.S. Users* (Mar. 7, 2024) ........................................................................................14

Pub. L. No. 47-126, 22 Stat. 58 ................................................................7

Pub. L. No. 68-139, ch. 190, 43 Stat. 153 ...............................................8

Pub. L. No. 118-50 .....................................................................................3

S.B. 419 ............................................................................................. 16, 17

*Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party*, 117th Cong. H121 ................................ 15-16

*Tik Tok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms Before the H. Comm. On Energy and Commerce*, 118th Cong. 13 ......................................... 11, 12, 13, 14

William E. Scheuerman, *Legal Indeterminacy and the Origins of Nazi Legal Thought: The Case of Carl Schmitt*, 17 Hist. of Political Thought 571 (1996) ............................................................................8

# GLOSSARY

CCP                              Chinese Communist Party

PAFACA                           The Protecting Americans from
                                 Foreign Adversary Controlled
                                 Applications Act

PRC                              People's Republic of China

## STATEMENT OF AMICUS CURIAE[1]

**HungryPanda** provides online Asian food delivery platform. Founded in 2017, HungryPanda is a platform that connects Chinese communities across the globe to lifestyle services, including delivery of fresh Chinese food. HungryPanda markets its services through the TikTok social media platform ("TikTok") at issue in this case. Amicus Curiae has an intense interest in this case due to Congress's unfounded perception that TikTok, and by extension HungryPanda and other companies that market through TikTok, have an affiliation with the People's Republic of China ("PRC" and its ruling party, the Chinese Communist Party ("CCP")). This discriminatory perception led Congress to enact the legislation at issue—the Foreign Adversary Controlled Applications Act. This legislation will have an enormous deleterious impact on HungryPanda's business—since its marketing efforts occur via TikTok—and paves the way for future unlawful and discriminatory bans of companies who may be perceived to be associated with China. In addition to its ties to TikTok, HungryPanda is especially at risk of being banned for discriminatory reasons because its primary audience consists of Chinese individuals who reside outside of China. The rights of HungryPanda and all other

---

[1] All parties have consented to the filing of this brief. No counsel for any party authored the brief in whole or in part. Only amicus curiae funded its preparation and submission.

companies that serve Chinese communities are at stake here, and therefore this is a matter of great significance across numerous industries.

Under PAFACA, unless Petitioners TikTok Inc. and ByteDance Ltd. divest their interests in the popular social media application (platform) TikTok, the entire platform will be banned in the United States. H.R. 815, Div. H, 118th Cong., Pub. L. No. 118-50 (Apr. 24, 2024). The Act was passed to serve an expressly discriminatory purpose—to ban an entire online platform based on the mere perception of control by a foreign nation and its ruling party, specifically the PRC and the CCP. The Act violates the Equal Protection guarantees afforded by the Fifth Amendment to the Constitution of the United States.

The Fifth Amendment, which applies to the federal government, "does not contain an equal protection clause as does the Fourteenth Amendment which applies only to the states." *Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954). However, the Equal Protection Clause of the Fourteenth Amendment applies to the federal government through the Due Process Clause of the Fifth Amendment, which prohibits the United States from invidiously discriminating against individuals or groups. *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)). The Supreme Court has repeatedly recognized that "discriminatory legislation may be so arbitrary and injurious in character as to violate the due process clause of the Fifth Amendment." *Detroit Bank v. United States*, 317 U.S. 329, 338 (1943). Thus, "equal protection analysis in the Fifth

Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976); *see also Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) ("This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.").

Throughout history, the United States government has made many attempts to target and discriminate against Asian individuals and entities. *See infra* Section II. Often justified by pretextual military necessity or a determination that allowing Asian individuals and entities to enjoy full constitutional rights poses a national security risk, these acts of discrimination have been overruled and apologized for in recent years. *Id.*

The Act is discriminatory on its face as it targets entities based solely on the basis of their national origin. TikTok, as a platform, is operated by global entities—Tik Tok Inc. and ByteDance Ltd.—that happen to have Chinese roots. The platform has diverse user demographics and its user base spans across the globe. The Act unfairly singles out TikTok for adverse treatment without a justification sufficient to pass constitutional muster. In fact, the many discriminatory statements, comments, and questions made by members of Congress in support of the Act demonstrate that the Act was substantially motivated by the national origin of TikTok in violation of the Equal Protection guarantees of the Fifth Amendment to

the U.S. Constitution. These statements echo the reasoning behind discriminatory actions throughout history that unfairly targeted Asian Americans due to their national origin.

Upon examination of analogous discriminatory regulations throughout United States history and consideration of PAFACA's legislative record, it is clear that the Act was largely motivated by an invidious discriminatory purpose in violation of the Fifth Amendment. Accordingly, this Court should intervene and prevent the anti-Chinese animus of legislators from banning TikTok on the basis of its national origin.

## ARGUMENT

### I.  Equal Protection Analysis

The Supreme Court has long held that the Equal Protection guarantees afforded by the Constitution apply "without regard to any differences of race, of color, or of nationality." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). Any exception to the Constitution's demand for Equal Protection must survive "strict scrutiny." *Adarand Constructors, Inc.* v. *Peña*, 515 U.S. 200, 227 (1995). Under that standard, courts first ask whether the classification is used to "further compelling governmental interests." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206-07 (2023) (internal citation omitted). "[O]nly those measures the State must take to provide a bulwark against anarchy, or to

prevent violence, will constitute a pressing public necessity' sufficient to satisfy strict scrutiny today." *Id.* at 252 (Thomas, J., concurring) (citing *Grutter v. Bollinger*, 539 U.S. 306, 353 (2003) (Thomas, J., concurring)). If a compelling government interest is found, Courts must then ask whether the government's use of national origin is "narrowly tailored"—meaning "necessary"—to achieve that interest. *Fair Admissions*, 600 U.S. at 185 (citing *Fisher v. University of Tex. at Austin*, 570 U.S. 297, 311–312 (2013).

Challenges to official action for violation of the Equal Protection Clause require proof that a "discriminatory intent or purpose" served as "a motivating factor in the decision" or law being challenged. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66 (1977). The Supreme Court has held that "'[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Fair Admissions*, 600 U.S. at 208 (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000); *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). "That principle cannot be overridden *except in the most extraordinary case.*" *Id.* (emphasis added).

In determining whether a government action is sufficiently justified, "[t]he legislative or administrative history may be highly relevant, *especially where there are contemporary statements by members of the decisionmaking body*, minutes of

its meetings, or reports." *Arlington Heights*, 429 U.S. at 268. (internal citation omitted) (emphasis added). This brief details some of the many government actions that discriminated on the basis of Asian national origin, recounts the reasoning that was cited in support of those actions, and highlights the statements made by numerous members of Congress expressing an improper discriminatory motive behind the Act.

## II.    Analogous Discriminatory Laws in American History

The Chinese Exclusion Act of 1882 was one of the earliest examples of explicitly anti-Chinese legislation in American history. This law prohibited Chinese laborers from entry to the United States because "in the Opinion of the Government of the United States the coming of Chinese laborers to this Country endangers the good order of certain localities within the territory thereof." Pub. L. No. 47-126, 22 Stat. 58. Upheld twice by the Supreme Court, the Chinese Exclusion Act became a cornerstone for legislation that discriminated on the basis of national origin. *See The Chinese Exclusion Case*, 130 U.S. 581, 609 (1889) (disregarding the law's violation of existing treaties because "[w]hatever license . . . Chinese laborers may have obtained . . . is held at the will of the government, revocable at any time, at its pleasure" and citing the fact that Chinese laborers were in competition with non-immigrant artisans, mechanics, and laborers as justification for their categorical exclusion); *Fong Yue Ting v. United States*, 149 U.S. 698, 724 (1893) (describing

Chinese laborers as "aliens, having taken no steps towards becoming citizens, and incapable of becoming such under the naturalization laws" who "therefore remain subject to the power of Congress to expel them . . . from the country, whenever, in its judgment, their removal is necessary or expedient for the public interest").

Following the Chinese Exclusion Act, Congress passed the National Origins Act in 1924, which banned immigration from Asian countries while allowing immigration from Europe. *See* Immigration Act of 1924, Pub. L. No. 68-139, ch. 190, 43 Stat. 153. The Immigration Act of 1924 made clear its discriminatory animus towards people of Asian national origin including China, Japan, and the "Asiatic Barred Zone." *Id.* The National Origins Act was praised by none other than Adolf Hitler in 1928, who applauded its exclusion of "strangers from the blood." William E. Scheuerman, *Legal Indeterminacy and the Origins of Nazi Legal Thought: The Case of Carl Schmitt*, 17 Hist. of Political Thought 571 (1996). Additionally, leading Nazi scholars wrote that changes to America's immigration policies in 1924 "represent[ed] a carefully thought-through system that protects . . . the United States from the eugenic point of view against inferior elements trying to immigrate." *Id.; see also* James Q. Whitman, *Hitler's American Model: The United States and the Making of Nazi Race* Law (Princeton Univ. Press 2017) ("Nazi lawyers regarded America, not without reason, as the innovative world leader in the creation of racist law.").

However, as attitudes towards racial and national origin-based discrimination shifted throughout history, the legal framework followed suit. In *Yick Wo v. Hopkins*, decided merely four years after the Chinese Exclusion Act became law, the Supreme Court famously invalidated an ordinance on the basis that it discriminated against Chinese individuals in San Francisco. 118 U.S. 356 (1886).

Further progress was made when the Chinese Exclusion Act was repealed in 1943. Chinese Exclusion Repeal Act, ch. 344, 57 Stat. 600 (1943). However, one year later, the Supreme Court held in *Korematsu v. United States* that the need to protect against espionage by Japan outweighed the rights of Americans who were of Japanese national origin. 323 U.S. 214 (1944), *abrogated by Trump v. Hawaii*, 585 U.S. 667, 710 (2018). *Korematsu* cited national security concerns in its justification of internment of individuals from Japan, and specifically found that these individuals were "excluded because we are at war with the Japanese Empire," depriving individuals of their most basic rights with a plea of military necessity. *Korematsu*, 313 U.S. at 223.

Continuing its practice of attempting to right historical wrongs committed against Asian Americans because of their national origin, on June 18, 2012, the House of Representatives passed H. Res. 683, a bipartisan resolution formally apologizing for the Chinese Exclusion Act and other legislation that discriminated against people of Chinese origin in the United States and expressing the regret of the

House of Representatives for the passage of laws that adversely affected the Chinese population in the United States, including the Chinese Exclusion Act, H.R. Res. 683, 112th Cong. (2012).

Widely regarded as one of the worst decisions in the Supreme Court's history, the Supreme Court recently made clear that "Korematsu was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—has no place in law under the Constitution." *Trump*, 585 U.S. at 710 (internal quotations and citation omitted). Further, as observed by the dissenting Justices in *Trump*, "[i]n the intervening years since *Korematsu*, our Nation has done much to leave its sordid legacy behind." 585 U.S. at 754 (Sotomayor, J., dissenting). Indeed, the Civil Liberties Act of 1988 granted reparations to Japanese Americans who had been wrongly interned by the government as upheld in *Korematsu*, acknowledged that restrictions of "fundamental violations of basic civil liberties and constitutional rights" were "motivated largely by racial prejudice, wartime hysteria, and a failure of political leadership." 50 App. U.S.C. § 1989a.

As this brief explores, PAFACA reverses many of the efforts taken to leave government action that discriminates against Asian national origin in the past. As demonstrated by the many statements by legislators that claim to be concerned with national security, the Act is clearly intended to target a popular online platform on the basis of its Chinese national origin.

### III. Evidence of Discriminatory Purpose

### A. Statements Made During Testimony of TikTok's CEO Shou Chew

On March 23, 2023, Shou Chew, CEO of Tik Tok Inc., testified before Congress on three topics: TikTok's consumer privacy and data practices, its impact on children, and its relationship with the PRC and CCP. *See, e.g.*, *Tik Tok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms Before the H. Comm. On Energy and Commerce*, 118th Cong. 13 ("*TikTok Testimony*"[2]). During his testimony, many members of Congress expressed the concern that "Tiktok surveils us all, and the Chinese Communist Party is able to use this as a tool to manipulate America as a whole." *TikTok Testimony* at 2 (statement of Rep. Cathy McMorris Rodgers). This concern over imagined harm posed by foreigners was exactly the reasoning employed by the Supreme Court when it upheld the Chinese Exclusion Act in *Fong Yue Ting* and when it upheld internment camps for people of Japanese ancestry in *Korematsu*. 149 U.S. at 724; 323 U.S. at 214.

Much of the discriminatory commentary from members of Congress stemmed from their skepticism that TikTok will ever embrace American values, freedom,

---

[2] A full transcript of the hearing is available at https://www.congress.gov/118/chrg/CHRG-118hhrg53839/CHRG-118hhrg53839.pdf, and a video is available at https://energycommerce.house.gov/events/full-committee-hearing-tik-tok-how-congress-can-safeguard-american-data-privacy-and-protect-children-from-online-harms

human rights, and innovation. Rep. Rogers made her views unequivocally clear, speaking to "the American people watching today: hear this, *TikTok is a weapon by the Chinese Communist Party to spy on you, manipulate what you see and exploit for future generations.*" *TikTok Testimony* at 26 (statement of Rep. Cathy McMorris Rogers) (emphasis added).

During Mr. Chew's testimony before the House Energy and Commerce Committee, Representative Frank Pallone stated that "National security experts are sounding the alarm warning that the Chinese communist government could require TikTok to compromise device security, maliciously access American user data, *promote pro-communist propaganda* and undermine American interests. Disinformation campaigns could be launched . . . by the Chinese Communist government through TikTok, which has already become rife with misinformation and disinformation illegal activities and hate speech." *Id.* at 8 (statement of Rep. Frank Pallone) (emphasis added).

Some representatives went so far as to inform Mr. Chew that "*there are those on this committee, including myself, who believe that the Chinese Communist Party is engaged in psychological warfare through TikTok to deliberately influence US children.*" *Id.* at 58 (statement of Rep. Earl Carter) (emphasis added). Others advised Mr. Chew of their disbelief in his testimony that TikTok "do[es] not remove, record, or censor certain content on behalf of the Chinese Government." *Id.* at 71. (statement

of Shou Chew), describing TikTok as "a cancer" and comparing it to "fentanyl, another Chinese export which causes addiction and death." *Id.* (statement of Rep. Neal Dunn).

At this same hearing, several legislators made a point to raise the distinctions between American values and the interests of the CCP to justify PACAFA. Representative Bob Latta, for example, stated that "*[u]nlike the Chinese Communist Party, the United States believes in individual freedom, innovation and entrepreneurship*." *TikTok Testimony* at 31 (statement of Rep. Bob Latta). He then continued to share his opinion that because Mr. Chew posted a TikTok video asking American users to mobilize in support of the application and oppose the potential U.S. government action to ban TikTok in the United States, "based on the established relationship between your company and the Chinese Communist Party," it was "impossible for [him] to conclude that the video is anything different than the type of propaganda the CCP requires Chinese companies to push on its citizens now." *Id.* These statements are plainly contradictory, lauding the individual freedoms afforded in the United States while at the same time proposing that those same freedoms be restricted on the basis of TikTok's national origin.

As Rep. Dan Crenshaw made abundantly clear, "[w]e all know that that means [TikTok] could, if it desired to use this data to influence narratives and trends, create misinformation campaigns, encourage self-destructive behavior, purposefully allow

drug cartels to communicate freely and organize human and drug trafficking. **Now, to be fair, all social media companies could do that. But here's the difference. It is only TikTok that is controlled by the Chinese Communist Party**." *Id.* at 117 (statement of Rep. Dan Crenshaw) (emphasis added). Representative Crenshaw continued on, detailing that "the principal is foreign adversary control of an app" and opening the "debate [over] what companies fall over/under that threshold." *Id.* As reflected here, legislators largely believe that solely because an application originated in China, it must be completely and entirely disallowed from operating within the United States.

## B. Other Legislative Testimony

Although Congressional questioning of Shou Chew opens a window into the motivations behind PACAFA, this is far from the only legislative record related to TikTok. In a press conference on March 7, 2024, Representative Mike Gallagher, a co-sponsor of the Act as introduced to the House of Representatives, explained that "we can't take the chance of having a dominant news platform in America controlled or owned by a company that is beholden to the Chinese Communist Party, our foremost adversary."[3] Senator Marco Rubio, for his part, offered, "[w]e know

---

[3] Press Release, Mike Gallagher, Chairman, House Committee on the Chinese Communist Party, *Response to TikTok Intimidation Campaign Against U.S. Users* (Mar. 7, 2024), https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-

[TikTok] answers to the People's Republic of China. There is no more time to waste on meaningless negotiations with a CCP-puppet company. It is time to ban Beijing-controlled TikTok for good." Press Release, Marco Rubio, *Rubio, Gallagher Introduce Bipartisan Legislation to Ban TikTok* (Dec. 13, 2022), https://www.rubio.senate.gov/rubio-gallagher-introduce-bipartisan-legislation-to-ban-tiktok/.

Still other legislators characterized TikTok as an agent of internet warfare, acting on behalf of the PRC. Senate Republican Leader Mitch McConnell described TikTok as "a tool of surveillance and propaganda" and further described it as "one of Beijing's favorite tools of coercion and espionage," pointing out that "everything is seen in China.") *National Security (Executive Session)*, 118th Cong. 13 (statement of Rep. Mitch Mcconnell), https://www.congress.gov/congressional-record/volume-170/issue-59/senate-section/article/S2631-7.[4] In a January 2023 committee meeting, it was alleged that "Chinese spy networks operate both on American soil and in cyberspace. And popular Chinese-owned apps like TikTok spread more propaganda and take massive amounts of Americans' personal data back to the Chinese Government." *Select Committee on the Strategic Competition Between the United*

---

document/3.7.24%20Transcript%20of%20Chairman%20Gallagher%E2%80%99s%20Press%20Conference%20Response%20to%20TikTok%20Intimidation%20Campaign%20Against%20U.S.%20Users.pdf.

[4] Also available in video format at https://www.youtube.com/watch?v=3VwE5CqFwFo.

*States and the Chinese Communist Party*, 117th Cong. H121 (statement of Rep. Tom Cole), https://www.congress.gov/118/crec/2023/01/10 /169/8/CREC-2023-01-10-pt1-PgH121-6.pdf.

As demonstrated by these statements, Congress is generally unconcerned with the fact that a social media platform is collecting user data. Their concern stems **only** from the national origin of the company collecting such data. Justified only by a pretextual national security concern, this targeted anti-Chinese rhetoric revitalizes the Nineteenth century surge of regulation that limited Chinese participation in a burgeoning American industry by restricting the rights of certain groups solely on the basis of national origin.

### C. Other Authorities

As acknowledged by courts in this Circuit, the justification behind the Act is to "protect the national security by preventing China from accessing that data and skewing content." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 83 (D.D.C. 2020). However, as shown above, legislators only seek to prevent *Chinese* companies from accessing American users' data.

States have similarly acted to restrict the ability of only Chinese applications to operate within their boundaries. Montana enacted S.B. 419, which bans TikTok from the state of Montana and imposes a $10,000 penalty on either TikTok or a mobile application store for "each time that a user accesses TikTok, is offered the

ability to access TikTok, or is offered the ability to download TikTok." *Alario v. Knudsen*, No. CV 23-56, 2023 WL 8270811 (D. Mont. Nov. 30, 2023), *appeal docketed*, No. 24-00034 (9th Cir. Jan. 3, 2024) (internal citation omitted).[5] The preamble of S.B. 419 states that the Montana legislature banned TikTok because it "is a wholly owned subsidiary of ByteDance, a Chinese Corporation," and because "TikTok gathers significant information from its users, accessing data against their will to share with the People's Republic of China." *Id.* The District of Montana upheld the TikTok Ban, finding that SB 419 was necessary to prevent both the Chinese Communist Party **and** the People's Republic of China from "conducting corporate and international espionage." *Id.* (emphasis added). However, SB 419 explicitly allows for this same conduct so long as it is not driven by a Chinese company, stating that the statute "is void if TikTok is acquired by or sold to a company that is not incorporated in any other country designated as a foreign adversary." *Id.* With its TikTok Ban, Montana has joined the cacophony of government officials calling for the ban of an application entirely on the basis of its national origin.

The leap from pretextual national security concerns to government action that patently discriminates on the basis of national origin are not unique to TikTok. They

---

[5] The Ninth Circuit has stayed appellate proceedings pending resolution of the instant case by this Court. *Alario v. Knudsen*, No. 24-00034 (9th Cir. May 22, 2024), ECF No. 73.1.

extend to other applications from China. For example, WeChat, a popular messaging application, was the subject of recent litigation in the Northern District of California. *U.S. WeChat Users All. v. Trump*, 488 F. Supp. 3d 912, 926 (N.D. Cal. 2020). *WeChat* was a challenge to Executive Order 13943, which prohibited "transactions" relating to WeChat for the purpose of protecting national security because WeChat "threaten[ed] to allow the Chinese Communist Party access to Americans' personal and proprietary information." *Id.* at 921. The court granted a preliminary injunction against the government on First Amendment grounds and reiterated that "Free speech is the bedrock of American democracy. Our Founding Fathers protected this sacred right with the First Amendment to the Constitution. The freedom to express and debate ideas is the foundation for all of our rights as a free people." *Id.* (internal citation omitted).

Alarmingly, the bubbling anti-Chinese sentiment in the United States is not only reflected in the digital arena. In *Shen v. Simpson*, 687 F. Supp. 3d 1219 (N.D. Fla. 2023), *appeal docketed*, No. 23-13737 (11th Cir. Aug, 23, 2023), a Florida district court declined to enjoin the enforcement of a law that restricts land purchases by any "[f]oreign principal," which it defines to include anyone "who is domiciled in a foreign country of concern and is not a citizen or lawful permanent resident of the United States." *Id.* (citing Fla. Stat. § 692.201(4)(d)). It specifies the countries "of concern" are China, Russia, Iran, North Korea, and others. *Id.* at 1230.

Importantly, *Shen v. Simpson* declined to enjoin enforcement of the statute's imposition of additional restrictions that apply "only to foreign principals domiciled in China—not other 'countries of concern.'" *Id.* at 1230. Some courts are all too willing to accept statutes which plainly infringe the rights of certain groups on the basis of their national origin, even if they are not "narrowly tailored to achieve a compelling interest."

In sum, the legislative record clearly establishes that any national security concern is a pretext for discrimination on the basis of national origin. This Court should find that PAFACA contravenes the very principles on which this nation was founded.

## CONCLUSION

For the foregoing reasons, this Court should reject the government's attempt to turn back time and usher in a new era of national origin discrimination. This Court should strike down PAFACA as unconstitutional under the Due Process Clause of the Fifth Amendment.

Dated: June 27, 2024

Respectfully Submitted,
*/s/ Edward Andrew Paltzik*
EDWARD ANDREW PALTZIK
SERGE KRIMNUS
MEREDITH LLOYD
Bochner PLLC
1040 Avenue of the Americas,

15th Floor
New York , NY 10018
(516) 526-0341
edward@bochner.law

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1.      This amicus brief complies with the type-volume limitations set by the Court's order of May 28, 2024 because it contains 3,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this document was prepared on Microsoft Word in the proportionally-spaced 14-point typeface Times New Roman.

*/s/ Edward Andrew Paltzik*
EDWARD ANDREW PALTZIK

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June, 2024, I caused true and correct copies of the foregoing *Brief of Amicus Curiae HungryPanda US, Inc. in Support of Petitioners* to be served via electronic mail upon all counsel of record, via the Court's ECF system.

*/s/ Edward Andrew Paltzik*
EDWARD ANDREW PALTZIK
