# United States Court of Appeals for the District of Columbia Circuit

## No. 24-1113

### (and Consolidated Cases 24-1130 & 24-1183)

TIKTOK INC. and BYTEDANCE LTD.,

*Petitioners,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

*(For Continuation of Caption See Inside Cover)*

*On Petition for Review of Constitutionality of the Protecting
Americans from Foreign Adversary Controlled Applications Act*

## BRIEF OF *AMICI CURIAE* SOCIAL AND RACIAL JUSTICE COMMUNITY NONPROFITS IN SUPPORT OF PETITIONERS

MATT K. NGUYEN
   *Counsel of Record*
TRAVIS LEBLANC
ROBERT H. DENNISTON
COOLEY LLP
1299 Pennsylvania Avenue NW,
   Suite 700
Washington, DC 20004
(202) 842-7800
mnguyen@cooley.com
tleblanc@cooley.com
rdenniston@cooley.com

KATHLEEN R. HARTNETT
COOLEY LLP
Three Embarcadero Center, 20th Floor
San Francisco, California 94111
(415) 693-2000
khartnett@cooley.com

JAMIE D. ROBERTSON
COOLEY LLP
110 North Wacker Drive, Suite 4200
Chicago, Illinois 60606
(312) 881-6500
jdrobertson@cooley.com

*Counsel for Amici Curiae*

June 27, 2024



BRIAN FIREBAUGH, *et al.*,

*Petitioners,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

———————————————

BASED POLITICS INC.,

*Petitioner,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

## CIRCUIT RULE 29(D) STATEMENT

Amici certify they are not aware of any other amicus brief addressing the subject of this brief—in particular, representing social and racial justice community nonprofits who value TikTok as a unique platform for First Amendment-protected expression by diverse groups and who harbor grave concerns about anti-Asian animus undergirding the TikTok Ban. A separate brief is necessary to permit amici joining this brief to offer their perspectives on the issues before the Court.

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), amici certify as follows:

### (A) Parties and Amici.

The parties to *TikTok Inc. v. Garland*, No. 24-1113, are petitioners TikTok Inc. and ByteDance Ltd. ("TikTok Petitioners") and respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. The parties to the first consolidated case, *Firebaugh v. Garland*, No. 24-1130, are petitioners Brian Firebaugh, Chloe Joy Sexton, Talia Cadet, Timothy Martin, Kiera Spann, Paul Tran, Christopher Townsend, and Steven King ("Creator Petitioners") and respondent Merrick B. Garland, in his official capacity as Attorney General of the United

States.  The parties to the second consolidated case, *BASED Politics Inc. v. Garland*, No. 24-1183, are petitioner BASED Politics Inc. and respondent Merrick B. Garland, in his official capacity as Attorney General of the United States.

Aside from the parties above, and any amicus briefs filed prior to and after this one, amici include:  Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition, Asian American Federation, Asian Americans Advancing Justice Southern California, Calos Coalition, Hispanic Heritage Foundation, Muslim Public Affairs Council, Native Realities, OCA-Asian Pacific American Advocates of Greater Seattle, OCA-Asian Pacific American Advocates: San Francisco, OCA-Greater Philadelphia, Sadhana, Sikh Coalition, and South Asian Legal Defense Fund.

**(B) Orders Under Review.**

Petitioners and amici seek direct review of the constitutionality of the *Protecting Americans from Foreign Adversary Controlled Applications Act* ("PAFACA" or the "TikTok Ban"), H.R. 815, div. H, 118th Cong., Pub. L. 118-50 (Apr. 24, 2024), such that there are no prior rulings under review.

**(C) Related Cases.**

To the best of amici's knowledge, there are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, amici state that they have no parent corporations and that no publicly held entity owns ten percent (10%) or more of any amicus organization.

## STATEMENT OF AUTHORSHIP
## AND FINANCIAL CONTRIBUTIONS

Amici certify that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money intended to fund the preparation or submission of this brief, and no party or person—other than amici, or amici's counsel—contributed money intended to fund the preparation or submission of this brief.

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 29(D) STATEMENT ........................................................ i

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ................................................................. i

    (A)   Parties and Amici .................................................................... i

    (B)   Orders Under Review ............................................................. ii

    (C)   Related Cases ....................................................................... iii

CORPORATE DISCLOSURE STATEMENT ........................................ iii

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ............................................................................ iii

TABLE OF CONTENTS ........................................................................ iv

TABLE OF AUTHORITIES ................................................................... vi

GLOSSARY OF ABBREVIATIONS ....................................................... xiv

STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE .......................................... xv

SUMMARY OF ARGUMENT .................................................................. 1

    I.     ARGUMENT ......................................................................... 2

          A.   TikTok is a platform where 170 million U.S. users, especially those from marginalized groups, engage in protected expression ......................... 2

          B.   The TikTok Ban violates the First Amendment ......... 11

              i.    The TikTok Ban, by censoring an entire forum, constitutes a prior restraint on speech and publication ....................................... 11

              ii.   The TikTok Ban engages in naked content and viewpoint discrimination .............................. 14

iii. The TikTok Ban fails even intermediate
scrutiny ............................................................. 17

C. Compelling evidence reveals that the TikTok
Ban was driven by animus against persons of
AANHPI descent .......................................................... 19

i. Our nation's history of enacting "national
security" laws as pretext to discriminate
against minorities belies the
Government's claimed rationale for the
TikTok Ban ........................................................ 22

ii. Contemporaneous statements by Members
of Congress confirm that the TikTok Ban
was intended to demonize AANHPIs.................. 27

CONCLUSION ......................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) ...................................................................... 19

*Alario v. Knudsen,*
2023 WL 8270811 (D. Mont. Nov. 30, 2023) ............ 3, 11, 18, 21, 30

*Bolling v. Sharpe,*
347 U.S. 497 (1954) ...................................................................... 19

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
473 U.S. 432 (1985) ...................................................................... 21

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994) ........................................................................ 18

*City of Los Angeles v. Alameda Books, Inc.,*
535 U.S. 425 (2002) ...................................................................... 17

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) ...................................................................... 20

*DHS v. Regents of the Univ. of Cal.,*
591 U.S. 1 (2020) ..................................................................... 19, 21

*Haaland v. Brackeen,*
599 U.S. 255 (2023) ...................................................................... 10

*Hassan v. City of New York,*
804 F.3d 277 (3d Cir. 2015) .......................................................... 24

*Hirabayashi v. United States,*
320 U.S. 81 (1943) ........................................................................ 25

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
515 U.S. 557 (1995) ...................................................................... 11

*Iancu v. Brunetti,*
588 U.S. 388 (2019) ................................................................. 14, 16

*IMDb.com Inc. v. Becerra,*
962 F.3d 1111 (9th Cir. 2020) ...................................................... 14

vi

*Korematsu v. United States*,
    323 U.S. 214 (1944), *overruled by Trump v. Hawaii*, 585
    U.S. 667, 710 (2018) ............................................................ 23, 27

*Loving v. Virginia*,
    388 U.S. 1 (1967) ............................................................ 20

*McCraw v. City of Oklahoma City*,
    973 F.3d 1057 (10th Cir. 2020) ...................................... 17

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971) ........................................................ 12, 18

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ........................................................ 12

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ........................................................ 2, 5, 12

*Ping v. United States* ,
    130 U.S. 581 (1889) ........................................................ 22

*Police Dep't of City of Chi. v. Mosley*,
    408 U.S. 92 (1972) ........................................................ 14

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ...................................... 14, 15, 16, 17

*Recht v. Morrisey*,
    32 F.4th 398 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 527
    (2022) ............................................................................ 17, 18

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ........................................................ 12

*Shen v. Comm'r, Fla. Dep't of Agric.*,
    Order, No. 23-12737 (11th Cir. Feb. 1, 2024), ECF No. 59 .......... 30

*Skinner v. Ry. Labor Execs.' Ass'n*,
    489 U.S. 602 (1989) ........................................................ 26

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ........................................................ 23

*Turner Broad. Sys., Inc. v. FCC*,
    520 U.S. 180 (1997) ...................................................................... 17

*U.S. WeChat Users All. v. Trump*,
    488 F. Supp. 3d 912 (N.D. Cal. 2020) ...................................... 12, 13

*United States v. Windsor*,
    570 U.S. 744 (2013) ...................................................................... 21

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) .................................................. 19, 20, 22, 27

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ...................................................................... 27

*Yim v. City of Seattle*,
    63 F.4th 783 (9th Cir. 2023)......................................................... 18

**Constitutional Provisions, Statutes, & Executive Orders:**

U.S. Const. Amend. I .............................................. 1, 2, 10, 11, 12, 13, 14,
    ............................................................................ 16, 17, 18, 19, 20, 31

U.S. Const. Amend. V................................................................. 2, 19, 31

E.O. No. 13769 (2017)......................................................................... 24

E.O. No. 13780 (2017)......................................................................... 24

E.O. No. 9066 (1942).......................................................................... 23

PAFACA, H.R. 815, 118th Cong., Pub. L. 118-50
    (Apr. 24, 2024) .......................................................... 11, 14, 16

Pub. L. 47-126, 22 Stat. 58 (1882)...................................................... 22

Pub. L. 95-608, 92 Stat. 3069 (1978)................................................... 10

Pub. L. 100-383, 102 Stat. 903 ........................................................... 23

Pub. L. 107-56, 115 Stat. 272 (2001).................................................. 24

Fla. SB 264........................................................................................ 30

**Other Authorities:**

*AAJC Joins Letter Urging Social Media Platforms to Fight Disinformation in Advance of Upcoming Mid-Term Elections*, ADVANCING JUSTICE–ASIAN AMERICAN JUSTICE CENTER (May 17, 2022), https://advancingjustice-aajc.org/publication/advancing-justice-aajc-joins-letter-urging-social-media-platforms-fight-disinformation ..................... 15

Ali Vitali, *In His Words: Donald Trump on the Muslim Ban, Deportations,* NBC NEWS (June 27, 2016), https://nbcnews.com/politics/ 2016-election/his-words-donald-trump-muslim-ban-deportations-n599901 ........................ 24

AZ AANHPI (@azaanhpiforequity), TIKTOK (Feb. 28, 2024), https://tiktok.com/t/ZPRKWg12A ..................................... 4

AZ AANHPI (@azaanhpiforequity), TIKTOK (May 27, 2023), https://tiktok.com/t/ZPRKWxgwU ..................................... 4

Beezay Dad (@beezay22), TIKTOK (Oct. 10, 2023), https://tiktok.com/ @beezay22/video/7288493382459018539 .......... 9

Biden-Harris HQ (@bidenHQ), TIKTOK, https://tiktok.com/@bidenhq............................................ 26

Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, TRAVEL+LEISURE (Oct. 21, 2022), https://travelandleisure.com/culture-design/how-indigenous-creators-use-tiktok-to-share-their-cultures ................. 9

Denny Agassi, *The TikTok Ban Could Be a Huge Blow to the LGBT+ Community—Here's Why*, RECKON (Mar. 15, 2024), https://reckon.news/ lgbtq/2024/03/the-tiktok-ban-could-be-a-huge-blow-to-the-lgbt-community-heres-why.html ...................... 8

Donald Trump (@realdonaldtrump), TIKTOK, https://tiktok.com/@realdonaldtrump............................................ 26

Emily Schmall, *Women Talk Through Their Abortions on TikTok*, N.Y. TIMES (Apr. 17, 2024), https://nytimes.com/2024/04/17/us/politics/ abortion-tiktok-videos.html........................................................ 8

GovTrack (Apr. 23, 2024), https://govtrack.us/congress/votes/118-2024/s154 ....................................................................... 28

*How TikTok Became a Haven for the Queer and Questioning Youth of Today*, OK COOL, https://okcool.io/how-tiktok-became-a-haven-for-the-queer-and-questioning-youth-of-today ............................................................................ 9

H.R.Comm. on Energy & Com., PAFACA, H.R. Rep. No. 118-417 (2024) ......................................................................... 15

James Broughel, *TikTok Is a Beacon of Democracy in the Social Media Landscape*, FORBES (Apr. 19, 2024), https://forbes.com/sites/ jamesbroughel/2024/04/19/tiktok-is-a-beacon-of-democracy-in-the-social-media-hellscape/ ............... 5

Jeffrey Gottfried, *Americans' Social Media Use*, PEW (Jan. 31, 2024), https://pewresearch.org/internet/2024/01/31/americans-social-media-use/ .......................................................... 3

John Herrman, *TikTok Is Shaping Politics. But How?*, N.Y. TIMES (June 28, 2020), https://nytimes.com/2020/06/28/style/tiktok-teen-politics-gen-z.html ........................................................................ 3

*Legislation to Protect American Data and National Security from Foreign Adversaries: Hearing Before the Comm. on Energy and Commerce*, 118th Cong. (2024), https://congress.gov/118/chrg/CHRG-118hhrg55083/CHRG-118hhrg55083.pdf ........................................................ 16, 29

Letter from Rep. Grace Meng et al., to Chuck Schumer, Majority Leader, et al. (Jan. 22, 2024), https://meng.house.gov/sites/evo-subsites/meng.house.gov/ files/evo-media-document/china-initiative-letter_0.pdf ................. 25

Marah (@marah_snoubar), TIKTOK (Feb. 26, 2024), https://tiktok.com/@marah_snoubar/video/73399916273454 81006 ........................................................................... 7

Michael Wines, *Arizona Review of 2020 Vote Is Riddled with Flaws, Says Secretary of State*, N.Y. TIMES (Sep. 24, 2021), https://nytimes.com/2021/05/06/us/arizona-vote-count-republicans.html ............................................................................ 30

Monica Anderson et al., *Teens, Social Media and Technology 2023*, PEW (Dec. 11, 2023), https://pewresearch.org/internet/2023/12/11/teens-social-media-and-technology-2023/ ......................................................... 3

MPAC (@mpacntl), TIKTOK (May 22, 2024), https://tiktok.com/t/ZPRK7F9yM ..................................................................... 7

Nazita Lajevardi et al., *Biden Reverses Trump's 'Muslim ban.' Americans Support the Decision.*, WASH. POST (Jan. 27, 2021), https://washingtonpost.com/politics/2021/01/27/biden-reversed-trumps-muslim-ban-americans-support-that-decision/ ...................................................................... 24-25

NextShark (@nextshark), TIKTOK (Feb. 1, 2024), https://tiktok.com/@nextshark/video/7330815984284093727 ....... 28

Nicholas Wu & Daniella Diaz, *House Progressives Signal Opposition to TikTok Bill*, POLITICO (Mar. 12, 2024), https://politico.com/live-updates/2024/03/12/congress/progressives-oppose-tiktok-bill-00146549 ...................................... 30

Olayemi, *TikTok Ban: Impact on Muslim Society*, COVERMECUTEE BLOG (Apr. 29, 2024), https://covermecutee.com/blogs/news/tiktok-ban-impact-on-muslim-society ................................................................................. 6

Policy Statement, Tribal Consultation, DOJ (2022), https://www.justice.gov/d9/2022-12/doj-memorandum-tribal-consultation.pdf ............................................................... 9

Ryan Adamczeski & Ariel Messman-Rucker, *LGBTQ+ TikTokers: Banning App Will '"Eliminate" Online Communities & Activism (Exclusive)*, ADVOCATE (Mar. 15, 2024), https://advocate.com/exclusives/lgbtq-tiktok-ban-response ........................................................................................... 8

Ryan Lucas, *The Justice Department Is Ending Its Controversial China Initiative*, NPR (Feb. 23, 2022), https://npr.org/2022/02/23/1082593735/justice-department-china-initiative ............................................................... 25

Sahil Kapur, Frank Thorp V, & Kate Santaliz, *TikTok Ban's Fate Is Uncertain in the Senate, Where There Is Less Urgency to Act*, NBC NEWS (Mar. 14, 2024), https://nbcnews.com/politics/congress/tiktok-bans-fate-uncertain-senate-less-urgency-act-rcna143162 (quoting Sen. Rand Paul) ......................................................... 30

SikhColouring (@sikhcolouring), https://tiktok.com/@sikhcolouring/video/7160395432747633926 ............................................................................ 7

Suhanee Mitragotri, *How TikTok Has Helped Build Community Among AA+PIs*, JOYSAUCE (June 3, 2024), https://joysauce.com/how-tiktok-has-helped-build-community-among-aapis ................................................ 5

*The Blame Game, How Political Rhetoric Inflames Anti-Asian Scapegoating*, STOP AAPI HATE (Oct. 2022), https://stopaapihate.org/wp-content/uploads/2022/10/Stop-AAPI-Hate-Scapegoating-Report.pdf ........................... 26

TIKTOK, https://tiktok.com/discover/icwa-videos ................................... 9

TIKTOK, https://tiktok.com/discover/indigenous-mental-health .............. 9

TIKTOK, https://tiktok.com/discover/stop-muslim-hating ....................... 7

TIKTOK, https://tiktok.com/tag/stopasianhate ......................................... 7

*TikTok: Connecting and Bridging Gaps Between Religious Youth of All Faiths*, HARTFORD INTERNATIONAL UNIVERSITY: BLOG (May 14, 2021), https://blog.hartfordinternational.edu/2021/05/14/building-interfaith-understanding-among-religious-youth-through-tiktok/ ............................................................................. 6

*TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms: Hearing before the H. Comm. on Energy and Commerce*, 118th Cong. (2023), https://www.congress.gov/118/chrg/CHRG-118hhrg53839/CHRG-118hhrg53839.pdf ............................................... 29

Wagon Burner (@oodhamboiii), TɪᴋTᴏᴋ (Feb. 23, 2023), https://tiktok.com/@oodhamboiii/video/7203470025469021482 ........................................................................................ 10

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| AAF | Asian American Federation |
| AJSOCAL | Asian Americans Advancing Justice Southern California |
| AZ AANHPI | Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition |
| CCP | Chinese Communist Party |
| HHF | Hispanic Heritage Foundation |
| ICWA | Indian Child Welfare Act of 1978 |
| MPAC | Muslim Public Affairs Council |
| PAFACA or TikTok Ban | Protecting Americans from Foreign Adversary Controlled Applications Act |
| SA LDF | South Asian Legal Defense Fund |

## STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

Amici curiae Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition, Asian American Federation, Asian Americans Advancing Justice Southern California, Calos Coalition, Hispanic Heritage Foundation, Muslim Public Affairs Council, Native Realities, OCA-Asian Pacific American Advocates of Greater Seattle, OCA-Asian Pacific American Advocates: San Francisco, OCA-Greater Philadelphia, Sadhana, Sikh Coalition, and South Asian Legal Defense Fund (collectively, "amici") file this brief in support of the TikTok Petitioners and Creator Petitioners (collectively, "Petitioners"). All parties have consented to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2); D.C. Cir. Rule 29(a)(2).

Amici are grassroots social and racial justice nonprofits. Many amici rely on TikTok as an important social media platform for fostering solidarity and engagement in and among marginalized groups; educating, building awareness, and disseminating news affecting these groups; dismantling biases, discrimination, and dehumanization involving race, ethnicity, gender/sexual orientation, immigration status, and religion; challenging falsehoods and disinformation; freely practicing their faith;

organizing politically to bolster democracy; and promoting laws, policies, and practices that advance civil liberties and freedoms for all. All amici represent communities that use TikTok for these purposes.

**Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition** ("AZ AANHPI"), a nonprofit, strives for equity and justice by building community power through organizing, civic engagement, and youth empowerment. AZ AANHPI and its members use TikTok to engage with Asian American Native Hawaiian and Pacific Islander ("AANHPI") youth and amplify AANHPI voices, values, and concerns in Arizona and across the United States.

**Asian Americans Advancing Justice Southern California** ("AJSOCAL") is the nation's largest legal and civil rights organization for AANHPIs. Through community outreach, advocacy, and litigation, AJSOCAL works to advance civil and human rights for AANHPI communities, and to promote a fair and equitable society for all. Consistent with its work, AJSOCAL has an interest in ensuring that the Government does not use national security concerns to trample the constitutional rights of AANHPIs and other Americans.

The **Asian American Federation** ("AAF") is a New York-based nonprofit dedicated to raising the influence and wellbeing of AANHPIs through research, policy advocacy, public awareness, and organizational development. Since its 1989 founding, AAF has become a beacon of leadership for over 70 member organizations and 1.5 million Asian New Yorkers. In 2020, AAF launched its Hope Against Hate campaign to combat anti-AANHPI violence. AAF has an interest in fighting policies and rhetoric that contribute to violence and discrimination against the AANHPI community.

The **Calos Coalition** ("Calos") is a nonprofit dedicated to uplifting the trans community and denouncing genocidal rhetoric. Calos seeks to leverage initiatives and platforms like TikTok to showcase trans joy, positivity, and excellence, knowing that trans joy can conqueror hate.

The **Hispanic Heritage Foundation** ("HHF"), a nonprofit established in 1987, works to empower Latinos in six areas of focus: education, workforce, social impact, justice, culture, and leadership. HHF has amplified the voices of tens of millions of Latinos in the United States and Latin America through agile, creative, impactful, high-profile, and

innovative programming—including, for example, by using TikTok to up-lift Latino small business owners.

The **Muslim Public Affairs Council** ("MPAC"), a nonprofit, has worked since its 1988 founding to enhance American pluralism, improve understanding of American Muslims, and speak out on policies that affect American Muslims and other marginalized groups. MPAC and its members use TikTok to elevate more nuanced portrayals of Muslims in America and to collaborate with other diverse communities to encourage civic responsibility and preserve America's democratic ideals as enshrined in the U.S. Constitution.

**Native Realities**, a fiscally-sponsored nonprofit, seeks to inspire Indigenous youth and communities through pop culture media, innovative experiences, and culturally dynamic programming. Native Realities believes that culturally-engaged creativity and imagination promote socioemotional health and wellbeing and positive representation.

**OCA-Asian Pacific American Advocates of Greater Seattle**, a nonprofit founded in 1995, advances the social, political, and economic wellbeing of AANHPIs by advocating for social justice, equal opportunity, and fair treatment; promoting civil participation, education, and

leadership; advancing coalition-building and community-building; and fostering cultural heritage.

**OCA-Asian Pacific American Advocates: San Francisco**, a nonprofit founded in 1989, advances the social, political, and economic wellbeing of AANHPIs by advocating for social justice, equal opportunity, and fair treatment; promoting civil participation, education, and leadership; advancing coalition-building and community-building; and fostering cultural heritage in the San Francisco Bay Area.

**OCA-Greater Philadelphia**, a nonprofit, is dedicated to embracing the hopes and aspirations of AANHPIs and advocating on civil rights and AANHPI community issues in the Southeastern Pennsylvania area. It is a chapter of the national OCA-Asian American Advocates formed in 1973.

**Sadhana**, a grassroots nonprofit founded in 2011, advocates for the heart of Hinduism: *ekatva* (oneness of all), *ahimsa* (peace and nonviolence), and *seva* (commitment to service and struggles for justice). Sadhana uses social media to empower social justice-oriented Hindu Americans to speak up whenever justice is denied—with key priorities

including environmental justice, racial and economic justice, gender equity, immigrant rights, and anti-casteism.

The **Sikh Coalition** is the largest community nonprofit working to protect Sikh civil rights across the United States. The Coalition's goal is working towards a world where Sikhs, and other religious minorities in America, may freely practice their faith without bias and discrimination. Since its inception, the Sikh Coalition has worked to defend civil rights and liberties for all, empower the Sikh community, create an environment where Sikhs can lead a dignified life unhindered by bias or discrimination, and educate the broader community about Sikhism.

The **South Asian Legal Defense Fund** ("SA LDF"), a nonprofit, uses the power of law, narrative, and community to defend and advance the full dignity and rights of South Asian people in America.

Although amici represent many different groups and causes, amici universally share the understanding that TikTok empowers diverse communities to engage in First Amendment-protected expression, which the TikTok Ban, in purpose and effect, threatens to suppress. Amici also harbor serious misgivings that the Government's purported rationale for censoring 170 million U.S. voices on TikTok arises from, and perpetuates,

our nation's history of weaponizing vague and unfounded national security concerns to demonize minorities. As nonprofits that care deeply about ensuring that TikTok remains a vibrant open platform for free expression for all—including, and especially, the diverse groups amici represent—amici have a strong interest in this Court holding that the TikTok Ban violates the First and Fifth Amendments.

## SUMMARY OF ARGUMENT

TikTok is a modern-day digital town square that empowers diverse communities, often neglected by traditional media outlets, to share their underrepresented voices with people across America and the world. Through TikTok's democratizing reach, amici and their diverse communities build solidarity, reach new audiences, challenge stereotypes and discrimination, and contribute to pressing conversations. In short, the diverse groups that amici represent value TikTok as a one-of-a-kind platform for free expression—speech, publication, petitioning, political activism, news dissemination, religious observance, and more.

In spite of this, PAFACA threatens to prohibit 170 million U.S. users from engaging in this protected expression. The TikTok Ban imposes an unprecedented prior restraint on free speech, silencing countless voices, while also discriminating on content and viewpoint. Even though such a heavy burden on the First Amendment must undergo strict scrutiny, the Government cannot even establish the TikTok Ban can survive intermediate scrutiny because any conceivable national security interest the law purports to advance is so ill-tailored to the mass censorship that Congress chose to enact.

In addition to violating the First Amendment, the TikTok Ban also casts aside the Constitution's equal protection guarantees by building on a long history of federal laws that trample on the rights of AANHPI and marginalized groups using national security as pretext. As remarks by Members of Congress clearly demonstrate, anti-AANHPI stereotypes and animus pervaded legislative consideration of the TikTok Ban every step of the way. Accordingly, the TikTok Ban must be enjoined for its contempt of the First Amendment and equal protection under the law.

## I. ARGUMENT

### A. TikTok is a platform where 170 million U.S. users, especially those from marginalized groups, engage in protected expression.

In today's digital age, "'vast democratic forums on the Internet' in general, ... and social media in particular," represent many of the "most important places ... for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (citation omitted). TikTok functions as a modern-day town square accessed by 170 million U.S. users for "a wide array of protected First Amendment activity" reaching all corners of the globe. *Id.* at 105. As Creator Petitioners aptly described, U.S. users rely on TikTok to "express themselves, learn, advocate for causes, share

opinions, create communities, and even make a living. … TikTok provides them a unique and irreplaceable means to express themselves and form community." Creators Pet. ¶ 1.

This reality rings true for amici and the diverse communities they represent. TikTok's most avid U.S. users include young and diverse people, with Pew surveys indicating that 63 percent of teens and 62 percent of adults under 30 use TikTok, and that people of color disproportionately use TikTok.[1] While these folks are often left out of the conversation by entrenched outlets, TikTok enables diverse users to engage in protected expression on a scale never before imagined possible. *See Alario v. Knudsen*, No. 23-56, 2023 WL 8270811, at *8 (D. Mont. Nov. 30, 2023) ("TikTok is not interchangeable with other social media applications.").

---

[1] Jeffrey Gottfried, *Americans' Social Media Use*, PEW (Jan. 31, 2024), https://pewresearch.org/internet/2024/01/31/americans-social-media-use/; Monica Anderson et al., *Teens, Social Media and Technology 2023*, PEW (Dec. 11, 2023), https://pewresearch.org/internet/2023/12/11/teens-social-media-and-technology-2023/; John Herrman, *TikTok Is Shaping Politics. But How?*, N.Y. TIMES (June 28, 2020), https://nytimes.com/2020/06/28/style/tiktok-teen-politics-gen-z.html (TikTok enables "millions of young Americans" to engage in "ideological formation" and "activism.").



*Figure 1: TikTok video by AZ AANHPI teaching about AANHPI history and discriminatory laws like the Chinese Exclusion Act.[2]*

TikTok, with over a billion users worldwide, also empowers diverse groups with unparalleled opportunities to develop their membership, advocate on behalf of their communities, and participate in worldwide discourse—placing marginalized views squarely before new audiences to break down stereotypes that persist in America and globally. This reach is possible since TikTok "is particularly effective at surfacing content from a wide range of users, regardless of their follower count or prior

---

[2] *See* AZ AANHPI (@azaanhpiforequity), TIKTOK (May 27, 2023), https://tiktok.com/t/ZPRKWxgwU; AZ AANHPI (@azaanhpiforequity), TIKTOK (Feb. 28, 2024), https://tiktok.com/t/ZPRKWg12A (calling out disproportionate incarceration of AANHPIs in for-profit prisons).

popularity."[3]  With its algorithm, U.S. users "have their videos seen by hundreds or even thousands of strangers. ... This democratization of reach is a refreshing departure from the entrenched hierarchies that can be found on other social media."[4]  In short, TikTok empowers diverse groups, including amici, "'with a voice that resonates farther than it could from any soapbox.'"  *Packingham*, 582 U.S. at 107 (citation omitted).

TikTok's transformative role in education, empowerment, activism, and civic engagement for diverse communities cannot be overstated.  One AANHPI user, known for skits on queer, intersectional identity, stressed: "TikTok has provided them with an opportunity to see [AANHPI] representation that they never saw when they were younger."[5]  Another added:

> It wasn't so long ago that [AANHPIs] were siloed as they grappled with these feelings [of not fitting in], particularly for individuals in small towns with few other [AANHPIs]. ... [C]reators who post videos about trauma, celebration, or funny stories from their [AANHPI] experience have comment sections filled with "OMG YES" or "thank god I'm not the only one." ...

---

[3] James Broughel, *TikTok Is a Beacon of Democracy in the Social Media Landscape*, FORBES (Apr. 19, 2024), https://forbes.com/sites/jamesbroughel/2024/04/19/tiktok-is-a-beacon-of-democracy-in-the-social-media-hellscape/.

[4] *Id.*

[5] Suhanee Mitragotri, *How TikTok Has Helped Build Community Among AA+PIs*, JOYSAUCE (June 3, 2024), https://joysauce.com/how-tiktok-has-helped-build-community-among-aapis.

[W]e haven't had a platform on which we could share these experiences so wholly until TikTok.[6]

Along similar lines, TikTok represents "a melting pot of voices, showcasing the rich tapestry of Muslim experiences in America."[7] Many American Muslims cherish TikTok as a means to build awareness about their culture and religion as "TikTok offers a creative outlet to defy stereotypes"—which is "empowering considering the racial profiling and stereotypes many Muslim people face, in particular black and immigrant Muslims."[8] So, for this community, "TikTok isn't just another social media platform; it's a vibrant digital canvas where they can express their culture, faith, and identity in creative and empowering ways ... where Muslims can reclaim their narrative and foster understanding across cultures."[9] And in tandem with community-building, TikTok also enables

---

[6] *Id.*

[7] Olayemi, *TikTok Ban: Impact on Muslim Society*, COVERMECUTEE BLOG (Apr. 29, 2024), https://covermecutee.com/blogs/news/tiktok-ban-impact-on-muslim-society.

[8] *TikTok: Connecting and Bridging Gaps Between Religious Youth of All Faiths*, HARTFORD INTERNATIONAL UNIVERSITY: BLOG (May 14, 2021), https://blog.hartfordinternational.edu/2021/05/14/building-interfaith-understanding-among-religious-youth-through-tiktok/.

[9] Olayemi, *supra* note 7.

users globally to witness and condemn racism, xenophobia, and hate crimes against diverse communities.[10]



*Figure 2: TikTok videos showing American Muslim and Sikh American community advocacy and religious practice.[11]*

Unsurprisingly, TikTok is also instrumental for women, LGBTQ+ folks, and Native Americans as they engage in free expression, self-care,

---

[10] *See* TɪᴋTᴏᴋ, https://tiktok.com/discover/stop-muslim-hating (showing 3.4 million posts on "Stop Muslim Hating"); TɪᴋTᴏᴋ, https://tiktok.com/tag/stopasianhate (showing over 342,000 posts on #StopAsianHate).

[11] MPAC (@mpacntl), TɪᴋTᴏᴋ (May 22, 2024), https://tiktok.com/t/ZPRK7F9yM (alerting DOJ to uptick in hate crimes targeting American Muslims) (left); Marah (@marah_snoubar), TɪᴋTᴏᴋ (Feb. 26, 2024), https://tiktok.com/@marah_snoubar/video/7339991627345481006 (setting table for Ramadan) (middle); SikhColouring (@sikhcolouring), https://tiktok.com/@sikhcolouring/video/7160395432747633926 (explaining religious significance of Sikh turbans) (right).

and advocacy—especially in response to restrictive efforts targeting their communities.[12]  For example, reproductive rights advocates use TikTok to fight for gender and reproductive freedom.[13]  Many queer youth in non-supportive environments experience affirming LGBTQ+ role models only on TikTok.[14]  Given the LGBTQ+ community's diaspora-like nature, many need TikTok to "connect with people all over the country ... against the anti-LGBTQ+ legislation sweeping the nation."[15]

---

[12] *See How TikTok Became a Haven for the Queer and Questioning Youth of Today*, OK COOL,  https://okcool.io/how-tiktok-became-a-haven-for-the-queer-and-questioning-youth-of-today.
[13] Emily Schmall, *Women Talk Through Their Abortions on TikTok*, N.Y. TIMES (Apr. 17, 2024),  https://nytimes.com/2024/04/17/us/politics/_abortion-tiktok-videos.html.
[14] Denny Agassi, *The TikTok Ban Could Be a Huge Blow to the LGBT+ Community—Here's Why*, RECKON (Mar. 15, 2024),  https://reckon.news/lgbtq/2024/03/the-tiktok-ban-could-be-a-huge-blow-to-the-lgbt-community-heres-why.html.
[15] Ryan Adamczeski & Ariel Messman-Rucker, *LGBTQ+ TikTokers: Banning App Will "Eliminate" Online Communities & Activism (Exclusive)*, ADVOCATE (Mar. 15, 2024),  https://advocate.com/exclusives/ lgbtq-tiktok-ban-response; Agassi, *supra* note 14.



*Figure 3:  TikTok video with over 580,000 views of Calos leaders fighting to protect trans kids at school board meeting in Virginia.*[16]

Native tribes use TikTok to connect, share, educate, and advocate.[17]

One Tohono O'odham Nation member posted a video with 4 million views

[16] Beezay Dad (@beezay22), TɪᴋTᴏᴋ (Oct. 10, 2023), https://www.tik-tok.com/@beezay22/video/7288493382459018539.

[17] *See, e.g.*, TɪᴋTᴏᴋ, https://tiktok.com/discover/icwa-videos (showing 5.9 million ICWA posts); TɪᴋTᴏᴋ, https://tiktok.com/discover/indigenous-mental-health (showing 108.5 million "Indigenous Mental Health" video views); Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Tʀᴀᴠᴇʟ +Lᴇɪsᴜʀᴇ (Oct. 21, 2022), https://travelandlei-sure.com/culture-design/how-indigenous-creators-use-tiktok-to-share-their-cultures.  Had the Government consulted tribes prior to the TikTok Ban, as DOJ policy requires, the record would clearly reflect that the law silences many young tribal voices.  *See* Policy Statement, Tribal Consul-tation, DOJ 4 (2022), https://www.justice.gov/d9/2022-12/doj-memoran-dum-tribal-consultation.pdf.  But the Government failed to do so.

condemning America's history of state-sponsored separation of Native children before the Indian Child Welfare Act of 1978, Pub. L. 95-608, 92 Stat. 3069 (1978) ("ICWA"), and warned that the Supreme Court may "overturn the law."



*Figure 4:  Native activist's TikTok video about* Haaland v. Brackeen.[18]

These are but a few of countless examples that powerfully illustrate how diverse communities value TikTok as they proudly connect, engage, educate, and advocate through free expression well-within the heartland of the First Amendment.

---

[18] 599 U.S. 255 (2023); Wagon Burner (@oodhamboiii), TikTok (Feb. 23, 2023), https://tiktok.com/@oodhamboiii/video/7203470025469021482.

**B. The TikTok Ban violates the First Amendment.**

Despite TikTok's role as a quintessential public square, PAFACA, Pub. L. 118-50 (Apr. 24, 2024), threatens to eliminate this important forum for protected expression by 170 million U.S. users, including amici and their diverse communities. "Without TikTok, [U.S. users] are deprived of communicating by their preferred means of speech, and thus First Amendment scrutiny is appropriate." *Alario*, 2023 WL 8270811, at *6; *see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) ("[A]n edited compilation of speech generated by other persons ... fall[s] squarely within the core of First Amendment security.").

The TikTok Ban contravenes the First Amendment for at least two reasons. ***First***, it imposes an unprecedented prior restraint on speech by silencing all voices across a platform synonymous with free expression. ***Second***, through the TikTok Ban, the Government plainly discriminates on content and viewpoint—selectively choosing winners and losers based on its preferred speakers and speech.

> *i. The TikTok Ban, by censoring an entire forum, constitutes a prior restraint on speech and publication.*

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen."

*Packingham*, 582 U.S. at 104. The First Amendment precludes the Government from eliminating a "key platform for communication" that millions of Americans, including the diverse groups amici represent, rely on for protected expression. *U.S. WeChat Users All. v. Trump*, 488 F. Supp. 3d 912, 926 (N.D. Cal. 2020); *id.* (enjoining WeChat ban that would "eliminate [a] key platform for communication, [and] slow or eliminate discourse"—"the equivalent of censorship of speech or a prior restraint").

Laws like the TikTok Ban that "deny use of a forum in advance of actual expression" constitute prior restraints on speech and publication. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (citation omitted).

PAFACA, if sustained, will foreclose all protected expression on TikTok. At the same time, amici know the detrimental effects of this mass censorship will fall most acutely on underrepresented groups that

have long been neglected by more established media.  *See supra* Section I.A.  It is these groups, including those that amici represent, that rely on TikTok most to build community and reach wider audiences.

To be clear, the TikTok Ban's outright prohibition on all protected expression by all U.S. users dwarfs any historical analog that the courts have voided as prior restraints.  In purpose and effect, the TikTok Ban leaves no doubt that its total suppression of speech, news, petitioning, advocacy, religious practice, and other protected expression constitutes a prior restraint abhorrent to the First Amendment.  Even assuming Congress's purported rationale were more than pretext, *see infra* Section I.C, generalized national security concerns cannot justify censoring ***all*** protected expression on a platform.  *U.S. WeChat Users*, 488 F. Supp. 3d at 927 ("[W]hile the government has established that China's activities raise significant national-security concerns—it has put in zero little evidence that its effective ban of WeChat for all U.S. users addresses those concerns.").  Through its prior restraint on speech and publication for 170 million U.S. users, the TikTok Ban exceeds any "incidental" burden on protected expression and tramples on core First Amendment protections.

ii. *The TikTok Ban engages in naked content and viewpoint discrimination.*

The First Amendment bars the Government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). "Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Nor may the Government suppress ideas because "viewpoint discrimination" is a more "'egregious form of content discrimination.'" *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (citation omitted).

Even a cursory examination of PAFACA's plain text confirms Congress intended to discriminate on content and viewpoint. *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020) (citation omitted) ("A speech-restricting statute is 'content-based' if it, 'by its very terms, singles out particular content for differential treatment.'"). For one, the TikTok Ban distinguishes on speech content by exempting "any website or application primarily used to post product reviews, business reviews, or travel information and reviews." PAFACA, H.R. 815, 118th Cong., Pub. L. 118-50 (Apr. 24, 2024).

Even worse, the TikTok Ban "goes even beyond mere content dis-crimination, to actual viewpoint discrimination." *R.A.V.*, 505 U.S. at 391. During consideration of PAFACA, a House report warned that detractors might use TikTok to "push misinformation, disinformation, and propa-ganda." H.R. Comm. on Energy & Com., PAFACA, H.R. Rep. No. 118-417 at 2 (2024). Setting aside the fact that this alleged concern applies to any social media platform (indeed, any forum), amici "wholeheartedly agree with" the Government's hostility towards such speech, *R.A.V.*, 505 U.S. at 392—in fact, amici use TikTok to condemn disinformation affect-ing their diverse groups.[19]

However, Congress's passage of the TikTok Ban due, at least in part, to its belief that disfavored speech ***may*** appear or that TikTok al-legedly fails to "embrace American values, values for freedom, human

---

[19] Social and racial justice groups like amici actively combat abuses across all media—such as disinformation, and algorithmic biases affect-ing marginalized groups. *See, e.g.*, *AAJC Joins Letter Urging Social Me-dia Platforms to Fight Disinformation in Advance of Upcoming Mid-Term Elections*, ADVANCING JUSTICE–ASIAN AMERICAN JUSTICE CENTER (May 17, 2022), https://advancingjustice-aajc.org/publication/advancing-jus-tice-aajc-joins-letter-urging-social-media-platforms-fight-disinfor-mation.

rights, and innovation"[20] is precisely the viewpoint discrimination the First Amendment forbids. *R.A.V.*, 505 U.S. at 391 ("The First Amendment does not permit [the Government] to impose special prohibitions on those speakers who express views on disfavored subjects"); *see Iancu*, 588 U.S. at 399 (Alito, J., concurring) ("Viewpoint discrimination is poison to a free society.").

The following hypothetical lays bare the inescapable reality that PAFACA discriminates on the basis of content and viewpoint: If U.S. users of a platform identical to TikTok in every way (aside from its name) censored their own speech and instead solely "post[ed] product reviews, business reviews, or travel information and reviews," PAFACA, H.R. 815, 118th Cong., Pub. L. 118-50 (Apr. 24, 2024), thereby avoiding disfavored speech, then that hypothetical platform would be categorically exempt from PAFACA.

---

[20] *Legislation to Protect American Data and National Security from Foreign Adversaries: Hearing Before the Comm. on Energy and Commerce*, 118th Cong. 3 (2024), https://congress.gov/118/chrg/CHRG-118hhrg55083/CHRG-118hhrg55083.pdf (statement of Rep. Cathy McMorris Rodgers, Chairwoman, H. Comm. on Energy & Com.) (claiming PAFACA is necessary since TikTok does not "embrace American values").

*iii. The TikTok Ban fails even intermediate scrutiny.*

Because the TikTok Ban implicates profound First Amendment concerns as a prior restraint and as a law discriminating on content and viewpoint, it must meet strict scrutiny. *R.A.V.*, 505 U.S. at 395–96; *see City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 455 (2002) (Souter, J., dissenting) ("[S]trict scrutiny leaves few survivors.") (citation omitted). But the Government cannot meet this high bar because it cannot even prove the TikTok Ban withstands intermediate scrutiny. *Recht v. Morrisey*, 32 F.4th 398, 410 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 527 (2022) ("[A] law failing intermediate scrutiny would also fail strict scrutiny. After all, if you can't ski a blue run successfully, you obviously can't tackle a double black diamond."); *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1070 (10th Cir. 2020). Under intermediate scrutiny, the Government must prove the TikTok Ban "advances important governmental interests unrelated to the suppression of free speech"; and any "incidental" burden on speech is no greater "than necessary to further that interest." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 186, 189 (1997).

As explained *supra* Section I.B.ii, the TikTok Ban suppresses disfavored speech and its burden on speech is the opposite of "incidental."

Rather, the TikTok Ban is so overbroad that it silences *all* speech and publication by 170 million U.S. users, including diverse communities, on an entire medium of expression. *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994) (expressing "particular concern with laws that foreclose an entire medium of expression"). If the Government were truly inspired to pass the TikTok Ban due to data security or propaganda, there are other avenues to tackle those issues without the blunderbuss approach that eliminates a digital public square and leaves the First Amendment-protected expression of 170 million U.S. users as acceptable casualties. *See* Creators Br. at 54, 57–59; TikTok Br. at 58–61; *N.Y. Times*, 403 U.S. at 718 (Black, J., concurring) (Courts may not disregard the "First Amendment's emphatic command ... in the name of 'national security.'").

Consequently, even under intermediate scrutiny, the TikTok Ban runs fatally afoul of the First Amendment. *See Alario*, 2023 WL 8270811, at *8 (Montana's TikTok ban "does not pass intermediate scrutiny review."). And since the TikTok Ban fails intermediate scrutiny, it too fails strict scrutiny. *Recht*, 32 F.4th at 410; *see Yim v. City of Seattle*, 63 F.4th 783, 793 (9th Cir. 2023).

### C. Compelling evidence reveals that the TikTok Ban was driven by animus against persons of AANHPI descent.

Beyond the TikTok Ban's violence to First Amendment principles, amici also harbor significant concerns that Congress adopted the TikTok Ban, in large part, to discriminate against AANHPIs contrary to the Fifth Amendment's equal protection guarantee. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 230 (1995) ("[A]ny individual suffers an injury when he or she is disadvantaged by the government because of his or her race."). Such animus may be established by "a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020) (plurality opn.) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977)). "[D]isparate impact on a particular group, '[d]epartures from the normal procedural sequence,' and 'contemporary statements by members of the decisionmaking body'" may individually or collectively demonstrate that invidious discrimination prompted the TikTok Ban. *Regents*, 591 U.S. at 34 (citation omitted).

The parties and amici agree that the Government has a compelling interest in protecting national security, *e.g.*, TikTok Pet. ¶ 66, Creators

Pet. ¶ 63—but only when the law's bona fide intent is actually directed at furthering national security and unencumbered by discriminatory purpose. *Arlington Heights*, 429 U.S. at 265–66 ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision ... judicial deference is no longer justified.").[21]

Here, however, while the Government characterizes the TikTok Ban as ordinary national security legislation, key historical context suggests strongly that anti-AANHPI discrimination motivated its passage. *See Loving v. Virginia*, 388 U.S. 1, 10 (1967) (invalidating policy infected by "arbitrary and invidious discrimination"). This Court should scrutinize the asserted national security interest when the TikTok Ban's gross overbreadth and underinclusivity raise serious doubts about the candor of that rationale. *See* TikTok Pet. ¶¶ 82–88; Creators Pet. ¶¶ 58, 65; *cf. Dep't of Com. v. New York*, 588 U.S. 752, 755 (2019) (scrutinizing the Government's purported rationale given its "significant mismatch").

---

[21] Additionally, evidence that anti-AANHPI animus was "a motivating factor" belies any argument that the TikTok Ban is necessary to further national security, such that its sweeping prohibition on all protected expression also fails the rigors of First Amendment intermediate and strict scrutiny. *See supra* Section I.B.

In a similar challenge to Montana's TikTok ban, which the state defended on national security grounds, the district court criticized "the pervasive undertone of anti-Chinese sentiment that permeates ... the instant legislation." *Alario*, 2023 WL 8270811, at *9; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 448 (1985) (Laws predicated on animus are unconstitutional because the Government has no legitimate interest in exploiting "negative attitudes, or fear" about a group.); *United States v. Windsor*, 570 U.S. 744, 770 (2013) (Laws whose "avowed purpose and practical effect ... are to impose a disadvantage, a separate status, and so a stigma" on an insular group are unconstitutional.).

So too here. Much like the *Alario* court found, Congress designed the TikTok Ban to single out persons and companies of AANHPI descent. Indeed, the combination of our nation's history of weaponizing so-called national security laws to undermine minority rights and "contemporary statements by members of [Congress]," suffused with anti-AANHPI stereotypes, powerfully demonstrate that animus was a "motivating factor" behind the TikTok Ban. *Regents*, 591 U.S. at 34 (citation omitted).

*i.  Our nation's history of enacting "national security" laws
    as pretext to discriminate against minorities belies the
    Government's claimed rationale for the TikTok Ban.*

The diverse communities that amici represent know from personal experience that the Government has not hesitated to adopt laws that curtail minority rights under the pretense of "national security."  This "historical background ... reveals a series of official actions taken for invidious purposes" masquerading as national security measures, and helps establish that anti-AANHPI bias inspired the TikTok Ban.  *Arlington Heights*, 429 U.S. at 267.

Throughout our nation's history, the Government has repeatedly cited national security and perpetual foreigner stereotypes to justify discriminatory laws.  In 1882, Congress passed the Chinese Exclusion Act grounded in the (baseless) assertion that AANHPIs "endanger the good order."  Pub. L. 47-126, 22 Stat. 58 (1882).  The Supreme Court—in its now-derided *Ping v. United States* ruling—favorably cited Congress's finding that "the presence of foreigners of a different race in this country, who will not assimilate with us, [is] dangerous to its peace and security" to uphold the Act.  130 U.S. 581, 606 (1889).

Half a century later, during World War II, President Franklin D. Roosevelt issued Executive Order ("E.O.") No. 9066, authorizing the incarceration in concentration camps, without due process, of more than 100,000 persons based on the discriminatory claim that persons of Japanese heritage would "sabotage … national-defense." E.O. No. 9066 (1942); *Korematsu v. United States*, 323 U.S. 214, 216–17 (1944), *overruled by Trump v. Hawaii*, 585 U.S. 667, 710 (2018).

But there, the Government had zero evidence that U.S. persons of Japanese ancestry posed any threat. Instead, its national security rationale was—as Congress and the Supreme Court expressly acknowledged decades later—pretext for "unlawful" discrimination "solely and explicitly on the basis of race." *Hawaii*, 585 U.S. at 710; *see id.* ("*Korematsu* was gravely wrong the day it was decided."); Civil Liberties Act of 1988, Pub. L. 100-383, 102 Stat. 903, 903 (Japanese internment was a "grave injustice ... without security reasons and without any acts of espionage or sabotage ... motivated by racial prejudice, wartime hysteria, and a failure of political leadership.").

Sadly, America's receptivity to discriminatory laws undergirded by "racial prejudice, wartime hysteria, and a failure of political leadership"

has bled seamlessly into the modern era. After the horrific 9/11 terrorist attacks, the Government deployed investigatory tools, such as The USA Patriot Act of 2001, to surveil innocent American Muslim, Arab, and South Asian communities under the guise of national security. The USA Patriot Act, Pub. L. 107-56, 115 Stat. 272 (2001); *e.g.*, *Hassan v. City of New York*, 804 F.3d 277, 294, 297 (3d Cir. 2015) (American Muslims stated claims they were unconstitutionally surveilled "not because of any reasonable suspicion of wrongdoing (or other neutral criterion) but solely because of their Muslim religious affiliation").

More recently, in 2017, President Donald Trump issued Executive Orders Nos. 13769 and 13780—which he called a "Muslim ban"[22]—barring U.S. entry by persons from several Muslim-majority countries allegedly "to protect [U.S.] citizens from terrorist attacks." E.O. Nos. 13769 & 13780 (2017). Yet, a few years later, the Government conceded that the proffered rationale animating the Muslim ban was, in truth, pretext for invidious discrimination.[23]

---

[22] Ali Vitali, *In His Words: Donald Trump on the Muslim Ban, Deportations,* NBC NEWS (June 27, 2016), https://nbcnews.com/politics/ 2016-election/his-words-donald-trump-muslim-ban-deportations-n599901.

[23] Nazita Lajevardi et al., *Biden Reverses Trump's "Muslim ban." Americans Support the Decision.*, WASH. POST (Jan. 27, 2021),

Other examples abound.  In 2018, the DOJ announced the "China Initiative"—a surveillance program widely criticized by social and racial justice groups including amici—which presumed that numerous innocent AANHPI academics were spies for China.  *Cf. Hirabayashi v. United States*, 320 U.S. 81, 100 (1943) (Murphy, J., concurring) ("Distinctions based on color and ancestry are utterly inconsistent with our traditions and ideals.").  Thereafter, the DOJ's national security head terminated the China Initiative, admitting that it appears to "appl[y] different standards based on race or ethnicity [that] harms the department and our efforts, and it harms the public."[24]  And during the COVID-19 pandemic, then-President Trump repeatedly deployed racist epithets like "Chinese

---

https://washingtonpost.com/politics/2021/01/27/biden-reversed-trumps-muslim-ban-americans-support-that-decision/ (quoting President Joe Biden calling the "Muslim ban" "morally wrong" and "designed to target primarily Black and Brown immigrants").

[24] Ryan Lucas, *The Justice Department Is Ending Its Controversial China Initiative*, NPR (Feb. 23, 2022), https://npr.org/2022/02/23/1082593735/justice-department-china-initiative.  As the Congressional Asian Pacific American Caucus pointed out, "[a]n unacceptably high number of [China Initiative] cases ended in dropped charges, dismissals, and acquittals because prosecutors could not prove allegations," and the Initiative failed to uncover any national security threat to warrant its "chilling effect on scientific inquiry and academic freedom in the United States."  Letter from Rep. Grace Meng et al., to Chuck Schumer, Majority Leader, et al. (Jan. 22, 2024), https://meng.house.gov/sites/evo-subsites/meng.house.gov/files/evo-media-document/china-initiative-letter_0.pdf.

virus" and "Kung Flu" to insinuate (falsely) that AANHPIs caused the pandemic and threatened national security.[25]

Accordingly, our history of using so-called national security laws as pretext to otherize minority communities counsels extreme caution and close equal protection scrutiny of the Government's alleged national security rationale for the TikTok Ban.[26] *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 635 (1989) (Marshall, J., dissenting) ("[H]istory teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure."). Although Congress hypothesized that TikTok's widespread popularity means that China could hypothetically attempt to seek U.S. user data, the Government offered no evidence China ever circumvented TikTok's data protections for U.S. users; that other companies are somehow immune to similar concerns; or that any legitimate national security interest could not be

---

[25] *The Blame Game, How Political Rhetoric Inflames Anti-Asian Scapegoating*, STOP AAPI HATE (Oct. 2022), https://stopaapihate.org/wp-content/uploads/2022/10/Stop-AAPI-Hate-Scapegoating-Report.pdf.
[26] Ironically, Presidents Biden and Trump use TikTok regularly to reach millions of Americans, casting greater doubt on any alleged national security threat posed by TikTok. Biden-Harris HQ (@bidenHQ), TIKTOK, https://tiktok.com/@bidenhq; Donald Trump (@realdonaldtrump), TIKTOK, https://tiktok.com/@realdonaldtrump.

addressed by means less fatal to the rights of AANHPIs and other Americans. *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886) (equal protection prohibits action "directed so exclusively against a particular class of persons" showing "hostility to [a] race and nationality").

As Justice Murphy warned in his *Korematsu* dissent, allowing the Government to weaponize pretextual concerns to demonize disfavored groups and undermine constitutional freedoms is "to destroy the dignity of the individual and to encourage and open the door to discriminatory actions against other minority groups in the passions of tomorrow." *Korematsu*, 323 U.S. at 240 (Murphy, J., dissenting).

> ii. *Contemporaneous statements by Members of Congress confirm that the TikTok Ban was intended to demonize AANHPIs.*

In the absence of any reasoned legislative findings accompanying PAFACA, the Court is forced to ascertain its underlying purpose through Member statements and legislative history. *Cf. Arlington Heights*, 429 U.S. at 268. As explained below, those statements clarify that anti-AANHPI animus pervaded Congress's consideration of the TikTok Ban.

Most prominently, in a now-infamous colloquy between Senator Tom Cotton and TikTok CEO Shou Chew during a Senate hearing this year, Senator Cotton repeatedly presumed that Chew—a Singaporean

citizen with U.S.-citizen family—was a national security threat and Chinese Communist Party ("CCP") puppet. Chew consistently (seven times) reminded Senator Cotton that he is Singaporean with no affiliation to the CCP. This exchange went viral on TikTok and other media, leading to global derision of Senator Cotton's discriminatory questions. This Senate hearing, showcasing blatant anti-AANHPI bias, occurred mere months before Senator Cotton voted for the TikTok Ban.[27]



*Figure 5: TikTok video by AANHPI news outlet NextShark counting seven times that Chew testified he is not Chinese or CCP-affiliated.[28]*

---

[27] *See* GovTrack (Apr. 23, 2024), https://govtrack.us/congress/votes/118-2024/s154.
[28] NextShark (@nextshark), TɪᴋTᴏᴋ (Feb. 1, 2024), https://tiktok.com/@nextshark/video/7330815984284093727.

Other Member remarks more subtly, but no less tellingly, leveraged harmful anti-AANHPI stereotypes to cast TikTok and its U.S. employees as "un-American."  As one example, a House committee chair insisted during a markup session that PAFACA is necessary because "TikTok will [n]ever embrace American values, values for freedom, human rights, and innovation."[29]  Another Member presumed:  "[T]here are a fair number of [TikTok] employees who are members of the [CCP]."[30]  Such ignorant remarks leaning on defamatory portrayals of AANHPIs as disloyal, perpetual foreigners leave little doubt that anti-AANHPI animus, in large part, animated the TikTok Ban.

Crucially, Members from across the political spectrum raised dire concerns that the TikTok Ban exacerbates anti-AANHPI discrimination. One conservative Member observed that PAFACA arises out of "hysteria

_____

[29] *Legislation to Protect American Data and National Security from Foreign Adversaries: Hearing Before the H. Comm. on Energy and Commerce*, 118th Cong. 3 (2024), https://congress.gov/118/chrg/CHRG-118hhrg55083/CHRG-118hhrg55083.pdf (statement of Rep. Rodgers).
[30] *TikTok: How Congress Can Safeguard American Data Privacy and Protect Children from Online Harms: Hearing before the H. Comm. on Energy and Commerce*, 118th Cong. 115 (2023), https://www.congress.gov/118/chrg/CHRG-118hhrg53839/CHRG-118hhrg53839.pdf (statement of Rep. H. Morgan Griffith).

of banning everything China, which I think isn't good."[31]  And a progressive Member stressed:  "I also have serious concerns regarding the First Amendment, but *I also think this is simply just fomenting anti-Asian and Chinese sentiment*."[32]

Taken as a whole, our nation's sordid history of discriminatory laws premised on vague national security rationale, alongside legislators expressing anti-AANHPI sentiments in supporting PAFACA, confirms that that the TikTok Ban arose out of invidious discrimination.  So beyond its

---

[31] Sahil Kapur, Frank Thorp V, & Kate Santaliz, *TikTok Ban's Fate Is Uncertain in the Senate, Where There Is Less Urgency to Act*, NBC NEWS (Mar. 14, 2024), https://nbcnews.com/politics/congress/tiktok-bans-fate-uncertain-senate-less-urgency-act-rcna143162 (quoting Sen. Rand Paul).
[32] Nicholas Wu & Daniella Diaz, *House Progressives Signal Opposition to TikTok Bill*, POLITICO (Mar. 12, 2024), https://politico.com/live-updates/2024/03/12/congress/progressives-oppose-tiktok-bill-00146549 (quoting Rep. Ayanna Pressley) (emphasis added).  Just as they warned, states have leveraged similar stereotypes to target AANHPIs.  Montana's TikTok ban was enjoined for "the pervasive undertone of anti-Chinese sentiment."  *Alario*, 2023 WL 8270811, at *9.  The Eleventh Circuit enjoined Florida's Senate Bill 264 limiting property ownership by persons of Chinese descent for similar reasons.  Order at 8, *Shen v. Comm'r, Fla. Dep't of Agric.*, No. 23-12737 (11th Cir. Feb. 1, 2024), ECF No. 59 (Abudu, J., concurring) ("SB 264 was enacted for the specific purpose of targeting people of Chinese descent").  And post-2020 election, Arizona ordered a conspiracy-riddled audit of the 2020 election based on the nonsensical theory that "bamboo ballots" were "flown in from Southeast Asia."  Michael Wines, *Arizona Review of 2020 Vote Is Riddled with Flaws, Says Secretary of State*, N.Y. TIMES (Sep. 24, 2021), https://nytimes.com/2021/05/06/us/arizona-vote-count-republicans.html.

invalidity under the First Amendment, the anti-AANHPI animus infecting the TikTok Ban illuminates the pretextual nature of the Government's national security rationale, and furnishes a standalone basis for voiding the TikTok Ban under the Fifth Amendment.

## CONCLUSION

For the foregoing reasons, amici respectfully request that the Court grant the Petitions and strike the TikTok Ban as unconstitutional.

Dated: June 27, 2024

/s/ Matt K. Nguyen
Matt K. Nguyen (65395)
    *Counsel of Record*
Travis LeBlanc (50652)
Robert H. Denniston (65387)
COOLEY LLP
1299 Pennsylvania Ave, NW
Washington, DC 20004-2400
(202) 842-7800
mnguyen@cooley.com
tleblanc@cooley.com
rdenniston@cooley.com

Kathleen R. Hartnett (52177)
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
(415) 693-2000
khartnett@cooley.com

Jamie D. Robertson (65400)
COOLEY LLP

110 N. Wacker Drive
Suite 4200
Chicago, IL 60606-1511
(312) 881-6500
jdrobertson@cooley.com

*Counsel for Amici Curiae Social and*
*Racial Justice Community Nonprofits*

## CERTIFICATE OF COMPLIANCE

1.      This amicus brief complies with the type-volume limitations set by the Court's order of May 28, 2024 because it contains 6,488 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this document was prepared on Microsoft Word in the proportionally-spaced 14-point typeface Century Schoolbook.


                                        */s/ Matt K. Nguyen*
                                        Matt K. Nguyen

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June, 2024, I caused true and correct copies of the foregoing *Brief of Amici Curiae Social and Racial Justice Community Nonprofits in Support of Petitioners* to be served via electronic mail upon all counsel of record, via the Court's ECF system.

*/s/ Matt K. Nguyen*
Matt K. Nguyen