ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024
No. 24-1183 (and consolidated cases)

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

BASED POLITICS, INC.,

*Petitioner,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United states,

*Respondent.*

---

*caption continued on inside cover*

---

On Petitions for Review of Constitutionality of the Protecting
Americans from Foreign Adversary Controlled Applications Act

---

ADDENDUM TO BRIEF OF PETITIONER BASED POLITICS, INC.

---

Jacob Huebert
Jeffrey M. Schwab
James McQuaid
LIBERTY JUSTICE CENTER
13341 W. U.S. Highway 290
Building 2
Austin, Texas 78737
512-481-4400
jhuebert@libertyjusticecenter.org
jscwhab@libertyjusticecenter.org
jmcquaid@libertyjusticecenter.org
*Counsel for Petitioners*

BRIAN FIREBAUGH, et al.,
*Petitioners,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,
*Respondent.*

_____

TIKTOC INC. and BYTEDANCE LTD.,
*Petitioners*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,
*Respondent*

## TABLE OF CONTENTS

Protecting Americans from Foreign Adversary
Controlled Applications Act, Pub. L. No. 118-50, Division H .................. 1

Declaration of Brad Polumbo .................................................................... 7

Declaration of Hannah Cox .................................................................... 10

H. R. 815—61

Fusion Development Strategy programs of the People's Republic of China, including the following:

(1) A brief summary of each such identified field and its relevance to the military power and national security of the People's Republic of China.

(2) The implications for the national security of the United States as a result of the leadership or dominance by the People's Republic of China in each such identified field and associated supply chains.

(3) The identification of at least 10 entities domiciled in, controlled by, or directed by the People's Republic of China (including any subsidiaries of such entity), involved in each such identified field, and an assessment of, with respect to each such entity, the following:

(A) Whether the entity has procured components from any known United States suppliers.

(B) Whether any United States technology imported by the entity is controlled under United States regulations.

(C) Whether United States capital is invested in the entity, either through known direct investment or passive investment flows.

(D) Whether the entity has any connection to the People's Liberation Army, the Military-Civil Fusion program of the People's Republic of China, or any other state-sponsored initiatives of the People's Republic of China to support the development of national champions.

(c) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Affairs of the House of Representatives;

(2) the Committee on Armed Services of the House of Representatives;

(3) the Committee on Foreign Relations of the Senate; and

(4) the Committee on Armed Services of the Senate.

# DIVISION H—PROTECTING AMERICANS FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS ACT

**SEC. 1. SHORT TITLE.**

This division may be cited as the "Protecting Americans from Foreign Adversary Controlled Applications Act".

**SEC. 2. PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.**

(a) IN GENERAL.—

(1) PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.—It shall be unlawful for an entity to distribute, maintain, or update (or enable the distribution, maintenance, or updating of) a foreign adversary controlled application by carrying out, within the land or maritime borders of the United States, any of the following:

H. R. 815—62

(A) Providing services to distribute, maintain, or update such foreign adversary controlled application (including any source code of such application) by means of a marketplace (including an online mobile application store) through which users within the land or maritime borders of the United States may access, maintain, or update such application.

(B) Providing internet hosting services to enable the distribution, maintenance, or updating of such foreign adversary controlled application for users within the land or maritime borders of the United States.

(2) APPLICABILITY.—Subject to paragraph (3), this subsection shall apply—

(A) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(A), beginning on the date that is 270 days after the date of the enactment of this division; and

(B) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(B), beginning on the date that is 270 days after the date of the relevant determination of the President under such subsection.

(3) EXTENSION.—With respect to a foreign adversary controlled application, the President may grant a 1-time extension of not more than 90 days with respect to the date on which this subsection would otherwise apply to such application pursuant to paragraph (2), if the President certifies to Congress that—

(A) a path to executing a qualified divestiture has been identified with respect to such application;

(B) evidence of significant progress toward executing such qualified divestiture has been produced with respect to such application; and

(C) there are in place the relevant binding legal agreements to enable execution of such qualified divestiture during the period of such extension.

(b) DATA AND INFORMATION PORTABILITY TO ALTERNATIVE APPLICATIONS.—Before the date on which a prohibition under subsection (a) applies to a foreign adversary controlled application, the entity that owns or controls such application shall provide, upon request by a user of such application within the land or maritime borders of United States, to such user all the available data related to the account of such user with respect to such application. Such data shall be provided in a machine readable format and shall include any data maintained by such application with respect to the account of such user, including content (including posts, photos, and videos) and all other account information.

(c) EXEMPTIONS.—

(1) EXEMPTIONS FOR QUALIFIED DIVESTITURES.—Subsection (a)—

(A) does not apply to a foreign adversary controlled application with respect to which a qualified divestiture is executed before the date on which a prohibition under subsection (a) would begin to apply to such application; and

H. R. 815—63

(B) shall cease to apply in the case of a foreign adversary controlled application with respect to which a qualified divestiture is executed after the date on which a prohibition under subsection (a) applies to such application.

(2) EXEMPTIONS FOR CERTAIN NECESSARY SERVICES.—Subsections (a) and (b) do not apply to services provided with respect to a foreign adversary controlled application that are necessary for an entity to attain compliance with such subsections.

(d) ENFORCEMENT.—

(1) CIVIL PENALTIES.—

(A) FOREIGN ADVERSARY CONTROLLED APPLICATION VIOLATIONS.—An entity that violates subsection (a) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $5,000 by the number of users within the land or maritime borders of the United States determined to have accessed, maintained, or updated a foreign adversary controlled application as a result of such violation.

(B) DATA AND INFORMATION VIOLATIONS.—An entity that violates subsection (b) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $500 by the number of users within the land or maritime borders of the United States affected by such violation.

(2) ACTIONS BY ATTORNEY GENERAL.—The Attorney General—

(A) shall conduct investigations related to potential violations of subsection (a) or (b), and, if such an investigation results in a determination that a violation has occurred, the Attorney General shall pursue enforcement under paragraph (1); and

(B) may bring an action in an appropriate district court of the United States for appropriate relief, including civil penalties under paragraph (1) or declaratory and injunctive relief.

(e) SEVERABILITY.—

(1) IN GENERAL.—If any provision of this section or the application of this section to any person or circumstance is held invalid, the invalidity shall not affect the other provisions or applications of this section that can be given effect without the invalid provision or application.

(2) SUBSEQUENT DETERMINATIONS.—If the application of any provision of this section is held invalid with respect to a foreign adversary controlled application that satisfies the definition of such term pursuant to subsection (g)(3)(A), such invalidity shall not affect or preclude the application of the same provision of this section to such foreign adversary controlled application by means of a subsequent determination pursuant to subsection (g)(3)(B).

(f) RULE OF CONSTRUCTION.—Nothing in this division may be construed—

(1) to authorize the Attorney General to pursue enforcement, under this section, other than enforcement of subsection (a) or (b);

H. R. 815—64

(2) to authorize the Attorney General to pursue enforcement, under this section, against an individual user of a foreign adversary controlled application; or

(3) except as expressly provided herein, to alter or affect any other authority provided by or established under another provision of Federal law.

(g) DEFINITIONS.—In this section:

(1) CONTROLLED BY A FOREIGN ADVERSARY.—The term "controlled by a foreign adversary" means, with respect to a covered company or other entity, that such company or other entity is—

(A) a foreign person that is domiciled in, is headquartered in, has its principal place of business in, or is organized under the laws of a foreign adversary country;

(B) an entity with respect to which a foreign person or combination of foreign persons described in subparagraph (A) directly or indirectly own at least a 20 percent stake; or

(C) a person subject to the direction or control of a foreign person or entity described in subparagraph (A) or (B).

(2) COVERED COMPANY.—

(A) IN GENERAL.—The term "covered company" means an entity that operates, directly or indirectly (including through a parent company, subsidiary, or affiliate), a website, desktop application, mobile application, or augmented or immersive technology application that—

(i) permits a user to create an account or profile to generate, share, and view text, images, videos, real-time communications, or similar content;

(ii) has more than 1,000,000 monthly active users with respect to at least 2 of the 3 months preceding the date on which a relevant determination of the President is made pursuant to paragraph (3)(B);

(iii) enables 1 or more users to generate or distribute content that can be viewed by other users of the website, desktop application, mobile application, or augmented or immersive technology application; and

(iv) enables 1 or more users to view content generated by other users of the website, desktop application, mobile application, or augmented or immersive technology application.

(B) EXCLUSION.—The term "covered company" does not include an entity that operates a website, desktop application, mobile application, or augmented or immersive technology application whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews.

(3) FOREIGN ADVERSARY CONTROLLED APPLICATION.—The term "foreign adversary controlled application" means a website, desktop application, mobile application, or augmented or immersive technology application that is operated, directly or indirectly (including through a parent company, subsidiary, or affiliate), by—

(A) any of—

(i) ByteDance, Ltd.;

H. R. 815—65

(ii) TikTok;

(iii) a subsidiary of or a successor to an entity identified in clause (i) or (ii) that is controlled by a foreign adversary; or

(iv) an entity owned or controlled, directly or indirectly, by an entity identified in clause (i), (ii), or (iii); or

(B) a covered company that—

(i) is controlled by a foreign adversary; and

(ii) that is determined by the President to present a significant threat to the national security of the United States following the issuance of—

(I) a public notice proposing such determination; and

(II) a public report to Congress, submitted not less than 30 days before such determination, describing the specific national security concern involved and containing a classified annex and a description of what assets would need to be divested to execute a qualified divestiture.

(4) FOREIGN ADVERSARY COUNTRY.—The term "foreign adversary country" means a country specified in section 4872(d)(2) of title 10, United States Code.

(5) INTERNET HOSTING SERVICE.—The term "internet hosting service" means a service through which storage and computing resources are provided to an individual or organization for the accommodation and maintenance of 1 or more websites or online services, and which may include file hosting, domain name server hosting, cloud hosting, and virtual private server hosting.

(6) QUALIFIED DIVESTITURE.—The term "qualified divestiture" means a divestiture or similar transaction that—

(A) the President determines, through an interagency process, would result in the relevant foreign adversary controlled application no longer being controlled by a foreign adversary; and

(B) the President determines, through an interagency process, precludes the establishment or maintenance of any operational relationship between the United States operations of the relevant foreign adversary controlled application and any formerly affiliated entities that are controlled by a foreign adversary, including any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing.

(7) SOURCE CODE.—The term "source code" means the combination of text and other characters comprising the content, both viewable and nonviewable, of a software application, including any publishing language, programming language, protocol, or functional content, as well as any successor languages or protocols.

(8) UNITED STATES.—The term "United States" includes the territories of the United States.

**SEC. 3. JUDICIAL REVIEW.**

(a) RIGHT OF ACTION.—A petition for review challenging this division or any action, finding, or determination under this division

H. R. 815—66

may be filed only in the United States Court of Appeals for the
District of Columbia Circuit.

(b) EXCLUSIVE JURISDICTION.—The United States Court of
Appeals for the District of Columbia Circuit shall have exclusive
jurisdiction over any challenge to this division or any action, finding,
or determination under this division.

(c) STATUTE OF LIMITATIONS.—A challenge may only be
brought—

(1) in the case of a challenge to this division, not later
than 165 days after the date of the enactment of this division;
and

(2) in the case of a challenge to any action, finding, or
determination under this division, not later than 90 days after
the date of such action, finding, or determination.

# DIVISION I—PROTECTING AMERICANS' DATA FROM FOREIGN ADVERSARIES ACT OF 2024

### SEC. 1. SHORT TITLE.

This division may be cited as the "Protecting Americans' Data
from Foreign Adversaries Act of 2024".

### SEC. 2. PROHIBITION ON TRANSFER OF PERSONALLY IDENTIFIABLE SENSITIVE DATA OF UNITED STATES INDIVIDUALS TO FOREIGN ADVERSARIES.

(a) PROHIBITION.—It shall be unlawful for a data broker to
sell, license, rent, trade, transfer, release, disclose, provide access
to, or otherwise make available personally identifiable sensitive
data of a United States individual to—

(1) any foreign adversary country; or

(2) any entity that is controlled by a foreign adversary.

(b) ENFORCEMENT BY FEDERAL TRADE COMMISSION.—

(1) UNFAIR OR DECEPTIVE ACTS OR PRACTICES.—A violation
of this section shall be treated as a violation of a rule defining
an unfair or a deceptive act or practice under section 18(a)(1)(B)
of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B)).

(2) POWERS OF COMMISSION.—

(A) IN GENERAL.—The Commission shall enforce this
section in the same manner, by the same means, and
with the same jurisdiction, powers, and duties as though
all applicable terms and provisions of the Federal Trade
Commission Act (15 U.S.C. 41 et seq.) were incorporated
into and made a part of this section.

(B) PRIVILEGES AND IMMUNITIES.—Any person who vio-
lates this section shall be subject to the penalties and
entitled to the privileges and immunities provided in the
Federal Trade Commission Act.

(3) AUTHORITY PRESERVED.—Nothing in this section may
be construed to limit the authority of the Commission under
any other provision of law.

(c) DEFINITIONS.—In this section:

(1) COMMISSION.—The term "Commission" means the Fed-
eral Trade Commission.

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| BASED POLITICS, Inc.,<br>            *Petitioner,*<br><br>v.<br><br>MERRICK B. GARLAND, in his<br>official capacity as Attorney<br>General of the United States,<br>            *Respondent.* | No. 24-1183 |

## DECLARATION OF BRAD POLUMBO IN SUPPORT OF <u>PETITIONER'S BRIEF ON THE MERITS</u>

I, Brad Polumbo, declare as follows:

1.      I make this declaration from personal knowledge.

2.      I am a journalist and a co-founder and employee of BASED Politics, Inc. ("BASED Politics"), the Petitioner in the above-captioned case.

3.      My work for BASED Politics includes posting content on social media platforms through my personal accounts, particularly content that promotes free markets and individual liberty, with the intent to appeal to members of "Gen Z," particularly users under 25 years of age.

4.     My TikTok account has nearly 18,000 followers.

5.     Many of my TikTok videos have been viewed tens of thousands of times, and one of them has been viewed more than two million times.

6.     My popular TikTok videos have addressed topics such as "misgendering,"[1] identity politics,[2] crime,[3] "Bidenomics,"[4] and government waste.[5]

7.     My TikTok videos often receive hundreds of comments from viewers, agreeing or disagreeing with the video's point of view, or making additional points on the topic.

8.     I also use TikTok to research topics and find videos with opinions that I disagree with that I can react to in my own TikTok videos.

---

[1] Publicly available at:
https://www.tiktok.com/@bradpolumbo0/video/7283535625914027307
[2] Publicly available at:
https://www.tiktok.com/@bradpolumbo0/video/7288482293318946091
[3] Publicly available at:
https://www.tiktok.com/@bradpolumbo0/video/7283973630411836718
[4] Publicly available at:
https://www.tiktok.com/@bradpolumbo0/video/7256874479362526510
[5] Publicly available at:
https://www.tiktok.com/@bradpolumbo0/video/7236395237331995947

Addendum-008

9.    I have found that there are subcommunities on TikTok based on a wide range of topics, from the serious to the lighthearted, which make it easy for me to find content on topics that are of interest to me (such as politics and LGBT content) and to share my content with others who might find it of interest.

10.    I consider TikTok essential to communicate with BASED Politics's target audience of members of Gen Z. I do not know of any other way that BASED Politics could reach the same audience, or even a comparable audience.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 27th day of June, 2024.

_____

Brad Polumbo

3

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| BASED POLITICS, INC.,<br>*Petitioner,*<br><br>v.<br><br>MERRICK B. GARLAND, in his<br>official capacity as Attorney<br>General of the United States,<br>*Respondent.* | No. 24-1183 |

## DECLARATION OF HANNAH COX IN SUPPORT OF
## <u>PETITIONER'S BRIEF ON THE MERITS</u>

I, Hannah Cox, declare as follows:

1.    I make this declaration from personal knowledge.

2.    I am the president and co-founder of BASED Politics, Inc.

("BASED Politics"), the Petitioner in the above-captioned case.

3.    BASED Politics, Inc. is a Georgia 501(c)(3) nonprofit

corporation.

4.    A central part of BASED Politics's mission is to reach

members of "Gen Z"—particularly users under 25 years old—with social

media content that promotes free markets and individual liberty.

5.    BASED Politics publishes its content on various internet platforms, including TikTok, primarily through the accounts of its founders, namely journalist Brad Polumbo and myself.

6.    My TikTok account has approximately 43,000 followers.

7.    My TikTok videos on topics such as systemic racism and the gender pay gap have reached hundreds of thousands, and as many as one million, people at a time.

8.    My TikTok videos include commentary on pending legislation—for example, supporting Tennessee school choice legislation[1] and criticizing federal vehicle "kill switch" legislation.[2]

9.    I consider the ability to comment contemporaneously on current events on TikTok to be essential to BASED Politics's efforts to participate in and influence public discourse.

10.   Other topics I have discussed in my TikTok videos include, among others, how the government manipulates numbers in labor

---

[1] Publicly available at:
https://www.tiktok.com/@hannahdcox/video/7332928861916777770
[2] Publicly available at:
https://www.tiktok.com/@hannahdcox/video/7299546301702688042

reports,[3] economic policies,[4] whether communism is better than capitalism,[5] the Federal Trade Commission's efforts to bring antitrust proceedings against Amazon,[6] public school curricula,[7] and government-funded animal torture.

11.    As one can observe at the links included in the footnotes to this declaration, my videos often receive hundreds of comments from viewers, agreeing or disagreeing with the video's point of view or making additional points on the topics.

12.    I also use TikTok to research issues that affect Americans, to gather information about people's reactions to various policies, and to craft messaging designed to help viewers connect their problems to existing solutions.

---

[3] Publicly available at:
https://www.tiktok.com/@hannahdcox/video/7332551282449861930
[4] Publicly available at:
https://www.tiktok.com/@hannahdcox/video/7323653964791057710
[5] Publicly available at:
https://www.tiktok.com/@hannahdcox/video/7313999271353863470
[6] Publicly available at:
https://www.tiktok.com/@hannahdcox/video/7269394647267413290
[7] Publicly available at:
https://www.tiktok.com/@hannahdcox/video/7243088899973598507

13.     In that way, I find TikTok to be a valuable tool to understand the correct public-policy approaches, the opposition they face, and the demographics with which they most resonate.

14.     I find TikTok more valuable than other social media platforms because of the content I receive through its content-recommendation engine.

15.     It appears to me that, based on what I view, the platform knows my core interests—economics, civil liberties, and women's issues—because it gives me nonstop content from others on those subjects.

16.     Viewing the content that TikTok provides in my "For You" feed allows me to see how people are experiencing the impacts of public policy in their everyday lives, learn more about their perspectives, and develop messaging for BASED Politics that is more attuned to their concerns.

17.     I also use TikTok to make a video podcast series for BASED politics called *Histrionics*, which examines women's and "gender war" issues from a centrist, individual liberty point of view.

18.     For each *Histrionics* episode, I pull videos I have saved on TikTok that speak to issues that concern women—for example, whether women are actually treated fairly in divorce court, whether there are dangers in the "trad wife" lifestyle, and whether women should have children.

19.     I then structure my own long-form video podcast around the TikTok videos, adding facts that I find through research, counterpoints, and other perspectives (which are often also taken from others' TikTok videos).

20.     I have found it easier to gain a following—and therefore to spread BASED Politics's ideas—on TikTok than on Instagram.

21.     My TikTok following is approximately double my following on Instagram, even though I have used Instagram for more than a decade and have only used TikTok since approximately 2021.

22.     I often comment on the President's State of the Union address and would like to comment on the ideas in the President's inaugural address in a TikTok video as soon as possible after it occurs on January 20, 2025.

23.    I consider TikTok essential to communicate with BASED Politics's target audience of members of Gen Z. I do not know of any other way that BASED Politics could reach the same audience, or even a comparable audience.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 27th day of June, 2024.

Hannah Cox