ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024
No. 24-1183 (consolidated with Nos. 1113 and 1130)

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

BASED POLITICS, INC.,
*Petitioner,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United states,
*Respondent.*

_____
*caption continued on inside cover*
_____

On Petitions for Review of Constitutionality of the Protecting
Americans from Foreign Adversary Controlled Applications Act

_____

BRIEF OF PETITIONER BASED POLITICS, INC.

_____

Jacob Huebert
Jeffrey M. Schwab
James McQuaid
LIBERTY JUSTICE CENTER
13341 W. U.S. Highway 290
Building 2
Austin, Texas 78737
512-481-4400
jhuebert@libertyjusticecenter.org
jschwab@libertyjusticecenter.org
jmcquaid@libertyjusticecenter.org
            *Counsel for Petitioner BASED Politics Inc.*

BRIAN FIREBAUGH, et al.,
*Petitioners,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,
*Respondent.*

_____

TIKTOK INC. and BYTEDANCE LTD.,
*Petitioners*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,
*Respondent*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioner BASED Politics certifies as follows:

### I.    Parties and Amici

The parties to BASED Politics Inc. v. Garland, No. 24-1183, are petitioner BASED Politics Inc. and respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. The parties to the first consolidated case, Firebaugh v. Garland, No. 24-1130, are petitioners Brian Firebaugh, Chloe Joy Sexton, Talia Cadet, Timothy Martin, Kiera Spann, Paul Tran, Christopher Townsend, and Steven King and respondent Merrick B. Garland, in his official capacity as Attorney General of the United States. The parties to the second consolidated case, TikTok Inc. v. Garland, No. 24-1113, are petitioners TikTok Inc. and ByteDance Ltd. and respondent Merrick B. Garland, in his official capacity as Attorney General of the United States.

### II.    Orders Under Review

Petitioners seek direct review of whether the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H (2024), is constitutional. There are therefore no prior rulings

iii

under review.

## III.   Related Cases

These cases were not previously before this Court or any other court. Counsel for Petitioner BASED Politics, Inc. is not aware of any other case currently pending before this or any other court that is related to these cases within the meaning of Circuit Rule 28(a)(1)(C).

<div style="margin-left:40%">

/s/ Jacob Huebert
Jacob Huebert

*Counsel for Petitioner*
*BASED Politics, Inc.*

</div>

## CORPORATE DISCLOSURE STATEMENT

Pursuant to the <u>Federal Rule of Appellate Procedure 26.1</u> and Circuit Rule 26.1, Petitioner states as follows: BASED Politics, Inc. is a Georgia 501(c)(3) nonprofit organization that publishes educational content on free markets and individual liberty. BASED Politics, Inc. has no parent. No publicly traded company owns 10% or more of the stock of BASED Politics, Inc.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ........................................................................ iii

CORPORATE DISCLOSURE STATEMENT .......................................... v

TABLE OF AUTHORITIES .................................................................

INTRODUCTION ............................................................................... 1

JURISDICTION .................................................................................. 2

ISSUES .............................................................................................. 3

STATUTE .......................................................................................... 3

STATEMENT OF THE CASE .............................................................. 3

    A. TikTok is a platform for speech that offers its users
       a unique ability to speak to a wide audience ................................. 3

    B. Petitioner BASED Politics Inc. uses TikTok to
       communicate ideas on public policy, individual liberty,
       and free markets to an audience it cannot reach
       anywhere else. ............................................................................. 5

    C. The Act bans TikTok and thus will prevent BASED Politics
       from speaking to its audience. ...................................................... 9

    D. The Act lacks any legislative findings stating its rationale. ......... 11

SUMMARY OF ARGUMENT .............................................................. 12

ARGUMENT ..................................................................................... 14

    I.      The Act infringes on Petitioner's First Amendment
             right to free speech. ............................................................... 14

    II.     The Act's infringement of Petitioner's rights
             violates the First Amendment. ................................................ 15

        A. The Act is invalid because it is a prior restraint
           on speech. ........................................................................... 15

        B. Even if it were not invalid as a prior restraint, the
           Act would warrant and fail strict scrutiny. ......................... 17

           1. The Act is subject to strict scrutiny because it
              imposes a content-based restriction on speech. ............... 17

           2. The Act fails strict scrutiny. ......................................... 19

C. The Act also fails intermediate scrutiny. ...........................22

III.    The Court should permanently enjoin the ban or,
in the alternative, issue a preliminary injunction. ..................25

A. The Court should permanently enjoin the ban. ..................25

B. In the alternative, the Court should preliminarily
enjoin the ban. ......................................................................28

CONCLUSION.................................................................................30

CERTIFICATE OF COMPLIANCE .......................................................32

CERTIFICATE OF SERVICE ..............................................................33

# TABLE OF AUTHORITIES

## Cases

*Bay Area Pace Navy v. United States,*
    914 F.2d 1224 (9th Cir. 1990) ........................................... 20

*Carroll v. President & Comm'rs of Princess Anne,*
    393 U.S. 175 (1968) ........................................................ 29

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................. 26, 29

*Florida Star v. B.J.F.,*
    491 U.S. 524 (1989) ........................................................ 21

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ...................................... 27

*Joelner v. Vill. of Wash. Park, Ill.,*
    378 F.3d 613 (7th Cir. 2004) .................................... 27, 28

*Legend Night Club v. Miller,*
    637 F.3d 291 (4th Cir. 2011) ........................................ 27

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ........................................................ 18

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ........................................................ 26

*Near v. Minnesota,*
    283 U.S. 697 (1931) ........................................................ 16

*Neb. Press Ass'n v. Stuart,*
    427 U.S. 539 (1976) ........................................................ 15

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................ 26

*Packingham v. North Carolina,*
    582 U.S. 92 (2017) .................................................... 24, 25

*Pursuing America's Greatness v. FEC,*
    831 F.3d 500 (D.C. Cir. 2016 ................................. 26, 27, 28

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ............................................................... 17, 18, 19

*Sottera, Inc. v. FDA*,
  627 F.3d 891 (D.C. Cir. 2010) ..................................................28

*Turner Broad. Sys. v. FCC*,
  512 U.S. 622 (1994) ................................................................23

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 802 (2000) ................................................................19

*Virginia v. Hicks*,
  539 U.S. 113 (2003) ................................................................27

**Statutes**

28 U.S.C. § 2201 ........................................................................ 2

Pub. L. No. 118-50, div. H (2024) ............................................3, 9, 10, 18

ix

## INTRODUCTION

TikTok is a social media platform on which some 170 million Americans publish and consume *speech*. Some of that speech might be considered frivolous—such as cat videos, trendy dances, or people lip syncing to popular songs. But much of the speech on TikTok is serious, addressing important political and social issues. And all of it is protected by the First Amendment.

Petitioner BASED Politics Inc. is a nonprofit organization that uses TikTok to reach a "Gen Z" audience with educational content and commentary from a perspective that favors free markets and individual liberty, through the accounts of its founders, Hannah Cox and Brad Polumbo. Their videos on topics such as systemic racism, the gender pay gap, economics, and free speech often receive thousands of views— some hundreds of thousands, and some more than a million. And thanks to TikTok's unique content recommendation engine, their videos reach young viewers who would not seek out their content, and whom they could not reach on other platforms.

The Foreign Adversary Controlled Applications Act would put an end to this by effectively banning TikTok in the United States. By taking

away the ability of Petitioner and millions of other Americans to share videos on TikTok, the Act violates the First Amendment's guarantee of freedom of speech. The Act offers no justification for this, but statements of the Act's sponsors make clear that shutting down speech was a major motivation for its enactment. That, of course, is a wholly improper purpose under the First Amendment. The Act's other purported justification—protecting Americans' data security—is speculative and could be better served in various ways that would not infringe so broadly on First Amendment rights.

The Act's ban on TikTok is an unconstitutional prior restraint on speech. It cannot survive any level of First Amendment scrutiny, and this Court should permanently enjoin it.

## JURISDICTION

This Court has original jurisdiction over this case under Section 3(a)-(b) of the Foreign Adversary Controlled Applications Act, which provides that all challenges to that Act must be brought in this Court. This Court also has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to decide this action and award relief because the

action presents an actual case or controversy within the Court's original jurisdiction.

## ISSUES

By effectively banning TikTok—and thus permanently preventing Petitioner from using the platform to spread and exchange ideas about free markets and individual liberty—does the Foreign Adversary Controlled Applications Act violate Petitioner's First Amendment right to free speech?

## STATUTE

The text of the Act (Pub. L. No. 118-50, div. H (2024)) is reproduced in the Addendum. Addendum 1-6.

## STATEMENT OF THE CASE

### A. TikTok is a platform for speech that offers its users a unique ability to speak to a wide audience.

As Petitioners TikTok Inc. and ByteDance Ltd. (the "TikTok Petitioners") have explained in detail, TikTok is an online platform that allows users to communicate with an audience of some 1 billion users worldwide—including 170 million users in the United States—by, among other things, creating and sharing videos. *See* Brief of

3

Petitioners TikTok Inc. & ByteDance Ltd. at 5-6, *TikTok, Inc. v. Garland*, No. 24-1113 (D.C. Cir. June 20, 2024) ("TikTok Br.").

TikTok is unique in that it does not require users to create profiles with personal information or depend on users following other users. *See* Brief of Creator Petitioners at 8-9*, Firebaugh v. Garland*, No. 1130 (D.C. Cir. June 20, 2024) ("Creators Br."). Instead, TikTok presents its users with an endless stream of videos to watch in their "For You" feed—with each user's unique stream determined by the platform's content-recommendation engine, which chooses the videos based on the user's past activity on the platform. *See id.* at 8-9; TikTok Br. at 6.

As a result, users can discover new content that is of interest to them. Conversely, the content-recommendation engine also allows creators with relatively few followers to reach a large audience and potentially go "viral," as it shares their content with users who are particularly likely to be interested in it, even if they would not have sought it out on their own. *See* Creators Br. at 8-9.

Further details about the platform, its features, and its content-recommendation system are presented in the briefs of the TikTok Petitioners and the Creator Petitioners, and Petitioner BASED Politics

4

Inc. adopts them here by reference.[1] *See* TikTok Br. at 5-8; Creators Br. at 4, 7-12.

## B. Petitioner BASED Politics Inc. uses TikTok to communicate ideas on public policy, individual liberty, and free markets to an audience it cannot reach anywhere else.

Petitioner BASED Politics Inc. is a 501(c)(3) nonprofit organization that seeks to reach members of Gen Z—particularly users under 25 years old—with social media content that promotes individual liberty and free markets. Declaration of Hannah Cox ("Cox Decl.") ¶¶ 3-4, Addendum 10. BASED Politics publishes its content on various internet platforms, including TikTok, primarily through the accounts of its founders, Hannah Cox and Brad Polumbo. *Id.* ¶ 5 (Addendum 11).

Cox's TikTok account has amassed some 43,000 followers, and her TikTok videos on topics such as systemic racism and the gender pay gap have reached hundreds of thousands, and as many as one million, people at a time. *Id.* ¶ 7. Cox's videos include commentary on pending

---

[1] To minimize duplicative briefing and disruption of the schedule established in the other two consolidated cases, Petitioner BASED Politics and the other parties to the consolidated cases agreed to a briefing schedule, which the Court approved, under which BASED Politics's primary brief is limited to 6,500 words, incorporating material from the other Petitioners' briefs by reference where appropriate.

legislation—for example, supporting Tennessee school choice legislation and opposing federal vehicle "kill switch" legislation. *Id.* ¶ 8. Other topics she has discussed in her TikTok videos include, for example, how the government manipulates numbers in labor reports, economic policies, whether communism is better than capitalism, the Federal Trade Commission's efforts to bring antitrust proceedings against Amazon, public school curricula, and government-funded animal torture. *Id.* ¶ 10.

Polumbo's TikTok account has nearly 18,000 followers. Declaration of Brad Polumbo ("Polumbo Decl.") ¶ 4 (Addendum 8). Many of his TikTok videos have been viewed tens of thousands of times, and one of his videos has been viewed more than two million times. *Id.* ¶ 5. His popular videos have addressed topics such as "misgendering," identity politics, crime, "Bidenomics," and government waste. *Id.* ¶ 6.

Cox's and Polumbo's videos often receive hundreds of comments from viewers, agreeing or disagreeing with the video's point of view, or making additional points on the topics. *Id.* ¶ 7.; Cox Decl. ¶ 11 (Addendum 12).

Cox also uses TikTok to research issues that affect Americans, to gather information about people's reactions to various policies, and to craft messaging designed to help viewers connect their problems to existing solutions. Cox Decl. ¶ 12. She finds it to be a valuable tool to understand the correct public-policy approaches, the opposition they face, and the demographics with which they most resonate. *Id.* ¶ 13. And she finds it more valuable than other social media platforms due to its content-recommendation engine. *Id.* ¶ 14. Based on what she views, the platform knows her core interests—economics, civil liberties, women's issues—and thus gives her nonstop content from others on those subjects. *Id.* ¶ 15. That allows her to see how people are experiencing the impacts of public policy in their everyday lives, learn more about their perspectives, and develop messaging for BASED Politics that is more attuned to their concerns. *Id.* ¶ 16.

She also uses TikTok to make a video podcast series for BASED Politics called *Histrionics*, which examines women's and "gender war" issues from what she describes as a "centrist, individual liberty point of view." *Id.* ¶ 17. For each episode, she pulls videos she has saved on TikTok that speak to issues that concern women—for example, whether

7

women actually are treated unfairly in divorce court, whether there are dangers in the "trad wife" lifestyle, and whether women should have children. *Id.* ¶ 18 (Addendum 14). She then structures her own long-form video podcast around the TikTok videos, adding facts that she finds through research, counterpoints, and other perspectives (often also taken from others' TikTok videos). *Id.* ¶ 19.

Similarly, Polumbo uses TikTok to research topics and find opinions he disagrees with that he can react to in his own videos. Polumbo Decl. ¶ 8 (Addendum 8). He has found that there are subcommunities on TikTok based on a wide range of topics, from the serious to the lighthearted, which make it easy for him to find content that is of interest to him (such as politics and LGBT content) and share his own content with others who might find it of in interest. *Id.* ¶ 9 (Addendum 9).

Also, Cox has found it easier to gain a following—and thus to spread her organization's ideas—on TikTok than on another popular platform, Instagram. *Id.* ¶ 20. Her TikTok following is approximately double her following on Instagram, even though she has used Instagram for more

than a decade and has only used TikTok since approximately 2021. *Id.*
¶ 21 (Addendum 14).

TikTok's content recommendation engine has introduced BASED
Politics content to thousands of unique individuals who likely never
would have heard its message anywhere else because many members of
Gen Z get news exclusively from TikTok. TikTok's unique
recommendation engine allows BASED Politics to reach an audience
that it could not reach on other media platforms, both because TikTok
has users who do not use other platforms, and because TikTok's content
recommendation engine shows BASED Politics content to people who
would not otherwise seek it out. *See* Cox Decl. ¶ 23 (Addendum 15);
Polumbo Decl. ¶ 10 (Addendum 9); Creators Br. at 9-12.

## C. The Act bans TikTok and thus will prevent BASED Politics from speaking to its audience.

As the TikTok Petitioners have explained in detail, the Act
effectively bans the TikTok platform in its current form. *See* TikTok Br.
at 21-24.

The Act's definition of a "foreign adversary controlled application"
includes any application operated by TikTok Inc., ByteDance Ltd., or
their affiliates. § 2(g)(3). And the Act makes it "unlawful for any entity

9

to distribute, maintain, or update" such an application through an "online mobile application store" or other "marketplace"—such as the Apple App Store or the Google Play Store. § 1(A). It also prohibits "[p]roviding internet hosting services to enable the distribution, maintenance, or updating of such [an] application." § 1(B).

The Act purports to allow an application to avoid the ban through a "qualified divestiture." § 2(c)(1). That requires the platform's owner to sell the application, and for the President to determine that the divestiture (i) results in the application "no longer being controlled by a foreign adversary" and (ii) "precludes the establishment or maintenance of any operational relationship between the application's U.S. operations and any formerly affiliated entities that are controlled by a foreign adversary." § 2(g)(6)(B).

The President may "grant a 1-time extension," of no more than 90 days, of the Act's 270-day deadline for an application to be shut down—but only if the President certifies that there is "a path to executing a qualified divestiture, "evidence of significant progress," and "binding legal agreements" in place. § 2(a)(3).

10

As the TikTok Petitioners have explained, these provisions effectively ban TikTok—permanently—effective 270 days after the Act's enactment (i.e., January 19, 2025). A "qualified divestiture" is not a viable option. It is technologically and operationally infeasible to sever a version of TikTok that would serve U.S. users only from TikTok's global platform in 270 days. *See* TikTok Br. at 21-22. It is commercially infeasible for a divested U.S.-only TikTok to compete with platforms that are allowed to operate globally. *See id.* at 23-24. And it is legally infeasible because the Chinese government will not allow a forced divestment of TikTok's recommendation engine. *See id.* at 24.

**D. The Act lacks any legislative findings stating its rationale.**

The Act includes no legislative findings stating its purpose. Many of the Act's supporters, however, have made no secret of their motive: a desire to censor content on TikTok of which they disapprove.

To summarize examples the other Petitioners have presented, the Act's supporters in Congress specifically cited the Chinese Communist Party's supposed control over the platform's content, content alleged to be harmful to children, supposedly excessive use of the hashtag "StandwithKashmir," the proliferation of Osama Bin Laden's "Letter to

11

America," alleged "one-sided" information on the conflict between Israel and Hamas, the alleged presence of more references to Palestinians than other platforms, and young Americans' reliance on the platform for news. *See* TikTok Br. at 19-20; Creators Br. at 16-17.

A March 2024 Justice Department report and a subsequent House committee report also cited concerns about the Chinese government *potentially* obtaining sensitive data from TikTok, but it contained no actual evidence of this, nor did it explain why measures TikTok had proposed to address these concerns would not suffice. *See* TikTok Br. at 18-19.

## SUMMARY OF ARGUMENT

The Act's ban on TikTok is a wholly unjustifiable severe violation of the First Amendment free-speech rights of Petitioner and all other TikTok users.

The Act infringes on the right to free speech by completely abolishing one of the biggest online forums for speech—preventing Petitioner from communicating with an audience it can reach nowhere else.

That restriction on speech is an invalid prior restraint on speech. Circumstances under which such a prior restraint could be justified are

12

exceedingly rare, and no one has even alleged, let alone shown, that they exist here.

In addition, the Act's ban on TikTok is subject to strict scrutiny because it discriminates against speech based on its content. It is content-based because it applies only to social media platforms that allow users to share content, and because it exempts platforms used for business and product reviews, and travel information and reviews. That points to its content-based purpose, expressed by many of its supporters in Congress: suppression of *political* speech that the government considers to be harmful.

The Act fails strict scrutiny because it is not narrowly tailored to serve a compelling governmental interest. Though the Act itself contains no statement of purpose or legislative findings, its legislative history suggests two purposes: suppression of propaganda and other speech the government deems harmful, and protection of Americans' data security. The suppression of propaganda (i.e., speech) is neither compelling nor even legitimate. And the supposed need to suppress speech to protect Americans' data security is speculative. If that is the Act's purpose, it is underinclusive because it does not address the many

13

other ways that foreign governments could obtain Americans' data—
and use the many other means available to address the issue without
severely abridging free speech.

Even if the Act were subject to intermediate First Amendment
scrutiny—though there is no reason why it should be—it would fail
because it does not directly and materially serve a substantial interest,
suppresses more speech than necessary, and does not leave open an
adequate alternative means of communication.

The remedy for this First Amendment violation is a permanent
injunction, without which Petitioner, its audience, and society as a
whole will suffer irreparable harm from the suppression of public
discourse.

## ARGUMENT

The Act's ban on TikTok is invalid as a prior restraint on speech, is
not narrowly tailored to serve a compelling or important governmental
interest, and thus fails any level of First Amendment scrutiny.

## I. The Act infringes on Petitioner's First Amendment right to free speech.

The Act will obviously, severely infringe on Petitioner's First
Amendment right to free speech by completely depriving it of its ability

14

to communicate with the unique audience that TikTok allows it to reach. On this point, Petitioner incorporates by reference the arguments made by the Creator Petitioners. *See* Creator Petitioners Br. at 24-37.

## II. The Act infringement of Petitioners' rights violates the First Amendment.

## A. The Act is invalid because it is a prior restraint on speech.

The Act must be struck down for violating the First Amendment, first and foremost because it imposes a prior restraint on speech.

Prior restraints on speech "are the most serious and least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Thus, "[a]ny prior restraint comes to this Court with a 'heavy presumption' against its constitutional validity." *Id.* at 558. And the Supreme Court has recognized that the damage caused by a prior restraint "can be particularly great"—and must be subject to the utmost scrutiny—"when [it] falls upon the communication of news and commentary on current events." *Id.*

The Act imposes a prior restraint because it permanently eliminates—in advance—Petitioner's ability to communicate with its audience on TikTok. It is therefore comparable to the quintessential

15

prior restraint struck down in *Near v. Minnesota*: a statute that authorized the government to enjoin publication of a newspaper, magazine, or periodical based on its publication of material deemed "obscene," "lewd," "lascivious," "malicious," "scandalous," or "defamatory." 283 U.S. 697, 701-02 (1931). But this ban is even worse. The statute in *Near* authorized injunctions against newspapers on a case-by-case basis, based on their publication of material that might *not* be protected by the First Amendment. The Act, however, suppresses all communication on TikTok by all its users—almost all of whom engage entirely in speech fully protected by the First Amendment, and many of whom, including Petitioner, use it to offer commentary on current events, speech at the core of the First Amendment's protection.

Petitioner cannot know how the government will attempt to justify this prior restraint because the Act completely lacks legislative findings setting forth its rationale. But the even most compelling purpose the Act's progenitors have invoked (however dubiously), national security, cannot suffice. The Creator Petitioners have explained this point well— noting, for example, that no one even alleges the sort of imminent danger that could justify a prior restraint, and that the ban's effective

16

date shows that Congress does not believe that any such immediate danger exists. Petitioner adopts their argument on this point by reference. *See* Creator Petitioners Br. at 40-42.

## B. Even if it were not invalid as a prior restraint, the Act would warrant and fail strict scrutiny.

Even putting aside its nature as a prior restraint on speech, the Act is subject to strict First Amendment scrutiny—and fails it.

### 1. The Act is subject to strict scrutiny because it imposes a content-based restriction on speech.

The Act is subject to strict scrutiny because it suppresses speech based on its content.

The Supreme Court has explained that a restriction on speech is "content based," and thus subject to strict scrutiny, if either (1) its text "draws distinctions based on the message a speaker conveys," notwithstanding any "benign motive, content-neutral justification, or lack of animus toward the ideas," or (2) "the purpose and justification for the law are content based." *Reed v. Town of Gilbert*, 576 U.S. 155, 166-67 (2015). The Act is both facially content-based *and* motivated by a desire to suppress speech based on its content.

The Act is content-based on its face. A law may be facially content based if it "applies to particular speech because of the topic discussed or the idea of message expressed," *id.* at 163, or if it "require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred," *McCullen v. Coakley*, 573 U.S. 464, 479 (2014). The Act imposes a content-based restriction on its face because it applies only to platforms that allow users to share content with each other—that is, it singles out user-generated content. It is also content-based because it exempts any company other than TikTok and ByteDance "that operates an [app or website] whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews"—that is, it targets user speech only where it does not pertain to one of the exempted content categories. Act § 2(g)(2)(B).

In carving out an exception for speech about products, businesses, and travel, the Act not only discriminates on content but reveals its true motive: to suppress *political* speech of which the government disapproves. And that is the other reason why it is a content-based restriction: its plain *purpose* is to suppress speech based on its content.

18

As discussed above, the Act's supporters in Congress made no secret of their desire to shut down TikTok specifically because of the views that content creators express and the concern over the content TikTok might choose to show users.

### 2. The Act fails strict scrutiny.

The Act fails strict scrutiny analysis, which "requires the Government to prove that [a challenged] restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 802, 813 (2000).

The government cannot show that the Act serves a compelling governmental interest. Again, the Act does not even identify its purpose and lacks any legislative findings. Presumably the government will invoke the same purposes the Act's supporters in Congress identified: protecting Americans from foreign propaganda and other speech believed to be harmful and protecting Americans' data security (which supposedly implicates national security).

19

The first potential justification—protection against propaganda or supposedly harmful ideas of which the government disapproves—is not a compelling governmental interest, and is instead a wholly illegitimate interest. *See* TikTok Br. at 49-51 (discussing relevant cases).

The other potential justification—data security—also fails, even if one assumes *arguendo* that protecting Americans' data security could be a compelling governmental interest.

As the other Petitioners have explained,[2] the idea that TikTok will give Americans' data to the Chinese government for espionage or other nefarious purposes is speculative—based on people's assertions about what TikTok and China *might* do rather than evidence of anything they have *actually* done. And speculation about potential harm cannot suffice to justify a content-based restriction on speech. *See Bay Area Pace Navy v. United States*, 914 F.2d 1224, 1228-29 (9th Cir. 1990).

Moreover, as the other Petitioners have observed,[3] the Act is extremely underinclusive as a means of addressing concerns about

---

[2] Petitioner incorporates the other Petitioners' arguments on this point by reference. *See* TikTok Br. at 51-54; Creators Br. at 55-56.
[3] Petitioner incorporates the other Petitioners' arguments on this point by reference. *See* TikTok Br. at 54-57; Creators Br. at 56.

20

Americans' data security. It is well known that many applications on virtually everyone's smartphones constantly collect data about their users. The providers of those apps are free to sell it to others. So if foreign governments want data about Americans, they can get it—and the Act won't stop them.

Courts consider underinclusiveness in evaluating a statute's constitutionality under the First Amendment in part because it "raises serious doubts about whether [the government] is, in fact, serving, with this statute, the significant interests which [it] invokes" to justify the law. *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989). Here, as discussed above, the government's ulterior motive is plain: shutting down speech of which it disapproves. The Act does not make sense as an effort to protect data security—as discussed below, there are more effective means the government could use that would do more to protect Americans' data while infringing much less on their First Amendment rights. On the other hand, the Act makes total sense as a means of accomplishing what many of its sponsors said they wanted: preventing the communication of certain ideas to its large audience.

21

If Congress really wanted to protect Americans' data, there are other means by which it could do so that would not infringe on Americans' First Amendment rights to the extreme extent that the Act does. It could restrict application providers' use of Americans' data generally, without banning any apps or platforms. It could restrict the installation of TikTok on devices used by federal employees and others with access to sensitive information—rather than restrict everyone's ability to use the platform. Or it could take TikTok up on its detailed offer to go to great lengths, at its own expense, to protect American users' data in a way that addresses this concern. *See* TikTok Br. at 15-17.

Thus, in sum, the Act does not serve any compelling governmental interest—but even if one assumes that it does, to some extent, it is not narrowly tailored to serve such an interest and thus cannot survive strict scrutiny.

## C. The Act also fails intermediate scrutiny.

Even if the Act were subject to intermediate scrutiny—though there is no reason why such a sweeping ban on speech should receive such relatively deferential review—it would still fail.

22

Under intermediate scrutiny, the government must prove that a restriction on speech: serves a "substantial" government interest, "unrelated to the suppression of free expression," that is "not merely conjectural"; would serve that interest in a "direct and material way"; is narrowly tailored to suppress no more speech than essential to further that interest; and leaves open ample alternative channels for speech. *Turner Broad. Sys. v. FCC*, <u>512 U.S. 622, 662</u> (1994).

Again, the Act's supporters' anti-propaganda justification *is* related to the suppression of free expression—indeed, from their perspective, it's the *whole point*—so that interest cannot satisfy intermediate scrutiny.

The government might have a "substantial" interest in protecting Americans' data security, but, as noted above, the notion that this ban serves such an interest—at all, let alone in a "direct and material way"—is "merely conjectural" and therefore cannot suffice.

Putting those fatal flaws aside, the Act also fails intermediate scrutiny because it is not narrowly tailored to suppress only as much speech as necessary to further the government's supposed interests. As discussed above, there are various ways the government could address

23

any legitimate concern about data security that do not entail banning an entire platform and suppressing all the speech that occurs on it.

Finally, and importantly, the Act does not leave open ample alternative channels for speech. As discussed in the Statement of the Case above, Petitioner uses TikTok to reach a "Gen Z" audience *that it cannot otherwise reach* with ideas about public policy, civil liberties, and free markets. [Even if a "qualified divestiture" were feasible and the platform were to continue in a divested form, separated from the global platform, that new version of TikTok would not be an adequate alternative.

In *Packingham v. North Carolina*, 582 U.S. 92 (2017), the Supreme Court held that a statute that prohibited sex offenders from accessing social networking platforms violated the First Amendment, in part because there is no adequate alternative to a major social media platform. The Court rejected a lower court's conclusion that other websites that served similar functions were adequate alternative means of communication because it recognized that "cyberspace" and "social media in particular" had become "the most important places . . . for the exchange of views." *Id.* at 104. And it noted that different social media

24

sites play distinct roles in facilitating different types of "protected First Amendment activity": Facebook for debating religion and politics with friends and neighbors; LinkedIn for, e.g., looking for work, advertising for employees, and tips on entrepreneurship; and Twitter for engaging with elected representatives. *Id.* at 104. The Court did not mention TikTok—which would not be introduced in the U.S. until later that year—but, as discussed above, TikTok also plays a unique role, particularly for anyone like Petitioner who seeks to reach a Gen Z audience.

Thus, the Act's ban on TikTok fails intermediate scrutiny, just as it fails higher levels of First Amendment scrutiny.

## III. The Court should permanently enjoin the ban or, in the alternative, issue a preliminary injunction.

## A. The Court should permanently enjoin the ban.

The necessary remedy for the TikTok ban's First Amendment violations is a permanent injunction against its enforcement.

A permanent injunction is warranted where (1) plaintiff will otherwise suffer irreparable harm; (2) plaintiff has no adequate remedy at law, such as monetary damages; (3) the balance of hardships weight in favor of an injunction; and (4) an injunction would not disserve the

public interest. *See Monsanto Co. v. Geertson Seed Farms*, <u>561 U.S. 139,</u> <u>156-57</u>, <u>162</u> (2010). Where the government is the party to be enjoined, the third and fourth factors merge. *Nken v. Holder*, <u>556 U.S. 418, 435</u> (2009).

All these factors support a permanent injunction against the Act.

First, an injunction is necessary to prevent irreparable harm to Petitioner. Unless the Act is enjoined, Petitioner will be permanently deprived of its ability to speak on TikTok, in violation of its First Amendment rights. As courts have long recognized, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, <u>427 U.S. 347, 373</u> (1976) (plurality opinion); *see also Pursuing America's Greatness v. FEC*, <u>831</u> <u>F.3d 500, 511</u> (D.C. Cir<u>r. 2016</u>) (quoting *Elrod* and concluding that preventing plaintiff from "includ[ing] candidate names in its website or social media page titles during this election cycle" would cause irreparable harm). And the harm of censorship would fall not only on Petitioner and other TikTok content creators who would otherwise use the platform for political speech, but also on "society as a whole, which

[would be] deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

Second, Petitioner has no adequate remedy at law. Because the harm from a violation of First Amendment rights is irreparable, monetary damages are never adequate to compensate for it. *See Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011). In addition, the federal government's sovereign immunity would prevent Petitioner from recovering any damages from Respondent or the federal government.

Finally, equity and the public interest favor an injunction. Protection of First Amendment rights is always in the public interest, and enforcement of a law that violates First Amendment rights is never in the public interest. *See Pursuing America's Greatness*, 831 F.3d at 511 ("[T]here is always a strong public interest in the exercise of free speech otherwise abridged by an unconstitutional regulation . . . . "); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is never in the public interest."). And here, an injunction would *directly* serve the public inasmuch as it would protect *everyone*'s right to engage in (and listen to) speech on TikTok—not just

27

Petitioner, but all 170 million Americans who use the platform and others who will do so in the future if the government does not shut it down.

### B. In the alternative, the Court should preliminarily enjoin the ban.

In the alternative, if the Court were to conclude that it lacks a sufficient record to issue a final decision on the merits, then, as the TikTok Petitioners have argued (TikTok Br. 71-72), it should issue a preliminary injunction to preserve the status quo while this case is pending.

In deciding whether to grant a preliminary injunction, a court considers whether "(1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010). In First Amendment cases, "the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis." *Pursuing America's Greatness*, 831 F.3d at 511 (quoting *Joelner*, 378 F.3d at 620).

28

Here, Petitioner is highly likely to succeed on the merits of its First Amendment claim for all the reasons explained above and in the other Petitioners' briefs. The Act's total ban on TikTok, including all of its users' speech on the platform—with *no* Congressional findings even attempting to justify it—is wholly indefensible and cannot stand.

Moreover, unless the Court enjoins the ban before it takes effect, Petitioner will suffer irreparable harm, even if the Court ultimately rules in Petitioner's favor later. Petitioner's speech on TikTok includes commentary on current events as they occur, such as commentary on pending legislation. Timeliness is therefore essential to many of Petitioner's communications on the platform. If TikTok were forced to go offline for any period of time, Petitioner—as well as its audience and society as a whole—would be especially harmed by its inability to reach its audience during that time. *See Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 182 (1968) ("It is vital to the operation of democratic government that the citizens have facts and ideas on important issues before them. A delay of even a day or two may be of crucial importance in some instances."); *Elrod*, 427 U.S. at 374 n.29 ("The timeliness of political speech is particularly important.").

29

In fact, coincidentally or not, the statute would force TikTok to shut down one day before the next presidential inauguration. Petitioner anticipates that it will want to use TikTok to comment on the ideas expressed in the inaugural address at that time, *see* Cox Decl. ¶ 22—but if the ban takes effect, it will not be able to do so. A later decision striking down the ban will not remedy this injury, as the opportunity to timely comment while the inauguration is the subject of public discourse will be lost.

Thus, the effect Petitioner's speech would have on public discourse—which is of course unknowable if the government prevents the speech from occurring—will never happen, nor will the potential cascading effects on others' ideas and speech, or the public policies that could result from the proliferation of Petitioner's ideas. That harm is immeasurable, irreparable, and potentially immense.

## CONCLUSION

Petitioner BASED Politics Inc. respectfully requests that this Court declare that the Foreign Adversary Controlled Applications Act violates the First Amendment's guarantee of freedom of speech and permanently enjoin Respondent Attorney General Merrick B. Garland

30

from enforcing it. Alternatively, Petitioner requests that the Court

enter a preliminary injunction against the ban pending a final

resolution of this case.


DATED: June 28, 2024                    /s/ Jacob Huebert

                                        Jacob Huebert
                                        Jeffrey M. Schwab
                                        James McQuaid
                                        LIBERTY JUSTICE CENTER
                                        13341 W. U.S. Highway 290
                                        Building 2
                                        Austin, Texas 78737
                                        512-481-4400
                                        jhuebert@libertyjusticecenter.org
                                        jscwhab@libertyjusticecenter.org
                                        jmcquaid@libertyjusticecenter.org
                                        *Counsel for Petitioner BASED Politics, Inc.*

31

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations set by the Court's order of May 28, 2024 because the brief contains 5,736 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word using proportionally spaced, 14-point Century Schoolbook font.


June 28, 2024                     /s/ Jacob H. Huebert
                                 LIBERTY JUSTICE CENTER
                                 13341 W. U.S. Highway 290
                                 Building 2
                                 Austin, Texas 78737
                                 512-481-4400
                                 jhuebert@ljc.org

                                 *Counsel for Petitioner*
                                 *BASED Politics, Inc.*

32

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on June 27, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

June 28, 2024

/s/ Jacob H. Huebert
LIBERTY JUSTICE CENTER
13341 W. U.S. Highway 290
Building 2
Austin, Texas 78737
512-481-4400
jhuebert@ljc.org

*Counsel for Petitioner*
*BASED Politics, Inc.*