**ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024**

# United States Court of Appeals
# for the District of Columbia Circuit

## No. 24-1113

### (and Consolidated Cases 24-1130 & 24-1183)

TIKTOK INC. and BYTEDANCE LTD.,

*Petitioners,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

*(For Continuation of Caption See Inside Cover)*

*On Petition for Review of Constitutionality of the Protecting
Americans from Foreign Adversary Controlled Applications Act*

## CORRECTED BRIEF OF *AMICI CURIAE* PROFESSORS MUELLER, EDGAR, AARONSON, AND KLEIN IN SUPPORT OF PETITIONERS

MARK DAVIES
JEREMY DUNBAR
ETHAN L. PLAIL
EDRED RICHARDSON
WHITE & CASE
701 Thirteenth Street, NW
Washington, DC 20005
mark.davies@whitecase.com

*Counsel for Amicus Curiae*

June 28, 2024

 COUNSEL PRESS     (800) 4-APPEAL • (330622)

BRIAN FIREBAUGH, *et al.*,

*Petitioners,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

---

BASED POLITICS INC.,

*Petitioner,*

*v.*

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent.*

# CERTIFICATES

***D.C. Cir. Rule 28(a), Certificate as to Parties, Rulings, and Related Cases.***

As of the finalization of this brief, the following *amici* have appeared in this Court or filed a notice of intent to do so: Professor Milton Mueller, Timothy H. Edgar, Susan A. Aaronson, Hans Klein, Electronic Frontier Foundation, Freedom of the Press Foundation, TechFreedom, Media Law Resource Center, Center for Democracy and Technology, First Amendment Coalition, Freedom to Read Foundation, the Cato Institute, and Professor Matthew Steilen.  Except for the above-listed *amici*, all parties, intervenors, and amici appealing in this Court are listed in the Brief for Petitioner.  The Petitioners seek review of the constitutionality of the Protecting Americans from Foreign Adversary Controlled Substance Act (H.R. 815, Div. H., 118th Cong., Pub. L. No. 118-50 (April 24, 2024).  There were no district court proceedings in any of the cases.  *Amici* are not aware of any other cases pending before this or any other court that are related.

***D.C. Cir. Rule 28(b)(5)***

All applicable statutes and regulations referenced herein are contained in the Petition for Review and/or the Brief for Petitioner.

***D.C. Cir. Rule 29(b)***

Pursuant to D.C. Cir. Rule 29(b), *Amici* certify that all parties have consented to *Amici*'s participation in this case.

i

***Fed. R. App. P. 29(a)(4)C***

Pursuant to Fed. R. App. P. 29(a)(4)(E), *Amici* certify that no party or counsel for any party authored this brief in whole or in part and that no one other than *Amici* or their counsel contributed any money that was intended to fund the preparation or submission of this brief.

***D.C. Cir. R. 29(d)***

Pursuant to D.C. Cir. R. 29(d), *Amici* certify that a separate amicus brief is necessary. This brief provides the unique viewpoints of internationally prominent scholars specializing in AI, cybersecurity, data governance, international public affairs, internet governance, and national security.

DATED: June 28, 2024                                   */s/ Mark Davies*
                                                                         Mark Davies

# TABLE OF CONTENTS

CERTIFICATES ................................................................................. i

TABLE OF CONTENTS ................................................................. iii

TABLE OF AUTHORITIES ............................................................ v

TABLE OF ABBREVIATIONS ...................................................... vii

STATEMENT OF INTEREST ........................................................ viii

INTRODUCTION AND SUMMARY OF ARGUMENT ..................... 1

BACKGROUND ............................................................................. 3

    TikTok ..................................................................................... 3

    Project Texas ......................................................................... 5

    The Ban ................................................................................. 7

ARGUMENT .................................................................................. 8

I.     The Ban Violates The First Amendment Because Congress Did Not Conduct A "Careful Assessment" Of The Asserted Threat ..................... 10

II.    The Ban Violates The First Amendment Because It Is Overly Broad And Not Narrowly Tailored To Address The National Security Risks ............ 13

    A.    The Ban Is Not Tailored To Reduce Foreign Access To Sensitive Information ................................................................. 14

    B.    The Ban Is Not Tailored To Reduce Foreign Access To The Vast Amount Of American Sensitive Data Available On Media Platforms ................................................................. 16

    C.    The Ban Is Not Tailored To Reduce Foreign Propaganda .............. 17

III.   The Ban Violates The First Amendment Because There Are Less Restrictive Ways to Deal with Any Potential National Security Concern 21

A.    Project Texas Is A Less Restrictive Way to Deal with Any Potential National Security Concern ................................................ 21

B.    Other Alternatives Are Less Restrictive Ways to Deal with Any Potential National Security Concern ................................................ 25

IV.    The Ban Violates the First Amendment Because Congress Did Not Conduct A "Careful Assessment" Of The Ban's Harms To National Security ........................................................................................ 26

CONCLUSION ................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bd. of Airport Comm'rs v. Jews for Jesus*,
    482 U.S. 569 (1987)................................................................9, 15

*FEC v. Ted Cruz for Senate*,
    596 U.S. 289 (2022)................................................................8, 11

*Lamont v. Postmaster General*,
    381 U.S. 301 (1965)................................................................20

*McCullen v. Coakley*,
    573 U.S. 464 (2014)................................................................9, 14, 21

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)................................................................10, 28

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)................................................................20

*Reno v. ACLU*,
    521 U.S. 844 (1997)................................................................9, 14

*Sable Commc'ns of California, Inc. v. F.C.C.*,
    492 U.S. 115 (1989)................................................................9

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000)........................................... 8, 9, 10, 11, 13, 21, 28

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002)................................................................9

## STATUTES, RULES, AND REGULATIONS

Protecting Americans from Foreign Adversary Controlled Applicaitions,
    H.R. Rep. No. 118-417 (2024) ...........................................................1

U.S. Const. amend. I ...................................................................8

EU Reg. 2022/2065 .......................................................................................25

# TABLE OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| API | Application Programming Interface |
| CCP | Chinese Communist Party |
| CFIUS | Committee on Foreign Investments in the U.S. |
| CISA | Cybersecurity and Infrastructure Security Agency |
| IEEPA | International Emergency Economic Powers Act |
| IO | influence operation |
| NIST | National Institute of Standards and Technology |
| NSF | National Science Foundation |
| PADFA | Protecting Americans' Data from Foreign Adversaries Act of 2024 |
| PRC | People's Republic of China |
| USDS | TikTok U.S. Data Security |

## STATEMENT OF INTEREST

Professors Milton L. Mueller, Timothy H. Edgar, Susan A. Aaronson, and Hans Klein are internationally prominent scholars specializing in AI, cybersecurity, data governance, public affairs, internet governance, and national security.

*Professor Mueller* is a Senior Professor at Georgia Institute of Technology, School of Public Policy, and is the Program Director for Georgia Tech's interdisciplinary master's degree in Cybersecurity. He is also the author of seven books and scores of journal articles.

*Professor Edgar* is a Professor of the Practice of Computer Science at Brown University, Senior Fellow at the Watson Institute of International and Public Affairs, and Lecturer on Law at Harvard Law School. He helped launch Brown University's professional Cybersecurity degree program.

*Professor Aaronson* is a Research Professor at the Elliot School of International Affairs and is George Washington University Public Interest Technology Scholar. She is also co-principal investigator with the NSF-NIST, Institute for Trustworthy AI in Law & Society, TRAILS.

*Professor Klein* is an Associate Professor in the School of Public Policy at the Georgia Institute of Technology. His research focuses on globalization, democracy, and Internet governance, and he has served as the Chair of Computer Professionals for Social Responsibility and led their activities on global Internet governance.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Professors Milton L. Mueller, Timothy H. Edgar, Susan A. Aaronson, and Hans Klein are internationally prominent scholars specializing in AI, cybersecurity, data governance, international public affairs, internet governance, and national security.  As professors often do, they disagree on matters both foundational and technical.  Yet here, the professors join to speak with one clear voice:  The Protecting Americans from Foreign Adversary Controlled Applications Act ("Act" or "Ban") is unconstitutional.  This is not a close case.

TikTok is an online platform used by over 170 million Americans to entertain, express themselves, advocate for various causes, or spread awareness.  Despite the existence of much less restrictive remedies, the Act will ban TikTok throughout the country.[1]  The Ban will put an end to this public forum for speech, a forum that is especially vibrant among young people.

The professors agree on the following dispositive points:

*First*, the lack of "hard evidence" or "careful analysis" as required by the First Amendment is reason enough to find the Ban unconstitutional.  The Ban is not

---

[1] Petitioner TikTok states that the "qualified divestitures" provision "is simply not possible: not commercially, not technologically, not legally."  TikTok-Petition, ¶3; TikTok-Br. 21-24.

supported by an adequate congressional record.  In fact, there is no congressional record, and no executive or agency findings were published.

*Second*, the Ban is not tailored to achieve the Government's national security interests.  TikTok is a social media platform whose videos and content offer a staggering variety of viewpoints and modes of expression.  The Ban takes the overbroad approach of banning all speech on TikTok indiscriminately.  The Ban will have a negligible effect on national security because it will not reduce foreign access to sensitive information nor reduce influence operations.

*Third*, the Ban disregards many less restrictive alternatives, including Project Texas, and is an unnecessarily drastic step considering those alternatives.  Indeed, Project Texas mandates the creation of an independent U.S.-based subsidiary called TikTok U.S. Data Security (USDS), which houses TikTok teams that access U.S. user data.  Moreover, Oracle Cloud would host the TikTok platform, including the algorithm and content moderation functions, in the United States.  And the Committee on Foreign Investments in the U.S. (CFIUS) would play an ongoing role in monitoring TikTok's compliance with Project Texas and would have a "shut-down option."  These, and other, parts of Project Texas mitigate the national security risks set out by Congress.

*Fourth*, the Ban will seriously undermine U.S. foreign policy interests. TikTok may be the first major non-U.S.-based social media platform to become

popular in the U.S., but it won't be the last. Simply banning every non-U.S. platform is not a viable or sustainable solution, nor is it consistent with longstanding U.S. foreign policy goals. Congress ignores these negative impacts of the Ban and, therefore, did not conduct a "careful assessment" of "hard evidence" as required by the First Amendment.

For at least these reasons, the Act cannot justify its extreme and indiscriminate restraint on free speech and should be held unconstitutional.

## BACKGROUND

**TikTok**

TikTok uses a content recommendation algorithm to suggest new videos to its users. Users view content primarily through TikTok's "For You" feed, which presents users with videos curated specifically for them by TikTok's proprietary recommendation engine.[2] Because TikTok is a globally integrated platform—its operations span geographies, functions, and organizations[3]—users can seamlessly access content created around the world.

Like many American-based social media companies, TikTok and ByteDance have developed products based on their valuable intellectual property for export to

---

[2] TikTok-Petition, ¶16.

[3] Gary Kildare, *IBM a Globally Integrated Enterprise*, CRITICALEYE, https://perma.cc/B5EP-9YUL (June 25, 2024).

foreign markets.[4]  TikTok is provided in the United States by TikTok Inc.—an American company incorporated and headquartered in California.  TikTok Inc.'s ultimate parent is ByteDance Ltd., a privately held company in the Cayman Islands. Its CEO, Shou Zi Chew, is Singaporean.  TikTok's entry into the global market was financed by American capital, Americans populate its board, and its U.S. subsidiary is run mainly by Americans.[5]  TikTok's entry into the U.S. market was commercially motivated.  TikTok is not available in the Chinese market.[6]

170 million Americans create, publish, view, interact with, and share videos on TikTok.  Americans rely on TikTok to express themselves, learn, advocate for causes, share opinions, create communities, and even make a living.[7]  Many of these Americans use TikTok to express themselves artistically or culturally.  Still more use TikTok to express themselves politically, advocate for various causes, or spread awareness about those causes.  Indeed, established, and new politicians from across

---

[4] ByteDance operates other online platforms and software applications for use in U.S. and international markets.  TikTok-Petition, ¶17; Laura He, *Wait, is TikTok really Chinese?*, CNN (Mar. 28, 2024), https://perma.cc/Y2F6-3BFG.

[5] ByteDance Ltd. is 58%-owned by global institutional investors, 21%-owned by its global workforce, and 21%-owned by one of its founders, Zhang Yiming, a Chinese national who lives in Singapore.  TikTok-Br. 14.

[6] Jessie Yeung & Selina Wang, *TikTok is owned by a Chinese company. So why doesn't it exist there?*, CNN (Mar. 24, 2023), https://perma.cc/D72B-R2EY.

[7] According to TikTok's Petition, ByteDance launched TikTok in May 2017 in over 150 countries, including the United States and has gained over one billion users worldwide and more than 170 million Americans use TikTok monthly.  TikTok-Petition, ¶15.

4

the spectrum (including President Biden and former-President Trump[8]) use TikTok to reach young people, activate new supporters, and break out as candidates.[9]

**Project Texas**

In January 2023, TikTok unveiled Project Texas, its plan to address the U.S. Government's national security concerns. Project Texas was proposed and refined during 18 months of negotiations between TikTok and CFIUS, and it includes elements addressing the Government's data security and content manipulation concerns, as well as auditing measures to monitor TikTok's compliance with the plan. Project Texas has several key provisions:[10]

*First*, Project Texas creates a new, U.S.-based subsidiary called USDS, that is independent of TikTok's global operations. USDS will house TikTok teams that access U.S. user data, access TikTok's software code and back-end systems, or moderate content on the platform. CFIUS can specify requirements for hiring at USDS. USDS employees must either be a U.S. citizen or have a green card.

---

[8] Firebaugh-Petition, ¶¶10, 12, 25-26, 28, 29-30; Alex Thompson, *Trump joins TikTok, outpaces Biden campaign for followers in hours*, AXIOS (June 2, 2024); Maridith McGraw & Rebecca Kern, *Trump joins TikTok, the app he once tried to ban*, POLITICO (June 2, 2024).

[9] Firebaugh-Petition, ¶29; Sen. Ed Markey (@senmarkey), TIKTOK, https://tinyurl.com/msxmmv5c (June 22, 2024); Team Rosen (@rosenhq), TIKTOK, https://tinyurl.com/3kxcrtf8 (June 22, 2024).

[10] Matt Perault & Samm Sacks, *Project Texas: The Details of TikTok's Plan to Remain Operational in the United States*, LAWFARE (Jan. 26, 2023), https://perma.cc/WXR5-AZ2H.

**Second**, to prevent unauthorized access to TikTok U.S. user data, Oracle Cloud will host the TikTok platform in the United States, including the algorithm and content moderation functions. Oracle will use automated processes and human review to monitor data flows for security breaches or improprieties.

**Third**, to prevent manipulation of TikTok's content, USDS will house TikTok's content moderation functions in the United States. Oracle will oversee the moderation system, the recommendation engine, and the promoted content.

**Fourth**, CFIUS will play an ongoing role in monitoring TikTok's compliance with the agreement. The "Agreement would also give CFIUS a 'shut-down option.'"[11]

TikTok's Brief includes a declaration from Christopher Simkins (App.719-57), a former Senior Counsel at the Justice Department responsible for its participation in the Committee, explaining that Project Texas "effectively mitigates national security risk associated with" TikTok.[12] TikTok's Petition also explains that TikTok "has begun the process of voluntarily implementing [Project Texas] to the extent it can do so without the U.S. government's cooperation."[13]

---

[11] TikTok-Petition, ¶75.
[12] TikTok-Br. 15-16; App.756.
[13] TikTok-Petition, ¶45.

**The Ban**

On March 5, 2024, the House of Representatives introduced a bill banning TikTok. Six weeks later, the House packaged the bill with aid for Israel and Ukraine. That omnibus bill quickly passed both houses, and on April 24, 2024, the President signed the Act into law.[14]

The Act prohibits various entities, including online mobile application stores like the Apple and Google app stores, from providing services to "foreign adversary-controlled applications." It creates two definitions of "foreign adversary-controlled application" one that applies only to TikTok Inc. and ByteDance Ltd. and one that creates standards and procedures for designating whether an application provided by a "covered company" poses a national security risk.[15] When an application falls within one of these definitions, a "Prohibition" of the application comes into effect unless its operator meets stringent conditions for executing a "qualified divestiture."

The Act contains no legislative findings, leaving no indication of what rationale—if any—majorities of the House and Senate and the President agreed to as the reason for banning TikTok. A House committee issued a report on a precursor to the Act that used different statutory language and did not address the Act's two-

---

[14] Trevor Hunnicutt et al., *Biden Signs Ukraine Aid, Tiktok Ban Package After Republican Battle*, Reuters (Apr. 24, 2024).

[15] TikTok Br., 11-12 (explaining the Act's provisions and definition of "covered company").

tiered structure or explain why it adopts one standard for TikTok and a different standard for everyone else.

## ARGUMENT

The First Amendment states that "Congress shall make no law…abridging the freedom of speech." U.S. CONST., amend. I. Where the government seeks to make a law restricting the freedom of speech, Congress must conduct a "careful assessment and characterization of an evil," corroborated by "hard evidence," to justify the restriction. *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 818 (2000). Congress must point to "record evidence or legislative findings" and cannot "simply posit the existence of the disease sought to be cured." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 307 (2022). Yet, here, the Act contains no legislative findings, no Senate committees were held, and Congress offered no rationale for "how widespread or how serious the problem…is." *Playboy*, 529 U.S. at 819.[16]

Scholars may disagree on the exact risk that TikTok poses from a national security perspective, but they agree that, even if a risk exists, the total ban of TikTok is not an appropriate solution. The Act bans all speech on TikTok indiscriminately. The Ban "on its face…reaches the universe of expressive activity, and prohibit[s] all

---

[16] H.R. Comm. on Energy & Com., *Protecting Americans from Foreign Adversary Controlled Applications Act*, H.R. Rep. No. 118-417 (2024) [hereinafter House Report].

protected expression," and therefore, is overbroad and unconstitutional. *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 574 (1987). The indiscriminate, total ban on TikTok is also unconstitutional because it is "not tailored to the [Government]'s stated interests." *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 161, 168 (2002); *McCullen v. Coakley*, 573 U.S. 464, 478 (2014); *Reno v. ACLU*, 521 U.S. 844, 879 (1997).

The Ban also "violates the First Amendment because the Government might further its interests in less restrictive ways." *Playboy*, 529 U.S. at 809. Here, the Government ignored Project Texas and all other possible alternatives to the Ban and failed to articulate why these alternatives would be ineffective. In short, there are "no legislative findings that would justify…concluding that there is no constitutionally acceptable less restrictive means, short of a total ban." *Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 129 (1989).

Finally, the U.S.'s continued role as an international leader in internet freedom is crucial and, according to the U.S government, is itself a "national security interest."[17] If the Ban goes into effect, the two major markets in which TikTok is unavailable will be China and the United States. Therefore, the Ban undermines U.S. dedication to an "open, free, global, interoperable, reliable, and secure" internet

---

[17] *Fact Sheet: Advancing Technology for Democracy*, OFF. OF THE PRESIDENT (Mar. 29, 2023), https://perma.cc/J8NQ-JB4C [hereinafter *Advancing Technology for Democracy*].

and harms U.S. "national security interest[s]." Congress does not address this fundamental inconsistency in the Ban. The Ban, therefore, does not reflect a "careful assessment" of "hard evidence" or "effectively…operate to prevent the threatened danger" as the First Amendment requires. *Playboy*, 529 U.S. at 818; *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562, 565, 569–70 (1976).

## I.     The Ban Violates The First Amendment Because Congress Did Not Conduct A "Careful Assessment" Of The Asserted Threat

The Ban has no legislative findings. Instead, TikTok, the public, other regulated social media applications, and scholars are left to hunt through a House Report and vague statements by Government officials to attempt to learn the Government's "reasons" behind the Ban. The absence of legislative findings by itself shows that Congress did not conduct a "careful assessment" of the facts. For this reason alone, the Ban should be found unconstitutional.

The House Report includes three justifications for the Act: First, that TikTok "collect[s] vast amounts of data on Americans" and that this data could be used to "conduct espionage campaigns," such as by tracking specific individuals.[18] Second, TikTok could be an influence operation (IO) or "propaganda threat."[19] Third, that under several laws of the People's Republic of China (PRC), the PRC can require

---

[18] House Report, *supra* note 16, at 2, 4.

[19] House Report, *supra* note 16, at 8.

10

TikTok to surrender all its data to the PRC.  None of these claims are adequately addressed in the report.

Regarding the first two justifications.  The House Report asserts that there is a "possibility that the [CCP] could use [TikTok] to control data collection" or that TikTok "could be used for influence operations if they so choose" without supplying any evidence to support these claims.[20]  The House Report thus rests on claims that there is a "possibility" that TikTok "could" be misused by the CCP.

Moreover, the evidence that is cited in the House Report is primarily political rhetoric, "anecdote, and supposition."  *Playboy*, 529 U.S. at 822.  For example, the House Report cites two Presidential Executive Orders and related politically oriented discussions of the Orders as support for the Ban.[21]  But those orders stand on shaky ground constitutionally and do not provide any "hard evidence" of wrongdoing.[22]  In short, Congress simply "posit[s] the existence of the disease sought to be cured" without any rationale explaining "how widespread or how serious the problem…is." *FEC,* 596 U.S. at 307; *Playboy*, 529 U.S. at 819.

---

[20] *Id*.

[21] *Id*. at 6-7.

[22] TikTok Br., 14-15 (explaining that one order was enjoined by the Courts and then withdrew, and the second order was held in abeyance after TikTok challenged it).

11

The House Report also claims that "[t]he PRC can require a company headquartered in the PRC to surrender all its data to the PRC."[23] It thus implies that the PRC has unrestricted access to all the data generated by TikTok's platform. This claim blurs the distinction between companies operating inside and outside the PRC. The Chinese laws cited in the House Report on their face apply only to companies *operating* in the PRC and to data about Chinese citizens and operations.[24] TikTok does not operate in the PRC, is not incorporated or headquartered in the PRC; and indeed, its app is unavailable in the PRC precisely because its managers and content are not under the control of the Chinese Government.[25] The language of the law also does not say a company in China must "surrender all its data" to the PRC government; it calls for "cooperation" with the Government.[26] The House Report assumes that "cooperation" compels TikTok to "surrender all its data" without any explanation or analysis—this is not the type of "careful assessment" necessary to withstand constitutional rigor.

---

[23] House Report, *supra* note 16, at 4 (citing (1) the National Intelligence Law, passed in China in 2017, (2) The PRC's 2014 Counter-Espionage Law, and (3) The PRC's Data Security Law of 2021).

[24] *Id*.

[25] Yeung, *supra* note 6.

[26] House Report, *supra* note 16, at 4.

II.     **The Ban Violates The First Amendment Because It Is Overly Broad And Not Narrowly Tailored To Address The National Security Risks**

Millions of Americans rely on TikTok to express themselves, learn, advocate for causes, share opinions, create communities, and even make a living. It is indisputable that most of the videos and content shared on TikTok are, manifestly, neither secret nor relevant to U.S. national security. And the speech of American content creators, users, and our elected officials on TikTok is not part of Chinese "espionage campaigns" or influence operations. Yet the Act bans all speech indiscriminately and violates both TikTok's and its users' First Amendment rights. *Playboy*, 529 U.S. at 811 (consumers have a First Amendment Right to view Playboy content; and Playboy has concomitant rights to transmit it).

The question the Court needs to consider is not whether public media outlets like TikTok can be used or affected by a foreign power. They can be, no matter who owns them. The question is whether banning a single app (TikTok), whose content is valued and used by millions of Americans for expressive purposes, would affect U.S. national security. The extreme measures put in place by the Ban should be tailored to address the specific national security concerns that led to its passage. As explained below, however, the Ban attempts no such tailoring and removes a popular forum for expression in exchange for little or no additional national security.

An indiscriminate total ban on TikTok is facially overbroad and is not "narrowly tailored" to address the Government's national security objectives. *McCullen,* 573 U.S. at 478; *Reno*, 521 U.S. at 879.

### A.    The Ban Is Not Tailored To Reduce Foreign Access To Sensitive Information

The House Report cites CISA advisories regarding Chinese hacking operations.[27]  But if that is the rationale, banning TikTok will have no material impact on China's hacking capabilities.  China, like the United States and Russia, can orchestrate sophisticated attacks that exploit vulnerabilities in both public and private databases to fulfill their objectives.

For example, in 2015, the U.S. Federal government's Office of Personnel Management lost 22 million records to a data breach attributed to China.[28]  Among other sensitive items, the Chinese exfiltrated security clearance applications (including Professor Edgar's security clearance records), one of the most sensitive data sets imaginable.[29]  China has also hacked the databases of American-owned hotel chains, giving them access to travel patterns useful for locating government

---

[27] House Report, *supra* note 16, at 2 n.1.

[28] Ellen Nakashima, *Hacks of OPM databased compromised 22.1 million people, federal authorities say*, THE WASH. POST (July 9, 2015, 8:33 PM), https://perma.cc/7MGP-3VRP.

[29] *Id*.

officials.[30]  Many of these attacks rely on phishing, which can be executed by and can target anyone using email.[31]  All these operations target systems such as Industrial Control Systems and other software applications and devices that are not owned, developed, or operated by Chinese-based companies.[32]

In other words, the threat of Chinese cyber espionage exists regardless of the presence of commercial companies from China in the American market.  Banning TikTok does not change the risks associated with Chinese cyber espionage as the same type of information is already accessible (and will remain accessible) to China with or without the Ban.  Moreover, the mere existence of exploitable vulnerabilities in social media platforms cannot be a sufficient reason to shut down TikTok because, as explained above, many other online sources have similar vulnerabilities.[33]  The Act is overly broad, because "on its face…[it] reaches the universe of expressive activity, and prohibit[s] all protected expression," without being narrowly tailored to address the risks of Chinese cyber-attacks.  *Jews for Jesus*, 482 U.S. at 569.

---

[30] Garrett M. Graff, *China's Hacking Spree Will Have a Decades-Long Fallout*, WIRED (Feb. 11, 2020).

[31] Gary Smith, *Top Phishing Statistics for 2024: Latest Figures and Trends*, STATIONX (Apr. 10, 2024), https://perma.cc/K7W7-6SBW.

[32] Lily Hay Newman, *The NSA Seems Pretty Stressed About the Threat of Chinese Hackers in US Critical Infrastructure*, WIRED (Nov. 18, 2023, 4:42 PM).

[33] Susan A. Aaronson, *Data is Dangerous: Comparing the Risks That the United States, Canada and Germany See in Data Trovers,* CENTER INT'L GOV. INNOVATION (Apr. 2020), https://perma.cc/F4H2-CVGW.

### B.    The Ban Is Not Tailored To Reduce Foreign Access To The Vast Amount Of American Sensitive Data Available On Media Platforms

Supporters of the Act argue that TikTok "collect[s] vast amounts of data on Americans" and that this data could be used to "conduct espionage campaigns," such as by tracking specific individuals.[34]  But Americans use multiple social media applications, which capture the same types of sensitive user data as TikTok (user location, identity, political affiliation).[35]

Sensitive user data can be scraped off websites and online platforms and accessed programmatically through Application Programming Interfaces (API).[36] In addition, large amounts of location data are openly sold on the market by various data brokers.[37]  Troves of digital data are open source and there for the taking by

---

[34] House Report, *supra* note 16, at 2, 4.

[35] Americans spend more time with American-based social media – and watching traditional TV – than with TikTok.  The most used mobile apps in the United States as of November 2023 were: 1) YouTube; 2) Facebook; 3) Gmail; 4) Google Search; 5) Google Maps; 6) Amazon; 7) Instagram; 8) Facebook Messenger; 9) Google Play, then; 10) TikTok and Spotify.  Jeffrey Gottfried, *American's Social Media Use*, PEW RSCH. CTR. (Jan. 31, 2024), https://perma.cc/BA5M-A49R; Sara Lebow, *Almost all U.S. TikTok shoppers are also using Amazon*, EMARKETER (May 15, 2024), https://perma.cc/5378-XYMA; STATISTA, SOCIAL MEDIA USAGE IN THE UNITED STATES 14 (2024), https://perma.cc/W36T-CMXE.

[36] An API allows two computer systems to communicate and exchange data programmatically.  *YouTube Data API*, YOUTUBE, https://perma.cc/77HM-T56C (June 18, 2024); *Twitter API Documentation*, TWITTER "X", https://perma.cc/QZL3-54GP (June 18, 2024).

[37] Congress recently passed the Protecting Americans' Data from Foreign Adversaries Act of 2024 (PADFA) which restricts foreign data sales by U.S. companies. The PADFA is designed to protect "personally identifiable sensitive data" from being sold to certain "foreign adversary" countries such as China.

foreign and domestic companies alike.[38]  In other words, China has multiple ways to access the same types of sensitive user data that is collected by TikTok.

Yet the Act does not address or provide any framework to protect this sensitive user data.  The Congressional record here fails to show how TikTok poses a greater risk to user's private data than any other social media platform, including American-based ones.  Indeed, the mere possibility that sensitive data can be misused cannot be sufficient to justify a complete ban on TikTok because such a justification could equally be used to close other social media platforms.[39]

### C.    The Ban Is Not Tailored To Reduce Foreign Propaganda

Supporters of the Act also argue that a "greater concern" is that TikTok could be an influence operation or "propaganda threat."[40]  But the Ban ignores that propaganda and influence operations are a ubiquitous problem in social media and online platforms in general, rather than one solely ingrained in TikTok.

---

Banning TikTok, therefore, does not change the risks of China's access to "personally identifiable sensitive data" because TikTok would presumably also be regulated by the PADFA.  Duane C. Pozza, et al., *New Federal Data Broker Law Will Restrict Certain Foreign Data Sales Effective June 23*, WILEY (May 7, 2024), https://perma.cc/K5KP-2868.

[38] Aaronson, *supra* note 33.

[39] Josh Richman, *Why U.S. House Members Opposed the TikTok Ban Bill*, ELEC. FRONTIER FOUND. (Mar. 14, 2024), https://perma.cc/KYV3-9NA7; Aaronson, *supra* note 33.

[40] House Report, *supra* note 16, at 8.

In fact, the Ban will have little effect on influence operations because under existing U.S. law (The Berman amendment to IEEPA) foreign nationals (and even adversarial governments themselves) are expressly free to operate cable television networks in the United States, spread propaganda through accounts on other online platforms that enable the sharing of user-generated content, or distribute copies of state-run newspapers physically or over the internet in the United States. Congress enacted the "Berman amendment" to IEEPA precisely because Congress believed that the correct remedy for foreign propaganda was not censorship or bans, but more free and open speech as envisioned by the First Amendment.[41] Here, Congress has not explained how TikTok is so different (and so dangerous) that it must depart from this tradition.

The U.S. Government has stated that foreign government propaganda is an industry-wide challenge for online platforms.[42] For example, Russian state-linked media organizations use social media (among other channels) "to deliver tailored content to subsets of the U.S. population" without owning or directly controlling the social media platform.[43]

---

[41] Andrew Boyle, *Checking the President's Sanctions Powers*, BRENNAN CENTER JUST. 1, 15 (June 10, 2021).

[42] NAT'L INTEL. COUNCIL, DECLASSIFIED INTELLIGENCE COMMUNITY ASSESSMENT, FOREIGN THREATS TO THE 2020 U.S. FEDERAL ELECTIONS (Mar. 10, 2021), https://perma.cc/VD3Y-VXSB.

[43] *Id*. at 4.

Russian and CCP-controlled organizations also already disseminate information through American-owned platforms. For example, China Daily, an English-language newspaper run by the CCP, The People's Daily, another CCP-controlled media outlet, and R.T. (formerly Russia Today), a Russian state-controlled news agency, actively distribute propaganda legally on U.S. online social media platforms.[44]

Foreign influence via social media comes not just from identified state-affiliated media like China Daily but also covertly and indirectly. All open social media platforms contain fake or misidentified accounts, often called "bot" accounts.[45] These bots are agents for a single source seeking to amplify a position to make it appear to be popular. They assume fake identities likely to attract support from the target audience.[46] These accounts are actively managed to spread disinformation or to promote the line of whatever Government or movement runs them.[47]

In other words, the "risk" of exposure to foreign propaganda is inherent in all social media, not just TikTok. And while TikTok (as a non-US company) may be

---

[44] Together, these organizations have more than 100 million followers on American social media platforms.

[45] DEP'T HOMELAND SECURITY, SOCIAL MEDIA BOTS OVERVIEW (May 2018), https://perma.cc/45YQ-7SUB.

[46] *Id.*

[47] Maggie Miller, *U.S. Officials Tracking Influence Operations from Russia, Iran*, OFF. DIR. NAT'L INTEL., https://perma.cc/7EHV-JHJ4 (June 22, 2024).

less likely than a U.S. company to moderate content according to U.S. preferences, the Government should not be permitted to ban a platform that does not align its editorial decisions with U.S. foreign policy goals. The First Amendment creates "breathing space" protecting the false statements, propaganda, and hyperbole that are "inevitable in free debate." *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). It does not prevent "political propaganda." *Lamont v. Postmaster General*, 381 U.S. 301 (1965).

Banning TikTok does not eliminate propaganda; it merely reduces the number of platforms through which competition for influence takes place. It may worsen the problem. Concentrating audiences on fewer and fewer platforms will encourage influencers to focus content manipulation on the remaining platforms. The Ban seeks to narrow the range of voices available and calls for the preemptive suppression of American speakers who use TikTok because of the mere possibility that the content TikTok's algorithm recommends might promote views counter to the U.S. Government's positions. First Amendment freedoms, not bans, are the best protection against national security threats from IO, because they encourage diverse sources of information, facilitate exposure and criticism of false claims and disinformation, and enable public attribution of propaganda to foreign powers.

20

### III. The Ban Violates The First Amendment Because There Are Less Restrictive Ways to Deal with Any Potential National Security Concern

As explained above, the Act must be the "least restrictive means" of addressing the Government's national security objectives to be constitutional. *McCullen*, 573 U.S. 464, 478 (2014); *Playboy*, 529 U.S. 816. Congress has disregarded every alternative.

### A. Project Texas Is A Less Restrictive Way to Deal with Any Potential National Security Concern

Scholars can disagree on whether TikTok's data is useful for the Chinese or what (if any) national security risks TikTok poses. Scholars can also disagree about the long-term benefits of data localization in the broader context of cybersecurity. But many scholars agree—including *amici*—that Project Texas would offer far more robust privacy and security protections than any American-based social media platform and would mitigate the national security risks set out by Congress far more effectively than the Ban—which does not mitigate these risks effectively at all.

As explained above, China is a sophisticated cyber power. But with the safeguards of Project Texas in place it would be challenging for China to conduct espionage or IO operations on TikTok U.S. without detection—probably more challenging, in fact, than it would be for China to do so on any other social media platform.

As explained in the Declaration of Christopher Simkins (App. 719-57), even "assuming a HIGH threat posed by Petitioners and a HIGH consequence to nation security if vulnerabilities are exploited" by implementing Project Texas "the overall vulnerability assessment associated with Petitioners owning and deploying the TikTok U.S. App…would be reduced to a LOW level."[48]  Indeed, Simkins explained that he could not "conceive of a more technically secure mitigation scheme for the App and the Platform in the U.S."[49]  Therefore, the Ban is overly restrictive because Project Texas would mitigate the risk to "a LOW level" through much less restrictive means.

At the same time, a forced sale of TikTok would provide much less protection for these national security interests than Project Texas.  For one, there is no plan to secure TikTok's data in case of a sale, and the Act does not make data security a condition of the forced sale.  Moreover, Project Texas is expensive.  TikTok maintains that it has spent more than $2 billion USD on Project Texas.[50]  Also, "because of the complex and burdensome data storage design it requires, the project degrades the quality and performance of the app."[51]  A new purchaser would minimize costs by seeking to assuage the U.S. government's national security

---

[48] Simkins Decl., ¶¶81-104.

[49] *Id*.

[50] TikTok-Petition, ¶46.

[51] Perault & Sacks, *supra* note 10.

concerns through less expensive technical and other safeguards.  And, if possible, avoid the cost and technological hurdles associated with Project Texas altogether.

The Congressional record also does not explain how Project Texas would be insufficient to protect user data.  The House Report's only complaints with Project Texas appear to be that: (1) ByteDance would continue to have a role in certain aspects of TikTok's U.S. operations and would be subject to PRC law; (2) Project Texas would allow TikTok to continue to rely on the engineers and back-end support in China; and (3) that Project Texas has not been completed.[52]  None of these are compelling reasons.

**(1)** While ByteDance is subject to Chinese laws, the Congressional record does not explain why ByteDance's having *any role* in TikTok raises a national security concern.  Under Project Texas, Oracle Cloud will host the TikTok platform in the United States.[53]  Even if ByteDance were ordered by the Chinese Government to turn over some or even all data, it is unclear (and was not explained by Congress) how ByteDance could comply with such an order when Oracle hosts the data and would be alerted to any data exfiltration program.

---

[52] House Report, *supra* note 16, at 4-5.

[53] Perault & Sacks, *supra* note 10.

(**2**) American-based social media companies have offices in China that employ engineers and back-end support staff.[54]   But neither the House Report nor any Congressional finding explains why the mere possibility that an engineer in China might have an engineering role raises a national security concern or subverts the protections in place under Project Texas.  Indeed, under Project Texas, TikTok's software code and back-end systems would be maintained in the U.S., not China, and Oracle would verify the code.  Any effort to introduce vulnerabilities into TikTok's code, or manipulate its algorithm, would be detected by Oracle.

(**3**) As to the criticism that Project Texas has not been completed, that is due to the Government.  According to its Petition, TikTok "has begun the process of voluntarily implementing" Project Texas[55] and has spent more than "$2 billion on Project Texas."[56]  TikTok has taken steps to implement the provisions of Project Texas.[57]  Moreover, according to TikTok, "[a]fter August 2022, however, CFIUS, without explanation, stopped engaging with Petitioners in meaningful discussions."[58]  It is hard to see how TikTok could complete Project Texas without

---

[54] *Our Locations*, META CAREERS, (June 22, 2024); *Locations*, MICROSOFT, https://perma.cc/W446-EFNL (June 22, 2024); *Our Offices*, GOOGLE, https://perma.cc/SS7C-3B6S (June 22, 2024).

[55] TikTok-Petition, ¶45.

[56] TikTok-Petition, ¶46.

[57] Perault & Sacks, *supra* note 10.

[58] TikTok-Petition, ¶24.

CFIUS assistance.  For example, at least some provisions of Project Texas require CFIUS to play an ongoing role in monitoring TikTok's compliance.[59]  This cannot be done without CFIUS' cooperation.

The Government provides no reasons or "hard evidence" explaining why Project Texas — a much less restrictive alternative to a total ban — would not meet its national security concerns.

## B.    Other Alternatives Are Less Restrictive Ways to Deal with Any Potential National Security Concern

Along with Project Texas, there are other alternatives to a ban that the Government has not address:

For example, in an effort by the Government to protect military or security-sensitive data, the Federal Government (including Federal Contractors) and 39 State Governments already ban the use of TikTok on Government devices.[60]

As another possible alternative, Congress could have promulgated industry-wide regulations such as the European Union's Digital Services Act.[61]

---

[59] Perault & Sacks, *supra* note 10.

[60] Allyson Park, National Defense Magazine, *TikTok Ban Issued for Federal Government Contractors*, NAT'L DEFENSE MAG. (June 26, 2024), https://perma.cc/TBX3-CWP5; Cailey Gleeson, *These 39 States Already Ban TikTok From Government Devices*, FORBES (Mar. 12, 2024), https://perma.cc/DSL4-MH5U.

[61] EU Reg. 2022/2065 arts. 15, 40(4), 42(2).

These types of laws are much more tailored in comparison to the overbroad approach of banning all speech on TikTok.

### IV. The Ban Violates the First Amendment Because Congress Did Not Conduct A "Careful Assessment" Of The Ban's Harms To National Security

TikTok is not available in China currently.[62]  If the Ban goes into effect, the U.S. and China will be the two biggest markets in which TikTok is not available. This alone shows how damaging such a policy will be to U.S. leadership on internet freedom.  For example, in anticipation of the Act the Chinese government in March 2024 said that the U.S. has "one way of doing things about the United States, and another way of saying and doing things about other countries."[63]  The Ban sends a message to the world that the U.S. is willing to use the same types of mass-media control and speech suppression as China—the same measures that we have always criticized.[64]

The U.S. has espoused a foreign policy of promoting a global internet landscape that is grounded in democratic principles such as the fundamental freedom of speech and expression rights.  As digital authoritarianism (where states actively

---

[62] Yeung, *supra* note 6.

[63] David McCabe, *What a TikTok Ban Would Mean for the U.S. Defense of an Open Internet*, N.Y. TIMES (Apr. 17, 2024).

[64] *Advancing Technology for Democracy*, *supra* note 17; *Fact Sheet: Announcing the Presidential Initiative for Democratic Renewal*, OFF. OF THE PRESIDENT (Dec. 9, 2021), https://perma.cc/GPU2-2QW [hereinafter *Presidential Initiative*].

suppress speech and expression) rises and social media platforms simultaneously gain global prominence, the U.S.'s continued role as an international leader on internet freedom is crucial. As explained by the current administration, ensuring a free, open, and borderless internet that is immune from autocratic censorship is "not only…the right thing to do, it is in the United States' **national security interest**, because strong, rights-respecting democracies are more peaceful, prosperous, and stable."[65]

The U.S. has also committed to contributing millions of dollars to expanding access to anti-censorship technologies (such as VPNs) that allow users in autocratic states to avoid government-imposed content restrictions.[66] In 2023, the U.S. assumed the Chairship of the Freedom Online Coalition, a partnership of 39 governments working to advance internet freedom, including in speech and expression rights.[67] The U.S. has similarly partnered with over 60 countries from around the world to launch the recent Declaration of the Future of Internet, which reaffirms the U.S.'s long-standing leadership in promoting foreign policies that ensure the internet is "open, free, global, interoperable, reliable, and secure."[68]

---

[65] *Presidential Initiative*, *supra* note 64.

[66] *Id*.

[67] *Advancing Technology for Democracy*, *supra* note 17.

[68] U.S. DEP'T OF STATE, DECLARATION FOR THE FUTURE OF THE INTERNET, https://perma.cc/WA8N-EN3B.

The Ban, therefore, contradicts the U.S.'s foreign policy goals and objectives on internet freedom and undermines these decades-long efforts. By silencing millions of voices without any findings or evidence to support the asserted national security interests in support of the Act—and despite the availability of less restrictive and more effective ways to address the Government's national security concerns—the TikTok ban damages the U.S.'s global standing as a leader in promoting, supporting, and ensuring internet freedom. Therefore, the Ban contradicts "the United States' national security interest."[69] Yet Congress did not consider the negative impact of the ban on national security. The Ban, therefore, does not reflect a "careful assessment" of "hard evidence" as required by the First Amendment. *Playboy*, 529 U.S. at 818. Moreover, the Ban is not "a workable method" of fulfilling the Government's interests because the Ban "would [not] operate to prevent the threatened danger." *Nebraska Press Ass'n*, 427 U.S. at 565.

Moreover, even the Act's overbroad approach, ignoring the more tailored and effective solutions discussed above, further erodes U.S. foreign policy interests because it shows a lack of commitment to real solutions to any security concerns present in the global and domestic digital ecosystem. User-choice—*i.e.*, freedom of choice in an open, pluralistic media environment—is what makes the U.S. system resilient. A wholesale government ban of a single social media application

---

[69] *Presidential Initiative*, *supra* note 64.

undermines that resilience.  TikTok is certainly not going to be the last non-U.S. social media platform to gain popularity in the U.S.  If the U.S. is to prove a continued and credible commitment to global internet freedom, it should adopt comprehensive legislation tailored to any international security concerns.  The Act's ban of a major social media platform like TikTok without compelling legislative findings or evidence is a betrayal of decades of bipartisan foreign policy favoring an internet that is free of government suppression and censorship.

## CONCLUSION

For the reasons above, the Ban should be held unconstitutional.


DATED: June 28, 2024                    Respectfully submitted,


                                        */s/ Mark Davies*_____
                                        **WHITE & CASE**
                                        Mark Davies
                                        Ethan L. Plail
                                        Edred Richardson
                                        701 Thirteenth Street, NW
                                        Washington, D.C. 20005
                                        P: (202) 637-6261
                                        E: mark.davies@whitecase.com
                                        E: ethan.plail@whitecase.com
                                        E: edred.richardson@whitecase.com


                                        Jeremy Dunbar
                                        609 Main St Suite 2900,
                                        Houston, TX 77002

29

T: (832) 786-6189
E: jeremy.dunbar@whitecase.com

*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(A) because it contains 6475 words according to the count of Microsoft Word, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in Microsoft Word with the proportionally-spaced typeface of Times New Roman 14-point font.

DATED: June 28, 2024                                      */s/ Mark Davies*
                                                                         Mark Davies

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals using the CM/ECF system.  I further certify that service upon all counsel of record was accomplished by electronic filing via the CM/ECF system.


DATED: June 28, 2024                                */s/ Mark Davies*
                                                                  Mark Davies