**ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024**
Case No. 24-1113 (and consolidated cases)

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

TIKTOK INC. ET AL,

*Petitioners,*

*v.*

MERRICK GARLAND, in his official capacity as Attorney General of the United States,

*Respondent.*

---

On Petition For Review of the Constitutionality of the Protecting Americans From Foreign Adversary Controlled Applications Act

---

## BRIEF AMICUS CURIAE OF PROFESSOR MATTHEW STEILEN IN SUPPORT OF PETITIONERS

---

Aaron D. Van Oort
John L. Rockenbach
William MacKinnon Morrow
FAEGRE DRINKER
BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 766-7000

Kirstin L. Stoll-DeBell
FAEGRE DRINKER
BIDDLE & REATH LLP
Unit 3400
1144 Fifteenth Street
Denver, CO 80202
(303) 941-8888

June 27, 2024

*Counsel for Amicus Curiae*

## <u>CERTIFICATE AS TO PARTIES,</u>
## <u>RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), amicus curiae submits this certificate as to parties, rulings, and related cases.

## A. PARTIES AND *AMICI*

Except for the following, all parties appearing in this Court are listed in the Brief for Petitioners TikTok Inc., and ByteDance Ltd.: (1) amicus curiae Matthew Steilen in support of petitioners; (2) amici curiae Electronic Frontier Foundation, Freedom of the Press Foundation, TechFreedom, Media Law Resource Center, Center for Democracy and Technology, First Amendment Coalition and Freedom to Read Foundation in support of petitioners; (3) amicus curiae Cato Institute in support of petitioners; (4) amici curiae San Francisco, Sadhana, Sikh Coalition, South Asian Legal Defense Fund, OCA-Asian Pacific American Advocates of Greater Seattle, Native Realities, Muslim Public Affairs Council, Hispanic Heritage Foundation, Calos Coalition, Asian Americans Advancing Justice Southern California, Asian American Federation and Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition in support of petitioners; (5) amici curiae

Foundation For Individual Rights And Expression, Institute For Justice,
And Reason Foundation in support of petitioners

## B. RULINGS UNDER REVIEW

References to the rulings at issue appear in the Brief of Petitioners
TikTok Inc., and ByteDance Ltd.

## C. RELATED CASES

This case was not previously before this Court. *Amicus Curiae*
Matthew Steilen is not aware of any related cases pending before this
Court or any other court.

# CERTIFICATE OF COUNSEL

# REGARDING AUTHORITY TO FILE

Pursuant to FRAP 29(a)(2), all parties have consented to the filing of this brief.

Pursuant to D.C. Circuit Rule 29(d), counsel for amicus curiae Matthew Steilen certifies that it is not aware of any other non-government amicus brief addressing the subject of this brief, *i.e.*, the history of the Bill of Attainder Clause. As a scholar of legal history and constitutional law, amicus curiae is particularly well-suited to provide the Court with important context on this subject that will assist it in resolving this case.

## <u>TABLE OF CONTENTS</u>

**Page**

Table of Authorities.................................................................................vi

Glossary ......................................................................................................vi

Statutes and Regulations....................................................................... x

Identity and Interest of Amicus Curiae............................................ x

Summary of Argument............................................................................ 1

Argument .................................................................................................... 3

      A.    A law that inflicts punishment on a specifically named person qualifies as a bill of attainder, and courts must look to history to evaluate whether a law inflicts punishment. ................................................................................ 3

      B.    Examining the colonies' experience with bills of attainder yields several principles useful for deciding Attainder cases today. ............................................................ 5

      C.    Applying those principles to this case confirms that the Protecting Americans From Foreign Adversary Controlled Applications Act is a bill of attainder..................... 19

            1.    The Act applies with specificity............................................ 20

            2.    The Act imposes punishment. ................................................ 21

                  a.    The Act imposes on TikTok and ByteDance consequences historically considered punitive........................................................................ 21

                  b.    The Act lacks a non-punitive purpose..................... 24

                  c.    The legislative history confirms that Congress intended to punish TikTok and ByteDance. ........................................................................ 26

                  d.    This Court's decision in *Kaspersky* is not to the contrary. ....................................................................... 30

Conclusion.................................................................................................. 32

Certificate of Compliance ........................................................................ 34

Certificate of Service ............................................................................... 35

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

**Page(s)**

*BellSouth Corp. v. F.C.C.*,
    144 F.3d 58 (D.C. Cir. 1998) ................................................................ 31

*BellSouth Corp. v. F.C.C.*,
    162 F.3d 678 (D.C. Cir. 1998) .............................................................. 31

*Consol. Edison Co. of New York v. Pataki*,
    292 F.3d 338 (2d Cir. 2002) ........................................................... 13, 20

*Cummings v. Missouri*,
    71 U.S. 277 (1866) ................................................................................ 22

*Foretich v. United States*,
    351 F.3d 1198 (D.C. Cir. 2003) ..................................................... 3, 20, 21

*Gaines v. Buford*,
    31 Ky. 481 (1833) (Op. of Nicholas, J.) ............................................. 18

*Jackson ex dem. St. Croix v. Sands*,
    1801 WL 640 (N.Y. Sup. Ct. 1801) .................................................... 23

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*,
    909 F.3d 446 (D.C. Cir. 2018) ...................................................20, 30, 31

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) ....................................... 4, 5, 24, 25, 27, 30

*Selective Serv. Sys. v. MPIRG*,
    468 U.S. 841 (1984); ..................................................... 3, 4, 31, 32

*United States v. Brown*,
    381 U.S. 437 (1965) ......................................... 3, 5, 7, 24, 26, 27

*United States v. Lovett*,
    328 U.S. 303 (1946) ............................................................ 22, 32

## Statutes, Rules & Regulations

1 Laws of the State of New York 772 (1886) ............................................... 13, 16

PL 118-50, April 24, 2024, 138 Stat. 895, Div. H ................................ 19, 20, 21, 23, 26

## Other Authorities

118 Cong. Rec. H1162 ..................................................................... 21

118 Cong. Rec. No. 47 ..................................................................... 20

1 Journals of the Provincial Congress, Provincial Convention,
     Committee of Safety and Council of Safety of the State of New-York,
     1775-1776-1777 (1842) ............................................................. 13

1 William Jay, The Life of John Jay (reprt. 1972) ................................... 15

3 Joseph Story, *Commentaries on the Constitution* § 1338 .................... 6, 7

9 Documentary History of the Ratification of the Constitution (1990) ......... 12

9 The Statutes at Large of Pennsylvania from 1682 to 1801 (James T.
     Mitchell & Henry Flanders eds., 1903) ....................................... 8, 9, 10

Alexander Hamilton, *A Letter from Phocion* 5 (Loudon 1784) ................. 1, 14

Claude Halstead Van Tyne, The Loyalists in the American Revolution
     (1902) ............................................................................... 10, 13, 16

Daniel J. Hulsebosch, *A Discrete and Cosmopolitan Minority: The Loyalists, the
     Atlantic World, and the Origins of Judicial Review*, 81 Chi.-Kent L. Rev.
     825 (2006) ........................................................................... 15

Declaration of Rights, art. IX, Pa. Const. of 1776 ............................... 8

Duane L. Ostler, *Bills of Attainder and the Formation of the American Takings
     Clause at the Founding of the Republic*, 32 Campbell L. Rev. 227 (2010) ...... 20

Francis D. Wormuth, *Legislative Disqualifications as Bills of Attainde*r, 4
     Vanderbilt Law Review 603 (1951) ........................................... 7

H.R. 7521, 118th Cong. (2024) ..................................................... 21, 24

Harrison A. Newman, *Corporations Under the Bill of Attainder Clause*, 69 Duke L.J. 923 (2020) ............................................................. 20

*House Address to President*, Nov. 27, 1794, 15 Papers of James Madison, Congressional Series (1985) ............................................. 21

James Westfall Thompson, *Anti-Loyalist Legislation During the American Revolution (Part II)*, 3 Ill. L. Rev. 147 (1908) ............................ 8, 10

John Jay: The Making of a Revolutionary: Unpublished Papers 1745-1780 (Richard B. Morris ed., 1975) ........................................... 14

John P. Collas, *Introduction* Selden Soc'y ix (1951) ........................... 6

Letter from Robert R. Livingston to John Jay (Apr. 21, 1779) ................ 14

Matthew J. Steilen, *Bills of Attainder*, 53 Hous. L. Rev. 767 (2016) .6, 8, 9, 13, 14, 15, 17, 19

Matthew Steilen, *The Josiah Philips Attainder and the Institutional Structure of the American Revolution*, 60 How. L.J. 413 (2017) .................. 4, 10, 11, 12, 18

Matthew Steilen, *The Legislature at War: Bandits, Runaways and the Emergence of a Virginia Doctrine of Separation of Powers* l. & Hist. Rev. 493 (2019) .......... 10, 12, 18

Samuel Johnson, *A Dictionary of the English Language* (1773) ............... 5

U.S. Const. art. I, § 9 ......................................................... 3

U.S. Const. art. I, § 10 ........................................................ 3

*What Happened to TikTok's Project Texas?*, Lawfare, Mar. 20, 2024 ............ 25

Zephaniah Swift, *A System of the Laws of the State of Connecticut* (1795) ........ 6

## **GLOSSARY**

**CCP** means Chinese Communist Party.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are reproduced in Brief for Petitioners TikTok Inc. and ByteDance, Ltd.

## IDENTITY AND INTEREST OF AMICUS CURIAE

Matthew Steilen submits this brief in support of Petitioners TikTok Inc., and ByteDance Ltd.[1] Steilen is a professor at the University at Buffalo School of Law, State University of New York. He teaches and writes about constitutional law and legal history, with a focus on legislative attainders. He has a strong interest in the sound development of these fields.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E) & D.C. Circuit R. 29(b), amicus curiae states that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief.  No person other than amicus curiae, its members, or its counsel contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

*Nothing is more common than for a free people, in times of heat and violence, to gratify momentary passions, by letting into the government, principles and precedents which afterwards prove fatal to themselves.*

Alexander Hamilton, *A Letter from Phocion* 5 (Loudon 1784) (condemning a bill of attainder passed by New York).

The Supreme Court has instructed courts to look to history when determining whether a challenged statute qualifies as an unconstitutional bill of attainder. This brief seeks to assist the Court in that task.

To that end, the brief recounts the colonies' experience with acknowledged bills of attainder. It then distills the colonies' experience into six principles useful to courts in analyzing a claim under the Bill of Attainder Clauses today:

**First**, bills of attainder targeted individuals and groups that were deemed a security threat.

**Second**, bills of attainder imposed a range of punishments, but commonly the deprivation of property.

**Third**, bills of attainder imposed punishments without judicial process, such as a hearing, the production of evidence, and confrontation of witnesses, which help to determine the truth of an allegation.

**Fourth**, some bills of attainder involved both the legislature and executive.

**Fifth**, the framers of the federal Constitution were highly familiar with the history and use of bills of attainder.

**Sixth**, even Americans who supported bills of attainder believed they should be conditional, which meant that individuals ought to be offered an opportunity to turn themselves in and claim a judicial proceeding.

Under those principles and Supreme Court precedent, the Act now before the Court is a bill of attainder. It specifically names TikTok and ByteDance and imposes punishment upon them. It imposes burdens mirroring those imposed by historical bills of attainder. It brands TikTok and ByteDance with a mark of disloyalty; it bars them from pursuing their chosen vocation; and it forbids them from continuing to own their property. The Act cannot reasonably be said to have a non-punitive

purpose, and the Congressional Record reveals that it was instead motivated by a punitive one.

## ARGUMENT

**A.** **A law that inflicts punishment on a specifically named person qualifies as a bill of attainder, and courts must look to history to evaluate whether a law inflicts punishment.**

As a limitation on federal power, Article 1, Section 9, of the Constitution establishes that "No Bill of Attainder or ex post facto Law shall be passed." A twin protection in Section 10 applies to the states.

A "Bill of Attainder," the Supreme Court has explained, is a law that specifically designates a person or group for punishment without trial. *Selective Serv. Sys. v. MPIRG*, 468 U.S. 841, 846–47 (1984); *United States v. Brown*, 381 U.S. 437, 447 (1965). Under the precedent of this circuit, a law qualifies as a bill of attainder "if it (1) applies with specificity, and (2) imposes punishment." *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003).

Punishment is the most pressing element in this case, and the Supreme Court has established a three-step analysis for determining whether a statute inflicts it.

3

The "starting point in the inquiry" is an examination of history. *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473 (1977). If the burden imposed (its consequence for the person named) "falls within the historical meaning of legislative punishment," *Selective Serv. Sys.*, 468 U.S. at 852, then the statute qualifies as punitive, end of discussion. *Nixon*, 433 U.S. at 473 ("A statutory enactment that imposes any of those sanctions on named or identifiable individuals would be immediately constitutionally suspect.").

As the Court recognized, there are distinctive reasons to look to history in interpreting the Bill of Attainder Clauses. *See id*. The framers of the federal Constitution had extensive experience with bills of attainder during the American Revolution. Early American lawyers studied their use in English history and debated their propriety. Matthew Steilen, *The Josiah Philips Attainder and the Institutional Structure of the American Revolution*, 60 How. L.J. 413, 432–34, 452–53 (2017). In contrast, today bills of attainder are relatively rare. For this reason, history is an important source of evidence about the meaning of the Bill of Attainder Clauses.

If the nature of the burden would not historically have been considered punitive, then the analysis moves to the second test, which considers the "function[]" or "purpose" of the law. *Nixon*, 433 U.S. at 475–76. This is an objective test:  Courts ask "whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Id.*

The final test considers "intent" or "motivation[.]" *Id.* at 478. It looks to the actual congressional record to determine whether the subjective intent of Congress was to inflict punishment. *Id.*

History plays a role in the second and third steps as well. When deciding whether a statute's purpose qualifies as "punitive," the Supreme Court has looked to historical justifications for bills of attainder. *See, e.g.*, *Brown*, 381 U.S. at 458–59.

## B. Examining the colonies' experience with bills of attainder yields several principles useful for deciding Attainder cases today.

In essence, a bill of attainder was a means of convicting someone by bill in the legislature. "Bill" was a term with both legislative and judicial meanings. Samuel Johnson, *A Dictionary of the English Language* (1773) ("4. An act of parliament .... 7. A declaration in writing that expresseth

either the grief and the wrong that the [plaintiff] hath suffered ... or else some fault ....”). State legislatures passed “private bills,” which addressed the “interests of one person ... or region.” Matthew J. Steilen, *Bills of Attainder*, 53 Hous. L. Rev. 767, 891–92 (2016). These bills were also quasi-judicial; before passing a private bill, the legislature typically gave notice to those affected and held a hearing. *E.g.*, Zephaniah Swift, *A System of the Laws of the State of Connecticut* 81–82 (1795). The term “attainder” came from the French *atteindre*, meaning “to reach” or “attain,” which in a legal context connoted conviction. John P. Collas, *Introduction*, 70 Selden Soc’y ix, xxi–lx (1951).

Bills of attainder were used to impose a range of punishments. The English bills of attainder that convicted someone of treason often imposed a death sentence. Many of these bills were conditional or “suspensive,” which meant that the targets were offered an opportunity to turn themselves in and claim a judicial proceeding. Bills imposing a penalty less than death were sometimes distinguished as bills of “pains and penalties.” *See* 3 Joseph Story, *Commentaries on the Constitution* § 1338.

In revolutionary America, however, the line between bills of attainder and bills of pains and penalties was never clear. *Id.* States imposed a variety of punishments in acts that went under a variety of names. In this respect, the term "Bill of Attainder" lacked a "precise legal definition" at the time the Constitution was ratified. Francis D. Wormuth, *Legislative Disqualifications as Bills of Attainder*, 4 Vanderbilt Law Review 603, 605 (1951); *see also Brown*, 381 U.S. at 442. According to Publius, it was to guarantee both "personal security and private rights" that a ban on bills of attainder was included in the federal Constitution, since "[o]ur own experience" had shown the protections in state constitutions to be insufficient. The Federalist No. 44 (James Madison).

This brief thus traces that experience, highlighting bills of attainder passed in three states. In all three cases, Americans used bills of attainder to summarily deal with threats to their security when they believed the ordinary judicial process would be unnecessary, ineffective, or dangerous.

*Pennsylvania.* Pennsylvania took a number of steps during the Revolution to punish individuals for undermining security. The

Pennsylvania Constitution of 1776 did not expressly separate legislative and executive power, and on several occasions the state's executive, the "Supreme Executive Council," worked in conjunction with the state legislature and the Continental Congress (which met in Philadelphia) to address perceived threats. Frame of Government, § 17; Declaration of Rights, art. IX, Pa. Const. of 1776; James Westfall Thompson, *Anti-Loyalist Legislation During the American Revolution (Part II)*, 3 Ill. L. Rev. 147, 156 (1908). For example, upon receiving some forged papers from General John Sullivan, the Continental Congress advised the Supreme Executive Council to take action against the state's Quakers, who had initially resisted independence and were religious pacifists. The Council believed the Quakers were disposed to communicate intelligence to the enemy. In late 1777, it made out a list of leading Quakers "dangerous to the State," put them under house arrest, and later banished them to Virginia. Steilen, *Bills of Attainder*, at 876–78.

Around the same time, the state legislature passed "*An act for the attainder of divers traitors.*" 9 The Statutes at Large of Pennsylvania from 1682 to 1801, at 201–02 (James T. Mitchell & Henry Flanders eds., 1903); Steilen, *Bills of Attainder*, at 882.

The Pennsylvania act had four parts. First, it declared that several specifically named persons would be "convicted and attainted of high treason" if they did not surrender themselves for trial. 9 Pa. Statutes at Large, at 201–02. Second, it declared forfeit the properties of those named, *id.* at 203–04, and created an elaborate system for liquidating their possessions, *id.*, at 204–215. Third, it empowered the Supreme Executive Council to identify other inhabitants who had aided the British army and to add their names to the list in the act. *Id.* at 202–03. Fourth, it broadly attainted of high treason all residents of the state who in the future served in the British army. *Id.* at 203.

The state was driven to employ a bill of attainder by practical and legal limitations in its law of treason. Practically, traitors could not be subject to the usual judicial process once they crossed enemy lines. At a time when Philadelphia, New York, and parts of New Jersey were under British control, this created a major roadblock to convicting traitors and seizing their forfeited property. Legally, it was unclear whether those who had lived in Pennsylvania but continuously supported the British government could really be called traitors. Legislative attainder offered a way to address both concerns. Steilen, *Bills of Attainder*, at 880–82.

The Pennsylvania attainder affected many people. Between those persons named in the statute and those later identified by the executive, about 500 people were attainted through Pennsylvania's bill. Thompson, *Anti-Loyalist Legislation*, at 157. Some cases were handled through subsequent legislation; the legislature passed a law giving the house of Joseph Galloway, a well-known conservative, to the president of the Supreme Executive Council. 9 Pa. Statutes at Large, at 323–24. Many others were affected by similar provisions, including laws that prohibited individuals from buying, selling, or transferring lands; serving in office; serving on a jury; suing to collect a debt; travelling; or possessing firearms. App. B, C, Claude Halstead Van Tyne, The Loyalists in the American Revolution 321–22, 334, 338 (1902).

*Virginia*. In 1778, Virginia passed a bill of attainder to deal with a gang of militant loyalists, led by Josiah Philips, which had terrorized parts of the state and murdered a militia captain. Matthew Steilen, *The Legislature at War: Bandits, Runaways and the Emergence of a Virginia Doctrine of Separation of Powers*, 37 L. & Hist. Rev. 493, 496–97 (2019). Thomas Jefferson drafted the bill. Steilen, *Josiah Philips Attainder*, at 425–26.

The Virginia act was a conditional attainder. It gave Philips and his "associates" one month to turn themselves in and claim a judicial trial. "*An act to attaint Josiah Philips and others, unless they render themselves to justice within a certain time*." 9 The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of The Legislature in the Year 1619, at 463 (William Waller Hening ed., 1821). If they did not, they would be "convicted and attainted of high treason," "suffer ... death," and "incur all forfeitures, penalties, and disabilities" associated with treason. *Id.* at 464. Philips' associates were unnamed in the act and permitted to claim a trial on the question of whether they were part of his gang, but the act also made it lawful for "any person" to kill them after the grace period had passed. *Id.*

Jefferson justified the Virginia attainder on safety grounds. Following the "usual forms and procedures of the courts of law," the text of the bill explained, would "leave the ... good people of [Virginia] for a long time exposed to murder and devastation." *Id.* at 463. The bill was passed through the legislature in only three days. Steilen, *Josiah Philips Attainder*, at 428.

The Philips case became an infamous example of the abuse of bills of attainder. During the state's ratification convention, Edmund Randolph, who would soon serve as the nation's first attorney general, cited the case as evidence that civil liberties were insecure under Virginia's vaunted 1776 constitution. 9 Documentary History of the Ratification of the Constitution 972 & n.5 (1990). Virginia lawmakers had been wrong about the dangers of following the "usual forms and procedures." Philips was captured by ordinary methods before the bill of attainder was even published. Jefferson's judgment of the threat may have been clouded by the fact, often mentioned, that Philips was a manual "laborer" and his gang included escaped slaves. Steilen, *Legislature at War*, at 495–96, 512–14. The bill of attainder had also ignored the legal problem with charging Philips with treason, since he claimed to hold a British military commission and may not have owed the state allegiance. Notably, upon capture Philips was indicted not for treason, but for "robbing the publick wagons," taking, among other things, twenty-eight men's felt hats and a ball of twine. Steilen, *Josiah Philips Attainder*, at 428–29, 438 (quoting Virginia Gazette, Oct. 30, 1778, p. 3, col. 2).

*New York*. The New York Constitution stated that "no acts of attainder shall be passed by the Legislature of this State," but made an exception for "crimes ... committed before the termination of the present war." 1 Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New-York, 1775-1776-1777, at 898 (1842). New York thus permitted, and enacted, many bills of attainder targeting British Loyalists. Like Pennsylvania, New York prohibited loyalists from voting, suing, practicing law, and holding or transferring property. Steilen, *Bills of Attainder*, at 845. It subjected them to interrogation, arrest, and summary removal from the state. Van Tyne, Loyalists in the American Revolution, at 320–22, 328, 330–32, 334, 337–38; Steilen, *Bills of Attainder*, at 846.

Nothing drew the ire of the framers more than the Confiscation Act of 1779. 1 Laws of the State of New York 772, 173–81 (1886). The Confiscation Act defined a new crime:  holding property in New York while adhering to the King of Great Britain. *Id.* at 173. To protect the "public justice and safety" of the State, the Act "convicted and attainted" several high-profile British loyalists by name. *Id.* at 173–74. It declared forfeit the "real and personal" property of those named. *Id.* at 174. It

13

"banished" the named persons from the State and declared that any named person later found there "[is] hereby adjudged and declared guilty of felony and shall suffer death." *Id.* at 174. It then announced special procedures for indicting unnamed persons of adhering to the British king. *Id.* at 174–81.

Alexander Hamilton condemned the Confiscation Act. He explained that "a certain evil … attend[ed]" New York's "intemperance":  a loss of reputation among the other countries of the world. *Letter from Phocion* at 16. He urged the State to instead follow "the regular and constitutional mode" for securing forfeitures: "legal process, trial and conviction." *Id.* at 10. This, he believed, would help the young country win over the loyalists who remained in the colonies and the world at large. *Id.* at 18–22.

He was not alone in doing so. In a letter to John Jay, Robert Livingston wrote that there had "[n]ever" been a "greater compound of folly, avarice, and injustice." Letter from Robert R. Livingston to John Jay (Apr. 21, 1779), in John Jay: The Making of a Revolutionary: Unpublished Papers 1745-1780, at 583–84 (Richard B. Morris ed., 1975). As for Jay, he wrote to the Governor:

> If truly printed, New-York is disgraced by injustice too palpable to admit even of palliation. I feel for the honour of

my country, and therefore beg the favour of you to send me a true copy of it; that if the other be false, I may, by publishing yours, remove the prejudices against you.

Letter from John Jay to Governor George Clinton (May 6, 1780), in 1 William Jay, The Life of John Jay 112 (reprt. 1972). Since Jay had proposed the final language in the New York Constitution permitting bills of attainder, what upset him was not the act as such, but likely the fact that it invented a criminal offense to target individuals for their land. New York's act was extreme in this regard, but other states also made use of bills of attainder to confiscate the property of loyalists. Daniel J. Hulsebosch, *A Discrete and Cosmopolitan Minority: The Loyalists, the Atlantic World, and the Origins of Judicial Review*, 81 Chi.-Kent L. Rev. 825, 835–38 (2006). Other complaints against the Confiscation Act focused on its absolute, rather than conditional form, which would have allowed individuals to assert their innocence in a judicial proceeding. Steilen, *Bills of Attainder*, at 844, 849–51, 855–56.

***

From these examples, we can distill a few key principles regarding bills of attainder.

**First**, bills of attainder targeted individuals and groups that were deemed a security threat. The acts typically began by declaring that an individual or group had been disloyal and was disposed to be disloyal in the future. For example, the Pennsylvania "act for the attainder of divers traitors" declared that the named individuals "have most traitorously and wickedly ... joined and adhered to and still do adhere to and knowingly and willingly aid and assist the army of the King of Great Britain." 9 Pa. Statutes at Large, at 201. New York's Confiscation Act made a similar declaration. 1 Laws of New York, at 173. In this way, American bills of attainder characteristically placed a brand of disloyalty on disfavored individuals or groups.

**Second**, bills of attainder imposed a range of punishments, but commonly the deprivation of property. Acts confiscating property formed part of a larger body of legislation imposing economic punishments, such as prohibitions on holding property, transferring property, practicing a profession, or engaging in a trade. Van Tyne, Loyalists in the American Revolution, at 337–38. "Loyal" individuals were permitted to purchase confiscated estates, but they benefitted from other economic punishments as well.

**Third**, bills of attainder imposed punishments without judicial process, such as a hearing, the production of evidence, and confrontation of witnesses, which help to determine the truth of an allegation. In this sense, they were a "summary form of legal process." Steilen, *Bills of Attainder*, at 889. Sometimes this was justified by claims that the crimes were "notorious," or commonly known; that it was too dangerous to follow ordinary procedures; or that courts would be unable to enforce their process. *Id.* at 889–90. Often bills of attainder were rushed out of concerns about security. Officials abandoned ongoing, ordinary forms of proceeding to take a quicker, more certain route through an act of the legislature. Edmund Randolph thought the result in Virginia was unjust, as did Alexander Hamilton in New York.

**Fourth**, some bills of attainder involved both the legislature and the executive. In these cases, the legislature would name a certain number of persons who were to be "attainted" and also authorize the executive to "add to the list." *Id.* at 890.

**Fifth**, the framers of the federal Constitution were highly familiar with the history and use of bills of attainder. Bills punishing individuals for disloyalty were enacted in every state. Some American lawyers

supported the use of bills of attainder in certain circumstances. They had studied their use. Thomas Jefferson, who drafted the Philips bill of attainder, possessed a significant library of English legal treatises, including a collection of books on parliamentary procedures. He and Patrick Henry had "rummaged over" English histories in search of "revolutionary precedents & forms." Steilen, *Legislature at War*, at 521–22.

**Finally**, even Americans who supported bills of attainder believed they should be conditional, which meant that individuals ought to be offered an opportunity to turn themselves in and claim a judicial proceeding. Criticisms of New York's Confiscation Act reflect a widely held assumption, reflected in English treatises, that an individual ought to be able to avoid legislative condemnation and prove their innocence in a judicial proceeding. Steilen, *The Josiah Philips Attainder*, at 419. These were known as conditional or suspensive bills of attainder. Other times, the bill would inflict an attaint only after the person took some subsequent action, such as enlisting with the enemy or remaining within the State. *See Gaines v. Buford*, 31 Ky. 481, 510 (1833) (Op. of Nicholas, J.) ("A bill of attainder … might declare that if certain individuals or a

class of individuals, failed to do a given act by a named day, they should be deemed to be, and treated, as convicted felons or traitors."); *see also Bills of Attainder*, The Heritage Guide to the Constitution ("[P]unishment may not only be for past acts, but it also may be triggered whenever the person engages in any future prohibited acts.").

### C.     Applying those principles to this case confirms that the Protecting Americans From Foreign Adversary Controlled Applications Act is a bill of attainder.

This history in hand, we return to the Supreme Court's framework for identifying bills of attainder in an age when they no longer identify themselves. Applying the principles derived, it becomes easier to see why the Protecting Americans From Foreign Adversary Controlled Applications Act qualifies as a bill of attainder.

At the outset, it is worth noting that the structure of the Act resembles that of some founding-era bills of attainder. Like the attainders in New York and Pennsylvania, it specifically brands some companies with disloyalty, naming their products a "foreign adversary controlled application," PL 118-50, April 24, 2024, 138 Stat. 895, Div. H ("Act"), §2(g)(3)(A), then establishes procedures by which the executive can "add to the list," Steilen, *Bills of Attainder*, at 890; Act, §2(g)(3)(B).

With the label of "foreign adversary controlled application" comes legal consequences: the companies must make available certain data, *id.* §2(b), and their foreign adversary controlled applications cannot be offered on an app store or receive internet hosting services, *id.* §2(a)(1), §2(c). Now we turn to the elements of the analysis.

### 1.     The Act applies with specificity.

"The element of specificity may be satisfied if the statute singles out a person or class by name or applies to 'easily ascertainable members of a group.'" *Foretich*, 351 F.3d at 1217. To the extent this element is contested, the Act easily satisfies it.

TikTok and ByteDance are specifically named in the statute. Act, §2(g)(3)(A). They, and they alone, are "single[d] out," 118 Cong. Rec. No. 47, E254 (Rep. Lofgren).[2] In fact, TikTok and ByteDance are called out in the very title of the House Bill that became the Act. Just as Virginia had its "act to attaint Josiah Philips," this Congress has its "bill [t]o

---

[2]As this Court has assumed in previous cases, the "Bill of Attainder Clause protects corporations as well as natural persons." *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 461 (D.C. Cir. 2018); *Consol. Edison Co. of New York v. Pataki*, 292 F.3d 338, 349 (2d Cir. 2002) (holding as much). No court has held otherwise, and that result is consistent with both the historical and modern conceptions of corporate personhood and corporate constitutional rights. Harrison A. Newman, *Corporations Under the Bill of Attainder Clause*, 69 Duke L.J. 923, 950–58 (2020); Duane L. Ostler, *Bills of Attainder and the Formation of the American Takings Clause at the Founding of the Republic*, 32 Campbell L. Rev. 227, 264 (2010) (describing Madison's position that a legislative statement against certain societies would be bill of attainder).

protect ... the United States ... from ... TikTok ... and ... ByteDance." H.R. 7521, 118th Cong. (2024).

2.    **The Act imposes punishment.**

Under each part of the Supreme Court's three-step analysis, the Act inflicts punishment on TikTok and ByteDance.

a.    **The Act imposes on TikTok and ByteDance consequences historically considered punitive.**

**First**, the Act afflicts TikTok and ByteDance with a "brand of infamy or disloyalty." *Foretich*, 351 F.3d at 1219. It states that any application controlled by TikTok or ByteDance qualifies as a "foreign adversary controlled application," thus labeling TikTok and ByteDance as "foreign adversar[ies]." Act, §2(g)(3); *see also* App.40 (Rep. Rodgers) ("ByteDance ... is beholden to the CCP[.]"); 118 Cong. Rec. H1162 ("ByteDance[] is owned by the Chinese Communist Party, meaning TikTok is essentially operating as Communist Chinese malware."). Under the view of at least one Framer, this feature alone would qualify the statute as a bill of attainder. James Madison took the position that a legislative statement condemning specific "classes or individuals" would amount to "severe punishment" and a "vote of attainder." *House Address*

*to President*, Nov. 27, 1794, 15 Papers of James Madison, Congressional Series 391 (1985).

**Second**, the Act "'operates as a legislative decree of perpetual exclusion' from a chosen vocation" and as a ban on holding property. *United States v. Lovett*, 328 U.S. 303, 316 (1946). The practical effect of the Act is to ban TikTok and ByteDance from owning or operating any website or application. App.126 (Sen. Ricketts) ("The bill incentivizes China to divest from TikTok or TikTok will face a ban."); App.134 (Sen. Scott) ("I would vote to ban TikTok, unless we see a total divestment from it by entities controlled by communist China."); App.124 (Sen. Rubio) ("I believe I was the first Member of Congress to call for a ... banning of ByteDance."). An app that cannot be distributed, updated, maintained, or serviced cannot continue long to exist. The effect is the same as the early American bills of attainder that prohibited individuals from practicing law or owning property.

That TikTok (the app) could *theoretically* escape the ban by finding a new owner does not make the Act any less of a bill of attainder. As we have seen, historical bills of attainder frequently operated conditionally. *See Cummings v. Missouri*, 71 U.S. 277, 324 (1866) ("These bills may

inflict punishment absolutely, or may inflict it conditionally."). More to the point, for TikTok Inc. and ByteDance Ltd., the qualified-divestiture provision is itself a punishment mirroring those historically imposed: even if they could get a fair price for the TikTok platform, the forced sale would still bar them from owning particular property or engaging in a particular trade. *See* Act, §2(g)(1)(A), (g)(3)(A); App.126 (Sen. Rubio). And because the Act offers TikTok Inc. and ByteDance Ltd. no way to avoid the ban, the Act resembles New York's absolute attainder. Just as the Confiscation Act prevented those accused of adhering to the British King from holding property in the State, so too the Act prevents TikTok and ByteDance, accused of being controlled by a foreign adversary, from owning a website or app in the United States.

**Third**, the Act *in reality* will amount to a forfeiture of property, the classic penalty associated with a bill of attainder. J*ackson ex dem. St. Croix v. Sands*, 1801 WL 640 (N.Y. Sup. Ct. 1801) (pointing to forfeiture as a reason to identify an act as a bill of attainder). As we have seen, bills of attainder in the early states deprived those attainted of specified property interests. The Act will do the same. "[G]iven the forced sale conditions," it would be impossible for TikTok Inc. and ByteDance Ltd. to

get a fair price for the Tiktok platform. TikTok Pet. 63. They would have to accept an "enormous discount." *Id.* More likely:  The divestiture would never even occur, as it is not economically or technologically feasible for TikTok Inc. and ByteDance to sell the TikTok platform required by the Act. TikTok Br. 21–24. Either way, the Act will deprive TikTok Inc. and ByteDance of their economically beneficial interest in the TikTok platform, *id.* 69, a burden that matches the burden of the traditional punishments of forfeiture or confiscation.

### b.    The Act lacks a non-punitive purpose.

The history detailed above confirms what the Supreme Court has said about punitive purpose: "It would be archaic to limit the definition of 'punishment' to 'retribution.' Punishment serves several purposes; retributive, rehabilitative, deterrent—and preventive." *Brown*, 381 U.S. at 458. Thus, the government must do more than identify a merely non-retributive purpose. It must identify a legitimate non-punitive purpose and show that the burdens the legislature imposed are sufficiently tailored to achieve that end. *Nixon*, 433 U.S. at 475–76; 482–83.

The House Bill identified "national security" as its purpose, H.R. 7521, but this alone cannot mean it is not a bill of attainder. As we have

seen, bills of attainder in the colonies were nearly always used in response to concerns about security. The Bill of Attainder Clauses, therefore, necessarily reflect a judgment that even when there are concerns about national security, governments must still follow certain procedures and respect certain boundaries between the branches of government. To hold that the mere assertion of national security interests justified legislative punishments of specific persons would be to exclude from constitutional prohibition every one of the historical examples considered above.

The "existence of less burdensome alternatives" for protecting national security shows that Congress's purpose was punitive. *Nixon*, 433 U.S. at 482. As TikTok and ByteDance explain, Congress abandoned ongoing efforts to craft an effective system for protecting national security, in the form of the "Project Texas" data protections. Congress also declined to employ the executive process to which all other applications are entitled. TikTok Br. 46, 59–66. Instead, lawmakers decided "in favor of creating a new governing authority that *presumes* the impossibility of any remedy aside from ban or divestment." *What Happened to TikTok's Project Texas?*, Lawfare, Mar. 20, 2024 (emphasis

added) https://www.lawfaremedia.org/article/what-happened-to-tiktok-s-project-texas.

Here the historical examples considered above are particularly instructive. In those cases, lawmakers also responded to complex legal and administrative problems by simply declaring a person or group a security threat. This gave effect to fear, bias, and partisan politics but left actual security threats unaddressed. In this case, as well, Congress has arbitrarily allowed potentially dangerous entities to escape regulation by, for example, operating a travel information website. Act, §2(g)(2)(B).

> ### c.    The legislative history confirms that Congress intended to punish TikTok and ByteDance.

The only purpose identified in the Congressional Record is a punitive one. Supporters of the Bill explained that "Congress [acted] to prevent foreign adversaries from conducting espionage, surveillance, and malign operations harming vulnerable Americans, our servicemen and women, and our U.S. Government personnel." Prevention is a punitive motive. "One of the reasons society imprisons those convicted of crimes is to keep them from inflicting future harm, but that does not make imprisonment any the less punishment." *Brown*, 381 U.S. at 458–59. The

Virginia bill of attainder, for example, was justified as necessary to incapacitate a threatening actor.

That is especially true when the desire to prevent stems from the target's alleged bad conduct, as is the case here. A legislature acts with punitive purpose when it makes "a judgment[,] based largely on past acts and associations ... that a given person or group [is] likely to cause trouble ... and therefore inflict[s] deprivations upon that person or group in order to keep it from bringing about the feared event." *Id*. The Congressional Record is replete with (unsubstantiated) references to TikTok and ByteDance's "alleged past wrongdoings," *Nixon*, 433 U.S. at 478, a telltale sign that Congress acted with punitive intent:

- "TikTok has allowed employees to covertly amplify content." App.118 (Sen. Warner).

- "TikTok restricts the information that Americans and others receive on a global basis." *Id.* (Sen. Cantwell)

- "TikTok, under CCP ownership, promotes or demotes content based on whether it aligns with the CCP's interests and its agenda." App.126 (Sen. Ricketts).

27

- "During the Hong Kong election, TikTok TikToked into Taiwan that ... the Uyghurs like [the ongoing] genocide, and they told them that the people of Hong Kong liked the destruction of their democracy." App.42 (Rep. Pelosi).

Other evidence shows that Congress acted out of retribution. In particular, the passage of the Act was motivated in part by TikTok's alleged misconduct during Congressional proceedings around the Act and other Congressional investigations:

- "[W]hen TikTok has appeared before Congress … it has not been candid." App.41 (Rep. Krishnamoorthi).

- "[L]ast March when I asked about Americans' data being stored and accessed by China, TikTok CEO stated under oath that it was not accessible by the CCP. However, this statement was a lie." App.45 (Rep. Walberg).

Some members of Congress even expressed a desire to punish TikTok for informing its users that Congress might ban it.

- "On the morning of [committee] vote, TikTok delivered a push notification and a popup to thousands of user[s] across the country. They used geolocation data targeting minor children

to then force them to call congressional offices in order to continue using the app. In doing so, these children called and asked the question: What is Congress, and what is a Congressman? This influence campaign illustrates the need for this bill." App.41 (Rep. Krishnamoorthi).

- "[TikTok] lied to their users saying Congress was going to ban TikTok, using young kids as political pawns. TikTok's gross stunt proved our point." App.44 (Rep. Hinson).

- "After being deluged with phone calls in my office, that very day, I wrote to TikTok[,] asking them to provide [documents relating to the] advocacy campaign … so that Congress may determine the role of the CCP in recruiting children to lobby Congress on its behalf. Four days later, TikTok ... responded, with piratical defiance, claiming that congressional interest in this issue was 'offensive' and 'patently false.' Really? You don't think that this is an issue that is in the national interest? We shall see about that." App.46 (Rep. Smith).

### d. This Court's decision in *Kaspersky* is not to the contrary.

None of the foregoing is changed by this Court's decision in *Kaspersky,* 909 F.3d 446, which also addressed a Bill of Attainder challenge. In that case, the federal government passed a law forbidding federal agencies from using the products or services provided by Kaspersky Lab, a Russian cybersecurity business, out of concerns that Russia might gain access to U.S. computer systems. *Id.* at 451–53. The crux of this Court's ruling in favor of the government was that the statute only prohibited Kaspersky from doing business with the federal government; "all other individuals and companies" remained free to use Kaspersky's products. *Id.* at 457. Under the historical test, this meant that the burden fell short of a vocational bar or brand of infamy. *Id.* at 461–63. Under the functional test, this meant the statute was tailored to achieve an interest the Supreme Court had recognized as non-punitive: the protection of government property. *Id.* at 459–60; *Nixon*, 433 U.S. at 478.

The statute in this case crosses all the lines drawn by *Kaspersky*. It does not ban TikTok merely on government devices; it effectively bans TikTok on all devices. It does not leave other companies free to do

business with TikTok; it bars them from doing so. It therefore fits snugly within the category of burdens historically considered punitive and fails to reasonably further non-punitive goals.

That said, this case presents this Court with the opportunity to clarify certain dicta in *Kaspersky* that arguably strays from Supreme Court precedent. *Kaspersky* reiterated that the "'functional test'—'invariably appears to be the most important of the three." *Kaspersky*, 909 F.3d at 455 (quotation omitted). As a practical matter, that may well be true. Infrequent will be the case where a legislature has been so brazen as to both specifically name a person in a statute and impose a historical punishment. But as a doctrinal matter, this Court should clarify (as it has in the past) that if a law satisfies the historical test, the inquiry ends. "[A] statute that names an individual and sentences him to death is a bill of attainder, without regard to whether Congress could articulate some non-punitive purpose for the execution." *BellSouth Corp. v. F.C.C.*, 162 F.3d 678, 686 (D.C. Cir. 1998). The point of the functional test is to "prevent[] Congress from circumventing the clause by cooking up newfangled ways to punish disfavored individuals or groups." *BellSouth Corp. v. F.C.C.*, 144 F.3d 58, 65 (D.C. Cir. 1998); *Selective Serv.*

*Sys.*, 468 U.S. at 852. It does not and cannot contract the scope of the Clause such that rights once protected are now exposed.

***

The Framers knew that governments in troubled times tend to take excited actions against those suspected of disloyalty. That is why they drafted a Constitution containing not one, but two Bill of Attainder Clauses. It is also why they created an independent judiciary. To quote Alexander Hamilton once more, "a limited constitution ... contains certain specified exceptions to the legislative authority; such ... as that it shall pass no bills of attainder, no ex post facto laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." *Lovett*, 328 U.S. at 314 (quoting Federalist No. 78).

## CONCLUSION

The Court should grant the petition for review and hold that the Protecting Americans From Foreign Adversary Controlled Applications Act is an unconstitutional bill of attainder.

32

Dated: June 27, 2024          Respectfully submitted,

                              *s/Aaron D. Van Oort*
                              Aaron D. Van Oort
                              John L. Rockenbach
                              William MacKinnon Morrow
                              FAEGRE DRINKER BIDDLE & REATH LLP
                              2200 Wells Fargo Center
                              90 South Seventh Street
                              Minneapolis, MN 55402
                              (612) 766-7000

                              Kirstin L. Stoll-DeBell
                              FAEGRE DRINKER BIDDLE & REATH LLP
                              Unit 3400
                              1144 Fifteenth Street
                              Denver, CO 80202
                              (303) 941-8888
                              *Counsel for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6469 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Office 365 ProPlus version of Word in 14-point Century Schoolbook.

Dated: June 27, 2024

<u>*s/Aaron D. Van Oort*</u>
Aaron D. Van Oort

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024 a copy of the foregoing brief was filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system, which will cause a notice of electronic filing to be served on all registered counsel of record.

*s/Aaron D. Van Oort*
Aaron D. Van Oort