**SCHEDULED FOR ORAL ARGUMENT SEPTEMBER 16, 2024**

No. 24-1113 (and consolidated cases)

# In the United States Court of Appeals for the District of Columbia Circuit

---

TIKTOK INC. and BYTEDANCE, LTD.,

*Petitioners,*

v.

MERRICK B. GARLAND,
in his official capacity as Attorney General of the United States,

*Respondent.*

---

On Petitions for Review of Constitutionality of the Protecting Americans
from Foreign Adversary Controlled Applications Act

---

**BRIEF OF *AMICUS CURIAE* PROFESSOR D. ADAM CANDEUB
IN SUPPORT OF RESPONDENT**

---

David H. Thompson
   *Counsel of Record*
Brian W. Barnes
Megan M. Wold
COOPER & KIRK
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
mwold@cooperkirk.com
*Counsel for* Amicus Curiae
*Professor D. Adam Candeub*

August 2, 2024

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PURSU-ANT TO CIRCUIT RULE 28(A)(1)

**A.    Parties and *Amici*.** Except for the *amici* filing this brief, all parties, interve-nors, and *amici* appearing before this Court are listed in Brief for Petitioner and Respondent.

**B.    Rulings Under Review.** An accurate reference to the law at issue appears in the Brief for Petitioners.

**C.    Related Cases.** Counsel for *amici curiae* are not aware of any other case cur-rently pending before this or any other court that is related to these consoli-dated cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/David  H. Thompson
David H. Thompson
*Counsel for Amicus Professor D. Adam Candeub*

**DISCLOSURE STATEMENT PURSANT TO CIRCUIT RULE 26.1**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 29(b), undersigned counsel certifies:

*Amicus curiae* is a natural person and as such has no parent corporations or stock.

/s/David H. Thompson
David H. Thompson
*Counsel for Amicus Curiae*
*Professor D. Adam Candeub*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES PURSUANT TO CIRCUIT RULE 28(A)(1) ............................ i

DISCLOSURE STATEMENT PURSUANT TO CIRCUIT RULE 26.1 ............... ii

TABLE OF AUTHORITIES ................................................................... v

STATEMENT REGARDING CONSENT TO FILE AND
SEPARATE BRIEFING ....................................................................... ix

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ......... x

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................... xi

INTRODUCTION ............................................................................... 1

I.    American Law Has A Long History Of Restricting Foreign
      Ownership Of Domestic Industries. ........................................... 2

      A.    U.S. Law Has Long Restricted Foreign Ownership of a
            Wide Variety of Domestic Industries. ............................... 2

      B.    U.S. Law Has Long Restricted Foreign Ownership in the
            Communication Industries Specifically. ........................... 4

II.   The Act's Ownership Restrictions Are Constitutional. ............... 7

      A. To the Extent the Act Restricts Speech At All, It Restricts
         Only Only The Speech Of Foreign Entities That Do Not
         Have First Amendment Rights. ...................................... 7

      B.    The First Amendment Does Not Apply Because the
            Act Regulates Conduct, Not Expression. ....................... 11

      C.    Even if the First Amendment Applies, Foreign-Ownership
            Restrictions Receive Rational-Basis Review. ............... 13

      D.    The Act Would Survive Intermediate Scrutiny
            If It Applied. ......................................................... 15

      E.    The Act Satisfies Even Strict Scrutiny. ....................... 17

iv

III.   The Act Is Not A Bill Of Attainder. ........................................................ 19

    A. The Act Does Not Inflict Punishment
       Under the Historical Test........................................................... 20

    B.   The Act Does Not Inflict Punishment Under
       the Functional Test. ................................................................. 22

    C.   The Act Does Not Inflict Punishment
       Under the Motivational Test. .................................................... 25

CONCLUSION ....................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   591 U.S. 430 (2020) ................................................................................ 7, 9

*Alario v. Knudsen*,
   No. 9:23-cv-56-M-DWM,
   2023 WL 8270811 (D. Mont. Nov. 30, 2023) ........................................... 17, 18

*Arcara v. Cloud Books, Inc.*,
   478 U.S. 697 (1986) ................................................................................ 11, 12

*BellSouth Corp. v. FCC*,
   144 F.3d 58 (D.C. Cir. 1998) ................................................................. 20, 22

*Bluman v. FEC*,
   800 F. Supp. 2d 281 (D.D.C. 2011) ..................................................................... 8

*Cellco P'ship v. FCC*,
   357 F.3d 88 (D.C. Cir. 2004) ..................................................................... 7

*Cellwave Tel. Servs. L.P. v. FCC*,
   30 F.3d 1533 (D.C. Cir. 1994) ..................................................................... 6

*FCC v. Nat'l Citizens Comm. for Broad.*,
   436 U.S. 775 (1978) ................................................................................ 13, 14

*Foretich v. United States*,
   351 F.3d 1198 (D.C. Cir. 2003) ............................................... 19, 21, 22, 25, 26

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ................................................................................ 17, 18

*Kaspersky Lab Inc. v. Dep't of Homeland Sec'y*,
   909 F.3d 446 (D.C. Cir. 2018) ..................................... 19, 20, 21, 22, 23, 24, 25

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ................................................................................ 9, 10

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ................................................................................ 6, 14

*Moody v. Netchoice, LLC*,
   144 S. Ct. 2383 (2024) ................................................................................ 7, 8, 10

*Moving Phones P'ship L.P. v. FCC*,
   998 F.2d 1051 (D.C. Cir. 1993) ................................................................. 5, 14, 15

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) ...................................................................... 2, 7

*Nat'l Broad. Co. v. United States*,
    319 U.S. 190 (1943) ......................................................................... 13

*Nixon v. Admin. of Gen. Servs.*,
    433 U.S. 425 (1977) ................................................ 20, 22, 23, 24, 25

*NTCH, Inc. v. FCC*,
    841 F.3d 497 (D.C. Cir. 2016) ........................................................... 6

*Pac. Networks Corp. v. FCC*,
    77 F.4th 1160 (D.C. Cir. 2023) .......................................................... 7

*Sacramento RSA Ltd. P'ship v. FCC*,
    56 F.3d 1531 (D.C. Cir. 1995) ........................................................... 6

*Schickel v. Dilger*,
    925 F.3d 858 (6th Cir. 2019)............................................................ 16

*Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*,
    468 U.S. 841 (1984) .................................................................... 20, 25

*Sinclair Broadcast Grp., Inc. v. FCC*,
    284 F.3d 148 (D.C. Cir. 2002) ......................................................... 14

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ......................................................................... 19

*Thunder Studios, Inc. v. Kazal*,
    13 F.4th 736 (9th Cir. 2021) .............................................................. 8

*Time Warner Ent. Co., L.P. v. FCC*,
    240 F.3d 1126 (D.C. Cir. 2001) ....................................................... 16

*Time Warner Ent. Co., L.P. v. United States*,
    211 F.3d 1313 (D.C. Cir. 2000) ........................................... 15, 16, 17

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ......................................................................... 17

*United States v. Brown*,
    381 U.S. 437 (1965) ......................................................................... 19

*United States ex rel. Turner v. Williams*,
    194 U.S. 279 (1904) ........................................................................... 8

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ........................................................................... 8

## Statutes

12 U.S.C. § 72 ................................................................................. 4

30 U.S.C.
   § 22 ........................................................................................ 3
   § 24 ........................................................................................ 3
   § 71 ........................................................................................ 3
   § 181 ...................................................................................... 3

40 U.S.C. § 17703 .......................................................................... 6

42 U.S.C. § 2133(d) (1988) ........................................................... 3

47 U.S.C. § 214 ........................................................................... 6, 7

47 U.S.C. § 310(b)(3) .................................................................... 5

49 U.S.C. § 41102(a) ..................................................................... 3

47 C.F.R § 63.21 ........................................................................... 7

Act of Apr. 10, 1816, ch. 44, § 11, 3 Stat. 266, 271, 273, 274 ....... 4

Act of Feb. 25, 1791, ch. 10, § 7, 1 Stat. 191, 193 .................... 3, 4

Air Commerce Act of 1926, Pub. L. No. 254, §§ 3(a), 6, 9(a),
   44 Stat. 568, 569, 572-73 ......................................................... 3

Cable Landing Licensing Act, ch. 12, § 2, 42 Stat. 8, 8 (1921)
   codified at 47 U.S.C.A. § 35 .................................................... 6

Consolidated Appropriations Act, 2023,
   Pub. L. No. 117-238, § 102, 136 Stat. 4459, 5258 (2022) .......... 24

Countering America's Adversaries Through Sanctions Act,
   Pub. L. No. 115-44, 131 Stat. 886 (2017) ........................... 24, 25

Federal Water Power Act § 4(d), Pub. L. No. 66-280,
   41 Stat. 1063, 1065-66 (codified as amended at 16 U.S.C. § 797(e)) ............... 3

National Defense Authorization Act of 2018, Pub. L. No. 115-91,
   § 1656, 131 Stat. 1283, 1761 (2017) ...................................... 24

National Defense Authorization Act of 2019, Pub. L. No. 115-232, § 889,
   132 Stat. 1636, 1917 (2018) .................................................. 24

Pub. L. No. 62-264, § 2, 37 Stat. 302, 303 (repealed 1927) ....... 4, 5

Pub. L. No. 632, §§ 3, 10, 21, 44 Stat. 1162 (repealed 1934) ......... 5

Vision 100--Century of Aviation Reauthorization Act, Pub. L. No. 108-176,
  § 807, 117 Stat. 2490, 2588 (2003)
  (codified as amended at 49 U.S.C. § 40102) ...................................................... 3

## **Other Authorities**

68 Cong. Rec. 3037 (1927) ........................................................................... 5

A Bill to Regulate Radio Communication: Hearing on HR 15357 before the House
  Comm. on the Merchant Marine & Fisheries, 62d Congress, 2d Sess. (1912) ... 5

Foreign Adversary Controlled Applications Act, H.R. 7521, 118th Cong.,
  § 2(g)(3)(B)(ii) (2024)................................................................................ 23, 24

H. Res. 1051, 118th Cong., 2d Sess. (Mar. 5, 2024), *available at* https://bit.ly/3LOpSw3
  ...................................................................................................... 18, 19

Hearings on H.R. 8301 Before the House Comm. on Interstate and Foreign
  Commerce, 73th Cong., 2d Sess. 21-27 (1934) ................................................. 5

**STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING**

Counsel for the United States and all Petitioners stated that they do not oppose the filing of this *amicus* brief.

Pursuant to D.C. Circuit Rule 29(d), *amicus* certifies that a separate brief is necessary to provide the unique perspective that given the national security threat posed by TikTok, the Protecting Americans from Foreign Adversary Controlled Applications Act (H.R. 815) is constitutional. This perspective is based on the collective experience of *amicus curiae* in security and defense policy, and thus is not amenable to a joint brief. Further, because *amicus* is not aware of any other *amicus* brief addressing these issues, it certifies pursuant to D.C. Circuit Rule 29(d) that joinder in a single brief with other *amici* would be impracticable.

/s/David H. Thompson
David H. Thompson
*Counsel for Amicus Curiae*
*Professor D. Adam Candeub*

**STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS**

No counsel for any party authored this brief in whole or in part. The Hudson Institute made a monetary contribution intended to fund the preparation and submission of this brief.

*/s/David H. Thompson*
David H. Thompson
*Counsel for Amicus Curiae*
*Professor D. Adam Candeub*

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

D. Adam Candeub is a professor of law and director of the Intellectual Property, Information and Communications Law Program taught law at Michigan State University College of Law where he has taught since 2004. He also served as Acting Assistant Secretary of Commerce for the National Telecommunications and Information Authority (2020) and Deputy Associate Attorney General (2020–21), and also has served as an attorney advisor in the Federal Communications Commission (2001–04).

Professor Candeub is a nationally recognized authority on the First Amendment, telecommunications and internet law as well as Federal Communications Commission regulation. He has published over forty scholarly articles and book chapters, and his articles have been cited by numerous federal courts, including the Supreme Court.

He has an interest in the coherent and faithful interpretation of federal communications law and regulation in a manner that best serves the public interest.

**INTRODUCTION**

Among government's most important duties is to "provide for the common defence" against foreign invasion and hostile interference in domestic affairs. U.S. CONST., Preamble. Mindful of that duty, Congress has since the beginning of the Republic passed laws that restrict foreign ownership in industries that serve key national security needs or are vital to preserving sovereignty. These industries have ranged from banking and electricity generation to shipping and communications. Courts routinely uphold these laws.

The Protecting Americans from Foreign Adversary Controlled Applications Act (the "Act") follows this long lineage and, like its predecessors, is constitutional. *First*, the First Amendment does not protect foreign entities abroad, including the ByteDance entities that control and direct the TikTok app. *Second*, the Act does not implicate the First Amendment because it regulates conduct—ownership by a foreign adversary—not expression. *Third*, even if the First Amendment applies, the Act should receive rational-basis review consistent with the analysis of the U.S. Supreme Court and of this Court in other cases about government restrictions on foreign ownership of domestic industries. *Fourth*, if heightened scrutiny applies, it is at most intermediate scrutiny, although the Act passes strict scrutiny in any event. *Fifth*, the Act is not an unconstitutional bill of attainder because it has no punishment purpose, whether viewed from a historical, functional, or motivational perspective.

1

*Amicus* urges the Court to uphold the constitutionality of the Act.

## I. American Law Has A Long History Of Restricting Foreign Ownership Of Domestic Industries.

Petitioners claim the Act is "unprecedented" and is "the first time in history" a law of its kind has been passed, ByteDance Pet. ¶ 1, but laws prohibiting foreign ownership of domestic industries have been consistently enforced throughout our nation's history, stretching back to the Republic's founding. None of these has ever been struck down on constitutional grounds. This includes a long history of such laws regulating a wide variety of industries and also a long history of such laws regulating the communications industry specifically. This "longstanding 'practice of the government'" is relevant to courts' "determination of 'what the law is,'" and provides significant support for the Act's constitutionality. *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 401 (1819); *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).

### A. U.S. Law Has Long Restricted Foreign Ownership of a Wide Variety of Domestic Industries.

Federal law has a long history of restricting foreign ownership across a wide variety of domestic industries, particularly those that raise national security concerns.

For example, because electricity generation is vital to national security and essential to the economy, federal law allows only U.S. citizens or domestic corporations to build hydroelectric power plants. Federal Water Power Act, § 4(d), Pub. L. No. 66-280, 41 Stat. 1063, 1065–66 (codified as amended at 16 U.S.C. § 797(e)). Similarly, licenses for the operation of atomic energy utilization or production facilities may not be issued to aliens or to foreign-owned or foreign-controlled corporations. 42 U.S.C. § 2133(d) (1988).

Rare minerals are vital to supply chains and carry national security implications. Federal law restricts mining on federal lands to United States citizens. 30 U.S.C. §§ 22, 24, 71, 181.

All air carriers operating in the United States must obtain a "certificate of public convenience and necessity" from the FAA, which may only be issued to United States citizens. 49 U.S.C. § 41102(a). Foreign ownership restrictions for air carriers extend back to the Air Commerce Act of 1926, Pub. L. No. 254, §§ 3(a), 6, 9(a), 44 Stat. 568, 569, 572–73. Congress strengthened these restrictions after 9/11 to require U.S. citizens to exercise "actual control" over corporate owners of air carriers. *See* Vision 100--Century of Aviation Reauthorization Act, Pub. L. No. 108-176, § 807, 117 Stat. 2490, 2588 (2003) (codified as amended at 49 U.S.C. § 40102).

As a final example in this non-exhaustive list, U.S. banking law has restricted foreign ownership and control reaching back to the 18th century. The First Bank of

the United States restricted ownership and control to U.S. citizens. Act of Feb. 25, 1791, ch. 10, § 7(III), 1 Stat. 191, 193 (1791) ("None but a stockholder, being a citizen of the United States, shall be eligible as a director."). The Second Bank of the United States had nearly identical restrictions. Act of Apr. 10, 1816, ch. 44, § 11, 3 Stat. 266, 271, 273, 274 (1816). And to this day, directors of all nationally chartered banks are required to be U.S. citizens. 12 U.S.C. § 72 ("Every director must, during his whole term of service, be a citizen of the United States . . . .").

As these examples show, laws restricting foreign ownership of domestic industries enjoy a long history in the United States and do not violate the Constitution.

### B. U.S. Law Has Long Restricted Foreign Ownership in the Communication Industries Specifically.

There is also a lengthy history of federal law restricting foreign ownership in the communications industries specifically, and these laws have not been held to violate the First Amendment despite the connection between communications technologies and speech.

Restrictions on foreign ownership of communications networks have been incorporated into our nation's oldest communications laws. These restrictions proceed from government's compelling national security interests and sometimes also its interest in protecting the national economy. One of the earliest federal communications laws, the Radio Act of 1912, prohibited foreign ownership of broadcast or common

4

carrier radio services (open radio services used, for instance, in ship-to-shore communications). Pub. L. No. 62-264, § 2, 37 Stat. 302, 303 (repealed 1927). Its successor, the Radio Act of 1927, copied these restrictions. Pub. L. No. 632, §§ 3, 10, 21, 44 Stat. 1162, 1163, 1166, 1170 (repealed 1934). Today's Communications Act of 1934 reflects these restrictions in 47 U.S.C. § 310(b)(3), which is still in effect. "Section 310(b) prohibits the grant of radio licenses, including licenses in the common carrier service, to aliens and to corporations evidencing specific levels of alien ownership or control." *Moving Phones P'ship L.P. v. FCC*, 998 F.2d 1051, 1055 (D.C. Cir. 1993).

Section 310 and its predecessors stem from national security concerns about the integrity of the country's communications systems. This Court has recognized that Section 310's alien ownership restrictions reflect government's intent to "safeguard the United States from foreign influence." *Id*. These concerns motivated Congress to pass these restrictions in the Radio Acts of 1912 and 1927, as well as their current iteration in Section 110. A Bill to Regulate Radio Communication: Hearing on HR 15357 before the House Comm. on the Merchant Marine & Fisheries, 62d Cong., 2d Sess. 41-42 (1912) (statement of Lt Comm David W Todd); 68 Cong. Rec. 3037 (1927) (statement of Sen. Burton K. Wheeler); Hearings on H.R. 8301 before the House Comm. on Interstate & Foreign Commerce, 73th Cong., 2d Sess. 21-27 (1934).

While Congress lifted some of Section 310(b)'s restrictions in the 1996 Tele-communications Act and the FCC has liberalized the application of Section 310(b) (to subject it to the FCC's overarching "public interest" standard), its core prohibition on alien ownership remains intact, and this Court has never questioned the provision's constitutionality. *See NTCH, Inc. v. FCC*, 841 F.3d 497, 500 (D.C. Cir. 2016); *Sacramento RSA Ltd. P'ship v. FCC*, 56 F.3d 1531 (D.C. Cir. 1995); *Cellwave Tel. Servs. L.P. v. FCC*, 30 F.3d 1533, 1534 (D.C. Cir. 1994).

Other laws also prohibit foreign ownership of communication networks. For instance, the Supreme Court in *Mathews v. Diaz* noted a "multitude of federal statutes [that] distinguish between citizens and aliens," citing a 1900 law that prohibited ownership of telegraph or other cable lines in Alaska. 426 U.S. 67, 78 n.12 (1976). While Congress repealed the statute mentioned in *Mathews*, other prohibitions on foreign ownership of Alaskan telephone lines are still in effect. 40 U.S.C. § 17703.

The Cable Landing Licensing Act, ch. 12, § 2, 42 Stat. 8, 8 (1921) codified at 47 U.S.C. § 35, singles out foreign ownership of submarine telecommunications cables to secure reciprocal rights for American companies in foreign countries. It provides that the President may revoke or withhold a license if doing so would "assist in securing rights for the landing or operation of cables in foreign countries." *Id.*

Similarly, Section 214 of the Communications Act gives the FCC the power to approve applications to provide international telecommunications within the

6

United States. 47 U.S.C. § 214. This Court has upheld denials of applications under this provision for national security reasons, *Pac. Networks Corp. v. FCC*, 77 F.4th 1160, 1166 (D.C. Cir. 2023). The FCC has interpreted this provision also to protect the U.S. telecommunications market against foreign networks whose monopoly power might have anti-competitive effects in the United States. 47 C.F.R § 63.21. This Court has approvingly noted Section 214's power to regulate foreign carriers for purposes of "national security, law enforcement, trade or foreign policy evaluation." *Cellco P'ship v. FCC*, 357 F.3d 88, 95 (D.C. Cir. 2004).

The Supreme "Court has treated practice as an important interpretive factor" when considering constitutional claims because "the longstanding practice of the government can inform [courts'] determination of what the law is." *Canning*, 573 U.S. at 525 (cleaned up). The frequency and long lineage of laws restricting foreign ownership of domestic industries strongly indicate that the Constitution allows them.

## II.   The Act's Ownership Restrictions Are Constitutional.

### A. To the Extent the Act Restricts Speech At All, It Restricts Only Only The Speech Of Foreign Entities That Do Not Have First Amendment Rights.

"[I]t is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020). This rule extends to corporations because "[c]orporations … are composed of human

7

beings with First Amendment rights," and therefore "possess First Amendment rights themselves," while "foreign persons and corporations located abroad do not." *Moody v. Netchoice, LLC*, 144 S. Ct. 2383, 2410 (2024) (Barrett, J., concurring).

While it is true that foreigners *can* enjoy "certain constitutional rights," such foreign entities must "come within the territory of the United States" and must have "developed substantial connections with this country," for that to occur. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 270–71 (1990); *see also United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904) (rejecting excludable alien's First Amendment claims because he had "not become one of the people to whom these things are secured by our Constitution"). Merely directing speech into the country from abroad is not enough to acquire First Amendment rights. *See Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 752 (9th Cir. 2021) (Lee, J., dissenting).

Nor is it *always* possible for a foreign entity to acquire U.S. Constitutional rights, even by attempting to create connections with this country. For example, "[t]he government may exclude foreign citizens from activities 'intimately related to the process of democratic self-government,'" including making political donations, even though such donations are ordinarily protected by the First Amendment. *Bluman v. FEC*, 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (Kavanaugh, J., op.) (quoting *Bernal v. Fainter*, 467 U.S. 216, 220 (1984)). And Congress's "plenary … power to make policies and rules for exclusion of aliens," also overrides First Amendment

8

interests, allowing the government to exclude a foreign national from the country even when U.S. citizens assert a First Amendment interest to have the individual visit and speak. *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972).

Petitioners artfully attempt to conceal the ultimate ownership of the TikTok platform and its algorithm by focusing on Petitioner ByteDance Ltd., but "Beijing ByteDance Technology is a Chinese internet technology company headquartered in Beijing and operating in the United States through a holding company ("ByteDance Ltd.")." App.3. As such, it is a foreign entity operating abroad and is not entitled to First Amendment protections. *Agency for Int'l Dev.*, 591 U.S. at 433.[1] Nor can ByteDance Technology gain First Amendment protection merely by laundering its communications through another foreign holding company or through subsidiary U.S. entities and their U.S.-based employees. In passing the Act, Congress described the "tight interlinkages between ByteDance Ltd., TikTok, and the Chinese Communist Party," including statements from ByteDance executives that the CCP would "take the lead" across "all product lines and business lines," including TikTok. App.3. "[I]f [a] platform's corporate leadership abroad makes the policy decisions about the viewpoints and content the platform will disseminate[,]" then those choices

---

[1] Petitioners readily admit that ByteDance Ltd. itself is a Cayman Islands-incorporated entity, founded by Chinese entrepreneurs and still substantially owned by non-U.S. entities and individuals. ByteDance Pet. ¶ 14. As such, it is also a foreign entity operating abroad and is not entitled to First Amendment protections. *Agency for Int'l Dev.*, 591 U.S. at 433.

are not protected by the First Amendment, no matter how many U.S.-based entities or employees it takes to actuate them. *See NetChoice*, 144 S. Ct. 2410 (Barrett, J., concurring). That is precisely ByteDance's business model with regard to TikTok, and it does not confer First Amendment rights on the foreign-adversary-controlled application.

Domestic entities and individuals cannot rely on *their* First Amendment rights to protect ByteDance's foreign-adversary control over TikTok either. To the extent domestic individuals assert a right to receive information from Beijing ByteDance Technology (including through the holding company intermediary ByteDance Ltd.), that First Amendment interest is overridden where Congress acts for a national security purpose, as it has done in enacting the Act. *Kleindienst*, 408 U.S. at 769–70.

ByteDance's foreign ownership provides a complete answer to the First Amendment claims in this case because the Act is satisfied if the domestic TikTok entities *divest* from the foreign ByteDance entities that control them—foreign entities that themselves have no First Amendment rights. App.17. Divestiture is accomplished when the "foreign adversary controlled application [is] no longer being controlled by a foreign adversary." *Id*. The only speech that the Act restricts is speech by foreign entities outside the United States, which the First Amendment does not protect.

### B.    The First Amendment Does Not Apply Because the Act Regulates Conduct, Not Expression.

Even if Petitioners' claims implicate the First Amendment rights of domestic entities or individuals, the Act should receive rational-basis review because mere ownership is expressive activity and not the equivalent of First Amendment-protected speech. The Act easily satisfies rational-basis review.

The Act does not require heightened scrutiny under the First Amendment because its divestiture requirement is a regulation of conduct, not expression. The Supreme Court's decision in *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), is on-point and controlling. In *Cloud Books*, New York officials sought to close an adult bookstore where they had observed "instances of solicitation of prostitution" and "of masturbation, fondling, and fellatio by patrons on the premises of the store, all within the observation of the proprietor." *Id.* at 699. The bookstore asserted "that a closure of the premises would impermissibly interfere with [its] First Amendment right to sell books." *Id.* at 700. The Supreme Court easily rejected that First Amendment defense. The "sexual activity carried on in this case manifests absolutely no element of protected expression," the Court explained. *Id.* at 705. And forcing the closure of the bookstore also did not "impermissibly burden[] its First Amendment protected bookselling activities," both because the store "remain[ed] free to sell the same materials at another location," "even if such locations are difficult to find," and because

11

the extension of the First Amendment on that basis "proves too much." *Id*. at 705–06 & n.2.

> One liable for a civil damages award has less money to spend on paid political announcements or to contribute to political causes, yet no one would suggest that such liability gives rise to a valid First Amendment claim. Similarly, a thief who is sent to prison might complain that his First Amendment right to speak in public places has been infringed because of the confinement, but we have explicitly rejected a prisoner's claim to a prison environment least restrictive of his desire to speak to outsiders.

*Id.* at 706 (citation omitted).

As in *Cloud Books*, so too here. Even *assuming* that the First Amendment extends some protection to TikTok's own hosting of its users' speech, the Act does not regulate *that* conduct at all. Instead, like the public decency statute at issue in *Cloud Books*, the Act regulates activity that "manifests absolutely no element of protected expression," *id.* at 705: the ownership and control that is exercised over TikTok by a foreign-adversary-controlled entity. And any argument that the regulation of this conduct indirectly "burdens [TikTok's] First Amendment protected [content-hosting] activities" not only "proves too much" for the reasons laid out in *Cloud Books*, but is also false, given that TikTok remains "free to carry on" hosting virtual content so long as it does so without foreign-adversary control. *Id.* at 705–06 & n.2.

**C.     Even if the First Amendment Applies, Foreign-Ownership Restrictions Receive Rational-Basis Review.**

Even if the First Amendment applies to the Act, only rational-basis review is required because the Act is content neutral.

The Supreme Court has upheld ownership restrictions of television networks when reviewing a First Amendment challenge without applying heighted scrutiny. *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 207 (1943). In *National Broadcasting Company*, the Supreme Court considered a First Amendment challenge to an FCC regulation that restricted "the licensing of two stations in the same area to a single network organization" because such licensing is anticompetitive and "basically unsound and contrary to the public interest." *Id*. The Supreme Court upheld the constitutionality of the regulation because it applied a "standard … for the licensing of stations" based on "the public interest, convenience, or necessity," not on the basis of applicants' "political, economic, or social views, or upon any other capricious basis." *Id*. at 226–27 (cleaned up). The Supreme Court has reiterated this distinction in subsequent cases. *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 799–01 (1978) (holding that a regulation "barring a newspaper owner from owning certain broadcasting stations" is "not content related" and distinguishing regulations based on "loyalty oath[s]" or "political affiliation").

Following these precedents, this "[C]ourt applies a rational basis standard of review . . . . [to] restrictions on common ownership" of communications networks.

13

*Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148, 167–68 (D.C. Cir. 2002); *Nat'l Citizens Comm. for Broad.*, 436 U.S. at 792. This Court has explicitly rejected arguments that restrictions on local ownership "regulate[] the content of speech" and are "thus … subject to strict scrutiny," because under binding Supreme Court precedent, other analogous "restrictions on common ownership in a local market" were deemed "not content related." *Sinclair Broad. Grp.*, 284 F.3d at 168. "[T]he only question" in these cases is whether the ownership restriction "is rationally connected to its goals." *Id*. Even goals less lofty than national security concerns will do. In *Sinclair*, an ownership restriction satisfied rational-basis review where it was rationally connected to the goal "of ensuring a diversity of voices and adequate competition in television broadcasting." *Id*.

The Act easily satisfies rational basis review. In *Moving Phones*, this Court applied rational-basis review to Section 310(b)'s ownership restrictions. 998 F.2d at 1056 (applying Supreme Court precedent holding that "classifications based on alienage in federal statutes are permissible so long as the challenged statute is not a 'wholly irrational' means of effectuating a legitimate government purpose," (quoting *Mathews*, 426 U.S. at 83).[2] The Court applied those precedents to conclude that

---

[2] *Moving Phones* concerned an equal protection claim rather than a First Amendment challenge, but the rational-basis standard is the same in either circumstance.

14

"[t]he national security policy" undergirding Section 310(b) "satisfies the require-

ment that there be a showing of some rational relationship between the interest

sought to be protected and the limiting classification." *Id*. (cleaned up).

Here, the Act also imposes alienage-based ownership restrictions because of

pressing national security concerns—concerns that dwarf the concerns that moti-

vated the law this Court upheld in *Moving Phones Partnership*. The congressional

findings in the Act and the Government's brief in this case demonstrate TikTok's

ability to obtain huge amounts of American's personal information and control what

information Americans see on a massive scale. This power far exceeds that which a

foreign entity could exert through ownership of a radio spectrum allocation. Accord-

ingly, the Act is not a "wholly irrational" means of protecting Americans from a

platform influenced by the Chinese government.

### D.    The Act Would Survive Intermediate Scrutiny If It Applied.

If some form of heightened scrutiny applies to the Act under the First Amend-

ment, it is *at most* intermediate scrutiny, which the Act survives.

This Court, outside of the broadcast context, has examined ownership re-

strictions in communications industries, most prominently the cable industry. In

*Time Warner Ent. Co., L.P. v. United States*, 211 F.3d 1313, 1316 (D.C. Cir. 2000)

(*Time Warner I*), the Court considered a First Amendment challenge to a provision

of the Cable Television Consumer Protection and Competition Act of 1992's (*Cable*

15

*Act*) that restricted the number of cable subscribers any one company could have. This Court applied intermediate scrutiny because the Cable Act's per-owner subscriber limits were "content-neutral." *Id*. at 1322. The regulation aimed to "preserve competition," "[b]y placing a value upon diversity and competition in cable programming." *Id*. at 1318.

The Act here is also content-neutral. Like the ownership restrictions in *Time Warner I*, the Act restricts ByteDance's access to American internet consumers. It does so not by regulating the content of the TikTok app but by requiring a particular corporate structure to govern the app. It makes no reference to the ideas or views that the TikTok platform transmits or expresses.

Even if the Act is interpreted as a speaker-based restriction, it is "not automatically content based or content neutral" on that basis. *Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019). The only arguably speaker-based distinction in the Act is one based on alienage, which the Supreme Court in *Mathews* has held is both subject to and survives rational-basis review. *Supra* at 6.

The Act satisfies intermediate scrutiny if it applies. Intermediate scrutiny asks whether the regulation "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Time Warner Ent. Co., L.P. v. FCC*, 240 F.3d 1126, 1130 (D.C. Cir. 2001) (cleaned up). Certainly, the Government's national security

16

interest—keeping a hostile foreign power from obtaining huge swathes of Americans' data and manipulating what Americans read through a secret algorithm—is an important interest and divestiture is necessary to achieve that end. In fact, divestiture is the *bare minimum* requirement that could resolve the pressing national security problem the Act identifies. In *Time Warner I*, this Court accepted less compelling governmental interests like "the promotion of diversity in ideas and speech" and "the preservation of competition." *Time Warner I*, 211 F.3d at 1319; *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662–64 (1994) (*Turner I*). The national security interests here are far more substantial because they address the "common defense" against malevolent foreign actors—perhaps the most compelling and important of all government duties. These harms are amply supported by Congress's findings in the Act and by the record developed in this matter. TikTok's "harms are real, not merely conjectural," *Turner I*, 512 U.S. at 664, and satisfy intermediate scrutiny. The First Amendment does not require the government to stand by while foreign powers weaken and undermine our national security.

### E.    The Act Satisfies Even Strict Scrutiny.

Even if strict scrutiny applies, the Act satisfies it. The government's interest in national security is unquestionably compelling. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010); *cf. Alario v. Knudsen*, No. 9:23-cv-56-M-DWM, 2023 WL 8270811, at *9 (D. Mont. Nov. 30, 2023) (striking down Montana ban on

17

TikTok because the "law's foreign policy purpose is not an important Montana state interest"). It is also supported by findings in a House report that the continuing Chinese ownership and control of TikTok poses an immediate and acute threat to national security. App.2–12; H. Res. 1051, 118th Cong., 2d Sess. (Mar. 5, 2024), *available at* https://bit.ly/3LOpSw3. Even under strict scrutiny, these findings are entitled to judicial deference. As the Supreme Court has explained, in contexts that "implicate[] sensitive and weighty interests of national security and foreign affairs," it is vital for courts "not to substitute [their] own evaluation of evidence for a reasonable evaluation by the Legislative Branch." *Humanitarian L. Project*, 561 U.S. at 34 (cleaned up).

As those findings indicate, ending Chinese control of TikTok is the least-restrictive means of protecting the national security interests from the threat the Act identifies. "[A]s long as TikTok is subject to the ownership or control of ByteDance," the House found, "no alternative to preventing or prohibiting TikTok's operation of the application in the United States has been identified that would be sufficient to address the [national security] risks." H.R. 1051 at 12. Indeed, the alternative TikTok itself proposes to alleviate those risks—so-called "Project Texas," which would store U.S. user data "in the United States, using the infrastructure of a trusted third party"—is insufficient for multiple reasons. *Id.* at 13. That alternative

USCA Case #24-1113    Document #2068098    Filed: 08/02/2024    Page 31 of 41


"would have allowed the application algorithm, source code, and development activities to remain in China under ByteDance's control," would have allowed "code development in and access to United States user data from China," thus "potentially expos[ing] United States users to malicious code, backdoor vulnerabilities, surreptitious surveillance, and other problematic activities," and would have allowed "TikTok to continue to send United States user data to China to update the machine learning algorithms and source code for the application, and to conduct related back-end services, like managing users' accounts." *Id.* at 13–14.

## III.    The Act Is Not A Bill Of Attainder.

The Act is not a bill of attainder because it does not punish Petitioners.[3] "Under the now prevailing case law, a law is prohibited under the bill of attainder clause if it (1) applies with specificity, and (2) imposes punishment." *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (cleaned up). Petitioners cannot

---

[3] For the same reasons that Petitioner ByteDance Ltd., as a foreign entity, is not protected by the First Amendment, it is also not protected by the Bill of Attainder Clause. *See supra* at 7–10. Additionally, the U.S. Supreme Court has never held that corporations can be protected by the Bill of Attainder Clause and has given some indications that the clause should *not* be so extended. *United States v. Brown*, 381 U.S. 437, 444 n.18 (1965) (Bill of Attainder Clause concerns "legislative interferences[] in cases affecting personal rights"); *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) (Bill of Attainder Clause operates "only as [a] protection[] for individual persons and private groups"). This Court has assumed without deciding that the clause can apply to corporations. *Kaspersky Lab Inc. v. Dep't of Homeland Sec.*, 909 F.3d 446, 453–54 (D.C. Cir. 2018), but the better view is that the clause only protects natural persons.

demonstrate that the Act "imposes punishment." "A 'punishment' is something more than a burden." *Kaspersky Lab*, 909 F.3d at 455. To identify a punishment, courts are to undertake three inquiries: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish." *Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 852 (1984) (quoting *Nixon v. Admin. of Gen. Servs*., 433 U.S. 425, 473 (1977)). The Act fails all three tests—historical, functional, and motivational. The Act is a regulatory measure aimed at protecting U.S. national security from an identified threat posed by foreign adversary-controlled apps. It does not punish.

### A. The Act Does Not Inflict Punishment Under the Historical Test.

"For the framers of the Constitution the term 'bills of attainder' carried a specific meaning: it referred to parliamentary acts sentencing named persons to death without the benefit of a judicial trial." *BellSouth Corp. v. FCC*, 144 F.3d 58, 62 (D.C. Cir. 1998). Early on, the constitutional limitation was also extended to "legislation subjecting specified persons to penalties short of death—what the framers called 'bills of pains and penalties,'" *id*., including "imprisonment, banishment, and the punitive confiscation of property." *Id.* at 64 (quoting *Selective Serv. Sys*., 468 U.S.

at 852). The Act obviously does not imprison or banish Petitioners, nor does it confiscate property. Divestiture results not in *confiscation* by the government, but in a sale to a private, third-party buyer. *Cf. Kaspersky Lab*, 909 F.3d at 460 (ban on doing business with the government did not result in foreign company having "its property confiscated").

After the founding, "legislative bars to participation in specified employments or professions" also came to be recognized as punitive laws, *id*. (quoting *Foretich*, 351 F.3d at 1218), but the Act is not analogous to these kinds of laws either. The Act *does not* bar TikTok from an entire employment or profession because TikTok is free to continue operating in any country on the globe other than the United States. Depriving it of access to the U.S. market—unless its Chinese corporate parent divests its interest—simply does not prevent it from exercising its chosen "profession." *Kaspersky Lab* is directly on point. *Id*. at 461. There, this Court explained that because "Kaspersky is one of the world's largest privately owned cybersecurity companies, and it does business all around the globe," depriving it of the ability to contract with federal agencies "does not prevent Kaspersky from engaging in its chosen profession, namely, developing and selling cybersecurity products and services." *Id.* at 462 (cleaned up). Just so here: depriving TikTok of access to the U.S. market does not foreclose TikTok's participation in the rest of the world's markets, and can be averted through divestiture in any event.

21

Additionally, the rationale for treating laws barring participation "in specified employments or professions" as punitive is based on stigma, the effect of "mark[ing] specified persons with a brand of infamy or disloyalty." *Foretich*, 351 F.3d at 1218–19. But corporations like Petitioners are not subject to the same stigma-based harms. As this Court articulated in *Kaspersky*, "the stain of a 'brand of infamy or disloyalty' matters ... to flesh-and-blood humans," while "[c]orporations are very different," and such a branding does not harm any "quality integral to a company's emotional well-being" nor does it "exact[] [a] psychological cost." *Kaspersky*, 909 F.3d at 461. Nor is it relevant that the Act references the TikTok platform specifically. In *BellSouth*, this Court upheld Section 274 of the Telecom Act of 1996 against a bill of attainder challenge where that section specifically applied to any "Bell operating company or any affiliate" and prohibited the speech-related conduct of "electronic publishing." 144 F.3d at 61, 67.

Applying the historical test, the Act is not punitive.

### B.     The Act Does Not Inflict Punishment Under the Functional Test.

The second inquiry "look[s] beyond mere historical experience" to determine whether a law *functionally* imposes form of punishment, *Nixon*, 433 U.S. at 475, and the Act also does not impose any "punishment" according to this test. *Kaspersky Lab*, 909 F.3d at 455 (describing this inquiry as "the most important of the three").

The functional test asks, "whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further non-punitive legislative purposes." *Nixon*, 433 U.S. at 475–76. "Where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Id.* at 476. To apply the text, a court must "identify the purpose, ascertain the burden, and assess the balance between the two." *Kaspersky Lab*, 909 F.3d at 455. Where the law is either "significantly overbroad" or "underinclusive" when judged in relation to the nonpunitive purpose, such a "serious imbalance may support an inference that the legislature's purported nonpunitive objective serves as a 'smokescreen' for some undisclosed punitive purpose." *Id*.

The Act easily passes this functional inquiry. The Act serves a compelling national security interest, App. 2–12, and its ban on foreign-adversary control of TikTok is not "significantly overbroad," *Kaspersky Lab*, 909 F.3d at 455, in relation to this purpose. The Act applies only to TikTok and other applications that the President may determine present "a significant threat to the national security of the United States." Foreign Adversary Controlled Applications Act, H.R. 7521, 118th Cong., § 2(g)(3)(B)(ii) (2024). It precisely targets the source of that threat: a foreign-adversary-controlled entity's continuing, controlling interest in the application. It

23

goes no further than resolving that national-security threat. Congress reasonably determined that divestment of that foreign control is the only way to prevent the threat to national security that it poses.

Nor is the Act significantly "underinclusive," in a way that "seemingly burdens one among equals." *Kaspersky Lab*, 909 F.3d at 456. While there may be other foreign adversary-controlled social media platforms that operate in the United States, TikTok is undoubtedly the largest one by orders of magnitude, and so Congress "reasonably determined that [TikTok's Chinese] ties differ in degree and kind from these other companies'." *Id.* at 459. To the extent the Act singles TikTok out, it thus creates "a legitimate class of one," based on the fact that only TikTok's foreign ownership "create[s] an imminent danger" to national security. *Nixon*, 433 U.S. at 472 (cleaned up). And perhaps more fundamentally, if other foreign adversary-controlled applications *do* pose a similar threat, the Act *includes a mechanism for addressing them*: the President's authority to designate other applications as covered by the Act. Foreign Adversary Controlled Applications Act, § 2(g)(3)(B); *cf. Nixon*, 433 U.S. at 472 (noting that challenged statute also provided for "further consideration of generalized standards to govern [President Nixon's] successors").

Indeed, Congress has frequently identified and regulated a class of one in the national security context. *See, e.g.*, Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, § 102, 136 Stat. 4459, 5258 (2022) (banning TikTok on government

24

devices); National Defense Authorization Act of 2019, Pub. L. No. 115-232, § 889, 132 Stat. 1636, 1917–18 (2018) (Huawei or ZTE products); National Defense Authorization Act of 2018, Pub. L. No. 115-91, § 1656, 131 Stat. 1283, 1761–62 (2017) (same); Countering America's Adversaries Through Sanctions Act, Pub. L. No. 115-44, 131 Stat. 886 (2017) (Islamic Revolutionary Guard Corps). The Act thus "has the earmarks of a rather conventional response to a security risk: remove the risk." *Kaspersky Lab*, 909 F.3d at 457 (cleaned up).

The Act does not impose "punishment" under the functional test.

### C.    The Act Does Not Inflict Punishment Under the Motivational Test.

The Act also does not inflict punishment under the motivational test, which looks for whether there was a "congressional intent to punish." *Nixon*, 433 U.S. at 478. "Courts conduct this inquiry by reference to legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation." *Foretich*, 351 F.3d at 1225. There is no "unmistakable evidence of punitive intent" in the legislative history, *Selective Service System*, 468 U.S. at 855 n.15, nor is there anything in the Act's "context or timing," *Foretich*, 351 F.3d at 1225, that would suggest any intent to *punish* TikTok or ByteDance for past behavior.

To the contrary, all of this evidence reflects the purpose that is evident from the title of the statute: protecting Americans from foreign adversary-controlled applications. The accompanying resolution spells out that threat in great detail, substantiating Congress's legitimate concerns. For example, Congress credited the conclusion of the Department of Homeland Security that:

> the PRC's data collection actions result innumerous risks to U.S. businesses and customers, including: the theft of trade secrets, of intellectual property, and of other confidential business information; violations of U.S. export control laws; violations of U.S. privacy laws; breaches of contractual provisions and terms of service; security and privacy risks to customers and employees; risk of PRC surveillance and tracking of regime critics; and reputational harm to U.S. businesses

a non-exhaustive list. App.4 (cleaned up). TikTok serves over 170 million U.S. users, so these threats are posed at enormous scale. App.3. Those concerns and the many others articulated in the Act are plainly sufficient to justify the statute and explain why Congress thought it necessary; this is not a case where there is an "absence of any plausible nonpunitive purpose." *Foretich*, 351 F.3d at 1226. Under the motivational test too, then, the Act does not inflict any form of "punishment" that is inconsistent with the Bill of Attainder Clause.

The Act is not an unconstitutional bill of attainder under any of the three tests courts apply to evaluate such a claim.

## CONCLUSION

*Amicus curiae* urges the Court to uphold the constitutionality of the Act.

Respectfully submitted,

David H. Thompson
   *Counsel of Record*
Brian W. Barnes
Megan M. Wold
COOPER & KIRK
1523 New Hampshire Ave., N.W.
Washington, DC 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
mwold@cooperkirk.com

*Counsel for* Amicus Curiae
*Professor D. Adam Candeub*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this document contains 6,178 words excluding parts of the brief exempted by FED. R. APP. P. 32(f) and Circuit Rule 32(e)(1).

This document complies with the typeface and type style requirements of FED. R. APP. P. 32(a)(5) and 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: August 2, 2023

*/s/David  H. Thompson*
David H. Thompson
*Counsel for Amicus Curiae*
*Professor D. Adam Candeub*

28

## CERTIFICATE OF SERVICE

I certify that on August 2, 2023, I filed the foregoing document via the appellate CM/ECF system of the United States Court of Appeals for the District of Columbia Circuit. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 2, 2023

*/s/David  H. Thompson*
David H. Thompson
*Counsel for Amicus Curiae*
*Professor D. Adam Candeub*