**ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024**

**Nos. 24-1113, 24-1130, 24-1183**

———————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————————

TIKTOK INC. and BYTEDANCE LTD.,

*Petitioners*,

v.

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent*.

(*caption continued*)

———————————————————

On Petitions for Review of the Protecting Americans from Foreign Adversary
Controlled Applications Act

———————————————————

**BRIEF OF *AMICUS CURIAE*
AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE
IN SUPPORT OF RESPONDENT**

———————————————————

William P. Barr
TORRIDON LAW PLLC
2311 Wilson Blvd, Suite 640
Arlington, VA 22201

*Counsel for American Free Enterprise
Chamber of Commerce*

Jonathan Berry
Michael Buschbacher
Jared M. Kelson
James R. Conde
Laura B. Ruppalt
Caleb Orr
BOYDEN GRAY PLLC
801 17th St NW, Suite 350
Washington, DC 20006
202-955-0620
jkelson@boydengray.com

_____

BRIAN FIREBAUGH et al.,

*Petitioners*,

v.

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent*.

_____

BASED POLITICS, INC.,

*Petitioners*,

v.

MERRICK B. GARLAND, in his official capacity as
Attorney General of the United States,

*Respondent*.

_____

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.   PARTIES AND AMICI

Petitioners are TikTok Inc. and ByteDance, Ltd. (No. 24-1113); Brian Firebaugh, Chloe Joy Sexton, Talia Cadet, Timothy Martin, Kiera Spann, Paul Tran, Christopher Townsend, and Steven King (No. 24-1130); and BASED Politics Inc. (No. 24-1183). Respondent in all three cases is Merrick B. Garland, in his official capacity as Attorney General of the United States.

As of this filing, amici are Electronic Frontier Foundation, Michael B. Mukasey, Freedom of the Press Foundation, TechFreedom, Jeff Sessions, Media Law Resource Center, Center for Democracy and Technology, Chris Inglis, First Amendment Coalition, Christopher A. Ford, Freedom to Read Foundation, Michelle Van Cleave, Cato Institute, William Evanina, Matthew Steilen, Gus P. Coldebella, American Free Enterprise Chamber of Commerce, Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition, Margaret M. Peterlin, Asian American Federation, Mike LeFever, Norman T. Roule, Asian Americans Advancing Justice Southern California, Lenora P. Gant, Calos Coalition, Paula Doyle, Hispanic Heritage Foundation, Teresa H. Shea, Muslim Public Affairs Council, Geof Kahn, Native Realities,

Jamil N. Jaffer, OCA-Asian Pacific American Advocates of Greater Seattle, OCA-Asian Pacific American Advocates: San Francisco, OCA-Greater Philadelphia, Rick Nelson, South Asian Legal Defense Fund, Andrew Borene, Sikh Coalition, Edward Fishman, Sadhana, Michael Geffroy, San Francisco, Knight First Amendment Institute at Columbia University, Free Press, Pen American Center, Milton Mueller, Timothy H. Edgar, Susan A. Aaronson, Hans Klein, Hungry Panda US, Inc., Shubhangi Agarwalla, Enrique Armijo, Derek Bambauer, Jane Bambauer, Elettra Bietti, Ashutosh Bhagwat, Stuart N. Brotman, Anupam Chander, Erwin Chemerinsky, James Grimmelmann, Nikolas Guggenberger, G. S. Hans, Robert A. Heverly, Michael Karanicolas, Kate Klonick, Mark Lemley, David S. Levine, Yvette Joy Liebesman, Dylan K. Moses, Sean O'Brien, and Christopher J. Sprigman.

### B.    RULINGS UNDER REVIEW

These petitions seek review of the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H, 138 Stat. 955 (2024). There are no prior rulings under review.

## C.    RELATED CASES

These cases were not previously before this Court or any other court.

Counsel for *amicus* is not aware of any related case currently pending before this

Court or any other court within the meaning of D.C. Circuit Rule 28(a)(1)(C).


Dated: August 2, 2024                    /s/ Jared M. Kelson
                                         Jared M. Kelson

                                         *Counsel for American Free Enterprise*
                                         *Chamber of Commerce*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 29(b), I hereby certify that *Amicus Curiae* American Free Enterprise Chamber of Commerce is a not-for-profit entity organized consistent with I.R.C. § 501(c)(6). It has no parent corporation, and no publicly held company has a 10% or greater ownership interest.

Dated: August 2, 2024                    /s/ Jared M. Kelson
                                         Jared M. Kelson

                                         *Counsel for American Free Enterprise*
                                         *Chamber of Commerce*

iv

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ vi

GLOSSARY ................................................................................ ix

INTEREST OF *AMICUS CURIAE* ........................................... x

INTRODUCTION ...................................................................... 1

ARGUMENT ............................................................................. 3

    I.    The Act Is Consistent with the First Amendment ....................... 3

        A.    The First Amendment Does Not Protect Speech by Foreign Organizations Operating Abroad ......................... 3

        B.    The Act Regulates Conduct, and Any Impact on the Speech of TikTok Users Is Incidental ................................. 6

    II.    Antitrust Law Supports the Constitutionality of Mandatory Divestment ................................................................. 10

    III.    Prohibiting Foreign Ownership and Control Is Nothing New .... 11

        A.    The Defense Production Act and Similar Statutes Limit Foreign Ownership and Control ...................................... 11

        B.    This Court Has Upheld FCC Orders Denying Licenses to Carriers Subject to PRC Ownership and Control .......... 13

CONCLUSION ......................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   591 U.S. 430 (2020) ........................................................................ 3

*Arcara v. Cloud Books, Inc.*,
   478 U.S. 697 (1986) ..................................................................... 5, 8

*Bank of the United States v. Deveaux*,
   9 U.S. (5 Cranch) 61 (1809) ......................................................... 4

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) ........................................................................ 4

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972) ....................................................................5, 10

*Cellwave Tel. Servs. L.P. v. FCC*,
   30 F.3d 1533 (D.C. Cir. 1994) ..................................................... 13

*China Telecom (Americas) Corp. v. FCC*,
   57 F.4th 256 (D.C. Cir. 2022) ...................................................... 15

*Citizen Publ'g Co. v. United States*,
   394 U.S. 131 (1969) ...................................................................... 10

*City of Ladue v. Gilleo*,
   512 U.S. 43 (1994) .......................................................................... 9

*Cummings v. Missouri*,
   71 U.S. 277 (1866) .......................................................................... 4

*E. States Retail Lumber Dealers' Ass'n*,
   234 U.S. 600 (1914) ...................................................................... 10

*Haig v. Agee*,
   453 U.S. 280 (1981) ...............................................................7, 8, 11

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
   452 U.S. 640 (1981) ........................................................................ 8

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) ...................................................................... 7

*Kovacs v. Cooper*,
    336 U.S. 77 (1949) .................................................................... 9

*Lamont v. Postmaster General*,
    381 U.S. 301 (1965) .................................................................. 6

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*,
    584 U.S. 617 (2018) .................................................................. 6

*Moving Phones P'ship L.P. v. FCC*,
    998 F.2d 1051 (D.C. Cir. 1993)............................................... 13

*Nat'l Broad. Co. v. United States*,
    319 U.S. 190 (1943) ................................................................ 10

*Pac. Networks Corp. v. FCC*,
    77 F.4th 1160 (D.C. Cir. 2023) .............................................. 14

*Palestine Info. Off. v. Shultz*,
    853 F.2d 932 (D.C. Cir 1988) ..........................................5, 6, 8

*Thunder Studios, Inc. v. Kazal*,
    13 F.4th 7364 (9th Cir. 2021) ................................................... 7

*United States v. AT&T Co.*,
    552 F. Supp. 131 (D.D.C. 1982) ............................................ 10

*United States v. Bertelsmann SE & Co. KGaA*,
    646 F. Supp. 3d 1 (D.D.C. 2022) ........................................... 10

*United States v. E.W. Scripps Co.*,
    1968 U.S. Dist. LEXIS 12210 (S.D. Ohio Nov. 12, 1968) ........................ 10

*United States v. O'Brien*,
    391 U.S. 367 (1968)........................................................3, 6, 7, 8

*Virginia v. Hicks*,
    539 U.S. 113 (2003)................................................................... 8

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ................................................................. 9

*Ziglar v. Abbasi*,
582 U.S. 120 (2017)................................................................. 8

**Statutes**

12 U.S.C. § 72 ......................................................................... 12

42 U.S.C. § 2133 ..................................................................... 12

47 U.S.C. § 151 ....................................................................... 13

47 U.S.C. § 310 ....................................................................... 13

49 U.S.C. § 40102 ................................................................... 12

49 U.S.C. § 41102 ................................................................... 12

50 U.S.C. § 4565 ................................................................ 11, 12

Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064 ................ 13

Defense Production Act of 1950, Pub. L. No. 81-774, 64 Stat. 798 .............. 11

Protecting Americans from Foreign Adversary Controlled Applications Act,
Pub. L. No. 118-50, div. H, 138 Stat. 955 (2024) ........................................ 1

**Other Authorities**

*In re China Mobile Int'l (USA) Inc.*,
34 FCC Rcd. 3361 (2019) ........................................................ 13

*China Telecom (Americas) Corp.*,
36 FCC Rcd. 15966 (2021) ...................................................... 13

H.R. Rep. No. 118-417 (Mar. 11, 2024)................................... 1, 2, 9

U.S.-China Econ. & Sec. Rev. Comm'n, 117th Cong.,
2021 Annual Report to Congress (Comm. Print 2021).............................. 2

## <u>GLOSSARY</u>

| | |
|---|---|
| Act | Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H, 138 Stat. 955 (2024) |
| CCP | Chinese Communist Party |
| CFIUS | Committee on Foreign Investment in the United States |
| FCC | Federal Communications Commission |
| PRC | People's Republic of China |

## <u>INTEREST OF *AMICUS CURIAE*</u>[1]

The American Free Enterprise Chamber of Commerce is a not-for-profit entity organized consistent with I.R.C. § 501(c)(6) that represents hard-working entrepreneurs and businesses across all sectors. Its members are vitally interested in the preservation of free markets, innovation, and the continued viability of our republic.

---

[1] No party's counsel authored this brief in whole or in part, and no person or entity other than *amicus* or their counsel made a monetary contribution intended to fund its preparation or submission.

## INTRODUCTION

Congress passed the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H, 138 Stat. 955 (2024) ("Act"), to make it unlawful for third parties to "distribute, maintain, or update" any "foreign adversary controlled application," which includes anything operated directly or indirectly by TikTok Inc. and its parent company, ByteDance Ltd. *Id.* § 2(a)(1), (g). That prohibition does not apply if the relevant company completes a "qualified divestiture" that removes the foreign adversary's control. *Id.* § 2(c)(1), (g)(6).

The Act followed years of unsuccessful efforts by Congress and the Executive Branch to address significant security concerns presented by the extremely popular social-media application TikTok, which is owned by ByteDance Ltd. and operated in the United States by TikTok Inc. *See* Gov.Br.7–11. TikTok is a platform to create, share, and view videos. Through its operation, TikTok collects data on the age, precise location, viewing habits, private messages, phone number, phone contacts, and sometimes Social Security and tax identification numbers of its users. *See* Gov.Br.27–28, 34.

House Report 118-417 notes the "tight interlinkages between ByteDance Ltd., TikTok, and the Chinese Communist Party" ("CCP") in the People's Republic of China ("PRC"). H.R. Rep. No. 118-417, at 3–4 (Mar. 11, 2024). It

explains that "the PRC can require a company headquartered in the PRC to surrender all its data" and secretly "assist or cooperate with CCP intelligence work," becoming an "espionage tool." *Id.* at 3–4. As the U.S.-China Economic and Security Review Commission observed, "[c]ontrol of Chinese firms is blurred, contrary to the precise division between state and nonstate firms implied in corporate ownership registration."[2]

ByteDance Ltd. and TikTok Inc. are owned by Beijing ByteDance Technology, "a Chinese internet technology company headquartered in Beijing." H.R. Rep. No. 118-417, at 3. ByteDance Ltd. is incorporated in the Cayman Islands and headquartered in Beijing. *Id.* The proprietary algorithm for TikTok is also maintained in the PRC. TikTok.Br.24; Gov.Br.16–17. That means the PRC has an effectual backdoor into the phones—and personal data stored there—of over 170 million TikTok users in the United States.

Numerous petitioners have challenged the Act under the First

---

[2] U.S.-China Econ. & Sec. Rev. Comm'n, 117th Cong., 2021 Annual Report to Congress 214 (Comm. Print 2021), https://www.uscc.gov/sites/default/files/2021-11/2021_Annual_Report_to_Congress.pdf; *see id.* ("China's government has developed numerous avenues through which to monitor corporate affairs and direct nonstate firms and resources toward advancing [CCP] priorities. Within this expanded framework of government control, traditional definitions of state control in an entity no longer apply because any entity may be compelled to act on behalf of the Chinese government's interest, regardless of the state's formal ownership.").

Amendment. Those arguments fail because foreign entities operating abroad don't have First Amendment rights, and prohibiting ownership and control of companies like TikTok regulates conduct, not speech. Any effect on speech is incidental, easily satisfying the standard in *United States v. O'Brien*, 391 U.S. 367, 377 (1968). Petitioners identify no cases holding that the First Amendment protects foreign control of domestic platforms, or that private individuals have a First Amendment right to have a foreign government amplify their speech.

This conclusion is reinforced by antitrust law, where the federal government routinely regulates publishers, newspapers, and other expressive entities—even forcing divestments—without violating the First Amendment. The Act is also consistent with a constellation of other statutes that limit foreign ownership and control of businesses and property in the United States.

**ARGUMENT**

## I.     THE ACT IS CONSISTENT WITH THE FIRST AMENDMENT

### A.     THE FIRST AMENDMENT DOES NOT PROTECT SPEECH BY FOREIGN ORGANIZATIONS OPERATING ABROAD

The First Amendment doesn't protect ByteDance Ltd. One of the "bedrock principles" of constitutional law is that "foreign organizations operating abroad … possess no rights under the First Amendment." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020). That means ByteDance Ltd.—which operates in the PRC—has no First Amendment claim

3

for what it does there, including curating content with its proprietary algorithm for TikTok, even if that material makes its way back to the United States.

The government contends that TikTok Inc. also lacks First Amendment rights because, although it is incorporated in California, it merely channels the speech of a foreigner operating abroad. Gov.Br.59–60. There's a persuasive argument that is correct—TikTok Inc. is controlled by ByteDance, which is controlled by the PRC. As the Supreme Court has explained, "[a] corporation is simply a form of organization used by human beings to achieve desired ends," and "[w]hen rights, whether constitutional or statutory, are extended to corporations, the purpose is to protect the rights of these people." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706–07 (2014); *cf. Bank of the United States v. Deveaux*, 9 U.S. (5 Cranch) 61, 86–88 (1809). Because TikTok Inc. is a conduit for decisionmaking by ByteDance Ltd. and the PRC—a foreign government— which have no First Amendment rights, TikTok Inc. doesn't either. *Cf. Cummings v. Missouri*, 71 U.S. 277, 325 (1866) ("The Constitution deals with substance, not shadows.").

In any event, assuming TikTok Inc. has First Amendment rights, entities subject to foreign control in a manner that threatens national security cannot escape regulation by simply asserting that they're engaged in expressive conduct. They cannot "use the First Amendment as a cloak for obviously unlawful public

… conduct by the diaphanous device of attributing protected expressive attributes to that conduct." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705 (1986); *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972) ("It is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute."). The First Amendment isn't implicated here because no "conduct with a significant expressive element"—foreign ownership and control—"drew the legal remedy in the first place," nor does this regulation "based on a nonexpressive activity" have "the inevitable effect of singling out those engaged in expressive activity." *Arcara*, 478 U.S. at 706–07.

And to the extent TikTok Inc. has First Amendment rights in this context, *Palestine Information Office v. Shultz*, 853 F.2d 932 (D.C. Cir 1988), is dispositive. The State Department there had ordered the Palestine Information Office in Washington, D.C., to close after finding it "operated as a foreign mission of the Palestine Liberation Organization." *Id.* at 934. This Court explained that the closure "did not … infringe upon" the First Amendment rights of the Palestine Information Office because its personnel remained "as free today as they were before the order to express whatever ideas they wish and to associate with whichever individuals they wish." *Id.* But they were "not free … to set up an office that functions as a foreign mission for the [Palestine Liberation

Organization] when the State Department finds that the national interest requires otherwise," because the "incidental impact on speech caused by the conduct limitations of the order at issue is outweighed by the strong governmental interests behind the order." *Id.* (citing *O'Brien*, 391 U.S. 367); *see also* Part I.B, *infra*. So too, here.[3]

### B. THE ACT REGULATES CONDUCT, AND ANY IMPACT ON THE SPEECH OF TikTok USERS IS INCIDENTAL

That leaves only the First Amendment rights of TikTok's users. But Congress passed the Act to prohibit ownership and control of TikTok by a foreign government, because it provides the PRC with access to the phones and personal data of its over 170 million users in the United States. Any impact on speech is, at most, incidental to that end.[4]

---

[3] TikTok also employs an algorithm to control the content displayed to its users. Members of Congress expressed additional concern that the PRC could use that ability for malign purposes. Because regulating foreign ownership and control to protect the personal data of over 170 million TikTok users in the United States satisfies *O'Brien*, and "the government would have [regulated] the conduct regardless," *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 664 (2018) (Thomas, J., joined by Gorsuch, J., concurring in part and concurring in judgment) (citing *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566–72 (1991); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)), this Court does not need to decide whether preventing algorithm manipulation provides an independent justification for the Act under *O'Brien* or any other test.

[4] Petitioners assert not just their right to speak, but also an interest in receiving communication from a foreign government under *Lamont v. Postmaster General*, 381 U.S. 301 (1965). *See, e.g.*, Creators.Br.33–34. That distinction doesn't affect

(*footnote continued on next page*)

As the Supreme Court explained in *O'Brien*, regulation of conduct does not violate the First Amendment if it: (1) "furthers an important or substantial governmental interest;" (2) "if the governmental interest is unrelated to the suppression of free expression;" and (3) "if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377. That test is easily satisfied.

First, "[s]ecurity against foreign danger is one of the primitive objects of civil society" and "an avowed and essential object of the American Union." The Federalist No. 41 (James Madison). It is therefore "'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)). The Supreme Court has further held that the federal government can take "preventative measure[s]" to counter such threats. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34–35 (2010); *see also Haig*, 453 U.S. at 303 ("History eloquently attests that grave problems of national security and foreign policy are by no means limited to times of formally declared war.").

---

whether the Act is a regulation of conduct with only incidental effects on First Amendment rights. And, in any event, limits on "the First Amendment right to receive information," including "from outside the United States," can be justified under *Lamont* on the basis of "national security concerns." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743–44 (9th Cir. 2021).

"National-security policy is the prerogative of the Congress and President," such that "judicial inquiry into the national-security realm raises 'concerns for the separation of powers in trenching on matters committed to the other branches.'" *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017) (quoting *Christopher v. Harbury*, 536 U.S. 403, 417 (2002)). Both agree here that the Act and its implementation are necessary to national security. And, as this Court has recognized, "[t]he authority of the executive branch, always great in the foreign policy field, is at its apex when it acts, as here, pursuant to an express congressional authorization." *Palestine Info. Off.*, 853 F.2d at 934.

Second, prohibiting the PRC from maintaining access to the phones of 170 million users in the United States "on its face deals with conduct having no connection with speech." *O'Brien*, 391 U.S. at 375. TikTok users also remain free to engage in the same speech "at another location," or on TikTok following a qualified divestiture, confirming the Act regulates conduct. *Arcara*, 478 U.S. 705; *see also Virginia v. Hicks*, 539 U.S. 113 (2003); *Haig*, 453 U.S. at 309.

It is immaterial that TikTok users prefer that platform, because "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). This is true even if state-imposed restrictions "reduce to some degree the potential audience for …

speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989). The Supreme Court in *Kovacs v. Cooper*, 336 U.S. 77 (1949), upheld a prohibition on sound trucks and other loudspeakers as a public nuisance, even though "more people may be more easily and cheaply reached" using that medium. *Id.* at 88–89. That conclusion is all the more persuasive when the loudspeaker amplifying the message is a foreign government.[5]

Third, divestment is the only way to stop the threat to national security. ByteDance Ltd. and TikTok Inc. confirm that, in its present form, there's no way to disentangle TikTok operations in the United States from the PRC. TikTok.Br.21–24. Nor is trying to monitor 2 billion lines of code in the PRC a feasible option, Gov.Br.56, especially when the PRC can require ByteDance Ltd. to keep any PRC involvement or influence a secret, *see* H.R. Rep. No. 118-417, at 4.

Accordingly, any impact on speech is incidental and does not violate the First Amendment.

---

[5] *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), is not to the contrary. The Court emphasized the "special respect for individual liberty in the home," which "has long been part of our culture and our law" and "has special resonance when the government seeks to constrain a person's ability to speak there." *Id.* at 58. That consideration is absent here.

## II.    ANTITRUST LAW SUPPORTS THE CONSTITUTIONALITY OF MANDATORY DIVESTMENT

Congressional authority to regulate foreign ownership of entities, including those whose operations implicate the First Amendment, finds strong support in the analogous context of antitrust law. Congress can regulate in a manner that includes publishers, newspapers, and other expressive entities— even forcing divestments—to facilitate competition and prevent monopolies without violating the First Amendment. Otherwise, ordinary federal antitrust review of mergers involving such companies would be plagued by First Amendment objections.

But the Supreme Court has long held that publishers are "not immune from the antitrust laws by reason of the fact that the press is under the shelter of the First Amendment." *Cal. Motor Transp.*, 404 U.S. at 514. Antitrust considerations touch on "[n]either news gathering nor news dissemination … only with restraints on certain business or commercial practices." *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 139–40 (1969); *see also Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943); *E. States Retail Lumber Dealers' Ass'n*, 234 U.S. 600 (1914); *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022); *United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982); *United States v. E.W. Scripps Co.*, 1968 U.S. Dist. LEXIS 12210 (S.D. Ohio Nov. 12, 1968).

If ordering divestiture from publishers, newspapers, and other expressive entities to promote market competition does not violate the First Amendment, despite its obvious implications for speech, it's hard to see how protecting national security—an "obvious and unarguable" interest recognized by the Supreme Court as "more compelling" than any other, *Haig*, 453 U.S. at 307 (cleaned up)—would be more restricted.

## III.    PROHIBITING FOREIGN OWNERSHIP AND CONTROL IS NOTHING NEW

### A.    THE DEFENSE PRODUCTION ACT AND SIMILAR STATUTES LIMIT FOREIGN OWNERSHIP AND CONTROL

Congress has elsewhere prohibited foreign ownership and control. The Defense Production Act of 1950, Pub. L. No. 81-774, 64 Stat. 798, authorizes the Committee on Foreign Investment in the United States ("CFIUS") to review and make recommendations to the President about regulating or prohibiting certain transactions involving foreign persons and ownership of businesses in the United States, the purchase of property near military installations or other sensitive areas, or investment in critical infrastructure, critical technologies, or "any unaffiliated United States business that … maintains or collects sensitive personal data of United States citizens that may be exploited in a manner that threatens national security," among other categories of transactions. 50 U.S.C. § 4565(a)(4)(B). CFIUS must also "take any necessary actions in connection with the transaction to protect the national security of the United States,"

11

especially if "the transaction is a foreign government-controlled transaction." *Id.* § 4565(b)(2)(A), (B)(i)(II). The President can also "suspend or prohibit any covered transaction that threatens to impair the national security of the United States." *Id.* § 4565(d)(1).

It would be passing strange for this entire regime to come crashing down because a foreign government claimed it wanted the property for a purpose protected by the First Amendment.

CFIUS is also part of a larger constellation of laws prohibiting foreign ownership and control. Congress has prohibited, for example: non-citizen control of banks, 12 U.S.C. § 72; issuing licenses for nuclear facilities "to an alien or any corporation or other entity if the [Atomic Energy] Commission knows or has reason to believe it is owned, controlled, or dominated by an alien, a foreign corporation, or a foreign government," 42 U.S.C. § 2133(d); and authorizing non-citizens to operate an air carrier, 49 U.S.C. §§ 40102(a)(15), 41102(a). Congress has even restricted granting broadcast licenses to "any foreign government" or "any corporation directly or indirectly controlled … by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the [Federal Communications Commission ("FCC")] finds that the public interest will be served by the refusal or revocation of such license." 47 U.S.C. § 310(a), (b)(4). This Court has

affirmed FCC decisions to deny licenses to foreign entities, without even the slightest hint that there might be First Amendment considerations. *See, e.g.*, *Cellwave Tel. Servs. L.P. v. FCC*, 30 F.3d 1533 (D.C. Cir. 1994); *Moving Phones P'ship L.P. v. FCC*, 998 F.2d 1051 (D.C. Cir. 1993); *see also* Part III.B, *infra*.

## B.    THIS COURT HAS UPHELD FCC ORDERS DENYING LICENSES TO CARRIERS SUBJECT TO PRC OWNERSHIP AND CONTROL

This Court has already upheld decisions to deny companies the ability to operate instrumentalities of communication in the United States when they are subject to the ownership and control of the PRC. Under the Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064, the FCC may consider national defense when making (or revoking) grants for the operation of communications lines. 47 U.S.C. § 151. The FCC has exercised that authority to deny or revoke authorization to subsidiaries in the United States that are "vulnerable to exploitation, influence, and control by the Chinese government." *In re China Mobile Int'l (USA) Inc.*, 34 FCC Rcd. 3361, 3366 (2019). This includes, for example, United States companies with an "indirect controlling parent" that is owned by the PRC and exerts influence. *Id.* at 3368; *see also China Telecom (Americas) Corp.*, 36 FCC Rcd. 15966 (2021).

This Court has upheld those orders. In *Pacific Networks Corp. v. FCC*, 77 F.4th 1160 (D.C. Cir. 2023), this Court recognized that ostensibly private carriers, incorporated and headquartered in the United States, can be considered

agents of the PRC by virtue of their ownership "through various affiliated Chinese companies" that "exercise significant control over … day-to-day operations." *Id.* at 1164. This Court noted that "China can access the carriers' records through those affiliates, including by invoking a Chinese law requiring all Chinese corporations to 'support, assist, and cooperate with national intelligence efforts.'" *Id.* (citation omitted). The concern was especially severe because the carriers had "amassed detailed call records of its United States customers," could "monitor the calls themselves," and had "access to customers' personally identifiable information." *Id.* This Court recognized that, on the basis of the available information, the FCC justifiably "concluded that the domestic operations … threatened national security by making vast amounts of sensitive information easily available to China." *Id.* at 1165.

This Court also determined that the FCC reasonably "rejected the possibility of mitigating measures short of revocation," in part because "[s]uch agreements are not self-enforcing, and the agency cannot comprehensively monitor compliance," and "oversight cannot reliably detect surreptitious, state-sponsored efforts at evasion." *Id.* at 1165–66.

In *China Telecom (Americas) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022), this Court similarly upheld the FCC's decision to revoke approval for "a U.S. subsidiary of a Chinese state-owned enterprise" because the carrier was "subject

14

to exploitation, influence, and control by the Chinese government." *Id.* at 260 (citation omitted). This Court credited the FCC's finding that the carrier's "operations give it the capability to access, monitor, store, disrupt, and misroute U.S. communications," and share that information with the PRC. *Id.* at 266. This Court found "compelling evidence that the Chinese government may use Chinese information technology firms as vectors of espionage and sabotage," and explained that the FCC "need not wait for a risk to materialize before revoking … authorization." *Id.* "In the national security context," this Court continued, "'conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what we may reasonably insist on from the Government.'" *Id.* (quoting *Olivares v. TSA*, 819 F.3d 454, 466 (D.C. Cir. 2016)).

If all this sounds familiar, that's because it's strikingly similar—if not identical—to the reasons Congress and the Executive Branch decided TikTok needed to sever ties with the PRC to continue operating in the United States. These cases would have been no different if the carriers alleged they would use their approvals to make their own phone calls, publish expressive content, or prioritize the speech of some of their patrons over others.

## <u>CONCLUSION</u>

This Court should deny the petitions for review.

15

Dated: August 2, 2024                    Respectfully submitted,

                                         /s/ Jared M. Kelson
William P. Barr                          Jonathan Berry
TORRIDON LAW PLLC                        Michael Buschbacher
2311 Wilson Blvd, Suite 640              Jared M. Kelson
Arlington, VA 22201                      James R. Conde
                                         Laura B. Ruppalt
                                         Caleb Orr
                                         BOYDEN GRAY PLLC
                                         801 17th St NW, Suite 350
                                         Washington, DC 20006
                                         202-955-0620
                                         jkelson@boydengray.com

                                         *Counsel for American Free Enterprise*
                                         *Chamber of Commerce*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,485 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT and 14-point font.

Dated: August 2, 2024                    /s/ Jared M. Kelson
                                         Jared M. Kelson

                                         *Counsel for American Free Enterprise*
                                         *Chamber of Commerce*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 2, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will serve all parties automatically.

Dated: August 2, 2024                    <u>/s/ Jared M. Kelson</u>
                                         Jared M. Kelson

                                         *Counsel for American Free Enterprise*
                                         *Chamber of Commerce*