1

2

3

4   EXECUTIVE SESSION

5   LEGISLATION TO PROTECT AMERICAN DATA AND

6   NATIONAL SECURITY FROM FOREIGN ADVERSARIES

7   THURSDAY, MARCH 7, 2024

8   House of Representatives,

9   Committee on Energy and Commerce,

10   Washington, D.C.

11

12

13

14

15       The committee met, pursuant to call, at 10:36 a.m., in

16   Room 2123, Rayburn House Office Building, Hon. Cathy McMorris

17   Rodgers [chairwoman of the committee] presiding.

18       Present:  Representatives Rodgers, Burgess, Latta,

19   Guthrie, Griffith, Bilirakis, Bucshon, Hudson, Walberg,

20   Carter, Duncan, Palmer, Dunn, Lesko, Pence, Crenshaw, Joyce,

21   Armstrong, Weber, Allen, Balderson, Fulcher, Pfluger,

22   Harshbarger, Miller-Meeks, Cammack, Obernolte, Pallone,

23   Eshoo, DeGette, Schakowsky, Matsui, Castor, Sarbanes, Tonko,

24   Ruiz, Peters, Dingell, Veasey, Kuster, Kelly, Soto, Schrier,

25   and Fletcher.

1         The Chair. The committee will come to order.

2         As a reminder to the members, we are now in a classified

3 executive session. The information that we discuss here

4 should not be discussed outside of a secure location.

5         Our first witness is David Newman with DOJ, and then he

6 will be followed by Jonathan with ODNI.

7         Mr. Newman, you are recognized for 5 minutes.

8         Mr. Newman. Thank you. Thank you very much. Thank you

9 to the chair and thank you to the ranking member --

10         The Chair. Maybe pull the mike a little closer. Okay.

11 Yeah.

12         Mr. Newman. Sorry.

13         Thank you to the chair and thank you to the ranking

14 member for taking up legislation to fill critical gaps in our

15 national security.

16         The Chair. Yeah, still it is hard to hear. I don't

17 know. Can you pull the box closer to you maybe? Can you

18 pull the box, the whole box. There we go. There we go. Try

19 that.

20         Mr. Newman. Do you want me to go first or the IC

21 briefer? Which would be your preference?

22         The Chair. What do you all think?

23         Mr. Newman. I think Jonathan should go first.

24         The Chair. Okay, Jonathan. We are going to hear from

25 Jonathan first with ODNI. Okay, here we go.

1       Jonathan.

2       <u>ODNI.</u>  Sure.  Thanks.  Good morning, everybody.

3       My name is Jonathan ████████ (ph).  I am the Deputy

4       Director for Investment Security at the ODNI, and I look at

5       critical technologies, economic threats.  The group I lead

6       looks at economic threats and risks to the United States for

7       the ODNI on behalf of the intelligence community.  The

8       briefing today for my remarks will be the TS/SCI level.

9       Thanks for having us.

10      So, as I understand, ██████████████████████ ████

11      ████████████████████████████████████████

12      ██████████████████████    The IC in that review of its

13      intelligence focused on three broad categories of concern.

14      The first was command and control links between TikTok

15      and the parent company ByteDance and PRC officials.  The

16      second was on data collection risks involving the platform.

17      And the third was on PRC plans and intentions to try to both

18      suppress content and conduct foreign influence operations

19      globally.

20      ████████████████████████████████████████

21      ████████████████████████████████████

22      ██████████████████████████████████████████

23      ████████████████████████.

24      The IC's bottom line ██████████████████████

25      ████████ is that TikTok and the parent company ByteDance pose a

██████████

1    latent threat to U.S. national security because Beijing has

2    legal and economic leverage over these companies and,

3    therefore, significant potential leverage over their

4    operations.



1

2

3

4

5         The <u>Chair.</u>  Take however much time you need.  So you can

6    slow down a little bit --

7         <u>ODNI.</u>  Oh, sure.

8         The <u>Chair.</u>  -- so the members can digest.  All right.

9    That would be great.

10         <u>ODNI.</u>  Sure.  I was worried about the 5-minute rule,

11    going over.

12         The <u>Chair.</u>  I know.  Okay.  We will waive that for you.

13         <u>ODNI.</u>  Perfect.

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



22    I am happy to take questions.

23    The Chairman.    Thank you, Jonathan.

24    Next we will hear from Mr. Newman with the Department of

25    Justice.

1          Mr. Newman.  Thank you.  Thank you to the chair, thank

2    you to the ranking member for taking up legislation to fill

3    critical gaps in our national security authorities.

4          In my role as the Principal Deputy Assistant Attorney

5    General for National Security at the Department of Justice, I

6    confront on a daily basis the threats that you just heard

7    that the People's Republic of China poses to the United

8    States, to Americans.  And increasingly, as we have seen,

9    that threat involves the PRC's attempts to weaponize

10   America's data against us.  And TikTok and its parent company

11   ByteDance are a case in point -- and perhaps even Exhibit A

12   -- in that story.

13        Our intelligence community leaders and our national

14   security experts have warned and just reiterated that the

15   parent company, ByteDance, presents a clear and present

16   danger to our national security, a latent threat but a threat

17   that could be deployed ███████████████████████████

18   ███

19        First, as you just heard, TikTok collects vast amounts

20   of personal data from the more than 170 million Americans who

21   actively use the platform, ████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████

24        Second, PRC -- TikTok relies on a proprietary algorithm

25   developed and maintained inside China to determine what

1   content to show and what content not to show to its American
2   users.

3
4
5
6
7

8        To date, Department of Justice leadership and other
9   senior national security administration officials have
10  identified only one viable solution for these national
11  security risks.
12       TikTok must be divested and sold to a trusted buyer,
13  severing the link that currently binds TikTok to Beijing and
14  its PRC-based parent, ByteDance.
15       In addition, TikTok must move the data that TikTok
16  collects about Americans and the development of its algorithm
17  and source code outside of China and to a trusted location.
18       In response to that, TikTok has publicly offered a
19  counterproposal, what it calls Project Texas.  But, in our
20  view, Project Texas would not achieve the national security
21  objectives that we have.
22       Among other things, Project Texas would still allow
23  TikTok's algorithm, source code, and software development to
24  remain in key measures in China, and it would allow Chinese
25  employees and ByteDance employees to continue to have

1    influence over TikTok's operations.

2    Last year, along with other officials from the
3    Department of Justice and the Treasury Department, I
4    personally told ByteDance's attorneys that Project Texas was
5    an inadequate solution.  And I made clear -- we all did --
6    that the only solution that we have identified is a sale of
7    TikTok to a U.S. Government-approved purchaser.

8    But that has left us in something of a legal standoff,
9    because our current U.S. laws have gaps and limits that have
10   seriously hindered our ability to compel that result from the
11   company.

12   The executive branch currently has two key authorities
13   that have been used in the past to try to force just this
14   divestment of TikTok.  The first is the International
15   Economic Emergency Powers Act, or IEEPA; and the second is
16   our authorities under the Committee on Foreign Investment in
17   the United States.

18   Both of those authorities were invoked first in the last
19   administration and then in this administration to try to
20   force a divestment of TikTok, but we are stalled out in the
21   courts.

22   That is for the following reason:  IEEPA contains a
23   pre-internet statutory exception, the so-called Berman
24   amendment, after Representative Berman, for executive -- for
25   informational materials and personal communications.

1         And given the amount of First Amendment-protected
2     activity and expressive content on the platform, courts have
3     held in this case that the Berman amendment does not allow
4     IEEPA to regulate and ban TikTok.

5         CFIUS, the Committee on Foreign Investment in the U.S.,
6     is a very powerful tool to review foreign acquisitions of
7     U.S. businesses.  The challenge with using it here is that
8     TikTok in the main did not originate from the acquisition of
9     a U.S. business.  It grew organically as a foreign-controlled
10    application and it has worldwide popularity.

11        And in the D.C. Circuit, in response to the CFIUS
12    divestment order, TikTok the company put forward a very
13    compelling factual showing that their 2017 acquisition of a
14    U.S. company or a U.S. subsidiary called Musical.ly is not
15    the reason that that company grew in the United States.

16        And as a result, we are in a challenging place to argue
17    that the risks you just heard from TikTok arise from their
18    application -- from their acquisition of a U.S. business as
19    opposed to from their organic growth outside the United
20    States.  Because of that, there are serious limits to what we
21    can do with CFIUS to try to bring this problem to heel.

22        So, put simply, as you know, TikTok is a sophisticated
23    legal adversary that understands the limits of our
24    authorities and the weakness of our negotiating position.

25        And that is why DOJ believes that strong new statutory

1    authority will be critical to compelling the separation of
2    ByteDance and China from the TikTok platform to address the
3    national security concerns.

4         We very much appreciate the committee's leadership in
5    marking up new legislation that takes into account our
6    learned experience and our technical assistance.

7         In particular, we appreciate that the bill you are
8    marking up today takes into account a number of proposals and
9    suggestions that we have made in the course of the drafting
10   process.

11        This includes making a detailed legislative record that
12   will be entitled to deference in the courts because of the
13   work that you have done and are doing today; allowing for a
14   qualified divestment to a U.S. buyer as an off-ramp to a ban,
15   which addresses some of the First Amendment issues that are
16   present in this fact pattern; and also providing targeted and
17   carefully circumscribed authority to address not just TikTok
18   and ByteDance, but also other future similar applications
19   controlled by foreign adversaries.

20        I also want to express appreciation for the work on the
21   draft legislation addressing data brokers, because even if we
22   succeed in forcing a divestment of TikTok, we know the
23   Chinese Government will be relentless in their efforts to
24   obtain the data of Americans through multiple means.

25        For too long there have been gaps in the law.  We

1    dedicate extensive resources to preventing China and other

2    nation-states from stealing U.S. data through cyber attacks,

3    through insider threats, and through economic espionage, but

4    the law, Federal law, does not preclude them from simply

5    buying that data from data brokers. That gap began to be

6    closed last week when the President signed an executive order

7    that applied to adversary-controlled acquisitions of U.S.

8    data, but we believe that an executive order on its own can

9    be reinforced, strengthened, and made more durable with

10   legislation. And we appreciate the committee's interest in

11   this topic.

12       So just to end where I started, I want to thank the

13   committee tremendously for its leadership on this topic, and

14   I look forward to working with you and to answering your

15   questions.

16       The Chair. Thank you. Thank you for your testimony.

17       Does the FBI, do you wish to offer opening comments,

18   statement, Brent?

19       Mr. Grover. Good morning. Thank you. I can expand a

20   little bit on some of the comments that Jonathan had from

21   ODNI.

22       So I think, from the FBI's perspective, there are a

23   couple things I would like to highlight.

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25





1
2
3
4
5
6
7
8
9
10

11    The <u>Chair.</u> Thank you. Thank you. And his name is
12    Brent, just so you all know.
13    Okay. Appreciate again everyone being here. Thank you.
14    Some of you briefed us last week. I found that briefing
15    extremely helpful in the SCIF. Thank you all for being here
16    again today.
17    I wanted to start -- Jonathan, would you just speak more
18    to
19
20    <u>ODNI.</u> Sure. So it is a great question. It is one we
21    grapple with not just in this instance but a lot of the
22    economic threats we look at.
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



1        ███████████████████████████████████████████

2        The Chair. Okay. Thank you.

3        I would like to ask then how much -- how were these

4 companies able to get a foothold in our country -- you talked

5 about the state-to-state challenges -- given the lack of a

6 nationwide standard for data privacy and security

7 protections. I would like to ask each of you that question

8 or whoever wants to respond to it.

9        Mr. Newman. So it is a great question. I think the

10 platform was able to grow because it is very popular, it has

11 been popular worldwide, and because there are no laws or

12 restrictions currently on the books that allow regulation or

13 even divestment of an application just because it is under

14 the control of an entity that is able to take direction from

15 a foreign adversary.

16        So at the time that it grew, my understanding is it was

17 growing, in part, because it was very popular in the world.

18 And there is a long history in China of allowing technology

19 companies to grow multinationally, to take hold, and then to

20 decide how best to use the fact that Chinese companies have

21 grown in that way to harm national security.

22        That is what we saw, for example, in the case of Huawei

23 and ZTE in the telecommunications sector, where these

24 products became very popular, in part for commercial reasons.

25 They were cheap. They were using stolen IP. They were doing

1   lots of things to undercut their competitors.  And then there

10      The Chair.  Thank you.  Thank you.

11      Mr. Newman, I wanted to ask you, because there have been

12  other bills proposed related to TikTok, banning TikTok.  Some

13  have raised concerns that they run the risk of violating the

14  First Amendment.

15      I would like to ask you to speak to the divestment

16  option that is in the legislation before us and how it is to

17  help address the First Amendment challenges.

18      Mr. Newman.  Thank you for the question.

19      We do think that that divestment off-ramp is very

20  important to the bill, and we appreciate seeing it in the

21  draft bill.

22      There is a long history in the national security space

23  of forcing companies to divest when they have problematic

24  foreign ownership.  That is the remedy.  That is the remedy

25  of last resort in the CFIUS process I mentioned earlier.

1          It happens regularly in that process, where companies
2     that are owned by foreign ownership go through transactions,
3     don't get the permission of CFIUS.  If they get caught and
4     there are national security concerns, they are forced to
5     divest.

6          So there is a long track record of divestment being a
7     remedy that can occur with the right national security
8     justification in a way that accords with the First Amendment.

9          And just to say it plainly, our civil litigators, the
10    Department of Justice, stands ready to defend this bill in
11    court, to defend against arguments we know will be made by
12    TikTok, which has very sophisticated and highly paid lawyers,
13    and to litigate these questions in the courts.

14          The Chair.  Okay.  Thank you.

15          The chair recognizes the ranking member, Mr. Pallone,
16    for 5 minutes.

17          Mr. Pallone.  Thank you, Madam Chair.

18          I am going to ask Mr. Newman my question just because
19    there is not a lot of time.

20          You know there are people out there who don't want to
21    ban or divest TikTok.  And, of course, they are already
22    calling our offices.  And the question they ask is:  Why is
23    TikTok a greater risk than Facebook or X, for example?  Why
24    are you picking on them?

25          And my understanding from what you said at the briefing

1    last week was that because TikTok was essentially owned by

2    Beijing that that puts it in a different category.  There are

3    a couple other places like that too.

4        So is that the distinction, is that the reason why

5    divesting TikTok is a bigger concern than all the

6    misinformation, et cetera, that is on Facebook, X, et cetera?

7        Mr. Newman.  That is exactly right.  From a national

8    security perspective, we see it as a question -- it is a

9    question of kind and not degree when you have foreign

10   adversary ownership and direction of a platform.  And that is

11   what you have in the case of TikTok.

12       We understand that there are a number of questions and

13   concerns about U.S. social media applications, and I know

14   there are other proposals to address them.  But there is a

15   ████████████████████████████████████████████████████████████

16   ████████████  ██████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18   ████████████████████████████

19       We are not trying to ban the platform.  We are just

20   trying to make sure it gets in the hands of responsible

21   ownership.

22       Mr. Pallone.  All right.  Then the second question I

23   have is -- the chair kind of got to it.

24       The Biden administration has stated an interest in

25   further strengthening H.R. 7521, to put it, as they say, in

1     the strongest possible legal footing. And obviously TikTok,

2     as you said, has all kinds of lawyers.

3     So my question is, could you just tell us briefly what

4     the DOJ litigators consider to be the biggest litigation

5     risks in the bill and if there are some revisions you think

6     that would deal with that problem?

7     I mean, I know it would probably take an hour and I am

8     asking you in a minute or so to tell us.

9     Mr. Newman. Sure.

10    So briefly, again, we stand ready to defend the bill in

11    its current form in court. So I think that is important as a

12    starting point.

13    It is the case that if litigation concerns were the only

14    concern, we would have an additional argument if there were

15    executive branch findings and executive branch process in

16    addition to the congressional findings and congressional

17    action that the bill would impose on TikTok and ByteDance,

18    and that would give us an additional argument. And we did

19    propose that or at least offer that point during the

20    technical assistance.

21    At the same time, I do understand that there are policy

22    considerations that go into that question. And the work that

23    Congress has done, to make findings, to give process, to have

24    the hearing that this committee had with TikTok's leadership,

25    definitely helps us to buy down that risk.

1          So at the end of the day, again, as a litigator, you
2     always want to walk into court with as many arguments as
3     possible, but we think we have a number of arguments to
4     respond to litigation in this case.

5          Mr. Pallone. And then, from what you said earlier, Mr.
6     Newman, you -- the way this bill is set up, it still would
7     have to be -- the administration, whoever it is, would still
8     have to make this determination before the divestiture
9     occurred, right? And so that would involve additional
10    findings and hopefully ways for you to bolster the case in
11    court. Is that correct?

12         Mr. Newman. That is right. There is discretion to
13    determine what counts as a qualified divestment in the case
14    of TikTok and ByteDance, and so we would have discretion in
15    that area.

16         It is also the case that there is an opportunity for the
17    administration to make potentially additional findings to
18    reinforce the national security concerns that the Congress
19    would have recognized in enacting this bill.

20         Mr. Pallone. All right. Now, just quickly yes or no.
21    You, I think, already said you agree that Congress should
22    prohibit the data brokers from selling Americans' sensitive
23    personal information. I think you already answered that
24    question as yes, correct?

25         Mr. Newman. Yes, in general. And the executive order

1    that my division is enforcing is one effort to do that, and I

2    know the legislation is trying to do that in an even more

3    comprehensive way.

4        Mr. Pallone.  And then lastly -- you can answer yes or

5    no too -- while this -- while what we are doing today is a

6    good start, you also agree that we need a comprehensive

7    Federal privacy law that ensures that consumers have

8    meaningful control over their personal information beyond

9    what we are doing today?

10       Mr. Newman.  So I am here in a national security role,

11   so I am a little bit limited because that is a shared

12   account.

13       But what I will say is, as a general matter, I know that

14   the administration has called for more comprehensive privacy

15   legislation.  And, as a national security official, a lot of

16   times the privacy concerns and the national security concerns

17   are reinforcing of one another.  And I think you see that

18   with respect to data brokers and you see that with respect to

19   TikTok.

20       Mr. Pallone.  Thank you.  Thanks so much.

21       The Chair.  The gentleman yields back.

22       The chair recognizes Mr. Burgess for 5 minutes.

23       Mr. Burgess.  Thank you.

24       And I think this question is for ODNI, but, law

25   enforcement, please feel free to weigh in.



8  ODNI.  Sure.  It is a great question.  And I will also

9  allow FBI to kind of answer it as well.



25  Mr. Burgess.  And let me just ask you, along that line,

1    ████████████████████████████████████, does that rise to

2    the level that would require this type of action by the

3    legislative branch?

4        ODNI.  That is a good question.  Let me defer to --

5        Mr. Newman.  I think it is an example of the clear and

6    present danger we face.  And in the national security world,

7    we often try to act before the action occurs, you know, to

8    the left of boom is what they say.

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15       Mr. Burgess.  Okay.  Fair enough.

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20       Is it a difference or is that something that you all

21   monitor as well?

22       Mr. Grover.  Again, sorry, apologies.  My name is Brent

23   Grover -- I failed to introduce myself earlier -- Section

24   Chief of the China Intelligence Section at FBI.

25   ████████████████████████████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15      Mr. Newman.  If I can make one very brief additional

16   point to your good question.

17      Mr. Burgess.  Sure.

18      Mr. Newman.



1
2
3
4
5
6
7
8
9
10      Mr. Burgess.
11
12
13
14

15      Let me just ask you one last thing. What prevents the
16      administration from saying they want to ban some other app or
17      some other thing that people use? What if they decided that
18      some conservative outlet was too conservative and they were
19      going to stop that?
20      Mr. Newman. So with respect to the legislation, the
21      bill that has been proposed, there are some very specific
22      findings and criteria that have to be met in order for the
23      executive branch to act.
24      That includes control by a foreign adversary. It
25      includes a very high number of users. It includes a series

1      of findings about the national security threat that the

2      application poses.  And in the main, I think that that would

3      not apply to most of the scenarios that you are talking

4      about.

5           Mr. Burgess.  Thank you very much.

6           I yield back.

7           The Chair.  The gentleman yields back.

8           The chair recognizes Ms. Eshoo for 5 minutes.

9           Ms. Eshoo.  Thank you, Madam Chairwoman and our minority

10     leader on the committee.

11          Thank you, gentlemen, for your help today.

12          I think that it is important to note in this undertaking

13     that this is not a banning.  This is not a banning.  This is

14     about divestment.

15          And we understand that in terms of your presentation

16     that there are limits to the present laws, and you went

17     through that I think very well, Mr. Newman.

18          I wasn't aware of the executive order on data brokers,

19     but I welcome it.  I don't know -- that is an important hole

20     that needs to be filled, because it just leaves the door so

21     wide open and essentially could make a mockery of our taking

22     the steps that are at hand, at least in my view.

23          You spoke about defending in court, Mr. Newman, and the

24     bill establishes one track for ByteDance and another for

25     other foreign adversary-controlled applications.  That is a

1    -- it is a two-track approach, and it will give ByteDance the

2    opportunity to argue it is being selectively persecuted and

3    not provided the same due process rights as other companies.

4        So can you allay my apprehension about that? I think

5    that that needs to be discussed and that you walk into court

6    with the tightest case possible. Because there have been

7    other attempts and the courts have turned them down, and that

8    should be highly instructive to us.

9        Mr. Newman. So it is a great question. I think they

10    would make that argument, because they have, again,

11    very sophisticated lawyers.

12        Ms. Eshoo. I would if I were them.

13        Mr. Newman. I would say three points in response.

14        One, there have been congressional findings,

15    congressional process that underpins what is taking place

16    here. And I think we would absolutely point to those and the

17    record that has been compiled and the work that all of you

18    are doing.

19        The second is, again, there is a long track record of

20    divestment of companies in the national security space when

21    they have problematic foreign owners. That is what we saw in

22    CFIUS.

23        I spoke at the briefing about, for example, one instance

24    of a U.S. application bought by a Chinese buyer and they had

25    to divest. And divestment, as to your point, is different

1    from a ban, and that is really what this bill requires, is
2    divestment.

3         And then the third is, there is a severability provision
4    in the bill.  In other words, if for whatever reason those
5    arguments worked -- and, again, we would argue that they
6    shouldn't work -- the executive branch could go back and
7    build a record under the more general provision against these
8    two companies and go back into court and use that record to
9    achieve the same outcome.

10        And so there is a belt and suspenders built into the
11   bill under which we could use that second option if, contrary
12   to the arguments that the Department would be making, a court
13   found that the first provision was problematic for some
14   reason.

15        Ms. Eshoo.  Well, that is most helpful.

16

17

18

19

20        Mr. Newman.

21

22

23

24

25

1

2

3

4

5         Ms. Eshoo.  Well, thank you for that.

6         I would just say to each one of my colleagues on the

7    committee this is going to be a highly covered issue when we

8    leave our committee hearings and undertakings, and I think

9    that each member needs to stress the following.

10        The United States of America is not banning.  We are

11   demanding divestment for the purposes of our national

12   security, full stop.

13        Thank you.

14        The Chair.  The gentlelady yields back.

15        The chair recognizes Mr. Latta for 5 minutes.

16        Mr. Latta.  Well, thank you, Madam Chair.

17        And I am going to ask a rhetorical question of all

18   three.  Does the CCP allow any U.S. apps or foreign Western

19   apps like TikTok in communist China?  That I assume --

20        Mr. Newman.  To answer your question, a rhetorical

21   question, the Chinese Government would never allow the degree

22   of freedom of access that we allow to the United States, and

23   that is one of the differences between our system and their

24   authoritarian system.

25        Mr. Latta.  Thank you.

1    And to our intelligence agencies, I won't use names

2    since we didn't have names originally, but let me ask this

3    question

4

5

6    ODNI.

7

8

9

10

11    Mr. Latta.  Okay.                                .  Thank you.

12    Mr. Newman, I know -- again, thanks for being with us

13    again.  And this has come up multiple times, but in the

14    confidence of defending this lawsuit, I assume you have

15    looked at this on a 360 degree, how all the different

16    arguments they are going to make on the TikTok side, because

17    you had mentioned that there is a long history of forcing

18    divestment of a company.

19    But the question is also in this situation is let's just

20    say that how confident are we that as soon as -- let's just

21    say they might have to divest -- that all this information

22    hasn't already been transferred to China to begin with?

23    Mr. Newman.  So it is a great question.  I know it is

24    one we spoke about in the briefing.

25    The legislation requires the President to make certain

1    determinations of what is a qualified divestment.  It

2    requires the executive branch to make those determinations.

3        And the core of that is to confirm that they have

4    severed the link between the new U.S. ownership of the

5    company and Beijing.

6        And so, to your point, not every divestment would

7    qualify, only divestment to a bona fide real buyer who is no

8    longer subject to doing the bidding and control of the

9    Chinese Government.

10    Mr. Latta.  Okay.  And again, because, again, I guess I

11    keep coming back to it because of the divestment question.

12    Because, again, in the history that we have had, and you said

13    there are two authorities in the law, and examples from

14    previous adversaries we might have out there that had

15    divestment.

16        But have we ever had a situation where it has been set

17    up like this where, okay, let's just say it is a defense

18    system and that they have to have the divestment.

19        You might be able to have that fix easily in there,

20    because you have got it -- if it is, let's say, a missile

21    system, you go back and say, okay, we are going to make sure

22    that whatever software was there has been changed.

23        But, again, I guess I keep going back to the question is

24    how confident are we going to be that this information that

25    is already out there, and it is just -- it is there, and in a

1  press of a button it could -- it is probably there already.

2     I don't trust them to begin with.  I assume that they

3  have already got it.

4     But I am just concerned, as you look -- you don't have

5  to answer right now on that -- but I am just concerned about

6  that as you look at your -- on the defending this in court.

1    [11:20 a.m.]

2        Mr. Latta.  For the FBI, quick question.

3        You know, one of the things you mentioned in your

4    testimony about ████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10       Mr. Grover.  ███████████████████████  ██████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21       Mr. Latta.  Okay.  Thank you.

22       And, again, and as my friend from California brought out

23   that this is not a ban but we have a divestiture, that I

24   think this is the information that we have to make sure of,

25   that the American people understand that we are not banning

1    anybody.  We are just making sure that it is safe for them to

2    use a certain app.

3        So I appreciate you all being here.

4        Madam Chair, I yield back.

5        The Chair.  The gentleman yields back.

6        The chair recognizes Ms. DeGette for 5 minutes.

7        Ms. DeGette.  Thank you very much, Madam Chair.

8        Thanks for all of you for coming.

9        I want to start with you, Mr. Newman, about the

10    constitutional issues.  And I know you said there is a long

11    record of divestment of companies and so on.

12        Have we ever had legislation targeting a specific

13    company?  Because that is part of what TikTok is arguing is

14    that we are specifically targeting them in legislation.

15        Mr. Newman.  So you do have legislation that targets

16    companies in related context, so, for example, disqualifies

17    them from being Federal contractors, disqualifies them from

18    selling services to the Federal Government, speaks to certain

19    companies' ineligibility.

20        I do think, to your point, that the company will try to

21    argue that this is a form of impermissible punishment, that

22    the Constitution --

23        Ms. DeGette.  And do you think there is legal precedent

24    that you have to say that is not the case?

25        Mr. Newman.  I do, because I think fundamentally our

1    position is this is not punishment for this company.  This is
2    not a ban on the company.  This is an effort to compel
3    something that we do regularly in the national security space
4    to force a divestment of problematic ownership.

5        Ms. DeGette.  We don't do legislation specifically
6    targeted at companies in the national security.  We do
7    require divestment in the nat- -- I mean, that is the
8    difference, right?

9        Mr. Newman.  There is a Federal statute under CFIUS that
10   allows divestment --

11       Ms. DeGette.  Right.

12       Mr. Newman.  -- across a number of companies.

13       Ms. DeGette.  I understand.

14       Mr. Newman.  And there are instances where Congress will
15   highlight national security risks of specific companies.

16       Ms. DeGette.  Okay.  My second question is, can you
17   briefly tell us the difference between -- tell us what
18   happened in the Montana case where in November the U.S. Court
19   judge ruled that the Montana ban was not constitutional.

20       Mr. Newman.  So there, that ruling, as I understand it,
21   rested on First Amendment grounds.

22       Ms. DeGette.  Right.

23       Mr. Newman.  And it reflects the fact that there is --
24   first of all, there is a lot of First Amendment protected
25   activity that takes place --

1          Ms. DeGette.  But did the Montana law have some of the
2     provisions that we have in this bill?

3          Mr. Newman.  States and the Federal Government are very
4     differently situated when it comes to legislating in the
5     national security interest --

6          Ms. DeGette.  Okay.  But my question is --

7          Mr. Newman.  -- and the Federal Government --

8          Ms. DeGette.  -- did the Montana law have some -- was it
9     structured the way we are or was it structured a different
10    way?

11         Mr. Newman.  I am probably not an expert on that law,
12    but it -- the fundamental difference from my perspective is
13    that Congress and the Federal Government has the power to act
14    in the national security interest in a way that States often
15    do not.

16         Ms. DeGette.  I am going to try to get some more
17    information about what that Montana law said.

18         Now, I have a question for either of the other two
19    witnesses here, which is, when we had our big hearing in this
20    committee last year, TikTok came in and they talked about
21    this Texas project.  They were transferring management of
22    TikTok to Oracle, and this was their whole big argument to us
23    about how this was taking it independent of PRC.

24         Can you guys comment on that effort and why you don't
25    believe that that is sufficient to get to -- to gain the

1    independence that we need?

2    <u>ODNI.</u> 

3

4

5

6

7

8

9

10

11

12

13    Ms. <u>DeGette.</u>

14

15

16    <u>ODNI.</u>

17

18

19

20

21        Mr. <u>Newman.</u>  And if I could just add a couple of points.

22    First, under their Project Texas proposal, you would still

23    have ByteDance executives, you know, directing certain of the

24    activities of TikTok.  And you would still have a lot of

25    synergy between TikTok's U.S. application and the TikTok

 1    Global platform selling ads, promoting certain content for

 2    commercial reasons, understanding sort of the commercial

 3    metrics that they would need to be responsible owners.  As a

 4    result, you would see a lot of data moving back and forth

 5    even if they were in good faith.

 6        And because we are concerned that they are not in good

 7    faith and we, the Department of Justice, and the FBI would

 8    probably be the ones to have to catch them, we are very

 9    ████████████████████████████████████████████████████████

10    ████████████████████████████████████████████████████

11    ████████████████████████████████    ██████    ██████

12    ████████████████████████████████████████████████████████

13    ████████████

14        Ms. DeGette.  Thank you.

15    Thank you very much.  I yield back.

16        The Chair.  The gentlelady yields back.

17        The chair recognizes Mr. Guthrie for 5 minutes.

18        Mr. Guthrie.  Thank you.  Thank you, Madam Chair.  Thank

19    you for the time.

20        Thank you for being here for this important hearing.

21        So I guess, Mr. Newman, I will address this to you.  So

22    you have used terms today, clear and present danger,

23    controlled by foreign adversary, foreign ownership and

24    direction.

25        And I know everything in China, if you have a local

1    market, you have a communist overlord.  We had the chair --
2    the CEO of TikTok before us.  And when we asked him any
3    connection, any -- any question that we would ask him with
4    any question of the CCP, the PRC, he dismissed it as almost
5    incredulous that we would even ask, that we didn't understand
6    how business even worked that we would even ask.  I mean, he
7    was pretty much insulting to almost every member that asked
8    him a question in that way.
9        And so what I am hearing from you and from all of you
10    today, ███████████████████████████████████████████████████
11    ████████████████████████████████████████    █████████████
12    ████████████████████████████████████████████████████████
13    ██    █████████████████████████████████████    ?
14        Mr. Newman.  From -- I want to answer your question
15    carefully because, obviously, a false statement to Congress
16    is a crime.  But what I would say is this.  If the important
17    question for national security is, ████████████████████████
18    ████████████████████████████████████████████████████████
19    █████████████████
20        Mr. Guthrie. ███████████████████████████████████████
21        Mr. Newman. ████████████████████████████████████████
22    ████████████████████that is what I am comfortable saying in
23    this setting.  I think it is a very fair question.
24        ODNI.  I was just going to, if I can, just add.  What I
25    was trying to get to with the intelligence portion of this



6        Mr. Guthrie.  But it would be -- and I am going -- I

7    know we got more people that want to talk.  But it would be

8    incredulous for us to believe that

9

10       So -- well, anyway, I think you answered my question as

11   far as you are going to answer.  So thank you.

12       And I will yield back.

13       The Chair.  Thank you.

14       The chair -- the gentleman yields back.

15       The chair recognizes Ms. Schakowsky for 5 minutes.

16       Ms. Schakowsky.  Thank you.

17       I am just wondering who you envision would actually

18   purchase TikTok, and are there antitrust issues that could be

19   involved?  And let me just also say that the concentration

20   that we have seen in the tech industry and the abuses that we

21   have seen of everyday consumers, I am concerned then, are we

22   going to now make it even tighter and have someone who is

23   already in the market?  And so who would buy it?

24       Mr. Newman.  Thank you for the question.

25       To break it apart into two pieces:  First, would there

1   be a buyer for TikTok?  I think our judgment is that there
2   would be a market to buy an app like TikTok, which is
3   profitable, which does have 170 million users, which does
4   generate a lot of revenue, and that ByteDance, although
5   subject to the direction and control of China, is a
6   for-profit company that would be very motivated commercially
7   to find a buyer and to structure its assets in a way that it
8   could get some value for this application.

9       Ms. Schakowsky.  Do you foresee that there would be some
10  antitrust issues that we might want to look at?

11      Mr. Newman.  I think it would be -- I am at the limits
12  as a national security lawyer, but I think it would be -- it
13  would depend, of course, on who the buyer was and what
14  conditions attached to that sale.

15      But there are a number of entities, including entities
16  that don't operate exactly in the space of the social media
17  world, and so it wouldn't raise the kind of horizontal
18  monopoly issues that could buy that platform, that would have
19  an interest in doing so.

20      Ms. Schakowsky.  Okay.

21      Mr. Newman.  I do think, as you say, there is a lot of
22  antitrust activity in the tech space, and I --

23      Ms. Schakowsky.  I hear you.

24      I want to -- you mentioned that the President of the
25  United States has an executive order that deals with foreign

1    adversaries and, you know, said, well, that is kind of a nice
2    thing.

3          How does that fall short, in your view, and require that
4    we make this particular decision in Congress?

5          Mr. Newman.  So that executive order for TikTok -- first
6    of all, that executive order is based on IEEPA, one of the
7    statutes I talked about at the beginning.  And so it cannot
8    apply to any expressive data or communications data because
9    there is a limitation in IEEPA that doesn't allow it.  And,
10    in fact, there is a carve-out in the executive order for that
11    type of data.  So it wouldn't address, for example, the
12    transfer of communications on the TikTok platform back to
13    China because the Berman amendment to IEEPA does not allow
14    that.

15          More generally, I think, although we feel confident in
16    the legal basis of an -- of the executive order, it is always
17    the case when you have innovative government regulation in a
18    new area that it is on a stronger legal footing if you have
19    the benefit of both Congress and the executive specifically
20    authorizing regulation.  And that is why we would very much
21    welcome congressional action.

22          Ms. Schakowsky.  Let me ask this.  Maybe this was asked.
23    But when we talk about bad actors and foreign adversaries,
24    what about Russia?  We know that they intervened in our
25    election.  So why are they not included here?

1      Mr. Newman.  So the answer is I think Russia is a very
2    bad actor, and they are and should be included.  So under the
3    executive order, there are actually seven countries that are
4    covered as foreign adversaries.  One of them is Russia.  And
5    under the legislation that we are discussing today, there are
6    four countries that are covered:  Russia, Iran, North Korea,
7    and China.

8      And I agree.  I mean, Russia doesn't have the same
9    commercial resources to try to dominate in these spaces.  But
10   you see in applications like Hisperski (ph), you see in other
11   Russian technology companies that they are --

12     Ms. Schakowsky.  We do see intervention right here in
13   our own country here, though, when it comes to the election.

14     Mr. Newman.  Yes.  And that was what they were able to
15   do on a platform they didn't own.  You can just imagine what
16   the capability is of a foreign adversary on a platform that
17   is owned by a company under their control.

18     Ms. Schakowsky.  So when you talk about CFIUS, so -- I
19   mean, there have been -- how does CFIUS fit into this?  And
20   does this tell us anything about buying another company?

21     Mr. Newman.  So CFIUS has a long history of requiring
22   divestment.  So I think what it tells us is there is a way to
23   sell assets that foreign acquirers buy that raise national
24   security risks.  And we have a process and a playbook for
25   doing so in the executive branch, and I think we would draw

1    on the lessons learned in trying to effectuate a divestment

2    here if this bill became law.

3        Ms. Schakowsky. Okay. Thank you.

4        And I yield back.

5        The Chair. The gentlelady yields back.

6        The chair recognizes Mr. Griffith for 5 minutes.

7        Mr. Griffith. Thank you very much, Madam Chair.

8        Let me start with what is going on today and just ask

9    you all to look into it. And that is, is that apparently

10    what we are hearing is that if you want to access TikTok and

11    you live in one of our congressional districts, you cannot

12    access TikTok without contacting our office first. And then

13    they encourage you to say be against this bill.

14        Does that cross any lines? I don't know the answer and

15    don't expect an answer today. Just want you all to look into

16    it. Can you assure me that you will do so?

17        That is an affirmative. I see a nod.

18        Mr. Newman. We will look into it, as we would anything.

19        Mr. Griffith. Okay.

20        Mr. Newman. I would also say it probably is a sign that

21    they are very concerned that this --

22        Mr. Griffith. Yeah.

23        Mr. Newman. -- bill will become law.

24        Mr. Griffith. It means we are doing something good.

25        All right. Number two, ███████████████████████████

1 ████████████████████████████████████████████

2 ████████████████████████████████████

3      ODNI.  Yeah, absolutely, yes.

4      Mr. Griffith.  So we can't go about that when we go out

5 on our stump speeches.

6      ODNI.  ████████████████████████████████████

7 ████████████████████

8      Mr. Griffith.  I am just trying to make sure I get the

9 rules right.

10      All right.  Mr. Newman, one of the things I was

11 concerned about when the CEO was in here -- and it goes to

12 what Jonathan was saying earlier about the control of

13 ByteDance and TikTok being the same -- I repeatedly asked

14 about their attorneys.  And even though they claimed they had

15 built a firewall between ByteDance and TikTok, they shared

16 the same attorneys, not just the same firm with a structure

17 under American judicial ethics firewall but the very same

18 attorneys.

19      Doesn't -- isn't that just exhibit A in why that they

20 are not separated and why their, in fact, their internal

21 workings in their administration are, in fact, still the

22 same?

23      Mr. Newman.  One of the concerns we have with Project

24 Texas and their current approach is that there is just too

25 much communication going on between the parent, TikTok

1    Global, and TikTok U.S.  And it is very hard to know where

2    the influences and interactions begin and end.

3    Mr. Griffith.  Well, in reality, if they instructed

4    their attorneys to access the information that was collected

5    by TikTok U.S., their attorneys would have to do it and the

6    attorneys would have access to it because it's the same

7    attorneys.

8    All right.  Enough said about that.

9    I was interested in Ms. DeGette's question.  And I think

10   what she was looking for you didn't give her, and that is,

11   can you cite a piece of legislation where we specifically

12   named a company?  It may apply to others, as this one may

13   apply to others.  But, you know, in World War II, did we name

14   that you couldn't do business with a particular German

15   company or a particular Japanese company before -- and

16   particularly before hostilities broke out?

17   Mr. Newman.  I would be happy to follow up and get

18   examples.  But there are a number of instances, for example,

19   in Federal acquisitions --

20   Mr. Griffith.  So you say they are out there where the

21   legislation specifically says XYZ corporation and any other

22   businesses currently in that same situation?

23   Mr. Newman.  Correct.  Outside the divestment context,

24   there are a number of places where for national security

25   reasons --

1       Mr. Griffith. You can get that to -- and I will say
2    Ms. DeGette probably want to see that too. But that is what
3    we are looking for is some evidence that we have authority to
4    do this and have done so in the past and not had it struck
5    down by the Supreme Court.

6       All right. And then I am okay with it. I said this in
7    our other briefing. I am okay with it. I think it is
8    important enough. But I do think that if we pass a piece of
9    legislation that TikTok can show reduces their market value,
10   I think that is a taking. I don't think it is -- I don't
11   think it is a bill of attainder, but I do think it is a
12   taking by the United States Federal Government. And we may
13   have to be a part of the sale or pay some money into the
14   company for it to be divested.

15      Do you agree or disagree? Have you researched it since
16   last we spoke?

17      Mr. Newman. So it is an excellent question. It took me
18   back to my law school property class. What I can say is I
19   spoke with our civil litigators about whether there would be
20   a takings clause litigation challenge brought and whether we
21   would be on strong footing. Their answer was they believed
22   that we would have good arguments against that, in part,
23   because of the national security backdrop to which all of
24   this is taking place and, in part, because we would still be
25   able to point to a broad number of qualified U.S. buyers,

1     just as we do in the CFIUS context.

2          But I think it is a good question. And like I said, I

3     had to study up after you posed it to me last time.

4          Mr. Griffith. Yeah. Well, and the interesting thing

5     about that is, even if we lost, it doesn't mean we can't

6     force the divestiture. It just means that we have to pay

7     a -- we will have to pass an appropriation to cover that.

8     Agreed?

9          Mr. Newman. If they -- if they succeeded, that would be

10    right. But, again, I think our current civil litigator's

11    judgment is that they could respond to it.

12         Mr. Griffith. Okay. And I am going go with their

13    judgment, but I just want us to be ready if we have to. It

14    is worth it. This is a big enough deal for the United States

15    of America's future that if we have to pay a little bit of

16    money to get rid of this cancer in our society, I am more

17    than willing to support it.

18         I yield back.

19         Mr. Cardenas. Will the gentleman yield for a point of

20    clarification?

21         Mr. Griffith. Yes.

22         Mr. Cardenas. Yeah, a point of clarification. The

23    divestiture requirement would be that they divest from

24    foreign adversary ownership. It doesn't mean that it has to

25    be an American purchaser. It could be as long as somebody

1    who purchased that portion of the company and that

2    divestiture is not on that list.

3         The Chair.  Not a foreign adversary.

4         Mr. Newman.  I think that is correct, but there would

5    have to be certain findings made that the effect of the

6    divestment was to cut off any connection to the foreign

7    adversary.  And we would obviously look to see whether the

8    buyer was sufficiently insulated from Chinese or Russian --

9         Mr. Cardenas.  But it doesn't require it be an American

10   purchaser.

11        Mr. Newman.  It doesn't necessarily require that, no.

12   Thank you.

13        Mr. Griffith.  I yield back the time I yielded.

14        The Chair.  All right.  The gentleman yields back.

15        The chair recognizes Ms. Matsui for 5 minutes.

16        Ms. Matsui.  Thank you very much, Madam Chair.

17        I have a question for the FBI.  Director Wray has

18   indicated the FBI has concerns that the Chinese Government

19   can control TikTok's recommendation algorithm.

20        How did the FBI make this determination, and does it

21   believe the PRC has ever taken steps to assert control over

22   TikTok's algorithms or recommendation processes?

23        Mr. Grover.  Thank you for the question.

24

25



19          Ms. <u>Matsui.</u>  Okay.  Then, how about the other witnesses?

20     Do you have evidence or reason to believe that TikTok's

21     algorithms have been modified at the direction of PRC?

22          Mr. <u>Newman.</u>  So I will let my intelligence community

23     colleague weigh in, but I know there are a number of outside

24     studies that suggest that some of the content on TikTok is

25     more favorable in its narratives to the PRC and less -- has

1    less present narratives critical of the PRC.

2    There are multiple reasons that could be and we don't

3    know definitively what they are, but it certainly raises the

4    concern --

5    Ms. Matsui. Right.

6    Mr. Newman. -- that that might be the case.

7    Ms. Matsui. Okay. Director Haines recently described

8    concerns about how the Chinese Government could utilize data

9    captured by TikTok, noting the capacity to then turn around

10   and use it to target audiences for information campaigns but

11   also to have it for future use is for a provided means.

12   Now, does the ODNI have evidence or reason to believe

13   information campaigns or any of these other strategies you

14   just described have been deployed against the interests of

15   the United States?

16   ODNI.

1           Ms. Matsui. Okay.  In addition to TikTok, what are
2      other data-gathering strategies the Chinese Government has
3      been utilizing against U.S. citizens?

4           Mr. Newman. So I am happy to start.

5           We have seen a broad effort by China to use U.S. data
6      and information against the U.S. Government.

7           One of the things that we are very focused on in the
8      Justice Department in my division is that they have taken a
9      number of actions to specifically target Chinese dissidents
10     and others inside the United States who are advancing
11     positions critical of the Chinese Government.

12          We have brought a number of cases, including a case that
13     I announced last year, the PRC police station case in
14     New York, including cases involving threats over the Zoom
15     platform that were made again dissidents, including
16     surveillance of individuals who they are trying to compel to
17     go back to China to face some purported criminal case called
18     Operation Fox Hunt that resulted in a criminal conviction a
19     few months back.

20          And so we have seen a large campaign under which the
21     Chinese Government is trying to project its authoritarian
22     rules using technology and using their access to the Chinese
23     diaspora in the United States.

24          Ms. Matsui. Okay.  I understand that you don't believe
25     that Project Texas is going to be doing what it is supposed

1    to be doing.

2        Is there an opportunity to look at Project Texas on its

3    own to maybe assess what we can do with that particular data

4    collection?

5        Mr. Newman.  If I understand the question, is there an

6    opportunity to kind of verify and audit whether Project Texas

7    is doing what the company --

8        Ms. Matsui.  Exactly.

9        Mr. Newman.  -- says it is doing?

10       Ms. Matsui.  Exactly.

11       Mr. Newman.  I think there is some -- the company hasn't

12   given us exactly that opportunity. ████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████  And I think that

18   is part of our concern is --

19       Ms. Matsui.  Okay.

20       Mr. Newman.  -- right now, they have a lot of incentive.

21   You know, TikTok knows that they are in the spotlight.  They

22   know that the Chinese Government is being scrutinized.  So I

23   am sure they are not doing very blatant and obvious things

24   right now.

25       Ms. Matsui.  Okay.

1           Mr. Newman.  But in the future, they might try to do
2      such a thing.

3           Ms. Matsui.  Okay.  Thank you.

4           And I yield back.

5           The Chair.  The gentlelady yields back.

6           The chair recognizes Mr. Bilirakis for 5 minutes.

7           Mr. Bilirakis.  Thank you.  Thank you, Madam Chair.
8      This is an excellent briefing.  I appreciate it, very
9      informative.

10          A question, I guess for Mr. Newman, but whoever wants to
11     respond.  In the event that ByteDance does not divest under
12     the bill, are there still ways for end users to access the
13     app or website for TikTok other than through the app stores
14     they are using now?  Essentially, will TikTok truly be
15     blocked or will it just be more difficult to access?  I think
16     that is very important.

17          Mr. Newman.  If --

18          Mr. Bilirakis.  And, again, assuming the bill becomes
19     law.

20          Mr. Newman.  If they didn't divest within the deadline,
21     there would be a number of prohibitions that would take --
22     kick in under the bill so that both the app stores, the Apple
23     app store, the Google Play store, as well as other service
24     providers and those who provide services in support of
25     TikTok, would face potential penalties if they continue to

1   support the app.

2        So my sense is, as a practical matter, it would be very

3   difficult for TikTok to continue to operate in the United

4   States once this bill became law, if they were unwilling to

5   undertake a qualified divestment.

6        Mr. Bilirakis. Okay. Thank you.

7        This legislation is not exclusive obviously to TikTok.

8   We have said that.

9        Are you actively investigating similar international

10  threats posed by other companies at this time? And you think

11  that this legislation, if enacted, of course, would be

12  invoked against in the foreseeable future based on your

13  knowledge of the threats, so international threats?

14       ODNI. Yeah. So from the ODNI perspective, ███████████

15

16

17

18

19

20

21

22

23

24

25       Mr. Newman.



9    But, of course, before we would use this authority,

10    someone would have to build a record, look at the statutory

11    requirements, and decide whether this specific criteria in

12    the statute were met for those companies.

13    Mr. Bilirakis.  Let me elaborate on my first question,

14    unless the FBI wants to -- do you want to chime in on that,

15    please?

16    Mr. Grover.

17

18

19

20

21

22    Mr. Bilirakis.  Okay.  Now, what kind of an enforcement

23    mechanism -- let's say that -- well, with regard to the bill

24    but penalties.  But let's say a -- another country, possibly

25    an ally of ours, is cooperating -- they must not be a good

1 ally if they do -- but cooperating with the Chinese CCP or

2 ByteDance or what have you, and people here in the United

3 States have access to users, or they can't get it from

4 Google, et cetera, but they can get it from another country

5   Is that possible?  Have we addressed that in the bill?

6   Mr. Newman.  So I know that some of the provisions in

7 the bill are limited to the territorial United States and

8 they don't apply extraterritorially to actors outside the

9 United States.  My sense is that is partly because,

10 obviously, the United States is much more limited in what it

11 can prohibit about extraterritorial application in a non-U.S.

12 company.

13   You know, to the point that was raised earlier about the

14 calls that you all have been getting from TikTok, I think the

15 fact that they are taking that step is a sign that they are

16 very nervous that if this bill became law, it would be a

17 devastating blow to their --

18   Mr. Bilirakis.  So we are doing the right thing.  That

19 is what it tells me.  Thank you very much.

20   In the interest of time, I will yield back.  Thank you.

21   The Chair.  The gentleman yields back.

22   The chair recognizes Ms. Castor for 5 minutes.

23   Ms. Castor.  Thank you, Madam Chair.

24   And thank you, gentlemen, for all you do to help keep

25 America safe.

1          The end of last year, the State Department Global

2     Engagement Center issued a first-of-its-kind 58-page report

3     that laid out Beijing's tactics and techniques for molding

4     public opinion, such as buying content, creating fake

5     accounts, how they spread their message, and use repression

6     to quash unfavorable opinions.

7          The head of that center said that -- warned that

8     Beijing's information campaign could eventually sway how

9     decisions are made around the world and undermine U.S.

10    interests.  He said:  Unchecked, the PRC's information

11    manipulation could in many parts of the world diminish

12    freedom to express views critical of Beijing, would transform

13    the global information landscape, and damage the security and

14    stability of the United States, its friends, and partners.

15         It went on and said:  In social media, the CCP deploys

16    armies of bots, trolls, and coordinated campaigns to suppress

17    critical content and boost pro-Beijing messages.

18         Chinese-made phones sold overseas have been found to

19    come with censorship capabilities.  Other experts say they

20    use it to sow discord and will use it to influence our

21    elections.

22         Are you familiar with this report?

23         Mr. Newman.  I am very familiar with it, and I had a

24    chance to meet with some of the authors of it before it was

25    released.

1          Ms. Castor.  So I -- Madam Chair, I would like to ask

2      our professional staff to consider entering into it the

3      record after you have an opportunity to review it.

4          Do you agree with what is set forth in this report?

5          Mr. Newman.  I do agree with it.

6          The one note I would add as a context is the Global

7      Engagement Center's principal agreement is about information

8      outside the United States, rather than information inside the

9      United States, and that is for a host of reasons.

10         But, fundamentally, what they are trying to do outside

11     the United States, they are trying to do with even more

12     assertiveness inside the United States, given that they view

13     the United States as their biggest global adversary in the

14     21st century.

15         Ms. Castor.  And, Jonathan, do you agree?

16         ODNI.  Yeah, we agree from the ODNI perspective too.

17         Ms. Castor.  And Brent?

18         Mr. Grover.  The focus there being, externally, we are

19     aware of the report and we are -- it is not a principal area

20     we are looking at in the FBI.

21         Ms. Castor.  All right.  So we know that young social

22     media users are prime targets.  They are targets for

23     surveillance and espionage.  And like many of my colleagues

24     here, I have advocated for modern guardrails on algorithmic

25     targeting, tracking practices that harm kids and young

1    people.  It is not just exclusively TikTok.  It is the other
2    big tech platforms.  They use manipulative designs to addict
3    kids to their products and funnel them towards harmful
4    content for their own gain.

5         Mr. Newman, can you speak to what is going on here with
6    using TikTok to target young people in the United States?
7    And what impact would that have long term on our national
8    security?

9         Mr. Newman.  So it is a great question.  There are
10   probably certain aspects of that question that is less in my
11   bailiwick as a national security person.  But what I can say
12   is the information they are collecting now about children,
13   about young people -- and young people often do some, you
14   know, foolish and reckless things online -- could one day be
15   very valuable to a foreign adversary in the future if it was
16   being stored and kept in the hands of the Chinese Government.

17        So I think there are a lot of other harms that probably
18   arise that are out of the national security space but very
19   important.  But from a national security perspective,
20   certainly young people, college students, high school
21   students, there is a lot in there that could be a value to a
22   foreign adversary.

23        Ms. Castor.  And, Jonathan, I mean, we are talking about
24   millions of young people across America now who their data
25   has been gathered.  ███████████████████████████████████

1  ▋▋▋▋▋▋▋▋▋▋▋    What implication does that have

2  for our national security long term?

3     ODNI.  ▋▋▋▋▋▋▋▋▋▋▋▋  ▋▋▋▋

4  ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

5

6

7

8

9

10

11

12

13

14

15

16     Ms. Castor.  And I will just close by saying we really,

17  the committee really needs a one-two punch here because, for

18  all of the weaknesses involving the Chinese Communist Party,

19  we don't have a fundamental privacy law in America that is

20  protecting all Americans, particularly kids.  We don't have

21  any requirements for how these addictive models are designed.

22     And I really urge the chairwoman, I know her heart is

23  here, but we really need to move quickly to address this.

24     Thank you, and I yield back.

25     The Chair.  The gentlelady yields back.

1          The chair recognizes Mr. Hudson for 5 minutes.

2          Mr. Hudson. I thank the chair. And I thank the chair

3    and ranking member for holding this very important hearing.

4          Thank you to the witnesses. Thank you for your service

5    to our country. Greatly appreciate it.

6          Mr. ███████ (ph), does the IC honestly think

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ███████

10   ODNI. ████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   Mr. Hudson. Wouldn't common sense dictate that a

17   company like ByteDance really isn't concerned with the

18   ████████████████████  ██████  ████████████████

19   ████████████████████████████████████████████

20   █████

21   ODNI. And I think our job as intelligence professionals

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████████



      Mr. Hudson. Okay. At our hearing last year, I asked
the question of the TikTok CEO about the access to
information on other devices connected to the same local
network as a device with TikTok on its app.

      So, for example, if Mr. Pallone invited me over for a
barbecue to his house and he gave me the password to his
local network and I had TikTok on my phone, does TikTok have
the capability of then uploading that off every device on his
local network, laptops, other devices?

      And the CEO told me that he would have to check with his
engineers and get back to me. He never got back to me, and
he also took part of my question out of context and made
TikTok videos to try to humiliate me, to make me look like I
didn't know how local networks work, to distract people from
the central question I asked.

      And so my question to any of you: Are you aware of this
capability? Are you aware that it may be happening? And if
so, is that -- do you view that as a threat?

      Mr. Newman. I think your question speaks to a very
important point which is, first,

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2    And, second, even apps that are behaving responsibly

3    collect a very broad amount of information and, over time, I

4    am sure will collect more. ▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6    ▮▮▮▮▮

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮

10    Mr. Hudson. But would you say it is a fair assumption

11    to assume they have the ability to do that ▮▮▮▮▮▮

12    ▮▮▮▮▮▮▮▮

13    Mr. Newman. ▮▮▮▮▮▮▮▮▮▮

14    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18    ODNI. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22    Mr. Hudson. Well, so I have been lobbied heavily before

23    this meeting. And I got a call the other day and I listened

24    to them politely and then told them the same story and said I

25    haven't gotten any information back.



1          And they sent an email to my staff saying that they --
2      my question was, do you have the capability to do it?  The
3      answer was we don't do this without permissions.

4          And so the permission could be when you check the box
5      and download the app.  I mean, that -- so I would -- I would
6      suggest this is something you all should look into.  I think
7      it is a real concern.

8          Switching topics.  I represent the largest military Army
9      base in the world, Fort Liberty, Fort Bragg.  In November of
10     2023, Duke University released a study revealing that
11     personal information of U.S. military members, including
12     addresses, health status, was available for purchase for
13     minimum cost of online brokers.

14         Are you aware -- and, of course, my concern is for them
15     getting information about our servicemembers.  They can track
16     their family members.  They could blackmail them.  There is a
17     lot of real concerns there.

18         Are you aware of any data brokers who have done this,
19     and are you aware of any foreign adversaries they sold this
20     information to?

21         Mr. Newman.  Thank you for that question.

22         We are very concerned about just that fact pattern.  The
23     data security executive order I referenced that was signed
24     last week has bulk thresholds about what is permitted to be
25     sold.  But when it -- in relation to certain categories of

1    sensitive government data, including, for example, data on

2    servicemembers, on IC personnel, it -- the threshold is

3    essentially zero, because we are very concerned that anyone

4    who is trafficking in that data is trafficking in a dataset

5    that could be of great value to a foreign adversary.

6         And it is something I think we have expressed.  I will

7    look to the IC colleagues, █████████████████████████████

8    ████████████████████████████████████████████████.

9         Mr. <u>Hudson.</u>  So do we know, ████████, that it is

10   happening?  Have we caught them doing it?

11        <u>ODNI.</u>  ██████████████████████████████    █████████████

12   ████████████████████████████████████████████████████████████

13

14

15

16

17

18

19

20        Mr. <u>Hudson.</u>  Thank you.

21        And, Madam Chair, my time has expired, so I will yield

22   back.

23        The <u>Chair.</u>  The gentleman yields back.

24        The chair recognizes Mr. Sarbanes for 5 minutes.

25        Mr. <u>Sarbanes.</u>  Thank you all very much.



9      And that makes me curious as to how you see that --

10     those interests being aligned or disaligned when it comes to

11     the issue of divestment.  In other words, do you think that

12     the PRC is going to want to get involved or interfere somehow

13     with the way the whole divestment project goes?  And if so,

14     what does that look like?  That is the first question.

15     If they see the divestments really coming, are they

16     going to speed up the kind of data collection that maybe they

17     have not been doing now because they are trying to -- they

18     are trying to showcase the or window-dress the Project Texas

19     thing in the way you describe?  So maybe they are not being

20     busy.  But if they see divestment on the horizon and have 180

21     days or whatever it is to go bananas and pull in as much data

22     as they can, what does that look like?

23     So maybe address those two things, if you could.

24     ODNI.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22          Mr. Newman.  If I could just add one further point.  I
23    do think that if this bill became law, it would in some ways
24    divide the interests of ByteDance and the PRC Government.
25    ByteDance does have shareholders.  They would want to get

1    value for their investment, and they would want to sell. And
2    I think for the inverse of the reasons that we are all here
3    today, the Chinese Government would want to keep that
4    application controlled in China.

5         In response to the last administration's effort to try
6    to divest TikTok, we saw the Chinese Government put an export
7    control restriction on the recommendation algorithm in an
8    effort to try to thwart any sale or divestment, and I would
9    expect that you would see similar things.

10        And my response would be, first, we -- China would never
11    allow us to do such a thing to their national security.  In
12    other words, they put all sorts of limits on companies
13    operating in China.  And they don't allow us to have a veto
14    on that by putting restrictions on our own companies.  And so
15    I don't think we should accede to that as a policy matter.

16        And, second, I do, think at the end of the day, that it
17    will be a -- they will have a very difficult calculus to
18    make, because if they ultimately allow this application,
19    which is one of the most successful, multinational Chinese
20    products in this space, to just be destroyed by the failure
21    to divest, that poses a lot of risks to their reputation.
22    And I could see them trying to find some kind of off-ramp
23    that would allow the app to be sold.

24        I mean, it is a tricky position we put them in but, in
25    my view, a position that they deserve, given their track

1     record in this space.

2          Mr. Grover.  And the only thing I would add is just on

3     the point of whether or not the PRC would be incentivized to

4     intervene or weigh in, I think we have seen that historically

5     even the last year or two where we have charged individuals

6     for associating with the PRC Government for obstruction of

7     justice with respect to their efforts to kind of insert

8     themselves into a ongoing litigation with a PRC

9     telecommunications firm.

10         Mr. Sarbanes.  Fourteen seconds, but what about the

11    accelerated vacuuming of data during an interim period

12    between now and a divestment?

13         Mr. Grover. ███████████████████████████████████████

14    ███████████████████████████████████████████████████████

15    ███████████████████████████████████████████████████████

16    ███████████████████████████████████████████████████████

17    ███████████████████████████████████████████████████████

18    ODNI. ███████        ███████████████        ███████████████

19    ███████████████████████████████████████████████████████

20    ███████████████████████████████████████████████████████

21    ███████████████████████████████████████████████████████

22    ███████████████████████████████████████████████████████

23    ███████████████████████████████████████████████████████

24         Mr. Sarbanes.  Okay.  Thank you.

25         The Chair.  The gentleman yields back.

1         The chair recognizes Mr. Walberg for 5 minutes.

2         Mr. Walberg. Thank you, Madam Chair, and thanks for

3    this classified hearing.

4         And thanks to the panel for being here.

5         We know the large ties that American business has to

6    TikTok and the challenges there. And even as our offices are

7    being blown up by phone calls put forward by TikTok, and even

8    as my staff speaks to some of those calls and says we are not

9    banning, we are giving the opportunity to divest, it is

10   interesting, some of the callers then say, Oh, really, what

11   is wrong with that? But it shows the power that is out there

12   from this entity.

13        And so while knowing that U.S. business has significant

14   ties for business purposes, et cetera, what political or

15   public policy organizations in the U.S. have ties --

16   financial, membership, or otherwise -- to ByteDance? Do we

17   have any record of that, political or public policy entities?

18        Mr. Newman. I have no doubt, and I think we are seeing

19   today that they have a large number of lobbyists,

20   consultants, advisors. I have met with their attorneys. So

21   they are -- I have no doubt that there are numerous such

22   people in the United States. I don't have a list here today.

23        Mr. Grover. ████████████ █ █ ████████████████████████

24   ████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████

1    ████████████████████████████ .

2        Mr. Walberg.  Well, I would suggest we might, in light

3    of the power that is there, certain public policy

4    organizations at the very least, we ought to check that out

5    because of the power that would have.

6        Let me follow up with the FBI on Representative Hudson's

7    question about the impact of information within our

8    servicemembers' personal information.

9        Do we have the capability of monitoring the sales of

10   personal information of military members, and does the FBI

11   have legal authority to do this?

12        Mr. Grover. ██ █ ██████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████████



1
2
3
4       Mr. Newman. So it is a terrific question. I really
5       appreciate it.
6       The specific executive order that was issued last week
7       gives DOJ new authority to regulate the sale of different
8       categories of data, including the kinds of data that I think
9       are most concerning for U.S. servicemembers. That includes
10      geolocation data, biometric identifiers, personal health and
11      financial data.
12      And as I mentioned, it is a graduated approach where for
13      most Americans, for most datasets, there is a bulk threshold,
14      and that makes sense to avoid interfering with commercial
15      activity. But for data sets that are exclusively government
16      data, it gives the Attorney General the ability to set a much
17      lower threshold, because we have seen that that data is so
18      specifically valuable to foreign adversaries.
19
20
21
22
23
24
25



1          And that is of grave concern, which is what led to that

2     executive order and leads to our efforts to try to regulate

3     data brokers in this space when it comes to foreign

4     adversaries.

5          Mr. Walberg.  Okay.  Thank you.

6          I yield back.

7          The Chair.  The gentleman yields back.

8          The chair recognizes Mr. Tonko for 5 minutes.

9          The gentleman yields back.

10         The chair recognizes Mr. Carter for 5 minutes.

11         Oh, did I miss somebody?  Oh, so then Ms. Clarke.  I am

12    sorry.

13         Ms. Clarke?

14         Ms. Clarke.  I yield back, Madam Chair.

15         The Chair.  Okay.  The gentlelady yields back.

16         Mr. Cardenas.

17         Mr. Cardenas.  Thank you, Madam Chair.

18         My office has gotten a lot of phone calls today.  You

19    know, it just rolled off my back until somebody said that

20    they were my son, Andres.  So I called my son, Andres.

21         And he says, Hello.

22         And I said, You called me.

23         He said, No, I didn't.

24         So that was just to show what they are doing.  It is,

25    you know, people calling.  We are used to that, right?  But

1    for them to act like they are one of my family --

2        The <u>Chair.</u>  Wow.

3        Mr. <u>Cardenas.</u>  -- members, that was ridiculous.

4        So when it comes to elections, we have already seen some

5    nefarious actions happening from foreign actors in our

6    elections here in the United States.

7        So what do you know about countries like Russia or

8    whether or not they are planning or doing anything about

9    misinformation and disinformation relating to our upcoming

10    elections this -- at the end of this year?

11        You don't have to be specific.  I mean, do we -- are we

12    concerned that that is going to be ebbing and flowing like we

13    have seen in the past?

14        <u>ODNI.</u>  I think it is always a concern.  And we were

15    talking about this before arriving.  I am probably not the

16    best person to speak to it, but we can put in the foreign

17    malign influence folks, the elections coordinator from ODNI

18    in touch regarding specific information.

19        Mr. <u>Cardenas.</u>  Specifically China, do we anticipate

20    China maybe getting more involved?  Do we anticipate they may

21    be getting more involved in this come fall of 2024?

22        <u>ODNI.</u>  I think generally the foreign malign influence

23    looks at all of our adversaries.

24        Mr. <u>Cardenas.</u>  But is there any concern more now than

25    maybe we have had in the past?

1          ODNI.  I am not in a position to say.

2          Mr. Newman.  Again, I am not the intelligence community

3    briefer. ████████████████████████████████████

4    ████████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    ████████████████████████        ███████████████

7    ████████████████████████████████████████████████

8    ████████████████████

9          Mr. Cardenas.  And the fact the data is somewhat

10   stagnant when it gets old, the fact that they are active

11   every single day with 170-plus Americans using apps like

12   TikTok, doesn't that enhance their ability to do something

13   like that, should they choose to?

14          Mr. Grover. ████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19          Mr. Cardenas.  Thank you.

20          Does the data collected through apps like TikTok enhance

21   or strengthen people's ability to disrupt, not just

22   elections, but actually do other nefarious things with

23   Americans?

24          Mr. Newman. ███████████████████████████████

25   ████████████████████████████████████████████████

                         ████████████████



6       Mr. Cardenas. And with the supercomputing that goes

7    along right now, one of the things that I anticipate should

8    be a concern is, for example, somebody's grandmother getting

9    a call where she actually believes that that is her

10    grandson's voice and, you know, saying that it is a desperate

11    situation, send money, et cetera, now, that those kinds of

12    things are more and more likely to happen.

13       But if adversaries have that information, then there is

14    more likely they will be victims of that in America?

15       Mr. Newman. Yes. I think, to answer your question,

16    yes, it is a big -- it is a very significant concern that

17    they can build very targeted dossiers to go after American

18    officials or others they want to intimidate.

19       Mr. Cardenas. One of the concerns that I have with the

20    legislation is that it focuses -- I am not concerned about

21    the fact that it focuses on foreign adversaries and countries

22    and/or companies that are on our list. What concerns me is

23    what if it is an American company or American billionaire,

24    for example, who disregards the things that we have been

25    discussing for the last hour and a half and just because they

1    are an American, does that mean that they are not going to be
2    held to a standard of respecting people's liberties and data,
3    et cetera?

4        Mr. Newman.  So without question -- I think it is a
5    great question.  Without question, I think that there is also
6    a lot of risk about the use of U.S. social media platforms by
7    foreign adversaries.

8        What I would say in response to your good question is,
9    first, I do think the legal authorities can be much stronger
10   against foreign adversary-controlled applications.  There are
11   a lot of First Amendment interests at stake when you are
12   talking about U.S. platforms and U.S. speakers.

13       And, second, we welcome engagement on whether it is data
14   brokers or other privacy legislation that could help to
15   address some of those concerns.

16       Mr. Cardenas.  Thank you.

17       My time having expired, I yield back.

18       Thank you very much, gentlemen.

19       The Chair.  The gentleman yields back.

20       The chair recognizes Mr. Carter for 5 minutes.

21       Mr. Carter.  Thank you very much.

22       And thank you very much for your service to our country.

23       Let me ask you real quickly now.  Mr. Sarbanes, I
24   believe, touched on this and that is that if they -- if the
25   Chinese Republican Party, if the Chinese party understands

1    that they are going to have to divest of this, that they are

2    going to speed up their efforts to collect, we are about to

3    have an election here.  We are not going to have this done by

4    that time.

5    Are you preparing?  Are you doing something that is

6    going to help us fight those people, those adversaries who

7    are going to try to impact that election?

8    Mr. Grover.  So I will take it from the FBI's



19    Mr. Carter.  Right.  All right.  Let me ask you this.

20    If an American company or a friendly company buys TikTok,

21    what are they buying?  Are they buying the equipment?  Are

22    they buying the algorithms?  What are -- what are they going

23    to get?  I mean, if they get the equipment, is -- you know,

24    it is Chinese equipment.  I mean, are they going to be able

25    to use it?

1       Are we going to have to -- you know, we have addressed

2    this with Huawei and with some of the other in the Secure

3    Communications Networks Act, the rip and replace.  I mean,

4    you know, to Mr. Griffith's point, are we going to have to

5    pay for it, because essentially we are going to tell them,

6    no, you can't use that?  So we are going to have money

7    available for you to replace it?

8       Mr. Newman.  It is a good question.

9       I think that TikTok is a little bit different from, for

10   example, Huawei in that if an American company were willing

11   to pay something approaching the market value of TikTok, I

12   would think they would do so with a plan to try to address

13   some of the fundamental privacy and national security

14   concerns that exist currently around the application.  And

15   they would have to have confidence that, going forward, the

16   software code was being revised in the United States, that

17   the app was not transmitting data back to China, and they

18   would have to look for any kind of vulnerabilities or back

19   doors in the system.

20      Sophisticated, large companies, I would think, would be

21   economically incentivized to try to address those issues, but

22   it would obviously depend on the structure of the

23   transactions.

24      Mr. Carter.  And that is going to downgrade the value of

25   TikTok and they are going to come back at us and want to be



1    compensated for that.  Don't you think?

2        Mr. Newman.  They may try.  But, for example, when we

3    order divestments in CFIUS, some of the same calculations

4    apply.  Someone has to buy -- we had a divestment of Grindr,

5    which was a dating app that was bought by a Chinese company.

6    Whoever bought that app had to find a way to address some of

7    the national security concerns that existed, and people still

8    pay a price.  It may bring the price down.  It may limit some

9    of the buyers.  But I don't think --

10        Mr. Carter.  Right.

11        Mr. Newman.  -- it would --

12        Mr. Carter.  Right.

13        Mr. Newman.  -- slow the market.

14        Mr. Carter.  Let me ask you, when the CEO of TikTok was

15    here, I asked him about the collection of biometric data.

16    And, you know, it is the only time I have ever gone viral on

17    the internet, and they -- it wasn't in a good way.  They were

18    making fun of me, and that is fine.

19        But my point is, have you gotten any examples of where

20    that has happened, where the apps are using biometric data or

21    collecting biometric data?

22

23

24

25

1     [12:20 p.m.]

2          Mr. Newman.  TikTok specifically or any?

3          Mr. Carter.  Any of them.

4          Mr. Newman.  Lots of apps collect biometric data,

5     genetic information, for example.  Apps collect your

6     fingerprints.

7          Mr. Carter.  What about TikTok?

8          Mr. Newman.  TikTok -- at a minimum, you know that

9     TikTok has a tremendous database of some of the public, of

10    people's faces, of people's voices.

11         To the question that was raised earlier about being able

12    to spoof voices and faces, it is an incredibly powerful

13    dataset.  And I think there is no question that over time the

14    richness of that data is just going to grow.

15         Mr. Carter.  Okay.

16         One last question.  We have noticed a rise of

17    anti-Semitism on the app.  Are you seeing that?  Is there any

18    proof of that that you can share with us?

19         Mr. Newman.  I am aware of some of the outside studies

20    that have shown disproportionate narratives like that on the

21    TikTok app.  ████████████████████████████████

22    ████████████████████████████████████████████

23    ████████████████████████████████████████████

24    ██

25         Mr. Carter.  But is it happening?

1    Mr. Newman. ███████████ ████████████████

2    ██████ ████████████████████████████████

3    ██████

4    Mr. Carter. ████████████████████████████

5    ██████ --

6    Mr. Newman. ██████████████████ ████████

7    █████████ █████████████████████████████

8    ████████████ ███████████████████████████

9    ████████

10    Mr. Carter. Right. Okay. Well, again, thank you for

11    your services. This is very important.

12    I yield back.

13    The Chair. The gentleman yields back.

14    The chair recognizes Mr. Ruiz for 5 minutes.

15    Mr. Ruiz. Hi. Thank you for being here, all of you,

16    and thank you for your service.

17    Under this legislation, China is considered a foreign

18    adversary, requiring ByteDance to divest its ownership to a

19    nonforeign adversary.

20    And I want to go back to the comments and concerns about

21    the potential purchase of TikTok by an entity that then can

22    become a monopoly in this space.

23    So, under this legislation, I mean, is there a way that

24    we can prevent that from happening, or is this just a

25    reactionary effort?

88

1    And this is to you, Mr. Newman. What can we do to
2    safeguard that from happening during this divestment?
3        Mr. Newman. It is a great question.
4        I don't think anything in this act suspends or limits
5    the antitrust principles that apply to mergers and
6    acquisitions. So whoever bought the app would have to comply
7    with and assure antitrust regulators that they had met the
8    requirements of U.S. antitrust.
9        Mr. Ruiz. Does that happen after the purchase, or is
10   that something that will be evaluated to prevent a purchase
11   if that happens?
12       Mr. Newman. As I -- I am not an antitrust lawyer, but
13   as I understand it, you would have to still go through the
14   Hart-Scott-Rodino filings and the other processes that would
15   need to occur in order to decide if you could complete a
16   merger under U.S. law.
17       Mr. Ruiz. Okay. Given that the Protecting Americans
18   from Foreign Adversary Controlled Applications Act does not
19   define "executed" when it comes to the divestment of a
20   company, has the Department provided any potential guidance
21   on how it intends to define and interpret the execution of
22   such divestments?
23       Mr. Newman. I am not aware of specific guidance about
24   what that provision would mean. But, for example, in the
25   CFIUS context there are instances where someone will



1   temporarily provide the asset to a trusted third party, who

2   will hold it pending completion of a merger or sale.

3        So I don't know whether that is a possibility under this

4   law, but it does occur in the CFIUS context, where you find a

5   trustee or fiduciary to hold the asset until such time as it

6   can be sold.

7        Mr. Ruiz.  Would that be a private company that would be

8   that trusted entity?  Who would make up that third party

9   person?

10       Mr. Newman.  So in the CFIUS context that I am familiar

11  with, sometimes you would find, for example, a board of

12  former national security officials who would operate the

13  company as a proxy board until such time as the foreign

14  ownership could be formally transferred to a new buyer.

15       Mr. Ruiz.  Okay.  We have had hearings on cybersecurity

16  threats to utility companies.  We are having this

17  conversation about TikTok and the potential national security

18  threat that it poses.  And we have not really addressed the

19  shortage of cybersecurity experts that we have in our

20  country.

21       And so I really recommend that this committee look at

22  ways that we can bolster the cybersecurity workforce that we

23  so desperately need in our company and how we can promote

24  cybersecurity hygiene with all American users of any device

25  so they can be more aware and protective of their

1    information.

2        With that, I yield back.

3        The Chair.  The gentleman yields back.

4        The chair recognizes Mr. Duncan and for 5 minutes.

5        Mr. Duncan.  Thank you, Madam Chair.

6        Thanks, guys, for being here.

7        I don't have TikTok on my phone, I don't have chatGPT on

8    my phone, I don't have WhatsApp on my phone, because of

9    foreign access to data there, although it is broadly used

10   across the globe.

11       I probably have watched TikTok reels via Instagram.  So

12   the first question I have for you, should we be concerned

13   about any collusion or data access via Instagram or any other

14   social media app where TikTok videos are uploaded and viewed

15   by guys like me who are sitting in an airport just killing

16   time before our flight, watching reels?

17       Mr. Newman.

18

19

20

21

22

23

24       Mr. Duncan.  Different apps?

25       Mr. Newman.



6    Mr. Duncan. Any other guys want to comment on that?

7    ODNI. One thing I would just highlight is we have a

17    Mr. Grover. And the only thing I would add -- I am also

25    Mr. Duncan. I am going to switch gears, Jonathan.



1    Are there examples of TikTok moderating or curating its

2    content in response to a request from China or Chinese

3    Government?

4    ODNI.

5

6

7

8

9

10

11

12

13

14    Mr. Newman.  If I can just add one point.

15    ByteDance, which owns TikTok,

16

17

18

19

20

21

22    ODNI.

23

24

25

93

1      Mr. Grover. ████████████████████████ ████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6      Mr. Duncan. That was my follow-up question. ██████

7  ████████████████████████████████████████████████ Can

8  you elaborate on that a little bit?

9      Mr. Grover. ████████████████████████ ██

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13     Mr. Duncan. ████████████████████████

14     Mr. Grover. ████████████████████ ████████

15 ████ ████████████████████

16     Mr. Duncan. Yeah. Okay.

17     Madam Chair, I don't have any further questions. I do

18 have some time if any of my members -- I will yield to

19 Mr. Griffith.

20     Mr. Griffith. I just want to make sure when I do my

21 stump speeches I am not getting in trouble.

22 ████████████████████████████████████████████████

23 ████████████████████████████, is that something we can talk

24 about publicly?

25     Mr. Grover. ████████████████████████████

███████

1           Mr. Griffith. Okay. Thanks.

2           I yield back to the gentleman.

3           Mr. Duncan. Madam Chair, I yield back.

4           The Chair. Okay. The gentleman yields back.

5           The chair recognizes Mr. Peters for 5 minutes.

6           Mr. Peters. Thank you very much, Madam Chair. Thanks

7      for this hearing.

8           I would say, first of all, I am very impressed with your

9      command of this information. I am convinced. I don't have

10     an issue with going forward with this.

11          The difficulty, Mr. Newman, of you not having your civil

12     lawyers here is we don't know what happens next to the level

13     of detail that you are able to tell us about what is

14     happening now.

15          We are walking into a major lawsuit. I was going to

16     follow up on Mr. Griffith's thing. I think that you may have

17     misspoke. The issue of whether there is a takings and under

18     the Fifth Amendment, I don't have my phone so I can't look up

19     any of the language, but you have to establish a public

20     purpose. You have clearly done that. But I don't think the

21     public purpose affects the value of what you have to pay for,

22     the finding of a public purpose affects the value of what you

23     have to pay for if there is a taking.

24          And so I am thinking -- I am sort of thinking what does

25     the lawsuit look like? I assume they will argue the bill of

1    attainder. I assume that they will argue that there has been
2    a taking of a property. I don't know whether they will
3    dispute whether there is a public purpose, but they are going
4    to ask for money.

5        The overlay is that if Meta buys it, if Meta is the
6    buyer, we are going to have the antitrust concerns that
7    Ms. Schakowsky was talking about. And clearly, that could
8    affect the value, right, of what they get?

9        So I don't know if you have any preview for me of what
10   we are looking at in terms of the litigation we are going to
11   see and how this plays out, whether it is after a sale or
12   before a sale. What can you tell us about that?

13       Mr. Newman. It is a great question.

14       Mr. Peters. Thank you.

15       Mr. Newman. So, first of all, I did meet with the civil
16   litigators before coming here specifically in reference to
17   that line of questions.

18       And I did -- and one of the things that they told me is
19   that, first of all, there is a long doctrine of regulatory
20   takings and whether or not regulatory takings create
21   actionable eminent domain and takings clause cases.

22       In general the government wins a lot of those cases,
23   because every regulation has economic impacts on companies.
24   And as long as the regulation has a broader application and
25   purpose, typically that is able to get you past it unless you

1    have completely destroyed the value of the asset.

2        Mr. Peters.  Although in this case, we are depriving

3    ownership.  But go ahead.

4        Mr. Newman.  Well, we are depriving ownership, but in a

5    way that is consistent with how the national security space

6    operates in this area.

7        I do know even from when the time that I clerked on the

8    Supreme Court that the takings doctrine has evolved.  And I

9    am sure that, with their very highly paid lawyers, they will

10   make those arguments.

11       But fundamentally, the Civil Division litigators who

12   have been litigating against TikTok believe that they have

13   good arguments in response to the takings clause questions.

14       Bill of attainder, same thing.  I think the question

15   would be, is this impermissible punishment of the company,

16   among other things?  And we believe that this is not a bill

17   that imposes impermissible punishment.  It imposes an

18   ownership change of this application and similar categories

19   of applications.

20       They will make First Amendment arguments, as was done in

21   the Montana case.  But, again, I think the Federal Government

22   has a much stronger footing.  And foreign actors generally

23   have lesser arguments under the First Amendment than do

24   U.S.-based companies and citizens.

25       Mr. Peters.  So does this get filed the day after it is



1    signed, or do we wait to see if they are able to sell it?

2         Mr. Newman.  I would think that when this gets signed,

3    there is a very good likelihood that they will seek to

4    litigate.  I also think, though, that they are a for-profit

5    company and they will want to also explore having a buyer for

6    the platform.

7         I have been among the people directly negotiating with

8    the company, and I think the company has an incentive to

9    sell.  Whether the Chinese Government will accede to that

10   right away I think is a separate question.

11        Mr. Peters.  And how does the antitrust issue play into

12   the litigation if the buyers are Meta and Google?

13        Mr. Newman.  My understanding is whichever company would

14   buy this would have to satisfy the antitrust regulators, as

15   would occur in an ordinary case.

16        Mr. Peters.  Assuming that we don't want Meta, who has

17   got Reels as the only competition, to be the buyer, and we

18   have raised, as a country, some antitrust objection to

19   potentially void the sale, how does that affect the

20   litigation?

21        Mr. Newman.  I don't know that that helps TikTok's claim

22   that this is a taking, because every large company is subject

23   to antitrust laws if it wants to sell itself to another

24   buyer.

25        But I do think, to your point, that it will be important

1    that whoever buys it is able to satisfy the antitrust

2    regulators that they have complied with U.S. antitrust laws.

3         Mr. Peters. All right. Well, it will be interesting to

4    see. But I really sincerely appreciate your work, and it has

5    been very professional and helpful. Thank you.

6         I yield back.

7         The Chair. The gentleman yields back.

8         The chair recognizes Mr. Dunn for 5 minutes.

9         Mr. Dunn. Thank you very much, Madam Chair. And let me

10   thank the ranking member as well for this hearing. It is an

11   important subject. It is complicated subject matter.

12        And as an aside, I would like to say I was stunned by

13   Representative Cardenas' story of the deepfake phone call

14   supposedly from his son.

15        So the first question, FBI, DOJ, one of you, are there

16   any true smoking guns evidence of TikTok targeting,

17   manipulating, blackmailing U.S. citizens with the data that

18   they collect?

19        Mr. Grover. I am sorry. Could you repeat the question?

20        Mr. Dunn. Sure. Any true evidence, I mean hard

21   evidence of blackmail, targeting, manipulation of American

22   citizens by TikTok or other similar applications?

23        Mr. Grover. ██████████████████        ██████████  █

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

1

2    Mr. Dunn. So my follow-up question would be to ODNI.

3 It is the same question about military personnel, because we

4 know they have a high interest in military personnel.

5    And I with alarming regularity get notifications that my

6 military record has been hacked again and again and again.

7    Is there anything you notice?

8    ODNI.

9

10

11

12

13

14

15

16

17

18

19    Mr. Dunn.

20

21    ODNI.

22

23

24    Mr. Dunn. FBI, we mentioned this earlier, alluded to

25 minors' use of TikTok. What do you think are the greatest



1    risk, briefly, the greatest risk to minors using TikTok at

2    this time?

3         Mr. Grover.

4

5

6

7    but kind of the broader risks to minors would be outside of

8    my purview.

9         Mr. Dunn.  I guess I am fortunate I am old enough,

10   because there were no cell phones when I was growing up.

11        ODNI, what CCP maneuvers can we expect following

12   implementation of this law so that they can continue their

13   collection and use of United States citizens' data?

14        ODNI.  That is a great question.

15

16

17

18

19

20

21

22

23        Mr. Dunn.  Did you want to add to that?

24        Mr. Newman.

25

1 

2 

3 

4 

5 

6      Mr. Dunn. So in the last year I have been added to the

7    Select China Committee and the Artificial Intelligence

8    Committee. And I have to tell you, the conjunction of those

9    two and the threat that TikTok and similar applications

10   present are magnified by my participation in both of those

11   committees.

12 

13 

14 

15 

16 

17   But I thank you very much, gentlemen, for your service,

18   and thank you for taking time to be with us today.

19      Madam Chair, I yield back.

20      Mr. Latta. [Presiding.] Thank you. The gentleman

21   yields back.

22      The chair now recognizes the gentleman from Florida's

23   Ninth District.

24      Mr. Soto. Thank you, Mr. Chairman.

25      Thank you all for being here.



1        I believe the two bills do strike that right balance.

2     We need to protect Americans.  We need to protect our

3     national security, our democracy.

4        We also need to protect access to a popular app called

5     TikTok, which millions of Americans enjoy, along with

6     Facebook and X and so many others.

7        Since today we are helping establish the record, it

8     would be great to hear from Justice, why isn't this a bill of

9     attainder, for instance?

10        Mr. Newman.  So, first of all, I think the bill of

11    attainder clause is about impermissible punishment, and we do

12    not view this as a punishment in the same way we do not view

13    this as a ban.

14        It requires a divestment to a different owner, which is

15    the same remedy that exists, for example, under CFIUS.  There

16    are also some other technical arguments that I know we are --

17        Mr. Soto.  Consider this your oral argument practice

18    here.  Why is it not an ex post facto law?

19        Mr. Newman.  I think ex post facto would suggest that

20    there is a criminal aspect to this.  That is a clause that

21    applies to the criminal law.  Again, there is nothing

22    criminalizing about this bill, and it doesn't apply

23    retroactively to conduct that predates the enactment of the

24    bill.

25        Mr. Soto.  Why wouldn't this be a taking, do you think?



1       Mr. Newman.  A taking -- there are a number of different
2       categories of taking, but one of them would have -- a
3       regulatory taking typically involves complete and total
4       destruction of the value of the asset, which is not the case
5       of what this bill would accomplish.

6       There are also other arguments about especially foreign
7       buyers and foreign investors and how much they are even
8       protected at all by the Fifth Amendment takings clause in
9       this context, given that it is a foreign parent owner of the
10      asset.

11      Mr. Soto.  And why isn't it a First Amendment violation?
12      Mr. Newman.  So, first and foremost, it goes back to the
13      point that there is nothing being banned here.  There is
14      simply a requirement to change ownership to a responsible
15      owner.  So if you are not banning anything, I think that is a
16      very different proposition under the First Amendment.

17      It is also the case that the company, ByteDance, I think
18      its First Amendment interests are pretty limited.  The users
19      of ByteDance and -- the users of the TikTok platform have
20      rights, but, again, those rights are not infringed by
21      something that regulates the ownership of the app on which
22      they are transacting.

23      Mr. Soto.  Would this bill apply to any other companies
24      similarly situated right now?

25      Mr. Newman.  This bill directly applies to TikTok and

1    ByteDance, and then it provides a process that would have to

2    be set up by the executive branch to determine if any other

3    companies meet the criteria that is targeted and specified in

4    the bill.

5        Mr. Soto.  And you had testified already, while there is

6    no exact modern day example or parallel, Huawei gives us

7    actually a more extreme measure we had to take. ▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  And we are not even requiring an

10   elimination of TikTok.  We are simply requiring a change of

11   ownership.

12       So would you say this is actually a less strict remedy

13   than we had to do with Huawei?

14       Mr. Newman.  I think it is a more targeted remedy

15   because it could be accomplished simply by a change in

16   ownership, whereas Huawei you have to pull it out of the

17   telecom infrastructure in its entirety.

18       Mr. Soto.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24       We will start with our national security folks, go to

25   Justice, and then the FBI.

105

1       ODNI. ███████████████

2       Mr. Grover. █████████████████████   ██████████

3       ████████████████████████████████████████

4       Mr. Soto.  Any opinions by Justice?

5       Mr. Newman.  I think we have seen some outside experts

6       point to content on the platform that they think is more

7       reflective of anti-Semitic narratives on TikTok than other

8       platforms, ████████████████████████████████.

9       Mr. Soto.  Well, we need some inside experts to look at

10      this as well to the extent that whatever data you have.  I

11      realize you will be able to make an opinion about the

12      fidelity of your conclusions, but a lot of us are seeing well

13      beyond anecdotal evidence that there is already influence on

14      U.S. policy right now, even setting aside elections, based

15      upon the type of -- the number of posts for one perspective

16      versus another that we are seeing.

17      So I appreciate you all agreeing to take that back to

18      your respective offices, because this is something we need

19      you to help analyze to help us form an opinion.

20      With that, I yield back.

21      Mr. Latta.  Thank you.  The gentleman yields back.

22      The chair recognizes the gentleman from Alabama's Sixth

23      District for 5 minutes.

24      Mr. Palmer.  Thank you, Mr. Chairman.

25      Gentlemen, I want to raise some questions about the fact



1    that the Chinese Communist Party bought golden shares in
2    ByteDance, and they were able to appoint one of the three
3    directors, a guy named Wu Shugang. This is a guy who sent
4    out a tweet that said, "I have only one wish, that one day I
5    can cut off the dog head of liberal Chinese people with
6    Western values." He added, "Let the Chinese traitors
7    preaching so-called human rights and freedom go to hell."

8        This guy was also overseeing the regulation of the
9    internet in China. I think he appointed the censor at
10   ByteDance. That is problematic in and of itself. But it
11   should also be noted that the laws under the People's
12   Republic of China permit the CCP to have access to the data
13   that ByteDance collects.

14       Their 2017 National Intelligence Law compels private
15   entities and individuals to cooperate with state intelligence
16   work. Specifically, Article 7 of the law declares that any
17   organization or citizen shall support, assist, and cooperate
18   with state intelligence work, according to the law.

19       I think this is where it starts to become problematic,
20   because -- and I see you guys nodding -- we really haven't
21   addressed what the bigger issue is here, and that is, in
22   terms of a threat to our national security, TikTok may be
23   identified separately from ByteDance, but in terms of how the
24   CCP sees them, they are one.

25       Would you agree with that?

1    Mr. <u>Newman.</u> I would agree that ByteDance is a wholly
2    owned -- I believe wholly owns TikTok and that ByteDance has
3    very strong ties to the Chinese Communist Party.

4    Mr. <u>Palmer.</u> ByteDance contains an internal corporate
5    CCP committee, through which they exercise influence over
6    that company and other companies, because they have done with
7    this other companies as well.

8    And I have forgotten your name from the FBI. You are
9    nodding and kind of grinning. So would you like to address
10   that?

11   Mr. <u>Grover.</u> Which aspect, again? I am sorry.

12   Mr. <u>Palmer.</u> Well, the fact that this idea that -- and
13   the CEO of TikTok came in and testified, and I do believe
14   that he misrepresented things. I think he lied to Congress.

15   There is no question in my mind that the CCP exerts
16   control over TikTok. Their law requires it. And then here
17   there is another statement from the Department of Justice
18   filing against TikTok in 2020 that ByteDance contains an
19   internal corporate CCP committee through which they exercise
20   influence at the company.

21   And even more problematic, there are 300 current TikTok
22   or ByteDance employees with ties to Chinese state media that
23   are both employed by ByteDance and TikTok and official
24   Chinese propaganda arms at the same time.

25   Mr. <u>Grover.</u> We would absolutely agree with Mr. Newman

1    in terms of the connection between the CCP and PRC Government
2    with ByteDance, and then obviously down through the chain to
3    TikTok.

4
5
6
7
8
9
10
11

12       Mr. Palmer.  This is precisely the reason that TikTok
13   needs to be divested, because as long as they are part of
14   ByteDance this is going to be a problem.

15       What most concerns you about what TikTok is collecting,
16   and do you or the Federal Government know what TikTok is
17   sharing with the CCP?

18       And part of this is they are getting about -- they are
19   collecting about -- an enormous amount of data.

20
21
22
23

24       So I would like for you to respond to that, all three of
25   you, if you have something you want to say about it.



1    Mr. <u>Grover.</u> I can go first. I think for us, it would

2

14    Mr. <u>Palmer.</u>

15

16                                                                        f

17

18    Go ahead, Mr. Newman.

19    Mr. <u>Newman.</u> One of the things that I learned from my IC

20    colleagues was that

21

22

23    You saw China's responsibility for the OPM hack, for

24    example, some years ago.

25



6      <u>ODNI.</u>  I would just add two things, because I think the

22      Mr. <u>Palmer.</u>  My last point on this --

23      Mr. <u>Latta.</u>  I am sorry.  The gentleman's time has

24  expired.

25      Mr. <u>Palmer.</u>  Okay.  Thank you, sir.



1     Mr. Latta. The chair now recognizes the gentlelady from
2     Washington's Eighth District for 5 minutes.
3          Ms. Schrier. Thank you all for your work on our
4     national security and all of your great answers today.
5          I was going to tee off a little bit of Mr. Soto's
6     comments but tie that to election a little bit.
7          Tell me if I am wrong on this. 2016, I think there was
8     plenty of evidence of Russian meddling and releasing
9     information and spreading disinformation and maybe amplifying
10    things that would divide the country and make us hate each
11    other. Can you confirm that, maybe?
12         Mr. Newman. In multiple elections of recent elections,
13    the intelligence community has put out reports that highlight
14    efforts to sow division and divisive narratives by foreign
15    adversaries, including --
16         Ms. Schrier. I wanted to just confirm that for the
17    whole room.
18         2020, I remember getting a briefing, probably on Zoom or
19    the phone,
20
21
22
23         There was -- again, correct me if I am wrong. Okay.
24    Then we had a secret briefing, so I have no notes. I have
25    very unclear recollection. But there was a secret

112



7      Is that confirming?  Maybe you don't know.  Do you

8  recall that?

9      Mr. Grover.                                                      

10                                    That is worked out of a different

11  shop for us.

12      Ms. Schrier.  Okay.

13

14

15

16      But now, as Darren was talking about, we have got this

17  Israel-Gaza thing, Rutgers.  Do any of you off the top of

18  your head have the numbers about the difference between

19  anti-Israel, pro-Palestinian/Gaza on TikTok versus Instagram

20  and other social media, like off the top of your head?

21      Mr. Newman.  I am familiar with the general study, but

22  not the specific numbers.

23      Ms. Schrier.  Okay.  I will look up the Rutgers study.

24  Again, no devices here.

25      But it seems like right now that is certainly dividing



1    our party like crazy.  It is causing all kinds of civil

2    discord.  It could easily sway this election, I mean, among

3    other things.  If masks potentially could have swayed the

4    last one then this could sway this one.

5        And so I guess one is just your comments about that and

6    how you are looking at that.

7

8        But then the second is, given the actor that Russia is,

9    do we know if China is selling this information or giving

10   this information to Russia for their use?

11       Mr. Newman.  So recognizing that I think my two

12   colleagues don't work in the foreign malign influence space,

13   here is I think what I can say for today.

14

15

16

17

18

19

20

21

22

23

24

25

1      ████████████    ████████████████    ███████████

2    ███████████████████████████████████████

3

4

5

6

7

8

9

10

11      Ms. Schrier.    █████████████    ████████████

12    ██████████████████████████████

13      At some point, off the record or later you can answer a

14    question about what constitutes a safe U.S. buyer, but I have

15    one more question.

16      Let's say this happens, this goes down.  We decide to

17    mandate that it gets sold.  There is divestiture.  Immediate

18    retaliation.  Like, do they stop buying our agriculture

19    products?  Do they suddenly release a storm of information

20    about people?  Like, do you anticipate -- maybe they just

21    release all the information to Russia.  They could hurt us in

22    a lot of ways right away.

23      Mr. Latta.  Could you answer the question briefly for

24    Ms. Schrier?

25      ODNI. ██████    ████████████████████



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
```

12      Ms. Schrier.  Thank you.  Yield back.

13      Mr. Latta.  Thank you.

14      The chair recognizes the gentlelady from Arizona's

15   Eighth District for 5 minutes.

16      Mrs. Lesko.  Thank you, Mr. Chair.

17      As you said, this legislation specifically calls out

18   TikTok and ByteDance.  I don't know the reason for that, if

19   that was political or legal.

20      And so my question is, is it helpful or hurtful legally

21   to name the company instead of just broadly rejecting all

22   companies that would do something egregious?

23      Mr. Newman.  From a litigation perspective, naming

24   companies gives another argument that they could raise in

25   litigation.  But just to reinforce what I said before, our

1    litigators stand ready to defend the bill in court.

2        Mrs. Lesko. So I think what you said is that legally,

3    as far as them suing, it would legally be better if we just

4    generically address the situation instead of naming a

5    particular company. Did I hear you correctly?

6        Mr. Newman. If you looked at it narrowly through the

7    lens of litigation, I think there are some additional

8    arguments we will have to contend with because the company is

9    named.

10        But just to go back to something that was asked earlier,

11    there are examples in other contexts, like Federal

12    acquisitions, where companies like Huawei, Kaspersky, and

13    others are named in legislation and they are not able to

14    prevail on bill of attainder and some of the other arguments

15    we have heard. And so I think we stand ready to respond to

16    those.

17        Mrs. Lesko. And I need some clarification on this

18    legislation. Would it just apply to TikTok and ByteDance, or

19    does it apply to any similar company from an adverse nation?

20        Mr. Newman. It applies directly to TikTok and

21    ByteDance, and it authorizes the executive branch to develop

22    a process to determine that other companies meet similar

23    characteristics with a series of criteria.

24        So it wouldn't automatically apply to any other

25    entities, it would only apply to those two, but there would



1    be an authority to designate other entities if they met the

2    criteria of the legislation.

3        Mrs. Lesko.  Thank you.

4        My next question is, when did India ban TikTok and how

5    did they do it and did they publicly say it was for national

6    security reasons?  Do any of you know?

7        Mr. Newman.  I am not an expert on their legislation.  I

8    do know that India and China have a very complicated

9    relationship across many vectors.  And I know that in recent

10   years they have taken increasing actions to make TikTok

11   unavailable in India.

12       Mrs. Lesko.  And can you repeat which countries would

13   qualify as a foreign adversary in this legislation?

14       Mr. Newman.  So this legislation cross-cites to a

15   specific statutory provision --

16       Mrs. Lesko.  Right.

17       Mr. Newman.  -- that involves four countries.  The

18   countries are China, Russia, Iran, and North Korea.

19       Mrs. Lesko.  And I have a couple minutes left, so I am

20   going to ask you a question totally unrelated.

21       My experience in buying cameras, cameras at my home,

22   they are all made in China.  Most of them are all made in

23   China.  My husband had witnessed that they called back to

24   China.  And so even NDAA-approved cameras inside our house,

25   outside our house were made in China.  He has set up an inner



1    loop so that it does not call back to China.

2         Have any of you investigated this at all?  Do you know

3    anything about what I am talking about?

4         Mr. Grover.

5

6

7

8

9

10

11

12

13        Mrs. Lesko.  And who would I talk to?  Who would I call?

14   Who would my office call to find out more about this?  Would

15   it be the FBI?  Who do I call?

16        Mr. Grover.  I would certainly encourage you to call the

17   FBI directly if it is a concern for your personal situation

18   as well.

19        Mrs. Lesko.  Well, my husband likes gadgets and things

20   like that, and he has said like all the cameras are made -- I

21   don't know if all of them -- but a majority of the cameras

22   are made in China and that they did call back.  They called

23   back to China.

24        And so that would be a huge national security risk if

25   they are collecting data inside our homes.  But thank you.



1          Mr. Latta. Thank you. The gentlelady yields back.

2          Mrs. Lesko. I yield.

3          Mr. Latta. Thank you very much.

4          And the chair recognizes the gentlelady from

5     Massachusetts' Third District for 5 minutes.

6          Mrs. Trahan. Thank you, Mr. Chair.

7          And thank you to the panel. This has been super

8     informative, illuminating all of the above.

9          I am actually going to focus on the second bill, not the

10    main event, the Protecting Americans' Data from Foreign

11    Adversaries Act.

12         Is there anything in that bill that would protect

13    against a middleman that could buy the data and transfer it

14    to a foreign adversary?

15         Mr. Newman. I probably would have to look at the bill

16    more closely, but I know the definition of data broker is a

17    fairly broad definition. And my sense would be that if the

18    middleman was inside the United States or subject to the

19    jurisdiction of the Federal Trade Commission under that bill,

20    then they would likely be violating the same provision,

21    because the definition of data broker is one who transacts in

22    data that you, as the actor, did not collect from the --

23    directly from the person who had it. And so that would be a

24    definition that would encompass some of the middle actors

25    that you are talking about.

1    Mrs. Trahan.  Correct.  But there could be a company
2    that is started the day after this bill that is not a foreign
3    adversary, not one of the four you just named, that could be
4    in the business, because this is a direct transfer between a
5    data broker and a foreign adversary.

6        And I just ask that question because I am sure you have
7    examples of how the data coming out of brokers is used to
8    target our intelligence officers, our servicemen and -women.

9

10

11

12

13    Mr. Newman.

14                                        But for the question you
15    raised, the executive order that was enacted, that was signed
16    into law and the rulemaking process contemplates a
17    prohibition on directly or indirectly making transfers of
18    such data to foreign adversaries and anticipates that when
19    you are selling data to other middle actors you would get
20    representations and assurances from them that they would
21    commit not to onward transfer the data.

22        Mrs. Trahan.  That is a tough one to enforce.  I mean,
23    this is a cut-and-paste.  So if you are -- we are having
24    issues sort of patrolling that today, those transfers, how do
25    we think we are going to do that if there is a -- there is

1    just a -- I think it is a gaping loophole in the bill as
2    written.
3         Mr. Newman.  I think -- I can speak more to the
4    executive order, which I worked on for some time, ███████
5    ████████████████████████████████████████████████████
6    ████████████████████████████████████████████████████
7    ████████████████████████      ████████████████████████
8    ████████████████████████
9         From DOJ's perspective -- and we have enforcement under
10   the executive order -- even if you can get one hop away and
11   enforce against that actor, that is a useful thing.
12        So if you have a company that is set up, let's say, in
13   UAE that is a proxy company that buys the data and then sells
14   it onward, if they are making false representations and they
15   are selling the data --
16        Mrs. Trahan.  Our data brokers have a credentialing
17   process for that?
18        Mr. Newman.  Well, the sale by data brokers of sales is
19   prohibited if it goes directly to foreign adversaries.  And
20   if they are selling to anybody else, they would have to get
21   essentially reps and commitments that they are not selling it
22   onward.  And if those commitments were false, then there
23   would be potential avenues of investigation that could follow
24   those false statements in furtherance of a violation.
25        Mrs. Trahan.  If an individual could opt out of the



1    collection of data to be used by data brokers, don't you

2    think you would have an internal policy where our IC and our

3    law enforcement and our servicemen and -women would do that

4    tomorrow?

5        ODNI. That is a great question. I am not the best

6    person to answer. I mean, it is a really good question,

7    though.

8        Mrs. Trahan. Well, because then the data is never

9    collected and it is never stored, so it is not at risk for

10   being transferred to anybody.

11       And I imagine the policy of our U.S. servicemen and

12   -women could not be targeted because we would have a policy

13   to just opt out of all that data collection for data brokers,

14   never mind what regular consumers would do.

15       Mr. Newman. To your point, I think there is a lot of

16   overlap between the value of data privacy laws and the

17   national security harms that we are worried about with

18   respect to specific populations, such as servicemembers and

19   IC personnel. And I think if you had laws like that, they

20   would also have that benefit.

21       Mrs. Trahan. Look, I think we all on this committee, we

22   are on the record as wanting a comprehensive privacy law.

23   But absent that, we know that this type of data could be used

24   for blackmail and worse.

25       And so if we are going to sort of mark up and eventually



123

1     vote on a bill today, I want it to be foolproof so that it is
2     not stored or at risk of being transferred.
3          Would you agree that that is a better option?
4          Mr. Latta. Could you answer the gentlelady very
5     quickly? Her time has expired.
6          Mr. Newman. We would be happy to work with you at any
7     technical assistance that you think would make sense to
8     further address your concerns.
9          Mrs. Trahan. Thank you.
10         Mr. Latta. Thank you. The gentlelady yields back.
11         The chair now recognizes the gentleman from Texas'
12    Second District for 5 minutes.
13         Mr. Crenshaw. Thank you, Mr. Chairman.
14         Thank you all for being here.
15         I think by intuition we understand what the threats are
16    from China and what their potential intentions are.  And
17    those intentions have to do with their doctrine of
18    unrestricted warfare, which includes nonmilitary warfare,
19    psychological warfare, media warfare, cultural warfare.  This
20    is part of their extended domain view, which adds different
21    domains to conflicts.
22         And so I think we rightfully look at TikTok as quite the
23    tool should they choose to use it and something that we are
24    envious of even.
25

124



1    My question is, do we have any -- and I think I know the

2    answer, because you have said it a few times, but I just want

3    to make sure.



4

5

6

7

8

9    ODNI.

10

11

12

13

14    Mr. Grover.

15

16

17

18

19    Mr. Crenshaw.  Yeah.

20

21    ODNI.

22

23

24    Mr. Crenshaw.  Okay.  Yeah.  I mean, a lot of my

25    questions have already been answered.  And I had another

1    really specific one that I have forgotten, so I think I will

2    yield back.  Thank you.

3        Mr. Griffith.  Would the gentleman yield?  Would the

4    gentleman yield to me instead of yielding back?

5        Mr. Crenshaw.  Okay.  I will yield my time.

6        Mr. Griffith.  He said, okay, fine, Mr. Chairman.

7        Mrs. Lesko asked the question -- if I could ask Mr.

8    Newman.  Over here.  Mrs. Lesko asked a question about naming

9    ByteDance and TikTok and then the second tier.

10       My assumption has been -- correct me if I am wrong --

11   that one of the aspects of the second tier, if you didn't

12   name the companies and you just had that second tier to set

13   up the criteria, is that to set the criteria up you would

14   have to follow the APA, the Administrative Process Act, and

15   that that could take a lot of time.  And if you didn't do

16   that correctly, that would be an additional line of

17   litigation that TikTok and ByteDance could bring.

18       So this, while it has negatives, it also has the

19   positives, that you get right into litigation, you argue it

20   out while the Administrative Process Act and the other

21   criteria or the other process is being developed by the

22   executive branch.  Am I correct in that assessment?

23       Mr. Newman.  I am not sure that the entire APA process

24   would dictate how you would have to make the factual

25   determination.

1       But I think your general point is correct, that by
2    Congress having these hearings and then making the findings
3    directly, it obviously happens faster and more definitively
4    than if the executive branch conducted its own review and
5    then made findings.
6       Mr. Griffith.  I now yield back to the gentleman from
7    Texas.
8       Mr. Crenshaw.  Thank you.  I reclaim my time.  I
9    remember the question now.
10       So does this legislation actually ban the app or does it
11    just ban future downloads of the app and updates?
12       Mr. Newman.  It effectively -- if there is no
13    divestment, it would prohibit actors such as the Apple App
14    Store and Google Play and others who would support the
15    distribution and operation of the app.
16       Mr. Crenshaw.  Right.  So it would disappear from app
17    stores for future users, but current users would still have
18    TikTok.  And it does nothing to actually stop the data flow
19    from the app, which is a technical possibility that we could
20    do but that is not what we are doing here.
21       Mr. Newman.  It doesn't do it directly.  I think other
22    actors who would be supporting the data flows would have to
23    look carefully at the bill to decide if they were on the
24    right side of the line.
25       Mr. Crenshaw.  Like telecom companies?

1    Mr. Newman. Right. And there is an exception for some
2    of those actors, but it depends on how the -- the technical
3    way that the app works, I think, who would be subject to it.
4    But, at a minimum, I think the App Store, Google Play, some
5    of the others who they need to be able to reach a U.S.
6    audience would no longer be able to distribute it.

7    Mr. Crenshaw. Right. Well, what do you think AT&T
8    would do if this was passed into law? Have they been
9    consulted? I mean, we have had a lot of conversations about
10   this.

11   Mr. Newman. It is a good question. I think different
12   actors may have different risk tolerance for the bill. But
13   fundamentally, I think the reason everyone is getting calls
14   today from those who TikTok is activating is because I think
15   they are very concerned that if the bill became law it would
16   be very difficult for them to continue to operate their
17   products with a U.S. audience.

18   Mr. Crenshaw. Okay. I hope it is, but I am not sure it
19   would be. Okay.

20   Thank you. I yield back.

21   The Chair. [Presiding.] The gentleman yields back.

22   The chair recognizes Mr. Veasey for 5 minutes.

23   Mr. Veasey. Thank you, Madam Chair.

24   I just have one question for you. I know that a lot of
25   what I have heard -- and I have been in and out, so let me

1   just say that, you may have already touched on this -- but a
2   lot of what I have heard is, as this data is being collected,
3   that it could pose a very serious future threat.

4       For people that are concerned about now -- and of
5   course, you sat through the same, similar type briefings that
6   all of us in here have that talk about how the Chinese think
7   about things long term.  They think about things 5, 10, 15,
8   20 years from now.  But in America we always think about
9   today.  We always think about how something affects us now.

10      And as Members of Congress, we have to go and sell what
11  we are doing to the American public.  So what type of threat
12  are you comfortable telling the American public now how this
13  affects them, and particularly the TikTok users that are very
14  loyal to this particular platform?

15      Mr. Newman.  So first, I would highlight that no one is
16  suggesting that this legislation would end the platform.  It
17  would simply transfer it to responsible ownership.

18      In terms of the risks right now, I think right now the
19  data that people are generating on the app, both public but
20  also private data, is potentially at risk of going to the
21  Chinese Government, being used now or in the future by the
22  Chinese Government in ways that could be deeply harmful to
23  tens of millions of young people who might want to pursue
24  careers in government, who might want to pursue careers in
25  the human rights field, and who one day could end up at odds

1    with the Chinese Government's agenda.  So I think that is a
2    concern right now, because they are generating the
3    information right now.

4        It is also the case that the narratives that are being
5    consumed on the platform, there is a risk right now that
6    those narratives are being affected by the algorithm and that
7    the Chinese Government potentially has the right to censor
8    information that the Chinese Government decides it does not
9    want the American public to know.

10       And when you look at the statistics of the number of
11   young people who, for example, get their news and information
12   from TikTok now versus just 3 years ago, it is striking to
13   what degree those narratives are resonating with young people
14   in America.

15       So, fundamentally, I think the message would be, this is
16   not a ban.  This is something that simply transfers it to
17   responsible ownership.  And there are risks right now of
18   having additional data collected and stored by the Chinese
19   Government for uses in the future.

20       Mr. Veasey.  Yeah.  One of the things that you did say
21   earlier in your testimony is that if they say no to an
22   American company being able to run TikTok USA that they could
23   just say, "We just won't have the platform in America then if
24   that is our only alternative," which would, in these people's
25   eyes, that would be a ban to them.

1        Mr. Newman. It is something that is a scenario to
2    discuss.

3        I think, first, I think that ByteDance the company would
4    be very motivated to find a way to sell the platform. It is
5    worth potentially as much as $100 billion dollars right now,
6    and there are executives and shareholders who would want to
7    see it sold for value.

8        Second, there would be -- in a world in which the
9    Chinese Government acted, I think we have seen in the past
10    that they have been reluctant to dramatically escalate in
11    this space.

12        There have been a number of U.S. legislative actions
13    taken, for example, with respect to Huawei, which was once
14    one of the most successful Chinese companies, to try to limit
15    its presence in the U.S. market and with U.S. consumers.

16        And although China has responded, they have responded in
17    a measured way, because at the end of the day China has a lot
18    of agendas in the world and they, frankly, have many onerous
19    restrictions on our companies inside China.

20        And so it is not clear to me that a restriction on a
21    Chinese company inside the United States would trigger that
22    type of dramatically escalatory reaction.

23        ODNI.
24
25

███████████████

1  ████████████████████████████████████████

2  ████████████████████████████████████████

3  ████████████████████████████████████████

4  ████████████████████████████████████████

5  ████████████████████████████████████████

6  ████████████████████████████████████████

7  ████████████████████████████████████████

8          Mr. Veasey.  Thank you.

9          Thank you, Madame Chair.  I yield back.

10         The Chair.  The gentleman yields back.

11         The chair recognizes Mr. Joyce for 5 minutes.

12         Mr. Joyce.  Thank you, Madam Chair.

13         And thank you for being here today.  I think this has

14     been incredibly informative.

15         I would like some nomenclature if we can, please.

16         Would you currently define TikTok as malware?

17         Mr. Newman.  I don't know if I would go quite that far,

18     ████████████████████████████████████████████████.

19         Mr. Joyce.  If I am on TikTok and I activate that it has

20     access to my photos or has access to my contact list, is

21     TikTok malware?

22         Mr. Newman.  I think lots of apps that operate in a

23     commercial way collect a lot of information.  So the

24     definition of what is malware is probably a little bit in the

25     eye of the beholder.



1

2

3

4

5      Mr. Joyce.

6

7

8

9

10      Mr. Newman.  I think what I would be comfortable saying

11  is that this stops a potential threat that is resident on the

12  phones of 170 million Americans or however many active users

13  there are in any given month, and that is a very significant

14  clear and present danger to the United States.

15                                          , it is a threat of

16  harvesting of data, and it is a threat of pushing or

17  censoring narratives in deference to the Chinese Government.

18      Mr. Joyce.  And I would say, thus,

19

20      So we all recognize that the harvesting of data by

21  ByteDance has on America's sensitive individual data and the

22  use of TikTok.

23      Do you find that any of that potentially could be

24  reversible, or has this done irreparable damage that we are

25  not going to be able to pull back?

133



1    Mr. Newman.

5    ODNI.

9    Mr. Joyce.  So the divestiture that this legislation

10   would do -- and we had the CEO in front of us and many of us

11   feel in a very untruthful dialogue back and forth.

12       So he talked about walling off of American data during

13   his testimony here.  Do you think that with divestiture and

14   allowing ByteDance to be removed and having TikTok owned by a

15   nonadversary, do you think that that walling off can occur?

16

17

18

19

20

21

22

23

24

25

1    [1:19 p.m.]

2        Mr. Newman.  I think if a trusted company bought the

3    platform, they would also want to buy some of the data that

4    exists, that allows the platform to operate, both to train

5    the algorithm and to ensure user experience continues.  So my

6    expectation would be that those assets would be part of the

7    sale that would occur in that event.

8

9

10

11       Mr. Joyce.  That is my question.

12       Mr. Newman.  -- which is a good question -- I think we

13                                              --

14       Mr. Joyce.

15       Mr. Newman.  --

16

17        Mr. Joyce.  That would be done.

18        And then just, finally, how important is it particularly

19    when it comes to medical data?  Individuals are on TikTok.

20    They have access to that data.  Many individuals keep all

21    their medical data, including their medical records, on

22    there.

23        We passed both pieces of legislation.  What threats are

24    currently posed in the space of medical data regarding

25    foreign adversaries being able to hold that data, moving

1   forward as well?

2       ODNI. 

3

4

5       Mr. Joyce.  Right.

6       ODNI.

7

8

9

10

11

12

13

14

15

16      Mr. Joyce.  Do you find anyone would be as interested in

17   that data, whether it would be Russia, North Korea, or Iran,

18   specifically regarding medical data?

19      ODNI.

20

21

22

23

24

25

■

1          Mr. Joyce. I thank you.

2          Madam Chair, my time has expired. I yield.

3          The Chair. The gentleman yields back.

4          The chair recognizes Mrs. Fletcher? Is that right?

5          Mrs. Fletcher. Yes. Thank you.

6          The Chair. Are you next?

7          Mrs. Fletcher. I think so.

8          The Chair. Okay.

9          Mrs. Fletcher. Mr. Veasey came back.

10         The Chair. Very good. Great.

11         Mrs. Fletcher. Thank you. I have gotten used to it,

12    being at the end and batting cleanup. A lot of people show

13    back up.

14         And I just want to thank you all. This has been a

15    really, really, really helpful session I think for all of us.

16    A lot of the questions I had coming in have been answered.

17    But I kind of want to follow up on three things just to get

18    my own sense of clarity on a couple.

19         One, there has been a lot of discussion about the

20    specific naming of TikTok -- this question is for you,

21    Mr. Newman -- the specific naming of TikTok in the bill and

22    whether that is more helpful or less helpful. And it seems

23    like there are legal arguments that can be raised and

24    challenged if it is in there.

25         But to what extent -- I mean, I guess I want to know

1    what you think is better.  There is one setting up the

2    process by which then the administration would have to say

3    TikTok falls under this process, which could potentially with

4    all the questions about Chevron and other stuff this year,

5    how much can the agencies and rulemaking are interpreting

6    sort of.

7         Do you just need the express intent of Congress that we

8    are trying to deal with TikTok here?  Is that more useful to

9    you despite the potential legal arguments that might be made

10    about the bill?

11        Mr. Newman.  I think it is very useful to us, the work

12    that Congress has done.  From a litigation perspective, there

13    are some benefits to giving the executive branch the ability

14    to act, in addition to Congress.  But I also understand that

15    there are some policy reasons and other considerations why

16    Congress wants to act quickly in this space given the

17    national security concerns.

18        Mrs. Fletcher.  And so this could eliminate setting up a

19    process, following the process, and a year from now saying,

20    okay, TikTok falls under the process that we have just set up

21    if we do it now.

22        Okay.  That was one question.  These are going to go in

23    not really sequential order.  I have another question for

24    Jonathan from ODNI, and possibly you may know something about

25    it as well.

1     But I have heard from some colleagues on the select
2     committee that is dealing with this that their own concerns
3     about -- that they have heard concerns not only about the
4     ██████████████████████████████████████████████
5     ████████████████████████████████████████
6     ████████████████████████████████████████████████
7     ██████████████████████████████████████████████
8     <u>ODNI.</u> ████████████████████████████████-
9     Mrs. <u>Fletcher.</u>  Okay.
10    <u>ODNI.</u>  --████████████
11    Mrs. <u>Fletcher.</u>  Okay.
12    <u>ODNI.</u> ████████████████████████████ ████
13    ████████████████████████
14    Mr. <u>Grover.</u> ████████████████████████████
15    ██████████████████████████████████████████
16    ████████████████████████.
17    Mrs. <u>Fletcher.</u>  Okay.  Well, I will say that some
18    members of the select committee have relayed that they heard
19    that concern ██████████████████████████████████ So I
20    don't think it surprises anybody, ████████████████████
21    ████████████████████████████
22    And then my last real question, so we can keep moving
23    before votes, is I think that everybody in here has
24    anticipated and kind of touched on the challenges, the phone
25    calls we are all getting.  I did check.  We are getting them

1    too.  Everybody is getting them.  And there is a

2    sophistication to that as well.  So I think there are a lot

3    of concerns about what we can and cannot say outside this

4    room.  Obviously, this is a classified setting.

5        But can I take it that the unclassified information that

6    we got from the DOJ today about the extent of the threat and

7    national security is something that we can share in framing?

8        And I think it would be helpful for the committee to

9    frame the national security significance and these particular

10   issues because of what we are seeing mobilizing today and

11   into the future.

12       And I think one of my questions is going to be, how do

13   we frame this kind of going forward?  Because I think we can

14   anticipate, and I am interested in -- again, sorry,

15   Mr. Newman, you have been like on the hot seat all day.  --

16   but kind of what you anticipate is the path forward.  I mean,

17   do we anticipate that even if this is passed here, passed in

18   the Senate, signed into law, there are going to be lawsuits

19   challenging the divestiture?

20       Like, what do you see as a reasonable path forward and

21   sort of a realistic timeframe where we have to explain and

22   kind of why this is so urgent?  And coupled with, as a

23   lawyer, I know the sort of slowness of the legal process in

24   getting it resolved, how do we balance those?

25       Mr. Newman.  So, first, with respect to the fact sheet,

1    that is unclassified.  Absolutely it can be shared.  It is
2    not subject to the concerns around classified information.

3       In terms of how this would play out, first of all, I
4    think if this bill passes the House, if it becomes law, it
5    does radically change the negotiating posture between the
6    United States Government and the company.  And I do think the
7    company will be very motivated to want to come to the table
8    with a solution that preserves the value of their asset.

9       So I think one is there could be some kind of negotiated
10   resolution.  I do anticipate that they will also likely try
11   to file litigation.  That is what I think their lawyers are
12   poised to do, and that is what they have suggested.

13      Again, we, our civil division, our litigators would
14   handle that litigation.  And we as a department believe that
15   we have much stronger arguments after this bill becomes law
16   than we have today when we already have litigation with the
17   company that is being held in abeyance in the D.C. Circuit.

18      In terms of the timeframe of how it would play out, it
19   is a little bit difficult to say.  But I do think there is a
20   real urgency to these issues, and I think the company at a
21   certain point would have the same urgency to try to find some
22   kind of solution for themselves in the negotiations if they
23   aren't able to succeed in litigation.

24      Mrs. Fletcher.  Okay.  Thank you.  I have gone over my
25   time.

1    So, Madam Chair, I yield back.  Thank you very much.

2    And thanks to all of you.

3    The Chair.  The gentlelady yields back.

4    The chair recognizes Mr. Weber for 5 minutes.

5    Mr. Weber.  Thank you, ma'am.

6    We have heard about at least one person in this country

7    that owns a 15 percent share of TikTok and, therefore,

8    reluctant to see this go forward.  Do we have a way of

9    knowing how many Americans or we -- can we see that trade?

10   Do we happen to know how many Americans have shares of

11   TikTok?  Do we know that?  Are we able to get that

12   information?

13   ODNI.  I was just going to say, from the intelligence

14   community, ███████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ███████████████████████      But I don't know from the other side.

17   Mr. Weber.  So I assume they are not listed on the

18   New York Stock Exchange, huh?  Do we know that?

19   Mr. Newman.  We don't have the visibility --

20   Mr. Weber.  Your mike is not on.

21   Mr. Newman.  Forgive me.

22   We don't have, I don't have the visibility into the

23   ownership structure to know all of the U.S.-based owners.

24   Mr. Weber.  Would that be beneficial to know?

25   Mr. Newman.  I would certainly be interested to know

1   more about who owns it.  But my assumption is that, as a

2   practical matter, the strongest ownership interest is in

3   China and among individuals who are subject to the

4   jurisdiction of the Chinese Government.

5       Mr. <u>Weber.</u>  Okay.  And this is a little bit afield, pun

6   intended, but the Chinese have been buying land.

7       Anything related to TikTok connection?

8       Mr. <u>Grover.</u>

9

10      Thank you.

11      Mr. <u>Weber.</u>  Okay.  So speaking of TikTok, which I want

12   all my grandkids and even my great-granddaughter to stay away

13   from,

14

15

16      <u>ODNI.</u>



24      Mr. <u>Weber.</u>

25      <u>ODNI.</u>



1

2

3

4

5    Mr. Weber.

6

7

8    ODNI.

9

10    Mr. Newman.  In the context of the negotiations over the

11    future of the company, they have certainly made some

12    presentations about how the algorithm works.

13

14

15    Mr. Weber.  Okay.  And this is probably more of a

16    personal question for all of us perhaps.  Are you all able to

17    monitor any flags that would have a Member of Congress' name

18    associated with an event, either nefarious or otherwise, off

19    TikTok?

20    Mr. Grover.

21

22    Mr. Weber.

23

24

25    Mr. Grover.

144



1
2
3
4    .
5
6
7
8
9
10    Mr. Weber.
11
12    Mr. Grover.
13
14    Mr. Weber.  Okay.
15    Mr. Grover.
16    Mr. Weber.  Okay.  Fair enough.  Let me continue.
17
18
19
20    ODNI.
21
22
23
24
25

5    Mr. Weber.  Forgive the interruption, shortness. ▮

10    ODNI. ▮ ▮

11    Mr. Grover.

15    Mr. Weber.  Okay.  And one last question real quick.

18    Mr. Newman.

146

1    Mr. Weber. Thank you.

2    I yield back.

3    The Chair. The gentleman yields back.

4    Just so everyone knows, votes have been called. We are

5    going to go until 1:50. Then we will break for votes.

6    You will get a break. You have been on the hot seat.

7    The chair recognizes Ms. Barragan for 5 minutes.

8    Ms. Barragan. Thank you.

9    My first question is about the timeline that the bill

10   provides. Considering the difficulty of identifying a U.S.

11   company that can purchase TikTok, can you explain why the

12   bill provides 6 months for ByteDance to divest TikTok rather

13   than a longer timeline, like maybe a year?

14   Mr. Newman. I can't speak to the choices that the

15   drafters made in the bill, except to say, in other contexts

16   in CFIUS, when we have done divestments, we have often been

17   able to accomplish those divestments in 6 months.

18   I agree with you that this is a very significant

19   acquisition that would have to be made by another buyer.

20   Ms. Barragan. Okay. So I have been reading that the --

21   that you all worked with the drafters of the bill, is that

22   accurate, for technical assistance?

23   Mr. Newman. We provided technical assistance I think

24   largely with an eye toward litigation-related risks and

25   legal.



1    Ms. Barragan.  Okay.  Was the timeline -- do you know if
2    the timeline was discussed at that time, the 6 months or
3    longer?

4    Mr. Newman.  In versions that I saw, the timeline was
5    open for a period of -- for a number of drafts.  It was not
6    actually spelled out in the document.  So I am not sure that
7    we provided specific assistance on that, but I can have our
8    leg team let you know.

9    Ms. Barragan.  Okay.  The next question is, the bill
10   defines foreign adversary-controlled application as a
11   application that is operated by, one, a company controlled by
12   a foreign adversary and then, two, that is determined by the
13   President to present a significant threat to the United
14   States.

15   Do we need to have both of those for this to go into
16   effect?  Do you need to have a foreign adversary and does the
17   President have to determine that there is a significant
18   threat?

19   Mr. Newman.  That is my understanding of how the bill
20   operates, is that in order to identify and designate
21   additional applications that would be subject to this bill,
22   there would need to be both a finding of national security
23   harm and a finding that it meets the criteria of being a
24   covered application within the meaning of the statute.

25   Ms. Barragan.  So hypothetically speaking, let's say

 1    TikTok was Russian owned and it is a foreign adversary, but
 2    we had a President in the White House that didn't really
 3    think Russia was a threat and, therefore, determined that
 4    TikTok was not a significant threat, this would not kick in,
 5    right, because you would have to have the President determine
 6    it is a significant threat?  Is that accurate?

 7        Mr. Newman.  It is accurate that for entities other than
 8    TikTok and ByteDance, there would need to be a determination
 9    by the executive branch.

10        Often when the President is referenced in statutes, what
11    will happen is there will be some kind of executive order and
12    rulemaking process that will give different executive branch
13    agencies the ability to make those determinations.

14        Ms. Barragan.  Okay.  Jonathan, earlier -- I don't know
15    if you can remember the context.  Very early on in the
16    hearing you made a comment.  You looked down and you -- looks
17    like you were reading something.  ▆▆▆▆▆▆▆▆▆▆▆
18    ▆▆▆▆▆▆▆▆.

19        Do you remember what that reference was to so I can get
20    clarification? ▆▆▆▆▆▆▆▆▆▆▆▆▆
21    ▆▆▆▆▆▆▆▆▆▆▆▆
22        ODNI. ▆▆▆▆▆▆▆▆▆▆▆▆
23    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
24    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
25    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆



5    Ms. <u>Barragan.</u> Okay. So you have no memory of the -- I

6    just wrote "███████████████," and I thought it was in

7    the context of talking about the threat or specific examples.

8    It was very early on in like the first few questions of the

9    hearing. If you find it, if you will just come back to me,

10   that would be helpful.

11   <u>ODNI.</u> Yep.

12   Ms. <u>Barragan.</u> I meant that to understand that you just

13   ████████████████████████████████  ████  ██

14   ███████  █████████████  ████████████████

15   ███████████

16   But did I misunderstand that?

17   <u>ODNI.</u> ███████████████████████████

18
19
20
21
22

23   Ms. <u>Barragan.</u> Okay. My last question is, FBI, DOJ, you

24   guys are currently, I have been hearing, that you are

25   ████████████████████████████  Is that

1    right?

2          Mr. Newman.  We certainly are expending a lot of

3    energies in looking at the threat of the Chinese Government.

4    

5    

6    

7          Ms. Barragan.  Okay.  So what the --

8          Mr. Newman.  -- on that basis.

9          Ms. Barragan.  Okay.  Thank you.

10          The question, because I am running out of time here, if

11    there is a cut to your budget, DOJ and FBI, is that going to

12    impact your ability to do your job on TikTok and these

13    foreign adversaries?

14          Mr. Newman.  If there is a cut to the national security

15    division's budget, it would affect broadly our ability to do

16    lots of things involving the Government of China and its

17    technology, correct.

18          Ms. Barragan.  Great.  Thank you.

19          I yield back.

20          The Chair.  The gentlelady yields back.

21          The chair recognizes Mr. Balderson for 5 minutes.

22          Mr. Balderson.  Thank you, Madam Chair.

23          Jonathan, do you want to answer the question?  So I will

24    give you that time.

25          ODNI.  Thank you.  Yeah, we found the point you are

1    referencing.

2

3

4

5

6

7         Mr. Balderson.  Madam Chair, I apologize.  I did not go

8    through the chair.

9         Thank you all.

10        And since my great colleague from Massachusetts brought

11   up my data broker's piece and the middleman, I am going to

12   shift and go complete opposite here, get away from ByteDance.

13        But, Brent, I guess it is going to be you predominantly

14   here from the FBI.  And so let's stick on the China stuff.

15   Let's stick on the data collection they do.

16        A solar panel company that is 49 percent owned by China

17   and 51 percent owned by the U.S. just opened up in the

18   congressional district that I represent.  I am concerned

19   about that, and the community is very concerned about that.

20   It has really brought an uproar here recently.

21        Mr. Walberg also has a Ford Motor battery plant that is

22   going in his district, and I don't want to speak for him

23   because he is not here, but that is also a partnership with

24   China.

25        I mean, I am concerned the solar manufacturing facility

1  could be learning sensitive information about our grid.  I

2  understand this is a hearing focusing on the ByteDance.

3  Where do we draw the line here in this country as far as

4  having a 49 percent China-owned solar manufacturing company

5  and a 51 percent owned U.S. company here?

6    Mr. Grover.

153



8    Mr. Balderson. Any ideas or thoughts I should tell the

9   constituents where this facility is located?  I mean, just

10   tell them that, I guess?

11    But, I mean, and the hard part also was it really wasn't

12   talked about amongst the deal.  You know, there -- yeah,

13   China partnership, maybe, but not 49 percent partnership.

14    So okay.  Thank you.

15    Now go ahead, Jonathan.

16   ODNI.

17

18

19

20

21    Mr. Balderson. Yeah, that is on my list.  I am going to

22   go down that path.

23   ODNI.

24

25

1

2

3

4      Mr. Balderson. Would that access be -- would that

5   information be allowed to come to us also as Members of

6   Congress?

7      ODNI. I can talk with --

8      Mr. Balderson. Okay.

9      ODNI. -- OLA about that.

10     Mr. Balderson. Thank you very much.

11     Madam Chair, I yield back.

12     Does anybody want my extra time?

13     Madam Chair, I yield back.

14     The Chair. The gentleman yields back.

15     You don't have any questions.

16     The chair recognizes Mr. Fulcher for 5 minutes.

17     Mr. Fulcher. Thank you, Ms. Chairman, and the panel.

18     This question goes to anybody on the panel that might

19   want to address it, and it is on a related note. But let's

20   take a hypothetical situation. You got a third-party data

21   broker in a friendly country, not the U.S. but a friendly

22   country. And that third-party data broker is actually a

23   front for an adversarial government.

24     Is there, from your vantage point, anything in this --

25   these pieces of legislation that might add to the toolbox to

1    address that, or is that something we need to take up in a

2    totally different set of language?

3        Mr. Newman.  So as I read this bill, if it were outside

4    the United States and it was an entity that was not within

5    the definition of data broker, then it wouldn't be covered by

6    the bill.

7        When we -- when we put in place the executive order, we

8    have language about directly or indirectly providing that

9    data to an adversary country, and we have other ways to try

10   to deal with those kind of intermediary issues.

11       Mr. Fulcher.  Okay.  So but this probably wouldn't cover

12   it, or you think it probably would?

13       Mr. Newman.  My understanding of the bill is that it

14   appears to be principally focused on direct transfers between

15   those who meet the definition of data brokers and adversary

16   countries.

17       Mr. Fulcher.  Okay.

18       Mr. Newman.  So you would need to have both of those

19   present.

20       Mr. Fulcher.  Okay.  Got it.  Thanks.

21       So on a related note, previous hearing in this committee

22   we talked about --

23

24

25



156

1    Same question.  In that context, does this add anything

2    in the toolbox for those circumstances?

3    Mr. Newman.  So, certainly, those threats go beyond what

4    this bill is focused on.  I do think that the threat of what

5    ██████████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ████████████████████████████    ██████████████

8    █████████████████████████████████████████████████

9    █████████████████████████████████████████████  █

10   ████████████████████████████████

11   Mr. Fulcher.  I realize this is a little bit off of that

12   subject, but I just -- I wanted to for the record just try to

13   get an understanding.

14   Moving on.  It is my understanding that China has a

15   cybersecurity law of 2017 they put in place.  It allows,

16   among many things, the Chinese Government to conduct remote

17   inspection of computer networks.

18   Is this your understanding?  Is this your understanding

19   to be true?

20   ODNI.  Yes.  So we see -- what we see is ███████████

21   ████████████████████████████    ████████████

22   ████████████████████████████████████████████████

23   ██████████████████████████████████████████████

24   ██████  ████████████████████████████████████

25   Mr. Fulcher.  Okay.  So I am going to go back to the

1    previous question.  Given that context, anything in this
2    legislation that might add to the toolbox for that?
3        I am just trying to find the guidelines of where we got
4    to go next, because --
5        Mr. Newman.  I don't think this directly --
6        Mr. Fulcher.  Okay.
7        Mr. Newman.  -- addresses --
8        Mr. Fulcher.  All right.
9        Mr. Newman.  -- those issues.
10       Mr. Fulcher.  Very good.
11       Madam Chair, I know we are on a time crunch.  I have got
12   more, but I am going to go on the record elsewhere.
13       I yield back.
14       The Chair.  The gentleman yields back.
15       The chair recognizes Mr. August Pfluger for 5 minutes.
16       Mr. Pfluger.  Thank you, Madam Chair.
17       And thank you all for testifying in front of my
18   subcommittee on Homeland Security.  That was extremely
19   helpful.
20       I want to get right to the point on the heating and
21   cooling issue.  And so probably primarily for the two of you,
22   ODNI and DOJ, let's talk about -- but anybody please
23   answer -- let's talk about the heating and cooling.  Have you
24   seen specific instances of industry, of people, of military,
25   geopolitical events, ongoing legal cases that TikTok has

1    weighed in and has used heating or cooling to change the

2    outcome, to influence the outcome like they are doing today

3    against lawmakers?  Have you seen other instances of that?

4        ODNI.

5

6        Mr. Newman.

7

8

9

10

11

12

13

14

15

16

17

18

19

20        Mr. Pfluger.  Does Christopher Wray still maintain that

21    the platform can be used as a manipulative arm of the CCP?

22        Mr. Grover.  Yes.  And I think we have established here

23    just some of those vectors and how that would kind of take

24    place.

25

1

2          Mr. Pfluger.  I appreciate the great testimony today,
3    and I yield back.
4          The Chair.  The gentleman yields back.
5          The chair recognizes Mrs. Harshbarger for 5 minutes.
6          Mrs. Harshbarger.  Thank you, Madam Chair.
7          Thank you guys for being here today.
8          I guess our bill does not apply to e-commerce companies.
9    And my question is, TikTok allows e-commerce on their app.
10   Could ByteDance simply sell the social media part of the app
11   and maintain the e-commerce component?
12         Mr. Newman.  I think ByteDance could try any number of
13   things to attempt to evade the bill, and I would have to look
14   more at the findings that are made.  I think as long as it
15   was still ByteDance, the entity, and TikTok, the entity, I
16   think they would have a problem, given the way the bill is
17   structured.  But they might try any number of ways --
18         Mrs. Harshbarger.  Yeah.
19         Mr. Newman.  -- to try to evade the bill.  And that is
20   why it was important there be follow-on authority that the
21   executive branch could use to designate other companies.
22         Mrs. Harshbarger.  I guess something you said earlier.
23   How do we determine that there has been a bona fide
24   divestment of TikTok, and how do we determine, I guess, a
25   bona fide buyer?  Because the bill requires that, in

1    coordination with all executive branch agencies, including
2    the National Security Agency and the Committee on Foreign
3    Investment in the United States, the President will determine
4    if TikTok is divested completely.

5        You mentioned that you would have to sit up a list of
6    criteria.  Do we not have that, I guess, criteria already?

7        Mr. Newman.  So as a practical matter, what I think
8    would happen is that when the President is given those kinds
9    of authorities in the bill, they would need to set up,
10   usually using an executive order or some kind of rulemaking,
11   a process for determining that the criteria of the bill had
12   been met.  And the best probably template for doing so would
13   be the process we have for determining that a divestment has
14   occurred that meets the requirements of CFIUS.

15       Mrs. Harshbarger.  So we would have to do that after the
16   bill is passed?

17       Mr. Newman.  Well, the executive branch would have to do
18   that, I guess --

19       Mrs. Harshbarger.  The executive branch.

20       Mr. Newman.  -- would have to set it up to make that
21   determination --

22       Mrs. Harshbarger.  Okay.

23       Mr. Newman.  -- as we do in the CFIUS context.

24       Mrs. Harshbarger.  We have four foreign adversary
25   entities listed in our legislation.  And my question is, how

1      or would you inform the committee if other foreign entities

2      who should be added to the list would be added, and would we

3      have to alter the bill in its current state?

4          Mr. Newman.  So there is a process set out in the bill

5      for adding entities.  It requires, among other things, a

6      public notice of the Presidential determination that sets out

7      the concern, as well as a public report to Congress that must

8      be submitted 30 days prior to the determination.

9          And so there is both a public piece, as well as a public

10     report to Congress, all of which have to be submitted prior

11     to the time at which the action would take effect.

12         Mrs. Harshbarger.  You mentioned you had seven adversary

13     nations.  Who are the other three?

14         Mr. Newman.  So the exec -- the legislation has four --

15         Mrs. Harshbarger.  Uh-huh.

16         Mr. Newman.  -- using a statutory definition.  The

17     executive order has seven, which also includes Cuba,

18     Venezuela, and -- it may be six.  I think I said seven, but

19     it is at least six that were in the executive order, and

20     there may be a seventh that --

21         Mrs. Harshbarger.  Okay.

22         Mr. Newman.  -- escape me at the moment.

23         Mrs. Harshbarger.  All right.  And my last question is

24     this:  Do you have any evidence of election interference in

25     this current cycle as of today?

1          ODNI.  On that one, I would have to, again, pivot back

2        to the Foreign Malign Influence Center and the elections

3        coordinator because I am certain they are tracking that and

4        they can probably provide a better briefing than I could.

5          Mrs. Harshbarger.  Maybe we need a briefing on that.

6          Okay.  With that, Mr. Chairman, I -- or, Ms. Chairman, I

7        yield back.

8          The Chair.  The gentlelady yields back.

9          The chair recognizes Mrs. Miller-Meeks for 5 minutes.

10         Mrs. Miller-Meeks.  I thank you, Madam Chair.

11        I thank our witnesses for being here today.

12         My questions are very brief because I think a lot of

13        questions have been asked.  And this is in follow up to

14        Mrs. Harshbarger's question that is there are a lot of

15        e-commerce sites which are actually Chinese owned or Chinese.

16        So whether it is e-commerce, whether it is reading sites,

17        literature sites, and couldn't these sites be used to do the

18        same kind of thing as far as gathering information?  And

19        then, do we continue to follow those or monitor those?

20         Mr. Grover.  I can take this one.  Thank you.  Thank you

21        for the question.

22

23

24

25

1

2

3

4

5

6

7          Mrs. Miller-Meeks.  And then very quick question.  Given

8     what has happened to Chinese tech owners and CEOs of

9     companies, Jack Ma, Ben -- Bao Fan, should Congress -- should

10    we pass this ban here and then pass it through Congress and

11    it is signed into law -- this is a really weird question --

12    but do we need to put Mr. Chow in protective custody?

13          Mr. Grover.

14

15

16

17          Mrs. Miller-Meeks.  I yield back.

18          The Chair.  The gentlelady yields back.

19          The chair recognizes Mrs. Cammack for 5 minutes.

20          Mrs. Cammack.  All right.  We are going for it.

21          You all had said that there is a -- speaking

22

23

24

25

1
2
3
4

5        Now, of course, in the last 24 hours, we have seen how
6    they can absolutely, utilizing geolocation data of their
7    users, pinpoint what congressional district and then freeze
8    the app unless you take an active -- an action through the
9    app itself.  So, I mean, that in itself should be pretty
10   concerning for everyone.

11       And I have gone through the device data accessible on
12   TikTok, and it is interesting because the connection
13   interfaces don't explicitly say -- and I went through their
14   terms of service -- that they can, in fact, use the
15   geolocation data.

16       Is there something from the DOJ side that is going to be
17   able to point to that as a violation of terms of service that
18   we can look into?  Would that complicate what we are trying
19   to do here or would that benefit what we are trying to do
20   here?

21       Mr. Newman.  So it is a good question.

22       If there were some degree of deception in their terms of
23   service --

24       Mrs. Cammack.  If?

25       Mr. Newman.  -- or in the collection of their



1    information, which there may well be, the immediate remedy
2    would probably actually be a remedy by the Federal Trade
3    Commission, which typically handles those types of instances
4    of violations of privacy policies and violations of terms of
5    service.

6         Mrs. Cammack.  Uh-huh.

7         Mr. Newman.  Conceivably, if it rose to the level of an
8    offense, for example, a violation of the Computer Fraud and
9    Abuse Act, 18 U.S.C. 1030, then there might be a basis for a
10   criminal investigation, but it would depend.  I wouldn't want
11   to speculate in a hearing about, you know, that particular
12   fact pattern without more information.

13        Mrs. Cammack.  So and to that point, though, so there
14   was                                             the marketing
15   pixels that are embedded, so kind of like cookies and how you
16   track, right?

17

18                                            Can you speak to that?

19        Because I think that that would be something this
20   committee would be very interested in.  It is one thing if
21   you have signed up and agreed to the terms of service of an
22   app.

23                                    I think that members would be very
24   curious to know that.

25        Mr. Grover.  So I am not an expert on the laws

1    surrounding the use of ad pixels and that technology.

2        Mrs. <u>Cammack.</u>  Right.

3        Mr. <u>Grover.</u>



6        Mrs. <u>Cammack.</u>  Of course.

7        Mr. <u>Grover.</u>

12        Mrs. <u>Cammack.</u>  Okay.  From -- well, and I was looking at

13    some of the timelines.  And there was one thing that I found

14    pretty interesting, and I wonder if there was a direct

15    correlation with the IC community and your visibility into

16    the company and some of the things happening around it.

17        So the founder of TikTok, the parent company ByteDance,

18    in 2017, he had been basically publicly admonished by the

19    CCP.  And they came after him.  He had to issue a public

20    apology and said -- in 2018 -- and said, "I apologize for

21    deviating from" -- and this is a quote -- "socialist core

22    values, and I pledge to ensure that the CCP's voices are

23    empathetically broadcasted."

24        Goes on to talk about all the different ways that they

25    are going to use ByteDance, and gave very specific examples.



1    Then you fast-forward to 2020, and they make a real shift in

2    implementing this.  And I feel like we went dark.

3

4        ODNI.

5

6

7

8

9

10       Mrs. Cammack.  Right.

11       ODNI.

12

13

14

15

16

17

18

19       Mrs. Cammack.  Well, and just as more of a confirmation

20   of my research,

21

22

23

24

25        This seems to be the first case that I have been able to

1    find where the CCP actually appointed someone from the CCP to

2    the board.

3         ODNI.  ███████████████.

4         Mrs. Cammack.  Thank you.

5         ODNI.  ███████████████

6         Mrs. Cammack.  Thank you.

7         With that, I yield.

8         The Chair.  The gentlelady yields back.

9         The chair recognizes Mr. Obernolte for 5 minutes.

10        Mr. Obernolte.  Thank you very much.  Thanks for your

11   patience.

12        Jonathan, we will start with you.  I love the fact that

13   we are using first names.  I think this should be the

14   practice going forward.  Change all of our name tags.  It

15   would be much better.

16        This is an issue I am really struggling with.  You know,

17   on the one hand, I don't think anyone on this dais relishes

18   the prospect of telling 170 million Americans that the

19   government is going to make the decision for them what social

20   media app they use.  The civil libertarian in me shudders at

21   the prospect.  On the other hand, I am absolutely convinced,

22   as you are, that the situation with TikTok and ByteDance

23   represents a latent national security threat.

24        So, for me, the crux of the issue is, how likely is

25   TikTok to exploit that national security threat?  And this is



1    what I wanted to ask you about, because we have talked about

2    the situation with ▮▮▮▮▮.   ▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮

6        And by the way, ▮▮▮▮▮▮▮▮▮▮▮

7    ▮▮▮  ▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9        We talked a little bit ▮▮▮▮▮   And my first

10   question.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12       ▮▮▮   Did TikTok actually do that?

13       Mr. Grover.  ▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮

16       Jonathan, do you have any --

17       ODNI.  I am just looking here.  ▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23       Mr. Obernolte.  Okay.  ▮▮▮▮▮▮▮ ▮

24   ▮▮▮▮

25       ODNI.  Yeah.



1    Mr. Obernolte. All right. Also, you testified earlier

2    that with the situation in ███████  ██████ , ██████

3    ████████████████████████████  ██████████

4    █████████████████████████████

5    ██████████████████████████████

6    ███████  ██████

7    Okay. So this comes down to something that wasn't said

8    today but was said in one of the other classified briefings,

9    that we think that there is a -- ████████████████

10   ████████████████████████████████████████

11

12

13   ODNI. ████████████████████████

14   ████████████████████████████

15   Mr. Obernolte. So, I mean, this is the problem that I

16   have. ████████████████████████

17   ██████████  ████████████████████

18   ██████   Did I misunderstand?

19   Mr. Newman. As one who was there at the previous

20   briefing, I think what was said is ████████████████

21   ████████████████████████████████████████

22

23

24

25



5    Mr. <u>Obernolte.</u>  Sure.

6    Mr. <u>Newman.</u>

9    <u>ODNI.</u>

15    Mr. <u>Obernolte.</u>  Okay.  Last question.  Mr. Newman, we

16    have been discussing this issue of divestiture.  And in

17    answering every question, you have made the assumption that

18    there would actually be a divestiture.

19    And let me challenge that a little bit, because if the

20    premise here is that the CCP would intervene and force

21    ByteDance to do something against their commercial interests

22    in, for example, influencing content in a way that benefits

23    the CCP, I mean, that is not good for ByteDance.  It is good

24    for the CCP.

25    What makes you think the CCP would allow ByteDance to


1    divest?  Because if your goal is to disrupt domestic affairs
2    in this country, it would be much better for them to take
3    TikTok offline, right?  We would have protests, 170 million
4    young people upset at government taking away their rights.
5    You know, why isn't that -- why isn't that something the CCP
6    would do?

7        Mr. Newman.  I think the CCP would face some very hard
8    choices if this bill became law because both answers are bad
9    for them.

10        I think if the app is sold, it takes away something that
11    is a latent threat that they can exploit in the future.  I
12    think if the app is not sold and it is no longer able to
13    operate in the United States, then that could become a model
14    for even more countries to join the United States and India
15    and others in taking action against what is one of the most
16    successful products that the Chinese Government is selling in
17    the sort of virtual ecosystem.  So they would face hard
18    choices.

19        When Huawei, for example, was the subject of a very
20    longstanding U.S.-led campaign to remove it from the telecom
21    infrastructure in the United States and elsewhere, the
22    Chinese Government responded but in a reasonably measured and
23    calibrated way, because they have other irons on the fire and
24    they didn't want to use all of their capital on trying to
25    resuscitate Huawei or signal how strongly they were



1    interested in seeing Huawei survive in the United States.

2         Mr. Obernolte. Okay. Well, I am out of time. I would

3    look more into if that I were you, because if it is only a

4    matter of money, I think the CCP might say, you know what,

5    this disruption that we have caused is worth the loss of the

6    money that we would gain in divestiture.

7         Anyway, I yield back, Madam Chair.

8         The Chair. Thank you.

9         Mr. Newman. Thank you.

10        The Chair. The gentleman yields back.

11        I ask unanimous consent to insert in the record the

12    documents included on the staff hearing documents list.

13        Without objection, so ordered.

14        [The information follows:]

15

16    ******** COMMITTEE INSERT ********

17

18

19

20

21

22

23

24

25

1      The Chair. I remind the members that they have 10

2  business days to submit questions for the record, and I ask

3  the witnesses to respond to the questions promptly.

4      Members should submit their questions by close of

5  business on March 21st, 2024. However, I remind members and

6  witnesses that today's hearing was a classified executive

7  session. Because we transmit our questions for the record by

8  email, members should not disclose sensitive information in

9  their questions. And I recommend that you not ask the

10  witnesses for information that may be sensitive. Likewise, I

11  ask the witnesses not to provide sensitive information in

12  their responses to any questions for the record.

13      Without objection, the committee is adjourned.

14      [Whereupon, at 2:05 p.m., the committee was adjourned.]

15

16

17

18

19

20

21

22

23

24

25