ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024

No. 24-1113 (and consolidated cases)

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

———

TIKTOK INC. and BYTEDANCE LTD.,

*Petitioners*,

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent.*

———

*caption continued on inside cover*

———

On Petitions for Review of Constitutionality of the Protecting Americans from Foreign Adversary Controlled Applications Act

———

## REPLY BRIEF OF PETITIONERS
## TIKTOK INC. AND BYTEDANCE LTD.

———

Andrew J. Pincus
Avi M. Kupfer
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3220
apincus@mayerbrown.com

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

August 15, 2024

Alexander A. Berengaut
  *Counsel of Record*
David M. Zionts
Megan A. Crowley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com

*continued on inside cover*

BRIAN FIREBAUGH, et al.,

*Petitioners,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent.*

————

BASED Politics Inc.,

*Petitioner,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent.*

John E. Hall
Anders Linderot
S. Conrad Scott
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

ARGUMENT ................................................................................. 5

I.    The Act Burdens Protected Speech and Is Subject to Strict Scrutiny ................................................................................ 5

    A.    Petitioners Engage in Protected Speech. ............................ 5

    B.    Strict Scrutiny Applies. ................................................... 9

II.    The Act Unconstitutionally Singles Out Petitioners. .................... 12

III.    The Act Fails Strict Scrutiny. .................................................. 16

    A.    The Court Should Disregard the Government's *Post Hoc* Justifications. ............................................................. 16

    B.    The Government's Arguments Are Legally Flawed and Contradicted by the Factual Record. ................................... 18

        1.    "Covert content manipulation" .................................. 19

        2.    "Data collection" ................................................... 24

    C.    The Act's Exception Confirms Its Extreme Underinclusiveness. .......................................................... 27

    D.    The Government's *Post Hoc* Critiques of the National Security Agreement Fail. .................................................. 29

IV.    The Act Is a Bill of Attainder. ................................................. 33

V.    The Act Is an Unconstitutional Taking. ...................................... 35

VI.    The Court Should Permanently Enjoin the Act, or Temporarily Enjoin It and Appoint a Special Master. .................. 35

CONCLUSION ............................................................................. 37

# TABLE OF AUTHORITIES

CASES                                                                Page(s)

*Agency for Int'l Dev. v. Alliance for Open Society Int'l,*
   591 U.S. 430 (1986) ............................................................... 7

*Arcara v. Cloud Books, Inc.,*
   478 U.S. 697 (1986) ............................................................. 12

*Ashcroft v. ACLU,*
   542 U.S. 656 (2004) ....................................................... 16, 37

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
   591 U.S. 610 (2020) ....................................................... 28, 29

*BellSouth Corp. v. FCC,*
   144 F.3d 58 (D.C. Cir. 1998) ............................................... 33

*Billups v. City of Charleston,*
   961 F.3d 673 (4th Cir. 2020) ............................................... 29

*Bluman v. FEC,*
   800 F.Supp.2d 281 (D.D.C. 2011) ....................................... 21

*Brown v. Ent. Merchants Ass'n,*
   564 U.S. 786 (2011) ............................................................. 26

*City of Ladue v. Gilleo,*
   512 U.S. 43 (1994) ............................................................... 28

*Consol. Edison Co. of N.Y. v. Pataki,*
   292 F.3d 338 (2d Cir. 2002) ................................................ 33

*CPR for Skid Row v. City of Los Angeles,*
   779 F.3d 1098 (9th Cir. 2015) ............................................. 10

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.,*
   561 U.S. 477 (2010) ............................................................. 13

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ........................................... 12, 17, 19, 20

ii

*Lamont v. Postmaster Gen.*,
　381 U.S. 301 (1965) ........................................................ 20

*Lost Tree Vill. Corp. v. United States*,
　787 F.3d 1111 (Fed. Cir. 2015) ........................................... 35

*McCullen v. Coakley*,
　573 U.S. 464 (2014) ....................................................... 29

*Meese v. Keene*,
　481 U.S. 465 (1987) ....................................................... 24

*Moody v. NetChoice, LLC*,
　144 S.Ct. 2383 (2024) .......................................... 6, 8, 9, 20

*Mt. Healthy City Sch. Dist. v. Doyle*,
　429 U.S. 274 (1977) ....................................................... 24

*Reed v. Town of Gilbert*,
　576 U.S. 155 (2015) ..................................................... 9, 11

*Shaw v. Hunt*,
　517 U.S. 899 (1996) ....................................................... 18

*Sorrell v. IMS Health Inc.*,
　564 U.S. 552 (2011) ....................................................... 12

*Texas v. Johnson*,
　491 U.S. 397 (1989) ....................................................... 11

*Time Warner Ent. Co. v. FCC*,
　93 F.3d 957 (D.C. Cir. 1996) ............................................. 17

*United States v. Brown*,
　381 U.S. 437 (1965) ................................................... 33, 34

*United States v. Nat'l Treasury Emps. Union*,
　513 U.S. 454 (1995) ....................................................... 21

*United States v. Playboy Ent. Grp.*,
　529 U.S. 803 (2000) .............................................. 11, 18, 21

*United States v. Robel,*
   389 U.S. 258 (1967) ...................................................................... 2

**CONSTITUTIONAL PROVISIONS**

Art. I, § 9, cl. 3................................................................................ 4, 33

Amend. I................................................................... 2, 4, 7, 8, 11, 21

**STATUTES**

International Emergency Economic Powers Act, 50 U.S.C.
   § 1701 *et seq.* .......................................................................... 5

Protecting Americans from Foreign Adversary Controlled
   Applications Act ...................................................................... 1
   Sec. 2(a) ............................................................................... 36
   Sec. 2(a)(2) .......................................................................... 15
   Sec. 2(a)(3) .......................................................................... 15
   Sec. 2(g)(1) .......................................................................... 15
   Sec. 2(g)(2)(A) ..................................................................... 26
   Sec. 2(g)(2)(A)(i) ................................................................. 10
   Sec. 2(g)(2)(B) .............................................................. 10, 12, 26, 27
   Sec. 2(g)(3) .......................................................................... 27
   Sec. 2(g)(3)(A) ................................................................. 13, 34
   Sec. 2(g)(3)(B)(ii)(II) ........................................................ 13, 15

**REGULATORY MATERIALS**

15 C.F.R. § 734.3(a)(2) ..................................................................... 22

**OTHER AUTHORITIES**

Elena Kagan, *Private Speech, Public Purpose*, 63 U. Chi. L.
   Rev. 413 (1996) ...................................................................... 28

## INTRODUCTION AND SUMMARY OF ARGUMENT

The government asks this Court to bless the most sweeping speech restriction in this country's history—a law that singles out and shutters a speech platform used by 170 million Americans.

The government's attempted rehabilitation of the Act is as precedent-shattering as the Act itself. It says the Court should ignore Congress's failure to enact findings explaining *why* it imposed this unprecedented speech restriction—and instead offers *post hoc* justifications resting on speculation and demonstrably erroneous factual assertions. It relies on secret submissions that it seeks to exempt from adversarial testing and public view. It brushes aside Congress's denial of the protections it afforded all other companies—depriving only Petitioners of a statutory basis to contest that they are "controlled by a foreign adversary" or pose a threat. The government's core legal contention—that a monumental speech restriction is subject to mere rational-basis review—flouts decades of settled precedent.

The government's submissions to this Court make its strategy clear: invoke national security to carve out new exceptions to constitutional safeguards. But while national security is a significant

1

government interest, "[i]mplicit in [it] is … defending those values and ideals which set this Nation apart," including "those ideals [that] have found expression in the First Amendment." *United States v. Robel*, 389 U.S. 258, 264 (1967).  In matters of national security, as elsewhere, courts must rigorously scrutinize government restraints on speech to ensure protection of First Amendment rights.  The Act fails that test.

No precedent supports the government's dramatic rewriting of what counts as protected speech.  TikTok Inc., a U.S. company, is not stripped of First Amendment protection because it is ultimately owned by ByteDance Ltd., a Cayman-incorporated holding company.  Does the government seriously believe, for example, that *Politico* (owned by a German company) has no First Amendment rights?  Nor can the government deny that the Act is a content-based regulation subject to strict scrutiny, when the government *itself* justifies the law in content-based terms.

Under any level of scrutiny, the government fails to defend Congress's singling out of Petitioners.  Even if its concerns were well-supported (they are not), the government cannot identify any harm from

applying to Petitioners the same standard Congress specified for all other alleged "foreign adversary controlled applications."

The government also cannot show that Congress endorsed any compelling justification for banning TikTok. It demands deference to what it imagines were Congress's company-specific "determinations." But Congress enacted no findings, making it impossible to know what determinations, if any, *Congress* made about TikTok.

The government tries to substitute its own *post hoc* justifications. But those justifications fail on their own terms. The government's asserted interest in regulating the content Americans view is illegitimate—Congress may not silence a U.S. company's speech because it wants to block content that Congress deems "propaganda." And the government repeatedly admits it has no evidence that China ever manipulated the content Americans see on TikTok. Its stated reason for fearing Chinese manipulation—its claim that the recommendation engine "resides within China"—is plainly wrong. The recommendation engine is in the United States, under Oracle's protection.

As for data collection, the government focuses on information about users' precise locations, ignoring that TikTok does not collect such data.

3

It misstates where sensitive U.S. user data resides—not in China, but in the secure Oracle cloud.  It admits it has no evidence that China has ever accessed U.S. user data.  And in all events, it cannot show that Congress would have passed the Act to address data collection alone—nor could it, given how underinclusive the Act is in addressing any such interest.

Even if the government could establish that its *post hoc* justifications were compelling, it has not proven the inadequacy of less restrictive alternatives.  The government ignores or misrepresents the robust protections of the 90-page National Security Agreement, and does not claim that Congress even *considered* all the Agreement's protections before jumping to a ban.

Not satisfied with constricting the First Amendment, the government asks the Court to be the first to exclude corporations from the Bill of Attainder Clause, and further to ignore the complete destruction of TikTok's value without just compensation.

For all these reasons, the government's defense of the Act fails as a matter of law, and the Act must be enjoined.  But if the Court concludes it must consider the government's factual claims and secret evidence, it should temporarily enjoin the Act and establish a fair process for

4

meaningful judicial review.  With the speech of 170 million Americans at stake, the Constitution demands nothing less.

## ARGUMENT

### I.    The Act Burdens Protected Speech and Is Subject to Strict Scrutiny.

The Act is an unprecedented intrusion on protected speech and must be subjected to strict scrutiny.  TikTok Br. 29-39.

### A.    Petitioners Engage in Protected Speech.

In testimony before a House committee, a Justice Department official acknowledged "the amount of First Amendment-protected activity and expressive content on the [TikTok] platform."  Transcript 13.  The official pointed to this protected activity as the reason why existing law—including the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*—did not "allow" the government to "ban TikTok."  Transcript 12-13; *see* TikTok Br. 14-15 (discussing court rulings that prior TikTok ban violated that statute's speech protections).  While Congress can of course change statutes, the limits of preexisting law reflect and reinforce *constitutional* speech protections, as the Executive Branch testimony recognized.

5

Given this testimony, it is unsurprising that the government concedes that "the curation of content on TikTok," including through TikTok's "recommendation engine," is "a form of speech." Gov't Br. 59-60; *accord Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2393 (2024); TikTok Br. 29-30. And that the government does not dispute that posts on TikTok (including by TikTok Inc.) constitute speech.

The government also does not dispute that a divestiture mandate would burden this speech. TikTok Br. 31-33; Gov't Br. 60-61. Nor does it contest that because "qualified divestiture" is infeasible, the Act bans TikTok. TikTok Br. 21-24; Gov't Br. 60-61. The government focuses exclusively on Chinese-law obstacles, suggesting Congress is not responsible for them. Gov't Br. 4. But undisputed evidence shows divestiture is infeasible for independent reasons the government does not contest. Congress is responsible for setting an operationally infeasible deadline, *see* App.686 (Milch), and imposing constraints that would guarantee commercial failure, *see* App.830-32 (Presser).

The government's core argument is that the speech of TikTok Inc.—a U.S. company operating a speech platform in the United States for U.S. users—is "the speech of a foreigner" and therefore "does not enjoy any

First Amendment protection." Gov't Br. 60.[1]  But its authority for this assertion is *Agency for Int'l Dev. v. Alliance for Open Society Int'l*, which addressed "*[f]oreign* organizations operating *abroad*"—not the speech of a U.S. company operating in the United States.  591 U.S. 430, 438 (2020) (emphasis added).

Moreover, *Open Society* confirms the "bedrock" principle "that separately incorporated organizations are separate legal units with distinct legal rights and obligations." *Id.* at 433, 435.  That refutes the notion (Gov't Br. 59) that an American company forfeits constitutional protection because it is owned by a foreign entity.  Surely the American companies that publish *Politico*, *Fortune*, and *Business Insider* do not lose First Amendment protection because they have foreign ownership. Supp.App.889 (Weber).  Surely AMC Theaters, during the decade it was majority-owned by a Chinese company, had a First Amendment right to choose what movies to show.  Supp.App.890.

The government further errs, factually and legally, in asserting that TikTok Inc. loses First Amendment protection because it uses a

---

[1] Bizarrely, the government invents an "admission" that TikTok Inc.'s content curation is a "foreigner['s]" speech.  Gov't Br. 60.  Petitioners made no such "admission."

"Chinese-controlled proprietary recommendation engine."  Gov't Br. 59-60 (citation omitted).  The government cites no evidence of this supposed Chinese control—and its contention is flatly wrong.  As explained below, the recommendation engine is in the United States, controlled by an American company, and safeguarded by Oracle.  *See infra* pp.21-22.

In any event, the First Amendment applies even under the government's inaccurate portrayal.  An American company's decision to use an expressive technology, whatever its origin, is *itself* expressive—just as an American movie theater's decision to show a foreign film is expressive.  By the government's logic, a U.S. newspaper that republishes the content of a foreign publication—*Reuters*, for example, Supp.App.889 (Weber)—would lack constitutional protection.[2]

Fifty-seven Members of Congress speculate in their *amicus* brief that only "corporate leadership abroad makes the policy decisions." Members Br. 21 (quoting *NetChoice*, 144 S.Ct. at 2410 (Barrett, J., concurring)).  Also wrong.  *Amici* ignore undisputed evidence that expressive policy choices regarding the moderation and promotion of

---

[2] Cases "describing registration and disclosure requirements" for "public-relations agents for foreign principals" (Gov't Br. 59) do not suggest that American agents *forfeit constitutional rights* or that they can be *silenced*.

content for U.S. users are made in the United States by U.S. persons. App.811-19 (Presser). Like the operators in *NetChoice*, TikTok Inc. is a U.S. company that makes a "wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint." 144 S.Ct. at 2405.

## B.    Strict Scrutiny Applies.

Notwithstanding the massive amounts of speech the Act silences, the government (at 65) argues for mere rational-basis review. Its arguments defy well-settled precedent and would enable previously unimaginable government speech restraints.

"[S]trict scrutiny applies" where the "justification for the law [is] content based." *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015). The government claims the Act is a content-neutral ownership regulation, but justifies the Act in *expressly* content-based terms: it fears that Petitioners may "mold the content" on TikTok and "promote disinformation." Gov't Br. 16.

The Act is also content-based "on its face." *Reed*, 576 U.S. at 166. The government is obviously wrong that a "foreign adversary controlled application" is "defined [under the Act] in terms of ownership rather than

content." Gov't Br. 67. It is defined to require particular ownership *and* particular content.

Chinese-controlled applications that do not share user speech are not covered. Sec. 2(g)(2)(A)(i). Chinese-controlled applications that host speech focused on certain subjects are exempted. Sec. 2(g)(2)(B). When a speech restriction "maintains exceptions for speech on certain subjects," it is "content-based." *CPR for Skid Row v. City of Los Angeles*, 779 F.3d 1098, 1109 (9th Cir. 2015) (citation omitted).

The government asserts (without citing evidence) that Congress left some adversary-controlled applications unregulated because they have different "susceptibilities." Gov't Br. 68. That is at best a proposed *justification* for content-based discrimination, which must be strictly scrutinized. It does not change the *fact* that Congress drew content-based lines.

The government also claims that expressly singling out specific speakers does not trigger strict scrutiny. Gov't Br. 72. Accepting that argument would set a dangerous precedent. It would allow Congress to ban the speech of identified American individuals, companies, and organizations—ordering the Sulzberger family to sell the *New York*

*Times*, for instance—subject only to rational-basis review. A "[l]aw[] designed [and] intended to suppress or restrict the expression of specific speakers contradict[s] basic First Amendment principles." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 812 (2000).

That is an apt description of what Congress did here, expressly targeting specific speakers and treating them differently from all others. The government denies the obvious when it says that the Act does not "focus[] … on the identity of any speaker." Gov't Br. 72.[3]

The same features demonstrate that the Act's burdens on speech are not "incidental." Gov't Br. 60. Speech burdens are not incidental when the government "asserts an interest" that is "related to expression"; the *content*-manipulation interest asserted here is plainly expression-related. *Texas v. Johnson*, 491 U.S. 397, 410 (1989). Nor are burdens incidental when "the conduct triggering coverage under the statute consists of communicating a message"—which is just what the user-

---

[3] There is also no question that Congress's speaker-based distinction "reflects a content preference." *Reed*, 576 U.S. at 170 (citation omitted). The government justifies the Act by *reference to content*. *Supra* p.9.

speech element and topic-based exception require. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010).[4]

Petitioners thus do not claim "special protection from governmental regulations of general applicability." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705, 707 (1986). The Act does not regulate foreign ownership economy-wide. It "imposes a burden based on the content of speech and the identity of the speaker." *Sorrell*, 564 U.S. at 567; *see* Creator Reply 4-9 (explaining why the Act is not an incidental burden and is unlike prior foreign ownership regulations).

## II.    The Act Unconstitutionally Singles Out Petitioners.

The government ignores the ways the Act treats Petitioners differently, and identifies no national security justification for such treatment. Nor does the government identify "historical precedent" for Congress singling out one named speaker and speech platform—a

---

[4] At times, the government maintains that Congress applied Section 2(g)(3)(B)'s content-based standard to TikTok, and determined those "criteria were satisfied." Gov't Br. 75. Elsewhere, the government brushes aside those criteria as "appl[ying] only to entities that might be designated in the future." Gov't Br. 69. In that case, the TikTok-specific provision cannot be an "incidental" speech burden, because it is based purely on "the identity of the speaker." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

12

"telling indication of a severe constitutional problem." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (citation omitted).[5]

**Differential Treatment.**  It is flatly untrue that Petitioners "received all the process … that would be afforded to other potentially regulated entities."  Gov't Br. 76.  Every application Petitioners operate is automatically deemed a foreign adversary controlled application under the Act.  Sec. 2(g)(3)(A).  Any other company will receive a process following "rules and procedures," Supp.App.835 (Presidential Memorandum), will be judged by defined criteria, and will receive a "public" statement "describing the specific national security concern" justifying its designation, Sec. 2(g)(3)(B)(ii)(II).

Rather than try to show that Petitioners received equivalent treatment, the government changes the subject, claiming that Congress received "substantial information" and held "hearings and briefings," and

---

[5]  Congressional committee members were concerned about the constitutionality of a law expressly targeting Petitioners, and asked the government if "we ever had legislation targeting a specific company."  Transcript 38.  The government identified only "examples in other contexts, like Federal acquisitions," and "companies like Huawei, Kaspersky," which raised no speech issues.  Transcript 116.

13

Petitioners and government officials had a "back-and-forth." Gov't Br. 73, 76. Even if true, that is not an *explanation* of the *actual reasons* for the ultimate *decision* by the *decisionmaker*. The congressional equivalent of the presidential determination required for everyone else would have been statutory findings.

Indeed, a government official told a House committee that "executive branch findings and executive branch process" would strengthen the Act, and appeared to contemplate "congressional findings." Transcript 23, 31. Yet Congress elected to proceed without executive *or* legislative findings, depriving Petitioners alone of an expressly stated justification to challenge.

The government does not even try to address the *substantive* protections Congress afforded everyone else. TikTok Br. 11-13.

For instance, Petitioners are designated automatically whether or not they meet the Act's definition of "controlled by a foreign adversary." But Petitioners do not meet those criteria—and would contest that point under the generally applicable process. Remarkably, at a hearing shortly before Congress voted on the Act, a government witness stated he would "be interested to know more about who owns" ByteDance, but "*assum[es]*"

14

that "the strongest ownership interest is in China."  Transcript 141-42.
The government's assumption is wrong.  TikTok Inc. is *not* "ultimately
owned by Beijing ByteDance Technology, a Chinese … company."  Gov't
Br. 7 (citation omitted); *see Ex Parte* Opp'n 16-17.  Nor is ByteDance Ltd.
20%-owned by any person "domiciled in" China.  Sec. 2(g)(1)(A)-(B); *see*
App.802 (Presser) (ByteDance Ltd. 21%-owned by "Chinese national who
lives in Singapore").

**Inadequate Justification.**  Rather than justify the Act's
differential treatment, the government merely calls it "sensibl[e]" for
Congress to address a "pressing problem directly."  Gov't Br. 73.  But the
Act's generally applicable designation process requires only "30 days"
notice.  Sec. 2(g)(3)(B)(ii)(II).  That is a trivial delay compared to the
"years" that "Congress and the Executive Branch" allegedly harbored
concerns, Gov't Br. 1; the multi-year negotiations over the National
Security Agreement, App.413 (Letter to Justice Department); and the
270 days (extendable by 90) by which Congress postponed the Act's
prohibitions, Sec. 2(a)(2)-(3).

Nor does any urgency explain Congress's choice of substantively
different standards.  Or how national security could possibly be harmed

by subjecting Petitioners to the generally applicable designation process. *See* Transcript 32 (Justice Department official admitting "executive branch could go back and build a record under the more general provision"). "Absent a showing that [this] less restrictive alternative would not be as effective, … the more restrictive option preferred by Congress [cannot] survive strict scrutiny." *Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004).

## III.   The Act Fails Strict Scrutiny.

### A.   The Court Should Disregard the Government's *Post Hoc* Justifications.

Lacking a record, the government purports to divine what "motivated Congress," what "Congress determined," and Congress's "actual concern." Gov't Br. 4, 6, 70. Yet the government cannot point to anywhere *Congress* made those or any other determinations.

The government identifies no precedent suggesting statutory findings are unnecessary in these circumstances. By the government's own account, Congress not only legislated a general rule, but "ma[d]e the determination that [generally applicable] criteria were satisfied" for one speaker. Gov't Br. 75. The government demands "deference" to a

16

company-specific "risk assessment" Congress allegedly performed. Gov't Br. 86 (citation omitted).

But if Congress singles out one speaker, statutory text is the only way to know what speaker-specific "determinations" Congress actually made, and what speaker-specific risks it actually "assessed." The ordinary rule may be that "[s]tatutes need not be backed by an administrative record," Gov't Br. 66—but Congress does not usually act like an agency, applying prohibitions to named speakers, TikTok Br. 48-49.[6]

More generally, the government invokes "potential" threats, Gov't App.26 (Blackburn), based on supposed empirical predictions, but there is no evidence those predictions were endorsed by House and Senate majorities. *Cf. Humanitarian Law Project*, 561 U.S. at 29 (deferring to "specific findings" on "empirical question"). And any assumption about the interests Congress must have been pursuing are undermined by the

---

[6] The government (at 66) cites a single case where Congress "made no specific findings." *Time Warner Ent. Co. v. FCC*, 93 F.3d 957, 976 (D.C. Cir. 1996) (per curiam). That case involved an amendment reflecting "nothing more than a new application of a well-settled government policy." *Id.* It presented nothing close to the unprecedented circumstances here.

17

illegitimate interests advanced by many Members, including the Act's *lead sponsors*. TikTok Br. 19-21.

Beyond the Act's lack of findings, the government ignores that *it* bears the "burden of identifying" Congress's genuine interest. *Playboy*, 529 U.S. at 817 (citation omitted). So *it* must "show that the alleged objective was the legislature's actual purpose." *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (citation omitted).

Instead, the government builds its case around *post hoc* declarations. Yet it conspicuously avoids saying what information in those declarations it actually shared with Congress. *See* Amended Notice Regarding Transcript 2 (stating only that "key judgments … were conveyed to Congress"). As for whatever information the Executive conveyed, it is not apparent that most or even many Members of Congress received it. *See Ex Parte* Opp'n 6-8.

## B. The Government's Arguments Are Legally Flawed and Contradicted by the Factual Record.

Even if considered, the government's arguments cannot justify the Act's severe speech burdens. The government generally has a strong interest in safeguarding national security. But "concerns of national security and foreign relations do not warrant abdication of the judicial

role." *Humanitarian Law Project*, 561 U.S. at 34. The government's *post hoc* justifications cannot withstand scrutiny.

### 1. *"Covert content manipulation"*

Many Members of Congress objected to content currently on TikTok. TikTok Br. 19-21. The heavily redacted hearing transcript is also suffused with such concerns, which government officials appeared to endorse. *See, e.g.*, Transcript 129 (government witness: "risk right now that" the "narratives that are being consumed on the platform" are "being affected by the algorithm," and "striking to what degree those narratives are resonating with young people in America"); *id.* at 112 (Member asking for "numbers about the difference between anti-Israel, pro-Palestinian/Gaza [sic] on TikTok versus Instagram"). (Of course, similar allegations have been levied against many other platforms.)

Given the government's statement that China has not manipulated U.S. content, Gov't App.4 (Blackburn), this "justification" is naked government censorship of "narratives" it does not like—and the government does not try to defend it. The government cannot disprove that this improper justification substantially motivated many, or even

all, of the Members of Congress who voted for the Act—especially in the absence of findings.

The government's substitute justification is that, *in the future*, "China may … covertly manipulate the application's recommendation algorithm to shape the content" on TikTok. Gov't Br. 35. That version of the justification is equally flawed.

*First*, it is *expressly* content-based—not an "interest[] unrelated to the suppression of free speech." *Humanitarian Law Project*, 561 U.S. at 27 (citation omitted). The government has no legitimate interest in regulating "the content that the application delivers to American audiences." Gov't Br. 35. Congress may not "control the flow of ideas to the public," even if it views those ideas as foreign "communist political propaganda." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 306-07 (1965) (citation omitted); *see NetChoice*, 144 S.Ct. at 2407-08 ("correct[ing] the mix of speech" on "social-media platforms" is "not [an interest] unrelated to the suppression of free expression, and the government may not

pursue it consistent with the First Amendment" (citation omitted)); Creator Reply 21-24; Cato Br. 6-14; Knight Br. 3-7.[7]

*Second*, the government admits it has "no information" that China has "manipulate[d] the information received by" Americans on TikTok. Gov't App.4 (Blackburn). Its declarant's tepid "conclusion" is about "potential risk." Gov't App.26. Courts do not uphold content-based speech restrictions without "hard evidence," *Playboy*, 529 U.S. at 819; "speculation about serious harms" is insufficient, *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995).

*Third*, the government's purported risk assessment is premised on a black-and-white factual error. According to the government, TikTok's recommendation engine is "based in China," and "its location in China would permit the Chinese government to covertly control the algorithm." Gov't Br. 2; *see, e.g.*, Gov't App.25 (Blackburn) ("[T]he content recommendation algorithm … resides within China….").

That central premise is wrong. Unrebutted evidence establishes that "TikTok's U.S. recommendation engine is stored in the Oracle cloud"

---

[7] This rule is not swallowed by cases addressing political expenditures by foreign nationals. Gov't Br. 36-37; *see Bluman v. FEC*, 800 F.Supp.2d 281, 292 (D.D.C. 2011) (specifying "important limits to our holding").

in the United States.  App.824 (Presser).  An American subsidiary of
TikTok Inc. "deploys the recommendation engine in the United States,"
and Oracle has full access to review its source code, including the
algorithm.  *Id.*; *see* App.187-88 (draft Agreement requiring U.S. platform
to reside "exclusively" in Oracle's "secure cloud infrastructure in the
United States"); Supp.App.841-43 (Simkins) (describing protections
around "control of the Recommendation Engine and its operations in the
United States").

The government offers no evidence showing that the "algorithm …
actually resides within China."  Gov't Br. 48.  It merely paraphrases
Petitioners' brief, misleadingly, as saying that the algorithm "cannot be
exported without China's permission."  *Id.*  What Petitioners *actually*
said is that China "regulates the *transfer* of technologies *developed* in
China."  TikTok Br. 24 (emphasis added); *accord* App.414 (Petitioners'
explanation that their technology is "subject to Chinese export control
laws" because it was "developed in China," and China would forbid "a
divestiture of the TikTok algorithm").  That is not unlike U.S. export
controls, which regulate transfers of certain "U.S. origin items wherever
located."  15 C.F.R. § 734.3(a)(2).  China's assertion of jurisdiction to

prevent a *forced transfer* of the U.S. TikTok platform's recommendation technology does not change the fact that it is *located* in the United States in the Oracle cloud, where it is open to review and oversight by Oracle (and, if the National Security Agreement is signed, by the U.S. government and others).

*Fourth*, the government (at 37) relies on a press report to allege that, in the past, "China-based employees had 'abused heating [*i.e.*, video-promoting] privileges.'" But the article "does not assert" that the employees "were based in China or used heating to further China's national interests." Supp.App.880 (Weber). In any event, the government asserts it is concerned with how TikTok is "currently operated." Gov't Br. 75. Under current policy, "all videos promoted in the U.S. are reviewed by a U.S.-based reviewer." App.818 (Presser); *see also supra* pp.8-9; *infra* pp.31-32.

*Fifth*, the government ignores an obvious less restrictive alternative. In framing its interest as "*covert[]*" influence, the government stresses China's alleged ability to "*secretly* shape the content that American users receive." Gov't Br. 2 (emphasis added). Congress could have fully addressed that concern by requiring disclosure of the

23

U.S. government's view of that risk, akin to a Surgeon General's Warning.

To be clear, no such disclosure is warranted or accurate—Petitioners take robust measures to *prevent* manipulation. But if there were any such legitimate concern, disclosure would resolve it *by definition*: any potential "shap[ing of] the content that American users receive" would not be "secret[]." *Id.* Disclosure is how Congress traditionally deals with concerns that Americans might be "deceived by" "information of foreign origin," "[r]esting on the fundamental constitutional principle that our people, adequately informed, may be trusted to distinguish between the true and the false." *Meese v. Keene*, 481 U.S. 465, 480 n.15 (1987) (citation omitted).

### 2. *"Data collection"*

Since the government's content-based justification is illegitimate, and it does not attempt to demonstrate that Congress would have passed the Act solely for data-collection reasons, the Act must be invalidated. *See Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977). Regardless, the purported data-collection interest is also fatally flawed.

24

*First*, the government's argument is based on clear factual errors about the data TikTok collects. It raises a particular concern about TikTok collecting "users' precise locations." Gov't Br. 1. But TikTok does not do that. "The current version of the TikTok app … does not collect GPS information from U.S. users." App.820 (Presser); *see also* Supp.App.901 (Farrell); Supp.App.873 (Weber); *Ex Parte* Opp'n 14-15.

The government also misleads regarding "information about non-users." Gov't Br. 27. Information from a user's contact list is available only if a user affirmatively opts in; that information is automatically anonymized and used only to facilitate connections with other TikTok users; it "cannot be used to recover the original contact information" of non-users; "and [it] is deleted" if there is no match to another user. Supp.App.902 (Farrell).[8]

*Second*, U.S. users' sensitive personal data is protected from Chinese access: it is located in the United States, under strict protections.

---

[8] The government's declarant further relies on characterizations of Chinese law. He is unqualified to opine on that topic and makes clear errors. *Compare* Gov't App.50 (claiming Article 37 of the Cybersecurity Law "requires Chinese companies to store their data within China" (footnote omitted)), *with* Gov't App.125 (imposing requirement only on "[o]perators of critical information infrastructure").

25

*See* App.823 (Presser); Supp.App.845 (Simkins) (government has "mistaken notion about the volume of data flow"). The government's response rests on another factual error, asserting that Petitioners send U.S. user data "to Beijing to train the algorithm." Gov't Br. 53. But "[t]he recommendation algorithm is trained on U.S. user data in the Oracle cloud." Supp.App.901 (Farrell).

*Third*, the government admits that China is "not reliant on ByteDance and TikTok to date" to "engage in … theft of sensitive data." Gov't App.16 (Blackburn). Its suggestion that Americans' data is at risk—despite protections specifically designed to keep data secure regardless of China's aims—is pure speculation.

*Fourth*, the Act is so "wildly underinclusive" as to "raise[] serious doubts" that data collection was Congress's real concern. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011). The government cannot explain why a law concerned with data collection—rather than content manipulation—would draw distinctions based on whether user speech is allowed, Sec. 2(g)(2)(A), or is focused on particular topics, Sec. 2(g)(2)(B).

Other companies with major "operations in China" operate popular applications that "collect and maintain U.S. user data." App.770-71

26

(Weber). The government's cursory response is that Congress was free to start with the "most pressing concern[]." Gov't Br. 73 (citation omitted). But it does not show that TikTok *was* most pressing: "the government does not assert that TikTok collects data from U.S. users that is different in amount or kind than the data typically collected from U.S. users by other applications, including foreign-owned applications." Supp.App.875 (Weber).

### C. The Act's Exception Confirms Its Extreme Underinclusiveness.

The product/business/travel-review exception poses an even broader underinclusiveness problem. TikTok Br. 55. The government responds with a convoluted "natural reading" of the exception (Gov't Br. 69) that ignores its text.

The text of the exception is clear. Any "entity that operates" a review application is not a "covered company." Sec. 2(g)(2)(B). And an application cannot be a "foreign adversary controlled application" unless it is operated by (A) Petitioners or (B) a "covered company." Sec. 2(g)(3). So if any "entity" but Petitioners "operates" a review application, that "entity" is not a "covered company," and *none* of its applications is subject to the Act.

27

The government may have trouble explaining why "Congress created [such] a loophole," Gov't Br. 69, but the text says what it says. And a coherent explanation for that text exists: Congress purpose-built the Act to ban TikTok because it objects to TikTok's content, added a veneer of general applicability, but ensured that other applications would be undisturbed. The government's account of the Act's purpose, by contrast, cannot be squared with the text. That just underscores why underinclusiveness matters: it is an objective means to "ferret out improper motive." Elena Kagan, *Private Speech, Public Purpose*, 63 U. Chi. L. Rev. 413, 415 (1996).

Recognizing the underinclusiveness problem, the government invites the Court to "sever the [review-application] exception." Gov't Br. 69. But the exception is not an infected limb that can be isolated and cut off; it permeates the whole Act.

"Before" considering "severability" of an exception, courts assess whether "the exceptions to a speech restriction … 'diminish the credibility of the government's rationale for restricting speech in the first place.'" *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 621-22 (2020) (plurality op.) (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 52

(1994)).  In *Barr*, the exception covered "only a slice of the overall … landscape," making it "not a case where a restriction on speech is littered with exceptions that substantially negate the restriction."  *Id.* at 622.  Here, the exception *does* substantially negate the restriction for everyone but Petitioners, making "the entire … restriction unconstitutional."  *Id.* at 623.

**D.    The Government's *Post Hoc* Critiques of the National Security Agreement Fail.**

The government is doubly misguided in arguing that "[t]he Executive Branch … determined" the National Security Agreement was insufficient, and therefore Congress acted "reasonably."  Gov't Br. 53.  Strict scrutiny is not administrative-law reasonableness review.  And whatever *the Executive Branch* determined cannot excuse *Congress*'s failure to consider alternatives before *it* banned TikTok.

The government must present "actual evidence" that Congress— "before enacting the speech-restricting law"—"'seriously undertook to address the problem with less intrusive tools.'"  *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020) (citation omitted) (quoting *McCullen v. Coakley*, 573 U.S. 464, 494 (2014)).  Although aspects of "Project Texas" were apparently discussed before some Members of

29

Congress, the government offers no indication that all (or any) Members were aware of key provisions of the Agreement, much less determined them to be ineffective. Petitioners (at 60-61) pointed this out; the government did not respond.

Instead, it alleges inadequacies that it never raised *during the negotiations*. Supp.App.896-98 (Farrell). And it falsely claims that the Agreement was Petitioners' "final proposal." Gov't App.46 (Newman). It was not. *See, e.g.*, App.364 (February 2023: "if there are additional measures that [the government] believe[s] are necessary to address [its] concerns, we are keenly interested in hearing them," and "will do everything in our abilities to address those concerns").

On the merits, the government's objections are riddled with errors and omissions:

- It is not true that "the company would never agree (and in the negotiations … did not agree) to cease collecting U.S. user data or sending it to Beijing to train the algorithm." Gov't App.81-82 (Newman). Under the Agreement, "training of the Recommendation Engine will take place in the United States

within the Secure Oracle Cloud ….” Supp.App.841-42 (Simkins). In fact, it already does. Supp.App.901 (Farrell).

- The government cites a *New York Times* article to doubt the effectiveness of data anonymization generally. Gov't App.74 (Newman). Yet the Agreement requires anonymization tools “often used by the U.S. Government to protect sensitive data.” Supp.App.847-48 (Simkins).

- In contending that TikTok's source code is too large to review, the government “fails to address … industry-standard techniques for source code review.” Supp.App.851-52 (Simkins) (describing personal experience, “in conjunction with government agencies,” “structur[ing] code review programs” for systems “at least as large”).

- The government suggests China could pressure ByteDance employees to “manually boost certain content” while “inhibiting the government from detecting” it. Gov't App.63-64 (Newman). But under the Agreement, content promotion “would be implemented through [TikTok U.S. Data

31

Security]" and "highly auditable and monitorable." Supp.App.854 (Simkins).

- The government claims the Lark messaging application can be used to send U.S. users' sensitive personal data to China. Gov't App.85-86 (Newman). But use "of Lark … would be subject to the same restrictions on the storage of and access to Protected Data that apply generally." Supp.App.863 (Simkins).

- The government "misunderstand[s] or disregard[s] important provisions of the [Agreement]," including its interpretation of the shut-down option, which is "inaccurate in several respects." Supp.App.867-69 (Simkins).

None of these flaws involves "predictive judgments" on matters within the government's declarants' expertise. Gov't Br. 66. Where the recommendation engine resides and is trained is an empirical question—the government just gets it wrong. What the Agreement says is a legal question—and the government gets it wrong. Whether source code review is feasible is a technical question—yet the government offers no technical evidence or witnesses with technical expertise. Such a flawed

32

analysis cannot meet the government's burden to *prove* the National Security Agreement inadequate.    At minimum, the government's litigation-driven criticisms must be put to the test through fair procedures.  *Infra* pp.36-37.

## IV.    The Act Is a Bill of Attainder.

Contrary to the government's argument (at 82-83), the text of the Bill of Attainder Clause has no carve-out for corporations.   "[T]he protection afforded" is "one of the constitutional rights enjoyed by corporations." *Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 347 (2d Cir. 2002); *see BellSouth Corp. v. FCC*, 144 F.3d 58, 63 (D.C. Cir. 1998) (Supreme Court has "suggested" that the Clause "protects corporations as well as individuals"); Steilen Br. 20 n.2 (discussing Founding-era evidence).

The Clause is a "separation of powers" provision, "safeguard[ing] against legislative exercise of the judicial function."   *United States v. Brown*, 381 U.S. 437, 442 (1965).   Congress engages in "trial by legislature," *id.*, whether the target is a natural or non-natural person.

On the merits, the government argues (at 81) that the Act cannot be punitive because of an alleged national-security interest, but bills of

33

attainder historically targeted groups "thought to present a threat to the national security." *Brown*, 381 U.S. at 453.

The government (at 81) emphasizes "[t]he Act's scope" as demonstrating a non-punitive purpose—but it mischaracterizes that scope. Through its review-application loophole, *supra* pp.27-29, Congress "arbitrarily allowed potentially dangerous entities to escape regulation." Steilen Br. 26. And if Congress was truly focused on the "particular susceptibilities" of "social-media platforms," Gov't Br. 68, it had no non-punitive reason to ban Petitioners from operating *all* kinds of applications, Sec. 2(g)(3)(A). The government's reliance on outdated allegations rather than current practices, *supra* pp.23, 25, further confirms punitive intent.

Finally, in asserting that Congress "permit[ted] TikTok to continue operating," Gov't Br. 82, the government ignores the undisputed evidence that Congress designed an impossible-to-meet divestiture standard, *supra* p.6. The Act singles out one company for a ban—exactly the sort of legislative punishment the Constitution forbids.

34

## V.    The Act Is an Unconstitutional Taking.

The Act will destroy the value of TikTok Inc., and therefore constitutes a taking without just compensation.  TikTok Br. 68-69.  The government does not dispute that if the Act effects a taking, an injunction is proper.  TikTok Br. 69-70.

The government asserts (at 84) that Petitioners retain other "assets that can be sold," such as "additional property the companies may own," but cites nothing supporting that speculation.  *See Lost Tree Vill. Corp. v. United States*, 787 F.3d 1111, 1117 (Fed. Cir. 2015) ("Speculative … uses are not considered as part of a takings inquiry.").  And its defense (at 84-85) that TikTok can be sold for value again ignores undisputed evidence that Congress fashioned an impossible-to-meet divestiture standard.  *Supra* p.6.

## VI.    The Court Should Permanently Enjoin the Act, or Temporarily Enjoin It and Appoint a Special Master.

This Court has sufficient grounds to permanently enjoin the Act. Petitioners do not "concede" that such an injunction should be limited to the TikTok-specific provision.  Gov't Br. 87.  The Act, as applied to Petitioners, is unconstitutional for reasons relating to the TikTok-specific provision, *supra* pp.12-16, 33-34, *and* reasons that apply regardless of

which track is used, *supra* pp.16-33, 35. It is the "Prohibition[s]" of Section 2(a) that cannot constitutionally be applied to Petitioners and should be enjoined.

At minimum, the Court cannot credit the government's national-security justifications without resolving factual disputes, including issues raised by the government's *ex parte* submissions. It should appoint a district judge as special master to hear from the parties, make procedural recommendations, and if needed hold hearings and recommend factual findings. *See Ex Parte* Opp'n 32-37.

Contrary to the government's disingenuous suggestion, Gov't Br. 87, Petitioners expressly "reserve[d] their right" to "seek discovery" or other "relief." Joint Mot. to Govern 4-5. Since then, the government decided to litigate this case through extensive, heavily redacted *post hoc* declarations. Just six days before this brief was due, the government revealed a heavily redacted, 174-page transcript of a hearing that occurred five months ago. Under these circumstances, Petitioners are well within their rights to insist on fair procedures.

Pending such procedures, an injunction is needed. Irreparable harm is massive and undisputed. Petitioners "must be deemed likely to

prevail" unless the government shows it can meet its "burden of proof." *Ashcroft*, 542 U.S. at 666. And the government cannot claim a public interest in urgently disrupting a status quo it has accepted "[f]or years." Gov't Br. 1. The government cannot frustrate meaningful review of the Act until it is too late.

## CONCLUSION

The Court should permanently enjoin the Act as applied to Petitioners, or enjoin it pending further proceedings.

Respectfully submitted,

Andrew J. Pincus
Avi M. Kupfer
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3220
apincus@mayerbrown.com
akupfer@mayerbrown.com

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut
  *Counsel of Record*
David M. Zionts
Megan A. Crowley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com
dzionts@cov.com
mcrowley@cov.com

John E. Hall
Anders Linderot
S. Conrad Scott
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
jhall@cov.com
cscott@cov.com
alinderot@cov.com

August 15, 2024

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations set by the Court's order of May 28, 2024 because this brief contains 6,499 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word using proportionally spaced, 14-point Century Schoolbook font.

August 15, 2024

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*

39

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on August 15, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

August 15, 2024

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com

*Counsel for Petitioners*
*TikTok Inc. and ByteDance Ltd.*