**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____
)
TIKTOK INC.,                               )
                                           )
and                                        )
                                           )
BYTEDANCE LTD.,                            )
                    *Petitioners*,         )
                                           )    No. 24-1113
    v.                                     )    (consolidated with
                                           )    Nos. 24-1130,
MERRICK B. GARLAND, in his official        )    24-1183)
capacity as Attorney General of the        )
United States,                             )
                    *Respondent*.          )
_____)

**PETITIONERS' EMERGENCY MOTION FOR INJUNCTION
PENDING SUPREME COURT REVIEW**

## INTRODUCTION

Petitioners move for a temporary injunction pending Supreme Court review. Absent such relief, the Act will take effect on January 19, 2025. That would shut down TikTok—one of the Nation's most popular speech platforms—for its more than 170 million domestic monthly users on the eve of a presidential inauguration. Before that happens, the Supreme Court should have an opportunity, as the only court with appellate jurisdiction over this action, to decide whether to review this exceptionally important case. And an injunction is especially appropriate because it will give the incoming Administration time to determine its position—which could moot both the impending harms and the need for Supreme Court review.

An injunction will impose no material harm on the Government. There is no imminent threat to national security. That is particularly clear since (1) Congress itself delayed the Act's effective date for 270 (and potentially 360) days; and (2) the Government's own defense of the Act at most asserts that China "could" engage in certain harmful conduct through TikTok, not that China is currently doing so or will soon do so. A modest delay in enforcing the Act will simply create breathing room for

the Supreme Court to conduct an orderly review and for the incoming Administration to evaluate this matter—before one of this country's most important speech platforms is shuttered.

In these circumstances, the equitable factors decisively favor Petitioners. And given that lopsided equitable balance, the prospect that the Supreme Court will grant certiorari and reverse is sufficiently high to warrant the temporary pause needed to create time for further deliberation. Indeed, this Court's holding that the Act satisfies strict scrutiny is sure to attract the Supreme Court's attention. As speech restrictions have survived strict scrutiny only in rare and narrow circumstances, the Supreme Court will want to ensure that this Court's decision has not diluted that critical standard. All the more so because, with respect, this Court's flawed legal rationales would create precedent opening the door to upholding content-based speech bans in factual contexts far different from this one.

For these reasons and others discussed below, this Court should grant a temporary injunction that prohibits Respondent from enforcing the Act with respect to Petitioners' applications, pending the timely filing

and ultimate disposition in the Supreme Court of a petition for a writ of certiorari and any resulting merits review.

Petitioners respectfully request a decision no later than December 16, 2024, to ensure time to seek emergency relief from the Supreme Court if necessary. The parties have agreed on the following schedule: Petitioners filed this motion by 10:00 a.m. on December 9; the Government will file any response by December 11; Petitioners will file any reply by December 12.

## BACKGROUND

TikTok is provided in the United States by TikTok Inc.—an American company incorporated and headquartered in California, with thousands of employees in the United States. App.801.[1] Since its launch in 2017, TikTok has grown to be one of the most widely used speech platforms in the world, with more than 170 million monthly users in the United States. App.804-05. TikTok Inc.'s ultimate parent is ByteDance Ltd., a privately held Cayman Islands-incorporated holding company that owns subsidiaries located around the world, including in China.

---

[1] References to "TikTok Inc." are to the U.S. corporate entity that is a Petitioner in this lawsuit; references to "TikTok" are to the online platform. *See* TikTok Pet. 1 n.1.

App.801.  ByteDance Ltd. is majority-owned by global institutional investors; the Chinese government has no ownership stake in ByteDance Ltd., directly or indirectly.  *See* App.802; TikTok Pet. 8-9.

On April 24, 2024, President Biden signed into law the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H (2024) ("Act").  The Act prohibits various entities, including online mobile app stores, from providing services to "foreign adversary controlled applications."  Sec. 2(a)(1).

The Act includes two definitions of "foreign adversary controlled application."  First, any application operated by TikTok Inc., ByteDance Ltd., or their affiliates is automatically deemed "foreign adversary controlled."  Sec. 2(g)(3)(A).  Second, for applications owned by certain other companies that have user-generated or user-shared content, the Act outlines standards and procedures to designate them as "foreign adversary controlled," including public notice and a presidential determination that the application presents a national security risk.  Sec. 2(g)(3)(B); *see* Sec. 2(g)(2).  When an application falls within either definition, the Act's prohibitions apply, unless the President determines

the operator meets conditions for executing a "qualified divestiture." Sec. 2(c)(1).

For applications operated by TikTok Inc. or ByteDance Ltd., the Act's prohibitions take effect on January 19, 2025. Sec. 2(a)(2)(A). The President may "grant a 1-time extension" lasting up to 90 days if he determines that certain conditions related to a qualified divestiture are met. Sec. 2(a)(3).

On May 7, 2024, Petitioners filed this action in this Court, which has original and exclusive jurisdiction over all challenges to the Act's constitutionality. Sec. 3(a)-(b). Shortly thereafter, certain content creators on TikTok filed two additional petitions for review, which were consolidated with this suit. On October 7, 2024, Robert F. Kennedy, Jr. and others filed a similar challenge, which has not yet been briefed or heard.

In its public submissions, the Government sought to defend the Act based on purported concerns about China manipulating the content Americans see on TikTok or misappropriating their private data. The Government's defense of those concerns also relied on significant *ex parte* submissions. The Government repeatedly admitted, however, that it has

no evidence that China has ever engaged in such behavior. Gov't App.4, 16; *see id.* at 26 (discussing "potential risk").

On December 6, 2024, the Court denied the three petitions for review before it. The Court held that the Act implicates the First Amendment and requires heightened scrutiny. Op.24-27. Judges Ginsburg and Rao assumed that strict scrutiny applies, Op.27-32, but held that the Act survives it, Op.32-57. Chief Judge Srinivasan concurred in part and in the judgment, concluding that the Act is only subject to, and satisfies, intermediate scrutiny. Conc.1.

## ARGUMENT

To grant an injunction pending further review, this Court considers (1) whether Petitioners have "made a strong showing" that they are "likely to prevail on the merits" before the Supreme Court; (2) whether Petitioners "will be irreparably injured" without an interim injunction; (3) whether such relief would "substantially harm" other parties; and (4) whether the "public interest" supports such relief. *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.* (*WMATA*), 559 F.2d 841, 842-43 (D.C. Cir. 1977) (quotations omitted). Of course, this standard does not require the Court to "grant interim relief only on a prediction

that it has rendered an erroneous decision"; that would make pointless the requirement to exhaust such requests with "the initial decisionmaker" before seeking relief in the reviewing court. *Id.* at 844.

The standard instead "contemplate[s] … that tribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained." *Id.* at 844-45. Here, the equities decisively favor interim injunctive relief, and there is more than enough likelihood that the Supreme Court will grant certiorari and reverse to warrant such relief. It is, at the very least, a close question whether the Act is the rare law that would survive strict scrutiny, the most demanding standard under the Constitution.

## I. The Equitable Factors Decisively Favor An Injunction Pending Supreme Court Review

If the Act takes effect on January 19, 2025, one of the Nation's leading speech platforms will be shuttered, inflicting irreparable injury by silencing Petitioners and the 170 million Americans who use the platform each month. The public interest favors providing sufficient time for the Supreme Court to conduct an orderly review process, and for the incoming Administration to evaluate this exceptionally important case.

Absent a temporary injunction, both will be deprived of that opportunity before the impending irreparable harm materializes. On the other hand, the Government will not suffer any meaningful harm from a modest delay in the Act's enforcement. Congress itself delayed the Act's effective date for 270 days (including through a presidential election). That choice reinforces that the asserted national security threat is not sufficiently imminent to forestall the completion of orderly judicial review. It is not often that the equitable balance weighs so one-sidedly towards interim injunctive relief.

## A. Absent Interim Injunctive Relief, Petitioners Will Suffer Irreparable Injury

Starting on January 19, the Act will inflict extreme and irreparable harm on Petitioners by banning their operation of TikTok in the United States on the eve of a presidential inauguration. This will deprive TikTok's base of 170 million monthly users and creators of access to one of the country's most popular speech platforms; destroy TikTok's ability to attract advertisers; and cripple Petitioners' ability to recruit and retain talent. Even if the ban is later lifted, a temporary shutdown will have irreparably harmed Petitioners in multiple ways:

***Loss of Users and Creators.*** Even a temporary shutdown will have devastating effects on TikTok Inc.'s business, which depends on its ability to attract users and creators. *See Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) ("Courts have recognized that price erosion and diminished market share can constitute irreparable harm.") (collecting cases); *see also* Declaration of Blake Chandlee ("Chandlee") ¶ 3. If the platform becomes unavailable in the United States, many current and would-be users and creators in the United States and abroad will migrate to competing platforms—and many will not switch back if the ban is later lifted. Chandlee ¶¶ 10-15. Petitioners estimate that even a one-month shutdown would cause the platform to lose approximately one-third of its daily users in the United States. Chandlee ¶ 13. A longer shutdown would result in an even greater loss. *Id.* This harm is irreparable. *See In re NTE Conn., LLC*, 26 F.4th 980, 991 (D.C. Cir. 2022) (loss of customers to other market players irreparable).

***Harms to Revenue, Commercial Relationships, and Competitive Position.*** While economic harm generally is not irreparable, it is where substantial losses will be *unrecoverable*, including—as here—because sovereign immunity bars damages.

*See, e.g., Ala. Ass'n of Realtors v. HHS*, 141 S.Ct. 2485, 2489 (2021) (per curiam); *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013). Even a temporary shutdown will cause TikTok to lose advertisers and commercial partners. This will result in an enormous loss of revenue during the shutdown, as well as reverberating harms to TikTok's relationships and competitive position. Chandlee ¶¶ 5, 8-9; App.826-27. Petitioners estimate that even a one-month shutdown would result in a loss of 29% of TikTok's total targeted global advertising revenue for 2025. Chandlee ¶ 5. All of these harms are irreparable. *See Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (harm to reputation irreparable); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (loss of market share irreparable).

***Difficulty Recruiting and Retaining Talent.*** The Act will significantly hamper Petitioners' efforts to attract and retain talent, which also constitutes irreparable harm. Chandlee ¶ 17; App.827; *see, e.g., Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021). Petitioners operate in a highly competitive market for talent, including for software engineers. Chandlee ¶ 17. Even a temporary

shutdown of TikTok will likely result in current and prospective employees accepting offers from competitors. *Id.* And even if the shutdown is later lifted, it will be difficult to recruit most of those employees back. *Id.*

**Constitutional Violations.** There are serious concerns, to say the least, that the Act violates Petitioners' First Amendment rights. *See* Part II, *infra.* And "[i]t has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quotation omitted).

### B. The Public Interest Favors An Interim Injunction

An interim injunction also is in the public interest. To begin, "there is always a strong public interest in the exercise of free speech rights." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). And as government officials acknowledged in congressional testimony, "there is a lot of First Amendment protected activity that takes place" on TikTok. Transcript of Mar. 7, 2024 House Energy and Commerce Committee Hearing ("Transcript"), at 39. Indeed, as one of the most popular speech platforms in America, TikTok is used by regular citizens,

businesses, and politicians alike—including, in the most recent presidential election, by both major-party candidates to communicate with American voters. Absent relief, all of these individuals will be deprived of one of the most popular speech platforms in America at a critical time in our Nation's history.

Even apart from those weighty First Amendment interests, other public interest factors overwhelmingly support a temporary injunction. Perhaps most significantly, before the irreparable harms to Petitioners and the public materialize, the Supreme Court should have an opportunity to conduct an orderly process for review of this significant constitutional question. *See* U.S. Const. art. III, § 2, cl. 2 ("the supreme Court shall have appellate Jurisdiction" over "all" cases over which the federal judicial power extends, subject to certain exceptions). That is particularly important because this Court is effectively sitting as a trial court, meaning that there has been *no* appellate review of the judgment upholding the Act.

Unless this Court grants interim relief, the Supreme Court will be forced to resolve an emergency injunction application on this weighty constitutional question in mere weeks (and over the holidays, no less).

Such expedited review would frustrate the Supreme Court's ability to "judg[e] the constitutionality of an Act of Congress," which is "the gravest and most delicate duty that [it] is called on to perform." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009) (quotation omitted). Out of respect for the Supreme Court's vital role, this Court should grant an interim injunction that enables a more deliberate and orderly process.

The public interest in avoiding hasty judicial review is particularly strong here because the Act will take effect just one day before the inauguration of a new President. The Act accords the President and Attorney General broad discretion over the timing and implementation of its provisions. *See* Sec. 2(a)(3), 2(d)(2), 2(g)(6); *see also* U.S. Const. art. II, § 3. And there is a reasonable possibility that the new Administration will pause enforcement of the Act or otherwise mitigate its most severe potential consequences. It has been widely reported, for example, that the incoming Administration "is expected to try to halt" the ban.[2] President-elect Trump has himself publicly announced "I'm

---

[2] *See, e.g.*, Jeff Stein et al., *Trump Expected to Try to Halt TikTok Ban, Allies Say*, Wash. Post (Nov. 12, 2024), https://perma.cc/QP5B-2FVE.

gonna save TikTok," *see supra* n.2; his incoming National Security Advisor stated that "[w]e absolutely need to allow the American people to have access to that app";[3] and one of his announced nominees for a Cabinet post (RFK Jr.) has filed a separate petition challenging the Act, *see supra* p.5.

It would not be in the interest of anyone—not the parties, the public, or the courts—to have emergency Supreme Court litigation over the Act's constitutionality, only for the new Administration to halt its enforcement mere days or weeks later. This Court should avoid that burdensome spectacle by granting an injunction that would allow Petitioners to seek further orderly review only if necessary. *Cf. Nw. Austin*, 557 U.S. at 205 (emphasizing that "constitutional avoidance" is "a well-established principle governing the prudent exercise of [the Supreme] Court's jurisdiction" (quotation omitted)).

### C. An Interim Injunction Would Impose No Material Countervailing Harm On The Government

On the other side of the equitable balance, the Government would suffer no meaningful harm from a modest delay that temporarily

---

[3] Ian Hanchett, *Waltz: Trump 'Wants to Save TikTok', but Wants to Protect Data*, Breitbart (Dec. 7, 2024), https://perma.cc/4AVE-XT64.

preserves the status quo. That is demonstrated by the Act's history and structure, as well as the Government's asserted interests.

The Government claims to have harbored its concerns about TikTok "[f]or years," Gov't Br. 1, and the current Administration's discussions with TikTok began in 2021, *see* Pet. 13-14, yet Congress did not act until April 2024. Moreover, once Congress eventually acted, it delayed the Act's effective date for 270 days, with the potential of an additional 90-day delay. Sec. 2(a)(2)(A), 2(a)(3). That period of delay covered a presidential election in which both major-party candidates prominently participated in the public discourse on TikTok. And nothing in the legislative record suggests a reason why Congress opted for the particular timelines it set—timelines that are indisputably too truncated for Petitioners to effectuate a qualified divestiture before January 19. *See* Transcript at 146-47 (colloquy between Member of Congress and government official expressing uncertainty as to why a particular timeline was chosen); App.648; Op.46. Congress's decision to delay implementation confirms that there is no public interest requiring an immediate shutdown of one of the Nation's largest speech forums.

To the contrary, the Act's timelines reflect that the asserted national security threat is not imminent. The Government admits that in the "years" it has had concerns about TikTok, Gov't Br. 1, it has found no evidence that any foreign adversary has manipulated the content Americans see on TikTok or misappropriated their private data. Gov't App.4, 16, 26. It instead justifies the Act based on a "potential risk" of what "could" happen in the future. Gov't App.26. Regardless of whether such future risk is sufficient to justify the Act on the merits, it does not support precipitously and irreversibly changing the status quo on January 19, before the Supreme Court and the incoming Administration can conduct an orderly review.

## II. Petitioners Are Sufficiently Likely To Succeed On The Merits Before The Supreme Court To Warrant Interim Injunctive Relief

Given the national importance of this case, the Supreme Court is likely to grant certiorari; given the strength of Petitioners' claims, the Court is likely to reverse. At minimum, because this Court "ruled on an admittedly difficult legal question and … the equities of the case suggest that the status quo should be maintained," this Court should grant interim relief to facilitate orderly review. *WMATA*, 559 F.2d at 844-45.

## A. The Supreme Court Is Likely To Grant Certiorari

The Supreme Court grants certiorari to review "important question[s] of federal law that [have] not been, but should be, settled by [that] Court." Sup. Ct. R. 10(c). This Court's opinion itself shows that the standard is met. Few questions are as important as whether Congress can "single[] out" someone "engage[d] in expressive activity" "for disfavored treatment." Op.26. And the consequences of this law alone will undoubtedly capture the Supreme Court's attention. It will force "millions" of Americans to "find alternative media of communication," Op.65—even though for many there is no adequate alternative, *e.g.*, App.809-10; No. 24-1130, App.14-15. "[M]any Americans" thus will "lose access to an outlet for expression, a source of community, and even a means of income." Conc.27.

The precedent being set is equally cert-worthy. Before this first-of-its-kind law is validated as a model for future speech regulation, the Supreme Court will likely conclude that its review is warranted. The unusual procedural posture makes that especially likely. By vesting this Court with exclusive jurisdiction over such challenges, Congress made it impossible for a circuit split to emerge on the Act's constitutionality.

Sec. 3(b).  Further, because Congress vested this Court with original jurisdiction, the Supreme Court is the only forum that can provide appellate review of the consequential decision here.

## B.    The Supreme Court Is Likely To Reverse

As a threshold matter, this Court was correct to assume that strict scrutiny applies.  The Government does not dispute either (1) that "TikTok[] Inc." is a *bona fide* "domestic entity operating domestically," or (2) that it is "engaged in expressive activity" through "the curation of content on" the platform.  Op.26-27.  And the Act "cannot be justified without reference to the content of the regulated speech" because (among other things) the Government's asserted concern about China's "ability to manipulate content covertly on the TikTok platform" *itself* "reference[s] the content of TikTok's speech."  Op.29-30 (quotation omitted).

Respectfully, however, the Supreme Court is likely to disagree with this Court's holding that the Act satisfies strict scrutiny—the Constitution's most demanding standard.  After all, when the Supreme Court applies strict scrutiny to speech regulations, it nearly always strikes them down.  The three narrow exceptions to that rule involved

laws banning very narrow, strictly defined categories of speech. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (ban on aiding terrorist organizations); *Burson v. Freeman*, 504 U.S. 191, 206 (1992) (plurality op.) (limited, "time-tested" electioneering restrictions to prevent voter intimidation); *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015) (restrictions on judicial election fundraising to preserve public confidence in judiciary).

That is nothing like the situation here, where Congress banned a speech platform used by 170 million Americans based solely on asserted concerns about potential foreign influence. The massive and unprecedented restriction of speech—which the Government concedes is fully protected, Gov't Br. 60—reinforces the importance of applying strict scrutiny with the full rigor the standard demands. Yet the Court's decision reduces this standard to a shadow of its normal self.

Notably, this Court considered this case to be "much like" one where it upheld a non-speech-related regulation by applying arbitrary-and-capricious review. Op.40-41 (discussing *Pac. Networks Corp. v. FCC*, 77 F.4th 1160 (D.C. Cir. 2023)). There is a fair prospect the Supreme Court will apply a more rigorous review and reverse. In particular, there are

at least four respects in which this Court departed from ordinary strict-scrutiny principles.

*First*, this Court held that "covert manipulation of content is not a type of harm that can be remedied by disclosure." Op.54. But the Supreme Court has already instructed otherwise. If Congress is worried that a U.S. entity's speech is on behalf of (or manipulated by) a foreign government, the proper response is to "label information of foreign origin," so that "our people, adequately informed, may be trusted to distinguish between the true and the false." *Meese v. Keene*, 481 U.S. 465, 480 n.15 (1987) (quotation omitted); *see also Citizens United v. FEC*, 558 U.S. 310, 369 (2010) (emphasizing that "disclosure" is the "less restrictive alternative" typically required to remedy misleading sources of speech). In particular, an appropriately visible, platform-level disclosure would render non-"covert" any risk that China could manipulate content. "[I]t is the Government's obligation" under strict scrutiny "to prove that th[is] alternative will be ineffective to achieve its goals." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 816 (2000). Yet the Government put forth, and this Court identified, no record evidence

that such a disclosure would be inadequate or that Congress even considered the issue. Op.54.

Indeed, that the Act eschewed the obvious alternative of disclosure strongly suggests that Congress's true concern was not the "covert" nature of any potential foreign content manipulation. Rather, contrary to this Court's suggestion, Op.45, Congress was evidently motivated by the threat of overt foreign influence on the content available on TikTok. After all, the only committee report on the Act more generally objected to "misinformation, disinformation, and propaganda." App.2. In fact, this Court likewise characterized the Government's concern as simply being that "the PRC might shape the content that American users receive." Op.30.

But the Government has no legitimate interest in "control[ling] the flow of ideas to the public," even if it views those ideas as "[foreign] political propaganda." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 306-07 (1965) (quotation omitted). "[I]nformation is not in itself harmful," and "the First Amendment makes for us" the "choice[] between the dangers of suppressing information[] and the dangers of its misuse if it is freely available." *Va. Pharmacy Bd. v. Va. Citizens Consumer Council*, 425 U.S.

748, 770 (1976). If Americans are "influence[d]" by the "content that appears on" TikTok, Op.44, that is the First Amendment in action. TikTok Inc., a U.S. speaker, has the fully protected right to exercise *its* editorial discretion by choosing to use a recommendation engine that the Government (wrongly) alleges may reflect a foreign government's influence.

*Second*, this Court held that it was permissible for Congress to single out TikTok as presenting the "most pressing concern[]" that China could improperly obtain U.S. user data collected by websites and applications. Op.42 (quoting *Williams-Yulee*, 575 U.S. at 449). But while strict scrutiny does not require "address[ing] all aspects of a problem in one fell swoop," nor does it permit "fail[ing] to regulate vast swaths of conduct that similarly [implicate] [the Government's] asserted interests." *Williams-Yulee*, 575 U.S. at 448-49. Here, the Act *categorically exempts* applications and websites controlled by foreign adversaries that either (1) do not have user-generated or user-shared content or (2) have the primary purpose of allowing users to post certain types of reviews. Sec. 2(g)(2). In fact, Petitioners submitted evidence that the "type and amount of data that TikTok collects from U.S. users" is "comparable" to

the data collected by other companies with equivalent alleged connections to China. Supp.App.875; *see* App.770-71. Yet this Court again failed to hold the Government to *its burden* of proving otherwise. Op.42.

This gross underinclusivity once more casts "doubts about whether the [G]overnment is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Williams-Yulee*, 575 U.S. at 448 (quotation omitted). Moreover, because Congress was at least partially motivated by an impermissible desire to eliminate the risk of foreign influence over the *content* on TikTok, the Government cannot rely on the data-security interest at all. That would require it to affirmatively prove that Congress would still have passed the Act "even in the absence of" the improper motive. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The Government made no effort to carry that burden, and this Court made no such finding.

*Third*, this Court failed in additional ways to hold the Government to its burden of "show[ing] that it seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014) (applying intermediate scrutiny); *see*

*Sable Comm'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989) ("[T]he congressional record contains no legislative findings that would justify us in concluding that there is no constitutionally acceptable less restrictive means, short of a total ban, to achieve the Government's interest….").

Most significantly, the Court deferred to "the Executive's judgment" that the National Security Agreement was inadequate. Op.49. But *Congress* banned TikTok, so *it* was required to consider alternatives. The Court assumed that Congress must have been "familiar[]" with the Agreement because "Executive Branch officials briefed congressional committees several times." Op.52-53. But nothing in the publicly available record suggests that the Agreement was part of those briefings. The Supreme Court will likely demand clearer evidence that Congress actually considered the Agreement's "combination" of "unprecedented" measures, which collectively produce the most "technically secure mitigation scheme" conceivable as an alternative to a sweeping speech ban. App.756. And given the substantial analytical flaws in the Government's post-hoc critiques of the Agreement, TikTok Reply Br. 30-33, the Supreme Court will likely require a more rigorous process before the Government can be said to have "shoulder[ed] its full constitutional

burden of proof" on this "less restrictive alternative." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 671 (2004).

At minimum, the Government has never demonstrated why its interests could not be met by applying to TikTok the same standards and process Congress deemed sufficient for *every other* application allegedly "controlled by a foreign adversary" and found to "present a significant threat to the national security of the United States." Sec. 2(g)(3)(B). While acknowledging this "differential treatment," the panel found it justified by an "immediate threat." Op.58. But as noted, the Act's delayed implementation and the Government's arguments demonstrate that any threat is not imminent. *See supra* pp.8, 15-16.

Regardless, the generally applicable process can be completed with just 30 days' notice to Congress, Sec. 2(g)(3)(B)(ii)(II)—a small fraction of the delays built into the Act, after Congress deliberated for "years," Gov't Br. 1. And the suggestion that immediacy required different *substantive* standards is dubious. Singling out one speaker for differential treatment presents extraordinary "potential for abuse," *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 592 (1983), and the general provisions demonstrate the availability of an obvious less

restrictive alternative, *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 730-31 (2014).

*Finally*, there is also a strong possibility that the Supreme Court will view the Government's reliance on secret evidence as incompatible with discharging its constitutional burden. *See* TikTok Opp'n to Gov't Mot. to File *Ex Parte* 4-32. To be sure, this Court stated that it "d[id] not rely on" the Government's classified evidence, and that its decision "rests solely on the unredacted, public filings in this case." Op.64-65 & n.11. Nevertheless, it repeatedly quoted conclusory statements from government affidavits supported by secret evidence Petitioners could not see or rebut. *See, e.g.*, Op.47 (quoting Gov't App.20, 23). Most glaringly, despite acknowledging that there is no evidence TikTok has manipulated content in the United States, the Court stressed the Government's conclusory assertion that "ByteDance and TikTok Global have taken action in response to PRC demands to censor content *outside* of China." Op.36, 47 (quoting Gov't App.17). Yet this is the public record the Court cited in support:

54. (U) Intelligence reporting further demonstrates that ByteDance and TikTok Global have taken action in response to PRC demands to censor content *outside* of China.



a.

17

**Gov't App. 17**

b.

55.

The Court faulted Petitioners for not "squarely den[ying]" this assertion and found their "silence on this point" "striking." Op.47. But

Petitioners did respond to this conclusory statement, pointing out that "many U.S. companies" have "made editorial decisions outside of the United States in response to requests or demands from foreign governments." Supp.App.882-83. And when specific allegations of censorship have been made, TikTok has investigated and refuted them. *See TikTok Inc. v. Trump*, No. 20-CV-2658, Dkt. 43-5 ¶¶ 19-24 (D.D.C. 2020) (refuting specific allegations of censorship invoked to support 2020 ban). But here, TikTok could not more specifically refute the Government's vague assertion because all of the detail purportedly supporting it was redacted. Petitioners were thus denied the "hallmark" of an adversary proceeding: "access to the evidence tendered in support of a requested court judgment." *Abourezk v. Reagan*, 785 F.2d 1043, 1060 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).

## CONCLUSION

To prevent irreparable harm to Petitioners and the public, and to ensure an orderly review process for the Supreme Court and the incoming Administration, this Court should grant a temporary injunction. The injunction should prohibit Respondent from enforcing the Act with respect to Petitioners' applications, pending the timely filing and ultimate disposition in the Supreme Court of a petition for a writ of certiorari (and any resulting merits review).

DATED: December 9, 2024

Respectfully submitted,

/s/ Alexander A. Berengaut

Noel J. Francisco
Hashim M. Mooppan
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com
hmmooppan@jonesday.com

Andrew J. Pincus
Avi M. Kupfer
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3220
apincus@mayerbrown.com
akupfer@mayerbrown.com

Alexander A. Berengaut
  Counsel of Record
David M. Zionts
Megan A. Crowley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com
dzionts@cov.com
mcrowley@cov.com

John E. Hall
Anders Linderot
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
jhall@cov.com
alinderot@cov.com

Counsel for Petitioners
TikTok Inc. and ByteDance Ltd.

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5,172 words, including the words contained in the image on page 27, *supra*, and excluding any materials exempted by Federal Rule of Appellate Procedure 27(a)(2)(B).

This motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO, Version 2402, in 14-point, Century Schoolbook font.

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com

December 9, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on December 9, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

December 9, 2024

*/s/ Alexander A. Berengaut*
Alexander A. Berengaut
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
aberengaut@cov.com